## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

## DEFENDANT'S OPPOSITION TO
## GOVERNMENT MOTION IN LIMINE ON ADVICE OF COUNSEL

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully requests that this Court deny the Government's Motion In Limine To Exclude Evidence Or Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel [Doc. 29], for the reasons set forth below.

## BACKGROUND

Picture this. You are a former top advisor to the President of the United States. You receive a subpoena from a congressional committee. The subpoena includes 10 pages of arcane instructions. It seeks testimony and documents about communications with your former boss while he was President. You are not a lawyer. You retain a lawyer. He is a seasoned former federal prosecutor who has experience with subpoenas. He explains that the former President has asserted executive privilege, and that based on long-standing U.S. Department of Justice authority, you should not appear for deposition or provide documents. He tells you that he will try to reach an accommodation with the Select Committee. You follow the advice of your attorney. Shortly thereafter you are charged with a crime and face up to two years in jail. You are told that when

you go to trial, the Government does not want the jury to hear anything about your state of mind, your lawyer's advice about the law, or your reliance on your lawyer's advice. Justice or not?[1]

The foregoing is not a hypothetical situation. It is the position taken by the Government in this case. Yet every event in this case involved attorney advice. Every communication was between attorneys. The Select Committee sought service of the subpoena not on Mr. Bannon, but *via* his attorney, Robert J. Costello, Esquire. The communications that followed between the Select Committee and Mr. Bannon were all made through attorneys. These communications involved complex legal principles – such as executive privilege – that are the argot of lawyers, not laymen. Based upon clear legal authority, Mr. Costello explained the legal justifications and communications with Select Committee counsel to Mr. Bannon. Mr. Costello provided legal justifications for Mr. Bannon's position to the Select Committee and received responses back from Select Committee attorneys. Mr. Costello provided legal advice to Mr. Bannon, and Mr. Bannon acted on that advice.

Mr. Costello's advice, followed by Mr. Bannon, included the following:

- The Select Committee subpoena was invalid, based on long-standing U.S. Department of Justice authority, because the Select Committee would not allow former President Donald J. Trump's counsel to be present at Mr. Bannon's deposition, so as to protect executive privilege;

- A former White House official does not violate 2 U.S.C. § 192 when a President invokes executive privilege in response to a congressional subpoena, based upon U.S. Department of Justice authority;

- Mr. Bannon could not waive executive privilege, since the privilege belonged to former President Trump; and

- Because former President Trump asserted executive privilege, Mr. Bannon was not in a position to determine what documents or testimony he could lawfully provide to the Select Committee; and

---

[1] *See*, *generally*, *A Theory Of Justice,* John Rawls (1971) (in creating the rules of a just society, the author must not know in advance where they would end up within that society).

2

- Consistent with prior experience, the lawyers involved would attempt to reach an accommodation between the two political branches, or the matter would be determined by a court of law.

To be sure, there was a difference of opinion on the legal issues between lawyers for the Select Committee and Mr. Bannon's attorney. On behalf of Mr. Bannon, Mr. Costello asked the Select Committee to allow a judge to decide the complex legal questions and declared that Mr. Bannon would respond to the subpoena once the privilege issues had been resolved. That was not an unreasonable position, given that where the political branches have a dispute involving executive privilege, it is the role of the judiciary to "'say what the law is.'" *United States v. Nixon*, 418 U.S. 683, 705 (1974) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). Yet the Select Committee rejected that request. Mr. Costello, again on behalf of Mr. Bannon, also asked the Select Committee for a one-week adjournment after former President Trump filed a civil lawsuit seeking the judicial determination of certain executive privilege issues. That request was denied. Instead, the very same day the Select Committee initiated this criminal prosecution.

Now, the Government wants to whitewash that history. The Government makes two principal arguments in support of its motion. First, the Government argues that a person commits a crime if they receive a congressional subpoena and decides not to appear or produce documents on the return date, regardless of the reason. [Doc. 29 at 3-6]. The Government's theory – based on a 60-year-old case that has been rendered obsolete by subsequent decisions – is without merit. Controlling law dictates that 2 U.S.C. § 192 is not a strict liability crime, as the Government contends. The Supreme Court has clarified that the word "willfully" in criminal statutes means knowledge that one's actions are unlawful. *See Bryan v. United States*, 524 U.S. 184, 191-192 (1998); *Ratzlaf v. United States,* 510 U.S. 135, 137 (1994).

Notably, none of the cases cited by the Government involve a former top Presidential advisor facing demands from a congressional committee on one hand, and an assertion of executive privilege by a former President on the other hand. U.S. Department of Justice policy provides clear direction. In such circumstances, Mr. Costello's advice to Mr. Bannon about what the law requires and Mr. Bannon's reliance and right to rely on the advice of his attorney is highly relevant in a subsequent criminal prosecution.

The Government's second argument is that this Court should rely upon legal principles that pertain to criminal Contempt of Court (18 U.S.C. § 401(3)) when construing the Contempt of Congress statute (2 U.S.C. § 192). No canon of statutory construction supports this theory, given the different language used in the two statutes. Beyond that, Contempt of Court is a different species entirely – unlike either civil or criminal actions. Contempt of Court involves an assertion of power to enforce obedience and keep the legal system functioning.

The Government alleges that Mr. Bannon committed a crime. Every act that they intend to rely upon as proof involved Mr. Bannon's reliance upon legal advice. Yet the Government wants to redact the legal advice before presenting the evidence to the jury. The question remains: why would the Government not want evidence of Mr. Bannon's actual intent presented to the jury?

### Relevant Facts[2]

On September 23, 2021, Kristen Amerling, Esq. ("Ms. Amerling"), Chief Counsel and Deputy Staff Director of the Select Committee, telephoned Robert J. Costello, Esquire ("Mr. Costello"), to ascertain whether he represented Stephen K. Bannon, and to inquire whether he was authorized to accept a subpoena directed to Mr. Bannon. [US-000255]. Mr. Costello confirmed that he represented Mr. Bannon and stated that he would seek authorization and get back to her.

_____

[2] See also Declaration of Robert J. Costello, Esquire [Exhibit "1" hereto].

4

That same day, Ms. Amerling emailed Mr. Costello a subpoena for Mr. Bannon along with other attachments. [US-000001 to 000010]. Ms. Amerling acknowledged in her email that Mr. Costello would check with his client about acceptance of service. *Id*. Despite not having received acceptance of service, Ms. Amerling sent an attachment to the email that included a "Proof of Service" which stated that she had "Served" the subpoena on "9/23/21" and the "Manner of service" was "email to attorney for Mr. Bannon, Robert Costello . . .." [US-000002]. On September 24, 2021, Mr. Costello agreed to accept service of the subpoena on Mr. Bannon's behalf. [US-000257]. The subpoena had a return date of October 14, 2021, for Mr. Bannon's testimony. [US-000001].

On October 5, 2021, Justin Clark, Esquire, counsel to former President Donald J. Trump, telephoned Mr. Costello and advised him that President Trump was invoking executive privilege with respect to the subpoena to Mr. Bannon. [US-001098]. On October 6, 2021, Mr. Costello received a letter from Mr. Clark, which stated, in pertinent part:

> President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.
>
> Through the Subpoenas, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by the executive and other privileges, including among others, the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court
>
> Therefore to the fullest extent permitted by law, President Trump instructs Mr. Bannon to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena.

[US-000971].

Upon receipt of this letter from President Trump's counsel, Mr. Costello provided legal advice to Mr. Bannon. Mr. Costello advised Mr. Bannon that he did not have the ability to waive executive privilege and he did not have the ability to discern what documents or communications were privileged, since that authority belonged to former President Trump. [US-001771]. Mr. Costello further advised Mr. Bannon that he should not provide documents or testify in response to the subpoena, because Mr. Bannon must be guided by President Trump's invocation of privilege, pending an accommodation between the Select Committee and former President Trump, or a judicial resolution of the matter. [US-001098].

Mr. Costello advised Mr. Bannon that based upon legal authority in binding authoritative opinions published by the U.S. Department of Justice Office of Legal Counsel (OLC), Mr. Bannon did not have to appear or produce documents in response to the Select Committee subpoena. Mr. Costello advised that the subpoena was invalid, among other reasons, because the Select Committee prohibited counsel for President Trump from being present at the deposition in order to protect executive privilege. [US-001772, 001779]. Mr. Costello confirmed with a Select Committee attorney that the Select Committee would not allow counsel for President Trump to attend Mr. Bannon's deposition in order to protect executive privilege. [US- 000317 to 000318].

On October 7, 2021, Mr. Costello emailed Ms. Amerling a letter detailing the communication from President Trump's counsel. It stated, in pertinent part, as follows:

> It is therefore clear to us that since the executive privileges belong to President Trump, and he has, through his counsel, announced his intention to assert those executive privileges enumerated above, we must accept his direction and honor his invocation of executive privilege. As such, until these issues are resolved, we are unable to respond to your request for documents and testimony…We will comply with the directions of the courts, when and if they rule on these claims of both executive and attorney client privileges. Since these privileges belong to President Trump and not to Mr. Bannon, until these issues are resolved, Mr. Bannon is legally unable to comply with you subpoena requests for documents and testimony.

[US-000234-235]. On October 8, 2021, Mr. Costello received a letter response from Congressman Bennie G. Thompson, Chair of the Select Committee, which rejected any assertion of privilege. [US-000238 to 000239].

On October 13, 2021, Mr. Costello spoke by telephone with Sean Tonolli, Esquire, Senior Investigative Counsel for the Select Committee. Among other things, Mr. Tonolli told Mr. Costello that the Select Committee would not allow an attorney for former President Trump to be present and participate in the deposition of Mr. Bannon, or to assert privilege objections on behalf of President Trump. [US-000317]. Mr. Costello advised Mr. Bannon that, based upon OLC opinions, Mr. Bannon need not appear for a congressional deposition at which President Trump's attorney could not be present to assert executive privilege because the subpoena was unconstitutional and a nullity. [US-001780].

In a separate telephone call that same day, Mr. Costello told Mr. Tonolli that he had asked counsel for President Trump (Mr. Clark) to delineate the subject areas upon which President Trump was invoking executive privilege, but had not received a response, and that Mr. Bannon was not in a position to draw those lines himself. [US-000318]. Mr. Costello informed Mr. Tonolli that the privilege issues needed to be resolved between the Select Committee and President Trump and that Mr. Bannon was on the sidelines of this inter-branch dispute. [US-000318, 001780].

On October 13, 2021, Mr. Costello emailed to Ms. Amerling a letter to Chairman Thompson. In the letter, Mr. Costello provided legal authority for Mr. Bannon's position given President Trump's assertion of executive privilege and stated that Mr. Bannon intended to comply with the subpoena if President Trump withdrew his assertion of executive privilege, or if a court ruled on the matter. The letter stated, in pertinent part, as follows:

Mr. Bannon's position is not in defiance of your Committee's subpoena; rather, Mr. Bannon noted that President Trump's counsel stated that they were invoking executive and other privileges and therefore directed us not to produce documents or give testimony that might reveal information President Trump's counsel seeks to legally protect. Mr. Bannon has testified on three prior occasions, before the Mueller Investigation, The House Intelligence Committee and the Senate Intelligence Committee. In each of those instances, when President Trump waived his invocation of the executive privileges, Mr. Bannon testified.

As recently as today, counsel for President Trump, Justin Clark, Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved. Your Committee will have the right to challenge that exercise or its scope. That is an issue between the Committee and President Trump's counsel and Mr. Bannon is not required to respond at this time. See *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, FN 34 (D.D.C. 2019) ("The President can certainly identify sensitive information that he deems subject to executive privilege, and his doing so gives rise to a legal duty on the part of the aide to invoke the privilege on the President's behalf when, in the course of his testimony, he is asked a question that would require disclosure of that information.")[.]

Until such time as you reach an agreement with President Trump or receive a court ruling as to the extent, scope and application of the executive privilege, in order to preserve the claim of executive and other privileges, Mr. Bannon will not be producing documents or testifying. As noted previously, Mr. Bannon will revisit his position if President Trump's position changes or if a court rules on this matter.

[US-000315 to 000316]. Mr. Bannon followed Mr. Costello's legal advice and did not appear for deposition on October 14, 2021. [US-000277-288].

On October 15, 2021, Ms. Amerling emailed Mr. Costello a letter signed by Chairman Thompson. Among other things, the letter stated that the Select Committee planned to meet on October 19, 2021, to consider whether to request that the U.S. House of Representatives find Mr. Bannon in contempt. The letter invited Mr. Costello to provide additional information on Mr. Bannon's behalf by October 18, 2021. [US-000300 to 000301].

On October 18, 2021, upon learning about the filing of a civil lawsuit, Mr. Costello sent an email to Ms. Amerling. The attachment to that email was a letter to Chairman Thompson requesting a short adjournment. The letter stated, in pertinent part, the following:

> We write on behalf of Stephen Bannon. We have just been advised of the filing of a lawsuit in federal court for the District of Columbia entitled Donald J. Trump v. Bennie Thompson, et al., 21-Civ-02769 (D.D.C. 2021). In light of this late filing, we respectfully request a one-week adjournment of our response to your latest letter so that we might thoughtfully assess the impact of this pending litigation.

[US-000290].

The next morning, on October 19, 2021, Ms. Amerling emailed Mr. Costello a one-paragraph response from Chairman Thompson rejecting Mr. Bannon's request for a one-week adjournment, noting that the Select Committee's work was too "important and urgent" to justify a one-week adjournment. [US-000275]. The same day, the Select Committee voted to recommend that the U.S. House of Representatives find Mr. Bannon in Contempt of Congress. [US-000322]. On October 21, 2021, the U.S. House of Representatives voted 229-202, largely along party lines, to find Mr. Bannon in Contempt of Congress. [US-000459-504].

Mr. Costello commenced discussions with representatives of the U.S. Attorney's office on Mr. Bannon's behalf, seeking to persuade them that a criminal prosecution would be a mistake.  Mr. Costello made clear to Government counsel that Mr. Bannon acted upon his legal advice, that the advice was based upon authoritative OLC opinions, and that long-standing DOJ policy precluded a criminal prosecution.  [US-001779 to 001782; US-001098 to 001105].

On November 12, 2021, the indictment followed. [Doc. 1].

## ARGUMENT

### A.  Evidence Of Advice Of Counsel Negates Criminal Intent

The Select Committee sought the criminal prosecution of Mr. Bannon. If the Select Committee really wanted information from Mr. Bannon, it could have taken the path suggested by Mr. Bannon – having a judge decide the legal questions in the civil context. When the Government proceeds with a criminal prosecution under 2 U.S.C. § 192, the accused is entitled

to "every safeguard which the law accords in all other federal criminal cases." *Russell v. United States*, 369 U.S. 749, 755 (1962). Now, the Government essentially asks this Court to rule that Mr. Bannon cannot put on a defense. *See* [Doc. 29 at 1] ("Any evidence or argument relating to the Defendant's or his counsel's views of the law, or the Defendant's reliance on it, should therefore be excluded at trial."). The Government's position is that it need only prove that Mr. Bannon received a subpoena and did not appear. This position must be rejected, as it would violate Mr. Bannon's constitutionally-based due process and trial rights.

Every citizen accused of a crime must be afforded the constitutional right to present a defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). It is a fundamental right rooted in the Fifth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process and Confrontation Clauses, as well as other fair trial rights. That guarantee extends to the evidence and argument a defendant is allowed to present, and the jury instructions on defense theories. *See*, *e.g.*, *United States v. Johnson*, 944 F.2d 980, 988 (2d Cir.) ("A criminal defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence."), *cert. denied*, 126 L.Ed. 2d 364, 114 S. Ct. 418 (1993).

Reliance on advice of counsel fundamentally negates guilt. It bears on whether a defendant acted "willfully" knowing that the action was unlawful. That is why the failure to instruct a grand jury on advice of counsel may require dismissal of the indictment. *United States v. Stevens*, 771 F. Supp. 2d 556, 567-568 (D. Md. 2011).[3] That is also why failure to provide an

---

[3] A significant exception to the general rule that a prosecutor need not present exculpatory evidence to a grand jury. *See United States v. Williams*, 504 U.S. 36 (1992).

advice of counsel jury instruction at trial may warrant reversal. *See United States v. DeFries*, 129 F.3d 1293, 1308-1309 (D. C. Cir. 1997) (reversing conviction for failure to give advice of counsel jury charge in embezzlement case, where defense evidence suggested that they relied on advice of counsel that their "severance payments" were not unlawful).

A central issue in any criminal prosecution is the intent or *mens rea* element of the offense charged. The Contempt of Congress statute charged in this case provides as follows:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, *willfully makes default*, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

2 U.S.C. § 192 (emphasis added).

The Supreme Court has noted that the statute describes two separate types of conduct: (1) "willfully makes default" and (2) appears but refuses to answer a pertinent question. *United States v. Murdock*, 290 U.S. 389 (1933). The Supreme Court found that:

> Two distinct offenses are described in the disjunctive, and in only one of them is willfulness an element. Sinclair, having been summoned, attended the hearing. He was therefore guilty of no willful default in obeying a summons. He refused to answer certain questions not because his answers might incriminate him, for he asserted they would not, but on the ground the questions were not pertinent or relevant to the matters then under inquiry. The applicable statute did not make a bad purpose or evil intent an element of the misdemeanor of refusing to answer, but conditioned guilt or innocence solely upon the relevancy of the question propounded. Sinclair was either right or wrong in his refusal to answer, and, if wrong, he took the risk of becoming liable to the prescribed penalty.

*Murdock*, *supra*, 290 U.S. at 397. The language suggests that even as early as 1933, the Supreme Court saw "bad purpose or evil intent an element of the misdemeanor of" the "willfully makes default" offense.

This is consistent with older Supreme Court cases which hold that "willfully" requires "bad purpose" or no "justifiable excuse." *See*, *e.g.*, *Heikkinen v. United States*, 355 U. S. 273, 279 (1958) ("[I]t cannot be said that he acted willfully - *i.e.*, with a bad purpose or without justifiable excuse") (internal quotations omitted); *Felton v. United States*, 96 U. S. 699, 702 (1878) (willfully implies a bad purpose). As discussed below, over time the Supreme Court moved away from the malleable concept of "bad purpose."

"Willfully makes default" is an inelegant formulation.[4] There is no definition of "makes default" or "willfully" in 2 U.S.C. § 192. Generally, "makes default" means failure to fulfill a legal duty.[5] *See* Default, BLACK'S LAW DICTIONARY (8th ed. 2004). "Willfully" is not surplusage. It adds yet another layer and must be construed in context. *See Bryan v. United States*, 524 U.S. 184, 191 (1998). In criminal statutes, "willfully" "typically refers to a culpable state of mind." *Bryan, supra,* 524 U.S at 191. "In other words, in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Id.* at 191-192 (quoting *Ratzlaf v. United States*, 510 U. S. 135, 137 (1994)). To meet its burden of proving a crime that requires that an action was done "willfully," the government must prove beyond a reasonable doubt "that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful." *Bryan*, *supra*, 524 U.S. at 193.[6]

---

[4] To the extent that the phrase "willfully makes default" is ambiguous, the defense reading should prevail. *See Adamo Wrecking Co. v. United States*, 434 U. S. 275, 284-285 (1978) ("'where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.'") (quoting *United States v. Bass*, 404 U. S. 336, 348 (1971)).

[5] For instance, in the civil context, a party defaults when they fail to fulfill a legal obligation required by a contract.

[6] The Supreme Court has distinguished this meaning of "willfully" from another term used in some criminal statutes, "knowingly." *See Bryan*, *supra*, 524 U.S. at 193 ("unless the text of the

The Government ignores controlling Supreme Court precedent that construes "willfully" as requiring proof that a defendant knew his conduct was unlawful. Instead, the Government relies upon *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961). But that reliance is misplaced. First, *Licavoli* was decided based on *Sinclair v. United States*, 279 U.S. 263 (1957). *See Licavoli*, *supra*, 294 F.2d at 207. But *Sinclair* is no longer good law. *See United States v. Gaudin*, 515 U.S. 506, 520 (1995). The Supreme Court has eviscerated *Sinclair* in no uncertain terms. *Id.* at 520 ("[o]ther reasoning in *Sinclair*, not yet repudiated, we repudiate now"), and 521 ("we think *stare decisis* cannot possibly be controlling when, in addition to those factors, the decision in question has been proved manifestly erroneous, and its underpinnings eroded, by subsequent decisions of this Court").

Significantly, in the six decades since *Licavoli*, the Supreme Court has provided clarity on the meaning of "willfully" in criminal statutes. *See Bryan*, *supra*, 524 U.S. at 196 (to establish "willfulness" the Government must prove that a defendant knew his conduct was unlawful); *Ratzlaff v. United States*, 510 U.S. 135, 138 (1994) ("to give effect to the statutory 'willfullness' specification, the Government had to prove [the defendant] knew the structuring he undertook was unlawful"). In fact, the D.C. Circuit has recognized a progression over time in the Supreme Court's construction of the word "willfully." *See*, *e.g.*, *United States v. Burden*, 934 F.3d 675, 692-692 (D.C. Cir. 2019) (discussing Supreme Court approach to reading "willfully" as requiring proof that a defendant had a "culpable state of mind" and knew that his acts were unlawful). District courts have applied this law. *See United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C. 2020) ("Generally, 'in order to establish a 'willful' violation of a statute, 'the

---

statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense").

Government must prove that the defendant acted with knowledge that his conduct was unlawful.'") (citation omitted).

The Government also relies on *dicta* in *Yellin v. United States*, 374 U.S. 109 (1963), a case which read in its entirety undermines the Government's position in this case. The Government's quotation of *dicta* from the opinion is misleading. [Doc. 29 at 4] ("should Yellin have refused to answer in the mistaken but good-faith belief that his rights had been violated, his mistake of law would be no defense"). The Government omits from its brief the next sentence in the opinion. *See Yellin*, *supra*, 374 U.S. at 123 ("But he would at least be entitled to submit the correctness of his belief to a court of law."). It is also curious that the Government omits from its brief the language in the paragraph from *Yellin* above its selected quotation, which reads as follows:

> It may be assumed that if petitioner had expressly rested his refusal to answer upon a violation of Rule IV and the Committee nevertheless proceeded, he would be entitled to acquittal, were he able to prove his defense.

*Id*. This language supports the rule that a witness who offers evidence of a good faith and valid reason for not complying a congressional subpoena may be entitled to acquittal. That is the circumstance here, and Mr. Bannon should be afforded wide latitude to submit his defense to the jury.

The Government's proposed definition of "willfully" in this case is anomalous. The Government has provided no reason why recent controlling authority on the construction of "willfully" in the Contempt of Congress statute should be ignored. The Government submits that Mr. Bannon's *actual intent* in responding to the congressional subpoena is of no matter. But the Government provides no persuasive authority for this position. Quite to the contrary, the Supreme Court has made clear that under 2 U.S.C. § 192, an accused is entitled to "every

safeguard which the law accords in all other federal criminal cases." *Russell*, *supra*, 369 U.S. at 755. In fact, in other cases involving the word "willfully" the Government has accepted – as it must – the Supreme Court's guidance on the meaning of "willfully." *See*, *e.g*., *United States v. Zeese*, 437 F. Supp. 3d 86, 95 (D. D.C. 2020) (Howell, C.J.) ("The government and the defendants thus agree that establishing a willful violation of 18 U.S.C. § 118 here requires proof that defendants *knew that it was unlawful* for them to remain in the Embassy after DSS agents had ordered them to leave.") (emphasis added).

## B.  Reliance On OLC Opinions Negates Guilt

The discussion above focuses on the intent element in *any* 2 U.S.C. § 192 prosecution. But the *specific circumstances of this case* further demonstrate that advice of counsel is a core issue that must be presented to the jury. This Court is well-versed in the separation-of-powers principles involved. For most of this country's history, disputes between the political branches involving the testimony and document production by executive branch witnesses have been resolved through accommodation, not criminal prosecution. Separation-of-powers interests have historically meant that senior advisors to a President could not be compelled to testify or produce documents to Congress. The rationale underlying this is that we want senior advisors to be candid and offer a range of ideas to be considered in Presidential decision-making. The assertion of executive privilege, which keeps those communications confidential, promotes candid discussions. *See In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) (noting critical role that confidentiality plays in Presidential decision-making). Consistent with the separation of powers doctrine, Congress cannot dictate to the Executive Branch when and how executive privilege may be involved. Nor can Congress appoint itself as the arbiter of executive privilege disputes.

The actions taken by Mr. Bannon were consistent with long-standing legal principles as explained to him by his attorney. Mr. Bannon's actions were intended to allow the Select Committee and President Trump to reach an accord on the testimony and documents sought. *See United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977) (Congress and Executive Branch "should take cognizance of an implicit constitutional mandate to seek optimal accommodation" to resolve disputes). Mr. Bannon's attorney advised him that he could not waive executive privilege on his own. His actions were fully consistent with his understanding of the law. Therefore, evidence of the legal advice that Mr. Bannon relied upon must be presented to the jury.

Mr. Bannon received a congressional subpoena *via* his attorney, which included 10 pages of arcane instructions and definitions. A former top White House advisor, he was informed by Mr. Costello that the President who he had served was asserting executive privilege. As a lay person, it is not surprising that he sought legal advice, and relied upon it to navigate this complex legal issue. The fact that Mr. Bannon no longer worked in the White House added yet another layer of complexity. Again, this involves legal issues beyond the ken of a layperson. Mr. Bannon's lawyer – an experienced former federal prosecutor – provided legal advice based on specific U.S. Department of Justice OLC opinions that directly applied to the circumstances. Mr. Bannon followed that advice. He was subsequently charged with a crime for acting in accordance with that legal advice. These facts unquestionably bear on whether Mr. Bannon "willfully ma[de] default" and must be presented to the jury.

For instance, Mr. Bannon received and relied upon advice that pertained to the invalidity of the subpoena given constitutional separation-of-powers principles. Just re-reading the previous sentence signals that the issues involved are not within the daily knowledge of a lay

person. The sentence cries – "ask a lawyer." Thus, it should be no surprise that Mr. Bannon did

just that. As a starting point, OLC authority directs that all presidential communications are

presumptively privileged. *Congressional Oversight Of The White House*, 45 Op. O.L.C. __, at

*34 (Jan. 8, 2021), *available at* https://www.justice.gov/olc/opinions-main. Moreover, the

Department of Justice has "long maintained . . . that the contempt statute does not apply to

executive branch officials who resist congressional subpoenas in order to protect the prerogatives

of the Executive Branch." *Id*. at 50. As recently as 2021, OLC has opined that:

> The White House has declined to make many of the President's immediate advisers
> available since the establishment of the EOP, and for almost 50 years, the Department of
> Justice has articulated this position as a legal immunity – that "the President and his
> immediate advisers are absolutely immune from testimonial compulsion by a
> Congressional committee on matters related to their official duties." *Immunity of the
> Former Counsel*, 43 Op. O.L.C. __, at *3 (internal quotation marks omitted).21 As
> Assistant Attorney General Rehnquist explained:
>
> The President and his immediate advisers – that is, those who customarily meet with the
> President on a regular or frequent basis – should be deemed absolutely immune from
> testimonial compulsion by a congressional committee. They not only may not be
> examined with respect to their official duties, but they may not even be compelled to
> appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from

William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of

Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7

(Feb. 5, 1971); *see also Immunity of the Former Counsel to the President from Compelled

Congressional Testimony*, 43 Op. O.L.C. __, at *7-11 (July 10, 2007) ("*Immunity of Former

Counsel"*), *available at* https://www.justice.gov/olc/opinions-main (listing historical examples of

immediate presidential advisors refusing to testify); Letter for Phillip E. Areeda, Counsel to the

President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, at 6 (Sept.

25, 1974) ("at least since the Truman Administration," presidential advisors "have appeared

before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission").

How do these principles apply to a Presidential advisor like Mr. Bannon, after they have left the federal government? The answer is that executive privilege survives a job change. Governing legal principles apply even after a Presidential advisor leaves the White House. *See Immunity of Former Counsel* at *2; *See also Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *15-16 (Jan. 8, 2021), *available at* https://www.justice.gov/olc/opinions-main (explaining that "the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure").

Mr. Bannon relied upon legal advice that the Select Committee subpoena was invalid because the committee would not allow former President Trump's lawyer to appear to assert and protect executive privilege. As was explained to Mr. Bannon, OLC opinions hold that under these unique circumstances, non-compliance with a congressional subpoena is lawful. *See Congressional Oversight Of The White House*, *supra*, at *56 ("subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients"); *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23, 2019) ("Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.").[7]

---

[7] The legal guidance provided by OLC is clear. Hence, even if there was no attorney involved, and Mr. Bannon read the opinions, evidence of Mr. Bannon's consideration of this information would negate criminal intent.

Mr. Bannon also relied upon legal advice that he did not have to comply with the subpoena because former President Trump was asserting executive privilege. OLC opinions and the long-standing policy of the Department of Justice, as explained to Mr. Bannon by counsel, hold that non-compliance with the subpoena under the circumstances would be lawful. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 129 (1984) ("We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it.[8]

What about his status as a former federal employee? Again, Mr. Bannon was advised of, and relied upon, advice of counsel based on OLC authority that stated that former executive branch officials must, protect executive privilege upon request of the privilege-holder. An OLC opinion states, in pertinent part, as follows:

> . . . communications between White House officials and individual outside the Executive Branch, including with individuals in the Legislative Branch . . . fall within the scope of executive privilege . . . Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch.

Letter from Paul D. Clement, Solic. Gen./Acting Att'y Gen., to President George W. Bush (June 27, 2007), https://www.hsdl.org/?view&did=741974. It is beyond dispute that Mr. Bannon received and acted in accordance with his attorney's advice. This utterly negates the

---

[8] *See also* Letter from Ronald C. Machen Jr., United States Attorney, to Speaker of the House John A. Bohner, (March 31, 2015) at 6 ("It has long been the position of the Department, across administrations of both political parties, that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege.").

Government's position that Mr. Bannon knew his actions were unlawful. Mr. Bannon is therefore entitled to present this defense to the jury.

Mr. Bannon was on solid ground when following the OLC opinions. The OLC is nearly as old as our nation and has opined on some of the weightiest matter in public life. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,* 846 F.3d 1235, 1238 (D.C. Cir. 2017). OLC opinions are authoritative and binding by custom and practice in the Executive branch. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 484 (D.C. Cir. 2019). Accordingly, OLC opinions are entitled to great weight. They "reflect the legal position of the executive branch" and "provide binding interpretive guidance for executive agencies." *Casa de Maryland v. United States Dep't of Homeland Sec.*, 924 F.3d 684, 718 n.1 (4th Cir. 2019).

The legal authority that Mr. Bannon relied upon was sound.  It had been the authoritative position of the executive branch across administrations of both political parties over many decades. It was objectively reasonable for Mr. Bannon to rely on it. But even if Mr. Bannon's reliance was misplaced, he did not commit a crime. The Supreme Court has held that a criminal defendant has not acted willfully even when the actions taken were based upon a good faith misunderstanding of the law or a good faith belief that the acts were not in violation of the law, regardless of whether the misunderstanding or belief was objectively reasonable. *Cheek v. United States*, 498 U.S. 192, 203 (1991) (noting that "forbidding the jury to consider evidence that might negate willfulness would raise a serious question under the Sixth Amendment's jury trial provision."). Because Mr. Bannon's reliance on Mr. Costello's advice goes to the core question of whether he "willfully ma[de] default," the defense must be allowed to present evidence and argument on this topic at trial.

Mr. Bannon's right to present advice of counsel evidence is also supported by additional legal defenses pertinent to this case. For instance, he may rely at trial upon a public authority defense, such as the defense of entrapment by estoppel. *See Raley v. State of Ohio*, 360 U.S. 423, 438 (1959). In *Raley*, the Court found that the government may not convict "a citizen for exercising a privilege which the State clearly had told him was available to him." *Id*. The case involved an accused charged with failing to answer questions put to him by the Un-American Activities Commission of the State of Ohio. *Id*. at 424. The accused had invoked the privilege against self-incrimination on advice that the privilege applied. *Id*. at 425. The accused was indicted for refusing to answer the questions, even though certain Commission members stated that it was acceptable to invoke privilege rather than answer the questions posed. *Id*. The Supreme Court reversed, holding that due process does not permit the criminal conviction of a person who acts in reliance on authoritative pronouncements by relevant government officials or a government agency. *Id*. at 438-39; *see also United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995) (entrapment by estoppel "focuses on the conduct of the government leading the defendant to believe reasonably that he was authorized to do the act forbidden by law. The doctrine depends on the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized."); *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992) (entrapment by estoppel is a defense to criminal liability where a government agency announces that a charged criminal act was lawful and accused reasonably relied on that announcement).

It is not clear what the Government is seeking. The motion requests that "[a]ll evidence and argument related to good-faith reliance on the law or an attorney's advice should therefore be excluded at trial." [Doc. 29 at 8]. It would unprecedented in a criminal case, however, to

prohibit an accused from presenting evidence that their actions were based on reliance on "the law" and it is an absurd proposition to urge otherwise. Mr. Bannon has the due process right to raise the defense of entrapment by estoppel based on his reliance on the binding authority of the OLC opinions described above. He must also be allowed to present evidence that supports any other defense based on his "good-faith reliance on the law." *See generally*, *United States v. House of Representatives*, 556 F. Supp. 150, 152-153 (D.D.C. 1983) (constitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution under Sec. 192, and this expressly includes the defense of executive privilege).

### C. <u>Contempt Of Court Is Distinguishable</u>

There are significant differences between the following two scenarios: (1) an attorney advising a client to disobey a lawful court order; and (2) an attorney advising a former top White House official – consistent with long-standing U.S. Department of Justice policy – not to appear before or provide documents to a congressional committee after a President has invoked executive privilege. The former case, for instance, involves no separation-of-powers principles involving co-equal branches of government. But another key distinction is the language of the two statutes involved. Because of these differences, the Government's reliance on Contempt of Court principles is misplaced. While Contempt of Congress and Contempt of Court have in common the word "contempt," any similarity ends there.

Contempt of Court cases are different in nature than civil actions or criminal prosecutions. *See Myers v. United States*, 264 U.S. 95, 103 (1924) ("Contempt proceedings are neither civil actions nor prosecutions for offenses within ordinary meaning of those terms; but are assertions of power inherent in all courts to enforce obedience which they must possess in

order properly to perform their functions."). The availability of Contempt of Court proceedings promotes expedition in the administration of law. *See United States v. Ryan*, 402 U.S. 530, 533 (1971). The court system could not function if every litigant or witness could disregard lawful orders. There is no similar need for expedition where a congressional committee is conducting fact-finding in advance of legislation. To deal with immediate threats to its functions, Congress has the power to "guard itself from contempts." *Anderson v. Dunn*, 19 U.S. 204, 228 (1821). But in this case, it has taken a different route – and there are many added steps when Congress seeks to initiate a prosecution under 2 U.S.C. § 192.

The Contempt of Court statute cited by the Government, 18 U.S.C. § 401(3), does not contain any of the words "willfully" "makes" or "default" – much less that combination of words as an element of the offense. So that statute cannot be used to construe the meaning of those words in 2 U.S.C. § 192.[9]

Beyond that, the cases the Government cites in its motion do not support the blanket position that an accused in criminal contempt proceedings cannot present evidence of reliance on advice of counsel. *See, e.g.*, *United States v. Myers*, 302 Fed. App'x 201, 205 (4th Cir. 2008) (district court "did not believe Myers had a legitimate, good faith belief in the advice from her counsel"); *United States v. Monteleone*, 804 F.2d 1004 (7th Cir. 1986) (no error where trial court refused to instruct jury on reliance in good faith on the advice of counsel where: (1) a judge immunized a witness and ordered him to testify before a grand jury; (2) the witness appeared before the grand jury and read a short statement saying he had previously refused to testify on

---

[9] While 18 U.S.C. § 401(3), not cited by the Government, does use the word "willfully" – it applies to actions that are both contempt of court and also constitute a criminal offense under federal or state law. Thus, that statute does not provide guidance on construing an element of 2 U.S.C. § 192.

the advice of counsel, then refused to answer any questions; and therefore (3) the 7th Circuit found that because the order to testify before the grand jury was "unambiguous and uncomplicated . . . [the witness] could not reasonably have believed that reading his statement complied with that order, no matter what his lawyer told him").[10]

In short, the Government's reliance on Contempt of Court principles is misplaced.[11]

---

[10] Nor does the *Rapone* case, cited by the Government, provide guidance on construing the phrase "willfully makes default." That case involved the repeated retaliatory harassment of a witness in an ongoing sexual harassment lawsuit, in direct violation of a court order. The D.C. Circuit found "abundant evidence" from which a reasonable fact-finder could find that the conduct involved – repeated harassing acts despite repeated warnings to obey the court's order, could lead a reasonable factfinder to find a willful violation of the order). *United States v. Rapone*, 131 F.3d 188, 195 (D.C. Cir. 1997).

[11] Moreover, the Government appears to subscribe to the notion "consistency is the hobgoblin of little minds." (Ralph Waldo Emerson, "Self-Reliance" Essays:  First Series 1841).  Its position on the availability of an advice of counsel defense appears to have shifted even with respect to a contempt prosecution under Section 401.  The Court in *United States v. Taylor*, 139 F.3d 924, 934 n.10 (D.C. Cir. 1998) expressly noted, in the context of the Section 401 contempt prosecution at issue, that this same U.S. Attorney's office did not contest the availability of an advice of counsel defense in such a prosecution and the district court assumed it was available as well, obviating the need for the circuit court to address the issue.

## CONCLUSION

**WHEREFORE**, Defendant Stephen K. Bannon respectfully requests that this Court deny the Government's Motion In Limine To Exclude Evidence Or Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel, for the reasons set forth above, together with those offered at any hearing on the motion.

Dated: February 25, 2022                     Respectfully submitted,

**SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

        /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)
210 N. Charles Street, 26th Floor
Baltimore, MD 21201
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com


        /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com


        /s/ Robert J. Costello
Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com


*Counsel for Defendant Stephen K. Bannon*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 25th day of February 2022, a copy of the foregoing Opposition To Government's Motion In Limine To Exclude Evidence Or Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel was served *via* the Court's CM/ECF system on all properly registered parties and counsel.

/s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

**<u>ORDER</u>**

Upon consideration of the Government's Motion In Limine To Exclude Evidence Or Argument Relating To Good-Faith Reliance On Law Or Advice Of Counsel, the Defendant's Opposition, the Government's Reply, and the entire record in the case, it is hereby **ORDERED** that the Government's Motion is **DENIED**.

Dated: _____, 2022

_____
Hon. Carl J. Nichols
*United States District Judge*