# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant.* | : | |

# DECLARATION OF ROBERT J. COSTELLO, ESQUIRE

Robert J. Costello declares the following:

## INTRODUCTION

1. I am submitting this Declaration in support of the Defendant, Stephen K. Bannon's Opposition to the Government's Motion in Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice Of Counsel [Doc. 29] in the above-captioned case. This Declaration is based on my personal knowledge.

2. I am a partner with the New York law firm Davidoff Hutcher & Citron LLP and I have been an attorney for almost fifty years. I previously served as the Deputy Chief of the Criminal Division of the United States Attorney's Office for the Southern District of New York.

3. I am providing in this Declaration information that is necessary to respond to the Government's motion; however, it is not my intention nor Mr. Bannon's

1

intention for the disclosures herein in response to the Government's motion to in any way constitute a waiver of Mr. Bannon's attorney-client privilege with me beyond the information disclosed herein.

4. I am personally familiar with the facts set forth in Mr. Bannon's Opposition to the Government's Motion in Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel ("Opposition"). All facts that are alleged in the Opposition are true and accurate to the best of my knowledge and recollection. I incorporate herein by reference all of the facts alleged in the Opposition. They do not, of course, reflect all relevant facts I know in this matter.

5. At all times relevant to the subpoena that is the subject of the above-captioned case, I have served as legal counsel for the Defendant Stephen K. Bannon.

6. From the initiation of this matter, on September 23, 2021, when I was first contacted by a Select Committee representative asking me to accept service of the subpoena on behalf of Mr. Bannon, through all times thereafter, any and all communication with the Select Committee related to Mr. Bannon has been exclusively with me, in my role as legal counsel for Mr. Bannon and never with Mr. Bannon. As noted in the Opposition, a Select Committee

representative contacted me from the outset and asked me to accept service of the subpoena for Mr. Bannon, rather than dealing directly with him.

7. The consideration of a subpoena from a Select Committee of Congress raises all sorts of legal issues that a diligent lawyer who faithfully wishes to serve his client's interests and competently advise his client must fully explore. Many of these are technical legal issues that a lay person would not be familiar with, and certainly Mr. Bannon was not. The subpoena required me to become familiar with the Select Committee's specific rules, the resolution for its formation, evaluate its legislative purpose, formation, and composition, and the pertinence of the subject matter of the subpoena, and more. Once executive privilege was invoked, the relevant issues became more in number and complexity. At all relevant times, Mr. Bannon relied entirely on my research and legal advice and agreed to follow my legal advice as my client.

8. As set out in the Opposition, from the date on which a copy of the subpoena for Mr. Bannon was sent to me by the Select Committee until October 21, 2021, when I was advised that the U.S. House of Representatives had voted to find Mr. Bannon in contempt of Congress, I was in regular telephone and written communication with representatives of the Select Committee as counsel for Mr. Bannon.

9. In my communications with the Select Committee as counsel for Mr. Bannon, I repeatedly offered suggestions for courses of action that would allow Mr. Bannon to comply with the subpoena, consistent with his legal rights, duties, and obligations.  No one can fairly or accurately say that Mr. Bannon in any way willfully defaulted with respect to this subpoena.  Mr. Bannon's actions, through me as his counsel, were quite the opposite of a willful default.

10. On October 5, 2021, I received a phone call from an attorney representing former President Trump, advising me that the former President was invoking executive privilege with respect to the Select Committee's subpoena directed to Mr. Bannon.  I immediately communicated that information to Mr. Bannon.

11. I immediately began researching the impact on Mr. Bannon's rights, duties, and obligations vis a vis the subpoena, in light of the former President's invocation of executive privilege.  I conducted exhaustive research on the subject, thoroughly reading all relevant formal opinions from the Department of Justice's Office of Legal Counsel ("OLC"), which I understood to be binding authority on the Executive Branch.  I also researched relevant case law.

12. I then shared with Mr. Bannon the results of my research. I advised Mr. Bannon as his attorney, and knowing that he was fully relying on my legal advice and would follow it, that in light of the fact that the Select Committee had adopted a rule that would prevent the President's counsel from attending the proposed deposition in order to protect the President's claims of executive privilege, the Office of Legal Counsel ("OLC") had issued an opinion in 2019, which was binding upon the Executive Branch of Government, which stated that the subpoena that Mr. Bannon received was illegal, unlawful and incapable of being enforced either civilly or criminally. Therefore Mr. Bannon was legally entitled to refuse to produce documents or testify pursuant to that subpoena. In spite of this statement of law which would allow Mr. Bannon to ignore the subpoena, we sought in good faith to try to reach an accommodation with the Select Committee. The Select Committee simply ignored our requests and made no attempt to reach an accommodation.

13. Indeed, from the date on which I was notified that executive privilege had been invoked forward, I began to develop a strategy that would allow Mr. Bannon to meet any and all legal obligations and again to see if some kind of accommodation could be reached with the Select Committee that would not

5

cause Mr. Bannon to violate his obligations under the invocation of executive privilege.

14. For example, I asked counsel for the Select Committee whether, if Mr. Bannon were to appear for a deposition pursuant to the subpoena, the Select Committee would permit a representative of the privilege holder to be present in order to be able to invoke privilege on a question by question basis. I was told unequivocally that the Committee would not permit this.

15. I advised the Select Committee that Mr. Bannon was constrained from complying with the subpoena based on the invocation of executive privilege; but I assured the Select Committee that if it were able to resolve the privilege issue with former President Trump or if the Select Committee would present the matter to a judge in a civil proceeding – a practice I had understood had been followed in other situations before other Congressional committees when executive privilege had been invoked – and the judge directed Mr. Bannon to comply with the subpoena, he would comply. The Select Committee ignored my proposal.

16. On the late afternoon of October 18th, as we were about to send our reply to Chairman Thompson's previous letter, I learned that former President Trump had filed a lawsuit against the Select Committee Chairman. I knew nothing about the substance of the lawsuit but I presumed it might address

the issues Mr. Bannon was facing and so, instead of just sending our reply to Chairman Thompson, I asked the Select Committee for a brief extension of time in order to evaluate that lawsuit and the impact it might have on Mr. Bannon's obligations under the subpoena. The next morning, which was the day the Select Committee was holding a televised news conference to vote on holding Mr. Bannon in criminal contempt of Congress, Chairman Thompson summarily rejected our request for an adjournment, claiming the Select Committee's work was too important to grant an adjournment. This was a farcical excuse as the same Committee has granted numerous adjournments to other subpoena recipients, but not to Mr. Bannon. That night on television, after they voted to recommend to the entire House that Mr. Bannon be held in criminal contempt of Congress, both the Chair and the Vice Chair said they wanted to make an example out of Mr. Bannon.

17. It soon became clear to me that the Select Committee did not actually appear to be interested in any information or materials it thought Mr. Bannon might have. Rather it seemed clear to me that the Select Committee wanted to try to punish Mr. Bannon for his adherence to the invocation of executive privilege and for partisan political reasons and to make him an example. Public comments by Select Committee members have confirmed this.

18. I suppose I should not have been surprised to conclude that this was the Select Committee's true agenda, given what I view as the extraordinarily inappropriate composition of the Select Committee, if it were truly intended to engage in an investigatory process concerning the events at the Capitol on January 6, 2021.

19. I learned that the Chairman of the Select Committee had personally filed a lawsuit against former President Trump that was filled with allegations concerning his view of the causes of the events of January 6th and asserting that former President Trump was responsible for those events and for causing personal damages to the Chairman. It struck me as outrageous that a person who had alleged such personal damages and who already had arrived at conclusions was selected to head an "investigation."

20. Similarly, I learned that other members of the Select Committee had made prejudgments about the cause of and responsibility for the events of January 6th . These included Congressman Raskin, who had led the impeachment prosecution centered on the events of January 6th and publicly announced his conclusions as well as Congressman Schiff, who similarly had announced his conclusions, with both members more recently hawking books each has written on the subject, while the "investigation" supposedly is ongoing. There are several other examples of Committee members who similarly have

announced their public prejudgments concerning the matters purportedly under investigation and who have made many public comments while serving on the Select Committee that indicate a partisan political agenda far removed from any legislative purpose and an inappropriate agenda vis a vis Mr. Bannon.

21. In the course of my evaluation of Mr. Bannon's legal rights, duties, and obligations with respect to the subpoena, I consulted several relevant OLC opinions which I believed were directly on point and that I understood to be binding authority which Mr. Bannon was duty bound to follow, as a former adviser in the executive branch.

22. Among the OLC opinions that I consulted and which I understood were binding and had to be followed by Mr. Bannon was the following:

A May 23, 2019 OLC Opinion titled: **Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Empoyees**.

This OLC Opinion covers a number of directly relevant subjects. These include the recognition of separation of powers concerns in such a situation as this and the absolute need for a representative of the Executive Branch party to be present in order to determine when to invoke privilege, and the application of the Opinion to former employees. Perhaps most significantly, it provides the formal binding opinion that a subpoena directing an

Executive Branch employee or former employee to appear before Congress for a deposition, while not permitting an appropriate Executive Branch employee to be present exceeds the Committee's authority and "therefore lack(s) legal effect." [Page 13]. It further holds that no such subpoena can be enforced by civil or criminal means or through any inherent contempt power of Congress. [Page 13-14]. The binding OLC Opinion then refers specifically to the possibility of a criminal prosecution under 2 U.S.C. Sections 192 and 194 and it notes that the OLC previously had opined that "the criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege." [Page 14]. Lastly, it expresses the view that it would be "unconstitutional" to try to enforce any such subpoena where the committee will not permit the Executive Branch representative to accompany the witness. [Page 14]. Tellingly, these principles apply under this OLC Opinion, even if the Executive Branch has not yet invoked the privilege; for it is essential that an Executive Branch representative be permitted to be present when a current or former Executive Branch employee is deposed in case a privileged matter were to arrive which the witness might not recognize as such. [Page 10].

23. I consulted several other directly relevant OLC Opinions that supported the conclusion that Mr. Bannon should not appear or produce documents under

10

the subpoena as a matter of law. At all times I discussed each Opinion and other legal source with Mr. Bannon, gave him my legal conclusions and I directed him that he must not appear or produce documents in response to the subpoena. He relied in good faith on my legal advice and on these OLC Opinions and other legal sources I brought to his attention, and he agreed to follow my legal advice as directed.

24. On behalf of Mr. Bannon, I did everything I believed to be legally possible and appropriate to arrive at some kind of accommodation with the Select Committee that was legally permissible (e.g. proposing that they take the matter before a judge for resolution of the issues; requesting a brief extension of time to let the executive privilege litigation play out). At no time did Mr. Bannon nor I intend to defy any Congressional body or default on any legal obligation. The fact that Mr. Bannon did not appear or produce documents pursuant to the subpoena was entirely a function of my legal conclusions and my legal advice and directives to him based on the OLC Opinions and case law concerning his legal rights, duties, and obligations, and the effect the invocation of executive privilege had on the same, prohibiting him, in my studied and expressed legal opinion, from complying with the subpoena.

25. In an attempt to secure a declination from the United States Attorney's Office for the District of Columbia, I produced all the correspondence between myself and the Select Committee and voluntarily agreed to meet with representatives of the United States Attorney's Office to set forth the reasons behind my legal conclusions. I provided them with the details of some of the OLC Opinions and other legal authority on which I relied in arriving at my legal conclusions and on which Mr. Bannon relied through my legal advice and direction.

26. I believed and continue to believe that there are other legal deficiencies with respect to the Select Committee and its authority that also rendered the subpoena legally unenforceable and prohibit any criminal prosecution of Mr. Bannon and I have so advised Mr. Bannon and he has continued to rely on my legal advice in good faith.

27. Following the referral by Congress to the Department of Justice for consideration of prosecution for criminal contempt, I entered in good-faith into discussions with the prosecutors assigned to this case in an effort to demonstrate why a criminal prosecution would be both unlawful and inappropriate under the circumstances of this matter. I provided them orally and in writing with my reasons, many of the bases for my legal conclusions, I specified OLC Opinions that I relied on and that Mr. Bannon had relied on

through me, and I repeatedly told the prosecutors that Mr. Bannon has at all times relied on the OLC opinions and my legal advice in all regards in this matter and that he did not comply with the subpoena based on my legal advice and directives to him and his good-faith reliance on the same and on the binding effect of the OLC Opinions which I went over with him, along with other legal authority.

28. I was shocked by additional events that have attended this matter. First, while I thought I was in the middle of good-faith discussions with these prosecutors, I was simply notified, without advance notice, that they had obtained an indictment against Mr. Bannon. Secondly, I was shocked to read that President Biden decided to insert himself in this matter and publicly called for the criminal prosecution in this case. Third, and most recently, I was shocked to learn last month that while I believed I was engaged in good-faith discussions, the prosecutors in this case were secretly taking steps to obtain my personal and professional telephone and email records. I have never encountered such conduct in the almost fifty years I have been practicing law.

29. Finally, I am baffled by the Government's motion. I cannot understand, especially in a case of this nature, why the Government would want to prevent the jury in this case from hearing all of the relevant facts and the

13

truth about the reason Mr. Bannon did not comply with the subpoena or why the Government would fail to acknowledge the appropriateness of a lay person having to rely on advice of counsel in dealing with technical legal concepts like executive privilege and committee rules. To prevent Mr. Bannon from putting on evidence or presenting any argument related to his good-faith reliance on my advice as his attorney would, by definition, mean presenting the jury with a false rendition of the actual operative facts. Moreover, the Government goes well beyond that in its motion and literally asks the Court to bar Mr. Bannon from putting on any evidence or making any argument that he acted in good-faith reliance on the law. The idea that a defendant charged in a criminal case cannot present a defense that he relied in good faith on the law is absurd beyond words and it is shameful that the Government would seek such an Order.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on February 25, 2022
New York, New York

/s/ Robert J. Costello