**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' REPLY IN SUPPORT OF ITS MOTION IN LIMINE**
**TO EXCLUDE EVIDENCE OR ARGUMENT RELATING TO**
**GOOD-FAITH RELIANCE ON LAW OR ADVICE OF COUNSEL**

It is a settled question that reliance on the law and advice of counsel provide no defense to contempt of Congress, and longstanding and controlling Supreme Court and Circuit precedent establish that neither is available to a defendant who deliberately refuses to comply with a valid congressional subpoena. Having chosen to ignore a congressional subpoena that required him to produce documents and appear for testimony, the Defendant, Stephen K. Bannon, cannot change binding law now that he is facing the consequences of his decision. The Government's motion to exclude evidence or argument related to these defenses should be granted.

**I.** **The Defendant's Incomplete Factual Recitation Attempts to Conceal His Bad Faith.**

The facts underlying the Defendant's contemptuous conduct are immaterial to the legal question of whether a good faith defense is available to him. But the inaccurate recitation of facts in the Defendant's opposition requires the Government to correct the record and make clear that, regardless of what the law may require, the Defendant and his attorney, Robert J. Costello, pursued a bad-faith strategy of total noncompliance with a valid congressional subpoena.

On September 23, 2021, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Committee") issued a subpoena to the Defendant for documents and testimony. Indictment, ECF No. 1, ¶ 7. The Defendant's inaccurate recitation of facts begins here.

The Defendant suggests that the Committee did not properly serve the subpoena.  ECF No. 30 at 5 ("Despite not having received acceptance of service, Ms. Amerling sent an attachment to the email that included a 'Proof of Service' which stated that she had 'Served' the subpoena on '9/23/21' and the 'Manner of service" was 'email to attorney for Mr. Bannon, Robert Costello.'").  The email correspondence to which the Defendant refers, but does not attach to his pleading, instead shows that the Committee asked Mr. Costello, as the Defendant's attorney, if he would accept service on the Defendant's behalf and stated that it was attaching the subpoena "in the event" he did.  Ex. 1 at US-001038.  The Committee by this email did not assume service complete. The next day, September 24, 2021, Mr. Costello confirmed that the Defendant had authorized him to accept service.  *Id*.

When he was served with the subpoena, the Defendant was a private citizen; although he had been a White House advisor for seven months at the beginning of former President Donald J. Trump's term, at the time the subpoena issued, he had not been an Executive Branch employee for more than four years.  Indictment ¶ 6.  And the subpoena sought records and testimony completely unrelated to his time in the White House.  The Committee's cover letter to the subpoena explained that it sought information from the Defendant because he had information relevant to January 6, 2021, including that he had been identified as present on January 5 for "an effort to persuade Members of Congress to block the certification of the election" and was quoted as having said that day, "All hell is going to break loose tomorrow."  *Id*. ¶ 7.

The subpoena required the Defendant to appear and produce documents to the Committee by 10:00 a.m. on October 7, 2021, and to appear for a deposition before the Committee on October 14, 2021.  *Id*. ¶ 8.  It also included clear instructions for compliance with the subpoena's demands. *Id*. ¶¶ 10-14.  With respect to documents, the subpoena made plain that, if the Defendant could not

fully comply with the subpoena's demand by October 7, he should comply to the extent possible and tell the Committee when he could accomplish full compliance; in addition, the subpoena directed that if the Defendant withheld documents for any reason, including a privilege, he should provide a detailed log of such documents to the Committee. *Id*. ¶ 12. Regarding the Defendant's required appearance at a deposition, the Committee provided the House of Representatives' established rules for depositions, which made clear that to assert a privilege, the Defendant had to appear for the deposition and assert the privilege on a question-by-question basis. *Id*. ¶ 14.

The Defendant's next steps after receiving the subpoena are where the Defendant's narrative again leaves out important facts. The Defendant claims that the former President's lawyer, Justin Clark, reached out to Mr. Costello on October 5, 2021, to inform him that the former President was invoking executive privilege. ECF No. 30 at 5. What he does not disclose is that, in the eleven days after accepting service of the subpoena, instead of gathering and reviewing potentially responsive records, Mr. Costello had spent the time searching for an attorney representing former President Trump. *See* Interview of Robert Costello, ECF No. 28-4 at 5; *id*. at 7 ("Costello was not prepared to respond on Bannon's behalf on October 7, 2021. At that time, Costello did not know what Bannon possessed that would have been responsive."). Mr. Costello seemingly did so because he was trying to help the Defendant find a way to avoid compliance with the subpoena; indeed, contrary to what the Defendant suggests to the Court, Mr. Costello told the Government that he believed he may have attempted to contact Clark first and that, when they finally made contact, it was Mr. Costello who may have initiated a discussion of executive privilege. *Id*. at 5, 10. Moreover, although Mr. Costello claims that Clark stated that former President Trump was "invoking executive privilege with respect to the Select Committee's subpoena directed to Mr. Bannon," Costello Decl., ECF No. 30-1, ¶ 10, as outlined below, the

former President never properly did so, and the Defendant and Mr. Costello knew this.

On October 6, 2021, after his phone call with Mr. Costello, Clark sent him a letter, as the Defendant outlines in his opposition.  ECF No. 30 at 5.  But, as is clear on the face of the letter, nowhere in it did former President Trump assert executive privilege over any document in the Defendant's possession or any testimony the Defendant may be called to provide.  *See* Gov't Opp'n to Mot. to Compel, Ex. 2, ECF No. 31-2 (October 6, 2021, Letter from Justin Clark).  Nevertheless, the Defendant endeavored over the next eight days to use the letter to refuse compliance, at any level, with the subpoena's demands.

First, the Defendant did not comply in any way with the subpoena's document demand by the 10:00 a.m. deadline on October 7, 2021.  Indictment ¶ 15.  The Defendant did not reach out to the Committee to discuss the subpoena, request an extension, or provide a log of withheld records. *Id*.  In fact, by the due date, the Defendant had taken no steps to determine what responsive materials he may possess.  *See* ECF No. 28-4 at 7.  Instead, seven hours after the Defendant willfully defaulted on the subpoena's document demands, Mr. Costello sent a letter to the Committee claiming the Defendant would not comply with the subpoena because of the October 6, 2021, letter from Clark.  Indictment ¶ 16.  The Defendant did this, despite Mr. Costello having identified categories of information they understood could not possibly implicate executive privilege, *see* ECF. No. 28-4 at 4, 6, 9—another fact the Defendant omits from his narrative.

The following day, on October 8, 2021, the Committee Chair responded to Mr. Costello's letter.  Indictment ¶ 17.  In particular, the Committee Chair's letter noted that the former President had not actually asserted executive privilege; that, in any event, most of the documents and testimony the Committee sought from the Defendant were not possibly covered by executive privilege; that the Defendant was required to provide non-privileged documents and a log of

withheld records; and reiterated the subpoena's requirement that the Defendant appear for his October 14 deposition and raise any privilege assertions in-person before the Committee. *Id.* Finally, the Committee Chair warned the Defendant that continued willful noncompliance with the subpoena could subject him to criminal prosecution. *Id.*

For several days, the Defendant did not respond to the Committee. On October 12, 2021, a Committee Senior Investigative Counsel ("Committee Counsel") reached out to Mr. Costello by telephone to determine whether the Defendant would appear as required on October 14 so the Committee could make logistical preparations. Ex. 2 at US-000360 (Interview Report, Committee Counsel). Mr. Costello responded that the Defendant was unlikely to appear and that he would send a letter to the Committee the following day. *Id.* Committee Counsel contacted Mr. Costello by email the next day, October 13, at 12:35 p.m., asking again about the Defendant's deposition. Ex. 3 (October 13, 2021, Email from Committee Counsel). At the same time, and seemingly for the first time, with the deadline looming, Mr. Costello sent an email to Clark attaching the Committee Chair's October 8 letter rejecting the Defendant's pretenses for refusing to comply with the subpoena, and writing to Clark, in part:

> Apparently they do not recognize your letter to the subpoena recipients as an invocation of executive and other privileges. I would strongly suggest that a direct communication from you on behalf of President Trump would clarify the President's position with respect to the document request and the deposition requests.

Ex. 4 at US-000999 (October 13, 2021, Email from Costello). This was not Mr. Costello's only recognition that the former President had not actually invoked executive privilege. As he told the Government, over the course of the Defendant's dealings with the Committee, Mr. Costello reached out to Clark several times to try to have the former President make a direct invocation, but Clark refused. ECF No. 28-4 at 7-8, 9.

After sending the email to Clark, Mr. Costello called Committee Counsel and informed him that the Defendant would not appear for a deposition the following day. Ex. 5 at US-000390 (October 13, 2021, Email from Committee Counsel). The Defendant claims that Mr. Costello informed Committee Counsel in a call on October 13 that the Defendant could not appear if former President Trump's counsel were not allowed by the Committee to appear. ECF No. 30 at 7. But this suggestion that he made former President Trump's counsel's appearance a condition of compliance conflicts with Mr. Costello's statements to the Government and contemporaneous evidence. In his interviews with the Government, Mr. Costello stated that, on the call, he told Committee Counsel only that he noticed the Committee's rules barred attorneys other than the witness's from attending the deposition, and Mr. Costello conceded that he did not ask Committee Counsel to change the rules because he noted that Committee Counsel was not in a position to do so. ECF No. 28-4 at 6. This aligns with an email Committee Counsel sent the same day recounting the conversation and noting that Mr. Costello inquired—but said that he did not need an immediate answer—whether there was a way for a lawyer for former President Trump to appear at the Defendant's deposition. Ex. 5 at US-000389. Never did the Defendant raise the attorney rules as an objection to the Committee. ECF No. 28-4 at 6. And, as Mr. Costello told the Government, but does not tell the Court, never did he ask Clark if counsel for former President Trump wanted to attend. ECF No. 28-4 at 10.

After his calls with Committee Counsel on October 13, 2021, at 5:19 that evening, Mr. Costello sent a letter to the Committee Chair reiterating that the Defendant would refuse to produce documents or appear for a deposition until "such time as you reach an agreement with President Trump or receive a court ruling as to the extent, scope and application of the executive privilege." Indictment ¶ 18.

As the Defendant recounts in his opposition, on the morning of October 14, 2021, the Defendant failed to appear for a deposition as required by the subpoena. ECF No. 30 at 8; Indictment ¶ 19. He omits from his retelling, however, that, while he was using Clark's October 6 letter as an excuse for total noncompliance, the former President's lawyer was admonishing that the Defendant not do so. On the afternoon of the Defendant's default, on October 14, Clark sent an email to Mr. Costello suggesting that Mr. Costello had misrepresented Clark's position to the Committee in his October 13 letter, writing in part:

> I just read your letter dated October 13, 2021 to Congressman Benny [sic] Thompson. In that letter you stated that '[a]s recently as today, counsel for President Trump, Justin Clark Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved.'
>
> To be clear, in our conversation yesterday I simply reiterated the instruction from my letter to you dated October 6, 2021, and attached below.

Ex. 6 at US-000987-88 (October 14, 2021, Costello Email Chain). Almost immediately, Mr. Costello forwarded Clark's message to the Defendant, writing:

> This is not accurate. He definitely stated that Trump was invoking the executive privilege. . . . I also told him to not leave anyone guessing he should send an email to the House stating Trump's invocation of executive privilege. I don't know what game Clark is playing but it puts Steve Bannon in a dangerous position. Beware."

*Id*. at US-000987   As Mr. Costello told the Government, he said, "Beware," "to warn Bannon his failure to comply could result in a referral to DOJ." ECF No. 28-4 at 13. Mr. Costello took no steps, however, to contact the Committee and correct the representations he had made regarding Clark's directions. And despite his counsel's warning, the Defendant took no steps to comply with the Committee's subpoena.

On October 15, 2021, the Committee Chair sent a letter advising the Defendant that the Committee would meet on October 19 to consider initiating contempt proceedings and directed

the Defendant to raise any issues regarding his noncompliance for the Committee's consideration by 6:00 p.m. on October 18.  Indictment ¶ 20.

On October 16, 2021, Clark again advised Mr. Costello that Mr. Costello was misrepresenting former President Trump's position to the Committee—particularly with respect to the Defendant's decision not to appear for his deposition—writing:

> Just to reiterate, our letter referenced below [the October 6 letter from Clark to Mr. Costello] didn't indicate that we believe there is immunity from testimony for your client.  As I indicated to you the other day, we don't believe there is.  Now, you may have made a different determination.  That is entirely your call.  But as I also indicated the other day other avenues to invoke the privilege - if you believe it to be appropriate - exist and are your responsibility.  If you haven't already I'd encourage you again to contact counsel for the committee to discuss it further.

Ex. 7 at US-000985 (October 14-18, 2021, Costello and Clark Email Exchange).  Still the Defendant did not comply with the subpoena.  Instead, two days later, Mr. Costello asserted to Clark, without support, that "President Trump's invocation of those privileges absolutely limits Mr. Bannon's ability to testify before Congress and provide documents."  *Id*. at US-000984.  This, despite Mr. Costello's acknowledgment to the Government that it was the former President, not Mr. Costello and the Defendant, who delineated the outlines of any claim of executive privilege the former President may assert.  ECF No. 28-4 at 4 ("Costello did not know who or what was covered under Executive Privilege but that decision was up to former President Trump and the courts.").  Mr. Costello also again asked Clark to confirm to the Committee that former President Trump was asserting privileges.  Ex. 7 at US-000984.  Clark never did.  Incredibly, even in light of Clark's messages, and the opportunity the Committee had offered to the Defendant to cure his complete noncompliance with the subpoena, the Defendant still took no steps to comply.

The Defendant's recitation of his supposed good-faith defense is irrelevant to the merits of the Government's motion because it is a matter of law, not fact, that bars good faith as a defense.

But there is no doubt that, as a factual matter, the Defendant lacks one in any event—the record above is littered with bad faith. The Defendant's attempt to suggest his is a sympathetic case that warrants ignoring controlling law is therefore particularly unavailing. The Court, however, need not reach those factual issues for the purposes of the Government's motion, because, whether asserted in good or bad faith, the Defendant's reliance on his and his counsel's opinions of the law are not available as a defense to contempt of Congress.

## II.    The Defendant's Claims that a Good-Faith Defense is Available for Contempt of Congress are Meritless.

The Defendant wishes to raise a defense that he believed, based on his attorney's advice, that the Committee and its subpoena were unlawful and therefore he was excused from compliance with the subpoena's demands. By this defense, the Defendant concedes that he made an intentional, deliberate decision not to appear or produce a single record. He did not fail to appear because he mistakenly thought he was to appear on a different day. He did not fail to produce records because he mistakenly believed that the Committee had given him an extension. He failed to appear or produce records because he made an intentional decision to do so. Having now admitted that he had the requisite intent under the law to commit the offense, he searches for any way out. But the law is the law. The Supreme Court has long made clear that Congress's authority to conduct investigations is not subject to the legal and political machinations of its witnesses. If it were, Congress would have no authority at all. Accordingly, the Supreme Court's and this Circuit's controlling precedents clearly establish that an intentional refusal to comply, regardless of the motive, is a contemptuous act subject to criminal sanction.

In support of his attempt to avoid controlling law, the Defendant makes several unavailing arguments. First, he claims that one of this Circuit's controlling precedents, *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), has been invalidated. ECF No. 30 at 13. Second, the

Defendant claims that the Government is attempting to make congressional contempt a strict liability offense and to deny him a defense.  *Id.* at 10, 14.  Third, the Defendant claims that any guidance this Court may find in the contempt of Court context must be ignored.  *Id.* at 22-24.  To make his arguments, the Defendant misapplies and ignores applicable legal principles.  His claims must be rejected and the Government's motion to exclude evidence or argument relating to good-faith reliance on the law and advice of counsel must be granted.

### A.     *Licavoli* **Remains the Controlling Law of this Circuit.**

In *Licavoli*, the D.C. Circuit held that advice of counsel is not a defense for a defendant who "willfully makes default."  294 F.2d at 209.  The holding is directly on point and controlling in this case.  The Defendant contests this and makes two claims in support of his position.  First, he claims that *Licavoli*'s holding is based on a prior Supreme Court holding in *Sinclair v. United States*, 279 U.S. 263 (1929), that since has been overturned.  ECF No. 30 at 13.  Second, he claims that the Supreme Court has, since *Licavoli*, "provided clarity" on the meaning of willfulness that has invalidated any meaning requiring less than a defendant's knowledge that his conduct was unlawful.  *Id.*  The Defendant is wrong on both fronts.

### 1.     **The Relevant Holding of** *Sinclair* **Has Never Been Invalidated.**

The Defendant claims that the controlling precedent in *Licavoli* must fall because, according to him, it relies on the Supreme Court's opinion in *Sinclair*.  He is incorrect.

As an initial matter, *Licavoli*'s holding on the meaning of "willfully makes default" is not based on *Sinclair*.  Instead, the D.C. Circuit found that the Supreme Court's decisions in *United States v. Bryan*, 339 U.S. 323 (1950), and *United States v. Fleischman*, 339 U.S. 349 (1950), had established that "he who deliberately and intentionally fails to respond to a subpoena 'willfully

makes default.'" 294 F.2d at 208.  In *Bryan* (1950),[1] the defendant was summoned by a committee

of the U.S. House of Representatives to appear and produce records.  339 U.S. at 324-25.  In

response, the defendant appeared but refused to produce records because "'after consulting with

counsel (she) came to the conclusion that the subpoena was not valid' because the Committee had

no constitutional right to demand the books and records." *Id*. at 325.  After the defendant was

convicted at trial, the Supreme Court found that where the Government introduced evidence "that

respondent had been validly served with a lawful subpoena directing her to produce records within

her custody and control, and that on the day set out in the subpoena she intentionally failed to

comply, it made out a prima facie case of wilful default." *Id*. at 330; *see also id*. at 328

("Respondent does not and cannot, in view of the jury's verdict, contest the finding that she

deliberately and intentionally refused to produce the papers called for in the subpoena.").

  After finding that, based on *Bryan* (1950) and *Fleischman*, willfulness in the context of

congressional contempt meant an intentional and deliberate refusal to comply with a congressional

subpoena, the *Licavoli* court found that the intent the Supreme Court required for willful default

was the same as that articulated by the Court in *Quinn v. United States*, 349 U.S. 155 (1955), for

a refusal to answer pertinent questions when appearing for testimony pursuant to a congressional

subpoena. *Licavoli*, 294 F.2d at 208.  Having found that the two intent standards were the same,

the Court then relied on the Supreme Court's finding in *Sinclair*, a case addressing a refusal to

answer questions once the witness had appeared, that advice of counsel was not a defense to that

standard. *Id*. at 207, 209.  From its review of the relevant Supreme Court cases, the *Licavoli* court

ultimately concluded, "[a]ll that is needed in either event is a deliberate intention to do the act.

---

[1] Because there are two Supreme Court cases at issue in this brief titled "*Bryan*," the Government will include the year of the relevant opinion in its short cites to avoid confusion.

Advice of counsel does not immunize that simple intention." *Id*. at 209.

Bryan (1950) and *Fleischman* still stand. The Defendant does not argue otherwise. Regardless of the status of *Sinclair*, therefore, *Licavoli*'s conclusion from *Bryan* (1950) and *Fleischman* that "[e]vil motive is not a necessary ingredient of willfulness under this clause of the statute," *id*. at 208, is untouched. Nor does the Defendant explain why two other Circuit precedents deciding the same issue of how willfulness is defined under the statute are no longer controlling. Several years before *Licavoli*, the D.C. Circuit in *Dennis v. United States*, similarly rejected that "to make out a case of wilfulness under the statute it was necessary that the Government be required to allege and prove that the act of refusal shall have been done from a bad purpose or evil motive." 171 F.2d 986, 990 (D.C. Cir. 1948). A year before that, in *Fields v. United States*, the D.C. Circuit affirmed the district court's instruction to the jury that, under Section 192, "[t]he word 'willful' does not mean that the failure or refusal to comply with the order of the committee must necessarily be for an evil or a bad purpose. The reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal was deliberate and intentional and was not a mere inadvertence or an accident." 164 F.2d 97, 100 (D.C. Cir. 1947). The Defendant does not address any of these precedents or why *Sinclair*'s status would have any bearing on them. Because they still stand and are controlling law, even without *Sinclair*, therefore, the basis for excluding advice of counsel still exists.

Nevertheless, the relevant holding of *Sinclair*, that advice of counsel is no defense to congressional contempt, has not been overruled. In *Sinclair*, the Supreme Court affirmed the defendant's conviction for refusing to answer a pertinent question posed by a U.S. Senate committee. 279 U.S. at 289-90. In affirming the conviction, the Supreme Court decided several issues, including whether the committee's inquiry had a legislative purpose, *id*. at 291-295;

whether a resolution to continue the committee's investigative authority was sufficient to do so where it failed to directly reference the prior resolution, *id*. at 295-96; whether the question posed was pertinent, *id*. at 296-98; whether the question of pertinency was for the judge or jury, *id*. at 298-99; and whether the defendant was entitled to present evidence that he relied in good faith on his counsel's advice not to answer the question, *id*. at 299.  The Court decided each of these issues. With respect to whether the judge or jury decides pertinence, the Court held it was a question of law for the court.  *Id*. at 298-299.  With respect to whether the defendant could present an advice-of-counsel defense, the Court held that he could not because the offense did not involve "moral turpitude" and "intentional violation is sufficient."  *Id*. at 299.

In *United States v. Gaudin*, the Supreme Court held that "materiality," as an element of the offense under 18 U.S.C. § 1001, the false statements statute, must be determined by the jury, not the court.  515 U.S. 506, 522-23 (1995).  In holding as such, the Court directly addressed and overturned *Sinclair*'s holding that pertinency was a question for the court.  *Id*. at 519-21.  The Court, however, never overturned *Sinclair*'s other holdings.  It did not even reference them.  The Defendant nevertheless claims that all of *Sinclair* was invalidated and that all of *Licavoli* therefore falls.  His argument misunderstands principles of *stare decisis*.

Courts, including the Supreme Court, recognize that, when the Supreme Court overrules one holding in an opinion, it does not automatically overrule every pronouncement of law therein. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005) (citing *Henry v. A.B. Dick Co.*, 224 U.S. 1, 48 (1912) for the proposition that a presumption arises of intent to infringe a patent where an article sold only can be used for the infringing purpose, despite other parts of *Henry* being overruled by the Court in *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 518 (1917)); *Avila v. Dailey*, 246 F. Supp. 3d 347, 355 (D.D.C. 2017)

13

(citing *Monroe v. Pape*, 365 U..S. 167 (1961) for the proposition that individual law enforcement officers are subject to suit under 42 U.S.C. § 1983, despite another holding of *Monroe* being overruled by the Supreme Court in *Monell v. Dep't of Soc. Servs. Of City of N.Y.*, 436 U.S. 658 (1978)).  There is no basis, therefore, to conclude that, because *Gaudin* overturned one holding of *Sinclair*, it overturned all of them.

The Defendant selectively quotes from the Court's opinion in *Gaudin* to try to suggest that the Court did, in fact, expressly overrule all of *Sinclair*'s holdings.  But when the Defendant's chosen excerpts are read in context, it is clear that the Court did not.  For example, the Defendant cites the *Gaudin* Court's statement that "[o]ther reasoning in *Sinclair*, not yet repudiated, we repudiate now," ECF No. 30 at 13 (quoting *Gaudin*, 515 U.S. at 520), as evidence that "[t]he Supreme Court has eviscerated *Sinclair* in no uncertain terms," *id*.  What he does not cite, however, is that the "other reasoning" of *Sinclair* the Court repudiates is clearly identified and delineated in the very next sentence through the following paragraph of the opinion, and it relates only to *Sinclair*'s assertion that the question of pertinency is like the question of relevance for the admission of trial evidence and *Sinclair*'s assertion that materiality in perjury cases is a question of law for the court.  *Gaudin*, 515 U.S. at 520-21.  These two propositions are irrelevant to the issue of intent.  Rejecting them, therefore, does nothing to undermine the reasoning behind the *Sinclair* Court's holding that advice of counsel provides no defense to the intent element of contempt of Congress.  The Defendant's attempt to twist *Gaudin*'s holding to do so fails.

      **2.**    ***Bryan* (1998) and *Ratzlaf* Do Not Overcome the Controlling Supreme Court and Circuit Precedents.**

Without any analysis, the Defendant claims that the Supreme Court's later decisions in *Bryan v. United States*, 524 U.S. 184 (1998), and *Ratzlaf v. United States*, 510 U.S. 135 (1994), control the meaning of "willful" under 18 U.S.C. § 192 and require the Government to prove that

the Defendant knew his conduct was unlawful.  ECF No. 30 at 13.  According to the Defendant, the opinions represent a "progression over time in the Supreme Court's construction of the word 'willfully,'" and he suggests they therefore invalidate any prior holding that "willful" in the context of congressional contempt means an intentional and deliberate decision.  ECF No. 30 at 12.  The Defendant's conclusory assertion is incorrect.

To understand why the Defendant's claims about *Bryan*'s (1998) and *Ratzlaf*'s effect are wrong, it is necessary to first review the different standards of willfulness the Supreme Court has recognized through its jurisprudence.  The highest standard is that articulated in *Cheek* and *Ratzlaf* for criminal tax and currency structuring offenses, in which a defendant's conduct is "willful" only if the defendant was aware that his conduct violated a specific legal duty.  *Cheek v. United States*, 498 U.S. 192, 199-201 (1991) (applying this standard to criminal tax offenses); *Ratzlaf*, 510 U.S. at 149 (requiring the government under structuring statutes to prove that the defendant knew the structuring in which he was engaged was unlawful).  In both cases, the Supreme Court's interpretation of "willful" grew from a concern that, without defining it by the heightened standard, the highly regulatory offenses would ensnare innocent conduct.  *See Cheek*, 498 U.S. at 199-200 (noting that "[t]he proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws"); *Ratzlaf*, 510 U.S. at 144-45 (expressing concern for individuals who structure transactions for reasons other than avoiding the relevant reporting requirement).

The next level of "willfulness" is that articulated in *Bryan* (1998).  In *Bryan* (1998), the Court held that to "willfully" violate a statute barring the unlicensed sale of firearms, a defendant had to know his conduct generally was unlawful, even if he did not know the specific law he was violating.   524 U.S. at 193-96.

Finally, the Supreme Court has interpreted "willful" to require only general intent in line with the traditional rule that ignorance of the law is no defense.  In *Bryan* (1950), as discussed above, the Court found that willful default had been shown where the Defendant "intentionally failed to comply."  339 U.S. at 330.  As another example, in *Browder v. United States*, the Supreme Court held that "willfully and knowingly" in the context of a statute prohibiting "willfully and knowingly" using a passport obtained by false statements meant "deliberately and with knowledge and not something which is merely careless or negligent or inadvertent."  312 U.S. 335, 341 (1941).  The Court further cited its earlier opinion in *United States v. Murdock*, 290 U.S. 389 (1933), which the Defendant also cites, ECF No. 30 at 11, for the proposition that "the word 'willful' often denotes an intentional as distinguished from an accidental act.  Once the basic wrong under this passport statute is completed, that is the security of a passport by a false statement, any intentional use of that passport in travel is punishable," *id*. at 342; *see also United States v. George*, 386 F.3d 383, 388-89 (2d Cir. 2004) (Sotomayor, J.) (applying *Browder*'s definition of "willfully and knowingly" to find that another provision of the same statute similarly did not require proof that the defendant knew his conduct was unlawful); *United States v. Aifang Ye*, 808 F.3d 395, 399 & n.2 (9th Cir. 2015) (same).

In neither *Cheek*, *Ratzlaf*, nor *Bryan* (1998) did the Supreme Court purport to re-define "willful" as it may have been interpreted in contexts other than those under the statutes at issue in those cases.  As the Court recognized in *Bryan* (1998), "[t]he word 'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears."  *Bryan*, 524 U.S. at 191 (citation omitted).  Further, the Court noted that it was only "typically" that "willful" in the criminal law referred to a culpable state of mind.  *Id*.  "Typically" is not "always."  *See Cheek*, 498 U.S. at 208-09 (Scalia, J., concurring) ("One may say, as the law

does in many contexts, that 'willfully' refers to consciousness of the act but not to consciousness that the act is unlawful.").  Indeed, several courts after *Cheek*, *Ratzlaf*, and *Bryan* (1998), including the D.C. Circuit, have applied the lowest standard of "willful" described above in various contexts, recognizing that the Supreme Court did not purport to eliminate the word's various meanings.  *See, e.g.*, *George*, 386 F.3d at 390-96; *United States v. Urfer*, 287 F.3d 663, 666 (7th Cir. 2002) (finding that "willfully" in a statute prohibiting "willfully injur[ing]" federal government property, 18 U.S.C. §§ 1361, 1362, required proof only that the defendants acted deliberately, not that they knew the act was unlawful, and rejecting that advice of counsel was a defense); *United States v. Hsia*, 176 F.3d 517, 521-22 (D.C. Cir. 1999) (finding that "willfully" under 18 U.S.C. § 2(b), which imposes criminal liability as a principal on "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States," did not require that the defendant knew her conduct was unlawful); *United States v. Georgopoulos*, 149 F.3d 169, 171-72 (2d Cir. 1998) (per curiam) (holding that 29 U.S.C. § 186(d)(2), which imposes criminal penalties on anyone who "willfully violates" a statute prohibiting certain payments to union officials, did not require the government to prove that "appellants had acted with bad purpose and with knowledge that their conduct was unlawful" but merely required a showing of general intent); *cf. United States v. Danielczyk*, 917 F. Supp. 2d 573, 576-77 (E.D. Va. 2013) (reviewing the three standards of willfulness).

The Defendant cites two cases from this Circuit, *Burden* and *Zeese*, as evidence that courts here have read *Cheek*, *Ratzlaf*, and *Bryan* (1998) to eliminate other meanings of "willful."  ECF No. 30 at 13.  The cases on which the Defendant relies do not support such a claim.  In *Zeese*, the district court recognized that, with respect to "willfulness," "[a]s the Supreme Court hinted in *Bryan*, in some cases, the government may be able to satisfy this element of the offense by relying

on the 'traditional rule that ignorance of the law is no excuse.'"  437 F. Supp. 3d 86, 96 (D.D.C. 2020) (quoting *Bryan*, 524 U.S. at 196).  In *Burden*, the D.C. Circuit cited *Bryan*'s (1998) note that willfulness has many meanings depending on the context and was deciding only the parties' dispute as to whether *Bryan* (1998) or *Ratzlaf/Cheek* applied to the statute at issue.  934 F.3d 675, 689-90 (D.C. Cir. 2019).  The court was not asked to and did not decide whether the spectrum of willfulness was limited to those two standards.

In any event, given that *Cheek*, *Ratzlaf*, and *Bryan* (1998) did not directly address the contempt of Congress statute and did not expressly overrule the Supreme Court's prior precedents in *Bryan* (1950) or *Fleischman*, to find that it overruled them nevertheless, this Court would have to conclude that the Supreme Court overruled its prior holdings on willfulness as used in other statutes—not just in *Bryan* (1950), but also in cases like *Browder*—by implication.  The Supreme Court has made clear, however, that "[w]e do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).  The D.C. Circuit has followed this direction, refusing to find on-point Supreme Court precedents overruled even where the Supreme Court itself has expressed doubts as to its continuing viability in light of later cases.  *See, e.g.*, *United States v. Webb*, 255 F.3d 890, 897-98 (D.C. Cir. 2001) (refusing to reject a Supreme Court precedent that had not been expressly overruled even where the Supreme Court had expressed skepticism about the prior holding in a later opinion) (citing *Agostini*, 521 U.S. at 237); *United States v. Weathers*,

186 F.3d 948, 955-57 (D.C. Cir. 1999) (finding the court could not assume that the Supreme Court's discussion of the meaning of "waiver" under Fed. R. Crim. P. 52(b) in one case "redefin[ed] sub silentio the meaning of the word 'waiver'" under Fed. R. Crim. P. 12 and thus overruled a prior Supreme Court precedent regarding waiver under Rule 12 where the later case did not mention the prior precedent or Rule 12). *Bryan* (1950) and *Fleischman* are directly on point, outlining the meaning of "willful default" under Section 192. Under the Supreme Court's direction, they control the meaning of willful in this case.

Aside from requiring this Court to find that the Supreme Court silently overturned its prior precedents, the Defendant's position also would require the Court to ignore binding Circuit precedent in *Licavoli*, *Dennis*, and *Fields* that is directly on point, something it also cannot do. "[D]istrict judges . . . are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997); *see also Rouse v. Berry*, 848 F. Supp. 2d 4, 10 (D.D.C. 2012) ("The decisions of the D.C. Circuit . . . are binding on the lower courts of this circuit 'unless and until overturned by the court en banc or by Higher Authority.'" (quoting *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc)). Neither *Licavoli*, *Dennis*, nor *Fields* has been overturned by the D.C. Circuit or the Supreme Court. Even if this Court were to conclude that *Cheek*, *Ratzlaf*, and *Bryan* (1998) weakened the reasoning of *Licavoli*, *Dennis*, and *Fields*, this Court is still bound by them. As described above, *Bryan* (1998), *Cheek*, and *Ratzlaf* neither address Section 192 nor do they claim to limit other definitions of willfulness such that they are incompatible with this Circuit's precedents on Section 192. Where intervening Supreme Court opinions do not address the specific statute at issue in the lower court matter, district courts do not find the intervening opinion to have overturned controlling circuit precedent that does

address the specific statute, even if the intervening Supreme Court opinion casts doubt on the

circuit's prior holding.  *See Brookens v. Acosta*, 297 F. Supp. 3d 40, 47 (D.D.C. 2018) ("[L]ower

courts . . . , out of respect for the great doctrine of *stare decisis*, are ordinarily reluctant to conclude

that a higher court precedent has been overruled by implication." (quoting *Levine v. Heffernan*,

864 F.2d 457, 461 (7th Cir. 1988)) (citing *Agostini*, 521 U.S. at 207)); *Mdewakanton Sioux Indians*

*of Minnesota v. Zinke*, 264 F. Supp. 3d 116, 130 n.21 (D.D.C. 2017) ("However, because the D.C.

Circuit has not yet addressed the application of [a more recent Supreme Court opinion] to §

2401(a), this Court continues to follow the D.C. Circuit's prior conclusion until the D.C. Circuit

addresses it in the first instance.");  *In re Chaplaincy*, 2016 WL 541126, at *3 (D.D.C. Feb. 9,

2016) (finding the district court remained bound by circuit precedent where it spoke clearly on the

direct issue at hand even where a Supreme Court opinion addressing a similar provision held

otherwise and the Circuit had "recently questioned the continuing viability" of its prior holding)

(citations omitted).  Even to the extent the Defendant may believe *Bryan* (1998), *Ratzlaf*, or *Cheek*

calls the controlling precedents into doubt, therefore, that is not a sufficient basis to ignore them.[2]

---

[2] Even if the intermediate level of willfulness applied and the Government had to prove
that the Defendant knew his refusal to comply with the subpoena was unlawful, the advice-of-
counsel defense the Defendant proffered in his opposition still would not be available to him
because it consists solely of advice that the underlying legal duty—the subpoena's demands—was
legally invalid.  *See, e.g.*, ECF No. 30 at 16, 18, 19; ECF No. 30-1 at ¶¶ 12, 18, 26.  A good-faith
belief, whether by advice or otherwise, that a legal duty is invalid is not a defense to willfulness.
*See Cheek*, 498 U.S. at 204-06 (rejecting defendant's claim that he should be acquitted because
"he believed in good faith that the income tax law is unconstitutional as applied to him and thus
could not legally impose any duty upon him of which he should have been aware," because the
beliefs "do not arise from innocent mistakes caused by the complexity of the Internal Revenue
Code.  Rather, they reveal full knowledge of the provisions at issue and a studied conclusion,
however wrong, that those provisions are invalid and unenforceable."); *Zeese* 437 F. Supp. 3d at
100 ("[T]o negate willfulness, a defense must suggest that defendants were unaware that their
conduct was unlawful.  A defendant's claim that the applicable legal duties are invalid, however,
suggests that the defendant knew about the legal duties, thought about the legal duties, and formed
an opinion about those legal duties. Considered disagreement with a legal duty embodied in the

*Bryan* (1950), *Fleischman*, *Licavoli*, *Dennis*, and *Fields* have direct application in this case—they define "willful" as the term is used in Section 192 and they delineate available defenses.  Their holdings are clear in their application to this matter and must be followed.

> **B.**     **"Willful Default" as Defined by Controlling Supreme Court and Circuit Precedent Does not Create a Strict Liability Offense or Bar the Defendant From Raising Legal Defenses.**

The Defendant, likely recognizing the legal infirmity of his assertions that the Court should ignore controlling precedent, resorts to hyperbole—arguing that defining "willfulness" as a deliberate and intentional refusal to comply makes contempt of Congress a "strict liability" offense and denies him his right to put on a defense.  *E.g.*, ECF No. 30 at 3, 10, 14.  The Defendant misunderstands the meaning of "willful" and the scope of his right to present evidence at trial.

As *Licavoli* made clear, "willfully" under Section 192 divides innocent default—a failure to appear or produce records due to, "e.g., illness, travel trouble, misunderstanding, etc."—from criminal default—a failure to comply due to a deliberate decision to defy the demands of a congressional subpoena.  294 F.2d at 208.  In both circumstances, a defendant may know he is not appearing or producing records as required.  What divides them, however, is whether his failure to do so was the result of accident or deliberate choice.  Without "willfully" in the statute, any default, for any reason, would be subject to prosecution.  Of course, then, the Defendant may justifiably be concerned that innocent conduct may be captured by the statute.  But the Supreme Court has made clear that deliberate defiance of a congressional subpoena is inherently not innocent conduct, because a summoned witness is not the arbiter of congressional authority.  *Quinn*, 349 U.S. at 165-66.  The definition of "willful" articulated by the controlling cases thus

---

criminal law is not a defense to a charged criminal violation, even where the *mens rea* of the offense is willfulness.").

marks the appropriate dividing line and allows a defense where failure to comply is for reasons out of a defendant's control.

The Defendant further claims that controlling precedents on the meaning of "willful" must be ignored because it denies him a defense.  ECF No. 30 at 10 ("Now, the Government essentially asks this Court to rule that Mr. Bannon cannot put on a defense."); *id*. at 14 ("Mr. Bannon should be afforded wide latitude to submit his defense to the jury."); *id*. at 22 ("He must be allowed to present evidence that supports any other defense based on his good-faith reliance on the law."). He is wrong.

As an initial matter, the Defendant confuses legal defenses and factual defenses.  The Defendant is not barred from challenging the indictment before this Court on the basis that the subpoena or the Committee's exercise of authority was unconstitutional or unlawful.  He certainly can do that at the motion-to-dismiss stage of this case.  And it is well-established that contempt of Congress charges cannot stand if Congress exceeds its legislative authority or encroaches on the constitutional rights of its witnesses.  *See Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959) ("The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution.  Broad as it is, the power is not, however, without limitations.  . . . [T]he Congress, in common with all branches of the Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action."). Such defenses are no different from those raising challenges to criminal charges on other constitutional grounds, such as vagueness or arguments that a statute's application in a particular case violates a defendant's First Amendment rights.  But they are constitutional attacks raising questions of law for the court, not issues going to the essential elements of the offense for the jury to decide.  *See Gaudin*, 515 U.S. at 513 (question of law are for the court).

22

A good-faith defense at trial, on the other hand, is not a defense on the merits of a defendant's legal opinions, however he may have obtained them. By the time of trial, the merits of those opinions have been rejected because the indictment still stands. A good-faith reliance defense is one that negates a heightened willfulness standard by demonstrating that, despite the inaccuracy of a defendant's beliefs, a defendant did not hold the requisite criminal intent because he, in good faith, relied on those inaccurate beliefs and thus believed he was complying with his legal obligations. In the contempt of Congress context, however, because the heightened willfulness standard is not the intent element at issue, good-faith reliance is not available as a defense. Accordingly, while the Defendant still can raise the merits of his legal claims about the subpoena's and Committee's legal validity to challenge the indictment through motions to dismiss, once he loses, he cannot then assert good-faith reliance on those claims as a defense at trial.

The Defendant's confusion between legal and factual defenses is evident in his misreading of the Supreme Court's decision in *Yellin v. United States*, 374 U.S. 109 (1963). *See* ECF No. 30 at 14. In *Yellin*, the Supreme Court found that a congressional committee's violation of one of its rules provided a basis for acquittal that the defendant could raise where the rule gave the defendant certain rights before the committee. 374 U.S. at 122-23. *Yellin* also made clear, however, that should the merits of the defendant's claims fail, he could not raise a good-faith reliance on them as a defense. 374 U.S. at 123. It is the first finding of the *Yellin* opinion that the Defendant cites in his opposition to argue that "[t]his language supports the rule that a witness who offers evidence of a good faith and valid reason for not complying a [sic] congressional subpoena may be entitled to acquittal." ECF No. 30 at 14. The Defendant combines two defenses, however—a "good faith" defense and a defense that his constitutional objection to the subpoena actually has merit. The Government does not dispute that the Defendant can argue the merits of his legal beliefs as a

23

defense in a motion to dismiss the indictment, but the law makes clear that he cannot then rely on his erroneous reliance on those beliefs as a factual defense to willfulness at trial.

Finally, the Defendant seems to suggest that, at the very least, he should be allowed to raise an advice-of-counsel defense in any event because "*the specific circumstances of this case* further demonstrate that advice of counsel is a core issue that must be presented to the jury."  ECF No. 30 at 15 (emphasis in original).  This perhaps explains why the Defendant provides a lengthy factual recitation of his proffered advice-of-counsel defense to answer a motion that moves to exclude the defense as a matter of law.[3]  But the intent standard for a particular criminal offense does not shift with the particular facts of each case.  *Cf. Ratzlaf*, 510 U.S. at 143 ("We have even stronger cause to construe a single formulation, here § 5322(a), the same way each time it is called into play.") (rejecting that the penalty provision applicable to multiple offenses takes on a different meaning depending on the offense to which it is applied).  That the Defendant in his particular case refused to comply on spurious claims of executive privilege has no bearing on the applicable intent standard.  Nor can the regret the Defendant's attorney may feel in leading him down this path change the intent standard.  *Cf. Maness v. Meyers*, 419 U.S. 449, 459-60 (1975) ("A lawyer who

---

[3] Of course, a proffer does not suffice to show the Defendant is entitled to have the jury consider an advice-of-counsel defense in any event, as the Defendant still would need to demonstrate that he made full disclosure of all material facts to his attorney before receiving advice and that he relied in good faith on the advice he received. *United States v. Gray-Burriss*, 920 F.3d 61, 66 (D.C. Cir. 2019).  Moreover, a defendant who asserts advice-of-counsel waives privilege, *e.g.*, *United States v. White*, 887 F.2d 267, 270 (D.C. Cir. 1989) (noting that a reliance on advice-of-counsel defense waives attorney-client privilege); *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018) ("Moreover, even otherwise-privileged communications that defendants do not intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense, are subject to disclosure in their entirety." (internal quotation marks and citation omitted)), and the counsel who offered the advice is disqualified from representation because he becomes a fact witness, *see Groper v. Taff*, 717 F.2d 1415, 1418 (D.C. Cir. 1983) (affirming disqualification of counsel where counsel was also a potential witness at trial); ABA Model Rule of Professional Conduct 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness.")

counsels his client not to comply with a court order during trial would, first, subject his client to contempt."). The Defendant may not like that the law renders his preferred defense irrelevant, but that does not mean the statute unconstitutionally bars him from putting on a defense. *See United States v. Libby*, 475 F. Supp. 2d 73, 91 (D.D.C. 2007) ("[A]lthough the Constitution entitles a defendant an opportunity 'to present [his] version of the facts . . . to the jury so it may decide where the truth lies,' that guarantee extends only to relevant evidence." (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)) (citations omitted)). The Defendant's attempts to justify his legal position because his defiance occurred under what he deems special circumstances should be rejected.

### C.    The Defendant's Attempts to Distinguish Contempt of Court Fail.

As outlined in its opening brief, both contempt of Congress and contempt of court, the latter in violation of 18 U.S.C. § 401(3), require that a defendant's contempt be "willful," and courts have defined the term to have the same meaning for both offenses. *See* ECF No. 29 at 6-7. The Supreme Court has recognized that contempt raises the same issues whether the contempt results from defiance of a congressional subpoena or defiance of a court subpoena. In *Bryan* (1950), for example, the Court relied on contempt of court principles in its reasoning for rejecting the defendant's claim that her default on a congressional subpoena should be excused because the relevant committee lacked a quorum. 339 U.S. at 330-35 (citing contempt of court cases, including, *United States v. Goldstein*, 105 F.2d 150 (2d Cir. 1939); *Blair v. United States*, 250 U.S. 273 (1919); and *Hale v. Henkel*, 201 U.S. 43 (1906)). The Court addressed the two offenses interchangeably when discussing a subpoenaed witness's obligations:

> [P]ersons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery. A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning

of courts and legislatures, would be a nullity. We have often iterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned.

*Id*. at 331 (citing *Blair*, 250 U.S. at 281 (contempt of court case); *Blackmer v. United States*, 284 U.S. 421, 438 (1932) (same)).

The Defendant claims contempt of court is different because it serves to keep the court system functioning and reflects the "power inherent in all courts to enforce obedience which they must possess in order properly to perform their functions." ECF No. 30 at 22-23 (quoting *Myers v. United States*, 264 U.S. 95, 103 (1924)) (internal quotation marks omitted). He fails to acknowledge, however, that the Supreme Court has recognized the same purpose in contempt of Congress. *Bryan*, 339 U.S. at 327 (finding contempt of Congress is a means of "vindicating the authority of Congress to compel the disclosure of facts which are needed in the fulfillment of the legislative function"). The Defendant also claims that contempt of court is different because it is not a criminal prosecution. ECF No. 30 at 22 ("Contempt of court cases are different in nature than civil actions or criminal prosecutions."). But the Supreme Court has held the opposite, finding that defendants in contempt of court cases are entitled to the same due process rights of any criminal defendant. *See Bloom v. State of Ill.*, 391 U.S. 194, 201 (1968) ("Criminal contempt is a crime in the ordinary sense.") (finding a constitutional right to a jury trial for contempt of court).

The Defendant's attempts to distinguish contempt of court from contempt of Congress appear to be aimed instead at avoiding the inevitable result of applying the Defendant's position vis-à-vis the meaning of "willful" to contempt of court. The Defendant takes the position that "willful" when used in the criminal law can mean nothing less than that a defendant knew his conduct was unlawful. This in turn allows defendants to raise defenses that they lack criminal intent because of good-faith reliance on the law. The consequences of this position for contempt

of court are just as clear as for contempt of Congress, however.  Litigants and witnesses could refuse to comply with a court order to appear for testimony or produce documents by simply hiding behind their own claims of belief or the advice of a lawyer that the order was an invalid exercise of the court's authority.  It would be the exact "game of hare and hounds" that the Supreme Court in *Bryan* (1950) found contempt charges to guard against.  339 U.S. at 331.

The Defendant's attempts to have this Court disregard any persuasive authority it may find in contempt of court cases are based on unfounded distinctions that this Court should reject.[4]

## III.    Conclusion

The Defendant's counsel asserts he is "baffled" by the notion that the Defendant would not be able to use his supposed belief that the subpoena was legally invalid as a defense at trial.  But that is the law.  It is clearly established in directly applicable and controlling Supreme Court and Circuit precedents.  Defendant was served with a subpoena and failed to do anything that the subpoena required him to do.  That was a choice he could make.  But, as the Supreme Court has recognized, it is a choice that equates to contempt.  The Government's motion to exclude all evidence and argument of good-faith reliance on the law or advice of counsel should be granted.

---

[4] The Defendant also suggests the Court cannot look to contempt of court cases unless a cannon of statutory construction so allows.  ECF No. 30 at 4.  But cannons of statutory construction are irrelevant.  The Court does not have to engage in statutory construction here.  The Supreme Court and D.C. Circuit have already defined willfulness as it is used in Section 192.  Because the definition is the same as that for "willful" in the contempt of court context, there is nothing barring the Court from looking to contempt of court cases for examples of how the definition is applied. That "willful" has already been defined is also why the rule of lenity is not available, as the Defendant claims. ECF No. 30 at 12 n.4.  "The rule of lenity . . . applies only if, 'after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended.'" *United States v. Slatten*, 865 F.3d 767, 783 (D.C. Cir. 2017) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). The Supreme Court in *Bryan* (1950) and the D.C. Circuit in *Fields, Dennis*, and *Licavoli* have found no such ambiguity in defining "willful" under Section 192 and finding an advice-of-counsel defense unavailable.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
        J.P. Cooney (D.C. 494026)
        Molly Gaston (VA 78506)
        Amanda R. Vaughn (MD)
        Assistant United States Attorneys
        United States Attorney's Office
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-1793 (Vaughn)
        amanda.vaughn@usdoj.gov