# EXHIBIT 4

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 2 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

10 U.S. Op. Off. Legal Counsel 68 (O.L.C.), 1986 WL 213239

Office of Legal Counsel

U.S. Department of Justice

RESPONSE TO CONGRESSIONAL REQUESTS FOR INFORMATION REGARDING DECISIONS MADE UNDER THE INDEPENDENT COUNSEL ACT

April 28, 1986

With one narrow exception, the Attorney General may not disclose to Congress the contents of any application or report filed with the court pursuant to the Independent Counsel Act unless the court agrees.All congressional requests for information about a decision regarding the appointment of an independent counsel must be supported by a legitimate legislative purpose. In addition, before such disclosures are made other considerations, such as whether or not to assert executive privilege, whether the information is covered by the attorney-client privilege, and whether the information must be kept confidential to preserve the integrity of the prosecutorial function, must be reviewed.Congress may not, as a matter of statutory or constitutional law, invoke the criminal contempt of Congress procedure against the head of an Executive agency acting on the President's instructions to assert executive privilege in response to a congressional subpoena.An assertion of executive privilege must be based upon an evaluation of the Executive Branch's interest in keeping the requested information confidential, the strength of Congress' need for the information, and whether those needs can be accommodated in some other way.

**1  MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

I. Introduction and Summary

You have asked this Office to review the legal principles that should inform the Department's response to congressional inquiries about any decision regarding appointment of an independent counsel under the Independent Counsel Act, 28 U.S.C. ss 591 et seq. (Act). The scope and nature of any such response would, of course, depend on the facts of the particular situation, including the scope and nature of the request, the congressional interests at stake, the status of the investigation and/or decision-making process within the Department, and your judgment as to the particular harm that would result from release of the requested information. To some extent the decision whether or how to respond to such congressional requests must weigh factors, such as political constraints that affect the Department's position vis- a-vis Congress, which are beyond our expertise. Our discussion here is therefore necessarily quite general and is limited to those constitutional and legal considerations that should be *69 reflected in the Department's response to possible congressional inquiries into decisions made under the Act. As we discuss below, we believe that the Department's response to any such inquiry must take account of: (1) the provisions of the Independent Counsel Act requiring that memoranda, reports, and other documents filed with the special division of the court remain confidential unless otherwise authorized by the court; (2) the scope of Congress' legitimate interest in obtaining the information; and (3) the Justice Department's responsibility to protect the integrity of ongoing criminal investigations and of prosecutorial decision-making. These considerations, which flow largely from the constitutionally mandated principle of separation of powers, would also shape any formal Presidential claim of executive privilege, in the unlikely event such a claim proves necessary to resist a congressional subpoena.

**2  In addition to our discussion of the substantive legal principles, we outline below the procedural steps that would be involved if Congress pursued its requests through a subpoena, and possible defenses that could be raised to any such subpoena.

II. Confidentiality Requirements of the Independent Counsel Act

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 3 of 18

The Independent Counsel Act itself contains strict confidentiality requirements. Section 592(d)(2) broadly provides:
No application or any other documents, materials, or memorandums supplied to the division of the court . . . shall be revealed to any individual outside the division of the court or the Department of Justice without leave of the division of the court.

28 U.S.C. s 592(d)(2).

Other, narrower provisions limit the disclosure of any report finding no grounds for appointment of an independent counsel,<sup>;B1</sup>[FN1]FN;F1 as well as the report required to be filed by the independent counsel at the completion of his investigation.<sup>;B2</sup>[FN2]FN;F2 Even the name and prosecutorial jurisdiction of any independent counsel appointed by the court remain confidential until an indictment is returned or a criminal information is filed, unless the Attorney General requests public disclosure prior to that time or the court determines "that disclosure of the identity and prosecutorial jurisdiction of such independent counsel would be in the best interests of justice." 28 U.S.C. s 593(b).

 *70  The confidentiality provisions were regarded as "crucial to the general scheme" of the Act. S. Rep. No. 170, 95th Cong., 2d Sess. 58 (1978). Congress recognized that "just because a person holds a high level position does not justify making unsubstantiated allegations of criminal conduct public, nor does it justify publicly announcing the initiation of a criminal investigation at a very early stage of the investigation." Id. In fact, Congress contemplated that there would be situations in which an independent counsel would be appointed "when the public is not at all aware that a criminal investigation is underway." Assuming that the independent counsel's investigation does not result in prosecution, "it is conceivable that this whole process could take place without the public even knowing that there were serious allegations against such a high level official." Id.

In cases in which there has already been considerable publicity about the allegations and the requirements of the Independent Counsel Act, Congress recognized that "there does not appear to be any purpose to keeping the fact that application for a special prosecutor has been made confidential." S. Rep. No. 170, supra, at 58. However, even if the court agrees to disclose that an application has been made or to announce the identity and jurisdiction of an independent counsel, "there may still be justification for keeping the contents of an application for a special prosecutor . . . confidential because of unsubstantiated allegations and other information which may be contained in the application for appointment." Id.

 **3  The language of the Act's confidentiality provisions that the documents "shall not be revealed to any individual outside the division of the court or the Department of Justice" is carefully drafted, and on its face prohibits disclosures to Congress no less than disclosures to the public. The legislative history of the Act supports this interpretation of the statute's unambiguous language. "The contents of the report by the Attorney General after a preliminary finding of some impropriety is to remain secret, available only to the court and I presume, to the special prosecutor, but may not be released to the public or to Congress without of special leave of this new court." 124 Cong. Rec. 3462 (1978) (remarks of Rep. Wiggins) (emphasis added).<sup>;B3</sup>[FN3]FN;F3

In general, then, the Act restricts the Attorney General's ability to of disclose to Congress the contents of any application or report filed with of the court, unless and until the court agrees. This blanket confidentiality requirement, however, is subject to a narrow exception triggered when Congress requests under s 595(e)<sup>;B4</sup>[FN4]FN;F4 that the Attorney General apply for an independent counsel. If the Attorney General receives such a request, he is required to "provide written notification of any action . . . taken in response to such request and, if no  *71  application has been made to the division of the court, why such application was not made." 28 U.S.C. s 595(e). Because such a notification must necessarily disclose at least some information that is included in the confidential report filed with the court, s 595(e) appears to create a narrow exception to the general rule of confidentiality.<sup>;B5</sup>[FN5]FN;F5

The legislative history of this provision suggests, however, that the scope of the required notification is very limited; disclosure of particular details of the investigatory findings and the prosecutorial decision is not contemplated:
[T]he Attorney General might respond that he had already applied for the appointment of a special prosecutor or he might respond that upon the conclusion of a preliminary investigation, he made a finding and filed the requisite memorandum

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 4 of 18

indicating that the matter was so unsubstantiated as to not warrant further investigation or prosecution. If no application for the appointment of a special prosecutor has been made to the division of the court, the Attorney General is required to explain the specific reasons why a special prosecutor is not required under the standard set forth in s 592(e). If the reason for not appointing a special prosecutor is the fact that the matter is so unsubstantiated as to not warrant further investigation or prosecution, the Attorney General's explanation under this subsection need only state that fact. The Committee does not intend that the Attorney General go into any detail with regard to the basis for the decision made in the exercise of his prosecutorial discretion that a matter simply did not warrant any further investigation or prosecution after the conclusion of a preliminary investigation.

**\*\*4** S. Rep. No. 170, supra, at 72 (emphasis added). That history also makes clear that Congress contemplated that the names of implicated individuals would be included in the required notification.[FN6]

Based on this legislative history and the overriding concern reflected in the Act with preserving confidentiality, we believe that, unless the court has approved disclosure, the notification required by s 595(e) need (and may) encompass only a statement that an application for an independent counsel has been filed as to a particular individual or individuals, or that after investigation the Attorney General determined that the allegations against particular individuals did not warrant further investigation. Obviously, if the Attorney General determined, on some ground other than the sufficiency and credibility of the evidence, that he need not apply for an independent counsel -- for example, **\*72** if he determined that the facts, if true, would nonetheless not constitute a non-petty criminal offense or that the individual is not covered by the Act -- the notification to Congress would set forth that rationale.[FN7]

The Act also contemplates that the independent counsel will provide "from time to time" reports to Congress and to the public containing "such information as the independent counsel deems appropriate," 28 U.S.C. s 595(a), and that the independent counsel "shall advise the House of Representatives of any substantial and credible information which such independent counsel receives that may constitute grounds for an impeachment." Id. s 595(c). Oversight jurisdiction "with respect to the official conduct of any independent counsel" is given to the "appropriate committees of Congress" and the independent counsel "shall have the duty to cooperate with the exercise of such oversight jurisdiction." Id. s 595(d). The legislative history of these provisions governing disclosures by the independent counsel is sparse and provides little guidance as to what extent the independent counsel would be bound by the Act's confidentiality restrictions when making such disclosures.

III. Protecting the Integrity of Criminal Investigations

A separate consideration is how disclosure of information about any independent counsel decision would affect the Attorney General's responsibilities as the Nation's chief law enforcement officer and the ability of the Department to investigate and prosecute criminal offenses.[FN8]

There are a number of factors, arising out of the separation of powers between the executive and legislative branches, that should be weighed in making that determination.

A. Constitutional Division of Responsibilities

Article II of the Constitution places the power to enforce the laws solely in the Executive Branch of government. The executive therefore has the exclusive authority to enforce the laws adopted by Congress, and neither the judicial nor legislative branches may directly interfere with the prosecutorial discretion of the Executive Branch by directing the executive to prosecute particular individuals.[FN9] United States v. Nixon, 418 U.S. 683, 693 (1974); Confiscation **\*73** Cases, 74 U.S. (7 Wall.) 454, 457 (1869); Smith v. United States, 375 F.2d 243, 247 (5th Cir.), cert. denied, 389 U.S. 841 (1967); United States v. Samango, 607 F.2d 877, 881 (9th Cir. 1979); accord Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific

Case 1:21-cr-00670-CJN Document 41-4 Filed 03/22/22 Page 5 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

individuals. See United States v. Lovett, 328 U.S. 303, 317 (1946); INS v. Chadha, 462 U.S. 919, 961-62 (1983) (Powell, J., concurring).[FN10] "'When the legislative and executive powers are united in the same person or body,' says (Montesquieu) 'there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner.'" The Federalist No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961) (emphasis in original).

**\*\*5** The constitutional role of Congress is to adopt general legislation that will be implemented "executed" by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 136 (1810). The courts have recognized that this general legislative interest gives Congress broad rein to investigate. Both Houses of Congress have broad power, "through their own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution." McGrain v. Daugherty, 273 U.S. 135, 160 (1927). The issuance of subpoenas in aid of this function "has long been held to be a legitimate use by Congress of its power to investigate," Eastland v. United States Servicemen's Fund, 421 U.S. 491, 504 (1975), provided that the investigation is "related to, and in furtherance of, a legitimate task of the Congress." Watkins v. United States, 354 U.S. 178, 187 (1957). See also McGrain v. Daugherty, 273 U.S. at 177 (inquiry must pertain to a subject "on which legislation could be had"). This sphere of legitimate legislative activity "is as penetrating and far reaching as the potential power to enact and appropriate under the Constitution." Barenblatt v. United States, 360 U.S. 109, 111 (1959). See also Watkins v. United States, 354 U.S. at 187. The power of investigation can be delegated by either House of Congress to committees, subcommittees, or even individual legislators, see Eastland v. United States Servicemen's Fund, 421 U.S. at 505; Watkins v. United States, 354 U.S. at 200-01, as long as "the instructions to an **\*74** investigating committee spell out that group's jurisdiction and purpose with sufficient particularity." Id. at 201. The scope of judicial inquiry on these matters is narrow, and "'should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.'" Eastland v. United States Servicemen's Fund, 421 U.S. at 506, (quoting Tenny v. Brandhove, 341 U.S. 367, 378 (1951)).

Nonetheless, the investigative power of Congress is not unlimited. Congress cannot, for example, inquire into matters "which are within the exclusive province of one of the other branches of Government . . . . Neither can it supplant the Executive in what exclusively belongs to the Executive." Barenblatt v. United States, 360 U.S. at 111; see also Kilbourn v. Thompson, 103 U.S. 168, 192 (1881) (Congress cannot exercise judicial authority). Congress must be able to articulate a legitimate legislative purpose for its inquiry; if Congress lacks constitutional authority to legislate on the subject (or to authorize and appropriate funds), arguably Congress has no jurisdiction to inquire into the matter.[FN11]

**\*\*6** Accordingly, a threshold inquiry that should be made upon receipt of any congressional request for information is whether the request is supported by any legitimate legislative purpose.[FN12] The clearest application of this constraint on congressional requests for information is with respect to matters that are vested exclusively in the President (such is as the removal of executive officers).[FN13] Given the breadth of Congress' legislative jurisdiction, particularly its authority regarding the appropriation of funds, it may be difficult to articulate more precise limits. With respect to decisions made by the Attorney General under the Independent Counsel Act, we believe that Congress could not justify an investigation based on its disagreement with the prosecutorial decision regarding appointment of an independent counsel for a particular individual. Congress simply cannot constitutionally second-guess that decision. Congress does, however, have a legitimate legislative interest in overseeing the Department's enforcement of the Independent Counsel Act and relevant criminal statutes and in determining whether legislative revisions to the Act should be made. Given the general judicial reluctance to look behind congressional assertions of legislative purpose, such an assertion would likely be deemed sufficient to meet the threshold requirement for congressional inquiry.

**\*75** B. Executive Privilege

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 6 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Assuming that Congress has a legitimate legislative purpose for its inquiry, the Executive Branch's interest in keeping the information confidential must be assessed. That interest is usually discussed in terms of "executive privilege," and we will use that convention here. The question, however, is not strictly speaking just one of executive privilege. Although the considerations that support the concept and assertion of executive privilege apply to any congressional request for information, the privilege itself need not be claimed formally vis-a-vis Congress except in response to a lawful subpoena; in responding to an informal congressional request for information, the Executive Branch is not necessarily bound by the limits of executive privilege.

1. Constitutional Basis of Executive Privilege

The Constitution nowhere states that the President, or the Executive Branch generally, enjoys a privilege against disclosing information requested by the courts, the public, or the legislative branch. The existence of such a privilege, however, is a necessary corollary of the executive function vested in the President by Article II of the Constitution, has been asserted by numerous Presidents from the earliest days of our Nation, and has been explicitly recognized by the Supreme Court. United States v. Nixon, 418 U.S. at 705-06.

2. Protection of Law Enforcement Files

Although the principle of executive privilege is well established, there are few clear guidelines regarding its practical application. The privilege has most frequently been asserted in the areas of foreign affairs and military and domestic secrets, but it has also been invoked in a variety of other contexts. In 1954, President Eisenhower asserted that the privilege extends to deliberative communications within the Executive Branch. In a letter to the Secretary of Defense, he stated:

**\*\*7** Because it is essential to effective administration that employees of the Executive Branch be in a position to be completely candid in advising with each other on official matters, and because it is not in the public interest that any of their conversations or communications or any documents or reproductions concerning such advice be disclosed, you will instruct employees of your Department that in all of their appearances before the Subcommittee of the Senate Committee on Government Operations regarding the inquiry now before it they are not to testify to any such conversations or communications or to produce any such documents or reproductions . . . .

1954 Pub. Papers 483-84 (May 17, 1954).

**\*76** Moreover, the policy of the Executive Branch throughout our Nation's history has generally been to decline to provide committees of Congress with access to, or copies of, open law enforcement files except in extraordinary circumstances. This policy with respect to Executive Branch investigations was first expressed by President Washington and has been reaffirmed by or on behalf of most of our Presidents, including Presidents Jefferson, Jackson, Lincoln, Theodore Roosevelt, Franklin Roosevelt, and Eisenhower. No President, to our knowledge, has departed from this position affirming the confidentiality and privileged nature of open law enforcement files. See "History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress" (Part I), 6 Op. O.L.C. 751 (1982).

This policy is grounded primarily on the need to protect the government's ability to prosecute fully and fairly. Attorney General Robert H. Jackson articulated the basic position over forty years ago:
It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the Laws be faithfully executed," and that congressional or public access to them would not be in the public interest.

Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 7 of 18

40 Op. Att'y Gen. 45, 46 (1941). Similarly, this Office has explained that "the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation." Memorandum for Edward L. Morgan, Deputy Counsel to the President from Thomas E. Kauper, Deputy Assistant Attorney General, Office of Legal Counsel (Dec. 19, 1969). Other grounds for objecting to the disclosure of law enforcement files include the potential damage to proper law enforcement that would be caused by the revelation of sensitive techniques, methods, or strategy; concern over the safety of confidential informants and the chilling effect on other sources of information; sensitivity to the rights of innocent individuals who may be identified in law enforcement files but who may not be guilty of any violation of law; and well-founded fears that the perception of the integrity, impartiality, and fairness of the law enforcement process as a whole will be damaged if sensitive material is distributed beyond those persons necessarily involved in the investigation and prosecution process.

**\*\*8 \*77** Quite apart from the concern that disclosure would prejudice the particular prosecution prompting congressional inquiry is the purely internal concern that disclosure might hamper prosecutorial decision- making in future cases. Cf. United States v. Nixon, 418 U.S. at 708. Employees of the Department would likely be reluctant to express candidly their views and recommendations on controversial and sensitive matters if those views could be exposed to public scrutiny by Congress upon request.

In addition, potential targets of enforcement actions are entitled to protection from premature disclosure of investigative information. It has been held that there is "no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm." Delaney v. United States, 199 F.2d 107, 114 (1st Cir. 1952). Pretrial publicity originating in Congress, therefore, can be attributed to the government as a whole and can require postponement or other modification of the prosecution on due process grounds. Ibid. Moreover, a person who is ultimately not prosecuted may be subjected to unfair and prejudicial publicity and thus suffer substantial and lasting damage to his professional and community standing based on unfounded allegations.[B14][FN14]FN;F14

There are, of course, circumstances in which the Attorney General may decide to disclose to Congress information about his prosecutorial decisions. Once an investigation has been closed without further prosecution, many of the considerations previously discussed lose some of their force. Access by Congress to details of closed investigations does not pose as substantial a risk that Congress will be a partner in the investigation and prosecution or will otherwise seek to influence the outcome of the prosecution; likewise, if no prosecution will result, concerns about the effects of undue pretrial publicity on a jury would disappear. Still, such records should not automatically be disclosed to Congress. Obviously, much of the information in a closed criminal enforcement file such as unpublished details of allegations against particular individuals and details that would reveal confidential sources, and investigative techniques and methods would continue to need protection (which may or may not be adequately afforded by a confidentiality agreement with Congress). In addition, the Department and the Executive Branch have a long-term institutional interest in maintaining the integrity of the prosecutorial decision-making process. The Supreme Court has recognized that "human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process." United States v. Nixon, 418 U.S. at 705. It therefore is important to weigh the potential "chilling effect" of a disclosure of details of the deliberative process against the immediate needs of **\*78** Congress and of the Department. After assessing all of these factors, on occasion the Department has briefed Congress on prosecutorial decisions and has disclosed some details of the underlying investigation, once the investigation has been closed.

3. Attorney-Client Communications

**\*\*9** Some of the communications relevant to an Independent Counsel Act decision could conceivably fall within the scope of the common law evidentiary privilege for attorney-client communications.[B15][FN15]FN;F15 Although the attorney-client privilege may be invoked by the government in litigation and under the Freedom of Information Act separately from any "deliberative process" privilege,[B16][FN16]FN;F16 it is not generally considered to be distinct from the executive privilege

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 8 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

in any dispute between the executive and legislative branches. The interests implicated under common law by the attorney-client privilege generally are subsumed by the constitutional considerations that shape executive privilege, and therefore it is not usually considered to constitute a separate basis for resisting congressional demands for information. As this Office has previously noted, for the purpose of responding to congressional requests, communications between the Attorney General, his staff, and other Executive Branch "clients" that might otherwise fall within the common law attorney-client privilege should be analyzed in the same fashion as any other intra-Executive Branch communications. See Confidentiality of the Attorney General's Communications in Counseling the President," 6 Op. O.L.C. 481, 490 & n.17, 494 & n.24 (1984).;B17[FN17]FN;F17

Nonetheless, when the Attorney General is acting in his role as the President's chief legal adviser, his communications to the President may warrant greater confidentiality than those of some other Cabinet advisers, in because of the nature of the Attorney General's responsibilities to the executive and his special areas of expertise, e.g., legal advice and law enforcement. This Office has previously emphasized the particular importance of protecting the President's ability to receive candid legal in advice:

 *79  The reasons for the constitutional privilege against the compelled disclosure of executive branch deliberations have special force when legal advice is involved. None of the President's obligations is more solemn than his duty to obey the law. The Constitution itself places this responsibility on him, in his oath of office and in the requirement of article II, section 3 that "he shall take Care that the laws be faithfully executed." Because this obligation is imposed by the Constitution itself, Congress cannot lawfully undermine the President's ability to carry it out. Moreover, legal matters are likely to be among those on which high government officials most need, and should be encouraged to seek, objective, expert advice. As crucial as frank debate on policy matters is, "it is even more important that legal advice be candid, objective, and even blunt or harsh," see United States v. Nixon, 418 U.S. at 708 (1974), where necessary. Any other approach would jeopardize not just particular policies and programs but the principle that the government must obey the law. For these reasons, it is critical that the President and his be able to seek, and give, candid legal advice and opinions free of the fear of compelled disclosure.

 **10  Memorandum for the Attorney General re "The Constitutional Privilege for Executive Branch Deliberations: The Dispute with a House Subcommittee over Documents Concerning the Gasoline Conservation Fee" (Jan. 13, 1981).

4. Independent Counsel Act Decisions

We believe that these considerations we have outlined apply to decisions whether to recommend appointment of an independent counsel no less than they apply to any other prosecutorial decision made by this Department. Although the ultimate decision whether to prosecute a particular individual rests with the independent counsel, the threshold decisions whether to investigate and whether to recommend appointment of an independent counsel are critical steps in that ultimate prosecutorial judgment. The decision whether "there are reasonable grounds to believe that further investigation or prosecution is warranted" is quintessentially a prosecutorial decision, akin to those made every day in the course of the Department's enforcement of the criminal laws. In fact, the Act specifically recognizes that the Attorney General's decision whether to seek appointment of an independent counsel is unreviewable by the courts, like any other exercise of prosecutorial discretion.;B18[FN18]FN;F18

 *80  A decision not to apply for an independent counsel could be treated as a closed investigation, in accordance with the Department's practice. If the Attorney General seeks appointment of an independent counsel, however, the investigation would be very much alive, as the independent counsel would step into the Department's shoes and continue the investigation into the allegations of wrongdoing.;B19[FN19]FN;F19 In fact, the Department could still be quite involved in assisting the independent counsel, including providing information, personnel, and other resources. See 28 U.S.C. s 594(d). It seems clear, therefore, that all the considerations that counsel against disclosure of information relevant to open investigations being conducted by the Department itself apply equally when the investigation is being conducted by the independent counsel.

The more difficult question is whether any distinction between "closed" and "open" investigations could or should be drawn in a case in which the Attorney General determines that the evidence warrants further investigation of some, but not all, of those individuals against whom allegations have been directed. That determination would rest in large part on the facts and documents at issue and would in most cases probably require a particularized judgment as to whether some information relating to "closed"

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 9 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

cases could be reasonably segregated and disclosed to Congress without undue risk of prejudicing the independent counsel's "open" investigation. We are obviously not in a position to make that judgment, and would defer to the Criminal Division. It seems to us, however, that in many, perhaps most, cases the evidence may be so intertwined that no separation is possible. In other cases, especially those of a simple nature in which the allegations against particular individuals are only marginally related, separation may be feasible.

**\*\*11** In addition, because the Attorney General's decision not to seek an independent counsel for particular individuals must be based on his determination that "there are no reasonable grounds to believe that further investigation or prosecution is warranted, "the interests of those individuals in continued confidentiality would seem particularly strong. Moreover, even though the decision by the Attorney General not to seek appointment of an independent counsel is nonreviewable, in an interrelated investigation the possibility always exists that the independent counsel's investigation may uncover new information that will result in further investigation.[FN20]

**\*81** Thus, we believe there are strong constitutional and policy considerations, flowing from the doctrine of separation of powers, the obligation to preserve the integrity of the prosecutorial function, and the need to protect the rights of those who are the target of criminal investigations, that should inform and guide the Department's response to a congressional request for information about independent counsel decisions. It may be that any such request could be accommodated through a process of negotiation with Congress. Only rarely do congressional requests for information result in a subpoena of an Executive Branch official or in any congressional action. In most cases the informal process of negotiation and accommodation mandated by President Reagan in his November 4, 1982, Memorandum for the Heads of Executive Departments and Agencies on "Procedures Governing Responses to Congressional Requests for Information" is sufficient to resolve any dispute.[FN21] On occasion, however, the process breaks down, and a subpoena is issued by a congressional committee or subcommittee. At that point, it would be necessary to consider what procedures and defenses are available to the Executive Branch.

We outline below some of the issues that would be raised if Congress subpoenaed the Attorney General in connection with a congressional request for information about an independent counsel decision. Our particular focus here is on the House of Representatives, because it is far more likely that such action would be taken by the House than by the Senate.

IV. Subpoena Authority of the House of Representatives

A. Basis of Subpoena Authority

As previously noted, Congress has a broad, but not unlimited, investigative authority. See McGrain v. Daugherty, 273 U.S. at 174. This investigative **\*82** authority necessarily presupposes some means of compelling the cooperation of contumacious witnesses:
A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information . . . recourse must be had to others who do possess it. Experience has taught that mere requests for such information are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.

**\*\*12** Id. at 175. Because the subpoena power is regarded as inherent in Congress' Article I power, it does not require enactment of a statute. Nonetheless, the exercise of subpoena power must be authorized by the relevant House. See, e.g., Reed v. County Commissioners, 277 U.S. 376, 389 (1928); McGrain v. Daugherty, 273 U.S. at 158.

Since 1974, the House Rules have given standing committees and subcommittees the authority to authorize and issue subpoenas.[FN22] House Rule XI(m)(1)(B) authorizes any committee or subcommittee "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents as it deems necessary." Subpoenas may be issued by a committee or subcommittee "only

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 10 of 18

when authorized by a majority of the members voting, a majority being present," except that " the power to authorize and issue subpoenas . . . may be delegated to the chairman of the committee pursuant to such rules and under such limitations as the committee may prescribe." House Rule XI(m)(2)(A). Any authorized subpoena must be signed by the chairman of the committee or by a member designated by the chairman. Id. The rules of each standing committee flesh out somewhat the requirements for issuance of a subpoena, specifying in particular if, or under what circumstances, the chairman of the full committee may issue a subpoena without a vote of the committee.

B. Enforcement of Subpoenas

If a subpoenaed witness refuses to respond fully to a subpoena, the subcommittee or committee, as the case may be, can vote to hold the witness in contempt of Congress. As a matter of consistent historical practice, a contempt of Congress vote by a subcommittee is referred to the full committee, although there appears to be no technical requirement to interpose committee approval ***83** between a subcommittee contempt resolution and referral to the full House.;B23[FN23]FN;F23

By operation of House Rule XI(m)(2)(B), any action to enforce compliance with a committee or subcommittee subpoena must be approved by and the House. See In re Beef Industry Antitrust Litigation, 589 F.2d 786, 790 (5th Cir. 1979) (House approval required for intervention in private antitrust suit to gain access to documents subpoenaed by subcommittee from d a party to the litigation); see generally Wilson v. United States, 369 F.2d 198, 201 (D.C. Cir. 1966) (suggesting that referrals under 2 U.S.C. ss 192-194 require a vote of the full House or Senate, except during adjournments).

The House would have three alternatives available to enforce the subpoena: (1) referral to the United States Attorney for prosecution under 2 U.S.C. ss 192-194; (2) arrest by the Sergeant-at-Arms; or (3) a civil suit seeking declaratory enforcement of the subpoena. The first two of these alternatives may well be foreclosed by advice previously rendered by this Office.

1. Referral Under 2 U.S.C. ss 192-194

 **\*\*13**  The criminal contempt of Congress statute contains two principal sections, 2 U.S.C. ss 192 and 194.;B24[FN24]FN;F24 Section 192, which sets forth the criminal offense of contempt of Congress, provides in pertinent part:

Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than 1 month nor more than 12 months.(;B25[FN25]FN;F25)

 **\*84**  Section 194 imposes certain responsibilities on the Speaker of the House or the President of the Senate, as the case may be, and on the United States Attorney to take actions leading to the prosecution of persons certified by a House of Congress to have failed to produce information in response to a subpoena. It provides:
Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failuree is reported and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the President of the Senate or Speaker of the House, as the case may be, to certify, and he shall so certify, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States Attorney, whose duty it shall be to bring the matter before the Grand Jury for its action.

Case 1:21-cr-00670-CJN Document 41-4 Filed 03/22/22 Page 11 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Under this provision, the committee would refer a resolution of contempt to the House, which would then have to approve the resolution and instruct the Speaker to certify the contempt to the United States Attorney for presentation to the grand jury.[B26][FN26]FN;F26

The contempt of Congress procedure has been used only once against an Executive Branch official who refused to comply with a subpoena on executive privilege grounds. In 1982, EPA Administrator Burford, acting at the President's direction, refused to release certain enforcement sensitive documents in response to a subpoena from the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation. The Subcommittee and subsequently the full Committee approved a contempt of Congress resolution, and on December 16, 1982, the full House adopted the resolution. On December 17, Speaker O'Neill certified the contempt to the United States Attorney for the District of Columbia for prosecution under s 192. The United States Attorney declined to refer the contempt citation to the grand jury, pending resolution of a lawsuit filed by the Executive Branch to block enforcement of the subpoena[B27][FN27]FN;F27 and completion of negotiations between the executive and legislative branches to reach a compromise settlement.[B28][FN28]FN;F28

**\*\*14 \*85** During the EPA matter, this Office rendered advice to the Attorney General, since memorialized in a memorandum, on the applicability of ss 192 and 194 to Executive Branch officials who assert claims of executive privilege on behalf of the President.[B29][FN29]FN;F29 In brief, we concluded that a United States Attorney is not required to refer a contempt citation to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction to assert executive privilege. Our conclusion rested partly on the need to preserve traditional prosecutorial discretion, *i.e.,* that Congress may not direct the executive to prosecute a particular individual without leaving any discretion in the executive to determine whether a violation of the law has occurred. We also concluded more broadly, however, that the contempt of Congress statute simply was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege. We noted that neither the legislative history nor the subsequent implementation of ss 192 and 194 suggest that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. Moreover, as a matter of constitutional law, we concluded that the threat of criminal prosecution would unduly chill the President's ability to protect presumptively privileged Executive Branch deliberations:

The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official. If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

8 Op. O.L.C. at ___. Therefore, Congress could not, as a matter of statutory or constitutional law, invoke the criminal contempt of Congress procedure set out in 2 U.S.C. ss 192 and 194 against the head of an Executive Branch agency, if he acted on the instructions of the President to assert executive privilege in response to a congressional subpoena.

**\*86** 2. Inherent Contempt Power of Congress

The second alternative is for the House to instruct the Sergeant-at-Arms to arrest the Executive Branch official and detain him in the Capitol guardroom. The arrest could then be challenged by application for a writ of habeas corpus. 28 U.S.C. ss 2241 et seq.

**\*\*15** The Supreme Court has ruled in the past that Congress has the inherent constitutional authority to imprison individuals for contempt. See Jurney v. MacCracken, 294 U.S. 125 (1935); Anderson v. Dunn, 19 U.S. (6 Wheat.) 204 (1821). The authority is one of self preservation and is accordingly limited to "the least possible power adequate to the end proposed." Id. at 231.

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 12 of 18

Although the authority has been cited by a court as recently as 1970, see United States v. Fort, 443 F.2d at 676, Congress has not attempted to use it for approximately 50 years;[B30][FN30]FN;F30 and it seems most unlikely that Congress would dispatch the Sergeant-at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege. Moreover, while Supreme Court precedents support the right of Congress to imprison individuals for contempt, there is some question whether such authority would continue to be upheld. In recent years the Supreme Court has been more wary of Congress' exercising judicial authority:

Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

United States v. Lovett, 328 U.S. at 317; see also United States v. Brown, 381 U.S. 437 (1965); INS v. Chadha, 462 U.S. at 962, 966 (Powell, J., concurring). The Court has also been careful in recent cases to restrict Congress to its legislative functions and not to permit it to exercise authority belonging to another branch. See INS v. Chadha, supra; Buckley v. Valeo, 424 U.S. 1 (1976). The current Court therefore may not afford Congress the same latitude with respect to its inherent contempt power that was provided during the 19th and early 20th centuries. See Memorandum for the Deputy Attorney General from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel (Oct. 18, 1984).

In any event, the same considerations that inform the analysis of the applicability of ss 192 and 194 to Executive Branch officials are relevant to an exercise of Congress' inherent contempt power. In our 1984 memorandum to the Attorney General discussing ss 192 and 194, we noted that the reach of the criminal contempt statute was intended to be coextensive with Congress' inherent civil contempt powers (except with respect the penalties imposed), and concluded that "the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." 8 Op. O.L.C. at _ n.42.

*87  3. Civil Suit for Enforcement of a Subpoena

The most likely route for Congress to take would be to file a civil action seeking enforcement of the subpoena. There is no statute that expressly grants the federal courts jurisdiction over such suits.[B31][FN31]FN;F31 There are, however, at least two precedents for bringing such civil suits under the grant of federal question jurisdiction in 28 U.S.C. s 1331. In 1973, the Senate Select Committee on Presidential Campaign Finances sought civil enforcement of its subpoena for tapes and documents; the Committee urged, inter alia, that s 1331 provided subject matter jurisdiction. The district court found that the $10,000 jurisdictional amount in controversy requirement was not met and held that jurisdiction was therefore lacking under section 1331. The court did not be suggest that there was any other basis for denying federal question jurisdiction. Senate Select Committee on Presidential Campaign Activities v. Nixon, 366 F. Supp. 51, 59 61 (D.D.C. 1973). Legislation was subsequently enacted to authorize jurisdiction over that particular suit. See Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 727 (D.C. Cir. 1974). Section 1331 has since been amended to be eliminate the $10,000 amount in controversy limitation in actions brought against the United States. Pub. L. No. 96-486, s 2(a), 94 Stat. 2369 (1980).

**16  General federal question jurisdiction was also used as a basis for the be civil suit filed by the Department of Justice against the House in the EPA matter. See United States v. House of Representatives, C.A. No. 82-3583 (D.D.C. 1983). The Department took the position in that case that the controversy be arose under the Constitution and laws of the United States, because resolution "depended directly on construction of the Constitution and be the Court has consistently held such suits are authorized by section 1331." Powell v. McCormack, 395 U.S. 486, 515 (1969). Relying upon the decision in United States v. AT&T Co., 551 F.2d 384 (D.C. Cir. 1976), which held that an action brought by the United States to block a response by a third party to a congressional subpoena met the threshold jurisdictional requirements of section 1331, the Department argued *88 that subject matter jurisdiction similarly exists in a suit to halt enforcement of a subpoena addressed directly to the Executive Branch.[B32][FN32]FN;F32 The rationale used by the Department in that suit would appear to apply equally to suits filed by a House of Congress seeking enforcement of its subpoena against executive privilege claims.

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 13 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

In addition, the courts may be willing to entertain a civil suit brought by the House in order to avoid any question about the possible applicability of the criminal contempt provisions of ss 192 and 194. When a possible impairment of the President's constitutional prerogatives is involved, the courts are particularly careful to construe statutes to avoid a constitutional confrontation. In United States v. Nixon, for example, the Court construed the limitation in 28 U.S.C. s 1291 (that appeals be taken only from "final" decisions of a district court) to permit the President to appeal an adverse ruling on his claim of executive privilege without having to place himself in contempt of court:

(T)he traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government.

418 U.S. at 691-92. The U.S. Court of Appeals for the District of Columbia has stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving document disputes, especially when they involve another governmental entity. See Tobin v. United States, 306 F.2d 270 (D.C. Cir.), cert. denied, 371 U.S. 902 (1962); see also United States v. Fort, 443 F.2d at 677-78. The Fifth Circuit appears to have held that no government official need subject himself to contempt in order to obtain review of his claim that the government is privileged to refuse to comply with a court's demand for documents. See Cates v. LTV Aerospace Corp., 480 F.2d 620, 622 (5th Cir. 1973); Carr v. Monroe Manufacturing Co., 431 F.2d 384, 387 (5th Cir. 1970), cert. denied, 400 U.S. 1000 (1971); but see In re the Attorney General, 596 F.2d 58, 62 (2d Cir.), cert. denied, 444 U.S. 903 (1979). Thus, although the civil enforcement route has not been tried by the House, it would appear to be a viable option.[FN33]

**17 *89 It is also possible that Congress might attempt to invoke the provisions of the Independent Counsel Act, which require the Attorney General to conduct an investigation "whenever he receives information sufficient to constitute grounds to investigate" that any of the enumerated Executive Branch officials "has committed a violation of any Federal criminal law other than a violation constituting a petty offense." 28 U.S.C. s 591. The crime of contempt of Congress is a non-petty criminal offense. See 2 U.S.C. s 192; 18 U.S.C. s 1. Thus a contempt citation against a covered official would arguably trigger the Attorney General's obligation under the Act. Invocation of the Act would not, however, necessarily require the Attorney General to apply for the appointment of an independent counsel. As this Office has advised on prior occasions, the Attorney General retains a certain measure of discretion with respect to whether to apply for an independent counsel.

B. Defenses to Congressional Subpoenas

1. Lack of Jurisdiction

As we discussed above, Congress' investigative power, while broad, is not unlimited. Thus, short of asserting executive privilege, there may be other lines of defense against a subpoena. The most promising line is that the subcommittee has no jurisdiction to request the information, either because Congress as a whole has no authority to inquire into the matter, or because Congress has not given the committee the requisite authority.

a. Scope of Congress' Jurisdiction

The Supreme Court has not articulated with precision whether there are particular limits to the jurisdiction of Congress to request information from the Executive Branch. Nonetheless, as we have previously set forth, Congress must at a minimum be able to articulate a legitimate legislative purpose for its inquiry. We will not repeat that discussion here, except to say that if the matter either falls exclusively within the province of another branch, see Kilbourn v. Thompson, 103 U.S. at 192, or Congress cannot point to some rational nexus between the inquiry and its legislative power, see Barenblatt v. United States, 360 U.S. at 111, we believe the subpoena would be held invalid for lack of authority, and could be challenged on that basis.

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 14 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

b. Scope of Committee's Jurisdiction

Not only must the investigation fall within Congress' jurisdiction, but the committee or subcommittee must also have been specifically authorized by the **\*90** relevant House to conduct the investigation. Since defiance of a subpoena raises the possibility of criminal prosecution, "a clear chain of authority from the House to the questioning body is an essential element of the offense." Gojack v. United States, 384 U.S. at 716. It "must appear that Congress empowered the Committee to act, and further that at the time the witness allegedly defied its authority the Committee was acting within the power granted to it.";B34[FN34]FN;F34 Id. (quoting United States v. Lamont, 18 F.R.D. 27 (S.D.N.Y. 1955), aff'd, 236 F.2d 312 (2d Cir. 1956)). See also Watkins v. United States, 354 U.S. at 204-05, 214-15; Eastland v. United States Servicemen's Fund, 421 U.S. at 505-06. Thus, a witness cannot be compelled to answer questions that fall outside of the investigative jurisdiction of a committee or subcommittee. See United States v. Rumely, 345 U.S. at 44-45; Bergman v. Senate Select Committee on Aging, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975); United States v. Cuestra, 208 F. Supp. 401, 406 (D.P.R. 1962).

**\*\*18** Although this general principle is well recognized by the courts, in practice they have given considerable deference to a committee's definition of its jurisdiction. In cases in which the courts have refused to enforce a subpoena because the inquiry fell outside of the committee's jurisdiction, the primary defect was that the investigative authority given to the committee was simply so broad and ill defined that it gave the witness no fair notice of the scope of the inquiry. See, e.g., Watkins v. United States, 354 U.S. at 204; United States v. Rumely, 345 U.S. at 43. In many cases, the courts have considered the "legislative history" of the committee's investigation (e.g., the language and background of the authorizing resolution, remarks made by the chairman or members of the committee to outline the scope of the investigation, the existence and scope of similar investigations) to determine whether a particular matter falls within a committee's jurisdiction. "Just as legislation is often given meaning by the gloss of legislative reports, administrative interpretation and long usage, so the proper meaning of an authorization to a congressional committee is not to be derived alone from its abstract terms unrelated to the definite context furnished them by the course of congressional actions." Barenblatt v. United States, 360 U.S. at 117. See also Wilkinson v. United States, 365 U.S. at 408; Tobin v. United States, 306 F.2d at 275-76; United States v. Fort, 443 F.2d at 682. This analysis, of course, cuts both ways. If a committee has historically exercised investigative jurisdiction over a particular subject, and makes the nexus between its investigative jurisdiction and the n to particular subject matter clear, the courts may hesitate to second guess to that judgment. See, e.g., Barenblatt v. United States, 360 U.S. at 119-20. On the other hand, if the committee has not previously asserted investigative jurisdiction over the subject matter, and the subject matter to is not clearly linked to the committee's jurisdiction, the courts may lean to in favor of protecting the **\*91** witness' prerogative to refuse to testify, particularly if constitutional interests are implicated.:B35[FN35]FN;F35 See Tobin v. United States, 306 F.2d at 275-76.

The courts have also suggested that the power of either the witness or to the court to define for itself the scope of a committee's jurisdiction is to limited. In Barenblatt, 360 U.S. at 124, the Court noted that it "goes to without saying that the scope of the Committee's authority was for the House, not a witness, to determine, subject to the ultimate reviewing responsibility of this Court." Similarly, "it is appropriate to observe o that just as the Constitution forbids the Congress to enter fields reserved o to the Executive and Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers." Hutcheson v. United States, 369 U.S. 599, 622 (1962). See also McSurely v. McClellan, 521 F.2d 1024, 1038 (D.C. Cir. 1975) (prerogative of the judiciary to determine whether the investigation is within the jurisdiction of a particular committee is "extremely limited").

**\*\*19** Nevertheless, it is clear that a witness may refuse to answer on the ground that the inquiry has not been authorized by the relevant House. Particularly where constitutional concerns are raised by compelled testimony, courts may be reluctant to countenance a far ranging inquiry by a particular committee or subcommittee that does not appear to fall within the jurisdiction granted by Congress.

2. Executive Privilege

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 15 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

Finally, the subpoena could be resisted on the ground that the information requested is protected by the executive privilege. It is important to remember, however, that assertion of the privilege does not just involve an evaluation of the Executive Branch's interest in keeping the information confidential; it also involves an evaluation of the strength of Congress' need for that information, and whether those needs can be accommodated in some other way.

Thus, Congress must be able to articulate its need for the particular materials to "point to . . . specific legislative decisions that cannot responsibly be made without access to materials uniquely contained" in the presumptively privileged documents (or testimony) it has requested, and to show that the material "is demonstrably critical to the responsible fulfillment of the Committee's functions." Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d at 731, 733. In Senate Select Committee, for example, the court held that the committee had not made a sufficient showing of need for copies of the Presidential tape recordings, given that the President had already released transcripts of the recordings. The committee argued that it *92 needed the tape recordings "in order to verify the accuracy of" the transcripts, to supply the deleted portions, and to gain an understanding that could be acquired only by hearing the inflection and tone of voice of the speakers. But the court answered that in order to legislate a committee of Congress seldom needs a "precise reconstruction of past events." Id. at 732. "The Committee has . . . shown no more than thatt the materials deleted from the transcripts may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it may propose legislation. It points to no specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in the tapes or without resolution of the ambiguities that the transcripts may contain." Id. at 733. For this reason, the court stated, "the need demonstrated by the Select Committee . . . is too attenuated and too tangential to its functions" to override the President's constitutional privilege. Id.

Moreover, in cases in which Congress has a legitimate need for information that will help it legislate and the Executive Branch has a legitimate, constitutionally recognized need to keep information confidential, the courts have referred to the obligation of each branch to accommodate the legitimate needs of the other. See United States v. AT&T Co., 567 F.2d 121, 130 (D.C. Cir. 1977).

**20 Here, the considerations outlined above particularly the need to preserve the position of the Executive Branch as the sole entity that enforces the criminal laws would weigh strongly in favor of nondisclosure by the Executive Branch. Ultimately it would be those interests in maintaining confidentiality that must be balanced against Congress' interest in gaining access to particular information for legitimate legislative purposes. As noted above, it is difficult for us to speculate as to what legitimate interests Congress would have in gaining access to the details of a prosecutorial decision made by the Attorney General - - a decision that Congress constitutionally could not alter or interfere with. The decision to assert executive privilege in response to a congressional subpoena, however, is the President's to make. Under the terms of the Reagan Memorandum, executive privilege cannot be asserted vis-a-vis Congress without specific authorization by the President, based on recommendations made to him by the concerned department head, the Attorney General, and the Counsel to the President. That decision must be based on the specific facts of the situation, and therefore it is impossible to predict in advance whether executive privilege could or should be claimed as to any particular types of documents or information.

Charles J. Cooper
Assistant Attorney General
Office of Legal Counsel

Footnotes

1   If the Attorney General notifies the court under s 592(b)(1) that "there are no reasonable grounds to believe that further investigation or prosecution is warranted," the memorandum filed with the court summarizing the Department's investigation "shall not be revealed to any individual outside the division of the court or the Department of Justice without leave of the division of the court." 28 U.S.C. s 592(b)(3).

2   The independent counsel must file a report with the court describing "fully and completely . . . the work of the independent counsel, including the disposition of all cases brought, and the reasons for not prosecuting any matter within the prosecutorial jurisdiction of such independent counsel which was not prosecuted." The court may release this report "to the Congress, the public, or to any

Case 1:21-cr-00670-CJN   Document 41-4   Filed 03/22/22   Page 16 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

| | |
|---|---|
| | appropriate person," subject to "such orders as are appropriate to protect the rights of any individual named in such report and to prevent undue interference with any pending prosecution." 28 U.S.C. s 595(b)(2), (3). |
| 3 | Although the language of the confidentiality provisions refers only to documents actually filed with the court, the provisions obviously cannot lawfully be circumvented by disclosing the contents of the documents. See 124 Cong. Rec. at 3462 ("The contents of the report . . . are to remain secret . . . ."); S. Rep. No. 170, supra, at 58. |
| 4 | Section 595(e) of the Act authorizes "(a) majority of majority party members or a majority of all nonmajority party members of the Committee on the Judiciary of either House of the Congress" to request the Attorney General to apply for the appointment of an independent counsel. 28 U.S.C. s 595(e). |
| 5 | Disclosure is not authorized to the public, although the committee may, either "on its own initiative or upon the request of the Attorney General, make public such portion or portions of such notification as will not in the committee's judgment prejudice the rights of any individual." 28 U.S.C. s 595(e). |
| 6 | In discussing cases in which the information contained in the notification should be kept confidential by Congress, the Senate Report specifically notes that "the Committee . . . may decide to delete the names of individuals mentioned in the notification especially if those individuals are not the subject of the alleged criminal activity." S. Rep. No. 170, supra, at 73. |
| 7 | Similarly, if the Attorney General applies for an independent counsel for an individual not named in s 591(b), because investigation by the Department "may result in a personal, financial, or political conflict of interest," 28 U.S.C. s 591(c), he would have to provide some specific description of the facts giving rise to the conflict. |
| 8 | Obviously, to the extent the confidentiality provisions of the Independent Counsel Act bar disclosure, the more generalized considerations we outline here need not be considered. However, there may be some information such as details of the deliberative process that are not encompassed by the confidentiality restrictions of the Act, or are not reflected in the report filed with the court. Moreover, at some point the court might authorize disclosure of some or all information contained in the report, which would remove any statutory bar to further disclosures. |
| 9 | For this reason the executive branch has expressed constitutional qualms about the Act itself, which allows an individual not appointed by the President or an officer of the executive branch nonetheless to carry out prosecutorial functions. Despite these doubts, the Department of Justice has thus far taken the position that it will abide by the provisions of the Independent Counsel Act. See Letter to Michael Davidson, Senate Legal Counsel from William French Smith, Attorney General (Apr. 17, 1981), reprinted in Hearings on the Ethics in Government Act Amendments of 1982 before the Subcomm. on Oversight of Government Management of the Senate Comm. on Governmental Affairs, 97th Cong., 2d Sess. 115 (1982). |
| 10 | In fact, the Constitution specifically excludes Congress from the decision whether to prosecute particular cases. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. See Selective Service System v. Minnesota Public Interest Research Group, 468 U.S. 841, 853-54 (1984); United States v. Brown, 381 U.S. 437, 447 (1965); United States v. Lovett, 328 U.S. at 315. |
| 11 | Moreover, there must be a subject matter for the inquiry, the investigation must be authorized by Congress, there must be a valid legislative purpose, the witness must be accorded certain constitutional protections, and the information demanded must be pertinent to the inquiry. See Gojack v. United States, 384 U.S. 702, 704-05, 714 (1966); Wilkinson v. United States, 365 U.S. 399, 408-09 (1961); Barenblatt v. United States, 360 U.S. at 111; Watkins v. United States, 354 U.S. at 187; United States v. Rumely, 345 U.S. 41, 44-46 (1953); McGrain v. Daugherty, 273 U.S. at 173, 176; Kilbourn v. Thompson, 103 U.S. at 190. |
| 12 | The relevance of this inquiry is not limited to the question whether the Department should respond, but affects also how it should respond. If Congress' legitimate legislative interest is relatively narrow, the Department may be able to satisfy the inquiry without disclosing confidential information. |
| 13 | For example, the Director of the Office of Personnel Management recently refused to answer questions asked by a congressional subcommittee concerning the removal of the Deputy Director of OPM, on the ground that the removal was a judgment that rested exclusively with the President. The appointment of officers presents a somewhat more difficult problem, at least for those officers who must be appointed with the advice and consent of the Senate. In such cases, the Senate can claim a legitimate interest in obtaining information about the nominee. |
| 14 | Department of Justice officials, as attorneys, are directed to observe the Code of Professional Responsibility to the extent it does not prevent their loyal service to the United States. See 28 C.F.R. s 45.735-1. The Code prohibits a lawyer who is associated with an investigation from making or participating in making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that does more than state without elaboration" already public or highly generalized information about the matter. Model Code of Professional Responsibility, DR 7-107(A) (1979). |
| 15 | The attorney-client privilege generally embraces confidential disclosures of a client to his attorney, made in order to obtain legal assistance and not for the purpose of committing a crime or tort. 8 Wigmore, Evidence s 2290 (McNaughton rev. 1961). In order |

Case 1:21-cr-00670-CJN Document 41-4 Filed 03/22/22 Page 17 of 18

RESPONSE TO CONGRESSIONAL REQUESTS FOR..., 10 U.S. Op. Off. Legal...

|     |     |
| --- | --- |
|     | to prevent inadvertent disclosures, either directly or by implication, of information which the client had previously confided to the attorney, as well as to foster the attorney's ability to give sound and informed professional advice, the privilege has generally been extended to include an attorney's communications to his client. Mead Data Central v. Department of the Air Force, 566 F.2d 242, 252-55 (D.C. Cir. 1977). |
| 16  | See, e.g., Brinton v. Department of State, 636 F.2d 600, 605 (D.C. Cir. 1980), cert. denied, 452 U.S. 905 (1981); Mead Data Central, Inc. v. Department of the Air Force, 566 F.2d at 252; Coastal States Gas Corp. v. DOE, 617 F.2d 854, 865 (D.C. Cir. 1980); 5 U.S.C. s 552(b)(5) (documents exempted from mandatory disclosure under the Freedom of Information Act include those "which would not be available by law to a party . . . in litigation with the agency"). |
| 17  | Likewise, communications that would be protected in litigation or under the Freedom of Information Act by the work product privilege would generally be considered part of the government's deliberative process, and therefore subsumed under executive privilege, for the purpose of responding to congressional requests for information. See generally 6 Op. O.L.C. at 497-98 n.32. |
| 18  | The Act provides that the Attorney General's decision to apply for appointment of an independent counsel "shall not be reviewable in any court." 28 U.S.C. s 592(f). The nonreviewability provision applicable to the Attorney General's decision not to seek appointment is phrased in somewhat different terms. Under s 592(b)(1), if the Attorney General reports to the court that "there are no reasonable grounds to believe that further investigation or prosecution is warranted," the court "shall have no power to appoint an independent counsel." Id. s 592(b)(1). In Banzhaf v. Smith, 737 F.2d 1167, 1169 (D.C. Cir. 1984), the Court of Appeals held that this provision was intended by Congress to bar any "judicial review, at the behest of members of the public, of the Attorney General's decisions not to investigate particular allegations and not to seek appointment of independent counsel." |
| 19  | It could be argued that even if the Attorney General applies to the court for appointment of an independent counsel, the Department's investigations may technically be considered "closed," because s 597(a) requires the Department to "suspend all investigations and proceedings regarding a matter within the prosecutorial discretion of an independent counsel" unless the independent counsel "agrees in writing that such investigation or proceedings may be continued by the Department of Justice." For the reasons set forth above, we believe this argument is without merit. |
| 20  | The independent counsel's jurisdiction is, of course, limited to that specified by the court, based on the application filed by the Attorney General. See 28 U.S.C. ss 592(d)(1), 593(b), 594(a). Although the language of the Act, see 28 U.S.C. ss 592(d)(1), 593(b), and its legislative history, see S. Rep. No. 170, supra, at 64, suggest that the court may have some flexibility in defining the independent counsel's jurisdiction, we do not believe that the court can grant the independent counsel -- or that the independent counsel can assume -- any jurisdiction in excess of that recommended by the Attorney General. Any other interpretation would completely circumvent the clear congressional judgment that the Attorney General's decision whether to seek an independent counsel be unreviewable. In addition, the Act itself provides several avenues by which the jurisdiction of the independent counsel could be expanded, all of which require the participation of the Attorney General. For example, if the Attorney General receives additional information "sufficient to constitute grounds to investigate about the matter to which such memorandum related," his obligation to investigate and report is renewed, see 28 U.S.C. s 592(c)(2); the Attorney General may ask the independent counsel "to accept referral of a matter that relates to a matter within that independent counsel's prosecutorial jurisdiction," id. s 592(e); and the independent counsel himself may ask the Attorney General or the court to "refer matters related to his prosecutorial jurisdiction" or "may accept referral of a matter by the Attorney General," see id. s 594(e). Finally, our constitutional qualms about the role of the independent counsel would be considerably exacerbated if the critical decision as to what individuals and offenses may be prosecuted were taken completely out of the hands of the Attorney General. |
| 21  | That memorandum states that "(t)he policy of this Administration is to comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch . . . . (E)xecutive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary. Historically, good faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege, and this tradition of accommodation should continue as the primary means of resolving conflicts between the Branches." |
| 22  | Prior to adoption of the Hansen proposals in 1974, subpoena authority was granted only on a case-by-case basis. See Congressional Quarterly, Guide to the Congress 164 (1982). |
| 23  | The courts have underscored the importance of the procedural safeguards built into the contempt of Congress process and, in particular, the multiple steps of review that must take place before a contempt of Congress prosecution is brought. See Wilson v. United States, 369 F.2d 198, 203 (D.C. Cir. 1966); see also United States Fund v. Eastland, 488 F.2d 1252, 1260 (D.C. Cir. 1973), rev'd on other grounds, 421 U.S. 491 (1975); Sanders v. McClellan, 463 F.2d 894 (D.C. Cir. 1972); Ansara v. Eastland, 442 F.2d 751, 754 (D.C. Cir. 1971). It could therefore be argued that committee consideration of a subcommittee contempt resolution would be necessary in order to provide an additional check upon the contempt of Congress process. No court, however, has so held, and we have not found any requirement in the House or any committee rules for referral to the full committee. Neither have we found any instance in which a |

|   |   |
|---|---|
|   | subcommittee referred a contempt resolution directly to the House, without seeking approval from the full committee. For example, the contempt resolution voted by the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation against EPA Administrator Burford was referred to the full Committee, and reported by that Committee to the House. |
| 24 | A third provision, 2 U.S.C. s 193, denies the existence of any testimonial privilege for a witness to refuse to testify on the ground that his testimony would disgrace him. |
| 25 | This statute has been found constitutionally valid as a punitive supplement to Congress' inherent coercive power to imprison for contempt. See, e.g., United States v. Fort, 443 U.S. 670, 677 (D.C. Cir. 1970), cert. denied, 403 U.S. 942 (1971). |
| 26 | By its terms, s 194 would permit the Speaker (or President pro tempore) to certify a contempt without the approval of the House, if the House were not in session. This option, however, would appear to be foreclosed by the House rules, which clearly require full House approval for any enforcement action. |
| 27 | United States v. House of Representatives, 556 F. Supp. 150 (D.D.C. 1983). |
| 28 | Those negotiations eventually resulted in an agreement and withdrawal of the contempt citation. |
| 29 | See "Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege," 8 Op. O.L.C. ___ (1984). |
| 30 | See Marshall v. Gordon, 243 U.S. 521 (1917); Congressional Quarterly, Guide to the Congress 162 (1982). |
| 31 | Under 2 U.S.C. s 288d, the Senate Legal Counsel "(w)hen directed to do so (by the Senate) . . . shall bring a civil action . . . to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened failure or refusal to comply with, any subpoena or order issued by the Senate or a committee or a subcommittee of the Senate authorized to issue a subpoena or order." The United States District Court for the District of Columbia has jurisdiction over such actions, but its jurisdiction does not extend to any actions brought "to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened refusal to comply with, any subpoena or order issued to an officer or employee of the Federal Government acting within his official capacity." 28 U.S.C. s 1364(a). The argument could be made that this authority provides the exclusive route for either House to bring a civil action to enforce its subpoenas, and thus, that no route exists for civil enforcement against an executive branch officer. The legislative history of these statutes, however, counsels against that conclusion. The legislative history specifically notes that the jurisdictional exception for executive branch subpoenas "is not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the Federal Government," but rather was intended specifically to provide the Senate with a less drastic remedy than criminal contempt for refusals by private citizens to comply with subpoenas, and to avoid reliance on the Department of Justice to enforce such subpoenas. See S. Rep. No. 170, 95th Cong., 2d Sess. 88-89 (1978). |
| 32 | The decision of the district court in United States v. House of Representatives does not directly address the jurisdictional question, although it casts considerable doubt on whether the executive branch can seek review in a civil action, when the legislative branch has chosen to use the criminal contempt provisions. 556 F. Supp. at 153. Nonetheless, the court did not foreclose any civil actions by the House:<br>Judicial resolution of this constitutional claim, however, will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding or other legal action taken by Congress.<br>Id. (emphasis added). |
| 33 | Any notion that the courts may not or should not review such disputes is dispelled by United States v. Nixon, 418 U.S. at 703-05, in which the Court clearly asserted its role as ultimate arbiter of executive privilege questions. The need for judicial review in fact was emphasized by this Department in the United States v. House of Representatives litigation as a basis for the court to entertain the suit. The Department argued that, in some circumstances, only judicial intervention can prevent a stalemate between the other two branches that could result in a partial paralysis of government operations. |
| 34 | Because the legality of the committee's action is judged as of the time the witness defies the subpoena, a subsequent vote by the full House to enforce the subpoena (through contempt or otherwise) will not cure any jurisdictional defect. Gojack, 384 U.S. at 175 n.12. |
| 35 | The judicial decisions dealing with Congress' subpoena authority have for the most part involved refusals by private individuals to testify. In those cases the courts have been sensitive to First, Fourth, and Fifth Amendment concerns raised by the defendants, and have weighed those interests in the balance in determining how specific Congress must be in authorizing a committee's investigation. See, e.g., United States v. Rumely, 345 U.S. at 45; Watkins v. United States, 354 U.S. at 204-05. Although the constitutional interests implicated by a subpoena of an executive branch official arise from Articles I and II, rather than the Bill of Rights, a court should be equally sensitive to those constitutional concerns. |

10 U.S. Op. Off. Legal Counsel 68 (O.L.C.), 1986 WL 213239

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.