**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No. 21-670 (CJN) |
| | : | |
| v. | : | |
| | : | |
| STEPHEN K. BANNON, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

**MOTION TO DISMISS THE INDICTMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

I.   BACKGROUND ........................................................................... 2

II.  THE SUBPOENA WAS NOT LAWFULLY ISSUED ........................................... 2

     A.   The Composition of the Select Committee Invalidates the Subpoena .......... 4

     B.   The Select Committee Exceeded Its Subpoena Authority – By
          Violating Rules Which Mandate Ranking Minority Member
          Consultation and Providing Protective Rules to the Deponent .................... 5

          1.   Limits on Subpoena and Deposition Authority ................................. 6

          2.   The Select Committee Has No Ranking Minority Member ............. 9

     C.   The Subpoena was a Misguided and Unconstitutional Effort to Make
          an Example of Mr. Bannon ......................................................... 12

     D.   Count II Must be Dismissed Because the Select Committee Has No
          Authority to Compel Production of a Privilege Log or Certification ......... 14

III. THIS PROSECUTION VIOLATES DUE PROCESS ........................................... 16

     A.   Mr. Bannon Relied on Official, Binding, Authoritative DOJ Policy .......... 17

     B.   OLC Opinions are Binding, Authoritative Statements Reflecting the
          Official Policy of the Department of Justice ................................... 22

     C.   This Prosecution is Barrd by the Doctrines of Entrapment by
          Estoppel, Actual Public Authority, and Apparent Public Authority .......... 27

          1.   Entrapment by Estoppel .................................................. 32

          2.   Public Authority ......................................................... 35

               a. Actual Authority ....................................................... 34

               b. Apparent Authority ..................................................... 35

     D.   The Government Should Be Estopped from Prosecuting This Case .......... 37

IV.    2 U.S.C. § 192 IS UNCONSTITUTIONAL AS APPLIED TO THE FACTS OF
       THIS CASE ................................................................................................... 39

       A.    Statutory Interpretation Problems ................................................. 42

       B.    2 U.S.C. § 192 as Applied Violates the Separation of Powers
             Doctrine, is Unconstitutional, Over Broad, and is Void for
             Vagueness ....................................................................................... 43

             1.    The Statute as Applied Violates the Constitutional Separation
                   of Powers Doctrine .......................................................... 43

             2.    The Statute as Applied is Unconsitutionally Overbroad and
                   Void for Vagueness .......................................................... 44

   VI.    PROSECUTORIAL OVER-REACHING REQUIRES DISMISSAL OF THE
          INDICTMENT ................................................................................... 48

       A.    Targeting Mr. Bannon's Counsel Requires Dismissal ................ 48

       B.    Misleading the Grand Jury Requires Dismissal .......................... 52

VI.    CONCLUSION ........................................................................ 53

# TABLE OF AUTHORITIES

## CASES

*Ansara v. Eastland,*
442 F.2d 751 (D.C.Cir.1971) ................................................................ 47

*Barenblatt v. United States,*
360 U.S. 109 (1959) ........................................................................... 47

*Boyce Motor Lines v. United States,*
342 U.S. 337, 343 n. 16 (1952) ............................................................. 2

*Calautti v. Franklin,*
439 U.S. 379, 395 (1979) .................................................................... 45

*Casa de Maryland v. United States Dep't of Homeland Sec,*
924 F.3d 684, 718 n.1 (4th Cir. 2019) .................................................... 24

*Cheney v. U.S. Dist. Court for Dist. of Columbia,*
542 U.S. 367, 370 (2004) .................................................................... 15

*\*Christoffel v. United States,*
338 U.S. 84 (1949) ......................................................................... 2, 5

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,*
846 F.3d 1235, 1238 (D.C. Cir. 2017) .................................................... 23

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,*
922 F.3d 480, 483 (D.C. Cir. 2019) ................................................... 23, 24

*City of Chicago v. Morales,*
527 U.S. 41, 74-81 (1999) .................................................................. 39

*Comm. On the Judiciary of the United States House of Representatives v. McGahn,*
968 F.3d 755 (2020) .......................................................................... 20

*\*Cox v. Louisiana,*
379 U.S. 559, 575 (1965) ............................................................ 30, 32, 33

*Exxon Corp. v. FTC,*
  589 F.2d 582, 592 (D.C. Cir. 1978) ....................................................................... 5

*I.N.S. v. Chadha,*
  462 U.S. 919, 944 (1983) ............................................................................... 15, 44

*Kilbourn v. Thompson,*
  103 U.S. 168 (1880), ......................................................................................... 3, 13

*Kolender v. Lawson,*
  U.S. 352, 357 (1983), ............................................................................................ 45

*Lanzetta v. New Jersey,*
  306 U.S. 451, 453 (1939), ..................................................................................... 45

*McGrain v. Daugherty,*
  273 U.S. 135, 161 (1927) .................................................................................. 6, 13

*Nixon v. Adm'r of General Services,*
  433 U.S. 425, 448-449 (1977) ......................................................................... 17, 44

*Nixon v. Fitzgerald,*
  457 U.S. 731, 749 (1982) ...................................................................................... 13

*Nixon v. Sirica,*
  487 F.2d 700 (1973) ............................................................................................... 15

*NLRB v. Sears Roebuck & Co.,*
  421 U.S. 132, 153 (1975) ...................................................................................... 24

*Raley v. State of Ohio,*
  360 U.S. 423 (1959 ................................................................................... 32, 33, 46

*Senate Select Committee on Presidential Campaign Activities v. Nixon,*
  498 F.2d 725, 730 (D.C. Cir. 1974) ............................................................... 15, 17

*Setser v. United States,*
  566 U.S. 231, 239 (2012) ...................................................................................... 43

*Stirone v. United States,*
  361 U.S. 212, 217 (1960) ................................................................ 52

*Tobin v. United States,*
  306 F.2d 270, 276 (D.C.Cir.1962) .................................................. 47

*\*Trump v. Mazars USA, LLP,*
  140 S. Ct. 2019, 2031 (2020) ........................................ 6, 12, 13, 43, 46

*Trump v. Thompson,*
  20 F.4th 10, 41 (D.C. Cir. 2021) .............................................. 13, 17, 47

*Trump v. Thompson,*
  142 S. Ct. 680 (2022)...............................................................17

*United States v. Abcassis,*
  45 F.3d 39 (2d Cir 1995)................................................................. 29

*United States v. AT&T,*
  *567 F.2d 121, 127 (D.C. Cir. 1977)*.............................................. 47

*\*United States v. Baker,*
  438 F.3d 749 (7th Cir. 2006)...............................................................35

*United States v. Baptista-Rodriguez,*
  17 F.3d 1354, 1368 n.18 (11th Cir. 1994)....................................... 35

*United States v. Batres-Santolino,*
  521 F.Supp. 744, 750-53 (N.D. Cal. 1981) .................................... 50

*United States v. Barker,*
  546 F.2d 940, 952 (D.C. Cir. 1976) ....................................28, 29, 30, 36, 37

*United States v. Baird,*
  29 F.3d 647, 654 (D.C. Cir. 1994) ................................................. 36

*United States v. Ballin,*
  144 U.S. 1 (1892) ............................................................................ 2

*United States v. Ciambrone,*
601 F.2d 616, 623 (2d Cir. 1979) ............................................................... 53

*United States v. Brown,*
381 U.S. 437, 443 (1965) .......................................................................... 53

*\*United States v. Davis,*
139 S. Ct. 2319, 2325 (2019) ...................................................................... 45

*United States v. House of Representatives,*
556 F. Supp. 150, 152-153 (D.D.C. 1983) .................................................. 47

*United States v. Hsia,*
81 F.Supp.2d 7, 19 (D.D.C. 2000) ............................................................. 51

*United States v. Irwin,*
612 F.2d 1182, 1187 (9th Cir. 1980) .......................................................... 51

*United States v. Levin,*
973 F.2d 463, 468 (6th Cir. 1992) ....................................................... 28, 29, 30

*\*United States v. Marshank,*
777 F. Supp. 1507, 1524 (N.D. Cal. 1991) ............................................. 50, 52

*United States v. Miller,*
2022 U.S. Dist. LEXIS 45696, *16-*17 (D. D.C., March 7, 2022) ......................... 42

*\*United States v. Nixon,*
418 U.S. 683, 708-709 (1974) ............................................................. 17, 42, 44

*United States v. Nobles,*
422 U.S. 225, 232 (1975) .......................................................................... 42

*United States v. Lawson,*
502 F. Supp. 158, 172 (D. Md. 1980) ........................................................ 53

*United States v. Licavoli,*
294 F.2d 207 (D.C. Cir. 1961) ................................................................... 40

*United States v. Pennsylvania Industrial Chemical Corp,*
   411 U.S. 655, 673-675 (1973) ................................................................. 29, 32, 34

*United States v. Pitt,*
   193 F.3d 751, 756-758 (3d Cir. 1999) .................................................................. 35

*United States v. Reyes-Vasquez,*
   905 F.2d 1497, 1500 n.5 (11th Cir. 1990) ............................................................ 35

*United States v. Salerno,*
   481 U.S. 739, 745 (1987) ..................................................................................... 39

*United States v. Schell,*
   775 F.2d 559 (4th Cir. 1985) .......................................................................... 51, 52

*United States v. Smith,*
   286 U.S. 6 (1932) ................................................................................................... 2

*United States v. Stevens,*
   569 U.S. 460, 473 (2010) ..................................................................................... 45

*United States v. Tobias,*
   662 F.2d 381, 387 (5th Cir. 1981) ....................................................................... 51

*United States v. Viola,*
   2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017) .......... 38

*United States v. Viola,*
   2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017) .......... 38

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc,*
   455 U.S. 489, 498-99 (1982) ............................................................................... 45

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442, 449-451 (2008) ............................................................................. 39

*Watkins v. United States,*
   354 U.S. 178, 200 (1957) ..................................................................................... 13

*Yellin v. United States,*
   374 U.S. 109, 114 (1963) .................................................................................................. 2,3

## **RULES**

Fed. R. Crim. P. 12(b)(3)(A) .................................................................................... 2, 4, 5, 48
Fed. R. Crim. P. 12(b)(3)(B) .................................................................................................. 2
Fed. R. Civ. P. 26(b)(5)(A)(ii) .............................................................................................. 14

## **STATUTES**

2 U.S.C. § 192 ........................................................ 3, 16, 26, 30, 38, 39, 42, 43, 45, 52
2 U.S.C. § 193 .................................................................................................... 42, 43
2 U.S.C. § 194 .............................................................................................................. 44
Model Penal Code § 2.04(3)(b) (1962) ...................................................................... 31, 37

Defendant Stephen K. Bannon, through his undersigned counsel, respectfully requests that this Court dismiss the Indictment. In support of this motion, we state as follows:

## I.      Background

On November 12, 2021, Mr. Bannon was charged in a two count Indictment based on his conduct after receiving a subpoena dated September 23, 2021, issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee").[1] [Doc. 1] Mr. Bannon now seeks dismissal of both counts based on defects in instituting the prosecution, Fed. R. Crim. P. 12(b)(3)(A), and defects in the Indictment, Fed. R. Crim. P. 12(b)(3)(B). A court considering a motion to dismiss an indictment assumes the truth of the indictment's factual allegations. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16 (1952).

## II.     The Subpoena Was Not Lawfully Issued

The indictment must be dismissed because the subpoena commanding Mr. Bannon to appear and produce documents was not lawfully issued. Mr. Bannon cannot be prosecuted for failing to comply with an unlawful subpoena. The Constitution vests the legislative power in Congress. U.S. Const. Art. I. Article I provides that "[e]ach House may determine the rules of its proceedings." U.S. Const. Art. I § 5. The current House of Representatives is the 117th Congress – which upon convening established the Rules that govern its actions. The "rules of Congress and its committees are judicially cognizable." *Yellin v. United States*, 374 U.S. 109, 114 (1963).[2] The

---

[1] Count One alleged that Mr. Bannon "refused to appear to give testimony" while Count Two alleged that he "refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way . . .." [Doc. 1 at ¶¶ 23, 25].

[2] *Citing Christoffel v. United States*, 338 U.S. 84 (1949); *United States v. Smith,* 286 U.S. 6 (1932); and *United States v. Ballin*, 144 U.S. 1 (1892).

rules provide an essential safeguard because they operate as a check and control on the actions of the majority.[3] When a committee violates the rules by exceeding its authorized power in a way that threatens the liberty interest of an individual, the judiciary must protect that individual. *See Yellin v. United States*, 374 U.S. 109, 117-119 (1963) (reversing 2 U.S.C. § 192 conviction where congressional subcommittee violated its rules by (a) failing to consider injury to the witness' reputation and (b) failing to address his request for an executive session).

The House Rules that apply to this case were established on January 4, 2021, when the House approved H. Res. 8 (adopting Rules for the 117th Congress).[4] [Ex. A]. The House Rules establish certain committees – to which the full House has delegated much of its power to act – as well as rules that govern the procedures of those committees. A committee may only act within the authority that has been delegated to it by the full House. This delegation of authority to a committee is set forth in the resolution establishing the committee. If a committee acts beyond its delegated authority, that action is *ultra vires* and invalid.

As reflected in ¶ 1 of the Indictment, the Select Committee was established by the passage of H. Res. 503 on June 30, 2021. [Ex. B]. The authority of the Select Committee is set forth in that authorizing resolution, together with the House Rules. In other words, in determining whether an action by the Select Committee is authorized, one looks to its authorizing resolution (the grant of authority by the House), and to the House Rules that govern the operations of all committees. Any action by the Select Committee that is inconsistent with the procedures authorized by the full

---

[3] *See Jefferson's Manual of Parliamentary Practice*, § I – Importance of Adhering To Rules ("It is much more material that there should be a rule to go by than what that rule is; that there may be a uniformity of proceeding in business not subject to the caprice of the Speaker or captiousness of the members") (available at https://www.govinfo.gov/content/pkg/HMAN-117/pdf/HMAN-117.pdf).

[4] H. Res. 8 adopted and modified certain House Rules from the 116th Congress.

House is *ultra vires* and invalid. *See*, *e.g.*, *Kilbourn v. Thompson*, Kilbourn v. Thompson, (congressional compulsory process may not exceed the limit of its own authority). In addition, the Select Committee, like any committee, may only act within the bounds set forth by the Constitution. Select Committee actions that infringe upon an individual's constitutional rights, or that implicate separation-of-powers issues, are invalid.

## A.   <u>The Composition Of The Select Committee Invalidates The Subpoena</u>.

The Select Committee that issued the subpoena to Mr. Bannon was not composed consistent with the authority granted to the Select Committee by the full House. Because its membership was not authorized, the subpoena to Mr. Bannon was not valid, and the Indictment must be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(A). The resolution authorizing the Select Committee provided, in pertinent part, as follows:

**Sec. 2. COMPOSITION.**

> (a) Appointment of Members. – The Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader.

[Ex. B at 3] (H. Res. 503, 117th Cong. (2021) at § 2) (emphasis added). The word "shall" provides no discretion to the Speaker. Nonetheless, the Speaker did not follow this mandatory language. In an unprecedented step,[5] the Speaker rejected the nominees suggested by the Minority Leader[6] and

---

[5] *See* Press Release by Minority Leader Kevin McCarthy (R-CA) (Jul. 21, 2021) ("Speaker Nancy Pelosi has taken the unprecedented step of denying the minority party's picks for the Select Committee on January 6. This represents an egregious abuse of power and will irreparably damage this institution.") available at https://www.republicanleader.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/; Press Release by Speaker Nancy Pelosi (D-CA), *Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol* (Jul. 21, 2021) (acknowledging that the rejection of the Minority Leader's nominees was an "unprecedented decision."), available at <u>https://www.speaker.gov/newsroom/7212-2</u>.

[6] The Minority Leader recommended Reps. Jim Banks (R-IN), Rodney Davis (R-IL), Jim Jordan (R-OH), Kelly Armstrong (R-ND), and Troy Nehls (R-TX).

instead appointed 9 members to the Select Committee of her own choosing.[7]

In a political body such as the House, procedural safeguards have been established to protect the rights of deposition witnesses and the rights of the minority party. These procedures are especially important where, as here, a select committee was created to inquire into events that took place following a disputed Presidential election. Nonetheless, the Speaker decided to appoint members of the Select Committee in a manner that violated the authorizing resolution. The result was that the Select Committee's membership was composed – according to the Minority Leader – to advance the Speaker's political objectives, without regard for the rights of the minority.[8] To act under a lawful grant of authority, however, the Select Committee "must conform strictly to [its authorizing] resolution." *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). Because the Select Committee was not composed as authorized, the subpoena to Mr. Bannon is invalid, and the indictment must be dismissed. *See Christoffel v. United States*, 338 U.S. 84, 90 (1949) (reversing perjury conviction before House committee because rule requiring quorum ignored – the Supreme Court held that "[a] tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction.").

**B. The Select Committee Exceeded Its Subpoena Authority – By Violating Rules Which Mandate Ranking Minority Member Consultation And Providing Protective Rules To The Deponent.**

---

[7] The Speaker appointed Reps. Bennie Thompson (D-MS), Zoe Lofgren (D-CA), Adam Schiff (D-CA), Pete Aguilar (D-CA), Stephanie Murphy (D-FL), Jamie Raskin (D-MD), Elaine Luria (D-VA), Liz Cheney (R-WY), and Adam Kinzinger (R-IL). 167 CONG. REC. H3597 (daily ed. July 1, 2021).

[8] *See* Chelsey Cox, *Who has been subpoenaed so far by the Jan. 6 committee?*, USA TODAY (Nov. 10, 2021, 8:22 P.M.), https://www.usatoday.com/story/news/politics/2021/11/10/jan-6-committee-whos-been-subpoenaed/6378975001/ (last updated Mar. 3, 2022, 4:52 P.M.) (Minority Leader stated that "Speaker Pelosi's rejection of the Republican nominees to serve on the committee and self-appointment of members who share her pre-conceived narrative will not yield a serious investigation. The Speaker has structured this select committee to satisfy her political objectives.").

On its face, the Indictment fails to allege that the subpoena was issued to Mr. Bannon in compliance with the subpoena authority granted to the Select Committee – which requires consultation with the ranking minority member. The Select Committee has no ranking minority member. Because the Select Committee violated the grant of subpoena authority provided by the full House, the Indictment must be dismissed under Fed. R. Crim. P. 12(b)(3)(A).

## 1.  Limits On Subpoena And Deposition Authority

In exercising its legislative power, the House of Representatives has delegated certain powers to committees. For instance, House committees have the power to secure information via subpoena. *Trump v. Mazars USA*, *LLP*, 140 S. Ct. 2019, 2031 (2020) (citing *McGrain v. Daugherty,* 273 U.S. 135, 161 (1927)). However, that grant of authority is limited. The rules protect the rights of deponents, as well as the rights of the minority.

There are three sources of authority for the rules that govern the Select Committee's exercise of subpoena and deposition power: (a) the resolution that created the Select Committee (H. Res. 503); (b) the Rules of the House for the 117th Congress; and (c) and the regulations for the use of deposition authority in the 117th Congress.

H. Res. 503 provides, in pertinent part, as follows:

**SEC. 5. PROCEDURE.**

\* \* \*

(c) APPLICABILITY OF RULES GOVERNING PROCEDURES
OF COMMITTEES.—Rule XI of the Rules of the House of Representatives shall apply to the Select Committee except as follows:

\* \* \*(6)(A) The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress.

(B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted by the chair of the Committee on Rules for printing in the Congressional Record on January 4, 2021.

[Ex. B at 9-11] (H. Res. 503, 117th Cong. (2021) at § 5) (emphasis added).Thus, the authorizing resolution only allows depositions, pursuant to subpoena, after consultation with the Select Committee's ranking minority member. The authorizing resolution also incorporates both the House Rules and the separate regulations on use of deposition authority, which both require consultation with the ranking minority member before seeking depositions pursuant to subpoena.

H. Res. 8 (adopting rules for the 117th Congress) provides, in pertinent part, as follows:

**SEC. 3. SEPARATE ORDERS.**

\* \* \*

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, *upon consultation with the ranking minority member* of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

[Ex. A at 16] (H. Res. 8, 117th Cong. (2021) at § 3(b)) (emphasis added). The deposition regulations referenced in both H. Res. 503 and H. Res. 8 also require ranking minority member consultation. They read, in pertinent part, as follows:

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

\* \* \*

2. Consultation with the *ranking minority member* shall include three days' notice before any deposition is taken.

\* \* \*

7

3. . . . Observers or counsel for other persons, including counsel for government agencies, may not attend.

\* \* \*

5. . . . When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the *ranking minority member* per round.

6. Deposition questions shall be propounded in rounds . . . equal time to the majority and minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the *ranking minority member* shall ask questions second.

\* \* \*

10. The chair and *ranking minority member* shall consult regarding the release of transcripts . . ..

11. A witness shall not be required to testify unless the witness has been provided with a copy of Section 3(b) of H. Res. 8, 117th Congress, and these regulations.

[Ex. C] (Cong. Rec. H41 (Jan. 4, 2021)) (emphasis added).

As demonstrated in the mandatory rules quoted above, the applicable rules and regulations limit the use of subpoena and deposition authority in ways designed to protect witnesses, and the rights of the minority. Among other things, the rules require consultation with the ranking minority member before issuance of a subpoena for deposition testimony, participation by counsel designated by the ranking minority member in questioning a deponent, and consultation with the ranking minority member before release of a deposition transcript.

The safeguards mandating consultation with the ranking minority member are so important that if a witness is not provided with a copy of the rules, then they need not testify. Paragraph 11 of the Regulations For Use Of Deposition Authority clearly states that "a witness shall not be required to testify unless the witness has been provided with" a copy of Section 3(b) (describing deposition authority) and the regulations for use of deposition (which include the witness protections involving the ranking minority member). The Indictment on its face does not allege

that the Select Committee followed the mandatory rule and provided him with a copy of Rule 3(b). Nor could the Indictment so allege, because it is undisputed that Mr. Bannon was *not* provided with a copy of Section 3(b).

In serving the subpoena on Mr. Bannon via his counsel Mr. Costello, Select Committee Chief Counsel and Deputy Staff Director Kristin Amerling provided 10 pages of detailed and arcane instructions, including the subpoena. She did not, however, provide the specific document required by the House Rules before a witness was required to testify. *See* Ex. D (November 10, 2021, FBI Report of Interview of Kristin Amerling) ("A copy of Section 3(b) was not provided to COSTELLO with the subpoena."). That unequivocal statement was made on November 2, 2021, in the presence of all three prosecutors in this case – just 10 days before the Indictment in this case was filed. Because Mr. Bannon was not provided with a copy of Section 3(b), the House Rules authorizing depositions makes explicit that he "shall not be required to testify." Given that, and the failure of the Indictment to explain the lack of lawful authority for the subpoena under those circumstances, the Indictment must be dismissed.[9]

## 2. **The Select Committee Has No Ranking Minority Member**

The Indictment does not allege that the subpoena to Mr. Bannon was issued after consultation with the Select Committee's ranking minority member, as required by the committee's authorizing resolution. Nor could it. There is no ranking minority member on the Select Committee. Doug Letter, the General Counsel for the U.S. House of Representatives,

---

[9] The House Rules further state that "[c]ompliance with a subpoena issued by a committee or subcommittee under subparagraph (1)(B) may be enforced only as authorized or directed by the House." [Ex. E at 20] (Rules of the House of Representatives, 117th Cong. (Feb. 2, 2021) at Rule XI, cl. 2(m)(1)(3)(C)). Compliance with the subpoena issued to Mr. Bannon could only be enforced under the authority of the House after providing him with Rule 3(b), which was not done.

acknowledged this in an FBI interview, in the presence of all three prosecutors in this case, as follows:

> Paragraph one of 3(b) makes reference to ranking minority members, who are typically a part of House committees. In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority member in a House committee and typically possess [sic] procedural powers. LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.

*See* Ex. D at 4 (Nov. 2, 2021, FBI Interview of U.S. House of Representatives General Counsel Doug Letter). Accordingly, the subpoena issued to Mr. Bannon was invalid. It was not in accord with the subpoena and deposition authority granted by the House to the Select Committee.

The Speaker designated Rep. Bennie Thompson (D-MS) chair of the Select Committee. The chair designated Rep. Liz Cheney (R- WY) as vice chair.[10] H. Res. 502 does not reference a vice chair. The authorizing resolution does not grant any power to a vice chair. The resolution uses the term "ranking minority member" a term with a long history. A vice chair is not a ranking minority member – and cannot fulfill the authorized duties of a ranking minority member that are set forth in the resolution creating the Select Committee and the subpoena and deposition rules that apply to the Select Committee.[11]

---

[10] *See* January 6 Select Committee, *Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair* (Sept. 2, 2021), available at https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-Cheney-select-committee-vice-chair.

[11] The House Rules reveal that vice chairs and ranking minority members are different. For instance, Rule XI, which sets forth committee procedures, provides that committees can continue their work in the temporary absence of a committee chair as follows: "If the chair and vice chair of a committee or subcommittee are not present at any meeting of the committee or subcommittee, the ranking majority member who is present shall preside at that meeting." [Ex. E at 17-18] (Rules of the House of Representatives, 117th Cong. (Feb. 2, 2021) at Rule XI, cl. 2 (d)).

A committee's ranking minority member is designated by the minority party.[12] Ranking minority members have significant roles that protect the rights of deposition witnesses and the rights of the minority in the legislative process.[13] By long-standing practice, it is the role of each party to, in accordance with its own procedures, determine how committee chairs and ranking members are designated. This role cannot be usurped by the other party.

Republicans are in the minority in the 117th Congress. Accordingly, Republican Conference rules set forth the procedures for the recommendation of select committee members, and the designation of ranking minority members.[14] Under these rules, the Republican Leader recommends Republican members for select committees and designates the Ranking Republican Member of select committees. [Ex. F at Rule 13 & 14].

Thus, the Speaker's "unprecedented" decision to appoint 9 members to the Select Committee (in contravention of the mandatory language of the authorizing resolution), and to reject the Republican Leader's nominees, including his nominee as ranking minority member, had unforeseen consequences. The Select Committee has no ranking minority member. It follows that the grant of subpoena power from the House to the Select Committee – which was contingent upon

---

[12] *See generally* Press Release by Minority Leader Kevin McCarthy (R-CA) (Jul. 21, 2021)        4

[13] *See A Guide To The Rules, Precedents, and Procedures of the House* (2017) at 806 ("Under long-standing practice, special orders of business give control of general debate in the House or in the Committee of the Whole to the chair and ranking minority member of the reporting committee(s), and recognition is extended accordingly."), available at https://www.govinfo.gov/content/pkg/GPO-HPRACTICE-115/pdf/GPO-HPRACTICE-115.pdf.

[14] Understanding these rules requires some transposition. While Republicans are in the minority, reference in the rules to "Speaker" becomes "Republican Leader," "Chair" becomes "Ranking Republican Member," and the authority vested under the rules to the "Speaker" and "Chair" are vested in the "Republican Leader" or "Ranking Republican Member." *See* [Ex. F] (House Republican Conference Rule 2(d)).

consultation between the chair and the ranking minority member before issuance of a deposition subpoena – cannot be lawfully exercised.[15]

### C. The Subpoena Was A Misguided And Unconstitutional Effort To Make An Example Of Mr. Bannon.

H. Res. 503 describes three functions of the Select Committee, namely: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for correct measures described in the subsection (c) as it may deem necessary." The subpoena issued to Mr. Bannon, however, did not advance any of those authorized functions. Instead, the subpoena was an unconstitutional attempt to usurp the executive branch's authority to enforce the law, and an effort to impede Mr. Bannon's first amendment rights to association and free speech. As made clear in the Indictment, the Select Committee targeted Mr. Bannon because on January 5, 2021, he was present at the Willard Hotel with others, and because he made statements on his podcast about what might occur on January 6, 2021. [Doc. 1 at ¶ 7]. Select Committee members have articulated that Mr. Bannon was targeted to send a message to other potential deponents. The Select Committee is not authorized to issue a subpoena for that purpose.

Congress' subpoena power is ancillary to its legislative authority. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031(2020). Accordingly, a congressional committee may only issue

---

[15] The procedural safeguard involving consultation with the ranking minority member before seeking a deposition is the rule, not an exception made just for the Select Committee.  *See* [Ex. A] (H. Res. 8 §3(b) 117th Cong. (2021)) ("During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.").

a subpoena that serves a valid legislative purpose. Even if Congress uses a subpoena to seek information relevant to contemplated legislation, the subpoena may still be invalid if the contemplated legislation would be unconstitutional – such as an impermissible infringement on the authority of the executive branch.  *See McGrain v. Daugherty*, 273 U.S. 135, 171 (1927); *Kilbourn v. Thompson*, 103 U.S. 168, 195 (1880); *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).

Courts considering whether a subpoena serves a valid legislative purpose consider whether a particular subpoena serves a valid purpose, not whether the committee has a valid legislative purpose. *See Mazars*, 140 S. Ct. at 2031. A committee subpoena issued in order to create a record of alleged violations of law, or to harass witnesses or send a message, is not valid. A congressional subpoena issued to investigate and punish perceived criminal wrongdoing unconstitutionally intrudes on the powers of the Executive Branch. Similarly, a desire to "expose for the sake of exposure" in not a valid purpose of a congressional subpoena. *See Watkins v. United States*, 354 U.S. 178, 200 (1957).The Indictment fails to allege how the subpoena issued to Mr. Bannon could validly inform legislation.[16] Rather, the statements of Select Committee members reveal that the subpoena issued to Mr. Bannon had an invalid purpose.[17] Because the subpoena was not issued in furtherance of a valid legislative purpose, the Indictment must be dismissed.

---

[16] While the D.C. Circuit has noted that "the January 6th Committee plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'" *Trump v. Thompson,* 20 F.4th 10, 41 (D.C. Cir. 2021) (quoting *Trump v. Mazars USA*, *LLP*, 140 S. Ct. 2019, 2031-32 (2020)), *injunction denied*, 142 S. Ct. 680 (Jan. 19, 2022), *cert. denied*, No. 21-932 (Feb. 22, 2022), we raise a different argument – that the subpoena *issued to Mr. Bannon* served no valid legislative purpose.

[17] Rep. Elain Luria – "[I]f we determine that criminal actions were taken … that will be forwarded from the committee and the appropriate manner [sic] to the Department of Justice ….  [T]hat's exactly why we're conducting the investigation to find out all the facts, … and … hold people accountable who are responsible." Rep. Jamie Raskin – Select Committee seeks to "expose each and every level of it … the closer you get to Donald Trump … a religious and political cult of personality … outside of our Constitutional order.", CNN POLITICS, Expose Each and Every Level: Lawmaker Makes Promise for Jan. 6 Hearings, (Jan. 16, 2022),  https://www.cnn.com/videos/politics/2022/01/16/rep-jamie-raskin-january-6th-

**D. Count II Must Be Dismissed Because The Select Committee Has No Authority To Compel Production Of A Privilege Log Or Certification.**

Count II must be dismissed because there is no House Rule that authorizes a committee to require a deponent to create a privilege log of documents withheld on the basis of privilege, or a "written certification that a diligent search has been completed." [Doc. 1 at ¶ 12]. Even if such a rule existed, its application to a former presidential advisor asserting executive privilege on behalf of the President he served would raise serious separation of powers issues.

The Select Committee's purported commands to Mr. Bannon were more onerous and posed a higher risk of disclosure of privileged material than the obligations imposed on civil litigants under Fed. R. Civ. P. 26(b)(5)(A)(ii), which requires that a party asserting privilege to "describe the nature of documents, communications, or tangible things not produced or disclose – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." By contrast, the Committee's instructions demanded specific details about the withheld materials that may in themselves be privileged. For example, requiring the privilege log to specify the name of the "author, addressee, and any other recipient(s)" as the "relationship of the author and addressee to each other" reveals significant information regarding confidential matters being contemplated by the President. Allowing the Select Committee to

---

hearings-dotb-acostanr-vpx.cnn). Rep. Bennie Thompson – "Witnesses who assert 5th Amendment rights before Select Committee should be considered "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty"*, REALCLEAR POLITICS(Dec. 2, 2021), https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html. Rep. Bennie Thompson – "[W]e'll let the evidence based on what we look at determine guilt or innocence." Rep. Bernie Thompson (D-MS), Kyle Cheney & Josh Gerstein, *Trump Cannot Shield White House Records from Jan. 6 Committee, Judge Rules*, available at https://www.politico.com/news/2021/11/09/trump-executive-privilege-court-ruling-kings-520512.

undermine the assertion of executive privilege in this manner would effectively eliminate all checks on Congress's ability to interfere with the prerogatives of the Executive Branch.

Controlling Supreme Court precedent directs that "[s]pecial considerations control when the Executive's interests in maintaining its autonomy and safeguarding its communications' confidentiality are implicated." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 370 (2004). Thus, presidential communications are presumptively privileged, and this presumption can be overcome "only by an appropriate showing of public need by the party seeking access to the conversations." *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (applying the standard from *Nixon v. Sirica*, 487 F.2d 700 (1973)). As explained by the Court of Appeals in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, the showing required to overcome the presumption favoring confidentiality turns "solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions." *Id.* at 731. The purpose of this required showing is to ensure that Congress cannot intrude upon the prerogatives and autonomy of the Executive unless doing so is "critical to performance of its legislative functions." *Id.* at 732. The Select Committee cannot circumvent this invaluable constitutional safeguard by demanding that Mr. Bannon produce an exhaustive privilege log detailing materials withheld pursuant to President Trump's invocation of executive privilege. *See generally*, *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983) ("the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983)).

III.     **This Prosecution Violates Due Process**

The prosecution in this case under 2 U.S.C. § 192 violates Mr. Bannon's right to due process of law, guaranteed under the Fifth Amendment to the United States Constitution.  As Mr. Bannon already has made clear in previous submissions in this case [*e.g.*, Doc. 30 at 16-21; Doc. 41; Doc. 44], his response to the subpoena on which this prosecution is based was at all times a function of the former President's invocation of executive privilege and was based on, pursuant to, and in reasonable, good-faith reliance upon the official published policy of the United States Department of Justice, through binding, authoritative legal opinions of that Department's Office of Legal Counsel ("OLC") and was fully consistent with the same.  The Department of Justice, of course, is the same agency that is prosecuting this case.  The OLC opinions were brought to Mr. Bannon's attention by his attorney, Robert J. Costello, Esquire, who advised Mr. Bannon that the OLC opinions were binding authority on the Department of Justice and that they were controlling authority in the circumstances he faced.  Mr. Costello provided Mr. Bannon with legal advice, based on the OLC opinions and Mr. Bannon acted at all relevant times in the manner Mr. Costello directed him, based on the OLC opinions and Mr. Bannon at all relevant times reasonably relied on the OLC opinions.

The OLC opinions provided Mr. Bannon with the actual, implied, and apparent public authority to proceed as he did with respect to the subpoena on which this prosecution is based, and his reasonable, good-faith reliance on the invocation of executive privilege and the OLC opinions at all times with respect to his actions vis a vis the subpoena further gives rise to the complete, due process-based defense of entrapment by estoppel, prohibiting the Department of Justice from prosecuting Mr. Bannon in this case.  All previous submissions by Mr. Bannon are incorporated

herein.  Mr. Bannon assumes the Court's familiarity with the relevant facts for these purposes.
[*See also e.g.*, Docs. 30, 30-1, 39].

### A.  <u>Mr. Bannon Relied On Official, Binding, Authoritative DOJ Policy</u>.

At all relevant times, Mr. Bannon proceeded with respect to the subpoena at issue in reliance upon and in conformity with former President Trump's invocation of executive privilege and the official, legally binding, authoritative policy of the Department of Justice, as reflected in its Office of Legal Counsel ("OLC") Opinions and related materials.

First**,** when former President Trump, through his attorney, Mr. Clark, advised Mr. Bannon, through Mr. Costello, that he was invoking executive privilege with respect to the subject matter of the subpoena, Mr. Bannon was duty bound under the OLC opinions (and relevant case law) to presume that the former President was within his authority to invoke executive privilege[18] and to presume that the matters so designated by former President Trump were, indeed, privileged.[19]

Second**,** Mr. Bannon was entitled to rely on binding DOJ policy, as reflected in the OLC opinions, for his conclusion that executive privilege can be and was properly invoked with respect to former employees, no longer working in the Executive Branch, and even to people from outside the Executive Branch whose privileged counsel the President might seek.[20]  The governing legal

---

[18] Mr. Bannon certainly was entitled to rely on the principle that a former President retains the right to invoke executive privilege as to communications that occurred during the time he was President.  *Nixon v. Adm'r of General Services*, 433 U.S. 425, 448-449 (1977); *Trump v. Thompson*, 142 S. Ct. 680; 211 L. Ed. 2d 579; 2022 U.S. LEXIS 589; 2022 WL 167347 (January 19, 2022), *denial of certiorari*; and *Id.*, 142 S. Ct. at 680-681 (Kavanaugh, J., concurring).

[19] [Ex. G] *Congressional Oversight of The White House*, 45 Op. O.L.C. slip op., at *34 (Jan. 8, 2021), *available at* https://www.justice.gov/olc/opinions-main.  *See also*, *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *United States v. Nixon*, 418 U.S. 683, 708-709 (1974).

[20] Consider the following official DOJ policy statement:
". . . communications between White House officials and individual outside the Executive Branch, including with individuals in the Legislative Branch . . . fall within the scope of executive privilege . . .

principles apply even after a Presidential advisor leaves the White House.[21]

Third, Mr. Bannon relied further on binding, authoritative DOJ OLC opinions that expressly provided that the Select Committee subpoena was invalid because the committee would not allow former President Trump's lawyer to appear to assert and protect executive privilege. As Mr. Costello explained to Mr. Bannon when he went over the OLC opinions with Mr. Bannon, OLC opinions hold that under these unique circumstances, non-compliance with a congressional subpoena is lawful.[22] [Doc. 30-1 at §§ 14, 22].  Mr. Bannon relied on this OLC opinion in reasonably believing that the subpoena was not valid and that compliance was not, therefore, either appropriate or required as a matter of fact and law.

Fourth, Mr. Bannon also relied on long-standing, definitive OLC opinions that not only advised him not to comply once executive privilege was invoked and that the matter was out of

_____

Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch."

*Letter from Paul D. Clement, Solic. Gen./Acting Att'y Gen., to President George W. Bush* (June 27, 2007), https://www.hsdl.org/?view&did=741974; *See also, Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys* at 5 (June 27, 2007) [Ex. H] (recognizing right to invoke Executive Privilege over communications with former employees and outside consultants never formally employed by the Executive Branch. Available at: https://www.justice.gov/file/451161/download#:~:text=Executive%20privilege%20may%20properly%20be%20asserted%20over%20the,that%20have%20been%20subpoenaed%20by%20congressional%20commit-%20tees.

[21] *See* [Ex. I] *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 43 Op. O.L.C. __, at *2 (July 10, 2007) ("*Immunity of Former Counsel*"), *available at* https://www.justice.gov/olc/opinions-main; *See* [Ex. G] *also Congressional Oversight of the White House* , 45 Op. O.L.C. __, at *15-16 (Jan. 8, 2021) , *available at* https://www.justice.gov/olc/opinions-main (explaining that "the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure").

[22] *See* [Ex. G] *Congressional Oversight of The White House*, *supra*, at *56 ("subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients"); *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23, 2019) ("Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.").

his hands, but he relied as well on express, definitive DOJ OLC opinions and the long-standing policy of the Department of Justice, that, under any circumstances (and certainly the circumstances present here) non-compliance with the subpoena would be lawful and could not subject him to criminal prosecution.[23] [Doc. 41-7 at 22]

Indeed, the Department of Justice has "long maintained . . . that the contempt statute does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch." [Ex. G] *Congressional Oversight of The White House,* at 50. As recently as 2021, an official binding OLC opinion declared as follows:

> The White House has declined to make many of the President's immediate advisers available since the establishment of the EOP, and for almost 50 years, the Department of Justice has articulated this position as a legal immunity – that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties." *Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *3 (internal quotation marks omitted).

> As Assistant Attorney General Rehnquist explained:
> The President and his immediate advisers – that is, those who customarily meet with the President on a regular or frequent basis – should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb.

---

[23] *See* [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 129 (1984) ("We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it.); [Ex. G] *Congressional Oversight of the White House*, 2021 WL 222744 (O.L.C.) at *33. *See also* [Ex. P] Letter from Ronald C. Machen Jr., United States Attorney, to Speaker of the House John A. Bohner, (March 31, 2015) at 6 ("It has long been the position of the Department, across administrations of both political parties, that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege.").

5, 1971); *see also* [Ex. I] *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 43 Op. O.L.C. slip op. at *7-11 (July 10, 2007) ("*Immunity of Former Counsel*"), *available at* https://www.justice.gov/olc/opinions-main (listing historical examples of immediate presidential advisors refusing to testify); *Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel*, at 6 (Sept. 25, 1974) ("at least since the Truman Administration," presidential advisors "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission").[24]

---

[24] Even if the conclusion of the OLC opinions as to the absolute immunity of an executive branch employee has been undermined in this Circuit by, for example, the decision in *Comm. On the Judiciary of the United States House of Representatives v. McGahn*, 968 F.3d 755 (2020) (*en banc*), Mr. Bannon maintains his right to immunity in reliance on the OLC Opinions, in addition to the other arguments advanced here.  The 2021 OLC opinion post-dates *McGahn*.  Mr. Bannon's reliance need not be correct, nor need the OLC opinion be a correct statement of the law for entrapment by estoppel or apparent authority purposes.  *United States v. Barker*, 546 F.2d 940, 952 (D.C. Cir. 1976).  The decision in *McGahn* is significant for at least two other reasons.  First, it clearly reflects the central role OLC opinions play within the Department of Justice and for Executive Branch employees or former employees who rely on them. Indeed, the Court in *McGahn* expressly cited the OLC opinions on which Mr. Bannon relied for his reasonable and correct conclusion that it is long-standing DOJ policy that no criminal charges under 2 U.S.C. §192 will lie when an executive branch or former executive branch member fails to comply with a congressional subpoena and Executive Privilege is invoked.  *McGahn,* 968 F.3d at 773 ("Yet the OLC has repeatedly opined that the criminal contempt statute does not and could not apply to a close Presidential advisor."). *See, e.g.,* [Ex. N] *Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 OLC LEXIS 2, 2019 WL 2315338, at *14 (O.L.C. May 20, 2019); [Ex. K] *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68-69 (2008) Cooper Opinion, 10 Op. O.L.C. at 83; Olson Opinion, 8 Op. O.L.C. at 142").

Secondly, the *McGahn* Court makes clear that it is the role of the judiciary – not Congress itself - to act as the arbiter, in the context of a civil matter, over a dispute between Congress and the Executive Branch in just such a matter as this, when there is a tension between Congress's subpoena power and the interests underlying executive privilege.  *See McGahn*, 968 F.3d at 766 ("Further, the OLC, in opinions never withdrawn, has stated that a House of Congress can file a civil action to seek enforcement of its subpoenas."). *See* [Ex. O] *Response to Congressional Requests for Information Regarding Decisions Made under the Independent Counsel Act,* 10 Op. O.L.C. 68, 83 (1986) ("Cooper Opinion"); [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 137 (1984) ("Olson Opinion")").  Indeed, the McGahn Court expressly noted that the DOJ has opined at least twice in OLC opinions that a civil enforcement action, not a criminal contempt indictment, is the "only practicable" way to proceed when non-compliance with a congressional subpoena by a current or former Executive Branch employee is at issue.  *McGahn*, 968 F.3d at 776.

The DOJ's definitive position that the criminal contempt statute does not apply where Executive Privilege has been invoked goes back well over six decades.  Mr. Bannon relied on that in his response to the subpoena and he was entitled to rely on that official policy.  The DOJ must be estopped from prosecuting this case, in light of its official, published policy on this exact issue.

As the OLC opinion, [Ex. K] *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 2008 WL 11489049 (O.L.C. at *2) expressly reports, in 1956, Deputy Attorney General William Rogers presented a report to Congress that concluded that the criminal contempt of Congress statute was "inapplicable to the executive departments" where the President has asserted executive privilege.  [See Doc. 41-6].

In 1976, Assistant Attorney General Rex Lee stated that if an executive branch member were cited for contempt of Congress because of the assertion of executive privilege, the DOJ would not present the matter to a grand jury (notwithstanding the mandatory language in Sec. 194).[25] In Assistant Attorney General Theodore Olson's comprehensive 1984 OLC Opinion,[26] drawing on canons of statutory construction, legislative history, and basic constitutional principles, (including constitutional separation of powers principles), the DOJ concluded that Section 192 was not intended to apply and could not constitutionally be applied to an executive branch official who asserts the President's claim of executive privilege. During the administration of President William J. Clinton, Assistant Attorney General Walter Dellinger stated that "the criminal contempt of Congress statute *does not apply* to the President or presidential subordinates who assert executive privilege."  [Ex. L] *Application of 28 U.S.C. Sec. 458*, 19 Op. O.L.C. at 356 (emphasis added).

---

[25] *Representation of Congress and Congressional Interests in Court: Hearings Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong. 8 (1976).

[26] [Ex. J] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("Prosecution for Contempt of Congress")

Professor Dellinger wrote further that to apply "the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Id*.[27] These are the binding DOJ policies on which Mr. Bannon reasonably relied.

### B. OLC Opinions Are Binding, Authoritative Statements Reflecting The Official Policy Of The Department Of Justice.

Under Article II of the Constitution, the President must "take Care that the Laws be faithfully executed." *U.S. Const. art. II, §* 3. The President exercises the power of legal interpretation to carry out this textually specified duty. "In doing so, he must first construe the law in order to enforce it."[28] It is, of course, the Attorney General who aids the President in fulfilling this function. (*See* Note 11, *infra*.).

Under the Judiciary Act of 1789, Congress created the office of Attorney General which was charged with the obligation to "give … advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments." *Judiciary Act of 1789,* Ch. 20 § 35:  *see,* 28 U.S.C. §§ 511-513.

Until the mid-20th Century, the opinions under the Judiciary Act were prepared primarily by the Solicitor General or Assistant Solicitor General.[29] Starting in 1950, the OLC took on the task of writing opinions under the Judiciary Act.[30] The OLC was assigned the role of "preparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the

---

[27] *See also*, [Ex. Q] *Letter from Michael B. Mukasey, Attorney General, to the Hon. Nancy Pelosi, Speaker of the House of Representatives* (Feb. 28, 2008); *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68 (1986) (by Assistant Attorney General Charles Cooper).

[28] *See* [Ex. DD] Note, *The Immunity-Conferring Power of the Office of Legal Counsel*, 121 Harv. L. Rev. 2086, 2087 (June 2008).

[29] *See*, [Ex. CC] Griffin B. Bell, *The Attorney General:  The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many*?  46 Fordham L. Rev. 1049, 1064 (1978).
[30] *Id.*

various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal advisor to the President." 28 C.F.R. § 0.25(a) (2007). Today the OLC opinions form "the largest body of official interpretation of the Constitution and Statutes outside the volumes of the Federal Court Reporters."[31] As Judge Randolph D. Moss has written, OLC Opinions "define … the meaning of the law for an entire branch of government and that branch of government has an obligation to get the law right." [Ex. M] Randolph D. Moss, *Executive Branch Legal Interpretation:  A Perspective from the Office of Legal Counsel*, 52 Admin.  L. Rev 1303, 1321, (2000). OLC advice has been treated "as conclusive and binding since [the Nineteenth Century]." *Id.* at 1320.

As the Court wrote in *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 483 (D.C. Cir. 2019) (CREW II), *quoting from*, *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,* 846 F.3d 1235, 1238 (D.C. Cir. 2017) (CREW I), [T]he authority of the Office of Legal Counsel (OLC) is "nearly as old as the Republic itself." "Since the Judiciary Act of 1789, the United States Attorney General has had the authority "to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching on matters that may concern their departments." *Id*. *quoting from,* Judiciary Act of 1789, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511-513). Since then, the Attorney General has "delegated much of his authority to the OLC." *CREW II*, at 483. "Over the years, the OLC has opined on 'some of the weightiest matters in our public life ….'" *CREW II*, at 483, *quoting from CREW I*, 846 F.3d at 1238. OLC opinions "reflect the legal position of the executive branch" and "provide binding interpretive

---

[31] *See*, [Ex. BB] John O. McGinnis, *Models of the Opinion Function of the Attorney General:  A Normative, Descriptive, and Historical Prolegomenon*, 15 Cardozo L. Rev 375, 376 (1993).

guidance for executive agencies." *Casa de Maryland v. United States Dep't of Homeland Sec.*, 924 F.3d 684, 718 n.1 (4th Cir. 2019).

The OLC "considers its written formal opinions to be 'one particularly important form of controlling legal advice.'" *CREW II*, 922 F.3d at 484, *quoting from* [Ex. U] Memorandum from David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office of Legal Counsel, [Ex. U] *Best Practices of OLC Legal Advice and Written Opinions 1-2* (July 16, 2010) at 1. The OLC's informal legal advice, often taking the form of letters or memoranda, along with the formal written opinions have been described by a former head of the OLC, Karl Thompson, as "authoritative" and "binding by custom and practice in the executive branch." Indeed, specifically referring to both the formal written OLC opinions and the informal OLC advice, given orally or in emails, OLC Head Thompson said, both are "authoritative," and "binding" in the executive branch. He said that both reflect the "official view of the office" and that [P]eople are supposed to and do follow it." *See CREW II*, 922 F.3d at 484, *citing*, Josh Gerstein, *Official: FOIA Worries Dampen Requests for Formal Legal Opinions*, at 2, POLITICO, Under the Radar, November 5, 2015).[32] The OLC opinions at issue in this case, reflect the OLC's legally binding, authoritative position on matters directly related to its own agency, the Department of Justice, and they reflect consistent policy directives extending back over six decades, having long ago been adopted by the DOJ. They are, in short, the DOJ's "working law," with the full "force and effect of law." *See e.g., NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 153 (1975), *quoting* H.R. Rep. No. 1497.

One leading legal commentator has written, "[F]or decades, the Office of Legal Counsel (OLC) has been the most significant centralized source of legal advice within the Executive

---

[32]    https://www.politico.com/blogs/under-the-radar/2015/11/official-foia-worries-dampen-requests-for-formal-legal-opinions-215567

Branch." [Ex. S] Trevor W. Morrison, *Stare Decisis in the Office of Legal* Counsel, 110 Colum. L. Rev. 1448, 1451 (2010).  *See CREW* I, 846 F.3d at 1238.

The OLC itself has gone to great lengths to ensure the reliability and correctness of its process and the substance of its opinions. Professor Morrison, an OLC veteran, cites three significant memoranda that reflect the emphasis on the integrity, mission, and goals of the OLC opinion-generating process.  *Id.* at 1452-1455.

These are (1) "Principles to Guide the Office of Legal Counsel" ("OLC Guidelines), a 2004 memorandum written principally by Professor Walter Dellinger and eighteen other members of the OLC (including Judge Moss of this Court) who served during the Clinton Administration, and some of whom worked in other administrations as well. These Guidelines provide, *inter alia*, that "OLC's legal determinations are considered binding on the executive branch, subject to the supervision of the Attorney General and the ultimate authority of the President" and they issue the directive that "OLC should provide an accurate and honest appraisal of applicable law, even if the advice will constrain the administration's pursuit of desired policies." *See* [Ex. T] Walter Dellinger, *et al.*, Principles to Guide the Office of Legal Counsel (2004); (2) An official OLC memorandum from May 2005 entitled "Best Practices for OLC Opinions" written by Principal Deputy Assistant Attorney General Steven G. Bradbury on May 16, 2005 ("OLC Best Practices Memorandum"). This memorandum provides, *inter alia*, that "Subject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch." *Id*. at 1.  It further provides that "OLC's interest is simply to provide the correct answer on the law …." *Id.* at 3.  Mr. Bradbury describes a detailed, careful process to make sure the OLC gets the law right, and especially on separation of powers issues, among all questions; *Id.*[33] and

---

[33] Mr. Bradbury is the author of one of the OLC Opinions on which Mr. Bannon relied.  *See Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress* (February 29, 2008).

(3) the July 16, 2010 David J. Barron Memorandum, referred to above, that updates the Bradbury "Best Practices Memorandum.[34]" This Memorandum reiterates that "OLC's core function … is to provide controlling advice to Executive Branch officials on questions of law…." Then Acting Assistant Attorney General Barron emphasizes the importance of the OLC's work and the central goal of getting the law right in every OLC Opinion, in a manner that is faithful to the substance and values reflected in the Constitution. *Id.* *See also,* [Ex. M] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective From the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1318-20 (noting that for over two hundred years "agencies have in practice treated (OLC) opinions as binding."). Professor Morrison persuasively argues that it is precisely because OLC Opinions always have been treated as binding within the executive branch that the principle of *stare decisis* should be applied and he emphasizes that "especially on issues of the constitutional separation of powers," the OLC Opinions play a particularly important role. 110 Colum. L. Rev. 1448 at 1493, 1496.

The legal authority that Mr. Bannon relied upon in this case reflects the formal, official, binding, authoritative position of the Department of Justice, the very agency that is prosecuting this case in direct contravention of its own formal, binding, published official policy. The policies relied upon reflect the legally binding, official, authoritative position adopted by the Department of Justice extending back over six decades and across every administration since at least 1956. It

---

Mr. Bradbury's OLC Opinion provides in no uncertain terms, drawing on OLC official policy papers going back at least to 1956, and across all administrations, the OLC's official, binding, authoritative conclusion, as a matter of binding policy, that former or current White House advisors who decline to provide documents or testimony, or who decline to appear to testify, in response to a subpoena from a congressional committee, based on the President's assertion of executive privilege, absolutely **cannot** be criminally prosecuted by the Department of Justice under the statute charged here, 2 U.S.C. § 192. https://www.justice.gov/opinion/file/832851/download

[34] https://www.justice.gov/sites/default/files/olc/legacy/2010/08/26/olc-legal-advice-opinions.pdf

was objectively reasonable and absolutely appropriate as a matter of fact and law for Mr. Bannon to rely on the OLC opinions.

### D. This Prosecution Is Barred By The Doctrines Of Entrapment By Estoppel, Actual Public Authority, And Apparent Public Authority.

This case emphatically presents the hallmark case in which the prosecuting authority must be prohibited from prosecuting the Defendant because its own formal, official, binding, published policy statements (OLC Opinions) licensed/directed the Defendant's conduct for which he is being prosecuted and assured the Defendant that if he were to engage in the conduct at issue – non-compliance with the subpoena based on the invocation of Executive Privilege – he absolutely could not lawfully be criminally prosecuted and would not be prosecuted.

This prosecution must be dismissed under the indisputably extraordinary circumstances of this case.  There can be no legitimate material dispute that (1) Mr. Bannon is a former close Executive Branch advisor of former U.S. President Trump, that (2) former President Trump invoked Executive Privilege with respect to the subpoena at issue in this case, that (3) Mr. Bannon, through counsel, advised the Committee that his non-compliance was based on the invocation of Executive Privilege and the relevant OLC opinions, that (4) counsel for Mr. Bannon asked the Committee whether the privilege holder's representative would be permitted to attend Mr. Bannon's deposition to which the subpoena was directed and was told that no privilege holder representative could attend, that it was not permitted under the Committee's rules and that (5) Mr. Bannon relied on OLC Opinions that provided, *inter alia*, that (A) the invocation by the former of current President is presumptively valid; that (B) Executive privilege validly can be invoked by a former President and can validly be invoked with respect to communications with a former Executive Branch employee/close advisor or any outside party consulted by the President (or former); and that (C) a person who refuses to comply with a congressional subpoena based on the

invocation of Executive Privilege cannot be criminally prosecuted – and specifically not under 2 U.S.C. § 192 and that (D) the refusal to let a privilege holder representative attend the deposition rendered the subpoena unlawful and invalid.

Under the circumstances presented here, it would be fundamentally unfair and a clear due process violation to permit this prosecution to go forward.  It must be dismissed. *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992) (granting pre-trial motion to dismiss). Here, as in *Levin*, there can be no factual dispute about what the written, binding, authoritative OLC Opinions provided on the matters directly at issue, nor can there be any factual dispute about Mr. Bannon's reliance on them. Dismissal, therefore, is the appropriate remedy. This is even more emphatically the case here, where Mr. Bannon also received a direct order from the former President requiring that he fully honor the invocation of executive privilege and where the authority relied upon is actually from the very agency now prosecuting the case. This prosecution is in direct contravention of its own binding, published, authoritative positions.

A due process-based prohibition on prosecuting a case under the operative facts presented in this case has long been established by the United States Supreme Court and this Circuit has led the way in acknowledging these principles. *See United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976).

**Preliminary Note:**

As a preliminary note, Government counsel appear to recognize the defenses discussed here, as of course they must,[35]  but their apparently evolving view, as they have presented it to the

---

[35] The U.S. Attorneys' Criminal Resource Manual has recognized these defenses that a defendant might assert if he or she is charged with committing a crime that arguably is committed in reliance upon the position taken by a government agency.  *See* [Ex. EE] U.S. Attorneys' Manual, Title 9:  Criminal Resource Manual § 2055 (archives).   https://www.justice.gov/archives/jm/criminal-resource-manual-2055-public-authority-defense.

Court most recently, reflects a fundamental misunderstanding on at least three issues. First, the Government has represented to the Court that the defenses of public authority and entrapment by estoppel require and turn on some direct interaction, a sort of question-and-answer session between a specific government agent and the defendant [Doc. 46 at 2-3]. The Government is absolutely wrong. *See United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 673-675 (1973) ("PICCO") (reliance on agency's administrative regulations); *United States v. Barker*, 546 F.2d 940, 951-952 (D.C. Cir. 1976) (reliance on a "legal theory espoused by this and all past Attorneys General for forty years").[36]

Secondly, Government counsel have represented to the Court that these defenses are "not legal defenses the Court decides on a motion to dismiss." [Doc. 46 at 2]. Again, the Government is wrong. Government counsel simply fail to acknowledge the decision in *United States v. Levin*, 973 F.2d 463, 468-470 (6th Cir. 1992), in which the Sixth Circuit expressly approved the district court's decision to grant a motion to dismiss at the pre-trial stage, based on the fundamental unfairness of prosecuting a defendant for conduct that the relevant agency's policy, reflected in opinion letters to others, indicated would be legal conduct. *See also Id*. at 465 (expressly noting that the defendants "initiated no inquiry of their own concerning the legality of (their conduct)").

---

[36] The Government repeatedly cites the landmark Second Circuit decision in *United States v. Abcassis*, 45 F.3d 39 (2d Cir 1995) in support of its thesis that direct inquiry and representations between the defendant and a government agent are required to support the defenses of public authority and entrapment by estoppel. [E.g., Doc. 43 at 8; Doc. 46 at 2]. *Abcassis* did, indeed, involve direct contact between the defendants, former government informants, and a government agent who they believed gave them license to pursue an illegal heroin importation deal and their convictions and sentences of 30, 12, and 5 years in prison were reversed, based on the district court's agreement to give an actual authority jury instruction, but refusal to give an entrapment by estoppel instruction. However, the fact that that was the scenario in that case or any other, or even if that is the paradigm scenario for public authority and entrapment by estoppel defenses, neither *Abcassis* nor any other decision stands for the proposition that this is the only kind of scenario that supports these defenses. Indeed, in *Abcassis*, 45 F.3d at 43, the Court expressly referred to the Sixth Circuit's decision in *United States v. Levin*, 973 F.2d 463 (6th Cir. 1992) in support of its conclusion, and the defendant in *Levin*, of course, made no inquiry and received no personal assurances; rather he relied on official written agency policy statements. *See Levin*, 973 F.2d at 465.

Also, in several other cases, once the Court found that the government's position was as the defendant understood it, the Court held that a prosecution under those circumstances would be totally unfair and could not be pursued, and the courts reversed the convictions. They did not remand for the defense to be put before a judge or jury at a new trial. *Cox v. Louisiana*, 379 U.S. 559, 575 (1965); *United States v. Tallmadge*, 829 F.2d 767, 775 (9th Cir. 1987). The defense clearly is not just a trial defense and the instant case presents the strongest case possible for pre-trial dismissal on this issue.

Third, Government counsel has asserted to the Court that OLC and other DOJ "records" that support Mr. Bannon's defense, which he "did not already know about" "could not be relevant to (the public authority and entrapment by estoppel defenses) and thus have no bearing on his ability to make motions related to them." [Doc. 46 at 3]. Once again, the Government is absolutely wrong. The formulation of the elements of an entrapment by estoppel defense in this Circuit and elsewhere includes a requirement that the reliance by the Defendant was "reasonable." *See, e.g.*, *United States v. Barker*, 546 F.2d at 951-952 (reasonable to rely on forty years of the Attorney General's position); *United States v. Levin,* 973 F.2d at 468 (defendant's reliance must be reasonable); *United States v. Tallmadge*, 829 F.2d 767, 773-775 (same; reversing conviction for defendant, based on entrapment by estoppel, finding it reasonable for defendant to rely on representations by licensed firearms dealer and defendant's attorney).[37]

---

[37] *See also,* The Model Penal Code, which provides in pertinent part as follows:

> "A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when … [the defendant] acts in *reasonable reliance* upon an official statement of the law … contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) *an official interpretation of the public officer of body charged by law with responsibility for the interpretation or enforcement of the law defining the offense."*

The history of the DOJ's OLC opinions writings and position on the subjects at hand is directly relevant to the question of "reasonableness." It is more "reasonable" for the Defendant to have relied on the OLC Opinions he saw and to have believed them to be legally binding, adopted, authoritative positions of the DOJ and the Executive Branch charged with enforcing the statute if the positions taken reflect the same positions taken and adopted over the course of six decades. Those historic "records" he might not have seen are directly relevant.  Similarly, say for example, the Defendant read an OLC Opinion that stated that employees of the Executive Branch cannot be prosecuted criminally under 2 U.S.C. § 192 for failing to comply with a subpoena when executive privilege is invoked, and the Defendant believed from the rationale of the OLC Opinion that it included former employees or even outside consultants who have communications with the President. OLC Opinions the Defendant might not have seen that expressly provide that former employees and outside consultants are covered as well are directly relevant to the "reasonableness" of his belief (and reliance on) regarding the ambit of the OLC Opinion he did see. Similarly, of course, as the Court in *Tallmadge* expressly found, the advice by Mr. Bannon's experienced attorney, Mr. Costello, is independently relevant to support the "reasonableness" of Mr. Bannon's belief in what the OLC Opinions provided and the "reasonableness" of his reliance on them. *Tallmadge*, 829 F.2d at 775. The historic "records" of the DOJ on the matters relevant to the issues before the Court are also independently relevant to demonstrate the adoption by the DOJ of the positions reflected in the OLC Opinions and other writings and as further evidence of actual and apparent authority.  Each of the OLC Opinions also should be deemed party admissions.

1. **Entrapment by Estoppel**

---

Model Penal Code § 2.04(3)(b) (1962) (emphasis added).

The doctrine of entrapment by estoppel was first recognized and explained in two decisions from the United States Supreme Court handed down many years ago: *Raley v. State of Ohio*, 360 U.S. 423 (1959) and *Cox v. Louisiana*, 379 U.S. 559 (1965).

In *Raley,* 360 U.S. 423, 438 (1959), the Court held that the government may not convict "a citizen for exercising a privilege which the State clearly had told him was available to him." *Id*. The case involved an accused charged with failing to answer questions put to him by the Un-American Activities Commission of the State of Ohio. *Id*. at 424. The accused had invoked the privilege against self-incrimination on advice that the privilege applied. *Id*. at 425. The accused was indicted for refusing to answer the questions, even though certain Commission members stated that it was acceptable to invoke privilege rather than answer the questions posed. *Id*. The Supreme Court reversed, holding that due process does not permit the criminal conviction of a person who acts in reliance on authoritative pronouncements by relevant government officials or a government agency. *Id*. at 438-39.

In *Cox v. Louisiana*, the Supreme Court reiterated the principles enunciated in *Raley*, making clear that due process of law does not permit a criminal prosecution for conduct a State official or agency indicated was lawful. 379 U.S. 559, 571 (1965).  In *Cox*, a group of people engaged in a demonstration across from a courthouse to protest what they believed to be the illegal arrest of 23 students. *Id.* at 564-65. Reverend B. Elton Cox, a civil rights leader, was convicted under a Louisiana statute that made it a crime to picket or demonstrate near a courthouse for the purpose of influencing a judge, juror, witness, or court officer. *Id.* at 559. The evidence was undisputed that, notwithstanding the term "near" in the statute, the State had made clear that demonstrating across the street from the courthouse was a permissible distance. *Id.* The *Cox* Court, relying on *Raley*, held that a conviction under those circumstances could not stand, even though

the Sheriff, at some point, ordered the demonstrators to disperse and leave. The Court in *Cox* opined:

> In *Raley v. Ohio*, 360 U.S. 423, this Court held that the Due Process Clause prevented conviction of persons for refusing to answer questions of a state investigating commission when they relied upon assurances of the commission, either express or implied, that they had a privilege under state law to refuse to answer, though in fact this privilege was not available to them. The situation presented here is analogous to that in *Raley*, which we deem to be controlling. As in *Raley*, under all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could "would be to sanction an indefensible sort of entrapment by the State -- convicting a citizen for exercising a privilege which the State had clearly told him was available to him." The Due Process Clause does not permit convictions to be obtained under such circumstances.

*Id.* at 571 (quoting *Raley v. Ohio*, 360 U.S. 423, 426 (1959) (internal citations omitted).

 In *United States v. Pennsylvania Industrial Chemical Corp.*, 461 F.2d 468 (3d Cir. 1972), *modified and remanded*, 411 U.S. 655 (1973), the Third Circuit first recognized and applied the defense of entrapment by estoppel. The defendant was charged with discharging pollution into the Monongahela River, in violation of the Rivers and Harbors Act, 33 U.S.C. § 407. At trial, the defendant sought to present evidence that its allegedly criminal acts had been authorized by Army regulations and the federal government's long-term interpretation of the statute. The district court prohibited the defendant from introducing the evidence and refused to instruct a jury that the defendant should be acquitted if his actions resulted from affirmative government representations that its acts were lawful.

Citing due process grounds, the Third Circuit reversed on appeal. The Court wrote that the concept of fair play is implicit in our basic notions of what is meant by due process of law. In this regard, an individual or corporation should not be held criminally responsible for activities which could not reasonably have been anticipated to be illegal based on 70 years of consistent

government interpretation and subsequent behavior. *Id*. 461 F.2d at 479. Because the defendant had not been allowed to present the evidence nor had the jury been instructed on the entrapment by estoppel defense, the Court of Appeals granted a new trial. *Id*.

The Supreme Court agreed with the Third Circuit's statement of the law, holding "it was error for the District Court to refuse to permit PICCO to present evidence in support of its claim that it had been affirmatively misled into believing that the discharges in question were not a violation of the statute." *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 675 (1973) ("PICCO"). The Court also held that the defense applies where there is reliance on a government agency's position or interpretation of the law it is charged with enforcing or on the enforcing agency's behavior with respect to the activity at issue and that reliance was reasonable under the circumstances. *Id*. In *PICCO,* there was no direct inquiry by the defendants to the agency nor any communication from the agency directly to the defendants.  The decision in PICCO prohibits this prosecution on due process grounds.  Mr. Bannon was entitled to rely on the former President's invocation and directive and on the OLC Opinions and he reasonably did so.  His prosecution is barred by the Due Process Clause, based on the defense of entrapment by estoppel.

## 2.  **Public Authority**

The defenses of entrapment by estoppel and public authority are closely related, with some courts questioning the meaningfulness of the difference between the two. *See e.g.*, *United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006).  Nevertheless, there are some subtle differences. Mr. Bannon raises the defenses of actual authority and apparent authority in addition to the defense of entrapment by estoppel.

### A.  **Actual Authority**

It is beyond dispute that the President – and therefore OLC – has the authority to interpret laws.[38] Further, the President has, pursuant to the Oath Clause and the Take Care Clause, the power to "decline to enforce a statute that he views as unconstitutional."[39] The defense of actual authority is consistent with the common law defense's recognition that actions taken "under color of public authority" are lawful and cannot be prosecuted criminally.[40] It requires reasonable reliance on the actual authority of an official with respect to the conduct at issue. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994).

Mr. Bannon received actual authority in this case for his non-compliance with the subpoena directly from former President Trump's invocation of executive privilege and corresponding directive to Mr. Bannon, that Mr. Bannon must honor that invocation with respect to the subpoena. The OLC Opinions referred to herein also provided a source of the actual authority Mr. Bannon received to the effect that the subpoena was unlawful and invalid, in light of the committee's rules (and refusal to permit a privilege holder representative to attend the deposition), that it would be unlawful for a congressional committee to try to compel production or testimony from a person so situated once executive privilege was invoked, and that it would be unconstitutional for a person so situated to be criminally prosecuted under the statute charged in this case. Mr. Bannon reasonably relied on both sources of actual authority, both the former President and the OLC Opinions carried with them actual authority in the situation at issue. Mr. Bannon cannot be

---

[38] *See* [Ex. V] Frank H. Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905, 905 (1990) ("Executive power to interpret the law is so well established, and so important to successful operation of government, that courts frequently accept the executive branch's view of a statute as conclusive.").

[39] [Ex. W] Memorandum from Walter Dellinger, Assistant Att'y Gen. to Abner J. Mikva, Counsel to the President (Nov. 2, 1994). https://www.justice.gov/sites/default/files/olc/opinions/1994/11/31/op-olc-v018-p0199_0.pdf   *See Id.* at ¶ 6, concluding that the President has an "enhanced responsibility to resist unconstitutional provisions that encroach upon the constitutional powers of the Presidency."

[40] *See United States v. Pitt*, 193 F.3d 751, 756-758 (3d Cir. 1999); *United States v. Fulcher*, 250 F.3d 244, 254 n.4 (4th Cir. 2001); *United States v. Reyes-Vasquez*, 905 F.2d 1497, 1500 n.5 (11th Cir. 1990).

criminally prosecuted on the undisputed operative facts in this case, based on the due process-based defense of actual authority.

### B. **Apparent Authority**

This Circuit's landmark decision in *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) also supports the dismissal of the indictment in this case on due process grounds.[41]

In *Barker*, the defenses of entrapment by estoppel and apparent authority truly converged. The defendants purportedly believed that their Watergate-era warrantless burglary of psychiatrist Daniel Ellsberg's office was authorized by their C.I.A. recruiter E. Howard Hunt, who they believed had the authority to authorize such conduct (apparent authority) and they further relied on a policy espoused by the President and put forward by the Attorney General as official policy for at least forty years. *Barker*, 546 F.2d at 951-954. The defense of apparent authority requires a reasonable belief (whether correct or mistaken) that the source for the information relied upon had the authority to license the conduct at issue and did so. *Barker*, 546 F.2d at 947-948, 954-957; Model Penal Code § 2.04(3)(b).[42]

---

[41] To the extent the Government has attempted to cast some question on the continued viability of the landmark *Barker* decision by quoting out of context a line in *United States v. Baird*, 29 F.3d 647, 654 (D.C. Cir. 1994) – *See* Doc. 43 at 7 n.3 ("The D.C. Circuit has since noted that '[t]he exact precedential effect of Judge Merhige's opinion is unclear'") – any such suggestion is misleading. Judge Merhige wrote a concurring opinion in *Barker* that would have narrowed the availability of the defense, from Judge Wilkey's broader formulation. *Barker*, 546 F.2d at 955. The instant case qualifies for the defenses of entrapment by estoppel and public authority under either judge's formulation of the defenses and their underlying principles. Moreover, the Court in *Baird*, in large part based on its reliance on *Barker*, reversed the defendant's conviction, expressly because the trial court had excluded testimony that would have included the position of the agency's legal and contracting officers, as transmitted to the defendant's superior officer, concerning the legality of the conduct for which the defendant was charged and convicted. *Baird*, like *Barker*, certainly supports Mr. Bannon's position in the instant case.

[42] Judge Merhige's Opinion specifically mentions "opinions of the Attorney General" as among the "strongest" bodies sources for authority, consistent with the policy fostered by the defense of apparent authority – obedience to the decisions issued by bodies put in "positions of prominence in the governing structure." *Barker*, 546 F.2d at 956.

Mr. Bannon was entitled as a matter of law to reasonably rely, as he did, on the directive from former President Trump when he invoked Executive Privilege and on the OLC Opinions ("the Attorney General's Lawyer")[43] described herein in proceeding as he did with respect to the congressional committee subpoena at issue and to reasonably believe that those two sources had the authority to license his conduct. He acted at all times consistently with the positions directed by those two sources of apparent authority as he reasonably believed their policies to provide.

3. **The Government Should Be Estopped From Prosecuting This Case.**

Mr. Bannon respectfully submits that, while the leading entrapment by estoppel cases do not spend a great deal of time focused on the estoppel implications of the decisions, the instant case presents the perfect vehicle through which this Court should order the Government estopped from pursuing this prosecution, based on the long line of OLC Opinions referenced herein, going back decades in their consistency for the propositions relied upon herein. Separate from the doctrine of entrapment by estoppel, Mr. Bannon asks the Court to find that as a matter of due process, the Government is estopped from prosecuting this case because it is irreconcilable with the legally binding policy and practice of this same prosecuting agency. Mr. Bannon respectfully submits that the principles underlying equitable estoppel, judicial estoppel, estoppel by opinion, and estoppel by selective non-enforcement (including the principle of desuetude) should bar this prosecution or if the Court rejects applying criminal estoppel, the Court permit evidentiary consequences from the Government's inconsistent and truly irreconcilable positions between its long-established policy and the pursuit of this prosecution.[44]

---

[43] [Ex. X] Douglas W. Kmiec, *OLC's Opinion Writing Function: The Legal Adhesive for a Unitary Executive*, 15 Cardozo L. Rev. 337 (1993).

[44] *See e.g.*, [Ex. Y] *Applying Estoppel Principles in Criminal Cases*, 78 Yale L.J. 1046 (1969); Anne Bowen Poulin, [Ex. Z] *Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its Story Straight*, 18 Cal. L. Rev. 1423 (2001).

In the instant case, the full circle is closed.  It was the "State," through the former President of the United States, that told Mr. Bannon that executive privilege had been invoked and that he was legally required to honor such invocation with respect to the subpoena and it was the "State," through the Department of Justice – the exact same federal agency now prosecuting Mr. Bannon[45] - whose official policy provided that, under the circumstances presented, (1) the subpoena was legally invalid, (2) the invocation of the privilege was the former President's sole prerogative and not Congress's, (3) the invocation was presumptively valid, (4) it applies to former employees and outside consultants, (5) that bringing a criminal prosecution against a person in Mr. Bannon's situation would violate the separation of powers doctrine and would be unlawful, and (6) that, for a variety of reasons, a person so situated cannot be prosecuted criminally under 2 U.S.C. § 192 as a matter of law. As all of the authority cited herein establishes, prosecuting Mr. Bannon under this statute, in light of the legally binding authoritative OLC Opinions and related writings and the former President's invocation of Executive Privilege, is prohibited as a matter of fundamental fairness and due process of law.   The defenses of actual and apparent public authority and entrapment by estoppel compel the dismissal of the indictment in this case.

## IV.  2 U.S.C. § 192 is Unconstitutional As Applied to the Facts of this Case.

Mr. Bannon respectfully moves to dismiss the indictment in this case on the ground that 2 U.S.C. § 192 is unconstitutional as applied to Mr. Bannon and the facts of this case.[46]

---

[45] *See e.g., United States v. Viola*, 2017 U.S. Dist. LEXIS 117055, *7-*9; 2017 WL 3175930 (W.D. La., July 26, 2017) (emphasizing the relevance of reliance on a federal authoritative source for the defense of entrapment by estoppel to apply to a federally charged crime).

[46] When mounting a facial challenge to a statute, a movant must, of course, establish "no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-451 (2008).  An as-applied challenge, raised here, asks a court simply to find the statute at issue unconstitutional as applied to the facts and the party before the court.  *See e.g., City of Chicago v. Morales*, 527 U.S. 41, 74-81 (1999) (Scalia, J.,

2 U.S.C. § 192 provides as follows:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, *willfully makes default*, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

2 U.S.C. § 192. (emphasis added).

On April 6, 2022, the Court unqualifiedly granted [Doc. 49] the Government's Motion in Limine to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel [Docs. 29; 35]. The impact of the Court's decision is that all that needs to be proven to establish a violation of the statute is that the defendant received a valid subpoena and did not comply with it. The reason for the non-compliance is legally irrelevant, according to the Government's motion and the Court's decision, unless the non-compliance was a function of an accident. No bad purpose or motive is required; nor does the Government need to prove even that the defendant had some awareness that his conduct was wrong or in violation of the law. *Id*.[47]

This, the Court concluded, is required by the decision in *United States v. Licavoli*, 294 F.2d 207 (D.C. Cir. 1961), and it applies to all defendants and circumstances surrounding the failure to

---

Dissenting) (explaining the difference between facial and as-applied challenges, favoring the latter, while suggesting the former should be impermissible); see also, Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000) ("[a]s-applied challenges are the basic building blocks of constitutional adjudication.").

[47] The rejection of a *mens rea* that includes some consciousness of the wrongfulness of the conduct, in favor of the standard adopted by the Court, has come under sustained criticism for many years in especially compelling terms where a term of incarceration is the possible consequence of conviction, with commentators asserting that the error in permitting the same is of constitutional dimensions. *See e.g.,* H. Packer, *Mens Rea and the Supreme Court*, 1962 Sup. Ct. Rev. 107, 147-152 (1962); Dubin, *Mens Rea Reconsidered: A Plea for a Due Process of Criminal Responsibility*, 18 Stan. L. Rev. 322 (1966); Note, *Criminal Liability Without Fault: A Philosophical Perspective*, 75 Colm. L. Rev. 1517 (1975). This also supports a dismissal.

comply with a congressional committee.   [Docs. 29, 35, 49].   Based on the Court's Order, a defendant who fails to comply on a whim or for no reason at all, is legally situated vis a vis criminal liability under the statute, identically to the defendant who (1) fails to comply because his lawyer told him the subpoena was invalid, (2) fails to comply because he was directed not to comply in connection with the invocation of Executive Privilege by a former President of the United States or (3) fails to comply in reliance on and consistent with the official, legally binding position of the Department of Justice. Indeed, the Government expressly argued in its motion that privilege provides no excuse for non-compliance under the applicable definition of "willfully." [Doc. 29 at 1; 8]. The failure to differentiate between the invocation of Executive Privilege and other situations vis a vis the application of this statute is completely contrary to the DOJ's long-standing official policy on this subject.[48]

The Court held that the reason or motivation for not complying is simply legally irrelevant under this criminal statute which carries a mandatory sentence of incarceration upon conviction. [Doc. 29 at 1, 8; 3/16/22 Hearing Tr. at 4, 5, 6, 7, 8; Doc. 49].[49]

---

[48] [Ex. J] The DOJ has made clear its view that the invocation of Executive Privilege stands alone and is different from a subpoena that triggers any other privilege, because of the separation of powers issues it implicates.   Theodore B. Olson, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* (OLC Opinion May 30, 1984) at 131, 134. ("Olson Memo"),https://www.justice.gov/sites/default/files/olc/opinions/1984/05/31/op-olc-v008-p0101_0.pdf#:~:text=As%20a%20matter%20of%20statutory%20construction%20and%20separation,of%20executive%20privilege%20before%20a%20committee%20of%20Congress. *See also,* [Ex. AA] Rex E. Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. Rev. 231, 259 (1978) (suggesting that the §§ 192 & 194 should not apply where Executive Privilege is invoked).

[49] The Government's motion expressly asserts the following: [T]he Defendant's excuses for non-compliance are without merit, and his erroneous reliance on privileges and purported advice of counsel is no defense to contempt.  The deliberate failure to comply with a congressional subpoena – *regardless of motivation* – constitutes the crime of contempt."  [Doc. 29 at 1] (emphasis added).  The Government's motion, again granted by the Court without qualification, goes even further than just referring to an advice of counsel defense (and jury instruction).  The Government urged the Court to take the following extraordinary position:

Based on the Court's Order construing the statute in this regard, 2 U.S.C. § 192 is unconstitutional as applied to Mr. Bannon and the circumstances of this case because it (1) violates the separation of powers doctrine; (2) is unconstitutionally overbroad, criminalizing lawful conduct (e.g., non-compliance based on the invocation of Executive Privilege and reliance on the OLC Opinions) within its ambit; (3) is unconstitutionally void for vagueness (e.g. when considered with the DOJ's official position as reflected in the OLC Opinions, it fails adequately to give notice

---

"But even if his contempt were based on an erroneous but good-faith belief that he had a valid legal excuse for ignoring the subpoena's demands, whether by his own determination or his attorney's, it is no defense. All evidence and argument related to good-faith reliance on the law or an attorney's advice should therefore be excluded at trial." [Doc. 29 at 8].

At oral argument, the Government reiterated its position that, other than an accident, there is no legal justification for failing to comply with a congressional subpoena. Government counsel put it as follows: "So contempt of Congress for willful default is about whether or not you showed up; that is whether to produce records or to testify." [3/16/22 Hearing Tr. at 4] (emphasis added). "So if a defendant makes a deliberate and intentional decision not to appear, he has the requisite intent for contempt; that is, does the defendant know he's been summonsed and does he intentionally, knowing that, not show up? That is all that is required." [*Id*. at 5] (emphasis added). "And what the Supreme Court made clear is that that intentional choice not to comply, that is inherently a criminal choice. There is no innocent way that someone decides they are just not going to comply with the statute. [*Id*. at 6] (emphasis added). "And that's where contempt of Congress draws (sic), between someone who accidentally does not comply with their obligations, and someone who makes an intentional and deliberate choice not to do so." [*Id*. at 7]. Finally, in response to the Court's direct question as to what the Government needs to prove in this case on *mens rea*, the Government summed up its position as follows:

"The government would need to demonstrate that the defendant knew he had been summonsed; so that means, knew that Congress was requiring him to show up and produce records on October 7th; and that Congress was requiring him to show up and testify on October 14th. And that he knew that that was the obligation; and that despite knowing that, he decided not to comply. He has to have – the government has to prove that he was given a clear choice from Congress. Either show up or you are in contempt. That would be all that the government is required to show there." … "And it's no different from in the contempt of court context. A witness gets a summons to appear before a grand jury or to appear for testimony in trial. And if they deliberately decide, I will not appear, they are subject to prosecution for contempt. It's the same principle in the contempt of Congress." [*Id*. at 8].

as to what conduct is subject to criminal prosecution); (4) unconstitutionally prohibits Mr. Bannon from telling the entire story of his case.[50]

A.   **Statutory Interpretation Problems**

There is a fundamental statutory interpretation problem with such a reading, when one considers the associated statute found in 2 U.S.C. § 193 which provides as follows:

> No witness is privileged to refuse to testify to any fact, or to produce any paper, respecting which he shall be examined by either House of Congress, or by any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or by any committee of either House, upon the ground that his testimony to such fact or his production of such paper may tend to disgrace him or otherwise render him infamous.

Construing the term "willfully" as used in § 192, the statute to which § 193 refers, as this Court has - making any reason for the failure to comply and any *mens rea*, other than that the witness "deliberately" and "intentionally" failed to comply, and thereby making a claimed justification of privilege for the failure to comply legally irrelevant, renders § 193 nothing more than surplusage. As this Court has noted, "[W]hen possible, of course, the Court must give effect to every word in a statute." *United States v. Miller*, 2022 U.S. Dist. LEXIS 45696, *16-*17 (D. D.C., March 7, 2022) (Nichols, J.), *citing, Setser v. United States*, 566 U.S. 231, 239 (2012). There would be no reason for Congress to have added § 193, if the invocation of privilege, like any other reason or motivation for the failure to comply, were legally irrelevant. "Willfully makes default," we already have been told, is not concerned with why the witness did not comply – what is in his mind as to why he did not have to comply; so there would be no need for Congress to identify what kind of privilege will not avail the witness.

---

[50] *See, e.g., United States v. Nixon*, 418 U.S. 683, 709 (1974) ("the need to develop all relevant facts in the adversary system is both fundamental and comprehensive.  The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts.  The very integrity of the judicial system depends on full disclosure of all the facts, within the framework of the rules of evidence."); *United States v. Nobles*, 422 U.S. 225, 232 (1975).

If, on the other hand, § 193 were intended to serve some legally cognizable purpose, then the Court's construction of § 192 would fail under fundamental *expressio unius* analysis, with its identification of one particular type of privilege – a claim that compliance would "tend to disgrace" or otherwise render the witness "infamous" – as being inapplicable, implying that other privileges, like executive privilege, would be a privilege that would permit the witness to refuse to testify or produce a document. The constitutional infirmities of 2 U.S.C. § 192, though, as applied to Mr. Bannon and the circumstances, where Executive Privilege is invoked and is relied on for noncompliance, go well beyond matters of statutory interpretation.

B.  **2 U.S.C. § 192 As Applied Violates the Separation of Powers Doctrine, Is Unconstitutionally Over Broad, And Is Void For Vagueness.**

1.  **The Statute As Applied Violates The Constitutional Separation Of Powers Doctrine.**

The Court's decision makes the invocation of Executive Privilege by the former President of the United States and the associated directive to Mr. Bannon not to comply with the subpoena, based on executive privilege legally irrelevant.  It gives Congress a veto over a President's invocation of privilege.  That position cannot be reconciled with the United States Supreme Court's holding in *Trump v. Mazars USA,* LLP, 140 S. Ct. 2019, *2032; 207 L. Ed. 2d 951 (2020) that executive privilege absolutely applies in the context of a congressional subpoena and its invocation provides a basis for noncompliance with a congressional subpoena. The validity of the invocation surely can be challenged in a civil enforcement proceeding; but it is presumed to be valid when made and provides a lawfully recognized basis for the witness's failure, indeed, inability, to comply. *Id*. The statute as applied also violates the separation of powers doctrine by directly infringing on the President's right to determine which communications he deems to be appropriately covered by executive privilege. Doing so is contrary to established constitutional

principles that a statute that "disrupts the proper balance between the coordinate branches" is unconstitutional and that the President's invocation of executive privilege is presumptively valid and must be honored by Congress.[51] As the Olson Memo provides, subjecting executive officials to prosecution for criminal contempt when they are carrying out the President's claim of Executive Privilege, "would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." *Olson Memo* at 134.

2 U.S.C. § 194 is unconstitutional as applied because its mandatory terms, especially where Executive Privilege is invoked, violate the separations of powers doctrine by encroaching on prosecutorial decisions reposited under the Constitution exclusively in the Executive branch.[52] Members of the Committee have made clear their belief that the prosecution is mandatory under the statute. Bess Levin, *January 6 Panel Politely Requests That Merrick Garland Do His F—king Job*, VANITY FAIR (Mar. 29, 2022), ( https://www.vanityfair.com/news/2022/03/january-6-committee-merrick-garland-donald-trump.   That renders the statute unconstitutional under *Chadha*.

### 2. The Statute As Applied Is Unconstitutionally Overbroad And Void For Vagueness.

The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[53]   The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process

---

[51] *Nixon v. Admin. of General Services*, 433 U.S. 425, 443 (1977); *United States v. Nixon*, 418 U.S. 683, 708 (1974).

[52] *See, e.g., United States v. Brown*, 381 U.S. 437, 443 (1965); *INS v. Chadha*, 462 U.S. 917 (1983).

[53] *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). "Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *Id*. "Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect." *Id*. (citations omitted). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.[54] Issues, like those here, with the *mens rea* element of the statute, exacerbate vagueness problems.[55] Vagueness concerns are intensified where a statute imposes criminal penalties.[56] A statute is unconstitutionally overbroad where, as here, it risks including within its prohibition fully lawful conduct undertaken in good-faith or because of the uncertainty of the definition of material terms (like "willfully" or "default").[57]

2 U.S.C. § 192, and specifically the phrase "willfully makes default" as this Court has interpreted it and has the elements of the offense charged have been characterized, is void for vagueness and overbroad, as applied to the instant case or any case in which executive privilege is invoked, especially in light of the OLC Opinions referred to in this motion to dismiss. The Government's position on the elements of the crime and that any reason for noncompliance, other than accident, is legally irrelevant, adopted by the Court in unqualifiedly granting its motion in limine [Docs. 29; 35; 49], is directly at odds with long-established authority that the invocation of

---

[54] *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

[55] *Calautti v. Franklin*, 439 U.S. 379, 395 (1979) ("Because of the absence of a scienter requirement in the provision … the statute is little more than a 'trap for those who act in good faith.'").

[56] *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The Court has … expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe").

[57] *See, e.g., United States v. Stevens*, 569 U.S. 460, 473 (2010)

executive privilege must be permitted as a legally cognizable reason for non-compliance. *See e.g.*, *Mazars*, 140 S. Ct. at 2032.

Moreover, in light of the legally binding, published, authoritative position of the Department of Justice, reflected in the OLC Opinions cited herein that the criminal statute does not apply and cannot be applied to a current or former executive branch employee when executive privilege is invoked, the statute, as applied, is void for vagueness; for it does not give constitutionally sufficient notice of what conduct will expose a person so situated to criminal sanction.

Statements by the Government, through its agents or officials, concerning criminal sanctions, which are contradictory or so vague and undefined "as to afford no fair warning as to what might transgress (the statute)" render the statute unconstitutionally vague, much in the same way contradictory statements within a criminal statute render the statute unconstitutional. *Raley v. State of Ohio*, 360 U.S. 423, 438 (1959). In the instant case, the OLC Opinions go well beyond mere "contradictory" or "vague" statements – they absolutely give full license, indeed they command, the very course of conduct Mr. Bannon took in response to the subpoena (and that was ordered by the invocation of Executive privilege); yet now he faces criminal prosecution for actions consistent with published DOJ policy. This renders the statute, at best, void for vagueness.

The statute is unconstitutionally overbroad as applied because, as the Court has defined "willfully makes default" and the elements of the crime, it unconstitutionally includes within its ambit, fully legal and constitutionally protected conduct – noncompliance based on the invocation of Executive Privilege and reliance on the OLC Opinions. Moreover, the Court's decision, granting the Government's motion, which included a prohibition on the Defendant's reliance "on law" is

irreconcilable with the well settled principle that in the criminal setting, all constitutional and other applicable defenses must be afforded the Defendant.[58]

The statute also is void for vagueness because the key phrase "willfully makes default" gives insufficient notice as to what constitutes a "default" in light of the long line of authority that raises to a constitutional level the imperative that Congress and the Executive branches must work toward an accommodation in situations like the one presented here.[59]  Mr. Bannon, through Mr. Costello, went to extraordinary lengths to try to come to an accommodation with the Committee. [Doc. 30-1, ¶¶ 13-20].  Among other steps, he advised the Committee that Mr. Bannon would testify if the Committee worked out the executive privilege issue with former President Trump or if they went before a judge and a judge ordered Mr. Bannon to comply, after considering the executive privilege claim.  Mr. Costello asked the Committee for a one-week adjournment to consider the impact of the lawsuit former President Trump filed against the Committee, involving issues of executive privilege, with the exact same issue present in this case.[60]

On October 18, 2021, notwithstanding his conclusion based on the OLC Opinions that the subpoena was unlawful and invalid, in a further effort to accommodate, Mr. Costello drafted a

---

[58] *United States v. House of Representatives*, 556 F. Supp. 150, 152-153 (D.D.C. 1983); *Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v. Eastland*, 442 F.2d 751 (D.C.Cir.1971); *Tobin v. United States*, 306 F.2d 270, 276 (D.C.Cir.1962).

[59] *See e.g., United States v. AT&T, 567 F.2d 121, 127 (D.C. Cir. 1977) (*Congress and Executive Branch "should take cognizance of an implicit constitutional mandate to seek optimal accommodation" to resolve disputes*)*.

[60] In the lawsuit former President Trump filed, a primary issue was whether a current President's decision to deny executive privilege can override a former President's invocation of executive privilege.  *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021).  In the instant case on October 18, 2021, after the return dates for the subpoena had passed, a representative of President Biden wrote to Mr. Costello, purporting to override former President Trump's invocation of executive privilege [Ex. GG] [U.S. 000313].  That same day, Mr. Costello asked the committee for a one-week extension to allow him to consider the matter and the impact of the lawsuit.  The committee summarily denied the request or any accommodation and set the following day for a vote on a contempt referral.

letter to the committee identifying categories of materials in the subpoena for which Mr. Bannon clearly had no responsive materials or testimony to offer. [U.S. 000992-000993]. The committee's response to Mr. Costello's accommodation efforts and request for a one-week extension of time to consider the Trump lawsuit and the executive privilege issue, was to set a committee vote on contempt the following day. The Select Committee made clear that they had no interest in an accommodation with Mr. Bannon (in sharp contrast to other witnesses who, for example, upon information and belief, the Select Committee permitted a privilege holder representative to appear at a deposition, and for whom extensions of time were granted, etc.).  Under these circumstances and the institutional interests in working toward an accommodation, the term "willfully makes default" is unconstitutionally void for vagueness and the indictment should be dismissed based on the Select Committee's refusal to work toward any accommodation.

For the foregoing reasons, this statute is unconstitutional as applied and the indictment must be dismissed.

## V.     Prosecutorial Over-Reaching Requires Dismissal Of The Indictment

Counsel for the Government improperly targeted Mr. Costello – counsel for Mr. Bannon – during the grand jury investigation in a manner that drove a wedge between attorney and client. Moreover, counsel for the Government misled the grand jury on key evidence. These errors require the dismissal of the Indictment pursuant to Fed. R. Crim. P. 12(b)(3)(A)(v).

### A.   Targeting Mr. Bannon's Counsel Requires Dismissal.

On October 21, 2021, the House made a contempt referral involving Mr. Bannon to DOJ.[61] [US-000459-504]. On October 25, 2021, Mr. Costello – counsel for Mr. Bannon – emailed AUSA

---

[61] The defense has moved to compel disclosure of Government efforts to obtain the telephone and email records of Mr. Costello, Mr. Bannon's attorney. [Doc. 26]. Certain documents have been provided, but the motion remains under advisement. Nonetheless, we move for dismissal of the Indictment based on the Government's conduct – and intend to supplement this motion if additional information is forthcoming.

Cooney to initiate efforts to seek a declination of any criminal charges. Mr. Costello identified himself as the attorney for Mr. Bannon. [US-001136]. On November 1, 2021, Mr. Costello sent AUSA Cooney a legal memorandum outlining the reasons for declination. A video conference was held on November 3, 2021, so that Mr. Costello and counsel for the Government could further discuss the matter. Mr. Costello believed – as is customary in criminal cases – that the back-and-forth between himself and counsel for the Government was a good faith effort to persuade DOJ not to prosecute his client, Mr. Bannon.

However, Government counsel misled Mr. Costello. They suggested to Mr. Costello that they were interested in hearing his arguments on declination. However, at the same time they were improperly using the power of the grand jury to collect evidence about Mr. Costello, in the hope that they could use it against his client Mr. Bannon. The very day of the initial contact with the U.S. Attorney's Office, October 25, 2021, the Government began issuing grand jury subpoenas to third party providers seeking Mr. Costello's phone and email records. Some of these grand jury subpoenas sought records dating to September 1, 2021 – 22 days before the Select Committee issued its subpoena.[62] This was improper. Section 9-13.410(A) of the U.S. Attorneys' Manual requires main DOJ approval in such circumstances. No approval was obtained by counsel for the Government here. In addition, counsel for the Government obtained a 2703(d) Order from a magistrate judge, seeking additional records of Mr. Costello.[63]

---

[62] And the records obtained via the § 2703(d) Order date back to March 5, 2021. [US-001151-001249].

[63] Incredibly, counsel for the Government represented to the Court that these records were necessary to the investigation, and that some grand jury subpoenas were for records of "other" Bob Costellos. Their purported reason has no basis in fact as they already knew that there was never a claim that Mr. Bannon did not accept service of the subpoena.

Moreover, counsel for the Government misled Mr. Costello by staging two surreptitious "interviews" of him, all the while suggesting to him that he was engaged on advocacy on behalf of his client. There was never any intention to consider declination – the issuance of the first subpoena before Mr. Costello ever met with anyone from the U.S. Attorney's Office established that. During videoconferences on November 3 and 8, 2021, counsel for the Government had FBI agents listen in and later draft FBI 302 "interview reports" capturing statements made by Mr. Costello. Finally, counsel for the Government requested, and Mr. Costello provided (on November 4, 2021), more than 100 pages of documents – including attorney work product created during the representation of Mr. Bannon – without divulging that Mr. Costello was being treated by the Government as a witness against Mr. Bannon, not his counsel.

This Court can, in its supervisory power, dismiss the Indictment as a sanction for the Government's improper conduct. *See*, *e.g.*, *United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *United States v. Batres-Santolino*, 521 F.Supp. 744, 750-53 (N.D. Cal. 1981). Dismissal is appropriate where, as here, the improper tactics by the Government drove a wedge between a defendant and his attorney. *United States v. Marshank*, 777 F. Supp. 1507, 1523 (N.D. Cal. 1991) (doctrine permitting dismissal of indictment on basis of outrageous government misconduct is grounded in due process clause of Fifth Amendment and is therefore applicable to cases where government interference in attorney-client relationship is so shocking to universal sense of justice that it violates due process); *U.S. v. Schell*, 775 F.2d 559 (4th Cir. 1985).   In determining whether governmental interference into an attorney-client relationship is outrageous enough to violate due process courts analyze: (1) the government's objective awareness of ongoing, personal attorney-client relationship between its informant and defendant; (2) whether the government's intrusion into that relationship was deliberate; and (3) actual and substantial

prejudice to defendant. *United States v. Hsia*, 81 F.Supp.2d 7, 19 (D.D.C. 2000); *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981) (whether outrageous government conduct exists depends on the totality of the circumstances). Prejudice can "result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial." *U.S. v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980).

The Government's intrusion into the attorney-client relationship was knowing and deliberate. The Government misled this Court and counsel with two different explanations for its conduct, neither of which make any sense. Moreover, Mr. Bannon been prejudiced by it. First, even if the toll and email records did not give the Government the contents of Mr. Costello's communications, having a record of who Mr. Costello spoke to and when provides significant insight into the defense's strategy and theory of the case that the Government would not have access to but for their improper intrusion. In addition, the Government has obtained numerous documents from Mr. Costello that would never have been turned over if he had been made aware that he was viewed as a witness against Mr. Bannon, not Mr. Bannon's advocate. The Government contended that Mr. Costello was "a witness to the Defendant's deliberate decision to ignore the subpoena's requirements." [Doc. 31 at 12-13]. Then at oral argument they claimed they needed the information to determine if Mr. Costello informed Mr. Bannon of the subpoena. Both claims are false. Courts have held that due process is violated when the government turns the defendant's attorney into a prosecution witness. *See United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *U.S. v. Schell*, 775 F.2d 559 (4th Cir. 1985). "Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances." *Schell*, 775 F.2d at 565.

B. **Misleading The Grand Jury Requires Dismissal.**

To return a valid indictment, a grand jury must consider evidence that satisfies all elements of the offense charged. *Stirone v. United States*, 361 U.S. 212, 217 (1960). 2 U.S.C. § 192 includes the element "willfully makes default." The grand jury here was misled in three ways by counsel for the Government, such that the grand jury could not have found evidence supporting that element of the offense.[64]

First, the grand jury was misled about Mr. Bannon's communication to the Select Committee that President Trump has asserted executive privilege. In testimony on November 12, 2021, the Government's sole grand jury witness – an FBI agent – suggested to the grand jury that a witness could not validly assert executive privilege before the Select Committee unless the President himself (or his representative) directly communicated the assertion of executive privilege to the Select Committee. [Exhibit FF at 44] (filed under seal in accordance with Protective Order). This was misleading testimony and Mr. Costello sent President Trump's counsel's letter invoking executive privilege to the Select Committee.

Second, the Government's sole grand jury witness suggested to the grand jury that Mr. Bannon never sought an adjournment of his deposition. *See* [Exhibit FF at 32-36] (filed under seal in accordance with Protective Order). This was false testimony. A request for a one-week adjournment was denied.

Third, the Government's sole grand jury witness suggested to the grand jury that Mr. Bannon received (through his attorney Mr. Costello) a complete copy of the House deposition

---

[64] We also move to dismiss the Indictment on the ground that the grand jury was not properly instructed as to the element of "willfully makes default" and the applicability of the advice of counsel doctrine. But given the Court's Order [Doc. 49] on the Government's motion in limine on advice of counsel [Doc. 29], we do not fully brief the issue again here.

rules along with the subpoena. *See* [Exhibit FF at 20-21] (filed under seal in accordance with Protective Order). This was false testimony as the General Counsel of the House, Doug Letter, informed the FBI and all three prosecutors more than a week before the grand jury testimony. As described in greater detail above, Mr. Bannon was not provided with section 3(b) of H. Res. 8, 117th Congress, even though the House Rules make explicit that "a witness *shall not be required to testify* unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations." [Ex. C ] (Cong. Rec. H41 (Jan. 4, 2021)) (emphasis added).

In short, the Indictment must be dismissed because the grand jury was misled about three key issues that bear on whether Mr. Bannon "willfully [made] default." *See U.S. v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979) ("[T]he prosecutor's right to exercise some discretion and selectivity in the presentation of evidence to a grand jury does not entitle him to mislead it or to engage in fundamentally unfair tactics before it."); *U.S. v. Lawson*, 502 F. Supp. 158, 172 (D. Md. 1980) ("By intentionally and repeatedly asking misleading questions, while failing to disclose known, exculpatory evidence on the issue of [defendants'] guilty knowledge, the prosecutor denied defendants their constitutional right to an 'unbiased' grand jury.").

## VI.    CONCLUSION

Accordingly, Mr. Bannon respectfully requests that the Court grant this Motion and dismiss the Indictment.

Dated: April 15, 2022                             Respectfully submitted,

                                                  SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

                                                      /s/ M. Evan Corcoran
                                                  M. Evan Corcoran (D.C. Bar No. 440027)
                                                  400 East Pratt Street – Suite 900
                                                  Baltimore, MD 21202
                                                  Telephone: (410) 385-2225

Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com

    /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com

    /s/ Robert J. Costello
Robert J. Costello (*Pro Hac Vic Pending*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of April 2022, a copy of the foregoing Motion To Dismiss The Indictment was filed through the Court's CM/ECF system and was served *via* electronic delivery on counsel of record.

    /s/ M. Evan Corcoran
M. Evan Corcoran (D.C. Bar No. 440027)