# EXHIBIT D



# FEDERAL BUREAU OF INVESTIGATION

Date of entry   11/10/2021

    KRISTIN AMERLING, Chief Counsel and Deputy Staff Director, U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol, was interviewed at the Thomas P. O'Neill Jr. Federal Building, 200 C Street SW, Washington, DC.  AMERLING was accompanied by U.S. House of Representatives General Counsel DOUG LETTER, and by U.S. House of Representative Deputy General Counsel TODD TATELMAN, who joined via phone.  AMERLING was interviewed by Assistant United States Attorney (AUSA) J.P. Cooney, US Attorney's Office for the District of Columbia (USAO-DC), AUSA Molly Gaston USAO-DC, AUSA Amanda Vaughn USAO-DC, FBI Special Agent Katherine E. Pattillo, FBI Special Agent Frank G. D'Amico, and FBI Special Agent Stephen R. Hart. After being advised of the identity of the interviewing AUSAs and Agents and the nature of the interview, AMERLING provided the following information (AMERLING was shown various numbered exhibits during the interview.  These will be referenced when shown during the interview and will be maintained in the 1A section of the file.):

    AMERLING's current role was as the Chief Counsel and Deputy Staff Director for the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the Select Committee).  In her role she worked directly with Staff Director DAVID BUCKLEY to staff the Select Committee.  Also, as a part of the investigative team, she oversaw any legal issues which arose during the investigation process.

    AMERLING was previously the legislative assistant for Representative Ted Weiss from 1988-1990.  AMERLING was then the press secretary for Senator George Mitchell from 1990-1991.  AMERLING then attended law school and worked for a private firm subsequent to graduation.  From 1997-2012, AMERLING worked for Representative Henry Waxman on the House Committee for Reform and Oversight.  During her tenure with Representative Waxman's office, Representative Waxman moved to the Energy and Commerce Committee

---

Investigation on  11/02/2021  at  Washington, District Of Columbia, United States (In Person)

File #  72-WF-3513323                                              Date drafted  11/02/2021

by  HART STEPHEN R, SA FRANK G. DAMICO, Katherine E. Pattillo

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

where he eventually became the Ranking Member. From 2013-2014, AMERLING was the Director of Investigations for the Senate Commerce Committee which was chaired by Senator Rockefeller. AMERLING then went to work in the Administration of President Obama and then separately became the General Counsel for the Senate Energy and the House Oversight Committees.

The Select Committee was composed of three primary teams: the investigative teams, the admin teams, and the communications teams. The investigative teams were led by Chief Investigative Counsel TIM HEAPHY. The various Chief Counsels had subject matter expert roles and the teams were staffed with additional attorneys and research staff. The Communications Director had an assistant and the Admin staff facilitated the personnel assignments. The Staff Director and the investigative teams were comprised of non partisan staff who worked collaboratively on subpoenas and other tasks. AMERLING was not sure if she could further describe the upper hierarchy or committee processes, but stated that all senior staff, which included herself and the Staff Director, worked together.

(AMERLING was shown Exhibit 1.) This document, House Resolution 503 (HR 503), along with the U.S. House of Representative Rules describe where the Select Committee get its authorities. HR 503 is the main source of the Select Committee's authority. This document is the primary source in which the purpose of the Select Committee is articulated. House Resolution 8 (HR 8) also contains rules for guiding the Select Committee's actions and authorities.

For document requests or subpoenas issued by the Select Committee, AMERLING reviews the initial proposal and provides input to the Staff Director and the Chair of the Select Committee. In the case of the Select Committee's subpoena to STEPHEN BANNON (BANNON), AMERLING served the subpoena to the attorney representing BANNON. AMERLING worked together with the investigative staff to put together the substantive request and with the administrative staff to "get the subpoena out the door."

LETTER advised all subpoenas issued by the Select Committee are reviewed by himself or members of the General Counsel's office as well as leadership of the U.S. House of Representatives. This process applies to subpoenas issued by every House committee. All subpoenas issued by all House

72-WF-3513323

Continuation of FD-302 of (U) November 2, 2021 Interview of Kristin Amerling , On 11/02/2021 , Page 3 of 8

committees are issued and signed by the Clerk for the U.S. House of Representatives. The Clerk will only sign subpoenas if they have been reviewed by LETTER. AMERLING explained the subpoenas were first signed by the Chair of the Select Committee, then reviewed by the General Counsel's Office, and then sent on to the Clerk for signature. LETTER further explained subpoenas were prepared by committee staff, signed by the Chair, reviewed by the Office of General Counsel, logged in, and then walked over to the Clerk.

(AMERLING was shown Exhibit 2.) AMERLING noted the subpoena called for BANNON to appear and testify, not just to appear. Document production is not always required to be done in person. Typically, after a subpoena is issued, document production from the recipient can be provided by hand, mail service, or via email. The subpoena commanded document production be completed by 10am on October 7, 2021, and that BANNON appear for a deposition on October 14, 2021. The subpoena was signed by both the Chair of the Select Committee and the Clerk of the U.S. House of Representatives. AMERLING confirmed she sent the subpoena via email to BANNON's defense attorney, ROBERT COSTELLO (COSTELLO). The letter that accompanied the subpoena was designed to inform the witness of the subpoena and to describe the range of information being requested in the subpoena. The letter summarizes the information commanded, whereas the attachment gives a detailed list of records and documents requested.

Neither the letter nor the attachment described the full accounting of the public records the Select Committee possesses and / or has reviewed. The subpoena schedule reflected a broad set of categories of information requested from BANNON, but the categories were not an exhaustive list of topics which might be covered in his depostion. Many of the categories had nothing to do with former President DONALD TRUMP. All of these categories were listed in the contempt report issued by the U.S. House of Representatives and covered a wide range of topics not dealing with former President TRUMP. AMERLING advised the last page of Exhibit 2, which described the Select Committee Regulations for Use of Deposition Authority, was provided to BANNON and COSTELLO so they would have a full understanding of BANNON's rights in regards to depositions and other proceedings of the Select Committee. The Select Committee was aware the email was sent to

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of  (U) November 2, 2021 Interview of Kristin Amerling ,On  11/02/2021 ,Page  4 of 8

COSTELLO.

Paragraph one of 3(b) makes reference to ranking minority members, who are typically a part of House committees. In these House committees, there are particular rules at hearings set aside for the Chair and Ranking Member. The Ranking Member is generally the highest minority member in a House committee and typically possess procedural powers. LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.

A copy of Section 3(b) was not provided to COSTELLO with the subpoena. However, the section would have been provided to the witness at deposition when the witness was reminded of their rights. COSTELLO received a copy of 117th Congress Regulations For Use of Deposition Authority with the letter accompanying the subpoena. COSTELLO never raised any objections related to the requirement stipulated in paragraph 11.

(AMERLING was shown Exhibit 3.) JENNA HOPKINS was a professional staff member of the Select Committee assigned to assist the research staff of the investigative teams. AMERLING did not recall anyone from the Select Committee directly contacting BANNON or an attorney representing BANNON before September 22, 2021. "Tim, Yoni, and Jacob" mentioned in Exhibit 3 were likely TIM HEAPHY, senior investigative counsel; YONI MOSKOWITZ, staff attorney; and JACOB NELSON, research assistant. Nothing outside of what was included in the email was discussed between AMERLING and HOPKINS.

(AMERLING was shown Exhibit 4.) AMERLING did not recall much of the conversation beyond what she cited in the email to COSTELLO. COSTELLO did not raise any objections during their phone call and advised he would get back to her after confirming with BANNON that COSTELLO was authorized to accept subpoena service. AMERLING sent the subpoena in a subsequent email to COSTELLO. At that time, AMERLING believed COSTELLO represented BANNON based upon COSTELLO's reply email.

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of  (U) November 2, 2021 Interview of Kristin Amerling  , On  11/02/2021  , Page  5 of 8

    (AMERLING was shown Exhibit 5.)  AMERLING first became aware of COSTELLO's objections to the subpoena through his correspondence with the Select Committee.  AMERLING was not sure if COSTELLO's objection was public at that time.

    (AMERLING was shown Exhibit 6.)  To date, neither AMERLING nor the Select Committee had received the letter from JUSTIN CLARK referenced in the exhibit.  AMERLING had not herself received nor was she aware of any objections or privilege assertions submitted to the Select Committee from former President TRUMP or his representatives.

    (AMERLING was shown Exhibit 7.)  The letter was specifically sent to remind BANNON of his obligation to respond to the subpoena as well as the requirement for a privilege log if warranted.  The letter also fully identified the criminal statutes BANNON would violate if he failed to comply with the Select Committee's subpoena.  AMERLING was not aware of any additional communications with COSTELLO leading up to the October 7, 2021, document deadline.

    (AMERLING was shown Exhibit 8.)  SEAN TONOLLI (TONOLLI) was responsible for conducting BANNON'S deposition.  TONOLLI is the leader of one of the investigative subgroups. It would be logical for someone in TONOLLI's position to reach out to COSTELLO to confirm logistical arrangements prior to the scheduled appearance.  LETTER interjected that different House committees use different processes; there were no standardized procedures in place governing the logistics of these arrangements.  AMERLING stated that different teams within the Select Committee handled different subjects and it would be logical for senior staff, like TONOLLI, to lead depositions and testimony.  The Chair of the Select Committee was aware of work assignments.  AMERLING could not recall the process by which TONOLLI was designated as the staff member to cover BANNON, but it was normally done with the knowledge of the Chair and other Members.  KEVIN ELLIKER, referenced in Exhibit 8, was a staff attorney on one of the investigative teams.

    AMERLING believed she and TONOLLI discussed TONOLLI's conversations with COSTELLO.  She could not recall the precise details of those discussions but believed, based on her communication with TONOLLI in Exhibit 8, the

US-000249

72-WF-3513323

Continuation of FD-302 of  (U) November 2, 2021 Interview of Kristin Amerling  , On  11/02/2021  , Page  6 of 8

discussions were confined to the logistics of BANNON's arrival and testimony. LETTER noted AMERLING was currently managing subpoenas to a number of different individuals, some of whom were going to appear before the Select Committee and some of whom may not appear before the Select Committee. AMERLING did not know the TOM KAVALER referenced in a separate email between TONOLLI and COSTELLO. AMERLING did not think there was any other correspondence memorializing any additional interactions between TONOLLI and COSTELLO. AMERLING was not certain but she believed she had been made aware of the discussions between TONOLLI and COSTELLO prior to the email sent by TONOLLI to AMERLING, BUCKLEY, and HEAPHY on October 13, 2021 (Exhibit 8).

In Exhibit 8, TONOLLI referred to COSTELLO's "two questions for future reference." AMERLING confirmed that neither BANNON nor COSTELLO were provided with other or alternative dates on which BANNON could testify. It was AMERLING's understanding that these questions did not prompt negotiation or discussion about alternate deposition dates. AMERLING believed COSTELLO was suggesting a general discussion point regarding a future appearance related to the subpoena, but no discussion ever occurred. TONOLLI was not authorized to offer or to say anything different than what had been sent in the October 8, 2021 email. AMERLING did not recall any other communications with TONOLLI about this issue. AMERLING did not formally accept COSTELLO's letter to Chairman THOMPSON as it was sent via email.

(AMERLING was shown Exhibit 10.) The Select Committee communicated with COSTELLO prior to receiving this particular letter. This letter offered no new objections and failed to address the Chair's points made on October 8, 2021, about testimony on topics unrelated to former President TRUMP.

(AMERLING was shown Exhibit 12.) Both AMERLING and TONOLLI attended the depostion on October 14, 2021. AMERLING believed Representative ADAM SCHIFF attended the hearing virtually. Other Select Committee staff who attended the hearing were: HEAPHY, ELLIKER, BARRY POMP, Select Committee parliamentarian, and EVAN MALDER, clerk. AMERLING advised she should be able to get interviewing agents and attorneys an un-redacted copy of the transcript. The Select Committee was prepared to proceed with the

72-WF-3513323

Continuation of FD-302 of  (U) November 2, 2021 Interview of Kristin Amerling   , On 11/02/2021 , Page 7 of 8

deposition had BANNON appeared.  AMERLING's role for the hearing would have been to serve as a consultative legal resource.  AMERLING was highly confident the Select Committee's Parliamentarian, POMP, would have brought the House Rules to the hearing.

AMERLING did not have any communication with BANNON or any party representing him on October 14, 2021.  No one from the Select Committee suggested to BANNON or anyone representing him that he did not have to appear before the Select Committee.  In fact, the Select Committee did quite the opposite.  No staff member told BANNON or anyone representing him they could work out privilege issues prior to BANNON being deposed.  The letters sent to BANNON and his counsel made it clear that BANNON had to appear at the hearing where he would be permitted to vocalize and memorialize his objections.  The Chair was available for contact during the scheduled hearing in case BANNON had arrived and voiced objections.  However, it was not required to resolve the objections during the hearing, it was only required to document them for the record.

(AMERLING was shown Exhibit 11.)  There was no communications between the Select Committee and BANNON or his representatives indicating that the prospect of a Contempt of Congress charge would change their response to the subpoena.  The email sent by AMERLING to COSTELLO on October 19, 2021, was the only communication subsequent to the depostion date.

(AMERLING was shown Exhibit 14.)  AMERLING received the letter from the White House via email.  AMERLING did not know if either BANNON or COSTELLO also received the letter from the White House.  AMERLING also did not receive any letters from the Department of Justice.  AMERLING was not aware of any sort of communication between the White House and BANNON or COSTELLO.  Correspondence from COSTELLO described a letter from an attorney representing former President TRUMP, however, AMERLING has not received a copy of that letter.  AMERLING believed the extent of President JOE BIDEN's knowledge of the proceedings was in Exhibit 14.  AMERLING was not aware of any other requests from COSTELLO to JUSTIN CLARK.

(AMERLING was shown Exhibit 13.)  She was aware of this letter and of the adjournment request.

FD-302a (Rev. 5-8-10)

72-WF-3513323

Continuation of FD-302 of  Amerling  (U) November 2, 2021 Interview of Kristin , On  11/02/2021 , Page  8 of 8

(AMERLING was shown Exhibit 15.)  The Select Committee issued two letters to COSTELLO; one before and one after the Select Committee hearing on October 19, 2021 (Exhibits 15 and 16).  AMERLING was not aware of any other communication or correspondence with COSTELLO after those letters.  AMERLING was not aware of any additional objections raised by COSTELLO not captured by correspondence between COSTELLO and the Select Committee.

US-000252