# EXHIBIT H

# Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys

Executive privilege may properly be asserted over the documents and testimony concerning the dismissal and replacement of U.S. Attorneys that have been subpoenaed by congressional committees.

June 27, 2007

THE PRESIDENT
    THE WHITE HOUSE

Dear Mr. President:

    The Senate Committee on the Judiciary and the House Committee on the Judiciary recently issued five subpoenas in connection with their inquiries into the resignation of several U.S. Attorneys in 2006. Broadly speaking, four of the five subpoenas seek documents in the custody of current or former White House officials ("White House documents") concerning the dismissal and replacement of the U.S. Attorneys. In addition, two of the five subpoenas demand testimony about these matters from two former White House officials, Harriet Miers, former Counsel to the President, and Sara Taylor, former Deputy Assistant to the President and Director of Political Affairs.

    You have requested my legal advice as to whether you may assert executive privilege with respect to the subpoenaed documents and testimony concerning the categories of information described in this letter. It is my considered legal judgment that you may assert executive privilege over the subpoenaed documents and testimony.

## I.

    The documents that the Office of the Counsel to the President has identified as responsive to the subpoenas fall into three broad categories related to the possible dismissal and replacement of U.S. Attorneys, including congressional and media inquiries about the dismissals: (1) internal White House communications; (2) communications by White House officials with individuals outside the Executive Branch, including with individuals in the Legislative Branch; and (3) communications between White House officials and Department of Justice officials. The Committees' subpoenas also seek testimony from Ms. Miers and Ms. Taylor concerning the same subject matters, and the assertion of privilege with respect to such testimony requires the same legal analysis.

    The Office of Legal Counsel of the Department of Justice has reviewed the documents identified by the Counsel to the President as responsive to the subpoenas and is satisfied that the documents fall within the scope of executive

privilege. The Office further believes that Congress's interests in the documents and related testimony would not be sufficient to override an executive privilege claim. For the reasons discussed below, I concur with both assessments.

### A.

The initial category of subpoenaed documents and testimony consists of internal White House communications about the possible dismissal and replacement of U.S. Attorneys. Among other things, these communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals. These types of internal deliberations among White House officials fall squarely within the scope of executive privilege. One of the underlying purposes of the privilege is to promote sound decisionmaking by ensuring that senior government officials and their advisers speak frankly and candidly during the decisionmaking process. As the Supreme Court has explained, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see also Assertion of Executive Privilege with Respect to Prosecutorial Documents*, 25 Op. O.L.C. 1, 2 (2001) ("The Constitution clearly gives the President the power to protect the confidentiality of executive branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (opinion of Attorney General Janet Reno) ("*Clemency Decision*") ("[N]ot only does executive privilege apply to confidential communications to the President, but also to 'communications between high Government officials and those who advise and assist them in the performance of their manifold duties.'") (quoting *Nixon*, 418 U.S. at 705). These confidentiality interests are particularly strong where, as here, the communications may implicate a "quintessential and nondelegable Presidential power," such as the authority to nominate or to remove U.S. Attorneys. *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997); *Clemency Decision*, 23 Op. O.L.C. at 2–3 (finding that executive privilege protected Department and White House deliberations related to decision to grant clemency).

Under D.C. Circuit precedent, a congressional committee may not overcome an assertion of executive privilege unless it establishes that the documents and information are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). And those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution").

*Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys*

As a threshold matter, it is not at all clear that internal White House communications about the possible dismissal and replacement of U.S. Attorneys fall within the scope of *McGrain* and its progeny. The Supreme Court has held that Congress's oversight powers do not reach "matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults with members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.[1] Consequently, there is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone. *See Clemency Decision*, 23 Op. O.L.C. at 3–4 ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision [because the decision to grant clemency is an exclusive Executive Branch function]."); *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain").

In any event, even if the Committees have oversight authority, there is no doubt that the materials sought qualify for the privilege and the Committees have not demonstrated that their interests justify overriding a claim of executive privilege as to the matters at issue. The House Committee, for instance, asserts in its letter accompanying the subpoenas that "[c]ommunications among the White House staff involved in the U.S. Attorney replacement plan are obviously of paramount importance to any understanding of how and why these U.S. Attorneys were

---

[1] *See, e.g., Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring) ("[T]he Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for [the] appointment."); *Myers v. United States*, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment, and when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.").

3

selected to be fired." Letter for Fred F. Fielding, Counsel to the President, from John Conyers, Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). But the Committees never explain how or why this information is "demonstrably critical" to any "legislative judgments" Congress might be able to exercise in the U.S. Attorney matter. *Senate Select Comm.*, 498 F.2d at 732. Broad, generalized assertions that the requested materials are of public import are simply insufficient under the "demonstrably critical" standard. Under *Senate Select Committee*, to override a privilege claim the Committees must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials." *Id*. at 733.

Moreover, any legitimate oversight interest the Committees might have in internal White House communications about the proposal is sharply reduced by the thousands of documents and dozens of hours of interviews and testimony already provided to the Committees by the Department of Justice as part of its extraordinary effort at accommodation.[2] This information has given the Committees extraordinary—and indeed, unprecedented—insight into the Department's decision to request the U.S. Attorney resignations, including the role of White House officials in the process. *See, e.g.*, *History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 758–59, 767 (1982) (documenting refusals by Presidents Jackson, Tyler, and Cleveland

---

[2] During the past three months, the Department has released or made available for review to the Committees approximately 8,500 pages of documents concerning the U.S. Attorney resignations. The Department has included in its productions many sensitive, deliberative documents related to the resignation requests, including e-mails and other communications with White House officials. The Committees' staffs have also interviewed, at length and on the record, a number of senior Department officials, including, among others, the Deputy Attorney General, the Acting Associate Attorney General, the Attorney General's former chief of staff, the Deputy Attorney General's chief of staff, and two former Directors of the Executive Office for U.S. Attorneys. During these interviews, the Committees' staffs explored in great depth all aspects of the decision to request the U.S. Attorney resignations, including the role of White House officials in the decisionmaking process. In addition, the Attorney General, the Deputy Attorney General, the Principal Associate Deputy Attorney General, the Attorney General's former chief of staff, and the Department's former White House Liaison have testified before one or both of the Committees about the terminations and explained, under oath, their understanding of such involvement.

The President has also made significant efforts to accommodate the Committees' needs. More than three months ago, the Counsel to the President proposed to make senior White House officials, including Ms. Miers, available for informal interviews about "(a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests," and he offered to give the Committees access to White House documents on the same subjects. Letter for Patrick Leahy, U.S. Senate, et al., from Fred F. Fielding, Counsel to the President at 1–2 (Mar. 20, 2007). The Committees declined this offer. The Counsel to the President has since reiterated this offer of accommodation but to no avail. *See* Letter for Patrick Leahy, U.S. Senate, and John Conyers, Jr., U.S. House of Representatives, from Fred F. Fielding, Counsel to the President at 1 (Apr. 12, 2007); Letter for Patrick Leahy, U.S. Senate, John Conyers, Jr., U.S. House of Representatives, and Linda T. Sanchez, U.S. House of Representatives, from Fred F. Fielding, Counsel to the President at 1–2 (June 7, 2007).

*Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys*

to provide information related to the decision to remove Executive Branch officials, including a U.S. Attorney).

In a letter accompanying the subpoenas, the House Committee references the alleged "written misstatements" and "false statements" provided by the Department to the Committees about the U.S. Attorney dismissals. *See* Letter for Fred F. Fielding, Counsel to the President, from John Conyers, Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). The Department has recognized the Committees' interest in investigating the extent to which Department officials may have provided inaccurate or incomplete information to Congress. This interest does not, however, justify the Committees' demand for White House documents and information about the U.S. Attorney resignations. Officials in the Department, not officials in the White House, presented the challenged statements, and as noted, the Department has provided unprecedented information to Congress concerning, *inter alia*, the process that led to the Department's statements. The Committees' legitimate oversight interests therefore have already been addressed by the Department, which has sought to provide the Committees with all documents related to the preparation of any inaccurate information given to Congress.

Given the amount of information the Committees already possess about the Department's decision to remove the U.S. Attorneys (including the involvement of White House officials), there would be little additional legislative purpose served by revealing internal White House communications about the U.S. Attorney matter, and, in any event, none that would outweigh the President's interest in maintaining the confidentiality of such internal deliberations. *See Senate Select Comm.*, 498 F.2d at 732–33 (explaining that a congressional committee may not obtain information protected by executive privilege if that information is available through non-privileged sources). Consequently, I do not believe that the Committees have shown a "demonstrably critical" need for internal White House communications on this matter.

**B.**

For many of the same reasons, I believe that communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals, fall within the scope of executive privilege. Courts have long recognized the importance of information gathering in presidential decisionmaking. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 751–52 (describing role of investigation and information collection in presidential decisionmaking). Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch. This need is particularly strong when the decision involved is whether to remove political appointees, such

*Opinions of the Office of Legal Counsel in Volume 31*

as U.S. Attorneys, who serve in local districts spread throughout the United States. In those situations, the President and his advisers will be fully informed only if they solicit and receive advice from a range of individuals. Yet the President's ability to obtain such information often depends on the provider's understanding that his frank and candid views will remain confidential. *See Nixon*, 418 U.S. at 705 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."); *In re Sealed Case*, 121 F.3d at 751 ("In many instances, potential exposure of the information in the possession of an adviser can be as inhibiting as exposure of the actual advice she gave to the President. Without protection of her sources of information, an adviser may be tempted to forego obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability.").

That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests. The communications at issue occurred with the understanding that they would be held in confidence, and they related to decisionmaking regarding U.S. Attorney removals or replacements or responding to congressional or media inquiries about the U.S. Attorney matter. Under these circumstances, the communications retain their confidential and Executive Branch character and remain protected. *See In re Sealed Case*, 121 F.3d at 752 ("Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the [presidential communications component of executive] privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.").[3]

Again, the Committees offer no compelling explanation or analysis as to why access to confidential communications between White House officials and individuals outside the Executive Branch is "demonstrably critical to the responsible fulfillment of the [Committees'] functions." *Senate Select Comm.*, 498 F.2d at 731. Absent such a showing, the Committees may not override an executive privilege claim.

### C.

The final category of documents and testimony concerns communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations. These communications are

---

[3] Moreover, the Department has previously conveyed to the Committees its concern that there would be a substantial inhibiting effect on future informal confidential communications between Executive Branch and Legislative Branch representatives if such communications were to be produced in the normal course of congressional oversight.

deliberative and clearly fall within the scope of executive privilege.[4] *See supra* p. 2. In this case, however, the Department has already disclosed to Congress a substantial amount of documents and information related to White House communications about the U.S. Attorney matter. Consequently, in assessing whether it would be legally permissible to assert executive privilege, it is useful to divide this category into three subcategories, each with slightly different considerations: (1) documents and testimony related to communications between the Department and White House officials that have not already been disclosed by the Department; (2) documents concerning White House-Department communications previously disclosed to the Committees by the Department; and (3) testimony from current or former White House officials (such as the testimony sought from Ms. Miers or Ms. Taylor) about previously disclosed White House-Department communications. After carefully considering the matter, I believe there is a strong legal basis for asserting executive privilege over each of these subcategories.

The President's interest in protecting the confidentiality of documents and information about undisclosed White House-Department communications is powerful. Most, if not all, of these communications concern either potential replacements for the dismissed U.S. Attorneys or possible responses to inquiries from Congress and the media about the U.S. Attorney resignations. As discussed above, the President's need to protect deliberations about the selection of U.S. Attorneys is compelling, particularly given Congress's lack of legislative authority over the nomination or replacement of U.S. Attorneys. *See In re Sealed Case*, 121 F.3d at 751–52. The President also has undeniable confidentiality interests in discussions between White House and Department officials over how to respond to congressional and media inquiries about the U.S. Attorney matter. As Attorney General Janet Reno advised the President in 1996, the ability of the Office of the Counsel to the President to assist the President in responding to investigations "would be significantly impaired" if a congressional committee could review "confidential documents . . . prepared in order to assist the President and his staff in responding to an investigation by the [committee] seeking the documents." *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996). Despite extensive communications with officials at the Department and the White House, the Committees have yet to articulate any "demonstrably critical" oversight interest that would justify overriding these compelling confidentiality concerns.

There are also legitimate reasons to assert executive privilege over White House documents reflecting White House-Department communications that have been previously disclosed to the Committees by the Department. As discussed,

---

[4] To the extent they exist, White House communications approving the Department's actions by or on behalf of the President would receive particularly strong protection under executive privilege. *See, e.g., In re Sealed Case*, 121 F.3d at 752–53 (describing heightened protection provided to presidential communications).

these documents are deliberative in nature and clearly fall within the scope of executive privilege. The Department's accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications. The D.C. Circuit has recognized that each branch has a "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *United States v. AT&T Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). If the Department's provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over White House documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations. Thus, in order to preserve the constitutional process of interbranch accommodation, the President may claim privilege over documents and information concerning the communications that the Department of Justice has previously disclosed to the Committees. Indeed, the relevant legal principles should and do encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process.

Here, the Committees' need for White House documents concerning these communications is weak. The Committees already possess the relevant communications, and it is well established that Congress may not override executive privilege to obtain materials that are cumulative or that could be obtained from an alternative source. *See Senate Select Comm.*, 498 F.2d at 732–33 (holding public release of redacted audio tape transcripts "substantially undermined" any legislative need for tapes themselves); *Clemency Decision*, 23 Op. O.L.C. at 3–4 (finding that documents were not demonstrably critical where Congress could obtain relevant information "through non-privileged documents and testimony"). Accordingly, the Committees do not have a "demonstrably critical" need to collect White House documents reflecting previously disclosed White House-Department communications.

Finally, the Committees have also failed to establish the requisite need for testimony from current or former White House officials about previously disclosed White House-Department communications. Congressional interest in investigating the replacement of U.S. Attorneys clearly falls outside its core constitutional responsibilities, and any legitimate interest Congress may have in the disclosed communications has been satisfied by the Department's extraordinary accommodation involving the extensive production of documents to the Committees, interviews, and hearing testimony concerning these communications. As the D.C. Circuit has explained, because "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability," Congress will rarely need or be entitled to a "precise reconstruction of past events" to carry out its legislative responsibilities. *Senate Select Comm.*,

*Assertion of Executive Privilege Concerning Dismissal of U.S. Attorneys*

498 F.2d at 732.[5] On the other hand, the White House has very legitimate interests in protecting the confidentiality of this information because it would be very difficult, if not impossible, for current or former White House officials testifying about the disclosed communications to separate in their minds knowledge that is derived from the Department's disclosures from knowledge that is derived from other privileged sources, such as internal White House communications. Consequently, given the President's strong confidentiality interests and the Committees' limited legislative needs, I believe that White House information about previously disclosed White House-Department communications may properly be subject to an executive privilege claim.

## II.

In sum, I believe that executive privilege may properly be asserted with respect to the subpoenaed documents and testimony as described above.

PAUL D. CLEMENT
*Solicitor General & Acting Attorney General*

---

[5] *See also Senate Select Comm.*, 498 F.2d at 732 (explaining that Congress "frequently legislates on the basis of conflicting information provided in its hearings"); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.").