# EXHIBIT L

# Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges

Section 458 of title 28 does not apply to presidential appointments of judges to the federal judiciary.

December 18, 1995

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

On April 25, 1995, President Clinton nominated Mr. William A. Fletcher to be a judge on the United States Court of Appeals for the Ninth Circuit. *See* 141 Cong. Rec. 11,243 (1995). While Mr. Fletcher's nomination has been pending before the United States Senate, questions have arisen as to whether his appointment would violate 28 U.S.C. § 458 because Mr. Fletcher's mother, the Honorable Betty B. Fletcher, has served as a judge on the same court since her appointment in 1979. Section 458 of title 28 provides as follows: "No person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to any justice or judge of such court."

We have previously opined that 28 U.S.C. § 458 does not apply to presidential appointments of judges to the federal judiciary. *See* Memorandum for Eleanor D. Acheson, Assistant Attorney General, Office of Policy Development, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges* (Mar. 13, 1995). In light of subsequent questions, you have asked whether we adhere to that position. For the reasons that follow, we do.

## A

Two bedrock principles of statutory construction guide our analysis. First, "we start, as we must, with the language of the statute." *Bailey v. United States*, 516 U.S. 137, 144 (1995). Second, "the meaning of statutory language, plain or not, depends on context." [1] *Id.* at 145. In this case, the particularly relevant constituents of context upon which statutory meaning depends are the constitutional framework within which all statutes are drafted and enacted, *see, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (stating principle that statutes be read to protect "the usual constitutional balance" of power), the statutory language taken as a whole, *see, e.g., King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (stating

[1] As Learned Hand explained, "words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their [meaning] from the setting in which they are used." *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (quoting *Federbush*); *Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19, 25 n.6 (1988) (same).

the "cardinal rule" that a "statute is to be read as a whole"), and the amendment history of the statute, *see, e.g., Bailey*, 516 U.S. at 144 (taking account of amendment history of 18 U.S.C. § 924(c)(1) to determine the meaning of the word "use"). Based on our review, we conclude that the plain meaning of the statute precludes its application to presidential appointments to the federal judiciary.

We begin, as indicated, with the language of the statute. The current language of § 458 was adopted in 1911,[2] amending a statute originally enacted in 1887.[3] Quoting the language again, § 458 in its current form provides that: "No person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to any justice or judge of such court." The statute does not by its express terms apply to the President, nor does it expressly name judgeships as one of the offices to which a related person may not be appointed. We believe that the inapplicability of this provision to presidential appointments of federal judges is conclusively established by the text of this provision, the history of its amendment, and the text of the Act of 1911 taken as a whole. We elaborate on these reasons in Parts II and III of this memorandum, which to a considerable degree recapitulate the analysis contained in our earlier memorandum. Before revisiting these points, however, in this part we analyze a feature of the constitutional framework within which statutes must be read that, in our view, also dictates the conclusion that § 458 does not apply to presidential appointments of federal judges, even if the text and its textual history did not conclusively establish the point.

Any argument that § 458 does apply to presidential appointments of federal judges depends entirely upon the fact that, while the statute refers to positions to which related persons may not be appointed, it makes no mention at all of the appointing authority, worded as it is in the passive voice. In this context, however, this silence must lead to just the opposite conclusion, because of the well-settled principle that statutes that do not expressly apply to the President must be construed as not applying to the President if such application would involve a possible conflict with the President's constitutional prerogatives. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). We can refer to this principle as a clear statement rule, one that is very well-established and that dictates the plain meaning of § 458.

Then-Assistant Attorney General William H. Rehnquist articulated this principle without limiting it to cases in which application of the statute would raise a constitutional question, opining that statutes "are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive." Memorandum for Egil Krogh, Staff Assistant to the Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Closing of Government Offices in Memory of Former President*

[2] Act of Mar. 3, 1911, ch. 231, § 297, 36 Stat. 1087, 1168 ("Act of 1911").

[3] Act of Mar. 3, 1887, ch. 373, § 7, 24 Stat. 552, 555.

*Eisenhower* at 3 (Apr. 1, 1969) (''Rehnquist Memorandum''). Even if this unqualified statement of the principle is overly broad, the narrower formulation given above clearly covers § 458, because its application to presidential appointments to the federal judiciary would raise serious constitutional questions regarding the President's authority under the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, as we explain below. Therefore, under the precedents of the Supreme Court as well as of the Department of Justice, § 458 may not be read as applying to presidential appointments.

The principle that general statutes must be read as not applying to the President if they do not expressly apply where application would arguably limit the President's constitutional role has two sources. First, it is a long-recognized ''cardinal principle'' of statutory interpretation that statutes be construed to avoid raising serious constitutional questions. *See, e.g., Crowell v. Benson*, 285 U.S. 22 (1932). This canon of statutory construction is a cornerstone of judicial restraint in that it ''not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution.'' *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The canon is equally applicable to executive branch interpretations. *Appropriations Limitation for Rules Vetoed by Congress*, 4B Op. O.L.C. 731, 732 n.3 (1980).

The second source is the constitutional principle of separation of powers. The fundamental device by which the framers sought to prevent tyranny was the division of power to prevent an excessive accumulation in any single repository. Thus, the Constitution divides power between the federal and the state governments as well as among the federal government's three coordinate and independent branches. *See Gregory*, 501 U.S. at 458. The clear statement rule exists in order to protect ''th[is] 'usual constitutional balance' '' of power. *See id.* at 460 (quoting *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985))), *Franklin*, 505 U.S. at 801 (''requir[ing] an express statement by Congress before assuming it intended'' to subject presidential action to judicial review); *id.* (''As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.''). Given the central position that the doctrines of federalism and separation of powers occupy in the Constitution's design, this rule also serves to ''assure[] that the legislature has in fact faced, and intended to bring into issue, the critical matters'' of the balance of power among the three branches of the federal government, in the context of separation of powers, and between the federal and state governments, in the context of federalism. *See Gregory*, 501 U.S. at 461; *United States v. Bass*, 404 U.S. 336, 349 (1971).

This clear statement rule has been applied frequently by the Supreme Court as well as the executive branch with respect to statutes that might otherwise be

susceptible of an application that would affect the President's constitutional prerogatives, were one to ignore the constitutional context. For instance, in *Franklin* the Court was called upon to determine whether the Administrative Procedure Act ("APA"), 5 U.S.C §§ 701–706, authorized "abuse of discretion" review of final actions by the President. The APA authorizes review of final actions by "agencies," which it defines as "each authority of the Government of the United States." 5 U.S.C. § 701(b)(1). From this definition, the APA expressly exempts Congress, the courts, the territories, and the District of Columbia government — but not the President.

Even though the statute defined agency in a way that could include the President and did not list the President among the express exceptions to the APA, Justice O'Connor wrote for the Court:

> [t]he President is not [expressly] excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.

505 U.S. at 800–01. To amplify, she continued, "[a]s the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements." *Id.* at 801. If anything, the case for reading the APA provision as applying to the President was stronger than is the case with respect to § 458, because the APA contains a list of express exceptions to its broad coverage and that list does not include the President. One might have contended that the omission of the President from a list of persons excluded is sufficiently clear evidence of a congressional decision to include him within the reach of the APA to alter the otherwise applicable rule of constitutional context. To the contrary, however, the Court affirmed the principle that the inclusion of the President must be express.

In a case that is closely analogous and that involves the President's appointment power, the Supreme Court held that the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. § 2, does not apply to the judicial recommendation panels of the American Bar Association because interpreting the statute as applying to them would raise serious constitutional questions relating to the President's constitutional authority to appoint federal judges. *See Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989). The FACA imposes open meeting and reporting requirements on advisory committees, which it defines to be any committee or similar group that is "utilized by one or more agencies,

in the interest of obtaining advice or recommendations for the President.'' 5 U.S.C. app. § 3(2)(c). Two public interest groups, Public Citizen and the Washington Legal Foundation, sought to have FACA applied to the ABA judicial screening committees. The Court unanimously rejected the public interest groups' argument. The majority ruled that while a ''straightforward reading,'' *Public Citizen*, 491 U.S. at 453, of FACA would seem to require its application to the ABA committee, the ''cardinal principle'' of statutory interpretation that a statute be interpreted to avoid serious constitutional question drove the majority to interpret FACA as not applying to the ABA committee. *Id.* at 465–67. Notably, the majority stated, ''[o]ur reluctance to decide constitutional issues is especially great where, as here, they concern the relative powers of coordinate branches of government,'' and ''[t]hat construing FACA to apply to the Justice Department's consultations with the ABA Committee would present formidable constitutional difficulties is undeniable.''[4] *Id.* at 466.

A recent Supreme Court case that applied the clear statement rule in protecting the constitutional separation of powers is *Sale v. Haitian Centers Council*, 509 U.S. 155 (1993). This case dealt with the extraterritorial application of the Refugee Act.[5] Prior to 1980, the act provided that the Attorney General was ''authorized to withhold deportation of any alien *within the United States*'' who was a refugee.[6] In 1980, the statute was amended to delete the ''within the United States'' language and to make it mandatory that the Attorney General not deport the refugee.[7] The petitioners, an organization advocating on behalf of Haitian refugees, plausibly argued that, by deleting ''within the United States,'' Congress plainly meant to give the act extraterritorial application. *See id.* at 170. The Court rejected this argument, holding that ''Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested. That presumption has special force when we are construing treaty and statutory provisions that may involve foreign and military affairs for which the President has unique responsibility.'' *Id.* at 188.[8]

*Sale* is but another example of the clear statement principle: Statutes will be read to exclude what they do not explicitly include when the inclusionary reading would involve a possible conflict with the President's unique responsibilities, so as potentially to upset the constitutional balance of powers. The President's constitutional appointment power, expressly assigned to him and him alone in Article II, is similarly a unique responsibility of the President, one that has been recently

[4] The three concurring justices reached the merits and found that application of the FACA would violate the Appointments Clause (as opposed to raising a serious question). 491 U.S. at 482–89 (Kennedy, J., concurring).

[5] Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 107.

[6] Immigration and Nationality Act of 1952, Pub. L. No. 82–414, § 243(h), 66 Stat. 163, 214 (1952) (emphasis added).

[7] Pub. L. No. 96–212, § 203(e), 94 Stat. at 107.

[8] To the same effect, *see American Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989).

termed a "central feature" of the President's constitutional role under Article II. *Freytag v. Commissioner*, 501 U.S. 868, 902 (1991) (Scalia, J., concurring).

In addition to the numerous Supreme Court precedents,[9] this Department has frequently applied the clear statement rule in the context of the separation of powers between the executive and legislative branches. For example, we applied this rule to a closely analogous question. We were asked whether the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"), prohibits the President from considering the age of judicial candidates when determining whom to nominate for federal judgeships. *See Judges—Appointment—Age Factor*, 3 Op. O.L.C. 388 (1979). We concluded that the ADEA should not be read to apply to the presidential appointment of federal judges:

> The power to appoint Federal judges, who hold office on good behavior, is by tradition and design one of the most significant powers given by the Constitution to the President. It provides one of the few administrative mechanisms through which the President can exert a long-term influence over the development and administration of law in the courts. The President's present power to exert that influence to the fullest by preferring candidates for appointment who are likely to have long, rather than short, careers on the bench is therefore a matter of constitutional significance. Whether Congress could deny the President that power by requiring him to disregard utterly the age of candidates for appointment has never been considered by the courts, but because of the gravity of the constitutional questions it raises, we would be most reluctant to construe any statute as an attempt to regulate the President's choice in that way, absent a very clear indication in the [ADEA].

*Id.* at 389.

In another important instance, Congress sought to apply the criminal contempt of Congress statute against the administrator of the Environmental Protection Agency when she asserted a claim of executive privilege on behalf of the President. That statute has a broad formulation that is similar to the formulation of § 458. Specifically, it applies to "[e]very person who ha[s] been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers." 2 U.S.C. § 192.

---

[9] The foregoing discussion analyzes only a sample of these precedents. *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), is yet another such example. A former executive branch employee brought a variety of claims against former President Nixon arising from the employee's termination. The Court held that the President was immune from suit because Congress had failed to create a cause of action expressly against the President of the United States, stating "[w]e consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* at 749; *see also id.* at 748 & n.27. Other examples include *United States ex rel. French v Weeks*, 259 U.S. 326, 332 (1922), and *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951).

We concluded that, despite the broad language, the criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984). First, we examined the legislative history of the contempt statute and determined that nothing in that history expressed an intent to apply the statute in the context of assertions of executive privilege. *Id.* at 129–32. We then cited the general rule that statutes are to be construed to avoid serious constitutional questions and further elaborated that, "[w]hen a possible conflict with the President's constitutional prerogatives is involved, the courts are even more careful to construe statutes to avoid a constitutional confrontation." *Id.* at 132. We then discussed how application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress. Because Congress had no "compelling need" to create this disruption, "the constitutionally mandated separation of powers requires the statute to be interpreted so as not to apply to Presidential assertions of executive privilege." *Id.* at 140.

Then-Assistant Attorney General William Barr opined that the Anti-Lobbying Act, 18 U.S.C. § 1913, does not apply fully against the President. *See Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 304–06 (1989). The Anti-Lobbying Act prohibits any appropriated funds from being "used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress." 18 U.S.C. § 1913. The statute provided an exception for communications by executive branch officers and employees if the communication was made pursuant to a request by a member of Congress or was a request to Congress for legislation or appropriations. Assistant Attorney General Barr concluded that applying the Act as broadly as its terms might otherwise allow would raise serious constitutional questions as an infringement of the President's Recommendations Clause power.

It is also the long-standing position of the Department of Justice that 18 U.S.C § 208 does not apply to the President. That statute prohibits any "officer or employee of the executive branch" from "participat[ing] personally and substantially" in any particular matter in which he or she has a personal financial interest. *Id.* In the leading opinion on the matter, then-Deputy Attorney General Laurence Silberman first determined that the legislative history disclosed no intention to cover the President and doing so would raise "[s]ome doubt . . . as to the constitutionality" of the statute, because the effect of applying the statute to the President would be to impose a qualification on his serving as President. *See* Memorandum for Richard T. Burress, Office of the President, from Laurence H. Silberman, Deputy Attorney General, *Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* at 2, 5 (Aug. 28, 1974).

In the Rehnquist Memorandum, we considered a statute the text of which is similar to § 458. 5 U.S.C. § 6105 provides that, "[a]n Executive department may not be closed as a mark to the memory of a deceased former official of the United States." Then-Assistant Attorney General William Rehnquist first reviewed the legislative history and determined that there was nothing to indicate that Congress meant to prohibit the President from closing a department as a mark to the memory of a deceased former official and that instead the purpose of the act was to prevent department heads from closing their departments. He then noted the general rule that statutes "are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive." Rehnquist Memorandum at 3.

In summary, there are numerous precedents of the Supreme Court as well as of the Department of Justice[10] holding that a statute that does not by its express terms apply to the President may not be applied to the President if doing so would raise a serious question under the separation of powers.[11] We believe there to be no dispute that such a serious question would be raised were § 458 read to apply to presidential appointments to the federal judiciary. In the next section we amplify on the reasons for that conclusion.

**B**

Congressional attempts to limit the class of persons from whom the President may appoint the highest officers of the government, including judges, raise serious constitutional concerns. The Appointments Clause provides that the President

[10] Again, the foregoing discussion covers a small sample of the Department's applications of this principle. Other significant examples include: *The President's Compliance with the 'Timely Notification' Requirement of Section 501(b) of the National Security Act*, 10 Op. O.L.C. 159 (1986); *Inter-Departmental Disclosure of Information Submitted under the Shipping Act of 1984*, 9 Op. O.L.C. 48 (1985); *Removal of Members of the Advisory Council on Historic Preservation*, 6 Op. O.L.C. 180, 185 n.7 (1982).

[11] The clear statement principle we have identified does not apply with respect to a statute that raises no separation of powers questions were it to be applied to the President. So, for instance, the Department of Justice has construed the federal bribery statute as applying to the President even though it does not expressly name the President. Memorandum for Laurence H. Silberman, Deputy Attorney General, from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Whether Governor Rockefeller, If Appointed as Vice President, Is Required to Execute a Blind Trust in Order to Avoid Possible Violation of 18 U.S.C. § 208* at 2 (Aug. 20, 1974). 18 U.S.C § 201 establishes that "[w]hoever, being a public official" receives a bribe commits a criminal offense. *Id.* § 201(c)(1)(B). "Public official" is defined as a "Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States . . . in any official function . . . ." *Id.* § 201(a)(1). Application of § 201 raises no separation of powers question, let alone a serious one. The Constitution confers no power in the President to receive bribes; in fact, it specifically forbids any increase in the President's compensation for his service while he is in office, which is what a bribe would function to do. *See* U.S. Const. art. II, § 1, cl. 7. Moreover, the Constitution expressly authorizes Congress to impeach the President for, inter alia, bribery. *Id.* § 4. The Constitution further provides that any party impeached and convicted may "nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." *Id.* art. I, § 3. We also opined that the Federal Advisory Committee Act applies to the Department of Justice Journal Board, because this application raises no separation of powers concerns. *See Application of Federal Advisory Committee Act to Editorial Board of Department of Justice Journal*, 14 Op. O.L.C. 53 (1990).

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other Public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States . . . but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. Because the Constitution gives the President alone the power to nominate non-inferior officers of the United States, any attempt by Congress to restrict his choice of nominees, otherwise than by the Senate's refusing its consent to a nomination, is questionable under the Constitution. We hasten to add that we do not take a final position on the difficult question of whether, and under what circumstances, Congress has authority to impose a qualification requirement on a constitutional office. It is sufficient for the purposes of this memorandum to demonstrate that applying a restriction such as that contained in § 458 to presidential appointment of federal judges would at a minimum raise a serious constitutional question. This office has not had the occasion to opine on this issue, and we cite previous statements for the sole purpose of demonstrating the difficulty and seriousness of the questions that the issue raises.

As the United States Court of Appeals for the District of Columbia Circuit recently wrote, "Congressional limitations—even the placement of burdens—on the President's appointment power may raise serious constitutional questions. . . . Presidents have often viewed restrictions on their appointment power not to be legally binding." *Federal Election Comm'n v. NRA Political Victory Fund*, 6 F.3d 821, 824 (D.C. Cir. 1993) (Silberman, J.), *cert. dismissed*, 513 U.S. 88 (1994). To support this conclusion, the court cited, as examples, statements issued by President Bush upon signing various pieces of legislation. *See Statement on Signing the Cranston-Gonzalez National Affordable Housing Act*, 2 Pub. Papers of George Bush 1699, 1701 (Nov. 28, 1990) ("National Affordable Housing Act Statement"); *Statement on Signing the National and Community Service Act of 1990*, 2 Pub. Papers of George Bush 1613, 1614 (Nov. 16, 1990); *Statement on Signing the Intelligence Authorization Act, Fiscal Year 1990*, 2 Pub. Papers of George Bush 1609, 1610 (Nov. 30, 1989). President Bush asserted, for example, that limitations set out in legislation "do[] not constrain the President's constitutional authority to appoint officers of the United States, subject only to the advice and consent of the Senate." National Affordable Housing Act Statement at 1701, *quoted in part in NRA Political Victory Fund*, 6 F.3d at 824–25.[12]

[12] The position taken by President Bush was based on the principles set out in Justice Kennedy's concurring opinion in *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989), joined by Chief Justice Rehnquist and Justice O'Connor. "By its terms," Justice Kennedy wrote, "the [Appointments] Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for appointment." *Id.* at 483. Furthermore, "where the Constitution by explicit text commits the power at issue to the exclusive control of the President, we have refused to tolerate

There has been a particular concern about applying qualifications for appointments of Article III judges. In 1979, for example, our Office rejected the argument that the ADEA applied to the President's choice of nominees for judgeships. *Judges—Appointment—Age Factor*, 3 Op. O.L.C. 388 (1979). We there accepted that Congress might impose some qualifications on some constitutional offices, but nevertheless noted that applying the ADEA to judicial nominations would constrain the President's ability to exercise a long-term influence on the development of the law. We concluded that, "because of the gravity of the constitutional questions [a requirement to ignore the age of potential nominees] raises, we would be most reluctant to construe any statute as an attempt to regulate the President's choice in that way." *Id.* at 389. As we stressed, "[t]he power to appoint Federal judges, who hold office on good behavior, is by tradition and design one of the most significant powers given by the Constitution to the President." *Id.*

The Constitution vests in the President the power to nominate judges and vests in the Senate the power to give, or refuse, its advice and consent to the nominations. Without taking a position on whether, and under what circumstances, Congress has authority to impose qualification requirements on constitutional offices, it is clear that, if a Congress tried to bind future Presidents and future Senates by imposing statutory constraints on eligibility, such legislation would raise serious constitutional questions.

## II

The clear statement rule settles the meaning of § 458. Section 458 does not apply to presidential appointments of federal judges. Even without applying this constitutionally based principle, however, analysis of the text of § 458, its predecessor, and the text of the Act of 1911 taken as a whole, establishes the same result. That result is further supported by every available piece of contemporaneous, extra-statutory evidence of the understanding of members of Congress, as well as by a consistent practice of non-application of the statute to the appointment of federal judges. In this part, we discuss the meaning of § 458 as it might be ascertained on the face of the statutes themselves, without reference to the clear statement principle. In the subsequent part, we review the contemporaneous congressional understandings of the statute's meaning. Finally, we review some of the instances in which related persons within the meaning of the statute have been appointed to the federal bench by the President.

As indicated earlier, the present statute appears to have originated as Act of Mar. 3, 1887, ch. 373, § 7, 24 Stat. 552, 555. In its original form, the provision stated that:

---

*any* intrusion by the Legislative Branch." *Id.* at 485. With regard to the highest officers of the government, therefore, the President "has the sole responsibility" for making nominations, *id.* at 487, and Congress may not intrude.

> no person related to any justice or judge of any court of the United States by affinity or consanguinity, within the degree of first cousin, shall hereafter be appointed *by such court or judge* to or employed by such court or judge in any office or duty in any court of which such justice or judge may be a member.

*Id.* (emphasis added). In that version, the statute referred specifically to appointments *by the courts or judges*, and could not be understood to encompass presidential appointments as well. In our constitutional scheme, judicial appointments are not made by judges, but rather have always been vested in the President with the advice and consent of the Senate.

The statute was next codified as Act of Aug. 13, 1888, ch. 866, § 7, 25 Stat. 433, 437. In that form too, it prohibited only the appointment of any person related to any federal justice or judge within the degree of first cousin "by such court or judge."

This provision was repealed by the Act of Mar. 3, 1911, ch. 231, § 297, 36 Stat. 1087, 1168.[13] The language substituted for the repealed provision did not, in terms, refer only to appointment "by such court or judge." Instead, it stated:

> No person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to the judge of such court.

*Id.* § 67, 36 Stat. at 1105.

The repeal and re-enactment in 1911 left the description of the offices or duties to which related persons may not be appointed unchanged. It did alter the description of the persons who may not make such appointments. Whereas prior to 1911 only a "court or judge" was prohibited from appointing related persons to such offices or duties, after 1911, the prohibition was simply that no related person could be appointed to such offices or duties. The evident purpose of the change was to remove an obvious loophole. Prior to 1911, the clerk of court, or the chief bailiff, or the chief stenographer, or any other official who worked in a court could appoint relatives of sitting judges to positions on his or her staff, without

---

[13] The Act of Mar. 3, 1911, was designed to restructure the federal judicial system. As Senator, later Justice, Sutherland explained, the legislation was:

> framed upon the theory that we shall hereafter have but one court of original jurisdiction, instead of two, as we have at present . . . . [W]e have to-day two separate and distinct courts of jurisdiction—a circuit court of the United States and a district court of the United States. Jurisdiction has been conferred upon the district court in a class of cases which might as well have been conferred upon the circuit court and jurisdiction has been conferred upon the circuit court which might as well have been conferred upon the district court . . . . There is absolutely no reason why the circuit court should possess a certain class of jurisdiction rather than that it should be possessed by the district court. The vital thing is to have a court of original jurisdiction for the trial of cases, and then a court of appellate jurisdiction, which may review the decisions of the trial court

46 Cong. Rec. 2137 (1911).

violating the statute. Because such individuals as these might possibly be susceptible to influence by sitting judges, the predecessor statute seemed to permit an evasion of the statute's anti-nepotistical purposes through the expedient of having a non-judge who worked in the court appoint a judge's relative.

Beyond closing this appointment loophole, the statute remained otherwise intact. Because the language of the statute describing the offices or duties to which related persons may not be appointed remained the same, no change was made in the class of offices or duties covered by the statute — a class that at no time included judges.

This conclusion is reinforced by a rule of construction that was written into the Act of 1911 itself, which reads as follows:

> [t]he provisions of this Act, so far as they are substantially the same as existing statutes, shall be construed as continuations thereof, and not as new enactments, and there shall be no implication of a change of intent by reason of a change of words in such statute, unless such change of intent shall be clearly manifest.

*Id.* § 294, 36 Stat. at 1167.

With respect to its description of the offices or duties to which related persons may not be appointed, section 297 of the Act is "substantially the same" as prior law. Nor is any "change of intent . . . clearly manifest" by reason of the linguistic change from the earlier provision. Accordingly, following the rule of construction set forth in the statute itself, we find that it does not vary prior law — judgeships were not in that class prior to 1911, and they are not in that class subsequent to 1911.[14]

---

[14] We note that our reading does not violate the maxim of statutory construction that words in a statute should not be construed so as to render them meaningless. It is true that the vast majority of the positions to which § 458 applies are "employments" rather than "offices." For a discussion of the difference between an employment and an office, see *United States v. Hartwell*, 73 U.S. (6 Wall.) 385 (1867); *United States v. Germaine*, 99 U.S. 508 (1878); *United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice). Nevertheless, the Supreme Court long ago concluded that the clerk of a district court is an officer in the constitutional sense, *Ex Parte Hennen*, 38 U.S. (13 Pet.) 230 (1839), and has recently reaffirmed that view, *see Morrison v. Olson*, 487 U.S. 654 (1988). This office has traditionally been filled by an appointment "by [a] court[] of law," specifically by the chief judge of the relevant district or circuit. We believe that the provision would continue to apply to appointments to the office of clerk by a federal judge.

We also note that our view avoids a serious question regarding the legality of the recent designation of District Judge Gordon Thompson, Jr., to sit by designation on a panel of the United States Court of Appeals for the Ninth Circuit with his brother, Judge David Thompson. *See* Howard Mintz, *Nepotism Law Threatens Nomination; Mother and Child Reunion on Bench?*, Legal Times, Dec. 11, 1995, at 8. Because we do not believe that § 458 applies to the office of judge, it is our conclusion that Chief Judge J. Clifford Wallace could not have violated § 458 by exercising his authority under 28 U.S.C § 292(a) to designate District Judge Thompson to sit as a Judge on a Ninth Circuit panel with his brother.

IIII

We have reviewed the legislative debate over the Act of 1911, and have found no evidence that the textual alteration of the earlier statutory language was intended to work any change in the class of offices or duties covered, and certainly none that it was meant to reach presidential appointments to the federal bench. Moreover, contemporaneous and near contemporaneous evidence of Congress's own understanding clearly substantiates that Congress did not intend to extend the scope of the earlier prohibition to include judicial appointments by the President. Section 297 of the Act of Mar. 3, 1911, was to go into effect on January 1, 1912, abolishing the circuit courts and causing the district courts to succeed them, so that clerks would have to be appointed for the district courts. Shortly before the law went into effect, it was pointed out in Congress that these changes "would prevent any man who is related within certain degree by affinity or consanguinity to the district judge from being appointed clerk." 48 Cong. Rec. 309 (1911) (remarks of Rep. Clayton). Thus, even incumbents who had not been appointed to circuit court clerkships by judicial relatives would be ineligible to be appointed to clerkships in the succeeding district courts if it happened that their close relatives sat on those district courts. Several members of Congress objected to that unforeseen and unintended outcome. Legislation was introduced, and eventually adopted, to "grandfather in" such incumbents.[15]

In the course of the House debate on this amendatory measure, several members adverted to the prohibition of the then-recent prior law. Congressman Mann described section 297 as "providing that *the judge of the Federal court* shall not be permitted to appoint his first cousin an officer of the court . . . . It should be the policy of the country to uphold the dignity of the Federal bench, to guard against the possibility of favoritism *on the part of the judges* because of close kinship." 48 Cong. Rec. at 310 (remarks of Rep. Mann) (emphasis added). Similarly, in colloquy, Mr. Hardy asked if the proposed amendment "opposes the appointment of relatives by public officials?", and Mr. Bartlett, referring to section 297, responded that "[t]he original section, I apprehend, had that purpose in view." *Id.* Plainly, then, the members of the House interested in the amendment in the December 1911 debate understood that the March 1911 enactment had only restricted the power of judges to appoint their near kin to positions with their courts. Although these remarks occurred after the enactment of section 297, they were made only a few months after that section had become law, and thus provide useful evidence of what the enacting Congress intended by it.

Later codifications carried forward the language adopted in 1911, with changes not relevant here. *See* Act of June 25, 1948, ch. 646, § 458, 62 Stat. 869, 908;

---

[15] *See* Act of Dec. 21, 1911, ch. 4, 37 Stat. 46 ("[N]o such person at present holding a position or employment in a circuit court shall be debarred from similar appointment or employment in the district court succeeding to such circuit court jurisdiction.").

H.R. Rep. No. 80–308, at A55 (1947). In light of this legislative history, we see no reason to suppose that Congress ever intended to do more than to make fully effective the original prohibition against nepotistical appointments *by judges*, and that the sole function of the change of 1911 was to close a loophole in the original statutory scheme.

## IV

Finally, we note that the consistent practice since the present version of § 458 was enacted in 1911 has been to construe the statute as not applying to presidential appointments. On at least three occasions since 1911, the President has appointed and the Senate has confirmed relatives within the statutory degree of consanguinity to the same court. In 1914, President Woodrow Wilson, just three years after the enactment of § 458 in its present form, appointed Augustus Hand to be a District Judge for the Southern District of New York, even though his first cousin, Learned Hand, had been a District Judge of that court since 1909. In 1927, President Coolidge elevated Judge Augustus Hand to be a Circuit Judge on the United States Court of Appeals for the Second Circuit, even though Judge Learned Hand had been appointed to that court three years earlier. More recently, in 1992, President Bush appointed and the Senate confirmed Judge Morris Arnold to be a Circuit Judge on the United States Court of Appeals for the Eighth Circuit, although his brother, Judge Richard Arnold, was already a member of that body.

In addition, if the practical construction of § 458 by the President and the Senate were to hold that it applies to presidential appointments, there would be a significant question as to the validity of a number of appointments where one relative served on an appeals court while another served on a district court. Specifically, it is not clear whether, for purposes of § 458, a district court is a component of the court of appeals for the circuit in which the district is located. Most recently, Diana Motz was confirmed and appointed to the United States Court of Appeals for the Fourth Circuit in 1994, while her husband, Frederick Motz, was a judge for the District of Maryland.

We are not aware of anyone ever proposing that § 458 applies to presidential appointments of federal judges. In this light, applying § 458 to presidential appointments of federal judges would represent a novel construction of the statute. We do not reject this construction, however, because it is novel. We reject it because it is contrary to the statute's language, structure, and purpose, as well as the consistent practice under that statute from the date of its enactment.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*