# EXHIBIT M

# EXECUTIVE BRANCH LEGAL INTERPRETATION: A PERSPECTIVE FROM THE OFFICE OF LEGAL COUNSEL

RANDOLPH D. MOSS[*]

## TABLE OF CONTENTS

Introduction ............................................................................................... 1303
  I.  The Neutral Expositor Model ...................................................... 1306
 II.  Counterarguments and Refinements ............................................ 1316
      A.  The Respective Roles of Lawyer and Client ........................ 1316
      B.  Legal Indeterminacy .............................................................. 1321
      C.  Democratic Accountability ..................................................... 1326
Conclusion .................................................................................................. 1330

## INTRODUCTION

 Much has been written about the role of the courts in interpreting the law.  In contrast, executive branch legal interpretation has received considerably less attention.[1]  The relative inattention to the executive branch as an

   *  Assistant Attorney General, Office of Legal Counsel, United States Department of Justice.  I am grateful to Evan Caminker, Maame Ewusi-Mensah, Vicki Jackson, Dawn Johnsen, Dan Koffsky, Marty Lederman, Trevor Morrison, Jeff Powell, and Bill Treanor for helpful comments on drafts of this Article.

   1.  A number of scholars have recently directed their attention to executive branch legal interpretation.  Among these important contributions is the first "case book" collecting and considering legal opinions of the Attorneys General.  *See* H. JEFFERSON POWELL, THE CONSTITUTION AND THE ATTORNEYS GENERAL (1999); *see also Symposium: Executive Branch Interpretation of the Law*, 15 CARDOZO L. REV. 21-523 (1993); 1 LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 264-67 (3d ed. 2000); Michael Stokes Paulsen, *The Most Dangerous Branch: Executive Power to Say What the Law Is*, 83 GEO. L.J. 217 (1994) [hereinafter Paulsen, *The Most Dangerous Branch*]; Christopher L. Eisgruber, *The Most Competent Branches: A Response to Professor Paulsen*, 83 GEO. L.J. 347 (1994); Sanford Levison, *Constitutional Protestantism in Theory and Practice: Two Questions for Michael Stokes Paulsen and One for His Critics*, 83 GEO. L.J. 373 (1994); Larry Alexander & Frederick Schauer, *On Extrajudicial Constitutional Interpretation*, 110 HARV. L. REV. 1359 (1997); *Symposium, Elected Branch Influences in Constitutional Decisionmaking*, 56 LAW & CONTEMP. PROBS. 1 (Autumn 1993); John Harrison, *The Role of the Legislative and Executive Branches in Interpreting the Constitution*, 73 CORNELL L. REV. 371 (1988).

Case 1:21-cr-00670-CJN    Document 58-13    Filed 04/15/22    Page 3 of 29

expositor of the law is striking given the extraordinary breadth and significance of executive branch legal interpretation. In the process of executing the laws, the executive branch is perpetually involved in giving the law meaning. From questions as profound as the circumstances under which the United States may commit its troops overseas[2] or assert executive privilege,[3] to issues as mundane as when a regulation is deemed "promulgated" under the Administrative Procedure Act,[4] the executive branch has historically interpreted—and thereby helped define—the law. In the vast majority of cases, moreover, executive branch interpretation is not subjected to judicial review. At times, no particular individuals are adversely affected by an executive branch legal interpretation. At others times, individuals are adversely affected, but either do not care to bring suit, or are foreclosed from doing so due to lack of a cause of action, lack of standing, mootness, ripeness, or other rules of non-justiciability.

Given the prevalence, importance, and frequent finality of executive branch legal interpretation, it is important to consider the standards governing that interpretative process.[5] Among the far-ranging questions this subject raises are issues as fundamental as the extent to which the executive branch should consider judicial pronouncements (and judgments) control-

---

2  *See, e.g.,* Deployment of United States Armed Forces into Haiti, 18 Op. Off. Legal Counsel 173, 179 (1994) (concluding that the President possessed legal authority to order deployment of troops into Haiti); Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization, 4A Op. Off. Legal Counsel 185, 186 (1980) (considering President's authority to deploy armed forces abroad without direct congressional authorization).

3.  *See, e.g.,* 1 WRITINGS OF THOMAS JEFFERSON 303-05 (Andrew A. Lipscomb ed., 1904) (discussing President Washington's request for advice from his cabinet regarding propriety of withholding from the House of Representatives documents related to the failure of General St. Clair's military expedition of 1791); *see also* HOUSE PERMANENT SELECT COMM. ON INTELLIGENCE, 106TH CONG. 1ST SESS., RECORD OF PROCEEDINGS ON H.R. 3829, THE INTELLIGENCE COMMUNITY WHISTLEBLOWER PROTECTION ACT 8 (Comm. Print 1998) (statement of Randolph D. Moss, Deputy Assistant Attorney General, Office of Legal Counsel) (stating precedent for executive authority to control secret documents).

4.  *See* Memorandum Opinion for the Attorney General: Federal Register Act—Date of "Promulgation" of Law Enforcement Assistance Administration Regulations, 1 Op. Off. Legal Counsel 12 (1977) (opining that filing of a regulation with the Federal Register constitutes promulgation).

5.  This question is distinct from consideration of what standards should govern in deciding whether and how the Department of Justice defends a statute or executive action, once challenged. *See, e.g.,* The Attorney General's Role as Chief Litigator for the United States, 6 Op. Off. Legal Counsel 47, 48 (1982); Drew S. Days III, *In Search of the Solicitor General's Clients: A Drama with Many Characters,* 83 KY. L.J. 485, 487 (1995); Mark B. Stern & Alisa B. Klein, *The Government's Litigator, Taking Clients Seriously,* 52 ADMIN. L. REV. 1409, 1410 (2000).

ling on its interpretation of the law[6] and whether the executive branch may appropriately decline to execute a constitutionally dubious statute.[7]  This Article, however, offers some thoughts on the antecedent question of the role of the executive branch lawyer.

To be sure, not all lawyers who work in the executive branch perform the same roles, and not all need—or should—approach this question from the same perspective.  It is appropriate and worthwhile to have some lawyers in government who, for example, are charged with nothing more than thinking creatively, testing assumptions, and ensuring that other executive branch lawyers do not needlessly hinder the effectuation of executive branch policy.  I will focus here on the role of the executive branch lawyer, however, from the perspective of the lawyers in the Department of Justice's Office of Legal Counsel.  When the views of the Office of Legal Counsel are sought on the question of the legality of a proposed executive branch action, those views are typically treated as conclusive and binding within the executive branch.  The legal advice of the Office, often embodied in formal, written opinions, constitutes the legal position of the executive branch, unless overruled by the President or the Attorney General.[8]  It is in this sense—the sense of the lawyer who is responsible for making decisions on behalf of the government regarding the interpretation of the laws—that I use the phrase "executive branch lawyer" in this Article.[9]

While the role of the executive branch lawyer cannot be reduced to any single model, it is helpful to consider two fundamentally distinct conceptions of how executive branch lawyers might approach legal interpretation.  Under the first model, the executive branch lawyer acts as an advocate, proffering any reasonable argument in support of his client's policy objec-

---

6.  *See* Paulsen, *The Most Dangerous Branch, supra* note 1, at 263; Michael Stokes Paulsen, *The Merryman Power and the Dilemma of Autonomous Executive Branch Interpretation*, 15 CARDOZO L. REV. 81, 83 (1993) [hereinafter Paulsen, *The* Merryman *Power*]; Eisgruber, *supra* note 1, at 347-49; Burt Neuborne, *The Role of the Legislative and Executive Branches in Interpreting the Constitution*, 73 CORNELL L. REV. 375, 377 (1998).

7.  *See, e.g.*, Frank H. Easterbrook, *Presidential Review*, 40 CASE W. RES. L. REV. 905, 924 (1989-90); Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199, 200-03 (1994); Dawn E. Johnson, *Presidential Non-Enforcement of Constitutionality Objectionable Statutes*, 63 LAW & CONTEMP. PROBS., 2000, at (forthcomming 2000).

8.  Since January 1977, the Office of Legal Counsel has, at the direction of the Attorney General, published selected opinions "for the convenience of the executive, legislative, and judicial branches of the Government, and for the convenience of the professional bar and the general public."  Leon Ulman, *Foreward* to 1 Op. Off. Legal Counsel, at v (1977); *see also* 28 U.S.C. § 521 (1994).

9.  I do not address the distinct, but equally important, responsibility of executive branch lawyers to help implement and explicate legal determinations made by the President.

tives.[10]  Only when no reasonable argument may be formed should the lawyer opine that action should not be taken.  The lawyer may candidly assess the relative merits of competing arguments for his client, but ultimately should not stand as a roadblock to the effectuation of administration policy unless the legal hurdles are clearly insurmountable.[11]  Under the second model, the executive branch lawyer acts more as a judge than as an advocate.[12]  He rejects legal arguments, even if reasonable, that do not represent the *best* view of the law.  Like a judge, the lawyer shuns consideration of his client's desired policy goals and acts instead with complete impartiality.[13]

Each of these models is, of course, a caricature, both overstating and understating the obligations of the executive branch lawyer.  The lawyer as advocate model overstates the lawyer's obligation to promote his client's policy objectives, and understates the obligation neutrally to interpret the law.  The lawyer as neutral expositor model, in contrast, is too quick to equate the executive branch lawyer with an Article III judge.  As developed below, in my view, the executive branch lawyer should work within the framework and tradition of executive branch legal interpretation and seek ways to further the legal and policy goals of the administration he serves.  He should do so, however, within the framework of the *best* view of the law and, in that sense should take the obligation neutrally to interpret the law as seriously as a court.  This is particularly so for to the Attorney General, and by delegation, the Office of Legal Counsel, who bear a distinct responsibility in executive branch legal interpretation.

## I.  THE NEUTRAL EXPOSITOR MODEL

When Congress created the office of Attorney General in the final section of the Judiciary Act of 1789, it assigned to that office only two duties: "to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned," and "to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments."[14]  Although the duties of the

---

10.  *See* John O. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon*, 15 CARDOZO L. REV. 375, 377, 402-03 (1993) (labeling this the "situational model" of opinion writing).

11.  *See id.* at 403.

12.  *See, e.g.*, HOMER CUMMINGS & CARL MCFARLAND, FEDERAL JUSTICE: CHAPTERS IN THE HISTORY OF JUSTICE AND THE FEDERAL EXECUTIVE 90 (1970) (quoting letter from Attorney General William Wirt to Secretary of War Calhoun).

13.  *See id.*

14.  Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93 (1845) (codified as amended in

Attorney General have undergone dramatic expansion, over two hundred years later she retains the duty to "give [her] advice and opinion on questions of law when required by the President,"[15] and to provide her "opinion . . . on questions of law arising in the administration of [a] department" when requested by the head of that department.[16]  In more recent years, Presidents have, by executive order, added two important refinements to these general duties.  First, the President has directed that the Attorney General resolve interagency legal disputes.[17]  Under this Executive Order, agencies are "encouraged" to submit to the Attorney General for resolution all legal disputes that the agencies are "unable to resolve . . . between them[selves]," and, under certain circumstances, are *required* to submit such disputes to the Attorney General for resolution.[18]  Second, the President has directed that the Director of the Office of Management and Budget transmit all proposed executive orders and proclamations to the Attorney General for her legal review prior to transmission to the President.[19]

---

28 U.S.C. § 511 (1994)).

   15.  28 U.S.C. § 511 (1994).

   16.  *Id.* § 512.  Without this provision, it is not clear that the Attorney General would possess statutory authority to provide legal advice to the various executive departments. *See* Duties of the Attorney General, 1 Op. Att'y Gen. 335, 336 (1820) (opining that if the Attorney General enlarges the sphere of official duties beyond that prescribed in the Judiciary Act he/she violates the oath of office).

   17.  *See* Exec. Order No. 12,146, 3 C.F.R. 409, 411 (1979).

   18.  The Executive Order provides in relevant part:

1-4.  Resolution of Interagency Legal Disputes.

1-401.  Whenever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General.

1-402.  Whenever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve such a dispute, the agencies shall submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere.

*Id.*

   19.  Executive Order No. 11,030, 3 C.F.R. 610, 611 (1959-63), *reprinted in* 44 U.S.C. § 1505 (1994), provides in relevant part:

Sec. 2(b).  If the Director of the Bureau of the Budget approves [a] proposed Executive order or proclamation, he shall transmit it to the Attorney General for [her] consideration as to both form and legality.

(c) If the Attorney General approves the proposed Executive order or proclamation, [s]he shall transmit it to the Director of the Office of the Federal Register, National Archives and Records Service, General Services Administration: *Provided*, that in cases involving sufficient urgency the Attorney General may transmit it directly to the President; and *provided further*, that the authority vested in the Attorney General by this section may be delegated by [her], in whole or in part, to the Deputy Attorney General, Solicitor General, or to such Assistant Attorney General as [s]he may desig-

The Attorney General has delegated each of these responsibilities to the Office of Legal Counsel. Under Department regulations, the Office of Legal Counsel is authorized, among other things, to provide legal advice within the executive branch, to prepare and render legal opinions, and to advise "as to [the] form and legality [of proposed executive orders and proclamations] prior to their transmission to the President."[20] Today, the Office of Legal Counsel renders all but a small portion of the formal legal opinions of the Department of Justice.

Few have addressed how the Attorney General and, more recently, the Office of Legal Counsel, should go about discharging these duties. It has been reported that President Washington informed the Nation's first Attorney General, Edmund Randolph, that he wanted "to find a skilled, neutral expounder of the law rather than a political advisor,"[21] and Randolph's service as Attorney General demonstrates that he, in fact, adopted that approach.[22] Other Attorneys General have echoed this view of their role and have followed suit.[23]

---

nate.

. . . .

(e) If the proposed Executive order or proclamation is disapproved by . . . the Attorney General, it shall not thereafter be presented to the President unless it is accompanied by a statement of the reasons for such disapproval.

20.  28 C.F.R. § 0.25(b) (1999).

21.  Griffin B. Bell, *Office of Attorney General's Client Relationship*, 36 BUS. LAW. 791, 791 (1981).

22.  *See, e.g.*, Walter Dellinger & H. Jefferson Powell, *The Constitutionality of the Bank Bill: The Attorney General's First Constitutional Law Opinions*, 44 DUKE L.J. 110, 112 (1994) ("Randolph, far more than either Hamilton or Jefferson, made a conscious attempt to distinguish his professional judgment about the legal question of constitutionality from his political judgment about the desirability of a national bank.").

23.   Attorney General William Wirt wrote in a letter to Secretary of War Calhoun:
"I do not consider myself as the advocate of the government . . . but as a judge, called to decide a question of law with the impartiality and integrity which characterizes the judiciary. I should consider myself as dishonoring the high-minded government, whose officer I am, in permitting my judgment to be warped in deciding any question officially by the one sided artifice of the professional advocate."

CUMMINGS & MCFARLAND, *supra* note 12, at 90 (citation omitted); *see also* GRIFFIN B. BELL & RONALD J. OSTROW, TAKING CARE OF THE LAW 185 (1982) (referring to "attorney general's duty to define the legal limits of executive action in a neutral manner"); William P. Barr, *Attorney General's Remarks, Benjamin Cardozo School of Law, November 15, 1992*, 15 CARDOZO L. REV. 31, 34-35 (1993) (emphasizing that "Attorney General's ultimate allegiance must be to the rule of law"); DAVID R. DEENER, THE UNITED STATES ATTORNEYS GENERAL AND INTERNATIONAL LAW 81 (1957) (quoting former Solicitor General Charles Fahy: "'The Attorney General is under the responsibility of giving the President his legal opinion, rather than giving an opinion to meet the policy view of the President.'").

In a particularly expansive statement by an Attorney General regarding his interpretative duties, Attorney General Caleb Cushing wrote to President Pierce in 1854, concluding that his duty to provide advice and opinions on questions of law was "quasi-judicial" in nature, and that "whether it be so or not, he feels, in the performance of . . . his duty [to provide advice and opinion], that he is not a counsel giving advice to the Government as his client, but a public officer, acting judicially, under all the solemn responsibilities of conscience and of legal obligation."[24]   Attorney General Cushing explained:

> In the discharge of the [statutory duty to provide legal advice and opinions], . . . the action of the Attorney General is quasi-judicial. His opinions officially define the law, in a multitude of cases, where his decision is in practice final and conclusive,— not only as respects the action of public officers in administrative matters, who are thus relieved from the responsibility which would otherwise attach to their acts,—but also in questions of private right, inasmuch as parties, having concerns with the Government, possess in general no means of bringing a controverted matter before the courts of law, and can obtain a purely legal decision of the controversy, as distinguished from an administrative one, only by reference to the Attorney General.[25]

Unfortunately, Attorney General Cushing's analysis does not clearly identify the source of the Attorney General's "quasi-judicial" role. Before exploring the strength of Cushing's position, I will consider the possible foundations for this view of the role of the Attorney General, and, by extension, the Office of Legal Counsel. Three possibilities exist.

First, the Attorney General's quasi-judicial role could be said to exist by virtue of statute. Although Congress has never expressly charged the Attorney General with providing objective, quasi-judicial advice, Congress may implicitly have done so in creating it's office of "Attorney General," and charging that office with the duty of giving "opinion[s] on questions of law." By using the phrase "Attorney General," Congress apparently in-

---

In the heat of a Senate debate over the legitimacy of various Attorney General opinions on the scope of the Recess Appointments Clause, former Attorney General Reverdy Johnson, then a member of the Senate, responded to the suggestion that "their opinions were not entitled to the weight that should be otherwise accorded to them because they held their office under the President, and they may have fashioned their opinions to suit the views of the President." CONG. GLOBE, 39th Cong., 1st Sess. 2116 (1866). With a touch of fight, he noted that the former Attorneys General were "men as far incapable of being influenced by any political consideration, and certainly as far from being influenced by any opinion which the President might entertain, as the honorable member from Illinois, or anybody else, could be in any situation in which they might be placed." *Id.* He added, this time with perhaps a touch of hyperbole, that the Attorneys General "are . . . *quasi-judicial* officers, and as far as I am advised . . . there never has been an opinion given by any incumbent of that office upon any question which he did not believe to be in itself sound." *Id.*

24. Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854).

25. *Id.* at 333-34.

tended to reference the functions of "the similar office with the same designation existing under English law,"[26] an office that, among other functions, carried a tradition of providing objective legal advice to the government.[27] Similarly, in using the statutory term "opinion[s]," Congress seems, at least implicitly, to have required some level of objectivity. Literally, the term requires a "persuasion of mind,"[28] and not merely the ability to articulate a colorable argument. Moreover, the congressional debate preceding adoption of the legislation that created the Department of Justice in 1870, and that re-enacted the provision authorizing the Attorney General to provide legal opinions to the heads of the executive departments, lends some support to this view. The proponents of the legislation were principally concerned with consolidating the legal offices of the executive branch to promote greater consistency and efficiency.[29] They also expressed concern, however, that counsel within particular agencies, who are

> [s]ubject to the control of the heads of the Departments, in some instances give advice which seems to have been instigated by the heads of the Department, or at least advice which seems designed to strengthen the resolution to which the head of the Department may have come in a particular instance.[30]

The very notion of a system designed to promote consistency and uniformity in legal advice, moreover, seems to presuppose that the advice provided will be objective and not colored by the exigencies of a particular circumstance or policy goal. In transferring ultimate responsibility for the rendition of legal opinions from a dispersed group of executive branch legal officers to the Attorney General, then, the Congress seems at least implicitly

---

26. United States v. San Jacinto Tin Co., 125 U.S. 273, 280 (1888).

27. *See, e.g.*, Sir Elwyn Jones, The Office of Attorney-General, 27 CAMBRIDGE L.J. 43, 50 (1969) ("[T]he basic requirement of our constitution is that however much of a political animal [the Attorney General] may be when he is dealing with political matters, he must not allow political considerations to affect his actions in those matters in which he has to act in an impartial and even quasi-judicial way.").

28. 1 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1755) (defining "opinion" to mean "[p]ersuasion of the mind, without proof or certain knowledge"); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1582 (Philip Babcock Groove ed., 1993) (defining "opinion" to mean "a view, judgment, or appraisal formed in the mind about a particular matter or particular matters" and "the formal expression (as by a judge, court, referee) of the legal reasons and principles upon which a legal decision is based").

29. *See, e.g.*, CONG. GLOBE, 41st Cong., 2d Sess. 3065 (1870) (statement of Rep. Lawrence) ("[T]he bill is necessary to secure uniformity in the legal opinions given to the President, and the heads of Departments, the heads of bureaus, and other officers of the Government for the guidance of their official action" and "to save the unnecessary expenditure of more than one hundred thousand dollars annually for extra official fees to counsel"); *Id.* at 3035-36 (1870) (statement of Rep. Jenckes) (stating the purpose of bill to "cut off . . . outside work" and establish a "unity of jurisprudence").

30. *Id.* at 3036 (statement of Rep. Jenckes).

to have endorsed the "quasi-judicial" role of the Attorney General.[31]

Second, there are strong prudential reasons for the Attorney General and the Office of Legal Counsel to strive to find the best view of the law, rather than to accept (and endorse) any reasonable argument that promotes the goals and interests of the President and his senior policy advisers. Objectivity and balance in providing legal advice are the currency of the Attorney General and the Office of Legal Counsel. That is, the legal opinions of the Attorney General and the Office of Legal Counsel will likely be valued only to the extent they are viewed by others in the executive branch, the courts, the Congress, and the public as fair, neutral, and well-reasoned. It is less likely, for example, that an Office of Legal Counsel opinion will conclusively resolve a long-standing interagency dispute if that opinion, or the typical approach of the Office, is seen as unobjective or tilted. Likewise, Congress is less likely to take seriously a constitutional objection to proposed legislation if that objection, or the general approach of the Office, is seen as policy—as opposed to legally—driven. For similar reasons, there is little reason for clients of the Office of Legal Counsel to ask whether a proposed action is legally colorable, as opposed to whether the action is authorized under the best view of the law. While posing the question in the former fashion might increase the likelihood of obtaining a favorable response, such a response will do little to assist the client in the face of subsequent criticism. A candid statement by the Attorney General

---

31. The fact that the 1870 legislation was ultimately unsuccessful in consolidating the rendition of legal advice in the Department of Justice does not undermine this conclusion. The 1870 legislation transferred "several solicitors from the Departments in which they [were then] located and [placed] them under the control of the Attorney General." *Id.* at 3036 (statement of Rep. Jenckes). The law further contemplated "that any advice or legal opinion which may be sought by any officer of the Government shall be sought" from the Attorney General, who could then, in turn, refer questions to the solicitors who had been transferred to the Department of Justice. *Id.* Confusion arose, however, regarding the status of the transferred solicitors, who continued to maintain their offices in their former departments and who continued to provide advice exclusively on questions posed by their former departments. *See* DEENER, *supra* note 23, at 28. As a result, the legislation failed to change "the 'practical relations' between the departmental law officers and their respective department heads." *Id.* at 29. By 1924, the Joint Committee on Reorganization of the Executive Departments recommended that the law be revised to reflect the practical reality that the departmental solicitors maintained only a nominal connection to the Department of Justice, and, in fact, continued to serve as legal advisers for particular departments, and, subsequently, the various departmental solicitors were transferred to the respective agencies they served. *See id.* at 29-30 ("'Their status in the departments where they perform their duties is precisely the same, in effect, as that of the regular officers of those departments.'" (footnote omitted)). There is no evidence, however, that the return of the solicitors to the various departments is at odds with the conclusion that the Attorney General's statutory responsibility to provide legal opinions derives, in part, from a desire to promote consistency and uniformity in executive branch legal interpretation.

or the Office of Legal Counsel that the action was supported by reasonable arguments, as opposed to a statement that the action was, under the best view of the law, legally authorized, would invite more questions than it would answer. The question would still remain whether the official acted legally, and a new question might be posed: why didn't the official seek advice on the best view of the law?

The third, and most compelling reason why the Attorney General and the Office of Legal Counsel must accept only the strongest legal arguments is that the Constitution mandates that the Executive branch interpret and apply the law—no less than the courts—as objectively and accurately as possible. There can be little doubt that the Framers understood that in charging the President with executing the law, they were necessarily conferring on the Executive the incidental authority to interpret the law. As Hamilton observed in *Federalist No. 33*, "the national government . . . must [be the] judge, in the first instance, of the proper exercise of its powers."[32] Joseph Story subsequently noted that constitutional structure, which provides a limited grant of powers, necessarily contemplates that government "functionaries must, in the first instance, decide" whether they possess the constitutional authority to act.[33] And, more recently, the Supreme Court has emphasized that there is "[n]o doubt the political branches have a role in interpreting and applying the Constitution,"[34] and that "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."[35] Both the text and structure of the Constitution strongly support the view that this interpretive function requires objectivity and should not, absent at least implicit authorization,[36] be swayed by extraneous considerations, such as a the desirability of a particular policy outcome.

Two particular provisions of Article II of the Constitution support this conclusion. First, the Take Care Clause seems, on its face, to speak directly to the question. It provides that the President "shall take care that the laws be faithfully executed."[37] The Framers reasonably could have omitted the word "faithfully" and charged that the President "take Care that the Laws be executed." The addition of the word "faithfully" demonstrates the

---

32. THE FEDERALIST NO. 33, at 85 (Alexander Hamilton) (Roy P. Fairfield ed., 2d ed. 1966).

33. 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 345 (1833).

34. United States v. Morrison, 120 S. Ct. 1740, 1753 n.7 (2000).

35. Bowsher v. Synar, 478 U.S. 714, 733 (1986).

36. For a discussion of congressional delegation of authority to interpret statutory provisions in light of policy considerations see *infra* at Part II.C.

37. U.S. CONST. art. II, § 3.

Framer's intent to stress the President's obligation to perform his duties with a steadfast and principled adherence to the law.[38] The obligation is not to execute the law in a *reasonable* or *colorable* manner, but in a *faithful* manner.

Although the meaning of the Take Care Clause is, in some respects, unsettled,[39] at a minimum, the Clause should be understood to stand for the proposition that "whatever valid legal requirements might exist" must be conscientiously followed.[40] As Attorney General Civiletti observed in a 1980 letter to the Chairman of a Senate subcommittee, the Framers were well aware of "the 17th century dispute between Parliament and the Stuart kings over the so-called 'dispensing power'"—that is, the power to defy a legislative act—"and it is clear that they intended to deny our President any discretionary power of the sort that the Stuarts claimed."[41] The Take Care Clause resolves any ambiguity on this point and makes clear that the President lacks a general dispensing power.[42]

---

38. *See* Martin S. Flaherty, *The Most Dangerous Branch*, 105 YALE L.J. 1725, 1794 (1996) (stating that the Take Care Clause mandates "that the executive remain faithful to something other than his whim—presumably federal laws and the Constitution"); Paulsen, *The Most Dangerous Branch*, *supra* note 1, at 261 ("'Faithful' execution of the laws implies execution in accordance with a proper interpretation of those laws and applicable constitutional principles."); *see also* JOHNSON, *supra* note 28 (defining "faithfully" to mean "[w]ith strict adherence to duty and allegiance").

39. *See, e.g.*, Evan Caminker, *The Constitutionality of* Qui Tam *Actions*, 99 YALE L.J. 341, 356 (1989) (noting that "[t]he Supreme Court has suggested occasionally that the 'take Care' clause vests the President with prosecutorial discretion," but arguing that the "clause is better viewed as a mandate to follow the will of Congress than as a grant of exogenously defined power").

40. Memoranda of the Office of Legal Counsel, Constitutional Limitations on Federal Government Participation in Binding Arbitration 24 (Sept. 7, 1995) <http://www.usdoj.gov/olc/1995opinions.htm>; Memoranda of the Office of Legal Counsel, Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion 1, 15 (June 15, 1999) <http://www.usdoj.gov/olc/ 1999opinions.htm>; *see also* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("[T]he embracing function of the President is that 'he shall take Care that the Laws be faithfully executed . . . .' Art. II, § 3. The nature of that authority has for me been comprehensively indicated by Mr. Justice Holmes. 'The duty of the President to see that the laws be faithfully executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.'" (quoting Myers v. United States, 272 U.S. 52, 177 (1926)).

41. The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation, 4A Op. Off. Legal Counsel 55, 57 (1980).

42. Memoranda of the Office of Legal Counsel, Constitutional Limitations on Federal Government Participation in Binding Arbitration 23 n.29, 24 nn.30 & 31 (Sept. 7, 1995) <http://www.usdoj.gov/olc/1995opinions.htm>; Angelus Milling Co. v. Commissioner of Internal Revenue, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of . . . offi-

The question whether the President has the authority to "dispense" with disfavored statutes is of a kind with the question whether the President must strive to find the best interpretation of the law or may settle for a reasonable interpretation that supports his policy goals. As to both questions, the Take Care Clause makes clear that the President must execute the law embodied in the Constitution and statutes of the United States, and may not substitute his judgment for that embodied in the law. If there is a better view of the law, which is rejected for policy reasons, the President has, in essence, dispensed with the law as established and substituted his own standard.[43]

Second, the Presidential Oath Clause emphasizes the gravity of the requirement that the President "faithfully" discharge his duties. While all federal and state officials are required under Article VI of the Constitution to take an oath to support the Constitution,[44] the President is required to take a special oath. He must "solemnly" swear or affirm that he "will faithfully execute the Office of the President of the United States, and will to the best of [his] Ability, preserve, protect and defend the Constitution of the United States."[45] In only one other place in the Constitution is a special oath required, and that is where the Senate exercises its extraordinary duty to sit as a court of impeachment.[46] And in no other constitutional provision are the precise words of the actual oath to be taken themselves set forth, as opposed to a general command that there be some oath.

There is, of course, a significant similarity between the command of the Take Care Clause that the President see to it "that the laws are faithfully executed," and the first portion of the Presidential Oath Clause, which requires that the President "solemnly" commit to "faithfully execute the Of-

---

cials."); Chadha v. INS, 462 U.S. 919, 953 n.16 (1983) ("'[I]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.'" (citation omitted)). The lack of a dispensing power, however, does not suggest that the President must execute unconstitutional statutes. As the Office of Legal Counsel has observed: "In those rare instances in which the Executive may lawfully act in contravention of a statute, it is the Constitution that dispenses with the operation of the statute. The Executive cannot." The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation, 4A Op. Off. Legal Counsel 55, 60 (1980); *see also* Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199, 200 (1994).

43. To be sure, as discussed *infra*, Congress may implicitly or explicitly delegate to the executive branch authority to resolve legislative ambiguity based on policy considerations. The judgment of whether Congress has done so, however, requires an analysis of the best view of the law, and cannot act as a substitute for it.

44. *See* U.S. CONST. art. VI, cl. 3 (stating that state and federal officials "shall be bound by oath or affirmation" to support the Constitution).

45. U.S. CONST. art. II, § 1, cl. 8.

46. *See* U.S. CONST. art. I, § 3, cl. 6.

fice of the President of the United States." Strikingly, when read together, these clauses require the President to take an oath that he will "faithfully execute" his duties, including his duty "faithfully" to execute the law. To this, the Oath Clause adds the requirement that the President "preserve, protect, and defend the Constitution" to "the *best of his ability*." This language is best understood to require the President to use all of his abilities—including his ability objectively to interpret and apply the Constitution—to "preserve" the Constitution. That is, a President prepared to interpret and apply the Constitution without regard for its best construction and application, but rather based on the expediency of the day, could hardly be said to be preserving the Constitution to the best of his ability.

Even without the Take Care and Presidential Oath Clauses, a compelling argument can be made that the Constitution demands that the executive branch approach its interpretive duties with strict objectivity. The Constitution does not expressly assign to the courts the power to interpret the law.[47] Rather, that power is ancillary to, and arises by implication from, the function of Article III courts to decide particular cases and controversies.[48] The same is true for the executive branch. Although the Constitution does not expressly assign to the executive branch the power to interpret the law, that power is necessarily ancillary to, and arises by implication from, the function of the President in the performance of his Article II duties, including the execution of the law.[49]

Just as each of the branches possesses an ancillary duty to interpret the law, each must, as a matter of constitutional principle, strive to do so in an objective manner. The objectivity of the courts in interpreting the law is, of course, protected by the life tenure and fixed compensation provisions of Article III. These provisions, however, do not, by their terms, themselves give rise to the obligation of federal judges to find the best view of the law, and they do not imply that the other branches lack a similar obligation. Rather, like the Take Care and Presidential Oath Clauses, they reinforce what is already implicit in the Constitution and the very structure of government. The courts, the executive branch and the Congress are established, and bound, by the Constitution and laws of the United States.[50] Those who hold government office do so based exclusively on the constitutional and statutory provisions that give rise to that office and that define

---

47. *See* TRIBE, *supra* note 1, at 722 (stating that the Constitution does not "expressly assign the power" to interpret federal law "to any of the three branches of government").

48. *See* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) ("Those who apply [a legal] rule to a particular case must of necessity expound and interpret that rule.").

49. *See* TRIBE, *supra* note 1, at 726-27.

50. *Cf.* Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199, 200 (1994).

its authorities and responsibilities.  They are empowered to act only to the extent the Constitution or laws of the United States provide that authority; any other act, taken without such authority, is, by definition, ultra vires.

Against this background, the duty of the executive branch lawyer to provide the best, as opposed to a merely colorable, view of the law to his or her client is plain.  In the vast majority of cases, that is the only question that is relevant.  The executive branch has no authority to act beyond the authority provided by the Constitution or statutes of the United States, and, if the Constitution and relevant statutes are *best* construed to preclude a proposed policy or action, it is largely irrelevant whether a *reasonable* argument might be made in favor of the legality of the proposal.  To act beyond the best view of the law is to act beyond those instruments that grant the official the status and authority that he or she seeks to employ.  A reasonable argument might diminish the political cost of the contemplated action and it might avoid embarrassment in the courts, but it cannot provide the authority to act.  Only the best view of the law can do that.

## II.  COUNTERARGUMENTS AND REFINEMENTS

The neutral expositor model, as articulated by Attorney General Cushing, thus finds considerable support in the Constitution, as well as in other legal and prudential considerations.  The model, however, is not without significant counterarguments.   These counterarguments elucidate the strengths and weaknesses of the model, and suggest important refinements to it.  Most significantly, they highlight the fact that the role of the executive branch lawyer cannot entirely be equated with that of an Article III judge.  At the same time, however, none of the counterarguments undermines the fundamental recognition that the executive branch lawyer must always strive to find the best view of the law.  In the end, the role of the executive branch lawyer is best understood as requiring both a firm allegiance to the rule of law and a respect for the unique structure of the executive branch, including the ultimate authority and democratic accountability of the President.

### A.  *The Respective Roles of Lawyer and Client*

One might first take issue with the premise that the role of the executive branch lawyer is, in any significant way, distinct from the role of a lawyer in private practice.  Both have clients, and both have an obligation to provide their clients with candid, considered advice.  Absent extraordinary circumstances, moreover, it is for the client to determine what advice to seek and to decide how to proceed in light of that advice.  As one commentator has observed:

> Like clients in private practice, the President is responsible for his own decisions, and in fact he has the authority either to make his own legal determinations without consulting any particular lawyer or to proceed in the face of contrary advice from any lawyer he does consult. Accordingly, there is no obvious reason for him to have less freedom than private clients to require from his lawyers the kind of legal advice he thinks will be most useful to him. It is true that the President has legal obligations that are different from those of any private citizen, but they are *his* obligations, not those of his lawyers or other subordinates.[51]

In short, the neutral expositor model is flawed, according to this counterargument, because it would support an arrogation of authority from client to lawyer. It is the President, and the agency heads based on his general direction, who must make the ultimate decision whether to go forward with particular initiatives, and it is the role of the lawyer merely to provide these clients with relevant information that will help them weigh the costs—including legal risks—and benefits of proposed actions.[52]

It is undoubtedly true that the President is entitled to reserve to himself many significant—and even trivial—questions of executive branch legal interpretation, and that he is entitled to seek whatever advice he believes appropriate to help inform his decisions. President Washington, for example, on a number of occasions sought the advice of multiple members of his cabinet on important questions of law. He sought and obtained written opinions from Secretary of the Treasury Alexander Hamilton, Secretary of State Thomas Jefferson, and Attorney General Randolph on the constitutionality of the national bank,[53] and he sought advice from his entire cabinet before invoking executive privilege for the first time.[54] Even more to the point, President Roosevelt signed his own opinion (drafted by a Justice Department lawyer) declaring unconstitutional what we term today the legislative veto, despite the contrary view of Attorney General Robert Jackson,[55] and President Taft heard extensive argument, reviewed 1,200 pages of testimony, and then issued an opinion defining the term "whiskey" for purposes of the pure food laws, in which he disagreed with the view taken by his Attorney General.[56]

---

51.  Nelson Lund, *Rational Choice at the Office of Legal Counsel*, 15 CARDOZO L. REV. 437, 449 (1993) (citations omitted).

52.  Professor Lund argues that the President can decide, and can permit the heads of departments to decide, whether to take "a cautious or aggressive approach to the law" in light of Administration goals and the "circumstances and the judgment of the people involved." *Id.* at 450.

53.  *See* Dellinger & Powell, *supra* note 22, at 112.

54.  *See* THE WRITINGS OF THOMAS JEFFERSON, *supra* note 3, at 303-05.

55.  *See* Robert H. Jackson, *A Presidential Legal Opinion*, 66 HARV. L. REV. 1353, 1353-54 (1953). *Cf.* Chadha v. INS, 462 U.S. 919, 966 n.9 (1983).

56.  *See* Lund, *supra* note 51, at 449 n.23.

The fact that the President may reserve to himself the last word on executive branch legal interpretation, however, does not fundamentally alter the role of the Attorney General and the Office of Legal Counsel in providing advice. In the overwhelming majority of cases, when the views of the Attorney General or the Office of Legal Counsel are sought, all understand that those views will conclusively resolve the legal question presented, short of subsequent judicial review.[57] The President, of course, typically has authority to overrule the Department of Justice on a question of law, and has done so on very rare occasions.[58] The President might also make clear that he intends to resolve a particular legal question, and, in that context, might seek input of whatever type he regards helpful. He might, for example, conclude that he believes a particular action is legally permissible, but seek the assurance of the Attorney General that she, at the very least, agrees that the argument he finds convincing is a reasonable one. Such cases, however, are extraordinarily unusual, and the Department, accordingly, must typically assume that, when its legal views are sought, they will become the final view of the executive branch of government.

Similarly, although the heads of departments are not generally required to seek legal guidance from the Department of Justice, when they do so, it is understood that the opinion provided will become the controlling view of the executive branch. Although subject to almost two hundred years of debate and consideration, the question of whether (and in what sense) the opinions of the Attorney General and, more recently, the Office of Legal Counsel, are *legally* binding within the executive branch remains somewhat unsettled.[59] Some have argued that Attorney General opinions "should be considered as law,"[60] binding on executive branch officials "until with-

---

57. The Office of Legal Counsel most frequently provides legal advice to the President in the context of the Office's review of proposed executive orders for form and legality. Under the governing Executive Order, neither a proposed executive order nor proposed proclamation may be forwarded to the President without the approval of either the Attorney General or the Office of Legal Counsel or a statement of their reasons for disapproval. *See* Exec. Order No. 12,146, 3 C.F.R. 409, 411 (1979). I am unaware of any case in which an executive order or proclamation has been forwarded to the President over the legal disapproval of the Attorney General or the Office of Legal Counsel.

58. President Washington, for example, rejected the view of Attorney General Edmund Randolph regarding the constitutionality of the National Bank, in favor of the view argued by Secretary of Treasury Alexander Hamilton, see Dellinger & Powell, *supra* note 22, at 112, and President Roosevelt disagreed with the view of Attorney General Robert Jackson regarding the constitutionality of the legislative veto, see Jackson, *supra* note 55, at 1353.

59. *See* Rita W. Nealon, *The Opinion Function of the Federal Attorney General*, 25 N.Y.U. L. REV. 825, 839, 840 & n.83 (1950).

60. Opinions of Attorneys General and Decisions of Auditors, 5 Op. Att'y Gen. 97, 97 (1849) (opining that the practice of the government has been to follow the opinions of the attorney general, and that these opinions should be considered law) (Attorney General John-

drawn by the Attorney-General or overruled by the courts."[61]   Others, in contrast, have taken the view that Attorney General opinions are "merely advisory,"[62] available to aid the heads of departments "in forming a judgment on questions of law."[63]   Still others, including the Supreme Court, have taken the view that the opinions of the Attorney General *should* be followed within the executive branch, without addressing whether that normative judgment is legally derived.[64]   Few, however, dispute the proposition that whether for legal reasons, to promote uniformity and stability in executive branch legal interpretation, or to avoid the personal risk of being

son); *see also* Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854) ("[T]he opinions of successive Attorneys General, possessed of greater or less amount of legal acumen, acquirement, and experience, have come to constitute a body of legal precedents and exposition, having authority the same in kind, if not the same in degree, with decisions of the courts of justice.") (Attorney General Cushing).

61.   Comptroller—Solicitor of the Treasury—Attorney-General, 20 Op. Att'y Gen. 654, 659 (1893) (Attorney General Olney); *see also* Attorney-General—Opinions—Detail of Registry Clerk to the White House, 25 Op. Att'y Gen. 301, 304 (1904) (stating that the Attorney General's opinion "is final and authoritative under the law, and should be so treated"); CONG. GLOBE, 41st Cong., 2d Sess. 3036 (1870) (statement by Rep. Jenckes) ("Whether the opinion of the Attorney General be right or wrong, it is an opinion that ought to be followed by all the officers of the Government until it is reversed by the decision of some competent court."). *But cf.* CONG. GLOBE, 36th Cong., 2d Sess. 3065 (1870) (statement of Rep. Jenckes) ("The heads of Departments may act on their own discretion; but when they take advice we want to know what that advice is, so that the law department of the Government shall not be giving different advice to different heads of Departments or different bureaus.").

62.   Grant of Land on Des Moines River to Iowa, 5 Op. Att'y Gen. 390, 391 (1851) ("The opinions of the Attorney General are merely advisory. No law gives them any technical, specific, or official consequence or effect.") (Attorney General Crittenden); *see also* Duties of Attorney General—Claims Under Cherokee Treaty, 3 Op. Att'y Gen. 367, 369 (1838) ("Even had the questions been properly referable to this office, the opinions given here would only have been advisory, and would not have bound the department, or the commissioners, on a point in which they might have been deemed erroneous.") (Attorney General Butler).

63.   Collins's Line of Steamships, 9 Op. Att'y Gen. 32, 36 (1857) ("The duty of the Attorney General is to advise, not to decide. . . . You may disregard his opinion if you are sure it is wrong.   He aids you in forming a judgment on questions of law; but still the judgment is yours, not his.   You are not bound to see with his eyes, but only to use the light which he furnishes, in order to see the better with your own.") (Attorney General Black).

64.   *See* Smith v. Jackson, 246 U.S. 388, 389-91 (1918) (finding that Auditor did not have power to refuse to carry out law and any doubt he may have had should have been subordinated to ruling of the Attorney General); *see also* Jurisdiction of Attorney General to Determine Meaning of the Term "Adjustments" as Used in Executive Order No. 6440 of November 18, 1933, as Amended, and Inclusion of Definition of Term in Proposed Order, 37 Op. Att'y Gen. 562, 563 (1934) ("The opinions of the Attorney General as the chief law officer of the Government should be respected and followed in the administration of the executive branch of the Government.") (Attorney General Cummings).

"subject to the imputation of disregarding the law as officially pro-nounced,"[65] executive branch agencies have treated Attorney General (and later the Office of Legal Counsel) opinions as conclusive and binding since at least the time of Attorney General William Wirt.[66] Indeed, we have been able to go for over two hundred years without conclusively determining whether the law demands adherence to Attorney General Opinions because agencies have in practice treated these opinions as binding.[67]

The finality of the Department's views, whether legally required or merely observed in practice, dictates the standard that must govern when the Attorney General and the Office of Law Counsel render legal opinions. As Attorney General Cushing observed, the Attorney General's "opinions

---

65.   Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854) (Attor-ney General Cushing).

66.   Letter from William Wirt, Attorney General, to Hugh Nelson, Chairman of the Ju-diciary Committee, House of Representatives, *in* 2 JOHN P. KENNEDY, MEMOIRS OF THE LIFE OF WILLIAM WIRT 62 (1850) ("[I]n relation, at least, to questions on municipal law, which are incessantly occurring, it is understood that the heads of the departments consider the ad-vice of the law officer conclusive."); Attorney-General, 20 Op. Att'y Gen. 383, 384 (1892) (explaining that "the general practice of the Government has been to follow" opinions of the Attorney General) (Acting Attorney General Aldrich).

67.   In certain areas, it seems plain that the law does require that agencies adhere to Attorney General and Office of Legal Counsel opinions. Executive Order 12,146, for ex-ample, provides for the submission of interagency legal disputes to the Attorney General (and, by delegation, the Office of Legal Counsel) for resolution. Exec. Order No. 12,146, 3 C.F.R. 409, 411 (1979). The very concept of "*resolution* of interagency legal disputes," re-quires a binding determination, absent which the dispute would almost certainly continue. *Id.* (emphasis added).

Although far less clear, it might also be argued that a 1918 executive order issued by President Wilson's requires that all agencies treat Attorney General opinions as binding. In that executive order, President Wilson declared: "[I] do hereby order . . . that any opinion or ruling by the Attorney General upon any question of law arising in any Department, execu-tive bureau, agency or office shall be treated as binding upon all departments, bureaus, agencies or offices therewith concerned." Exec. Order No. 2877 (1918). The status of this executive order, however, is unclear. As indicated in the preamble, the executive order was premised on the President's authority "as Chief Executive" and on a May 20, 1918 statute "authorizing the President to coordinate or consolidate executive bureaus, agencies and of-fices, and for other purposes, in the interest of economy and the more efficient concentration of the Government." *Id.* The May 20, 1918 statute, however, was a wartime measure that expired six months after the end of the war, and it provided that "[u]pon termination of this Act all executive or administrative agencies, departments, commissions, bureaus, offices, or officers shall exercise the same functions, duties, and powers as heretofore or as hereafter by law may be provided, any authorization of the President under this Act to the contrary not-withstanding." § 6, ch. 78, 40 Stat. 556, 557 (1918). Although the statutory basis for the executive order thus no longer exists, it might reasonably be argued that the President exer-cised his non-statutory authority as "Chief Executive" to order that agencies treat Attorney General opinions as binding and that there is no indication that President Wilson intended the executive order to lapse upon the expiration of the separately cited statutory authority.

officially define the law, in a multitude of cases, where his decision is in practice final and conclusive."[68]   Put somewhat differently, because the Attorney General's opinions are treated as "final and conclusive" they necessarily become the executive branch interpretation of the law.  Indeed, as Cushing further suggested, because in many cases private parties have "no means of bringing a controverted matter before the courts," the Attorney General's opinion will define the law more generally.[69]  If one combines this role with the further recognition, discussed above, that the executive branch has an obligation to adopt only the best view of the law, then the role of the Attorney General and the Office of Legal Counsel becomes clear.  That role is distinct from that of the typical private attorney because, at least in practice, the Attorney General and the Office of Legal Counsel define, through their opinions, the meaning of the law for an entire branch of government, and that branch of government has an obligation to get the law right.

### B.  Legal Indeterminacy

The second counterargument challenges the neutral expositor model on the most fundamental of grounds.  That model, so goes this counterargument, rests on the assumption that there, in fact, exists a *best* view of the law and that the government lawyer is able to discover that view.  Greater humility, however, might caution that the law is far from certain and that only a degree of arrogance would permit a government lawyer to permit his own legal views to stand, in the face of a reasonable argument to the contrary, as a roadblock to achieving the policy goals of the President.  Although the significance of this counterargument cannot be discounted, like the first counterargument, it does not require abandonment of the core notion that the executive branch lawyers must strive to find the best view of the law.  It does say something, however, about how he or she should go about doing so.

Scholars have labored for years over the question whether the law is determinate—that is, whether legal dilemmas admit of right and wrong answers.  In one sense, this question is more theoretical than real.  Lawyers, legislators, and judges operate on a daily basis on the understanding that there are right and wrong answers in the law, or, at least, answers that do and must govern relevant conduct.  Theory, moreover, in my view, comports with this reality.  The law involves a vast array of principles and precedents.  The best view of the law is that which provides the most coherent explanation of those principles and precedents.  To be sure, certain

---

68.  Office and Duties of Attorney General, 6 Op. Att'y Gen. at 334.
69.  *Id.*

*ADMINISTRATIVE LAW REVIEW*

principles and precedents may be discarded or overruled when they themselves no longer fit within the most coherent overall understanding of the law. The objective of legal reasoning remains, however, to find the view of the law that best reconciles the relevant body of text, principle and precedent. A judicial opinion that provides the most coherent explanation of the governing text, principles and precedent can be said to represent the *best* view of the law. One that fails to reconcile the proffered result with important text, principles and precedents does not.[70]

Whether premised on mere practice or more considered theory, this conception of legal reasoning and the ability to find the *best* view of the law holds as true for executive branch lawyers as for judges. To be sure, it may prove exceedingly difficult at times to find the best view of the law. Compelling arguments might support opposing conclusions, relevant principles and precedents might conflict, or there might exist very little positive law upon which to draw. Where such uncertainty exists, an executive branch lawyer, like a judge, can seek input from concerned parties, can reconsider conclusions in light of further developments, and can apply legal rules, like the rule of lenity,[71] designed to address uncertainty. Yet, if there exists a *best* view of the law that judges are capable of finding through reasoned analysis, then there is no reason to conclude that executive branch lawyers are any less able, or under a lesser duty, to do so.

Judges, it might be argued in response, must decide hard cases, but executive branch lawyers can, in essence, rely on the judiciary ultimately to achieve the best resolution of difficult legal issues. The premise of this argument is also faulty. In many cases, executive branch legal interpretation is not subject to subsequent judicial review, and, in still others, the executive branch lawyer simply will not know whether suit will be brought. The executive branch lawyer, accordingly, must typically act on the assumption that his or her legal determination will constitute the final word on the meaning of the law at issue. The argument fails, moreover, for an even more fundamental reason. Since all executive and judicial power is derived exclusively from the Constitution and other federal laws, executive and ju-

---

70. *Cf.* RONALD DWORKIN, LAW'S EMPIRE 225 (1986) ("The adjudicative principle of integrity instructs judges to identify legal rights and duties, so far as possible, on the assumption that they were all created by a single author—the community personified—expressing a coherent conception of justice and fairness. . . . According to law as integrity, propositions of law are true if they figure in or follow from the principles of justice, fairness, and procedural due process that provide the best constructive interpretation of the community's legal practice.").

71. *See, e.g.,* Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts, 13 Op. Off. Legal Counsel 300, 304 (1989) ("Under the widely recognized 'rule of lenity,' criminal provisions subject to more than one reasonable construction should be interpreted narrowly, and ambiguity should be resolved in favor of lenience.").

dicial officers, alike, are without power to act beyond the best view of the law. To recognize those limits and to strive to define them as best one can does not constitute an act of arrogance, but of humility. Indeed, to take from that uncertainty the liberty to issue an executive branch legal opinion endorsing a governmental action that is inconsistent with the lawyer's best view of the law—e.g., the lawyer's best understanding of the meaning of a statute—would constitute a fundamental usurpation of authority. Such an opinion, in essence, would constitute an avowal by the lawyer that a government official can engage in some action that the lawyer believes neither the Framers nor the Congress authorized.

This is not to say that the executive branch lawyer should allow his or her personal legal views to dictate the scope of executive branch authority, a point that this counterargument properly highlights. Rather, the executive branch lawyer must approach his or her duty to interpret the law with due respect, not only for judicial precedent, but also for the existing body of executive branch practice and precedent. This rich body of precedent is important for at least three reasons. First, as Justice Frankfurter observed in the Steel Seizure Cases, "[d]eeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them[,]" and can, as a result, make "such exercise of power part of the structure of our government."[72] Thus, for example, the Supreme Court relied on a long-standing executive practice, supported by a number of Attorney General opinions, to uphold an implied presidential power to withdrawn public lands from private acquisition,[73] and relied on "the history of acquiescence in executive claims settlement" in upholding an executive order that suspended those "claims" against Iran that were made subject to resolution before the Iran-United States Claims Tribunal.[74] Similarly, the Office of Legal Counsel has relied upon "constitutional practice over two centuries" to support "the existence of broad constitutional power" of the President to use "military forces abroad in the absence of prior congressional approval."[75] In these, and

---

72. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring).

73. *See* United States v. Midwest Oil Co., 236 U.S. 459, 469-75 (1915). In 1976, Congress "repealed" "the implied authority of the President to make withdrawals and reservations [of public lands] resulting from acquiescence of the Congress." Federal Land Policy and Management Act of 1976, § 704(a), Pub. L. No. 95-579, 90 Stat. 2743, 2792.

74. Dames & Moore v. Regan, 453 U.S. 654, 686 (1981).

75. Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization, 4A Op. Off. Legal Counsel 185, 187 (1980); *see also* Deployment of United States Armed Forces into Haiti, 18 Op. O.L.C. 173, 178 (1994) (citing various instances of executive use of the military without congressional approval, and illustrating that "[s]uch a pattern of executive conduct, made under claim of right, extended over many decades and engaged

other areas, executive branch practice and precedent may help define the scope of presidential authority.[76]

Second, in an important respect, the advice that the executive branch lawyer provides does not come from the individual lawyer, but from the office that he or she holds. When a question is posed to the executive branch lawyer, he or she must, accordingly, provide the office's best view of the law, which in turn requires consideration of relevant office precedents, executive practice, and statements of the law from other executive branch officials, including, most notably, the President.[77] In this sense, for the executive branch lawyer, the best view of the law is not only that which finds coherence in the general body of law, but also finds consistency and principle in the more specific body of executive branch legal interpretation.[78] In writing about the role of judges, Ronald Dworkin observed that the process of judicial interpretation is akin to the writing of a chain novel, an "enterprise [in which] a group of novelists writes a novel *seriatim*; each novelist in the chain interpret[ing] the chapters he has been given in order to write a new chapter, which is then added to what the next novelist receives, and so on."[79] In a similar fashion, Dworkin continues, a judge must take the law as given to him and provide the next chapter.[80] The "interpretation he takes up must . . . flow throughout the text; it must have general explanatory

---

in by Presidents of both parties, 'evidences the existence of broad constitutional power.'").

76.  *See* HAROLD HONGJU KOH, THE NATIONAL SECURITY CONSTITUTION: SHARING THE POWER AFTER THE IRAN-CONTRA AFFAIR 70-71 (1990).

77.  For example, on signing a bill into law, the President might issue a statement providing his view of how the law is properly construed. Although not binding on a court, such a signing statement would "have the effect of binding the statutory interpretation of other executive branch officials." Legal Significance of Presidential Signing Statements, 18 Op. Off. Legal Counsel 131, 132 (1993).

78.  One recent episode involving the Office of Legal Counsel illustrates this point. In September 1994, Assistant Attorney General Walter Dellinger issued a letter to Senators Dole, Simpson, Thurmond and Cohen explaining his conclusion that the President possessed legal authority to deploy the United States military forces in Haiti. *See* Deployment of United States Armed Forces into Haiti, 18 Op. Off. Legal Counsel 173, 173 (1994). Some took issue with Assistant Attorney General Dellinger's conclusion, and, in that context, argued that he had taken a position while a Professor at Duke Law School regarding the commitment of U.S. troops in the Persian Gulf that they believed was in tension with his view as Assistant Attorney General regarding the proposed Haiti deployment. In response, Assistant Attorney General Dellinger noted, first, that the inference that he would have held a different view regarding the Haiti deployment if not a government official was not at all clear, and, second, that "unlike an academic lawyer, an executive branch attorney may have an obligation to work within a tradition of reasoned, executive branch precedent, memorialized in formal written opinions." Walter Dellinger, *After The Cold War: Presidential Power and the Use of Military Force*, 50 U. MIAMI L. REV. 107, 109-10 (1995).

79.  DWORKIN, *supra* note 70, at 229.

80.  *See id.*

power, and it is flawed if it leaves unexplained major structural aspects of the text."[81]   The same is true for the executive branch lawyer, who must provide legal advice in light of what both judges and executive branch lawyers have previously concluded.[82]   To be sure, an executive branch lawyer is not legally bound by most prior executive branch interpretation.   He or she may appropriately disavow prior advice, but, like a court, the executive branch lawyer should have a compelling reason to do so, should not lightly cast aside "the secure foundation of [legal interpretation] laid by others who have gone before him,"[83] and should be prepared to explain why the precedent was discarded.[84]

Although a full treatment of this issue is beyond the scope of this Article, this notion of the role of the executive branch lawyer provides some insight regarding the meaning of "the best view of the law" in executive branch interpretation.   Scholars, for example, have debated whether the executive branch is bound by existing judicial pronouncements and judgments.[85]   The answers to this question may be found, at least in part, in long-standing executive branch practice.   Overwhelming executive branch practice and precedent support the conclusions that the executive branch should, and will, treat final judicial judgments as binding in particular cases,[86] will generally follow established Supreme Court precedents re-

---

81.   *Id.*

82.   *See* H. Jefferson Powell, *The President's Authority over Foreign Affairs: An Executive Branch Perspective*, 67 GEO. WASH. L. REV. 527, 536-37 (1999) ("[P]residential assertions of authority and executive branch legal opinions interpreting the Constitution, are legal authorities that shape the contours within which lawyers should address constitutional issues . . . . The tradition of formal legal arguments by presidents and their legal advisors is . . . central to the executive's fulfillment over time of the President's duty to interpret and ensure the faithful execution of the Constitution.").

83.   Runyon v. McCrary, 427 U.S. 160, 191 (1976) (Stevens, J., concurring) (quoting BENJAMIN CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 149 (1921)); *see also* Harold Hongju Koh, *Protecting the Office of Legal Counsel from Itself*, 15 CARDOZO L. REV. 513, 516 (1993).

84.   *Id.* at 523.

85.   *See supra* note 6.

86.   *See* Powell, *supra* note 82, at 532-33 (noting "executive's long-acknowledged duty to execute particular judicial orders," dating back to James Madison's conclusion that the executive must enforce the decisions of the judiciary).   *But see* Paulsen, *The* Merryman *Power*, *supra* note 6, at 83 (discussing President Abraham Lincoln's refusal to honor a writ of habeas corpus issued by Chief Justice Roger Taney in *Ex Parte Merryman*, 17 F. Cas. 144 (C.C.D. Md. 1861) (No. 9,487)).   In a subsequent article, Professor Paulsen notes that another scholar, Professor Issacharoff, argued that "saying that the executive may refuse to enforce judgments because that's what Lincoln did in *Merryman* is a little like saying that the best way to go to Atlanta is to take a huge army and march there, burning everything in your path, because that's what Sherman did." Paulsen, *The Most Dangerous Branch*, *supra* note 1, at 282.

solving particular questions,[87] and will typically rely upon more general guidance from the Supreme Court in addressing unresolved questions, absent a strong, executive branch conviction that such guidance is not well-founded.[88] Although not necessarily conclusive, this practice and precedent provide substantial guidance regarding the scope of the executive branch obligation to look to the courts in defining the law, and, like acquiescence by the other branches in long-standing executive branch authority,[89] constitutes a form of executive branch acquiescence in the relative primacy, but non-exclusivity, of the courts in defining the law.

### C. Democratic Accountability

Finally, one might argue that the neutral expositor model is flawed to the extent it fails to take into account the constitutional significance of democratic accountability. Because the President and his senior advisers are most directly accountable to the People, the government lawyer should, if at all possible, leave them with discretion to decide how to proceed. Indeed, one might argue that Attorney General Cushing's notion of the Attorney General as a "quasi-judicial" officer, insulated from political influence,[90] is at odds with the political responsibility of the executive branch. As Professor McGinnis has observed, it might be argued that the Framers consciously did not insulate the President "from public passions in the same way that life tenure insulates the Article III judiciary," and "at least some of the Framers believed it important that the people influence constitutional interpretation through their political representatives: only in this

---

87.   The Office of Legal Counsel has opined that the Department:
[B]elieve[s] that the constitutional structure obligates the executive branch to adhere to settled judicial doctrine that limits executive and legislative power. While the Supreme Court's decisions interpreting the Constitution cannot simply be *equated* with the Constitution, we are mindful of the special role of the courts in the interpretation of the law of the Constitution.
Memoranda of the Office of Legal Counsel, The Constitutional Separation of Power Between the President and Congress 3 (May 7, 1996) <http://www.usdoj.gov/olc/1996opinions.htm>; *see also* Powell, *supra* note 82, at 532.

88.   *See id.*; *see also* Memoranda of the Office of Legal Counsel, The Constitutional Separation of Powers Between the President and Congress, 52 n.115, 54 (May 7, 1996) <http://www.usdoj.gov/olc/1996opinions.htm> (concluding that the rationale of the Court's decision in *Wiener v. United States*, 357 U.S. 349 (1958)—that the Court should infer a "for-cause removal restriction when *the Court* believes the functions of the agency demand tenure protection"—seemed "questionable" and stating "that the executive branch should resist any further application of the *Wiener* rationale . . . except with respect to officers whose only functions are adjudicatory").

89.   *See supra* notes 73-76 and accompanying text.

90.   Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854).

way can people correct constitutional usurpations."[91]

This counterargument might be taken in one of two ways. First, it might be taken to suggest that the executive branch lawyer should adopt any reasonable view of the law that furthers the policies of the President and his senior advisers, even if it is not the best view. Alternatively, it might suggest that such policy and political considerations may, at times, help define the best view of the law. To the extent the counterargument is understood in the former manner, it cannot withstand scrutiny. The later approach, however, points to an important qualification on the role of the executive branch lawyer.

The notion that political—that is, non-legal—considerations may at times override the best view of the law is at odds with the very nature of law itself. As Alexander Hamilton observed in the *Federalist Papers*: "A law, by the very meaning of the term, includes supremacy. It is a rule which those to whom it is prescribed are bound to observe."[92] This is true at the margin, as well as at the core of the law. To allow political or policy considerations to trump the best view of the law in favor of a reasonable, but ultimately less persuasive view, is fundamentally inconsistent with the concept of law itself.

This is not to say, however, that legal interpretation is divorced from a political debate about the proper meaning of the Constitution and laws. To the contrary, the public may elect a President based, in part, on his view of the law, and that view should appropriately influence legal interpretation in that President's administration. Due respect for the democratic principle and the President's status as Chief Executive demands that executive branch lawyers not substitute their own views for the views of the President, who is directly responsible to the People. Indeed, the Framer's belief that the electoral process would provide a check on legal interpretation by the political branches, at least to the extent that government might "make a tyrannical use of its powers,"[93] assures that the public may appropriately influence legal interpretation by electing officials who share their view of the law. The President, and the lawyers who serve in his administration, must maintain a principled and coherent view of the law, but the American people influence the fundamental constitutional and legal norms that govern in the executive branch through their choice of President. In this man-

---

91. McGinnis, *supra* note 10, at 397 (citation omitted).

92. THE FEDERALIST NO. 33, at 86 (Alexander Hamilton) (Roy P. Fairfield ed., 2d ed. 1961).

93. *Id.* at 85-86; *see also* STORY, *supra* note 33, at 373 ("[I]f the usurpation should be by the president, an adequate check may be found, not only in the elective franchise, but also in the controlling power of congress, in its legislative or impeaching capacity, and in an appeal to the judicial department.").

ner, the democratic process informs Constitutional interpretation.[94]

The importance of democratic accountability also requires recognition of the limits of the law. Most fundamentally, the best view of the law will, at times, require the conclusion that a question is one of policy and not law. This point is perhaps most clearly made in the Supreme Court's seminal decision in *Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc.*, in which the Court considered whether the Environmental Protection Agency acted within its authority under the Clean Air Act Amendments of 1977 in defining a key statutory term to permit the grouping of all "pollution-emitting devices within the same industrial grouping . . . within a single 'bubble.'"[95] In upholding the agency's decision, the Court set forth the now familiar two-part analysis of administrative discretion. First, the court must consider "whether Congress has directly spoken to the precise question at issue."[96] If it has, the inquiry ends there, and congressional intent controls.[97] Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[98] The court need not determine whether the agency's "construction was the only one it permissibly could have adopted," but merely a reasonable one.[99]

The Court premised this framework on two points. First, Congress may either expressly or implicitly delegate authority to an administrative agency to make appropriate rules implementing a regulatory program or to "fill gaps" left in a statutory scheme.[100] Second, in contrast to judges, it is entirely appropriate for an agency to consider the policy views of "the incumbent administration" in deciding how best to exercise congressionally delegated policy-making responsibilities.[101] The Court wrote:

> While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with administration of the statute in light of everyday realities.[102]

As a result, *Chevron* is best understood to stand for the proposition that genuine gaps and ambiguities in statutes, which cannot readily be resolved

---

94. *See* TRIBE, *supra* note 1, at 262; *see also id.* at 267.
95. 467 U.S. 837, 840 (1984).
96. *Id.* at 842.
97. *See id.* at 842-43.
98. *Id.* at 843.
99. *Id.* at 843 n.11.
100. *See id.* at 843-44.
101. *Chevron*, 467 U.S. at 865.
102. *Id.* at 865-66.

applying the traditional tools of statutory interpretation,[103] are generally best treated as congressional delegations to the politically accountable officials in the executive branch responsible for implementing the relevant administrative programs.

Under the reasoning of the *Chevron* case, an executive branch lawyer might at times appropriately conclude that a statute that he or she has been asked to construe does not answer the question at issue, and that, within defined bounds, the question may be resolved based on the policy priorities of the administration. In practice, this approach at times can be a perilous one for the executive branch lawyer, who must insure that an articulated "gap" or "ambiguity" in a statute is a genuine one, and not the sort of ambiguity that a good lawyer can find in almost any statutory text. Where a true gap exists, *Chevron* analysis creates an express or implied delegation to the executive branch of authority to resolve a question as a matter of policy, and the lawyer should not usurp a decision that the Congress has committed to policymakers. More generally, the obligation to find the best view of the law includes the duty to identify where either the Constitution or a relevant statute vests the President or another executive branch official with a zone of discretion in which to act, and to avoid conflating questions of law and policy.

Finally, the executive branch lawyer can serve the interest of democratic accountability, without departing from the best view of the law, in one additional and equally important manner. When the lawyer concludes that a proposed course of action is not legally available, he or she can explore what legally available alternatives might exist. On almost a daily basis, the Office of Legal Counsel works with its clients to refine and reconceptualize proposed executive branch initiatives in the face of legal constraints. This dynamic process is only rarely evidenced in the Office of Legal Counsel's written opinions[104] because the Office's formal opinions typically focus on the end product of any such process. It nonetheless constitutes a critical

---

103. *See id.* at 843 n.9.

104. On occasion, however, the Office of Legal Counsel opinions identify both legal obstacles and legally available alternatives. *See, e.g.*, Procedures for Investigating Allegations Concerning Senior Administration Officials, 6 Op. Off. Legal Counsel 626, 626 (1982) (concluding that the Inspector General Act does not authorize an Inspector General from one agency to investigate misconduct in another, but that the President possesses inherent authority to supervise and direct the conduct of his appointees, and he may delegate that authority to others in his administration); Disclosure of Grand Jury Matters to the President and Other Officials, 17 Op. Off. Legal Counsel 59, 59 (1993) (concluding that Federal Rule of Criminal Procedure 6(e) does not typically permit disclosures for non-criminal law enforcement purposes, but that such disclosures may be permissible when necessary to the President's discharge of his Article II responsibilities, such as where the Attorney General learns through the grand jury process of a grave threat of terrorism).

part of the work of the Office of Legal Counsel and provides a means by which the executive branch lawyer can contribute to the ability of the popularly-elected President and his administration to achieve important policy goals. In this manner, the executive branch lawyer can balance the duty to work within the framework of the best view of the law with the obligation to assist those who are most directly accountable to the People in achieving their policy objectives.

## CONCLUSION

Long ago, Attorney General Cushing observed that, in providing advice and opinions on questions of law, the Attorney General's role is "quasi-judicial" in nature and that "whether it be so or not, he feels, in the performance of this part of his duty [to provide advice and opinion], that he is not a counsel giving advice to the Government as his client, but a public officer, acting judicially, under all of the solemn responsibilities of conscience and of legal obligation."[105]  Cushing's focus on the obligation of the Attorney General—and, by more recent implication, the Office of Legal Counsel—to find the best view of the law is well-taken but incomplete. Unlike a court, the executive branch lawyer is part of an administration that is accountable to the People and should thus strive, within the bounds of the best view of the law, to achieve its policy goals. He or she should do so with due respect not only for relevant judicial precedent, but also for the tradition of the executive branch legal interpretation and the substantial body of non-judicial precedent that informs that process. In the end, because the law is by its very nature supreme, the best view of the law must trump other interests.

---

105. Office and Duties of Attorney General, 6 Op. Att'y Gen. 326, 334 (1854).