# EXHIBIT S

# STARE DECISIS IN THE OFFICE OF LEGAL COUNSEL

*Trevor W. Morrison\**

*Legal interpretation within the Executive Branch has attracted increased interest in recent years, much of it focused on the Justice Department's Office of Legal Counsel (OLC). The most significant centralized source of legal advice within the Executive Branch, OLC has also been plagued by charges of undue politicization—especially in connection with various issues relating to the "war on terror." Yet there has been little consideration of the role in OLC of one of the main devices thought to constrain political and ideological preferences within the Judicial Branch—stare decisis.*

*This Article provides the first sustained descriptive and normative examination of the role of stare decisis in OLC. Descriptively, it analyzes all of OLC's publicly available legal opinions from the beginning of the Carter Administration through the end of the first year of the Obama Administration. The data show that OLC rarely openly departs from its prior opinions, but that an express request for overruling from the executive entity most affected by the opinion is a good predictor of such a departure. Normatively, the Article considers whether OLC should employ something like a rule of stare decisis with respect to its prior opinions, and, if so, in what circumstances it is justified in departing from those precedents. It argues that stare decisis has a legitimate place in OLC, but that OLC's location within the Executive Branch affects both the weight it should accord its precedents and the circumstances in which it should depart from them.*

INTRODUCTION ................................................... 1449
I. THE SUPPLY AND DEMAND OF OLC LEGAL ADVICE .......... 1458
   A. Background ......................................... 1458
   B. Particular Features of OLC's Work ................... 1460
      1. Formally Nonmandatory Jurisdiction.............. 1460
      2. Formal Requests, Binding Answers, and Lawful
         Alternatives ................................... 1463
      3. Written versus Oral Advice ...................... 1468
II. A HISTORICAL AND EMPIRICAL PICTURE OF OLC
    PRECEDENT............................................. 1470
    A. Early Attorney General Accounts of Precedent........ 1470

---

\* Professor of Law, Columbia Law School. For helpful comments on earlier drafts, I thank Bruce Ackerman, Bill Dailey, John Dehn, Walter Dellinger, Ariela Dubler, Jamal Greene, Philip Hamburger, Bert Huang, Marty Lederman, John Manning, Gillian Metzger, Henry Monaghan, Nate Persily, Jeff Powell, Fred Schauer, Bill Simon, Norman Spaulding, Kevin Stack, Peter Strauss, Matt Waxman, and participants in faculty workshops and colloquia at Columbia, Michigan, Northwestern, and UCLA Law Schools. I am grateful to Kevin Angle, Beth Bates, Adam Carlis, Andrew Davis, Matt Guarnieri, Kristin Olson, and Arvind Ravichandran for superb research assistance, and to Adam Klein of the *Columbia Law Review* for outstanding editorial support. I served in the Office of Legal Counsel in 2000–2001 and in the White House Counsel's Office in 2009. The views presented here are solely my own and should not be taken to represent the views of any part of the federal government.

    B.  The Practice of Precedent at OLC .................. 1475
        1.  The Data ....................................... 1476
        2.  Findings ...................................... 1479
           a.  Overall Treatment ........................... 1480
           b.  Statutory versus Constitutional Precedent ..... 1481
           c.  Party Affiliation and Presidential
               Administration .............................. 1484
           d.  Requests for Reconsideration ................. 1488
III.  Toward a Theory of Precedent in OLC ............... 1492
    A.  Reasons for Following Precedent ..................... 1494
        1.  The Standard Stare Decisis Values ............... 1494
        2.  Stare Decisis and Executive Power ............... 1497
    B.  Overruling .......................................... 1504
        1.  The *Casey* Factors .............................. 1504
        2.  The President's Constitutional Views ............ 1511
        3.  Disclosure ..................................... 1518
    C.  An Objection ....................................... 1520
Conclusion ................................................ 1524

INTRODUCTION

The doctrine of precedent, or stare decisis,[1] is a staple of American law. In barest form, it holds that a prior authoritative decision to resolve an issue in a particular way provides a reason to continue resolving the issue that way, without regard to the apparent correctness of the prior decision.[2] There is a vast academic literature on the topic, almost all of which focuses on the courts.[3] Yet just as legal interpretation in general is not the exclusive province of the judiciary, so too do questions of precedent extend beyond the courts.

This point is underappreciated. To be sure, there is a substantial literature—generally pitting "judicial supremacy" against "departmentalism"—on the extent to which judicial interpretations of the Constitution

---

1. In full, "stare decisis et non quieta movere"—"[t]o stand by things decided, and not to disturb settled points." Black's Law Dictionary 1443 (8th ed. 2004).

2. This is a version of Frederick Schauer's account: "The previous treatment of occurrence X in manner Y constitutes, *solely because of its historical pedigree*, a reason for treating X in manner Y if and when X again occurs." Frederick Schauer, Precedent, 39 Stan. L. Rev. 571, 571 (1987) [hereinafter Schauer, Precedent].

3. See, e.g., Saul Brenner & Harold J. Spaeth, Stare Indecisis: The Alteration of Precedent on the Supreme Court, 1946–1992 (1995); Thomas G. Hansford & James F. Spriggs II, The Politics of Precedent on the U.S. Supreme Court (2006); Larry Alexander, Constrained by Precedent, 63 S. Cal. L. Rev. 3 (1989); Richard H. Fallon, Jr., Stare Decisis and the Constitution: An Essay on Constitutional Methodology, 76 N.Y.U. L. Rev. 570 (2001); Henry Paul Monaghan, Stare Decisis and Constitutional Adjudication, 88 Colum. L. Rev. 723 (1988); Caleb Nelson, Stare Decisis and Demonstrably Erroneous Precedents, 87 Va. L. Rev. 1 (2001); Schauer, Precedent, supra note 2; Jeffrey A. Segal & Harold J. Spaeth, The Influence of Stare Decisis on the Votes of United States Supreme Court Justices, 40 Am. J. Pol. Sci. 971 (1996).

ought to bind the other branches and, conversely, on the weight courts should give to the constitutional judgments of those branches.[4] But those questions all focus one way or another on the courts. What about the role of *non*judicial precedent in *non*judicial legal interpretation, constitutional and otherwise?[5] Do nonjudicial actors called upon to answer legal questions employ anything like a stare decisis rule with respect to their own prior decisions? Should they?

Neither the descriptive nor the normative answer is likely to be uniform across all domains.[6] What is true in Congress may not be true in the Executive Branch. And even within the latter, differences in function, power, and accountability mean that not only the content but also the

---

4. See, e.g., Congress and the Constitution (Neal Devins & Keith E. Whittington eds., 2005); Larry D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review (2004); Mark Tushnet, Taking the Constitution Away from the Courts (1999); Larry Alexander & Frederick Schauer, Defending Judicial Supremacy: A Reply, 17 Const. Comment. 455 (2000); Larry Alexander & Frederick Schauer, On Extrajudicial Constitutional Interpretation, 110 Harv. L. Rev. 1359 (1997); Michael C. Dorf & Barry Friedman, Shared Constitutional Interpretation, 2000 Sup. Ct. Rev. 61; Dawn E. Johnsen, Faithfully Executing the Laws: Internal Legal Constraints on Executive Power, 54 UCLA L. Rev. 1559 (2007); Sanford Levinson, Constitutional Protestantism in Theory and Practice: Two Questions for Michael Stokes Paulsen and One for His Critics, 83 Geo. L.J. 373 (1994); Thomas W. Merrill, Judicial Deference to Executive Precedent, 101 Yale L.J. 969 (1992); Michael Stokes Paulsen, Abrogating Stare Decisis by Statute: May Congress Remove the Precedential Effect of *Roe* and *Casey*?, 109 Yale L.J. 1535 (2000) [hereinafter Paulsen, Abrogating Stare Decisis by Statute]; Michael Stokes Paulsen, Lincoln and Judicial Authority, 83 Notre Dame L. Rev. 1227 (2008); Michael Stokes Paulsen, The Most Dangerous Branch: Executive Power to Say What the Law Is, 83 Geo. L.J. 217 (1994); Cornelia T.L. Pillard, The Unfulfilled Promise of the Constitution in Executive Hands, 103 Mich. L. Rev. 676 (2005); Kermit Roosevelt III, Polyphonic Stare Decisis: Listening to Non-Article III Actors, 83 Notre Dame L. Rev. 1303 (2008); Frederick Schauer, Judicial Supremacy and the Modest Constitution, 92 Calif. L. Rev. 1045 (2004); Larry Alexander & Lawrence B. Solum, Popular? Constitutionalism? 118 Harv. L. Rev. 1594 (2005) (reviewing Kramer, supra); David Barron, Constitutionalism in the Shadow of Doctrine: The President's Non-Enforcement Power, Law & Contemp. Probs., Winter/Spring 2000, at 61. My own contributions include Trevor W. Morrison, Suspension and the Extrajudicial Constitution, 107 Colum. L. Rev. 1533 (2007) [hereinafter Morrison, Suspension] and Trevor W. Morrison, Constitutional Avoidance in the Executive Branch, 106 Colum. L. Rev. 1189 (2006) [hereinafter Morrison, Avoidance].

5. The very few academic treatments of this question include a chapter on "Nonjudicial Precedent" in Michael J. Gerhardt, The Power of Precedent 111 (2008); Harold Hongju Koh, Protecting the Office of Legal Counsel from Itself, 15 Cardozo L. Rev. 513, 515–16 (1993); and Mark Tushnet, Legislative and Executive Stare Decisis, 83 Notre Dame L. Rev. 1339 (2008) [hereinafter Tushnet, Stare Decisis].

6. See Schauer, Precedent, supra note 2, at 603 ("When Congress considers a private bill, precedent is rarely mentioned, but when Congress impeaches and tries a president or a judge, precedent rightfully comes into play. . . . [T]he Department of Justice may rely less on precedent when establishing prosecutorial priorities than when giving advice to the president with respect to constitutional responsibilities." (footnote omitted)); Philip Bobbitt, War Powers: An Essay on John Hart Ely's *War and Responsibility: Constitutional Lessons of Vietnam and its Aftermath*, 92 Mich. L. Rev. 1364, 1383–84 (1994) (book review) ("[T]here are as many kinds of precedent as there are constitutional institutions creating them.").

role of precedent may (and likely should) vary from one executive component and function to the next. Thus, the study of nonjudicial precedent should be context-sensitive. Proceeding from that premise, this Article focuses on the role of precedent in the provision of legal advice by the Justice Department's Office of Legal Counsel (OLC).

Of course, OLC is not just any executive office. For decades, it has been the most significant centralized source of legal advice within the Executive Branch.[7] Exercising authority delegated by the Attorney General, it provides legal advice to the President and other executive components. The questions OLC addresses are often among the most vexing in the Executive Branch. Its answers sometimes take the form of written legal opinions which, together with the legal opinions issued directly by Attorneys General themselves, "comprise the largest body of official interpretation of the Constitution and statutes outside the volumes of the federal court reporters."[8] And because many of the issues addressed by OLC are unlikely ever to come before a court in justiciable form, OLC's opinions often represent the final word in those areas unless later overruled by OLC itself, the Attorney General, or the President.

The role of precedent at OLC has become a matter of increased interest in recent years, spurred in part by the leak in 2004 of an OLC opinion concluding that the federal anti-torture statute only minimally constrained the government's use of "enhanced interrogation techniques" on suspected terrorists.[9] Known colloquially as the "Torture Memorandum," it became the target of withering public criticism and was soon disavowed by the Justice Department.[10] Some critics saw in the

---

7. See Pillard, *supra* note 4, at 710 ("[T]he head of the Office of Legal Counsel is the executive branch's chief legal advisor."). Other executive offices with important legal advisory roles extending beyond their own departments or agencies include the Office of the Legal Adviser in the State Department.

8. John O. McGinnis, Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon, 15 Cardozo L. Rev. 375, 376 (1993) [hereinafter McGinnis, Attorney General]. Although Attorneys General still do occasionally issue legal opinions under their own name, "[a]s a matter of practice, since the beginning of the 1960s the Assistant Attorney General for OLC, or on occasion a deputy assistant attorney general, has signed all but a tiny percentage of the Justice Department's legal opinions." H. Jefferson Powell, The Constitution and the Attorneys General, at xv n.2 (1999).

9. See Memorandum from Jay S. Bybee, Assistant Att'y Gen., Office of Legal Counsel, to Alberto R. Gonzales, Counsel to the President, Re: Standards of Conduct for Interrogation Under 18 U.S.C. §§ 2340–2340A, at 34 (Aug. 1, 2002) [hereinafter Torture Memorandum], available at http://www.washingtonpost.com/wp-srv/politics/ documents/cheney/torture_memo_aug2002.pdf (on file with the *Columbia Law Review*), subsequently withdrawn and replaced by Memorandum from Daniel Levin, Acting Assistant Att'y Gen., Office of Legal Counsel, to James B. Comey, Deputy Att'y Gen., Re: Legal Standards Applicable Under 18 U.S.C. §§ 2340–2340A (Dec. 30, 2004), available at http://www.justice.gov/olc/18usc23402340a2.htm (on file with the *Columbia Law Review*).

10. See Office of Prof'l Responsibility, U.S. Dep't of Justice, Investigation into the Office of Legal Counsel's Memoranda Concerning Issues Relating to the Central Intelligence Agency's Use of "Enhanced Interrogation Techniques" on Suspected

opinions an abandonment of what they viewed as OLC's proper role, replaced by a willingness to adopt implausible and even professionally irresponsible legal positions in order to please the client—in that case, the White House Counsel.[11] That in turn prompted broader discussion of the procedures OLC should follow when providing legal advice, including the weight it should accord to its own precedents.

Current and past members of OLC have made three noteworthy contributions to the dialogue. The first, called "Principles to Guide the Office of Legal Counsel" (which I will call the Guidelines), was issued in late 2004 by a group of former OLC lawyers in their personal capacities.[12] The second is an official OLC memorandum from May 2005, entitled

---

Terrorists 121–23 (July 29, 2009) [hereinafter OPR Report], available at http://judiciary.house.gov/hearings/pdf/OPRFinalReport090729.pdf (on file with the *Columbia Law Review*). For a collection of criticisms of the Torture Memorandum, see Morrison, Avoidance, supra note 4, at 1231 n.182.

11. Whether any of the underlying legal advice constituted professional misconduct became the subject of a five-year formal investigation by the Justice Department's Office of Professional Responsibility (OPR). OPR Report, supra note 10. OPR ultimately concluded that former Assistant Attorney General Jay Bybee and former Deputy Assistant Attorney General John Yoo had committed "professional misconduct" (Bybee recklessly and Yoo intentionally) in connection with their work on the Torture Memorandum and related opinions. Id. at 11. In response to objections lodged by Bybee and Yoo, Associate Deputy Attorney General David Margolis reviewed the OPR Report and advised the Attorney General that he did not adopt the professional misconduct findings and would not authorize OPR to refer its findings to relevant state bar authorities. Memorandum from David Margolis, Assoc. Deputy Att'y Gen., to Eric Holder, Att'y Gen., Re: Memorandum of Decision Regarding the Objections to the Findings of Professional Misconduct in the Office of Professional Responsibility's Report of Investigation into the Office of Legal Counsel's Memoranda Concerning Issues Relating to the Central Intelligence Agency's Use of "Enhanced Interrogation Techniques" on Suspected Terrorists 2 (Jan. 5, 2010) [hereinafter Margolis Memorandum], available at http://judiciary.house.gov/hearings/pdf/DAGMargolisMemo100105.pdf (on file with the *Columbia Law Review*). Of course, whether these attorneys committed professional misconduct is not the same as whether they followed what anyone would call best practices for OLC. As to the latter, Margolis called the Torture Memorandum and related opinions "an unfortunate chapter in the history of the Office of Legal Counsel." Id. at 67. He suggested that Yoo allowed his "loyalty to his own ideology and convictions [to] clou[d] his view of his obligation to his client and [lead] him to author opinions that reflected his own extreme, albeit sincerely held, views of executive power while speaking for an institutional client." Id. at 67.

12. Walter Dellinger, et al., Principles to Guide the Office of Legal Counsel (2004) [hereinafter OLC Guidelines], reprinted in Dawn E. Johnsen, supra note 4, 1603 app. 2 (2007). The nineteen signatories to the Guidelines all served in OLC during the Clinton Administration. Some also served in previous Republican administrations or held over into the George W. Bush Administration. Five now serve or have served in the Obama Administration, including two in OLC. I note that I have worked with some of the signatories on related projects, including congressional testimony endorsing the Guidelines. See Restoring the Rule of Law: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary, 110th Cong. 180 (2008) [hereinafter Hearing, Restoring the Rule of Law] (joint statement of David J. Barron, Walter E. Dellinger, Dawn E. Johnsen, Neil J. Kinkopf, Martin S. Lederman, Trevor W. Morrison, and Christopher H. Schroeder. I also worked with several of the signatories during my time at OLC in 2000–2001 and the White House Counsel's Office in 2009.

"Best Practices for OLC Opinions."[13] And the third, issued when this Article was in final editing, is a July 2010 OLC memorandum that "updates" the one from 2005, entitled "Best Practices for OLC Legal Advice and Written Opinions."[14] All three are in substantial agreement on a number of points,[15] including general statements about the importance of precedent. As the 2010 Best Practices Memorandum puts it, "OLC opinions should consider and ordinarily give great weight to any relevant past opinions of Attorneys General and the Office. The Office should not lightly depart from such past decisions, particularly where they directly address and decide a point in question . . . ."[16] Similarly, the Guidelines call for "due respect for the precedential value of OLC opinions from administrations of both parties," and urge "careful consideration and detailed explanation" of any decision to overrule a prior opinion.[17]

But a general acknowledgement of "due respect" for precedent leaves many important questions unresolved. First, does OLC in fact treat its past decisions as presumptively binding without regard to whether it now deems them correct? Or does OLC instead see its precedents as

---

13. Memorandum from Steven G. Bradbury, Principal Deputy Assistant Att'y Gen., Office of Legal Counsel, to Attorneys of the Office, Re: Best Practices for OLC Opinions (May 16, 2005) [hereinafter 2005 OLC Best Practices Memorandum], available at http:// www.justice.gov/olc/best-practices-memo.pdf (on file with the *Columbia Law Review*).

14. Memorandum from David J. Barron, Acting Assistant Att'y Gen., Office of Legal Counsel, to Attorneys of the Office, Re: Best Practices for OLC Legal Advice and Written Opinions 1 n.* (Jul. 16, 2010) [hereinafter 2010 OLC Best Practices Memorandum], available at http://www.justice.gov/olc/pdf/olc-legal-advice-opinions.pdf (on file with the Columbia Law Review) ("This memorandum updates a prior memorandum, 'Best Practices for OLC Opinions,' issued May 16, 2005.").

15. The author of the 2005 OLC Best Practices Memorandum, Steven Bradbury, expressed substantial agreement with the Guidelines during the Senate hearings on his nomination to head OLC. See Confirmation Hearings on Federal Appointments: Hearings Before the S. Comm. on the Judiciary, 109th Cong. 766 (2005) (written responses of Steven Bradbury, nominee to the position of Assistant Attorney General for OLC, to questions from Senator Leahy) ("The [Guidelines] generally reflect operating principles that have long guided OLC in both Republican and Democratic administrations."). Other lawyers who occupied senior positions in the Bush Administration have expressed similar agreement. See, e.g., Confirmation Hearing on the Nomination of Timothy Elliott Flanigan to be Deputy Att'y Gen.: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 120 (2005) (written responses of Timothy Flanigan to questions from Senator Kennedy) ("I have reviewed generally the [Guidelines] and agree with much of the document. I believe that the document reflects operating principles that have long guided OLC in both Republican and Democratic administrations."); Jack Goldsmith, The Terror Presidency 33–34 (2007) (expressing agreement with the Guidelines' statement of OLC's basic institutional posture).

16. 2010 OLC Best Practices Memorandum, supra note 14, at 2. The 2010 Memorandum here follows the position marked out in the 2005 Memorandum, which provides that "OLC opinions should . . . consider and apply the past opinions of Attorneys General and this Office, which are ordinarily given great weight. The Office will not lightly depart from such past decisions, particularly where they directly address and decide a point in question." 2005 OLC Best Practices Memorandum, supra note 13, at 2.

17. OLC Guidelines, supra note 12, at 1608–09.

*COLUMBIA LAW REVIEW*

merely helpful resources worth consulting, on the theory that past occupants of the office were thoughtful lawyers whose work is liable to be illuminating even though not binding?[18] If the answer lies somewhere in between, where on the continuum between presumptive bindingness and mere illumination does it fall? And moving from the descriptive to the normative, to what extent should OLC treat its precedents as binding?

A second and related question also has both descriptive and normative components: How strong is OLC's tendency to follow precedent, and how strong should it be? The 2010 Best Practices Memorandum says that, "as with any system of precedent, past decisions may be subject to reconsideration and withdrawal in appropriate cases and through appropriate processes."[19] But what are the appropriate cases? When are the values supporting OLC's adherence to precedent outweighed by other considerations, and when should they be? The classic competing consideration is a belief that the precedent is wrong. If mere error in a precedent were always sufficient to overrule, OLC would have no operative doctrine of stare decisis.[20] But does that mean error should *never* be sufficient to overrule? The Guidelines do not take that position, suggesting instead that "OLC's current best view of the law sometimes will require repudiation of OLC precedent."[21] On this point the drafters likely had in mind the Torture Memorandum. We now know that shortly after Jack Goldsmith became head of OLC in late 2003, he reviewed both the Torture Memorandum and a follow-on opinion[22] and concluded that both were so "deeply flawed," "sloppily reasoned, overbroad, and incautious" that they had to be withdrawn.[23] Goldsmith reached that conclusion even though he supported OLC's "powerful tradition of adhering to

18. The latter circumstance involves treating a past decision as a source of what Frederick Schauer calls experience, not precedent. With arguments from experience, "a present array of facts similar to some previous array leads a decisionmaker to draw on experience in reaching a conclusion," as where "a physician sees a certain array of symptoms that in the past have indicated typhoid," and on the basis of that experience "diagnose[s] typhoid when those symptoms again appear." Schauer, Precedent, supra note 2, at 575. Experience, in other words, is consulted on the theory that it is likely to reveal something helpful to the resolution of the present issue. It has no independent weight beyond what it can teach about the present.

19. 2010 OLC Best Practices Memorandum, supra note 14, at 2.

20. See United States ex rel. Fong Foo v. Shaughnessy, 234 F.2d 715, 719 (2d Cir. 1955) ("Stare decisis has no bite when it means merely that a court adheres to a precedent it considers correct."); Schauer, Precedent, supra note 2, at 575 ("[I]f we are truly arguing from precedent, then the fact that something was decided before gives it present value despite our current belief that the previous decision was erroneous.").

21. OLC Guidelines, supra note 12, at 1609.

22. Memorandum from John C. Yoo, Deputy Assistant Att'y Gen., Office of Legal Counsel, to William J. Haynes II, Gen. Counsel, Dep't of Def., Re: Military Interrogation of Alien Unlawful Combatants Held Outside the United States (Mar. 14, 2003), available at http://www.justice.gov/olc/docs/memo-combatantsoutsideunitedstates.pdf (on file with the *Columbia Law Review*).

23. Goldsmith, supra note 15, at 10; see also OPR Report, supra note 10, at 112–13 (describing withdrawal of Yoo Memorandum).

its past opinions, even when a head of the office concludes that they are wrong."[24]  Thus the question:  How grave must an error be to warrant departing from this tradition?  Should error *alone* ever be enough?

Another competing consideration warrants special mention, and will receive extended attention in this Article:  the views of the President.[25] The Guidelines state that OLC's work should "reflect the institutional traditions and competencies of the executive branch as well as the views of the President who currently holds office."[26]  But what happens when these factors do not align—when OLC precedent is at odds with the views of the current President?  The Guidelines recognize but do not resolve this potential tension, stating merely that OLC "serves both the institution of the presidency and a particular incumbent, democratically elected President in whom the Constitution vests the Executive power."[27]  In a similar vein, Goldsmith has noted that "OLC is not entirely neutral to the President's agenda," and has suggested OLC should keep "the political dimension in view" when providing legal advice.[28]  How should OLC do this?  We can fairly predict that OLC will face great pressure to conform its views to those of the President, and it is worth attending to those pressures.[29]  But as a matter of best practice, should OLC ever overrule itself in deference to the President's views?

This Article addresses the descriptive and the normative questions posed above.  Descriptively, it provides the first empirical survey of OLC's published opinions to determine how often and in what circumstances it departs from its prior opinions.  Normatively, it considers whether and to what extent OLC ought to follow a rule of stare decisis.  There is a wide range of potential answers to the normative question.  At one end of the spectrum, granting "due respect"[30] to OLC's precedents might mean considering them in each case, but following them only to the extent they now appear correct on the merits.  At the other end, "due respect" might mean treating past opinions as binding in all cases, even when they conflict with the views of the President—thus requiring him to reverse OLC if he insists on another course.  I ultimately defend a middle position.  Stare decisis, I argue, has a legitimate place in OLC, but OLC's location within the Executive Branch affects both the weight it should accord its precedents and the circumstances in which it should depart from them.

In elaborating and defending that position, I proceed from two distinct but equally critical premises:  that OLC's legal advice is treated as binding within the Executive Branch unless "overruled" by the Attorney General or the President, and that OLC provides advice based on its best

---

24. Goldsmith, supra note 15, at 145.
25. See infra Part III.B.2.
26. OLC Guidelines, supra note 12, at 1606.
27. Id.
28. Goldsmith, supra note 15, at 35.
29. See infra Part I.B.
30. OLC Guidelines, supra note 12, at 1608–09.

*COLUMBIA LAW REVIEW*     [Vol. 110:1448

view of the law. OLC has consistently embraced both premises when describing its role,[31] and I accept them here. Yet in doing so, I do not mean to suggest there is anything constitutionally inevitable about them. At least in theory, OLC's job could be defined in very different terms.[32] Rather than considering those potential differences here, I take OLC roughly as I find it—or at least as OLC presents itself—and ask what role OLC's precedents should play in its work, accepting that its job is to provide binding legal advice based on its best view of the law.[33] As I explain later in the Article,[34] it is also critical that the formulation here is *OLC's* best view of the law, not *the* best view.[35] This reflects the idea that, as an office within the Executive Branch, OLC views the law through a particular lens, and thus that its best view of the law might legitimately differ on some issues from that of a differently situated actor. With these points in

---

31. See 2010 OLC Best Practices Memorandum, supra note 14, at 1 ("OLC's core function . . . is to provide controlling advice to Executive Branch officials on questions of law . . . ."); 2005 OLC Best Practices Memorandum, supra note 13, at 1 ("[S]ubject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch."); id. at 3 ("OLC's interest is simply to provide the correct answer on the law . . . ."); OLC Guidelines, supra note 12, at 1603 ("OLC's legal determinations are considered binding on the executive branch, subject to the supervision of the Attorney General and the ultimate authority of the President."); id. at 1604 ("OLC should provide an accurate and honest appraisal of applicable law, even if that advice will constrain the administration's pursuit of desired policies."). As I describe below in Part I.B.2, there is actually some uncertainty whether OLC's opinions are truly binding within the Executive Branch as a technical matter. But there is a longstanding practice of *treating* them as binding. That practice is the premise on which I rely here.

32. Many other offices in the Justice Department operate in an advocacy mode. Their job is to provide the best defense before a court of an already-passed law or an already-determined position. See generally Seth P. Waxman, Defending Congress, 79 N.C. L. Rev. 1073 (2001) (describing role of Solicitor General in defending laws passed by Congress). OLC could conceivably operate in a similar mode. See, e.g., McGinnis, Attorney General, supra note 8, at 377, 402 (identifying three "plausible" models for Attorney General and OLC opinions, including "situational model" in which opinions would be written "in the situational interest of [the] client without any obligation to preserve legal principles whether autonomous or court-centered"). But that is not how OLC has depicted its role. My focus here is on how the actual OLC operates or purports to operate; I do not take up the situational or any other more advocacy-focused model not espoused by OLC itself.

33. I thus do not consider the extent of Congress's power to change OLC's role—by, for example, requiring OLC to provide legal advice based on something other than its best view of the law, or requiring OLC to ignore certain factors (like the views of the President) when providing legal advice, or limiting the power of even the Attorney General or President to overrule OLC's advice. I leave questions of that order for another day. Full consideration of them would require examination of the line of Supreme Court decisions culminating in Free Enterprise Fund v. Public Co. Accounting Oversight Board, 130 S. Ct. 3138 (2010), as well as competing claims about the constitutional contours of presidential law-interpreting authority tracing as far back as the Pacificus-Helvidius debates.

34. See infra Part III.

35. See 2010 OLC Best Practices Memorandum, supra note 14, at 1 ("OLC must provide advice based on its best understanding of what the law requires . . . .").

mind, my goal is to elaborate a realistic best practice for OLC's treatment of its precedents.[36]

The Article proceeds in three parts. Part I situates OLC and its work in institutional context, looking in particular at the incentives and constraints OLC faces in its work. The recent history of the Torture Memorandum and other "war on terror" opinions notwithstanding, administrations of both political parties have recognized the instrumental value of ensuring OLC is broadly perceived as reasonably independent and credible. An OLC that too readily answers "yes" to its clients is an OLC whose advice is not worth seeking. To that end, OLC has developed a number of procedural and other tools to preserve its reputation for independence, some of which harness political forces to help insulate OLC rather than to threaten it. In the end, though, those tools are only as reliable as the OLC personnel employing them.

Against that background, Part II provides a historical and empirical account. After surveying statements by early Attorneys General describing their views of the deference due to the legal opinions of their predecessors, I then undertake to provide a descriptive account of precedent— or, more precisely, the limits of precedent—in OLC. I examine all publicly available, written OLC opinions from the start of the Carter Administration to the end of the Obama Administration's first year, 1,191 opinions in all, to determine how frequently OLC overrules or substan-

---

36. To be clear, it *is* a premise of this Article that although it may be difficult for OLC to follow its best view of the law, it is not impossible. I thus reject the idea that OLC is so completely beholden to the policy or ideological agenda of the incumbent presidential administration that its advice is best viewed as "invariably and exclusively lawyers' rationalizations for the policy preferences of the President." Powell, supra note 8, at xvi (describing and rejecting this view). Throughout its history, OLC has opposed the President on nontrivial matters. Jack Goldsmith's withdrawal of the Torture Memorandum is one dramatic example. Others include OLC's conclusion during the Nixon Administration that the President lacks the inherent authority to impound funds appropriated by Congress, see Memorandum from William H. Rehnquist, Assistant Att'y Gen., Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools (Dec. 1, 1969), reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary, 92d Cong. 279 (1971), its conclusion during the Reagan Administration that the President lacks inherent line-item veto authority, see The President's Veto Power, 12 Op. O.L.C. 128, 128 (1988), and its conclusion near the end of the Clinton Administration that a former President can be prosecuted for the same offenses that had been the focus of an unsuccessful impeachment proceeding against him, see Memorandum from Randolph D. Moss, Assistant Att'y Gen., Office of Legal Counsel, to the Att'y Gen., Re: Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate (Aug. 18, 2000), available at http://www.justice.gov/olc/expresident.htm (on file with the *Columbia Law Review*). I do not mean to infer too much from anecdotal evidence like this, but it does show the *possibility* of opposing the President on important issues. Moreover, as I discuss in Part I.B, OLC has developed a number of practices that help protect it in situations where its best view of the law departs from the President's (or any other client's) initially preferred position, so that it can both adhere to that best view and avoid direct, outcome-determinative confrontations with the President.

tially amends its precedents, and to identify the factors that correlate with overruling. The data suggest that OLC does not often overrule itself and that it is most likely to do so when urged by the executive department or agency most directly affected by the precedent in question.

Moving from the descriptive to the normative, Part III considers the extent to which OLC should follow a rule of stare decisis. I show that most of the values associated with judicial stare decisis—including consistency, predictability, reliance, efficiency, and credibility—are also important in OLC's work. There is thus good reason for OLC to maintain at least a strong presumption in favor of its precedents. I also suggest that OLC's location within the Executive Branch gives it a special reason to grant added weight to its precedents on issues of executive power. Moreover, consideration of that factor helps illuminate what it means for OLC to provide legal advice based on *its* best view of the law.

Part III then turns to the factors OLC should consider when deciding whether to overrule itself. Part of the answer lies in the factors considered by courts, which turn out to be generally applicable in OLC as well. Those factors support, for example, Goldsmith's decision to withdraw the Torture Memorandum. But I also argue that OLC's institutional location introduces an additional legitimate basis for dispensing with the constraints imposed by an earlier opinion: the views of the President. I suggest that although the fact that the current head of OLC disagrees with a precedent is not sufficient to warrant overruling it, in at least some instances the settled and publicly expressed views of the President can be enough. This factor is admittedly difficult to manage; there is a risk that the President's preferences could become dispositive in a way that rendered OLC legal advice no longer truly *its* advice. I offer some thoughts for how to protect against that risk while according appropriate weight to the President's views.

## I. The Supply and Demand of OLC Legal Advice

OLC's work should be viewed in its institutional context. In this Part, I describe the structural, procedural, and other features of that work and discuss some of the incentives created by those features. The goal is to provide a picture of OLC in its institutional context, as a backdrop for the precedent-focused discussions to follow.

### A. *Background*

OLC's core function is to provide "formal advice through written opinions."[37] Its clients range across the Executive Branch, though the White House and the Attorney General are the most frequent.[38] The

---

37. 2005 OLC Best Practices Memorandum, supra note 13, at 1.

38. Pillard, supra note 4, at 711. OLC is authorized to provide legal advice only to the Executive Branch and "do[es] not advise Congress, the Judiciary, foreign governments, private parties, or any other person or entity outside the Executive Branch." 2005 OLC

responsibility to advise such clients is assigned by statute to the Attorney General, but is delegated to OLC by regulation.[39]   That delegation is a relatively recent phenomenon.   Indeed, from the earliest days of the Union until the mid-twentieth century, Attorneys General themselves regularly provided legal advice to the President and others in the Executive Branch.[40]

---

Best Practices Memorandum, supra note 13, at 1.  However, OLC lawyers do occasionally testify before congressional committees to explain legal positions or practices of the office or other elements of the Executive Branch.  See, e.g., The Use of Presidential Signing Statements:  Hearing Before the S. Comm. on the Judiciary, 109th Cong. 98–108 (2006) (statement of Michelle E. Boardman, Deputy Assistant Att'y. Gen., Office of Legal Counsel); Federalism Accountability Act of 1999:  Hearing on S. 1214 Before the S. Comm. on Governmental Affairs, 106th Cong. 296–305 (1999) (prepared statement of Randolph D. Moss, Acting Assistant Att'y Gen., Office of Legal Counsel).  From time to time, OLC lawyers also communicate with congressional staffers in more informal ways to discuss constitutional or other legal issues raised by proposed legislation.

39. See 28 U.S.C. § 511 (2006) ("The Attorney General shall give his advice and opinion on questions of law when required by the President."); id. § 512 ("The head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department."); id. § 513 ("When a question of law arises in the administration of [one of the military departments] . . . , the cognizance of which is not given by statute to some other officer . . . , the Secretary of the military department shall send it to the Attorney General for disposition."); 28 C.F.R. § 0.25(a) (2009) (assigning to Assistant Attorney General for OLC the task of "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal adviser to the President and as a member of, and legal adviser to, the Cabinet"); id. § 0.25(c) (tasking Assistant Attorney General for OLC with "[r]endering opinions to the Attorney General and to the heads of the various organizational units of the Department on questions of law arising in the administration of the Department"); see also 2010 OLC Best Practices Memorandum, supra note 14, at 1 ("By delegation, [OLC] exercises the Attorney General's authority under the Judiciary Act of 1789 to provide the President and executive agencies with advice on questions of law."); 4A Opinions of the Office of Legal Counsel of the United States Department of Justice Consisting of Selected Memorandum Opinions Advising the President of the United States, the Attorney General, and Other Executive Officers of the Federal Government in Relation to Their Official Duties, at v (Margaret Colgate Love ed., 1980) [hereinafter Opinions of the Office of Legal Counsel] (summarizing history of vesting of this responsibility in OLC).

40. When section 35 of the Judiciary Act of 1789 created the office of Attorney General of the United States, one of the two duties it imposed on that officer was "to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments."  Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93.  Perhaps the most important early exercises of that authority came in 1791, when Attorney General Randolph issued two opinions to President Washington on the constitutionality of the bill to incorporate a Bank of the United States.  Powell, supra note 8, at 3–10.  Randolph concluded that the bill exceeded Congress's authority.  The competing opinions of Secretary of the Treasury Hamilton and Secretary of State Jefferson on the issue are relatively well known; Randolph's analysis has received less attention, but in many ways may be "closer in terms of method and approach to the mainstream of contemporary legal thought than the ideologically charged opinions of either Jefferson or Hamilton."  Id. at 10.  In the end Washington was persuaded by Hamilton's

*COLUMBIA LAW REVIEW*

In 1870, Congress created the position of Solicitor General and included among his responsibilities the provision of legal opinions on matters referred by the Attorney General.[41] Starting in the 1920s, that function was performed by a specialized Assistant Solicitor General.[42] In 1933, Congress made that Assistant subject to presidential nomination and Senate confirmation.[43] It was not until 1950 that Congress replaced that position with a separate office (first known as the Executive Adjudications Division and then renamed the Office of Legal Counsel in 1953) led by its own presidentially nominated and Senate confirmed Assistant Attorney General.[44]

Today, OLC is a fairly small office of about two dozen lawyers. In addition to the Assistant Attorney General who heads the office, there are also several politically appointed (but not Senate confirmed) Deputy Assistant Attorneys General along with one Deputy who is not politically appointed. The rest of the lawyers in the office are "career" civil service lawyers. Most are called Attorney-Advisers; a few are members of the elite Senior Executive Service with the title Senior Counsel.[45] Many Attorney-Advisers serve in the office for only a few years, although some remain for much longer.

B. *Particular Features of OLC's Work*

OLC's legal advisory function is not subject to the justiciability constraints applicable to courts, but neither is it the self-directed work of an academic. Its perspective is not that of a life-tenured judge, but neither is it that of an avowedly partial advocate. And its opinions are not back-stopped by a court's contempt power, but neither are they merely precatory. In short, its work "is something inevitably, and uncomfortably, in between."[46] Here I describe some aspects of that in-between space.

1. *Formally Nonmandatory Jurisdiction.* — With a few exceptions, there is no formal requirement that legal questions within the Executive Branch be submitted to OLC. One exception is for certain questions arising within the military, another is for jurisdictional or other disputes between agencies or departments, and a third involves review of proposed executive orders for form and legality. In those circumstances, statutes or regulations either require or strongly encourage the submission of the

---

arguments defending the bill, and signed it into law. And of course the Supreme Court ultimately upheld Congress's power to charter a national bank in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819).

41. Act of June 22, 1870, ch. 150, §§ 1–2, 16 Stat. 162.

42. See Pillard, supra note 4, at 710.

43. Fourth Deficiency Act, Fiscal Year 1933, Pub. L. No. 73-78, § 16, 48 Stat. 283, 307–08; Pillard, supra note 4, at 710.

44. Reorganization Plan No. 2 of 1950, § 4, 15 Fed. Reg. 3173, 3173–74, reprinted in 64 Stat. 1261, 1261 (1950); see also Opinions of the Office of Legal Counsel, supra note 39, at v; Pillard, supra note 4, at 710.

45. Pillard, supra note 4, at 716 n.125.

46. Goldsmith, supra note 15, at 35.

matter to OLC.[47]  But otherwise, as a formal matter OLC's involvement is a function of client choice.

That discretionary function gives OLC an incentive to provide legal advice in a way that encourages its clients to return with more requests in the future.[48]  And that, in turn, creates a risk that OLC may be tempted to say "yes" too readily—concluding on dubious grounds that the client possesses the legal authority to take the action in question, or that it does not have certain legal obligations it would like to avoid.  Clients like good news, and may be more likely to return if OLC is perceived as a reliable source of such news.

On the other hand, an OLC that says "yes" too often is not in the client's long-run interest.[49]  Virtually all of OLC's clients have their own legal staffs, including the White House Counsel's Office in the White House and the general counsel's offices in other departments and agencies.  Those offices are capable of answering many of the day-to-day issues that arise in those components.  They typically turn to OLC when the issue is sufficiently controversial or complex (especially on constitutional questions) that some external validation holds special value.[50]  For example, when a department confronts a difficult or delicate constitutional question in the course of preparing to embark upon a new program or course of action that raises difficult or politically sensitive legal questions, it has an interest in being able to point to a credible source affirming the

47. See 28 U.S.C. § 513 (2006) ("When a question of law arises in the administration of [one of the military departments] . . . , the cognizance of which is not given by statute to some other officer . . . , the Secretary of the military department shall send it to the Attorney General for disposition."); Management of Federal Legal Resources, Exec. Order No. 12,146, 3 C.F.R. 409, 411 (1980), reprinted in 28 U.S.C. § 509 (1982) (providing that "[w]henever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is *encouraged* to submit the dispute to the Attorney General," and that "[w]henever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve such a legal dispute, the agencies *shall* submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere" (emphasis added)).  The power to resolve all these is part of the power delegated by the Attorney General to OLC.  See 28 C.F.R. § 0.25(b) (2009) (delegating to OLC the task of "[p]reparing and making necessary revisions of proposed Executive orders and proclamations, and advising as to their form and legality prior to their transmission to the President").

48. Cf. Pillard, supra note 4, at 716–17 ("Because it lacks mandatory jurisdiction, OLC decides only those issues that the [P]resident, the Attorney General, or the heads of agencies . . . decide to bring to it. . . . [T]he more critically OLC examines executive conduct, the more cautious its clients are likely to be in some cases about seeking its advice.").

49. See Goldsmith, supra note 15, at 38 (quoting Walter Dellinger, former head of OLC during the Clinton Administration, as saying: "You won't be doing your job well, and you won't be serving your client's interests, if you rubber-stamp everything the client wants to do.").

50. See Pillard, supra note 4, at 714 (describing reasons why OLC's advice might be sought).

legality of its actions.[51]  The in-house legal advice of the agency's general counsel is unlikely to carry the same weight.[52]  Thus, even though those offices might possess the expertise necessary to answer at least many of the questions they currently send to OLC, in some contexts they will not take that course because a "yes" from the in-house legal staff is not as valuable as a "yes" from OLC.  But that value depends on OLC maintaining its reputation for serious, evenhanded analysis, not mere advocacy.[53]

The risk, however, is that OLC's clients will not internalize the long-run costs of taxing OLC's integrity.  This is in part because the full measure of those costs will be spread across all of OLC's clients, not just the client agency now before it.  The program whose legality the client wants OLC to review, in contrast, is likely to be something in which the client has an immediate and palpable stake.  Moreover, the very fact that the agency has come to OLC for legal advice will often mean it thinks there is

---

51. This might happen when a representative of the agency or department is called to testify before Congress, or when its actions are scrutinized by the press, or, on litigable issues, when it is defending its position in court.

52. There are countervailing considerations, however.  On statutory issues that are likely to be litigated, an agency's request for advice from OLC might cause the courts to be less inclined to defer to the agency's ultimate position under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  The theory of *Chevron* is that statutory ambiguity constitutes an implicit congressional delegation to the agency responsible for implementing the statute to resolve matters implicating that ambiguity on the basis of their particular expertise.  By seeking OLC's advice on a legal issue and agreeing to be bound by it, an agency arguably does not exercise the expertise that *Chevron* contemplates, and thus may be ineligible for deference from the courts.  Thus, on statutory questions involving the statute(s) an agency administers, the decision whether to seek OLC's advice can be somewhat more complicated.  I thank Gillian Metzger for emphasizing this point to me.  Cf. New Process Steel v. NLRB, 130 S. Ct. 2635, 2638–40 (2010) (holding delegee group of NLRB could not continue to exercise its delegated authority once its and NLRB's membership fell to two and rejecting (with no mention of *Chevron*) NLRB's argument to the contrary, which was based on an OLC opinion to which NLRB had agreed to be bound).

53. As explained by Randolph Moss, head of OLC at the end of the Clinton Administration:

> [T]he legal opinions of the Attorney General and the Office of Legal Counsel will likely be valued only to the extent they are viewed by others in the executive branch, the courts, the Congress, and the public as fair, neutral, and well-reasoned . . . .  For similar reasons, there is little reason for clients of the Office of Legal Counsel to ask whether a proposed action is legally colorable, as opposed to whether the action is authorized under the best view of the law.  While posing the question in the former fashion might increase the likelihood of obtaining a favorable response, such a response will do little to assist the client in the face of subsequent criticism.

Randolph D. Moss, Executive Branch Legal Interpretation: A Perspective From the Office of Legal Counsel, 52 Admin. L. Rev. 1303, 1311 (2000); see also Tushnet, Stare Decisis, supra note 5, at 1352 (noting OLC's agency clients "are under no obligation to seek the views of OLC about the lawfulness of their policy initiatives," and that they therefore "will seek out OLC's advice only if they believe that OLC will provide them with a more disinterested view of the law's content than they received from within").

at least a plausible argument that the program is lawful. In that circumstance, the agency is unlikely to see any problem in a "yes" from OLC.

Still, it would be an overstatement to say that OLC risks losing its client base every time it contemplates saying "no." One reason is custom. In some areas, there is a longstanding tradition—rising to the level of an expectation—that certain executive actions or decisions will not be taken without seeking OLC's advice. One example is OLC's bill comment practice, in which it reviews legislation pending in Congress for potential constitutional concerns. If it finds any serious problems, it writes them up and forwards them to the Office of Management and Budget, which combines OLC's comments with other offices' policy reactions to the legislation and generates a coordinated administration position on the legislation.[54] That position is then typically communicated to Congress, either formally or informally. While no statute or regulation mandates OLC's part in this process, it is a deeply entrenched, broadly accepted practice. Thus, although some within the Executive Branch might find it frustrating when OLC raises constitutional concerns in bills the administration wants to support as a policy matter, and although the precise terms in which OLC's constitutional concerns are passed along to Congress are not entirely in OLC's control, there is no realistic prospect that OLC would ever be cut out of the bill comment process entirely. Entrenched practice, then, provides OLC with some measure of protection from the pressure to please its clients.

But there are limits to that protection. Most formal OLC opinions do not arise out of its bill comment practice, which means most are the product of a more truly voluntary choice by the client to seek OLC's advice. And as suggested above, although the Executive Branch at large has an interest in OLC's credibility and integrity, the preservation of those virtues generally falls to OLC itself. OLC's nonlitigating function makes this all the more true. Whereas, for example, the Solicitor General's aim of prevailing before the Supreme Court limits the extent to which she can profitably pursue an extreme agenda inconsistent with current doctrine, OLC faces no such immediate constraint. Whether OLC honors its oft-asserted commitment to legal advice based on its best view of the law depends largely on its own self-restraint.

2. *Formal Requests, Binding Answers, and Lawful Alternatives.* — Over time, OLC has developed practices and policies that help maintain its independence and credibility. First, before it provides a written opinion,[55] OLC typically requires that the request be in writing from the head or general counsel of the requesting agency, that the request be as specific and concrete as possible, and that the agency provide its own written

---

54. See Morrison, Avoidance, supra note 4, at 1244–45 (describing bill comment process); Pillard, supra note 4, at 711–12 (same).

55. See infra Part I.B.3 for a discussion of oral versus written advice.

views on the issue as part of its request.[56] These requirements help constrain the requesting agency. Asking a high-ranking member of the agency to commit the agency's views to writing, and to present legal arguments in favor of those views, makes it more difficult for the agency to press extreme positions.

Second, as noted in the Introduction,[57] OLC's legal advice is treated as binding within the Executive Branch until withdrawn or overruled.[58] As a formal matter, the bindingness of the Attorney General's (or, in the modern era, OLC's) legal advice has long been uncertain.[59] The issue has never required formal resolution, however, because by longstanding tradition the advice is *treated* as binding.[60] OLC protects that tradition today by generally refusing to provide advice if there is any doubt about whether the requesting entity will follow it.[61] This guards against "advice-shopping by entities willing to abide only by advice they like."[62] More broadly, it helps ensure that OLC's answers matter. An agency displeased with OLC's advice cannot simply ignore the advice. The agency might

---

56. See OLC Guidelines, supra note 12, at 1608; Pillard, supra note 4, at 711. There are exceptions, especially when OLC's advice is needed quickly and the client seeks only an oral response. In addition, OLC does not require a detailed written analysis accompanying requests from the White House Counsel, the Attorney General, or the heads of other senior management offices within the Justice Department. See 2005 OLC Best Practices Memorandum, supra note 13, at 2.

57. See supra text accompanying note 31.

58. See 2010 OLC Best Practices Memorandum, supra note 14, at 1 ("OLC's core function . . . is to provide controlling advice to Executive Branch officials on questions of law . . . ."); 2005 OLC Best Practices Memorandum, supra note 13, at 1 ("[S]ubject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch."); OLC Guidelines, supra note 12, at 1603 ("OLC's legal determinations are considered binding on the executive branch, subject to the supervision of the Attorney General and the ultimate authority of the President."); OPR Report, supra note 10, at 15 ("OLC opinions are binding on the Executive Branch."); see also Pillard, supra note 4, at 727 (quoting former OLC head Ted Olson as stating "it is not our function to prepare an advocate's brief or simply to find support for what we or our clients might like the law to be," but instead to produce "the clearest statement of what we believe the law provides").

59. See Moss, supra note 53, at 1318–19 ("Although subject to almost two hundred years of debate and consideration, the question of whether (and in what sense) the opinions of the Attorney General, and, more recently, the Office of Legal Counsel, are *legally* binding within the executive branch remains somewhat unsettled."); Peter L. Strauss, Overseer, or "The Decider"? The President in Administrative Law, 75 Geo. Wash. L. Rev. 696, 739–41 (2007) [hereinafter Strauss, Overseer] (collecting early Attorney General statements that their opinions were "advisory, not legally binding").

60. See Moss, supra note 53, at 1318–20 ("[W]e have been able to go for over two hundred years without conclusively determining whether the law demands adherence to Attorney General Opinions because agencies have in practice treated these opinions as binding."). As Moss notes, the regulations that provide for the submission of interdepartmental and interagency disputes to OLC for "resolution" imply that OLC's answer will constitute a "binding determination, absent which the dispute would almost certainly continue." Id. at 1320 n.67.

61. See Pillard, supra note 4, at 711; Strauss, Overseer, supra note 59, at 742–43.

62. Pillard, supra note 4, at 711.

*STARE DECISIS IN OLC*

construe any ambiguity in OLC's advice to its liking, and in some cases might even ask OLC to reconsider its advice.[63] But the settled practice of treating OLC's advice as binding ensures it is not simply ignored.

In theory, the very bindingness of OLC's opinions creates a risk that agencies will avoid going to OLC in the first place, relying either on their general counsels or even other executive branch offices to the extent they are perceived as more likely to provide welcome answers. This is only a modest risk in practice, however. As noted above, legal advice obtained from an office other than OLC—especially an agency's own general counsel—is unlikely to command the same respect as OLC advice.[64] Indeed, because OLC is widely viewed as "the executive branch's chief legal advisor,"[65] an agency's decision *not* to seek OLC's advice is likely to be viewed by outside observers with skepticism, especially if the in-house advice approves a program or initiative of doubtful legality.

OLC has also developed certain practices to soften the blow of legal advice not to a client's liking. Most significantly, after concluding that a client's proposed course of action is unlawful, OLC frequently works with the client to find a lawful way to pursue its desired ends.[66] As the OLC Guidelines put it, "when OLC concludes that an administration proposal is impermissible, it is appropriate for OLC to go on to suggest modifications that would cure the defect, and OLC should stand ready to work with the administration to craft lawful alternatives."[67] This is a critical component of OLC's work, and distinguishes it sharply from the courts. In addition to "provid[ing] a means by which the executive branch lawyer can contribute to the ability of the popularly-elected President and his administration to achieve important policy goals,"[68] in more instrumental terms the practice can also reduce the risk of gaming by OLC's clients. And that, in turn, helps preserve the bindingness of OLC's opinions.[69]

---

63. See infra Part II.B.2.d.

64. See supra notes 51–53 and accompanying text.

65. Pillard, supra note 4, at 710.

66. See 2010 OLC Best Practices Memorandum, supra note 14, at 2 ("[U]nlike a court, OLC will, where possible and appropriate, seek to recommend lawful alternatives to Executive Branch proposals that it decides would be unlawful."); Moss, supra note 53, at 1329 ("On an almost daily basis, the Office of Legal Counsel works with its clients to refine and reconceptualize proposed executive branch initiatives in the face of legal constraints.").

67. OLC Guidelines, supra note 12, at 1609.

68. Moss, supra note 53, at 1330.

69. In the course of its investigation into whether the OLC attorneys responsible for the 2002 Torture Memorandum and related opinions committed professional misconduct, the Justice Department's Office of Professional Responsibility considered as a "threshold matter . . . whether the attorneys were aware of the result that the client wanted"—the suggestion being that such awareness would compromise the integrity of OLC's legal analysis. Margolis Memorandum, supra note 11, at 14 (discussing OPR's treatment of this issue) (internal quotation marks omitted). But as both John Yoo and Jay Bybee (the subjects of the investigation) pointed out in their objections to the draft report, OLC lawyers virtually always know what the client wants, and there is nothing untoward about that. Id. at 14–15. Indeed, as noted supra at notes 66–68 and accompanying text, both the

To be sure, OLC's opinions are treated as binding only to the extent they are not displaced by a higher authority. A subsequent judicial decision directly on point will generally be taken to supersede OLC's work, and always if it is from the Supreme Court. OLC's opinions are also subject to "reversal" by the President or the Attorney General.[70] Such reversals are rare, however. As a formal matter, Dawn Johnsen has argued that "[t]he President or attorney general could lawfully override OLC only pursuant to a good faith determination that OLC erred in its legal analysis. The President would violate his constitutional obligation if he were to reject OLC's advice solely on policy grounds."[71] *Solely* is a key word here, especially for the President. Although his oath of office obliges him to uphold the Constitution,[72] it is not obvious he would violate that oath by pursuing policies that he thinks are plausibly constitutional even if he has not concluded they fit his best view of the law. It is not clear, in other words, that the President's oath commits him to seeking and adhering to a single best view of the law, as opposed to any reasonable or plausible view held in good faith. Yet even assuming the President has some space here, it is hard to see how his oath permits him to reject OLC's advice *solely* on policy grounds if he concludes that doing so is indefensible as a legal matter.[73] So the President needs at least a plausible legal basis for

---

2010 OLC Best Practices Memorandum and the 2004 Guidelines endorse working with the client to find lawful ways to achieve the client's desired ends. In light of the widespread endorsement of this practice, the final version of OPR's report omitted any criticism of Yoo and Bybee on this particular point. Margolis Memorandum, supra note 11, at 14–15.

70. See Goldsmith, supra note 15, at 79 ("[T]he President [stands] atop the executive branch and [can] in theory reverse any OLC decision and set legal policy for the executive branch."); Johnsen, supra note 4, at 1577 ("OLC's legal interpretations typically are considered binding within the executive branch, unless overruled by the attorney general or the President (an exceedingly rare occurrence)."). I think it is best to refer to this action as a reversal, not an overruling, as it is more analogous to an appellate court reversing a lower court in the same proceeding than to a later-in-time determination in some other context to overrule the earlier decision.

71. Johnsen, supra note 4, at 1577.

72. See U.S. Const. art. II, § 1, cl. 8 ("Before . . . enter[ing] on the Execution of his Office, [the President] shall . . . swear (or affirm) that [he] will faithfully execute the Office of President of the United States, and will to the best of [his] Ability, preserve, protect and defend the Constitution of the United States.").

73. Of course, even in those circumstances there would remain the theoretical possibility of extralegal action—of defying legal constraints during an emergency and later seeking approval of, or at least forgiveness for, the violation. As Jefferson famously observed: "A strict observance of the written laws is doubtless *one* of the high duties of a good citizen, but it is not *the highest*. The laws of necessity, of self-preservation, of saving our country when in danger, are of higher obligation." Letter from Thomas Jefferson to J.B. Colvin (Sept. 20, 1810), *in* 12 The Writings of Thomas Jefferson 418 (Andrew A. Lipscomb ed., 1904). But this is not a theory of *lawful* authority; it is instead an assertion of a "need, if not [a] right, to act *contra legem, at least in an emergency*." Henry P. Monaghan, The Protective Power of the Presidency, 93 Colum. L. Rev. 1, 24 (1993); see also id. at 25 ("[E]mergency conduct, either not authorized by statute or contrary to statute, is extraconstitutional in nature."). The idea of a presidential prerogative to act extralegally is thus not a theory of the President's *lawful* authority.

disagreeing with OLC's advice, which itself would likely require some other source of legal advice for him to rely upon.

The White House Counsel's Office might seem like an obvious candidate. But despite recent speculation that the size of that office during the Obama Administration might reflect an intention to use it in this fashion,[74] it continues to be virtually unheard of for the White House to reverse OLC's legal analysis. For one thing, even a deeply staffed White House Counsel's Office typically does not have the time to perform the kind of research and analysis necessary to produce a credible basis for reversing an OLC opinion.[75] For another, as with attempts to rely in the first place on in-house advice in lieu of OLC, any reversal of OLC by the White House Counsel is likely to be viewed with great skepticism by outside observers. If, for example, a congressional committee demands to know why the Executive Branch thinks a particular program is lawful, a response that relies on the conclusions of the White House Counsel is unlikely to suffice if the committee knows that OLC had earlier concluded otherwise. Rightly or wrongly, the White House Counsel's analysis is likely to be treated as an exercise of political will, not dispassionate legal analysis. Put another way, the same reasons that lead the White House to seek OLC's legal advice in the first place—its reputation for

---

There is also the related idea, often associated with Lincoln, that "measures, otherwise unconstitutional, might become lawful, by becoming indispensable to the preservation of the constitution, through the preservation of the nation." Letter from Abraham Lincoln to Albert G. Hodges (Apr. 4, 1864), *in* 7 The Collected Works of Abraham Lincoln 281 (Roy P. Basler ed., 1953); cf. Abraham Lincoln, Message to Congress in Special Session (July 4, 1861), *in* 6 A Compilation of the Messages and Papers of the Presidents 1789–1897, at 20, 25 (James D. Richardson ed., 1897) ("Are all the laws *but one* to go unexecuted, and the Government itself go to pieces lest that one be violated?"). Although the merits and limits of that idea have seen extensive and important debate, I do not address them here. For present purposes, it suffices to note that a President pursuing this tack would not be defending a policy or action he acknowledged was illegal but would instead be insisting on its legality in virtue of the needs of the moment.

74. See, e.g., Jon Ward, White House Beefs up Legal Staff; Officials Cite Need to Tackle 'Nightmare' Vetting Process, Wash. Times, July 21, 2009, at B1 (reporting that White House Counsel's Office in the first year of the Obama Administration contained more than forty lawyers). This number is misleading, as it includes a number of lawyers who, though formally deemed to be part of the White House Counsel's Office, are actually part of a separate sub-office focused exclusively on vetting presidential nominees for positions within the Executive Branch. The core attorneys in the White House Counsel's Office number in the low twenties. See Press Release, The White House Office of the Press Sec'y, President Obama Announces Key Additions to the Office of the White House Counsel (Jan. 28, 2009), at http://www.whitehouse.gov/the_press_office/Obama AnnouncesKeyAdditionstotheOfficeoftheWhiteHouseCounsel (on file with the *Columbia Law Review*) (announcing appointment of twenty-two attorneys to positions in White House Counsel's office).

75. See Goldsmith, supra note 15, at 79–80 (noting challenges President would face if he overruled an OLC opinion).

providing candid, independent legal advice based on its best view of the law—make an outright reversal highly unlikely.[76]

Of course, the White House Counsel's Office may well be in frequent contact with OLC on an issue OLC has been asked to analyze, and in many cases is likely to make it abundantly clear what outcome the White House prefers.[77] But that is a matter of presenting arguments to OLC in support of a particular position, not discarding OLC's conclusion when it comes out the other way.[78] The White House is not just any other client, and so the nature of—and risks posed by—communications between it and OLC on issues OLC is analyzing deserve special attention. I take that up in Part III.[79] My point at this stage is simply that the prospect of literal reversal by the White House is remote and does not meaningfully threaten the effective bindingness of OLC's decisions.

3. *Written versus Oral Advice.* — A final point concerns the form of OLC's advice. Not all of it is memorialized in a formal opinion; some of it is oral, and some is communicated by email.[80] At least in theory, this variation presents gaming opportunities. An agency seeking OLC's advice on the legality of a proposed program might first seek oral advice. If

---

76. The same point holds for the Attorney General. Early in the Obama Administration, the press reported that after seeing a preliminary opinion from OLC concluding that a bill giving the District of Columbia a voting member in the House of Representatives was unconstitutional, the Attorney General "ordered up a second opinion from other lawyers in his department and determined that the legislation would pass muster." Carrie Johnson, A Split at Justice on D.C. Vote Bill; Holder Overrode Ruling that Measure is Unconstitutional, Wash. Post, Apr. 1, 2009, at A1. Although no one doubted the Attorney General's formal authority to overrule OLC, press reports of his actions in this matter triggered substantial criticism of the way he had exercised his authority, including charges that he had engaged in "a sham review" that "abused OLC for partisan political purposes." Edward Whelan, Op-Ed., Look Who's Politicizing Justice Now, Wash. Post, Apr. 5, 2009, at B3; see also John McGinnis, An End Run Around the Rule of Law, Executive Watch: A Weblog of the Duke Law Program in Public Law (Apr. 6, 2009, 12:52 PM), at http://executivewatch.net/2009/04/06/an-end-run-around-the-rule-of-law (on file with the *Columbia Law Review*). The heat of that criticism—whether justified or not—helps explain why the Attorney General so rarely exercises his reversal authority. But see William R. Dailey, Who is the Attorney General's Client? A Model for Understanding the Attorney General's Role 48–49 (unpublished manuscript) (on file with the *Columbia Law Review*) (defending idea of such Attorney General interventions).

77. See Bruce Ackerman, The Decline and Fall of the American Republic (forthcoming 2010) (manuscript at 173 n.43) (on file with author) (reporting Elena Kagan's and Walter Dellinger's recollections of "lengthy phone calls in which Kagan, then in the White House Counsel's Office, tried to convince Dellinger, the head of OLC, to change his mind about legal issues").

78. Thus, when Jack Goldsmith informed White House Counsel Alberto Gonzales and Counsel to the Vice President David Addington that he could not support the legality of an important counterterrorism program, there was no real prospect that the White House would reverse him. See Goldsmith, supra note 15, at 79. Goldsmith recounts that Addington was furious with his decision and told him that "the blood of the hundred thousand people who die in the next attack will be on *your* hands," id. at 71, but that simply underscores the fact that reversal by the White House was not a realistic possibility.

79. See infra Part III.B.2.

80. Pillard, supra note 4, at 713.

*STARE DECISIS IN OLC*

OLC advises that the program is lawful, the agency could then ask for a written opinion memorializing the advice. But if OLC returns with a negative answer, the agency might want to minimize the damage by not asking for a written opinion.

There are at least two reasons why the agency might respond this way. The first is both the most brazen and the least likely: If the program in question is important to the agency, it might choose to ignore OLC's advice and press forward anyway. If OLC's advice is merely oral, there will be less of a paper trail on the issue, making it less likely that an external monitor like Congress will know about the agency's defiance of OLC. This risk is more theoretical than real, however. As discussed above, there is a longstanding and robust norm in favor of treating OLC's advice as binding, and OLC has a strong interest in the preservation of that norm.[81] If OLC learned that its oral advice was being ignored, it could take a number of countermeasures: alerting the Attorney General, who might raise an objection at the Cabinet level or even with the President; refusing to provide future advice to the agency without its advance express agreement to be bound; and insisting that any future advice to the agency be in writing. These are powerful tools. Because virtually all of OLC's clients are repeat customers, outright defiance of even oral advice is highly unlikely.

There is a second, more plausible reason why an agency might seek oral advice first and ask for a written version only when it likes the answer: precedent. Oral advice is typically more cursory and less far-reaching than written advice. The very act of writing often exposes side issues that need addressing, and justifying a position in writing may require a fuller articulation of the principle supporting the outcome. Thus, an agency willing to adhere to OLC's negative advice in the matter immediately at hand may worry that the written version of that advice could impose a broader set of constraints going forward. The agency in this scenario treats the advice it receives from OLC as binding, and precisely for that reason it desires to receive relatively less rather than more advice.

This sort of gaming can go together with OLC's well-established practice, discussed above, of working with its clients to find lawful ways to achieve their aims.[82] OLC's initial advice that the proposed program is unlawful could be oral, but if OLC is able to work with the client to find a lawful alternative way to pursue its desired ends, that conclusion might then be memorialized as a formal written opinion. If this mechanism is at work, the body of OLC's written precedents could become weighted more toward client-friendly conclusions than the totality of all its legal advice, oral and written combined.

---

81. See supra text accompanying notes 57–62.

82. See supra notes 66–69 and accompanying text.

\* \* \*

The picture of OLC that emerges here is of an office that is not immune to various external pressures, but that can also rely on a range of well-established procedural devices to deflect or at least lessen those pressures. What those devices cannot do, however, is guarantee OLC's own commitment to integrity, independence, and excellence in its work. Although that commitment is critical to OLC's value within the Executive Branch, it ultimately depends upon what Jack Goldsmith has called "the cultural norms in the office."[83]

This suggests a point to which I return in Part III: Publicity may be the best means of motivating OLC's lawyers to preserve the independence and integrity of the office. With publicity comes the possibility of public scrutiny, and with that comes an incentive for OLC's lawyers to uphold the stated standards of the office lest they tarnish their own professional reputations. And if this is true of OLC's work in general, it should also be true of its treatment of precedent in particular. Publicity, then, may be the best way to ensure OLC takes proper account of its precedents—whatever we ultimately determine "proper" to mean.

Of course, it remains to be seen just how OLC treats its precedents, and how it should treat them. Those questions are the preoccupation of Parts II and III.

## II. A Historical and Empirical Picture of OLC Precedent

This Part examines the question of OLC precedent from a historical and empirical perspective. I begin by discussing how early Attorneys General described the role of precedent in their legal advisory work. The early Attorneys General frequently described that work in quasi-judicial terms, and thought adherence to precedent was appropriate in their work just as it was appropriate in the courts. With that history as a backdrop, I seek to provide an empirical picture of precedent in the modern OLC. Specifically, I look at the frequency with which OLC explicitly overrules or modifies its prior opinions, and I attempt to identify the kinds of cases in which it is most likely to do so. The focus is on outcomes: Without regard to how OLC justifies its decisions, when does it overrule itself?

### A. *Early Attorney General Accounts of Precedent*

The modern OLC is the inheritor of a legal advisory function originally performed by the Attorney General. And although OLC today operates in a very different institutional context from that of the virtually solo-practitioner Attorneys General of the early nineteenth century, heads of OLC often look to statements by those Attorneys General to describe

---

83. Goldsmith, supra note 15, at 37.