# EXHIBIT V

# Articles

# Presidential Review

## Frank H. Easterbrook*

JUDGES ARE FOND of claiming the power to say what the law is. As the Supreme Court held in *Marbury v. Madison*,[1] the power to interpret the law includes the power to interpret the Constitution. Sometimes judges make the bolder claim that *only* they may interpret the law — or at least the Constitution.

No one would take seriously an assertion that the President may not interpret federal law. After all, the President must carry out the law, and faithful execution is the application of law to facts. Before he can implement he must interpret. Executive power to interpret the law is so well established, and so important to successful operation of government, that courts frequently accept the executive branch's view of a statute as conclusive.[2] But what of the Constitution? Perhaps that is the exclusive preserve of judges. I shall discuss the extent to which the President may act on views at variance with statutory law, when persuaded that the

---

* Judge, United States Court of Appeals for the Seventh Circuit; Senior Lecturer, The Law School, The University of Chicago. This essay grows out of the Twelfth Sumner Canary Lecture presented at the Law School of Case Western Reserve University on February 7, 1990, and is Copyright by Frank H. Easterbrook. I thank Akhil R. Amar, Ruth Bader Ginsberg, Larry Kramer, Hans A. Linde, Alan Meese, Geoffrey P. Miller, Richard Murphy, Richard A. Posner, and Geoffrey R. Stone for helpful comments on earlier drafts.

1. 5 U.S. (1 Cranch) 137 (1803).
2. One example is when the statute leaves play in the joints and delegates to an agency. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984); Chicago Mercantile Exchange v. SEC, 883 F.2d 537, 547-48 & n.4 (7th Cir. 1989); Anthony, *Which Agency Interpretations Should Bind Citizens and Courts?*, 7 YALE J. REG. 1 (1990); Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511.

law departs from the Constitution.

Before I begin, the obligatory disclaimer. A federal judge is like a ghost. He must be present and absent at the same time. I speak to you with the knowledge that other judges may disagree, and that when a case comes before me I shall try to divine the view prevailing among my superiors rather than insist on an idiosyncratic one. On top of that, I may have to apply qualifications that I do not spell out here. All that said, however, I shall use a broad brush, so that you may see the forest while remembering that in the event of litigation I will not walk into a tree.

Example: President Reagan refused to implement part of the Competition in Contracting Act of 1984, which requires protests over the awards of certain contracts to be referred to the Comptroller General, who is not part of the Executive Branch. President Reagan thought the statute an unconstitutional intrusion on powers reserved to him by Article II. The Ninth Circuit, by contrast, thought the President presumptuous—more, thought it *un*-constitutional for the President to prefer the Constitution to a statute. According to the court, the President not only violated the take care clause but also invaded the judicial domain.[3] On occasion the Supreme Court has said similar things, although always in *dicta*.[4]

I

There is a long history of presidential action on the basis of

---

3. Lear Siegler, Inc. v. Lehman, 842 F.2d 1102, 1119-26 (9th Cir. 1988), *vacated in immaterial part*, 893 F.2d 205 (1989) (in banc). The District of Columbia Circuit took a related view in Rafeedie v. Immigration and Naturalization Serv., 880 F.2d 506, 513-15 (D.C. Cir. 1989), and Continental Air Lines, Inc. v. Department of Transp., 843 F.2d 1444, 1455-56 (D.C. Cir. 1988). *See* Gressman, *Take Care, Mr. President*, 64 N.C.L. REV. 381 (1986). On the other hand, the District of Columbia circuit in National Wildlife Fed'n v. ICC, 850 F.2d 694, 708 (D.C. Cir. 1988), remanded a case so that the agency could consider a constitutional objection to its decision, and a series of cases dealing with the "fairness doctrine" invited the FCC to junk its rules on constitutional grounds, *e.g.*, Meredith Corp. v. FCC, 809 F.2d 863, 872-74 (D.C. Cir. 1987), a course it ultimately adopted. Syracuse Peace Council v. FCC, 867 F.2d 654 (D.C. Cir. 1989), *cert. denied*, 110 S. Ct. 717 (1990); *see* Marozsan v. United States, 852 F.2d 1469, 1492 n.4 (7th Cir. 1988) (in banc) (Easterbrook, J., with Coffey and Manion, JJ., dissenting).

4. See Weinberger v. Salfi, 422 U.S. 749, 765 (1975), saying in dictum that "the constitutionality of a statutory requirement [is] a matter which is beyond his jurisdiction to determine." "His" referred to the Secretary of Health, Education, and Welfare. Many similar assertions may be found in the cases, every last one of them as unreasoned. *But see United States v. Nixon*, 418 U.S. 683, 703 (1974) ("In the performance of assigned constitutional duties each branch of the government must initially interpret the Constitution . . . .").

constitutional views, sometimes views at variance with those of the courts.[5] Four categories are unproblematic: pardons, vetoes, additions, and proposals for legislation. I give examples of presidential actions in these categories without the slightest effort to be comprehensive.

1. Pardons. A Federalist Congress enacted, and Federalist judges enforced, the Sedition Act of 1798. On taking office President Jefferson first instructed the United States Attorneys to cease prosecuting violators and then pardoned all who had been convicted while the Federalists held sway. This effectively nullified the statutes, as much as if the Supreme Court had held them unconstitutional — which it was to do, on grounds similar to Jefferson's, 163 years later.[6]

2. Vetoes. The Nation's inaugural veto was cast exclusively on constitutional grounds. President Washington vetoed the first bill apportioning representatives among states, calling it unconstitutional because it gave too many representatives to the smaller states, implying that it left too few for Virginia.[7] Secretary of State Jefferson, another prominent Virginian, wrote the veto message. President Madison vetoed on constitutional grounds a bill chartering a church in the District of Columbia.[8] Then there was a cause célèbre: after the Supreme Court held in *Osborn v. Bank of the United States*[9] that Congress has the power to establish a national bank, Congress reauthorized the Bank. President Jackson vetoed the bill, concluding that the Supreme Court was wrong and the statute unconstitutional.[10] Jackson's veto was controversial — but because he invoked reasons in addition to constitutional ones!

---

5. G. GUNTHER, CASES AND MATERIALS ON CONSTITUTIONAL LAW 22-26 (11th ed. 1985) and Lee, *The Provinces of Constitutional Interpretation*, 61 TUL. L. REV. 1009, 1012-14 (1987) collect presidential views on the subject. *See* A. BICKEL, THE LEAST DANGEROUS BRANCH 260-64 (1962).

6. New York Times Co. v. Sullivan, 376 U.S. 254, 273-76 (1964); *see* H. KALVEN, A WORTHY TRADITION: FREEDOM OF SPEECH IN AMERICA 63-68 (1988).

7. 1 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 1789-1897 124 (J. Richardson ed. 1896) [hereinafter COMPILATION] (veto message Apr. 5, 1792). Both the bill and the veto created a national stir, and Washington's cabinet was sorely divided. *See* 5 J. MARSHALL, THE LIFE OF GEORGE WASHINGTON 279-84 (1807).

8. 1 COMPILATION, *supra* note 7, at 489-90 (veto message Feb. 21, 1811); *see* American Jewish Congress v. Chicago, 827 F.2d 120, 136-37 (7th Cir. 1987) (Easterbrook, J., dissenting).

9. 22 U.S. (9 Wheat.) 738 (1824).

10. 2 COMPILATION, *supra* note 7, at 581-91 (veto message July 10, 1832).

Until Jackson's bold step, many believed that the veto should be exercised exclusively on constitutional grounds.[11]

3.  Additions. If a statute says "do at least X," the President may decide to do more because he believes the Constitution requires more. This is a common response to procedural shortcomings. The Lloyd-LaFollette Act, the charter of the civil service system, provides hearings on discharge, which became inadequate in light of revisionist interpretations of the due process clause. The President may add the necessary procedures. Presidents may add procedures and do "more," in other ways, on instrumental grounds too; not all decisions depend on constitutional imperatives.[12]

4.  Proposals for new legislation. President Franklin Roosevelt asked Congress to enact laws that were out of step with *Lochner* because he did not accept the soundness of that case and the skein of substantive due process results. He wanted to strike off on a different course and asked Congress to go with him. It did, and during the next four years the Court held the central components of the package unconstitutional, triggering the Court-packing plan and sorely tempting him to decline to implement one of its decisions.[13]

Pardons, vetoes, additions, and proposals for laws are not problematic because they do not subvert the take care clause. Proposals ask for laws the President may execute faithfully; vetoes

---

11.  Black, *On the Veto*, 40 L. & Contemp. Prob. 87 (1976); *see* R. REMINI, ANDREW JACKSON AND THE BANK WAR: A STUDY IN THE GROWTH OF PRESIDENTIAL POWER (1967).

12.  See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543-49 (1978), pointedly saying that agencies may adopt procedures exceeding statutory minima, while courts have no power to demand that they do so.

13.  President Roosevelt prepared a speech to deliver if the Court should strike down the legislation abrogating "gold clauses" in federal obligations. He planned to quote from Lincoln's First Inaugural Address (to be discussed below) and add:

> To stand idly by and to permit the decision of the Supreme Court to be carried through to its logical, inescapable conclusion would so imperil the economic and political security of this nation that the legislative and executive officers of the Government must look beyond the narrow letter of contractual obligations, so that they may sustain the substance of the promise originally made in accord with the actual intention of the parties."

F.D.R. — HIS PERSONAL LETTERS 1928-1945 459-60 (E. Roosevelt ed. 1950) (Proposed Speech on the Gold Cases (Feb. 1935)). The Court sustained the legislation, *Perry v. United States*, 294 U.S. 330 (1935), so the President did not deliver the speech. *See* Dam, *From the Gold Clause Cases to the Gold Commission: A Half Century of American Monetary Law*, 50 U. CHI. L. REV. 504, 509-18 (1983).

stop bills from becoming laws; in neither case is the take care clause activated. Additional process also does not "violate" or "invalidate" a statute. Pardons do frustrate the implementation of laws, but as *all* pardons do so to some degree, the existence of the pardon clause must authorize nonenforcement, at least at retail rather than wholesale. So too with the President's ability to decline criminal prosecution in the first place. What one President may omit, a successor may countermand and nullify.

Casting vetoes and granting pardons on grounds of politics or prudence is acceptable;[14] how odd it would be if a President, free to consider the welfare of donors in casting vetoes, could not consider the Constitution! That would reverse the original practice, in which Presidents gave exclusively constitutional grounds for their vetoes.

Presidents often justify their vetoes, pardons, additions, and proposals on broader grounds. Consider President Thomas Jefferson's explanation for the pardons of those convicted under the Sedition Act:

> [N]othing in the Constitution has given [the judiciary] a right to decide for the Executive, more than to the executive to decide for them. Both magistracies are equally independent in the sphere of action assigned to them. The judges, believing the [law] constitutional, had a right to pass a sentence of fine and imprisonment, because that power was placed in their hands by the Constitution. But the executive, believing the law unconstitutional, was bound to remit the execution of it; because that power had been confided to him by the Constitution. That instrument meant that its coordinate branches should be checks on each other. But the opinion which give to the judges the right to decide what laws are constitutional, and what are not, not only for themselves in their own sphere of action, but for the Legislature & Executive also, in their spheres, would make the judiciary a despotic branch.[15]

Or consider President Andrew Jackson's explanation for his veto of the bill chartering the second Bank of the United States.

---

14. *See* C. Black, The People and the Court 81 (1960) ("the President can veto for any reason that appeals to him"). Chester J. Antieau, in THE EXECUTIVE VETO (1988), collects vetoes and the Presidents' grounds for their decisions.

15. 8 The Writings of Thomas Jefferson 310-11 (P. Ford ed. 1897) (letter to Abigail Adams dated Sept. 11, 1804); *see* G. HASKINS & H. JOHNSON, 2 HISTORY OF THE SUPREME COURT OF THE UNITED STATES 148-49 (1981); C. PATTERSON, THE CONSTITUTIONAL PRINCIPLES OF THOMAS JEFFERSON 117-25 (1953).

The Congress, the Executive, and the Court must each for itself be guided by its own opinion of the Constitution. Each public officer who takes an oath to support the Constitution swears that he will support it as he understands it, and not as it is understood by others. It is as much the duty of the House of Representatives, of the Senate, and of the President to decide upon the constitutionality of any bill or resolution which may be presented to them for passage or approval as it is of the supreme judges when it may be brought before them for judicial decision. The opinion of the judges has no more authority over Congress than the opinion of Congress has over the judges, and on that point the President is independent of both. The authority of the Supreme Court must not, therefore, be permitted to control the Congress or the Executive when acting in their legislative capacities, but to have only such influence as the force of their reasoning may deserve.[16]

Both Presidents Jefferson and Jackson contended that no law may go into force unless all three branches agree that it is constitutional. Each, acting within its sphere, has the power to say no: Congress not to enact, the President not to approve in his legislative role or enforce in his executive role, and the Court to set aside.

President Abraham Lincoln expressed stronger thoughts in his debates with Stephen Douglas, allowing on the one hand that *Dred Scott*[17] bound Scott to his master and asserting on the other that the case had no broader significance:

We nevertheless do oppose [that decision] as a political rule which shall be binding on the voter, to vote for nobody who thinks it wrong, which shall be binding on the members of Congress or the President to favor no measure that does not actually concur with the principles of that decision. . . . If I were in Congress, and a vote should come up on a question whether slavery should be prohibited in a new Territory, in spite of the *Dred Scott* decision, I would vote that it should.[18]

In his First Inaugural Address President Lincoln reaffirmed that view when explaining that he would propose and enforce legislation inconsistent with the principle underlying *Dred Scott*: that as a matter of substantive due process, no person of African origin

---

16. 2 COMPILATION, *supra* note 7, at 582.
17. Scott v. Sandford, 60 U.S. (19 How.) 393 (1856).
18. Sixth Lincoln-Douglas debate at Quincy, Oct. 13, 1858, in 3 THE COLLECTED WORKS OF ABRAHAM LINCOLN 255 (R. Basler ed. 1953).

could be a citizen of the United States. Lincoln said:

> [T]he candid citizen must confess that if the policy of the Government upon vital questions affecting the whole people is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made in ordinary litigation between private parties in personal actions, the people will have ceased to be their own rules, having to that extent practically resigned their Government into the hands of that eminent tribunal.[19]

Here we encounter the assertion that a law deemed constitutional by legislative and executive branches may go into force without the judiciary's approbation, a much broader claim of executive authority than either Jefferson or Jackson advanced.

## II

A brief detour is appropriate. People sometimes find assertions of presidential power irksome because they think such a power would give the President the upper hand in the struggle with Congress. If the executive department has this power, would it not gain too much at the expense of Congress? When this thought comes to mind, it is well to remember that the legislative branch has its own role in interpreting the Constitution.[20] Legislative constitutional interpretive powers parallel those of the President, and some of these are also non-controversial.

(1) Any legislator may vote against a bill on constitutional grounds, including grounds that the Supreme Court has rejected.

(2) Legislators may vote for a bill that the Court has held unconstitutional, in order to prompt change. Roosevelt's Congress of 100 Days challenged *Lochner* in this fashion; after the Court held much of the program unconstitutional, Congress reenacted the laws with a thin veneer; it eventually prevailed. Congress challenged the Supreme Court's decision that it may not regulate the wages and hours of state and local officials by enacting more such

---

19. First Inaugural Address, Mar. 6, 1861, in 4 THE COLLECTED WORKS OF ABRAHAM LINCOLN, *supra* note 18, at 268.

20. *See* Brest, *Congress as Constitutional Decisionmaker and its Powers to Counter Judicial Doctrine*, 21 GA. L. REV. 57 (1986); Brest, *The Conscientious Legislator's Guide to Constitutional Interpretation*, 27 STAN. L. REV. 585 (1985); Fisher, *Constitutional Interpretation by Understanding Members of Congress*, 63 N.C.L. REV. 707 (1985); Hickok, *The Framers' Understanding of Constitutional Deliberation in Congress*, 21 GA. L. REV. 217 (1986); Ross, *Legislative Enforcement of Equal Protection*, 72 MINN. L. REV. 311 (1987); Note, *The Senate and the Constitution*, 97 YALE L. J. 1111 (1988).

laws. It has prevailed in this fight.[21] State legislatures regularly
enact laws concerning abortion in order to challenge *Roe v.
Wade*,[22] and the contours of that decision have changed under
pressure.[23] Legislation that bumps against accepted bounds is a
force for change as legitimate as the arguments of lawyers who
try to curtail governmental powers by asking for the invalidation
of laws previously sustained. There is no ratchet in constitutional
law.

(3) Congress may impeach and remove from office all who
violate the Constitution, as Congress understands it. The principal
efforts —the impeachment and acquittal of Samuel Chase and
Andrew Johnson, the campaigns to impeach Earl Warren and
William O. Douglas — came to naught, but the power is there.
The impeachment of Richard Nixon fits this pattern, although his
resignation prevented resolution.

(3A) Impeachment does not exhaust the tools for enforcing
the legislature's view of the Constitution. If Congress enacts a
War Powers Act and the President goes his merry way in reliance
on a more expansive view of executive power (and a stingy view of
legislative power), Congress need not give up. It may refuse to
enact defense appropriations bills or may take away the Presi-
dent's helicopters or enact a national health bill the President's
supporters abhor. For two hundred years, the House of Represent-
atives has enforced its constitutional prerogative to initiate tax
legislation by the mundane expedient of refusing to approve tax
bills devised by the Senate.[24] The power of the purse is potent,
and Congress has *carte blanche* at every turn. It is why the Fram-
ers feared Congress above all other internal dangers to the
Republic.

(4) There is the extraordinary power to interpret *and change
the meaning of* the 14th and 15th Amendments. Congress may
enact laws expressly disagreeing with the Supreme Court's view of

---

21. National League of Cities v. Usery, 426 U.S. 833 (1976), *overruled by* Garcia v.
San Antonio Metro. Transit Auth., 469 U.S. 528 (1985).

22. 410 U.S. 113 (1973).

23. *See* Webster v. Reproductive Health Services, 109 S. Ct. 3040 (1989).

24. *E.g.,* 132 Cong. Rec. 26,202 (1986); 106 Cong. Rec. 15,818-19 (1960); Cong.
Globe, 35th Cong., 2d Sess. 1666-67 (1859). Authorities are collected in C. CANNON, 6
CANNON'S PRECEDENTS OF THE HOUSE OF REPRESENTATIVES §§ 314-15 (1935); L.
DESCHLER, 3 DESCHLER'S PRECEDENTS OF THE UNITED STATES HOUSE OF REPRESENTA-
TIVES ch. 13, §3 (1974); A. HINDS, 2 HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTA-
TIVES ch. 47 (1907).

these amendments — and the Court has said it will acquiesce in light of the power to legislate those amendments confer.[25]

Given this assortment of constitutional powers, the legislature is in no danger if we recognize in the President some scope for constitutional decision.

### III

Now for a fifth presidential example that is not controversial in practice but should be so in theory. A President may refuse to enforce a law that is "like" one held invalid by the courts. In the 1970s the Court struck down sex differences in social welfare laws.[26] The Department of Justice trudged through these statutes identifying similar gender-based rules and instructing the Executive Branch not to follow them. In the end the Supreme Court decided only five or six Social Security sex discrimination cases, and the remainder of the sex-based provisions were carved out of the law by administrative decision, or on occasion by decisions of district judges that were not appealed and were acquiesced in nationwide — a step that is functionally a final constitutional decision by the Executive Branch.

The Attorney General, on the advice of the Solicitor General and the Assistant Attorney General for the Office of Legal Counsel, decided not to enforce so *many* statutes that Congress required the Department of Justice to notify counsel for House and Senate when the Administration decided not to appeal from a decision holding a statute unconstitutional.[27] A few of these non-enforcement decisions even reached the Supreme Court by the back door, and the Court did not seem restive that constitutional questions had been resolved by another branch. One of these came up when the Department of Justice stopped enforcing a sex-based rule in the Social Security Act after "the Solicitor General . . . concluded that the statutory presumption could not be defended under the standards announced by this Court."[28] Disputes about

---

25.  Oregon v. Mitchell, 400 U.S. 112, 128-29 (1971); Katzenbach v. Morgan, 384 U.S. 641 (1966). See Carter, *The Morgan "Power" and the Forced Reconsideration of Constitutional Decisions*, 53 U. CHI. L. REV. 819 (1986), treating *Morgan* as a privilege in Congress to disagree with the Court and compel it to re-think, with a slant in Congress' favor.

26.  *See, e.g.*, Califano v. Westcott, 443 U.S. 76 (1979); Califano v. Goldfarb, 430 U.S. 199 (1977).

27.  *E.g.*, 2 U.S.C. §288k(b) (1988) (notice to Senate counsel).

28.  Heckler v. Edwards, 465 U.S. 870, 873 n.2 (1984).

the appropriate remedy took the case to the Court, which held that because the Executive Branch quit enforcing the law, a remedy for persons claiming injury would not be deemed one based on the Constitution.

Assuming the Court's opinions have generality and force beyond the parties, the President must have the ability to declare laws unconstitutional in the course of applying the governing rules. To apply the rules includes the power to interpret them. I shall come back to this, because it is illuminating. If the President may go beyond a decision's four corners to implement "the principle" found there, he must have the ability to implement a principle even when others disagree with his interpretation. Next we shall wonder what counts as a "similar" decision. That will depend on the level of generality selected, a question to which there is no right answer. To grant the President the power to generalize is to grant him the power to make independent constitutional decisions.

## IV

Now for some controversial decisions. Let me give several, all involving a decision by the President not to enforce a law even when there is no decision on point by the Supreme Court.

1. President Reagan's decision not to enforce the part of the Competition in Contracting Act requiring references to the Comptroller General.

2. Many presidents' decisions not to carry out laws with one-house veto provisions, in advance of the decision holding all such laws unconstitutional.[29]

3. Congress enacted the Federal Advisory Committee Act, requiring open meetings by groups "utilized by one or more agencies, on the interest of obtaining advice or recommendations for the President."[30] Does the Act apply to the ABA's Standing Committee on the Judiciary, which advises the President, before he makes nominations, whether someone would be a good federal judge? President Ford concluded that it does but refused to enforce the law because he thought it an unconstitutional restriction on his ability to make nominations. He did so on the advice of Attorney General Levi, who acted on advice of Assis-

---

29. Immigration & Naturalization Serv. v. Chadha, 462 U.S. 919 (1983); *see* Elliott, *The Administrative Constitution, The Constitution, and the Legislative Veto*, 1983 S. Ct. Rev. 125.

30. 5 U.S.C. App. § 3(2)(c) (1988).

tant Attorney General Scalia.[31] Fifteen years later the question reached the Supreme Court. Three Justices agreed with this view; five turned handsprings to construe the law as inapplicable in order to avoid the problem.[32] One member of the Court kept his thoughts to himself: Justice Scalia.

4. President Wilson appoints a postmaster, later changes his mind and fires him despite a law giving him tenure; President Truman appoints a member of the War Claims Commission, whom President Eisenhower fires despite statutory tenure. Former President Taft, who lost the election to President Wilson in 1912, was Chief Justice by the time the controversy over his successor's action reached the Court. Taft vindicated Wilson. Justice Frankfurter rebuffed Eisenhower. Neither suggested that the President transgressed constitutional limits on his role in putting the statute to a test.[33]

5. Ongoing disputes about intelligence operations and the War Powers Act. No President has implemented the War Powers Act. Many have given notices that they call "consistent" with it, in order to compromise political disputes, but not one has conceded that the Act binds him in the event he has a view of the international situations that differs from the one held by Congress.

6. The patriarch of cases of defiance: President Andrew Johnson sacks Secretary of War Edwin Stanton despite the Tenure of Office Act, which provided that no cabinet secretary could be relieved until his successor had been confirmed. Secretary Stanton refused to budge; President Johnson was impeached; only his acquittal by the Senate persuaded Stanton to vamoose.[34] Just as the Court declared the Sedition Act unconstitutional 163 years after President Jefferson issued his blanket pardon, so the Court sustained President Andrew Johnson's constitutional views 60 years later, in the course of vindicating President Wilson's discharge of Postmaster Myers.[35]

---

31. Letter from Attorney General William B. Saxbe to the American Bar Association, *discussed in* History of Appointments to Supreme Court, 4B Op. Off. Legal Counsel 457, 473 & n.54 (1980).

32. Public Citizen v. Department of Justice, 109 S. Ct. 2558 (1989).

33. The two cases are Myers v. United States, 272 U.S. 52 (1926), and Wiener v. United States, 357 U.S. 349 (1958). *See* Carter, *The Independent Counsel Mess*, 102 HARV. L. REV. 105, 129-34 (1988); Entin, *The Removal Power and the Federal Deficit: Form, Substance, and Administrative Independence*, 75 KY. L.J. 699 (1987). *Myers* and *Wiener* present different executive claims; in *Myers* to be free of legislative control, and in *Wiener* to operate a unitary executive. *See* Bowsher v. Synar, 478 U.S. 714 (1986). For current purposes the distinction is unimportant.

34. H. TREFOUSSE, ANDREW JOHNSON 276-78, 293-334 (1989).

35. *Myers*, 272 U.S. at 164-76.

Must Presidents comply with such laws until 60 or 160 years have gone by and a justiciable case or controversy reaches the Supreme Court? The argument that the President must do so follows one of five lines: (1) the take care clause; (2) expertise — judges have it and Executive Branch doesn't; (3) chaos, which devours us if there are competing voices on constitutional issues; (4) Congress' greater power not to enact the statute implies the power to have it enforced as written; and occasionally (5) signing the bill waives the right to object to it.

## A

Four of these five are makeweights. Start with the fourth: the greater power includes the lesser. Justice Holmes once advanced this argument.[36] Greater-includes-the-lesser failed to carry the day when Holmes used it to explain why you could fire a policeman on account of speech, and the approach that defeated Holmes's position came to be known as the "unconstitutional conditions doctrine." The contention fares no better when dealing with the apportionment of powers among branches. It implies that all laws satisfy the Constitution, which Holmes did not believe. It also implies that judges, too, are without authority to question the constitutionality of statutes. Holmes did not believe that either. The argument is equally unsuccessful even if recast as an assertion that the capacious power of Congress makes the law constitutional, not that it defeats the power of the President to express a view.

Now for "expertise." Here's an irrelevant characteristic. The Supreme Court did not invalidate one federal statute during the 50 years between *Marbury* and *Dred Scott*; many judges of state courts rarely consider constitutional questions; in neither case does power evaporate with lack of experience. Judges have disinterest more than they have expertise, yet they engage in judicial review even when their own posers are at stake. Professors of constitutional law have both disinterest and expertise yet no power. Governmental powers go with the office, not with professional skills. Be that as it may, if expertise is important it parades down the halls of the executive branch.

The President (or anyone else in the Executive Branch) acts on the advice of the Attorney General, who relies on the Solicitor

---

36. *Id.* at 177 (Holmes, J., dissenting).

General and the Assistant Attorney General for the Office of Legal Counsel. To say that the President lacks expertise is to say that these people — the real decision-makers — lack expertise. Yet in the last 20 years the occupants of these offices include Griffin B. Bell (AG 1977-79), Robert H. Bork (SG 1973-77), Wade H. McCree, Jr. (SG 1977-81), William H. Rehnquist (OLC 1969-71), Antonin Scalia (OLC 1974-77), and Kenneth F. Starr (SG 1989- ), to list only those who were federal judges before or since. Others were or are distinguished professors of law; still others were or are at the top of the bar. Earlier occupants-turned-judge include William Howard Taft, Charles Evans Hughes, Robert Jackson, Stanley Reed, Thurgood Marshall, Charles Fahy, Simon Sobeloff, George Thomas Washington, my colleague Walter J. Cummings — and the man who wrote the President's veto message on the Bank of the United States, Roger Brooke Taney! It is said in the halls of Congress that what goes around comes around. President Lincoln was to treat Taney's opinion in *Dred Scott* with the same tender mercies that Taney and President Jackson reserved for Marshall's opinion in *Osborn*.

Next comes waiver. One could say that a President consents by signing the bill, that refusal to comply is a form of line-item veto. To insist that the President's signature on a bill compels him to enforce the law is to say that with the stroke of a pen a President may eliminate constitutional objections — may create extra-constitutional (perhaps contra-constitutional) institutions on his own volition. "Agreement" of this character does not override limitations in the fundamental document. No one may consent to violate the Constitution, or bind his successor to do so.[37] Anyway, Presidents often sign bills despite objections to some portions of them, because the remainder is beneficial or even necessary.[38] Sticking an unconstitutional proviso into the bill setting the debt ceiling — a bill the President must sign to keep the government in operation — does not dispatch the constitutional problem.[39]

As for chaos: There is only one President. The Executive

---

37. Although it is out of place in this essay to answer an argument by relying on the Supreme Court, I'll succumb this one time. *Myers* allowed President Wilson to refuse, on constitutional grounds, to carry out a bill he signed into law. *See* Buckley v. Valeo, 424 U.S. 1 (1976); Nixon v. Administrator of General Services, 433 U.S. 425, 556-57 (1977) (Rehnquist, J., dissenting).

38. Jackson, *A Presidential Legal Opinion*, 66 HARV. L. REV. 1353 (1953).

39. Sidah & Smith, *Four Faces of the Line Item Veto: A Reply to Tribe and Kurland*, 84 Nw. U.L. REV. 437, 452-57 (1990).

Branch can act in a unified way. Someone desiring chaos could do no better than to delegate constitutional questions to more than 20,000 state judges, or 600 federal district judges, whose work is reviewed by more than 150 circuit judges sitting in panels of three! That way lies babble — and we have fulfilled all expectations. A unitary Executive always does better at avoiding chaos than does a hydra-headed, uncoordinated judiciary.[40] This was, after all, one of the principal arguments for a unitary executive in 1787.

People commonly overstate the extent to which divergence of opinion and practice breeds "chaos." Tension and enduring disagreement are not chaos. Presidents are at loggerheads with Congress repeatedly, and the two houses of Congress with other. Separation of powers — the inability of any one person or branch to have its way — was thought to be an essential component of a free republic, not a hindrance to good government. We know from the supremacy clause that *state* executive officials must put the Constitution ahead of state and federal law.[41] Is this acceptable while the similar decision of a single President produces chaos? Unlikely.

Other nations have taken separation further. France has three systems of courts, each supreme within its province. The *Conseil Constitutionnel* may declare laws unconstitutional before they go into force but not thereafter; the *Cour de Cassation* and the *Counseil d'État* owe no respect to the decisions of the *Counseil Constitutionnel* and lack the powers that we identify with judicial review. Chaos has not broken out in France as a result.

Civilian legal systems also deny precedential force to judicial decisions. They insist that the code — the statute or constitution — is the only law, and that judicial decisions are glosses with the same force as scholarly commentary, maybe a little less.[42] In these legal systems professors have more prestige than judges.[43] The ab-

---

40. See generally Easterbrook, *Ways of Criticizing the Court*, 95 HARV. L. REV. 802 (1982), for an explanation why an unitary decision-maker will do better than any multiple-member political body, a category that includes the Supreme Court.

41. Alleghany Corp. v. Haase, 896 F.2d 1046, 1054-56 (7th Cir. 1990) (Easterbrook, J., concurring); Cooper v. Eugene School Dist. No. 4J, 301 Or. 358, 361 & n.7, 723 P.2d 299, 302-03 & n.7 (1986).

42. *See* J. MERRYMAN & D. CLARK, COMPARATIVE LAW: WESTERN EUROPE AND LATIN AMERICAN LEGAL SYSTEMS 551-87 (1978).

43. A point forcefully brought home to one of Justice Scalia's children, who proudly told a European family with whom she was staying that her father had become a judge, only to learn that her hosts assumed that her father must have been disgraced to accept

sence of "precedent" as we know it greatly enlarges the discretion of the legislative and executive branches, again without bringing civilization to a close. The great western democracies have very different legal systems but fundamentally similar economic and legal realms.

B

This leaves the take care clause. The President must enforce, not negate. Simple — and very misleading.

For the President must take Care that the "Laws" are executive. Is the Constitution a "law"? If so, then the President must execute it too. In any contest between statute and Constitution, the Constitution wins.

To tell whether the President may put the Constitution over a law, step back and ask: Why may a *judge* put the Constitution first? The answer Chief Justice Marshall gave in *Marbury* is simple: that the Constitution is law.[44]

— We departed from the United Kingdom by having a written and therefore an enforceable constitution.
— The Constitution establishes a structure of separated and limited powers, implying enforceable limits.
— The supremacy clause gives a hierarchy, with the Constitution on top. Although technically it refers to state judges rather than federal ones, the clause implies a structure binding every public officer, one in which the Constitution prevails over competing sources of legal obligation.
— All officers take an oath to that hierarchy.

So in the event of conflict the Constitution wins. The tough question in *Marbury* was not *whether* the Constitution trumps a statute, but *who* interprets the meaning of the Constitution: Congress when it enacts the law, the President when he executes, or the Court when it decides cases and controversies? Why not say that the legislature or President, on acting, resolved the constitutional questions?

John Marshall's answer was essentially: "Every man for himself." Each official owes the same duty to the hierarchy and must

---

such a demotion. *See* R.B. Ginsburg, *Thoughts on Writing Separately*, 65 WASH. L. REV. 133, 136 (1990).

44.  *See* Easterbrook, *Approaches to Judicial Review*, in THE BLESSINGS OF LIBERTY: AN ENDURING CONSTITUTION IN A CHANGING WORLD 147 (J. David & R. McKay eds. 1989).

make his own decision. Judges can't knuckle under to the view of others, it is the Constitution, not someone else's view about the Constitution, that governs.

The claim is especially strong when the decision is self-denying. Ability to construe *for myself* is at its apex when an actor is denying his own power. *Marbury* did not impose duties on other branches or proclaim that others must agree. The Justices said only that Congress cannot compel them to hear a case that they believe the Constitution does not allow them to decide.

Now translate to the President the rationales of constitutional review.

If we accept Alexander Hamilton's justification for judicial review — that unconstitutional enactments are simply not "law" and do not bind anyone[45] — then there is no distinction between judge and President. The Supreme Court has said more times than one can count that unconstitutional statutes are "no law at all."[46] Add the observation that what is "no law" can't bind the Executive Branch, and the argument is complete. *Marbury* itself used functional rather than formal arguments, however, and these carry over completely.

— The Constitution is *law*, a source of rules.
— The hierarchy is the same.
— The duty is to Constitution and its structure.
— Every man for himself: the President can't kowtow to Congress' view any more than the Court will. Especially given the unique presidential oath to the Constitution in article II, section 1, clause 7: "I do solemnly swear that I will faithfully execute the office of President of the United States and will, to the best of my Ability, preserve, protect, and defend the Constitution of the United States." Nothing there about executing laws while ignoring the Constitution!
— Non-enforcement of a law is a modest, self-denying power along the lines of *Marbury*. Even when the power is invoked in support of one's own position (a President protects executive powers, as he perceives them, from legislative encroachment), the President does not insist that anyone else agree.

Self-denial is the sort of power that even Jefferson approved.[47] Jefferson was not at the constitutional convention, but

---

45. THE FEDERALIST No. 78, at 491-93 (A. Hamilton) (B. Wright ed. 1961).

46. *E.g.*, Norton v. Shelby County, 118 U.S. 425, 442 (1886).

47. As Jefferson wrote to Spencer Roane, "[e]ach of the three departments has equally the right to decide for itself what is its duty under the constitution, without any

Madison was and approved of this view:

> [E]ach [department] must in the exercise of its functions be
> guided by the text of the Constitution according to his own in-
> terpretation of it; and that consequently in the event of irrecon-
> cilable interpretations, the prevalence of one or the other depart-
> ment must depend on the nature of the case, as receiving its
> final decision from one or the other, and passing from that deci-
> sion into effect, without involving the functions of any other.[48]

James Wilson, the author of article III of the Constitution, saw
things the same way. During the debates in Pennsylvania on the
ratification of the Constitution, Wilson had this to say:

> I say, under this constitution, the legislature may be restrained
> and kept within its prescribed bounds by the interposition of the
> judicial department. . . . I had occasion on a former day to
> state that the power of the constitution was paramount to the
> power of the legislature acting under that constitution. For it is
> possible that the legislature, when acting in that capacity, may
> transgress the bounds assigned to it, and an act may pass in the
> usual *mode* notwithstanding that transgression; but when it
> comes to be discussed before the judges, when they consider its
> principles, and find it to be incompatible with the superior pow-
> ers of the constitution, it is their duty to pronounce it void; and
> judges independent, and not obliged to look to every session for
> a continuance of their salaries, will behave with intrepidity and
> refuse to the act the sanction of judicial authority. In the same
> manner the President of the United States could shield himself
> and refuse to carry into effect an act that violates the
> constitution.[49]

---

regard to what the others may have decided for themselves under a similar question."
Letter from Thomas Jefferson to Spencer Roane (Sept. 6, 1819) *reprinted in* 12 WORKS OF
THOMAS JEFFERSON 139 (P. Ford ed. 1905). Jefferson was consistent. In his NOTES ON THE
STATE OF VIRGINIA (1784), written before the drafting of the Constitution and discussed
by Madison in the 49th Federalist. Madison stated that the "several departments, being
perfectly coördinate by the terms of their common commission, none of them, it is evident,
can pretend to an exclusive or superior right of settling the boundaries between their re-
spective powers." THE FEDERALIST No. 49, at 348 (J. Madison) (B. Wright ed. 1961). The
quotation is from Madison's exposition of Jefferson's views. Madison disputes Jefferson's
conclusion that because the departments have equal powers all disputes must be resolved
by the people; he does not, however, disagree with Jefferson's view of the right of each
department to equal claim to determine the limits of its powers.

48.  E. Burns, JAMES MADISON: PHILOSOPHER OF THE CONSTITUTION 187 (1968) (re-
print of 1938 original) quoting from one of Madison's unpublished memoranda. See id. at
159-60 186-89 for Burns's summary of Madison's approach.

49.  PENNSYLVANIA AND THE FEDERAL CONSTITUTION OF 1787-1788 304-05 (J. Mc-
Master & F. Stone eds. 1888).

Notice that Wilson first justifies judicial review and then equates the President with the judges in ability and authority to set the Constitution over a statute.[50]

C

If arid logic and history do not persuade, what about an example? Inflamed by the latest scandal in defense procurement, Congress passes this law:

> Section 1. The President shall execute the CEO of Apex Missiles Corporation and the claque that surrounds him, and he shall confiscate their property, and none of their lineal descendents shall be eligible for any office under the United States, or any of them.
>
> Section 2. No court of the United States shall have jurisdiction to review acts required by Section 1.

This is a bill of attainder (with the corruption-of-blood feature that the Framers detested). Whether or not the view-preclusion section works, the President must decide whether to dispatch the firing squad. Is the President obliged to rub out the CEO and dispossess his heirs? Or could (must) he say: This is a bill of attainder, and my duty to carry out the Constitution trumps any obligation to carry out this law? This is a self-answering question. Even Jefferson, who thought ill of judicial review in general, and John Marshall in particular, conceded the power of each Department to decide *for itself* whether the law is consistent with constitutional imperatives.

If there is doubt, how about the next question in line: The Supreme Court holds the law unconstitutional as applied to the CEO, but a member of the claque (call him Lovett) did not obtain judicial review. Must the President execute Lovett, or may he say that the constitutional principle has been established in the CEO's case? If the President may not set the Constitution above the law, why may he spare Lovett on the basis of a decision in a stranger's case? Why, indeed, could he spare the CEO? The judicial decision is just an interpretation of the Constitution, and if for the Executive Branch the law is superior to the Constitution then it trumps the judicial decision too! But if the President may spare Lovett on the basis of the decision in the CEO's lawsuit, why can't

---

50. S. SNOWISS, JUDICIAL REVIEW AND THE LAW OF THE CONSTITUTION 23-44, 72-89 (1990), collects similar statements from Wilson and other of the Constitution's authors.

the President decide other constitutional issues on the basis of existing law? The concession that a decision about one statute discriminating on account of sex allows the President to cease enforcing others "like" it carries powerful implications.

Perhaps the response is that all of this supposes that the Constitution is "law," to be respected in the same way as other law. If Congress passes inconsistent laws, the President must choose one to implement; so too if the law collides with the Constitution. If, however, we abandon the view that the Constitution is law, treating it as "policy" made up by judges, then of course the President must carry out the statute 'til a court makes up the policy. There isn't any "Constitution" that can collide with the law until the court establishes it.

Sure enough, only judges have "the power" when the Constitution is *solely* "what the judges say it is" — by definition. Still, if "the Constitution" is in flux, if our written Constitution is no more *the* Constitution than is the Magna Carta or the Bill of Rights of 1689 or the latest treatise on moral philosophy, it need not follow that judges have primacy. In other lands without written, binding constitutions, there is no judicial review at all. A judge's claim to interpret such an unwritten tradition (or to propose a new one) is no greater than a President's, or a philosopher's. Presidents should not be able to disregard laws on the basis of philosophical developments — but then judges should not have this power either.

It is one thing to say that "as a political matter, if not as a matter of strict legal theory, judicial review of Acts of Congress for federal constitutionality no longer rests wholly on the arguments of *Marbury v. Madison*, or on those of Federalist No. 78," but "rests also on the visible active, and long-continued acquiescence of Congress,"[51] a rearrangement after the fashion of nations (such as England) that lack written constitutions. It is quite something else again to say that this transformation (if indeed it has occurred) shuts off powers other branches exercise. Presidents have not become passive; every President in this century has used the power of presidential review to refuse to enforce statutes, and the more recent Presidents have been aggressive about it. Congress has acquiesced in this practice no less than in the Court's adventurism.

---

51. C. Black, Structure and Relationship in Constitutional Law 70-71 (1969).

Case 4:21-cr-00670-CJN   Document 58-22   Filed 04/15/22   Page 21 of 27

I happen to think that a view of Constitution-as-policy logically defeats all claims for judicial review rather than the Executive Branch's ability to prefer Constitution to law. Judicial review — a unique institution in which a public official is entitled to disregard statutory law in preference to some other source of legal rules — depends on the view that the Constitution is law. *Marbury* says it is, and *Marbury* is right.

If we grant case law any generative force — any effect beyond the parties — that must be because the Constitution in general prevails over the law. Any given decision illuminates the meaning of the Constitution. It is then the Constitution and not the decision that the President implements in analogous cases.

If the President may act on the strength of a "similar" decision, he may act without one — for it is still the Constitution that supplies the rules. It is the Constitution itself, and not the view of temporary officeholders, that authorizes action.

## D

Defense of presidential constitutional power sends chills up many spines. Some fear that Presidents will confuse the Constitution with their parties' platforms. Others remember the struggle to carry out *Brown v. Board of Education*[52] and equate a power to decide constitutional questions with the power to nullify the Constitution. *Cooper v. Aaron*[53] settled *that* question, the refrain goes, so why reopen old wounds?

There is a big difference between a power in the President and a power in Orville Faubus. The President is one of three co-equal branches of the federal government. The supremacy clause explicitly requires states to follow the Constitution and other federal law. Binding national law is essential to any nation. I have been concerned with the allocation of powers within the national government, not with the relation between the federal government and the states.

There is also a gulf between a power to implement and a power to nullify the Constitution. Rhetoric being what it is, one man's implementation is another's nullification. Justice McReynolds is reputed to have declaimed from the bench during the announcement of the gold clause cases that "the Constitution, as we

---

52.  347 U.S. 483 (1954).
53.  358 U.S. 1 (1958).

have know it, is gone." The projects are different in principle, though. Real "nullifiers" assert that the Constitution does not govern state and local affairs, and none of the arguments I have advanced would give comfort to a nullifier. Interpretation and nullification have nothing in common.

To say that a power to interpret may be used as cover for the power to nullify is not condemn it. Powers of all sorts may be put to poor use, and those wielding power may dissemble about their reasons and objectives. The same power of judicial review that gave us *Brown v. Board of Education* also gave us *Dred Scott*, *Plessy v. Ferguson*, and *Lochner v. New York*. If disputes about interpretation counsel against the exercise of constitutional review, we shall have to abandon the project: the great majority of constitutional opinions in the Supreme Court these days come with dissenting opinions.[54] If misuse of power in the name of the Constitution is enough to condemn it, then we shall have to abandon judicial review: *Lochner* and *Plessy* reigned longer than *Brown*.

I grant that the President is more likely to find in the Constitution a rule favorable to his political program than is the Court: Justices do not have political programs. Presidents declare invalid statutes that allocate more power to Congress. Ability to hand yourself, or your political allies, additional power in the name of the Constitution is a temptation, and the Framers understood that politicians yield to temptations all too often. Yet Justices find themselves in the same position. Constitutional cases rarely diminish the power of *courts* while enhancing that of the political branches. Statutory interpretation follows suit. Judges have given themselves immunity from damages under both Constitution and statutes, while deciding that members of other branches must pay. Judges also make decisions that promote their own conceptions of proper government, a form of self-interested behavior.[55] If judges may (and do) look after the interests of the judicial branch, there is no principled objection to the like power — and the like potential for misuse — in the President.[56]

---

54. Easterbrook, *Agreement Among the Justices: An Empirical Note*, 1984 S. Ct. Rev. 389, 392-95.

55. *See* Easterbrook, *What's So Special About Judges?*, ___ Colo. L. Rev. ___ (1990) (forthcoming).

56. Rauol Berger, who believes that Presidents generally must enforce laws that they think are unconstitutional, makes an exception when the President's own powers are at stake. *See* R. Berger, Executive Privilege: A Constitutional Myth 306-09 (1974). Limiting the power of presidential review to those in which the President's self-interest

Now for the other bogeyman: the belief that if the President may entertain constitutional views at all, he may ignore the Supreme Court. President Lincoln once did this (he refused to release a prisoner despite Chief Justice Taney's writ of habeas corpus), but no other President has followed suit. None should — and the arguments I have been discussing do not allow for disobedience. There is a fundamental difference between carrying out an order of the court, rendered in a case within the court's jurisdiction, and acquiescing in a rule of decision, a difference Lincoln cleaved to in calmer moments. Article III of the Constitution creates the "judicial Power of the United States," and a "judicial Power" is one to render dispositive judgements. People may disagree about the meaning of the Constitution or the generality of its commends without doubting that a judgment conclusively resolves the case. Orville Faubus was more than a nullifier; he denied the power of the Supreme Curt to resolve a case to which the state was a party.

The difference between the binding force of a decision and the rule of decision that produced it underlies much of jurisprudence Courts frequently explain their judgments in novel or sweeping ways, and no one expects the President to streak off in whatever direction an opinion pointed most recently. Justices themselves do not do so, and a number of doctrines confine the power of judgments. Non-parties are free to disregard them. The Executive Branch, party to thousands of lawsuits, may stick to its (legal) guns, asserting in tomorrow's case theories that were rejected in yesterday's.[57] President Lincoln dealt with *Dred Scott* in a way we would today call "nonacquiescence." He told members of the executive branch to treat African-Americans as citizens, despite that case, whenever possible: they received passports, patents, and other recognition available only to citizens, although the Court had said they could not be citizens.[58]

---

makes his judgment least dispassionate is a curious inversion. Self-interested decisions are the hardest to justify.

57. *United States v. Mendoza*, 464 U.S. 154 (1984), holds that the Executive Branch need not follow the legal views of the lower courts beyond the bounds of the case. *See* Diller & Morawetz, *Intracircuit Nonacquiescence and the Breakdown of the Rule of Law: A Response to Estreicher and Revesz*, 99 YALE L.J. 801 (1990); Estreicher & Revesz, *The Uneasy Case Against Intracircuit Nonacquiescence: A Reply*, 99 YALE L.J. 831 (1990); Estreicher & Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679 (1989).

58. 5 THE WORKS OF CHARLES SUMNER 497-98 (D. Donald ed. 1880); 6 *id.* at 144.

This leads to a related objection: presidential review will prevent the courts from deciding constitutional questions. If the President declines to enforce a law, there may be no occasion for the Supreme Court to give its own opinion. It follows, the argument would go, that the President must at least direct the Solicitor General to press the law with enough vigor to obtain a constitutional decision, a course followed in *Lovett* and *Chadha*.

Prudence may counsel this course, but the Constitution does not compel it. For one thing, litigation is apt to ensue even if the President refuses all enforcement. A beneficiary of the law could file suit in an effort to obtain what Congress bestowed. Whether or not a private party has standing does not matter, however. Judges exist to decide cases, not to resolve issues. Constitutional decisions are byproducts of real cases, not the *raison d'être* of the judicial system. Decrees are the ends of live controversies, not a means to settle abstract questions.[59] If the political branches arrange their affairs so as to eliminate occasions for litigation, neither the courts nor the people have a complaint.

E

Presidential review is neither a power to nullify nor a power to disregard judgments. It is important and beneficial in five principal classes of disputes that raise neither problem:

(1) Constitutional limitations constrain governmental power. No one may go to jail — the government may not act in many other ways — unless multiple holders of power concur in the constitutionality of that decision. Congress must enact the law; the executive branch must prosecute; the court must convict. At each step the person exercising the power of government must decide whether the Constitution authorizes the step. This is plain enough in criminal cases. Acknowledging the power of presidential review shows that it holds throughout the system of government. Each branch brings to the problem its distinctive perspective, enriching our civic discourse, and consensus supports any action eventually taken.

(2) Many disputes do not entail much prospect of judicial resolution, given the case-or-controversy requirement of Article

---

59.  Rhodes v. Stewart, 488 U.S. 1 (1988); Hewitt v. Helms, 482 U.S. 755 (1987); Alliance to End Repression v. Chicago, 820 F.2d 873 (7th Cir. 1987).

III.[60] Foreign policy and fiscal affairs rarely end up in court, making the President's constitutional decision the end of the line — as Congress's constitutional decision would be, if we were to deny the existence of presidential review.

(3) Many more disputes fester for years, decades, even centuries between enactment of the legislation and authoritative resolution by a court. The Sedition Act took 163 years, the Tenure of Office Act 60 years, and these are not isolated examples. In the interim legislative and executive officials must decide whether the law is constitutional or not, and act accordingly. No one doubts that Senators could vote yea or nay on the articles of impeachment laid against President Johnson on the basis of their conclusion that the Tenure of Office Act was (or was not) constitutional. President Johnson needed the same power of decision, lest the limitations in article III ensnare the political branches into enduring disregard of the Constitution.

(4) Once the Court resolves a point of constitutional law, a power of presidential review ensures quick compliance. The winnowing of the social security laws for sex-based classifications is a case in point. *Brown* provides an even more vivid example (at the expense of moving to state-federal relations, which I promised not to do). Getting as far as we have in eliminating segregation and its vestiges has taken almost two generations and hundreds of suits. But the volume of litigation is as nothing compared with the number of school districts that desegregated on their own. If executive officials must follow the law until slapped with an injunction, then recalcitrant officials were *right* to drag their heels, and the many who took *Brown* seriously and desegregated were violating their duties! Once the Court held that states may not exclude women from jury venires,[61] it was unnecessary to bring 49 more suits, or perhaps 3,041 more (one per county), to achieve compliance throughout the nation. There were 83,186 local governments in the United States in 1987 and oodles of state agencies;[62] I shudder to think that none of them need comply with the Constitution until told to by a judge, one clause at a time. Presidential review, executive review in general, speeds up the process of com-

---

60. *See* Casper, *Constitutional Constraints on the Conduct of Foreign and Defense Policy: A Nonjudicial Model*, 43 U. CHI. L. REV. 463 (1976); Dam, *The American Fiscal Constitution*, 44 U. CHI. L. REV. 271 (1977).

61. Duren v. Missouri, 439 U.S. 357 (1979).

62. 1990 Statistical Abstract of the United States table 454.

pliance with constitutional norms.

(5) The disagreeable corollary, to many, is the belief that presidential review *can* have the reverse effect. It can't. Presidential review will not speed up compliance if the President does not agree with the Court — but even then compliance, coming one case at a time, will be no slower than it would be if there were no power of presidential review. It is the duty to put the Constitution ahead of the law that requires *compliance* without one suit per school district. If executive officials are forbidden to place Constitution over law, that produces the ultimate in heel-dragging, for no one acts until a judge orders him to. What presidential review (and legislative review) does is facilitate *challenges* to judicial decisions. Those who resisted *Lochner* by enacting and carrying out laws could claims that they were acting within their powers when disagreeing with the Court.

Presidential review is in this sense a counterweight to judicial review. Life tenure has conflicting effects on the judicial system. It is designed to (and does) liberate judges from current politics. This could lead them to carry out their personal agendas. It is suppose to have the former effect; an unpleasant byproduct is that for some portion of judges it has the latter. Separated and overlapping powers of review can help control the phenomenon.

We live in a constitutional republic in which many actors hold overlapping powers. Powers are not so much separated as duplicated and distributed, so that concurrent approval is necessary to action. This is not an efficient system; it is designed to frustrate all claims of power. Presidential review fits neatly in such a framework. We live in a constitutional republic. Contemporary officeholders are but squatters in that mansion. All owe their duties to the real owners.