# EXHIBIT X

# OLC's OPINION WRITING FUNCTION: THE LEGAL ADHESIVE FOR A UNITARY EXECUTIVE

*Douglas W. Kmiec* *

From the Judiciary Act of 1789 onward, the Attorney General's primary duty has been to advise the President and the heads of the executive departments on legal matters.[1] A biography of James Monroe's Attorney General, William Wirt, suggests that it is the importance of this opinion function which sets the Attorney General apart from all others in the President's cabinet:

> There is a peculiarity in the responsibilities of this officer, which requires the exercise of more than common care in his selection. He does not deal with ordinary routine of business which inferior intelligence and system can manage, but when doubts and difficulties intervene upon the powers conferred by law, or the rights intended to be secured, the appeal is made to him.[2]

The Office of Legal Counsel ("OLC") has been known throughout government as "the Attorney General's Lawyer."[3] This is an apt description of an office that has been delegated virtually all of the Attorney General's contemporary opinion writing. OLC originated as the Office of the Assistant Solicitor General, but was statutorily separated in 1933 and renamed twenty years later.[4] OLC has been credited with guiding Presidents "in many famous executive decisions."[5] Luther Huston offers the following examples:

> [I]n 1940, the "Lend-Lease" opinion of Attorney General Robert H. Jackson gave President Roosevelt legal authority to transfer American destroyers to England in return for the right to establish naval and air bases in British possessions. In 1957, the Office of

---

* Professor of Law, University of Notre Dame; former Assistant Attorney General, Office of Legal Counsel, United States Department of Justice.

[1] 28 U.S.C. §§ 511, 512 (corresponds to Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 92-93).

[2] S.L. Southard, Discourse on the Professional Character and Virtues of William Wirt, Pronounced in the House of Representatives, March 18, 1834, on the Occasion of the Death of Attorney General William Wirt 32-33 (Gales & Seaton, Washington, 1834), *cited in* Rita Nealon, Contributions of the Attorneys General to the Constitutional Development of the American Presidency 35 (1949) (unpublished Ph.D. thesis, New York University, on file with author).

[3] A title respectfully borrowed for a recent book, DOUGLAS W. KMIEC, THE ATTORNEY GENERAL'S LAWYER: INSIDE THE MEESE JUSTICE DEPARTMENT (1992).

[4] LUTHER HUSTON, THE DEPARTMENT OF JUSTICE 60 (1967).

[5] *Id.*

Legal Counsel justified the use of federal troops in Little Rock, Arkansas, to enforce a court order that the schools be [de]segregated. And in 1963, the Office devised the basis for the quarantine of Cuba during the missile crisis.[6]

A description of OLC's contemporary advice giving role follows. It is informed by my service as head of this office in the later years of the Reagan administration. This sampling includes OLC's review of pending and enrolled legislation, its advice on the legality of the President's program, including the review and preparation of executive orders, the handling of executive privilege matters, and OLC's vital dispute settlement function among executive agencies. Critics of past Attorneys General often speculate that this law officer requires greater independence from the partisanship of the White House.[7] This survey of the recent work of OLC concludes by exploring whether the scope of the Attorney General's delegation to OLC, together with the autonomy with which OLC typically analyzes and renders opinions, effectively creates an "independent" Attorney General—at least in the few functional areas where independence may be warranted.

## I. OLC AND CONGRESS' PROGRAM

### A. *Legislative Review of Pending Legislation*

Much of OLC's work table is arranged by the legislative activity of Congress. OLC is asked to review any piece of pending legislation that may raise questions of constitutionality. In form, OLC opinions on pending legislative matters are often prepared as letters to the director of the Office of Management and Budget ("OMB") over the signature of the head of the Justice Department's Legislative Affairs division. Upon receipt, OMB is expected to transmit OLC's legal views to the appropriate committee in Congress.

The question may be raised as to why both Legislative Affairs and OMB intervene in the transmission of OLC's legal wisdom to Congress. It is not by and large, as might be thought from outside government, to substantively alter or review the advice. While it is not unheard of for Legislative Affairs or OMB to question some aspect of OLC's thinking, there is an operating assumption that if OLC confirms its advice upon questioning, it stands. Rather, the role of Legislative Affairs is simply to ensure that there is a singular point of

---

6 *Id.*
7 NANCY V. BAKER, CONFLICTING LOYALTIES: LAW AND POLITICS IN THE ATTORNEY GENERAL'S OFFICE, 1789-1990, at 166 (1992).

contact dealing with Congress concerning the vast activities of the Department on a day-to-day basis. So too, OMB plays a similar coordination or contact function for the executive branch as a whole. Thus, in many instances, OLC's legal advice pertaining to pending legislation is often transmitted together with the policy or administrative commentary from other affected agencies. In those cases where the legal issues predominate, OMB will instruct Legislative Affairs to transmit OLC's thinking directly to Congress in its own departmental letter.

While this all may seem like so much bureaucracy, this procedural routine does yield noticeable benefits. OLC seldom has to concern itself with the "political fallout" from its advice. Insofar as OMB or Legislative Affairs receives, by virtue of their legislative contact function, the Congressional reaction, OLC is arguably freer to give a dispassionate reading of the law without concern that opinions will immediately ensnare staff in testy confrontations with counterparts on Capitol Hill. To be sure, this is not total immunity from political reality. Both Legislative Affairs and OMB are apt to remind the head of OLC of the political cost to the administration of defending unpopular OLC advice. Yet, even this is more palatable than having OLC staff lawyers chilled or chastened by such criticism. On occasion, OLC is asked to testify to explain its legal thinking, but such activity is rare.

The use of intermediaries to transmit OLC legal advice to Congress does pose some problems. First, Legislative Affairs, and certainly OMB, is not always fully conversant with the legal argumentation underlying an OLC opinion. This is only natural since the personnel in these entities do not perform the research. Second, OMB cannot always be relied upon to fully divulge OLC's legal thinking to Congress. From OMB's perspective, a constitutional question might need to be sacrificed or horse-traded for an administration policy goal. This, of course, is constitutional blasphemy to OLC, and it has, on occasion, misled the Congress or placed the President in the awkward position of later being presented with enacted legislation he could not, at least as a constitutional matter, accept. One such occasion was the Whistleblower Protection legislation.

### The "Whistleblower" Legislation

Those familiar with the details of the legislative process know well that legislation is seldom fully comprehended by its popular name or public description. President Bush's lack of success in explaining how legislation denominated as a cable price control measure

actually raises cable prices is illustrative. This political axiom also applied to legislation protecting "whistleblowers," those federal employees reporting fraud, waste or abuse in an executive agency. On the surface, the purpose of such legislation was benign, if not salutary. In operation, however, Congress's whistleblower legislation contained elements designed to fractionate the executive branch contrary to the constitutional design.[8]

Under the Civil Service Reform Act of 1978,[9] a special counsel was designated to receive and investigate complaints by whistleblowers who thought they were retaliated against for reporting government mismanagement. If this special counsel concluded that retaliation or other prohibited personnel practice had occurred, he could request the Merit Systems Protection Board to take corrective action.

OLC has no brief for impermissible personnel practices, but it does have a special mandate to ensure that the legislative branch does not encroach on executive function. This is an OLC interest that cuts across party lines, and indeed, the dedication with which it is pursued by OLC is one of its most tangible contributions to advancing a rule of law. Thus, it was not surprising that Jimmy Carter's head of OLC, John Harmon, protested the removal limitations on the proposed special counsel. Harmon wrote: "the functions of the Special Counsel would be predominantly executive in character. . . . If the Special Counsel is appointed by the President, since he will be performing largely executive functions, [OLC] believe[s] that Congress may impose no restrictions on the President's power to remove him."[10]

Nevertheless, the special counsel position, removal limitation and all, was written into law. It only took a few years for Congress to aggravate this encroachment. In early 1986, the House undertook consideration of a bill to authorize the special counsel to file suit against executive agencies in court.[11] Picking up Harmon's previous objection, OLC contended that this would place the President "in the untenable position of speaking with two conflicting voices in the federal courts."[12] Both the special counsel and the defendant executive agency are subordinate parts of the executive branch, and the Presi-

---

8  *See*, KMIEC, *supra* note 3, at 60-63.

9  Civil Service Reform Act of 1978, 5 U.S.C. § 1101 (1988).

10  Letter from John Harmon, Assistant Attorney General, Office of Legal Counsel, to Senator Abraham Ribicoff, Chairman of the Senate Committee on Governmental Affairs 6 (June 14, 1978) (on file with author).

11  Whistleblower Protection Act of 1986, H.R. 4033, 99th Cong., 2d Sess. (1986).

12  Memorandum regarding H.R. 4033 from Douglas W. Kmiec, Office of Legal Counsel 8 (Feb. 11, 1986) (on file with author).

dent must be able to resolve disputes between executive agencies without having to go to court.[13]

Beyond this trespass upon the President's supervisory authority, the intrabranch legislation contemplated in the whistleblower legislation also offended the separation of powers in another way. Federal courts may not render advisory opinions.[14] Since both the special counsel and any defendant executive agency are subject to presidential direction, a lawsuit between them would not have the concrete adversity of interest that is necessary to make a dispute a "case or controversy" within the meaning of Article III.[15]

OLC is ever watchful for legislation usurping the President's ability to maintain the confidentiality of executive branch information. The whistleblower legislation did this as well. Specifically, the legislation authorized the special counsel to transmit executive branch material to Congress "without review, clearance, or approval by any other administrative authority."[16] OLC assumed, correctly as it turned out, that the intent of this provision was to prevent the President, or a designee like OMB, from reviewing the special counsel's submissions to Congress. Again, such legislative intrusion into the mundane functioning of the executive branch could not be constitutionally tolerated. After all, Article II, Section 3 provides that the President shall "recommend to [Congress the] consideration of such Measures as he shall judge necessary and expedient"; it does not contemplate the special counsel doing the same.

In the normal process described above, OLC advised Legislative Affairs and OMB of its opposition to the legislation on constitutional grounds. Had the process functioned well, this would have opened a

---

[13] Executive Order 12,146 provides that the Attorney General must resolve disputes between "two or more Executive agencies whose heads serve at the pleasure of the President." Agencies are "encouraged" to submit all other disputes to the Attorney General. Exec. Order No. 12,146, 3 C.F.R. 409 (1979), *reprinted in* 28 U.S.C. § 509 (1988).

[14] Hayburn's Case, 2 U.S. (2 Dall.) 409, 410 n.(a) (1792). *See also* GERALD GUNTHER, CONSTITUTIONAL LAW 1593-94 (12th ed. 1985) (discussing the Supreme Court's early refusal to interpret treaties for President Washington absent a bona fide judicial controversy, especially since the President can call upon the heads of executive departments for opinions).

[15] Admittedly, there has been some intrabranch litigation, but it has been confined to disputes involving the executive and a so-called independent agency. *See, e.g.,* Udall v. Fed. Power Comm'n, 387 U.S. 428 (1967). The denomination of agencies as "independent" is overly facile and conclusory. Usually, the only "independence" is for designated officers not to be removable at will.

However, it is now clear, after Morrison v. Olson, 487 U.S. 654 (1988), that such agencies exercise executive power, and not some hybrid power as was previously thought in Humphrey's Ex'r v. United States, 295 U.S. 602 (1935). Given that recognition by the Court, nothing precludes, indeed I would argue that the President has a duty to undertake, supervision of the day-to-day decision making of such agencies. *See* KMIEC, *supra* note 3 at 58-59.

[16] H.R. 4033, 99th Cong., 2d Sess. § 3 (1986).

conversation between the executive and the legislative branches over what amendments might be mutually acceptable. However, the process did not function well as OLC's objections were muffled by OMB personnel. Some of the motivation for doing so was wholly political, insofar as a few late-in-the-term Reagan OMB appointees apparently wanted to make the transition to the Bush Administration. Thinking that a "kinder-gentler" Bush would be more tolerant of legislative usurpations, these individuals informally signalled Congress that OLC's constitutional concerns need not control the legislative outcome.

The legislative process was not completed until late 1988. But the outcome was the unanimous passage of the "Whistleblower Protection Act of 1988." OLC was appalled. In carrying out its review of the enrolled bill, OLC reiterated its objection to the removal limitation on the special counsel first stated by John Harmon a decade earlier. The Court's subsequent decision in *Morrison v. Olson*[17] could not be read as approving such "for cause" limitations. The Court in *Morrison* limited its approval of removal limitations to an independent counsel that served for a limited time and with a limited jurisdiction.[18] By contrast, the special counsel in the whistleblower context would serve a minimum five year term and have jurisdiction to review the personnel actions of the entire executive branch. While the Supreme Court might tolerate moderate for cause limitations on the removal of limited purpose independent counsels rationalizing that such do not "interfere impermissibly" with the President's ability to faithfully execute the laws, OLC was of the strong belief that limiting the removal of an executive official with a broader scope of authority clearly did. Moreover, to OLC, such removal restrictions could not be analyzed in isolation, since the accretion of additional removal restrictions in a host of new legislation might cumulatively erode the President's oversight authority.

OLC, of course, restated its constitutional objections to intrabranch litigation and for good measure reminded OMB that historically the Department of Justice had opposed any legislative proposal eroding the Attorney General's statutory litigating authority.[19] While this aspect of OLC's objection was not a matter of constitutional law per se, it had constitutional underpinnings since centralizing litigation

---

[17] 487 U.S. 654 (1988).

[18] Theoretically, at least. Lawrence Walsh, the Independent Counsel in the Iran-Contra matter, has been serving for over six years. *See* Douglas W. Kmiec, *Pardoning Weinberger Was Right*, NAT'L L.J. Feb. 8, 1993, at 15, 17.

[19] *See* 28 U.S.C. §§ 516, 519 (1992).

*OLC'S OPINION WRITING*

authority in the Attorney General allows for the presentation of uniform positions on important legal issues, the selection of test cases which produce results most favorable to the interests of the United States, more objective handling of cases by attorneys unaffected by narrow agency missions, and the facilitation of presidential supervision of executive policies affected by government litigation.

OLC recommended a veto and forwarded a draft veto message to the Counsel to the President. OMB was nonplussed. Efforts were made again to downplay OLC's constitutional concerns. The President was told that he would be creating an enormous public relations problem for George Bush who was in the final weeks of his 1988 campaign. "Think of it, Mr. President," the argument went, "this will supply the Dukakis campaign with an example of how neither you nor your Vice-President are interested in punishing government mismanagement or abuse." In a presidential campaign dominated by so-called "ethics" issues, this was not an inconsiderable image concern.

But that was all it was, an image and public relations concern. In the end, OMB admitted that it had failed to transmit to Congress OLC's constitutional misgivings in a full and timely manner. If apologies to the Congressional leadership in the President's party were needed, so be it. In pocket vetoing the legislation, Ronald Reagan realized that his duty was to protect the office of the Presidency, not to justify the expedient, mistaken actions of his subordinates. In this action, Reagan gave life to the sage counsel of Attorney General Caleb Cushing who said:

> I hold that no Head of Department can lawfully perform an official act against the will of the President; and that will is by the Constitution to govern the performance of all such acts. If it were not thus, Congress might by statute so divide and transfer the executive power as utterly to subvert the government, and to change it into a parliamentary despotism, like that of Venice . . . with a nominal executive Chief utterly powerless.[20]

In his memorandum of disapproval, President Reagan directed the Attorney General and others "to prepare constitutional and effective whistleblower protection legislation for me to submit at the beginning of the next session of the Congress."[21] Thus, OLC's role would continue. Over the next several months OLC met with legislative staff in Congress in an effort to reach agreement on language that would

---

20 *Finally Awake at the Wheel*, WALL ST. J., Oct. 31, 1988, at A18 (quoting Attorney General Caleb Cushing).

21 Memorandum of Disapproval for the Whistleblower Protection Act of 1988, 24 WEEKLY COMP. PRES. DOC. 1377 (Oct. 26, 1988).

protect whistleblowers without infringing on executive authority. OLC was successful, and the Whistleblower Protection Act of 1989 became the first piece of legislation signed into law by President Bush on April 10, 1989. In his signing statement, Bush observed that the new legislation

> addresses the chief constitutional concerns raised by earlier versions of this legislation. The most substantial improvement in the bill is the deletion of provisions that would have enabled the Special Counsel, an executive branch official, to oppose other executive branch agencies in court. Under our constitutional system, the executive branch cannot sue itself.[22]

OLC did not get everything it wanted in its negotiations with Congress. In particular, the new legislation retained provisions authorizing the special counsel to transmit executive branch materials to Congress. Unlike the original legislation, however, this material was now to be submitted "concurrently" to the President (or his designee) and·Congress, eliminating the provision that it be "without review." In the signing statement OLC drafted for President Bush, an effort was·made to give this provision an acceptable constitutional interpretation. Specifically, the President stated: "I do not interpret these provisions to interfere with my ability to provide for appropriate prior review of transmittals by the Special Counsel to the Congress."[23] With these words, the President, as advised by OLC, was signalling how the new legislation was to be implemented. OLC's legislative function had thus traveled the full executive route, from reviewer and disapproving critic to draftsman and implementing agent.

Yet, OLC's words, adopted by the President in his message of approval, are not without their inconsistencies. How, after all, was executive branch material to be submitted "concurrently but only following prior review"? At a minimum, this is a metaphysical challenge. Some in Congress would say it is the manipulation, even disregard, of the public law. OLC, of course, would argue that it is merely construing public law under the higher command of the Constitution. Putting either pejorative or supportive terminology to one side, it is certainly a practical attempt to allow for presidential approval of legislation that is not constitutionally perfect. The signing statement has become the coverlet hiding constitutional imperfections or disagreements in much the same way diplomatic vagary is employed to achieve a basic level of agreement in a treaty among sover-

---

[22] Statement on the Signing of the Whistleblower Protection Act of 1989, 25 WEEKLY COMP. PRES. DOC. 516 (Apr. 10, 1989).

[23] *Id.*

eigns. This use of such statements and related questions is discussed next.

## B. *Signing Statements*

While the history of signing statements can be traced back to 1830 when Andrew Jackson employed the device to give his interpretation of a road appropriation,[24] they were infrequently used by early presidents. John Tyler was the second President to issue such approval commentary,[25] but his comments questioning the constitutionality of an apportionment bill provoked the displeasure of the House of Representatives. In this regard, a select committee strongly objected to President Tyler's temerity in going beyond the simple act of approving a bill by his signature.[26] The committee opined that presidential statements should "be regarded in no other light than a defacement of the public records and archives."[27] Notwithstanding this Congressional back of the hand, presidents since Tyler, and especially in the last half century, have frequently issued signing statements upon their approval of a bill.

Presidents have issued signing statements for several purposes. In a few instances, presidents have issued formal statements simply to underscore approval. In most instances, though, a President has issued a statement objecting to a provision in a bill which he nonetheless signed. These objections are either based upon policy disagreements about the wisdom of the measure or, as in the case of George Bush's treatment of the whistleblower legislation, described above, upon constitutional concerns.[28]

The majority of presidential signing statements express policy rather than constitutional objections to a provision in the legislation.[29] These objections do not originate in OLC and are not discussed here. Where constitutional objections have been raised, however, it has fallen to OLC to set forth in a draft signing statement how the unconstitutional feature will be handled. In outlining these courses, OLC first assesses how serious the constitutional problem is. Something of

---

[24] 2 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS, 1789-1897 at 493 (James D. Richardson ed., 1897). *See also* Douglas W. Kmiec, *Judges Should Pay Attention To Statements By Presidents*, NAT'L L. J., Nov. 10, 1986 at 13.

[25] 4 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS, 1789-1897 159-60 (James D. Richardson ed., 1897).

[26] H.R. REP. No. 909, 27th Cong., 2d Sess. (1842).

[27] *Id.* at 2.

[28] *See supra* note 23 and accompanying text.

[29] *See, e.g.,* 1 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS, 1789-1897, at 265 (James D. Richardson ed., 1897) (Jan. 27, 1885 statement of President Arthur expressing a belief that too much money is appropriated for a particular purpose).

*CARDOZO LAW REVIEW* [Vol. 15:337

an OLC lexicon has arisen, ranging from a conclusion of "clear unconstitutionality" to "serious constitutional concerns" to mere "constitutional questions." A problem is more likely to be denominated as serious if it affects the core purpose of a statute or if the provision alters the separation of powers in a way that is not likely to be subject to challenge by a private party.

The seriousness of a problem may be mitigated by a severability clause. However, in the limited time frame available to OLC in its review of enrolled legislation, it is not always possible to undertake a severability analysis. In this regard, the enrolled legislation's legislative history is seldom, if ever, available for review before the President is asked to approve or disapprove a measure. In some cases, a bill's history is not completely written, even though Congress sometimes purports to bind the executive to its hidden, unenacted content. Along these lines, OMB Director James Miller in the later years of the Reagan presidency advocated that the President inform Congress that the executive need not follow lists of spending instructions appearing only in committee reports.[30] President Bush made this point explicit in one signing statement, reciting that "Congress cannot create legal obligations through report language" and "such language has no legal force or effect."[31]

With some legislation, a signing statement can be used to espouse a construction that avoids the constitutional problem altogether. For example, OLC frequently drafted statements construing legislative veto provisions as "report and wait" requirements to avoid the implication of executive approval of this constitutionally-unauthorized method of legislative "enactment." This approach received constitutional approval in *INS v. Chadha*.[32] These OLC-inspired objections predate even the Court's decision in *Chadha* which insisted upon the importance of bicameral passage and presentment.[33] Other constitutional problems also have been finessed with construction. Many of these have related to Congress' proclivity to direct, rather than request, that the President undertake some foreign affairs responsibility.[34] Still others have related to Congress' inability to comprehend

---

[30] James C. Miller, *A Presidential Veto for Pork Spending*, WALL ST. J., Jan. 30, 1990, at A18.

[31] Statement on Signing the Department of Defense Appropriations Act, 1990, PUB. PAPERS 1572 (Nov. 21, 1989).

[32] 462 U.S. 919, 925 (1983).

[33] *Id.* at 919. President Carter used a signing statement for this purpose over a dozen times. As early as 1963, President Johnson employed the same device. *See* Statement by the President Upon Approving the Public Works Appropriations Act, PUB. PAPERS 104 (Dec. 31, 1963).

[34] *See, e.g.*, Statement on Signing H.R. 3363 Into Law, PUB. PAPERS 1434 (Aug. 15, 1979)

the niceties of the Appointments Clause.[35]

OLC practice in these cases is thus highly analogous to that of the judiciary. The Court construes a law to be constitutional where possible.[36] Of course, the construction must actually be a possible one. OLC, like the Court, should not be about the business of rewriting the statute. So long as there is more than one possible construction of the statute, however, the principle may have application.

Less serious constitutional matters also may be handled by having the President direct the Attorney General to work with agencies to implement the statute in a constitutional fashion. Similarly, the President can recommend repeal legislation. If constitutional difficulties cannot be construed away or avoided by careful executive implementation, the President's only choice may be to veto.[37] In *The Attorney General's Lawyer*, however, it is explained at some length why the veto may be practically unavailable in the face of Congress'

---

(statement of President Carter construing a provision relating to the closure of U.S. consulates to be a recommendation rather than a requirement); Statement by the President Upon Signing the Mutual Security Appropriations Act, PUB. PAPERS 753-54 (Aug. 2, 1955) (statement of President Eisenhower interpreting a provision to avoid a restriction on his ability to conduct negotiations with certain foreign governments).

[35] U.S. CONST. art. I, § 3, cl. 2. *See, e.g.,* Statement on Signing the Arts and Artifacts Indemnity Act, PUB. PAPERS 1990-91 (Dec. 20, 1975) (statement of President Ford avoiding an Appointments Clause problem by employing alternative statutory authority to alter the membership on the Federal Council on the Arts and the Humanities).

[36] *See* NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937).

[37] President Reagan followed this course when the free-standing Fairness in Broadcasting Act of 1987 was presented to him in June 1987. This Act would have codified the so-called "fairness doctrine" authorizing federal officials to supervise the editorial practices of broadcasters. Even though the Supreme Court sanctioned such content-censorship because of the (now out-dated) understanding that the broadcast medium is technologically limited, *see* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969), the President exercised his independent constitutional judgment in vetoing the legislation. He noted straightforwardly: "[t]his type of content-based regulation by the Federal Government is, in my judgment, antagonistic to the freedom of expression guaranteed by the First Amendment." Message to the Senate Returning Without Approval the Fairness in Broadcasting Bill, PUB. PAPERS 690 (June 19, 1987).

  Even when legislation is not presented in a free-standing form and the President is forced to sign a multisubject bill with a provision he believes is unconstitutional, in order to give proper deference to the role of the Court in matters of constitutionality, the President should seek a judicial determination. Only where the provision is not likely to give rise to a case or controversy or where the provision is manifestly repugnant to the Constitution should nonenforcement be considered. In all events, occasions for nonenforcement must be strictly limited to serious constitutional flaws, not policy disagreements. Thus, for example, Richard Nixon's impoundment of funds because he disagreed with certain educational assistance was without constitutional warrant. William Rehnquist shared this view when he was head of OLC. *See* William H. Rehnquist, Memorandum Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary,* 92d Cong., 1st Sess. 283-84 (1971). *See also* Kendall v. United States, 37 U.S. (12 Pet.) 524 (1838).

practice of lumping together numerous unrelated provisions in omni-
bus bills, often inserting the most controversial provisions in emer-
gency appropriations measures passed at, or after, fiscal deadlines.[38]
The following extended excerpt from the book explains matters as
well as I am able:

> The greatest dilemma faced by a president is when needed legisla-
> tion is presented with serious constitutional defect. The most nota-
> ble historical example, perhaps, was Franklin Roosevelt's approval
> of the Lend-Lease Act, which provided vital support to our allies
> in World War II. As presented to the President, the Act contained
> a provision for the termination of the President's authority upon
> the passage of a "concurrent resolution of the two Houses. . . ."[39]
> Roosevelt correctly thought this an unconstitutional infringement
> of the presidential office because it provided for repeal without fol-
> lowing the required procedure for new or repeal legislation set out
> in the Constitution, which included presentment to the president.
> Interestingly, then Attorney General Robert Jackson, later a jus-
> tice of the Supreme Court, was more equivocal speculating that the
> statutory limitation on the president's authority might be viewed
> not as a repeal but "a reservation or limitation by which the
> granted power would expire or terminate."[40] Roosevelt would
> have none of it, and in a rare twist, issued a legal opinion to his
> Attorney General stating that he "felt constrained to sign the mea-
> sure [to meet a momentous emergency of great magnitude in world
> affairs], in spite of the fact that it contained a provision which, in
> [his] opinion, is clearly unconstitutional."[41] Roosevelt directed the
> Attorney General to put his legal opinion in the "official files of the
> Department of Justice" in order to preclude his approval of the
> Act from being used "as a precedent for any future legislation com-
> prising provisions of a similar nature."[42] Roosevelt was right
> about the unconstitutionality of this type of provision, as was con-
> firmed later by the Supreme Court in *Chadha* in 1983.[43] He also
> correctly anticipated that Congress would continue its efforts to
> circumvent the presidential judgment and veto in similar ways.
>
>         As dramatic as the Lend-Lease case is, it did not pose as great
> a problem as it might have because there was little chance that the
> Congress was going to implement its illicit authority in the midst
> of a world war. But what if there is an unconstitutional provision

---

[38] KMIEC, *supra* note 3, at 53-57.

[39] Lend-Lease Act, Pub. L. No. 11, 55 Stat. 32 (1941), *quoted in* Robert H. Jackson, *A Presidential Legal Opinion*, 66 HARV. L. REV. 1353 (1953).

[40] *Id.* at 1355.

[41] *Id.* at 1357.

[42] *Id.* at 1358.

[43] INS v. Chadha, 462 U.S. 919 (1983).

in needed legislation that ostensibly requires immediate implementation, is the President obligated to enforce it? This problem confronted President Reagan with the passage of the Competition in Contracting Act of 1984 ("CICA").[44] CICA gave executive authority to stay a procurement to a legislative officer, the Comptroller General.[45] Seeing this, the Department objected while CICA was pending. Congress ignored the objection and presented CICA to the President as part of a much larger Deficit Reduction Act. Once again seemingly caught in an impossible position, Reagan signed the measure, but in his signing statement directed the Department to inform executive branch agencies how they might comply with CICA in a manner consistent with the Constitution.[46]

OLC examined the law. . . . [and] determined that no constitutional construction was possible. Quite simply, under the Court's decision in *Chadha*,[47] the vesting of a legislative officer with the power to affect the legal rights, duties, and relations of individuals outside of Congress without following the prescribed legislative process is impermissible.[48] There was no getting around it; this is what CICA did.

Having made the determination that CICA could not be enforced consistently with the Constitution, then-Attorney General Bill Smith notified Congress that CICA would not be defended in court by the Department and would not be implemented by the administration.[49] Subsequently, a few district and appellate courts in dubiously reasoned opinions found CICA constitutional and a nomination-battered Meese replaced Smith. Notwithstanding the lower court determinations, Meese still felt that CICA was unconstitutional under Supreme Court precedent, and he maintained the nonenforcement posture, until Congressman Peter Rodino, then chairman of the House Judiciary Committee, threatened to deny funding for the entire Department unless Meese would implement the disputed provision. The Attorney General relented, even though the CICA issue remains judicially disputed and not finally resolved by the Court.[50]

---

[44] Competition in Contracting Act, 31 U.S.C. §§ 3551-56 (1984).

[45] 31 U.S.C. § 3553(c)-(d) (1988).

[46] Statement on Signing the Deficit Reduction Act of 1984, Pub. Papers 1053 (July 18, 1984).

[47] 462 U.S. 919 (1983).

[48] *Chadha* makes this point clear, but the exact application of *Chadha* to CICA remains curiously mired in the lower courts. *See infra* note 50.

[49] Letter from William F. Smith to Thomas P. O'Neill, Speaker of the House, (Nov. 21, 1984) (on file with author). Since 1979, conditions in Department appropriations have required the Department to notify Congress when it will either not enforce or defend statutes it believes to be unconstitutional. *See, e.g.*, Pub. L. No. 98-411, § 203(a), 98 Stat. 1545 (1985).

[50] *See* Ameron v. United States Army Corps of Engineers, 809 F.2d 979 (3d Cir. 1986) (holding that the Comptroller General's stay of contract award was a legitimate use of legisla-

Should the President and the Attorney General enforce statutes that they believe are unconstitutional? It may be remembered that Andrew Johnson didn't think so, and this thinking nearly got him impeached. Congress had passed the Tenure-of-Office Act over Johnson's veto. The Act precluded Johnson from freely removing members of his cabinet. Notwithstanding the law's passage, Johnson removed Secretary of War Stanton and this became one of the articles of impeachment. In Johnson's defense, his counsel stated:

> If the law be upon its very face in flat contradiction of the plain expressed provisions of the Constitution, as if a law should forbid the President to grant a pardon in any case, or if the law should declare that he should not be Commander-in-Chief, or if the law should declare that he should take no part in making of a treaty, I say the President, without going to the Supreme Court of the United States, maintaining the integrity of his department, which for the time being is entrusted to him, is bound to execute no such legislation; and he is cowardly and untrue to the responsibility of his position if he should execute it.[51]

Johnson's counsel had a winning argument. Chief Justice Salmon P. Chase, casting the deciding vote against Johnson's impeachment, declared that the president has no duty to execute a statute that "directly attacks and impairs the executive power confided to him by [the Constitution]."[52]

Was CICA such an occasion? Bill Smith and Ed Meese thought so. Smith, for example, pointed out to Congressman Rodino that "historical examples of refusals by the Executive to enforce or defend an Act of Congress have been precipitated for the most part by Congress's attempt to alter the distribution of constitutional power by arrogating to itself a power which the Executive believes the Constitution does not confer on Congress but, instead, reposes in him."[53] Encroachments on the executive were especially apt for nonenforcement since it is unlikely that anyone would have the legal standing to challenge the disputed statute.[54]

---

tive power but CICA did not authorize the Comptroller General to execute procurement laws or interfere with the executive's performance of procurement duties); Lear, Siegler, Inc., Energy Products Div. v. Lehman, 842 F.2d 1102 (9th Cir. 1988) (holding that the CICA stay provisions did not violate the separation of powers, and the government's refusal to comply with the provisions was in bad faith).

[51] 2 TRIAL OF ANDREW JOHNSON 200 (DeCapo Press 1970) (1868).

[52] ROBERT B. WARDEN, AN ACCOUNT OF THE PRIVATE LIFE AND PUBLIC SERVICES OF SALMON PORTLAND CHASE 685 (Cincinnati, Wiltach, Baldwin & Co. 1874).

[53] Letter from William French Smith to Peter Rodino 5 (Feb. 22, 1985) (on file with author).

[54] See RAOUL BERGER, EXECUTIVE PRIVILEGE: A CONSTITUTIONAL MYTH 208 (1974) (arguing that nonenforcement is only appropriate where the president's power is infringed).

Predictably, the *New Republic* and a host of liberal law professors opined that nonenforcement might be appropriate, but only if a statute would "significantly infringe individual liberties."[55] But constitutional principle cannot depend on whose ox is being gored.

If John Marshall was correct that "an act of the legislature, repugnant to the Constitution, is void,"[56] and insofar as the president has the express responsibility to "take care that the Laws [including the Constitution as the supreme law] be faithfully executed,"[57] enforcing an invalid law would be contrary to a president's constitutional duty and oath. This is a proposition as old as the founding. For example, James Wilson, a principal drafter and advocate of the Constitution, wrote that "the President of the United States could shield himself and refuse to carry into effect an act that violates the Constitution."[58]

It can be argued, of course, that it is not within the province of the Attorney General, OLC, or even the President, to pass upon questions of constitutionality. This is a conundrum as old as the Republic. Andrew Jackson emphatically stated that "[t]he Congress, the Executive, and the Court must each be guided by its own opinion of the Constitution."[59] Abraham Lincoln and the cousins Roosevelt indulged much the same view. By contrast, James Buchanan watched as the southern states announced their secessions lamenting that the President "is not more than the chief executive officer of the government. His province is not to make the laws but to execute the laws . . . ."[60] An Attorney General opinion at the turn of the century took the view that "it is not within the province of the Attorney General to declare an Act of Congress unconstitutional—at least, where it does not involve any conflict between the prerogatives of the legislative department and those of the executive department."[61] It is certainly sound advice to limit strictly the occasions for executive nonenforce-

---

[55] Murray Waas & Jeffrey Toobin, *Meese's Power Grab*, THE NEW REPUBLIC, May 19, 1986, at 16 (quoting Professor Sanford Levinson).

[56] Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).

[57] The President promises to "preserve, protect and defend the Constitution of the United States." U.S. CONST. art. II, § 1, cl. 8. Chief Justice Chase concluded that sincere presidential belief that an act was unconstitutional meant that "it was a proper and peaceful, if not the only proper and peaceful mode of protecting and defending the Constitution," to not enforce the disputed act. J.W. SCHUCKERS, THE LIFE AND PUBLIC SERVICES OF SALMON PORTLAND CHASE 578 (Mnemosyne Pub. Co. 1969) (1874).

[58] 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 451 (Merrill Jensen ed., 1976) (statement of James Wilson on Dec. 1, 1787). KMIEC, *supra* note 3 at 53-57 (citations renumbered).

[59] ARTHUR B. TOURTELLOT, THE PRESIDENTS ON THE PRESIDENCY 268 (1964).

[60] *Id.* at 417.

[61] 31 Op. Att'y Gen. 476 (1919).

*CARDOZO LAW REVIEW* [Vol. 15:337

ment to examples of manifest unconstitutionality[62] or transgressions of the separation of powers.[63] However, to the extent that the Constitution is a necessary part of the written law that the President by oath and duty is to "take care to faithfully execute," no Attorney General or OLC can entirely escape constitutional and statutory conflicts of this nature.

Putting the difficult issue of nonenforcement of unconstitutional provisions to one side, the use of signing statements allows a president to properly direct the executive branch in matters of statutory interpretation. A president either guides his subordinate executive officers or, consciously or unconsciously, accepts the direction announced by his subordinates. OLC's heightened use of signing statements made it plain that the primary guidance for a law's enforcement, consistent with legislative terms and purposes of course, was to originate with the President. While the Counsel to the House of Representatives[64] and other commentators have from time-to-time erroneously sought to deny that the President can exercise this supervisory role, presidential direction via signing statement is no more illegitimate, and every bit as necessary, as presidential supervision of executive rulemaking or litigation.[65]

---

[62] *See, e.g.,* Simpkins v. Moses H. Cone Memorial Hosp., 211 F. Supp. 628 (M.D.N.C. 1962), *rev'd* 323 F.2d 959 (4th Cir. 1963), *cert. denied,* 376 U.S. 938 (1984) (U.S. intervention in private civil rights litigation successfully contesting the constitutionality of statutes providing for "separate but equal" facilities).

[63] *See, e.g.,* Buckley v. Valeo, 424 U.S. 1 (1976) (Attorney General successfully argued that certain congressional appointments to the Federal Election Commission transgressed the Appointments Clause); United States v. Lovett, 328 U.S. 303 (1946) (Justice Department successfully contested the constitutionality of a statute directing that salaries of certain officials not be paid); Myers v. United States, 272 U.S. 52 (1926) (successful argument that Congress could not limit the President's power of removal of a local postmaster).

[64] *See* Linda Greenhouse, *In Signing Bills, Reagan Tries to Write History,* N.Y. TIMES, Dec. 9, 1986, at B14 (quoting Steven L. Ross, Counsel to the House of Representatives, as saying that the President's role is "limited to thumbs up or thumbs down, with no shades of gray [in between]").

[65] Congress presently indulges the bizarre notion that it can deny presidential supervision, and therefore accountability, over the execution of the law by assigning authority to specific subordinate executive officers or departments. This is untenable. *See* KMIEC, *supra* note 3, at 47-65. Nevertheless, Congress continues to disregard the President's assertion of control over "a unitary executive." Thus, in one Senate Report, it is stated:

The Office of Management and Budget has never been given any legislative authority over marketing orders. OMB has attempted to become involved in the management of marketing order programs through the President's task force on regulatory review in recent years. The Committee has included language prohibiting OMB from acting with regard to marketing orders.

S. REP. No. 105, 101st Cong., 1st Sess. 57 (1989). President Bush properly responded that this would "impair [his] ability as President to supervise the executive branch." Statement on Signing the Treasury, Postal Service and General Government Appropriations Act, 25 WEEKLY COMP. PRES. DOC. 1669, 1670 (Nov. 3, 1989).

*OLC'S OPINION WRITING*

## II.   OLC AND THE PRESIDENT'S PROGRAM

### A.   *The Item Veto*

The discussion thus far has concentrated upon OLC's advice regarding pending or enrolled legislation. But OLC is also regularly consulted with regard to the legality of some desired aspect of the President's program. Both Presidents Reagan and Bush repeatedly requested line-item veto authority. This sought-after authority is not unrelated to the problem of nonenforcement since a president with item-veto authority could selectively excise provisions deemed to be unconstitutional.

During the Reagan and Bush presidencies, item-veto authority was sought primarily for fiscal reasons. At one point, public commentary suggested that this authority was "inherent" in the Constitution.[66] This argument naturally intrigued President Reagan, and the Attorney General and OLC were called upon to respond.

The public argument for the inherent item-veto relied heavily upon Article I, Section 7, Clause 3 of the Constitution which provides:

> Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.[67]

The uniformly understood intent of this provision was to preclude the Congress from engaging in maneuvers to defeat the President's veto power by avoiding presentment by styling a bill under another name. In light of the craftiness of modern legislative practice, it is claimed that the clause also supports a president approving or disapproving parts of aggregated, or so-called "bundled," legislation.

After painstaking research, OLC concluded that this claim for an inherent veto was unsustainable.[68] In so doing, OLC was exhibiting its highly cautious approach to the rendering of legal advice. The negative answer was a great disappointment to the President. But, properly, OLC advice is not driven by policy disappointment. Ironically, however, OLC's negative view of the inherent item veto did co-

---

[66] Stephen Glazier, *Reagan Already Has Line-Item Veto*, WALL ST. J., Dec. 4, 1987, at 14.

[67] U.S. CONST. art. I, § 7, cl. 3.

[68] 12 Op. Off. Legal Counsel 159 (Prelim. Print 1988); *see also* Charles J. Cooper, *The Line-Item Veto: The Framers' Intentions*, *in* PORK BARRELS AND PRINCIPLES: THE POLITICS OF THE PRESIDENTIAL VETO 29 (1988).

incide with the conclusion of the usually adventuresome views of the President's liberal opposition.[69] This article does not rehearse the inherent item-veto arguments, but the curiosity of the OLC result may be usefully explored as an example of how OLC's "belt and suspenders" methodology can act as a brake upon the pursuit of policy.

OLC readily admitted that the Constitution did not define the term "Bill." However, from the country's inception bills have combined separate items of appropriation.[70] Moreover, it was the view of George Washington that he "must approve all the parts of a Bill, or reject it in toto."[71] While this has the appearance of being highly relevant, even dispositive, in fact, it may disclose little. Indeed, the framers' acceptance of omnibus or combined appropriations actually says nothing about whether the framers believed the President could disaggregate those combinations and veto part. As several writers have since put it succinctly, "[t]he same constitutional silence that sanctions the bundling of bills may *also* sanction their veto on something other than an all-or-nothing basis."[72]  In this regard, the assumption by Washington and some later presidents that they could not veto parts of bills may be said to beg the very question in issue: namely, what is a bill?

Perhaps because of this, OLC carefully examined the proceedings of the constitutional convention of 1787. The convention, OLC found, did express some concern over the practice of tacking unrelated riders to money bills. But it was a concern over legislative, not

---

[69] *See* Letter from Laurence Tribe, Professor, Harvard Law School, & Philip Kurland, Professor, University of Chicago, to Senator Edward Kennedy (Oct. 31, 1989), *reprinted in* J. Gregory Sidak & Thomas Smith, *Four Faces of the Item Veto: A Reply to Tribe and Kurland*, 84 NW. U. L. REV. 437, 437 n.1 (1990).

[70] Even though omnibus appropriations are present throughout this country's history, the practice of inserting substantive riders in appropriations—in essence, imposing unpalatable or arguably unconstitutional provisions with money—did not arise until the midpoint in our nation's history. *See infra* text accompanying note 81. So too, the practice of bundling or aggregating nongermane substantive matters did not exist at the founding.  British precedents held the practice of aggregation in great reproach:

> Even where the propositions are separately not liable to objection in either House, the heaping together in one law such a variety of unconnected and discordant subjects, is unparliamentary . . . .  But to do this in cases where it is known that one of the component parts of the Bill will be disagreeable to the Crown, or to the Lords; and that, if it was sent up alone, it would not be agreed to—for this reason, and with a view to secure the Royal assent, or the concurrence of the Lords, to tack it to a Bill of Supply which the exigencies of the State make necessary—is a proceeding highly dangerous and unconstitutional.

3 JOHN HATSELL, PRECEDENTS AND PROCEEDINGS IN THE HOUSE OF COMMONS 222 (photo. reprint 1971) (3d ed. 1818).

[71] 33 THE WRITINGS OF GEORGE WASHINGTON 96 (John C. Fitzpatrick ed., 1940).

[72] Sidak & Smith, *supra* note 69, at 469.

executive, parity. Since money bills were to originate in the House,[73] the convention members focused on how the Senate, not the President, might protect itself against the House. The Framers' solution was to provide the Senate with unlimited power of amendment. This rendered the Senate coequal in legislative deliberations, and according to OLC, created a negative implication against inherent item-veto authority in the President. To imply such authority in the President, OLC reasoned, would arguably not make him coequal, but more powerful because an item veto could be affirmed by one-third plus one of a single chamber (the number needed to block an override). By contrast, for a Senate amendment to be affirmed—that is, included in the legislation—it would have to be agreed to by a majority of the House.

OLC's analysis also included a thorough review of practices before and after the adoption of the Constitution. OLC found that omnibus appropriation measures existed in the colonial and confederation experience, and that there was objection to the aggregation of unrelated substantive matters or the insertion of substantive riders in appropriations measures. Nonetheless, OLC found no evidence that these objections prompted recipient executives to disaggregate the bundled measures.

This is fine, lawyerly parsing; however, it is important to recognize that OLC's caution in the face of uncertainty can be misunderstood by a nonlawyer president as an unalterable and highly certain legal requirement. For all of OLC's item-veto reasoning, it was able only to prove that the Constitution was textually silent and that there was no explicit prior executive claim of item-veto authority. There have, however, been implicit presidential claims of item-veto authority. In modern practice, presidents, aided and abetted by OLC itself, have exercised a de facto item veto, at least in those limited circumstances where provisions of enrolled bills are manifestly unconstitutional[74] or they encroach upon executive power. Indeed, the consequences of OLC's formal conclusion that no inherent item veto exists produces the constitutional anomaly that Congress has less direct opportunity to react to executive nonenforcement than if inherent

---

73 U.S. CONST. art. I, § 7, cl. 1.

74 See, for example, the Statement on Signing the Treasury, Postal Service and General Government Appropriations Act, 1990, 25 WEEKLY COMP. PRES. DOC. 1669, 1670 (Nov. 3, 1989), where President Bush states:

> [N]umerous provisions of H.R. 2989 purport to condition my authority, and the authority of affected executive branch officials, to use funds otherwise appropriated by the Act on the approval of various committees of the House of Representatives and the Senate. These provisions constitute legislative veto devices of the kind declared unconstitutional in *INS v. Chadha* . . . . Accordingly, I will treat them as having no legal force or effect in this or any other legislation in which they appear.

item-veto authority had been acknowledged. Two commentators have observed that "[r]eturning an unconstitutional measure to Congress for another vote (if Congress so decides) would at least continue a constitutional colloquy between co-equal branches, a debate which is not always well-suited to the courts."[75]

In other contexts, OLC has been careful to observe that while Congress' appropriation power is expansive, it cannot be used to decimate the presidency. In the OLC filing in *United States v. North*,[76] OLC wrote:

> Congress' appropriation power is quite broad, and includes as a general matter the authority to attach conditions to appropriations, [but] it is not limitless. . . . That Congress appropriates money for the Army, however, does not mean that it can constitutionally require, as a condition on appropriations, that the armed forces conduct a specific tactical operation.[77]

The same point arguably can be made concerning the item veto. Just as there is no explicit provision in the Constitution governing the misuse of the appropriations power, there is no explicit provision in the Constitution addressing abuse of legislative presentment. OLC's role in both cases is to construe the Constitution in a fashion that preserves its underlying structure, not necessarily to extrapolate from silence a constitutional prohibition.

Where there is constitutional silence, there must be careful attention to constitutional purpose. James Madison identified the primary objects of the veto power as "restrain[ing] the Legislature from encroaching on the coordinate Departments, or on the rights of the people at large; or from passing laws unwise in their principle, or incorrect in their form."[78] As Hamilton echoed in *The Federalist*:

> The primary inducement to conferring the power in question upon

---

75 Sidak & Smith, *supra* note 69, at 455-56. The authors insightfully note that: the power of the President to excise unconstitutional parts of legislation either by an item veto or by refusal to enforce unconstitutional laws, or by both, is fundamentally similar to the other great implicit power in the Constitution—judicial review. Indeed, the concepts are so interrelated that the framers debated (but ultimately rejected) the idea of having the executive and the judiciary *jointly* exercise the "revisionary" power. While one could argue that *all* of the revisionary power subsequently was vested in the judiciary, this view seems implausible in light of the framers' discussion of the President's veto as a "revisionary" power.

*Id*. (citations omitted).

76 910 F.2d 843 (D.C. Cir. 1990).

77 Amicus brief of the United States filed by the Department of Justice at 24, United States v. North, 910 F.2d 843 (D.C. Cir. 1990) (No. 88-0080-02) (*cited in* KMIEC, *supra* note 3, at 186).

78 JAMES MADISON, NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787, at 80 (1966).

the executive is to enable him to defend himself; the secondary, is to increase the chances in favor of the community against the passing of bad laws, through haste, inadvertence, or design. The oftener the measure is brought under consideration, . . . the less must be the danger of those errors which flow from want of due deliberation, or those missteps which proceed from the contagion of some common passion or interest.[79]

Historical acquiescence by earlier presidents is informative, but not dispositive. Later presidents cannot be estopped from returning to the original understanding. The Supreme Court recognized as much in holding that the President has the power to sign bills subsequent to the adjournment of Congress, even though long established practice was to the contrary.[80] Moreover, history is not quite as categorical as OLC's austere conclusion against the item-veto suggests. Indeed, it is reasonably clear that for the first seventy years of the Republic, substantive riders were not inserted into appropriations measures. The mere contemplation of such action in the 1850s triggered strong opposition within the legislative branch, itself.[81] True, as an expedient in a time of national emergency, Lincoln did accept appropriations with "friendly" substantive riders. However, it was not until a weakened Andrew Johnson signed into law an appropriations bill that effectively denied him control of the Army that the "historical practice" of conditioning appropriations on substantive riders took hold in a constitutionally offensive form. As noted earlier, OLC decried this very type of illicit appropriation condition in its filing in *United States v. North*. Even Johnson lamented:

> [t]hose provisions are out of place in an appropriation act. I am compelled to defeat these necessary appropriations if I withhold my signature to the act. Pressed by these considerations, I feel constrained to return the bill with my signature, but to accompany it with my protest against the sections which I have indicated.[82]

OLC in rendering its item-veto opinion refers to Johnson's lament for support. But given that Johnson—a President in extremis—raised a protest at all, arguably supports, not detracts from, the exercise of an item veto. OLC also references a series of vetoes by Presi-

---

[79] The Federalist No. 73, at 443 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[80] *See* Edwards v. United States, 286 U.S. 482, 483 (1932).

[81] Senator Benton insisted that no foreign matter be tacked onto legislation admitting California because doing so would "impede the free working of the Constitution . . . ." Cong. Globe, 31st Cong., 1st Sess. 794 (1850).

[82] 6 A Compilation of The Messages and Papers of The Presidents, 1789-1897, at 472 (James D. Richardson ed., 1897).

*CARDOZO LAW REVIEW*           [Vol. 15:337

dent Hayes in reaching its conclusion. Yet, again Hayes made it plain that

> [i]t is clearly the constitutional duty of the President to exercise his discretion and judgment upon all bills presented to him without constraint or duress from any other branch of the Government. To say that a majority of either or both of the Houses of Congress may insist upon the approval of a bill under the penalty of stopping all of the operations of the Government . . . is to deny to the Executive that share of the legislative power which is plainly conferred by the second section of the seventh article of the Constitution. It strikes from the Constitution the qualified negative of the President.[83]

Hayes chose to veto—several times—all of the bundled measures in an effort to stop what he clearly viewed as an unconstitutional practice—the bundling itself. Hayes' decision to employ this undifferentiated veto does not ipso facto deny a later President the very constitutional authority assumed in the Hayes' protests, namely the discretion to evaluate legislation individually. OLC does note that Johnson, Hayes, Grant, Taft and several other Presidents all complained of the aggregation of legislative matters, but OLC emphasizes that these Presidents never vetoed, at least formally, parts of these bundled measures. This is OLC's chosen emphasis, not necessarily that of history. It may well be that OLC put the emphasis on the wrong constitutional syllable.

In brief, OLC was not obliged to conclude as a matter of law that Congress may deny a president's exercise of independent judgment by the clever means of wrapping an entire legislative program into a single instrument or an instrument necessary for continued government operations. As others have commented, "[c]ritics of the item veto apparently would have us believe that, if Congress can come up with any way not specifically anticipated by the framers to evade the veto power, the President must simply put up with it."[84] It is thus an unsatisfactory answer for OLC to say that a more vigorous exercise of the veto of aggregated measures is sufficient to deter this pernicious practice. It has not been. In any event, it again begs the question, or at least the President's dilemma, of not being practically able to veto the whole. And lest it be overlooked, as a veto of the whole defeats that which is constitutionally obnoxious, it also deprives the nation of salutary measures within that whole. The framers envisioned the veto as stopping the passage of "bad laws," not the converse.

---

[83] 7 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 1789-1897, at 531 (James D. Richardson ed., 1897).

[84] Sidak & Smith, *supra* note 69, at 478.

In the end, OLC's legal conclusion against this part of the President's program assumed the entire burden of persuasion rests with the President. Given the long period in our history where substantive riders in appropriations were never tolerated, the benign manner in which they arose out of the exigencies of the Civil War, and the repeated presidential objection to their more insidious continuation, the case for the inherent item veto may be more tenable than not. Put differently, the constitutional text or principle that affirmatively justifies the Congressional practice of inserting substantive riders in appropriations, and the aggregation of nongermane matters generally, is far more dubious. OLC's abundance of caution in the face of uncertainty, while often admirable for its implicit respect for our constitutional system, may have in this instance perpetuated an unintended constitutional imbalance.

### III.  THE PRESIDENT'S PROGRAM AND THE EXECUTIVE ORDER

Nowhere does OLC speak more directly to the President than in its review of "form and legality" of all presidential executive orders. There is something chastening in directly sending and signing letters: "My dear Mr. President," even as many of these letters may be viewed by some, outside of OLC, as mere legal "formalities." As the head of OLC in Lyndon Johnson's administration commented:

> OLC's review of executive orders is no mere formality. Many of those drafted in other departments are modified in OLC, sometimes in minor ways but often substantially. . . .
>
> The authority of the President to "make law" by executive order does not exist in mid-air. It must find its taproot in Article II of the Constitution or in statutes enacted by the Congress. In some instances, . . . a proposed executive order has been blocked on the ground that it exceeded the legal authority of the President . . . .[85]

The discussion here will focus on OLC's review of two of the many executive orders that were studied, modified, blocked, or issued, during my tenure in OLC. In the first case, the abundantly cautious OLC approach led to no order being issued; in the second, OLC approved an executive order that resulted in a vast expansion of the nation's territory.

### A.  *Pornography At The Government Store*

The Attorney General's Commission on Pornography recom-

---

[85] Frank M. Wozencraft, *OLC: The Unfamiliar Acronym*, 57 A.B.A. J. 33, 35 (1971).

mended a variety of ways in which the impact of pornography on society and its denigration of women and abuse of minor children might be contained consistent with constitutional guarantees.[86] In its deliberations, the Commission learned of a troubling fact: "[t]he Federal Government is one of the single largest distributors of sexually explicit material, some of which may be legally obscene. The General Services Administration licenses 526 shops in federal buildings. . . . The military operates 413 major retail stores and thousands of smaller retail outlets throughout the world."[87] To address this embarrassment, the White House requested that OLC draft an executive order to rid federal establishments "of obscenity and child pornography, as well as restricting minors' access to indecent or sexually explicit materials, on federal lands and in federal stores, both military and civilian."[88]

The order to accomplish the above purposes was completed and approved as to form and legality by OLC. At that point, however, Congress, in the person of Senator Armstrong, learned of the effort and pressed for a more expansive executive order that would rid federal property of all sexually explicit material, even that like *Playboy*, which by judicial decree would be within the ambit of protected speech. It fell to OLC to evaluate whether this more sweeping order would be constitutional.

OLC hedged. It concluded that there was a plausible constitutional argument not directly precluded by precedent that, where the government acts as a proprietor and must of necessity choose to sell some publications and not others, the exercise of that choice (deciding not to sell publications dealing with sexually explicit speech) should not be thought to violate the First Amendment. Nevertheless, OLC cautioned that it was unable to conclude that the courts would indulge this view and uphold the more expansive order. As a result, the more expansive order was not issued.

In retrospect, several things are troubling about OLC's answer.[89] First, it understates the wisdom of the "government as proprietor" position. It is important to pursue this because, in the wake of the military's "Tailhook" scandal, new legal inquiries are being made by the Pentagon as to its authority to ban sexually explicit magazines

---

[86] U.S. Att'y Gen. Comm'n on Pornography Final Rep. 215 (1986).
[87] *See* Kmiec, *supra* note 3, at 90 (*quoting* Office of Policy Dev., Rep. to the Domestic Pol. Council on the Family 11 (1988)).
[88] *Id.*
[89] For which I take responsibility.

from military bases.[90] Common sense dictates that the government must, in proprietary circumstances, select some publications and exclude others. In doing so as a proprietor, content is necessarily relevant. "Logically, if one thought of a federal bookstore at the Gettysburg Memorial, few would think the government obliged to sell books there unrelated to the Civil War."[91] The same is generally true everywhere from the public school to the public library.[92]

Arguably, this proprietary discretion has since been more clearly articulated by the Supreme Court itself in *Rust v. Sullivan*,[93] upholding speech-related conditions on government funds. As the Court observed, "[w]hen Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, . . . it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as Communism and Fascism."[94] While some limiting arguments may be made pursuant to the Court's public forum cases[95] to distinguish government property from government money, in general, they are both fairly understood as subsidies. While the government may not condition the use of federal property or federal money on a citizen foregoing speech with personal resources, government necessarily must have the leeway to allocate its own resources to the interests and issues it favors.[96] This is part and parcel of governance.

Second, and more troubling for purposes of the present discussion, the OLC conclusion was driven more by the risk of adverse litigation than a dispassionate appraisal of the constitutional requirements. Like OLC's handling of the item veto, the opinion seems more calculated to preserve the status quo, than to fully demarcate the extent of the President's authority. Thus, this is more than a case of hindsight being clearer. Rather, it is another example of OLC's institutionalized reluctance to sanction practices other than those that are so thoroughly established as to be beyond all legal question.

There is nothing wrong with narrowly focused, highly cautious

---

90 Charles Aldinger, *Pentagon to Study Whether Adult Magazines Can Be Banned*, Reuters, Oct. 15, 1992, *available in* LEXIS, Nexis Library, Wires file.

91 KMIEC, *supra* note 3, at 91.

92 *Cf.* Board of Education v. Pico, 457 U.S. 853, 870-71 (1982) (plurality ruling that a school board could not remove library books for narrowly partisan or political reasons).

93 111 S. Ct. 1759 (1991).

94 *Id.* at 1773.

95 In most cases, government stores are not public fora.

96 For a discussion of the proper constitutional treatment of government speech, see Douglas W. Kmiec, *In the Aftermath of* Johnson *and* Eichman: *The Constitution Need Not be Mutilated to Preserve the Government's Speech and Property Interests in the Flag*, 1990 B.Y.U. L. REV. 577, 624-37.

legal advice, if the client understands that the advice originates from this perspective. · However, having directly discussed the pornography executive order with President Reagan, I am not convinced that OLC legal advice is always received in this fashion. I suspect that President Bush may have been equally baffled by *his* OLC's negative response to recent public commentary by a former OLC head—to the effect that administrative authority exists, without new legislation, for the President to index the tax treatment of capital gains.[97]

Not every OLC review results in a negative answer as the OLC review of the executive order on the expansion of the territorial sea reveals.

### B. *The Territorial Sea*

Prior to December 1988, the United States claimed a three-mile territorial sea. Quaintly based upon the distance a cannonball could be shot,[98] the U.S. position was at odds with the twelve-mile limit claimed by the signatories to the United Nation's Law of the Sea Convention, which the United States generally observes, but has not ratified. The more conservative U.S. claim created a number of national security difficulties, not the least of which was the presence of then-Soviet intelligence submarines 3.1 nautical miles offshore from San Diego, Norfolk and elsewhere. In addition, the smaller territorial claim provided only a limited secure area in which U.S. vessels could maneuver and train.

President Reagan formed an interagency group to address the policy issue of expanding the territorial sea claim of the United States. While these policy deliberations were highly favorable, substantial legal questions arose over how, and even whether, the President could unilaterally declare the new territorial area. In mid-August 1988, President Reagan asked OLC to examine the issue.

The issues presented were novel and difficult ones. The territorial sea is treated under international law as the equivalent of a nation's land territory. Because of this, the proposed expansion of the territorial sea raised the issue of the ways in which the United States may acquire and assert sovereignty over territory in general. Senator (later Justice) Sutherland observed, "[t]here is no provision in the Constitution by which the national government is specifically author-

---

[97] *See* Charles J. Cooper, *Capital Gains, as Seen by Congress in 1918*, WALL ST. J., Sept. 4, 1992, at A8; Charles J. Cooper, *Capital Gains Tax and Presidential Power*, WALL ST. J., Aug. 31, 1992, at A10.
[98] *See* The Ann, 1 F. Cas. 926 (C.C.D. Mass. 1812) (No. 397); *see generally* SWARZTRAUBER, THE THREE-MILE LIMIT OF TERRITORIAL SEAS 23-35 (1972).

ized to acquire territory; and only by a great effort of the imagination can the substantive power·to do so be found in the terms of any or all of the enumerated powers."[99] Thus the territorial sea question was similar to that addressed by OLC in the matter of the item veto. This time, however, constitutional silence did not defeat the President's initiative.

OLC concluded that despite the absence of explicit constitutional direction, the President could extend the territorial sea from three to twelve miles by proclamation.[100] In reaching this conclusion, OLC was assisted·by prior presidential·action that was perceived as less timorous than that which constrained OLC's analysis of the item veto, namely the broad authority exercised by the President in matters of foreign relations, some of which has been traced by the Supreme Court to originate outside the constitutional document.[101] In particular, the Court has recognized that it is the President who has "the power to determine how far this country will claim territorial rights in the marginal sea as against other nations."[102] But claims of territorial sea may either be claims of limited jurisdiction, that is, for particular purposes like sea-bed mining, or claims of full sovereignty. It was the desire of the President to assert the latter, which would require, as it turned out, closer analysis.

The authority of the federal government to acquire and assert sovereignty over new territory was seriously questioned in the years immediately following the adoption of the Constitution. It was argued that the Constitution's silence reserved this power to the States.[103] This issue and others, of course, bedeviled Thomas Jefferson's Louisiana Purchase.[104] By 1828, however, Chief Justice John Marshall could observe that "[t]he Constitution confers absolutely on the government of the Union, the powers of making war, and of making treaties; consequently, that government possesses the power of acquiring territory, either by conquest or by treaty."[105] The question

---

99 GEORGE SUTHERLAND, CONSTITUTIONAL POWER AND WORLD AFFAIRS 52 (Johnson Reprint Corp. 1970) (1919).

100 The OLC opinion can be found in Douglas W. Kmiec, *Legal Issues Raised by the Proposed Presidential Proclamation to Extend the Territorial Sea*, 1 TERR. SEA J. 1 (1990) and 12 Op. Off. Legal Counsel 301 (Prelim. Print 1988). OLC opinions, like Attorney General opinions, have been officially published by the government through 1992.

101 *See* United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315-22 (1936).

102 United States v. Louisiana, 363 U.S. 1, 35 (1960).

103 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1317 (3d ed. Boston, Little, Brown & Co. 1858).

104 For a discussion of the history·of the Louisiana Purchase see 1 THE WRITINGS OF ALBERT GALLATIN 114 (Henry Adams ed., J.B. Lippincott & Co. 1879); Downes v. Bidwell, 182 U.S. 244, 251-53 (1901).

105 American Ins. Co. v. Canter, 26 U.S. (1 Pet.) 511, 542 (1828).

*CARDOZO LAW REVIEW*           [Vol. 15:337

for OLC was whether sovereignty over new territory could also be asserted by presidential proclamation.

It is here that past presidential practice became significant. It can be argued that President Washington's three-mile limit claim was one of full sovereignty. There is little in the correspondence of Secretary of State Jefferson, who implemented Washington's proclamation, to suggest otherwise.[106] In addition, John Marshall and Joseph Story both later viewed the territorial sea premised upon this proclamation, as part of the territory of the United States.[107] Beyond the venerable historical example of Washington's proclamation, however, there were only a handful of instances in which presidents acting alone had acquired territory. Most territorial claims can be traced to treaty. Nevertheless, in 1869, the United States formally took possession of the Midway Islands by order of the Secretary of the Navy.[108] The Navy vessel U.S.S. Bennington laid claim to Wake Island on January 17, 1899.[109] Finally, Trivial Pursuit buffs may remember Millard Fillmore's unilateral acquisition of Horseshoe Reef near Buffalo for a lighthouse.[110]

The occasions for unilateral presidential acquisition may be sparse, but reasoning from the structural position occupied by the President in the constitutional scheme—our "sole organ" in matters of foreign affairs—OLC was right to accord them significance. Moreover, OLC could find no example where the Congress had asserted jurisdiction or sovereignty over territory, apart, of course, from the Senate's formal treaty ratification role. Congress does have the constitutional power to admit new states[111] and to dispose of and regulate the property of the United States,[112] but upon close examination, neither authority proved wholly apposite. While the Supreme Court has never definitively settled the issue, it has suggested that Congress cannot establish a state boundary greater than the territorial sea established by the President.[113]

On December 27, 1988, the territory of the United States, in the

---

[106] Letter from Jefferson to British Minister George Hammond (Nov. 8, 1793), *reprinted in* H.R. EXEC. DOC. NO. 324, 42d Cong., 2d. Sess. 553-54 (1872).

[107] Church v. Hubbart, 6 U.S. (2 Cranch) 187, 234 (1804) (Marshall, C.J.); The Ann, 1 F. Cas. at 926-27 (Story, J.).

[108] S. REP. NO. 194, 40th Cong., 3d Sess. 1 (1869).

[109] 1 MOORE, INTERNATIONAL LAW DIGEST § 111, at 554-55 (1906).

[110] 5 T.I.A.S. No. 145 (1937).

[111] U.S. CONST. art. IV, § 3, cl. 1.

[112] U.S. CONST. art. IV, § 3, cl. 2.

[113] *See, e.g.*, United States v. Louisiana, 363 U.S. 1, 35, 51 (1960). For a view asserting a larger Congressional role, see Jack H. Archer & Joan M. Bondareff, *The Role of Congress In Establishing U.S. Sovereignty Over the Expanded Territorial Sea*, 1 TERR. SEA J. 117 (1990).

form of the territorial sea, was extended from three to twelve miles.[114] The proclamation was largely drafted, and as with all executive orders, approved for form and legality by OLC. In the spring of 1992, the House Merchant Marines and Fisheries Committee and the Foreign Affairs Committee approved legislation designed to further the implementation of the proclamation. The legislation recites that it "ratifies" President Reagan's acquisition order.[115]

Not every OLC action is embraced by Congress as the following discussion of OLC's role in executive privilege claims suggests.

## IV.  THE ASSERTION OF EXECUTIVE PRIVILEGE

In *United States v. Nixon*,[116] the Supreme Court acknowledged the "valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties"[117] stating that "the importance of this confidentiality is too plain to require further discussion."[118] As a matter of political reality, however, justification for maintaining the confidentiality of executive branch material has seldom been "too plain" for Congress. OLC is repeatedly called upon to advise executive agencies confronted with congressional requests for confidential information. By memorandum, President Reagan specifically directed cabinet officers to consult with the head of OLC handling these requests.[119]

In March 1989, OLC responded to a request for guidance by an interagency group composed mostly of Inspectors General ("IG")— that is, internal agency auditors charged under law to keep the heads of agencies and Congress apprised of agency fraud or other serious problems and abuses. In particular, this group inquired as to the proper framework for responding to congressional requests for confidential information about open criminal investigations.

There are three generally recognized components of executive privilege: state secrets, law enforcement, and deliberative process. The Court in *Nixon* opined that the state secrets component is entitled to the greatest deference, but the others are hardly insignificant. While confidentiality is often sought for executive deliberations gener-

---

[114] Proclamation No. 5928, 54 Fed. Reg. 777 (1988).

[115] H.R. 3842 *discussed in* 9 OCEAN POL. NEWS 4 (1992).

[116] 418 U.S. 683 (1974).

[117] *Id.* at 705.

[118] *Id.*

[119] Memorandum for the Heads of Executive Departments and Agencies (Nov. 4, 1982), *reprinted in* PETER M. SHANE & HAROLD H. BRUFF, THE LAW OF PRESIDENTIAL POWER 182-83 (1988) [hereinafter Memorandum].

ally in order to invite candor, the need for maintaining the privilege in law enforcement can be paramount. As Attorney General Robert Jackson opined:

> It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the Laws be faithfully executed," and that congressional or public access to them would not be in the public interest.
>
> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.[120]

Beyond being of aid to defendants, premature disclosure of open law enforcement files raises the risk of revealing sensitive techniques, methods, or strategies, as well as the identities of informants. Public perception of fairness might also be damaged, as a grant of access may imply inappropriate executive responsiveness to efforts to either advance or impede prosecution. Relatedly, consideration must also be given to the rights of innocent parties who may be discussed in law enforcement files. The fact that an information request originates with Congress does not obviate these concerns. As one court commented, there is "no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm."[121]

This is not to say that congressional requests should be disregarded. Congress has legitimate oversight authority that is "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution."[122] Thus, each chamber of Congress has power, "through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution."[123] Nevertheless, the Court has recognized that "[b]road as it is, the power [of Congress] is not, however, without limitations. Since Congress may only investigate into those

---

[120] 40 Op. Att'y Gen. 45, 46 (1941).
[121] Delaney v. United States, 199 F.2d 107, 114 (1st Cir. 1952).
[122] Barenblatt v. United States, 360 U.S. 109, 111 (1959).
[123] McGrain v. Daugherty, 273 U.S. 135, 160 (1927).

areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government."[124]

In short, each request for executive material from Congress contemplates a balancing of a number of factors arising out of the separation of powers. The key factors to be assessed are the nature of the Congress's oversight interest in the information and the interest of the executive in maintaining confidentiality. A fair application of this balancing formula thus instructs OLC to make every effort to accommodate requests within legitimate congressional oversight authority while remaining faithful to its law enforcement responsibilities. President Reagan underscored this posture by stating that it was the policy of his "Administration to comply with Congressional requests for information to the fullest extent consistent with constitutional and statutory obligations of the Executive Branch."[125]

Because of this accommodation posture, only rarely do congressional requests for information result in a subpoena. In most cases, the informal process of negotiation and accommodation is sufficient to resolve any dispute. That said, for accommodation to work, each side must carefully identify its particular interests. As one federal court put it in the Watergate matter, Congress must be able to "point[ ] to . . . specific legislative decisions that cannot responsibly be made without access to materials uniquely contained" in the presumptively privileged executive materials.[126] For its part, the executive does have strong law enforcement interests in maintaining the integrity of an ongoing investigation.[127] These interests recede to some extent after an investigation is closed because there is then less worry about Congress appearing to be an illicit partner in a prosecution or about improper pretrial publicity. However, some concerns remain even with closed investigations. For example, there is still the risk of disclosing informants or innocent parties mentioned in the course of an investigation.

Based on the above considerations, OLC advised the interagency group of Inspectors General that except in extraordinary circumstances an IG must decline to provide confidential information about open criminal investigations. This prompted a sharp response from the Counsel to the House of Representatives. The OLC opinion was

---

[124] *Barenblatt*, 360 U.S. at 111-12.
[125] Memorandum, *supra* note 119, at 182-83.
[126] Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 733 (D.C. Cir. 1974).
[127] *See supra* text accompanying notes 119-21.

characterized as "gratuitous" and a "blanket stonewalling of Congressional inquiries" that was "plainly without merit."[128] It was further asserted that the Inspector General Act of 1978[129] specifically required Inspectors General to provide information to Congress on open criminal investigations. OLC had addressed this point as well, finding that neither the text nor legislative history of this Act imposed such a requirement.[130] Nor could it, given the constitutional basis for maintaining the confidentiality of this executive branch information.

It may be that the House reacted this strongly to the OLC opinion in order to test the mettle of the new Bush administration. The House Counsel highlighted that this was "the first official pronouncement during the Bush Administration regarding withholding of information from Congress."[131] Whatever its motivation, the congressional reaction greatly exaggerated the disagreement between Congress and the Executive and it seemed calculated more to confront than foster the sensitive balancing and accommodation necessary to resolve executive privilege disputes.

## V. THE SETTLEMENT OF INTRABRANCH DISPUTES

One of the most important functions performed by the Attorney General and, by delegation, OLC, is the resolution of legal disputes among executive agencies. By law, "[t]he head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department."[132] There are few limitations on the availability of this dispute resolution capacity, other than that the issue presented must actually arise in the administration of an executive department.[133] This statutory authority has been embellished by two executive orders. Executive Order 2877 provides that "any opinion or ruling by the Attorney General upon any question of law arising in any department, executive bureau, agency or office shall be treated as binding upon all departments, bu-

---

128 Memorandum from Steven R. Ross & Charles Tiefer, General Counsel & Deputy General Counsel to the Clerk of the House of Representatives to Congressman Jack Brooks, Chairman, Committee on the Judiciary 2, 4 (May 2, 1989) (copy on file with author).

129 Pub. L. No. 95-452, *reprinted as amended in* 5 U.S.C. app. (1988 & Supp. III 1992).

130 For example, OLC quoted the legislative history: "It would be highly improper and often a violation of due process for an [IG's] report to list the names of those under investigation or to describe them with sufficient precision to enable the identities of the targets to be easily ascertained." 124 CONG. REC. 30,949 (1978); S. REP. No. 1071, 95th Cong., 2d Sess. 30 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2705.

131 Memorandum, *supra* note 119, at 1.

132 28 U.S.C. § 512 (1988).

133 *See, e.g.*, 31 Op. Att'y Gen. 234, 236 (1918); 31 Op. Att'y Gen. 127, 131 (1917); 20 Op. Att'y Gen. 178, 181 (1891).

reaus or offices therewith concerned."[134]  In addition, Executive Order 12,146[135] "encourages" all executive agencies to submit legal disputes to the Attorney General,[136] and requires executive agencies "whose heads serve at the pleasure of the President" to submit such disputes to the Attorney General "prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere."[137]

The scope of authority exercised by OLC at the delegation of the Attorney General under these provisions was directly challenged in several matters in the late 1980s.  At issue were disputes between the Department of Labor ("Labor") and the Department of Housing and Urban Development ("HUD") and the Veterans Administration ("VA") over the proper application of the Davis-Bacon Act.[138]  Davis-Bacon provides generally that contractors and subcontractors performing construction work financed by federal money shall be paid a "prevailing wage" rate set by the Secretary of Labor.  This prevailing wage is often far higher than the wage that could be negotiated on the open market in fair competition.[139]

HUD and the VA argued that Labor had misapplied the law in a number of contexts.  HUD argued that Labor could not properly require Davis-Bacon wages under the Housing and Community Development Act where federal money was not being used for actual construction work, but only for site acquisition, the purchase of equipment, or "soft costs," like engineering and architectural fees. Labor initially took the position that all of these items triggered the payment of Davis-Bacon wages on the subsequent construction be-

---

[134] Exec. Order No. 2,877 (1918), *discussed in* BAKER, *supra* note 7, at 9.

[135] Exec. Order No. 12,146 § 1-401, *supra* note 13, at 409.

[136] *Id.* at § 1-401.

[137] *Id.* at § 1-402.  The distinction between executive agencies and executive agencies with heads removable by the President arguably enables the Attorney General to resolve a dispute between independent agencies or between an independent agency and an executive agency. It has been OLC's practice to issue legal opinions to independent agencies if, in advance of resolution, they agree to abide by the result.

Executive Order 12,146 may have been issued because previous Attorneys General felt that their opinion function under 28 U.S.C. § 512 was limited to executive agencies fully within one of the executive departments. *See, e.g.,* 20 Op. Att'y Gen. 312, 313 (1892), stating that:

> The Civil Service Commission is not included within any of the great Departments of Government . . . . Until the Commission shall request the President, to whom they are directly responsible, to present the question of law arising in the discharge of their duties to the Attorney General, he is not called upon to give, and should not under the law give, his opinion.

[138] 42 U.S.C. § 5310 (Supp. II 1991).

[139] *See, e.g.,* John T. Berg & Ralph C. Erickson, *An Evaluation of the Impact of the Davis-Bacon Act,* 6 GOV'T UNION REV., Summer 1985, at 1.

cause they were "integrally and proximately related" to the construction.[140] Similarly, in a separate instance, Labor demanded the retroactive payment of Davis-Bacon wages by the VA where the VA had entered into a lease pursuant to which the lessor chose to construct a new facility to lease to the VA.[141]

The legal issues in each of these cases were being closely monitored by interested parties outside government, and the respective positions were vigorously argued in the briefs or position papers submitted to OLC by the contending sides. OLC's resolution of the matter, however, was slowed by two factors. While OLC assiduously maintains a "judicial" posture in resolving executive branch disputes, and thus shuns ex parte contacts with either side, political pressure was brought by Labor on the Deputy Attorney General to try to "settle" the HUD dispute without the issuance of a formal OLC opinion. This proved largely unsuccessful, and not surprisingly therefore, HUD continued to press OLC for a definitive resolution.

With informal settlement impossible, Labor directly challenged the opinion-writing jurisdiction of the Attorney General and OLC. In the HUD matter, Labor contended that a government reorganization plan placed the proper interpretation of Davis-Bacon solely with the Secretary of Labor.[142] OLC conceded that the reorganization plan allowed Labor to coordinate the application of Davis-Bacon, but by virtue of the separate statutory directive to the Attorney General to render legal advice, it could not preclude the head of another department from asking for an opinion with regard to a question of law arising in the administration of his department. OLC cited an opinion by Attorney General Levi[143] in an analogous matter in support of its determination.

Labor then tried to circumvent OLC jurisdiction by modifying its previous opinion which had triggered HUD concern and the broad application of Davis-Bacon, even to site acquisition. OLC denied that this change in position precluded it from issuing an opinion, maintain-

---

[140] 11 Op. Off. Legal Counsel 119 (Prelim. Print 1987).

[141] 12 Op. Off. Legal Counsel 109 (Prelim. Print 1988).

[142] The referenced plan provides:

> In order to assure coordination of administration and consistency of enforcement of the labor standards provisions of each of the [several federal laws including the Housing and Community Development Act of 1974 among others] by the Federal agencies responsible for the administration thereof, the Secretary of Labor shall prescribe appropriate standards, regulations, and procedures, which shall be observed by these agencies . . . .

Reorg. Plan No. 14 of 1950, 15 Fed. Reg. 3176 (1950), *reprinted as amended in* 5 U.S.C. app. at 1261 (1988), *and in* 64 Stat. 1267 (1970).

[143] 43 Op. Att'y Gen. No. 8 (1977).

ing that since the Secretary of HUD continued to ask OLC for an opinion with respect to a legal question arising in the administration of his department, it did not matter whether a present dispute existed. OLC reasoned that under Title 28 the Attorney General is required to answer the legal query of a cabinet member, and the withdrawal of the previous Labor view "is simply irrelevant" to the exercise of the statutory right.[144]

OLC buttressed its jurisdictional conclusion by referencing the Attorney General's litigating authority,[145] and the general prohibition against the head of an executive department employing an attorney for the agency litigation, rather than referring the matter to the Department of Justice.[146] OLC argued that merely because Congress had provided a solicitor for Labor did not change this general prohibition, for his authority is narrowly circumscribed. In any event, the Labor Solicitor cannot displace the Attorney General's authority to render the exclusive and ultimate view of the position of the United States on the proper interpretation of statutes before the courts.[147]

In the VA matter, OLC similarly sustained its own jurisdiction. Here, Labor argued that Executive Order 12,146 allowing the Attorney General to resolve a dispute did not apply because only the VA had submitted the dispute for resolution, not Labor. OLC found this to be a misreading of the Executive Order, reasoning that while section 1-401 of the order states that each agency is encouraged to submit disputes, it does not require that every agency involved in a dispute request an opinion from the Attorney General. OLC reiterated that the Attorney General's statutory authority to provide the VA with an opinion on a legal question arising in the course of the administration of its work could not be finessed.

On the merits of both matters, OLC found Labor's broad application of Davis-Bacon to be contrary to the plain text and legislative history of the respective statutory provisions under review.

While the VA opinion request was pending in OLC, a union rushed into court and moved for summary judgment characterizing Labor's view as "final agency action." The district court, in *Building*

---

[144] 11 Op. Off. Legal Counsel 119, 122 (Prelim. Print 1987).

[145] 28 U.S.C. § 516 (1988).

[146] 5 U.S.C. § 3106 (1988).

[147] OLC observed that the HUD-Labor dispute over the proper application of the Davis-Bacon Act in the housing context had spilled into the courts in pending litigation. OLC referenced that fact here as support for having the Attorney General resolve the matter. However, this is a bit unusual. OLC generally refrains from issuing an opinion when a matter is in litigation. *See* Wozencraft, *supra* note 85, at 34 (citing LAGELUTTIO, THE DEPARTMENT OF JUSTICE OF THE UNITED STATES xi (1927)).

*and Construction Trades Department, AFL-CIO v. Turnage,*[148] upheld Labor's interpretation on the theory articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[149] *Chevron* requires judicial deference to reasonable agency interpretation of a statute in the absence of a clear and unambiguous indication of Congressional intent to the contrary. The *AFL-CIO* court did not refer to the OLC opinion, even though it was subsequently made aware of it in petition for review submitted by the VA. Unfortunately, the court assumed, incorrectly, that the Labor view continued to be the final executive agency action, and that the OLC opinion was merely a statement of litigation position. Thus, the trial judge failed to perceive the extent to which, by statute and executive order, the OLC opinion necessarily supplanted the Labor decision.

OLC believed the district court decision to be wrong as a matter of law and that Labor's interpretation was not entitled to *Chevron* deference. Nevertheless, because of the trial court's confused understanding of the procedural history, the Civil Division, with OLC concurrence, did not pursue an appeal.[150] OLC acknowledged that Labor must abide by the decision in the particular case adjudicated; however, it informed Labor that it expected it to adhere to the holding of the OLC opinion in all future cases.

The HUD and VA disputes with Labor reveal the extent to which OLC serves as the legal adhesive for the unitary executive, and the extent to which it vigorously defends the privilege and the responsibility of that role.

## A. *Afterword: An "Independent" Attorney General?*

There has been a longstanding debate over whether the Attorney General is the President's advocate or an impartial interpreter of the law. The debate has gone unresolved, and the nation has done well, though at different times, under both types. Attorneys General as advocates bring intellectual coherence to the legal direction of a political administration. They get things done. By contrast, these advocates are thought to be ill-suited for times of self-doubt or divisive conflict. Here, an Attorney General above the political fray, as it were, is the order of the day. In this regard, it is not surprising to find the immediate Attorneys General of the post-Watergate era to be described as nonpartisan or independent. During the 1976 campaign, Griffin Bell

---

[148] 705 F. Supp. 5 (D.D.C. 1988).

[149] 467 U.S. 837 (1983); *see* Douglas W. Kmiec, *Judicial Deference to Executive Agencies and the Decline of the Nondelegation Doctrine,* 2 ADMIN. L.J. 269, 271-80 (1988).

[150] Letter to Thorn from Kmiec (Jan. 23, 1989) (copy on file with author).

persuaded Jimmy Carter to announce on "Meet the Press" that if elected he would establish an independent Department of Justice, with an Attorney General serving a longer term than the President.[151] Unfortunately, when Attorney General Bell asked OLC to implement the suggestion, Bell reports that OLC concluded that it would be unconstitutional insofar as it would interfere with the President's constitutional duty to "take care that the laws be faithfully executed."[152]

Bell was not the first to suggest the creation of an independent Attorney General. Then Senator Lloyd Bentsen at one time attached an amendment to the Ethics in Government Act to preclude the President from nominating anyone for Attorney General who had served as a high-level campaign adviser to the President.[153] One institutional reform that has taken root was to separate the Attorney General from the day-to-day handling of federal litigation by creating the assistant attorneys general for the civil and criminal divisions.[154]

OLC was not created to separate the Attorney General from his opinion function. However, this separation has largely occurred. It is probably fair to describe the modern experience of the heads of OLC in the last thirty years as one of remarkable independence and latitude. Opinion requests seldom come through the Attorney General, but rather directly to OLC, and they are seldom "cleared" by the Attorney General in any formal way before their release.[155] Indeed, OLC's quasi-judicial stance allows OLC to regularly rebuff the inquiries of curious members of the Attorney General's personal staff and certainly "lesser mortals" in other departmental divisions or outside the Department. In a few cases, even the Attorney General has adopted a level of deference to OLC's—delegated, it should be remembered—opinion function. Griffin Bell's recollection in his memoir of how OLC decided against his independent Attorney General notion on constitutional grounds suggests that he viewed the issue as "decided by OLC," not as an issue for further legal examination.

Of course, if the Attorney General is unquestioning of OLC decisions, it is likely that the President will be as well.[156] One former

---

[151] GRIFFIN B. BELL & RONALD J. OSTROW, TAKING CARE OF THE LAW 28 (1982).

[152] *Id.*

[153] 33 CONG. Q. ALMANAC 581, 583 (1977).

[154] BAKER, *supra* note 7, at 169, citing *Senate Hearings Before the Select Comm. on Investigation of Att'y Gen. Harry M. Daugherty,* 68th Cong., 1st Sess., pt. 9, at 2565 (1924).

[155] This is reported to be the experience of OLC dating back to Lyndon Johnson. *Id.* at 11.

[156] A former OLC attorney observed: "Sometimes I wondered whether the attorney general had any idea what legal advice the president was relying on, or the president, where it [the advice] came from. He may assume it comes from the attorney general, but ninety-nine times out of one hundred times, it does not." *Id.* at 12 (citing an interview with Thomas Kauper

OLC attorney in the Nixon administration reports how President Nixon announced the abolition of the U.S. Board of Tea Tasters to demonstrate "his seriousness about cutting the budget."[157] The decision was overridden, however, by an OLC opinion that this statutory board could not be eliminated by unilateral executive action.

If any further evidence of OLC's independence were needed, it can be gleaned from the declining number of formal Attorney General opinions. A search of the LEXIS data base reveals that since 1974, less than ten percent of the opinions of the Department of Justice have been signed by the Attorney General. The database records contain no opinions by Attorneys General Thornburgh or Barr.[158]

Is this OLC independence a salutary development? The answer may depend on the function being performed by OLC. In matters of dispute settlement, OLC's carefully circumscribed quasi-judicial role does enhance impartiality and lend credibility to its opinions. In contrast, when OLC is asked to legally review aspects of the President's program or pending legislation, this guise of impartiality is seldom appreciated by those outside the executive branch, and as is suggested by OLC's handling of the item veto and pornography executive order matters, possibly misleading to OLC's client, the President.

Scholars who have examined the issue of whether an Attorney General should be an advocate for the President or an impartial judicial decisionmaker have concluded that a successful Attorney General may well require both qualities: "His Advocate features must be tempered with this important Neutral trait."[159] Yet, few argue that the Attorney General can merely be the President's judge. At his confirmation hearing, Griffin Bell [a former judge] stated: "I will be an advocate attorney general, not an arbiter as I was as a judge."[160]

The fact that OLC relieves the Attorney General of virtually all of the internal executive branch dispute settlement function should lessen the conflicting loyalties felt by an Attorney General. But this then may aggravate the conflicts for OLC. After all, if an Attorney General must be both an advocate and impartial, OLC can only faithfully and effectively serve the Attorney General by being sensitive to when it is appropriate for OLC, as the Attorney General's lawyer, to play one role or the other.

---

who served as an attorney-advisor in OLC and assistant attorney general in the Antitrust Division in the Nixon and Ford Administrations).

   [157] *Id.* at 6.

   [158] Excluding, of course, opinions written by Attorney General Barr while he headed OLC.

   [159] BAKER, *supra* note 7, at 179.

   [160] *Hearings on Griffin Bell, Attorney General Designate*, 95th Cong., 1st Sess. 144 (1977).