# EXHIBIT AA

# BYU Law Review

Volume 1978 | Issue 2                                                      Article 1

5-1-1978

# Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships

Rex E. Lee

Follow this and additional works at: https://digitalcommons.law.byu.edu/lawreview

 Part of the Constitutional Law Commons, and the Law and Politics Commons

Recommended Citation

Rex E. Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 BYU L. Rev. 231 (1978).
Available at: https://digitalcommons.law.byu.edu/lawreview/vol1978/iss2/1

This Article is brought to you for free and open access by the Brigham Young University Law Review at BYU Law Digital Commons. It has been accepted for inclusion in BYU Law Review by an authorized editor of BYU Law Digital Commons. For more information, please contact hunterlawlibrary@byu.edu.

# Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships

### Rex E. Lee*

In *United States v. Nixon,*[1] the United States Supreme Court recognized the existence of the President's right under appropriate circumstances to withhold certain kinds of information from coordinate branches of government.[2] The Court held that this right, which bears the label executive privilege, is based on separation of powers. One year later, in *Eastland v. United States Servicemen's Fund,*[3] the Court held that the issuance and enforcement of congressional subpoenas are protected under the speech or debate clause.[4]

A case now pending before the United States Court of Appeals for the District of Columbia Circuit, *United States v. American Telephone & Telegraph Co. (AT&T),*[5] raises additional important issues concerning executive privilege, congressional investigative power, and the broader separation of powers context out of which these issues arise. Described by the court of appeals as presenting "nerve-center constitutional questions,"[6] the case brings squarely into confrontation for the first time in history three potent prerogatives of our three branches of government:

---

* Dean and Professor of Law, J. Reuben Clark Law School, Brigham Young University. B.A., 1960, Brigham Young University; J.D., 1963, University of Chicago. Assistant United States Attorney General, May 1975-January 1977. Dean Lee was personally involved in the *AT&T* case, and argued the case before the district court and the court of appeals. The views expressed herein do not necessarily represent those of the Department of Justice during the Ford administration.

The author acknowledges the valuable assistance of Allen D. Butler, a recent graduate of the J. Reuben Clark Law School, Brigham Young University.

1. 418 U.S. 683 (1974).

2. *Id.* at 706-07. In *Nixon* the Court held that, under the circumstances of the case, the President was obligated to comply with a judicial subpoena, because the President raised only generalized claims of confidentiality, as contrasted with the judiciary's specific need for the information in a criminal proceeding. While congressional subpoenas were not directly involved in *Nixon,* the fair inference to be drawn from the opinion is that executive privilege has applicability to attempts by either Congress or the courts to obtain information.

3. 421 U.S. 491 (1975).

4. *See* notes 43-58 and accompanying text *infra.*

5. The court of appeals has issued two opinions in the case. The first is reported at 551 F.2d 384 (D.C. Cir. 1976); and the second, at 567 F.2d 121 (D.C. Cir. 1977).

6. 551 F.2d at 394.

Congress' investigatory (subpoena) power, executive privilege exercised to protect foreign intelligence secrets, and judicial review.

Section I of this Article briefly examines that *AT&T* case. Subsequent sections will explore some of the issues that it raises. Section II will discuss the applicability of the speech or debate clause to congressional investigations and the scope of executive privilege when the information at issue is not in the government's possession. Secton III will explore the possible procedural avenues by which an executive privilege-congressional subpoena confrontation might arise, including the constitutional impediments to bringing such confrontations before the courts. Section IV deals with the constitutional authority of the courts to resolve these conflicts, and Section V examines the possible standards appropriate for their resolution.

## I.   United States v. American Telephone & Telegraph Co.

### A.   History of the Controversy

For several decades, the United States has engaged in warrantless electronic surveillance (wiretapping) to protect national security interests.[7] Such surveillance is initiated only after ap-

---

7. There is no authorizing statute for such surveillance. Its assumed legal basis is an inherent power in the President derived from his responsibilities as Commander in Chief of the Armed Forces, his responsibilities in the area of foreign relations, and his duty under article II, § 1 of the Constitution to "preserve, protect, and defend the Constitution of the United States." The Supreme Court held in United States v. United States District Court (Keith), 407 U.S. 297 (1972), that the President lacks such power at least insofar as domestic threats to national security are concerned. The *Keith* opinion left open the issue of inherent Presidential power to protect national security from foreign threats, including foreign powers, foreign agents, and agents of foreign powers. *Id.* at 308, 321-22. *See also* Zweibon v. Mitchell, 516 F.2d 594 (D.C. Cir. 1975) (held illegal a warrantless surveillance imposed on the Jewish Defense League whose activities were directed against foreign powers, but which is not itself a foreign power).

Further detail on the procedures involved in instituting such a surveillance is contained in United States v. AT&T, 419 F. Supp. 454, 456 (D.D.C.), *modified,* 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

The lack of statutory authority for these foreign intelligence surveillances has been a source of concern for the Attorney General. To alleviate this problem, S. 3197, 94th Cong., 2d Sess., was proposed in 1976 with the support of the Ford administration, particularly Attorney General Levi. The bill was reported favorably by the Senate Judiciary Committee and by the Senate Committee on Intelligence, but died in the Senate at the close of the 94th Congress. Currently, the Foreign Intelligence Act of 1978, S. 1566, 95th Cong., 2d Sess., has been reported favorably by the same committees that reported S. 3197 during the 94th Congress. S. Rep. No. 701, 95th Cong., 2d Sess. 6-7 (1978).

S. 3197 recognized the possible existence of inherent Presidential authority, in addition to that authorized by the bill. The current bill, by contrast, specifies that its provisions constitute the "exclusive means by which electronic surveillance as defined . . . may be conducted." S. 1566, 95th Cong., 2d Sess. § 2511(2) (1978).

Case 1:21-cr-00670-CJN   Document 58-27   Filed 04/15/22   Page 5 of 69

proval by the Attorney General, and is effected by the government leasing a telephone line which runs from the telephone of the surveillance target to an FBI monitoring station. Prior to 1969, the arrangements for these leased lines were handled orally.[8] Since then, however, all leased line arrangements have been memorialized by a "leased line letter," sometimes called a "national security request letter." This is a single-paragraph form letter identifying the points "from" and "to" which service is to be leased. It states that the service is to effect a foreign intelligence surveillance authorized in writing by the Attorney General, and cautions that the existence of the letter should not be disclosed lest the investigation be impeded.[9] These leased line letters have never been classified. The persons who handle them within the AT&T affiliate companies are all AT&T employees who have not undergone any formal governmental clearance procedure. The security afforded the letters has been described, however, as

8. United States v. AT&T, 551 F.2d at 388 n.5.
9. The leased line letter form is as follows:

Date

Addressee
Dear Mr. _____

   In connection with an investigation being conducted by the Federal Bureau of Investigation, under its lawful and established jurisdiction, it is requested that you furnish to the Federal Bureau of Investigation, at the usual commercial rates, the facilities or services set out below. This request is made upon the specific written authorization of the Attorney General of the United States as a necessary investigative technique under the powers of the President to protect the national security against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities, in connection with an investigation of organizations or individuals suspected to be agents of or acting in collaboration with a foreign power. Your cooperation in this matter will be greatly appreciated.
   It is requested that private line facilities be furnished as follows:
   From:
   To:
   You are not to disclose the existence of this request. Any such disclosure could obstruct and impede the investigation.

Very truly yours,

Clarence M. Kelley,

Director

Joint Appendix at 48, United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion) [hereinafter cited as Joint Appendix].
   The "from" portion of the form is followed by information identifying the surveillance target by telephone number, address, telephone pole or line number, or other more technical information from which the telephone company can identify the telephone to be tapped.

234    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

involving "the strictest security safeguards."[10]

On June 22, 1976, pursuant to its investigation into possible governmental abuse of section 605 of the Communications Act,[11] the House Committee on Interstate and Foreign Commerce issued a subpoena directing AT&T to deliver to that committee's Subcommittee on Oversight and Investigations four categories of documents.[12] The first category consisted of the leased line letters

---

10. *Id.* at 44. AT&T security safeguards were described by Robert L. Keuch, deputy assistant to the Attorney General, as follows:

> Upon information and belief AT&T receives and maintains all leased line letters under the strictest security safeguards. In the normal case not more than one individual per company is authorized to receive and have access to the request letter. In all cases the leased line letters are maintained within the security section of the corporation. Under company policies, members of AT&T's security organization are employed only after a full field investigation of the general nature utilized by the FBI in processing security clearances. Finally, all leased line letters are separately maintained in safes or secure compartments as would be required for classified information held by the Executive Branch. In all the years in which AT&T has performed this function, there is no evidence that the security of the leased line evidence has ever been compromised.

*Id.*

11. 47 U.S.C. § 605 (1970). Section 605 protects the privacy of radio or wire communications by prohibiting the interception of such communications or the divulgence of the contents of such communications. *Id.* The dual purpose of the investigation, as described by Congressman Moss, was "to determine whether existing law, specifically section 605 of the Communications Act, is being abused by the Executive Branch" and "the possible need for corrective legislation . . . relating to the protection and interception of private, interstate communications." Joint Appendix, *supra* note 9, at 193.

Certain activities by the President are excepted from § 605:

> Nothing . . . in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security information against foreign intelligence activities.

18 U.S.C. § 2511(3) (1970).

12. The four categories were:

> 1. Full and complete copies of Federal Bureau of Investigation (FBI) national security request letters, in the possession or control of American Telephone and Telegraph (AT&T) and its 24 operating companies listed below, for access to phone lines handling either verbal or non-verbal communications.
>
> 2. Copies of any and all records in the possession or control of AT&T or its operating companies prior to 1969 when written FBI requests were not routinely requested by AT&T and its operating companies.
>
> 3. Copies of any and all applicable Bell System Practices (BSP's) describing company policy regarding national security "taps" or "provision of facilities" to law enforcement or intelligence agencies. This should include both current BSP's and any BSP's on the subject which have since been revised or discontinued.
>
> 4. Copies of internal memoranda, correspondence, board minutes, or other records relative to AT&T, and/or any AT&T operating company, practice or

in the possession of AT&T and its affiliates. The White House responded to the AT&T subpoena by attempting to negotiate a compromise with the subcommittee. The principal focus of the negotiation efforts was to substitute copies of memoranda prepared by the FBI for the leased line letters. These memoranda describe the facts and circumstances relevant to the requested surveillance, and provide the basic information considered by the Attorney General in making his decision.

The general concept of such a substitution served the interests of both sides. One of the principal concerns underlying the congressional investigation was whether the wiretaps had been restricted to foreign intelligence matters or activities or whether some of the taps had been used for domestic purposes. The letters themselves contained no information concerning the background or activities of the person whose telephone had been tapped or why those activities qualified him—or failed to qualify him—as a legitimate foreign intelligence surveillance target.[13] By contrast, the backup memoranda would reveal to the subcommittee the circumstances and considerations that justified the surveillance. The executive branch also preferred to release the memoranda (with certain deletions to prevent identification of the specific targets) rather than the letters themselves. Release of the letters would increase the number of people having access to information that could identify every foreign intelligence target under United States surveillance since 1969.

Through a series of negotiations lasting nearly a month, agreement was reached on some, but not all points. It was agreed that AT&T would provide to the subcommittee, and the subcommittee in turn would provide to the FBI, a list of the dates of the leased line letters. From these dates, the FBI would identify the letters that pertained exclusively to domestic surveillances,[14] and the backup memoranda pertaining to domestic surveillances would be supplied with only such minor deletions as were neces-

---

policy with respect to national security "taps" or "provision of facilities" to law enforcement or intelligence agencies, covering the last 10 years.

United States v. AT&T, 419 F. Supp. 454, 455-56 (D.D.C.), *modified,* 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

13. It would be theoretically possible, of course, for the subcommittee to conduct its own investigation to determine whether a tap on a particular telephone was for legitimate foreign intelligence, but there is no suggestion that the subcommittee proposed, or felt itself qualified, to carry out that kind of highly secret and sensitive investigation.

14. Leased line letters in this category would be limited to those that occurred between 1969, when the leased line letter procedure began, and June 19, 1972, the date of the *Keith* decision. *See* note 7 *supra.*

sary to shield particularly sensitive ongoing investigations. With regard to foreign intelligence surveillances, the subcommittee would select a random sample of the backup memoranda for two selected years, 1972 and 1975. The FBI would make copies of these sample memoranda, substituting generic classifications or descriptions[15] for any information that might identify targets or sources. The subcommittee would then have access to the edited memoranda at the FBI.

The irreconcilable point of difference was the subcommittee's view that in order to verify the integrity of the expurgating process, the subcommittee would need to compare a subsample of the edited backup memoranda with unexpurgated originals. The subcommittee proposed that three representatives be allowed to compare the original and edited memoranda at the FBI, and that they be permitted to take their notes back to the subcommittee. The executive branch opposed this plan principally because the notes, if allowed to leave the FBI, would become subcommittee records, subject to examination by any House member under House Rule XI § 2(e)(2).[16]

On July 22, after nearly a month of negotiations and one day prior to the July 23 subpoena compliance date, the executive branch filed suit against AT&T to obtain a temporary restraining order.[17] At the temporary restraining order hearing, Congressman John Moss, chairman of the subcommittee, presented a motion to intervene which the court granted. After argument, the court issued an order restraining AT&T from releasing the letters.

---

15. For example, the term "Middle East Diplomat" might be substituted for the target's name.

16. Rule XI § 2(e)(2) provides: "All committee hearings, records, data, charts, and files shall be kept separate and distinct from the congressional office records of the member serving as chairman of the committee; and such records shall be the property of the House and all Members of the House shall have access thereto." W. BROWN, MANUAL AND RULES OF THE HOUSE OF REPRESENTATIVES, H.R. DOC. No. 416, 93d Cong., 2d Sess. 420 (1975).

17. At the same time, the President sent a letter to Congressman Staggers, chairman of the full Committee on Interstate and Foreign Commerce, who had signed the subpoena. The letter constituted an invocation of executive privilege. It advised the chairman:

> I have determined that compliance with the subpoena would involve unacceptable risks of disclosure of extremely sensitive foreign intelligence and counterintelligence information and would be detrimental to the national defense and foreign policy of the United States and damaging to the national security. Compliance with the Committee's subpoena would, therefore, be contrary to the public interest.

United States v. AT&T, 419 F. Supp. 454, 458 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion) (quoting letter from Gerald R. Ford to Harley O. Staggers (July 22, 1976)).

Eight days later the district court rendered final judgment for the executive branch.[18]

The court observed that the case involved an assertion of executive privilege having an effect on Congress' powers of speech or debate under *Eastland v. United States Servicemen's Fund*,[19] but rejected the position taken by Congressman Moss that the legislative authority to investigate is absolute. In the district court's view, "the power of one coordinate branch of government must be balanced against that of the other. Neither can be considered in a vacuum."[20] The district court concluded not only that "[t]he helpfulness of the national security request letters in determining the basis on which the wire taps were instituted is minimal," but also that "the President has determined that release of the material would present an unacceptable risk of disclosure of the most sensitive national security and foreign policy matters." Because "[s]uch a determination by the Executive is generally accorded great deference by the courts,"[21] judgment was rendered for the executive and a permanent injunction issued.

The Court of Appeals for the District of Columbia Circuit[22] took a different approach. After holding that there was federal jurisdiction to consider the case under 28 U.S.C. § 1331,[23] the court held that it need not decide whether the case was moot,[24] whether it presented a nonjusticiable political question,[25] or how it should resolve the "patently conflicting assertions of absolute authority."[26] Following its earlier precedent in *Nixon v. Sirica*,[27]

---

18. United States v. AT&T, 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

19. 421 U.S. 491 (1975).

20. 419 F. Supp. at 459.

21. *Id.* at 460.

22. United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

23. Section 1331 grants jurisdiction over cases arising under the Constitution, laws, or treaties of the United States, wherein the amount in controversy exceeds $10,000. 28 U.S.C. § 1331(a) (1970). The court found a federal question in the executive's claim that "its constitutional powers with respect to national security and foreign affairs included the right to prevent transmission of the request letters to Congress." 551 F.2d at 389. The $10,000 requirement was satisfied by the court's conclusion that "far more than $10,000 would be required to repair [the] damage" which would result from disclosure, such as "disruption of diplomatic relations and of our intelligence and counterintelligence programs, including possible danger to the lives of counterintelligence sources." *Id.*

24. 551 F.2d at 390. The subpoena would have expired with the adjournment of the House, since the House, unlike the Senate, is not a continuing body. Eastland v. United States Servicemen's Fund, 421 U.S. 491, 512 (1975).

25. 551 F.2d at 390-91. The court did face this issue in its second opinion. *See* notes 126-29 and accompanying text *infra*.

26. 551 F.2d at 391-92.

27. 487 F.2d 700 (D.C. Cir. 1973).

the court held that issues of such magnitude involving the constitutional powers of its sister branches should not be judicially resolved until every opportunity for a negotiated settlement had been exhausted, especially since (at least in the court's view) the parties had already come so close to reaching a settlement.[28] While observing that "[i]t would be the function of the parties to propose the structure and its details," the court suggested in some detail how the parties might proceed.[29] The court of appeals ordered the district court "to report to us concerning the progress of these negotiations within three months of the date of this opinion, unless the executive and congressional parties jointly ask for an extension or report an earlier impasse."[30]

Negotiations pursuant to the court of appeals' first opinion and order extended over a period of two months, culminating in a final offer by the Justice Department closely approximating the suggestions contained in the court of appeals' opinion. The subcommittee found this proposal unacceptable.

When the case came back before the court of appeals for the second time,[31] that court held the controversy justiciable and rejected the claims of both parties that their respective substantive positions were entitled to absolute constitutional protection. The court declined, however, to render a final judgment in favor of either side. Adhering to the fundamental premise of its earlier opinion that, to the maximum extent possible, the conflict should be resolved by negotiation between the article I and article II branches rather than by decree from the article III branch, the court elected "to continue our approach of gradualism."[32] The court ordered that the parties experiment with the following procedure: Members of the subcommittee staff would be allowed to examine a sample of ten unexpurgated memoranda, and would be allowed to take notes. The notes, however, would remain under

---

28. "There was almost a settlement in 1976. It may well be attainable in 1977." 551 F.2d at 394. Earlier the court had observed: "It is an additional, if fortuitous, advantage that under our decision, negotiations can be conducted not only by a new House but by a new President." *Id.* at 390.

29. *Id.* at 395 n.18. The suggestion of the court was that a small number of congressional staff investigators be given access to a subsample of the unexpurgated backup memoranda. The President would be allowed to certify the investigators' security clearance, and the investigators' notes would be held under seal and not revealed unless there was a claim that there were discrepancies between the original and edited memoranda. That claim would be submitted to the district court, which would base its decision on an in camera comparison of both sets of memoranda and the investigators' sealed notes.

30. *Id.* at 395.

31. 567 F.2d 121 (D.C. Cir. 1977).

32. *Id.* at 131.

seal with the FBI. If inaccuracies were found, the subcommittee could take its claim to the district court, where the memoranda would be examined in camera. The executive would be allowed to make substitutions, but only upon an in camera showing that the memoranda were accurately edited and that the contents were extraordinarily sensitive. While this procedure was being carried out, the subcommittee was to have access to all memoranda for the sample years (1972 and 1975) in edited form.[33]

Thus, on the delicate and difficult ultimate issue in the case—accommodating the competing constitutional needs of two sister branches, and declaring a winner—commonsense practicality once again prevailed over traditional judicial form. In its second opinion as in its first, the court of appeals used the power and authority of the federal judiciary not to settle the dispute between the other two branches, but rather to intensify the incentive and the pressure on these branches to settle the dispute themselves. The theoretical and practical strengths of this approach are discussed in Section III, Subsection C of this Article.

### B. Implications of the Controversy

The court of appeals in its first opinion expressed the view that "[t]he negotiations came close to success."[34] In one sense this is a correct statement. The information at issue—targets and sources contained in a subsample of original memoranda—constituted only a very small portion of the total information in the memoranda, viewed either from the standpoint of word count or substantive content.

From another vantage point, however, the disagreement over verification represented nothing less than a head-on conflict between the fundamental authority and responsibility of the article I and article II branches: congressional powers of investigation versus Presidential responsibility for preservation of foreign intelligence secrets. Chairman Moss insisted that the subcommittee's rights of investigation, as interpreted by the Supreme Court in *Eastland*, were absolute and that the subcommittee could not discharge its responsibility without verifying, at least on a sample basis, (1) that there were in fact original memoranda from which the expurgated copies had been made, and (2) the accuracy of the generic substitutes. The President, on the other hand, relied

---

33. *Id.* at 131-32.
34. 551 F.2d at 386.

upon *United States v. Nixon*[35] to his assertion that it was the executive's prerogative to decide whether sensitive intelligence information should be disclosed. From the executive's viewpoint, the proposed verification process raised the same concerns as did access to the leased line letters: identification of foreign intelligence surveillance targets. Though the problem was susceptible to resolution through negotiation, neither was willing to trust the other. Chairman Moss would not accept the President's assurance that no domestic surveillances were involved, and the President was unwilling to run the risk that out of 435 members of Congress having access to the information, not one would disclose it.[36] Thus, each side was in the unaccustomed position of having one of its constitutional responsibilities in a face-off with an equally clear constitutional responsibility of another branch. Accordingly, the prerequisite to a negotiated settlement was a concession by one branch of part of its constitutional authority to the corresponding benefit of the other branch.[37]

During the negotiations the dispute had centered around the allocation of authority between two branches of government. But once the suit was filed, the conflict expanded to embrace the authority of the article III branch as well. In the initial district court proceedings, counsel for Chairman Moss took the position that the court's restraining order would have no effect on Congress and that article I gave Congress exclusive jurisdiction over all aspects of the matter.[38] On the day following the temporary

---

35. 418 U.S. 683 (1974).

36. The court of appeals observed that such release could be forbidden either by the subcommittee, the committee, or the full House. 551 F.2d at 386. Any individual member of Congress, however, may publicize even the most sensitive information, and so long as he does so within the scope of congressional activity covered by the speech or debate clause—such as floor debate or committee hearings—that clause immunizes him from any civil or criminal consequences from such publication. Gravel v. United States, 408 U.S. 606 (1972).

37. An objective examiner of the record in *United States v. AT&T* might conclude that just such a concession was in fact made by the President and rejected by Chairman Moss. There was an offer to permit the chairman himself to compare the expurgated copies with the original documents from which they were copied. Joint Appendix, *supra* note 9, at 145-48. This might be viewed as effectively resolving the standoff in favor of the legislative branch. Nevertheless, the chairman rejected this offer. In his view the subcommittee had a right of access to the information, and the expurgated-copy-with-verification procedure was itself a compromise. Particularly significant in the chairman's view was the fact that "[w]e have been advised by the Federal Bureau of Investigation that at least 14 Executive Branch officials and staff have routine access to these documents, and an unknown number of additional staff have access on a 'need-to-know' basis." Joint Appendix, *supra* note 9, at 148 (letter from Chairman Moss to Assistant Attorney General Rex E. Lee).

38. At the outset of his argument at the temporary restraining order hearing, counsel for the subcommittee stated: "The issue is, I don't think your Honor with due respect,

restraining order hearing, however, the subcommittee elected not to enforce its subpoena and thus avoided placing AT&T in the difficult position of having to choose between being held in contempt of court or contempt of Congress.[39]

*United States v. AT&T* marks the second time in history that a case involving an assertion of executive privilege against a congressional subpoena has reached the federal court of appeals level.[40] It is the first such case where the purpose of the executive privilege assertion was to protect foreign intelligence secrets. In light of the holding in *United States v. Nixon*[41] that executive

---

with all due respect to Your Honor and to the Court, I don't think you have jurisdiction to block Article I of the Constitution where we have, where the Subcommittee has clear jurisdiction." Transcript of Oral Argument, Motion for Temporary Restraining Order at 20, United States v. AT&T, 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

The following colloquy occurred at the time the district court judge indicated that he would grant a temporary restraining order:

> THE COURT:  I am going to grant a TRO.
> MR. LEMOV:  That won't affect the Congress.
> THE COURT:  All Right.
> MR. LEMOV:  I am sorry, Your Honor.
> THE COURT:  All right. I am glad to know the position of your constituents.
> MR. LEMOV:  Our position is that Article One is self sufficient and it is not—
> THE COURT:  In other words, you are going to flaunt the TRO, is that it?
> MR. LEMOV:  I would not say we are going to flaunt the TRO. It is—
> THE COURT:  Well, what did you say?
> MR. LEMOV:  I would say that the TRO would not bind the Congress in the exercise of its legislative powers, but I would refer that matter to our Subcommittee.
> THE COURT:  Yes.
> MR. LEMOV:  To make that decision.

*Id.* at 29.

39.  The occasion was a subcommittee hearing held at the appointed time for compliance with the subpoena, Friday, July 23. The witnesses at the hearing were AT&T officials. Chairman Moss reiterated the view stated the evening before by his counsel that the courts had no authority to enjoin compliance with a properly issued congressional subpoena. Nevertheless, he announced that he would not precipitate the issue by holding AT&T officials in contempt of Congress:

> MR. MOSS:  Well, the Chair recognizes the very difficult position American Telephone and Telegraph is placed in because of the actions of the court, which were taken late yesterday afternoon.
>
> While the Subcommittee or the Chairman, does not recognize that the court has a lawful authority to interfere with this committee, it recognizes that to pursue this matter at this moment would place AT&T between the very difficult choices of being in contempt of the House or in contempt of the court.

Joint Appendix, *supra* note 9, at 95.

40.  The first was Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974). *See* text accompanying notes 90-105 *infra*.

41.  418 U.S. 683 (1974).

privilege is constitutionally based, and the holding in *Eastland v. United States Servicemen's Fund*[42] one year later that at least some aspects of the issuance and enforcement of congressional subpoenas are included within the speech or debate immunity, issues raised by the confrontation between these two constitutionally based prerogatives are likely to be increasingly important in the future. In *AT&T*, and potentially in future cases, the scope of these competing congressional and executive prerogatives has an important bearing on the conflict between them. Two issues involved with the scope of these prerogatives are discussed in Section II.

## II.   SCOPE OF SPEECH OR DEBATE AND EXECUTIVE PRIVILEGE

The final issue with which this Article will deal concerns the standards by which federal courts should resolve conflicts between Congress' investigative powers and a Presidential assertion of executive privilege.[43] Before such standards can be delineated, however, the scope of the two competing powers and the constitutional anchorage of each must be explored. Accordingly, this Section will examine two problems. The first concerns the scope of the speech or debate clause as it relates to congressional investigations. The second involves the scope of the executive privilege doctrine when the information is in the hands of a private third party.

### A.   *Speech or Debate and Congressional Investigations*

Congress' investigative powers are not expressly authorized by the Constitution. The Supreme Court has long recognized, however, that they are so essential to the legislative function as to be implied by the general vesting of legislative power in Congress.[44] *Eastland v. United States Servicemen's Fund* contains

---

42. 421 U.S. 491 (1975).

43. Section V *infra.*

44. Watkins v. United States, 354 U.S. 178, 187 (1957); McGrain v. Daugherty, 273 U.S. 135, 174-75 (1927). The investigatory powers are not unlimited, however, and may be employed only "in aid of the legislative function." Kilbourn v. Thompson, 103 U.S. 168, 189 (1881). In addition, a congressional committee must show that it has been authorized to make the investigation and that the information sought is pertinent. Watkins v. United States, 354 U.S. at 201, 208-09. *Cf.* Barenblatt v. United States, 360 U.S. 109 (1959) (giving a much more liberal interpretation of the authorization requirement).

The protection afforded by the speech or debate clause has similar limitations in that it protects only those activities which fall within the "sphere of legitimate legislative activity." Tenney v. Brandhove, 341 U.S. 367, 376 (1951). *See* Doe v. McMillian, 412 U.S. 306 (1973) (clause did not bar suit against person who, with authorization from Congress,

arguable bases for an inference that the speech or debate clause, where applicable, affords an even larger measure of support for congressional investigative activity than are implied by Congress' general investigative powers.[45]

The speech or debate clause appears in the first paragraph of article I, section 6 of the Constitution. That paragraph provides:

> The Senators and Representatives Shall receive a Compensation for their services, to be ascertained by Law, and Paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

Both the context and also the language of the speech or debate clause imply that its fundamental purpose is to prevent the kind of interference with the discharge of congressional responsibilities that would result from Senators and Representatives being involuntarily involved in legal proceedings while Congress is in session.[46] The thrust of the clause is to protect members of the Congress (or their aides) from arrest or litigation *as defendants.* This

---

distributed allegedly injurious materials to the public rather than limiting distribution solely to legislative activities); Gravel v. United States, 408 U.S. 606 (1972) (clause would bar questioning of congressional aide, but would not preclude an inquiry into alleged arrangements for the private publication of the Pentagon Papers); United States v. Brewster, 408 U.S. 501 (1972) (clause did not bar prosecution for acceptance of a bribe).

45. One of these inferential bases is provided by Justice Marshall's concurring opinion, analyzed in this Section. Another is the Court's distinction of its earlier holdings in Watkins v. United States, 354 U.S. 178 (1957), and Barenblatt v. United States, 360 U.S. 109 (1959). *See* note 51 *infra.* A third is the bare fact that the Court decided the case under the speech or debate clause. Whether speech or debate extends to congressional investigative activities other than the issuance and enforcement of subpoenas, and whether those components of congressional investigations that are included within speech or debate (assuming there is a difference) enjoy greater constitutional protection, are questions outside the reach of this Article. For reasons discussed in Section V, the controlling consideration for present purposes is the fact that Congress' investigative powers which come into confrontation with assertions of executive privilege are constitutionally based.

46. Powell v. McCormack, 395 U.S. 486, 505 (1969). *See also* Dombrowski v. Eastland, 387 U.S. 82, 84-85 (1967); Tenney v. Brandhove, 341 U.S. 367, 377 (1951) (same immunity accorded state legislators); LIBRARY OF CONGRESS, THE CONSTITUTION OF THE UNITED STATES OF AMERICA, ANALYSIS AND INTERPRETATION, S. DOC. No. 82, 92d Cong., 2d Sess. 117-20 (1973). For a detailed history of the speech or debate clause, see Reinstein & Silvergate, *Legislative Privilege and the Separation of Powers,* 86 HARV. L. REV. 1113 (1973). For a complete discussion of all Supreme Court decisions regarding the clause, see Suarez, *Congressional Immunity: A Criticism of Existing Distinctions and a Proposal for a New Definitional Approach,* 20 VILL. L. REV. 97 (1974).

is the only application of speech or debate that has ever been made by Supreme Court holdings.

In *Eastland* the Court held that the speech or debate clause precluded a federal court from enjoining the issuance of a congressional subpoena duces tecum directing a bank to produce records of an organization, notwithstanding the Court's apparent acceptance of the argument that the disclosure of such records would infringe upon the plaintiff's first amendment rights of association.[47] An issue left unresolved by *Eastland* is whether speech or debate protection is applicable in those cases where no congressional person or entity is named as a defendant. Alternatively stated, the issue is whether speech or debate creates only an immunity from suit for Congressmen and their aides, or whether it constitutes a positive constitutional guarantee that can be asserted either defensively or affirmatively. The issue is present in cases involving an assertion of executive privilege where the executive branch can simply refuse to disclose information in its possession, thus forcing Congress to go to court as a plaintiff to enforce its subpoena. The issue also arises in the *AT&T* situation since the executive branch can achieve its nondisclosure objective through a judicial decree that runs only to noncongressional parties to the litigation, thus forcing Congress into the role of intervenor.

Although the issue was not raised in *Eastland,* some support can be found in that case for the proposition that speech or debate protects all congressional investigations from judicial interference.[48] Rather than resting the decision upon the simple fact that

---

47. *Eastland* involved a subpoena issued by the Senate Subcommittee on Internal Security. The subcommittee was investigating the activities of the United States Servicemen's Fund (USSF) and, pursuant to that investigation, issued a subpoena to the bank where USSF had an account, commanding the bank to produce " 'any records appertaining to or involving the account or accounts of [USSF].' " 421 U.S. at 494. USSF and its members brought suit to enjoin implementation of the subpoena. Named as defendants were Subcommittee Chairman Eastland, nine other Senators, the subcommittee's chief counsel, and the bank. *Id.* at 495. The bank did not participate in the action. *Id.* at 495 n.5.

48. The issue would have been raised in *Eastland* if the suit had been pursued exclusively against the bank. (Although the bank was named as a defendant, it did not participate in the action—apparently because it was never served. *Id.* at 494-95 nn.4 & 5.) Although the majority opinion does not deal with the issue, the theoretical complications from the presence of the bank—a nongovernmental entity—as a defendant in the case were the focus of some concern at the oral argument. During the rebuttal argument, the Court persisted in questioning Mr. Miller, attorney for the subcommittee and Senator Eastland, concerning the nonavailability of the speech or debate immunity to the bank, until it finally extracted from him the following concession:

MR. MILLER:  The Court of Appeals decision authorizes a judgment

the decree in that case ran only to Senators and their aides, the Court emphasized the disruption and delay of the legislative process occasioned by judicial review. At one point the Court stated:

> This case illustrates vividly the harm that judicial interference may cause. A legislative inquiry has been frustrated for nearly five years, during which the Members and their aide have been obliged to devote time to consultation with their counsel concerning the litigation, and have been distracted from the purpose of their inquiry. The Clause was written to prevent the need to be confronted by such "questioning" and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority.[49]

Also instructive is the Court's approach to the issue in *Eastland.* As the Court framed the issue, "[t]he question to be resolved is whether the actions of [Congress] fall within the 'sphere of legitimate legislative activity.' If they do, [Congress] 'shall not be questioned in any other Place' about those activities since the prohibitions of the Speech or Debate Clause are absolute . . . ."[50] The significance of these two sentences, is of course, their confinement of the relevant issues in the case to the scope of the speech or debate clause. The Court found that the power to investigate and the subpoena power plainly fell within the "legitimate legislative sphere" protected by speech or debate. Having found that, the Court refused to balance the speech or debate interests against the plaintiff's countervailing first amendment claim.[51]

---

against the Senators. And if I say so myself, it would be the only time, to my knowledge, that any such type—

QUESTION: But if we should reverse that, Mr. Miller, there will still be, in this lawsuit, something that involves the banks?

MR. MILLER: The banks are, as I understand it, are still defendants, and—

QUESTION: So even if you win, this lawsuit is not completely over?

MR. MILLER: I assume that they could still proceed against the banks, to—the banks are defendants unless—

QUESTION: And if they do in that circumstance, your victory on the Speech or Debate Clause will not assist the banks any, in their defense of the lawsuit.

MR. MILLER: I would think not, Your Honor. I would think not.

Joint Appendix, *supra* note 9, at 68-68a.

49. 421 U.S. at 511 (footnote omitted).

50. *Id.* at 501 (footnote omitted).

51. The Court recognized that in two earlier opinions, Watkins v. United States, 354 U.S. 178, 198 (1957), and Barenblatt v. United States, 360 U.S. 109, 126 (1959), first amendment rights had been balanced against congressional investigatory power. Those cases were distinguishable, however, because they were criminal prosecutions, wherein the

On the other hand, Justice Marshall's concurring opinion in *Eastland* (joined by Justices Brennan and Stewart) contains language that appears squarely supportive of the view that the speech or debate clause provides immunity only in suits against Congressmen or their aides. The following excerpts are illustrative:

> As our cases have consistently held, . . . the Speech or Debate Clause protects legislators and their confidential aides from suit; it does not immunize congressional action from judicial review.[52]

> [T]he protection of the Speech or Debate Clause is personal. It extends to Members and their counsel acting in a legislative capacity; it does not preclude judicial review of their decisions in an appropriate case, whether they take the form of legislation or a subpoena.[53]

> Our prior cases arising under the Speech or Debate Clause indicate that only a Member of Congress or his aide may not be called upon to defend a subpoena against constitutional objection, and not that the objection will not be heard at all.[54]

The language cited above, taken either alone or in context,[55]

---

defendants asserted their first amendment rights to justify their refusals to answer congressional inquiries, and thus Congress had sought the aid of the judiciary in enforcing its will. *Eastland,* on the other hand, was "an attempt to interfere with an ongoing activity by Congress, and that activity is . . . within the legitimate legislative sphere"; thus balancing would not be applied. 421 U.S. at 509 n.16. Another commentator suggests that the import of *Eastland* "is not simply that particular defendants were immune from suit, but rather that pre-enforcement review of a congressional subpoena may not be available at all." *The Supreme Court, 1974 Term,* 89 HARV. L. REV. 47, 136 (1975) (footnote omitted).

52. 421 U.S. at 513 (Marshall, J., concurring).

53. *Id.* at 515.

54. *Id.* at 516.

There may be another explanation for the apparent neatness with which these and other excerpts from Justice Marshall's concurrence fit the argument that the speech or debate immunity applies only where Congressmen or their aides are the actual defendants. The peculiar problem in *Eastland* was that the persons whose first amendment rights were allegedly threatened did not have custody over the documents whose disclosure would constitute the alleged invasion of first amendment interests. As a consequence, the usual procedure for challenging a subpoena on constitutional grounds—refusal to comply followed by litigation of the legal issues in the enforcement proceeding—was not available to the United States Servicemen's Fund, "since a neutral third party could not be expected to resist the subpoena by placing itself in contempt." *Id.* at 514. Thus, it may be that the purpose of Justice Marshall's concurrence in *Eastland* was simply to emphasize that, notwithstanding the absolute nature of the speech or debate guarantee, it was proper for the district court to entertain the suit brought by the servicemen's fund. Because the fund was not subject to the subpoena it could not assert its constitutional interests in the customary way, by resisting compliance.

55. Particularly if that context includes the concession extracted from counsel for the

implies that at least three members of the United States Supreme Court have concluded that the speech or debate clause provides only immunity from suit to Congressmen and their aides. While Justice Marshall's opinion stops short of an assertion that the speech or debate clause would be unavailing in a suit where the only relief sought was an injunction against a private party, that is its necessary import. The opinion recognizes and approves the absolute nature of the speech or debate guarantee which, where applicable, puts an end to judicial inquiry. It also approves the district court's entertaining the suit under the peculiar procedural posture of that case. But both of these propositions were also recognized by the majority, and Mr. Justice Marshall's concurrence appears to be written for the principal purpose of expressing a view on an issue that is not covered by the majority opinion.

The issue whether the speech or debate clause guarantees only an immunity for members of Congress and their aides when they are joined as defendants in litigation, or whether it constitutes an affirmative grant of power, was raised in *United States v. AT&T* because the documents at issue were in the possession of a private party, and disclosure could be enjoined without naming a member of Congress or congressional aide as a defendant.

In its brief in *AT&T* the executive argued:

> Both by its express language and by Supreme Court interpretation, the Speech or Debate Clause creates nothing more than an immunity of Congress in actions *against them*. It is not a tool that Congress may use to prevent judicial determination of Constitutional issues. It is a defense to either criminal or civil liability and available only to members of Congress and their aides. It cannot be asserted for the benefit of private parties or entities, either by those private parties, or by members of Congress.[56]

The district court rejected the executive's position:

> The plaintiff has taken the position that this action should be considered one seeking solely to restrain a private entity, AT&T, from releasing documents in its possession. In this way, plaintiff argues, the Court need not consider the applicability of the Speech or Debate Clause, since the immunity of that constitutional provision runs only to members of Congress and their

---

subcommittee at oral argument—*see* note 48 *supra*.

56. Brief for Plaintiff-Appellee at 50-51, United States v. AT&T, 419 F. Supp. 454 (D.D.C.), *modified*, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

close aides when defending against a lawsuit, and does not afford any protection to a private entity such as AT&T. This argument is advanced so that the Court can avoid dealing with a constitutional confrontation between two of the three branches of our Government. But to take this avenue would be to place form over substance. The effect of any injunction entered by this Court enjoining the release of materials by AT&T to the Subcommittee would have the same effect as if this Court were to quash the Subcommittee's subpoena. In this sense the action is one against the power of the Subcommittee and should be treated as such, assuming that Representative Moss has authority to speak for the Subcommittee.[57]

Neither of the court of appeals' opinions reached the ultimate issue on the merits, but the second opinion appears to agree with the executive branch on the *Eastland* issue.[58]

Justice Marshall's concurrence in *Eastland* and the court of appeals' opinion in *United States v. AT&T* notwithstanding, the speech or debate protection should not be limited to cases in which relief is sought against members of Congress and their aides. The reasons for this position can be best appreciated in connection with the somewhat comparable problem of the applicability of executive privilege to information outside the control of the government.

---

57. 419 F. Supp. at 458.

The reach of speech or debate immunity was not dispositive in *AT&T*. The district court held that even though speech or debate is not limited to suits against Congressmen or their aides, and even though *Eastland* imparted to speech or debate a potency that gives it absolute powers of infringement on first amendment rights, it does not necessarily follow that speech or debate powers are similarly absolute when pitted against the constitutionally based prerogatives of another branch. *Id.* at 459-61.

58. The court of appeals' second opinion states:

The fact that the Executive is not in a position to assert its claim of constitutional right by refusing to comply with a subpoena does not bar the challenge so long as members of the Subcommittee are not, themselves, made defendants in a suit to enjoin implementation of the subpoena. *See Eastland,* 421 U.S. at 513, . . . Justice Marshall concurring.

567 F.2d at 129. The court went on to say:

In sum, while this case is similar in several respects to the situation in *Eastland,* . . . for purposes of considering whether the Executive's claim is entitled to at least some judicial consideration, we emphasize that no member of the Subcommittee in the present dispute has been made a defendant in a judicial proceeding. The courts do not accept the concept that Congress' investigatory power is absolute. What the cases establish is that the immunity from judicial inquiry afforded by the Speech or Debate Clause is personal to members of Congress. Where they are not harassed by personal suit against them, the clause cannot be invoked to immunize the congressional subpoena from judicial scrutiny.

*Id.* at 130.

### B.  Executive Privilege: Applicability Where the Information Is Not in the Possession of the Government

One view of executive privilege is that it is a narrowly limited, strictly defensive doctrine, applicable only in circumstances where the executive branch declines to supply information in its possession. On the other hand, executive privilege may be viewed as an affirmative power to prevent disclosure of information whose disclosure would be harmful to the interests of government. In most circumstances, the difference in the two views is of no practical significance, because the information sought is in the executive's possession. This is not always the case, however. In order to carry out certain governmental functions the United States must enter into contracts with private companies and share with them highly secret information. Probably the most common example of this practice is in the manufacture of military equipment, which is frequently accomplished through contracts with private companies. Pursuant to such contracts, the government makes available to the private contractor design data, construction details, and other secret information. Another example is of course the line-leasing arrangement involved in *United State v. AT&T* which required the executive to share the location of its wiretapping activities with the telephone company. In these and other contexts, so long as the government elects not to go into the business of running the nation's telephone service, or building its own national defense hardware, it must enter into contractual arrangements with private entities and often share highly secret information with them. Is that information—which originated from the government, and which would not be in the possession of the private entity but for the governmental function performed by that entity—subject to executive privilege?

The limited judicial authority on this question would appear to answer it in the affirmative. Although the only case squarely on point is *United States v. AT&T,* and none of the opinions in that case discusses the issue, the district court held in favor of the executive. Additionally, the court of appeals' second opinion appears to rest on the premise that the invocation of executive privilege is not impeded by the fact that the information is in nongovernmental possession. And, two earlier cases have implied an affirmative executive privilege to restrain third-party disclosures.

In *E.W. Bliss Co. v. United States,*[59] the Supreme Court

---

59. 248 U.S. 37 (1918).

affirmed an order enjoining a government contractor "from exhibiting or communicating the construction and operation of a torpedo known as the Bliss-Leavitt torpedo."[60] The government in the *Bliss* case was enforcing an explicit contract, but the Supreme Court quoted with approval this observation of the lower court:

> Throughout the entire record, in the contracts, correspondence and dealings of the parties, the importance of secrecy is everywhere manifest. *The nature of the services rendered was such that secrecy might almost be implied. It is difficult to imagine a nation giving to one of its citizens contracts to manufacture implements necessary to the national defense and permitting that citizen to disclose the construction of such implement or sell it to another nation.* The very nature of the service makes the construction urged by the defendant untenable.[61]

Similarly, in *United States v. Marchetti,*[62] the Fourth Circuit Court of Appeals upheld an injunctive order against a former CIA official enforcing an agreement not to publish certain information concerning the Central Intelligence Agency.[63] It would thus appear that executive privilege can be used affirmatively to prevent the disclosure of sensitive information in the hands of third parties.

There are similarities between this issue and the issue discussed in Subsection A of this Section, the scope of the speech or debate clause as it relates to congressional investigations. In both instances the issue is raised in cases where a nongovernmental third party is involved: In the speech or debate cases, the private party (rather than Congress) is the potential defendant in a suit

---

60. *Id.* at 39.

61. *Id.* at 46 (emphasis added).

62. 466 F.2d 1309 (4th Cir.), *cert. denied,* 409 U.S. 1063 (1972).

63. The court stated:

[T]he agency requires its employees as a condition of employment to sign a secrecy agreement, and such agreements are entirely appropriate to a program in implementation of the congressional direction of secrecy. Marchetti, of course, could have refused to sign, but then he would have not been employed, and he would not have been given access to the classified information he may now want to broadcast.

Confidentiality inheres in the situation and the relationship of the parties. *Since information highly sensitive to the conduct of foreign affairs and the national defense was involved, the law would probably imply a secrecy agreement had there been no formally expressed agreement,* but it certainly lends a high degree of reasonableness to the contract in its protection of classified information from unauthorized disclosure.

*Id.* at 1316 (emphasis added).

to prevent compliance with the congressional subpoena—the bank in *Eastland,* the telephone company in *AT&T.* In the executive privilege context, the private party (rather than the President) is the one in possession of the information whose disclosure an assertion of executive privilege seeks to prevent. In both settings the question is whether the doctrines are limited to defensive uses, relieving the particular branch from the necessity of taking action that it views as undesirable, or whether the doctrines can also be used to require action or forbearance on the part of someone else. The most important similarity is that in each case the fundamental issue is whether the reach of a constitutionally based doctrine central to the operation of one of the branches of government should be determined by conceptual considerations or by the policy on which the doctrine is founded.

With both speech or debate and executive privilege, the arguments for a narrow interpretation are largely conceptual. In the case of executive privilege, the premise concept is a privilege to refrain from divulging information within one's own control. In the case of speech or debate, the premise concept is an immunity against being joined as a defendant in a lawsuit. On the other hand, policy considerations in both cases eschew a restrictive view. A basic purpose of executive privilege is to permit the President to withhold information whose dissemination, in his considered view, would be sufficiently detrimental to the public interest that such extraordinary action as assertion of executive privilege is warranted. Physical possession of the information is irrelevant to the considerations that the President takes into account. This does not mean that the President can prevent the disclosure of any information in the possession of any private person or entity upon a determination by him that its disclosure would be detrimental to the national interest. Certainly the President could not prevent a private corporation from disclosing information whose existence and development were unrelated to government, no matter how detrimental to governmental interests the disclosure might be. But in cases such as *Bliss, Marchetti,* and *AT&T,* the information came from the government, the only reason that the information is in the possession of the private party is because it is essential to the performance by that private party of a governmental function, and but for the performance of that essential governmental function the information would never have been supplied. In that kind of case the President should have the same power to prevent disclosure as if the information were in the

possession of one of his subordinates.[64]

Similar policy considerations apply in delineating the scope of the speech or debate clause. The applicability of that constitutional guarantee to congressional investigations should not turn on the fortuity of whether Congress participates in the litigation as plaintiff, defendant, or intervenor. While it is true that in *Eastland* the congressional litigants were defendants, it is also true that the impact on congressional activity (and therefore on speech or debate) will be the same when the executive can prevent third parties from disclosing, without naming Congress as a defendant, as in *AT&T*. Thus, the district court in *AT&T* was correct in concluding that to draw a distinction between members of Congress (or their aides) as defendants and as intervenors "would be to place form over substance."[65]

For these policy reasons, the applicability of either executive privilege or speech or debate should not be foreclosed in those cases where the documents or other information are in the possession of a private party or where the congressional entity participates in the litigation as plaintiff or intervenor. In considering the conflicting interests of the two doctrines, as discussed in Section V, the courts should afford a generous interpretation that will give full effect to the underlying purpose of each.

In fact, however, very few executive privilege-congressional subpoena cases have reached the courts. One of the reasons is that there are significant roadblocks—constitutional and otherwise—to each of the avenues by which such disputes can reach the courts. Some of the problems attendant upon bringing executive privilege-congressional subpoena problems before the courts constitute the subject of Sections III and IV.

---

64. During the early stages of the AT&T litigation, the government relied on an agency theory. The complaint squarely alleged that "defendant AT&T has participated as an agent of the United States in effectuating certain national security investigations." Joint Appendix, *supra* note 9, at 16-17. The agency argument was not pursued beyond the pleading stage, and the agency analogy is not very helpful. Whether an agency relationship exists or not is simply irrelevant to the competing interests on both sides of the information disclosure issue. Mr. Marchetti was quite clearly an agent of the CIA and of the United States. The Bliss Company, at least for purposes of torpedo manufacture, was an agent of the United States. AT&T's agency is more questionable. But the important point is that focusing on the agency issue diverts attention away from the relevant issues, the involvement of the government in the creation of the information, and whether the government as a matter of public interest and constitutional doctrine should be able to prevent its disclosure.

65. 419 F. Supp. at 458.

### III.  CONGRESSIONAL ENFORCEMENT POWERS IN EXECUTIVE PRIVILEGE CASES

The typical executive privilege-congressional subpoena conflict arises because the executive has determined not to give information to the Congress. The conflict is usually resolved either by negotiation or by eventual abandonment of the attempt to obtain the information. In a small number of cases, however, a negotiated settlement will not be possible. Since the executive usually has possession of the documents, the next move is up to Congress. There are there three procedures available to Congress to implement its investigatory objective:[66] (1) direct punishment for contempt by the appropriate House of Congress; (2) criminal prosecution by the appropriate United States Attorney under 2 U.S.C. § 194; or (3) a civil suit to enforce the subpoena. Each of these alternatives presents separate but significant hurdles.

### A.  Direct Punishment for Contempt

Although the Constitution does not expressly confer upon Congress the power to punish for contempt,[67] Congress' power to do so was early established by Congress itself[68] and also by the Supreme Court. In *Anderson v. Dunn* the Court held that to deny

---

66. Of course Congress has indirect means available for enforcing its will. It can cut off funds or attempt to impeach the President for failure to respond to its wishes. Even an appropriation cutoff, however, is not always successful, as demonstrated by President Eisenhower's response to a cutoff of foreign aid funds because the executive failed to reveal information. Eisenhower simply instructed the Secretary of the Treasury to disregard the cutoff and to draw on federal funds to make the payments. *See* R. BERGER, EXECUTIVE PRIVILEGE: A CONSTITUTIONAL MYTH 306 (1974); C. MOLLENHOFF, WASHINGTON COVER-UP 173-74 (1962).

67. Article I, § 5 of the Constitution deals with such internal affairs as the authority of each House to judge the elections, returns, and qualifications of its members, the constitution of a quorum to do business, compelling the attendance of absent members, punishing members for disorderly behavior, expulsion of members, and adjournment; but it says nothing about punishment for contempt.

68. The first attempt by Congress to respond in an official way to contumacious conduct occurred in 1795. It arose out of an alleged bribery of certain members of the House by Robert Randall and his chief associate, Charles Whitney. Under authority of a warrant signed by the Speaker of the House, Randall and Whitney were arrested and appeared before the bar of the House. Their request to be represented by counsel and for time to prepare a defense was granted, and the full House considered both direct and cross-examination testimony. At the conclusion of the hearing, the House adopted a resolution declaring Randall guilty of contempt, resulting in a reprimand by the Speaker and commitment to the custody of the Sergeant at Arms. He was finally discharged a week later. The Randall-Whitney case is recorded in 5 ANNALS OF CONG. 166-230 (1795). *See* C. BECK, CONTEMPT OF CONGRESS 3, 191 app. (1959). A summary of the major contempt cases initiated between 1795 and 1943 and a list of all prosecutions from 1944 through 1958 are set forth in appendixes A and B of C. BECK, *supra*.

the legislature such powers would lead to "the total annihilation of the power of the House of Representatives to guard itself from contempts, and [leave] it exposed to every indignity and interruption that rudeness, caprice, or even conspiracy, may meditate against it."[69] The procedure basically involves a resolution by the affected House of Congress and the subsequent issuance of a warrant signed by its presiding officer. The alleged contemnor is then arrested by the Sergeant at Arms. The accused may be represented by counsel, and may be given time to prepare a defense. The entire House hears the testimony, both direct and cross-examination, and then adopts a resolution as to the guilt or innocence of the accused. If guilt is found, the resolution prescribes an appropriate punishment.[70]

Although the constitutionality of the direct contempt proceeding appears to be well established, there are several reasons why it is not the most appropriate vehicle for the enforcement of a congressional inquiry. There is something unseemly about a House of Congress getting into the business of trial and punishment. Congress is simply not geared to the determination of guilt or innocence or the meting out of punishment for improper conduct. Though the constitutionality of the direct contempt proceeding has been upheld, there is an uncomfortable similarity between the direct contempt proceeding and a bill of attainder. Both involve the legislative branch in determining whether certain conduct should be punished and what punishment is appropriate. It is true that access to the courts is ultimately available through a habeas corpus proceeding, but at least in the first instance it is a House of Congress that determines guilt and prescribes punishment. Moreover, in a case involving an assertion of executive privilege the alleged contemnor is usually a prominent officer of the executive branch. Use of the direct contempt proceeding in that setting might degrade not only the alleged contemnor, but also government in general, including Congress.[71]

---

69. Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 228 (1821). *See also Ex parte* Nugent, 18 F. Cas. 471 (C.C.D.D.C. 1848) (No. 10,375). Nugent had obtained and given to the *New York Herald* a copy of the secret treaty between the United States and Mexico. He was called to the bar of the Senate and sworn as a witness, but refused to answer questions concerning his publication. Imprisoned on order of the President of the Senate, Nugent applied, unsuccessfully, for a writ of habeas corpus.

70. *See* C. Beck, *supra* note 68, at 3-5, 191-95 app.

71. Some scholars evidently do not feel that this approach should be avoided.

This need not be regarded as unseemly or punitive but merely as the mechanism that opens the door to judicial review. Once the recalcitrant official is in Congress' custody he can obtain his freedom by filing a petition with a court for a

Finally, the direct contempt proceeding has been virtually replaced by criminal prosecution for contempt. No direct contempt proceeding has been brought since 1945.[72]

## B.   Criminal Prosecution for Contempt

Prior to 1857 the only means for punishing congressional contempt was the direct contempt procedure. In 1857 Congress established contempt as a statutory crime,[73] thus shifting to the courts the major responsibility for determining contempt. Over the intervening century, the 1857 statute has been modified, but its basic provisions have remained the same. The current version, 2 U.S.C. § 192, provides:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.[74]

---

writ of habeas corpus, which poses the issue of Congress' constitutional power to insist that the information be supplied.

R. Berger, *supra* note 66, at 310. *But see* Levi, *Some Aspects of Separation of Powers,* 76 Colum. L. Rev. 371, 390 (1976):

Either course [the direct contempt procedure or statutory prosecution under § 194] would be, at the least, unedifying, the more so when punishment rather than clarification is sought. It would be an attempt by one branch to assert its authority by imposing personal sanctions on officials who seek to perform their duty for another branch equal to the Congress in its responsibility to serve the people. This is neither the level of statesmanship which created our republic, nor is it justified by past abuses. Such an attempt would not rectify abuses; it would supplant them with new ones.

The one arguable advantage of the direct contempt procedure is that there are no barriers to getting the controversy into court. For reasons set forth in Subsection C, I do not regard as salutary the absence of such barriers. The principal disadvantage, discussed above, is that it vests in Congress the initial responsibility for determining guilt or innocence and for imposing punishment. Such functions do not mesh well with congressional structure or duties. The congressional role is to make general policy, not to determine individual wrongdoing. Congress' organization and institutional mind-set is oriented toward the achievement of the former, but not the latter.

72. C. Beck, *supra* note 68, at 7.

73. Act of Jan. 24, 1857, Ch. 19, 11 Stat. 155 (current version at 2 U.S.C. 192 (1970)).

74. 2 U.S.C. § 192 (1970).

Section 192 is a criminal statute. Therefore, in contrast to direct contempt procedures, which are the exclusive province of Congress, implementation of section 192 is the responsibility of the executive branch, carried out by enlisting the machinery of the judiciary. Whenever a violation of section 192 is reported to the appropriate House of Congress, 2 U.S.C. § 194 provides that the President of the Senate or Speaker of the House is to refer the matter "to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action."[75] The establishment of a statutory contempt proceeding did not diminish Congress' direct contempt power; it simply provided Congress with an alternative means of dealing with contempts.[76]

Use of the statutory contempt proceeding creates no particular separation of powers problem where the alleged contemnor is a private party. But it is a different case where the alleged contempt results from a government officer's refusal to give testimony or deliver documents on the ground that the information sought is subject to an assertion of executive privilege. Referring that kind of case to "the appropriate United States attorney," who by statute has an unqualified obligation to prosecute, places the Attorney General on the horns of a dilemma. One of the horns is statutory, the other ethical. The "appropriate United States attorney" is an officer of the Justice Department. His file leader is the Attorney General. By statute the conduct of litigation in which the United States is a party (which would of course include section 194 suits) is vested in the Attorney General.[77] Therefore, the command of section 194 to United States attorneys is also a command to the Attorney General. But, ethically, the Attorney General may not be able to obey that command. The assertion of executive privilege by the President is a weighty and solemn matter. Before taking such a step, it is virtually certain that the President will have conferred with his chief legal officer, the Attorney General; indeed, since 1969 this has been a formal requirement by presidential directive.[78] Having consulted the President

---

75. *Id.* § 194.

76. "[T]he purpose of the statute was merely to supplement the power of contempt by providing for additional punishment." Jurney v. MacCracken, 294 U.S. 125, 151 (1935).

77. 28 U.S.C. § 516 (1970).

78. In 1969 President Nixon issued the following memorandum:

The policy of this Administration is to comply to the fullest extent possible with Congressional requests for information. While the Executive branch has the responsibility of withholding certain information the disclosure of which would

about the assertion, the Attorney General could not then ethically bring an action against the President or one of the President's subordinate officers in connection with a matter on which the Attorney General earlier gave his advice as a lawyer.[79]

The statute, however, permits no exceptions: the case is certified to the United States attorney, "whose duty it shall be to bring the matter before the grand jury for its action."[80] Utilizing the statutory procedure in an executive privilege case would therefore force the nation's chief legal officer either to refuse to obey an unqualified statutory command or to bring a criminal prosecution against one whose sole criminal conduct consists of obedience to a Presidential order, in connection with which the

---

be incompatible with the public interest, this Administration will invoke this authority only in the most compelling circumstances and after a rigorous inquiry into the actual need for its exercise. For those reasons Executive privilege will not be used without specific Presidential approval. The following procedural steps will govern the invocation of Executive privilege:

1.   If the head of an Executive department or agency (hereafter referred to as "department head") believes that compliance with a request for information from a Congressional agency addressed to his department or agency raises a substantial question as to the need for invoking Executive privilege, he should consult the Attorney General through the Office of Legal Counsel of the Department of Justice.

2.   If the department head and the Attorney General agree, in accordance with the policy set forth above, that Executive privilege shall not be invoked in the circumstances, the information shall be released to the inquiring Congressional agency.

3.   If the department head and the Attorney General agree that the circumstances justify the invocation of Executive privilege, or if either of them believes that the issue should be submitted to the President, the matter shall be transmitted to the Counsel to the President, who will advise the department head of the President's decision.

4.   In the event of a Presidential decision to invoke Executive privilege, the department head should advise the Congressional agency that the claim of Executive privilege is being made with the specific approval of the President.

5.   Pending a final determination of the matter, the department head should request the Congressional agency to hold its demand for the information in abeyance until such determination can be made. Care shall be taken to indicate that the purpose of this request is to protect the privilege pending the determination, and that the request does not constitute a claim of privilege.

R. Nixon, Memorandum for the Heads of Executive Departments and Agencies: Establishing a Procedure to Govern Compliance with Congressional Demands for Information (Mar. 24, 1969).

79.  "A lawyer should never represent in litigation multiple clients with differing interests . . . ." ABA CODE OF PROFESSIONAL RESPONSIBILITY EC 5-15 (1975). "No one could conscionably contend that the same attorney may represent both the plaintiff and defendant in an adversary action." *Id.* n.19 (quoting Jedwabny v. Philadelphia Transportation Co., 390 Pa. 231, 235, 135 A.2d 252, 254 (1957), *cert. denied,* 355 U.S. 966 (1958)).

80.  2 U.S.C. § 194 (1970).

Attorney General was consulted, and whose issuance he probably counseled.[81]

Referring section 194 cases involving executive privilege to a special prosecutor would not solve the problem. A special prosecutor within the executive branch would have some of the same ethical problems discussed above. Vesting the enforcement of section 192 in a special prosecutor attached to Congress or the courts would raise other serious constitutional questions since the executive branch has exclusive authority and absolute discretion to decide whether to prosecute a case.[82]

A theoretically possible solution—though not an adequate one—might be to establish a special prosecutor with powers analogous to those of an independent regulatory agency, appointed by the President, but not subject to his removal powers. Currently, the conduct of litigation in which the United States is a

---

81. The dilemma implicit in statutorily mandating the Attorney General to criminally prosecute conduct which he has advised in his capacity as a governmental lawyer arose in 1975 when the problem approached the crisis stage in two cases involving members of the President's Cabinet.

The first case involved an assertion of executive privilege by Secretary Kissinger. The House Select Committee on Intelligence had subpoenaed "[a]ll documents relating to State Department recommending covert action made to the National Security Council and the Forty Committee and its predecessor committees from January 20, 1961, to the present." House Select Comm. on Intelligence, Report of the Select Committee on Intelligence Citing Henry A. Kissinger, H.R. Doc. No. 693, 94th Cong., 1st Sess. 5 (1975). President Ford asserted executive privilege as to these documents. The House Select Committee then recommended that the Speaker certify its report to the United States Attorney for the District of Columbia "to the end that Henry A. Kissinger, as Secretary of State, may be proceeded against in the manner and form provided by law." Id. at 2. In subsequent briefings the information was supplied to the committee, and as a result Chairman Pike reported to the House that "substantial compliance has been achieved" and by unanimous consent the committee's report recommending contempt proceedings was recommitted. 121 Cong. Rec. 39730 (1975).

The second case arose at about the same time. On Nov. 11, 1975, the Subcommittee on Oversight and Investigations of the House Interstate and Foreign Commerce Committee voted to recommend to the full committee that Secretary of Commerce Rogers Morton be cited for contempt for refusing to deliver to the subcommittee documents concerning compliance by American companies with the Arab boycott. Secretary Morton's position was not based on executive privilege, but was grounded in part on an opinion from the Attorney General that the subcommittee was not entitled to receive the reports in question unless, in exercising the discretion granted him by § 7(c) of the Export Administration Act, 50 U.S.C. app. § 2406(c) (1970), the Secretary determined that withholding them would be contrary to the national interest. Once again, crisis was averted through negotiation, this time on the eve of a full committee vote. See Contempt Proceedings Against Secretary of Commerce, Rogers C. B. Morton including Hearings and Related Documents Before the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, 94th Cong. 1st Sess. (1975).

82. See United States v. Nixon, 418 U.S. 683, 694 (1974); Confiscation Cases, 74 U.S. (7 Wall.) 454 (1869); United States v. Cox, 342 F.2d 167, 171 (5th Cir.), cert. denied, 381 U.S. 935 (1965).

party—which of course includes criminal litigation—is vested in the Attorney General.[83] This could be changed by statute. There is at least some question, however, whether a function located as close to the core of executive responsibility as enforcement of a criminal statute could constitutionally be vested in an entity possessing an element of insulation from the executive branch comparable to the independent regulatory agencies. Moreover, as a matter of practical policy and politics, it is highly doubtful that Congress would create a special prosecutor with such independent powers in order to solve a problem that exists only in theory, and has never ripened into an actual prosecution in spite of the fact that the statute has been in existence for almost a century and a quarter.

The best solution would be to interpret the mandatory language of section 194 as inapplicable to executive privilege cases or any other cases in which the allegedly contumacious conduct consists of obedience to legal advice given by the Attorney General. Although on its face the statutory language permits no such exception, and there is nothing in the legislative history to indicate that Congress thought about this problem, it is certainly not an unreasonable interpretation in light of the wrenching effect that a literal reading of section 194 would have on separation of powers problems and the Attorney General's ethical responsibilities. The scope of this exception would be limited, and nonapplicability of section 192 within such a limited sphere does not offend basic notions of fair play. At issue is not the general power of the executive branch to punish violations of criminal statutes by persons within the executive branch. The Justice Department clearly possesses and exercises that power. But when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and for getting the legal issues into court.

---

83. 28 U.S.C. § 516 (1970).

There is such an alternative: a civil suit to enforce a congressional subpoena ordering delivery of the desired information. Assuming a continuation of congressional declination to use its direct contempt powers, this is the only feasible vehicle by which conflicts between congressional investigative powers and Presidential assertions of executive privilege can be resolved.

### C.   Civil Enforcement of Congressional Subpoenas

Even though civil enforcement is the preferred route to the resolution of executive privilege-congressional subpoena disputes (assuming the failure of negotiation), such a procedure also raises constitutional questions. Does the initiation of a civil suit by Congress constitute a usurpation of the executive's law enforcement function? Does a federal court have jurisdiction to decide the issue? And, assuming that the court has jurisdiction, is the issue justiciable? The law enforcement and jurisdiction issues are discussed in this Section, while the broader justiciability issue is discussed in Section IV.

### 1.   Congressional suit as law enforcement

The constitution declares that the President "shall take Care that the Laws be faithfully executed."[84] The Supreme Court reaffirmed, in *Buckley v. Valeo,* that the executive responsibility includes bringing litigation to implement federal policy: "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.' Art. II § 3."[85] One issue that must be faced, therefore, is whether a civil suit to enforce a congressional subpoena is an unconstitutional usurpation of the executive's law enforcement responsibility. Analogies can be drawn to direct contempt proceedings, the constitutionality of which has been upheld. On one hand, civil action, unlike direct contempt, requires the filing of a lawsuit enlisting the federal judicial machinery in the vindication of congressional interests. In this sense civil action involves an element of enforcement not present in direct contempt cases. On the other hand, while either civil enforcement or direct contempt proceedings may be used to obtain information, direct contempt involves the infliction of punishment for offenses against

---

84. U.S. Const. art. II, § 3.
85. 424 U.S. 1, 138 (1976).

a governmental entity. In this respect direct contempt bears a closer resemblance to law enforcement than does a civil proceeding to enforce a subpoena.

The controlling consideration, however, is that civil enforcement suits, like direct contempt and unlike bills of attainder or law enforcement, generally are brought for the sole purpose of vindicating internal congressional prerogatives, not enforcing criminal statutes or other laws or policies of the United States. A civil proceeding to enforce a subpoena is not a suit "vindicating public rights"[86] or implementing official federal policy; seen in that light, such a proceeding is not forbidden by the Court's holding in *Buckley v. Valeo.* Additionally, it has been held that a Congressman has a right to sue in his representative capacity as a Congressman to enforce rights inherent in his position, and from this right a congressional power to bring civil enforcement suits can be extrapolated. *Kennedy v. Sampson*[87] held that because of his interest in protecting the effectiveness of his vote, Senator Kennedy had standing to challenge an attempted "pocket veto" of a bill for which he had voted. Similarly, in *Mitchell v. Laird*[88] the Court of Appeals for the District of Columbia Circuit held that a Congressman had standing to challenge executive action taken in prosecuting the war in Indochina without congressional approval. While standing is a separate issue from separation of powers, the constitutionality of civil enforcement actions would seem to follow a fortiori from the holding in *Kennedy* and *Mitchell.* In those cases lawsuits were initiated by individual members of Congress, and the courts entertained them even though they involved vindication of public policy because the suits related to the performance of their duties as Congressmen. If individual Congressmen can sue, certainly Congress itself can authorize a similar remedy, so long as the suit is for vindication of interests internal to Congress, and not for enforcement of general national policy.[89]

---

86. *Id.* at 140.

87. 511 F.2d 430 (D.C. Cir. 1974). *See also* Kennedy v. Jones, 412 F. Supp. 353 (D.D.C. 1976); Note, *Congressional Access to the Federal Courts,* 90 HARV. L. REV. 1632 (1977); Comment, *Congressional Standing to Challenge Executive Action,* 122 U. PA. L. REV. 1366 (1974); Note, *Standing to Sue for Members of Congress,* 83 YALE L.J. 1665 (1974).

88. 488 F.2d 611 (D.C. Cir. 1973). *Cf.* Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir. 1973), *cert. denied,* 416 U.S. 936 (1974) (holding that a Congresswoman did not have standing to obtain an injunction against United States participation in military activities in or over Cambodia).

89. The court of appeals in its first *AT&T* opinion observed: "It is clear that the

*2. Jurisdiction*

Another impediment to a civil enforcement action is federal court jurisdiction to entertain it. The only authority on the subject to date is the district court's opinion in *Senate Select Committee on Presidential Campaign Activities v. Nixon.*[90] In that case Judge Sirica held that such jurisdiction is not supported by any general jurisdictional statute. *Senate Select Committee* was a suit by the Senate Select Committee and its chairman, Senator Ervin, to compel compliance with two subpoenas: one seeking certain tapes, and the other requiring the production of certain documents and other materials the committee considered relevant to its investigation. The plaintiffs "deliberately chose not to attempt an adjudication of the matter by resort to a [criminal] contempt proceeding . . . or via Congressional common law powers which permit the Sergeant at Arms to forcibly secure attendance of the offending party."[91]

Four jurisdictional bases were urged by the plaintiffs: 28 U.S.C. § 1345[92] (suits by the United States as plaintiff), 28 U.S.C. § 1361[93] (suits in the nature of mandamus to compel an officer of the United States to perform his duty), 5 U.S.C. §§ 701-706[94] (the Administrative Procedure Act), and 28 U.S.C. § 1331[95] (the "federal question" jurisdictional statute). Judge Sirica rejected all four grounds: section 1345 because 28 U.S.C. § 516 "reserves to the Attorney General and the Department of Justice authority to litigate as United States,"[96] the mandamus statute because "the Court cannot in good conscience hold that any duty defendant may have as President is 'plainly defined as preemptory,' "[97] and the Administrative Procedure Act because "the rule in this Circuit precludes use of this Act altogether as an independent basis of jurisdiction."[98] Federal question jurisdiction was unavailable because the case was not "capable of valuation in dollars and cents"[99] and thus failed to satisfy the requirement that the

House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." 551 F.2d at 391.

90. 366 F. Supp. 51 (D.D.C. 1973).

91. *Id.* at 54.

92. (1970).

93. (1970).

94. (1970).

95. (1970).

96. 366 F. Supp. at 56.

97. *Id.* at 57.

98. *Id.* at 58 (footnote omitted).

99. *Id.* at 59.

amount in controversy exceed the sum or value of $10,000. Since "[n]o jurisdictional statute known to the Court, including the four which plaintiffs name[d], warrant[ed] an assumption of jurisdiction,"[100] the action was dismissed.

While the appeal in the *Senate Select Committee* case was pending, Congress passed a special statute conferring jurisdiction on the District Court for the District of Columbia over any civil action brought by the Senate Select Committee "to enforce or secure a declaration concerning the validity of any subpoena."[101] After the new statute took effect, the court of appeals remanded[102] the case to the district court which ruled against the committee on other grounds.[103] An appeal was taken only as to the subpoena seeking the tapes, but the court of appeals did not reach the jurisdictional issue.[104]

The solution to the jurisdictional problem in *Senate Select Committee* may seem to suggest that it would be advisable to enact a general statute conferring jurisdiction on federal courts over all civil suits to enforce congressional subpoenas.[105] Disputes over congressional subpoenas typically involve issues of law—issues that touch on the most fundamental powers of two branches of government. Does it not follow that disputes of such magnitude should be regularly resolved by the third branch, whose powers are not directly at issue and whose core functions include interpretation of the laws and the Constitution and the resolution of disputes?

---

100. *Id.* at 61.

101. Act of Dec. 18, 1973, Pub. L. No. 93-190, 87 Stat. 736 (1973).

102. *See* Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 727-28 & n.11 (D.C. Cir. 1974).

103. Senate Select Comm. on Presidential Campaign Activities v. Nixon, 370 F. Supp. 521 (D.D.C.), *aff'd*, 498 F.2d 725 (D.C. Cir. 1974) (ruling on the subpoena requesting the tapes); *id.* at 522 n.1 (ruling on the subpoena requesting the documents).

104. Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974).

105. Indeed, somewhat comparable legislation has been proposed. During the 93d Congress, a bill was introduced containing the following provision:

The District Court for the District of Columbia shall have original, exclusive jurisdiction for any civil action brought by either House of Congress, a joint committee of Congress, or any committee of either House of Congress with respect to any claim of executive privilege asserted before either such House or any such joint committee or committee.

*Hearings Before the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations and the Subcomms. on Separation of Power and Administrative Practice and Procedure of the Senate Comm. on the Judiciary,* 93d Cong., 1st Sess. 534-35 (1973) (S. 2073, § 1364). A companion section of the bill authorized any Senate, House, or joint committee to bring suit to contest claims of executive privilege. *Id.* at 536-37 (§ 3103).

On balance, I think not.

There is an observable reluctance on the part of both the article I and article II branches to submit issues for resolution by the third branch that go to the core of their respective constitutional authority. This may be due in part to interbranch territorial instincts or to a residual discomfort over some of the implications of *Marbury v. Madison.*[106] Whatever the reason for this reluctance, the result contributes to good government. Notwithstanding the judiciary's final authority in matters of constitutionality, all three branches are concerned with constitutional issues which they are called upon to resolve as a regular part of their duties. Moreover, it is in the interest of each branch individually—and in the interest of the nation as a whole—that disputes concerning overlapping or allegedly inconsistent powers conferred by article I and article II be resolved, if possible, by the branches whose powers are implicated. This is not only because negotiated settlements are usually more effective than litigation in accommodating the competing interests of both sides,[107] whether in the government or nongovernment context. It is also because there is something of an inverse relationship between the effectiveness of article III's heavy artillery for dispute resolution and the frequency of its use. Particularly in areas involving conflicts over interbranch powers, saving the judiciary for the few cases in which Congress and the President are absolutely unable to resolve their own differences will sharpen the issues that must go to litigation and will magnify respect for the judicial decision in the rare case in which it must be rendered.

Recognition of the superiority of a negotiated settlement over a judicially imposed settlement appears to be an underlying premise of the court of appeals' approach in both of its opinions in *United States v. AT&T.* The facts of that case illustrate the correctness of the premise. The competing interests of the two branches in *AT&T* were, on the one hand, the need to protect foreign intelligence secrets, and on the other, the need for information relevant to possible legislation. The depth and breadth of those needs are matters that lie peculiarly within the expertise of the executive and legislative branches. The extent to which the provisions of a judicial decree might adversely affect these or other important governmental interests are also peculiarly within

---

106. 5 U.S. (1 Cranch) 137 (1803).

107. *See* Levi, *Some Aspects of Separation of Powers,* 76 COLUM. L. REV. 371, 385-86 (1976); Comment, United States v. AT&T: *Judicially Supervised Negotiation and Political Questions,* 77 COLUM. L. REV. 466 (1977).

the ken of the disputants. While the approach taken by the court of appeals in *AT&T* does not mesh nicely with traditional judicial forms or procedures, it does combine judicial creativity and flexibility with the fundamental values of judicial restraint. The portions of the second opinion dealing with the steps that the district court is to take in implementing the court of appeals' decision demonstrate the essentially nonjudicial aspects of the task.[108] The skills that this opinion requires of the district court are more the skills of the mediator, or even the manager, than the federal judge. And yet, just as the court of appeals' approach is characterized by creativity and flexibility, it also achieves the fundamental values of judicial restraint. There was a dispute between parties to a lawsuit. Based upon applicable precedents, the court correctly held that it was a justiciable case or controversy under article III of the Constitution. The court discharged its responsibility to resolve the controversy by utilizing its judicial power only to the minimum extent necessary, leaving the maximum opportunity for the parties before it—its sister branches of government—to apply their own superior knowledge concerning their own peculiar needs. This is the essence of judicial restraint.

Ironically, then, it is not in the interest of good government to make it easier for two coordinate branches to have differences over their respective constitutional powers readily resolved by the third. Accordingly, enactment of a statute generally conferring federal court jurisdiction over the enforcement of congressional subpoenas would not be in the public interest. Such disputes are best resolved by ad hoc enactment of narrow jurisdictional statutes such as the Senate Watergate Committee obtained. Direct punishment should be left in its present dormant state, and 2 U.S.C. § 194 should be used only for non-executive-privilege cases which do not confront the Attorney General with the dilemma discussed above. With the only avenue for judicial relief in executive privilege-congressional subpoena confrontations requiring an act of Congress, the pressure on both sides[109] to reach a negotiated settlement will be just about right—not insuperable, as the Senate Watergate Committee experience shows, but nevertheless sufficient to provide real incentive.

The preferability of negotiation over adjudication as a means

---

108. 567 F.2d at 131-32. *See* text accompanying note 33 *supra.*

109. In one sense, the "pressures" are greater on Congress, because the disputed information is in the possession of the executive branch. It is Congress, however, that can elect judicial resolution as an alternative to a negotiated settlement by enacting a jurisdictional statute.

of settling interbranch disputes is also fundamental to the issues of the justiciability of such disputes. These issues are the subject of Section IV of this Article.

## IV.   JUSTICIABILITY OF EXECUTIVE PRIVILEGE-CONGRESSIONAL SUBPOENA CONFLICTS

Whether a conflict between a President's exercise of executive privilege and a congressional assertion of investigative power is a justiciable "case or controversy"[110] that the federal courts are authorized by article III to adjudicate depends principally on whether such an issue is a "political question." In 1958, when the reach of the political question doctrine was far broader than it is today, no lesser an authority than Judge Learned Hand expressed the view that such a dispute between two branches of government was a clear example of a nonjusticiable constitutional question.[111]

The leading case dealing with the political question issue, *Baker v. Carr*,[112] contains a general statement that "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.' "[113] Judicial accommodation of the doctrines of executive privilege and congressional subpoena power fits rather neatly within the Court's general description, "the relationship between the judiciary and the coordinate branches of the Federal Government." Necessarily, however, any time the federal courts are called upon to determine the scope of the constitutional authority of a coordinate branch, "the relationship between the judiciary and the coordinate branches of the Federal Government" is involved. On several occasions over the past half century, the Court has been required to make decisions having the effect of allocating authority between the legislative and executive branches. *A.L.A. Schechter Poultry Corp. v. United States*[114] and *Panama Refining*

---

110. *See* U.S. CONST. art. III, § 2, cl. 1. In earlier years a dispute between Congress and the executive might have been thrown out of court on the grounds that the same party—the United States—cannot be both plaintiff and defendant. The Gray Jacket, 72 U.S. (5 Wall.) 342, 371 (1866) (Treasury Department could not ordinarily oppose the Attorney General). In recent years, however, the courts have entertained intergovernmental suits. *See, e.g.,* United States *ex rel* Chapman v. Federal Power Comm'n, 345 U.S. 153 (1953); ICC v. Jersey City, 322 U.S. 503 (1944). *See also* R. BERGER, *supra* note 66, at 313-20.

111. L. HAND, THE BILL OF RIGHTS 15-18 (1962).

112. 369 U.S. 186 (1962) (holding that equal protection challenges to legislative apportionment were justiciable).

113. *Id.* at 210.

114. 295 U.S. 495 (1935) (invalidating as an unconstitutional delegation of legislative

*Co. v. Ryan*[115] involved allocations of constitutional power between the Congress and the President where there was no dispute between the branches. *Buckley v. Valeo,*[116] *Youngstown Sheet & Tube Co. v. Sawyer,*[117] *United States v. Lovett,*[118] *Humphrey's Executor v. United States,*[119] and *Meyers v. United States*[120] all involved, in one form or another, issues of allocation of authority between Congress and the President that the third branch was called upon to resolve. These are the clearest kinds of cases involving "the relationship between the judiciary and the coordinate branches of the Federal Government."

*Baker v. Carr* also described some of the characteristics "[p]rominent on the surface of any case held to involve a political question."[121] They are,

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[122]

The "lack of judicially discoverable and manageable standards

---

powers portions of the National Industrial Recovery Act authorizing the President to approve "codes of fair competition").

115. 293 U.S. 388 (1935) (striking down the "Petroleum Code" of the National Industrial Recovery Act as excessive delegation of legislative powers to the executive).

116. 424 U.S. 1 (1976) (holding that Congress may not appoint federal executive officers, in this case, members of a federal elections commission; the power to appoint officers of the United States is an article II executive power and the Constitution prohibits Congress from performing that function).

117. 343 U.S. 579 (1952) (invalidating a Presidential order nationalizing the steel industry as a usurpation of the lawmaking authority of Congress).

118. 328 U.S. 303 (1946) (invalidating as a bill of attainder a provision of an appropriation bill requiring that no funds could be used to compensate three named government employees).

119. 295 U.S. 602 (1935) (holding that Congress could limit the President's power to remove members of the Federal Trade Commission, an independent regulatory agency).

120. 272 U.S. 52 (1926) (holding that Congress could not constitutionally prohibit the President from removing executive officers).

Powell v. McCormack, 395 U.S. 486 (1969), another prominent political question case, dealt solely with the issue of congressional power asserted with respect to internal congressional affairs, and did not implicate the powers of the executive branch.

121. 369 U.S. at 217.

122. *Id.*

for resolving" the issue and the "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion" would appear particularly descriptive of executive privilege-congressional subpoena confrontations. In the few instances in which federal courts have faced such issues, however, they have decided them. A conflict between a congressional subpoena and a Presidential assertion of executive privilege was involved in *Senate Select Committee on Presidential Campaign Activities v. Nixon.*[123] Neither the court of appeals nor the district court opinions in that case discussed justiciability, but both courts reached the merits. Necessarily, therefore, both held the case justiciable.[124]

Although the *Senate Select Committee* decisions were rendered prior to *Eastland's* very deferential treatment of congressional activities,[125] the same conflict between executive privilege and congressional investigations was involved in *United States v. AT&T* and, in that case, both courts held it justiciable. The court of appeals dealt at length with the justiciability issue in its second opinion. The court first noted that the Constitution did not commit the resolution of the issue to either branch.[126] It then rejected both the executive's claim that the "Constitution confers on the executive absolute discretion in the area of national security"[127] and Congress' claim that the speech or debate clause prevented judicial interference with its actions.[128] As to the question whether the court should abstain for lack of "judicially discoverable and manageable standards," the court concluded that negotiations

---

123. 498 F.2d 725 (D.C. Cir. 1974). This appeal involved only the subpoena seeking disclosure of certain tape recordings. No appeal was taken from the district court's earlier order quashing a subpoena seeking certain records and documents. *See* notes 102-04 and accompanying text *supra.*

124. Judge Wilkey took the position that the case presented a nonjusticiable political question; however, because that conclusion was foreclosed by the court's earlier holding in Nixon v. Sirica, 487 F.2d 700 (1973), he concurred in the court's opinion. 498 F.2d at 734 (Wilkey, J., concurring).

125. *See* notes 44-58 and accompanying text *supra.*

126. 567 F.2d at 126.

127. *Id.* at 128. The court noted that the Constitution confers powers related to national security upon both the President and Congress, and that "the question of allocation of powers associated with foreign affairs and national security" falls within a "zone of twilight" in which the President and Congress share authority. *Id.*

128. *Id.* at 128-29. In refuting Congress' claim that the speech or debate clause immunized congressional action from judicial interference, the court relied upon *Senate Select Committee* and the *Eastland* Court's observation that in prior cases the Court had balanced congressional investigatory powers against first amendment rights. *Id.* at 129. *See* note 51 *supra.*

between the parties had "largely obviated this problem by bringing into sharper focus the needs of the parties."[129]

The Court in *United States v. Nixon* observed in connection with the justiciability argument in that case that "[i]n the Constitutional sense, controversy means more than disagreement and conflict; rather it means the kind of controversy courts traditionally resolve."[130] If "the kind of controversy courts traditionally resolve" means historic judicial practice and not just frequency of occurrence, it would seem quite clear that *United States v. Nixon* also supports the view that article III authorizes judicial resolution of disputes concerning allocation of authority between the article I and the article II branches.[131] The instances in which such disputes have reached the courts have been rare. But when they have, the courts historically have resolved them, as illustrated by the cases discussed above.

The controversy in *Nixon* was between two officials of the executive branch. Other things being equal, the case for justiciability of an intrabranch dispute is harder than that of a dispute between coordinate branches of government. Most of the criteria prescribed by *Baker v. Carr*—including particularly "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion" and "the potentiality of embarrassment from multifarious pronouncements by various departments on one question"[132]—are clearly more pronounced when the dispute involves only a single branch. Disagreements between two executive departments or two committees of Congress would seem clearly nonjusticiable under the *Baker v. Carr* guidelines and under the dictates of common sense. In an intrabranch dispute there is a final, nonjudicial authority over the disputants (the President or the congressional leadership) and the controversy should be resolved within the branch in which it arises. Even so, *United States v. Nixon* and *Powell v.*

---

129. 567 F.2d at 127.
130. 418 U.S. at 696.
131. Professor Archibald Cox takes a different view as to the meaning of this phrase:

But the Chief Justice probably meant to limit these sentences by the preceding sentence which points out that the evidence whose production is sought and resisted is "deemed by the Special Prosecutor to be relevant and admissible *in a pending criminal case*"—an element that satisfied the need for the "kind of controversy courts traditionally resolve."

Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1423-24 (1974) (emphasis in original) (footnote omitted).

132. 369 U.S. at 217.

*McCormack*[133] were both intrabranch controversies that were held justiciable. In those cases, however, the concept of an intrabranch final authority was inapplicable because the President in *Nixon* and the congressional leadership in *McCormack* were parties to the disputes. Moreover, there is serious question whether *United States v. Nixon* would have been justiciable absent the regulation delegating authority "to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure."[134]

Professor Cox argues that "[t]he absence of a material private stake in the outcome may prove . . . important"[135] to the justiciability issue. He points out that in *Schechter Poultry, Panama Refining, Meyers, Humphrey's Executor, Youngstown Sheet & Tube,* and *Lovett* "[e]ach of the . . . cases was brought by or against a state or a private person who had a material stake in the outcome."[136] By contrast, he points out, "[t]he named parties in an action to enforce a subpoena against a claim of executive privilege might be the Congress or a congressional body and the President."[137] It is probably true that there will be some kind of private stake in the outcome in most cases (other than executive privilege-congressional subpoena conflicts) wherein the underlying issue concerns the distribution of power between two branches of government. This was true in *Powell v. McCormack,* as well as in the cases cited by Professor Cox. It was technically true in *United States v. AT&T,* though the interest of the telephone company in that case was only a formal one.[138] But, the presence of a private stake in the outcome of interbranch disputes should have no bearing on justiciability. No more important questions come before federal courts than how the Constitution distributes power among the branches of government. The com-

---

133. 395 U.S. 486 (1969).

134. 418 U.S. at 694 (footnote omitted).

135. Cox, *supra* note 131, at 1423.

136. *Id.*

137. *Id.*

138. Professor Cox seems to argue that even in *United States v. Nixon* there was something like a private controversy. *Id.* at 1423-24. He finds significant the language of the opinion describing the evidence at issue as "deemed by the Special Prosecutor to be relevant and admissible in a pending criminal case." 418 U.S. at 697. In my view, the interest of the special prosecutor did not impart to *United States v. Nixon* "a material private stake in the outcome." However his peculiar relation to the executive branch is defined, the special prosecutor was clearly an officer of government and an officer of the executive branch. He was performing functions that no one outside the executive branch could constitutionally perform. Buckley v. Valeo, 424 U.S. 1, 138 (1976). And his interest in the litigation rested exclusively on his official governmental responsibilities.

Case 1:21-cr-00670-CJN   Document 58-27   Filed 04/15/22   Page 43 of 69

parative magnitude of the relevant governmental interests do not vary in the slightest according to whether some private party also has a stake in the outcome. Therefore, the existence or nonexistence of private interests should be irrelevant to the justiciability question.

A characteristic of executive privilege-congressional subpoena cases that arguably cuts against justiciability is that withholding judicial relief will not result in failure of resolution. The case will usually be resolved by the President's deciding to comply or not comply with the subpoena. While the President is an elected officer and is presumed to act in the public interest, this approach is not at all satisfactory because it commits the resolution of the dispute to one of the disputants.[139] Moreover, where, as in *AT&T*, the documents at issue are in the possession of a private corporation, a holding of nonjusticiability shifts the effective decisional authority, not to a governmental entity, but to a corporation which has neither an interest in the dispute nor any reason to have considered—much less weighed—the competing governmental values.

There is another characteristic—unique to executive privilege-congressional subpoena cases—which, taken alone, makes the case for justiciability of such disputes more difficult than in other instances where the judiciary is called upon to resolve competing claims to constitutional authority by its sister branches. For reasons discussed in Section V below, the preferable method for judicial resolution of executive privilege-congressional investigation conflicts is to have the courts balance the competing interests without creating a presumption in favor of either. Admittedly, that kind of balancing will significantly involve the federal courts in reexamining underlying policy choices in substantive areas quite clearly committed to one or both of the other branches of government. It is, however, the alternative that is most consistent, both in theory and in application, with underlying separation of powers precepts. In this respect, the issue of justiciability is closely linked to the final issue

---

139. The court of appeals in its second *AT&T* opinion stated:

Where the dispute consists of a clash of authority between two branches, however, judicial abstention does not lead to orderly resolution of the dispute. No one branch is identified as having final authority in the area of concern. If the negotiation fails—as in a case where one party, because of chance circumstance, has no need to compromise—a stalemate will result, with the possibility of detrimental effect on the smooth functioning of government.

567 F.2d at 126.

to be discussed by this Article: If federal courts are constitutionally empowered to resolve confrontations between assertions of executive privilege and exercise of congressional investigatory powers, by what standards should they perform that task? The final discussion of justiciability will therefore be deferred and considered in connection with the issue of appropriate judicial standards.

## V. Standards for Judicial Resolution of Interbranch Executive Privilege-Congressional Subpoena Conflicts

One approach to constitutional law is to divide the entire field into two broad components. The first deals with the powers of government, state or federal, and the second with the protection of individual interests against the exercise of those governmental powers. The lines separating the two are not always rigid. The diffusion of power and authority among the three branches, as well as between the national and state governments, helps to assure against arbitrary infringement of individual rights by lessening the concentration of power in any one group, and by setting off some governmental entities as checks and balances against the powers of others.

This view of constitutional law as divisible into two broad categories is helpful in determining the proper standards by which federal courts should decide cases involving conflicts between executive privilege and congressional investigations. Such conflicts fall within the realm of the first category of constitutional law, the powers of government. Determination of the proper standards for resolution of these conflicts, however, is aided by examination of the judicial struggles and the results of those struggles in connection with the second category, the protection of individual interests against the exercise of governmental powers.

In attempting to achieve a constitutional accommodation of governmental-societal and individual interests, the courts have used a single overarching approach. That approach has been to balance in some fashion the competing sets of interests—those of the individual, and those of society (as determined by society's elected legislative representatives). Not all of the opinions describe their approach as involving balancing, and in most cases the balancing has not been evenhanded in the sense that the inquiry is usually not whether the interests on the one side or the other preponderate. Rather, the courts generally inquire into whether the interests on one side are sufficient to overcome a

predetermined weighting favoring the other. But it is a balancing approach in the sense that the conflicting interests of the individual and society are reconciled by taking into account in some fashion the comparative strengths of those conflicting interests in each particular case. Indeed, the only alternative to some kind of balance between governmental and individual interests is an absolutist, per se approach, which would prescribe that in certain contexts either the legislative decision will always be honored or the constitutionally recognized individual rights will always be protected. While the absolutist approach has been advocated in cases involving individual versus societal interests,[140] it has rarely if ever been followed.

The question has not been whether to balance, but how. Some of the most important issues over the long range of our experience with constitutional adjudication have concerned the weighting of the balance scales either in favor of the individual or the government. This weighting is not that which results from a consideration of the merits of the individual case, but rather that which occurs before the court reaches the merits for all cases of that kind, so that in the particular case one side or the other will have more than a fifty-fifty burden to overcome.

In areas where there have been a substantial number of cases involving a conflict between governmental and individual interests—including the first amendment, equal protection, due process, and the commerce clause—this pre-merits weighting has occurred. Some of the most important developments in American constitutional history have centered on whether the weighting should favor government or the individual. In determining the constitutionality of state-imposed burdens on interstate commerce resulting from exercises of the police power, the balance scales were at one time weighted heavily in favor of the legislative judgment.[141] The weighting probably still favors state government, though not as much as before.[142] In cases involving the first

---

140. Its most vigorous advocates in recent years have been Justices Black and Douglas, who have argued for such an approach in favor of government in commerce clause cases, *see, e.g.,* Southern Pac. Co. v. Arizona, 325 U.S. 761, 789 (1945) (Black, J., dissenting); *id.* at 795 (Douglas, J., dissenting); J. HELLERSTEIN & W. HELLERSTEIN, STATE AND LOCAL TAXATION, 250-51 (4th ed. 1978), and in favor of the individual in first amendment cases, *see, e.g.,* Konigsberg v. State Bar, 366 U.S. 36, 64-74 (1961) (Black, J., dissenting); Black, *The Bill of Rights,* 35 N.Y.U. L. REV. 865, 867, 875-81 (1960). *See also* Brandenburg v. Ohio, 395 U.S. 444, 450-57 (1969) (Douglas, J., concurring). On the general issue of the absolutist versus the balancing approach see L. TRIBE, AMERICAN CONSTITUTIONAL LAW 582-84 (1978).

141. South Carolina Highway Dep't v. Barnwell Bros., 303 U.S. 177 (1938).

142. Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 524 (1959): "These safety

274    BRIGHAM YOUNG UNIVERSITY LAW REVIEW    [1978:

amendment and other "fundamental" rights, the pre-merits weighting favors the individual.[143] In substantive due process cases, individual interests, both economic and noneconomic, were given a heavy preference for many years.[144] At least as to economic matters this has now been reversed, and the judicially imposed weighting favors the government;[145] indeed, the opinions in some cases even suggest an absolutist standard.[146] As to certain non-economic matters, the eradication of the earlier substantive due process approach is less clear.[147] In equal protection cases the general rule has been for many years,[148] and still is,[149] that the state may distinquish among persons or classes so long as the distinction is not irrelevant to the achievement of a legitimate state objective. Two exceptions have been rather firmly established, however. If either (1) the classification itself falls into a "suspect" category,[150] or (2) the individual interest affected is "fundamental,"[151] the weighting is reversed and the balance scale, prior to consideration of the merits of the individual case, is tipped in favor of the individual. Thus, the consistent judicial approach to cases constituting one of the two broad components of constitutional law—the accommodation of individual and gov-

---

measures carry a strong presumption of validity when challenged in court." Southern Pac. Co. v. Arizona, 325 U.S. 761, 770 (1945): "There has thus been left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce."

143. Kramer v. Union Free School Dist. No. 15, 395 U.S. 621 (1969); Shapiro v. Thompson, 394 U.S. 618 (1969); Sherbert v. Verner, 374 U.S. 398 (1963).

144. Pierce v. Society of Sisters, 268 U.S. 510 (1925); Meyer v. Nebraska, 262 U.S. 390 (1923); Coppage v. Kansas, 236 U.S. 1 (1915); Adair v. United States, 208 U.S. 161 (1908); Lochner v. New York, 198 U.S. 45 (1905); Allgeyer v. Louisiana, 165 U.S. 578 (1897).

145. Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421 (1952); West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937); Nebbia v. New York, 291 U.S. 502 (1934).

146. Fergusson v. Skrupa, 372 U.S. 726, 731 (1963): "Unquestionably, there are arguments showing that the business of debt adjusting has social utility, but such arguments are properly addressed to the legislature, not to us." Williamson v. Lee Optical Co., 348 U.S. 483, 487 (1955): "The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement."

147. Vlandis v. Kline, 412 U.S. 441 (1973); Roe v. Wade, 410 U.S. 113 (1973); Griswold v. Connecticut, 381 U.S. 479 (1965). *See also Constitutional Law Symposium: Allocation of Policymaking Authority Between Court and Legislature*, 1976 B.Y.U. L. Rev. 37.

148. McGowan v. Maryland, 366 U.S. 420 (1961); Kotch v. Board of River Pilot Comm'rs, 330 U.S. 552 (1947).

149. Mathews v. De Castro, 429 U.S. 181 (1976).

150. The categories which have been defined as "suspect" include race, alienage, and national origin. Graham v. Richardson, 403 U.S. 365, 371-72 (1971). *But see* Foley v. Connelie, 98 S. Ct. 1067 (1978) (holding that limiting state police appointments to U.S. citizens does not violate equal protection rights of aliens).

151. Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 626 (1969).

Case 1:21-cr-00670-CJN   Document 58-27   Filed 04/15/22   Page 47 of 69

ernmental interests—has been to balance and to identify in advance of the balance which set of interests is to be preferred.

In those cases involving conflicts between governmental interests and individual interests, there are sound theoretical and practical reasons for pre-merits weighting of the balance scales. The practical reason is that cases calling for a choice between competing interests are easier to decide if the court is called upon, not to decide which of the two is in fact heavier, but whether one is sufficiently heavy to overcome a predetermined handicap. The theoretical support for a pre-merits weighting of governmental-versus-individual-interests cases is that the competing interests are of different quality and come from readily distinguishable sources. With the governmental set of interests being rooted in a legislative judgment and the individual set of interests in the Constitution, good arguments can be made for preferring either.

The basic argument for weighting the scale in the individual's favor is that his position is based on the Constitution and is therefore entitled to greater weight than his opponent's competing claim based on a statute. As Hamilton observed in *No. 78* of *The Federalist*, "If there should happen to be an irreconcilable variance between [the Constitution and a statute] that which has the superior obligation and validity ought of course to be preferred; or in other words, the Constitution ought to be preferred to the statute."[152] This familiar statement is probably the best contemporary support for the argument that judicial review was contemplated by the original Constitution-makers. Its underlying and undisputed premise—the superiority of the Constitution over legislative acts—also provides a theoretical basis for a general pre-merits weighting in favor of individual interests.

On the other hand, it can be argued that the legislature should have the scales tipped in its favor, since the competing considerations underlying all legislative judgments involve issues of public policy. The accommodation of competing policy interests is the single most important responsibility of legislative bodies. Legislators, like judges, are sworn to uphold the Constitution, and to the extent constitutional issues are involved, these will be taken into account by the legislators in making the final choices among policy alternatives. Therefore, the argument runs, though legislators' decisions should not be immune from judicial review, their judgments should be given deference.

For present purposes, the important point is not which of

---

152. THE FEDERALIST No. 78, at 492 (A. Hamilton) (B. Wright ed. 1961).

these positions is more persuasive, or whether what the court has in fact done—giving the preference to the state in some contexts and to the individual in others—is in accord with sound constitutional principles. The important point is that there is a sound theoretical basis for giving a preference either way, and good practical reasons for doing so.

There is a difference between this kind of case and executive privilege-congressional subpoena cases, however. Executive privilege-congressional subpoena cases involve questions of the constitutional allocation of power among coequal branches of the federal government, rather than protection of constitutionally based individual interests against the exercise of governmental powers. The conflict in first amendment, fourteenth amendment, and commerce clause cases is between governmental and nongovernmental parties. The claim of one is based on the Constitution, and the other on the judgment of the legislature in matters of public policy choice. By contrast, in executive privilege-congressional subpoena cases, the conflicting interests are rooted in the same source and are of the same general type. The dispute is between two of three coordinate branches of the federal government, each of which bases its claim on a grant of power contained in the United States Constitution.

In selecting the appropriate standard for deciding executive privilege-congressional subpoena conflicts, the courts have three basic choices. They are:

(1.) An absolute, per se rule, under which the interests of one of the branches will always prevail, regardless of the comparative strengths of the parties' positions in the case.

(2.) A balancing approach similar to that employed in the governmental interests versus individual interests context, assigning a predetermined preference either to congressional subpoena power or executive privilege.

(3.) A true, evenhanded balance, weighing the impact of alternative outcomes on the underlying objectives of both executive privilege and congressional investigations without any pre-merits weighting.

These three alternatives for judicial resolution of executive privilege-congressional subpoena cases will now be considered, including, as to each, an examination of its supporting authority and the theoretical and practical implications of its adoption. These alternatives assume that the substance of the controversy is to be resolved by the courts. The alternative of resolution by another branch (by hypothesis one of the parties to the dispute), the policy and constitutional issues posed by that alternative,

and its similarities to the absolutist approach will also be considered in connection with the examination of the alternative standards.

## A.   The Absolutist Standard

There are three basic arguments favoring adoption of an absolutist approach. The first is that it is simple to apply. Second, it yields consistent, predictable results with consequent planning benefits to government and nongovernment individuals and institutions. The third argument is similar to the position that executive privilege-congressional subpoena cases are not justiciable: either of the other approaches necessarily involves the judiciary to some degree in a reexamination of the underlying policy considerations made by one or both of the other branches in issuing the subpoena or asserting executive privilege. These are matters that are not only "committ[ed] . . . to a coordinate political department,"[153] they lie at the very core of the responsibilities of the other branches.

The strongest support for vesting final decisional authority in the Congress comes from Professor Cox, who would vest that authority in either House of Congress that considers the matter. Judges MacKinnon and Wilkey of the Court of Appeals for the District of Columbia Circuit have advocated that the President should have that authority.

## 1.   Professor Cox and absolute deference to Congress

In the subsection of his article on executive privilege entitled "Modern Need to Invest the Court With Enforcement Jurisdiction," Professor Cox reviews three developments that in his view "furnish persuasive evidence of a need to increase the power of Congress to compel the President and others in the executive branch to produce information."[154] He then proposes the following:

> These trends probably make it desirable to put the force of law behind some congressional subpoenas addressed to the President, his aides or other executive officials. Ideally, I think, the legislative right should prevail in every case in which either the Senate or House of Representatives votes to override the Executive's objections, provided that the information is relevant to a

---

153. Baker v. Carr, 369 U.S. at 217.
154. Cox, *supra* note 131, at 1432.

matter which is under inquiry and within the jurisdiction of the body issuing the subpoena, including its constitutional jurisdiction. A single committee or subcommittee, because it offers little guaranty of restraint, is the greatest threat to the values of confidentiality and carries the great danger of oppression. The very need for a vote of an entire chamber would not only provide a forum in which the Executive's arguments could be fairly considered, but the uncertainty of the outcome would press all concerned to negotiate a resolution. A vote of the entire Senate or House of Representatives is required to cite a private person for contempt. The requirement has proved useful in the past. If either House did vote to require the information, the President should have no constitutional right to withhold it and the Judiciary should not go behind the voted demand except to decide questions of relevance and jurisdiction. This would avoid the difficulty of developing nonpolitical, judicial standards of decision and thus would meet the chief constitutional objection to other legislative proposals.[155]

Under Professor Cox's proposal, the judicial role would be limited to deciding the threshold questions of relevance and jurisdiction. Any issues concerning the conflicting policy demands of the legislative and executive branches would presumably be left to the final decision of the particular House of Congress, as would the persuasiveness of the executive's arguments, which are to be "fairly considered."

### 2. Judges MacKinnon and Wilkey and absolute deference to the President

The positions of Judges MacKinnon and Wilkey are set forth in separate opinions concurring in part and dissenting in part from the en banc per curiam opinion of the Court of Appeals for the District of Columbia Circuit in *Nixon v. Sirica.*[156] At issue in *Nixon v. Sirica* was an order entered by District Judge Sirica to enforce a grand jury subpoena duces tecum directing President Nixon to produce certain tapes and documents. The legality of Judge Sirica's order was challenged by both the President and also the special prosecutor, then Mr. Archibald Cox. Because of serious questions concerning its jurisdiction to consider the special prosecutor's petition under the "all writs" statute,[157] the

---

155. *Id.* at 1434. *See also* P. KURLAND, WATERGATE AND THE CONSTITUTION 130 (1978).

156. 487 F.2d 700, 729-62 (D.C. Cir. 1973) (MacKinnon, J., concurring in part, dissenting in part); *id.* at 762-99 (Wilkey, J., dissenting).

157. "The Supreme Court and all courts established by Act of Congress may issue

court exercised its discretion to consider only the President's petition.[158]

Having asserted executive privilege with regard to the items sought by the grand jury, President Nixon's counsel contended, *inter alia,* "that Executive privilege is absolute with respect to presidential communications, so that disclosure is at the sole discretion of the President."[159] The majority rejected the President's argument that the privilege is absolute, observing that throughout history "there have frequently been conflicts between independent organs of the federal government"[160] and that "[w]hen such conflicts arise in justiciable cases, our constitutional system provides a means for resolving them—one Supreme Court."[161] In response to the contention that the President's position was sustained by the doctrine of separation of powers, the court responded that "[t]o leave the proper scope and application of Executive privilege to the President's sole discretion would represent a mixing, rather than a separation of Executive and Judicial functions."[162]

In place of absolute deference, the majority applied a weighted balancing test, discussed further in Subsection B, with the pre-merits presumption favoring the executive. The court observed that "such conversations are presumptively privileged"[163] but held that the presumption "must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this case."[164]

Judges MacKinnon and Wilkey wrote separate opinions and each concurred in the other's opinion. Judge MacKinnon's opinion contains a lengthy and scholarly review of the history of Presidential assertions of executive privilege and an analysis of some of the relevant Supreme Court opinions, from which he concludes there is a sound basis for "an absolute, evidentiary privilege for conversations and deliberations of the President with his close advisors," and further that "the privilege also has constitutional dimensions."[165]

---

all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (1970).

158. 487 F.2d at 706-08.
159. *Id.* at 708.
160. *Id.* at 715.
161. *Id.*
162. *Id.*
163. *Id.* at 717.
164. *Id.*
165. *Id.* at 750 (MacKinnon, J., concurring in part, dissenting in part).

In Judge Wilkey's view, the issue in the case was as follows:

> The *Per Curiam* here never confronts the fundamental Constitutional question of separation of powers, but instead prefers to treat the case as if all were involved was a weighing and balancing of conflicting public interests. There *are* conflicting public interests involved, they must be carefully weighed, balanced, and appraised; the President says he has done just that. Therefore, the most fundamental, necessarily decisive issue is, Who Does [sic] the weighing and balancing of conflicting public interests? The District Judge or the President? The answer to this question necessarily involves the Constitutional question of separation of powers.[166]

Addressing the issue "Who decides?" Judge Wilkey concluded:

> I thus reach the conclusion, differing from the majority of my colleagues, that the privilege asserted by the President here derives *both* from the Constitutional principle of separation of powers and from the common sense-common law, statutory privilege of confidentiality of Governmental decision-making, whatever the Branch. The latter may be subject to weighing and balancing of conflicting public interests, as many of the cases have done, but never in a case involving the President as a party. But where the privilege of the Chief Executive is derived from the *Constitutional principle* of separation of powers, it is no more subject to weighing and balancing than any other Constitutional privilege can be weighed  and balanced by extraneous third parties.
>
> Every President, beginning with Washington and Jefferson, has asserted that the privilege and the scope and applicability are for him alone to decide. This is precisely what Congress does when it either grants or withholds documents in response to the request of a court for evidence in a criminal case. This is what no doubt *this court* would do if confronted with a demand by a Congressional committee for any of our internal documents. We would weigh and decide and assert the privilege as *we* saw it, not as a Congressional committee would see it. *We* would do so on the Constitutional ground of separation of powers. And this is what the President has done here.[167]

*Nixon v. Sirica* did not involve a conflict between executive privilege interests and congressional investigative interests. While there was no confrontation of executive and legislative branch prerogatives, there was a straight confrontation between

---

166. *Id.* at 763 (Wilkey, J., dissenting) (emphasis in original).

167. *Id.* at 773-74 (Wilkey, J., dissenting) (emphasis in original).

the judiciary and the executive.[168] Thus, Judges MacKinnon and Wilkey contended for absolute deference to the Presidential judgment in asserting executive privilege against the judiciary. There is no reason to conclude they would take any other position vis-à-vis Congress. Moreover, in his concurring opinion in *Senate Select Committee on Presidential Campaign Activities v. Nixon*,[169] which involved a confrontation between congressional investigative power and executive privilege, Judge Wilkey referred to his opinion in *Nixon v. Sirica* as taking the position that actions challenging Presidential assertions of executive privilege are nonjusticiable.[170]

The positions taken by advocates of the absolutist approach demonstrate the close linkage between the issues of justiciability and the substantive standards by which courts should resolve the dispute. If the judicial decision on the merits runs in favor of the executive, then in the majority of cases the net effect will be the same as if the court held either that (1) the case is not justiciable, or (2) even though justiciable the courts should withhold judicial relief as a matter of prudence. In the typical executive privilege-congressional subpoena case it is Congress that needs affirmative judicial action because the executive has possession of the documents. If the courts do not act, that possession remains unaffected, and the executive wins. The result is the same if the courts decide the case, but defer absolutely to the executive. Thus, it should not be surprising that the opinions of the two principal advocates of absolute deference to the executive judgment, Judges MacKinnon and Wilkey, do not sharply distinguish between issues of justiciability and substantive standards for decision. Rather, they concentrate on the propriety—as a matter of history, policy, and good constitutional adjudication—of leaving the final judgment to the President. Similarly, while Professor Cox's view is that ultimate resolution should be left to a full vote of the appropriate House of Congress, it is not clear whether his position is (1) that Congress should pass a statute authorizing such a procedure, and the courts should hold the statute constitutional; (2) that absent such a statute, courts should hold that since another branch of government is better suited to resolve

---

168. The tapes were to be examined in camera by the district judge "and the grand jury may never see or hear any of them after the District Judge's review *in camera.*" *Id.* at 788. As a consequence, "the Judiciary-Executive confrontation is there at the outset, whatever the character of the grand jury." *Id.*

169. 498 F.2d 725 (D.C. Cir. 1974).

170. *Id.* at 734 (Wilkey, J., concurring).

such disputes the courts will refrain from decision and will if necessary enforce the judgment of the House of Congress when made; or (3) that if a House of Congress has passed on the issue, courts should refrain from taking any action. As in the case of the positions taken by Judges MacKinnon and Wilkey, any of these views results in shifting the real decisional authority from the courts to another branch of government.[171]

### B.   Weighted Balancing

Three federal judicial opinions have considered on the merits square conflicts between a Presidential assertion of executive privilege and a congressional subpoena. They are the district court's and court of appeals' opinions in *Senate Select Committee on Presidential Campaign Activities v. Nixon*,[172] and the district court opinion in *United States v. AT&T*.[173] At least two of the three opinions (and perhaps all three) have applied a weighted balancing standard, with the pre-merits weighting favoring the President. This is the only approach, therefore, that is clearly supported by a majority opinion of a federal court.

The *Senate Select Committee* case was a suit by the Ervin committee seeking access to five tape recordings of conversations between President Nixon and John Dean. The committee had served a subpoena duces tecum on the President, who responded by asserting executive privilege. On the first go-around of attempted judicial enforcement, Judge Sirica ruled that the district court lacked jurisdiction. Congress thereupon passed a special statute giving the district court jurisdiction to enforce the select committee's subpoenas.[174] In the subsequent enforcement action the district court (Judge Gesell) dismissed the complaint without prejudice. Whether he gave any pre-merits weight to the assertion of executive privilege is not clear from the opinion. On the one hand, the opinion made the observation that "[i]t has not been demonstrated to the Court's satisfaction that the Committee has *a pressing need* for the subpoenaed tapes or that further public hearings before the Committee concerning the content of those

---

171. If shifted to a House of Congress, this will mean that the legislative branch wins. There may, however, be some occasions when a House of Congress would decide to deny to one of its constituent committees the information requested from the executive branch, but this would rarely occur.

172. The district court opinion is reported at 370 F. Supp. 521 (D.D.C. 1974) and the court of appeals opinion at 498 F.2d 725 (D.C. Cir. 1974).

173. 419 F. Supp. 454 (D.D.C.), *modified,* 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

174. *See* text accompanying note 101 *supra.*

tapes will at this time serve the public interest."[175] On the other hand, the concluding paragraph stated that "while the controversy presented is justiciable, the Select Committee *has not established by a preponderance of the evidence* that it is entitled at this particular time to an injunction directing the President to comply with its subpoena for the five tape recordings."[176]

By contrast, the court of appeals in the *Senate Select Committee* case quite clearly followed a weighted balancing approach. That court held applicable the same basic approach that it had followed in *Nixon v. Sirica:* a generalized assertion of executive privilege by the President is "presumptively privileged,"[177] and the presumption can be overcome "only by a strong showing of need by another institution of government—a showing that the responsibilities of that institution cannot responsibly be fulfilled without access [to the documents sought]."[178] Thus, the court of appeals in *Senate Select Committee* (1) adopted as the governing rule a weighted balancing approach with the presumption favoring the Presidential assertion of privilege in cases involving conflicts between congressional subpoenas and assertions of executive privilege based on confidential communications; (2) relied as precedent on its earlier ruling in *Nixon v. Sirica,* thus suggesting that the same standard is applicable whether the Presidential assertion conflicts with fundamental functions of either of the other branches; and (3) rejected the district court's opinion insofar as it followed a contrary approach.[179] By the time the case reached the court of appeals, the House Committee on the Judiciary had begun its inquiry into Presidential impeachment. Under these circumstances, the court held that "the Select Committee has failed to make the requisite showing"[180] because its "immediate oversight need for the subpoenaed tapes is, from a congressional perspective, merely cumulative."[181] With regard to the weight of the burden, the court observed that the committee had not shown that "the subpoenaed evidence is demonstrably

---

175. 370 F. Supp. at 522 (emphasis added).

176. *Id.* at 524 (emphasis added).

177. 498 F.2d at 730.

178. *Id.*

179. The "apparent understanding" of the district court opinion which the court of appeals rejected was probably the district court's failure to weight the scales in the President's favor. *Id.*

180. *Id.* at 731.

181. *Id.* at 732. With regard to congressional oversight, the opinion observed, "In the circumstances of this case, we need neither deny that the Congress may have, quite apart from its legislative responsibilities, a general oversight power, nor explore what the lawful reach of that power might be under the Committee's constituent resolution." *Id.*

Case 1:21-cr-00670-CJN   Document 58-27   Filed 04/15/22   Page 56 of 69

critical to the responsible fulfillment of the Committee's func-
tions."[182]

The court of appeals opinion in *Senate Select Committee v.
Nixon* was issued just about a year before the Supreme Court held
in *Eastland v. United States Servicemen's Fund* that the issu-
ance and enforcement of congressional subpoenas are included
within the speech or debate clause immunity. *United States v.
AT&T* is the only post-*Eastland* case to consider on the merits a
square conflict between executive privilege and congressional
subpoena power. The magnitude of the conflict was sharpened by
the fact that the asserted executive interest was the protection of
foreign intelligence secrets, an area of Presidential responsibility
in which the United States Supreme Court declared in *United
States v. Nixon* that "courts have traditionally shown the utmost
deference."[183] Moreover, the congressional interest in *AT&T* was
enforcement of a subpoena, held by *Eastland* to be included
within speech or debate, and the *Eastland* opinion had declared
that "the prohibitions of the Speech or Debate Clause are abso-
lute."[184]

While the formal parties in *United States v. AT&T* were the
United States (the executive branch) as plaintiff and AT&T as
defendant, the telephone company had no interest in the outcome
of the suit, filed no pleadings, and neither briefed nor argued any
of the issues. The position adverse to that of the President was
vigorously advanced by the intervenor and the real party in inter-
est, Chairman Moss, who initially appeared on behalf of himself,
and later on behalf of the entire House of Representatives. Chair-
man Moss took the absolutist position that the judicial inquiry
should end with a determination that the subpoena was issued for
a legitimate legislative purpose. The district court rejected this
view and stated that the appropriate test was to balance the
competing interests:

> The Court accepts the position of the intervenor that the
> subpoenaed materials are sought pursuant to a legitimate legis-
> lative investigation. Contrary to the intervenor's argument,
> however, the Court's inquiry cannot conclude at this point. The
> legislative authority to investigate is not absolute. In our system
> of government the Constitution is supreme, but no one portion
> of the Constitution is sacrosanct. Here, the nature, the extent

182. *Id.* at 731.
183. 418 U.S. at 710.
184. 421 U.S. at 501.

and the relative importance of the power of one coordinate branch of government must be balanced against that of the other. Neither can be considered in a vacuum.[185]

The district court listed three factors it felt should appropriately be taken into account in affecting the balance: (1) "whether the information requested is essential to 'the responsible fulfillment of the committee's functions,' *Senate Select Committee v. Nixon*, . . . 498 F.2d 725, 731 (1974)"; (2) "whether there is 'an available alternative' which might provide the required information 'without forcing a showdown on the claim of privilege,' *United States v. Reynolds*, 345 U.S. 1, 11 . . . (1953)"; and (3) "the circumstances surrounding and the basis for the Presidential assertion of privilege. [*United States v. Reynolds*, 345 U.S. at 11]; *United States v. Nixon*, 418 U.S. 683, 710-11 . . . (1974)."[186]

As to the first two factors, the court commented that "[t]he helpfulness of the national security request letters in determining the basis on which the wiretaps were instituted is minimal."[187] However, the backup memoranda, even though subject to deletion of specific information, would "ostensibly afford the Subcommittee relevant information upon which to determine whether the wiretaps were instituted for foreign intelligence surveillance rather than domestic surveillance and to make the determination as to whether new legislation should be drawn."[188]

With regard to the third factor, the court observed:

> [T]he President has determined that release of the material would present an unacceptable risk of disclosure of the most sensitive national security and foreign policy matters. The possible effect of such disclosure has been detailed above. Such a determination by the Executive is generally accorded great deference by the courts.[189]

The court's final conclusion was as follows:

> [I]f a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure, must be made, it should be made by the constituent branch of government to which the primary role in these areas

---

185. 419 F. Supp. at 459.
186. *Id.* at 460.
187. *Id.*
188. *Id.*
189. *Id.* (citing United States v. Nixon, 418 U.S. 683, 710-11 (1974); United States v. Reynolds, 345 U.S. 1, 10 (1953); Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948)).

286    BRIGHAM YOUNG UNIVERSITY LAW REVIEW      [1978:

is entrusted. In the areas of national security and foreign policy, that role is given to the Executive.[190]

The same considerations discussed above as supporting an absolutist approach also support the position that if the court is to balance the interests of one branch against those of another, pre-merits weighting is better than a straight balancing. It is easier, it yields more consistent and predictable results, and it requires lesser judicial involvement in policy matters clearly committed to another branch. Weighted balancing also has the support of the limited judicial precedents dealing with the issue. The conceded materiality of these considerations notwithstanding, they are insufficient to carry the day. They bear more heavily on justiciability and on the wisdom of the court of appeals' efforts in the *AT&T* and *Nixon v. Sirica* cases to achieve a negotiated settlement than on the standards for judicial decision.

I believe that the preferred approach is an evenhanded balancing with no pre-merits weighting. Unlike the other two approaches, it has been advocated by neither judicial nor scholarly opinion. Some of the reasons why it is the best approach are closely linked to the issue of justiciability. Accordingly, the final Subsection of this Article will discuss my views concerning justiciability (discussed earlier in Section IV) and nonweighted balancing as the appropriate standard for judicial resolution of executive privilege-congressional subpoena cases.

## C.   Justiciability and Nonweighted Balancing

### 1.   Justiciability

All three opinions that have resolved on their merits conflicts between executive privilege and the congressional subpoena power—the district court and the court of appeals in *Senate Select Committee* and the district court in *AT&T*—have necessarily held that such conflicts are justiciable. The court of appeals' second opinion in *AT&T* also held such disputes justiciable, thus providing the basis for its creative attempts to achieve a negotiated solution, if possible, and for its ultimate disposition of the merits of the case, if necessary.

---

190. *Id.* at 461. This case demonstrates that the three standards suggested above—absolute deference, weighted balancing, and straight balancing—may shade into each other. Judge Gasch's final paragraph, quoted above, suggested that in carrying out his stated purpose to balance the competing considerations he may have weighted the scales so heavily in the executive's favor that the end result was absolute deference to the President's decision, the approach advocated by Judges Wilkey and MacKinnon.

The arguments against justiciability, discussed in Section IV above, highlight the problems that result from judicial attempts to resolve confrontations between executive privilege and congressional investigative power. If the appropriate judicial standard is to balance without a pre-merits weighting, judicial resolution will not only involve consideration of matters that are "committ[ed] . . . to a coordinate political department;"[191] in the usual case courts will be required to reevaluate the policy judgments reached by the other branches. Moreover, in the usual executive privilege-congressional subpoena case, these policy judgments are not only central to the other branches' constitutional duties; they are also judgments that the other branches are much more qualified to make.

What this counsels, however, is not that executive privilege-congressional subpoena cases are nonjusticiable, but rather that courts should follow the lead of the court of appeals in *AT&T*: decline to reach the merits in such suits until all reasonable efforts to bring about a negotiated settlement have been exhausted. Manifestly, the parties understand better than the courts which aspects of their positions can be compromised without working serious damage to their own particular needs and to important governmental objectives. Moreover, because of the case or controversy limitation on judicial fact finding, courts lack the fine-tuning capability to achieve through judicial decree a resolution that would serve the competing interests as well as would a negotiated compromise. It is therefore consistent with article III's case or controversy limitation, as well as with basic separation of powers principles, for courts to afford the parties to interbranch disputes every reasonable opportunity to achieve—and sometimes pressure them toward achieving—a compromise, prior to and as a precondition of judicial resolution.

It must be recognized, however, that even the most creative judicial efforts to maximize the opportunity and the incentive for a negotiated settlement will not always bear fruit. While it is in the interest of good government to have the disputant branches resolve their own differences if they can, it is not in the interest of good government to leave the dispute unresolved. Indeed, leaving such disputes "unresolved" does not really leave them unresolved. A holding of nonjusticiability means victory for the defendant; in most executive privilege-congressional subpoena cases this will be the President. The conflict in these cases is real and

---

191. Baker v. Carr, 369 U.S. at 217.

the stakes are high; the relevant issues are central to governmental functions. Such issues deserve consideration on the merits rather than decision by default. It is unthinkable, for example, that the dispute in *Youngstown Sheet & Tube Co. v. Sawyer*[192]—a pure vanilla dispute over the respective powers of Congress and the President—should have been left unresolved.

It is therefore necessary that there be a final decisional authority. Such authority should—and does—rest with the courts. The issues in interbranch controversies concern the interpretation of the Constitution for the purpose of settling disputes between disagreeing parties. Both the resolution of disputes and the declaration of constitutional doctrine are the traditional province of the judiciary. And whatever the difficulties or potential improprieties posed by the federal judiciary's attempting to resolve such disputes and fashion an appropriate remedy, they are certainly no greater than in legislative apportionment or busing cases. Judicial resolution of interbranch disputes should be a last resort. But in those rare cases where judicial resolution is necessary, decision of such cases on the merits is not only consistent with the case or controversy limitation of article III, it is the most important thing federal courts do.

### 2. Nonweighted balancing: the preferred judicial approach

Just as courts should avoid deciding executive privilege-congressional subpoena cases as long as there is any reasonable possibility that judicial efforts to induce a negotiated settlement may be successful, a court faced with the necessity of deciding such cases should apply a rule of decision that recognizes the equality of its sister branches of government who are the litigants in its courtroom. The standard that achieves maximum fidelity to this objective is a straight balance with no pre-merits weighting given to either side.

As discussed above, an absolutist standard would be the easiest to apply and would yield the most consistent and predictable results. But it is a standard that places the judiciary in the position of having to decide which of its sister branches is to receive such automatic and inflexible favor at the expense of the other. That kind of judicial decision is unseemly, unwise, and inconsistent with sound separation of powers theory. A fundamental premise of separation of powers theory is that even though each branch enjoys spheres of activity within which it is supreme, in

---

192. 343 U.S. 579 (1952).

their interbranch relationships and in the status to which each is entitled before other branches, all are equal. This is especially true when the position of each branch in a litigated interbranch dispute is solidly grounded on settled constitutional principles. An absolute, never-changing preference of one of these positions over the other regardless of the circumstances of the individual case is inconsistent with the premise that each branch is equal in its relationships with other branches.

Based perhaps on notions of separation of powers, there is a decided and understandable judicial reluctance to reexamine a policy judgment made by a coordinate branch within its own particular sphere of responsibility. For example, in support of his "Who decides?" approach in *Nixon v. Sirica* (and his conclusion that the one who decides is the President), Judge Wilkey reasons, "There *are* conflicting public interests involved, they must be carefully weighed, balanced, and appraised; the President says he has done just that."[193] Judge Wilkey's conclusion is:

> Thus, the real issue, even by the analysis in other parts of the *Per Curiam* opinion, is whether it is appropriate for the court to determine the legal validity of a claim of privilege by the President, or whether the Constitutional principle of separation of powers requires the court to yield to the President's judgment as to where the public interest lies. My answer would be the latter.[194]

The final paragraph of District Judge Gasch's opinion in *United States v. AT&T* states the same basic approach:

> The Court is not implying that the members of the Sub-committee, or of the House of Representatives, will act negli-

---

193. 487 F.2d 700, 763 (D.C. Cir. 1973) (Wilkey, J., dissenting) (emphasis in original). The foregoing analysis assumes, for reasons set forth and discussed in text accompanying notes 168-70 *supra*, that Judges Wilkey and MacKinnon would apply the same rationale as contained in their *Nixon v. Sirica* opinions to a controversy involving conflicting prerogatives of the legislative and executive branches. In any event, the analysis set forth above is also applicable to the dispute in *Nixon v. Sirica*, since the conflict there was between the powers of the executive and judicial branches. Arguably, the hardest case for justiciability of interbranch conflicts and for the application of a nonweighted balancing approach occurs in those cases where one of the branches involved in the interbranch conflict is the judiciary. In such cases, the courts act, in a sense, as judges of their own case. Notwithstanding this conceptual concern, the conclusions reached in the text are equally applicable where judicial powers are in conflict with those of another branch. The underlying premise of the "rule of necessity," Evans v. Gore, 253 U.S. 245, 247-48 (1920); Atkins v. United States, 556 F.2d 1028, 1040 (Ct. Cl. 1977), is that when there is no other alternative, judicial decision of cases in which the judiciary may have an institutional interest poses lesser net drawbacks than leaving important issues, particularly constitutional issues, unresolved.

194. 487 F.2d at 794 (Wilkey, J., dissenting).

gently or in bad faith if they have access to these documents.
But it does appear to the Court that if a final determination as
to the need to maintain the secrecy of this material, or as to
what constitutes an acceptable risk of disclosure must be made,
it should be made by the constituent branch of government to
which the primary role of these areas is entrusted. In areas of
national security and foreign policy, that role is given to the
Executive.[195]

This reluctance to reevaluate the policy judgments of an-
other branch is appropriate in the vast majority of contexts. In-
deed, on many issues within areas of exclusive executive or legis-
lative responsibility, the judicial standard ought to be nothing
less than absolute deference.[196] But that kind of approach breaks
down where the interests on both sides of the conflict are sup-
ported by policy determinations made by officials of two separate
branches of government, each acting in his own particular sphere
of governmental responsibility. Judge Wilkey is right: The Presi-
dent has balanced the competing national interest considera-
tions. He has done so in the exercise of his constitutional responsi-
bilities, and he has reached a final conclusion. If the President
were the only governmental entity and if his decision were the
only public policy judgment involved in the litigation, then abso-
lute deference or something approaching it would be the appro-
priate standard. But where the litigated interests in conflict with
those of the President are also supported by a policy judgment
made by a coequal branch of government, the supporting ration-
ale for absolute deference is missing and the absolutist approach
is inappropriate.

Professor Cox's position that "the legislative right should
prevail in every case in which either the Senate or the House of
Representatives votes to override the Executive's objections"[197]
suffers from the same defect. His assurance that "[t]he very
need for a vote of an entire chamber would . . . provide a forum
in which the Executive's arguments could be fairly considered"[198]
might or might not be realized in any given case. A fair forum
notwithstanding, vesting the final decisional authority over dis-
putes between the Congress and the President with either of the

---

195. 419 F. Supp. at 461.
196. Eastland v. United States Servicemen's Fund, 421 U.S. 491 (1975); Banco Na-
cional de Cuba v. Sabbatino, 376 U.S. 398, 431-33 (1964); Chicago & S. Air Lines, Inc. v.
Waterman S.S. Corp. 333 U.S. 103 (1948).
197. Cox, *supra* note 131, at 1434.
198. *Id.*

disputants is still fundamentally unfair and the unfairness strikes at the very roots of coequality and separation of powers.

The district court in *AT&T* concluded

> that if a final determination as to the need to maintain the secrecy of this material, or as to what constitutes an acceptable risk of disclosure, must be made, it should be made by the constituent branch of government to which the primary role [in the areas of national security and foreign policy] is entrusted.[199]

There is a parallel, equally persuasive article I-based position that if a final decision as to the need of these materials for legitimate legislative purposes—and the ability of a subcommittee to adequately safeguard them—must be made, it should be made by the constituent branch of government to which the primary responsibility for policymaking is entrusted.[200] Thus, litigation involving interbranch conflicts places the court in a genuine theoretical dilemma. Choosing between the conflicting positions of sister branches and reviewing the substance of policy decisions made by those branches are not the kinds of functions that courts perform best. But the alternatives are even worse: adopting the absolutist approach and thus yielding automatically in every case to the judgment of one branch and rejecting that of the other; or simply staying out of the matter, which necessarily results in a de facto holding in favor of one branch or the other.

A weighted balancing approach is also inappropriate for the resolution of executive privilege-congressional subpoena cases. When the competing interests requiring judicial resolution are those of society on one hand and the individual on the other, there are both practical and theoretical reasons for giving a preference to one set of interests.[201] There is no adequate basis for such a distinction, however, when the competing interests are those of

---

199. 419 F. Supp. at 461.

200. Indeed Chairman Moss took just such a position. His first brief before the court of appeals states:

> The plain mandate of existing judicial authority . . . makes clear that the responsibility of courts in a case such as this is limited to a determination of whether Congress is acting within its jurisdiction, as opposed to usurping powers exclusively vested elsewhere. Conversely, those authorities make abundantly clear that, having made such determination, the principle of separation of powers precludes the courts from substituting their judgment for that of Congress as to the specific need for particular information that Congress seeks in a course of a valid legislative investigation.

Brief for Intervenor-Appellant at 49-50, United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) (first opinion), 567 F.2d 121 (D.C. Cir. 1977) (second opinion).

201. *See* text following note 151 *supra*.

coordinate branches of government and when both sets of interests are rooted in the Constitution.

While there are other possible arguments for preferring one set of interests over another, they fall short of justifying a premerits weighting in favor of either the legislature or the executive. In favor of Congress it might be asserted that congressional investigative powers fall under the speech or debate immunity[202] which is expressly guaranteed by the Constitution while executive privilege is only implied. Although a true statement, it is unpersuasive for several reasons. First, even though the Constitution expressly provides for speech or debate immunity, it does not expressly extend such immunity to the issuance and enforcement of congressional subpoenas. Second, the Court has not traditionally assigned a higher constitutional value to express rights and principles than to implicit ones and is not likely to do so. The premier power and function of the federal courts, judicial review, is implicit rather than express. Some of the individual rights that the Court has held to be "fundamental," such as the right to travel[203] and various aspects of the right of privacy,[204] must be inferred from more explicit provisions.

For the executive, it might be argued that a decision by the President, in whom all article II authority is vested, does not really stand on the same footing as a decision by a single committee of one House of Congress (or in some cases, a single subcommittee or subcommittee chairman, vested with authority to issue subpoenas). This argument also is insufficiently persuasive. The functioning of each branch within itself and the level of approval that must be obtained before official action is to be taken are matters internal to that branch, as long as the requirements of the Constitution are met. Even if one were to assume that the Constitution requires such symmetry that the decision of a President is under all circumstances to be preferred to that of a congressional committee or subcommittee, the needs of such conceptual symmetry would be satisfied by the fact that the reason subpoenas can be approved by the action of a committee, subcommittee, or a chairman is that the entire House of Congress has arranged its internal structure to permit such a procedure.

Finally then, these two postulates remain: (1) Each branch enjoys primary responsibility and authority over certain govern-

---

202. *See* notes 44-58 and accompanying text *supra.*
203. Shapiro v. Thompson, 394 U.S. 618 (1969).
204. Roe v. Wade, 410 U.S. 113 (1973); NAACP v. Alabama, 357 U.S. 449 (1958).

mental functions (lawmaking, law enforcement, and law interpre-
tation, including judicial review). Nevertheless, in their inter-
branch relationships, in the deference that each branch owes to
the other two, and in the standing that each enjoys before the
others, the three branches are equal. (2) It is fundamentally in-
consistent with that principle of coequality for the judiciary to
resolve cases or controversies involving competing constitution-
ally based claims of the other two branches by according absolute
deference to the judgment of either. It is equally inconsistent with
coequality for the courts to hold such a case nonjusticiable
(thereby effecting the same net result as absolute deference) or
to employ a balancing approach that weights the balance scales
in favor of one branch or the other.

Thus, the remaining alternative is a genuine balancing ap-
proach without any predetermined preference for either side, with
the victor to be determined on the basis of a simple preponder-
ance of relevant considerations. This approach will be the most
difficult of all possible judicial approaches and will provide the
least predictable results. Since executive privilege-congressional
subpoena controversies so rarely call for judicial resolution, how-
ever, and since the governmental stakes involved are so large,
judicial ease and predictability do not seem as important as in
other contexts.

Whenever an executive privilege-congressional subpoena
case comes before a court, both parties will have already made
certain judgments and reached certain conclusions. In the *AT&T*
case, for example, the subcommittee had determined that access
to the leased line letters was necessary to the subcommittee's
oversight function and to enable it to determine whether amend-
ments to the Communications Act should be enacted. On the
other side of the balance scale was the President's determination
that compliance with the subpoena would involve unacceptable
risks of disclosure. In attempting to achieve a balance between
these two competing determinations, there are several levels of
possible judicial reevaluation of underlying policy judgments,
and concomitantly, judicial intrusion into substantive policy
areas committed to other branches.

The first level, involving the least judicial intrusion, would
be for the court to accept the correctness of the judgments made
by each of its sister branches and—taking these judgments as
correct—balance the one against the other. Because it involves
less judicial intrusion into the affairs of the other branches, this
would be the preferable approach, provided that it would satis-
factorily resolve the case. I suspect that in many executive

privilege-congressional subpoena cases, however, it will not. Applying such an approach to the facts of the *AT&T* case, it might be contended that the President's determination has a broad sweep involving detriment "to the national defense and foreign policy of the United States and damag[e] to the national security." Accepting this determination at full value, it has a greater impact on national interests than the oversight of one subcommittee and consideration of the possible need to amend section 605 of the Communications Act. This is an unduly formalistic kind of analysis, however, and would simply invite broader congressional definitions of the legislative investigative purpose. In *AT&T*, for example, the purpose of the investigation could have been described as a determination of the extent to which the United States government is infringing upon the constitutionally guaranteed rights of its own citizens. This could have been coupled with a legislative determination that access to the documents was indispensable to the achievement of the legislative objective. Thus, taking the policy judgments of the respective branches totally at face value as articulated by Congress or the President and attempting to balance them may be a futile exercise.

The level of judicial inquiry at the opposite extreme would involve the court in a complete redetermination of the policy judgments made by the other two branches. In the *AT&T* case, reexamination of the underlying legislative policy judgments would have involved such inquiries as, "Why is this information really important to the legislative inquiry?" or "What kind of legislation does the subcommittee have in mind, and how do these documents bear on that legislation?" A more extreme inquiry—which I assume no court would ever make—would be, "Are any amendments to section 605 really necessary?" On the Presidential side, a reevaluating court might ask what the "risks of disclosure" really are, and why they are "unacceptable." Neither Mr. Moss nor anyone on the subcommittee ever indicated an intent to disclose anything in the subpoenaed documents. Indeed, the subcommittee pointed to its own excellent record in maintaining the security of secret information. On what, then, does the President base his judgment that there are risks of disclosure and that they are unacceptable? This kind of reevaluation of Presidential decisions could lead the court into other areas which most courts would quite clearly want to avoid and which in most cases they should avoid. But, in some cases, certain such questions might be appropriate for in camera review, such as: What do the documents really contain? And, why is it that their disclosure

(assuming that there are risks of disclosure) would be detrimental to national interests?[205]

In most cases, total judicial abstinence from substantive examination of the competing determinations of the other branches would provide an insufficient basis for deciding the case, but complete judicial reevaluation of those judgments would involve more judicial intrusion than is necessary. There is an intermediate level of judicial inquiry that I believe in most cases will enable the court to satisfactorily perform its constitutional duty to decide cases or controversies, without unduly intruding into the constitutional domain of the other branches. In most—possibly all—executive privilege-congressional subpoena cases the court could accept as its premise the correctness of the competing policy judgments made by the Congress and the President. It could then focus on possible alternatives to the withholding or disclosure of the information at issue, and in the process determine which alternatives would serve the policy objectives of one of the branches without significantly diminishing those of the other.

The *AT&T* case is again illustrative. The President determined that compliance with the subpoena would involve unacceptable risks of disclosure. Without reexamining that judgment, are there alternative means for protecting against the risks of disclosure, other than total withholding? Would it be possible to limit the examination of the documents to a secure place provided by the executive branch, or to limit the number of legislative branch personnel who will make the examination and who

---

205. There are persons whose general orientation opposes exposure of secret material to persons outside the executive branch. Certainly, it is in the interest of government and its citizens to limit the number of persons, no matter how reliable, who have access to secret information. But, there is no magical linkage between executive branch employment and reliability with regard to secret information. For reasons set forth below, it is preferable for courts applying a balancing test to executive privilege-congressional subpoena cases to do so at a level that will involve the least possible intrusion into underlying policy judgments of sister branches, so long as such intrusion minimization can be achieved without sacrificing the court's ability satisfactorily to decide the case. The subjective impression born of my personal experience is that courts generally are very cautious about examining government secrets, and that when such examination has been necessary, the judicial security record is at least as good as that of either of the other branches. It is true that federal judges have not signed—as executive branch personnel have—a written undertaking not to disclose, and it would be unseemly to ask them to do so. But they have taken an oath to uphold and defend the Constitution. In those few cases where it may be necessary for a court to conduct a limited in camera investigation of secret material, including material of the sensitivity involved in the *AT&T* case, such an examination should be made. The reason that executive branch personnel have access to such information is that it is necessary to the performance of the governmental responsibilities. There are circumstances under which the same would be true with the federal judge. In such a case, the court should make the examination.

will have access to the results of that study? On the legislative side, the subcommittee determined that the information contained in the leased line letters is essential to the performance of its legislative duties of oversight and possible statutory revision. Accepting the correctness of that determination, are there means of supplying the information other than providing access to the leased line letters? Are there other documents whose delivery to the subcommittee (accepting also at face value the President's determination concerning risks of disclosure) would pose lesser risks, but would be just as helpful or even more helpful to the committee?

The foregoing questions certainly do not exhaust the alternatives in *AT&T*, and any executive privilege-congressional subpoena case will present its own unique set of alternative solutions. What these examples illustrate is that in *AT&T* the consideration of alternatives would permit the court to apply a nonweighted balancing approach at a level that would minimize substantive reexamination of the underlying policy judgments made by its sister branches. This should be true in most executive privilege-congressional subpoena cases. The ultimate issue in those cases will always be whether information should be delivered to Congress, where a component of Congress has decided that it should be delivered and the President has decided that it should not. Thus, just as in *AT&T* and in the *Senate Select Committee* case (where the court of appeals considered alternatives to the information sought by the committee and ultimately based its decision on the existence of such alternatives), any executive privilege-congressional subpoena case should present opportunities for consideration of alternative solutions. The consideration of alternatives does not completely extricate courts from the business of policy reevaluation, but at the very least, it shifts the reevaluation to a less intrusive level. In *AT&T*, consideration of alternatives could be undertaken without disturbing either the Presidential judgments concerning the disclosure risks, or the congressional judgments concerning the need for information.

In other contexts, consideration of alternatives has been found relevant to the resolution of constitutional issues.[206] In executive privilege-congressional subpoena cases, such an approach would permit the courts to balance the competing governmental

---

206. Linmark Assocs., Inc. v. Township of Willingboro, 431 U.S. 85 (1977); United States Trust Co. v. New Jersey, 431 U.S. 1 (1977); Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976); Dean Milk Co. v. City of Madison, 340 U.S. 349 (1951).

interests, but with minimal reevaluation of the policy judgments made by other branches. It would therefore seem to be the approach that best satisfies the judicial responsibility to decide cases or controversies without undue intrusion into functions that are equally central to constitutional duties of the other two branches.

## VI.  CONCLUSION

The germs of executive privilege and congressional investigatory powers were contained in the 1787 Constitution. Nevertheless, principles for dealing with the interactions between these two doctrines have only recently begun to emerge.

Probably the least satisfactory judicial approach to the accommodation of the competing needs of these two constitutional doctrines would be to hold the issue nonjusticiable. Such an approach would in fact resolve the conflict on a general, all-encompassing basis, without any opportunity for taking into account the particular characteristics of the individual case.

It is important that courts resolve these or any other conflicts between Congress and the President in a way that not only decides the case, but also recognizes the equality of the article I and article II branches as they appear before the article III branch. The only approach that is faithful to this objective is a straight balance of the competing interests, with no pre-merits weighting. For this reason it is the preferred approach, even though to date no court has applied it, and no judge or scholar has advocated it.