# EXHIBIT BB

# MODELS OF THE OPINION FUNCTION OF THE ATTORNEY GENERAL: A NORMATIVE, DESCRIPTIVE, AND HISTORICAL PROLEGOMENON

## John O. McGinnis*

Introduction ............................................... 375
I.   The Constitution and the Attorney General as Opinion
     Writer ............................................... 378
     A.   The Court-Centered Model ....................... 382
     B.   The Independent Authority Model................ 389
     C.   The Independent Authority Model and Stare
          Decisis ......................................... 400
     D.   The Situational Lawyer Model.................... 402
     E.   Theoretical Models in a Political World .......... 403
II.  The First Example of the Independent Authority Model
     and its Consequences ................................. 406
     A.   Attorney General Levi Lincoln and Independent
          Interpretive Authority ............................ 407
     B.   Attorney General Lincoln, President Jefferson, and
          the Louisiana Purchase ........................... 412
III. An Analysis of the Operations of the Current Office of
     Legal Counsel ........................................ 420
     A.   The Central Dilemma of OLC..................... 421
     B.   The Matching of Models to Tasks ................ 425
Conclusion ................................................ 435

### INTRODUCTION

The judiciary is not the only branch of government that offers authoritative constructions of the Constitution and other federal laws. Since the beginning of the Republic, the executive branch has made

* Assistant Professor, Benjamin N. Cardozo School of Law. I served as an attorney advisor from 1985 to 1987 and as Deputy Assistant Attorney General from 1987 to 1991 in the Office of Legal Counsel ("OLC"). I participated in drafting some of the materials cited in this article. I discuss, however, only material that has been made publicly available.

I am grateful to Robert Delahunty, a senior civil servant at OLC, for verifying certain of OLC's informal jurisdictional rules discussed in part III as well as for his helpful comments on this Article. I am also grateful to David Leitch, formerly Deputy Assistant Attorney General in OLC, for obtaining copies of letters drafted by OLC and sent to Congress. Thanks also to Mark Edelman, Michael Herz, David Rudenstine, Jeanne Schroeder, Paul Shupack, and Charles Yablon for their helpful comments.

formal pronouncements on constitutional and statutory issues of such a substantial scope and variety that they rival the opinions of the Supreme Court. A public recording of the executive branch's most authoritative legal voice is contained in forty-three volumes of published opinions of the Attorney General and sixteen volumes of published opinions of the Office of Legal Counsel ("OLC")—the office to which the Attorney General now delegates the great majority of his legal opinion writing.[1] These published opinions are only the tip of the iceberg. In OLC's library sit at least five filing cabinets of largely unpublished opinions dating from the time of OLC's creation in 1932. Biographies of former Attorneys General also report the existence of important unpublished opinions and memoranda of advice from past Attorneys General.[2]

These opinions comprise the largest body of official interpretation of the Constitution and statutes outside the volumes of the federal court reporters. Moreover, many of the opinions are the final word on the law because judicial resolution of the legal issue is unavailable. Yet, while the Supreme Court's work has been subjected to detailed and disparate analysis by historians, political scientists, and law professors, the opinion work of the Attorney General and his modern principal delegate—the OLC—has never been systematically addressed.

To be sure, the Attorney General's opinion-writing function has been mentioned in studies of the office of the Attorney General,[3] and some of the major opinions of the Attorney General addressing such issues as the Bank of the United States and the Missouri Compromise have been discussed in the context of the political and legal controversies that gave rise to them. These opinions, however, are never analyzed as a group in order to shed light on the role of the executive branch's legal interpretation in constitutional theory or on the influence of the Attorney General's opinions in constitutional history. If, as is widely believed, the executive branch has some measure of responsibility for interpreting the Constitution,[4] more attention should

---

[1] On January 15, 1993 the Office of Legal Counsel released a "preliminary print" of opinions from 1983 to 1992. These continue a series of six bound volumes begun in 1977.

[2] *See, e.g.*, Letter from Edmund Randolph to Thomas Jefferson (July 7, 1792), *quoted in* JOHN J. REARDON, EDMUND RANDOLPH: A BIOGRAPHY 205 (1974) (opining that a recess appointment could be made only if the vacancy occurred during a recess of the Senate). For a discussion of the circumstances of the opinion, see REARDON, *supra*.

[3] For a discussion of the opinion function in the most recent study of the office of the Attorney General, see NANCY V. BAKER, CONFLICTING LOYALTIES: LAW AND POLITICS IN THE ATTORNEY GENERAL'S OFFICE, 1789-1990, at 14-18, 24-26 (1992).

[4] *See, e.g.*, LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 3-4, at 34-37 (2d ed. 1988). The inattention is all the more surprising in light of the substantial interest that has

be paid to what is distinctive regarding the substance and scope of its construction.

The purpose of this Article is to make a start in filling this gap in both constitutional analysis and constitutional history. Because so little previous analysis exists, the most useful kind of work is a prolegomenon—a framework for more detailed analysis to come. To this end I will first address as a normative constitutional matter the three most plausible models of Attorney General as opinion writer: the "court-centered" model that views the Attorney General as bound by Supreme Court precedent and therefore as essentially circumscribed by the judiciary's view of the law; the "independent authority" model which views the Attorney General as providing an interpretation of the law that articulates the President's jurisprudential principles rather than those of the Court; and the "situational" model which views the Attorney General as interpreting the law in a manner that most advances the President's political or situational interest on a particular issue with little or no sense of obligation to either court-centered or autonomous jurisprudential principles. The analysis will address the premises of each model and attempt to compare them on a theoretical and practical level, addressing along the way some implications of the models for such constitutional doctrines as stare decisis.[5] Finally, this section will consider what political forces will influence the kind of model of executive interpretation or mix of models that an Attorney General chooses to adopt.

Second, this Article will provide an example of an early administration's adoption of one of the models and its consequences. In his opinion writing in the Jefferson administration, Attorney General Levi Lincoln consciously embraced an independent authority model so he could advance the strict constructionist jurisprudence of Jefferson and the Republicans—a jurisprudence not shared by the Federalist judiciary.[6] Lincoln, however, ultimately failed to persuade Jefferson to adhere to his own jurisprudence in the Louisiana Purchase.[7] His failure facilitated the triumph of Federalist jurisprudence. Indeed, John Quincy Adams believed that it was this lapse in executive interpretation that guaranteed the victory of Chief Justice

---

been shown in the work of the Solicitor General in his role as the chief litigator of the United States. *See, e.g.,* LINCOLN CAPLAN, THE TENTH JUSTICE (1987); Eric Schnapper, *Becket at the Bar—The Conflicting Obligations of the Solicitor General,* 21 LOY. L.A. L. REV. 1187 (1988).

[5] Thus, the purpose of this Article is *not* to determine which model is correct, but rather to refine the models and show the relationships among them.

[6] *See infra* notes 126-29 and accompanying text.

[7] *See infra* notes 137-60 and accompanying text.

Marshall's constitutional principles.[8] I hope this case study of one Attorney General's jurisprudence may prompt inquiry into the work of other Attorneys General and thus reorient the history of constitutional interpretation from its exclusive focus on the Supreme Court.

Finally, I will address the role of the modern Office of Legal Counsel. This office has inherited most of the opinions functions of the Attorney General, while the Attorney General's office has evolved from one primarily concerned with legal analysis to one whose responsibilities extend to as many policymaking areas as a European home secretary or interior minister. OLC is a producer of legal opinions, but it is also a bureaucracy in the modern administrative state concerned with maintenance of its position. Accordingly, this Article will explore the complex set of bureaucratic needs and pressures that shape the processes by which the legal opinions are produced and effect the degree to which various models of executive branch interpretation are realized in modern practice. Thus, through a mixture of normative constitutional theory, constitutional history, and bureaucratic theory, this Article will attempt to clarify the nature and function of the opinions of the Attorney General and OLC.[9]

## I. THE CONSTITUTION AND THE ATTORNEY GENERAL AS OPINION WRITER

The Constitution makes clear that the President has legal responsibilities. He swears an oath to "preserve, protect and defend the Constitution of the United States."[10] The Framers expected him to exercise this power of legal interpretation in vetoing bills: he would interpret the statute and then measure it against the Constitution.[11] At least some framers also expected him to refuse to execute unconsti-

---

[8] *See infra* note 166 and accompanying text.

[9] In the first section I will refer to the Attorney General generically to encompass both the Attorney General and his or her opinion-writing delegate.

[10] U.S. CONST. art. II, § 1, cl. 8. For a fuller discussion of the significance of the President's oath—an oath more elaborate in form than that required of any other constitutional actor—see John O. McGinnis, *Principle Versus Politics: The Solicitor General's Office in Constitutional and Bureaucratic Theory*, 44 STAN. L. REV. 799, 804 & n.31 (1992) [hereinafter McGinnis, *Solicitor General's Office*]; John O. McGinnis, *The President, the Senate, the Constitution, and the Confirmation Process: A Reply to Professors Strauss and Sunstein*, 71 TEX. L. REV. 633, 646-47 (1993) [hereinafter McGinnis, *Reply*].

[11] *See* THE FEDERALIST NO. 73, at 442, 445 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (stating that the veto power protects against laws that would violate the President's constitutional prerogatives). Madison also believed that the veto power was given to the President in part so he could veto unconstitutional laws. *See infra* note 40. Professor Michael Rappaport has recently argued that the President has a constitutional obligation to veto unconstitutional laws. *See* Michael B. Rappaport, *The President's Veto and the Constitution*, 87 NW. U. L. REV. 735, 771-76 (1993).

tutional laws and therefore to engage in a constitutional review of enacted laws in a manner not unlike that of the judiciary itself.[12]

While the Framers did not focus directly on the interpretation of the laws which any administration has to undertake to carry out its day to day functions, the structure of Article II suggests that the President is ultimately responsible for the legal interpretation of his administration. He has the right to require opinions from any department within his administration.[13] He has the obligation to

[12] 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 450-51 (Merrill Jensen ed., 1976) [hereinafter DOCUMENTARY HISTORY] (statement of James Wilson on Dec. 1, 1787) (analogizing the authority of the President to refuse to enforce an unconstitutional law to the judiciary's duty to invalidate an unconstitutional law that comes before it). *See also* Freytag v. Comm'r, 111 S. Ct. 2631, 2653 (1991) (Scalia, J., dissenting) ("[T]he means [available to the President] to resist legislative encroachment . . . [include] the power to veto encroaching laws or even to disregard them when they are unconstitutional.") (citation omitted).

[13] U.S. CONST. art. II, § 2, cl. 1. Professor Lessig has argued that the early practice of the opinion writing by the Attorney General undercuts the contention that the Framers contemplated a unitary executive branch. *See* Lawrence Lessig, *Readings by our Unitary Executive*, 15 CARDOZO L. REV. 175, 186-96 (1993). Specifically, he argues that the Attorney General's narrow construction of the statute that mandated opinions for cabinet heads and his refusal to write opinions beyond his statutory mandate suggests that the Framers did not believe that the power to create a centralized opinion function was inherent in the executive branch. *Id.* at 196. The evidence he adduces, however, does not appear to support his claim. All statements of the early Attorneys General in the opinions Professor Lessig cites are wholly consistent with the proposition that the Attorney General has the authority to write any opinion on any subject at the direction of the President. As long as the President retains this inherent authority (and Congress even appeared to recognize it in passing a statute that provided that the Attorney General should write opinions when "required by the President," as well as "requested by the heads of any of the departments," *see* Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93), executive branch legal interpretation is as unitary as the President chooses to make it.

Indeed, the decisions of the early Attorneys General to refuse to write opinions without express direction from the President for anyone besides heads of departments is completely consistent with the actual holding of Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792), cited by Professor Lessig himself. Lessig, *supra*, at 188 & n.62. In *Hayburn*, the Court held that Attorney General Randolph needed authorization from the President to enter a case where a federal law was being challenged as unconstitutional. 2 U.S. (2 Dall.) at 409. He was thus not viewed as the equivalent of the British Attorney General who had an independent commission to represent the public interest without authorization from the head of government. *See* Maeva Marcus & Robert Teir, Hayburn's Case: *A Misinterpretation of Precedent*, 1988 WIS. L. REV. 527, 534-39. In light of this rebuff to a previous Attorney General, Attorney General Wirt's restraint in rendering opinion without the express direction of the President is better interpreted as respect for the *President's* role as head of a hierarchical executive branch and a rejection of the notion of the Attorney General as a quasi-judge or the representative of the public interest in legal uniformity. Should the President have requested him to do so either specifically or by standing order, there is no indication that he would not have rendered opinions to district attorneys and others within the executive branch for whom he refused to write opinions. As Professor Lessig himself acknowledges, *see* Lessig, *supra*, at 190, the office of the Attorneys General was so understaffed in the early republic that it probably influenced the Attorneys General to interpret their statutory responsibilities narrowly to avoid being

*CARDOZO LAW REVIEW* [Vol. 15:375

"take Care that the Laws be faithfully executed."[14] This combination of authority and obligation gives him both the means and the responsibility to conduct an administration under the rule of law. Thus, it would appear that a model of the Attorney General as opinion writer would begin with the notion that he is aiding the President in carrying out the legal responsibilities, including that of constitutional interpretation, with which the President has been entrusted by the Constitution itself.

Although the Constitution gives the President these legal responsibilities, it does not expressly define how they should be exercised and therefore has left substantial room for disagreement concerning the Attorney General's obligation as a legal advisor and opinion writer.[15] Three basic models for the Attorney General have been suggested. The first model I have labeled the court-centered model because it is premised on the contention that the Attorney General is obliged in his legal opinions to follow the precedents laid down by the

---

overburdened, and the President would have been constrained in making his own legal demands for similar reasons.

Moreover, no inference adverse to unitariness can be drawn, as Professor Lessig suggests, *see id.* at 189, from Attorney General Wirt's refusal to render opinions for Congress. He was not required to do so by Congress (such a requirement would raise separation of powers issues in any event), and it hardly would be in the President's interest for the Attorney General to have permitted Congress to foist hard legal questions on the executive whenever it chose. Like the OLC of today, *see infra* part III, early Attorneys General understood that interpretative authority had to be exercised prudently to be politically effective.

[14] U.S. CONST. art. II, § 3. Of course, the meaning of the Take Care Clause is a matter of some controversy; its explication would require a full article in itself. Professor Lessig has presented the beginnings of an interesting argument that the Take Care Clause does not confer upon the President the authority to control the discretionary legal interpretations of his agents within the executive branch. *See* Lessig, *supra* note 13, at 196-99. The case for construing the Clause to confer this power on the President has recently been advanced in Saikrishna B. Prakash, *Hail to the Chief Administrator: The Framers and the President's Administrative Powers*, 102 YALE L.J. 991, 1000-04 (1993).

[15] In my view, however, the various oaths which the Constitution requires of the judges, legislators, and the President may suggest that each branch's responsibility is to the Constitution itself rather than to another branch's interpretation of the Constitution. As Professor Sanford Levinson has said:

If one believes that the judiciary "finds" the [law] instead of "creating" it, then the law is indeed "unconstitutional from the start." Indeed, the judicial authority under this view is derived from its ability to recognize the constitutionality or unconstitutionality of laws, but, at least theoretically, the constitutional status [of statutes] is independent of judicial recognition. To argue otherwise is ultimately to adopt a theory that says that the basis of law—including a declaration of unconstitutionality—is the court's decision itself. *Among other problems with this theory is the incoherence it leads to in trying to determine what it can mean for judges to be faithful to their constitutional oaths.*

*Constitutionality of GAO's Bid Protest Function: Hearings Before a Subcomm. of the Comm. on Gov't Operations House of Rep.*, 99th Cong., 1st Sess. 67 (1985) (remarks of Professor Sanford Levinson) (emphasis added).

Supreme Court.[16] The second model is labeled the independent authority model because it is premised on the contention that the President has the authority to interpret the law as he believes it should be interpreted independent of Court precedent.[17] The final model is the situational model in which the President simply interprets the law to advance his political objectives, taking into account precedent or legal principles only to the extent that they may create a political obstacle to fulfilling those objectives.[18]

It will be the thesis of this section that although the initial premises of these normative models seem wholly different, a more refined analysis of the constitutional theory will suggest that the disparities among the models and the divergence among the opinions they would produce may not be as substantial as might at first appear. First, as a matter of theory, even within a court-centered model the executive branch retains substantial autonomy in interpretation. Because the Constitution places the executive branch in a different institutional role from the judiciary, it should, as a matter of theory, have to take an independent view of any issues that rest on judicial doctrines that depend on institutional concerns peculiar to the judiciary, such as the political question doctrine. While the range of the Court's doctrine that rests on institutional as opposed to purely analytical concerns is itself open to dispute, within that range the Attorney General should be understood to exercise independent interpretative authority even under the court-centered model.[19]

Thus, the difference between the court-centered model and the independent model as a matter of theory can be narrowed to the issue of whether the executive branch must follow judicial precedent that rests on analytical foundations. The strongest argument for executive independence with respect to the analytical judgments of the Court rests on the notion that even these judgments need to be subject to

---

[16] For examples of adherence to this model, see Burt Neuborne, *The Binding Quality of Supreme Court Precedent*, 61 TUL. L. REV. 991, 1001 (1987); Michel Rosenfeld, *Executive Autonomy, Judicial Authority and the Rule of Law: Reflections on Constitutional Interpretation and the Separation of Powers*, 15 CARDOZO L. REV. 137, 173 (1993) (suggesting that except in extraordinary circumstances the President's obligation to abide by Supreme Court precedent resembles that of a federal appellate judge).

[17] For recent statements of this view, see John Harrison, *The Role of the Legislative and Executive Branches in Interpreting the Constitution*, 73 CORNELL L. REV. 371 (1988); Edwin Meese III, *The Law of the Constitution*, 61 TUL. L. REV. 979 (1987).

[18] Although commentators do not explicitly defend this model, the situational or political model may be the most influential in actual practice. *See* BAKER, *supra* note 3, at 27. For a possible defense of the situational model as a normative matter, see *infra* notes 95-100 and accompanying text.

[19] For a discussion of the difference between jurisprudence that rests on analytical as opposed to institutional concerns, see *infra* notes 29-39 and accompanying text.

challenge by another institution with a different perspective. The distinctive institutional perspective of the executive branch, however, rests precisely on the fact that it is closer to the popular will. This implies that the executive must be appropriately expected to reflect the popular will to some degree. Taken to an extreme, this political component will tend to make executive interpretation turn on the pressing policy issues of the day without regard to any underlying jurisprudential issues, such as those of interpretive methodology. Thus, a more sophisticated understanding of the court-centered model reveals that it incorporates a substantial amount of independent executive authority; so, too, a sophisticated analysis of the independent model reveals that it incorporates aspects of the situational model.

Thus, while the three models would continue to yield different results in at least some cases, the relationship of the models should be imagined as three cones whose bases overlap rather than three separate cones. One important conclusion of the inquiry into constitutional theory is that under any sophisticated model, executive branch interpretation, including that carried out by the Attorney General, cannot be simply interpretation by an executive officer that attempts to mimic the judiciary in either form or content. A recognition of the popular base of independent executive interpretation may in fact suggest that the executive, at least on occasion, should employ a somewhat different jurisprudential methodology of interpretation from that of the judiciary, one that better reflects the popular will through the use of analogical and particularistic argument rather than deductive and abstract argument. Moreover, the overlap between the models makes it easier for an administration to employ an eclectic mix of models depending on the context and kind of legal issue presented.

## A.  *The Court-Centered Model*

The first model of the Attorney General's opinion-writing function assumes that executive branch officials are not only obliged to obey the decisions of the Supreme Court but must also follow the constitutional principles the Court announces. In *Cooper v. Aaron*,[20] the Supreme Court in fact appeared to suggest that its holdings become a part of the supreme law of the land and thus are no less binding on government officials than the text of the Constitution itself.[21]

---

[20] 358 U.S. 1 (1958).

[21] *Id.* at 18 ("[T]he interpretation of [the Constitution] enunciated by this Court . . . is the supreme law of the land, and Art[icle] VI of the Constitution makes it of binding effect on the States . . . . Every state legislator and executive and judicial officer is solemnly committed by

Under this view of the content of constitutional law, the President's responsibility for interpreting the Constitution is mediated by the decisions of the Supreme Court.[22] Thus, in the starkest form of the court-centered model, the Attorney General as an opinion writer becomes not unlike an "inferior" court charged with trying to faithfully interpret Supreme Court decisions as well as the Constitution itself.[23]

The pure court-centered model, however, is tempered substantially both in theory and practice by the limitations the Constitution imposes on the judiciary and by the jurisprudential limitations the judiciary imposes on itself.[24] In some areas of the law, for instance, the Attorney General will be addressing issues which rarely, if ever, come before the Court because of the justiciability barriers posed by the "Cases . . . [and] Controversies" requirement of Article III.[25] A prime example of cases barred by this requirement are those in which there are few, if any, litigants who have standing to bring a relevant

---

oath taken pursuant to Art[icle] VI, cl. 3, 'to support this Constitution.' "). Thus, the strong version of *Cooper*'s holding is that Supreme Court decisions themselves become part of the supreme law of the land and thus binding on all those who take an oath to support the Constitution. If Supreme Court decisions have this exalted status, it would appear that the members of the executive branch, who, like state officials, take an oath to uphold the Constitution, would be no more entitled to disregard or dissent from them than they would be entitled to disregard or dissent from the Constitution itself. This view of the status of Supreme Court decisions cannot be correct (if it is correct) simply because the Court announced it. To conclude that the Court's principles have binding force beyond the case in which they are announced on the basis of an announcement in a case would be obviously circular.

[22] I have elsewhere argued against the court-centered view in the context of the appellate advocacy of the executive branch. *See* McGinnis, *Solicitor General's Office*, *supra* note 10, at 801-08. Some variation of the court-centered view, however, has been defended in discussions of the Solicitor General and elsewhere. *See, e.g.*, CAPLAN, *supra* note 4, at 127-33; Neuborne, *supra* note 16, at 1001 (1987) (praising the "conception of judicial precedent" set forth in *Cooper v. Aaron*, namely, that the Court's construction of the Constitution is "binding on all government officials").

[23] As Professor Merrill observes, the court-centered model can also be supported by the notion that stare decisis applies across all branches of the government—not simply the judiciary. *See* Thomas W. Merrill, *Judicial Opinions as Binding Law and as Explanations for Judgments*, 15 CARDOZO L. REV. 43, 66-67 (1993). If the court-centered model rests on this premise, it is still subject to the substantial limitations noted here.

[24] *See* Frank H. Easterbrook, *Ways of Criticizing the Court*, 95 HARV. L. REV. 802, 826-28 (1982) (suggesting that the institutional structure of the Supreme Court, principally its changing membership and shifting coalitions, make it impossible for the Court to render consistent decisions). Moreover, as a practical matter, as long as the Court's decisions are in tension with one another within a single subject matter area, the court-centered model would also allow substantial autonomy as a practical matter because the Attorney General may choose to favor one line of decisions over another. Nevertheless, this practical autonomy does not fundamentally disturb the analogy between the Attorney General and an inferior court because inferior courts also have substantial ability to weave together the conflicting precedent of a superior court to reach what they perceive to be a constitutionally correct result.

[25] U.S. CONST. art. III, § 2, cl. 1, *amended by* U.S. CONST. amend. XI.

constitutional claim.[26] Nevertheless, under a pure court-centered view, the Attorney General would appear obligated to look to judicial decisions for analogy or appropriate methodology even where there is no directly relevant precedent. Given that constraints of a multi-member decision-making body make it difficult, if not impossible, for a court to apply a consistent interpretative methodology across substantive areas,[27] the Attorney General will nevertheless have, as a practical matter, enormous autonomy in these areas of a kind not enjoyed by inferior courts.

Moreover, the institutional character of much of the Court's jurisprudence also tempers the court-centered model as a matter of theory. The Court's jurisprudence throughout history has been deeply self-referential; at least, as a matter of conscious theory, the question has not simply been how the Constitution should be interpreted by an ideal observer but how it should be interpreted by the judicial observer with its peculiar institutional and structural constraints.[28] Thus, the Court's constitutional jurisprudence often reflects an *institutional* approach, peculiar to the judiciary itself, rather than a purely *analytical* approach which could be employed by anyone or any branch.[29]

---

[26] Many issues relating to the allocation of foreign affairs and war power fall into this category.

[27] If the Court is not consistent even within a single area, *see* Easterbrook, *supra* note 24, it certainly cannot be expected to be consistent in interpretive methodologies that cut across substantive areas. Therefore in subject matter areas which the Court does not address, the Attorney General will not be constrained by a consistent methodology that can be inferred from cases in other areas.

[28] For a classic statement of the view that the Court should take institutional factors into account in its jurisprudence, see ALEXANDER M. BICKEL, THE LEAST DANGEROUS BRANCH (1962).

[29] The distinction is between the Court's rejecting a constitutional claim for "analytical" reasons (e.g., the text of the Constitution fails to support this claim) and "institutional" reasons (e.g., the claim cannot be enforced for reasons such as judicial competence). *See* Lawrence G. Sager, *Fair Measure: The Legal Status of Underenforced Constitutional Norms*, 91 HARV. L. REV. 1212, 1217-18 (1978). Professor Sager makes this distinction to argue that constitutional actors other than the federal courts (in particular the Congress and the state courts) may legitimately enforce constitutional norms to a greater extent than the federal courts when these norms are underenforced in the federal judicial forum for institutional reasons. *Id*. at 1220-21. Professor Sager, however, does not apply the distinction, as we do here, in a consideration of the executive branch's interpretative responsibilities, nor does he apply the distinction to the enforcement of structural as opposed to individual rights provisions of the Constitution.

The distinction, however, can clearly be applied to the executive branch: insofar as the executive branch has a different institutional position and competence than that of the judiciary, its responsibility for enforcing the Constitution may differ. Moreover, institutional considerations play a role in interpreting the structure of the enumerated powers and other limitations on the federal government no less than in the interpretation of individual rights. The Constitution of 1789 was in large measure designed to keep the federal government from infringing on state authorities and these limitations may be underenforced for institutional

*ATTORNEY GENERAL*

For instance, one strand of the political question doctrine suggests that the Court may be institutionally unsuited to determine certain kinds of constitutional issues.[30] The court-centered model would not require the Attorney General to follow the Court and also to decline to decide an issue because of such a precedent when the Court has in fact made a decision about the judiciary's institutional competence and not about the executive's. Moreover, it might well not be sensible to look for other precedents in other areas or at the Court's general methodology because this strand of the political question doctrine is itself a recognition that the Court's own jurisprudential tools are not well adapted to determining these kind of questions.[31]

The importance of the Court's self-referential institutional constraints as a limitation of the court-centered model depends on the degree to which the Court's jurisprudence incorporates institutional concerns. Certainly, there are many other areas besides the political question doctrine in which the Court is frank to acknowledge that its institutional limitations affect its enforcement of constitutional norms. For instance, in *Garcia v. San Antonio Metropolitan Transit Authority*,[32] the Court abjured the enforcement of the Tenth Amendment in part because it claimed that it was unable to draw principled lines to distinguish between state functions which were "traditional" and thus protected from Congressional regulation under the Tenth Amendment and those that were not "traditional" and thus unprotected.[33] If the executive branch believed it were in a better institutional position

---

reasons. *See infra* note 51. The concept of overenforcement and underenforcement as it relates to the separation of powers is more complicated because it is not always clear which provisions are meant to empower and which to limit particular branches. Nevertheless, in the separation of powers, the judiciary also can give both analytical and institutional reasons for its decisions. Therefore when a separation of powers decision is based on institutional reasons, the executive may enforce separation of powers provisions to a greater or lesser extent than the judiciary.

[30] *See* Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are . . . delicate, complex, and involve large elements of prophecy. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility . . . ."); Goldwater v. Carter, 444 U.S. 996, 1002-03 (1979) (Rehnquist, J., concurring) (stating that the President's power to abrogate a treaty was a " 'political' and therefore nonjusticiable" issue). The notion goes back to Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803), the fount of judicial review, which itself suggests institutional limits on the Court's role: "Questions, in their nature political, or which are, by the [C]onstitution and laws, submitted to the executive, can never be made in this court." *Id.* at 170 (orthography modernized). *See also* Sager, *supra* note 29, at 1224-25.

[31] *See* Coleman v. Miller, 307 U.S. 433, 454-55 (1939) (stating that "the lack of satisfactory criteria for a judicial determination" is one of the "dominant" considerations in the political question doctrine).

[32] 469 U.S. 528 (1985).

[33] *Id.* at 539-47.

to make the evaluation of such traditions, perhaps it could undertake more vigorous enforcement of the Tenth Amendment than attempted by the Court.[34]

Once a distinction between analytical and institutional reasons underlying Court decisions is recognized, there remains the question of the degree to which the executive branch may determine for itself which decisions are motivated by institutional and which by analytical reasons. A weaker version of the executive branch's autonomy within the court-centered model would permit the exercise of independent judgment *only* insofar as the Court's opinion declared openly that it was based on institutional reasons. A stronger version of this authority would permit executive autonomy as long as the Court itself has not identified whether institutional or analytical concerns are at the core of its reasoning. A justification for this version of executive authority would be broadly analogous to the underlying rationale of the Supreme Court's own decision to review state constitutional law decisions unless it is clear that they rest on independent and adequate state grounds: just as the Court's rule encourages state courts to be clear about whether a decision rests on state rather than federal law, a presumption of autonomy would encourage the Court to be clear about the degree to which its decision rested on analytical rather than institutional concerns.[35]

Under the latter view, the executive branch would enjoy substantial autonomy over a wide range of issues. For instance, the Court today no longer enforces the Commerce Clause[36] to any substantial extent against Congress when the latter regulates private parties.[37] The reason for judicial abnegation can be understood as the failure of the Court to find any standard (such as the indirect-direct distinction) that was capable of principled judicial application. Such a view of the development of the Court's Commerce Clause jurisprudence would empower the Attorney General, even when acting within a court-cen-

---

[34] One of the reasons that the executive branch may be in a better institutional position is that it more closely reflects the popular will and thus can better engage in a more open-ended process of analogical reasoning to assess whether a particular form of state activity is central to political governance. *See infra* notes 76-84 and accompanying text.

For another discussion of the distinct roles of the Congress and the judiciary under *Garcia*, see Mark V. Tushnet, *The Constitution Outside the Courts: A Preliminary Inquiry*, 26 VAL. U. L. REV. 437, 451-53 (1992). Tushnet uses the term "court-centered" to mean something akin to what I refer to as the judiciary's institutional considerations in jurisprudence.

[35] *See* Michigan v. Long, 463 U.S. 1032, 1042 (1983) (holding that the Supreme Court will review state judicial decisions that raise federal constitutional issues unless there is a "plain statement" that these decisions rest on independent and adequate state grounds).

[36] U.S. CONST. art. I, § 8, cl. 3.

[37] *See, e.g.*, Wickard v. Filburn, 317 U.S. 111 (1942).

*ATTORNEY GENERAL*

tered model, to employ his own and stricter Commerce Clause jurisprudence in determining whether to recommend a veto of congressional legislation.[38]

Indeed, many analyses of the Court's jurisprudence view institutional considerations as necessarily at the heart of *all* its constitutional opinions. For instance, it has been argued that as a matter of judicial restraint—a consideration that flows from the Court's institutional position in the government—the Court should give substantial deference to congressional enactments, invalidating them only when their constitutionality is beyond "reasonable doubt."[39] If the judiciary systematically underenforces a constitutional norm such as the Tenth Amendment because of general considerations of judicial restraint, even under a model that respects the judiciary as the ultimate generator of constitutional principle, the Attorney General has the authority, if not the obligation, to enforce the Constitution without reference to considerations of judicial restraint.

Paradoxically, however, the same focus on the institutional character of constitutional decision-making that permits the executive branch substantial autonomy even within the court-centered model may also temper the executive's use of that autonomy in either the court-centered or wholly independent authority model. If the executive branch may purge its analysis of the judiciary's institutional considerations, it follows that under any model of executive branch interpretation the executive branch should reflect on its own institutional constraints in the exercise of at least some of its constitutional interpretations: it is not an ideal observer any more than is the judiciary.

For instance, consider the difference between the function an Attorney General's opinion performs in determining whether a law should be vetoed because it is unconstitutional and whether enforcement of a law should be refused because it is unconstitutional.[40] In

---

[38] One might claim that because the President could veto such a bill for any reason at all, the fact that he gives constitutional reasons for doing so does not bear on the extent or autonomy of his interpretative authority. For a response, see *infra* note 40.

[39] James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 HARV. L. REV. 129, 149 (1893). *See* Sager, *supra* note 29, at 1216-17.

[40] Some have suggested that a theory of the executive branch's interpretative authority does not have to address the President's vetoes of bills for constitutional reasons. *See, e.g.*, Judge Samuel Alito, Address at the *Cardozo Law Review* Symposium on Executive Branch Interpretation (Nov. 15, 1992). It has been argued that because the President may veto a bill for any reason at all, it does not matter whether he exercises his vetoes on autonomous jurisprudential principles or on court-centered ones. The Framers, however, gave the President the veto power in part so he could veto bills on constitutional grounds, *see* James Madison, Observations on the "Draught of a Constitution for Virginia," *in* 11 THE PAPERS OF JAMES

the first instance, the Attorney General is advising the President on the exercise of a power by which he himself participates in the legislative process.[41] Because this process is not complete until he signs the bill, the constitutional determination embodied in the bill deserves less deference than that given by the judiciary to a legislative enactment.[42] Therefore the President may veto bills even if they are not clearly unconstitutional. Because of this relaxed standard, he naturally may depend more on his own views of the Constitution and does not have to fortify confidence in his judgments by reference to the Supreme Court.[43] On the other hand, once the bill has become law it is possible to argue that the executive branch's constitutional review should become at least as deferential as the "clearly unconstitutional" standard once suggested for judicial review of legislation.[44] Judicial

---

MADISON 285, 292-93 (Robert A. Rutland & Charles F. Hobson eds., 1977), and also directed the President to uphold the Constitution. U.S. CONST. art. II, § 1, cl. 8. Therefore he has an obligation to veto bills if they are unconstitutional even if they seem good policy. Thus the standard of constitutional review he should employ is a matter of moment when he confronts legislation that from his point of view is sound policy but is constitutionally questionable. The issue is also of frequent practical importance to the Attorney General when he must decide whether to urge the veto of a bill on constitutional grounds that the rest of the administration supports as a matter of policy (or at least as a matter of assuaging a powerful congressman). Moreover, whenever the President vetoes a bill for constitutional reasons, his veto message has generally been understood to become part of the common constitutional discourse and can be relied upon as precedent by the legislature and his successors. The constitutional veto is thus an act that cannot be assimilated to a veto for mere policy reasons.

[41] *See* THE FEDERALIST No. 73, at 444 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (discussing the President's veto power as part of a system of legislation).

[42] For a discussion of this deferential standard, see *supra* note 39 and accompanying text.

[43] For an example of a recent presidential veto based on constitutional views not shared by the Supreme Court, see Message to the Senate Returning S. 742 Without Approval, 23 WEEKLY COMP. PRES. DOC. 715 (June 19, 1987) [hereinafter Veto Message]. President Reagan vetoed a congressional enactment of the so-called "fairness doctrine," *see* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969), that permitted content-based regulation of that medium, suggesting that technological advances in broadcasting had undermined Supreme Court precedent and also stating that "[q]uite apart from these technological advances, . . . [h]istory has shown that the dangers of an overly timid or biased press cannot be adverted through bureaucratic regulation, but only through the freedom and competition that the First Amendment sought to guarantee." Veto Message, *supra*, at 715.

[44] Attorneys General have even on occasion suggested a more deferential standard with respect to decisions not to enforce a statute. *See* 4A Op. Off. Legal Counsel 55, 59 (1980) (opinion of Attorney General Civiletti stating that the President should refuse to enforce a law for constitutional reasons only in "rare cases" and giving examples of *patently* unconstitutional legislation such as a statute that would order the prosecution of members of a particular party). The underlying rationale for this even more deferential standard was the Attorney General's observation that in most cases the judiciary could be relied on to invalidate unconstitutional statutes. *Id.* Presumably his notion was that since the courts could entertain the suits and the executive branch had already had a chance to evaluate the bill at the time of presentment, the judiciary was the appropriate forum.

The executive branch, however, has not always articulated such a deferential standard. *See* 9 Op. Att'y Gen. 462, 469-70 (1860) ("*Every law is to be carried out so far forth as is*

precedents suggesting that a law is unconstitutional fortify the President's judgment and may thus have a greater role to play in decisions not to enforce than in veto decisions. Accordingly, it may be a theory of *executive* restraint, which relies on institutional considerations that parallel those underlying judicial restraint, and like the theory of judicial restraint has its roots in a branch's self-reflection on its constitutional position, that justifies the much greater latitude Attorneys General have traditionally taken in constitutional interpretation when recommending or threatening the veto of bills than in refusing to enforce laws once they are enacted.[45]

## B. *The Independent Authority Model*

Even under the more sophisticated understanding discussed above, the court-centered model differs from the independent authority model. The more sophisticated understanding permits the executive branch to exercise autonomy insofar as decisions that would otherwise constrain it are made for institutional reasons peculiar to the judiciary.[46] Insofar as judicial decisions rest on analytical reasons, however, it is the essence of the court-centered model to require that these decisions be binding precedent on the executive branch.

The independent authority model ultimately rests on the notion that even the analytical decisions of the Court should be subject to challenge by an official interpreter of the Constitution. A premise of this view is that the text and structure of the Constitution assigns to

---

*consistent with the Constitution . . . .* You are therefore entirely justified in treating this condition (if it be a condition) as if *the paper on which it is written were blank.*") (emphasis added). One way of reconciling Attorney General Black's hyperaggressive approach to the issue of non-enforcement with the *far* more deferential standard of Attorney General Civiletti is to note that the former addressed a provision that violated the separation of powers. The President may have more latitude in refusing to enforce provisions that violate the separation of powers than provisions that violate other constitutional provisions because it is well understood that the best way to reach a constitutional equilibrium in this area is for each branch to vigorously enforce its own interests. *See infra* notes 87-88 and accompanying text. *See also* 14 Op. Off. Legal Counsel 38, 51-53 (1990) (preliminary print) (suggesting that the President's authority to refuse to enforce a law is at its height when a provision violates his own prerogatives).

[45] For a discussion of an instance in which the Department of Justice recommended a veto on constitutional grounds of provisions it did not challenge once enacted, see the discussion of the Reagan and Bush administrations' analysis of independent agencies, *infra* notes 215-22 and accompanying text.

[46] It is important to note that the autonomy of the Attorney General under the court-centered model is contingent on the Court's incorporation of institutional considerations into its jurisprudence. Much of his autonomy would disappear if the Supreme Court simply interpreted the Constitution as a set of formal rules which it was entirely competent to interpret in every case (or at least all those cases where the Constitution does not contain a meta-rule depriving it of interpretative authority in a particular area).

the executive branch a responsibility to interpret the Constitution independently in carrying out its responsibilities. As to the text, we have already seen that there are a variety of textual provisions that suggest that the executive has legal responsibilities separate from those of the judiciary.[47] As to the structure, the Constitution generally is structured to avoid giving a monopoly on any function to a single branch, and the power of constitutional interpretation should be no exception. This structural argument is strengthened if one believes that systemic errors in the Court's analytical output are likely to flow from the Court's institutional position. For instance, its relative insulation from the direct control of other branches may naturally tend to encourage it to aggrandize its own powers in its analytical interpretations of the Constitution.[48] In other words, despite the self-reflection found in the institutional reasons for its decisions, analytical errors can inevitably be expected to arise from the Court's *unacknowledged* exploitation of its institutional position.[49]

As a result, it is the danger of overenforcement rather than the danger of underenforcement of norms that provides most often the compelling motivation for the independent authority model.[50] It is the Court's institutional position—its insulation from direct political

---

[47] *See supra* notes 10-15 and accompanying text, particularly the remarks of Professor Levinson, *supra* note 15.

[48] For a general discussion of the way the Court's institutional interests shape its doctrine, see John O. McGinnis, *Constitutional Review by the Executive in Foreign Affairs and War Powers: A Consequence of Rational Choice in the Separation of Powers*, 56 LAW & CONTEMP. PROBS. (forthcoming 1993).

[49] Analytical error under this view can be defined only by a neutral observer with no institutional position to distort his interpretation. No official interpreter of the Constitution possesses this privileged position, but that does not deprive the concept of its meaning because all actors act as if there are analytical constitutional truths that can be defined apart from their institutional perspective. In other words, analytical correctness is a presupposition of constitutional interpretation: even if not realized in practice, it is a regulative ideal for constitutional interpreters.

The most difficult question for the independent autonomy model is to what degree autonomous executive interpretation is likely to move the system toward analytical correctness. As discussed below, the model rests on the notion that the clash of interpreters with different institutional interests is more likely to lead to analytical correctness than leaving the responsibility wholly in the hands of an actor with a single distinctive institutional perspective.

[50] Overenforcement of constitutional norms can rarely be understood as premised on institutional considerations—as opposed to analytical error. One counterexample is perhaps the exclusionary rule. The Court's decision to prohibit all involuntary confessions may overenforce the Fifth Amendment because, for institutional reasons, the Court cannot create a system of tort liability that would adequately enforce the Fourth Amendment. *See* Henry P. Monaghan, *The Supreme Court, 1974 Term—Foreword: Constitutional Common Law*, 89 HARV. L. REV. 1, 3-10 (1975). If Congress had created such a liability system, the Court might substantially defer to Congress's judgment, i.e., that its choice of tort liability was a sufficient remedy for Fifth Amendment violations. Thus, by proposing and signing legislation to enact such a remedial scheme, the President would be engaged in constitutional interpreta-

response—that gives it the latitude to overenforce constitutional norms, such as the Bill of Rights, and so usurp the prerogatives of the other branches and the states.[51] There is no adequate response to this problem within the court-centered model because, in that model, the executive branch acquiesces in the judiciary's usurpations so long as these usurpations are based on analytical considerations.[52] Thus, the strongest argument for the independent authority model of executive branch interpretation is the familiar need for "[a]mbition . . . to counteract ambition."[53] If the President and his subordinates within the executive branch have the authority to interpret the Constitution independent of the Court, they may insure that the debate about first constitutional principles is ever renewed and no usurpation is entrenched beyond challenge.[54] As such, the independent authority model may be thought to comport with the architecture of the Constitution as a whole, specifically in its exploitation of institutional conflict to prevent a monopoly of power by any one branch over any aspect of civic life.

Professor Paulsen has argued that the independent authority model must logically permit the executive branch to disregard the Court's judgments as well as challenge the Court's precedents.[55] Professor Paulsen contends that if the executive branch has an independent obligation to follow the Constitution, it must consider that obligation in deciding whether to execute the Court's judgments no less than in any other situation.[56] Professor Paulsen's lucid and crea-

---

tion that would discount the institutional limitations of the judicial branch that led to overenforcement of the Fourth Amendment.

[51] Underenforcement, however, can also result from the judiciary's abuse of its institutional position. Indeed, the anti-federalist Brutus feared that the judiciary as a federal entity would have an institutional interest in failing to construe the enumerated powers strictly. *See* Brutus No. 11 *in* THE ANTI-FEDERALIST PAPERS AND THE CONSTITUTIONAL CONVENTION DEBATES 296-98 (Ralph Ketcham ed., 1986). As we will see, the motivation behind the adoption by Jefferson's Attorney General of an independent authority model was the enforcement of what Jefferson believed were unenforced limitations on the federal government.

[52] Another response within the court-centered model would be for the President to appoint Supreme Court justices who disagree with constitutional principles or precedent espoused by the Court, but this response is not adequate by itself to provide an effective check. First, it depends on the accident of a court vacancy. Second, the incorrect principle or precedent will be debated again only if the Court takes an appropriate case, and it may often be the case that only the President (or Congress) can act inconsistently with Court precedent to create another case. *See infra* note 69 and accompanying text.

[53] THE FEDERALIST No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961).

[54] For a discussion of the importance of structuring government to provide debate about the first principles of the republic, see McGinnis, *Reply, supra* note 10, at 658-59.

[55] Michael S. Paulsen, *The Merryman Power and the Dilemma of Autonomous Executive Branch Interpretation*, 15 CARDOZO L. REV. 81, 99-109 (1993).

[56] *Id.* at 103-06.

*CARDOZO LAW REVIEW* [Vol. 15:375

tive arguments are important because the independent authority model had not previously been thought to imply that executive authority may disobey judgments. Nevertheless, his arguments are not persuasive either as a matter of the Constitution's text or its original understanding.

First, the "Cases . . . [and] Controversies" language of Article III[57] can be understood as a textual commitment to constitutional decisions in particular cases.[58] Just as the judiciary lacks authority to review the Senate's constitutional determinations in an impeachment trial,[59] the executive lacks the authority to review the judiciary's determination in a particular case. Thus, the text of the Constitution itself offers a persuasive reason to distinguish the executive obligation to follow precedent from its obligation to obey a judgment.

Moreover, the Framers' original understanding of the concept of the judicial power can only be understood against the rise of the English judiciary as a check against arbitrary action by the king—a check that was premised precisely on the understanding that the king was not at liberty to refuse to execute the judiciary's judgments.[60] There seems to have been no similar understanding of the king's obligation to follow judicial precedent.[61] It is thus not surprising that even ad-

---

[57] U.S. CONST. art. III, § 2, cl. 1 (amended 1795).

[58] Article III, Section 2, Clause 1 provides:
The judicial Power *shall* extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the Unites States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.
*Id.* (emphasis added).

[59] *See* Nixon v. United States, 113 S. Ct. 732 (1993).

[60] It seems to have been a premise of the English Constitution from the time of the Stuart Monarchy that the king could not disregard judgments of the courts. Although the king tried to influence judicial decisions, he did not flout their mandates. Indeed, the understanding of the finality of judgments under the Stuarts is underlined by King James I's use of his power to dismiss judges who would likely make undesirable rulings. *See* J. P. KENYON, THE STUART CONSTITUTION 1603-1688, at 90, 92, 103 (1966) (discussing the king's power of dismissal and his use of this power to dismiss recalcitrant judges, including the great Sir Edward Coke). Moreover, at least in the eyes of the Puritans, the entire political system of England was founded on "distributive authority"—the notion that the fundamental law distributed power to the courts, Parliament, and the king as independent institutions. *See* JOHN D. EUSDEN, PURITANS, LAWYERS, AND POLITICS IN EARLY SEVENTEENTH-CENTURY ENGLAND 141-43 (1958). There would be nothing left of the authority distributed to the courts if the king could constitutionally disregard their judgments because the English constitutional system had no provision for the impeachment of a king.

[61] In contrast to viewing judgments as binding, sophisticated jurists like Sir Edward Coke

herents of the autonomy of executive branch legal interpretation among the founding generation *conceded* that court judgments must be obeyed even though these judgments did not create binding precedent. A signal proof of the consensus that the binding nature of judgments was an essential attribute of judicial power were the views of Jefferson's first Attorney General, Levi Lincoln. As we shall see, Lincoln not only articulated an independent Republican jurisprudence that sharply contrasted with the Federalist courts but. he also expressly celebrated the multiplicity of legitimate constitutional interpreters other than the Court, including the executive branch.[62] Yet Lincoln himself acknowledged the binding force of the Supreme Court's judgment in any case in which it was rendered, while reserving the executive branch's right to disregard that precedent in the future.[63] There is thus substantial evidence that the distinction between judgments and precedents that Professor Paulsen seeks to obliterate was well recognized both in English history and among the founding generation.

The corrective mechanism rationale for autonomy in executive branch interpretation also suggests that there are structural reasons as well that the executive branch should have the authority to challenge the Court's precedents but not its judgments. If the Court's precedents were not open to challenge, any usurpations would be permanent, and thus the constitutional order could be permanently disfigured. On the other hand, obeying judgments as a general matter does not permanently undermine constitutional order.[64] If the judgment is based on an erroneous constitutional interpretation, there will be other cases in which the correct constitutional principles can be asserted.[65]

---

recognized that even in a common law system precedent could be challenged. KENYON, *supra* note 60, at 102-03. This view gains additional force in a system, like that of the United States, where a written constitution is available against which to measure a judge's decisions.

[62] For a discussion of these views of Levi Lincoln, see *infra* notes 126-28 and accompanying text.

[63] *See infra* notes 126-28 and accompanying text.

[64] The Court could threaten a lasting transformation of the constitutional order if it entered a permanent injunction against the executive branch, for instance, if it enjoined the President from taking military action in the absence of congressional authorization. The extent of such an injunction, however, would raise serious questions about whether the Court was following the "case or controversy" requirement of the Constitution. *See* U.S. CONST. art. III, § 2, cl. 1 (amended 1795). Because this requirement is a presupposition of the executive branch's obedience, *see supra* notes 57-59 and accompanying text, the executive may have a stronger case for disregarding that portion of the judgment which disregarded the requirement. This extraordinary and limited circumstance is no warrant for inferring a general executive authority to disobey judgments when a court has honored the case or controversy requirement.

[65] Indeed, if Judge Easterbrook is correct in the view that the Court necessarily embraces inconsistent principles in its decisions, *see supra* note 27 and accompanying text, the executive

Moreover, if the executive were required to pass on the legality of all judgments of the Court, its power over the development of the law would be stronger than that of the judiciary because it would have the final say in constitutional interpretation, not only on constitutional issues which did not give rise to a case or controversy, but also on issues which did give rise to such a case. There is substantial evidence, however, that the Framers thought the judiciary had a comparative advantage over the other branches in making constitutional interpretations.[66] This advantage would be greatly diluted if the executive sat as a kind of court of appeal from the judiciary's decisions in every case. The Constitution is characteristically structured to give one branch the greatest share of control over a particular subject, but checks that power through giving another branch a less comprehensive power over the same subject.[67] Only in this way does the Constitution obtain the benefits of the comparative advantages of the institutions it creates while denying any institution a monopoly of power. By retaining the judiciary's absolute authority over judgments while permitting executive departures from precedent, one both preserves comparative advantage and avoids monopoly.

At the other extreme from Professor Paulsen, some commentators have argued that the executive branch does have a general obligation to follow Court precedent, suggesting that a sufficient corrective mechanism exists as long as the executive branch has the power simply to criticize Supreme Court decisions.[68] One difficulty with this argument is that mere criticism of the Court does not necessarily create an opportunity for changing the Court's jurisprudence. For instance, if the Court had ruled fifty years ago that imposing drug tests on any federal employee violates the Fourth Amendment, the only way to challenge that ruling would be to institute the drug tests again. Similarly, if the Court had ruled that it was improper to fire the head of an "independent" agency except for moral turpitude, the only way to change that regime would be to fire the head of an independent agency for other reasons. The same "case or controversy" require-

branch over time may be able to exploit those inconsistencies to shift the Court's framework of analysis to its liking.

[66] *See* THE FEDERALIST NO. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (viewing the judiciary as the branch "least dangerous to the political rights of the Constitution"). Mark Tushnet also uses the term "comparative advantage" regarding the federal judiciary. *See* Tushnet, *supra* note 34, at 443. I have also used the term previously and independently. *See* McGinnis, *Reply, supra* note 10, at 648.

[67] *See* McGinnis, *Reply, supra* note 10, at 668 (characterizing the Appointments Clause as giving a substantial advantage to the President in nominations while relying on the Senate as a check on the President's power).

[68] *See* Neuborne, *supra* note 16, at 993; Rosenfeld, *supra* note 16, at 169-71.

ment that requires executive obedience to the judgments also prohibits advisory opinions and therefore may force the elected branches to take concrete steps to create an opportunity for reconsideration.

Indeed, a refusal to permit the executive and other elected branches the opportunity to take action that is inconsistent with Supreme Court precedent creates a troubling asymmetry. Whenever the Court has ruled against the right of the executive (or Congress for that matter) to take an action because of the Bill of Rights, there would be no opportunity to force reconsideration. On the other hand, whenever the Court ruled in favor of the executive branch, there would be no structural impediment to the renewal of the arguments that the Bill of Rights correctly interpreted should bar the action. The asymmetry is especially troubling if one believes that the Court may have an institutional tendency to overenforce the Bill of Rights in order to increase its own power.[69] Therefore an additional argument for the independent authority model is that it is neutral as to the underenforcement and overenforcement of constitutional provisions: both kinds of erroneous interpretations may be subject to direct challenge.

The most difficult question for the independent authority model is not whether the executive must obey judgments of the Court or whether it must always follow precedent, but whether it must follow particular kinds of precedent as, for instance, where a failure to do so would lead to substantial disparities in the treatment of similarly situated individuals or to needless litigation. For instance, if the Second Circuit has made a decision on a Social Security case, can the executive, if it disagrees with the decision, force Social Security recipients within the Second Circuit to relitigate the case? This is the area of potential executive autonomy that is generally described by the term "nonacquiescence." Although the subject is too large for resolution here,[70] an outline of a theory emerges from the preceding discussion of the executive's obligation to obey judgments.

First, the executive branch has no general obligation rooted in the Constitution's text to follow such precedents. The textual commitment of cases to the judiciary requires only that judgments be obeyed.[71] Nevertheless, a corrective mechanism exists as long as the executive ultimately retains the right to challenge precedent; therefore the most important structural rationale for autonomy does not sug-

---

[69] For reasons for such a belief, see McGinnis, *supra* note 48.

[70] For an excellent discussion of nonacquiescence, see Samuel Estreicher & Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679 (1989).

[71] *See supra* notes 57-59 and accompanying text.

gest that the executive must at every turn challenge a precedent that it believes wrong in the face of countervailing considerations. Prudence may dictate acquiescence in a range of cases for reasons either of equity or litigation resources. These prudential decisions regarding when to acquiesce may in turn create traditions from which the executive should not depart but for compelling reasons.

In any event, as long as the executive retains the right to challenge precedent in the Supreme Court and the judiciary retains the right to have its judgments respected, each branch has a mechanism for ensuring continuing conflict.[72] The battle over where to draw the line on nonacquiescence is a secondary one: it is less important that the line be drawn in any particular place than that it be drawn as a result of the tension between two branches with conflicting institutional structures and ambitions.

While the difference in the view of the President's interpretative responsibilities is likely to make a substantial difference both in litigation strategy and in opinion writing, the difference in opinion writing may well be greater precisely because of these prudential traditions. Litigation occurs either before inferior courts, which have an almost absolute obligation to follow the Supreme Court's precedent, or before the Supreme Court, which gives substantial weight to its own precedent because of the doctrine of stare decisis. Accordingly, prudence may suggest accepting Court precedents with which the Attorney General as litigator disagrees.[73] On the other hand, many of the Attorney General's opinions do not address justiciable issues. Moreover, the Attorney General's opinions may often pretermit judicial review of the issue. For instance, the President may be considering vetoing a bill: if it is vetoed on constitutional grounds, it will never be considered by the judiciary. (Presidents have, in fact, vetoed bills on constitutional grounds even though they would clearly be upheld by the Court.)[74] Similarly, an executive or administrative action that is

---

[72] As Professor Merrill observes, the judiciary, by creating causes of action that hold officials liable in damages for illegal acts, offers a powerful incentive for the executive to comply with judicial precedent. These incentives would operate even assuming the executive has the *constitutional* authority to disregard precedent. *See* Merrill, *supra* note 23, at 72.

[73] Of course, the independent authority model has substantial implications for the conduct of litigation as well. *See* McGinnis, *Solicitor General's Office, supra* note 10, at 805-09 (describing how the Solicitor General should conduct his business under the independent authority model).

[74] President Jackson vetoed the Bank of the United States legislation despite the fact that it had been upheld in M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819). Veto Message from Andrew Jackson to the Senate (July 10, 1832), *in* 2 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 1789-1897, at 576, 581-82 (James D. Richardson ed., Washington, Gov't Printing Office 1896) [hereinafter 2 MESSAGES].

considered unconstitutional and therefore not implemented will never be reviewed. Therefore, it is in the opinions of the Attorney General that one would most expect to find an articulate body of independent constitutional and statutory interpretation.

Even assuming that the Attorney General should exercise substantial autonomy in these areas of his work, there remains at least one additional question within the independent authority model: should his opinions approximate those of the judiciary in method or should they have a distinctive, non-judicial cast of interpretation? As we have seen,[75] even under the court-centered model of the Attorney General as opinion writer, there can be, at least theoretically, substantial divergences between the opinions of the Attorney General and those of a court when the judicial precedents depend on institutional considerations that are inapplicable to the executive branch. A fortiori, under the model of the Attorney General as independent interpreter, the institutional constraints which may color the opinions of the judiciary no longer need apply.[76]

More fundamentally, however, it is not clear that the Constitution contemplates that the President and his subordinates will exercise their constitutional responsibilities with a jurisprudence whose methodology exactly tracks that of the judiciary; and the independent authority model does not necessarily imply that Attorney General opinions not resemble those that would be produced by a shadow court of jurists following the President's jurisprudential principles.[77] The President is not insulated from public passions in the same way that life tenure insulates the Article III judiciary. Indeed, at least some of the Framers believed it important that the people influence constitutional interpretation through their political representatives: only in this way can people correct constitutional usurpations.[78] Given that the President's constitutional responsibilities are, as a matter of constitutional structure, more closely related to the people's will, the independent authority model can be expected to generate opinions that should reflect in part some of that "will" and not partake only of the "judgment" expected of the judiciary.[79] The premises

---

[75] *See supra* notes 29-39 and accompanying text.

[76] I discuss above the possibility that institutional constraints peculiar to the executive branch should circumscribe the Attorney General's opinion-writing function in some instances. *See supra* notes 42-45 and accompanying text.

[77] Of course, even to make this comparison one has to believe, as I do, that the Constitution presupposes that a court will have a jurisprudence of a particular character. *See* McGinnis, *Reply, supra* note 10, at 665 n.140.

[78] THE FEDERALIST NO. 44, at 286 (James Madison) (Clinton Rossiter ed., 1961).

[79] Hamilton justifies the judiciary power of judicial review on the assumption that judicial decisions are based entirely on "judgment" and not on the "will" exerted by the political

of the independent authority model may thus tend to move the executive branch toward a more political mode of interpretation.[80]

Indeed, if legal reasoning were made up of different elements, and if no one system of jurisprudence were likely to arrive at just results on its own, it would seem reasonable for each branch to contribute the kind of legal reasoning in which it has a comparative advantage. In this way, as a general matter, the analytical product of a system of institutionally distinct interpreters may result in a product superior to that of a single system.[81] Professor Sunstein has recently argued that reasoning from systematic principle and reasoning from analogy are in tension.[82] It may be that the judiciary has a tendency to reason more systematically than the political branches, pushing abstract principles derived from the Constitution to their limit, even when the consequence is to substantially transform social practices.[83] The executive branch may be expected to be more restrained in its systematic reasoning, preferring a more analogical approach with particular attention to distinctions rooted in the social world.[84] Thus, the methodology of executive branch legal interpretation may, as a gen-

---

branches. THE FEDERALIST NO. 78, at 469 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[80] For a discussion of the reasons that the independent model, despite its more political orientation, may not wholly collapse into the situational model of interpretation, see *infra* note 96 and accompanying text.

[81] Of course, there may also be some areas of jurisprudence in which the institutional structure of one branch would preclude it from participating as an equal partner in law interpretation. The political questions doctrine, for instance, demarcates some areas where the judiciary defers almost entirely to the political branches. *See supra* notes 30-31 and accompanying text. Moreover, given that the decision of particular cases is textually committed to the judiciary in many areas, the judiciary has the last word at any given moment.

[82] Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 751 (1993).

[83] The Court has not always been guided by an application of determinate principle in the manner the Constitution presupposes. *See* McGinnis, *Reply, supra* note 10, at 665 n.140 (arguing that judicial review presupposes that the Court will proceed by the application of fairly determinate principles). Chief Justice Warren, for instance, both expressly and covertly grounded his decisions as much on the basis of his vision of the good society as on elaboration of constitutional principles. *See* Philip B. Kurland, *Earl Warren: Master of the Revels*, 96 HARV. L. REV. 331, 338-39 (1982) (reviewing G. EDWARD WHITE, EARL WARREN: A PUBLIC LIFE (1982)) (stating that Chief Justice Warren attempted to construct a jurisprudence based on his visceral reactions to issues). When the Court departs from its proper constitutional interpretative methodology, it would be likely that an executive branch that opposed the results of that reasoning would choose a more formalist methodology so as to criticize it in a manner that would seem principled in comparison with a judiciary that had abandoned its proper function. Thus, in practice, there may be eras of jurisprudential inversion in which the judiciary and the executive exchange their normal methodology for the methodology of the other branch.

[84] Sunstein correctly sees that the tension between these different kinds of reasoning are not unlike the tensions between the French *philosophes* and Edmund Burke. *See* Sunstein, *supra* note 82, at 754 & n.49. It is natural that those purposefully insulated by life tenure from the vicissitudes of public life should resemble the French *philosophes* and that those in the popu-

*ATTORNEY GENERAL*

eral matter, appropriately be in some tension with that of the judicial branch.[85] From that tension, an appropriate synthesis, or, in Professor Sunstein's words, "reflective equilibrium," can be reached between systematic principles and a more particularistic, socially cognizant way of reasoning.[86]

In some specific areas of constitutional interpretation, a distinctive executive branch approach to interpretation may be necessary to create an appropriate jurisprudential equilibrium given the institutional interests of the other branches. For instance, the President is, in a very real sense, the party in interest in separation of powers cases that involve his prerogatives. Not surprisingly, the Framers believed that the President would use his power of legal interpretation to safeguard his own office.[87] Indeed, there are systemic reasons as well not to object to an intrusion of the executive branch's institutional interests into its interpretation in separation of powers issues: institutional interests will surely have a particularly strong influence on the other branches' interpretation of constitutional provisions that affect their own institutional prerogatives and the prerogatives of the competing branches.[88] Given the inevitability of strong institutional interests in

---

larly elected branches should be generally more sensitive to the place of social distinctions in the framework of legal reasoning.

[85] The view that the executive and the judiciary may engage in a somewhat different kind of legal reasoning was not unfamiliar to the Framers. Blackstone saw the grant of the pardoning power as a way for the executive to construe the law according to its spirit while the judiciary was restricted to its letter. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES *397 ("[T]he exclusion of pardons [from the power of the king] must necessarily introduce a very dangerous power in the judge or jury, that of construing the criminal law by the spirit instead of the letter; or else it must be holden, what no man will seriously avow, that the situation and circumstances of the offender . . . ought to make no distinction in the punishment.") (citation omitted) (orthography modernized). Blackstone's understanding of the pardoning power had wide currency among the Framers. *See* 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA, IN 1787, at 110-13 (Jonathan Elliot ed., Philadelphia, J.B. Lippincott & Co. 2d ed. 1876) [hereinafter 4 ELLIOT'S DEBATES] (remarks of James Iredell) (stating that the pardoning power was given to the President so he can apply the spirit rather than the letter of the law); WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, 174-78 (Philadelphia, Philip H. Nicklin, Law Bookseller 1829) (same).

[86] Sunstein, *supra* note 82, at 751. Although the notion that constitutional interpretation may represent a synthesis of different principles is not, to my knowledge, expressly reflected in the era of the Framers, the notion that republican government must synthesize conflicting principles was very familiar. GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC 1776-1787, at 197-255 (1969) (describing republican theory of constructing mixed government to reflect different and potentially conflicting principles in the republic).

[87] *See* 2 DOCUMENTARY HISTORY, *supra* note 12, at 451 (stating that the President could use the authority of constitutional review to "shield himself").

[88] For a discussion of the manner in which institutional interest shapes the Court's doctrine, see McGinnis, *supra* note 48.

this area, it would appear that a plausible solution is to permit the constituent parts of the system to pursue their self-interest with the confidence that a system so constituted could work more easily in the public interest. Thus, a vigorous advocacy by the Attorney General of the executive branch's institutional interests on separation of powers questions in his opinions could be seen to redound to the benefit of the constitutional system as a whole.

The manner of pursuing this interest would, of course, have to take into account (and in a sense be enlightened by) the existence of the other branches. For instance, the executive branch would presumably be careful not to make such outlandish claims for its powers that the other branches would be in a good position to obtain the support of public opinion in resisting them.[89] Nevertheless, the approach in such an interpretation would be fundamentally different from the ideal of judicial interpretation since it would not undertake its reasoning with dispassion but with a regard for the executive branch's own interests.

The executive branch's understanding of the tripartite nature of the constitutional system would similarly seem to prevent political excesses from infecting its autonomous interpretation of the Constitution. The body of the Attorney General's opinions will have greater influence in constructing a plausible alternative jurisprudence insofar as they are principled and consistent. Given that one of the central purposes of permitting the President independent authority to interpret the Constitution is to make available a method of correction to the constitutional interpretation of the Court, these opinions overall should partake of the coherence necessary to influence the judiciary and the public.

## C.  *The Independent Authority Model and Stare Decisis*

In any event, acceptance of the independent authority model to any degree suggests constitutional doctrines, where relevant, take conscious account of the jurisprudential interplay between the branches.

---

[89] Perhaps the best example of such a failure by the executive branch was Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952), popularly known as the *Steel Seizure Case*, in which the claims put forward were so broad that they elicited an adverse public reaction and ultimately unfavorable judicial opinion. *See* WILLIAM H. REHNQUIST, THE SUPREME COURT 47-53 (1987). Interestingly, at the time of the *Steel Seizure Case*, President Truman was bereft of an Attorney General because Howard McGrath had been forced to resign in a corruption scandal. MAEVA MARCUS, TRUMAN AND THE STEEL SEIZURE CASE 35 (1977). Moreover, the legal advice in the Truman administration has been generally characterized as "evasive" and "unresponsive." *Id.* at 36 (quoting Richard Neustadt, a staff member of the White House at the time).

For instance, stare decisis as applied by the judiciary in recent times has looked only to judicial precedent to determine whether a constitutional issue should be treated as settled.[90] However, if constitutional law is understood to be constituted by a reflective equilibrium brought about by executive (and perhaps legislative and state) interpretation as well as judicial interpretation, then stare decisis should not be confined to an inquiry into past judicial interpretation. Instead, stare decisis should be replaced by a broader doctrine of constitutional closure that regards constitutional law as settled only when concurred to (for some period of time or through some number of instances) by more than one branch of government.

Such an understanding of constitutional closure has the additional advantage of comporting with the understanding widely shared in the early Republic. For instance, in agreeing to sign bank legislation, James Madison put aside his doubts about the bank's constitutionality by referring to the "repeated recognitions under varied circumstances of the validity of such an institution in acts of the *legislative, executive, and judicial branches* of the Government, accompanied by indications, *in different modes*, of a concurrence of the general will of the nation . . . ."[91] In *M'Culloch v. Maryland*,[92] Chief Justice John Marshall also referred to the constitutional approval that other branches had previously given to the bank as an important reason for holding the bank to be constitutional:

> The principle now contested was introduced at a very early period of our history, has been *recognized by many successive legislatures*, and has been acted upon by the judicial department, in cases of peculiar delicacy . . . . After being resisted, first in the fair and open field of debate, and *afterwards in the executive cabinet*, with as much persevering talent as any measure has ever experienced, and being supported by arguments which convinced minds as pure and as intelligent as this country can boast, [the bill to incorporate the bank] became a law.[93]

Justice Joseph Story, the first comprehensive theorist of the Constitu-

---

[90] *See* Planned Parenthood v. Casey, 112 S. Ct. 2791, 2803, 2810 (1992) (implicitly criticizing the executive branch for asking that *Roe* be overruled and viewing the stare decisis effect of *Roe* solely in the context of *judicial* developments in constitutional law).

[91] Veto Message from James Madison to the Senate (Jan. 30, 1815), *in* 2 MESSAGES, *supra* note 74, at 540.

[92] 17 U.S. (4 Wheat.) 316 (1819).

[93] *Id.* at 401-02 (emphasis added). The minds which were convinced were, of course, Alexander Hamilton and George Washington, who signed the bill into law. Both Thomas Jefferson, the Secretary of State, and Edmund Randolph opposed the bill on constitutional grounds. REARDON, *supra* note 2, at 197-99. It was President Washington's practice to ask for the legal opinions of all of his cabinet officers on legal matters rather than rely solely on the opinion of his Attorney General. *Id.* at 199, 229.

tion, also appeared to have a theory of constitutional closure that was not court-centered but took into account the views of other official interpreters of the Constitution.[94]

### D.   *The Situational Lawyer Model*

Without the kind of institutional constraints discussed above[95] as well as constraints imposed by any method of legal reasoning (even more analogical methods),[96] the model of independent interpretation would collapse into the situational model of the Attorney General.  In such a model, the Attorney General would write opinions in the situational interest of his client without any obligation to preserve legal principles whether autonomous or court-centered.  This model can be justified normatively in one of two ways.  First, it can be premised on a rejection of the notion that the President has any special duties of legal fidelity under the Constitution.  The oath to defend the Constitution is simply a generalized admonition not to subvert it through self-evidently extraconstitutional means (for instance, by entering into a treaty with a foreign power that abrogated the Constitution).[97]  The duty to "take Care that the Laws be faithfully executed"[98] is simply a requirement not to suspend or ignore laws that Congress has passed.  A second defense of the model would be premised on the idea that the President's interpretation was understood to be political not merely in the sense that it should reflect an articulation of the popular will but that the popular will is represented simply by pursuit of the President's particular political interest on a case-by-case basis.

The consequences of such a view would be that the Attorney General would approach his opinion work with an attitude akin to the bad man's view of the law.[99]  As in the court-centered model,

---

[94] *See* 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 391 (photo. reprint 1970) (Boston, Hilliard, Gray, & Co. 1833) (arguing that the system of construction of the Constitution which mandated judicial review was as "absolutely conclusive, as any ever can be" because it was accepted by Congress and the states for a period of forty years). *See also* H. Jefferson Powell, *The Political Grammar of Early Constitutional Law*, 71 N.C. L. REV. 949, 968-74 (1993).

[95] *See supra* note 89 and accompanying text.

[96] *See* Sunstein, *supra* note 82, at 770-71 (arguing that analogical reasoning imposes "discipline" on decision-making).

[97] *Cf.* David A. Strauss & Cass R. Sunstein, *On Truisms and Constitutional Obligations: A Response*, 71 TEX. L. REV. 669, 674 (suggesting that the Oath Clause does not impose any obligation on the President to nominate a justice who shares his constitutional principles).

[98] U.S. CONST. art. II, § 3.

[99] I originally entitled this model the "private lawyer" model, but the role of the private lawyer is not invariably that of Holmes's proverbial bad man, particularly in opinion writing. Indeed, particularly in complex transactional work, the lawyer will frequently be called on to render a legal opinion which must meet a high standard of objectivity, since it will be relied on

Supreme Court precedent would be considered, not as a matter of obligation, but only insofar as the flouting of precedent would have adverse political consequences. If the President's short term situational interest demanded, the Attorney General would make the most plausible case for a position even in the teeth of precedent.[100] Unlike the independent authority model, a particular Attorney General would not be concerned with expounding a consistent and principled jurisprudence that reflected the President's philosophy but with using any plausible principles to achieve the policy goal desired by his client. The only substantial constraints on the Attorney General in this model would be those of self-interest—of the President's and his own—such as: 1) the need to avoid specific legal positions so untenable that the costs outweighed the benefits to the President; 2) the more general need to cultivate the appearance of fidelity to the law that is probably expected by the public of the President and his subordinates; and 3) the desire of the Attorney General and those writing the opinions to maintain their professional reputations.

### E.   *Theoretical Models in a Political World*

While each model of the Attorney General—court-centered, independent authority, and situational—has at least a measure of plausibility as well as internal coherence, we have seen that the models are not as distinct as they may first appear. Because of the distinctive institutional content of Supreme Court jurisprudence, even the court-centered model permits a large measure of independent executive branch autonomy in interpretation. The independent authority model, in turn, can by degrees be shaped to give free enough play to the President's institutional and political interests that opinions under that model might often be hard to distinguish from that of a lawyer acting in his client's situational interests. Despite the blurring at the edges of each model, we can expect that each of these normative con-

---

by parties to the transaction as a kind of insurance. The varying standards such private opinions must meet are well understood among the circle of transactional lawyers who use them and are enforced by a mixture of legal sanctions (e.g., malpractice laws) and social sanctions (e.g., the lawyer's standing and reputation among other transactional lawyers). For an interesting discussion of the problems of providing a legal opinion in private and the role reputation plays in giving value to the opinion, see JAMES C. FREUND, LAWYERING: A REALISTIC APPROACH TO LEGAL PRACTICE 313-23 (1979).

[100] A caricature of the "situational" model was implicit in a recent column of Evans and Novak discussing the issue of the President's legal authority to index capital gains. *See* Rowland Evans & Robert Novak, *A Presidential Test on Capital Gains,* WASH. POST, Sept. 2, 1992, at A21. According to Evans and Novak, the issue was not whether OLC could write a legally correct opinion in favor of this position but rather how the White House could make plain that it wanted an opinion with this result, whatever the reasoning. *Id.*

stitutional models appeals to different kinds of administrations and may lend themselves to different types of issues within a single administration. Indeed, as we shall see, in some circumstances the President and Attorney General, for reasons of political or bureaucratic interest, may adopt a more naive and less nuanced version of a model than can be strictly justified as a matter of constitutional theory. This suggests that to a large degree political and bureaucratic imperatives shape the Attorney General's opinion-writing function in practice as much as normative constitutional considerations.[101]

The model of independent interpretation would appear to have most purchase with an administration with a jurisprudence that differed substantially from that which prevailed in the federal courts and that was an important part of the President's political platform. For such a President, it would be of substantial importance to present and live by a coherent body of constitutional principles that would present a clear alternative to the established constitutional jurisprudence. Backed by the President's political power, such a jurisprudence could help change the country's perception of the Constitution and bring about a constitutional transformation. Paradoxically, however, the implementation of an independent authority model to effectuate the President's revolutionary jurisprudence may perhaps be best achieved if these principles are applied by an officer not generally responsible for policy or political issues likely to be at cross purposes with the advancement of a specific set of jurisprudential principles.[102] Indeed, in delegating his interpretative function to the Attorney General (and creating a structure in which the Attorney General would be insulated from political influence), such a President could be understood to be following a "precommitment strategy" in which he understands that the siren song of politics and policy will always be tempting the President himself to abandon his jurisprudence in order to achieve other political goals.[103] While the President always retains the power to untie himself, there are likely to be a set of cases where he would

---

[101] For a discussion of the power of organizational imperatives to shape the executive branch's conduct of its constitutional responsibilities even in the face of proper constitutional imperatives, see McGinnis, *Solicitor General's Office, supra* note 10, at 804-12.

[102] By "revolutionary" I mean a jurisprudence that departs sharply from the contemporary Court's jurisprudence.

[103] For a discussion of precommitment strategies generally, see THOMAS C. SCHELLING, THE STRATEGY OF CONFLICT (1980) (explaining how an actor can optimize his utility according to a theory that prevents him from choosing future actions inconsistent with his current preferences); *cf.* Michael J. Klarman, *Constitutional Fact/Constitutional Fiction: A Critique of Bruce Ackerman's Theory of Constitutional Moments*, 44 STAN. L. REV. 759, 795 (1992) (book review) (viewing the Constitution as a whole as a precommitment strategy to protect against moments of political passion).

have jumped but for the trouble of untying himself. Overruling the Attorney General is often not politically cost free; hence the selection of a principled Attorney General may maximize the opportunity to promote an independent jurisprudence.[104]

Of course, not all Presidents will have an interest in promoting a revolutionary jurisprudence. For them, the independent authority model will have less appeal. It adds another dimension to policy decisions and therefore risks entanglements in controversies of a legal nature that may distract from the economic, social, and foreign policy of their administration. Insofar as Presidents lack a substantial jurisprudential interest, they will probably embrace an internal legal regime that tends toward the other two models because both have advantages to the administration. The court-centered model has the advantage of administrative regularity. As the panel on the unitariness of executive interpretation suggested,[105] the different departments and agencies of the government are frequently fragmented in their interpretation of the law because they have fundamentally different political and bureaucratic interests. Some of these controversies will be of no substantial importance to the implementation of the President's political or policy agenda. What is important about these disputes is not so much that they have a particular resolution as that they be settled in a predictable fashion rather than be permitted to create festering legal discord within the administration.[106] Moreover, the mechanism to resolve these disputes should appear neutral and determined by criteria outside of the control of the agencies themselves. If an interagency dispute has been resolved by an apparently neutral mechanism and has the appearance of fairness, the President and his subordinate will have to spend less resources enforcing it. Because a court-centered model offers well-established and neutral principles as a framework for the Attorney General's resolution of some kinds of issues, the court-centered model may actually be superior to an independent authority model and a situational lawyer model, even from the point of view of the administration's self-interest. For this model to succeed the Attorney General too must have substantial independence from the policy and political imperatives of a given case that would other-

---

[104] President Jefferson appeared to follow this strategy, appointing a strong adherent of the strict constructionist school of jurisprudence to be Attorney General. *See infra* text accompanying notes 118-19.

[105] *See, e.g.*, Michael Herz, *Imposing Unified Executive Branch Statutory Interpretation*, 15 CARDOZO L. REV. 219, 249 (1993).

[106] Insofar as the resolution is predictable, there should be fewer disputes. As a result, there should be both less of the kind of interagency uncertainty that is created by a dispute and fewer resources devoted to resolving these disputes.

wise distort the desired administrative regularity.[107]

Inevitably, the administration faces a set of legal disputes and legal issues whose outcome, unlike most disputes, implicates the President's essential political and policy interests. In such disputes, the court-centered model can impair the President's interests because it will, in some instances, call for results that are more consonant with the Supreme Court's jurisprudence at the expense of resolutions that would maximize the President's policy or political interests. Thus, an administration without strong jurisprudential commitments would appear to favor the situational lawyer model for the resolution of such disputes. Even under this model the Attorney General will have some measure of independence, albeit limited, since the President will presumably want to understand the legal consequences of his actions, the proper evaluation of which are likely to be distorted if the officer responsible for making them is too heavily involved in the policy decision itself.[108]

Thus, each of the three roles for the Attorney General that we have mapped as normative constitutional models potentially fits different potential interests of the President and the executive branch. The degree to which different models will have purchase in an administration thus can be expected to depend both on the general interest of the President and the kind of dispute at issue. The third section of the Article will expand on this analysis in an attempt to explicate the operations of the modern Office of Legal Counsel.

## II.  THE FIRST EXAMPLE OF THE INDEPENDENT AUTHORITY MODEL AND ITS CONSEQUENCES

Given that the first section creates models of the roles of the Attorney General almost entirely as a matter of construction from constitutional theory, it would be useful to review the entire history of the Attorney General's opinion writing to determine to what degree the various Attorneys General have operated under the normative models described and what the consequences are for their administration for the model or mix of models they have chosen. Obviously a complete survey would be a massive undertaking that cannot be attempted here. What can be done is to provide a single case study of the interpretative choices of an Attorney General and their consequences.

The first and perhaps purest example of the Attorney General as

---

[107] Hence there are also reasons within this model for the President to precommit himself by choosing a lawyer of consistent principle. *See supra* note 103 and accompanying text.

[108] In part III we will review how all three models can coexist in the modern OLC depending on the function performed.

independent interpreter is Levi Lincoln, Jefferson's Attorney General.[109] His story is instructive, because it shows the difficulty of making consistent and principled independent interpretations even in the administration of a President fundamentally committed by public declaration to a system of constitutional interpretation distinct from that of the Supreme Court. It shows how more pragmatic officials can frustrate an Attorney General who forcefully articulates the President's jurisprudential views when these views conflict with important policy concerns. Precisely because these jurisprudential views are independent of court precedent, abandoning them may create few legal difficulties in the courts or elsewhere. Thus, the President himself may likely discount his own jurisprudential principles in matters of overwhelming political importance: as we shall see, Jefferson did so, when, over Lincoln's objections, he agreed to purchase and add Louisiana to the United States without seeking authorization in a constitutional amendment.

Nevertheless, as Attorney General, Lincoln vindicated a distinctive executive jurisprudence of strict construction in some not inconsequential matters, even in the face of policy considerations favoring contrary results. Moreover, Lincoln's persistence in attempting to apply a consistent jurisprudence even when politically disadvantageous shows that once an Attorney General has chosen a model for his actions, as Lincoln did, the internal logic of the model chosen will have substantial influence over his actions and opinions even if it becomes opposed to the situational interest of the President.

## A. *Attorney General Levi Lincoln and Independent Interpretive Authority*

There can be no doubt that Jefferson was elected in part on a platform of constitutional interpretation—the so-called Virginia school of constitutional interpretation—that stressed that the powers of the federal government were enumerated and limited and that the states as well as the federal courts had the authority to interpret the

---

[109] For a discussion of Edmund Randolph, another early Attorney General, see Susan L. Bloch, *The Early Role of the Attorney General in our Constitutional Scheme: In the Beginning There was Pragmatism*, 1989 DUKE L.J. 561. Randolph appears to have been a much less jurisprudentially aggressive Attorney General than Levi Lincoln. Washington in fact wanted Randolph to be an arbitrator between the conflicting views of Alexander Hamilton and Thomas Jefferson—views that frequently manifested themselves in legal opinions. *See* REARDON, *supra* note 2, at 189 ("Randolph's uncanny talent for identifying the 'middle position' [between Hamilton's and Jefferson's] had made him indispensable to the President."). As we shall see, however, Levi Lincoln's jurisprudential approach shows that early Attorneys General were *not* always pragmatists.

scope of such powers for themselves.[110] For instance, one of Jefferson's principal objections to the Federalist administration of John Adams was its unconstitutional usurpation of state rights. These objections came to head in the controversy over the Alien and Sedition Acts[111] which punished seditious speech.

James Madison summarized the constitutional objections in the Virginia Resolutions.[112] The Resolutions' first ground of objection to these Acts was not that they violated the First Amendment but that they were beyond Congress's enumerated powers. The Virginia Resolutions also posited the existence of a power of independent constitutional interpretation in the states. They declared that

> the powers of the federal government . . . [are] no further valid than they are authorized by the grants enumerated in that compact; and that, in case of a deliberate, palpable, and dangerous exercise of other powers, not granted by the said compact, the states, who are parties thereto, have the right, and are in duty bound, to interpose, for arresting the progress of the evil, and for maintaining, within their respective limits, the authorities, rights, and liberties, appertaining to them.[113]

Jefferson agreed with the substance of the Virginia Resolutions but believed that the proclamation of the states' authority of constitutional interpretation and action should be made even stronger. Jefferson's draft of the Kentucky Resolutions was even more forceful in its defense of independent state authority, declaring "that [the federal] government, created by this compact, was not made the exclusive or final judge of the extent of the powers delegated to itself . . . but that . . . *each party has an equal right to judge for itself* [the meaning of the Constitution] . . . ."[114]

Accordingly, Jefferson came to power with a distinctive constitutional philosophy completely opposed to the Federalist orthodoxy that dominated the federal courts and the federal bar.[115] He also had

---

[110] As Jefferson said in his first inaugural address, "I deem [one of] the essential principles of our government, and consequently [one] which ought to shape its administration . . . [to be] the support of the state governments in all their rights . . . ." Thomas Jefferson, Inauguration Address (Mar. 4, 1801), *in* 3 THE WRITINGS OF THOMAS JEFFERSON 317, 321 (Albert E. Bergh ed., 1907) [hereinafter Bergh, 3 WRITINGS].

[111] Act of June 18, 1798, ch. 54, 1 Stat. 566 (repealed 1802); Alien Enemies Act, ch. 66, 1 Stat. 577 (1798) (current version at 50 U.S.C. §§ 21-22 (1988)); Alien Act, ch. 58, 1 Stat. 570 (1798) (expired 1800); Sedition Act, ch. 74, 1 Stat. 596 (1798) (expired 1801).

[112] Virginia Resolutions of 1798, 4 ELLIOT'S DEBATES, *supra* note 85, at 528 (pronouncing the Alien and Sedition Laws to be unconstitutional).

[113] *Id.*

[114] *Id.* at 540.

[115] Robert W. Gordon, *The Independence of Lawyers*, 68 B.U. L. REV. 1, 41 (1988) ("In the New England of 1800, . . . the list of bar leaders is virtually identical to the roster of the

*ATTORNEY GENERAL*

a robust view of the interpretative authority of constitutional actors outside the courts. The stage thus appeared set for a Presidency which would attempt to transform constitutional interpretation from Federalist principles to the Virginia School.

One leading Federalist, however, shrewdly, if cynically, welcomed the likely effect of Jefferson's election on constitutional jurisprudence. Shortly after Jefferson's election, Gouverneur Morris of Pennsylvania, a prominent Framer of the Constitution, discussed the effect of political exigencies on the coming Republican administration's interpretation of the Constitution's enumerated powers:

> The democrats will push the Constitution forward more rapidly than the federalists dared to do, and will wind up its powers as high as they ought to go, and perhaps a little higher. The result of this will be some clashing, by and by, with their friends in the States; and if we have good sense enough not to make too much noise we shall by and by be called in to take the business up in a much better condition than when we were forced . . . to lay it down . . . .[116]

Morris thus foresaw that a Republican administration, eager to exercise effective political power, would be constantly tempted to undermine its own jurisprudence and pave the way for broader acceptance of the Federalist's jurisprudence. Perhaps Jefferson's famous line in his inaugural address, "We are all republicans—we are federalists,"[117] immediately presaged this kind of difficulty for the advancement of Republican jurisprudence, indicating that President Jefferson might be tempted to push divisive jurisprudential issues into the background in the interest of building broad political coalitions.

At the center of this delicate mixture of jurisprudence and politics was Jefferson's first Attorney General, Levi Lincoln, a leading Republican politician from western Massachusetts.[118] He had made a reputation there as a strict constructionalist, an adherent of states' rights, and indeed something of a political firebrand, making acerbic speeches against religious ministers who were some of the mainstays of the Federalist party in predominantly Federalist Massachusetts.[119]

---

Federalist party leadership cadre."); Stewart Jay, *Origins of Federal Common Law: Part One*, 133 U. PA. L. REV. 1003, 1016 (1985) (observing that all federal judges before the election of Jefferson were Federalists).

[116] Letter from Gouverneur Morris to John Parish (Nov. 13, 1801), *in* 2 THE DIARY AND LETTERS OF GOUVERNEUR MORRIS 415 (Anne Cary Morris ed., New York, Charles Scribner's Sons 1888).

[117] Thomas Jefferson, Inauguration Address, Bergh, 3 WRITINGS, *supra* note 110, at 319.

[118] For a discussion of Levi Lincoln's life, see Marvin J. Petroelje, Levi Lincoln, Sr.: Jeffersonian Republican of Massachusetts (1969) (unpublished Ph.D. dissertation, Michigan State).

[119] *Id.* at 55-63.

He was elected to the House of Representatives in 1800.[120] Once Jefferson was elected President, Lincoln was promptly appointed Attorney General because he was an able lawyer who was perhaps the most unwavering adherent of Jeffersonian republicanism in all New England.[121]

Shortly after taking office, Lincoln took the opportunity to strictly construe the Constitution against the opposition of Treasury Secretary Albert Gallatin and the rest of the Cabinet.[122] The issue was the extent of the President's authority as commander-in-chief to take action without the authorization of Congress. The precipitating event was the sailing of a squadron of United States warships to protect American shipping against the Barbary pirates.

Lincoln argued that the navy had authority only to repulse individual attacks, thus suggesting that the executive branch's military authority was quite limited in the absence of congressional authorization.[123] Gallatin thought that once hostilities began the executive should have general authority to direct force as it chose, permitting it to pursue the enemy ships if necessary.[124] Jefferson, in recounting the subsequent action, appeared to side with Lincoln, suggesting that the navy action had been merely defensive and that Congress would have to authorize offensive action.[125]

Early in his tenure as Attorney General, Lincoln took a more important step toward creating a distinctively Republican jurisprudence by seizing an opportunity to declare the President's independent authority to interpret the Constitution even in the teeth of contrary Supreme Court precedent.[126] The Schooner Peggy, an armed French vessel, was captured by the United States. It was condemned by a district court and ordered sold as a prize. The Court ordered the return of the prize money.[127] Although Lincoln disagreed with the Court's ruling, he acknowledged that the principle the Jus-

---

[120] 10 ANNALS OF CONG. 1005 (1851).

[121] Petroelje, *supra* note 118, at 70.

[122] The entire deliberations of the cabinet are well recounted in NOBLE E. CUNNINGHAM, THE PROCESS OF GOVERNMENT UNDER JEFFERSON 15 (1974).

[123] Lincoln stated: "Our men of war may repel an attack on individual vessels, but after the repulse, may not proceed to destroy the enemy's vessels generally." *Id.* at 48-49.

[124] *Id.* at 49.

[125] Jefferson requested that Congress "consider whether, by authorizing measures of offence, also, they will place our force on an equal footing with that of its adversaries." First Annual Message of Thomas Jefferson (Dec. 8, 1801), *in* 8 THE WRITINGS OF THOMAS JEFFERSON 108, 118 (Paul L. Ford ed., New York, G.P. Putnam's Sons 1897) [hereinafter 8 WRITINGS].

[126] 1 Op. Att'y Gen. 119, 119-20 (1802).

[127] United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103 (1801).

tices laid down was "binding in this particular instance" because the Court was "competent to decide this principle."[128] Nevertheless, Lincoln declared that

> Although they have fixed the principle for themselves, and thereby bound others, in reference to the case on which they have adjudicated, it can, I conceive, extend no further. In all other cases in which the executive or other courts are obliged to act, they must decide for themselves; paying a great deference to the opinions of a court of so high an authority as the supreme one of the United States, but still greater to their own convictions of the meaning of the laws and [C]onstitution of the United States, and their oaths to support them.[129]

Lincoln's appears to be the first official statement of the independent interpretative authority of the President.[130] The President's independent interpretative authority flowed naturally from the Virginia school of constitutional interpretation with its emphatic denial that the federal government had a monopoly on constitutional interpretation. It was no harder to infer the executive's right of independent authority from the Oath Clause than to infer the states' interpretative authority from the structure of the Constitution as compact.[131] With this declaration of interpretive independence, Lincoln created a vehicle for the Jeffersonian Presidency to infuse Republican constitutional views into its administration of the law.

Lincoln then used this right of independent interpretative authority to craft an opinion jurisprudence that bore the mark of the Virginia school even when those interpretations circumscribed the authority of the President, thus preventing at least temporarily the validation of Gouverneur Morris's prediction. For instance, Lincoln declared that there was no federal common law of crime available to vindicate the Spanish Ambassador, who had complained to the federal government that he had been a victim of an assault. Lincoln

---

128 1 Op. Att'y Gen. 119, 122 (1802).

129 *Id.*

130 Lincoln may have used an Attorney General opinion to proclaim the President's independent authority in constitutional interpretation because other more pragmatic cabinet members had previously prevailed upon Jefferson to remove such a declaration from his first annual message to Congress. *See* CUNNINGHAM, *supra* note 122, at 75-76. In his draft of the message, Jefferson had suggested that his oath required him to declare the Seditions Act unconstitutional because it was "in palpable and unqualified contradiction to the [C]onstitution." Letter from Robert Smith, Secretary of the Navy, to Thomas Jefferson (Nov. 21, 1801), *quoted in* CUNNINGHAM, *supra* note 122, at 75.

131 Attorney General Meese more recently came to similar conclusions based in part on his reading of the Oath Clause. *See* Meese, *supra* note 17. However, there is no recognition in either his speech or the extensive commentary on it that Meese was following directly in the footsteps of one of the earliest Attorneys General.

wrote that the alleged assault would violate the law of nations but that this law was "part of the municipal law of each State" and not of the federal government.[132] In rejecting a federal common law of crime, Lincoln was following the Republican philosophy of strict construction and ruling against federal power in a sensitive area although prior opinions by a Federalist Attorney General[133] and justices of the Supreme Court had endorsed the federal common law of crime.[134] In another opinion, Lincoln strictly construed the Ordinance of the Northwest Territory[135] to vest the appointment of most officials in the Governor rather than the President and rejected the notion that presidential powers could generally be enlarged by implication.[136]

## B. *Attorney General Lincoln, President Jefferson, and the Louisiana Purchase*

By far the most important test of Republican jurisprudence, however, concerned the purchase of Louisiana from France. Near the end of 1802, an official of Spain closed New Orleans to transshipment of American goods.[137] Although later rescinded, this act was widely thought to presage the attitude France would take toward the United States shipping when it took control of Louisiana under a pending treaty from Spain.[138] Merchants throughout the country, but particularly in the South and West where the Republicans were strong, became insistent that France not be allowed to obtain a stranglehold on this crucial commercial transit.[139] The Jefferson administration was urged to protect free passage to the Gulf with force if necessary.[140] Thus when Monroe negotiated to buy the Louisiana Territory and parts of Florida, he did so with the knowledge that the protection of commercial interests which the treaty afforded was crucial to keeping the fledgling republic at peace. The stakes were higher than those the Jefferson administration faced by repulsing the Barbary pirates and the constitutional issues no less significant.

---

132 5 Op. Att'y Gen. 691, 692 (1803). *See* Stewart Jay, *The Status of the Law of Nations in Early American Law*, 42 VAND. L. REV. 819, 844 & n.115 (1989).

133 1 Op. Att'y Gen. 52, 53 (1794).

134 For a collection of these opinions, see Jay, *supra* note 115, at 1083-89.

135 Act of Aug. 7, 1789, ch. 8, 1 Stat. 50.

136 1 Op. Att'y Gen. 102, 103-04 (1802). The opinion did relax its strict constructionist approach to admit that the President could continue to appoint certain kinds of judges which previous Presidents had also appointed. *Id.*

137 JAMES K. HOSMER, THE HISTORY OF THE LOUISIANA PURCHASE 61 (1902).

138 *Id.* at 61-62.

139 *Id.* at 57, 63-64.

140 Indeed, Federalist Senator Ross of Pennsylvania had proposed a resolution suggesting immediate seizure of New Orleans by force. *Id.* at 68.

Two principal constitutional issues were raised by the purchase. First, Article IV of the Constitution provided Congress with the express authority to admit new states into the Union but did not provide the Union with express authority to acquire new territory.[141] Thus, the Jefferson administration faced the strict constructionist argument that the federal government lacked the authority to acquire territory even with the consent of Congress.[142] Moreover, the strict constructionist argument continued, the executive could not exceed the enumerated powers of the federal government merely by making the acquisition in the form of the treaty.[143]

Second, once the territory was acquired there was the issue of its status: could it be admitted by Congress as a state?  It might seem as a textual matter that this is an easier question to answer assuming that the United States has a right of acquiring additional territory.  The right of Congress to admit new states is only qualified when the terri-

---

[141] Article IV, Section 3 provides:

New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

U.S. CONST. art. IV, § 3.

[142] As an original matter, the question of whether Article IV implicitly grants the United States the power to acquire territory is a difficult one.  A report by the Committee on Detail at the Constitutional Convention restricted the power of admission to states "within the present limits of the [U]nited [S]tates."  2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 147 (Max Farrand ed., 1966). A later draft omitted the word "present." *Id.* at 173.

The Supreme Court did not address this question until 1828.  Justice Marshall settled the question in a single declarative sentence: "The Constitution confers absolutely on the government of the Union, the powers of making war, and of making treaties; consequently, that government possesses the power of acquiring territory, either by conquest or by treaty." American Ins. Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511, 542 (1828).

[143] In Missouri v. Holland, 252 U.S. 416 (1920), the Court held that a treaty could resolve issues that Article I of the Constitution did not otherwise authorize Congress to address. Justice Holmes's reasons for giving such scope to the treaty power, however, were hardly consistent with a strict constructionist philosophy:

It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, "a power which must belong to and somewhere reside in every civilized government" is not to be found. . . . [W]hen we are dealing with words that are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters.

Missouri v. Holland, 252 U.S. 416, 433 (1920) (quoting Andrews v. Andrews, 188 U.S. 14, 33 (1903)).

tory of the state to be admitted is under the jurisdiction of a state already in the Union.[144] Nevertheless, the admission of a new state could lead to change in the balance of the Union thus suggesting to adherents of states' rights that such a significant transformation of the nation could be accomplished only by an act of the sovereign people speaking through their states in the amendment process.[145]

Attorney General Lincoln tactfully expressed a strict constructionist view, writing Jefferson before Monroe entered into the treaty that

> [i]f the opinion is correct, that the Genl Govt [sic] when formed, was predicated on the then existing *United* States, and such as could grow out of *them*, . . . and that its authority, is, constitutionally, limited to the people composing the several political State Societies in that union, & such as such might be formed out of them; would not a direct independent purchase, be extending the executive power further, . . . than the proposed indirect mode?[146]

The "indirect mode" Lincoln proposed instead was to add the territory not to the United States but to its already existing states and territories—in this case, to Georgia and the Mississippi territory—thus avoiding the appearance that the United States was itself acquiring land. Presumably, the theory was that the nation was not acquiring territory and thus not exceeding its enumerated powers, because Georgia would have consented to the addition to its territory and Congress, which was charged by the Constitution with plenary power over the territories, would have consented on behalf of the Mississippi territory.

Albert Gallatin, Jefferson's Secretary of Treasury, ridiculed Lincoln's solution and suggested that no constitutional problem existed in the first place:

> If the acquisition of territory is not warranted by the Constitution, it is not more legal to acquire for one State than for the United States . . . . What could, on his construction, prevent the President and the Senate by treaty annexing Cuba to Massachusetts, or Ben-

---

[144] U.S. CONST. art. IV, § 3, cl. 1 (prohibiting new states from being formed from existing states or from the junction of two states "without the Consent of the Legislatures of the States concerned").

[145] Indeed, as a matter of social, even if not constitutional, theory, such adherents were clearly right about the significance of admitting new states: because the questions that their admission prompted could not easily be answered within the framework of the original compact, disputes over their admission in Congress led to a series of national crises culminating in the Civil War.

[146] Letter from Levi Lincoln to Thomas Jefferson (Jan. 10, 1803), *quoted in* EVERETT S. BROWN, THE CONSTITUTIONAL HISTORY OF THE LOUISIANA PURCHASE 18, 19 (photo. reprint 1972) (1920).

gal to Rhode Island, if ever the acquirement of colonies shall become a favorite object with governments, and colonies shall be acquired?

But does any constitutional objection really exist?

: . . .

. . . To me it would appear:

1st. That the United States as a nation have an inherent right to acquire territory.

2d. That whenever that acquisition is by treaty, the same constituted authorities in whom the treaty-making power is vested have a constitutional right to sanction the acquisition.[147]

Thus Gallatin first seized upon a weakness in the articulation of Lincoln's argument: if, as Lincoln conceded, a new territory could be admitted as long as one state was willing to enlarge its territory, the nation could be enlarged even without constitutional amendment. The breadth of Gallatin's affirmative constitutional argument for territorial acquisition, however, was directly contrary to the main tenets of a Republican jurisprudence. In a government of strictly enumerated powers, the United States had no powers not granted by the Constitution and thus no *inherent* right to acquire territory.[148]

Jefferson seemed at first swayed by Gallatin's arguments, although his reply was somewhat ambiguous:

You are right, in my opinion, as to Mr. L's proposition; there is no constitutional difficulty as to the acquisition of territory, and whether, when acquired, it may be taken into the Union by the Constitution as it now stands, will become a question of expediency. I think it will be safer not to permit the enlargement of the Union but by amendment of the Constitution.[149]

By August 9, 1803, however, Jefferson wrote that a constitutional amendment to complete the incorporation of Louisiana into the

---

[147] Letter from Albert Gallatin to Thomas Jefferson (Jan. 13, 1803), *in* 1 THE WRITINGS OF ALBERT GALLATIN 111, 112-13 (photo. reprint 1960) (Henry Adams ed., Philadelphia, J.B. Lippincott & Co. 1879).

[148] In a sense, Gallatin's argument presaged that of the Court in United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936), in which Justice Sutherland asserted that the federal government's powers in foreign affairs, unlike that in the domestic sphere, was largely inherited from the Crown rather than granted by the states. *Id.* at 316-17. His argument is not clearly right as a matter of the original understanding of the Framers, *see* Charles A. Lofgren, United States v. Curtiss-Wright Export Corporation: *An Historical Reassessment*, 83 YALE L.J. 1 (1973) (criticizing Sutherland for misreading history), and in any event was at odds with the central tenet of the Virginia School of constitutional interpretation—that the federal government had only the powers enumerated in the Constitution, and those powers were to be strictly construed against the federal government as beneficiary.

[149] Letter from Thomas Jefferson to Albert Gallatin (Jan. 1803), *in* 8 WRITINGS, *supra* note 125, at 241 n.1.

Union "seems necessary."[150] He stated clearly that the doctrine of strict construction required such an action. "Our confederation is certainly confined to the limits established by the revolution. The general government has no powers but such as the [C]onstitution has given it; and it has not given it a power of holding foreign territory, & still less of incorporating it into the Union."[151]

In fact, Jefferson circulated to the entire cabinet a constitutional amendment that would have obviated the constitutional difficulties Lincoln raised.[152] Lincoln favored transmitting the amendment to Congress but apparently the rest of the cabinet members disagreed.[153] Jefferson did not submit the amendment to Congress. Besides the opposition of his cabinet, the prime reason was fear that entangling the treaty in a constitutional amendment might delay and kill the treaty by kindling debate on fundamental issues of constitutional interpretation.[154] He wrote Lincoln: "[T]he less that is said about any constitutional difficulty, the better; and that it will be desirable for Congress to do what is necessary, *in silence*. I find but one opinion as to the necessity of shutting up the country for some time."[155]

Jefferson, however, appeared to leave open the possibility that he would submit an amendment after the treaty was approved by the Senate. His Third Annual Message to Congress seems studiously am-

---

[150] Letter from Thomas Jefferson to John Dickinson (Aug. 9, 1803), *in* 8 WRITINGS, *supra* note 125, at 261, 262.

[151] *Id*. at 262.

[152] 8 WRITINGS, *supra* note 125, at 241-49. There were two versions of the proposed amendment remaining in Jefferson's manuscripts. The shorter reads as follows:

Louisiana, as ceded by France to the U S. [sic] is made a part of the U S. Its white inhabitants shall be citizens, and stand, as to their rights & obligations, on the same footing with other citizens of the U S. in analogous situations. Save only that as to the portion thereof lying North of an East & West line drawn through the mouth of Arkansa [sic] river, no new State shall be established, nor any grants of land made, other than to Indians in exchange for equivalent portions of land occupied by them, until authorised by further subsequent amendment to the Constitution shall be made for these purposes.

Florida also, whenever it may be rightfully obtained, shall become a part of the U S. U S. [sic] its white inhabitants shall thereupon be Citizens & shall stand, as to their rights & obligations, on the same footing with other citizens of the U S. in analogous situations.

*Id*. at 241-45. The longer version incorporates Louisiana into the United States as well, but also, among other things, specifically addresses the relations between Indians and other inhabitants in the newly incorporated territory. *See id*. at 241-49.

[153] Petroelje, *supra* note 118, at 95 n.75.

[154] *See* Letter from Thomas Jefferson to Thomas Paine (Aug. 18, 1803), *in* 8 WRITINGS, *supra* note 125, at 245 n.1. *See also* Letter from Thomas Jefferson to James Madison (Aug. 18, 1803), *in* 8 WRITINGS, *supra* note 125, at 245 n.1.

[155] Letter from Thomas Jefferson to Levi Lincoln (Aug. 30, 1803), *in* 8 WRITINGS, *supra* note 125, at 246 n.1.

*ATTORNEY GENERAL*

biguous as to what steps were ultimately necessary to bring Louisiana into the Union.[156] A month before he had written to Wilson Cary Nicholas, a Republican Senator, of his continuing concerns about the constitutionality of the purchase but suggested that he would be guided by his party colleagues as to what action to take.[157]

His Republican colleagues in Congress did not press for an amendment and defended the acquisition as constitutional under the treaty power.[158] On the other hand, the Federalists delighted in noting that it was clearly unconstitutional under strict constructionist theories.[159] After the respective positions taken in this debate, it would have been clearly impossible for Jefferson to suggest a confirming amendment because the suggestion would have undercut his own party's position.[160] Thus, in purchasing Louisiana without obtaining the constitutional amendment favored by his Attorney General, Jefferson abandoned his jurisprudential principles in the face of political exigencies.

---

[156] Jefferson stated, "Should the acquisition of Louisiana be constitutionally confirmed and carried into effect, a sum of nearly thirteen millions of dollars will then be added to our public debt . . . ." Thomas Jefferson, Third Annual Message to Congress (Oct. 17, 1803), *in* Bergh, 3 WRITINGS, *supra* note 110, at 351, 356. The phrase "constitutionally confirmed" seems to encompass either passage of an amendment or simply obtaining the advice and consent of the Senate.

[157] *See* Letter from Thomas Jefferson to Wilson C. Nicholas (Sept. 7, 1803), *in* 8 WRITINGS, *supra* note 125, at 247, 248 n.1 ("[I]t [is] important . . . to set an example against broad construction, by appealing for new power to the people. If, however, our friends shall think differently, certainly I shall acquiesce with satisfaction; confiding, that the good sense of our country will correct the evil of construction when it shall produce ill effects.").

[158] For instance, Senator John Taylor stated:

> Neither the means nor the right of acquiring territory are forbidden to the United States; on the contrary, in the fourth article of the Constitution, Congress is empowered "to dispose of and regulate the territory belonging to the United States." [sic] This recognises the right of the United States to hold territory. The means of acquiring territory consist of war and compact . . . .

13 ANNALS OF CONG. 50 (1852).

[159] *Id.* at 54 (statement of Sen. Tracy).

[160] Lincoln himself resigned less than a year after the treaty's passage. *See* CUNNINGHAM, *supra* note 122, at 69. Gallatin remained as Secretary of Treasury for over twelve years, serving well into the Madison administration and gaining the reputation as the indispensable minister in Republican government. RAYMOND WALTERS, JR., ALBERT GALLATIN: JEFFERSONIAN FINANCIER AND DIPLOMAT 262 (1957). After Gallatin left the Treasury, he was offered the post again by James Madison and John Tyler. *Id.* at 297, 371. John Quincy Adams also wanted him for the post but did not make him a direct offer because Gallatin made it known that he would not accept. *Id.* at 330. The last offer came when he was eighty-three. *Id.* at 371. He continued to display Federalist jurisprudential sympathies, making efforts on behalf of the Bank of the United States and generally espousing a construction of the Constitution indistinguishable from that of his predecessor, Alexander Hamilton. *Id.* at 237-43, 262-63.

After leaving the presidency, Jefferson himself attempted a justification of his actions:

> The question you propose, whether circumstances do not sometimes occur, which make it a duty in officers of high trust, to assume authorities beyond the law, is easy of solution in principle, but sometimes embarrassing in practice. A strict observance of the written laws is doubtless *one* of the high duties of a good citizen, but it is not *the highest*. The laws of necessity, of self-preservation, of saving our country when in danger, are of higher obligation. To lose our country by a scrupulous adherence to written law, would be to lose the law itself, with life, liberty, property and all those who are enjoying them with us; thus absurdly sacrificing the end to the means.[161]

Jefferson did not specifically refer to the Louisiana purchase in expounding these sentiments, but he did refer to a hypothetical purchase of territory that was not strictly constitutional. Thus it seems fair to take this letter as his apologia for the act of acquiring Louisiana without the constitutional amendment he implicitly acknowledges was required.

In the same letter Jefferson advocates fidelity to the Constitution in more minor matters.

> [The principle of yielding to a higher duty than obeying the Constitution] do[es] not go to the case of persons charged with petty duties, where consequences are trifling, and time allowed for a legal course, nor to authorize them to take such cases out of the written law. In these, the example of overleaping the law is of greater evil than a strict adherence to its imperfect provisions. It is incumbent on those only who accept of great charges, to risk themselves on great occasions, when the safety of the nation, or some of its very high interests are at stake.[162]

Accordingly, Jefferson justified the aggressive jurisprudence of his Attorney General in quotidian matters while reserving to himself the power of constitutional suspension on great matters of state.

One difficulty with this justification is that the effect of one act of indifference to the President's constitutional jurisprudence in a matter of substantial public importance is likely to long outlive his presidency while the many acts of constitutional fidelity on smaller matters will be buried with the end of his administration. So it appears to be the case with Jefferson's administration. By rejecting his Attorney General's advice to obtain the Louisiana purchase by constitutional

---

161 Letter from Thomas Jefferson to John B. Colvin (Sept. 20, 1810), *in* 12 THE WRITINGS OF THOMAS JEFFERSON 418, 418 (Albert E. Bergh ed., 1907).

162 *Id.* at 421-22.

amendment and discarding the Republicans' strict construction of the enumerated powers, the President notoriously undermined the jurisprudence he proclaimed. Gouverneur Morris's prophesy was fulfilled because it appeared that even a Republican administration ran on a Federalist jurisprudence whenever it was particularly useful. Attorney General Lincoln's other constitutional opinions could hardly compensate for this abandonment in the public mind. Although Lincoln's opinion on unconstitutionality of the federal law of crimes did ultimately prevail,[163] Jefferson's very public repudiation of strict construction appeared to have more lasting consequences.

When questions of the constitutionality of enumerated powers came before the Court in *M'Culloch v. Maryland*,[164] it was understood that even the adherents of the strict constructionist philosophy had already discarded it when the philosophy conflicted with important political imperatives. This could hardly fail to make even Republican Justices more reluctant to invalidate the creation of a bank which merely facilitated the execution of *enumerated* powers when the first Republican President had appeared to countenance the assertion of an *unenumerated* right to acquire territory.[165] An observer no less prominent than John Quincy Adams summed up the effect of the Louisiana purchase on subsequent constitutional developments:

> It introduce[d] whole systems of legislation abhorrent to the spirit and character of our institutions, and all this done by an Administration which came in blowing a trumpet against implied powers. After this, to nibble at a bank, a road, a canal, the mere mint and cummin [sic] of the law, was but glorious inconsistency.[166]

---

[163] *See* United States v. Hudson and Goodwin, 11 U.S. (7 Cranch) 32, 32 (1812) (holding that the United States cannot exercise "a common law jurisdiction" in criminal cases).

[164] 17 U.S. (4 Wheat.) 316 (1819).

[165] The whole incident sheds a somewhat ironic light on Jefferson's bitter complaints about the performance of Republican appointees on the Marshall Court. *See* Letter from Thomas Jefferson to Thomas Ritchie (Dec. 25, 1820), *in* 15 THE WRITINGS OF THOMAS JEFFERSON 295, 295-99 (Albert E. Bergh ed., 1907) (calling certain Justices on the Court, presumably including his appointees, "lazy or timid" for failing to dissent from the opinions of Chief Justice Marshall, "a crafty chief judge"). Lincoln was not timid, but his boldness did not allow him to succeed in persuading Jefferson to seek a constitutional amendment in order to purchase Louisiana. Jefferson in fact appears to have justified his refusal to abide by Republican jurisprudence with a theory as "crafty" as any espoused by Chief Justice Marshall.

[166] 5 MEMOIRS OF JOHN QUINCY ADAMS 401 (Charles F. Adams ed., Philadelphia, J.B. Lippincott & Co. 1875). His grandson, Henry Adams, took a similar view of the effect of the Louisiana purchase. *See* HENRY ADAMS, HISTORY OF THE UNITED STATES OF AMERICA DURING THE ADMINISTRATIONS OF THOMAS JEFFERSON 353-79 (Library of America 1986).

Perhaps John Quincy Adams slightly overstated his case. Presidents did veto legislation on the basis of a strict constructionist constitutional theory favoring states' rights even after the Louisiana Purchase. For instance, James Madison vetoed a bill for internal improvements because he believed the creation of improvements were not among the enumerated powers and

## III. AN ANALYSIS OF THE OPERATIONS OF THE CURRENT OFFICE OF LEGAL COUNSEL

This final section will analyze the current functions and structure of the Office of Legal Counsel in order to provide a fuller understanding of the bureaucratic and political forces that shape its opinions and advice.[167] In contrast to the models in part I which are drawn from normative constitutional theory and a consideration of presidential interest, this section will emphasize analysis drawn from "bottom-up" organizational analysis.[168] In this way we will survey how the beliefs, tasks, and interests of the managers and line attorneys in OLC influence its output—its opinions and advice—and lead to the employment of a mix of the models discussed in part I.

Indeed, analyzing executive legal opinions in terms of the interests of the legal advisor as well as his client is suggested not only by bureaucratic theory but by William Shakespeare. In fact, the largest concentration of legal material appearing in any Shakespearean play is essentially a legal opinion for the executive—the Archbishop of

---

thus a constitutional amendment was necessary to permit them. *See* James Madison, Veto Message (Mar. 3, 1817), *in* 8 THE WRITINGS OF JAMES MADISON 386, 386-88 (Gaillard Hunt ed., 1908). Nevertheless, many of his Republican colleagues in the Congress did not agree, *see* JEFFERSON POWELL, LANGUAGES OF POWER: A SOURCEBOOK OF EARLY AMERICAN CONSTITUTIONAL HISTORY 315 (1991), and his veto, as well as the subsequent veto of the bank by Andrew Jackson on constitutional grounds, did not succeed in rallying a consensus against the more dominant nationalist theories of constitutional interpretation.

[167] Unless otherwise indicated, the information about the OLC in this section comes from my experience there. The assertions about its procedural rules and the composition of its staff have been kindly verified by Robert Delahunty, Senior Counsel at OLC.

[168] For a discussion of "bottom-up" bureaucratic analysis, see JAMES Q. WILSON, BUREAUCRACY 23-28 (1989). The premise of this analysis is that bureaucratic behavior can be explained in terms of the distinctive mission and organization of the bureaucracy and the interests of the bureaucrats who work there. *See also* GRAHAM T. ALLISON, ESSENCE OF DECISION 67 (1971) (describing a paradigm in which governmental behavior can be understood less as the result of deliberative choices of high-level leaders, and "more as *outputs* of large organizations functioning according to standard patterns of behavior"). The bottom-up analysis has its roots in the organization theory of James March and Herbert Simon which stresses that the limitation of knowledge of organizational actors leads to a structure that "relies upon habits, routines, and other forms of programmed decisionmaking." *See* Terry M. Moe, *Politics and the Theory of Organization*, 7 J.L. ECON. & ORG., Special Issue 1991, at 106, 110. *See also* JAMES G. MARCH & HERBERT A. SIMON, ORGANIZATIONS 34-82 (1958) (examining the relationship between organizational demands and individual attitudes in determining organizational behavior).

Competing theories of political organization include the "institutional school of organization theory," which views organizational structures as more a reflection of society at large than a solution to the tasks for which the organization is responsible, and "positive economic theories of organization" which stress that organizations can be understood as a product of rational choice theory. *See* Moe, *supra*, at 116-20 (surveying current political organization theories). These theories offer plausible explanations of some aspects of OLC's structure. *See, e.g., infra* note 199 and accompanying text.

Canterbury's eighty-line explication of Henry V's right to conquer certain lands in France.[169] Despite King Henry's claim that he is interested in sincere and objective legal advice,[170] Shakespeare makes clear that the Archbishop has his own interests in giving the King the advice he wants to hear: in the opening scene of the play, the Archbishop suggests that forwarding the King's plans in France will influence him to oppose a pending bill which would deprive the Church of half its property.[171] It has recently been argued that the advice was legally correct in terms of the law of war existing at the time of Henry's reign.[172] Nevertheless, within the context of the play, the Archbishop's prolix, convoluted, and repetitive speech, studded with references to a dozen different historical personages as well as obscure events, and confusing to the King himself,[173] would naturally be played as comedy, thus also undercutting any perception that the advice is well reasoned. Shakespeare's message about executive legal opinions is clear: to understand the shape of the opinions produced, one must understand the interests of both the advisor and the advised.

## A.  *The Central Dilemma of OLC*

The Office of Legal Counsel is headed by an Assistant Attorney General who reports directly to the Attorney General. Considered to be one of forty or so key subcabinet posts in an administration, he is a political appointee confirmed by the Senate and is generally selected from the ranks of the lawyers of the President's party with outstanding credentials and reputation.[174] Although he is the Attorney General's lawyer, he also provides advice directly to other agencies and in particular to the White House. Given that he is the White House Counsel's lawyer as well as the Attorney General's, the White House and the Counsel's office in particular will often have more influence over his appointment than over other assistant attorneys general.[175]

---

[169] WILLIAM SHAKESPEARE, THE LIFE OF KING HENRY THE FIFTH act 1, sc. 2, lines 35-98, 101-118 (Louis B. Wright & Virginia A. LaMar eds., Folger Library 1960) [hereinafter HENRY V].

[170] *Id.* at lines 10-34.

[171] *Id.* at act 1, sc. 1, lines 76-85.

[172] *See* Theodor Meron, *Shakespeare's Henry the Fifth and the Law of War*, 86 AM. J. INT'L L. 1 (1992).

[173] In the first sixty lines of his speech the Archbishop fails to give a firm conclusion, triggering an exasperated question from the King: "May I with right and conscience make this claim?" HENRY V, *supra* note 169, at act 1, sc. 2, line 99.

[174] *See* SENATE COMM. ON GOV'TAL AFFAIRS, 102D CONG., 2D SESS., UNITED STATES GOVERNMENT POLICY AND SUPPORTING POSITIONS 85 (Comm. Print 1992) (commonly referred to as the PLUM BOOK).

[175] For instance, William P. Barr, when he was appointed as the first Assistant Attorney General for OLC in the Bush administration, had no connections to the incumbent Attorney

*CARDOZO LAW REVIEW* [Vol. 15:375

The central dilemma for any Assistant Attorney General of OLC is how to provide his clients, particularly his key patrons, the White House Counsel and the Attorney General, with advice and opinions they find generally congenial while at the same time upholding the reputation of the office as an elite institution whose legal advice is independent of the policy and political pressures associated with a particular question.[176] The reputation of the office is particularly important to the Assistant Attorney General for both personal and institutional reasons.

His interest in giving congenial advice is readily explained: by doing so he protects his position, retains influence with the president and Attorney General, and advances his prospects of promotion.[177] His interest in the reputation of the Office requires a more complicated explanation. Personally, he has an interest maintaining the reputation because it will be useful to his career. Because OLC does not have a specialized subject matter area or substantial litigation or lobbying functions, the prestige and reputation of the office will be what will enhance his status as he returns to private practice. (For those heads of OLC coming from academics, the concern over reputation for principled decision-making may be even more readily apparent since a reputation for principled analysis is understood as central to academic standing.) Moreover, heads of OLC are judges in waiting to the highest courts in the land both during and after their tenure.[178] A public reputation for offering the rubber stamp of legality for

General, Richard Thornburgh, but was often described by the media as a protege of C. Boyden Gray, the White House Counsel. *See, e.g.,* Phil McCombs, *Counsel's Last Hurrah: The Final, Furious Days of C. Boyden Gray,* WASH. POST, Jan. 16, 1993, at G1, G9.

[176] The tension between maintaining OLC's reputation and serving its clients may be understood as a classic example of the tension between the maintenance and function of an organization explored in CHESTER I. BARNARD, THE FUNCTIONS OF THE EXECUTIVE (30th anniversary ed. 1968). OLC's reputation is necessary to maintain its effectiveness by attracting good lawyers and by giving its opinions weight beyond that of general counsel's throughout government. Its function, however, is to serve clients within the executive branch, most importantly the President and the Attorney General.

[177] Nelson Lund believes that the actions of OLC can be essentially explained by this interest. *See* Nelson Lund, *Rational Choice at the Office of Legal Counsel,* 15 CARDOZO L. REV. 437 (1993).

[178] William Rehnquist was Assistant Attorney General when he was appointed to the Supreme Court. Richard L. Berke, *Clinton Names Ruth Ginsburg, Advocate for Women, to Court,* N.Y. TIMES, June 15, 1993, at A1, A22 (inset entitled *The High Court in Profile* giving position of each justice at time of appointment). Antonin Scalia was Assistant Attorney General from 1974 to 1977 and was later named a justice of the Supreme Court. 2 WHO'S WHO IN AMERICA 2968 (Marquis Who's Who ed., 47th ed. 1992). More recently, Michael Luttig was head of the Office of Legal Counsel when he was appointed to the United States Court of Appeals for the Fourth Circuit. *See* Daniel Klaidman, *Inside Justice: Barr Learning the Bureaucratic Minute,* LEGAL TIMES (Washington), Nov. 18, 1991, at 6, 12.

whatever the policy favored by the most powerful decision-makers in the administration would not enhance the prospects of being confirmed to such a position.[179]

The reasons for protecting OLC's reputation, however, are not only narrowly personal but broadly institutional.[180] As indicated in part I and described in more detail below, one of OLC's central functions is to resolve disputes between agencies.[181] Insofar as OLC maintains an outstanding reputation for principled legal advice, agencies are more likely to accept OLC's resolutions as final rather than (1) covertly resisting its rulings, causing continuing disarray within the administration and uncertainty in the administration's legal position, or (2) appealing the rulings to the Attorney General or the President.[182] The disadvantages of such appeals are threefold, in increasing order of importance. First, they take up the valuable time of the President or the Attorney General. Second, their resolution will frequently require a greater expenditure of political capital on the part of the President and the Attorney General because any political unpopularity in legal resolution will fall more directly on them. Finally, the resolution of the legal issue will likely appear based more on legal principles than on policy or political issues if it is made by OLC rather than the President or the Attorney General. Because of the centrally political nature of his job, decisions of the President—even those purporting to be based on law—will inevitably be viewed through a political prism. This is also increasingly true of the Attor-

---

[179] Of course, to be nominated he must please the President and the Attorney General. Even in terms of raw personal ambition, the head of OLC must perform a difficult balancing act.

[180] The notion that organizations evaluate their actions in terms of their "reputation effects" is not confined to political organizations. *See* David M. Kreps, *Corporate Culture and Economic Theory*, *in* PERSPECTIVES ON POSITIVE POLITICAL ECONOMY 90, 90-143 (James E. Alt & Kenneth A. Shepsle eds., 1990) (explaining behavior and indeed the existence of corporations to be premised largely on the need to build a reputation for trust that will avoid the "prisoner's dilemma" of a one shot transaction where each side would have incentives to cheat the other).

[181] According to OLC's public budgetary data, OLC gave 625 opinions to outside agencies in 1991. Although these figures do not distinguish instances in which the legal issue is contested by two or more agencies from those in which the legal issue is addressed by only one agency, according to Senior Counsel Robert Delahanty, a senior OLC civil servant, interagency disputes constitute at least 25% of opinions rendered to outside agencies.

[182] Indeed, given the uncertainty over whether some interagency disputes are amenable to resolution by the judicial rather than the executive branch, the executive branch has an interest in providing a fair forum for the resolution of such disputes. This will discourage resorting to the judiciary which will tend to erode the President's authority if successful and will publicize the dispute if unsuccessful. For a discussion of the extent to which the courts entertain interagency suits, see Michael Herz, United States v. United States: *When Can the Federal Government Sue Itself?*, 32 WM. & MARY L. REV. 893 (1991).

ney General who has growing policy responsibilities because more law enforcement responsibility has become federal and because, at least in the Reagan and Bush administrations, a measure of responsibility for general domestic policy has fallen to him through the chairmanship of the domestic policy council.[183]

Even outside the area of interagency disputes the reputation of OLC for legally principled advice has political and policy value for the President and the Attorney General. Precisely because the President (and to a lesser extent the Attorney General) have so many political responsibilities, the legal force of even their purportedly legal decisions or views may be discounted. And yet the President is likely to want his legal views to have force. This will certainly be so to the extent that, like Presidents from Jefferson to Reagan, he has a distinctive legal jurisprudence that he wishes to press before the country and the Supreme Court. Even in the absence of such a jurisprudence, the President will recognize that the President is perceived to have legal obligations[184] and he will thus want a mechanism by which he is perceived to be taking these responsibilities seriously. Hence it is useful for the office to cultivate a reputation of applying the law scrupulously without regard to political or policy interest.

The need for preserving reputation is also reinforced by the need to recruit outstanding attorneys who can carry the heavy responsibilities shouldered by the Office of Legal Counsel. Unlike the Solicitor General's Office and the litigating divisions of the Department, attorneys at OLC do not gain litigation or other readily transferable knowledge from their experience; and yet like these attorneys, their salaries are far less than they could command in private practice. Thus, the only incentive is the reputation of the office and the interest of the work. The reputation for principled legal analysis is particularly important to those attorneys at OLC who plan an academic career.[185]

However strong the reputation of OLC, the lack of readily trans-

---

[183] *See* John Hanchette, *Campaign '92: Musical Chairs at the White House*, Gannet News Service, Feb. 5, 1992, *available in* LEXIS, Nexis Library, Wires File (noting that Attorneys General Meese and Barr had been Chairmen of the Domestic Policy Council). While William P. Barr became Attorney General, the Domestic Policy Council was dissolved in a government reorganization. *Id.*

[184] He is correct in believing he has such responsibilities. *See supra* notes 10-13 and accompanying text. In any event, it is a staple of modern political culture that the President is to be governed by the rule of law through the operation of a nonpartisan Justice Department. *See, e.g.*, Terry Adamson & Zoe Baird, *Advice to William French Smith: Learn From the Past*, LEGAL TIMES (Washington), Feb. 16, 1981, at 11.

[185] In the last twenty years, about 20% of attorneys at OLC have chosen an academic career.

ferable skill tends to limit the tenure of line attorneys to two or three years.[186] The large turnover is one of the important reasons that each Assistant Attorney General has the opportunity to appoint a greater proportion of his own staff than the Solicitor General and thus build an office whose members generally share his and the administration's general jurisprudence. This is one reason that the Office has a culture that tends to take the jurisprudential concerns of the President more seriously than does the Office of the Solicitor General.[187] This difference will manifest itself more acutely in an administration in which the President has a distinctive jurisprudential program, like the Reagan administration.[188]

## B.  *The Matching of Models to Tasks*

The tension between preserving the Office's reputation and providing advice that is consonant with the administration's objectives is central to understanding how OLC conducts its assignments. OLC's principal responsibility is to provide legal opinions and advice to executive branch agencies. The Attorney General "shall give his advice and opinion on questions of law when required by the President."[189] In addition, he is charged with giving advice to department heads who "may require the opinion of the Attorney General on questions of law arising in the administration of his department."[190] By executive order the President has directed that agency heads should seek the opinion of the Attorney General when they have different opinions about a matter that implicates their responsibilities and thus have a legal dispute.[191] The Attorney General in turn has delegated this

---

[186] At one time the staff of OLC consisted largely of attorneys who would make a career of government service. The Carter administration changed from that hiring model and subsequent administrations have never returned to it. The advantages of hiring highly credentialed legal attorneys directly from a clerkship or after a few years of private practice are twofold. First, they will generally be stronger in raw analytic ability. Second, they will better understand current methods of interpretation generally prevalent in the legal academy and in the judiciary.

[187] Another reason is the ability of the Solicitor General's office to use its putative expertise in Supreme Court precedent as insulation from the views of other legal actors in the administration. *See* McGinnis, *Solicitor General's Office, supra* note 10, at 809-14.

[188] For discussion of the clashes between the head of OLC and the Solicitor General's office in the Reagan administration, see CHARLES FRIED, ORDER AND LAW 34-35 (1991).

[189] 28 U.S.C. § 511 (1988).

[190] 28 U.S.C. § 512 (1988).

[191] Section 1-401 of Executive Order No. 12,146 provides: "Whenever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General." Exec. Order No. 12,146, 3 C.F.R. 409 (1979), *reprinted as amended in* 28 U.S.C. § 509 (1988). This order has been interpreted to allow any agency to request resolution of a dispute even if other agencies

authority to OLC by providing that its Assistant Attorney General is responsible for "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal advisor to the President and as a member of . . . the Cabinet."[192]

Opinions are now rarely rendered in the form of Attorney General opinions.[193] Instead, the advice is rendered in writing in the form of opinions from the Assistant Attorney General or one of his deputies. Moreover, although the statutes appear to give agency heads the right to obtain opinions, OLC has by tradition and informal rules limited this right by imposing a variety of requirements on outlying agencies (all agencies except the White House, OMB, and the Department of Justice itself) seeking opinions.

These jurisdictional requirements help OLC preserve its reputation by preventing it from becoming engulfed in needless controversy.[194] For instance, OLC will not generally write an opinion about a matter in litigation because it is recognized that an argument asserted in litigation does not have to meet the same standard as one that forms the basis of an OLC opinion.[195] Writing on matters in litigation would thus frequently force OLC to the unwelcome choice of abandoning its reputation for scrupulousness or clashing with the Department of Justice's litigating divisions.

Another example is the rule against providing opinions to a requesting agency unless that agency itself provides a legal opinion.[196]

---

would prefer not to see the dispute resolved. *See* Memorandum for Donald L. Ivers, General Counsel, Veterans Administration, from Charles J. Cooper, Assistant Attorney General, 12 Op. Off. Legal Counsel 109, 113-14 (1988) (preliminary print).

[192] 28 C.F.R. § 0.25(a) (1992).

[193] William Barr, Richard Thornburgh, and Edwin Meese did not sign any formal opinions arising from inquiries or proceedings outside the Department of Justice although they occasionally signed cover memoranda that accompanied formal opinions. *See, e.g.,* Letter from William P. Barr, Attorney General, to President Bush, 16 Op. Off. Legal Counsel 6 (1992) (preliminary print) (summarizing and enclosing OLC opinion on the President's authority to commit troops to Somalia). This is the culmination of a decades-long trend in which the Attorney General does not personally supervise the writing of even the most important legal opinions in the executive branch. His responsibility for the Department's litigation, for overseeing its vast law enforcement and immigration bureaucracy, and for participating in helping to set the domestic policy of the administration apparently make such close analytic work impossible.

[194] Indeed, one might compare OLC's use of these requirements to the Supreme Court's use of jurisdictional and other doctrines as "passive virtues" that help preserve its political capital and respect among citizens by avoiding decisions in controversial matters at inopportune times. *See* BICKEL, *supra* note 28, at 111-99. *See also infra* note 219 and accompanying text.

[195] *See* 38 Op. Att'y Gen. 149, 150 (1934). The rule is a venerable one.

[196] This convention was the rule that in my experience most often blocked opinion requests

Forcing the requesting agency to record its own legal opinion has as a primary objective preventing outlying agencies from sending legal questions to OLC simply to avoid controversy. Thus the rule helps preserve OLC's reputation by reducing its opinions on controversial topics which, however well reasoned, would be subject to political attack because of their results. The rule has the added advantage of imposing a cost (in time and effort) on the agencies seeking advice and thus preventing OLC from being swamped by opinion requests.[197] Even so, OLC frequently has more opinion requests than it can handle, but even this overload can be turned to its advantage as long as it is not too substantial. Opinion requests that pose controversial questions but which the White House or other powerful interests in the administration are not pressing to have answered can be allowed to languish and principled opinions on less controversial subjects can be produced instead.[198]

The final advantage to the rule requiring submissions from other agencies is that it creates a formal process that helps OLC to act and appear to act much like a court. This is clearest in the case of an interagency legal dispute where OLC receives submissions from both parties but is true even of unilateral submissions. By forcing the agency to express its arguments in a legal memoranda, OLC obtains the advantage that any court does from forcing litigants to provide it with briefs ventilating legal issues. This is particularly important for OLC since its lawyers are typically young generalists and agency lawyers will have far more specific experience and expertise in the issues involved. The requirement that the parties to the disputes make written submissions, however, has an expressive as well as functional

---

from other agencies. Its origins are obscure and may seem in tension with a former ruling—which was not applied during my tenure—that OLC would not rule merely to confirm another Department's internal position. *See* 28 Op. Att'y Gen. 596, 597 (1911).

[197] The degree of uniformity of interpretation throughout the executive branch is likely to be determined in practice by a balancing of the cost and benefits of such uniformity. When the cost of a divided interpretation to the President or another powerful subordinate becomes greater than the costs (political and institutional) of settling the issue, the interpretation will be unified by OLC or another mechanism. This suggests that the executive branch is always likely to embrace a number of substantially divergent interpretations in areas where unity is relatively unimportant. Moreover, it suggests that the reason that OLC only occasionally settles disputes between independent agencies and executive branch agencies is the high political cost of enforcing the settlement. Hence OLC has a variety of rules, both formal and informal, that permit it to avoid getting involved in such disputes where the costs outweigh the benefits.

[198] Thus, the jurisdictional conventions of OLC may have an important agenda-setting function. By allowing some opinion requests to languish, OLC can more easily avoid issues whose resolution would interfere with the administration's agenda and settle issues that would promote some item on its agenda. Mechanisms for agenda setting are central to rational choice theories of organization. *See* Moe, *supra* note 168, at 119.

value.[199] OLC's process symbolizes that OLC will be acting more like a court than a private outside counsel: the only arguments that will influence its decision are those that can be reduced to legal writing. With requests from outlying agencies OLC typically emphasizes its judicial appearance by rarely meeting with lawyers from the other agencies and never meeting with policymaking officials, choosing instead to rely on written submissions and its own research.

OLC not only administers an opinion-writing process for outlying agencies that mimics the judicial process in some instances but creates a product that has the appearance of deliberative and authoritative judicial opinions.[200] This satisfies the interests of the OLC attorneys as former clerks and as lawyers with an academic and architectural interest in the law. The formality of the process and the product also allows the Office to appear to be more than simply another legal office within the government, but rather *the* oracle of executive branch legal interpretation.[201] Another mark of differentiation is that the Office publishes many of its opinions (although after a lag of several years to preserve confidentiality), thus proclaiming that they can endure the same scrutiny as a judicial opinion or law review article.[202]

The fairly formal process that is used for opinions from outlying agencies also reinforces a court-centered model for the content of opinion writing. The agencies appeal to precedents and other well-established principles (which generally means that they have been established by courts) and OLC deliberates on the principles and precedents and then writes an opinion which can be measured against established law. Nevertheless, it is possible to make this process consistent with the model of independent authority at least where the administration's independent principles are well known. As discussed in part I, however, an administration will rarely have as reticulated a

---

[199] For a discussion of the importance of symbolic values to organization theory, see Moe, *supra* note 168, at 117-18.

[200] The sixteen published volumes of OLC opinions are full of lengthy and self-consciously deliberate opinions. For an example of an opinion of particularly self-consciously legal refinement, see 5 Op. Off. Legal Counsel 116 (1981) (discussing the issue of whether an attempt to assassinate the President could be made punishable by the death penalty).

[201] If, as suggested in part I, executive branch legal interpretation may be understood to have a constitutional purpose distinct from that of judicial branch interpretation, there may be a danger in having OLC opinions so consciously ape the judicial product. *See* Alito, *supra* note 40. In the public mind the judiciary is the ultimate (and indeed perhaps the only) repository of authoritative legal interpretation, and it is therefore natural for OLC to try to build its reputation by mimicking the judiciary. As we shall see, it sometimes then uses this reputation to undertake legal analysis that is more distinctly like that of the executive branch in nature.

[202] Publication of opinions also has the advantage of economy as agencies can find the answers to questions that they would otherwise put to OLC.

body of principles as the courts, and thus it will be easier to uphold a reputation for legally principled opinions if the legal principles used can be referenced to principles articulated in court.

The process emphasis in the production of most OLC opinions, however, is not consonant with the model of the Attorney General as situational legal advisor. There is little reason for such formality if the opinion must simply translate the preferred policy position into a legal formulation. Moreover, publication of opinions may actually be harmful since they may reveal substantial jurisprudential inconsistencies in opinions taken for different policy ends.

When the legal issues implicate essential policy interests of the administration, the Assistant Attorney General for OLC faces a different trade-off between the twin objectives of maintaining the reputation of his office and serving his patrons. Therefore, on issues of interest to the White House or the Attorney General, the jurisdictional requirements and formal process imposed on outlying agencies are substantially relaxed. The White House Counsel's office is able to obtain opinions without first providing their own analysis. Moreover, there is much greater willingness to supply the White House with oral advice. (OLC generally disfavors oral advice because by furnishing a necessarily less deliberate analysis in circumstances where it has been less able to evaluate the legal and political implications of its views, OLC runs a more substantial risk of legal error and of controversy.) Moreover, as informal contact is substituted for formal process, OLC lawyers naturally come to treat the White House more as clients than as litigants. This informality symbolizes that the court-centered model no longer has substantial sway and the Office has moved toward an independent authority or situational model, depending on whether it is following the independent jurisprudential principles or the situational interests of the White House. This in turn depends on how far the administration is interested in advancing independent jurisprudential principles.[203]

This is not to say that OLC, on the basis of the situational model, simply provides a legal seal of approval to the White House's policy desires. The emphasis on process in the treatment of outlying agencies under the judicial model has a powerful influence on the culture of OLC. Further, the lawyers of OLC are generally recent judicial clerks for whom a court-centered model has the intrinsic appeal of familiarity. Finally and most importantly, because of its greater ex-

---

[203] For a discussion of the President's trade-off between advancing an independent set of jurisprudential principles and his own situational political interest, see *supra* notes 102-03 and accompanying text.

*CARDOZO LAW REVIEW* [Vol. 15:375

pertise in the law, OLC may assess more accurately than policy makers around the President legal events such as, for instance, the Supreme Court's certain rejection of a line of argument and the long-term policy consequences of these events.[204]

In fact, in several recent cases the Office has decided against the President's perceived political interest.[205] The most celebrated instance of resistance by OLC to a strong policy interest of the President, however, occured when William Rehnquist, while serving as the first Assistant Attorney General of the Nixon administration, rejected the proposition that the President had an inherent authority to impound funds (i.e. refuse to spend funds appropriated by Congress). He wrote bluntly: "It may be argued that the spending of money is inherently an executive function, . . . and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them."[206] Subsequently in the Nixon administration, an Assistant Attorney General was eased out of office largely on account of similar views,[207] and Deputy Attorney General Sneed, a former law school dean, testified that the President did have a constitutional right to impound funds, expressly disavowing Rehnquist's memorandum.[208] In light of these developments, it is hard to imagine that it was clearly in Rehnquist's self-interest, as defined solely by his interest in pleasing the White House and advancing his career, to render this blunt and unfavorable advice. It is better explained by a concern to protect his own reputation and that of the Office by refusing to advance a doubtful proposition even if other able lawyers outside OLC were willing to do so.

---

[204] *See supra* note 107 and accompanying text.

[205] *See, e.g.,* 12 Op. Off. Legal Counsel 159 (1988) (preliminary print) (opining that President did not have inherent constitutional authority to veto separate items within a single bill); 16 Op. Off. Legal Counsel 145 (1992) (preliminary print) (opining that the Treasury did not have the legal authority to index capital gains by means of regulation).

[206] Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools 11 (Dec. 1, 1969) (on file with author).

[207] These events were recounted to me by Herman Marcuse, an attorney who has served at OLC for the past few decades. By this time, Rehnquist had been appointed to the Supreme Court.

[208] *Impoundment of Appropriated Funds by the President: Joint Hearings on S. 373 Before the Ad Hoc Subcomm. on Impoundment of Funds of the Senate Comm. on Gov't Operations and the Subcomm. on Separation of Powers of the Sen. Comm. on the Judiciary,* 93d Cong., 1st Sess. 358, 362, 380 (1973) (statement of Hon. Joseph T. Sneed, Deputy Att'y Gen., Justice Dep't). Department of Justice litigators also subsequently argued (with little success) that the President had inherent power to impound funds. *See* Guadamuz v. Ash, 368 F. Supp. 1233, 1239, 1243-44 (D.D.C. 1973); Sioux Valley Empire Elec. Ass'n v. Butz, 367 F. Supp. 686, 691, 697-98 (D.S.D. 1973); Oklahoma v. Weinberger, 360 F. Supp. 724, 728 (W.D. Okla. 1973); Local 2677, Am. Fed'n of Gov't Employees v. Phillips, 358 F. Supp. 60, 76-77 (D.D.C. 1973).

A second central duty of the Office is to review legislation for its constitutionality and then send comments on the legislation to Congress if it is still pending there or to the White House if the bill has been presented. The function OLC plays in these bill comments is also more consciously that of an advocate than in interagency opinions. Because the legislation originates in a separate and often adversary branch of government, OLC will react more as an adversary than as a court. Moreover, because a bill that dies or is vetoed on account of constitutional objections is never subject to legal challenge, the executive may be bolder with its opinions because there is necessarily less fear of being directly contradicted by the judiciary. Accordingly, it is not surprising that in bill comments either the independent authority model or situational model holds greater sway (depending on the extent to which the administration wishes to press a coherent independent jurisprudence).[209]

In particular, in the bill comment process, OLC treats congressional encroachments on the President's putative constitutional powers in a manner particularly far removed from the court-centered model. As noted in part I, the structure of constitutional interpretation the President and his subordinates employ should analyze separation of powers issues from the standpoint of the executive branch's institutional interest. Moreover, there is little risk to OLC's reputation in advocating a version of the jurisprudence on executive-congressional separation of powers issues that aggressively advances the executive interest with little regard for court precedent because the permanent interests of the executive branch are likely to generate a coherent and articulated jurisprudence that has substantial continuity between administrations.[210] For these reasons, OLC regularly gives cases unfavorable to executive branch prerogative vis-à-vis Congress a far more limited reading than cases in other areas and, conversely, gives favorable cases a very broad reading.[211]

---

[209] As we have seen in part I, the independent authority model and situational model can blend together, particularly in the context of the separation of powers.

[210] Of course, such separation of powers issues may arise in the course of opinions outside of the bill comment process where OLC's views may be subject to challenge in court. Given that the bill comment process bulks so large in OLC's daily activities and consists largely of defending the executive branch against congressional encroachments, the jurisprudence of separation of powers stemming from the bill comment process will establish an aggressive edge to OLC's entire opinion writing on the subject.

[211] Another important product of OLC in recent years is the signing statement. When the President needs, for policy or political reasons, to obtain passage and to sign a bill with constitutional defects, the solution has been for the President to issue a signing statement listing the constitutional defects. By signing the bill but attaching a signing statement, the President's pragmatic interest is served while the structure of the office's separation of powers jurisprudence is preserved at least in form. Signing statements are thus a natural product of an office

Perhaps the best example of OLC's approach in interpreting a separation of powers case is its treatment of *Morrison v. Olson*.[212] In that case, the Court upheld the law creating an office of independent counsel against the contention that it violated Article II because the counsel was liable to dismissal "only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties."[213] Congress has attempted to use this as a precedent to create other offices with similar removal provisions and, in every instance, despite *Morrison*, the Department of Justice has declared that provisions limiting removal would be unconstitutional.[214]

For instance, in 1992 Congress proposed transferring authority over uranium enrichment from the Department of Energy to the United States Enrichment Corporation, whose Administrator would be removable "only for neglect of duty or malfeasance in office."[215] Despite the limited scope of the duties of the Administrator, the Department sharply distinguished *Morrison* in a manner that showed that it would apply that case to permit restrictions only on the re-

---

concerned with maintaining a consistent jurisprudence but wishing to avoid opposition to the President's political and policy imperatives. As OLC has come to comment on all legislation, the number of signing statements has sharply risen. For instance, in the third year of the Bush administration, the President issued over twenty times as many signing statements as did President Carter in the third year of his administration. Compare Signing Statements of President Carter, 15 WEEKLY COMP. PRES. DOC. (1979) with Signing Statements of President Bush, 25 WEEKLY COMP. PRES. DOC. (1989).

212 487 U.S. 654 (1988). This is only one of many examples. The Department has recently seized on Justice Kennedy's concurrence in Public Citizen v. United States Dep't of Justice, 491 U.S. 440 (1989), to argue that Congress is without power to impose qualifications requirements on principal officers, *see* Letter from W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs, to Rep. George Miller, Chairman, Committee on Interior and Insular Affairs (Feb. 13, 1992) (on file with author), despite the many statutes that already have such qualifications. Indeed, the statute that has been publicized as preventing Hillary Rodham Clinton from being appointed to a cabinet post by her husband is plainly unconstitutional under OLC's view. *See generally* 5 U.S.C. § 3110 (1988) (prohibiting the President from appointing close relatives to government positions); Naftali Bendavid, *The First Lady and the Law: Old Debate Over Spouse's Role Takes a New Twist*, LEGAL TIMES (Washington), Mar. 15, 1993, at 1, 22 (discussing the statute and U.S. District Judge Royce Lamberth's March 10 ruling).

213 *Morrison*, 487 U.S. at 663 (quoting 28 U.S.C. § 596(a)(1) (1988)). The *Morrison* Court also upheld the statute against the challenge that court appointment of the independent counsel violated the Appointment Clause and that judicial involvement in the independent counsel process violated Article III. *Id*. at 671-85.

214 For examples of letters opposing independent agencies after *Morrison*, see Letter from W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs, to Rep. Dan Rostenkowski, Chairman, Committee on Ways and Means (June 23, 1992) (on file with author) (opposing creation of an independent Social Security Administration as unconstitutional). OLC drafts the Department's letters on constitutional issues.

215 S. Res. to Amend H.R. 776, 102d Cong., 2d Sess. 337, 138 CONG. REC. S10700 (daily ed. July 29, 1992).

moval of the independent counsel itself.[216] Indeed, in suggesting that agencies with permanent policymaking responsibilities cannot be insulated from presidential control under the *Morrison* analysis, OLC's analysis casts doubt on the constitutionality of independent agencies in general, most of which engage in more important policymaking decisions than the Uranium Enrichment Corporation.[217] The fact that

---

[216] The Department wrote:

First, the Administrator of the Enrichment Corporation appears to have the powers and duties of a principal officer, not an inferior officer. His appointment by the President with the advice and consent of the Senate is consistent with this status. *See* U.S. Const. art. II, § 2, cl. 2. Such individuals have traditionally been viewed as being at the heart of the corps of officers whom the President must have unfettered discretion to supervise if he is to execute the law in a unified and coherent fashion.

Second, the Administrator would not have jurisdiction limited in time and scope as that of the independent counsel in *Morrison*. Rather, he would be appointed to serve a renewable term of six years and would be charged with substantial policymaking and administrative authority over the government's uranium enrichment functions. *Compare* proposed AEA §§ 1501(b)(2) & 1401 *with Morrison*, 487 U.S. at 691-93.

Third, unlike the independent counsel in *Morrison*, who generally is to follow the prosecutorial guidelines established by the Department of Justice, the Administrator may exercise authority without any statutory direction to follow policy guidelines established by the Department of Energy or any other agency. *See generally* proposed AEA § 1501(c)(2).

Finally, unlike the situation in *Morrison*, where there was arguably a conflict of interest between the President's duty to prosecute individuals and his putative concern for protecting his closest personal advisers, there is no conflict between the President's duty to execute the law and the Administrator's duty to supervise uranium enrichment activities.

Letter from W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs, to Sen. J. Bennett Johnston 13-14 (Sept. 15, 1992) (on file with author). Because the letter addressed constitutional issues it was written by OLC.

[217] Most commentators see *Morrison* as strengthening rather than weakening the doctrinal argument for the constitutionality of independent agencies, *see, e.g.*, Glen O. Robinson, *Independent Agencies: Form and Substance in Executive Prerogative*, 1988 DUKE L.J. 238, because it explicitly rejects the strong unitary position espoused by Justice Scalia in dissent. *Compare Morrison*, 487 U.S. at 705 (Scalia, J. dissenting) (stating that all officers of the United States must be removable at will by the President) *with Morrison*, 487 U.S. at 690 n.29 (labeling the dissent's claim a "rigid demarcation—a demarcation incapable of being altered by law in the slightest degree, and applicable to tens of thousands of holders of offices neither known nor foreseen by the Framers [which] depends upon an extrapolation from general constitutional language which we think is more than the text will bear"). This view is open to question, however, because *Morrison* eliminates the safe-harbor that Humphrey's Executor v. United States, 295 U.S. 602 (1935), and Wiener v. United States, 357 U.S. 349 (1958), gave to quasi-legislative and quasi-judicial agencies. In contrast, *Morrison*'s test replaces these "rigid categories" with a more functional test, focusing on whether "the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." 487 U.S. at 689, 691. In holding that the independent counsel did not interfere with the President's ability because it had "limited jurisdiction and tenure and lack[ed] . . . significant administrative authority," the Court left open to constitutional attack the independence of administrative agencies with substantially more administrative power. *Id.* at 691. Thus, once the fact that

*CARDOZO LAW REVIEW* [Vol. 15:375

the Department of Justice does not challenge the constitutionality of these ongoing entities shows that the Department generally applies a different standard of constitutional review to pending legislation than it applies to enacted statutes.[218]

Accordingly, OLC's opinion work cannot be described as following any one particular model but rather is an eclectic mix of different models and models used to different degrees depending on the function of the opinion. The models arise from a set of bureaucratic practices and attitudes that have as their objective achieving the proper trade-off between advancing both the administration's situational interest and advancing OLC's reputation for principled legal advice—a reputation which is itself in the administration's long-term interest. Because, as we saw in Part I, the models themselves overlap to some degree, it will not always be clear which model the executive is employing. Moreover, the overlap makes it easier to move more smoothly among models depending on the bureaucratic and political interests involved. Of course, the mixture is likely to be affected by the degree to which the President has a genuine interest in a coherent jurisprudence that departs from that prevailing in the courts; but as long as OLC serves as a centralized opinion-writing office in a compartmentalized executive branch, the independent authority model is likely to be generally subordinate to other models for the bulk of OLC's opinion writing function.

It should not escape notice that this analysis of OLC suggests that it operates, at least in part, on the political or reputational capital model not wholly dissimilar to that which has been used to explain the performance of the Supreme Court.[219] While its opinions for the most part aim at objectivity and consistency, the jurisdictional doctrines it employs are subject to—perhaps even designed for—manipu-

---

the executive branch lost in *Morrison* recedes in importance, the doctrine it lays down may well be understood as a two-edged sword.

Moreover, *Morrison*'s emphasis on the President's duty to "take care that the laws be faithfully executed," *id.* at 690 (quoting U.S. CONST. art. II, § 3) (alteration in original), may also permit the President to reduce the autonomy independent agencies enjoy in construing their statutes. For instance, while an agency may enjoy autonomy in exercising the discretion provided by delegation of statutory authority, *Morrison*'s emphasis on the Take Care Clause suggests that the President may have a duty to supervise the agency in its construction of the outer limitations of the delegation. If the agency head refuses to follow the President's construction, *Morrison* may permit the President to contend that such a refusal in itself may be cause for dismissal.

[218] For a discussion of a theory of these limitations, see *supra* notes 34-40 and accompanying text.

[219] For an example of understanding the Court's doctrines as a means of husbanding its political capital, see ARCHIBALD COX, THE ROLE OF THE SUPREME COURT IN AMERICAN GOVERNMENT 103-04 (1976).

lation.[220] These "passive virtues" permit OLC to avoid entanglements that would be unwise and preserve its political capital for other decisions that will be of more use both to the President and to its own reputation.[221] Occasionally, this political capital is spent in giving the President the benefit of the doubt on a close issue that is of particular importance to him, just as occasionally the Court appears to make an unprincipled decision for the greater social good. Moreover, just as the Court's product is also shaped in part by internal institutional considerations such as, for instance, its concern for institutional stability,[222] it is not surprising OLC's methods and products also reflect the interests and aspirations of those who work there.

Accordingly, it should be stressed that undertaking this bureaucratic analysis of OLC's operations is in no way to denigrate the opinions it produces. That institutional forces shape OLC's opinions and shape them differently depending on their function does not make OLC different from other legal institutions, notably the Supreme Court. In any event, understanding the forces that are at work is the first step to reforming any institution charged with legal interpretation if the product of those forces does not comport with our notion of what the Constitution requires.

## CONCLUSION

The strongest argument for autonomy in executive branch interpretation is that it serves as a necessary check on the ambition of the judiciary and helps prevent a monopoly of power in official constitutional interpretation. Executive interpretation, however, will inevitably itself be a product of that branch's own ambition. Because its ambition is of a different character—more political and more concerned with the daily problems of governance—and because many of its core constitutional responsibilities are often of a type left unaddressed by courts, executive branch interpretation will necessarily be different in scope and character from that undertaken by the judiciary. On the other hand, executive branch interpretation does not appear to be simply politics by other means, for the Constitution's imposition of legal duties on the President has created substantial pressures for some kind of legal regularity. Between the political and

---

[220] For a justification of the Supreme Court's manipulation of its jurisdictional doctrines, see BICKEL, *supra* note 28, at 199-208.

[221] The phrase "passive virtues" is, of course, Bickel's. *Id.* at 111.

[222] For an interesting discussion of the institutional reasons for the Court's jurisprudence of statutory interpretation, see Frederick Schauer, *Statutory Construction and the Coordinating Function of Plain Meaning*, 1990 SUP. CT. REV. 231.