# EXHIBIT CC

# Fordham Law Review

Volume 46 | Issue 6                                           Article 1

1978

# The Attorney General: The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?

Griffin B. Bell

## Recommended Citation

Griffin B. Bell, *The Attorney General: The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?*, 46 Fordham L. Rev. 1049 (1978).
Available at: http://ir.lawnet.fordham.edu/flr/vol46/iss6/1

This Article is brought to you for free and open access by FLASH: The Fordham Law Archive of Scholarship and History. It has been accepted for inclusion in Fordham Law Review by an authorized administrator of FLASH: The Fordham Law Archive of Scholarship and History. For more information, please contact tmelnick@law.fordham.edu.

# THE ATTORNEY GENERAL:

## The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?

### *GRIFFIN B. BELL**

### I. INTRODUCTION

I became Attorney General with fixed expectations about the Department of Justice. Despite its size and recent history I expected to find a strong Department with a clear understanding of its place in the nation's government and a confident vision of its future.

After only a few weeks on the job I began to question my expectations. Now, well into my second year, I believe I fully appreciate the realities of the Department of Justice.

The truth is that the Department of Justice is strong. But it is a strength born solely of the outstanding individuals who comprise it. The Department as a whole draws little strength or stability from a clear conception, either within the Department or elsewhere, of the role that the Department should play in our federal government. Least of all is there a clear course charted for the future of the Department.

As Attorney General I am unavoidably caught up in several great issues: the investigation of Korean influence-buying in Congress, the investigation of past abuses in the Federal Bureau of Investigation, the national effort to develop a response to the influx of undocumented aliens, and several others. But these headline-grabbing issues will pass, many to become mere footnotes to history. As much as possible without shortchanging sensitive matters of the immediate moment, I am focusing on the Department of Justice as a whole—past, present, and future. It is my firm belief that clarifying the position and role of the Department of Justice in the order of government is of first importance to the long-range interests of the nation.

Tonight I want to share some of what I have learned about the Department, some of my perceptions of its current problems, and some tentative views on its proper place in our system.

The Department of Justice today has 54,528 employees, including 3,806 attorneys (2,008 in the Justice Department and 1,798 in the United States Attorney's Offices).[1] About 92% of our attorneys are involved in the trial and appeal of lawsuits. The other 300 attorneys

---

* Attorney General of the United States. This Article is taken from the Eighth Annual John F. Sonnett Memorial Lecture, delivered by Mr. Bell at the Fordham University School of Law on March 14, 1978.

1. *See* U.S. Dep't of Justice, Legal Activities 2 (1977).

supervise divisions or offices, render legal advice, consult with Congress or other departments and agencies regarding legislation, and—to a quite limited extent—draft and interpret rules and regulations.

Shortly after I took office, the President asked me to determine the total number of lawyers in the government and their functions. I learned that such information had not been gathered in several years, so we started an inventory of every department and agency in the government. We discovered 19,479 lawyers who are performing "lawyer-like" functions—litigating, preparing legal memoranda, giving legal advice, and drafting statutes, rules, and regulations. These lawyers are distributed throughout the departments and agencies, and practically no agency is too small to have its own "General Counsel."

Some of the 15,673 federal lawyers in government agencies outside the Department of Justice are handling litigation themselves; some are involved in direct support of the Justice Department's litigation efforts. Others are involved in other administrative law functions within their agencies. About one-fourth of all the federal government's lawyers, 5,247 to be exact,[2] are in the Department of Defense and the military services where they administer a totally separate court-martial system under the Uniform Code of Military Justice.

Although I am the chief legal officer in the executive branch, I have learned that I have virtually no control or direction over the lawyers outside the Department of Justice, except indirectly in connection with pending litigation.

## II. Authority of the Attorney General and the Department of Justice

### A. *History*

It may come as a surprise to many of you, as it did to me, to learn that the Department of Justice is little more than a century old. For over eighty years the nation had only an Office of the Attorney General. This fact alone, and the reasons for it, go far to explain the absence of strong traditions and clearly defined roles to undergird the present Department.

The first Congress created the office of Attorney General in the Judiciary Act of 1789,[3] at the same time it created the federal court system. The Act called for "a meet person, learned in the law, to act as attorney-general for the United States,"[4] but gave him little power. He

---

2. This figure includes 3,739 lawyers in uniform.

3. Ch. 20, § 35, 1 Stat. 93 (corresponds to 28 U.S.C. § 503 (1970)).

4. *Id.*

was to do nothing more than represent the United States before the Supreme Court and, upon request, to give opinions on matters of law to the President and heads of departments.[5] Congress also clearly intended the Attorney General to rank below the heads of the three departments—War, Foreign Affairs, and Treasury—which existed at the time. First, it ranked the Attorney General behind them for succession and protocol purposes. Whereas the salary for the heads of the Treasury and Foreign Affairs Departments was set at $3,500, that of the Attorney General was only $1,500.[6] And, whereas the department heads were given ample staff and quarters, the Attorney General received nothing beyond his salary—no funds to hire a clerk, purchase office supplies, or provide for heat or light. He was required to pay all his expenses himself.

Historians have discerned two motives behind Congress' treatment of the office of Attorney General. The first was frugality; the new nation was unsound financially and Congress had to cut corners wherever possible.[7] But the second and perhaps more important motive for our purposes was fear of a strong Attorney General.[8] Those early representatives vividly remembered the tyranny that could result from strong central enforcement of laws, and they hesitated to create machinery in the executive branch that possibly could serve as an engine of oppression. Nowhere was this concern more evident than in the arrangement for the enforcement of penal law and the representation of the federal government in civil litigation at the trial level. The Judiciary Act gave the Attorney General no role in either matter, vesting both powers exclusively in the thirteen United States attorneys,[9] then called district attorneys, who were totally independent of the Attorney General.

The first Attorney General, Edmund Randolph, made his first report to the President in 1791. In it he sought redress of the very handicaps that Congress had intentionally placed upon him. He requested authority to participate in litigation in the inferior courts, in order to have some input into making the records in cases which he eventually would have to argue in the Supreme Court. He requested authority to supervise the district attorneys, because they already had shown tendencies toward uneven enforcement of the laws. And he requested a clerk to help him with the simple mechanical chores of his office.

---

5. *Id.* (corresponds to 28 U.S.C. §§ 511-512 (1970)).

6. J. Easby-Smith, The Department of Justice 5 (1904).

7. *See* L. Huston, The Department of Justice 9-10 (1967).

8. *See id.* at 7-8.

9. Ch. 20, § 35, 1 Stat. 92 (1789) (no longer in force).

President Washington endorsed all three requests and transmitted them to Congress—where they got nowhere.[10]

The congressional snub of Randolph's recommendations in 1791 established a pattern that was to persist for decades. Seven Attorneys General had succeeded Randolph before Congress in 1818 finally appropriated funds for the hire of a clerk.[11] Despite renewed recommendations by President Jackson in 1829 and 1830, by President Polk in 1846, and by President Pierce in 1854, it was not until 1861—a full seventy years after the first request by Randolph and Washington— that Congress finally gave the Attorney General some measure of authority over the district attorneys.[12]

The congressional opposition to these requests by successive administrations illustrates the persistence throughout much of the nineteenth century of the fear of a strong Attorney General. As the federal government grew, its legal business grew along with it. There were periodic attempts by some administrations and some members of Congress to gain support for the idea of a centralized law department to handle that legal business. The unfailing reaction of Congress to each new increment, however, was to create a law officer, usually known as a Solicitor, in the department generating the legal issues and put him in control of the resulting litigation with no duty to answer to the Attorney General. The first Solicitor was created in the Treasury Department in 1830.[13] The next forty years witnessed a steady stream of such officers—Solicitors for the Navy, for the War Department, for the State Department, for the Post Office, for Internal Revenue.

As for the Attorney General, the Congress was perfectly willing to add piecemeal to his duties; for instance, placing him on the Patent Board, making him a member of the Sinking Fund Commission— whatever that was, and rerouting executive clemency petitions from the State Department to him. But Congress refused to authorize any enlargement of his legal domain. And it was careful to keep the Attorney General's staff just large enough—some would say too small—to assist him with his duties already assigned, so there was no chance of his augmenting his power by asserting de facto control over legal business where Congress had refused him de jure authority. In fact, in debates over how to handle increasing federal litigation, those who opposed the creation of a law department invariably cited the overworked state of the Attorney General as proof that the new business could not be lodged with him.

10. J. Easby-Smith, The Department of Justice 6-7 (1904).
11. W. Seymour, United States Attorney 21 (1975).
12. *Id.* at 22.
13. *See* A. Langeluttig, The Department of Justice of the United States 5 (1927).

At some point, of course, the fear of centralized authority had to dissipate as the memories of legal oppression from the Old World receded and the federal government increased in power without becoming more prone to abuses of the states or individuals in the process. Added to that development was a growing belief that centralization of the legal activity of the federal government would be more efficient and thus cheaper than the system of Solicitors and relatively independent district attorneys. That system had effectively broken down under the continuing press of new business in the 1860's, resulting in the hiring of numerous outside counsel at considerable expense.

The conjunction of these two threads—acceptance of the idea of centralization, and a desire for economy—helped to create the Department of Justice in 1870. The debates in Congress at the time evidence a third reason for the move—the need to insure that the federal government spoke with one voice in its view of and adherence to the law. Senator Jenckes of Rhode Island, in explaining the proposal to the Senate, addressed himself to the existing Solicitors and expressly spelled out this purpose:

> I need not dwell upon the manner in which these officers have performed their duties. I have no doubt they have performed them to the best of their ability and honestly in every case. But we have found that there has been a most unfortunate result from this separation of law powers. We find one interpretation of the laws of the United States in one Department and another interpretation in another Department. . . .
>
> . . . .
>
> . . . It is for the purpose of having a unity of decision, a unity of jurisprudence, if I may use that expression, in the executive law of the United States, that this bill proposes that all the law officers therein provided for shall be subordinate to one head.[14]

The Act establishing the Department of Justice sought to remedy the problem of divergent executive branch legal views by giving the Attorney General supervision over the several departmental Solicitors as well as the district attorneys and any outside counsel employed on behalf of the United States.[15] The position of Solicitor General was created as an assistant to the Attorney General, as were two positions of Assistant Attorney General.[16] The Act also gave the Attorney General and the Department of Justice control of all criminal and civil litigation in which the United States was interested.[17]

---

14. Cong. Globe, 41st Cong., 2d Sess. 3036 (1870).

15. Act of June 22, 1870, ch. 150, §§ 3, 15-16, 16 Stat. 162, 164 (corresponds to 28 U.S.C. §§ 518-519, 543 (1970)).

16. *Id.* § 2, 16 Stat. 162 (corresponds to 28 U.S.C. §§ 505-506 (1970)).

17. *Id.* § 5, 16 Stat. 162-63 (corresponds to 28 U.S.C. §§ 514-519 (1970)).

*FORDHAM LAW REVIEW* [Vol. 46

On its face, the Act of 1870 seemed to presage preeminence for the new Department of Justice and a new era of economy and harmony in the legal business of the federal government. But two serious oversights by Congress at the time effectively doomed from the outset this attempt to consolidate and rationalize federal legal activity. First, Congress failed to repeal or modify the statutes establishing the various Solicitors as independent legal officers and defining their duties. The 1870 Act did state that they now were subject to "supervision" by the Attorney General,[18] but that is a vague term and the Solicitors continued to claim their same pre-1870 powers and independence. The second oversight greatly compounded the difficulties caused by the first. Congress gave the new Department no building or other quarters where all of the attorneys under the Attorney General's supervision could concentrate their offices. The Solicitors stayed in the buildings housing their old departments, where they were subject to continuing supervision by the heads of those departments rather than their nominal new boss, the Attorney General.

Congress was exhibiting a curious ambivalence about the role of the Attorney General and the Department of Justice, appearing to give them total control over the nation's legal business on the one hand but failing to take action necessary to make that control effective on the other. Within five years of creating the Department of Justice, Congress took three steps that showed it had not been serious about centralizing all legal activity under the Attorney General. In 1871 and 1872 it created two new Assistant Attorney General positions, but expressly assigned them to the Interior and Post Office Departments where they were subject to supervision by the heads of those departments rather than the Attorney General. And in 1874 Congress reenacted all of the old laws defining the roles of the Solicitors, with no attempt to modify their powers so as to subject them to more effective attorney general control.

The creation of the first independent regulatory agency, the Interstate Commerce Commission, in 1887,[19] with the express congressional intent that it not be under the control of the President or the executive branch, added a new dimension to what Congress intended the role of the Department of Justice to be. There is some evidence that the Commission handled most of its cases in the lower courts from the beginning, and that it cooperated with the Solicitor General in the presentation of its cases to the Supreme Court. In any event, in 1910 President Taft sent a special message to Congress recommending that

---

18. *Id.* § 3, 16 Stat. 162 (no longer in force).

19. Act of February 4, 1887, ch. 104, § 11, 24 Stat. 383 (current version at 49 U.S.C. § 11 (1970)).

all litigation affecting the government be under the control of the Department of Justice and specifically objecting to the practice of the Interstate Commerce Commission in employing its own attorneys who, "while subject to the control of the Attorney-General, act upon the initiative and under the instructions of the commission."[20] After a vigorous debate in Congress—centering largely on whether the Department of Justice would have the authority to second-guess the Commission on the merits—Congress enacted legislation allowing the Commission to intervene as a party and, as such, to be represented by its own attorneys. Justice Department attorneys could therefore oppose the Commission's attorneys in court, and indeed, that has happened on a number of occasions, although the Commission and the Solicitor General have cooperated to file joint briefs in the Supreme Court in most cases.

During most of the pre-World War I period, however, the Attorney General was nominally the head of all federal legal activity, but the Solicitors and their offices retained their actual independence. The Labor, Commerce, and Agriculture Departments were created, each with its own Solicitor. And at the Attorney General's suggestion the two Assistant Attorneys General in the Post Office and Interior Departments were made Solicitors in acknowledgment of their real independence from him.

There was one bright spot for the Attorney General during this period. In 1886 the last vestige of the earlier concern with downgrading the Attorney General was removed when the Attorney General was restored to the fourth rank among Cabinet positions for protocol and succession purposes. Previously he had ranked behind all other heads of departments, even those created after the office of Attorney General.[21]

At the outset of World War I many new agencies were created in the federal government to meet the emergency situation. Following the lead of the older departments, these agencies all insisted on their own legal counsel and authority over their own litigation. Their demands created enough confusion that the question of the lack of centralized litigating authority was brought to President Wilson's personal attention. The result was an Executive order under which all Solicitors and other law officers were directed to submit to the Attorney General's authority, and the Attorney General's legal opinions were made binding on all execu-

---

20. Special Message of the President of the United States on Interstate Commerce and Antitrust Laws and Federal Incorporation, H.R. Doc. No. 484, 61st Cong., 2d Sess. 5 (1910).
21. J. Easby-Smith, The Department of Justice 4-5 (1904).

tive departments.[22] But this Executive order was promulgated under an act giving the President temporarily expanded powers for the war effort, and it expired along with the act six months after the armistice. The predictable result was an almost immediate return to the status quo ante, with all Solicitors and other legal officers reasserting their independence from the Attorney General.

In 1920, the Interstate Commerce Commission attorneys were granted statutory authority to appear for the Commission "in any case in court,"[23] and the United States Shipping Board was authorized to employ attorneys to "represent the board in any case in court."[24] In 1921 a Veterans Bureau was established, and its attorneys were given control over all veterans' litigation.

Before long, different parts of the government again were making different interpretations of the same laws and again taking inconsistent positions before the courts. In 1928, the Attorney General in his Annual Report likened the situation to that which had existed prior to the creation of the Department of Justice in 1870. He noted that only 115 of the 900[25] legal positions in the executive departments and agencies in Washington were even nominally under his control. The Attorney General recommended that serious consideration again be given to consolidating all legal activities under the chief law officer of the government.[26]

A few months into his administration, President Franklin Roosevelt issued an Executive order centralizing all litigating authority in the Department of Justice and giving the Attorney General the exclusive right to supervise United States attorneys.[27] Roosevelt's action, like that of the Congress in 1870 and President Wilson in 1918, resulted from a perception that decentralized control of the government's legal affairs had led to chaos and excessive expense.

Roosevelt's effort met the same fate as the two before it. The trend away from centralized responsibility started again almost immediately. The Securities and Exchange Commission was established in 1934[28] and the National Labor Relations Board in 1935,[29] and both were given the

22.   Exec. Order No. 2877 (May 31, 1918), *reprinted in* Key, *The Legal Work of the Federal Government*, 25 Va. L. Rev. 165, 190 n.94 (1938).

23.   Transportation Act, 1920, ch. 91, § 428, 41 Stat. 492 (current version at 49 U.S.C. § 16(11) (1970)).

24.   Act of June 5, 1920, ch. 250, § 3, 41 Stat. 990 (repealed 1936).

25.   Compared to 3,806 of the 15,740 federal civilian lawyers today.

26.   [1928] Att'y Gen. Ann. Rep. 1-2, 347.

27.   Exec. Order No. 6166, § 5 (June 10, 1933), *reprinted in* 77 Cong. Rec. 5707-08 (1933).

28.   Securities Exchange Act of 1934, ch. 404, § 4, 48 Stat. 885 (current version at 15 U.S.C. § 78d (1976)).

29.   Act of July 5, 1935, ch. 372, § 3(a), 49 Stat. 451 (current version at 29 U.S.C. § 153(a) (1970)).

power to conduct their own litigation. The cycle of disintegration and reform had continued.

The exceptions to centralized litigation authority which were created during the next thirty-five years mostly involved new independent regulatory agencies, although one executive department, the Department of Labor, also received some independent litigating authority. Agencies such as the Federal Communications Commission, the Federal Power Commission (now the Federal Energy Regulatory Commission), the Federal Maritime Commission, the Atomic Energy Commission (now the Nuclear Regulatory Commission), and the Equal Employment Opportunity Commission were granted at least some degree of independent litigating authority. Since about 1969-1970, new grants of independent litigating authority have literally seemed to explode, with authority not only going to independent agencies such as the Consumer Product Safety Commission, the Commodity Futures Trading Commission, and the International Trade Commission, but also to some executive branch agencies such as the Environmental Protection Agency. Today, some thirty-one separate federal governmental units have or exercise authority to conduct at least some of their own litigation.

## B.  *The Present*

The basic statutory scheme today is the same as in 1870: Except as otherwise authorized by Congress, the conduct of litigation in which the United States or an agency or officer thereof is a party, or is interested, is reserved to officers of the Department of Justice, under the direction of the Attorney General. The problem is the number of exceptions authorized by Congress. Professor John Davis has aptly characterized the situation as follows:

a continuing effort by Attorneys General to centralize responsibility for all government litigation in Justice, a continuing effort by many agencies to escape from that control with respect to civil litigation, and a practice by Congress of accepting the positions of the Attorneys General in principle and then cutting them to pieces by exceptions.[30]

Prosecution of all criminal violations is controlled by the Department of Justice, and I do not understand that authority to be seriously challenged; but there is no consistent or rational statutory scheme applicable to agencies in civil litigation. The curious patchwork of civil litigation authority cannot be explained in terms of a congressional conception of the role of the Justice Department. Some grants of separate litigating authority seem to have been enacted simply because of loud and persistent complaints from the agencies seeking such authority. Others seem

---

30.  Davis, Department of Justice Control of Agency Litigation 17 (Report to the U.S. Administrative Conference Aug. 14, 1975).

designed to increase the control of particular congressional committees or subcommittees over particular agencies or programs. Neither a congressional body which works closely with an agency, nor the agency itself, wants the Justice Department making decisions counter to its desires. Fiefdoms have been created, and the Justice Department's efforts to ensure uniformity in government litigating postures can constitute a real threat to them.

Some recent grants of independent litigating authority have occurred in strange ways. For example, the litigating authority of the Federal Trade Commission was significantly enlarged in 1973 by an amendment on the floor of the Senate tacked onto the Act authorizing the Trans-Alaska oil pipeline,[31] thereby avoiding veto.

I recognize that Congress intended some regulatory agencies and government corporations to be independent of the executive branch and the President. That independence has extended to independence from the Department of Justice in legal matters, including litigation. The price of such independence is high, as it can and sometimes does result in two sets of government lawyers opposing each other at taxpayer expense. More importantly, it requires the judicial branch to decide interagency disputes that might be resolved more easily and better through the mediation of the Department of Justice.

I do not favor the independence of these regulatory agencies and government corporations in legal matters. I think it is unseemly for two government agencies to sue each other. It requires the judicial branch to decide questions of government policy, a role never envisioned by our country's Founding Fathers. It is time-consuming and expensive. I believe it would be possible to preserve the independence of these bodies even if they were represented by the Justice Department. Such a system would be more efficient and would reduce the amount of judicial intrusion into intragovernmental disputes. The Department of Justice can exercise a review and supervisory function in an effort to bring uniformity to government legal positions and still recognize the independence of the regulatory agencies' enforcement efforts.

My predecessors as Attorney General have shared my view that the Justice Department should represent the regulatory agencies. To date, however, Congress has been willing to pay the price of independent litigating authority for those agencies.

If separate litigating authority is going to continue for independent regulatory agencies and government corporations, then we should at least devise a rational system for the conduct of such litigation. One

---

31. Act of Nov. 16, 1973, Pub. L. No. 93-153, § 408. 87 Stat. 591-92 (1973) (current version at 15 U.S.C. §§ 45(l), 46, 53(b), 56 (1976)).

agency's case often will affect other regulatory agencies or executive branch departments. At the least, an agency should be required to alert the Justice Department in such cases so that the views of the executive branch could also be presented to the court. If a case could affect the entire government, such as an employment discrimination claim or a Freedom of Information Act complaint, the Justice Department should have control of the litigation rather than the single agency which is party to the case. The position taken by a single agency on a question of general concern should not bind the entire federal government.

It is my view that the Justice Department should represent all executive branch departments and agencies. The Department must, of course, work closely with its clients in a cooperative effort, recognizing the peculiar expertise and abilities of agency lawyers and delegating authority to agency lawyers in certain circumstances, but always retaining final control in the Justice Department.

A study of federal legal offices in 1955 found that the absence of lines of authority from agency general counsels to the Attorney General contributed to the diversity of legal positions in the federal government. The report of that study strongly supported centralized litigation authority in the Department of Justice.

President Carter last August directed his Reorganization Project to study the way the government's lawyers are used, stating that he considers "the effective use of legal resources to be a vital part of . . . [the] Administration's effort to improve the performance of the Federal Government . . . ." The President hopes that better use of these resources will enable the federal government better to comply with its own rules and regulations and thus prevent unnecessary litigation and administrative delay. The President stated that he also hoped to improve the procedures for conducting government litigation in order to ensure more uniform application of the law.[32]

## C. *Plans for the Future*

The President's Reorganization Project is completing its study and will forward its recommendations to the President in the next few weeks. This seems a particularly appropriate time to discuss the proper role of the Department of Justice in the future.

It is clear that the Solicitor General must continue to perform his current function of representing all the executive departments and the independent regulatory agencies before the Supreme Court. As counsel

---

32. In addition to studying the proper allocation of litigation authority, the President's Reorganization Project is examining several other issues that touch on the future role of the Justice Department. These include the flow of information between government lawyers, the hiring and retention of lawyers, and their training.

for the federal government, the Solicitor General is responsible for presenting cases to the Supreme Court in the manner which will best serve the overall interests of the United States. He is also responsible for deciding whether lower court decisions adverse to the Government should be appealed, and whether the Government should file amicus curiae briefs in cases to which it is not a party. During the past term, the Government filed or supported petitions for writs of certiorari in 107 cases, 76% of which were granted.[33] That percentage should be compared to the percentage of all petitions granted—6%. This reflects the Solicitor General's careful screening of the Government's cases, and his skillful advocacy in presenting the Government's views in an accurate and balanced manner. Last year was not exceptional—over the past decade, the Supreme Court has reviewed only 6-10% of the cases presented to it, but taken 60-70% of the Government's cases.[34]

The United States is involved in about one-half of the cases decided on the merits by the Supreme Court each year.[35] The Solicitor General's overview of all these cases is critical to avoiding inconsistencies in the Government's positions. His responsibility to the entire government helps him avoid litigating a significant legal issue with government-wide impact in a case which, because of its factual or procedural context, is a poor vehicle. An agency often does not see this broader picture; vindication in the pending case is often more important to it than the long-range interests of the United States. Solicitor General Erwin Griswold made that point in this way:

The Solicitor General's client in a particular case cannot be properly represented before the Supreme Court except from a broad point of view, taking into account all of the factors which affect sound government and the proper formulation and development of the law. In providing for the Solicitor General, subject to the direction of the Attorney General, to attend to the "interests of the United States" in litigation, the statutes have always been understood to mean the long-range interests of the United States, not simply in terms of its fisc, or its success in the particular litigation, but as a government, as a people.[36]

The Solicitor General's screening function is an aid to the Supreme Court itself because of the large volume of cases filed there. The Court recognizes and supports this role. Chief Justice Burger sent a letter to Congress in 1971, on behalf of a unanimous Court, in response to a

---

33. [1977] Solicitor Gen. Ann. Rep. 2.

34. *See* Statement of Solicitor General Erwin N. Griswold Concerning Securities Exchange Act H.R. 5050 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 93d Cong., 1st Sess. 5 (June 7, 1973).

35. *See* [1977] Solicitor Gen. Ann. Rep. table I.

36. The Office of the Solicitor General—Representing the Interests of the United States Before the Supreme Court 12, Address by Solicitor General Erwin N. Griswold, University of Missouri Law School (Mar. 14, 1969) (footnote omitted).

congressional inquiry whether the Securities and Exchange Commission should be empowered to conduct its Supreme Court litigation independently of the Solicitor General's Office. The Chief Justice noted the Solicitor General's "highly important role in the selection of cases to be brought here"[37] and predicted that diluting the Solicitor General's authority would very likely increase the workload of the Supreme Court.

The various Solicitors General have been careful in the exercise of their authority, and the Office is well respected by other departments and agencies for its expertise, independence, and objectivity. Although Congress has authorized several agencies[38] independently to file petitions for writs of certiorari in certain categories of cases, such separate petitions have been relatively infrequent, presently averaging one or two a year. The Solicitor General's Office recognizes that control over the Government's litigation is not intended to transform the Department of Justice into a superagency sitting in judgment on the policy decisions of other departments or agencies. With a few notable exceptions, such as the antitrust and the civil rights laws and the Freedom of Information Act, Congress has committed elsewhere the primary responsibility for most of the policy decisions in the government.

It is my belief that all 3,800 lawyers in the Justice Department can perform with the same degree of independence, objectivity, and litigation expertise as the twenty attorneys in the Solicitor General's Office. Agency lawyers are enmeshed in the daily routine of a specific government agency, and cannot be expected to litigate cases with the broad perspective and objectivity that ensures proper representation of the best interests of the entire government, and therefore of the people. Justice Department lawyers have the perspective and objectivity, but they must take care not to interfere with the policy prerogatives of our agency clients. An agency's views should be presented to a court unless they are inconsistent with overall governmental interests, or cannot fairly be argued.

Agency lawyers are often experts in their own regulatory and enforcement programs and statutes, and are often deeply involved in their

---

37. Statement of Solicitor General Erwin N. Griswold Concerning Securities Exchange Act H.R. 5050 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 93d Cong., 1st Sess. 11 (June 7, 1973).

38. These include the Federal Communications Commission, the Nuclear Regulatory Commission, the Interstate Commerce Commission, the Federal Maritime Commission, the Maritime Administration, and the Secretary of Agriculture (under the Packers and Stockyards Act, 1921, ch. 64, § 316, 42 Stat. 168 (current version at 7 U.S.C. § 217 (1976)), and the Perishable Agricultural Commodities Act, 1930, ch. 436, § 11, 46 Stat. 535 (current version at 7 U.S.C. § 499k (1976)). In addition, the Tennessee Valley Authority has in some cases represented itself before the Supreme Court.

agency's programs. Justice Department lawyers and United States attorneys are litigation experts, and perform a critical function in translating the agency's programmatic expertise into effective briefs and arguments for judges who deal with an almost bewildering variety of cases and problems involving the federal government.

I recognize that our lawyers must better utilize the expertise of our client agencies. Since taking office I have recognized that we need to improve our day-to-day working relationships with other agencies. We have taken new steps to ensure advance consultation with client agencies before cases can be settled, and to ensure that our client agencies are properly informed of the progress of pending cases. In short, we have tried to develop a new sensitivity to treating our client agencies as any private lawyer would treat a client. To help nurture this sensitivity, we are devising a new system of evaluating the performance of our lawyers which will include consideration of comments from the agencies they have represented.

We are considering other steps to more effectively and better serve our client agencies. A number of agencies feel that the Justice Department has not devoted sufficient effort to affirmative enforcement of their programs because of the demands of an increasingly heavy civil defensive caseload. One way to meet this problem may be the establishment of a group of attorneys who would litigate only affirmative agency cases.

Overburdened and strained resources continue to be a problem for the Justice Department, just as they were during our early history. We are examining ways to better manage the resources we have, including a better system of dividing civil cases between Washington and the field. We also have to work with our client agencies to make the most effective use of our attorneys. For example, every case does not need an agency lawyer in the field, an agency lawyer in Washington, a Justice Department lawyer in Washington, and an assistant United States attorney to review and agree to the filing of each pleading. More sensible delegations of responsibility simply have to be worked out. As a first step we are considering significantly increasing the authority of United States attorneys to settle monetary claims against the Government without first getting approval from Washington. In keeping with our concern for the views of our client agencies, however, if the client agency objects to the proposed disposition we will require review of the matter at a supervisory level of the Justice Department in Washington.

I would like to speak for a moment to another issue related to the Justice Department's role of representing agencies in litigation. I believe Justice can and should play a greater role in prelitigation counseling of other departments and agencies. After all, one of the principal functions of a lawyer is to "keep all clients out of court"—that is, to advise him or

*ATTORNEY GENERAL*

her how to accomplish objectives without leaving him or her vulnerable to suit. This legal counseling role for government agencies is now generally performed by their own general counsels. Functioning as a lawyer independent of the agency, the Department of Justice can provide the agency with a dispassionate view of legal problems associated with policy objectives. Moreover, as chief litigator for the government, the Department is able to apply the knowledge and experience it gains in that arena to anticipate potential legal difficulties presented by agency activities.

A good example of how that experience has been put to use is in the area of agency affirmative action efforts. The Department has probed this complex area of the law through its experience in formulating a position in the *Bakke* case,[39] as well as in representing the Department of Commerce in extensive litigation over the minority business enterprise provision of the Public Works Employment Act of 1976.[40] By gaining familiarity with the issues common to all affirmative action programs, we are able to advise departments or agencies of potential legal problems. Thus, the experience gained in filing a brief amicus curiae on behalf of the United States and in representing the Department of Commerce might be utilized in advising the Department of Defense or representing the Labor Department.

Because the Department has become familiar with potential problems in the affirmative action area, I have brought those questions to the attention of the various departments and have offered the services of the Department in advising them on the establishment of such programs. For example, the Department has taken the position that an affirmative action program is legally justified if necessary to remedy the effects of past public and private discrimination. Articulation of such a purpose will aid a court in evaluating the legality of a program if it is later challenged. Moreover, we can advise agencies how to tailor their programs to accomplish their remedial objectives. In this way we hope to establish a uniform position throughout the government, to enable agencies to better accomplish their goals and to avoid litigation.

The Freedom of Information Act[41] is another example of a set of legal principles and public policies which pertain to all federal activities and which should be interpreted and respected throughout the government with a fair degree of uniformity. There is a clear need for effective government-wide coordination to avoid conflicting interpretations by

---

39. Bakke v. Regents of the Univ. of Cal., 18 Cal. 3d 34, 553 P.2d 1152, 132 Cal. Rptr. 680 (1976), *cert. granted,* 429 U.S. 1090 (1977).

40. Pub. L. No. 94-369, § 207, 90 Stat. 1007-08 (current version at 42 U.S.C.A. § 6727 (West Supp. 1978)).

41. 5 U.S.C. §§ 552-559 (1976).

*FORDHAM LAW REVIEW* [Vol. 46

various government agencies. In 1977 the Justice Department consulted with other federal agencies over 400 times on Freedom of Information Act questions not then in litigation, and we feel these efforts make an important contribution to securing a uniform application of the law.

## III. OPINIONS OF THE ATTORNEY GENERAL: THE STRUGGLE FOR POLITICAL INDEPENDENCE

Since 1789, the Attorney General has been charged by statute with responsibility for providing the President and the heads of departments with his opinion on questions of law.[42] With regard to the President, this responsibility was extended in 1870 to the giving of the Attorney General's "advice" as well as his opinion on legal questions.[43]

Most opinions are rendered on questions that will not ultimately be resolved by the courts in litigation. Attorneys General have traditionally declined to render formal legal opinions on questions then in litigation. These opinions of the Attorney General are generally regarded as authoritative within the executive branch, and they may often have the salutary effect of avoiding litigation by acting as a check on executive conduct that may not be in accord with the law.

Historically, Attorneys General have personally approved and signed their opinions. Until 1950, preparation of those opinions was vested generally in the Solicitor General or the Assistant Solicitor General. In 1950, the latter position was abolished and the opinion preparation function was transferred to what is now the Office of Legal Counsel, headed by an Assistant Attorney General. In addition to preparing his formal legal opinions, that Office, acting for the Attorney General, renders legal advice and opinions to the executive branch and agencies on a daily basis under the same rules as are followed with respect to formal opinions of the Attorney General.[44]

The increased complexity of our society and the government's relationship to it over the past several decades is reflected in the opinion-giving functions performed by the Attorney General and his subordinates. Today, the subject matter encompassed by that function is as broad as the activities of the government itself. It is not overstatement to say that, in this complex society, the need for sound legal advice in

---

42. *See* Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 93 (corresponds to 28 U.S.C. §§ 511-512 (1970)).

43. Act of June 22, 1870, ch. 150, § 14, 16 Stat. 164 (corresponds to 28 U.S.C. § 511 (1970)).

44. Formal opinions of the Attorney General have been published in the past. We are now preparing for publication the first volume which will contain the separate opinion letters and memoranda of the Office of Legal Counsel as well as the formal Attorney General opinions.

advance of governmental action has become particularly acute. There is no substitute for doing something right the first time.

Another important objective—and one perhaps more difficult to achieve—furthered by the opinion function is ensuring that the many diverse agencies of government speak with one voice on the many legal issues that cut across the responsibilities of more than one department or agency. In the past, the reconciling of interagency disputes regarding questions of law arising in litigation has often not taken place until specific cases were brought to the attention of the Solicitor General after a decision by a federal district court on the question involved. Where no litigation is involved, the opinion function may serve and has served to harmonize diverse legal opinions and to ensure that the government acts legally.

As we examine what the role of the Department of Justice should be in the future, we must consider the fact that in recent years there has been a frequent voicing of the idea of an "independent" Attorney General. This concept encompasses the entire Department of Justice and contemplates some kind of formal measures to insulate it from executive branch pressures in carrying out its law-defining and law-enforcing responsibilities. The currency of this "independence" movement is partly due to the Watergate experience. Many people called not only for a cleansing of the Department but for the removal of the potential for abuse forevermore. In 1976, President Carter made the subject one of national debate by proposing during his campaign that the Attorney General be appointed for a term of between five and seven years, with removal occurring only upon congressional and presidential approval.

Discussions about the role of the Attorney General and his need for independence from policy matters are not new to the political scene. From the inception of the office of the Attorney General in the Judiciary Act of 1789,[45] there has been ambiguity about the role, and disagreement about the independence, of the Attorney General. The Judiciary Act described the functions of the office in terms seemingly without relation to the policymaking, politically-rooted tasks of the rest of the executive branch:

to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned, and to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments . . . .[46]

---

45. Ch. 20, § 35, 1 Stat. 93 (corresponds to 28 U.S.C. § 503 (1970)).
46. *Id.* (corresponds to 28 U.S.C. §§ 509, 511 (1970)).

The opinion-giving responsibility of the Attorney General was for "questions of law" only. Moreover, President Washington's letter to Edmund Randolph urging him to become Attorney General indicates he was seeking a skilled, neutral expounder of the law rather than a political adviser:

> The selection of the fittest characters to expound the laws, and dispense justice, has been the invariable object of my anxious concern. I mean not to flatter when I say that considerations like these have ruled in the nomination of the attorney general of the United States, and that my private wishes would be highly gratified by your acceptance.[47]

Notwithstanding those noteworthy independent beginnings, our Attorneys General soon came to know the tensions created when the independence of their deliberations came in conflict with the policy preferences of the Presidency. Senator George H. Williams, who himself later became Attorney General, described such a clash during the controversy in 1830 over the national bank:

> Consulting with his Attorney General, [President Jackson] found that some doubts were entertained by that officer as to the existence of any law authorizing the Executive to [designate certain banks to be depositories of U.S. funds], whereupon Old Hickory said to him, "Sir, you must find a law authorizing the act or I will appoint an Attorney General who will."[48]

This tension between the Attorney General's role as one who dispassionately defines the legal limits of executive action and the presidential desire to receive legal advice facilitating certain policy decisions has been manifested in modern administrations as well.

In 1940, President Roosevelt determined to provide the British with fifty destroyers in exchange for long-term leases on British territory in the western hemisphere. However, the United States had in 1939 proclaimed its neutrality, which potentially barred such an exchange. As a result, three legal questions were posed to then Attorney General Robert H. Jackson:

> (a) Could the President acquire the leases by an executive agreement between himself and the British Prime Minister, or must the agreement be submitted to the Senate as a treaty . . . ? (b) Did the President have the authority to dispose of the 50 destroyers, and if so, on what conditions? (c) Did the statutes of the United States forbid delivery of such war vessels by reason of the belligerent status of Great Britain?[49]

---

47. L. Huston, A. Miller, S. Krislov & R. Dixon, Roles of the Attorney General of the United States 44 (1968).

48. *Id.* at 51. There is some doubt as to whether this incident actually occurred. *See* H. Cummings & C. McFarland, Federal Justice 109-10 (1937).

49. L. Huston, A. Miller, S. Krislov & R. Dixon, Roles of the Attorney General of the United States 57 (1968).

Although each of these issues was difficult, Jackson stated in an opinion issued on August 27, 1940, that the President could make the exchange without seeking Senate approval,[50] and the exchange was made. But a respectable, though by no means unanimous, body of legal opinion in the United States thought that Jackson had gone too far in accommodating the law to the exigencies of politics.

A somewhat different example of limited independence of an Attorney General is reported in Francis Biddle's account of the internment of American Japanese in World War II. Biddle, Attorney General under Roosevelt, stated that at the time of the internment proposal he thought the program "ill-advised, unnecessary, and unnecessarily cruel."[51] However, he did not so advise the President, and the Justice Department subsequently defended the action successfully before the Supreme Court. Biddle explained that he "was new to the Cabinet, and disinclined to insist on my view to an elder statesman [Secretary of War Stimson] whose wisdom and integrity I greatly respected."[52]

A final illustration of the pressures on an Attorney General when a President seeks a legal opinion on a course of action he deems to be necessary occurred during the 1962 Cuban missile crisis. President Kennedy had decided to take action, but there was concern as to whether a detention and search of Soviet ships carrying arms to Cuba would be interpreted as a blockade, an act of war. If the ship searches could be considered a quarantine, they would qualify as a legitimate defensive measure. Because of time pressures, the opinion was hammered out in oral discussions between Justice and State Department lawyers. Notwithstanding serious questions of international and constitutional law, the opinion was favorable to the President's wishes.[53]

This difficulty regarding independence is due in part to the multifaceted nature of the Attorney General's job. The Attorney General has a variety of responsibilities: to prosecute violations of federal law; to represent the United States in judicial proceedings, either as lawyer for client agencies and departments or as amicus in cases of national importance; to provide legal opinions on questions submitted by other departments and agencies; to provide requested comment on pending legislation; to propose and steer Justice Department legislation through the Congress; and to advise the President on the appointment of federal judges and prosecutors. These tasks and responsibilities require varying degrees of contact and coordination with the executive branch on the one hand, and independence from the executive branch on the other.

---

50. *Id.* at 57-58.
51. *Id.* at 55.
52. *Id.* at 56.
53. *Id.* at 59.

Thus, the independence of the Attorney General has only a general and uneven tradition to support it, and a complexity that resists easy resolution.

The executive branch inevitably encounters legal questions arising out of its policy formulation and implementation alternatives. As a matter of good government, it is desirable generally that the executive branch adopt a single, coherent position with respect to the legal questions that arise in the process of government. Indeed, the commitment of our government to due process of law and to equal protection of the laws probably requires that our executive officers proceed in accordance with a coherent, consistent interpretation of the law, to the extent that it is administratively possible to do so. It is thus desirable for the President to entrust the final responsibility for interpretations of the law to a single officer or department. The Attorney General is the one officer in the executive branch who is charged by law with the duties of advising the others about the law and of representing the interests of the United States in general litigation in which questions of law arise. The task of developing a single, coherent view of the law is entrusted to the President himself, and by delegation to the Attorney General. That task is consistent with the nature of the office of Attorney General.

Moreover, with a few rather significant exceptions, the Attorney General is removed from the policymaking and policy implementation processes of government, and this is especially true when he deals with legal questions that arise in the administration of departments other than his own. It makes sense to assign the task of making definitive legal judgments to an officer who is not required, as a general matter, to play a decisive role in the formulation of policy. Such an officer enjoys a comparative advantage over policymakers in the discharge of the law-giving function.

Therefore, some have suggested that the independence of the Attorney General should be increased and secured institutionally, within the limits imposed by the Constitution. It has been suggested that an Executive order could be issued that would endorse the concept that the Attorney General must be free to exercise independent judgment in his litigating function and in his counseling function, subject only to the constitutional prerogatives of the President. Such an order could provide that the Attorney General's opinions on questions of law, as opposed to questions of policy, would be binding in certain circumstances. It could establish removal procedures that would require the President to justify the removal of an Attorney General because of differences of opinion over questions of law. It might also include an expiration provision, terminating the order on the inauguration of President Carter's successor, but the order could be a model for future administra-

tions. I haven't reached any conclusions as to whether I would recommend to President Carter that he issue such an Executive order. However, as we discuss and decide the future role of the Department of Justice, careful consideration must be given to this problem.

In the *Bakke* case[54] and in some other instances, I have played an important role as a buffer between our truly independent litigating lawyers in the Department of Justice, including the Solicitor General and his staff, and other government officials outside the Department of Justice. In these specific instances, I think I have been successful in preserving the independent positions taken by our Justice Department lawyers. A refined definition of the Attorney General's role in such disputes is something that is clearly needed as we decide our charter for the future.

## IV. CONCLUSION

I have mentioned a number of important questions tonight that deserve careful consideration as we reexamine what the roles of the Attorney General and the Department of Justice should be in the future. Although our client is the government, in the end we serve a more important constituency: the American people. As the President seeks to make our increasingly complex federal government more responsive to the needs of the people, we must improve the performance of the government's lawyers, including those in the Department of Justice. I hope we can do that in part by developing a clear concept of just what the roles of the Attorney General, the Justice Department, and indeed, the government lawyer, should be.

We covered a lot of history tonight. I don't know if you've been as fascinated listening to the history of the Department as I have been in researching it and telling the story. I must share one little tidbit with you as an aside. I was very pleased to learn that the Attorney General when the Department of Justice was created, A. T. Akerman, was from Georgia. I admit that I subsequently discovered that he was born in New Hampshire, but he moved to Georgia at an early age and grew up there. While that rather significant fact doesn't have much to do with tonight's speech, it was an important discovery for an amateur Georgia historian. His lack of fame in Georgia is no doubt the result of his having been appointed Attorney General by President Grant shortly after what we in the South sometimes call the War of Northern Aggression.

---

54.  Bakke v. Regents of the Univ. of Cal., 18 Cal. 3d 34, 553 P.2d 1152, 132 Cal. Rptr. 680 (1976), *cert. granted,* 429 U.S. 1090 (1977).

*FORDHAM LAW REVIEW*

## SELECTED BIBLIOGRAPHY*

Bell, *Federalism in Current Perspective,* 1 Ga. L. Rev. 586 (1967).

Cohen, *Justice Report: Richardson Moves To Assert His Control of Watergate-Shaken Justice Department,* 5 Nat'l J. Rep. 1011 (1973).

Cohen, *Justice Report: U.S. Attorneys Push Wide-Ranging Study To Gain Larger Role in Law Enforcement Policy,* 5 Nat'l J. Rep. 1785 (1973).

Comm. on Organization of the Executive Branch of the Government, Final Report to the Congress (June 1955) (2d Hoover Comm.).

Eisenstein, J., Counsel for the United States (1978).

Horowitz, D., The Jurocracy (1977).

Key & LeSourd, The Struggle of the Attorney General To Retain His Powers (undated, unpublished paper in Department of Justice Library).

Learned, *The Attorney-General and the Cabinet,* 24 Political Sci. Q. 444 (1909).

Navasky, V., Kennedy Justice (1970).

Note, *Government Litigation in the Supreme Court: The Roles of the Solicitor General,* 78 Yale L.J. 1442 (1969).

Note, *Judicial Resolution of Administrative Disputes Between Federal Agencies,* 62 Harv. L. Rev. 1050 (1949).

Stern, *"Inconsistency" in Government Litigation,* 64 Harv. L. Rev. 759 (1951).

Swisher, *Federal Organization of Legal Functions,* 33 Am. Political Sci. Rev. 973 (1939).

---

* Supplemental to those materials cited in footnotes.