# EXHIBIT DD

# NOTES

## THE IMMUNITY-CONFERRING POWER
## OF THE OFFICE OF LEGAL COUNSEL

At a February 2008 congressional hearing, Attorney General Michael Mukasey stated that "the Justice Department . . . could not investigate or prosecute somebody for acting in reliance on a Justice Department opinion," even if it turns out that the advice in the opinion was erroneous.[1]  When pressed by Congressman Bill Delahunt on whether any "legal precedent" supported this conclusion, the Attorney General replied that his analysis rested on "a practical consideration."[2] He acknowledged, "I can't sit here and cite you a case."[3]

The Department of Justice's Office of Legal Counsel (OLC) had issued the legal opinions that were the subject of this colloquy.  OLC exercises the Attorney General's opinion-writing function and serves as "the executive branch's most authoritative legal voice."[4]  As OLC has risen in prominence since 9/11, many commentators have asserted, in agreement with Attorney General Mukasey, that it is "virtually inconceivable" that criminal charges could be brought against officials for illegal acts previously approved by an OLC opinion.[5]  This "momentous and dangerous power[]" of OLC is not limited to issues in the war on terrorism.[6]  It is potentially at stake every time the office interprets a criminal law that applies to the government.

The widespread belief in OLC's immunity-conferring power is not matched by analysis of the legal or institutional bases supporting the belief.  This Note aims to fill that gap.  Part I provides background on OLC's advisory function and procedures.  Part II analyzes three potential defenses that stand in the way of prosecuting someone who has relied on an OLC opinion: entrapment by estoppel, the public authority defense, and innocent intent.  Part III contends that, although the

---

[1] *Oversight Hearing of the Department of Justice: Hearing Before the H. Comm. on the Judiciary*, 110th Cong. (2008), *available at* 2008 WL 331459 [hereinafter *Oversight Hearing*].

[2] *Id.*

[3] *Id.*

[4] *See* John O. McGinnis, *Models of the Opinion Function of the Attorney General: A Normative, Descriptive, and Historical Prolegomenon*, 15 CARDOZO L. REV. 375, 376 (1993).  McGinnis refers to the collective legal opinions of the Attorney General and OLC, but in recent decades OLC has produced the vast majority of these memoranda.

[5] Posting of Marty Lederman to Balkinization, http://balkin.blogspot.com/2008/02/dissenting-view-on-prosecuting.html (Feb. 8, 2008, 3:33 EST); *see also* JACK GOLDSMITH, THE TERROR PRESIDENCY: LAW AND JUDGMENT INSIDE THE BUSH ADMINISTRATION 96 (2007) (citing a senior official's belief that prosecution is "practically impossible"); Kathleen Clark, *Ethical Issues Raised by the OLC Torture Memorandum*, 1 J. NAT'L SECURITY L. & POL'Y 455, 469 (2005) (deeming prosecution "unlikely").

[6] GOLDSMITH, *supra* note 5, at 97.

immunizing effect of OLC opinions is ambiguous as a doctrinal matter, Department of Justice prosecutions are implausible due to various institutional and practical factors. Part IV concludes.

## I. THE ADVISORY FUNCTION OF THE OFFICE OF LEGAL COUNSEL

### A. History

Under Article II of the Constitution, the President must "take Care that the Laws be faithfully executed."[7]  The President must exercise the power of legal interpretation to carry out this textually specified duty: he must first construe the law in order to enforce it.

By statutory duty, the Attorney General aids the President in fulfilling this function. In the Judiciary Act of 1789, Congress charged the newly created office of the Attorney General with the obligation to "give . . . advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments."[8]  The Attorney General's opinions were prepared primarily by the Solicitor General or Assistant Solicitor General until the mid-twentieth century.[9]

Upon the elimination of the Assistant Solicitor General position in 1950, OLC assumed the opinion-writing mantle.[10]  The office is tasked under Department of Justice regulations with "[p]reparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal adviser to the President."[11]  Today, OLC lawyers pen almost all of the Department of Justice's formal opinions — "the largest body of official interpretation of the Constitution and statutes outside the volumes of the federal court reporters."[12]

### B. Pressures

In the private lawyer context, a defendant who acts illegally cannot invoke an advice-of-counsel defense.[13]  As Judge Richard Posner

---

[7] U.S. CONST. art. II, § 3.

[8] Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511–513 (2000)).

[9] *See* Griffin B. Bell, *The Attorney General: The Federal Government's Chief Lawyer and Chief Litigator, or One Among Many?*, 46 FORDHAM L. REV. 1049, 1064 (1978).

[10] *Id.*

[11] 28 C.F.R. § 0.25(a) (2007).

[12] McGinnis, *supra* note 4, at 376.

[13] *See* 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.6(e)(4), at 419 (2d ed. 2003); *see also* Livingston Hall & Selig J. Seligman, *Mistake of Law and* Mens Rea, 8 U. CHI. L. REV.

*HARVARD LAW REVIEW*

noted: "There are almost a million lawyers in the United States. Not all of them are competent; not all are honest. If unreasonable advice of counsel could automatically excuse criminal behavior, criminals would have a straight and sure path to immunity."[14]

In the government lawyer context, the stakes are higher. Former Assistant Attorney General of OLC Randolph Moss observed that the office's responsibilities differ from those of private lawyers because its opinions "define . . . the meaning of the law for an entire branch of government, and that branch of government has an obligation to get the law right."[15] OLC issues advice to a wide array of executive branch agencies and personnel, often aided by little to no judicial precedent. As judicial resolution is unavailable for many issues,[16] officials have treated Attorney General and OLC advice "as conclusive and binding since [the early nineteenth century]."[17] When an OLC opinion sanctions a course of conduct, it not only advises officials on potential legal exposure, but also shapes how the Department of Justice enforces the law as a practical matter.

One characteristic of OLC advice is that it is prepared at the behest of executive branch officials. OLC opinions thus differ from, for instance, "no-action letters" by the Securities and Exchange Commission (SEC). SEC letters similarly opine on the legality of proposed transactions, but are requested by private parties dealt with at arm's length.[18] OLC opinions, in contrast, challenge the lawyers to provide valuable advice while resisting the attendant pressures of self-dealing.

Precisely what it means as a normative matter for OLC to "get the law right" is uncertain. OLC is housed in a political branch of government, but the extent to which it may bear in mind political considerations has been vigorously debated. The Assistant Attorney General of OLC is a political appointee and thus necessarily "philosophically attuned" to the administration's policies.[19] But there are countervailing fears that the office, subject to little oversight, could become overly

---

641, 652 (1941) ("[Private l]awyers are under enough temptations toward dishonesty already, without giving them the power to grant indulgences, for a fee, in criminal cases.").

[14] United States v. Urfer, 287 F.3d 663, 665 (7th Cir. 2002).

[15] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 ADMIN. L. REV. 1303, 1321 (2000) (referring to Attorney General and OLC opinions collectively).

[16] Executive branch interpretations often do not adversely affect private individuals, and when they do, suits are often precluded by justiciability barriers such as standing, mootness, or ripeness. *See id.* at 1304.

[17] *Id.* at 1320.

[18] *See* Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters: Current Problems and a Proposed Framework*, 83 CORNELL L. REV. 921, 936–39 (1998).

[19] William H. Rehnquist, *The Old Order Changeth: The Department of Justice Under John Mitchell*, 12 ARIZ. L. REV. 251, 252 (1970); *see also* GOLDSMITH, *supra* note 5, at 34 ("Philosophical attunement with the administration is legitimate . . . .").

politicized and interpret the law opportunistically.[20]   Professor Jack Goldsmith, who headed OLC from 2003 to 2004, observed that "[l]egal advice to the President from the Department of Justice is neither like advice from a private attorney nor like a politically neutral ruling from a court.  It is something inevitably, and uncomfortably, in between."[21]

### C.  Ex Ante Procedural Constraints

The inherent tensions in OLC's advisory function underscore the importance of the office's internal norms.  OLC has implemented — by tradition and informal regulation — numerous checks to aid its lawyers in resisting political pressures.  These ex ante constraints help ensure that they get the law wrong as rarely as possible, notwithstanding the normative debate over OLC's interpretive posture.[22]   By minimizing erroneous or tendentious opinions and controversial entanglements, these processes "protect OLC from itself."[23]

First, OLC exercises jurisdictional discretion over whom to advise and imposes requirements on requesting agencies and personnel.  Typically, an agency's General Counsel must provide his or her own legal opinion.[24]   The submissions not only ventilate the issues for the benefit of OLC, but also deter agencies from inundating the office with frivolous questions.  They also guard against agencies' punting contentious issues to OLC merely to avoid taking the heat — thus keeping opinions on politically divisive topics to a minimum.

Second, OLC generally does not write opinions "on matters in litigation."[25]   This enables the lawyers to avoid getting locked into post hoc justifications of the government's action.[26]   At the same time, this norm steers OLC away from the unsavory choice of either "abandoning its reputation for scrupulousness or clashing with the Department of Justice's litigating divisions."[27]

---

[20] *See* Moss, *supra* note 15, at 1306 (noting that OLC should reason "within the framework of the *best* view of the law").

[21] GOLDSMITH, *supra* note 5, at 35.

[22] *See* Richard B. Bilder & Detlev F. Vagts, Editorial Comment, *Speaking Law to Power: Lawyers and Torture*, 98 AM. J. INT'L L. 689, 693–94 (2004) (noting the difficulty of "agree[ing] on any clear criteria or tests for determining when a legal argument or position . . . is so clearly erroneous or politically slanted as to be simply 'out of the ballpark' and beyond the range of permissible good-faith argument").

[23] Harold Hongju Koh, *Protecting the Office of Legal Counsel from Itself*, 15 CARDOZO L. REV. 513, 515 (1993) (emphasis omitted).

[24] *See* McGinnis, *supra* note 4, at 426–27.  However, requests from the White House may not be declined and are excepted from this practice.  *Id.* at 426.

[25] *Id.* at 426.

[26] *See* Koh, *supra* note 23, at 515.

[27] McGinnis, *supra* note 4, at 426.

Third, OLC disfavors giving oral advice on major matters, opting for a formalized writing process.[28] The requesting agency's opinion is used as a starting point from which OLC lawyers conduct independent research and consult agencies with expertise on opinion drafts,[29] before securing the sign-off of the Assistant Attorney General or one of his deputies. Requiring written memoranda promotes a deliberative drafting process that allows OLC to present itself authoritatively — an appearance particularly valuable in resolving interagency disputes. The formality also helps prevent recipients from exaggerating or selectively comprehending nuanced analyses.

Fourth, OLC opinions adhere to substantive guiding principles. The lawyers appeal to executive branch practices and judicial principles to write opinions that measure up against settled law. If Supreme Court precedents are on point and well-established, the executive branch generally acquiesces to "the relative primacy, but non-exclusivity, of the courts in defining the law."[30] If precedents are less clear, OLC tends to rely on "general guidance" from the Court, "absent a strong, executive branch conviction that such guidance is not well-founded."[31] As a 1996 OLC opinion stated: "While the Supreme Court's decisions interpreting the Constitution cannot simply be *equated* with the Constitution, we are mindful of the special role of the courts in the interpretation of the law of the Constitution."[32] OLC, although often cast as "quasi-judicial,"[33] recognizes that its interpretive license is constrained to a degree by the pronouncements of other branches.

Lastly, many OLC opinions are published and made available to the public online.[34] Publication, however, typically occurs only "after a lag of several years."[35] Moreover, classified information may not be divulged, precluding publication of many national security–related opinions. Nonetheless, to some degree this routine conditions OLC lawyers to prepare only sound analyses that they believe can withstand public scrutiny.

---

[28] *See id.* at 429.

[29] GOLDSMITH, *supra* note 5, at 166.

[30] Moss, *supra* note 15, at 1326.

[31] *Id.*

[32] Memorandum from Walter Dellinger, Assistant Att'y Gen., to the Gen. Counsels of the Fed. Gov't (May 7, 1996), *reprinted in* LAW & CONTEMP. PROBS., Winter/Spring 2000, at 514, 517.

[33] *See* Nelson Lund, *Rational Choice at the Office of Legal Counsel*, 15 CARDOZO L. REV. 437, 441 (1993).

[34] *See* Office of Legal Counsel, Memoranda and Opinions, http://www.usdoj.gov/olc/opinions.htm; *see also* McGinnis, *supra* note 4, at 428.

[35] McGinnis, *supra* note 4, at 428.

## II. Legal Grounds for Immunity

Officials who rely on OLC's legal conclusions worry that, in spite of OLC's best efforts, erroneous legal opinions will slip through the cracks. For these officials, the dearth of prosecutions in practice brings tenuous relief, but uncertainties remain about the long-term legal consequences of their actions.

In civil cases, qualified immunity ensures a margin of error for officials to make reasonable mistakes about the law.[36] Even if there has been a legal violation, officials are generally not liable for damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[37] In effect, "all but the plainly incompetent or those who knowingly violate the law" are immunized.[38] As the Supreme Court reasoned in *Harlow v. Fitzgerald*,[39] imposing liability would "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties"[40] and deter talented individuals from entering public service.[41]

In criminal cases, by contrast, it is less clear that officials enjoy the same leeway. On the one hand, *Harlow*'s deterrence rationale seems to apply with even greater force, because criminal punishment deals a more devastating blow than does civil liability. On the other hand, immunizing officials from government prosecution raises self-dealing concerns absent from private party suits. And although some commentators assert that officials who have relied on OLC opinions are "already protect[ed] . . . against criminal culpability,"[42] few have rigorously explored the doctrinal bases for this assumption.

---

[36] That said, the "reasonableness" of mistakes based on OLC opinions in qualified immunity cases may be undermined by recent reports that the Department of Justice's Office of Professional Responsibility is investigating OLC's approval of waterboarding tactics against Al Qaeda suspects. *See* Scott Shane, *Waterboarding Focus of Inquiry by Justice Dept.*, N.Y. Times, Feb. 23, 2008, at A1.

[37] Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[38] Malley v. Briggs, 475 U.S. 335, 341 (1986); *see also* United States v. Lanier, 520 U.S. 259, 270–71 (1997) (describing the qualified immunity test as "the adaptation of the fair warning standard [in criminal law]").

[39] 457 U.S. 800.

[40] *Id.* at 814 (alteration in original) (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)) (internal quotation marks omitted). Due to their lesser financial benefits and greater exposure to conflict-prone situations, officials are susceptible to "skewed incentives" toward "inaction, underenforcement, delay and other defensive tactics that . . . disadvantage the public." Barbara E. Armacost, *Qualified Immunity: Ignorance Excused*, 51 Vand. L. Rev. 583, 586 (1998).

[41] *Harlow*, 457 U.S. at 816.

[42] Posting of Marty Lederman to Balkinization, http://balkin.blogspot.com/2005/12/mccain-amendment-ugly.html (Dec. 16, 2005, 11:24 EST).

*HARVARD LAW REVIEW* [Vol. 121:2086]

Under U.S. criminal law, ignorance of the law or a mistake as to the law's requirements is generally not a defense to criminal conduct.[43] However, courts have carved out narrow doctrinal exceptions to this maxim.[44]  The U.S. Attorneys' Criminal Resource Manual describes three closely related defenses — entrapment by estoppel, the public authority defense, and innocent intent — that "in theory a defendant might assert" upon committing a crime "in response to a [governmental] request."[45]  Whether reliance on an OLC opinion warrants an exception to the mistake-of-law rule will turn on whether relying officials can effectively avail themselves of these defenses.

## A. Due Process: Entrapment by Estoppel

Due process bars conviction when a defendant commits what would otherwise be a crime in reasonable reliance on an official interpretation of the law.[46]  This affirmative defense, "entrapment by estoppel"[47] (EBE), applies when four requirements are met: first, a government official with authority over the area in question[48] affirmatively represented that the conduct was legal;[49] second, the de-

---

[43] *See* United States v. Int'l Minerals & Chem. Corp., 402 U.S. 558, 563 (1971); Lambert v. California, 355 U.S. 225, 228 (1957); Hall & Seligman, *supra* note 13, at 641.

[44] *See, e.g.*, *Lambert*, 355 U.S. at 229–30 (exception for lesser regulatory crimes); People v. Weiss, 12 N.E.2d 514, 515–16 (N.Y. 1938) (call-to-aid exception); 1 LAFAVE, *supra* note 13, § 5.6(e)(1), at 412 (exception for conduct occurring before enactment "reasonably made available" (quoting MODEL PENAL CODE § 2.04(3)(a) (1962))); *id.* § 5.6(e)(2), at 413–15 (exception for reliance upon statutes or judicial decisions subsequently deemed invalid).

[45] U.S. ATTORNEYS' MANUAL, TITLE 9: CRIMINAL RESOURCE MANUAL § 2055, *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/crm02055.htm.  The three defenses are often confused.  *See* United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994) (noting the "muddled state of the law . . . regarding defenses . . . when a defendant claims he performed the acts for which he was charged in response to a request from an agency of the government"); U.S. ATTORNEYS' MANUAL, *supra*, § 2055 (grouping entrapment by estoppel, public authority, and innocent intent all under the subtitle "Public Authority Defense").

[46] The Model Penal Code provides:
> A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when . . . [the defendant] acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) a statute or other enactment; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense.

MODEL PENAL CODE § 2.04(3)(b) (1962).

[47] EBE is also referred to as "criminal estoppel."  *See, e.g.*, John W. Lundquist, *"They Knew What We Were Doing": The Evolution of the Criminal Estoppel Defense*, 23 WM. MITCHELL L. REV. 843 (1997).

[48] *See* Mark Cohen, *Entrapment by Estoppel*, NEB. LAWYER, June 2001, at 11, *available at* http://www.nebar.com/pdfs/nelawyer/2001/060104.pdf ("[T]he source of the information [must be] a public officer or body charged by law with responsibility for defining permissible conduct with respect to the offense at issue.").

[49] Government silence, conduct alone, prior nonenforcement of law, and vague or contradictory statements do not meet the bar.  *See id.*

fendant relied on the representation; third, reliance was reasonable; and fourth, prosecution would be unfair.[50]  EBE is related to the principle that citizens punished under overly vague or contradictory statutes have been deprived of fair warning.[51]  By similar logic, punishing citizens whom the state has "active[ly] misle[d]" violates principles of fundamental fairness grounded in the Due Process Clauses of the Fifth and Fourteenth Amendments.[52]

EBE has its genesis in two Warren Court opinions.  *Raley v. Ohio*[53] involved witnesses called to testify before the Ohio Un-American Activities Commission.  Relying on erroneous instructions by the Commission chairman, the witnesses invoked the privilege against self-incrimination and were subsequently convicted of contempt.[54]  The Supreme Court reversed the convictions, stating that to hold otherwise would "sanction the most indefensible sort of entrapment by the State — convicting a citizen for exercising a privilege which the State clearly had told him was available to him."[55]

Six years later, in *Cox v. Louisiana*,[56] the Court considered the case of a demonstrator who was assured by the Chief of Police that he could picket if he remained 101 feet from the courthouse steps.[57]  The demonstrator was later convicted under a statute prohibiting demonstrations "near" a courthouse.[58]  The Court reversed, holding that the defendant was wrongly advised by the very officials "charged with responsibility for administering and enforcing" the statute.[59]  Prosecution under these circumstances would again be "indefensible . . . entrapment" violative of due process.[60]

---

[50] *See id.*

[51] Criminal sanctions are unsupportable if imposed under "vague and undefined" terms or "[i]nexplicably contradictory" statutes.  Raley v. Ohio, 360 U.S. 423, 438 (1959) (citing Lanzetta v. New Jersey, 306 U.S. 451 (1939), and United States v. Cardiff, 344 U.S. 174 (1952)).

[52] *Id.*; *cf.* Lambert v. California, 355 U.S. 225, 228 (1957) ("Engrained in our concept of due process is the requirement of notice.").

[53] 360 U.S. 423.

[54] *Id.* at 424–25.

[55] *Id.* at 438.  The Court later applied *Raley* to a prosecutor's statements regarding the existence of immunity, Stevens v. Marks, 383 U.S. 234, 245–46 (1966), State Department pronouncements on area restrictions, United States v. Laub, 385 U.S. 475, 485–87 (1967), and longstanding Army Corps of Engineers regulations interpreting discharge permit requirements, United States v. Pa. Indus. Chem. Corp., 411 U.S. 655, 673–74 (1973).

[56] 379 U.S. 559 (1965).

[57] *Id.* at 570–71.

[58] *Id.* at 560.

[59] *Id.* at 568.

[60] *Id.* at 571 (quoting *Raley*, 360 U.S. at 426).

*HARVARD LAW REVIEW* [Vol. 121:2086]

Every federal court of appeals has recognized the defense.[61]  Defendants have successfully invoked EBE by pointing to Army[62] and Air Force officers,[63] draft boards,[64] state judges,[65] DEA agents,[66] and even federally licensed gun dealers,[67] upon whom they have relied. With *objective reasonableness* as the touchstone, lower courts have explained that reliance is reasonable when "a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries."[68]

In the same vein, a defendant who has reasonably relied on OLC lawyers may seek to estop the government from prosecution.  Reliance was justified in *Raley* because the "Chairman of the Commission . . . appeared to be the agent of the State in a position to give such assurances."[69]  It was similarly justified in *Cox* because the Chief of Police was one of "the highest police officials of the city."[70]  OLC is comprised of "outstanding attorneys" selected for their expertise and credentials.[71]  Unlike a policeman expounding on the bounds of a statute, the lawyers are specifically charged with issuing legal advice. Moreover, unlike the on-the-spot advice in *Cox*, dispensed at the scene of a demonstration, OLC opinions undergo a rigorous drafting process. As a result, OLC arguably deprives officials of fair warning when it affirmatively espouses the legality of the relevant conduct.

However, courts have applied EBE with "great reluctance"[72] and may be wary of extending the doctrine.  The OLC situation diverges

---

[61] *See* United States v. Stewart, 185 F.3d 112, 124 (3d Cir. 1999); United States v. Aquino-Chacon, 109 F.3d 936, 938–39 (4th Cir. 1997); United States v. Spires, 79 F.3d 464, 466 (5th Cir. 1996); United States v. Howell, 37 F.3d 1197, 1204 (7th Cir. 1994); United States v. Nichols, 21 F.3d 1016, 1018 (10th Cir. 1994); United States v. Levin, 973 F.2d 463, 468 (6th Cir. 1992); United States v. Corso, 20 F.3d 521, 528 (2d Cir. 1994); United States v. Brebner, 951 F.2d 1017, 1024 (9th Cir. 1991); United States v. Smith, 940 F.2d 710, 714 (1st Cir. 1991); United States v. Austin, 915 F.2d 363, 365 (8th Cir. 1990); United States v. Hedges, 912 F.2d 1397, 1404 (11th Cir. 1990); Dellums v. Powell, 566 F.2d 167, 182–83 (D.C. Cir. 1977).

[62] *See* United States v. Clegg, 846 F.2d 1221, 1223 (9th Cir. 1988).

[63] *See Hedges*, 912 F.2d at 1398–99.

[64] *See* United States v. Timmins, 464 F.2d 385, 386–87 (9th Cir. 1972).

[65] *See* United States v. Brady, 710 F. Supp. 290, 294–95 (D. Colo. 1989).

[66] *See* United States v. Abcasis, 45 F.3d 39, 40–42 (2d Cir. 1995).

[67] *See* United States v. Tallmadge, 829 F.2d 767, 774 (9th Cir. 1987).

[68] United States v. Treviño-Martinez, 86 F.3d 65, 69 (5th Cir. 1996) (quoting United States v. Brebner, 951 F.2d 1017, 1024 (9th Cir. 1991) (internal quotation marks omitted)).

[69] Raley v. Ohio, 360 U.S. 423, 437 (1959).

[70] Cox v. Louisiana, 379 U.S. 559, 571 (1965).

[71] McGinnis, *supra* note 4, at 424.

[72] United States v. Browning, 630 F.2d 694, 702 (10th Cir. 1980); *see also id.* ("The only circumstances justifying use of the doctrine are those which add up to the conclusion that it does not interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation."); Sean Connelly, *Bad Advice: The Entrapment by Estoppel Doctrine in Criminal Law*, 48 U. MIAMI L. REV. 627, 633 (1994) ("[B]ecause the doctrine is such strong medicine, the doctrine should be reserved for those cases where it is truly needed.").

from paradigmatic EBE applications in potentially significant ways. First, in EBE cases, the two parties are typically a public official and a private citizen, often on adversarial footing, with the advice tendered at arm's length. In the OLC context, the two are members of the same team: the executive branch. The so-called victims are often long-serving experts with informed views and an independent "obligation to ascertain the legality of [their] conduct."[73] This eviscerates underlying "entrapment" concerns, because it is highly unlikely that OLC would make deliberate misrepresentations to ensnare officials into committing crimes they would not otherwise commit.[74] It also amplifies the risk of self-dealing. Availing officials of the EBE defense could magnify "pressures on government lawyers to 'bend' or ignore the law in order to support policy decisions."[75] The fear is that granting EBE in practice may amount to providing advance immunity for officials' intended actions.

Second, EBE misrepresentations are made "*directly* to the defendant" who acts in reliance on that misrepresentation.[76] However, OLC's status as "the executive branch's most authoritative legal voice"[77] does not connote a direct relationship with every executive branch official. OLC advice is conveyed, at varying levels of generality, by General Counsels down indeterminate chains of communication, resulting in attenuated relationships between OLC and recipient officials. In fact, officials who act on the basis of OLC conclusions may be wholly unaware of OLC's role. More often than not, "direct" authorization comes from immediate superiors — upon whom reliance may not be so reasonable.

Additionally, in *Raley* and *Cox*, the conduct allegedly implicated constitutional rights.[78] In contrast, EBE claims have been unsuccessful in lower court cases involving such nonconstitutionally protected

---

[73] 1 LAFAVE, *supra* note 13, § 5.6(d), at 410.

[74] *See infra* Part III, pp. 2102–08.

[75] Bilder & Vagts, *supra* note 22, at 693 (discussing pressures on government lawyers in rendering opinions on highly political issues such as foreign policy); *cf.* Miriam Gur-Arye, *Reliance on a Lawyer's Mistaken Advice: Should It Be an Excuse from Criminal Liability?*, 29 AM. J. CRIM. L. 455, 466 (2002) (noting concerns "that granting the excuse [in the private lawyer context] might lead to people purchasing custom-tailored legal opinions in order to acquire immunity from criminal prosecution").

[76] United States v. Eaton, 179 F.3d 1328, 1332 (11th Cir. 1999) (emphasis added).

[77] McGinnis, *supra* note 4, at 376.

[78] *See* Raley v. Ohio, 360 U.S. 423, 427 (1959) (discussing Ohio and federal Fifth Amendment privileges against self-incrimination); *see also* Cox v. Louisiana, 379 U.S. 559, 560–66 (1965) (discussing First Amendment challenge); *cf.* Stevens v. Marks, 383 U.S. 234, 246 (1966) ("A witness has, we think, a constitutional right to stand on the privilege against self-incrimination . . . . This, it seems to us, is the teaching of *Raley* . . . .").

*HARVARD LAW REVIEW* [Vol. 121:2086

acts as drug trafficking,[79] illegal reentry,[80] fraudulent transfers,[81] and the importation of illegal species.[82] Moreover, EBE may be simply inapplicable when the underlying acts are so egregious and reprehensible that defendants cannot claim lack of notice of illegality.[83] The issues before OLC are wide-ranging and frequently unrelated to constitutional rights. Application of the defense, therefore, will at a minimum be issue-specific.

## B. Public Authority Defense

At common law, courts excused illegal acts committed in the course of an official's duties if the official was specifically authorized to engage in the conduct to further the public interest.[84] This "public authority" defense applies to individuals who have acted in reasonable reliance on a government agent's authority to engage him or her in a covert governmental activity.[85] The public authority defense is sometimes termed the "CIA Defense" because it has most often arisen in cases where defendants believed their acts to be intelligence- or national security–related operations authorized by the CIA.[86]

The distinction between EBE and the public authority defense is a subtle one.[87] The defendant in EBE cases believed, due to erroneous official assurances, that his conduct constituted no offense. By contrast, the defendant in public authority cases knew his conduct to be otherwise illegal, but engaged in the conduct at the request of an official. The mistake of law involved not the substance of the official interpretation itself, but a misperception of the legal prerogatives at-

---

[79] United States v. Pitt, 193 F.3d 751, 758–59 (3d Cir. 1999); United States v. Smith, 802 F.2d 1119, 1124–26 (9th Cir. 1986).

[80] United States v. Treviño-Martinez, 86 F.3d 65, 69–70 (5th Cir. 1996).

[81] United States v. Stewart, 185 F.3d 112, 124 (3d Cir. 1999).

[82] United States v. Eaton, 179 F.3d 1328, 1332–33 (11th Cir. 1999).

[83] *See* Lundquist, *supra* note 47, at 868 (suggesting that EBE might not be applicable to "heinous" criminal offenses where "consequences . . . are so severe and the acts so reprehensible"); *cf.* Armacost, *supra* note 40, at 662 (predicting that "when the underlying conduct is egregious[,] . . . qualified immunity will be denied regardless of whether there is factually-analogous precedent") (emphasis omitted).

[84] *See* 2 PAUL H. ROBINSON, CRIMINAL LAW DEFENSES § 141 (1984) (discussing law enforcement authority, authority to maintain order and safety, parental and benevolent custodial authority, and medical authority).

[85] *See* United States v. Pitt, 193 F.3d 751, 756 (3d Cir. 1999).

[86] *See, e.g.,* United States v. Reyes-Vasquez, 905 F.2d 1497, 1499 (11th Cir. 1990) (discussing claim that CIA encouraged cocaine deal); United States v. Anderson, 872 F.2d 1508, 1513–20 (11th Cir. 1989) (discussing claim that CIA authorized violations of firearms and explosives law); United States v. Rosenthal, 793 F.2d 1214, 1235–37 (11th Cir. 1986) (discussing claim that CIA authorized drug smuggling activities as part of intelligence operation for national security objectives); United States v. Lopez-Lima, 738 F. Supp. 1404, 1408–13 (S.D. Fla. 1990) (discussing claim that CIA authorized hijacking of plane to Cuba).

[87] *See* United States v. Jumah, 493 F.3d 868, 875 n.4 (7th Cir. 2007).

tached to the official's status.  The objective reasonableness of the defendant's reliance thus turns on the legal *authority* of the authorizing official.  In assessing the validity of the defense, courts have struggled to define the requisite level of "authority."

*1. Apparent Authority.* — The most expansive formulation of the defense was articulated by Judge Malcolm Wilkey in *United States v. Barker.*[88]  Under Judge Wilkey's view, a defendant need not establish that the official had real authority to permit the proscribed activity — only that he *reasonably believed* he did.[89]  Two threshold showings are required: facts justifying reasonable reliance on the official, and a legal theory on which to base reasonable belief that the official possessed authority to permit the conduct.[90]

*Barker* involved the Ellsberg break-in of the Watergate affair.[91]  The defendants allegedly had believed the warrantless burglary to be specially authorized by E. Howard Hunt, the White House official who recruited them.[92]  Reversing their convictions,[93] Judge Wilkey analogized to a police officer's reliance on a magistrate's issuance of a defective search warrant, or a citizen's reliance on an officer's authority when called to aid an unlawful arrest.[94]  In each case, he reasoned, there was "an overriding societal interest in having individuals rely on the authoritative pronouncements of officials whose decisions we wish to see respected."[95]

OLC's pronouncements provide a potential apparent authority defense if a defendant believed OLC could legally validate otherwise illegal acts.  The mistake, arguendo, could be justified by the overriding interest in having officials rely on OLC to ensure uniform legal interpretation throughout the executive branch.  For "facts justifying reasonable reliance," the defendant could point to longstanding executive branch practice treating OLC opinions as binding.  For "a legal theory," the defendant could highlight OLC's unique proximity to the Attorney General.  Judge Wilkey found plausible the *Barker* defendants' theory that there were valid exceptions to the warrant requirement in

---

[88]  546 F.2d 940, 943 (D.C. Cir. 1976) (opinion of Wilkey, J.).

[89]  *Id.* at 949; *cf.* FED. R. CRIM. P. 12.3 (recognizing the defense of "actual or believed" public authority).

[90]  *Barker*, 546 F.2d at 949 (opinion of Wilkey, J.).

[91]  Two men broke into the office of Daniel Ellsberg's psychiatrist.  Ellsberg was the source of the Pentagon Papers leak to the New York Times.  *Id.* at 943.

[92]  *Id.* at 943–44.

[93]  The case was remanded for a new trial by a 2–1 vote, with Judges Merhige and Wilkey agreeing that the defendants might have a valid defense based on an exception to the mistake-of-law rule, although disagreeing on the parameters of the exception.  *See id.* at 944; *id.* at 957 (opinion of Merhige, J.).

[94]  *Id.* at 948 (opinion of Wilkey, J.).

[95]  *Id.* at 947.

*HARVARD LAW REVIEW* [Vol. 121:2086]

part because Attorneys General had long endorsed this theory.[96] Specifically, he pointed to the "vast accumulated experience" of Attorneys General and their "long perspective of what our legal problems . . . have been . . . and are likely to be."[97] The defendant could argue that this same deference should attach to "the Attorney General's Lawyer."[98]

However, *Barker* excused the defendants' misconception of Hunt's authority largely because of "the gap . . . between a private citizen and a government official with regard to their ability . . . to judge the lawfulness of a particular governmental activity."[99] When two government officials are involved, this gap closes. The relying individual should have independent knowledge,[100] and both parties share a strong interest in believing in the conduct's legality. Courts may take seriously the danger (not presented in apparent authority cases) that officials will seek out OLC opinions as "advance pardon[s]."[101] Even apart from the question of whether the President's pardon power may be delegated to a subordinate official — the prevailing view is that it may not[102] — courts may find the risk of abuse to be too great.[103]

Moreover, lower courts have been reluctant to embrace the apparent authority defense.[104] As the Fourth Circuit warned in *United States v. Wilson*,[105] recognition of the apparent authority defense would potentially "grant any criminal *carte blanche* to violate the law

---

[96] *Id.* at 951–52.

[97] *Id.* at 952 n.37.

[98] Douglas W. Kmiec, *OLC's Opinion Writing Function: The Legal Adhesive for a Unitary Executive*, 15 CARDOZO L. REV. 337, 337 (1993) (internal quotation marks omitted).

[99] *Barker*, 546 F.2d at 948–49 (opinion of Wilkey, J.).

[100] *See* Thomas W. White, Note, *Reliance on Apparent Authority as a Defense to Criminal Prosecution*, 77 COLUM. L. REV. 775, 806–07 (1977) ("[T]hose who believe themselves to be operating on behalf of the government should be held to a strict standard of knowledge of the substantive limitations imposed on their actions by the Constitution and laws of the United States."); *see also id.* at 808 (deeming the defense "inappropriate for a situation where the actor acts voluntarily and which involves a long period of advance planning").

[101] GOLDSMITH, *supra* note 5, at 96.

[102] *See* Margaret Colgate Love, *Of Pardons, Politics and Collar Buttons: Reflections on the President's Duty To Be Merciful*, 27 FORDHAM URB. L.J. 1483, 1486 (2000).

[103] *See Barker*, 546 F.2d at 969 (Leventhal, J., dissenting) (noting concern for "opening the door to justification for serious offenses"); White, *supra* note 100, at 807 ("[A] defense based solely on . . . apparent authority . . . could excuse the grossest forms of anti-social conduct as well as invasions of elementary civil rights." (footnote omitted)).

[104] *See, e.g.*, United States v. Fulcher, 250 F.3d 244, 253–54 (4th Cir. 2001); United States v. Pitt, 193 F.3d 751, 758 (3d Cir. 1999); United States v. Holmquist, 36 F.3d 154, 161 n.6 (1st Cir. 1994); United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994); United States v. Rosenthal, 793 F.2d 1214, 1235–37 (11th Cir. 1986); United States v. Duggan, 743 F.2d 59, 83–84 (2d Cir. 1984). Even the D.C. Circuit conceded that it "d[id] not think that any coherent principle [could] be gleaned from the *Barker* case." United States v. North, 910 F.2d 843, 881 (D.C. Cir. 1990).

[105] 721 F.2d 967 (4th Cir. 1983).

should he subjectively decide that he serves the government's interests thereby. Law-breakers would become their own judges and juries."[106]

*2. Actual Authority.* — A narrower formulation of the defense has been more palatable to courts and more consistent with the doctrine's common law origins.[107] This version requires reasonable reliance on the *actual* authority of an official to engage the defendant in the covert activity.[108] In other words, only "[a]ctions *properly* sanctioned by the government are not illegal."[109]

It is well established that the President — and thus OLC — has the authority to interpret laws.[110] The President has, pursuant to the Oath Clause and Take Care Clause, a corresponding power to "decline to enforce a statute that he views as unconstitutional."[111] In 1994, then-Assistant Attorney General of OLC Walter Dellinger issued an opinion calling the proposition "uncontroversial" and supported by "significant judicial approval" and executive branch "[o]pinions dating to at least 1860."[112]

Nonetheless, OLC does not have actual authority to *authorize illegal conduct* — the critical element of the actual authority defense. There is a vigorous debate over the extent to which the executive branch, as a coequal branch of government, may defy judicial decisions with which it disagrees.[113] This debate, however, is largely theo-

---

[106] *Id.* at 975; *see also North*, 910 F.3d at 883–84 (warning that the apparent authority defense might allow "a jury sympathetic to the official's individual notion of morality [to] exculpate a self-styled Robin Hood bureaucrat who concealed, altered, or destroyed documents that he knew Congress needed").

[107] Requiring actual authority is consistent with the common law defense's requirement that actions be taken "under color of public authority." *See Fulcher*, 250 F.3d at 254 n.4 (citing United States v. Reyes-Vasquez, 905 F.2d 1497, 1500 n.5 (11th Cir. 1990)).

[108] *See id.* at 252; *Pitt*, 193 F.3d at 758; *Holmquist*, 36 F.3d at 161 n.7; *Baptista-Rodriguez*, 17 F.3d at 1368 n.18; *Duggan*, 743 F.2d at 84.

[109] *Baptista-Rodriguez*, 17 F.3d at 1368 n.18 (emphasis added).

[110] *See* Frank H. Easterbrook, *Presidential Review*, 40 CASE W. RES. L. REV. 905, 905 (1990) ("Executive power to interpret the law is so well established, and so important to successful operation of government, that courts frequently accept the executive branch's view of a statute as conclusive.").

[111] Memorandum from Walter Dellinger, Assistant Att'y Gen., to Abner J. Mikva, Counsel to the President (Nov. 2, 1994), *available at* http://www.usdoj.gov/olc/nonexcut.htm.

[112] *Id.; see also* Recommendation that the Department of Justice Not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, 8 Op. Off. Legal Counsel 183, 195 (1984); The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation, 4A Op. Off. Legal Counsel 55, 59 (1980); Memorial of Captain Meigs, 9 Op. Att'y Gen. 462, 469–70 (1860).

[113] The debate is often framed as a battle between judicial supremacists, who underscore the need for deference to the Supreme Court, and departmentalists, who emphasize the President's independent capacity for constitutional interpretation. However, "[v]ery few self-described departmentalists argue that the President's interpretive independence includes the authority to refuse to comply with judicial orders." Dawn E. Johnsen, *Functional Departmentalism and Nonjudicial Interpretation: Who Determines Constitutional Meaning?*, LAW & CONTEMP. PROBS., Summer 2004, at 105, 112. *But see* Michael Stokes Paulsen, *The Most Dangerous Branch: Execu-*

retical, as "[o]verwhelming executive branch practice and precedent" indicate that OLC will not deem any activities that are illegal under judicial precedents to be legal.[114]  Meanwhile, nothing in OLC's statutory grant or delegated responsibilities authorizes the approval of exceptions to constitutional or statutory law.[115]

A further distinction is that OLC's authority lies wholly in the arena of legal advice, rather than enforcement.  In paradigmatic applications of the actual authority defense, citizens claimed that they were solicited to assist with CIA covert operations.[116]  By contrast, no recipients of an OLC opinion could believe themselves recruited to participate in an OLC covert "operation."

## C. Innocent Intent

Lower courts have shown more readiness to consider "innocent intent" arguments than EBE and public authority defenses.[117]  Unlike the other two defenses, innocent intent is not an independent basis for exoneration.  It is not an affirmative defense per se, but rather a "failure of proof 'defense[]'"[118] — a strategy to negate "an essential element of the prosecution's case."[119]  A defendant seeks to negate the mens rea for the crime by showing, first, that he honestly believed he was acting in cooperation with the government, and second, that the official on whom he relied had actual authority to authorize the acts.[120]  The defendant initially offers evidence of his "innocent intent."[121]  If the evi-

---

*tive Power To Say What the Law Is*, 83 GEO. L.J. 217, 343 (1994) ("The President may exercise a power of legal review over the determinations of the judiciary . . . and refuse to give them effect . . . .").

[114]  Moss, *supra* note 15, at 1325–26.

[115]  *See* 28 U.S.C. § 510 (2000); 28 C.F.R. § 0.25(a) (2007).

[116]  *See, e.g.*, United States v. Clegg, 846 F.2d 1221, 1222–24 (9th Cir. 1988) (permitting defendant to present evidence that he was solicited by military personnel to supply arms to Afghan rebels); United States v. Lopez-Lima, 738 F. Supp. 1404, 1413 (S.D. Fla. 1990) (permitting defendant to introduce evidence that he reasonably relied on government assets who could obtain CIA authorization for anti-Castro mission); United States v. Smith, 592 F. Supp. 424, 432 (E.D. Va. 1984) (addressing defendant's contention that CIA authorized his disclosure of classified information).

[117]  *See, e.g.*, United States v. Reyes-Vasquez, 865 F. Supp. 1539, 1547 (S.D. Fla. 1994) ("The fact that [the district judge] did not permit the defense to rely upon the apparent authority and entrapment by estoppel defenses in no way precluded the defense of lack of the specific intent to commit the crime with which the Movant was charged.").

[118]  United States v. Jumah, 493 F.3d 868, 873 (7th Cir. 2007).

[119]  United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994); *see also* United States v. Anderson, 872 F.2d 1508, 1517–18 & n.14 (11th Cir. 1989) (approving jury instruction that defendants should be exonerated if jury entertained reasonable doubt whether they acted in good faith under the sincere belief that their activities were exempt from the law); United States v. Juan, 776 F.2d 256, 258 (11th Cir. 1985) (reversing conviction on the ground that district court prohibited defendant from introducing evidence necessary to prove defense of lack of criminal intent).

[120]  U.S. ATTORNEYS' MANUAL, *supra* note 45, § 2055.

[121]  *See id.*

dence is admitted, he receives a jury instruction that puts the prosecution to the burden of proving each element of the offense beyond a reasonable doubt.[122]  Thus, in *United States v. Anderson*,[123] the court approved an instruction to the jury that, if it harbored "a reasonable doubt as to whether the [d]efendant acted in good faith, sincerely believing himself to be exempt by the law, then he did not intentionally violate a known legal duty."[124]  In other words, an "essential part of the offense would not be established."[125]

The central requirement, therefore, is merely *honest belief* — not objective reasonableness.  Showing honest belief of acting "in cooperation with the government" is relatively straightforward in the OLC situation, where the defendant is himself a government official.  Private citizen defendants claiming innocent intent have had to resort to offering, for example, evidence of a prior relationship with a government agency[126] or previous engagement as a civilian operative[127] to substantiate their alleged state of mind.  But government defendants acting in the course of their official duties presumptively believe themselves to be assisting the government.

An OLC opinion that espouses the legality of conduct might underscore the defendant's honest, good faith belief that he is not violating criminal law.  The opinion, in other words, would illustrate the basis of the defendant's lack of knowledge that his conduct constitutes a crime.  Under these circumstances, the government would be hard-pressed to prove the intentional violation of a known legal duty.

The second requirement, the official's actual authority to authorize otherwise criminal acts, is more problematic.  Most lower courts that have considered the question have held that criminal intent is not negated when a defendant cooperates with an official with mere *apparent* authority.[128]  On this score, innocent intent arguments run up against the same problem as the public authority defense: OLC lacks the actual authority to authorize illegal acts.[129]

More generally, innocent intent applies only to crimes which expressly include — or which courts have interpreted to include — intent requirements.  Ignorance is no excuse unless the statutory formulation requires, or is read to require, proof of knowledge of the elements of the crime.  To be sure, the Supreme Court has, over the past century,

---

[122] 2 LAFAVE, *supra* note 13, § 9.1(a).

[123] 872 F.2d 1508.

[124] *Id.* at 1518 n.14.

[125] *Id.*

[126] United States v. Juan, 776 F.2d 256, 258 (11th Cir. 1985).

[127] United States v. Baptista-Rodriguez, 17 F.3d 1354, 1363 (11th Cir. 1994).

[128] *See, e.g.*, United States v. Fulcher, 250 F.3d 244, 252 (4th Cir. 2001).

[129] *See supra* pp. 2099–2100.

construed an expanding array of statutory and regulatory criminal laws to require such proof of knowledge of illegality.[130]  Such constructions are more prevalent when the laws in question are highly technical or complex,[131] as is often true when OLC intervenes.  It is nonetheless far from clear that courts would do so with every crime in the OLC context.  And it is equally unclear that doing so would inure to the benefit of every official relying on OLC advice.

Ultimately, the efficacy of innocent intent arguments — as well as EBE and public authority claims — is riddled with uncertainties.  Their legal force will turn on the willingness of courts to fashion exceptions to the general rule that ignorance of the law is no excuse.  At the core of the mistake-of-law maxim is the argument that "it may be harsh upon the individual defendant who was reasonably ignorant or mistaken concerning the penal law, [but] 'public policy sacrifices the individual to the general good.'"[132]  This argument will pose obstacles to an official who has engaged in illegal conduct in reliance on an OLC opinion, and who fears that he will become that sacrificial figure.

## III. Institutional and Pragmatic Grounds for Immunity

Whether the three potential defenses translate to the OLC context is unresolved by courts and likely to depend on the particular facts litigated.  The legal defenses, however, provide only part of the picture.  The immunizing effect of OLC opinions is not solely a doctrinal question, but a practical one as well.  Notwithstanding the defenses' potential shortcomings, there are numerous reasons why the Department of Justice is unlikely to bring criminal charges against officials who have relied on OLC advice at all.  The widespread belief in OLC's immunity-conferring power is more a product of prevailing institutional and pragmatic considerations than of the doctrinal considerations sketched in Part II.  Coupled with the reality that few officials violate the law in reliance on official advice in the first place, these factors help explain why prosecutions do not and will not happen in practice.

### A. Promoting Reliance on OLC Advice

One reason for the immunizing effect of OLC opinions is that OLC, the President, the Department of Justice, and the public each

---

[130] *See* Sharon L. Davis, *The Jurisprudence of Willfulness: An Evolving Theory of Excusable Ignorance*, 48 DUKE L.J. 341, 343–44 (1998).

[131] *See, e.g.*, Cheek v. United States, 498 U.S. 192, 201 (1991) (interpreting "willfulness" in tax evasion statute to require proof of a "voluntary, intentional violation of a known legal duty").  The Court justified its interpretation by pointing to the complexity of the tax laws. *Id.* at 199–200.

[132] 1 LAFAVE, *supra* note 13, § 5.6(d), at 408 (quoting OLIVER WENDELL HOLMES, JR., THE COMMON LAW 48 (1881)).

have instrumental interests in fostering reliance on these opinions. Exposing officials who have relied on OLC opinions to the possibility of jail — or even, as in EBE, subjecting their reliance to a reasonableness inquiry — would dramatically undermine this confidence. Prosecution would undercut incentives to seek out OLC advice at all.[133]

From OLC's perspective, there is a reputational interest at stake. OLC is not merely a legal advisor but "also a bureaucracy in the modern administrative state concerned with maintenance of its position."[134] In the "competitive market for advisory power," OLC must maintain the high value of its opinions to secure its status and share of responsibility.[135] Agency heads have no formal duty to solicit OLC's advice on the legal questions before them.[136] Concerns about the reliability of OLC advice could prompt the Attorney General or President to increasingly turn to other government lawyers.[137]

OLC's reputation as a principled expositor of the law has political payoffs for the President as well. Many decisions of the President, and to a large extent the Attorney General, are viewed through a politicized lens.[138] Thus, it is often beneficial to maintain OLC's perceived independence; the President can potentially defuse controversies by deflecting responsibility onto OLC.[139] Any prosecution of an official for acts undertaken pursuant to an OLC opinion would cast doubt on OLC's legal analysis and credibility. The more controversial and agenda-driven its image, the less weight that OLC's support for the administration's legal positions will carry with Congress and the public. Fostering reliance on OLC, therefore, preserves this option for the President.

For the Department of Justice — the presumptive prosecuting entity — reliance on OLC opinions is essential to deter unconstitutional conduct and ensure systematic compliance with the rule of law by executive branch officials. An internal advice-seeking norm promotes the respect for rule of law at the heart of the public service ideal. The norm also promotes the smooth functioning of government generally.

---

[133] Attorney General Michael Mukasey expressed qualms about undermining reliance on Department of Justice opinions at a recent congressional hearing:

> [Prosecution] would put in question not only th[e] opinion [on which the official relied], but also any other opinion from the Justice Department. Essentially, it would tell people: ' . . . [Y]ou will be subject to criminal investigation when, as and if the tenure of the person who wrote the position changes or, indeed, the political winds change.' And that's not something that I think would be appropriate . . . .

*Oversight Hearing, supra* note 1.

[134] McGinnis, *supra* note 4, at 378.

[135] Lund, *supra* note 33, at 440.

[136] *See id.* at 488.

[137] *Id.* at 497.

[138] *See* McGinnis, *supra* note 4, at 423–24.

[139] *Id.* at 423.

First, it gives OLC leverage to resolve interagency disputes. If agency officials were to resist OLC's authority, it would engender "continuing disarray within the administration and uncertainty in the administration's legal position."[140] Second, it serves as a moderating influence by forcing agencies to undertake more probing deliberations before proceeding with initiatives. Because OLC requires the requesting official to submit his or her own analysis ex ante, it conditions officials to confront legal questions thoroughly at a preliminary stage.

Finally, the advice-seeking norm may also reap long-term benefits for members of the public. OLC opinions collectively "construct[] a self-referential system of precedent that Justice Department attorneys can consult as future cases come along."[141] In effect, reliance helps ensure that executive branch legal interpretation builds incrementally. This in turn promotes predictability and stability in law enforcement practices and executive action generally.

### B. Preventing Chill on OLC Lawyers

A less intuitive explanation for OLC's immunity-conferring power is a fear of the effect on OLC lawyers — specifically, a fear of overdeterrence. There is much hand-wringing over how best to ensure the detached, independent nature of OLC opinions. There is, however, a correlative need to ensure that the analysis pushes sufficiently close to the legal line. The Department of Justice, as both the primary prosecuting entity and the home of OLC, is wary of prosecution's potential chill on its own lawyers.

The exclusionary rule provides an apt analogy. The suppression of evidence obtained unconstitutionally deters police misconduct. The Supreme Court, however, has also carved out numerous "good faith" exceptions[142] to afford police the room to make reasonable mistakes. In effect, the Court recognized that there is a point at which the deterrence benefits of preventing police from obtaining evidence unlawfully are "marginal or nonexistent."[143] At that point, they do not justify the costs of overdeterring police from taking sufficiently aggressive action to pursue and investigate crime.

Commentators have fiercely debated where to draw the line between deterrence and overdeterrence in the context of OLC lawyering.

---

[140] *Id.*

[141] Koh, *supra* note 23, at 515.

[142] *See, e.g.,* Illinois v. Krull, 480 U.S. 340 (1987) (admitting evidence seized in reliance on an unconstitutional statute); Massachusetts v. Sheppard, 468 U.S. 981 (1984) (admitting evidence seized in reliance on a warrant that incorrectly listed items to be seized); United States v. Leon, 468 U.S. 897 (1984) (applying good faith exception to admit evidence discovered pursuant to a warrant not supported by probable cause).

[143] *Leon,* 468 U.S. at 922.

At one end of the spectrum is the "quasi-judicial" or "neutral expositor" model of OLC. The "quasi-judicial" model hearkens back to Attorney General Caleb Cushing's pronouncement in 1854 that the Attorney General "is not a counsel giving advice to the Government as his client, but a public officer, acting judicially, under all the solemn responsibilities of conscience and of legal obligation."[144] Under this view, OLC lawyers must be strongly deterred from engaging in aggressive analysis and insulated from political considerations. They must be vigilant in "accept[ing] only the strongest legal arguments"[145] and must achieve "[o]bjectivity and balance"[146] when they interpret and apply the law.

However, others have advocated more client-centered lawyering. Randolph Moss has opined that OLC should reason "within the framework of the *best* view of the law," yet also be encouraged to "further the legal and policy goals of the administration [it] serves."[147] Former Attorney General Elliot Richardson argued that "[a]dvice to a president needs to have the political dimension clearly in view, without a regard for any pejorative attached to the word political."[148] And Professor Nelson Lund has suggested that OLC may adopt a "private practice" model because "there is no obvious reason for [the President] to have less freedom than private clients to require from his lawyers the kind of legal advice he thinks will be most useful to him."[149]

Professor Douglas Kmiec points to one example of excessively cautious advice. In an opinion evaluating a proposed executive order banning government pornography sales at military bases and other federal retail outlets, OLC "hedged."[150] The office found a plausible constitutional argument that the proposal would not violate the First Amendment. It also warned, however, that this argument might not be embraced by courts. As a result, no order was issued. In Professor Kmiec's view, the opinion was "driven more by the risk of adverse litigation than a dispassionate appraisal of the constitutional requirements . . . to fully demarcate the extent of the President's authority."[151] The recipient was unable to discern the difference between what was a conservative appraisal of the risks of litigation, and a conclusion that

---

[144] Moss, *supra* note 15, at 1309 (quoting 6 Op. Att'y Gen. 326, 334 (1854)) (internal quotation mark omitted).

[145] *Id.* at 1312.

[146] *Id.* at 1311.

[147] *Id.* at 1306.

[148] NANCY V. BAKER, CONFLICTING LOYALTIES: LAW AND POLITICS IN THE ATTORNEY GENERAL'S OFFICE 27 (1992).

[149] Lund, *supra* note 33, at 449.

[150] Kmiec, *supra* note 98, at 360–61.

[151] *Id.* at 361.

the proposal was actually illegal or unconstitutional.[152]   A narrow assessment of the "best" view of the law — "so thoroughly established as to be beyond all legal question"[153] — may have less utility to recipients than information about where the outer edges of legal authority lie.

More concretely, in the national security context, excessively cautious advice has been lambasted for handicapping the government's ability to combat threats.  The 9/11 Commission Report pointed to "institution[al] avers[ion] to risk" and bureaucratic paralysis as key factors contributing to the terrorist attacks.[154]   "[C]autious lawyers" had "spooked" the military and intelligence establishments[155] and created a "paralyzing culture of risk-averse legalism . . . before 9/11."[156]   Thus, even as the Department of Justice seeks to deter illegal conduct, it is fearful of overdeterring OLC lawyers from offering advice that goes right up to the legal line.  Such advice may ultimately better aid officials in evaluating how to respond to crises or promote administration priorities.[157]

### C.  Inter-Administration Comity

Granting immunity to officials that have relied on prior OLC opinions reinforces institutional continuity across different administrations.  As a general guideline, OLCs strive to maintain a level of respect for previous occupants of the office.  "OLC has adopted a rule suggesting that past precedent should be accorded a certain measure of stare decisis from administration to administration, even if those administrations represent different political parties and strikingly different political philosophies."[158]   One illustration of the stare decisis effect of OLC opinions was the consistent position adopted by numerous administrations that the legislative veto was unconstitutional — a position ultimately adopted by the Supreme Court in *INS v. Chadha*.[159]   Government lawyers view themselves as "obligat[ed] to work within a tradition of reasoned, executive branch precedent, memorialized in formal written opinions."[160]

---

[152] *See id.* at 361–62.

[153] *Id.* at 361.

[154] *See* GOLDSMITH, *supra* note 5, at 95.

[155] *Id.*

[156] *Id.* at 94.  *See also Nomination of Scott W. Muller To Be General Counsel of the Central Intelligence Agency: Hearing Before the S. Select Comm. on Intelligence*, 107th Cong. (2002) (opening statement of Sen. Bob Graham), *available at* http://www.fas.org/irp/congress/2002_hr/100902muller.html.

[157] *Cf.* GOLDSMITH, *supra* note 5, at 94.

[158] Koh, *supra* note 23, at 516.

[159] 462 U.S. 919 (1983).

[160] Walter Dellinger, *After the Cold War: Presidential Power and the Use of Military Force*, 50 U. MIAMI L. REV. 107, 109 (1995).

Inter-administration comity brings stability and predictability in the law.  To be sure, the Department of Justice's legal analysis has not always withstood the test of time: During the Nixon Administration, Deputy Attorney General Joseph Sneed disavowed an earlier OLC opinion by then-Assistant Attorney General William Rehnquist that denied any constitutional authority for the President to impound funds.  In 1989, an OLC opinion partially reversed an earlier opinion on the FBI's authority to engage in extraterritorial abductions.  In 1991, an OLC opinion overruled a decade-old opinion regarding whether Haitian refugees interdicted on the high seas should be afforded a screening process to substantiate their claims.[161]  And in 2004, OLC formally repudiated the analysis in a 2002 opinion on the aggressive interrogation of terrorism suspects, replacing the so-called "torture memo" with a new opinion.[162]

However, these reversals of position have been flashpoints for criticism.[163]  The desires to avoid controversy and provide clear guidelines to officials on the bounds of permissible activities have meant that OLC has only rarely revisited its prior determinations.  This is particularly so with respect to issues involving statutory or treaty interpretation, when the underlying language has remained constant.[164]  This continuity across administrations of both parties stems in part from OLC's institutional interest in staying above the winds of political pressure.  Frequent repudiation of opinions penned by OLCs of previous administrations would appear politically motivated and damage OLC's credibility.  Prosecutions of officials who relied on previous OLCs' opinions would likewise be vulnerable to these charges of politicization.

### D. Unlikelihood of Jury Conviction

From a prosecutorial standpoint, the unlikelihood that juries would convict officials who have acted pursuant to OLC advice is another powerful limiting force.  "Prosecutors do not charge in a vacuum; they do so against the backdrop of trial."[165]  They have incentives not to press criminal charges when cases are unlikely to be won.[166]  These incentives are compounded by the greater influence of costs on prosecu-

---

[161] Koh, *supra* note 23, at 520.

[162] *See* Press Briefing by White House Counsel Judge Alberto Gonzales, DoD General Counsel William Haynes, DoD Deputy General Counsel Daniel Dell'Orto and Army Deputy Chief of Staff for Intelligence General Keith Alexander (June 22, 2004), *available at* http://www.whitehouse.gov/news/releases/2004/06/20040622-14.html.

[163] *See generally* Koh, *supra* note 23.

[164] *Id.* at 516.

[165] Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract*, 101 YALE L.J. 1909, 1933 (1992).

[166] *Id.*

tors' discretionary decisions today as compared to thirty or forty years ago.[167]  In addition to other barriers to bringing officer suits to trial — for instance, split loyalties or official stonewalling of investigations — the low chance of obtaining a conviction gives prosecutors pause.

Federal prosecutors confront structural and legal problems in bringing criminal charges against law enforcement officials.  One study of criminal cases brought by the Department of Justice's Civil Rights Division between 1984 and 2001 is indicative, revealing that the Department had "greater difficulty obtaining a successful prosecutorial outcome . . . for law enforcement officials than non-law enforcement individuals."[168]  Law enforcement defendants also constituted the "vast majority of acquittals."[169]

One basis for the disparity lies in the traditional deference juries have shown to officials who have acted within their scope of employment.  Particularly on national security matters — which are most likely to entail covert programs, detention, interrogation, surveillance, or other aggressive actions — juries will tend to defer to operatives in much the same way that they have historically deferred to police officers in police misconduct cases.[170]  Juries are unlikely to second-guess the judgment calls of officials who have made heat-of-battle determinations in emergency situations.  And it is precisely in these high pressure situations that OLC's ex ante constraints may be short-circuited and tendentious legal opinions are most likely to arise.

An additional challenge is that OLC typically intervenes when difficult constitutional or statutory issues not easily resolved by existing precedent are at stake.  In the absence of clear legal guidelines, prosecutors would be hard-pressed to convince a jury that a legal opinion is so patently unreasonable or erroneous that the relying official should have known better than to accept it as true.  This holds especially true when questions of first impression are at issue.  Barring instances of truly egregious conduct or collusion, therefore, prosecutors are unwilling to expend valuable resources on these suits.

---

[167] *See* William J. Stuntz, *The Political Constitution of Criminal Justice*, 119 HARV. L. REV. 780, 815–16 (2006).

[168] Steven Puro, *Federal Responsibility for Police Accountability Through Criminal Prosecution*, 22 ST. LOUIS U. PUB. L. REV. 95, 118 (2003).  Between 1984 and 1995, the Criminal Section had a 71% success rate in prosecuting law enforcement officers charged with civil rights violations, compared to a 95% success rate for prosecuting non-law enforcement individuals.  *Id.* at 104; *see also* Laurie L. Levenson, *The Future of State and Federal Civil Rights Prosecutions: The Lessons of the Rodney King Trial*, 41 UCLA L. REV. 509, 541 & n.182 (1994) (noting that a 1993 Civil Rights Division Internal Report revealed consistently lower conviction rates for prosecution of law enforcement officers than any other type of civil rights prosecution).

[169] Puro, *supra* note 168, at 113.

[170] *See id.* at 116.

## IV. Conclusion

Framing OLC's immunity-conferring power as a legal question misplaces the focus. EBE, the public authority defense, and innocent intent are three defenses that would potentially shield officials from domestic criminal liability. They are, nevertheless, tools of imperfect recourse and as yet relatively uncharted territory for courts. Thus far, lower courts have applied EBE's fairness rationale narrowly and have resisted broader formulations of the public authority and innocent intent defenses. The efficacy of these defenses in the OLC context, therefore, is likely to depend on numerous factors: the reasonableness of the official's reliance, the egregiousness of the acts, the unreasonableness of the advice, and, more generally, how strictly courts analogize to the paradigmatic cases. The doctrinal grounds thus do not on their own provide an adequate explanation for OLC opinions' immunizing effect.

Dwelling on the legal enforceability of OLC opinions misses the reality that immunity is ultimately a question of practicality. The widespread belief in immunity stems not from the surefire strength of the legal defenses, but rather the powerful institutional and pragmatic forces guiding the Department of Justice. Unless the institutional landscape changes, these practical considerations render prosecution of officials who have relied on OLC advice implausible and, ultimately, bad policy.

The existence of de facto immunity does not alleviate the pressures on OLC. Rather, it lays bare OLC's momentous capacity to shield a wide spectrum of government activities from prosecution with the issuance of an opinion. Accordingly, it serves to highlight the ongoing and thorny dilemmas surrounding how this immunity-conferring power should best be exercised.