## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The Defendant contends that the Indictment should be dismissed. His principal grievance is that his total noncompliance with the subpoena is excused by executive privilege and prior Department of Justice writings and opinions. Not so. The Defendant's contention ignores the straightforward facts of this case: that the Defendant was subpoenaed for information related to his activities as a private party in 2020-21, and not in his capacity as a White House advisor in 2017; that neither the current nor former President asserted executive privilege in a manner consistent with or allowing the Defendant to engage in total noncompliance; and Department of Justice writings and opinions say nothing about someone like the Defendant—a private party subpoenaed to testify and provide documents to Congress about events that occurred long after he left the government. The Defendant's remaining challenges to the Indictment—that 2 U.S.C. § 192 is unconstitutional as-applied, that the Committee exceeded its authority in issuing the subpoena, and that the prosecution team committed misconduct—are also meritless. The courts have applied Section 192 to contemnors for over 100 years without difficulty; the Defendant waived procedural objections to the subpoena by failing to raise them with the Select Committee, which acted well within its legislative authority; and the prosecution did not commit misconduct or otherwise overreach in investigating and prosecuting the Defendant's default. The Defendant's motion to dismiss should be denied.

## BACKGROUND

The Defendant is a private citizen who, for about seven months in 2017, worked in the White House as an advisor to former President Donald J. Trump.  ECF No. 1, Indictment ¶ 6.  On September 23, 2021, the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Committee") subpoenaed the Defendant on information and belief that he possessed information relevant to its investigation of the circumstances of the January 6, 2021, Capitol attack.  *Id.* ¶ 7.  The subpoena commanded the Defendant (1) to produce, by October 7, 2021, documents related to the attack or a log of documents withheld under any claim of privilege; and (2) to appear, on October 14, 2021, for a deposition.  *Id.* ¶¶ 8, 10-14.  He did neither.  *Id.* ¶¶ 15, 19.  Instead, the Defendant sent letters to the Committee claiming that executive privilege exempted him from any modicum of compliance.  *Id.* ¶¶ 16, 18.  The Committee rejected the Defendant's executive-privilege assertion and warned him that his total noncompliance could result in a contempt prosecution.  *Id.* ¶¶ 17, 20.  The Defendant persisted in his noncompliance and offered no further justification or objection to the subpoena.  *Id.* ¶ 21.

On November 12, 2021, a Grand Jury of the District of Columbia returned an Indictment charging the Defendant with two counts of contempt of Congress, in violation of 2 U.S.C. § 192—Count One for willfully defaulting on his obligation to appear for a deposition and Count Two for willfully defaulting on his obligation to produce documents or a privilege log.  *See* ECF No. 1.

## ARGUMENT

According to the Defendant's brief, he seeks dismissal of the Indictment under Federal Rule of Criminal Procedure 12(b)(3)(A) for alleged defects in instituting the prosecution and 12(b)(3)(B) for alleged defects in the Indictment.  ECF No. 59-1 at 2.  He claims (1) that executive

privilege and prior Department of Justice writings and opinions excuse his noncompliance with the Committee's subpoena and bar the prosecution; (2) that Section 192 is unconstitutional; (3) that the Committee's subpoena is unlawful based on procedural defects; and (4) that the prosecution committed misconduct.  We address the claims in that order.  For each, the Court should accept as true the factual allegations contained in the Indictment.  *United States v. Ballestas*, 795 F.3d 138, 148-49 (D.C. Cir. 2015).

## I.    EXECUTIVE PRIVILEGE PROVIDES NO BASIS FOR DISMISSING THE INDICTMENT.

The Defendant seeks dismissal of the Indictment on the ground that executive privilege excused his appearance at the deposition before the Committee and his production of any documents in response to the Committee's subpoena and so it is unconstitutional to prosecute him under Section 192.  *See* ECF No. 59-1 at 43-44.  He also argues that the Department of Justice is estopped by its opinions and writings from prosecuting for contempt of Congress apparently anyone, private or public, who seeks to aid the President.  *Id.* at 16-38.  Neither claim holds water.

### A.    The Defendant Has Failed to Establish That Executive Privilege Was Asserted to Justify Total Noncompliance.

The Defendant repeatedly asserts in his briefing that there was an invocation of executive privilege by former President Trump that allowed the Defendant to ignore the Committee's subpoena entirely.  *See, e.g.*, ECF No. 59-1 at 43 (describing "the invocation of Executive Privilege by the former President . . . and the associated directive to Mr. Bannon not to comply with the subpoena").  But the Defendant does not identify when the privilege was invoked, how it was invoked, or over what information it was invoked, nor does he explain why it allowed him to legally default.  In fact, there is no evidence that the former President ever invoked executive privilege over the materials and information sought by the Committee's subpoena in a manner

calling for total noncompliance.  Accordingly, the Court does not need to consider whether any invocation validly allowed the Defendant's total default, because the Defendant has failed to demonstrate that there was, in fact, any such assertion of privilege in the first place.  The Defendant's claims for dismissal based on executive privilege must be rejected.

Because the Defendant does not hold the executive privilege, he cannot assert it.  *See Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (noting that the privilege resides with the current President and that former presidents have been recognized to "retain for some period of time a right to assert executive privilege over documents generated during their administrations" (internal citation omitted)); *cf. United States v. Reynolds*, 345 U.S. 1, 7 (1953) (finding that the state secrets privilege "can neither be claimed nor waived by a private party").  Instead, the Court must look to whether the President—here, based on the Defendant's claims, the former President—made an assertion of executive privilege.  *See id*.; *cf. McClelland v. Andrus*, 606 F.2d 1278, 1290 n.59 (D.C. Cir. 1979) ("To interpose an objection to disclosure based on Executive privilege '(t)here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.'" (quoting *Reynolds*, 345 U.S. at 7-8)); *Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980) ("We think it abundantly clear . . . that any claim of privilege, whether of executive or Presidential privilege . . . , must be made with particularity.").  The Defendant offers no evidence that the former President asserted executive privilege with respect to the Defendant's subpoena directly to the Committee, in any court proceeding, or to any office of the Executive Branch.  Instead, to support his arguments, the Defendant relies entirely on the communications he received from the former President's counsel, Justin Clark.  *See* ECF No. 59-1 at 17.  Whatever the validity of an assertion by the former President might be, however, Mr. Clark's correspondence never explicitly asserted

executive privilege, never claimed that any such privilege applied to all potentially responsive records, and never directed the Defendant to refuse to appear for a deposition.  *See* ECF No. 52-2.

To make his executive privilege objections to the Committee, the Defendant relied on a letter he received from Mr. Clark on October 6, 2021, one day before the subpoena's document deadline.  *See* ECF No. 52-2; ECF No. 29-1 at US-000418-19.  The letter did not assert executive privilege over the entirety of the information subject to the Committee's subpoena or state that the Defendant should delay compliance or refuse to comply in any way.  *See* ECF No. 52-2.  Instead, the letter indicated, at most, the possibility that the former President would assert privilege at some point, stating only that the subpoena seeks information "which is potentially protected from disclosure by [] executive and other privileges" and that the former President "is prepared" to defend the privileges in court.  *Id*.  Indeed, in reporting the letter to the Committee, the Defendant recognized that it represented only an "intention" to assert executive privilege at some future time. *See* ECF No. 29-1 at US-000418-19 (explaining that the Defendant, after receiving the October 6 letter, would not comply "since the executive privileges belong to President Trump, and he has, through his counsel, announced his intention to assert those executive privileges enumerated [in the October 6 letter]").  After noting the former President's potential invocation, Mr. Clark's October 6 letter then stated, in a separate paragraph, that the Defendant was being instructed to, as the law allowed, "where appropriate, invoke any immunities and privilege *he* may have from compelled testimony in response to the Subpoena," to "not produce any documents concerning privileged material," and to "not provide any testimony concerning privileged material."  ECF No. 52-2 (emphasis added).

The letter provided no further information.  It did not indicate what privileged material the Defendant should withhold; did not request an opportunity to review the material for potentially

privileged information before the Defendant produced it; did not instruct the Defendant to seek an extension or make a protective claim of privilege on the former President's behalf so that the former President could review material and assert as necessary; did not instruct the Defendant to withhold non-privileged material and to refuse to produce a privilege log of records withheld; did not ask to have counsel attend the deposition with the Defendant to assert executive privilege on the former President's behalf; and did not instruct the Defendant to refuse to appear for testimony. *See id.* Moreover, as confirmed by the Committee, *see* ECF No. 29-1 at US-000421, and Mr. Costello's preindictment interviews with the Government, *see* ECF No. 28-4 at US-001775-79, 001781-82, after sending this letter, Mr. Clark never followed up with the Defendant or the Committee to do any of those things or to take any other steps to assert or preserve the privilege—despite Mr. Costello's entreaties to Mr. Clark that he do so.

In fact, in later correspondence, Mr. Clark admonished that the former President had neither asserted privilege in a manner to allow, nor instructed the Defendant to engage in, total noncompliance. On October 14, 2021, Mr. Clark emailed Mr. Costello stating that he had read Mr. Costello's October 13 letter to the Committee, in which Mr. Costello asserted to the Committee that "counsel for former President Trump, Justin Clark Esq., informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved." ECF No. 52-3. Mr. Clark then stated, "To be clear, in our conversation yesterday, I simply reiterated the instruction from my letter to you dated October 6, 2021." *Id.* Mr. Costello forwarded this email to the Defendant and told him to beware in deciding not to comply with the subpoena based on Mr. Clark's communications. *See* ECF No. 35-6. In an October 16, 2021, email to Mr. Costello, Mr. Clark further made clear that the former President did not invoke executive privilege in any way to bar the Defendant from

appearing for a deposition or to direct him not to attend, stating, "Just to reiterate, our letter referenced below [the October 6, 2021, letter] didn't indicate that we believe there is immunity from testimony for your client.  As I indicated to you the other day, we don't believe there is." ECF No. 52-3.

The Defendant has acknowledged time and again throughout this litigation the settled principle that executive privilege is not his to invoke.  *See, e.g.*, Mot. Hrg., 3/16/21, Tr. at 66:10 (Costello: "Executive privilege doesn't belong to Steve Bannon."); ECF No. 59-1 at 27 (stating that he is not the privilege holder); ECF No. 28-4 at US-001771, 001780.  Only the privilege holder can invoke it.  Even assuming that the former President can invoke executive privilege in this context—an issue the Court need not decide—he has previously demonstrated his ability, intention, and decision to assert executive privilege in relation to the Committee's investigation. *See Trump*, 20 F. 4th at 20-21 (noting that the former President reviewed and identified specific pages of records out of a larger collection over which he was asserting executive privilege when the Committee subpoenaed his presidential records from the National Archives).[1]  The Defendant has failed to show that the former President took any similar steps here or asserted executive privilege here in a manner purporting to direct the Defendant to engage in total noncompliance. All the Defendant's claims based on an invocation of executive privilege can be rejected, therefore, without further analysis.

In any event, the Government is aware of no authority, and the Defendant points to none, supporting the notion that a private citizen subpoenaed in that capacity is entitled to absolute immunity from testimony based on executive privilege.  In fact, courts in this district have rejected

---

[1] The former President was represented in *Trump v. Thompson* by Justin Clark, the same attorney who corresponded on the former President's behalf with Mr. Costello.

the application of absolute immunity from deposition altogether.  *See Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 202-03 (D.D.C. 2019), *overruled on other grounds*, 951 F.3d 510 (D.C. Cir. 2020); *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 99-107 (D.D.C. 2008). Although the Government disagrees with those categorical holdings, the Department of Justice's view, as outlined in Office of Legal Counsel (OLC) opinions and its briefings in *McGahn* and *Miers*, has been that absolute immunity from appearing at a deposition under a claim of executive privilege is only available, at most, to senior presidential advisors, subpoenaed in their capacity as such or in relation to their service as such, over whose testimony executive privilege is asserted and who are consequently directed by the President not to appear.  *See generally Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *55 (Jan. 8, 2021); Combined Mem. of Points and Authorities in Support of Def.'s Mot. for Summary Judgment and In Opp. To Pl.'s Mot. for Summary Judgment, *McGahn*, Case No. 1:19-cv-02379, ECF No. 33 at 58-61 (Oct. 1, 2019); Mem. in Support of Defs.' Mot. to Dismiss, *Miers*, Case No. 1:08-cv-00409, ECF No. 16-2 at 50-55 (May 9, 2008).  The Defendant was subpoenaed in his capacity and in relation to his activities as a private citizen—indeed, the subpoena's date range was from April 1, 2020, to the date of its issuance, pertaining to documents and information several years after the Defendant's departure from the White House.  And the Defendant was never directed by the former President—let alone by the current President—not to appear for the subpoenaed deposition.  In fact, he was told exactly the opposite.  *See* ECF Nos. 52-1, 52-3.  No assertion of executive privilege gave the Defendant immunity from appearing for a deposition.  Moreover, a subpoenaed witness cannot refuse to appear simply because he thinks Congress might exceed the bounds of its authority in its questioning.  *See Barenblatt v. United States*, 360 U.S. 109, 132 (1959) ("[C]ertainly the conclusion would not be justified that the questioning of petitioner would have exceeded

permissible bounds had he not shut off the Subcommittee at the threshold."); *cf. Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 773 (D.C. Cir. 2020) (noting that the ability to invoke executive privilege to refuse to answer specific questions during congressional testimony is "unaffected by an order compelling [the witness] to appear and testify").

Likewise, executive privilege provides no basis to refuse to produce even a single document. As the Defendant's counsel has conceded, ECF No. 28-4 at US-001770, US-001777, the Committee's subpoena sought several categories of records completely unrelated to the former President and the Executive Branch that executive privilege does not reach. *See* ECF No. ECF No. 53-1 at US-000410-12; *see also Trump*, 20 F.4th at 25 ("[The presidential communications privilege] allows a President to protect from disclosure 'documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.'" (quoting *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997))); *In re Sealed Case*, 121 F.3d at 737 ("[The deliberative process privilege] allows the government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966), *aff'd*, 384 F.2d 979 (D.C. Cir. 1967))). The Government is aware of no authority, and the Defendant cites none, that executive privilege reaches private records about the private affairs of a private citizen. Thus, even if the former President had made a valid assertion of executive privilege over some records, the Defendant was not excused from producing the rest.

The Defendant has not met the threshold requirement to demonstrate that executive privilege was invoked in a manner prompting total noncompliance. All the Defendant's claims

for dismissal based on a purported assertion of executive privilege must therefore be rejected and his motion to dismiss based on those claims denied.

### B.   The Defendant Has Failed To Demonstrate that Dismissal is Appropriate on the Ground of Entrapment by Estoppel.

To succeed on an entrapment-by-estoppel defense, the Defendant carries the burden of proof and must establish four elements:  "(1) that a government agent actively misled [the defendant] about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (quoting *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).  The Government examined the Defendant's burden and these elements in depth in its Motion in Limine to Exclude Evidence of Department of Justice Opinions and Writings, ECF No. 52 at 5-14, and will not repeat its review of the controlling law here but incorporates it by reference.

In his Motion to Dismiss, the Defendant does not even cite the elements of estoppel, let alone explain why he has met them.  Instead, relying on a Sixth Circuit case, *United States v. Levin*, 973 F.2d 463, 470 (6th Cir 1992), he contends that he is entitled to dismissal because "there can be no factual dispute about what the written, binding, authoritative OLC Opinions provided on the matters directly at issue, nor can there be any factual dispute about Mr. Bannon's reliance on them."  ECF No. 59-1 at 28 (citing *Levin*, 973 F.2d at 470 (affirming district court's dismissal of fraud and false statements charges where "undisputed extrinsic evidence" supporting estoppel rendered the prosecution "incapable of proving beyond a reasonable doubt the intent required to convict" (emphasis omitted)).  But unlike the defendants in *Levin*, the Defendant cites no facts at

all, let alone undisputed ones, supporting his estoppel claim.  In fact, the factual record reveals that the OLC opinions on which the Defendant claims to have relied do not sanction his total noncompliance with the Committee's subpoena, and, in any event, he provides no evidence that he considered or relied on them other than his unsupported assertion that he did.  The Defendant's motion to dismiss the Indictment on entrapment-by-estoppel grounds should, therefore, be denied, and as explained in the Government's motion to exclude, the Defendant should be prohibited from introducing any evidence or argument on the defense at trial.

> **1.      The Defendant has failed to identify any government statement sanctioning his default.**

First, the Defendant has failed to identify any Government writing or opinion that stated his default did not violate 2 U.S.C. § 192.  Although the Defendant makes claims that he was "duty bound" and "entitled to rely" on various OLC opinions, ECF No. 59-1 at 17, and selectively quotes from some of them, *see id*. at 27-30, he identifies only three opinions on which he claims to have "relied" in deciding he could lawfully default:

1) *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* [hereinafter *Prosecution for Contempt of Congress*], 8 Op. O.L.C. 101 (1984), *see* ECF No. 59-1 at 19-20 n.23;

2) *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __ (May 23, 2019) [hereinafter *Exclusion of Agency Counsel*], *see* ECF No. 59-1 at 18 n.22; and

3) *Congressional Oversight of the White House*, 45 Op. O.L.C. __ (Jan. 8, 2021), *see* ECF No. 59-1 at 18-19 & n.21.

The Defendant also suggests he "relied" on a letter from the former U.S. Attorney for the District of Columbia to the former Speaker of the U.S. House in which the U.S. Attorney stated, "It has long been the position of the Department . . . that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant

to a presidential assertion of executive privilege." *See* ECF No. 59-1 at 19 n.23.  None of these opinions or writings, however, suggests that the separation of powers immunizes a private citizen, subpoenaed in relation to his capacity as such, from complying with a congressional subpoena, particularly where, as here, there was no presidential assertion of executive privilege.  These opinions and writings, therefore, cannot support an entrapment-by-estoppel defense to the Defendant's noncompliance with the subpoena in this case.

An examination of the documents on which the Defendant claims to have relied—an exercise in which he does not engage—makes plain that they do not apply here.  The opinion in *Prosecution for Contempt of Congress* is limited to circumstances entirely different from those of the Defendant's default.  The opinion addressed an executive branch official's refusal to produce law enforcement records where the official first identified responsive records that contained sensitive law enforcement information, submitted the materials to OLC and the President's counsel for a determination of whether executive privilege applied, and received a memorandum from the President after that evaluation, instructing the official to withhold the documents under an assertion of executive privilege.  8 Op. O.L.C. at 105-07.  The opinion thus addresses only "whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege," *id*. at 102, and concludes that, "[i]n the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official," *id*. at 142; *see also id*. at 129 ("The Department of Justice has previously taken the position that the criminal contempt of Congress

statute does not apply to executive officials who assert claims of executive privilege at the direction of the President.").  Because the former President did not assert executive privilege here, and neither the current nor former President instructed the Defendant not to appear at the deposition or to refuse to produce any documents, the opinion is irrelevant and does not excuse his default. Indeed, the opinion is striking in how much the conduct it addresses differs from the Defendant's.

OLC's opinion in *Exclusion of Agency Counsel* similarly addresses only the legality of a current or former executive branch official refusing to comply with a subpoena in relation to his or her official duties.  Specifically, the opinion states that such an official acts lawfully if he or she refuses to appear for testimony after a congressional committee refuses to allow agency counsel to accompany the official over the Executive Branch's objection.  43 Op. O.L.C. at *4 ("The question we address here arose out of the Committee's effort to compel two executive branch witnesses . . . to appear at depositions."); *id*. at *2 ("The Committee, therefore, could not constitutionally bar agency counsel from accompanying agency employees called to testify on matters within the scope of their official duties."); *id*. at *13-14 ("[W]e further advised that the subpoenas that required them to appear without agency counsel, over the Executive Branch's objections, exceeded the Committee's lawful authority and therefore lacked legal effect."); *id*. at *14 ("[A]gency employees . . . who follow an agency instruction not to appear without the presence of an agency representative are acting lawfully.").  Again, the Defendant was subpoenaed only in relation to his activities as a private citizen.  Moreover, because the former President's counsel never requested or sought to attend the deposition, *see* ECF No. 28-4 at US-001774, 001780, or directed the Defendant not to attend without the former President's counsel, *see* ECF No. 52-3, the opinion also has no conceivable relevance to the Defendant's case and does not sanction his

default.  Furthermore, the opinion says nothing of a congressional document demand, a wholly separate requirement of the subpoena with which the Defendant failed to comply.

OLC's opinion in *Congressional Oversight of the White House* addresses whether and under what circumstances current or former executive branch officials, subpoenaed in relation to their capacity as such, may lawfully refuse compliance with a subpoena.  The opinion states that "the contempt statute does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch." 45 Op. O.L.C. at *50 (citing *Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 129-42).  It further states that "the President and his immediate advisors are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties," *id*. at 53 (citing *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, at *3 (May 20, 2019)), and on that basis, "the President can also direct them not even to appear," *id*. at 54 (citation omitted)).  The opinion further describes this immunity as applying to compelled testimony from immediate presidential advisors "about their official duties in that capacity even after they leave the White House," *id*. at *54-55 (citation omitted), and describes the fact-based inquiry required to determine whether an executive branch official qualifies for the immunity, *id*. at *55 ("[I]n determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President.").  The opinion notes that "most members of the White House staff do not qualify for immunity from compelled testimony." *Id*.  The opinion also states that "[s]ubpoenas requiring White House personnel to testify without agency counsel . . . may not be enforced, civilly or criminally, against their recipients." *Id*. at *56 (citing *Exclusion of Agency Counsel*, 43 Op. O.L.C. at *3-14).  Because the Committee subpoenaed the Defendant only in relation to his activities as

a private citizen, activities that occurred three years after he left the White House, *see* ECF No. 53-1 at 4-6 (subpoena describing topics on which the Defendant was believed to have relevant information and on which he was required to produce records), and because neither the current nor former President directed him not to appear, OLC's opinion in *Congressional Oversight of the White House* has no relevance to the Defendant's case and does not sanction his default.

Moreover, all three opinions make clear that executive privilege does not protect from disclosure a private citizen's private papers or information. For example, OLC's opinion in *Congressional Oversight of the White House* describes the deliberative process, attorney-client communications and work-product, and presidential communications components of executive privilege as protecting from disclosure "internal communications and information concerning presidential and other executive branch decision-making," *id.* at *32, notes that the various components of the privilege "vary in scope and the extent of protection from disclosure," *id.* at *57, and states that "[i]t has long been the Executive Branch's policy to 'comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch,'" *id.* at *59 (citation omitted). The Office's opinion in *Prosecution for Contempt of Congress* similarly describes the bounds of executive privilege, noting that it protects "deliberative communications between the President and his advisors," "material necessary to protect military, diplomatic, or sensitive national security secrets," and "open law enforcement files." 8 Op. O.L.C. at 116-17; *see also id.* at 116 (describing executive privilege as "prevent[ing] disclosure of certain Executive Branch documents"); *id.* ("[I]t may be invoked (although perhaps overridden by a court) whenever the President finds it necessary to maintain the confidentiality of information within the Executive Branch in order to perform his constitutionally assigned responsibilities."). By contrast, as the Defendant himself has identified,

ECF No. 28-4 at US-001770, areas of inquiry on the face of the subpoena here have no relation to the former President or executive privilege.  ECF No. 53-1 at US-000410-12.  Nevertheless, the Defendant did not produce records or appear to testify on those matters, whatever the claim of executive privilege might be with respect to other categories of information.

Finally, the letter from the former U.S. Attorney for the District of Columbia that the Defendant cites for the most part addresses issues entirely unrelated to those presented by this case—specifically, whether a congressional witness could be prosecuted for contempt of Congress after invoking her Fifth Amendment right against self-incrimination to refuse to answer questions during a hearing to which she had been subpoenaed.  *See* ECF No. 58-16.  To be sure, the letter states that "[i]t has long been the position of the Department . . . that we will not prosecute an Executive Branch official under the contempt of Congress statute for withholding subpoenaed documents pursuant to a presidential assertion of executive privilege," *see* ECF No. 59-1 at 19 n.23, but this is all it says on the issue and it notes that "[t]he fullest explanation of the legal basis for the Department's position" was provided in *Prosecution for Contempt of Congress*, ECF No. 58-16.  The letter is inapposite for the same reason the OLC opinion which it incorporates is inapposite: The Defendant was not an executive branch official and there was no presidential assertion of executive privilege as to particular documents.  The letter provides no basis for the Defendant's disregard of the subpoena.

The Department writings on which the Defendant claims to have relied address the legality of circumstances entirely different from those presented by the Defendant's default, and, despite having the burden of proof for the affirmative defenses he raises, the Defendant provides no evidence or argument to conclude otherwise.  The fact of the matter is that the Defendant cannot point to a single Department writing stating that a private individual may lawfully ignore a

congressional subpoena for materials or testimony relating to his conduct as a private individual. For that reason alone, the Defendant cannot satisfy the requirements for an entrapment-by-estoppel defense.  *See United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109 (9th Cir. 2000) (explaining that the defendant "must do more than show that the government made 'vague or even contradictory statements'" and "must show that the government affirmatively told him the proscribed conduct was permissible" (quoting *Raley v. Ohio*, 360 U.S. 423, 438 (1959))); *United States v. Abcasis*, 45 F.3d 39, 43-44 (2d Cir. 1995) ("The defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization.").

>   **2.      The Defendant has failed to demonstrate that his decision to default was made in reliance on Department writings.**

To establish an estoppel defense, the Defendant must not only have been "actively misled" by the Government into believing his conduct was lawful, but he must have acted in reliance on the Government's statement of the law when committing the offense.  *Chrestman*, 525 F. Supp. 3d at 31.  Here, not only do the writings on which the Defendant claims to have relied fail to address the legality of his actions, but, even if they did, the Defendant has failed to meet his burden to show that he even had knowledge of the OLC opinions.  Instead, the record demonstrates that the Defendant relied on his attorney's estimation of how the government might extend the reasoning in the OLC opinions to the Defendant's conduct.  An entrapment-by-estoppel defense cannot be sustained when it is a private party's interpretation of the law on which the Defendant relies.  *United States v. Hardridge*, 379 F.3d 1188, 1194 (10th Cir. 2004) ("[W]here, as here, the alleged unfairness to the defendant arises out of private conduct and not from government action, it is not the government that has denied due process." (emphasis omitted)); *United States v. W.*

*Indies Transp., Inc.*, 127 F.3d 299, 314 (3d Cir. 1997) ("The entrapment by estoppel defense applies only to representations made by government officials, not to asserted reliance on legal advice or representations from non-governmental actors.  Representations made by [a] private entity as to the legality of [the defendant's conduct] cannot remotely establish a valid entrapment by estoppel defense.").

The Defendant appears to concede that he never read the OLC opinions himself and instead relied on what his attorney told him about the opinions.  *See* ECF No. 59-1 at 16 ("The OLC opinions were brought to Mr. Bannon's attention by his attorney, Robert J. Costello, Esquire, who advised Mr. Bannon that the OLC opinions were binding authority on the Department of Justice and that they were controlling authority in the circumstances he faced.  Mr. Costello provided Mr. Bannon with legal advice, based on the OLC opinions and Mr. Bannon acted at all relevant times in the manner Mr. Costello directed him, based on the OLC opinions and Mr. Bannon at all relevant times reasonably relied on the OLC opinions.").  In addition, the record reflects that in most, if not all instances, the Defendant relied on Mr. Costello's personal conclusions about how the government might view the Defendant's default based on his reading of the OLC opinions, not the actual substance of the OLC opinions.  *See* Costello Decl., ECF No. 30-1, at ¶ 7 ("At all relevant times, Mr. Bannon relied entirely on my research and legal advice and agreed to follow my legal advice."); *id*. at ¶ 23 ("At all times I discussed each Opinion and other legal source with Mr. Bannon, gave him my legal conclusions and I directed him that he must not appear or produce documents in response to the subpoena.  He relied in good faith on my legal advice and on these OLC Opinions and other legal sources I brought to his attention, and he agreed to follow my legal advice as directed."); *id*. at ¶ 24 ("The fact that Mr. Bannon did not appear or produce documents pursuant to the subpoena was entirely a function of my legal conclusions and my legal advice and

directives to him based on the OLC Opinions and case law concerning his legal rights, duties, and

obligations, and the effect the invocation of executive privilege had on the same, prohibiting him,

in my studied and expressed legal opinion, from complying with the subpoena.").  For example,

Mr. Costello, in the sworn statement he has submitted to the Court, stated,

> in light of the fact that the Select Committee had adopted a rule that would prevent
> the President's counsel from attending the proposed deposition in order to protect
> the President's claims of executive privilege, the Office of Legal Counsel ("OLC")
> had issued an opinion in 2019, which was binding upon the Executive Branch of
> Government, which stated that the subpoena that Mr. Bannon received was illegal,
> unlawful and incapable of being enforced either civilly or criminally.  Therefore
> Mr. Bannon was legally entitled to refuse to produce documents or testify pursuant
> to that subpoena.

Costello Decl., ECF No. 30-1, at ¶ 12.  As outlined above, however, OLC's opinion in *Exclusion*

*of Agency Counsel* addresses only a congressional demand for testimony, not congressional

demands for documents as Mr. Costello told the Defendant.  *See* 43 Op. O.L.C. at *4.  Moreover,

the opinion does not decide whether the mere existence of a rule excluding outside counsel renders

defiance lawful, but instead concludes only that "agency employees . . . who follow an agency

instruction not to appear without the presence of an agency representative are acting lawfully," *id*.

at *14, and the opinion is limited to circumstances in which agency employees, or former agency

employees, are called to testify "about information created or received during their employment,"

*id*. at *10, and who were acting at the direction of agency counsel in refusing to appear, *id*. at *14.

Mr. Costello's conclusion that the Department may ultimately conclude the mere existence of the

rule would bar compliance in all circumstances based on its conclusions in the narrow

circumstances addressed in *Exclusion of Agency Counsel* cannot provide a basis for estoppel.

### 3. The Defendant has failed to demonstrate that any reliance he placed on Department writings was reasonable.

While the Defendant asserts that the "history" of the OLC opinions and his attorney's

advice are "relevant" to evaluating reasonableness, *see* ECF No. 59-1 at 31, the Defendant nowhere

actually cites the standard for "reasonableness" that courts apply in considering entrapment-by-estoppel claims or explains why his reliance on his counsel's extrapolation from inapposite OLC opinions was, in fact, reasonable. He has thus failed to demonstrate this element of the entrapment-by-estoppel defense as well.

"[R]easonable reliance means a defendant must establish that 'a person truly desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *W. Indies Transp., Inc.*, 127 F.3d at 313. None of the four writings on which the Defendant claims to have relied address his circumstances or position, and the foundational writing, *Prosecution for Contempt of Congress*, on which the others rely, makes clear that whether and under what circumstances a subpoenaed witness has immunity from appearing in response to a congressional subpoena based on executive privilege is a fact-based inquiry requiring independent analysis of each situation. *See* 8 Op. O.L.C. at 103 (cautioning that the opinion's conclusions are fact-based and that the issues "could conceivably be resolved differently depending upon the facts of a controversy"); *see also Congressional Oversight of the White House*, 45 Op. O.L.C. at *55 (noting that "most members of the White House staff do not qualify for immunity from compelled testimony" and explaining that "[i]n determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President."). With a clear statement in the OLC opinions that the Defendant should inquire further, the Defendant cannot seriously claim his actions meet the standard for reasonableness under an entrapment-by-estoppel defense.

### C.   The Defendant Has Failed to Demonstrate that His Default Was Conducted Under Public Authority.

To establish a public authority defense, which is distinct from an estoppel defense, the Defendant must demonstrate 1) that "a federal law enforcement officer . . . actually authorized the

defendant to commit the particular criminal act at issue," 2) that "the defendant . . . reasonably relied on that authorization when engaging in that conduct," and 3) that "the government official on whom the defendant purportedly relied . . . actually had the authority to permit a cooperating individual to commit the criminal act in question." *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015). As with entrapment-by-estoppel, the Government examined these elements and their application to the instant case in-depth in its motion in limine, and will not duplicate that analysis here, but incorporates it by reference. *See* ECF No. 52 at 14-19. In arguing for dismissal based on public authority, the Defendant does not cite, let alone engage in any analysis of, these elements. Applying these elements to the facts of the Defendant's default, however, makes clear that the Defendant's public-authority defense fails because the Defendant does not and cannot demonstrate that he received a direction from any law enforcement officer to commit the crime of contempt and he has failed to demonstrate that any reliance would have been reasonable.

        **1.**     **The Defendant has failed to establish that he received a direction from a federal law enforcement officer with actual authority to engage in contempt of Congress.**

The Defendant claims that both the former President and OLC are federal law enforcement officials with actual authority to direct him to default. *See* ECF No. 59-1 at 35. He then claims that he received a direction to default from the former President based on the latter's "invocation of executive privilege and corresponding directive to Mr. Bannon, that Mr. Bannon must honor that invocation with respect to the subpoena." *Id.* He also claims that OLC directed him to default by its opinions concluding that executive branch officials need not comply with subpoenas for testimony where directed by agency personnel after a congressional committee refuses to allow agency counsel to attend. *Id.* Neither the former President nor OLC were law enforcement

officials with actual authority to direct the Defendant to commit a crime. He cannot, therefore, make out a public-authority defense.

First, the former President was a private citizen at the time the Defendant received the Committee's subpoena. He was not a federal law enforcement official. Any direction the former President gave to the Defendant to default, therefore, fails to meet the threshold requirement of a public-authority defense that a defendant be acting under the direction of a law enforcement officer. *See, e.g.*, *United States v. Sariles*, 645 F.3d 315, 317 (5th Cir. 2011) (noting the defense "is available when the defendant is engaged by a government official to participate or assist in covert activity" (internal quotation marks and citation omitted)). As the Defendant acknowledges, the public-authority defense is available for actions "taken 'under color of public authority.'" ECF No. 59-1 at 35 (quoting *United States v. Fulcher*, 250 F.3d 244, 254 n.4 (4th Cir. 2001)). A private citizen's direction does not provide color of public authority.

Second, the Defendant has not identified an official within OLC that he claims directed him to engage in contempt of Congress or, even if one had, that the official had actual authority to do so. He did not seek and OLC did not issue any directives or opinions to the Defendant. To support his claim that OLC directed him to engage in total noncompliance, the Defendant instead includes one sentence in his brief:

> The OLC Opinions referred to herein also provided a source of the actual authority Mr. Bannon received to the effect that the subpoena was unlawful and invalid, in light of the committee's rules (and refusal to permit a privilege holder representative to attend the deposition), that it would be unlawful for a congressional committee to try to compel production or testimony from a person so situated once executive privilege was invoked, and that it would be unconstitutional for a person so situated to be criminally prosecuted under the statute charged in this case.

ECF No. 59-1 at 35. The Defendant appears to be referring only to OLC's May 23, 2019, opinion regarding the presence of agency counsel at depositions. This opinion, however, was not directed

to the Defendant and, as described above, *supra* at 13-14, it addresses only the legality of an executive branch official, subpoenaed in relation to his duties as such, refusing to appear for a deposition where he receives a direction not to appear from the agency after the relevant committee refuses to allow agency counsel to attend the deposition over the agency's objection.   The Defendant meets none of those criteria.  *See also* ECF No. 60 at 2 (United States' Response to Defendant's Notice Under Federal Rule of Criminal Procedure 12.3, explaining the deficiency of the Defendant's notice of public-authority defense for failing to identify any law enforcement agency member on whose behalf he acted).

Moreover, the Defendant has failed to demonstrate that any OLC official, even if he had identified one, had actual authority to direct the Defendant to default on the subpoena.  To establish that an OLC official had actual authority to direct the Defendant to engage in criminal conduct, the Defendant states only that "the President – and therefore OLC – has authority to interpret laws." *See* ECF No. 59-1 at 35.  But the ability to interpret laws is not an ability to direct violation of them.  OLC is not like a DEA agent directing an informant to buy drugs from a subject-drug dealer after having received the necessary agency authorizations to run a drug trafficking investigation with controlled buys.  *See Fulcher*, 250 F.3d at 254-55 (finding DEA agent's testimony that he could not authorize a money laundering operation without the Attorney General's approval and would not authorize an individual to sell drugs suggested the DEA agent lacked authority to direct the defendant to engage in money laundering and drug trafficking); *United States v. Rosenthal*, 793 F.2d 1214, 1236 (11th Cir. 1986) (finding CIA officials had no actual authority to direct individuals to engage in drug activity because they were subject to regulations barring them from authorizing conduct that would violate U.S. laws).  As the Defendant explains at length to the Court, *see* ECF No. 59-1 at 22-27, OLC's sole function is to render legal advice to the Executive

Branch.  The Defendant does not identify and the Government is aware of no regulations, laws, or other authority that allows OLC to direct individuals to engage in criminal conduct.

> **2.**  **"Apparent authority" does not give rise to a public-authority defense and the Defendant identifies no person who acted even with the apparent authority of a federal law enforcement officer.**

The Defendant also claims that, even if the former President and OLC did not have actual authority to direct his default, they had apparent authority.  ECF No. 59-1 at 36-37.  But the defense of apparent public authority is not supported by controlling authority in this or any Circuit, and, even it was, for many of the same reasons just discussed, the Defendant still has not met his burden.

The legal foundation for the Defendant's claim is the opinion of a single judge—Judge Wilkey—in a D.C. Circuit case, *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976), which the Defendant claims was a "landmark decision" providing for an apparent authority public-authority defense.  *See* ECF No. 59-1 at 36 (citing *Barker*, 546 F.2d at 947-48, 951-54).  But *Barker* had no controlling opinion.  Instead, the Court issued a per curiam decision reversing the judgment of the district court and the two judges supporting reversal wrote separate opinions.  Only one of those judges, Judge Wilkey, endorsed the idea of a public-authority defense based on apparent authority. 546 F.2d at 949.  The other, Judge Mehrige, endorsed a defense that aligns with the entrapment-by-estoppel defense, *id.* at 955, which, as explained above, is unavailable to the Defendant.  In *United States v. North*, 910 F.2d 843, 878-81 & n.10 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on other grounds*, 920 F.2d 940 (D.C. Cir. 1990), the D.C. Circuit rejected the argument that the public-authority defense includes apparent authority, holding that the defendant was not entitled to a jury instruction on the authorization defense purportedly recognized in *Barker*.  The D.C. Circuit explained that "we have read *Barker*, and reread it, and simply cannot find a rule of law to apply," *id*. at 879, and concluded that "[i]n the absence of clear

and comprehensible Circuit authority that we must do so, we refuse to hold that following orders, without more, can transform an illegal act into a legal one." *Id.* at 881; *see also id.* at 881 n.10 (explaining that whatever the exact scope of an authorization defense, it "is far more circumscribed than the one sought by [the defendant] here").

Apart from Judge Wilkey's non-binding opinion, the Defendant cites no legal authority supporting an apparent authority public-authority defense—because none exists.  Indeed, every court to decide the issue has held that a public-authority defense is unavailable based on a law enforcement officer's "apparent authority."  *See, e.g.*, *Sariles*, 645 F.3d at 318-319 (observing that Judge Wilkey's opinion "cannot be viewed as the rationale" of the D.C. Circuit and holding "that the public authority defense requires the defendant reasonably to rely on the actual, not apparent, authority of the government official or law enforcement officer to engage the defendant in covert activity" (internal citation and quotation marks omitted)); *Fulcher*, 250 F.3d at 254 ("[W]e adopt the unanimous view of our sister circuits that the defense of public authority requires reasonable reliance upon the actual authority of a government official to engage him in a covert activity."); *United States v. Pitt*, 193 F.3d 751, 758 (3d Cir. 1999) (limiting "the use of the defense of public authority to those situations where the government agent in fact had the authority to empower the defendant to perform the acts in question"), *abrogated on other grounds by Honeycutt v. United States*, 137 S. Ct. 1626 (2017); *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994) ("[R]eliance on the *apparent* authority of a government official is not a defense in this circuit." (emphasis in original)); *United States v. Holmquist*, 36 F.3d 154, 161 n.6 (1st Cir. 1994) ("The 'defense' of apparent public authority is a defense based on a mistaken but good-faith belief that one's conduct is authorized by the government.  Appellant's repeated references to this defense constitute little more than a school of red herrings.  The defense is not a defense at all.");

*United States v. Duggan*, 743 F.2d 59, 84 (2d Cir. 1984) ("We decline to adopt Judge Wilkey's view that a defendant may be exonerated on the basis of his reliance on an authority that is only apparent and not real."), *superseded by statute on other grounds as recognized by United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010).

The Court does not have to decide if apparent authority satisfies the requirements of a public-authority defense, however, because, even if it did, the Defendant still has failed to demonstrate his default meets the defense's elements.  The D.C. Circuit has noted that, assuming the defense exists, "a defendant must show at least that he 'honestly and reasonably' believed that his actions were being committed pursuant to lawful authority, and the belief must be 'objectively reasonable.'"  *United States v. Lam Kwong-Wah*, 924 F.2d 298, 310 n.9 (D.C. Cir. 1991) (quoting *Barker*, 546 F.2d at 947–49).  Even Judge Wilkey in *Barker* would have required the defendant to show "both (1) facts justifying [his] reasonable reliance on [the official's] apparent authority and (2) a legal theory on which to base a reasonable belief that [the official] possessed such authority." 546 F.2d at 949 (Wilkey, J.).

Here, the Defendant has identified no facts on which he could have reasonably believed the former President, a private citizen, was an authorized law enforcement official.  And the Defendant concedes OLC's sole duties consist of interpreting the law and providing legal advice to the Executive Branch.  *See* ECF No. 59-1 at 22-27.  Further, even had the Defendant shown he reasonably believed an OLC official had the authority to direct his default, he still has failed to show any official did.  Moreover, for the same reasons that the Defendant cannot establish that his alleged reliance on past Department writings and opinions to defy the Committee's subpoena would be reasonable, he has failed to establish it for purposes of attempting to mount a public-

authority defense.  Accordingly, the Defendant cannot satisfy his burden to adduce facts supporting a public-authority defense whether it rests on actual or apparent authority.

## II.    THE DEFENDANT'S OTHER CONSTITUTIONAL CLAIMS SHOULD BE REJECTED.

### A.    The Constitutionality of 2 U.S.C. § 194 is Irrelevant to the Pending Charges.

In three sentences and with no analysis, the Defendant asserts that 2 U.S.C. § 194, the statute laying out the referral procedures for contempt of Congress, is unconstitutional as applied. *See* ECF No. 59-1 at 44.  But the Defendant does not explain why, even if Section 194 is unconstitutional, the unconstitutionality of that statute would provide a basis for dismissing an Indictment charging him with violating a different statute (Section 192).  Nor has the Defendant established why he has standing to challenge Section 194 in this case.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In any event, the Defendant has claimed an "as-applied" challenge.  Here, the Government exercised its discretion to investigate the allegations and determine whether they should be presented to the grand jury, as it always has with respect to contempt of Congress referrals.  It did not act by automation.  And it was the grand jury that returned the Indictment after finding probable cause to believe the Defendant committed the charged offenses.

### B.    The Defendant's Supposed Efforts to Reach an Accommodation With the Committee Does Not Render the Term "Default" Unconstitutionally Vague.

The Defendant asserts that the term "default" in Section 192 is unconstitutionally vague as applied because of the admonition that Congress and the Executive Branch should accommodate each branch to the extent possible when disputes arise over one or the other's scope of authority. *See* ECF No. 59-1 at 47.  Other than recite his supposed efforts to accommodate the Committee, however, the Defendant does not cite any authority for his position or engage in any analysis as to

why "default" is vague.  "The determination whether a criminal statute provides fair warning of its prohibitions must be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (internal citation and quotation marks omitted).  Accordingly, whether "default" is vague has nothing to do with whether the former President and Congress should try to work out disputes when it comes to executive privilege— although there was nothing to work out in this case, because there was no assertion supporting total noncompliance.  Instead, the inquiry requires "assessing meaning with the elementary rule of statutory interpretation: Words receive their plain, obvious and common-sense meaning, unless context furnishes some ground to control, qualify, or enlarge it."  *Id*. at 1108 (internal citation omitted).  "Default" is a word with a plain and clear meaning.  *See* "Default," *Merriam-Webster.com Dictionary* (defining default as "to fail to fulfill a contract, agreement, or duty" or "to fail to appear in court"), *available at* https://www.merriam-webster.com/dictionary/default (last viewed May 6, 2022).  It thus provides a clear standard against which an ordinary person can judge their conduct—*i.e.*, whether they show up when subpoenaed or not—and does not render Section 192 unconstitutionally vague.  *See Bronstein*, 849 F.3d at 1107 ("[A] statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'" (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971))).

### C.    The Defendant's Other Vagueness and Overbreadth Challenges Reflect a Fundamental Misunderstanding of the Defense He Has Been Barred from Raising at Trial.

The Defendant claims that Section 192 is "void for vagueness" and "unconstitutionally overbroad" because he cannot assert executive privilege as a defense to the charges under this

Court's April 6 Order precluding a good-faith defense.  *See* ECF No. 59-1 at 45-46 (claiming Section 192 is "void for vagueness" as applied to him because the definition of "willful" within the statute is contrary to Supreme Court precedent and OLC opinions holding that executive privilege provides immunity from congressional subpoenas); *id*. at 46-47 (claiming the statute is "unconstitutionally overbroad as applied" because it criminalizes "constitutionally protected conduct—noncompliance based on the invocation of Executive Privilege and reliance on OLC Opinions").  The Defendant's claims, however, are based on a fundamental misunderstanding of the defense he has been barred from raising at trial pursuant to the Court's April 6 Order granting the Government's Motion to Exclude All Evidence and Argument Relating to Good-Faith Reliance on Law or Advice of Counsel.  *See* ECF No. 49.  The Government has never argued, and no court has ever held, that executive privilege, or any other privilege, cannot be a defense to a contempt charge under Section 192.  Indeed, Supreme Court precedent makes clear that privileges, when they are valid and properly asserted before the relevant congressional committee, provide a defense to contempt charges.  *See, e.g.*, *Watkins v. United States*, 354 U.S. 178, 196-97 (1957); *Barenblatt*, 360 U.S. at 112.

As the Government has pointed out several times, however, when the Defendant has previously made the same misguided claim, *e.g.*, ECF No. 35 at 22; ECF No. 43 at 56, whether Congress exceeded its constitutional authority in attempting to compel the Defendant's appearance and the production of documents in violation of a valid privilege is a question determined by the court before trial—juries are not asked to determine the bounds of constitutional privileges.  The Government's motion and the Court's Order granting it, however, address an entirely different question—that is, whether a defendant's purported good-faith, but erroneous, reliance on privilege, or his counsel's advice about it, negates the intent element of the offense.  As the Supreme Court,

the D.C. Circuit, and now this Court have held, it does not, because the intent element of the statute requires only that the Defendant's failure to appear or produce records be deliberate and intentional, whatever the reason it is so.

The Defendant has not, therefore, been barred from attempting to raise constitutional challenges to the Committee's subpoena and the subsequent contempt charges. Once those claims have been rejected as meritless, however, he is barred from attempting to argue to the jury that his deliberate decision not to appear or produce a single record should be excused because his attorney told him to do it or he believed he was excused under the law. As he has before, the Defendant confuses defenses to the factual elements of the offense and constitutional defenses to the charges. Because the Defendant's vagueness and overbreadth challenges are based on this misunderstanding and nothing more, they should be rejected.

### D. The Defendant's Attempts to Relitigate the Government's Motion to Exclude Evidence or Argument Relating to Good-Faith Reliance on Law or Advice of Counsel Should be Rejected.

Under the guise of raising constitutional challenges to Section 192, the Defendant seeks to relitigate the meaning of "willful" under the statute. Specifically, he claims that the settled definition of "willful," which precludes good-faith reliance defenses, is invalid under canons of statutory construction because it renders meaningless 2 U.S.C. § 193, which precludes claims of privilege based on disgrace or infamy to avoid complying with a congressional subpoena, ECF No. 59-1 at 42-43, and contradicts the Supreme Court's opinion in *Trump v. Mazars USA, LLP,* 140 S. Ct. 2019 (2020), *id.* at 43. Again, however, the Defendant misunderstands this Court's April 6 Order and the meaning of "willful" under the statute. Because both arguments are based on his misunderstanding, they are meritless and should be rejected.

First, Section 193 is not rendered superfluous by the settled definition of "willful" as used in the contempt of Congress statute.  The Defendant claims that, as defined, "willful" bars defendants from raising any privilege to avoid compliance with a subpoena, and, therefore, Section 193, which expressly bars subpoenaed witnesses from raising particular privileges would be unnecessary.  ECF No. 59-1 at 42.  But, as described above, the definition of "willful" does not bar witnesses from asserting privileges before a congressional committee and then relying on them as a basis to dismiss a contempt charge if a court subsequently finds the invocation of the privilege valid.  *See Quinn v. United States*, 349 U.S. 155, 164-65 (1955) (reversing contempt of Congress conviction where congressional committee and district court failed to recognize and rule on a valid privilege assertion).  The meaning of "willful" only bars defendants from raising their reliance on privilege, or any other law or legal advice, at trial as a factual defense to the intent element of the offense.

For the same reason, the settled definition of "willful" in the contempt of Congress statute is not contrary to the Supreme Court's opinion in *Mazars*.  In *Mazars*, the Court noted that subpoenaed witnesses retain all constitutional privileges before congressional committees.  140 S. Ct. at 2032.  They do.  And the Defendant can raise such privileges before the Court as he has in his motion to dismiss.  Once they are rejected, however, his reliance on erroneous claims of privilege cannot negate a deliberate and intentional decision not to comply with a subpoena.

## II.     THE DEFENDANT HAS WAIVED HIS OBJECTIONS TO THE SUBPOENA AND THE SUBPOENA WAS A VALID EXERCISE OF LEGISLATIVE AUTHORITY.

The Defendant moves to dismiss the Indictment because of several alleged procedural defects in the operation of the Committee and its issuance of the subpoena, which the Defendant claims renders the subpoena unlawful and thus unenforceable.  ECF No. 59-1 at 2-12.  All his objections to the subpoena fail, however, because the Defendant could have made them at the time

of his noncompliance, and did not—accordingly, he has waived them.  In addition, the Defendant argues that the subpoena issued to him did not have a valid legislative purpose, *id*. at 13, but this claim also is without merit.

> ### A.   The Defendant Waived the Objections Raised in His Motion to the Composition of the Committee and Compliance with Its Rules.

The Defendant's motion raises for the first time before this Court several objections that he could have—but did not—raise before the Committee.  These include his objection to the composition of the Committee, ECF No. 59-1 at 4-5; the claim that the Committee did not provide the Defendant with a copy of a particular rule, *id*. at 8-9; and the Committee's lack of a member using the title of "ranking minority member," *id.* at 5-12.  The Defendant waived all of these objections.

When he refused to produce documents or appear for a deposition before the Committee, the Defendant raised only one objection or privilege as a basis for doing so: an alleged assertion of executive privilege by the former President.  As set forth in the Government's Motion in Limine to Exclude Evidence Relating to Objections to Subpoena that Defendant Waived, ECF No. 53, the Defendant has waived any other privileges or objections that were apparent at the time of his default, but that he did not make.  *See United States v. Bryan*, 339 U.S. 323, 330-334 (1950) (finding defendant waived objection regarding a "defect in composition" of the issuing Committee—lack of quorum—because she raised it for the first time at her contempt trial); *cf. Hutcheson v. United States*, 369 U.S. 599, 608-611 (1962) (a constitutional objection "must be adequately raised before the inquiring committee if [it] is to be fully preserved for review in this Court.  To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer.") (internal citations omitted).

In his motion, the Defendant cites *Yellin v. United States*, 374 U.S. 109 (1963), but that case is inapposite here. *See* ECF No. 59-1 at 2-3. *Yellin* concerned a witness who, after being subpoenaed by a congressional committee for public testimony, sent the committee a telegram asking instead to testify in an executive session. 374 U.S. at 111. A committee staff member rejected the Defendant's request. Not apparent to the witness in the rejection, however, was that, in violation of its rules, the Committee members—instead of the staff—had not considered the witness's request before it was rejected. *Id*. at 120-123. The *Yellin* court held that, in such a situation, a witness is not considered to have waived an objection or privilege that a witness could not have known about. *Id*. at 122-123. The Defendant is not similarly situated here to the defendant in *Yellin*, however—every objection that he makes in his motion to dismiss was available and apparent at the time that he chose to default, and he did not raise any of them before the Committee. Thus, he waived them.

> 1. **The Defendant waived his objection to "the composition" of the Committee.**

Much like the defendant in *Bryan*, 339 U.S. at 330, the Defendant makes for the first time before this Court the argument that there is a defect in the composition of the Committee requiring testimony and documents because the Committee has nine members, but its authorizing resolution states that the Speaker of the House "shall appoint 13" members. ECF No. 59-1 at 4. And like the defendant in *Bryan*, the Defendant's claim before the Court fails because he could have objected at the time he was subpoenaed but did not. As the Defendant sets forth in his brief, the political dispute regarding the Committee's composition was public and known to him at the time that he received the subpoena. The Defendant, for instance, cites press releases issued by members of Congress on July 21, 2021, and the Congressional Record on July 1, 2021—the date that the Speaker of the House appointed Committee members. ECF No. 59-1 at 4 n.5, 5 n.7. When the

Defendant received his subpoena three months after this, the cover letter that accompanied his subpoena listed the members of the Committee—nine of them.  *See* ECF No. 53-1 at US-000410. The Defendant had all of the information necessary to object to the Committee's subpoena on the basis that it was issued by a Committee with too few members, but he chose not to, and has now waived that particular objection.

Even if the Defendant had not waived, a court in this District has already considered and dispensed with this objection to the Committee's composition on the merits.  *See Republican Nat'l Comm. v. Pelosi*, Case No. 1:22-cv-00659, ECF No. 33 at 30-31 (May 1, 2022) (rejecting challenge to a subpoena based on the Committee having only nine members because the Committee's authorizing resolution "is not conclusive as to whether thirteen members are required for it to lawfully operate" and because the House's adoption of the Committee's contempt resolutions reflect that the House views the Committee as "duly constituted and empowered to act under its authorizing resolution, even though [it] has only nine members.").

### 2.    The Defendant waived his objection to not being provided with Section 3(b) of House Resolution 8.

The Defendant next claims that he was excused from complying with the Committee's subpoena because the House's rules for deposition authority state that a witness "shall not be required to testify unless [he] has been provided with a copy of Section 3(b)" of House Resolution 8, ECF No. 28-8 at US-000963, and he was not provided with a copy of Section 3(b).  ECF No. 59-1 at 8-9.  The deposition rules on which the Defendant relies to raise this objection were attached to the subpoena that the Defendant received, however, meaning that he knew that he was entitled to a copy of Section 3(b) at the time he defaulted but never raised the issue as a reason for his noncompliance before the Committee—which would have allowed the Committee to resolve the issue.  *See* ECF No. 53-1 at US-000417.  "To deny the Committee the opportunity to consider

the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes." *Bryan*, 339 U.S. at 333 (internal citation omitted).  In any event, the record shows that the Committee planned to provide the Defendant with Section 3(b), as required, before the start of his deposition; Committee counsel brought a copy to the deposition at which the Defendant failed to appear.  *See* ECF No. 35-2 at US-000362.

### 3.    The Defendant waived his objection to the Committee Vice Chair.

Next, the Defendant appears to raise two objections based on the Committee's use of the title "Vice Chair" for its ranking minority member.  The first—the fact that the Committee's ranking Republican Member is referred to as a Vice Chair rather than a Ranking Minority Member—he has waived for the same reasons he has waived the objections discussed above: it was public knowledge at the time he defaulted and he did not raise it with the Committee.  *See* ECF No. 53 at 6-7.  The title was used in the press releases issued by the Committee, that predate the Defendant's default, and that the Defendant cites in his motion.  *See id.*; ECF No. 59-1 at 10 n.10.  Yet, he did not object before the Committee.  *See Bryan*, 339 U.S. at 332 ("[T]he courts need not treat as important that which the witness obviously regarded as unimportant.").

The Defendant's second argument appears to be that because the Committee does not have a "ranking minority member," the Committee violated its rule that the Chair consult with such a member before issuing the Defendant's subpoena.  ECF 59-1 at 7-12.  If in fact the Committee violated its rules requiring internal Committee consultation, the Defendant's claim might have merit for the reasons articulated in *Yellin*—that he could not have known about, and objected to, such a violation of Committee Rules that occurred behind closed doors and out of public view.  But, as the Defendant is aware from the discovery in this case, the Chair was in consultation with Committee members, including the ranking minority member, Rep. Cheney, before the subpoena

was issued to the Defendant, and the Committee abided by its deposition notice requirement to its members.  *See* Ex. 1 at US-001143.  The Defendant has failed to identify any defect.

### 4.    The Defendant waived his objection to the procedure for a privilege log contained in the subpoena.

The Defendant also argues that the second count of the indictment—which charges him with failing to provide documents in response to the subpoena—is invalid because the Committee does not have authority to compel production of a privilege log.  ECF No. 59-1 at 14-15.  Although the Committee cannot compel the Executive Branch to produce a privilege log, *see Miers*, 558 F. Supp. 2d at 107 ("[I]n the absence of an applicable statute or controlling case law, the Court does not have a ready ground by which to *force* the Executive to [provide a privilege log] strictly in response to a congressional subpoena." (emphasis in original)), the question of whether Congress can compel a private party subpoenaed in his private capacity to produce a log has not been litigated.  But the Court need not address that question here because the Defendant is charged in Count II with refusing to comply with the document demand in any way, even though there were subpoena items that, as even he partially concedes, could not possibly have implicated executive privilege, *see supra* at 15-16.  Whether the Committee can or cannot require a privilege log would not excuse the rest of the Defendant's noncompliance.

In any event, in advance of his default on the document demand, the Defendant did not raise a specific objection to the Committee regarding its request for a privilege log.  That the Defendant is now searching for after-the-fact justifications for his noncompliance is all the more reason that his failure to do so previously constitutes waiver.  *See McPhaul v. United States*, 364 U.S. 372, 378-80 (1960) (finding that if defendant did not produce records because he did not have them "a decent respect for the House of Representatives . . . would have required that (he) state (his) reasons for noncompliance upon the return of the writ," that "[h]is failure to make any such

statement was 'a patent evasion of the duty of one summoned to produce papers before a congressional committee (, and) cannot be condoned,'" and that, because he raised the claim for the first time at trial, the government had no burden to show he could have produced the records).

### B.     The Subpoena Had a Valid Legislative Purpose.

Finally, the Defendant claims the subpoena the Committee issued to him served no legislative purpose. *See* ECF No. 59-1 at 13.  But as the Defendant concedes, this Circuit has already determined that the Committee itself has a valid legislative purpose.  These purposes include that:

> Congress could (1) pass laws imposing more serious criminal penalties on those who engage in violence to prevent the work of governmental institutions; (2) amend the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election; (3) allocate greater resources to the Capitol Police and enact legislation to "elevat[e] the security posture of the United States Capitol Complex," *id.* § 4(a)(2)(D); or (4) revise the federal government's "operational plans, policies, and procedures" for "responding to targeted violence and domestic terrorism[,]" *id.* § 4(a)(2)(B), J.A. 97.

*Trump*, 20 F.4th at 42 (citing H.R. Res. 503 § 4(a)(2)).

As described in the Indictment, the Committee's cover letter to the subpoena stated that it sought documents and testimony from the Defendant because he may "have information relevant to understanding important activities that led to and informed the events at the Capitol on January 6, 2021."  ECF No. 1 at ¶ 7.  And the topics the subpoena identifies for which the Committee sought records and testimony from the Defendant all relate to the planning for and lead up to the events of January 6.  ECF No. 53-1 at US-000410-12.  The information the subpoena sought falls within multiple of the Committee's valid legislative purposes articulated by this Circuit in *Trump v. Thompson*, as information from the Defendant could lead to amendments to the Electoral Count Act, elevating the security posture of the Capitol Complex, or revisions to the government's operational plans, policies, and procedures.  *See Republican Nat'l Comm.*, Case No. 1:22-cv-

00659, ECF No. 33 at 35 n.11 (rejecting plaintiff-RNC's challenge to Committee subpoena on basis that it is unrelated to a legislative end, noting that examples of legislation for which subpoenaed information would be relevant "are not hard to find").

Despite the legislative purpose apparent on the face of the subpoena, the Defendant claims Committee members' statements show that it lacks such a purpose.  ECF No. 59-1 at 13 & n.17. Not only does the Defendant fail to cite any statements made in relation to his subpoena—indeed, since the Defendant concedes the Committee has a legislative purpose, quotes from members about the general activities of the Committee do not serve his argument at all—but the Supreme Court has long held that courts will not inquire or consider the motives of a Committee's members in determining whether a Committee acted with a legislative purpose.  *Barenblatt*, 360 U.S. at 133. The Defendant also suggests that the Indictment does not sufficiently allege "how the subpoena issued to Mr. Bannon could validly inform legislation."  ECF No. 59-1 at 13.  He provides no support for his argument, and the Indictment clearly alleges the pertinency of the information sought by the subpoena to the Committee's investigation, *see also* ECF No. 1 ¶¶ 2-4, 7.  To the extent the Defendant is claiming that the Indictment also must allege the constitutional authority of the Committee, he is wrong.  The legal question of the constitutional bounds of the Committee's activity is not an element of the offense to be alleged and proven, it is a question for this Court.

## IV.   THE GOVERNMENT'S INVESTIGATION WAS WARRANTED AND APPROPRIATE.

The Defendant moves for dismissal on the ground that the Government "overreached" in the investigation leading to the Indictment.  Specifically, he claims that the Government intruded upon the attorney-client relationship, ECF 59-1 at 49-52, and misled the grand jury, *id*. at 52-53. The Defendant's arguments are counterfactual and, in any event, would not support dismissal under any applicable legal framework.

A.     **For an Indictment to Be Dismissed Based on Government Misconduct, a Defendant Must Show Misconduct and Substantial Prejudice.**

The Defendant's motion suggests the Government's investigation constitutes outrageous conduct violating the Fifth Amendment and that it infringed the grand jury's independence, but he fails to support the claims.

The Supreme Court has recognized there may be circumstances "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973); *see also United States v. Kelly*, 707 F.2d 1460, 1468 (D.C. Cir. 1983). Where the alleged outrageous conduct involves a claim relating to the attorney-client relationship, a defendant must show, at minimum, "the government's objective awareness of an ongoing, personal attorney-client relationship between [the attorney] and the defendant," "deliberate intrusion by the government into that relationship," and "actual and substantial prejudice to the defendant." *See United States v. Hsia*, 81 F. Supp. 2d 7, 18-19 (D.D.C. 2000) (citing *United States v. Voigt*, 89 F.3d 1050 (3rd Cir. 1996)). Courts have "rarely applied the doctrine" of outrageous misconduct to dismiss an indictment, *United States v. Singhal*, 800 F. Supp. 2d 1, 5 (D.D.C. 2011) (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)) (internal quotation marks omitted) ("[C]ourts have rejected its application with almost monotonous regularity"), recognizing that they "must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable," *id*. (quoting *Voight*, 89 F.3d at 1065).

"When examining a claim that the grand-jury proceeding was infected by prosecutorial misconduct, the Court first affords that proceeding 'a presumption of regularity.'" *United States v. Akinyoyenu*, 199 F. Supp. 3d 34, 36 (D.D.C. 2016) (quoting *United States v. Mechanik*, 475 U.S.

66, 75 (1986)). For a court to even consider dismissal as a possible sanction, "the defendant [must] show[ ] that the prosecutor instituted some error or irregularity—more than a mere assertion that the prosecutor presented 'inadequate, unreliable or incompetent evidence.'" *See id.* (quoting *United States v. Borda*, 905 F. Supp. 2d 201, 204 (D.D.C. 2012)). Even then, "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988); *accord Akinyoyenu*, 199 F. Supp. at 36. "That is, the defendant must also prove 'that the violation substantially influenced the grand jury's decision to indict, or [that] there is grave doubt that the decision to indict was free from the substantial influence of such violations.'" *Akinyoyenu*, 199 F. Supp. at 36-37 (quoting *Bank of Nova Scotia*, 487 U.S. at 256) (additional internal quotation marks and citations omitted).

Here, the Defendant has failed to demonstrate substantial prejudice or misconduct. His claims must be rejected.

### B. The Government's Interactions with Mr. Costello and Related Investigative Steps Were Appropriate and Lawful.

The Defendant claims that the Government's interactions with and investigation of the Defendant's counsel before the Committee, Mr. Costello, were outrageous and warrant dismissal. As an initial matter, however, the Defendant fails to accurately report the facts of the Government's interactions with Mr. Costello. First, the Defendant contends that the Government conducted two "surreptitious 'interviews'" of Mr. Costello. ECF No. 59-1 at 50. There was nothing surreptitious about the Government's interactions with Mr. Costello; they were transparent and entirely voluntary, and the FBI's involvement was not a secret. As reflected in the FBI reports memorializing the November 3 and 8, 2021, videoconferences between Mr. Costello and the Government, Mr. Costello was apprised of the identity of each person who was in attendance at

the outset.  *See* ECF No. 28-4 at US-001769, US-001779.  Additionally, after the first meeting on November 3, the Government sent Mr. Costello an email identifying the name and title of each participant.  Ex. 2.

The Defendant further claims that Mr. Costello thought that these were "meetings," not "interviews," insinuating some trickery on the Government's part.  It is not clear why a "meeting" would be any different from an "interview," but any distinction between the words is immaterial. Mr. Costello himself used the word "interview" in an email to the Government after the November 3, 2021, meeting, stating that he was willing to participate in "a follow up interview" and "to answer any follow up questions [the Government] may have."  Ex. 3.  His grievance boils down to a disingenuous game of semantics, not substance.

The Defendant points to the fact that the FBI memorialized Mr. Costello's statements on his client's behalf in a "FD-302 Report of Interview" as evidence of foul play.  *See* ECF No. 59-1 at 50.  But the fact that the FBI special agents took notes and prepared a "FD-302 Report of Interview" reflects diligence, not misconduct.  This is the way in which FBI special agents typically memorialize events in a criminal investigation, including interactions with individuals providing information pertinent to the investigation—regardless of whether the interaction is with an attorney, civilian, or someone else and regardless of whether it is called a "meeting," "videoconference," "discussion," "interview," or something else.  And it is standard practice for the Government to memorialize an attorney's statements on behalf of his client, particularly where the attorney himself is a witness to the events under investigation.  The Government was not engaged in some underhanded effort; the Government was trying to discover the facts surrounding the Defendant's default.  At both the November 3 and November 8 meetings, the Government asked questions and Mr. Costello voluntarily answered them.  In such a circumstance, prudence,

not trickery, dictates that Mr. Costello's statements be memorialized. What is more, the Government disclosed to the Defendant in discovery the FD-302s and special agents' notes, illustrating the transparency surrounding its interactions with Mr. Costello.

Next, the Defendant contends that the Government's investigative steps to collect Mr. Costello's toll and email records, but not their content, was improper because "Section 9-13.410(a) of the U.S. Attorney's Manual requires main DOJ approval in such circumstances." ECF No. 59-1 at 49. That is incorrect. Section 9-13.410 sets forth "Guidelines for Issuing Subpoenas to Attorneys for Information Related to Representation of Clients," not subpoenas and other process served on third parties for non-content, such as the process deployed in the investigation of this case. In any event, Justice Manual § 9-13.410(F) states that its provisions create no enforceable rights, a fact that courts have repeatedly recognized. *See* United States' Opp. to Def.'s Mot. to Compel, ECF No. 31 at 7 (collecting cases). As the Government has described before, Mr. Costello was a witness to the contempt under investigation and it obtained Mr. Costello's toll records to investigate a requisite element of contempt—that is, whether the Defendant received notice of the Committee's subpoena. Nothing was improper about the Government's investigation. *See United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991) ("As a necessary consequence of its investigatory function, the grand jury paints with a broad brush.").

As required for dismissal based on a claim of outrageous misconduct, the Defendant has failed to demonstrate any intrusion on the attorney-client relationship and has made no showing of prejudice, let alone substantial prejudice. It cannot be contested that the toll records the Government obtained are not privileged because they do not reveal any confidential communications between the Defendant and Mr. Costello made for the purpose of obtaining or providing legal advice. *See* ECF No. 31 at 13-15 (collecting cases). In fact, the Defendant

concedes the point. *See* ECF No. 59-1 at 50 (acknowledging that "the toll and email records did not give the Government the contents of Mr. Costello's communications"). Nor do the records, which reflect only the time, date, and duration of, and the other party or parties to, Mr. Costello's phone calls in the limited time-period surrounding the service of the Committee subpoena betray any attorney-work product—especially given that the calls were exchanged before the Committee even made a referral for investigation. *See United States v. Williams Companies, Inc.*, 562 F.3d 387, 393 (D.C. Cir. 2009) ("The doctrine protects written materials that lawyers prepare 'in anticipation of litigation,' ensuring that 'lawyers can prepare for litigation without fear that opponents may obtain their private notes, memoranda, correspondence, and other written materials.'" (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1988))). Even if litigation was pending or anticipated—which it was not—the fact that a particular communication occurred at a particular time reveals nothing about Mr. Costello's private notes, memoranda, correspondence, or other written materials. Nor does the Defendant offer even a suggestion that Mr. Costello's voluntary statements and production of documents on behalf of his client were in some way privileged.

The Defendant cites just two cases in which indictments were dismissed based on prosecutorial intrusion of the attorney-client relationship, *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991) and *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985). ECF 59-1 at 51. Both involve circumstances in which the prosecutor and defense attorney essentially colluded to secure the defendants' indictment and arrest. *See Marshank*, 777 F. Supp. at 1521 (dismissing indictment where defendant's attorney "was in league with the government" to investigate and secure defendant's arrest, while simultaneously representing a key government witness with a financial interest in the prosecution); *Schell*, 775 F.2d at 565-66 (dismissing indictment where

former defense attorney turned prosecutor participated in investigation resulting in his former clients' indictment on charges that were the subject of the former representation).  The facts of these cases—the only the Defendant could muster in support of his claim—are a far cry from even the most fanciful interpretation of the Defendant's allegations in this case.  Moreover, the Government did not "turn" Mr. Costello into a witness against his client.  He was a witness to the Defendant's contempt before the investigation in this matter ever began.  The Defendant's decision to waive his right to conflict-free counsel in this case does not render the Government's investigation and prosecution improper.  *See* Model Rule of Professional Responsibility 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness.").

Finally, the Defendant grasps at straws with respect to the requisite showing of substantial prejudice.  First, the Defendant speculates that the Government's access to Mr. Costello's toll records "provides significant insight into the defense's strategy and theory of the case," ECF No. 59-1 at 51, but he provides no explanation as to how that is the case since the records predate the investigation in this matter or what information about his strategy the Government could possibly divine from the records.  *Cf. United States v. Legal Servs. For New York City*, 249 F.3d 1077, 1081-82 (D.C. Cir. 2001) ("[T]he burden of demonstrating the applicability of the privilege lies with those asserting it.  That burden requires a showing that the privilege applies to each communication for which it is asserted." (internal citations omitted)).

Second, the Defendant contends that he has been prejudiced because "the Government has obtained numerous documents from Mr. Costello that would never have been turned over if he had been made aware that he was viewed as a witness against Mr. Bannon, not Mr. Bannon's advocate."  ECF No. 59-1 at 51.  As Mr. Costello has noted several times, he has been a practicing attorney for decades and is a former prosecutor.  The fact of the matter is that the Defendant,

hoping to avoid prosecution, cooperated with the Government and produced documents and information voluntarily in response to specific written requests without restriction concerning how they would be used. *See* Exs. 2, 3, 4. That the Defendant's strategy failed provides no justification to turn around and accuse the Government of misconduct. Criminal subjects routinely engage in the sort of cooperative back and forth in which the Defendant engaged through Mr. Costello in this case. Sometimes that strategy works; sometimes it does not.

In any event, the Government did not present to the grand jury any communication records it obtained for accounts suspected to be associated with Mr. Costello, any documents or other information obtained exclusively from the Defendant through Mr. Costello, or any testimony about Mr. Costello's interviews with the Government. He therefore cannot establish any prejudice at all with respect to the grand jury's decision to indict him.

### C.      The Government Did Not Mislead the Grand Jury.

The Defendant alleges that the Government misled the grand jury in three ways. ECF No. 59-1 at 52-53. The Defendant offers no argument or evidence that he was prejudiced by the supposed errors—i.e., that he would not have been indicted but for them—and his claims for dismissal should be rejected on that basis alone. *See Akinyoyenu*, 199 F. Supp. at 36-37. Moreover, his claims are based on a factually incorrect recitation of what occurred before the grand jury and he has failed to show any error at all.

First, the Defendant claims "the grand jury was misled about Mr. Bannon's communication to the Select Committee that President Trump has asserted executive privilege" through testimony that a witness must appear personally before the Committee to make such an assertion. *Id.* at 52. The Defendant does not reveal, however, that the testimony of which he complains is not an instruction about the law of executive privilege or the requirements for invoking it, but a verbatim reading of the Committee's October 8, 2021, letter to the Defendant responding to his October 7

letter in which the Defendant informed the Committee that he was withholding documents under executive privilege.  *See* ECF No. 58-32 at 44 (sealed); ECF No. 31-4 (sealed).  Moreover, contrary to the implication in the Defendant's brief, *see* ECF No. 59-1 at 52 ("This was misleading testimony and Mr. Costello sent President Trump's counsel's letter invoking executive privilege to the Select Committee."), the Government presented and read to the grand jury the letter from Mr. Costello to the Committee in which Mr. Costello quotes the letter he had received from the former President's attorney, and which the Defendant purports to be an assertion of executive privilege.  *See* ECF No. 58-32 at 37-41 (sealed); Ex. 5.  The testimony was not misleading—it was completely truthful.  The grand jury was presented the very evidence the Defendant implies was omitted.

Second, the Defendant claims the Government "suggested to the grand jury that Mr. Bannon never sought an adjournment of his deposition," through testimony that at no point between the service of the subpoena and the date of the grand jury presentation did the Defendant ever contact the Committee to try and schedule an alternative date for his deposition.  ECF No. 59-1 at 52 (citing ECF No. 58-32 at 32-36 (sealed)).  That testimony was not misleading at all; it was exactly right.  The Defendant never requested an "adjournment of his deposition."  On October 18, 2021, four days after defaulting on the subpoena for testimony, the Defendant sent a letter to the Committee to "request a one-week adjournment of our response to your [October 15, 2021] letter," which had informed the Defendant that he was in default.  ECF No. 31-3.  That is not, as the Defendant implies, a request to adjourn the deposition; that is a post-default effort to delay a contempt citation.

Finally, the Defendant claims that the Government improperly "suggested to the grand jury that Mr. Bannon received (through his attorney Mr. Costello) a complete copy of the House

deposition rules along with the subpoena." ECF No. 59-1 at 52-53.  But, as explained above, *supra* 34-35, the Defendant was in fact provided a copy of the House deposition rules and he never raised a contrary objection to the Committee.  In any event, the testimony about which the Defendant complains involves reading to the grand jury the Committee's September 23, 2021, cover letter to the Defendant accompanying the subpoena, which correctly lists its enclosures, and showing the enclosures to the grand jury so that grand jurors could verify what was provided to the Defendant for themselves.  *See* ECF No. 58-32 at 18-21 (sealed); Ex. 6.  The testimony was not misleading— it was completely accurate.

## <u>CONCLUSION</u>

The Defendant's strategy in this case is to hide his contempt of Congress behind executive privilege and legal claims that have nothing to do with the facts and circumstances of his independent decision to defy the Committee's subpoena.  His motion to dismiss is another example.  The grounds on which he argues for dismissal are meritless, and the motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Amanda R. Vaughn*
        J.P. Cooney (D.C. 494026)
        Molly Gaston (VA 78506)
        Amanda R. Vaughn (MD)
        Assistant United States Attorneys
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-1793 (Vaughn)
        amanda.vaughn@usdoj.gov