**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal No. 21-670 (CJN) |
| v. | : | |
| STEPHEN K. BANNON, | : | |
| *Defendant*. | : | |

**REPLY IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

Defendant Stephen K. Bannon ("Mr. Bannon"), through undersigned counsel, files this Reply in support of our Motion To Dismiss The Indictment [Doc. 58] and states as follows:

### I.   Summary Of Reply

The Government tries to excuse the missteps it made in instituting this prosecution. None of the Government's belated excuses, however, can cure the fatal defects in the Indictment. Nor can *post hac* rationalizations remedy the Government's errors in pursuing this criminal case. For example, the Government tries to recast the lack of legal authority of the Select Committee as a "procedural objection" that can be waived. [Doc. 65 at 1]. A criminal defendant does not waive an element of the offense by pre-indictment action or inaction. The Government, not the Defendant, has the burden of proving – as an element of the offense – that the Select Committee acted within the authority granted by the full House of Representatives. As detailed in our Motion, the Select Committee's subpoena to Mr. Bannon was *ultra vires*. No valid explanation has been offered by the Government, so the Indictment must be dismissed on that basis.

The Government's attempt to devalue the OLC opinions is also misguided.  Their first gambit was to argue that the OLC opinions are irrelevant. They have shifted course. Now, without

providing any authority, the Government contends that the OLC opinions do not apply once a person leaves federal service. The Government's position is flawed for at least two reasons. First, the OLC opinions, read together, clearly apply to situations involving a *former* top Presidential advisor. Second, the Government has lost sight of *who holds* executive privilege. It is the President. So even if a conversation takes place at a time when one party to the conversation is not a federal employee, if the President is still in office – as here – then executive privilege may be asserted.

Finally, the Government hopes to conceal serious flaws in the Indictment and the prosecution of this case with sweeping assertions that: Section 192 has been applied for years without constitutional challenge; Mr. Bannon waived objections to the Select Committee's unauthorized actions; and that prosecutorial interference with the attorney-client relationship by seeking attorney telephone and email records is no big deal. As detailed below, because the Government's excuses are inconsistent with the facts and controlling law, the Indictment must be dismissed.

## II.     Mr. Bannon Cannot Waive The Requirement That The Select Committee Must Act Within Its Grant Of Authority

Words have meaning. H. Res. 503 [Doc. 58-2] is an "authorizing" resolution that established the Select Committee. Since this is a criminal case, unlike other challenges made to the authorization of this Select Committee, the Government has the burden of proof which requires it to establish that the Select Committee has been constituted properly pursuant to its enabling legislation.  The words of that resolution delimit the "authority" of the Select Committee. H. Res. 503 is explicitly referenced in the Indictment as the starting point for this prosecution. [Doc. 1 at ¶¶ 1 – 5]. Both Counts of the Indictment include language that addresses the "authority" element of 2 U.S.C. § 192, as follows: "STEPHEN K. BANNON, having been summoned as a witness by

the authority of the U.S. House of Representatives . . .." [Doc. 1 at ¶¶ 23 & 25]. However, Mr. Bannon was *not* summoned as a witness by the authority of the U.S. House of Representatives. He was summoned as a witness by a Select Committee subpoena that was outside of the authority granted to the Select Committee by the House. No authority identified by the Government allows a congressional committee, as here, to exceed its grant of authority from the full House.[1] The Government's novel theory – that through silence a criminal defendant can somehow empower a congressional committee to act beyond the scope of its authorizing resolution – is nonsensical and should be rejected.

Moreover, the Government's argument that the Select Committee would have cured all defects if Mr. Bannon had just raised them earlier defies logic. [Doc. 65 at 33-34]. Again, it stretches the imagination to think that – had Mr. Bannon echoed the heated debate about the Select Committee formation ("The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader") [Doc. 58-2 at 3] – the Select Committee would have rushed out to obtain the required four additional members. The Government argues that this Court should follow lead of the district court in *Republican Nat'l Comm. V. Pelosi,* Civil Case No. 22-659 (TJK), but of course the discussion of issues in that civil case are not controlling authority here. In that case, Judge Kelly found that "on this record the Court must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation purposes." Memorandum Opinion at 33 (May 1, 2022) (Civil Action No. 22-659 (TJK) (Document 33)). The parties in that civil lawsuit did "not dispute that

---

[1] This Court may construe the term "ranking minority member" as used in H. Res. 503 because the term is clear and unambiguous. *See U.S. v. Rostenkowski*, 313 U.S. App. D.C. 303, 318-320 (D.C. Cir. 1995) (courts may construe unambiguous House rules). To the extent that this Court finds any House Rule ambiguous in the factual circumstances of this criminal case, the rule of lenity requires that the ambiguity be resolved in favor of Mr. Bannon. *See*, *e.g.*, *Liparota v. United States,* 471 U.S 491, 427 (1985).

Chairman Thompson consulted with Representative Cheney before issuing the subpoena" at issue in that case to a third party. *Id*. at 32. No such record, and no such concession, exist in this criminal case. Here, the situation is quite different, because the Government has to prove all of the elements of this offense, and they cannot.

The record here is clear that Rep. Cheney was not acting as the "ranking minority member" with respect to the subpoena to Mr. Bannon. *See* [Doc. 58-4 at 4] (Nov. 2, 2021, FBI Interview of U.S. House of Representatives General Counsel Doug Letter)[2] ("LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to be the Vice Chair of the Select Committee; since the Select Committee has a Chair and a Vice Chair, there are no express rules for the Vice Chair as there would be for a Ranking Member.").[3] It strains credulity to argue that if Mr. Bannon had pointed out what was painfully apparent to Select Committee members already – that they lacked a "ranking minority member" – then committee members could have somehow persuaded the Minority Leader to reverse course and designate a Select Committee member as the "ranking minority member."[4]

Nor is there any merit to the Government's waiver argument [Doc. 65 at 34 – 35] pertaining to Section 3(b). The language of the House rule does not allow the Government any room for creative, after-the-fact interpretation. It mandates that "[a] witness shall not be required to testify unless the witness has been provided with a copy of Section 3(b) of H. Res. 8, 117th Congress,

---

[2] FBI 302, dated November 2, 2021, of interview conducted in the presence of the entire prosecution team: AUSA's J.P. Cooney, Molly Gaston, and Amanda Vaughn.

[3] The statements made by House General Counsel Doug Letter were subject to the penalties that attach to 18 U.S.C. § 1001.  A false statement would constitute a felony.

[4] The district court in *Republican Nat'l Comm.* was not apprised of Mr. Letter's concession, made under penalty of 18 U.S.C. § 1001, that the Select Committee has no "ranking minority member."

and these regulations." [Doc. 58-3 at ¶ 11]. The Indictment explicitly references the cover letter from Chairman Bennie G. Thompson to Mr. Stephen K. Bannon that accompanied the September 23, 2021, subpoena and misleadingly states that Mr. Bannon was provided with the required deposition rules. [Doc. 1 at ¶¶ 7 & 14 ]. That statement was clearly false. There can be no waiver where, as here, Mr. Bannon was affirmatively misled by the Select Committee about being provided the required deposition rules. *See* [Ex. 1, Letter from Chairman Bennie G. Thompson to Mr. Stephen K. Bannon (Sept. 23, 2021) at 1 ]("A copy of the rules governing Select Committee depositions, and a copy of document production definitions and instructions are attached.") This was a false statement, as the one rule that *must be given to every deponent* was not attached, or ever provided to Mr. Bannon.

Finally, the Government argues that Mr. Bannon waived any objection to Rep. Liz Cheney serving as "vice chair" of the Select Committee. The Government misapprehends our argument. We do not seek dismissal on the ground that the Speaker appointed Rep. Cheney as "vice chair." But "vice chairs" and "ranking minority members" are different animals. *See* [Doc. 58 at footnote 11] (quoting House Rule XI, cl. 2(d), which distinguishes the two positions). No action by Rep. Cheney could remedy the gap in authority created by the fact that the Select Committee has no "ranking minority member." "Ranking minority member" is a term of art, with decades of usage, and describes a position that protects the rights of the minority party. The absence of a "ranking minority member" is significant, in that no criminal prosecution can follow the issuance of a subpoena by the Select Committee, given that the authorizing resolution only allows the issuance

of such subpoenas after consultation with the "ranking minority member." Thus, the Indictment must be dismissed. *See Yellin v. United States*, 374 U.S. 109, 117-119 (1963).[5]

### III.   <u>This Prosecution Violates Due Process</u>

The Government attempts to argue that: (a) executive privilege was not properly invoked in this matter; (b) executive privilege does not provide a basis for Mr. Bannon's noncompliance with the subpoena; (c) the defenses of public authority and entrapment by estoppel do not apply; and (d) 2 U.S.C. § 192 is constitutional as applied. [Doc. 65 at 3-31]. The Government's submission is without merit and in many instances is frivolous. Notably, the Government failed to even attempt to address Mr. Bannon's compelling fair notice/due process and estoppel arguments that require dismissal.  [*See* Doc. 58 at 21 & 46; 37-38].

The Government's submission on these issues suffers from the same defects that have characterized each of its previous filings on these subjects. It makes factual assertions that bear little relationship to the facts. It conflates legal concepts (*e.g.* immunity and executive privilege). It attempts to draw distinctions that have no actual legal significance in this context (e.g. "private citizen"), it misrepresents the legal principles attending the defenses of public authority and entrapment by estoppel, and fails to address directly relevant OLC Opinions that Mr. Bannon has identified. The Government also continues to improperly defy its own binding departmental authority that is directly contrary to its arguments in this case.

Most of the Government's argument has already been addressed in previous submissions (*e.g.*, Docs. 58, 58, 64). To avoid repetition, Mr. Bannon incorporates herein by reference all prior

---

[5] Similarly, the Government's waiver argument pertaining to a privilege log misses the mark. We argue – and the Government seems to concede – that the Select Committee *does not have authority to* require a potential deponent to draft a privilege log.

submissions. To the extent any portion of the Government's Opposition is not addressed herein, it is because it already has been adequately briefed in other filings or it is meritless.

On the matter of whether the OLC opinions apply to a private citizen, we note that a former executive branch official, no longer in government service is, by definition, a "private citizen." The Government's attempt to somehow draw a distinction throughout its response, for purposes of the application of the OLC Opinions, between a "private citizen" and current executive branch employee is unavailing. As has been discussed at length in our previous submission, the OLC Opinions expressly provide that the principles that are relevant here fully apply to current and former executive branch employees as well as outside consultant "private citizens" never employed as executive branch employees for obvious reasons, expressly enunciated in those OLC Opinions, including the need for the President to be able to consult whoever he believes would be helpful on the matter at hand, while being able to assure that person of confidentiality, and the needs of the outside consultant to have his or her communications kept confidential.  [*See e.g.*, Doc. 58-8 at 5] ("Paul Clement Letter"].

The Government seems to pretend that this key OLC document and others simply do not exist.  *See also, United States v. Nixon*, 418 U.S. 683, 705 (1974) (recognizing need for communications to be kept confidential; *In Re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) (ensuring confidentiality promotes candor); *Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977) (recognizing need to maintain former President's ability to assert privilege after leaving office to foster full and frank advice when in office). OLC Opinions already cited are to the same effect. *See also*, *Applicability of Post-Employment Restrictions in 18 U.S.C. § 207 to a Former Government Official Representing a Former President or Vice President in Connection with the Presidential Records Act* (June 20, 2001, Memorandum Opinion for the Associate

Counsel to the President by Daniel L. Koffsky Acting Assistant Attorney General).
https://irp.fas.org/agency/doj/olc/pra-post.pdf; *Letter from Attorney General Eric Holder to President Barack Obama* (June 19, 2012).

The Government's attempt to characterize the subpoena as being directed to Mr. Bannon in his private citizen capacity is similarly unavailing. It is the former President's prerogative to determine whether communications with a former executive branch employee were privileged or not; it is not a matter dictated by a committee's subpoena or the Government's post-hoc characterization of that subpoena. The privilege is not a function of the employee's status at the time; it is based on the nature of the communications between the witness and the President. *See* Doc. 58 at 17-18 & n. 20; 18 & n. 21 and OLC Opinions cited therein. The former President considered the subpoena and determined that it implicated executive privilege and he therefore invoked executive privilege and his invocation is presumptively valid as a matter of law, no matter how many times the Government characterizes Mr. Bannon as a "private citizen" or the materials sought as "private records" concerning his "private affairs."  [See e.g. Doc. 65 at 9].

Mr. Bannon certainly was entitled to rely on the principle that a former President retains the right to invoke executive privilege as to communications that occurred during the time he was President. *Nixon v. Adm'r of General Services*, 433 U.S. 425, 448-449 (1977); *Trump v. Thompson*, 142 S. Ct. 680; 211 L. Ed. 2d 579; 2022 U.S. LEXIS 589; 2022 WL 167347 (January 19, 2022), *denial of certiorari*; and *Id.*, 142 S. Ct. at 680-681 (Kavanaugh, J., concurring) and that the privilege invocation was presumptively valid. *Congressional Oversight of The White House*, 45 Op. O.L.C. __, at *34 (Jan. 8, 2021), *available at* https://www.justice.gov/olc/opinions-main.

*See also*, *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *United States v. Nixon*, 418 U.S. 683, 708-709 (1974).[6]

**The Government's Arguments On Executive Privilege are Wrong and Irrelevant.**

The Government speciously argues that executive privilege does not apply here. [Doc. 65 at 3-10]. It appears to argue that executive privilege was not properly invoked, citing former President Trump's invocation of executive privilege to Mr. Bannon, rather than to the committee (a position the committee clearly could have and should have raised in a civil enforcement

---

[6] Justice Kavanaugh recently summed up the state of the law on the subject in his concurrence with the denial of certiorari in *Trump v. Thompson*, 142 S. Ct. 680, 680-681; 211 L. Ed. 2d 579; 2022 U.S. LEXIS 589; 2022 WL 167347 (January 19, 2022), *denial of certiorari*; and *Id.*, 142 S. Ct. at 680-681 (Kavanaugh, J., concurring):

"… A former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, even if the current President does not support the privilege claim. Concluding otherwise would eviscerate the executive privilege for Presidential communications.

As this Court stated in *United States v. Nixon*, 418 U. S. 683, 708, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974), the executive privilege for Presidential communications is rooted in Article II of the Constitution and is "fundamental to the operation of Government." The *Nixon* Court explained that the "importance" of "confidentiality" to the Presidency was "too plain to require" further discussion. *Id.,* at 705. "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Ibid.* Yet a President "and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.,* at 708. By protecting the confidentiality of those internal communications, the Presidential communications privilege facilitates candid advice and deliberations, and it leads to more informed and better Presidential decisionmaking.

The *Nixon* Court noted, by way of historical example, that the Constitutional Convention was conducted "in complete privacy" and that the records of the Convention remained confidential for more than 30 years. *Id.,* at 705, n. 15. As was true at the Constitutional Convention, the Presidential communications privilege cannot fulfill its critical constitutional function unless Presidents and their advisers can be confident in the present *and* future confidentiality of their advice. If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends…."

proceeding if it believed it to be true). [7] This argument ignores the part of the directive from former President Trump to Mr. Bannon that expressly invokes executive privilege with respect to the specified documents, and it ignores Mr. Costello's phone call with President Trump's attorney in which President Trump's invocation of executive privilege was unequivocally communicated. [8] The Government also confuses the concepts of immunity (which is conferred by operation of law and not by a President or former President) with executive privilege (which can be and was invoked by the former President).  [Doc. 65 at 3-10].

### As Mr. Bannon Reasonably Believed, Executive Privilege Was Properly Invoked.

The record demonstrates that former President Trump, through his attorney, contacted Mr. Costello, first by telephone on October 5, 2021, and again by letter on October 6, 2021, and advised Mr. Costello that the former President was invoking executive privilege as to the documents and testimony sought in the subpoena. In the October 6, 2021, letter, President Trump advised Mr.

---

[7] Former President Trump properly invoked executive privilege.  It was in part, by necessity, a fully recognized "protective assertion" at this stage without having a chance to fully analyze what materials would and would not be covered and with the committee refusing to grant adequate time.  It was invoked consistent with long-standing and accepted practice of notifying the witness or the holder or documents and testimony of its invocation as a matter of first course.  *See e.g., Trump v. Thompson*, 20 F.4[th] 10, 20 (2021) (Former President Trump asserted executive privilege to the Archivist and President Biden asserted his determination that executive privilege was not in the country's best interest also to the Archivist).

For purposes of the defenses of entrapment by estoppel and public authority, it does not matter whether executive privilege was properly invoked or even whether it actually would have been found by a judge in a civil enforcement proceeding to apply to all materials in the subpoena.  What is relevant is: (1) that Mr. Bannon was advised by the former President, through his lawyer, that executive privilege was being invoked with respect to the subpoena the committee issued and that he was to comply with that invocation by not producing any documents or providing any testimony "to the fullest extent permitted by law" [See Doc. 35-6]; (2) that Mr. Bannon reasonably believed the former President properly invoked executive privilege and that such an invocation is presumptively valid *see In Re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997); and (3) that Mr. Bannon acted with respect to the subpoena in a manner that he believed was fully consistent with the directives he received from the former President and with what he reasonably believed the binding authoritative policy statements of the DOJ, through its OLC Opinions and other authoritative writings, provided, based on his circumstances, as these elements are more fully explained in his motion to dismiss [Docs. 58 and exhibits; 58].  The Government's argument has no bearing on the issues now before the Court regarding the defenses raised by Mr. Bannon.  It is significant to note here, though, that the OLC has recognized that executive privilege concerns can arise and require protection from congressional inquiry, even before executive privilege has been asserted.  *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *8 (May 23, 2019)  *https://www.justice.gov/olc/file/1215056/download*.

[8] *See* Costello Declaration [Doc. 30-1 at ¶10]; Doc. 39 at ¶6; Doc. 34-1 at ECF Page 17; Doc. 29-1 at 6].

Bannon (through their respective attorneys) that he considered the subpoena to be seeking "records and testimony … which is potentially protected from disclosure by the executive and other privileges…" and that "President Trump is prepared to defend these fundamental privileges in court." [Doc. 35-6 at 4]. President Trump's letter went on to provide that, "to the fullest extent permitted by law, President Trump instructs Mr. Bannon to … (b) not produce and documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena." [*Id*.]. This letter and the previous day's telephone call clearly demonstrate former President Trump's invocation of executive privilege. The Government believes that President Trump's invocation of executive privilege was somehow invalid because he did not specify in granular detail the exact documents and testimony over which he was asserting privilege and because in a later email, President Trump's lawyer advised Mr. Costello that he did not "believe there is immunity for your client" [Doc. 65 at 7, citing Doc. 52-3]. The Government is wrong. The invocation of executive privilege in and of itself triggers the OLC Opinions that were relied upon by Mr. Bannon, including the OLC Opinions on immunity. It was therefore reasonable for Mr. Bannon to believe that these opinions applied once executive privilege was invoked, especially given his role as a former top adviser to President Trump.

The Government's characterization of the invocation of executive privilege as an "intention" to invoke privilege [Doc. 65 at 5] is factually incorrect and legally irrelevant. Indeed, when the President recognizes that a subpoena is directed toward materials and information that might implicate executive privilege, it is well recognized that the President can make a "protective" assertion of privilege to give him the opportunity to determine exactly what documents and

11

information are subject to executive privilege.[9] Once again, the Government's position is premised on a misunderstanding of the legal principles underpinning this case and deliberate blindness to the expressly stated bases for Mr. Bannon's noncompliance with the subpoena.[10]

As discussed in previous filings, Mr. Bannon's reasonable belief that he was neither obligated nor legally permitted to comply with the subpoena was based on four separate principles contained in the DOJ's own OLC Opinions:

---

[9] *See Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents,* 20 Op. O.L.C. 1, 1 (1996) (Reno, Att'y Gen.) https://www.justice.gov/file/20056/download; *accord Protective Assertion of Executive Privilege Over Unredacted Mueller Report and Related Investigative Files, 43 Op. O.L.C. __ (May 8, 2019) (Barr, Att'y Gen.)* https://www.justice.gov/olc/opinion/file/1350191/download.  *See also* Doc. 58-7 at 58, n.22.

[10] Unfortunately, the Government's submission is also characterized by misrepresentations of fact once again and, as in the past, there is, of course, no record citation for the misrepresentation because the facts do not exist [*See* Doc. 39, citing past occasions].  For example, the Government writes "[I]n fact, in later correspondence, Mr. Clark admonished that the former President had neither asserted privilege in a manner to allow, nor instructed the Defendant to engage in, total noncompliance."  [Doc. 65 at 6].  This never occurred.  In the same paragraph, Government counsel writes, [I]n an October 16, 2021, email to Mr. Costello, Mr. Clark made clear that the former President did not invoke executive privilege in any way to bar the Defendant from appearing for a deposition or to direct him not to attend, stating, 'Just to reiterate, our letter referenced below [the October 6, 2021 letter] didn't indicate that we believe there is immunity from testimony for your client.  As I indicated to you the other day, we don't believe there is.' ECF No. 52-3" [Doc. 65 at 6-7].  It simply is not true that President Trump's lawyer conveyed to Mr. Bannon a limitation on the invocation of executive privilege and the cited passage does not support the Government's assertion.  It simply refers to "immunity" and that is not a concept that is up to a President or former President to assign or convey.  It arises by operation of law, once executive privilege is invoked, as one after another OLC Opinion makes clear.  It arises by operation of law for several reasons which the OLC Opinions set out, but among them is the fact that the witness cannot determine which documents or testimony the invocation of executive privilege would cover and compelling a witness's testimony after executive privilege has been invoked risks a separation of powers intrusion and an unlawful intrusion into the President's (or former President's) deliberative process and prerogative.  [See e.g., Doc. 58-7 at 53-55; 58, n.22].  The relevant OLC Opinions previously have been cited.

Finally, on this point, Government counsel's additional representation to the Court: "In any event, the Government is aware of no authority, and the Defendant points to none, supporting the notion that a private citizen subpoenaed in that capacity is entitled to absolute immunity from testimony based on executive privilege" [Doc. 65 at 7] is wrong and very disturbing for several reasons.  First, there is crystal clear binding authority from OLC Opinions which Mr. Bannon has, indeed, pointed to, which absolutely provide that a former executive branch official (a "private citizen") is entitled to "immunity from testimony" (actually, immunity from being compelled to even appear) when executive privilege is invoked.  If Government counsel is not "aware" of it, then they need to re-read the cited OLC Opinions.  Secondly, the relevant OLC Opinions on this subject both pre-date and post-date the decisions in *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 202-03 (D.D.C. 2019), *overruled on other grounds*, 951 F.3d 510 (D.C. Cir. 2020) and *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 99-107 (D.D.C. 2008), which the Government cites [Doc. 65 at 8].  These are binding authoritative OLC Opinions from these prosecutors' own Department and Mr. Bannon was entitled to rely on them.  Third, as has been stated, and as will be discussed further, Mr. Bannon was not only relying on the OLC Opinions on "immunity" for his response to the subpoena.

First, OLC Opinions direct that once executive privilege has been invoked, the witness is immune from being compelled to comply with a committee subpoena. The OLC Opinions further provide that once executive privilege has been invoked, a current or former executive branch official cannot be charged under 2 U.S.C. § 192 for not complying with a subpoena that implicates privileged materials.[11]

---

[11] In the OLC Opinion, *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, for example, OLC Assistant Attorney General Charles J. Cooper recounted the OLC's historic analysis of the consequences when a witness fails to comply with a congressional subpoena based on a claim of executive privilege and wrote the following at https://www.justice.gov/file/23826/download (Page 85) (relying in part *on "Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,"* 8 Op. O.L.C. 101 (1984) ("Olson Opinion"):

> "During the EPA matter, this Office rendered advice to the Attorney General, since memorialized in a memorandum on the applicability of §§ 192 and 194 to Executive Branch officials who assert claims of executive privilege on behalf of the President. … *We also concluded more broadly, however, that the contempt of Congress statute simply was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege. We noted that neither the legislative history nor the subsequent implementation of §§ 192 and 194 suggest that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. Moreover, as a matter of constitutional law, we concluded that the threat of criminal prosecution would unduly chill the President's ability to protect presumptively privileged Executive Branch deliberations … If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution. 8 Op. O.L.C. at 102. Therefore, Congress could not, as a matter of statutory or constitutional law, invoke the criminal contempt of Congress procedure set out in 2 U.S.C. §§ 192 and 194 against the head of an Executive Branch agency, if he acted on the instructions of the President to assert executive privilege in response to a congressional subpoena."* (Emphasis added) (citation omitted).

> *See also, Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 OLC LEXIS 2, 2019 WL 2315338, at *14 (O.L.C. May 20, 2019)[Doc. 58-14]; *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68-69 (2008) [Doc. 58-11]; *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Privilege*, 8 Op. O.L.C. 101 (1984) [Doc. 58-10]; *Immunity of Former Counsel to the President from Compelled Congressional Testimony*, 43 Op. O.L.C. slip op. (July 10, 2007) [Doc. 58-9]; *Application of 28 U.S.C. §458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. slip op. at 356 (December 18, 1995) [Doc. 58-12] ("Despite the broad language, the criminal contempt of Congress statute does not apply to the President or to presidential subordinates who assert executive privilege."), *quoting*, Doc. 58-12].  In 2021, after the decision in *McGahn*, the OLC reiterated its long-standing position on immunity, and provided several other principles that it considers a bar to compelling current or former Executive Branch officials from testifying before Congress when executive privilege has been invoked, specifically noting why it applies to former officials with equal force and noting its firm position that the failure to permit the privilege holder's representative to attend any deposition renders the subpoena invalid and unconstitutional. *Congressional Oversight of the White House*, 45 Op. O.L.C. slip op. at 50-57 (January 8, 2021) [Doc. 58-7].

Secondly, OLC Opinions direct that once executive privilege has been invoked, if the committee will not permit a representative of the privilege holder to be present during the taking of testimony, the subpoena is invalid and cannot constitutionally be enforced and the witness cannot constitutionally be charged with criminal contempt. [Doc. 58 at 18].

> Subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients"; "This Office has advised that barring agency counsel from congressional depositions is unconstitutional because it 'compromise[s] the President's constitutional authority to control the disclosure of privileged information and to supervise the Executive Branch's communications with congressional entities.'");

*Congressional Oversight of The White House*, *supra*, at *56. [Doc. 58-7 at 56]; *see also Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *1 (May 23, 2019) ("Congressional subpoenas that purport to require agency employees to appear without agency counsel are legally invalid and are not subject to civil or criminal enforcement.").

The Select Committee was unequivocal in its communications to Mr. Costello that its rules prohibited a representative for President Trump to be present for Mr. Bannon's testimony. Mr. Bannon has always made clear that once the committee communicated this prohibition, he reasonably relied on the applicable OLC Opinions that direct that a congressional subpoena is invalid and unconstitutional under these circumstances.

Third, Mr. Bannon is not the privilege holder. The privilege belongs to former President Trump. Therefore, as the OLC Opinions make clear, Mr. Bannon lacked any legal authority to decide what materials or information that President Trump deemed privileged. As explained by the OLC Opinions, Mr. Bannon appearing for testimony or producing documents under these

circumstances presented both an untenable risk of intrusion into the President's privilege and an abrogation by the legislature of the executive branch's autonomy. Mr. Bannon was therefore obligated to observe President's invocation of executive privilege and could not produce documents or testify without further guidance as to the scope of the materials and information over which President Trump asserted executive privilege.  [*See* Ex. 2, Mar. 16, 2022 Hearing Tr. at 66].[12]

Fourth, Mr. Bannon was duty bound to honor the constitutional mandate to work toward an accommodation, as reflected in the case law, the OLC Opinions, and congressional practice.[13] Mr. Bannon also relied on his four previous experiences with a committee subpoena for which the accommodation process was used and was allowed to run its course, leading to his testimony. He attempted to reach an accommodation from the outset, with his letter to Chairman Thompson

---

[12] *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 2019 WL 2563045 (O.L.C.) at *8 (May 23, 2019)  https://www.justice.gov/olc/file/1215056/download.

> "Even if the President has not yet asserted a particular privilege, excluding agency counsel would diminish the President's ability to decide whether a privilege should be asserted. The Executive Branch cannot foresee every question or topic that may arise during a deposition, but if questions seeking privileged information are asked, agency counsel, if present, can ensure that the employee does not impermissibly disclose privileged information. See Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding at 2 (July 23, 1982) ("A witness before a Congressional committee may be asked—under threat of contempt—a wide range of unanticipated questions about highly sensitive deliberations and thought processes. He therefore may be unable to confine his remarks only to those which do not impair the deliberative process."). The President, through his subordinates, must be able to intervene before that information is disclosed, lest the effectiveness of the 3 See, e.g., Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys, 31 Op. O.L.C. 1 (2007) (opinion of Acting Attorney General Paul D. Clement) (concluding that the President may assert executive privilege with respect to testimony by two former White House officials). Attempted Exclusion of Agency Counsel from Congressional Depositions 11 privilege be diminished. See Memorandum for Peter J. Wallison, Counsel to the President, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel at 2 (Sept. 8, 1986) (agency counsel attending congressional interviews can advise "about the sensitivity of particular information and, if need be, to terminate the interview to avoid disclosure of privileged information"). Accordingly, Committee Rule 15(e) unduly interferes with the President's supervision of the disclosure of privileged information by barring agency counsel from the deposition of an agency employee concerning official activities."

[13] *See e.g., United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977); Doc. 58-7 at 38 (OLC Opinion of Jan. 8, 2021).

advising that he would comply if the privilege issue were resolved with President Trump and that he would comply if a judge determined that Mr. Bannon must comply with the subpoena notwithstanding the invocation of executive privilege. Mr. Bannon later received a letter from Deputy White House Counsel Jonathan Su, advising, in effect, that President Biden had decided to try to override President Trump's invocation of executive privilege. When Mr. Bannon learned about the filing of *Trump v. Thompson*, in which this priority question was directly at issue, Mr. Bannon simply asked the committee for a one-week adjournment to determine whether the Court's decision in that case yielded any guidance for Mr. Bannon's predicament. The committee denied that request for no reason, other than apparently the already scheduled televised contempt referral vote it wanted to capitalize on for political purposes. [See Doc. 30-1, ¶¶12-16]. Mr. Bannon never engaged in "total noncompliance" as the Government asserts. He simply requested the same extension of time that the committee has afforded to other witnesses in this investigation. Mr. Bannon expressly advised the committee through counsel that he was not ignoring or acting in defiance of the subpoena and was committed to working out a way to comply, if possible, consistent with his legal duties. [See e.g., Doc. 29-1 at ECF Pages 6-7l Doc. 30-1, ¶¶12-16]. He fulfilled his accommodation obligations; the committee completely rejected theirs.[14]

For these reasons, the Government's argument that Mr. Bannon is not entitled to rely on the defenses of entrapment by estoppel or public authority because executive privilege was not properly invoked has no merit and its argument at Opposition pages 3-10 must be rejected.

---

[14] "A congressional committee may not avoid its obligation to participate in this constitutionally mandated process by issuing or seeking to enforce a subpoena before the accommodation process has run its course." [Doc. 58-7 at 56; see also *Id.* at 37-40, discussing the constitutional foundations for the accommodation process].

Furthermore, Pages 10-27 of the Government's Opposition make specious arguments reflecting its position that the defenses of entrapment by estoppel and public authority do not apply. The Government has argued throughout this case that, contrary to express authority from the United States Supreme Court and this Circuit, the defense of entrapment by estoppel only applies when a defendant has made direct inquiry of an agency and received direct, personalized advice. This is a fundamental error which undermines the Government's arguments on entrapment by estoppel across the board. Its repeated assertions that Mr. Bannon cannot reasonably rely on OLC Opinions that were not issued in response to his direct inquiry or that the impact of OLC Opinions is limited to the facts on which the OLC was asked to opine is belied by the decision in *Comm. on the Judiciary v. United States v. McGahn*, 968 F.3d 755 (2020) (*en banc*). In *McGahn*, the Court repeatedly refers to and credits OLC Opinions as reflecting binding DOJ policy on the legal principle involved and did not limit the applicability of that legal principle to the specific facts that necessitated the OLC Opinion in the first place. In fact, the Court expressly notes long-established DOJ policy, reflected in OLC Opinions (upon which Mr. Bannon relies in this case), as support for its conclusion that a civil enforcement action is only viable course of action to compel compliance with a subpoena once executive privilege has been invoked, specifically because the OLC has made clear the DOJ's position that the criminal contempt statute does not and cannot apply. *McGahn*, 968 F.3d at 773, 775.[15] The very purpose of OLC Opinions is to guide the DOJ in their prosecution of cases and to give binding authoritative notice of their departmental policy. It would therefore be anomalous to hold that the legal principles espoused in OLC Opinions, which

---

[15] "Yet the OLC has repeatedly opined that the criminal contempt statute does not and could not apply to a close Presidential advisor. *See, e.g., Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 OLC LEXIS 2, 2019 WL 2315338, at \*14 (O.L.C. May 20, 2019) [Doc. 58-14]; *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68-69 (2008) [Doc. 58-11] Cooper Opinion, 10 Op. O.L.C. at 83 [Doc. 58-15]; Olson Opinion, 8 Op. O.L.C. at 142." [Doc. 58-10].

are based on legislative history, caselaw, and painstaking research by some of the foremost legal scholars at DOJ, cannot be applied to cases implicating the very same legal principles . [*See* Doc. 58 at 22-27].

Unfortunately, throughout their Opposition, Government counsel choose to substitute condescension and offensive tone for relevant substantive argument. Their arguments are frivolous. They are based on false factual and legal premises[16] and a mistaken presentation of the role and authority of the OLC Opinions. The conclusions and principles of law arising from many of the directly relevant binding OLC Opinions and other authoritative DOJ writings on the exact subjects at issue are badly misrepresented or ignored. Mr. Bannon need not burden the Court at any great length with a reply to these issues. He will rely on his motion to dismiss and will be prepared to address these other matters at oral argument.  After one general comment, he will focus

---

[16] For its entire argument that the defenses of entrapment by estoppel and public authority do not apply, the Government uses a false factual construct of a subpoena directed toward a "private citizen" seeking his "private records" and for which no claim of executive privilege has been asserted. [Doc. 65 at 4-27]. That is not this case. The Government's submission simply does not address the issues in the case based on the actual relevant facts and law.

With respect to the OLC Opinions and other DOJ writings, the Government limits the universe of relevant authoritative writings to four [Doc. 65 at 11-17], without any legitimate basis for doing so, and it presents a skewed picture of those four, ignoring or unduly limiting the principles for which they stand. Indeed, the Government ignores the clear overriding authoritative, binding principles enunciated in these four, as it does for other applicable OLC Opinions and consistently ignores or misrepresents legal principles clearly set out in the authoritative writings.

For example, a central underlying theme of the Government's argument is that the authority of the relevant OLC Opinions that provides that when a witness receives a committee subpoena and executive privilege is invoked he cannot be compelled to comply and he cannot be prosecuted under §192 does not apply to a "private citizen." [Doc. 65 at 11-17].

Putting aside that that characterization of Mr. Bannon fatally ignores his role as a former top executive branch advisor to President Trump, the Government's attempt to narrow the principles for which the OLC Opinions stand finds no support in the law and does not reflect the actual standing and impact of the OLC Opinions as a matter of binding policy.  [See Doc. 58 at 17-27].  Multiple OLC Opinions cited by Mr. Bannon expressly provide that these protections that flow from the invocation of executive privilege apply in full force to former executive branch employees and to outside consultants with whom the President communicated, all of whom are at that point "private citizens."  [See e.g., citations at Doc. 30 at 18; Doc. 58 at 17-18, n. 20].  Moreover, independent of the OLC Opinions, the Government's thesis makes no sense.  It cites no authority for the absurd proposition that a President (or former President) cannot assert executive privilege regarding communications with an outside consultant or that the legislative branch has the right to override the President's prerogative as to what communications he deems privileged. Yet the Government's entire argument is based on that unsupportable thesis.

on two important arguments in his motion to dismiss that the Government failed to address in its opposition.

The Government has argued throughout this case, against express authority from the Supreme Court and D.C. Circuit, that the defense of entrapment by estoppel only applies when a defendant has made direct inquiry of an agency and received direct, personalized advice. This is a fundamental error which undermines the Government's arguments on entrapment by estoppel across the board. Its repeated assertions that Mr. Bannon cannot reasonably rely on OLC Opinions that were not issued in response to his direct inquiry or that the impact of OLC Opinions is limited to the facts on which the OLC was asked to opine and cannot be applied more broadly based on the principles they enunciate, are belied, among numerous other sources, by the decision in *Comm. on the Judiciary v. United States*, 968 F.3d 755 (2020) (*en banc*).  In *McGahn*, the Court repeatedly referred to and credited OLC Opinions as reflecting binding DOJ policy on the legal principle involved and not limited to the facts at issue in the OLC Opinion.  In fact, the Court expressly noted long-established DOJ policy, reflected in OLC Opinions relied upon by Mr. Bannon, as support for its conclusion a civil enforcement action is the only viable course of action with respect to a subpoena when executive privilege has been invoked – specifically because the OLC has made clear the DOJ's position that the criminal contempt statute, §192, does not and cannot apply. *McGahn*, 968 F.3d at 773, 775.[17]  This makes sense, of course, given the bases for deserved stature of the OLC Opinions and the DOJ's intention that they serve as formal, binding, policy statements for the DOJ.   [See Doc. 58 at 22-27]. The Government sacrifices important jurisprudential

---

[17] "Yet the OLC has repeatedly opined that the criminal contempt statute does not and could not apply to a close Presidential advisor. *See, e.g., Testimonial Immunity Before Congress of the Former Counsel to the President*, 2019 OLC LEXIS 2, 2019 WL 2315338, at *14 (O.L.C. May 20, 2019) [Doc. 58-14]; *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68-69 (2008) [Doc. 58-11] Cooper Opinion, 10 Op. O.L.C. at 83 [Doc. 58-15]; Olson Opinion, 8 Op. O.L.C. at 142." [Doc. 58-10].

principles for political expedience in attempting to narrow or diminish the OLC Opinions, in furtherance of its "anything goes" misuse of the criminal justice system to advance a partisan political agenda in this case.[18]

### IV.     2 U.S.C. § 192 Is Unconstitutional As Applied

**The Fair Notice Requirement of Due Process Requires Dismissal in Light of the OLC Opinions**

At Pages 43-48 of his motion to dismiss, Mr. Bannon argues that 2 U.S.C. §192, as applied, is unconstitutionally overbroad and is void for vagueness.  [Doc. 58 at 43-48].  Among the several arguments Mr. Bannon makes as to why the statute is unconstitutional as applied, perhaps the most directly compelling one that demands the indictment's dismissal is that the statute, when considered with the relevant OLC Opinions, which reflect official, binding, authoritative DOJ policy, violates the constitutional right to due process of law by failing adequately to give fair notice of what conduct will subject a person to criminal liability or prosecution under the statute. [Doc. 58 at 44-46].

Statements by the Government, through its agents or officials, concerning criminal sanctions, which are contradictory or so vague and undefined "as to afford no fair warning as to what might transgress (the statute)" render the statute unconstitutionally vague, much in the same way contradictory statements within a criminal statute render the statute unconstitutional.  *Raley v. State of Ohio*, 360 U.S. 423, 438 (1959). In *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 674 (1973), the Supreme Court expressly highlighted the due process concerns implicated by agency writings in the context of a criminal prosecution. The Court wrote that fair warning of criminality must be provided, even where the agency's writings do not purport

---

[18] There are many additional errors and misrepresentations of material facts and legal principles throughout the balance of the Government's Opposition. The defense can address any of these at oral argument, if the Court so requires.

to "create or define the statutory offense at issue" but nonetheless can be interpreted as a guide to future conduct. *Id*. The Court wrote that such agency policy writings as were at issue there, "deprived (PICCO) of fair warning as to what conduct the Government intended to make criminal" and that when that occurs, as it undeniably has here, "… there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution." *Id*. (citations omitted). *See also, United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992) (pre-trial dismissal ordered under the Due Process Clause); Floyd D. Shimomura, *Federal Misrepresentation:  Protecting the Reliance Interest*, 60 Tul. L. Rev. 596, 636-641 (1986); SueAnn D. Billimack, *Reliance on an Official Interpretation of the Law: The Defense's Appropriate Dimensions*, 1993 U. Ill. L. Rev. 565, 578 (1993) (fair notice/due process).

The situation here is far more violative of due process than just failing to give adequate notice of what will constitute criminal conduct. The OLC Opinions first give license to the course of action Mr. Bannon took in response to the subpoena and the assertion of executive privilege. As described in detail, with citations provided throughout the motion to dismiss, the OLC Opinions make clear that a witness who receives a congressional subpoena with respect to which executive privilege is asserted, must presume the invocation of privilege to be valid, must honor the privilege and cannot be compelled to comply with the subpoena. The OLC Opinions further provide that when, in connection with a subpoena in such a circumstance the committee refuses to allow the privileged holder's representative to attend the taking of any testimony, the subpoena is rendered invalid, unconstitutional, and unenforceable. These clear, binding, authoritative OLC Opinions, consistent over decades and adopted by the DOJ, guided and licensed Mr. Bannon's conduct. But most directly relevant for the instant fair notice/due process issue that requires dismissal, the OLC Opinions, in place since at least 1984 (based on even earlier official DOJ writings), unequivocally

provide that the criminal contempt statute cannot be applied in this exact situation – Mr. Bannon cannot be subjected to criminal prosecution under the attending circumstances.

It has been official DOJ policy since at least 1984 that the criminal prosecution of a current *or former* executive branch official under 2 U.S.C. §192 is prohibited where, as here, executive privilege was invoked.[19] Six decades of official consistent DOJ policy, reflected in its OLC Opinions, is that when an executive branch official (or former executive branch official) receives a congressional subpoena and the President (or former President) invokes executive privilege in connection with the subpoena, that person cannot be prosecuted under §192.[20] Mr. Bannon was, of course, a close and top advisor to former President Trump in the executive branch and former President Trump, in the exercise of his exclusive prerogative, invoked executive privilege with respect to the subpoena Mr. Bannon received and that underlies this prosecution.

Under the operative circumstances here, in light of the binding, authoritative OLC Opinions, Mr. Bannon could not possibly have had the fair notice due process requires to know or even have reason to believe that his conduct in response to the subpoena could expose him to criminal liability. Quite to the contrary, the OLC Opinions assured Mr. Bannon, and anyone

---

[19] As noted earlier, as recently as 2020, the D.C. Circuit confirmed that it is the consistent long-standing official position of the DOJ, reflected in multiple OLC Opinions, that the criminal contempt statute "does not and could not apply to a close Presidential advisor." *McGahn*, 968 F.3d 755 at 773, 776 (D.C. Cir. 2020) (en banc) (citing OLC Opinions).

[20] *See e.g.*, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 129 (May 30, 1984) [Doc. 58-10]:

"We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it. Our conclusion is based upon the following factors: (1) the legislative history of the contempt of Congress statute demonstrates that it was not intended to apply to Presidential assertions of executive privilege; and (2) if the statute were construed to apply to Presidential assertions of executive privilege, it would so inhibit the President's ability to make such claims as to violate the separation of powers."

*See also*, *Congressional Oversight of the White House, 2021 WL 222744 O.L.C.* 2021 WL 222744 at *33 (O.L.C.) [Doc. 58-7]; Machen letter of March 31, 2015 [Doc. 58-16].

similarly situated that it would be absolutely prohibited to charge a person so situated who refuses

to comply with the subpoena under such circumstances as this case presents with a violation of the

statute charged in this case, 2 U.S.C. §192.  In fact, the OLC Opinions and other authoritative DOJ

writings have provided this assurance consistently across all administrations.

A relevant section from the motion to dismiss, which the Government has failed to oppose

bears reiterating: The DOJ's definitive position that the criminal contempt statute does not apply

where Executive Privilege has been invoked goes back well over six decades.  Mr. Bannon relied

on that in his response to the subpoena and he was entitled to rely on that official policy.  The DOJ

must be estopped from prosecuting this case, in light of its official, published policy on this exact

issue.

As the OLC opinion, *Whether the Department of Justice May Prosecute White House*

*Officials for Contempt of Congress*, 2008 WL 11489049 (O.L.C. at *2) expressly reports, in 1956,

Deputy Attorney General William Rogers presented a report to Congress that concluded that the

criminal contempt of Congress statute was "inapplicable to the executive departments" where the

President has asserted executive privilege.  [See Doc. 41-6].

In 1976, Assistant Attorney General Rex Lee stated that if an executive branch member

were cited for contempt of Congress because of the assertion of executive privilege, the DOJ would

not present the matter to a grand jury (notwithstanding the mandatory language in Sec. 194).[21]  In

Assistant Attorney General Theodore Olson's comprehensive 1984 OLC Opinion,[22] drawing on

---

[21] *Representation of Congress and Congressional Interests in Court: Hearings Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong. 8 (1976).

[22] *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("Prosecution for Contempt of Congress").

canons of statutory construction, legislative history, and basic constitutional principles, (including constitutional separation of powers principles), the DOJ concluded that Section 192 was not intended to apply and could not constitutionally be applied to an executive branch official who asserts the President's claim of executive privilege. During the administration of President William J. Clinton, Assistant Attorney General Walter Dellinger stated that "the criminal contempt of Congress statute *does not apply* to the President or presidential subordinates who assert executive privilege." *Application of 28 U.S.C. Sec. 458*, 19 Op. O.L.C. at 356 (emphasis added). Professor Dellinger wrote further that to apply "the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Id.*[23] Mr. Bannon would respectfully commend the Court's attention to Pages 129-142 of the Olson Opinion, provided to the Court at Doc. 58-10, to see just how forcefully the OLC Opinions make the point that §192 does not and cannot apply to Mr. Bannon's situation, with full detailed support and careful reasoning by Mr. Olson provided.

In light of the cited OLC Opinions (and other DOJ writings consistent with them), which Mr. Bannon, as a former executive branch employee who received a subpoena to which President Trump invoked executive privilege, was entitled to consult and rely and did so, Mr. Bannon unquestionably was deprived of the fair notice that his conduct could give rise to criminal liability that due process requires.  In fact, the DOJ writings assured him that he could not and would not face criminal liability.  The constitutional guarantee of due process demands the dismissal of the indictment.  [*See also* Doc. 58 at 19 & n. 23].

---

[23] *See also*, *Letter from Michael B. Mukasey, Attorney General, to the Hon. Nancy Pelosi, Speaker of the House of Representatives* (Feb. 28, 2008); *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68 (1986) (by Assistant Attorney General Charles Cooper).

## <u>The Government Must Be Estopped From Pursuing This Criminal Prosecution</u>.

The Government also failed to respond to Mr. Bannon's conceptually similar, but independent argument that, in any event, the Government, acting through the Department of Justice, should be estopped from prosecuting this case as a matter of due process and equity, if the accepted principle that OLC Opinions are binding authority on the DOJ is to have any meaning at all. [Doc. 58 at 37-38].  Mr. Bannon incorporates by reference that argument here.

Mr. Bannon has demonstrated that the official, formal, binding authority in the DOJ's OLC Opinions unequivocally establish as long-standing, consistent DOJ policy that (1) the subpoena in this case was legally invalid, unconstitutional, and unenforceable because, notwithstanding the invocation of executive privilege, the committee rules refused to allow the privilege holder's representative to be present for the subpoenaed deposition and the committee confirmed that it would follow that rule; (2) the invocation of the privilege was the former President's sole prerogative and not Congress's, (3) the invocation was presumptively valid, (4) it applies to former employees and outside consultants, (5) that bringing a criminal prosecution against a person in Mr. Bannon's situation would violate the separation of powers doctrine and would be unlawful, and (6) that, for a variety of reasons, a person so situated cannot be prosecuted criminally under 2 U.S.C. § 192 as a matter of law.  It is inconceivable that any just system could allow the same prosecutorial authority that formulated those positions as a matter of law, through binding enactments, to now prosecute Mr. Bannon in direct contravention of those binding principles.  The Government must be estopped.[24]  The indictment must be dismissed.

---

[24] *See*, *Applying Estoppel Principles in Criminal Cases*, 78 Yale L.J. 1046, 1069 (1969) (Citing two "interrelated advantages for a rational system of criminal justice" of the "development of a full-blown defense of criminal estoppel."); John T. Parry, *Culpability, Mistake, and Official Interpretations of Law*, 25 Am. J. Crim. L. 1, 78 (Fall 1997) (Asserting that the criminal law will be better served if courts recognize both the "moral culpability" and due process rationales for applying estoppel in criminal cases).

## V.       **Prosecutorial Over-Reaching Requires Dismissal**

Throughout the course of this case, the Government has taken the brazen position that they did nothing wrong by seeking Mr. Costello's telephone and email records, and surreptitiously "interviewing" him in order to obtain evidence against his client, Mr. Bannon. *See* [Ex. 2, Mar. 16, 2022, Hearing Tr. at 12] ("So Mr. Costello is the intermediary here. He is the only one interfacing with the Committee. So as the government is starting its investigation, it could possibly be that Mr. Costello just never fully communicated with the defendant about what the Committee was requiring of him."). It is outrageous that the Government tries to excuse their highly unusual actions by characterizing Mr. Costello as an "intermediary" and not a lawyer. Outrageous government conduct is, as the Government acknowledges, grounds for dismissing an indictment. *See United State v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991).

The Government argues that for this Court to dismiss the Indictment, the record must establish: (a) Government awareness of an attorney-client relationship; (b) deliberate intrusion into that relationship; and (c) prejudice. [Doc. 65 at 39] (citing *United States v. Hsia*, 81 F. Supp. 2d 7, 18-19 (D.D.C. 2000). These factors are established in the record here. The Government deliberately sought the telephone and email records of Mr. Costello precisely because they knew that he served as counsel to Mr. Bannon in his interactions with the Select Committee. The Government deliberately interfered with that relationship, by seeking – without main DOJ authorization – Mr. Costello's records to obtain evidence that could be used against Mr. Bannon in this very prosecution.

Mr. Bannon was prejudiced by the Government's action because they drove a wedge between him and his lawyer. *See* [Ex. 2, Mar. 16, 2022, Hearing Tr. at 68] (Mr. Costello: "Now, I can't think of any way to put a wedge between a lawyer and his client than to say that that guy that

you thought, Mr. Bannon, was your lawyer, is now going to be a witness against you; that's what they were doing here."); *Id*. at 71-72 (Mr. Costello: "But I certainly was not advised that this is going to be an FBI interview . . . When Mr. Bannon found out about that, he was irritated because he thought I gave an interview to the FBI because of the 302. So that's the kind of wedge I'm talking about here that they drive between a lawyer and his client, by making that lawyer look like he's not a lawyer representing you. In fact, he's going to be a witness against you.").

History teaches us that what is permitted will come to be expected. If no sanction is imposed for the Government's gross abuse of power and interference with Mr. Bannon's Sixth Amendment right to counsel, then years from now the *Bannon* case will stand for the proposition that a federal prosecutor is just doing a thorough investigation when he or she: (a) seeks a grand jury subpoena for the attorney's phone records; (b) seeks a court order for the attorney's email records; and (c) surreptitiously "interviews" a defendant's attorney under the guise of participating in counsel discussions regarding a proposed declination, when all the while, the prosecution was considering the lawyer a witness to a purported "crime" rather than an advocate on behalf of a client. Unless the Indictment is dismissed, prosecutors across the country will be emboldened to copy the outrageous Government conduct here. The Constitution guarantees an accused the right to counsel; no authority allows the prosecutor to decide by fiat to turn an accused's lawyer into a witness against him.

On the misleading grand jury testimony, again the Government mischaracterizes our brief. Our quarrel is not with *whether* the grand jury was informed about the assertion of execution privilege in any form. The misleading grand jury testimony was by the sole grand jury witness, who testified upon prompting by the prosecutor that neither former President Donald J. Trump nor his representative communicated *directly with* the Select Committee to assert executive privilege.

[Doc. Ex. FF – grand jury transcript filed under seal – at 44]. That testimony suggested, improperly, that the Select Committee had not received a formal or informal assertion of privilege by President Trump, which was false and misleading. Similarly, the grand jury testimony about an adjournment is misleading, and the Government's opposition brief is misleading to the extreme. The Government knows that the request for adjournment was not a "post-default effort to delay a contempt citation" [Doc. 65 at 46], because Chairman Thompson invited Mr. Costello to submit the October 18, 2021, letter, [Ex. 3 at 1], and after receiving it, the Chairman explicitly noted that it was a "letter requesting a one-week 'adjournment.'" [Ex. 4 at 1 (US-000275)]. The Government had this in their position – yet did not present it to the grand jury. Instead, they presented false testimony that Mr. Bannon never sought an adjournment. [Doc. Ex. FF – grand jury transcript filed under seal – at 32-36]. Based upon the presentation of false testimony on key issues. The Indictment should be dismissed. *See U.S. v. Lawson*, 502 F. Supp. 158, 172 (D. Md. 1980).

## CONCLUSION

WHEREFORE, Defendant Stephen K. Bannon respectfully requests that this Court grant his Motion To Dismiss The Indictment, for the reasons set forth in the filings, together with any offered if at the hearing on this motion, and the entire record in this matter.

***(Signature block on next page)***

Dated: May 17, 2022

Respectfully submitted,

**SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

    /s/ M. Evan Corcoran

M. Evan Corcoran (D.C. Bar No. 440027)
400 E. Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: ecorcoran@silvermanthompson.com


    /s/ David I. Schoen

David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: schoenlawfirm@gmail.com


    /s/ Robert J. Costello

Robert J. Costello (*pro hac vice*)
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Email: rjc@dhclegal.com

*Counsel for Defendant Stephen K. Bannon*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 17th day of May 2022, a copy of the foregoing Reply In Support Of Motion To Dismiss The Indictment was served *via* the Court's CM/ECF system on all properly registered parties and counsel.

    /s/ M. Evan Corcoran       
M. Evan Corcoran (D.C. Bar No. 440027)
