**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

UNITED STATES OF AMERICA     )

                            )

       v.             )       Criminal No. 21-670 (CJN)

                            )

STEPHEN K. BANNON,        )

                            )

         _Defendant._     )

                            )

_____)

**<u>BRIEF OF UNITED STATES HOUSE OF REPRESENTATIVES AS AMICUS CURIAE
IN SUPPORT OF THE DEPARTMENT OF JUSTICE</u>**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION AND STATEMENT OF INTEREST ............................................. 1

ARGUMENT ....................................................................................... 2

I.   Defendant's Efforts To Undermine The Select Committee And Its Subpoena
     Are Mistaken ............................................................................... 2

     A.   The Constitution's Rulemaking Clause Forecloses Defendant's Arguments ......... 3

     B.   Defendant Advances A Flawed Reading Of H. Res. 503,
          Asking This Court To Improperly Substitute Its View Of
          The Requirements Of That Provision For Those Of The House ........................... 3

     C.   The Select Committee Properly Sought Defendant's Deposition........................ 8

     D.   The Select Committee Has A Valid Legislative Purpose For
          The Subpoena........................................................................ 11

II.  The Select Committee Has the Authority To Compel Production Of A
     Privilege Log Or Certification, And Such Authority Does Not Violate
     the Separation of Powers ................................................................ 14

     CONCLUSION.............................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. F.B.I.*,
    198 F.R.D. 306 (D.D.C. 2000)...............................................................................16

*Avery Dennison Corp. v. Four Pillars*,
    190 F.R.D. 1 (D.D.C. 1999).................................................................................16

*\*Barker v. Conroy*,
    921 F.3d 1118 (D.C. Cir. 2019)..............................................................................1

*Barry v. United States ex rel. Cunningham*,
    279 U.S. 597 (1929)...............................................................................................2

*\*Budowich v. Pelosi*,
    No. 21-3366 (D.D.C. Jan. 20, 2022) ................................................................7, 12

*\*Comm. on Judiciary, U.S. House of Representatives v. McGahn*,
    415 F. Supp. 3d 148 (D.D.C. 2019)..................................................................15, 19

*Comm. on Judiciary, U.S. House of Representatives v. McGahn*,
    968 F.3d 775 (D.C Cir. 2020) (en banc)............................................................15

*\*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008).....................................................15, 17, 18, 19

*Comm. on Judiciary of U.S. House of Representatives v. Miers*,
    542 F.3d 909 (D.C. Cir. 2008)........................................................................15, 18

*Comm. on Oversight and Government Reform v. Holder*,
    No. 12-1332, 2014 WL 12662665 (D.D.C. Aug. 20, 2014)..............................17, 19

*\*Eastman v. Thompson*,
    No. 8:22-00099 (C.D. Cal. Jan 25., 2022) ................................................7, 12, 19

*In re Grand Jury Subpoena*,
    274 F.3d 563 (1st Cir. 2001).................................................................................16

*In re Search of The Rayburn House Off. Bldg. Room No. 2113*,
    432 F. Supp. 2d 100 (D.D.C. 2006) .......................................................................19

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)...............................................................................................14

*Northrop Corp. v. McDonnell Douglas Corp.*,
    751 F.2d 395 (D.C. Cir. 1984)...............................................................................19

*Rangel v. Boehner*,
    20 F. Supp. 3d 148 (D.D.C. 2013) ..................................................................1, 3

*\*Repub. Nat'l Comm. v. Pelosi*,
    No. 22-659, 2022 WL 1294509, at \*15 (D.D.C. May 1, 2022) .........................6, 7, 9

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
    No. 16-621, 2016 WL 11681577 (D.D.C. Sept. 30, 2016) .............................15, 17

*\*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) ..............................................................11, 14, 18

*United States v. Am. Tel. & Tel. Co.*,
    551 F.2d 384 (D.C. Cir. 1976) ...............................................................15

*U.S. v. Constr. Prods. Rsch., Inc.*,
    73 F.3d 464 (2d Cir. 1996) ...................................................................16

*United States v. Durenberger*,
    48 F.3d 1239 (D.C. Cir. 1995) ..............................................................7

*United States v. Nixon*,
    418 U.S. 683 (1974) ...........................................................................18

*\*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ..............................................................1, 6

*Vander Jagt v. O'Neil*,
    699 F.2d 1166 (D.C. Cir. 1982) ...........................................................3

*Yellin v. United States*,
    374 U.S. 109 (1963) ...........................................................................8

**Constitution**

U.S. Const., Art. I, § 5, cl. 2 ...................................................................1

**Statutes and Rules**

2 U.S.C. § 192 ...................................................................................2

26 U.S.C. §§ 8001-05 ..........................................................................4

Fed. R. Civ. P. 45 ...............................................................................16

**Legislative Authorities**

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) .......................................4

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) ...................................................4

167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) .................................................11

167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021)............................................5

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) ......................................6

167 Cong. Rec. H7786 (daily ed. Dec. 14, 2021) ...........................................5

167 Cong. Rec. H7793(daily ed. Dec. 14, 2021) .............................................5

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) .......................................6

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) ..............................................5

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) .........................................6

H. Rep. No. 109-377 (2006) .........................................................................4, 5

H. Rep. No. 117-152 (2021) ..........................................................................12

H. Res. 8, 117th Cong. (2021) .....................................................................9, 10

H. Res. 10, 117th Cong. (2021) .......................................................................9

H. Res. 437, 109th Cong. (2005) ......................................................................4

H. Res. 503, 117th Cong. (2021) ....................................................3, 4, 5, 8, 12

H. Res. 730, 117th Cong. (2021) ......................................................................6

H. Res. 851, 117th Cong. (2021) ......................................................................6

H. Res. 1037, 117th Cong. (2022) ....................................................................6

Rules of the U.S. House of Representatives, 117th Cong. (2021)

    Rule I.................................................................................................4

    Rule X ...............................................................................................4

    Rule XI.............................................................................................15

**Other**

Aaron Blake, *Who could have predicted the Capitol riot? Plenty of people –
    including Trump allies*, Wash. Post (Jan. 28, 2021), https://perma.cc/QRC6-WV5H ............13

Glossary of Legislative Terms, https://perma.cc/83HA-3DKY ......................................9

Steve Bannon, *War Room: Pandemic, EP 634 – Tuesday Special (with Maggie VandenBerghe, Ben Berquam, and Peter Navarro)* (Jan. 5, 2021), https://perma.cc/5SPG-BCQ4 .................13

## INTRODUCTION AND STATEMENT OF INTEREST

The United States House of Representatives files this *amicus curiae* brief in support of the position of the U.S. Department of Justice that this Court should deny Defendant Stephen Bannon's motion to dismiss his indictment.  The House is in the best position to provide this Court with the House's interpretation of its own rules and procedures, which Defendant has put at issue.  Indeed, the D.C. Circuit has held that explanations by the House in court briefs and at oral argument concerning the scope and meaning of House internal rules and procedures can be dispositive in ruling on the merits of claims involving those rules.  *See Barker v. Conroy*, 921 F.3d 1118, 1124, 1130-32 (D.C. Cir. 2019).

In so holding, the D.C. Circuit relied on the Constitution's Rulemaking Clause, which states that "[e]ach House may determine the Rules of its Proceedings."  U.S. Const., Art. I, § 5, cl. 2.  The *Barker* court explained that this Clause "'clearly reserves to each House of the Congress the authority to make its own rules,' and . . . interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'"  921 F.3d at 1130 (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013).

Because the Rulemaking Clause bars federal courts from usurping the House's rulemaking process and from invalidating House actions when a litigant (or even a court) might read the relevant House rules differently, it is important for this Court to have before it the official position of the House regarding the meaning of its rules, which often turns on historical practice and traditions of the House—areas well within the House's expertise.  Likewise, the House is uniquely positioned to elaborate on the legitimate legislative purpose and authority of

the House Select Committee to Investigate the January 6th Attack on the United States Capitol, as well as the validity of the Select Committee subpoena that Defendant defied.

Defendant's attacks against the validity of the subpoena are deeply flawed: They ignore the deference that a court owes the House regarding the meaning and application of its own rules and procedures, and the presumption of regularity due Congress. *See Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity . . . cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority."). And they have already been rejected by the three courts to have considered them. Defendant's defiance of the Select Committee's subpoena constitutes criminal conduct under 2 U.S.C. § 192, and his motion to dismiss his indictment should therefore be denied.

## ARGUMENT

### I.   Defendant's Efforts To Undermine The Select Committee And Its Subpoena Are Mistaken

Besides other arguments (which the Justice Department fully addresses in its brief), Defendant contends that he could wholly ignore the Select Committee's subpoena because the Select Committee: (1) was formed in a manner that (Defendant believes) is inconsistent with the House resolution that created it; (2) did not follow certain procedures for seeking his deposition; and (3) does not have a valid legislative purpose for the subpoena.

As a preliminary matter, Defendant did not communicate any of these challenges to the Select Committee as a basis for resisting the subpoena, and those arguments were therefore waived, as the Justice Department has explained. *See* Gov't Mot. in Limine to Exclude Evidence, ECF No. 53 at 5-9; Gov't Opp'n to Def's MTD, ECF No. 65 at 31-37. In any event,

Defendant's challenges to the Select Committee's formation and authority are mistaken, and did not free him to defy with impunity the subpoena he received.

### A.     The Constitution's Rulemaking Clause Forecloses Defendant's Arguments

Defendant's demand that this Court override the actions of the House and its Speaker for assertedly not following House rules violates important Constitutional separation of powers principles.  As explained above, the Rulemaking Clause is a critical aspect of the Legislative Branch's constitutional design because it "grants the House the power to make its own Rules about its internal proceedings." *Rangel*, 20 F. Supp. 3d at 167.  Accordingly, the D.C. Circuit has pointed out that it is a "startlingly unattractive idea, given our respect for a coequal branch of government, for us to tell the Speaker" whom to appoint to committees. *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1175-77 (D.C. Cir. 1982) (citation and internal quotation marks omitted).

### B.     Defendant Advances A Flawed Reading Of H. Res. 503, Asking This Court To Improperly Substitute Its View Of The Requirements Of That Provision For Those Of The House

Defendant argues that, because the Select Committee's authorizing resolution uses the word "shall," the Speaker had "no discretion" in appointing Members to the Select Committee. Mot. to Dismiss Indictment, ECF No. 58 at 4.[1]  He claims that, because the Speaker did not simply accept the nominees suggested by the Minority Leader, but "instead appointed 9 members to the Select Committee of her own choosing," the "Select Committee was not composed as authorized" and "the subpoena to Mr. Bannon is invalid."  ECF No. 58 at 4-5.

The House has four different kinds of committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis. *See,*

---

[1] H. Res. 503 states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader."  H. Res. 503, 117th Cong. § 2(a) (2021).

*e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021) (House Rules) (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the Joint Committee on Taxation); H. Res. 503, 117th Cong. § 1 (2021) (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31). The House rules and procedures governing appointments to these four distinct types of committees vary. Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here. *See* House Rule I.11, ("[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House."). And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House." *See* 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).

Defendant's attack on the appointment and composition of the Select Committee is wrong. The Resolution does not require that *all* thirteen Members be appointed in order for the Select Committee to function, and we are aware of no rule or law providing that the authorization to appoint thirteen Members required appointment by the Speaker of that precise number. Given the way that the House operates and interprets its rules (by paying close attention to prior practice), it is critical to note that precedent supports a House select committee operating with fewer than its full allotment of Members being appointed by the Speaker. In the 109th Congress, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty Members, using language analogous to the Resolution here. *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the Speaker[.]"). Then-House Speaker Dennis Hastert

appointed only eleven Members, all of whom were from the then-majority Republican Party. *See* H. Rep. No. 109-377, at ii (2006) (listing Members).

The Katrina Select Committee also issued subpoenas. *See* H. Rep. No. 109-377, at 23 (2006) (noting that the Katrina Select Committee issued a subpoena to the Department of Defense, and that the Department complied). This precedent strongly supports the Speaker's actions here in appointing the Members of the January 6th Select Committee.

House Resolution 503 itself contemplates the possibility of "vacancies," but provides no specific timeline for filling them. *See* H. Res. 503 § 2(c). Nor does House Resolution 503 provide that the Select Committee would become invalid, or that it must suspend all action, should a vacancy occur—even though, by definition, it would have fewer than thirteen members. *Id.*

Moreover, the full House affirmatively ratified the relevant actions of the Select Committee, in the face of challenges raised by Members on the House floor identical to what Defendant here raises.[2] As Judge Kelly of this district recently ruled on this very point, "the

---

[2] For example, when the resolution on Mark Meadows's contempt was debated before the full House, several Members of Congress raised the argument about the composition of the Select Committee. *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate. It has violated its own rules of creation. It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6. You can't have a committee to find out what happened because you are interested. You can't do that. And that is what they are doing today.") (statement of Rep. Biggs); *id.* at H7786 (contending that the Select Committee does not comply with H. Res. 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members") (statement of Rep. Banks); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.); 167 Cong. Reg. H5760 (daily ed. Oct. 21, 2021) (arguing, in debate on the contempt resolution for Defendant, that "the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative purpose") (statement of Rep. Banks). The interpretive arguments Defendant now presents have been rejected by the Select

House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution, even though the Select Committee has only nine members.  This understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas." *Repub. Nat'l Comm. ("RNC") v. Pelosi*, No. 22-659, 2022 WL 1294509, at *15 (D.D.C. May 1, 2022).  *See* H. Res. 851, 117th Cong. (2021) (approving Select Committee's referral for contempt of Congress); H. Res. 730, 117th Cong. (2021) (same).

In rejecting the argument that House rules mandated that the Speaker had to appoint thirteen Members to the Select Committee, Judge Kelly explained that the fact "that [House Resolution 503 § 2(a)] states that Speaker Pelosi 'shall' appoint thirteen members to the Select Committee is not conclusive as to whether thirteen members are required for it to lawfully operate." *RNC*, 2022 WL 1294509, at *15.  Judge Kelly concluded that if he accepted the argument (which is identical to Defendant's argument) about the Select Committee's composition, he "would be 'interpret[ing] the Rule differently than . . . the [House] itself' and

---

Committee, the Rules Committee, the Parliamentarian, the Speaker, and the full House of Representatives.  Moreover, the full House has since approved the Select Committee's referrals of Defendant, Meadows, Navarro, and Scavino for contempt of Congress.  *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino).  These resolutions were reported by the Select Committee, approved for floor consideration by the House Rules Committee and approved by the full House. *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) (vote on Defendant); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino).  The full House's ratification of the referrals reinforces that Defendant's objections to the Select Committee's composition cannot be accepted.

'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *Id.* at 31 (quoting *Rostenkowski*, 59 F.3d at 1306-07).[3]

Judge Kelly was not the first judge to find the argument being made here by Defendant unconvincing; he was the third judge to do so, and no judge has ruled differently.

In *Budowich v. Pelosi,* Judge Boasberg also rejected the same challenge that Defendant brings here concerning the composition of the Select Committee.  He held that courts must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping Congressional authority" to hold that the Select Committee was not validly composed.  Oral Arg. Tr. at 33-34, *Budowich v. Pelosi*, No. 21-3366 (D.D.C. Jan. 20, 2022).

Furthermore, Judge Carter of the Central District of California agreed with Judge Boasberg, likewise recognizing the deference owed to the Speaker, the full House, and the Select Committee in interpreting a House resolution.  "A court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'"  Order Denying Pl.'s Mot. for Prelim. Inj. at 9 n.12, *Eastman v. Thompson*, No. 8:22-00099 (C.D. Cal. Jan. 25,

---

[3] In *RNC v. Pelosi*, the court described the Speaker's consultations with Minority Leader McCarthy: "House Minority Leader Kevin McCarthy recommended five more members to Speaker Pelosi: Representative Jim Banks (to serve as Ranking Member) along with Representatives Rodney Davis, Jim Jordan, Kelly Armstrong, and Troy Nehls.  Speaker Pelosi agreed to appoint Representatives Davis, Armstrong, and Nehls but declined to appoint Representatives Banks and Jordan, and she asked Minority Leader McCarthy to recommend two other members.  That same day, Minority Leader McCarthy decided to withdraw all five of his recommended appointees in protest." No. 22-659, 2022 WL 1294509, at *2 (D.D.C. May 1, 2022) (citations omitted).  Following the Minority Leader's failure to continue the consultation process, the Speaker interpreted and applied Resolution 503 and House Rules consistent with House precedents, as outlined herein.  As indicated, the Constitution's Rulemaking Clause leaves no doubt that judicial deference to this application of Resolution 503 is required.  *See also* Defs' Mot. for Summ. J. at 7-8, 17-25, *Meadows v. Pelosi*, No. 21-3217 (D.D.C. Apr. 22, 2022), ECF No. 15.

2022), ECF No. 43 (quoting *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995)).

Under such circumstances, Defendant's demand that this Court tell the House the meaning of its own internal rules and procedures is in plain contravention of the separation of powers and the House's constitutionally assigned authority to set its own rules.

Although Defendant heavily relies on the Supreme Court's decision in *Yellin v. United States*, 374 U.S. 109 (1963) (*see* ECF No. 58 at 2-3), to try to overcome this problem, his reliance is misplaced.  There, the Court overturned a criminal conviction because a Congressional committee had failed to comply with two of its own rules, thereby excusing a witness's refusal to answer questions.  Unlike in the case at bar, in *Yellin*, the Congressional committee's "practice . . . in construing its rules"—to which the Court gave "weight"—actually *reinforced* that the committee had violated its own rule.  374 U.S. at 116-17.  Critically, the committee there did not challenge the witness's interpretation of the committee's rules; it assumed that those rules had indeed been violated.  *See id.* at 116-19.  The Court therefore had no occasion to defer to the committee in its interpretation of its own rules.  The *Yellin* decision is therefore irrelevant here.

**C.**     **The Select Committee Properly Sought Defendant's Deposition**

Defendant next contends that the Select Committee exceeded its authority because: (1) House Resolution 503 allows depositions only after consultation with the Select Committee's ranking minority member and (according to Defendant) the Select Committee has no such member; and (2) the Select Committee did not provide Defendant with a copy of Section 3(b) of H. Res. 8, 117th Cong. (2021).  Defendant is wrong on both scores.

1.  House Resolution 503 provides that "[t]he chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including

pursuant to subpoena."  H. Res. 503 § 5(c)(6)(A).  Defendant incorrectly argues (ECF No. 58 at 9-12) that his subpoena violated the Resolution because the Select Committee has no ranking minority member for purposes of the Resolution.  In fact, though, the Resolution's consultation requirement was satisfied by the Chair's consultation with Vice Chair Liz Cheney.

Consistent with House practice and precedent, the term "ranking minority member" means the first member of the minority party appointed to the Select Committee by the Speaker. *See, e.g.*, *Ranking Member*, Glossary of Legislative Terms, https://perma.cc/83HA-3DKY (defining "ranking member" as "[t]he most senior (though not necessarily the longest-serving) member of the minority party on a committee"); H. Res. 10, 117th Cong. (2021) (containing ranking minority member appointments to the standing Committees of the House, colloquially referred to as "ranking members").

Representative Cheney, by virtue of being the first minority party Member appointed to the Select Committee, is, by definition, the senior ranking minority member of the Select Committee.  Accordingly, pursuant to the House's longstanding interpretation of "ranking minority member," House Resolution 503 was satisfied by consultation with Vice Chair Cheney.  And, to the extent there is any ambiguity, the House's interpretation should control.  *See* pp. 1, 3, *supra*; *RNC*, 2022 WL 1294509, at *16 ("on this record the Court must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation purposes").

Defendant relies on the report of an informal FBI discussion with the General Counsel for the House of Representatives (ECF No. 58 at 9-10), but that reliance is misplaced.  Defendant's argument takes the General Counsel's statement that the Select Committee does not have a ranking minority member out of context.  As a practical matter, the Select Committee is

functioning differently than other House Committees.  Here, there is no formalistic division

between majority Members and minority Members, or majority staff and minority staff.  Rather,

the Select Committee is functioning as a single, unified body with a joint staff.  There is thus no

Member who uses the formal title "ranking member," and matters like the division of time and

questioning in depositions are not governed by party affiliation.  The General Counsel did *not*

say that there was no Select Committee Member who would be considered the "ranking minority

member" for purposes of the deposition provisions of House Resolution 503.

In any event, the paraphrased statements of the General Counsel in notes from an

informal discussion between the FBI and the General Counsel cannot and do not override the

House's longstanding interpretation of the term "ranking minority member" to mean the first

Member of the minority party appointed to a select committee.

2.  Defendant also argues (ECF No. 58 at 8-9) that the Indictment must be dismissed

because the Select Committee did not provide him with a copy of Section 3(b) of H. Res. 8,

117th Cong. (2021), which concerns deposition procedures.  But the Select Committee's

standard practice is to provide deponents with copies of this document at their deposition,

consistent with the 117th Congress Regulations for Use of Deposition Authority.  In fact, on the

morning of the deposition, Select Committee counsel had "a manila folder of documents to be

provided to Bannon should he appear," which "contained a copy of House Resolution 503,

Section 3(b) of House Resolution 8, and a copy of the 117th Congress Regulations for Use of

Deposition Authority."  ECF No. 35-2 at 6; *see also* ECF No. 58-4 at 5 ("[T]he section would

have been provided to the witness at deposition when the witness was reminded of their rights.").

As the Department of Justice has explained, "[t]he only reason the Defendant did not receive a

copy of Section 3(b) . . . is because he failed to appear as required by the subpoena." ECF No. 53 at 9.

Defendant cites no authority that supports his assertion that a copy of Section 3(b) needed to be provided further in advance of the deposition, and no such authority exists. Instead, the Regulations indicate only that "[a] witness shall not be required to *testify* unless the witness has been provided with a copy of [S]ection 3(b)"—not that the witness need not *appear* at the deposition, unless the witness has received a copy. 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) (117th Cong. Reguls. for Use of Dep. Auth.); ECF No. 28-8 at 2; ECF No. 53 at 8-9 (emphasis added).

Indeed, Defendant's attorney was provided with a copy of the Regulations prior to the deposition (*see* ECF No. 58-4 at 5), and thus was on notice of Section 3(b). Yet Defendant's attorney never raised any objections related to the requirement. ECF No. 53 at 6 (noting that Defendant did not inform the Select Committee that his noncompliance with the subpoena was due to not having been provided with a copy of Section 3(b)); *see also* ECF No. 58-4 at 5. As with his other challenges to the Select Committee and its composition, Defendant has waived his opportunity to object in this forum by not raising any such objection with the Select Committee. *See* ECF No. 53 at 9.

### D.    The Select Committee Has A Valid Legislative Purpose For The Subpoena

Defendant notably does not contest the legislative purpose of the Select Committee itself, and for good reason. The D.C. Circuit has already squarely held that "the January 6th Committee plainly has a valid legislative purpose and its inquiry concerns a subject on which legislation could be had." *Trump v. Thompson*, 20 F.4th 10, 41 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) (internal quotation marks and citation omitted). The D.C. Circuit emphasized "Congress's uniquely vital interest in studying the January 6th attack on itself to

formulate remedial legislation and to safeguard its constitutional and legislative operations."  *Id.*
at 17.[4]  Defendant challenges the legislative purpose of the subpoena served on him specifically,
arguing that the subpoena was intended "to make an example of Mr. Bannon."  ECF No. 58 at
12.  Not so.

Defendant is important for the Select Committee's investigation.  House Resolution 503
expressly authorizes the Select Committee to: (1) "investigate the facts, circumstances, and
causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate
the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3)
"issue a final report to the House containing such findings, conclusions, and recommendations
for corrective measures . . . as it may deem necessary."  H. Res. 503, 117th Cong. § 4(a)(1)-(3)
(2021).  Information from Defendant is central to the work of the Select Committee, and his
refusal to cooperate with the Select Committee interferes with its work.

Defendant was a central player in the lead-up to the January 6th attack on the Capitol.  He
played a pivotal role in constructing and participating in the "stop the steal" public relations
effort that motivated the attack, and he planned certain other activities in advance of January 6th
that are of interest to the Select Committee.  H. Rep. No. 117-152, at 6-7 (2021).  And, on at
least one occasion, Defendant spoke directly with President Trump about the plans for January
6th.  *Id.*

Notably, Defendant made multiple public statements leading up to the attack, predicting
and encouraging unprecedented and violent events on January 6th.  On the day before the attack,

---

[4] *See also* Oral Arg. Tr. at 33, *Budowich v. Pelosi*, No. 21-3366 (D.D.C. Jan. 20, 2022);
Order Denying Pl.'s Mot. for Prelim. Inj. at 10, *Eastman v. Thompson*, No. 8:22-00099 (C.D.
Cal. Jan. 25, 2022), ECF No. 43 (holding that "the issues surrounding the 2020 election and the
January 6th attacks" are "clearly 'subjects on which legislation could be had'").

he stated that the country was facing a "constitutional crisis" and "that crisis is about to go up about five orders of magnitude tomorrow."[5]  Defendant told his podcast listeners, "It's not going to happen like you think it's going to happen.  OK, it's going to be quite extraordinarily different.  And all I can say is, strap in. [. . .]  You have made this happen and tomorrow it's game day.  So strap in.  Let's get ready."[6]  Defendant elaborated, "[i]t's all converging, and now we're on the point of attack tomorrow."[7]  He also predicted "[a]ll hell is going to break loose tomorrow" and stated, "[s]o many people said, 'Man, if I was in a revolution, I would be in Washington.'  Well, this is your time in history."[8]

The Select Committee's subpoena sought documents related to Defendant's involvement in the events of January 6th.  The documents at issue include those related to:

- Defendant's presence, purpose, statements, and activities at a meeting with Members of Congress at the Willard Hotel on January 5, 2021, or the presence, purpose, statements, or activities of others in attendance related to that meeting;

- People with whom Defendant communicated with respect to any aspect of the planning, objectives, conduct, or participation in the January 6, 2021 rally;

- People with whom Defendant communicated with respect to efforts, plans, or proposals to contest the 2020 Presidential election results or delay, influence, or impede the electoral count;

- Communications efforts to persuade Americans that the election was stolen;

- The January 6, 2021 rally on The National Mall and Capitol grounds in Washington, D.C., in support of Former President Trump and opposition to the counting of the results of the 2020 Presidential election;

---

[5] Steve Bannon, *War Room: Pandemic, EP 634 – Tuesday Special (with Maggie VandenBerghe, Ben Berquam, and Peter Navarro)* (Jan. 5, 2021), https://perma.cc/5SPG-BCQ4.

[6] *Id.*

[7] Aaron Blake, *Who could have predicted the Capitol riot? Plenty of people – including Trump allies*, Wash. Post (Jan. 28, 2021), https://perma.cc/QRC6-WV5H.

[8] *Id.*

- The financing or fundraising to assist travelers to attend or participate in the January 6, 2021 rally;

- The organization or group named "March for Trump" and its activities relating to the January 6, 2021, rally.

ECF No. 53-1 at 5-6 (subpoena).  As its contents make clear, the subpoena was plainly served to advance the Select Committee's important work, rather than to harass or punish Defendant.

Moreover, the subpoena does not reflect an effort "to create a record of alleged violations of law." ECF No. 58 at 13.  The Select Committee has been clear that it is not conducting a criminal investigation of anyone, and "[t]he mere prospect that misconduct might be exposed does not make the [Select] Committee's request prosecutorial." *Trump*, 20 F.4th at 42; *see also McGrain v. Daugherty*, 273 U.S. 135, 179-80 (1927) (explaining that it is not a "valid objection" to a Congressional investigation that "it might possibly disclose crime or wrongdoing").

To the extent that Defendant has become an "example" of a person facing prosecution by the Department of Justice for defying the Select Committee's subpoena, it is an example of Defendant's own making that resulted from his decision to blatantly defy the subpoena and to refuse to work in good faith with the Select Committee.

## II.  The Select Committee Has the Authority To Compel Production Of A Privilege Log Or Certification, And Such Authority Does Not Violate the Separation of Powers

Defendant next argues (ECF No. 58 at 14) that Count II of the indictment must be dismissed because "no House Rule . . . authorizes a committee to require a deponent to create a privilege log of documents withheld on the basis of privilege, or a 'written certification.'"  To the contrary, a Congressional committee has ample authority to seek a privilege log when the recipient of a subpoena expresses an intent to withhold requested documents on the basis of privilege.

14

"Congress has a right—derived from its Article I legislative function—to issue and enforce subpoenas, and a corresponding right to the information that is the subject of such subpoenas." *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 84 (D.D.C. 2008).  Courts have thus held that Congressional committees have "the right to direct the performance of another with respect to the production of documents," *Comm. on Judiciary, U. S. House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 167 (D.D.C. 2019)[9]—as well as "to investigate and *acquire* information by subpoena." *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 393 (D.C. Cir. 1976) (emphasis added), *appeal after remand on other grounds*, 567 F.2d 121 (D.C. Cir. 1977).

Indeed, a Congressional committee's authority to issue subpoenas allows it to "direct[] the nature of the response required." *Senate Permanent Subcomm. on Investigations v. Ferrer*, No. 16-621, 2016 WL 11681577, at *4 (D.D.C. Sept. 30, 2016); *see also id.* at *1.  According to House Rules, a committee can request "the production of such books, records, correspondence, memoranda, papers, and documents as [the Committee] considers necessary."  House Rule XI.2(m)(1)(B).  A committee's "right to direct the performance . . . with respect to the production of documents," *McGahn*, 415 F. Supp. 3d at 167, and corresponding right to "acquire information," *AT&T*, 551 F.2d at 393, thus plainly include the right to require creation of a privilege log in order to evaluate withholding of any information that is subject to the subpoena.

Consistent with the foregoing authority, the Select Committee's subpoena to Defendant included a schedule specifying the categories of documents to be produced and providing

---

[9] The district court's conclusion in *McGahn* that the House Committee had standing to bring suit to enforce its subpoena was affirmed by the *en banc* D.C. Circuit.  *See* 968 F.3d 755 (D.C. Cir. 2020) (en banc).  The *en banc* court did not reach the other issues in the case, and the appeal was ultimately dismissed as moot after Mr. McGahn appeared voluntarily before the Judiciary Committee.

instructions and specifications regarding the production.  ECF No. 53-1 at 5-6.  As relevant here,

the schedule instructed:  "In the event that a document is withheld on any basis, provide a log

containing the following information concerning any such document: (a) the reason it is being

withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general

subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of

the author and addressee to each other; and (f) the basis for the withholding."  *Id.* at 8.  The

Select Committee's authority to request such a privilege log for any documents withheld is

simply part and parcel of its authority to request the production of documents.  And such

authority is consistent with the principle that a subpoena recipient should engage in good faith

accommodation negotiations in response to Congressional investigations.

Indeed, a privilege log is the traditional means for identifying and supporting privilege

claims so that the requesting party (or a court) can evaluate those claims.  In other contexts,

when deponents "resist[] disclosure" of the information required by subpoena based on a

qualified privilege, courts require them to provide enough information to "facilitate" privilege

"determination[s]" and to resolve privilege claims.  *In re Grand Jury Subpoena*, 274 F.3d 563,

575 (1st Cir. 2001); *U.S. v. Constr. Prods. Rsch., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996).  Privilege

logs promote "the interests of justice" by "inform[ing] the requestor of the character of the

information being withheld."  *Alexander v. F.B.I.*, 198 F.R.D. 306, 312 (D.D.C. 2000).

Notably, the federal rules provide that a party who withholds subpoenaed documents in

the litigation context must "describe the nature of the withheld documents . . . in a manner

that . . . will enable the parties to assess the claim.  Fed. R. Civ. P. 45(e)(2)(A)(ii).  Courts have

"consistently . . . held that this rule requires a party resisting disclosure to produce a document

index or privilege log."  *In re Grand Jury Subpoena*, 274 F.3d at 575.  Put simply, privilege logs

are "the universally accepted means of asserting privileges[.]"  *Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, at *1 (D.D.C. 1999) (internal quotation marks omitted).

A committee's authority to seek a privilege log is thus implicit in its authority to compel documents and direct the manner of production.  The Select Committee was well within its authority to seek the "universally accepted means" of a privilege log in its subpoena to Defendant.

In other cases involving Congressional subpoenas, courts have required subpoena recipients to produce detailed descriptions of their privilege claims.  In *Committee on Oversight and Government Reform v. Holder*, for example, another court in this district held that, "[t]o facilitate judicial review of any claims of privilege that remain," the defendant Attorney General "must prepare a detailed list that identifies and describes the material in a manner sufficient to enable resolution of any privilege claims."  No. 12-1332, 2014 WL 12662665, at *2 (D.D.C. Aug. 20, 2014).  The court specified that "[t]he list should set forth not only the author and recipient(s) and the general subject matter of the record being withheld, but the basis for the assertion of the privilege; in particular, defendant should specify the decision that the deliberations contained in the document precede."  *Id.*  Likewise, in *Senate Permanent Subcomm. on Investigations v. Ferrer*, the court stated that a Senate committee's request for a privilege log "was not a suggestion or a recommendation," and concluded that the defendant had waived his privilege claims by failing to provide a privilege log.  Order at 4, No. 16-mc-621 (D.D.C. Sept. 16, 2016), ECF No. 29.

Even before *Holder* and *Ferrer*, in *Miers*, the district court held that that the defendants (the White House counsel and Chief of Staff)—who had received subpoenas from a Congressional committee—must "produce a more detailed list and description of the nature and

17

scope of the documents [they] seek[] to withhold on the basis of executive privilege sufficient to enable resolution of any privilege claims." 558 F. Supp. 2d at 107. (The D.C. Circuit referred to this as a "privilege log." *See Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 910 (D.C. Cir. 2008).)

The *Miers* court speculated in dicta that it did not "have a ready ground by which to *force*" the defendants to produce a privilege log "strictly in response to a congressional subpoena." 558 F. Supp. 2d at 107. But the court ultimately did "not decide that question" because it ordered production of a detailed list of privilege claims as part of the litigation. *Id.* Here, the Select Committee is not asking this Court to *force* Defendant to produce a privilege log. Rather, Defendant faces prosecution for contempt due to his outright defiance of the Select Committee's subpoena, which included valid instructions for a privilege log describing any documents Defendant was attempting to withhold. As the *Miers* court recognized, a privilege log is "a tremendous aid during the negotiation and accommodation process," because it "may lead the Committee to conclude that it has no need for certain categories of documents, thus helping to narrow the dispute between the parties and enhance the possibility of resolution." *Id.* It is thus no surprise that, incident to its well-settled subpoena power, a Congressional committee can require such a widely accepted aid in evaluating privilege claims.

Defendant also argues that allowing the Select Committee to require a privilege log would "undermine the assertion of executive privilege" and "effectively eliminate" the checks and balances system between these two co-equal branches. ECF No. 58 at 14-15. This concern is misplaced. As courts have recognized, executive privilege is a *qualified* privilege; "generalized concerns for Executive Branch confidentiality" must yield to a specific, demonstrated need for disclosure. *Trump*, 20 F.4th at 33. In other words, "broad,

undifferentiated claim[s] of public interest" are not sufficient to invoke the privilege.  *United States v. Nixon*, 418 U.S. 683, 706 (1974).

The information requested by the Select Committee—"the name of the 'author, addressee, and any other recipient(s)'" and "the 'relationship of the author and addressee to each other'"—was necessary to evaluate any claims of qualified privilege.  Defendant's assertions that such information may itself be privileged or would be unduly burdensome to provide (ECF No. 58 at 14) lack any support.  In fact, federal district courts have ordered production of similar details in other matters concerning Congressional subpoenas, including one involving the Select Committee.  *See* Order at 3, *Eastman v. Thompson*, No. 8:22-cv-00099 (C.D. Cal. Jan. 26, 2022), ECF 50 (ordering that the privilege log shall include dates, recipients, general descriptions, and client names); *Holder*, 2014 WL 12662665, at *2.  Such details are especially pertinent in the context of claims of executive privilege because Congress's "need for [] information cannot be balanced against" the "sensitiv[ity]" of the Executive's information "without any indication of what the information is," and "[t]he power to determine the scope of one's own privilege is not available to . . . [even] the President of the United States."  *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 405 (D.C. Cir. 1984); *In re Search of The Rayburn House Off. Bldg Room No. 2113*, 432 F. Supp. 2d 100, 115 (D.D.C. 2006).

*     *     *     *     *

Finally, the House underscores that Defendant cannot rely on any absolute immunity to avoid prosecution for contempt of Congress here.  Unlike the Department of Justice, the House maintains that the Office of Legal Counsel opinions discussing the doctrine of absolute immunity for Presidential aides are incorrect and have no basis in the law, as two courts in this district have already held.  *See Miers*, 558 F. Supp. 2d at 99-107; *McGahn*, 415 F. Supp. 3d at 202-03.  In any

event, the House fully agrees with the Department of Justice that those Office of Legal Counsel opinions, by their own terms, do not apply here (*see* ECF No. 65 at 3-10), and thus this Court has no reason to address their merits.

## **CONCLUSION**

For the reasons stated above, the House submits this brief in support of the Department of Justice's position that Defendant's motion to dismiss his indictment should be denied.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

May 10, 2022