# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

          Plaintiff,

     vs.

STEPHEN K. BANNON,

          Defendant.

CR Action
No. 1:21-670

Washington, D.C.
March 16, 2022

11:05 a.m.


TRANSCRIPT OF ORAL ARGUMENT
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the Plaintiff:**    **AMANDA ROSE VAUGHN**
                            **J.P. COONEY**
                            **MOLLY GASTON**
                            U.S. ATTORNEY'S OFFICE FOR D.C.
                            555 4th Street NW
                            Washington, DC 20001
                            202-252-1793


**For the Defendant:**    **DAVID I. SCHOEN**
                            2800 Zelda Road, Suite 100-6
                            Montgomery, AL 36106
                            334-395-6611

                          **MATTHEW EVAN CORCORAN**
                            SILVERMAN THOMPSON SLUTKIN WHITE
                            201 N Charles Street, 25th Floor
                            Baltimore, MD 21201
                            410-385-2225

                          **ROBERT J. COSTELLO**
                            DAVIDOFF HUTCHER & CIRTON LLP
                            605 Third Avenue
                            New York, NY 10158
                            646-428-3238

```
Reported By:      LORRAINE T. HERMAN, RPR, CRC
                  Official Court Reporter
                  U.S. District & Bankruptcy Courts
                  333 Constitution Avenue, NW
                  Room 6720
                  Washington, DC 20001
                  202-354-3196
```

      Proceedings reported by machine shorthand, transcript

produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2          **COURTROOM DEPUTY:**  Good morning, Your Honor.  This

3   is criminal case year 2021-670, *United States of America*

4   *versus Stephen K. Bannon.*

5          Counsel, please come forward and introduce

6   yourselves for the record, beginning with the government.

7          **THE COURT:**  And let me just note my view, at least

8   currently, on non-jury matters, that is to say arguments,

9   status conferences and the like, is that whoever is at the

10  podium, please take your mask off.  It's easier for me to

11  hear, easier for opposing counsel to hear, the court

12  reporter and the like.  And then just put your mask back on

13  when you sit down.

14         **MS. VAUGHN:**  Yes, Your Honor.

15         Good morning, Your Honor.  Amanda Vaughn, Molly

16  Gaston and J.P. Cooney for the United States.

17         **THE COURT:**  Good morning.

18         **MR. SCHOEN:**  Good morning, Your Honor.  David

19  Schoen, Evan Corcoran and Robert Costello for Mr. Bannon,

20  Your Honor.

21         **THE COURT:**  Good morning, Counsel.

22         **MR. SCHOEN:**  Good morning.  Thank you.

23         **THE COURT:**  So I've reviewed all of the papers

24  that have been submitted, including the supplemental

25  materials filed over the last day or two.

1          Obviously, we have cross motions, in a sense.  I

2    don't want to have argument on the motions individually.  I

3    want to take them in a somewhat more efficient manner, which

4    is I want to hear from the government on all questions

5    first, and then the defendant all questions.  I'll allow the

6    government then, essentially, a short rebuttal; and then the

7    defendant a short surrebuttal.

8          With that, Ms. Vaughn, will you be taking the

9    lead?

10         **MS. VAUGHN:**  Yes, Your Honor.

11         **THE COURT:**  I think I'd like to start with your

12   Motion in Limine, but then I'd like to proceed through

13   Mr. Bannon's motions as well.

14         **MS. VAUGHN:**  Yes, Your Honor.

15         So starting with the government's Motion to

16   Exclude all Evidence in Argument Relating to Advice of

17   Counsel.  So contempt of Congress for willful default is

18   about whether or not you showed up; that is whether to

19   produce records or to testify.

20         The summoned witness doesn't get to decide if

21   Congress can make them show up.  If the witness were able to

22   decide that, it would mean Congress had no subpoena power at

23   all.  And these are the principles that are reflected in the

24   meaning of willfulness, under the contempt of Congress

25   statute, as the Supreme Court and the D.C. Circuit defined

1     that term more than half a century ago.

2          So if a defendant makes a deliberate and

3     intentional decision not to appear, he has the requisite

4     intent for contempt; that is, Does the defendant know he's

5     been summonsed and does he intentionally, knowing that, not

6     show up?  That's all that is required.

7          **THE COURT:**  Don't you agree that seems

8     inconsistent with more recent case law about what

9     "willfully" means from the Supreme Court?

10         **MS. VAUGHN:**  Well, Your Honor, I think the more

11    recent case law in *Bryan* and *Ratzlaf* and *Cheek*, didn't deign

12    to rewrite the meaning of willfulness as it might appear in

13    other criminal laws.  Those cases were limited to the

14    specific laws that arose in those specific cases.  And in

15    *Cheek* and *Ratzlaf*, obviously, that's the highest standard,

16    which I don't think anyone is arguing for here.

17         Even the intermediate standard, in *Bryan* it dealt

18    with the statute that you needed to be licensed to sell

19    firearms.  That too is more of a regulatory scheme.  And the

20    Court even expressed its view in that case that that statute

21    was intended to divide innocent conduct from criminal

22    conduct.  So that's really where the dividing line is.  And

23    that's what "willful," as defined by the Supreme Court, in

24    the 1950 *Bryan* and the D.C. Circuit in *Licavoli*, that's

25    where "willful" draws the line under the contempt of

1      Congress statute.

2              **THE COURT:**  What seems anomalous to me, is that

3      that means, I think, that the mens rea requirement for

4      making default and refusing to answer any questions is the

5      same, even though the term "willfully" applies only to

6      making default.

7              **MS. VAUGHN:**  So I think what the D.C. Circuit

8      found in *Licavoli*, which I think still applies, is without

9      willful before default, you are in a sense creating a strict

10     liability statute.  Because someone could be on their way to

11     Congress, break down in their car.  They know they are not

12     showing up.  They know they've committed the acts

13     constituting default.  And without that word "willful"

14     there, they would be subject to criminal prosecution under

15     the statute.

16             So "willful" separates that kind of accident,

17     where the person still knows they are making default, but it

18     wasn't intentional or deliberate.  From an intentional and

19     deliberate choice to show up.  And what the Supreme Court

20     made clear is that that intentional choice not to comply,

21     that is inherently a criminal choice.  There is no innocent

22     way that someone decides they are just not going to comply

23     with the statute.

24             **THE COURT:**  Right.  But that sounds a lot like

25     intentional rather than willful.  And those two terms

1      typically mean different things.

2              **MS. VAUGHN:**  Well, intentional and deliberate is

3      the definition of "willful" that's been determined for this

4      statute under the controlling precedent from the Supreme

5      Court and the D.C. Circuit.

6              And to your question --

7              **THE COURT:**  Does the government think that if

8      *Licavoli* had not been decided the way it is, that that is

9      still correct interpretation of the statute?

10             **MS. VAUGHN:**  The government does think that is

11     still the correct.  And *Licavoli* was relying on the Supreme

12     Court's decision earlier in *Bryan* and *Fleischman*.  Because,

13     again, I think what the Supreme Court talks about in *Cheek*

14     *Ratzlaf* and 1998 *Bryan*, is that these intent standards are

15     intended to divide criminal conduct from citizens who

16     innocently, sort of, get caught up in these regulatory

17     schemes.  And that's where willful and contempt of Congress

18     draws, between someone who accidentally does not comply with

19     their obligations, and someone who makes an intentional and

20     deliberate choice not to do so.

21             **THE COURT:**  So as a practical matter, assuming I

22     grant your motion, this motion, what proof does the

23     government need to make on mens rea?  What's showing?

24             **MS. VAUGHN:**  The government would need to

25     demonstrate that the defendant knew he had been summonsed;

1    so that means, knew that Congress was requiring him to show

2    up and produce records on October 7th; and that Congress was

3    requiring him to show up and testify on October 14th.  And

4    that he knew that that was the obligation; and that despite

5    knowing that, he decided not to comply.

6         He has to have -- the government has to prove that

7    he was given a clear choice from Congress.  Either show up

8    or you are in contempt.  That would be all that the

9    government is required to show there.

10        **THE COURT:**  And that would be -- the willful

11   there, really, to the extent that it does any work here goes

12   to the latter, because if a defendant knew he had or she had

13   a summons, and mistakenly missed the date, or had his or her

14   car break down, then that defendant would not act willfully

15   in the government's view.

16        **MS. VAUGHN:**  That's right, Your Honor.

17        And it's no different from in the contempt of

18   court context.  A witness gets a summons to appear before a

19   grand jury or to appear for testimony in trial.  And if they

20   deliberately decide, I will not appear, they are subject to

21   prosecution for contempt.  It's the same principle in the

22   contempt of Congress.

23        **THE COURT:**  Okay.

24        So let's move on to -- unless you have anything to

25   say on that, anything more to say on that subject, on that

1    motion.

2              **MS. VAUGHN:**  Not unless the Court has questions.

3              **THE COURT:**  So let's move on to defendant's

4    motions.  I think I'd like to start first with the motion

5    relating to Mr. Costello's records or the records that

6    turned out to be a different Costello's records.

7              **MS. VAUGHN:**  Yes, Your Honor.

8              **THE COURT:**  So that suite of issues.

9              **MS. VAUGHN:**  So I think they raise different

10   issues.  Now we are talking about two categories of records.

11   The first is Mr. Costello's toll records.  So these are

12   simply phone records showing who the subscriber is, and then

13   showing to and from phone numbers, dates and times.

14              And the defendant's request there, as I understand

15   it now, is that they would like all of the underlying grand

16   jury subpoenas, all of the government's internal

17   deliberations and records about its decisionmaking with

18   respect to seeking those records.

19              **THE COURT:**  So let me just pause there, because it

20   wasn't clear from the government's brief.  You just said,

21   "grand jury subpoenas."  Can you state publicly how those

22   toll records were obtained?

23              **MS. VAUGHN:**  I don't think there is an issue with

24   saying that it was part of the grand jury investigation that

25   we obtained those records, Your Honor.

1          **THE COURT:**  Okay.

2          **MS. VAUGHN:**  So the defendant is seeking those

3    grand jury subpoenas, copies of the subpoenas, which would

4    obviously show which records the grand jury sought.

5          **THE COURT:**  You just said grand -- so are we

6    talking about grand jury subpoenas --

7          **MS. VAUGHN:**  Yes, Your Honor.

8          **THE COURT:**  -- for Mr. Costello's toll records?

9          **MS. VAUGHN:**  Yes, Your Honor.

10         Also the defendant is asking for the government's,

11   sort of, internal processes --

12         **THE COURT:**  Yes.  Understood.

13         **MS. VAUGHN:**  -- in doing that.

14         So, obviously, what subpoenas were issued has no

15   bearing on establishing or disproving the facts of the

16   offense; that is, did the defendant receive a subpoena?  Did

17   it require him to show up?  Did he intentionally and

18   deliberately decide to ignore that demand?  Because it

19   doesn't go to any of those facts, those records are not

20   discoverable under Rule 16 or *Brady*.

21         So the defendant has to identify another basis to

22   be entitled to those records.  With respect to the grand

23   jury materials, he needs to show a particularized need.  And

24   the defendant's relying on the provision of Rule 6, that

25   it's needed because it may support a Motion to Dismiss.

1          But in order to pierce secrecy of the grand jury,

2     the defendant needs to do more than just allege there's

3     misconduct here.  He needs to identify what grounds he will

4     be moving to dismiss.  And he hasn't done that.

5          **THE COURT:**  So on that, as I understand it,

6     whether it's about toll records or email records, the

7     government's argument is, At the time we sought those

8     records, we needed to prove -- still need to prove -- well,

9     it may be stipulated now or conceded now -- but at one point

10    we knew that we needed to prove that Mr. Bannon knew about

11    the subpoenas or the summons from Congress.

12         And so we sought Mr. Costello's email and phone

13    toll records to what?  To help create a -- I'm missing the

14    next part.  Because it's not at all apparent to me how even

15    knowing with whom Mr. Costello was communicating would prove

16    or tend to prove that Mr. Bannon knew about the subpoena

17    from Congress.

18         **MS. VAUGHN:**  Well --

19         **THE COURT:**  If that was even a disputed issue at

20    that point.

21         **MS. VAUGHN:**  Your Honor, so obviously the scope of

22    the grand jury's investigation is not limited.  They can act

23    on suspicion, rumor, whatever they need to do to investigate

24    every lead --

25         **THE COURT:**  Is there really any dispute by the

1    time these subpoenas or the Stored Communication Act order

2    was issued that -- was there any dispute that Mr. Bannon

3    didn't know about the subpoena?  I mean, the world knew

4    about it.  The world knew about the contempt proceeding.

5          **MS. VAUGHN:**  Your Honor, the world did know about

6    it, but the government still has an obligation to make sure

7    that it has evidence to prove each of the elements.

8          **THE COURT:**  But what's unique here is that the

9    government didn't just go get -- I'll put it this way --

10   regular old records.  It sought records of the person whom

11   the government knew was serving as counsel to Bannon.  Why

12   is that an appropriate first move as a source for

13   information, where it seems to me those records are pretty

14   darn attenuated from that element of knowledge that the

15   government had to prove -- has to prove?

16         **MS. VAUGHN:**  So Mr. Costello is the intermediary

17   here.  He is the only one interfacing with the Committee.

18   So as the government is starting its investigation, it could

19   possibly be that Mr. Costello just never fully communicated

20   with the defendant about what the Committee was requiring of

21   him.

22         So the government needed to investigate whether

23   those communications had happened.  And Mr. Costello wasn't

24   the only person the government sought records for.  We also

25   sought records for the defendant.  But, obviously, we may

1   not be able to find all of the defendant's phone numbers or

2   email accounts.

3          So even though we don't have the content through

4   the tolls -- which we never sought content of any

5   communications -- the fact that a call might happen, let's

6   say, between the defendant and his intermediary with the

7   Committee, on the same day that the Committee counsel tells

8   Mr. Costello, again, No, he has to show up.  That is,

9   obviously, evidence that Mr. Costello was communicating that

10  direction to the defendant.  It may not be the most direct

11  evidence, but it is certainly relevant evidence in proving

12  that the defendant was engaged in this process with the

13  Committee, even though he was not directly engaging with it.

14         **THE COURT:**  Did the investigation team need to get

15  senior approval at DOJ to seek those toll and email records?

16         **MS. VAUGHN:**  The Justice Manual, Your Honor, only

17  requires approval for issuing subpoenas directly to an

18  attorney or a law firm.

19         **THE COURT:**  So under the Justice Manual, as I

20  understand it, the government could seek the contents of an

21  attorney's emails with a client, so long as the request is

22  posed to an internet provider?

23         **MS. VAUGHN:**  Well, obvious, we are --

24         **THE COURT:**  I mean, without seeking senior

25  approval.

1          **MS. VAUGHN:**  Yes.  And, obviously, we would go

2     through a filter process because we are not just Hoovering

3     up privileged materials; and that's the difference here too.

4     The government's only getting toll records.  There is no

5     content.  It's not a privileged communication that we are

6     collecting.  It's merely the fact that a conversation -- or

7     maybe the conversation didn't even happen.  It can be a

8     missed phone call, that it happened at a certain date and

9     time.  It doesn't tell us anything about the confidential

10    communications.  It is only that confidential communication

11    that is potentially protected.  So the government never even

12    sought that.

13         **THE COURT:**  Now, I note in the final footnote to

14    the supplemental brief the government lodged that you've

15    offered to let the defense see the application for the Gmail

16    account, so long as the defendant agrees to treat it as

17    sensitive under the protective order or otherwise is willing

18    to modify the protective order to see it.  I didn't see a

19    response to that question or proposal in Mr. Bannon's

20    response to the supplemental filing.  Would the government

21    be willing to make that same offer as to the toll records

22    subpoenas?

23         **MS. VAUGHN:**  I'm not sure that the government is

24    in the same position to be able to make that offer, because

25    the subpoenas would be controlled by Rule (6)(e).  And

1    *McKeever* made clear that unless there's a basis to provide

2    it under (6)(e) or disclose grand jury material under

3    (6)(e), the government can't do that.  And so that goes back

4    to the defendant's obligation to show a particularized need

5    for those subpoenas.

6         **THE COURT:**  Would the government object to

7    producing those requests, subpoenas, as I understand it, to

8    me for ex parte review?

9         **MS. VAUGHN:**  The government would be happy to

10   provide it to the Court for ex parte review, if the Court

11   would require that.

12        **THE COURT:**  Okay.

13        To summarize, there is obviously the question of

14   those records, the requests.  And on the -- so you've

15   provided me with the Stored Communication Act application,

16   ex parte.  I've reviewed it.  You've offered to make that

17   available to the defense team, so long as they are willing

18   to agree to certain protections.

19        You are willing to provide me the other requests,

20   the toll records and the like.  I'm not sure you can do that

21   to the defense, given (6)(e).  But then let's just go back

22   to, essentially, the two buckets of information.  You have

23   some of this turns up, as we all know now, email records for

24   a Costello, who is not Mr. Bannon's counsel.

25        **MS. VAUGHN:**  Uh-huh.

1          **THE COURT:**  The government's view, I assume is,

2    those are wholly irrelevant here, because they have nothing

3    do to with any communication between Mr. Bannon and anyone.

4          **MS. VAUGHN:**  That's right, Your Honor.

5          **THE COURT:**  And they quite plainly are not going

6    to be in this case.

7          **MS. VAUGHN:**  That's right, Your Honor.

8          **THE COURT:**  And as to the toll records of the

9    actual Mr. Costello, the government's position is that --

10   especially now that the question of Mr. Bannon's knowledge

11   and the like is essentially undisputed, the government

12   doesn't intend to use those?

13         **MS. VAUGHN:**  I hesitate to predict how trial

14   evidence might come in.  The government obviously doesn't

15   anticipate that it would need to use it affirmatively in its

16   case-in-chief.

17         Obviously, if the defendant were to start to

18   suggest, through its cross-examination of government

19   witnesses, or through any case that the defendant might

20   choose to put on, it might become necessary to the extent --

21         **THE COURT:**  In any event, that information is in

22   -- the government has produced that to the defendant.

23         **MS. VAUGHN:**  (Nodded)

24         **THE COURT:**  And beyond that the, I will put it

25   this way, methods through which the government went about

1    obtaining that information, is not in the government's view,

2    discoverable now.  But might be *Giglio* material, to the

3    extent that anyone who testifies touched that information?

4          **MS. VAUGHN:**  So to the extent we have impeachment

5    material relating to a witness that might testify.  Let's

6    say a government agent testifies.

7          **THE COURT:**  Yep.

8          **MS. VAUGHN:**  We would turn that over.

9          The government is not aware of any impeachment

10   material that would go to that, that it knows of or has

11   position of at this time, but if we became aware of it, we

12   would obviously turn it over.

13         **THE COURT:**  So now let's go to the rest -- unless

14   there is something else you would like to say on the

15   attorney records point.

16         **MS. VAUGHN:**  I -- well, I think the bottom line of

17   the attorney records is the defendant still needs to -- to

18   go rummaging around in the government's files, the defendant

19   still needs to identify on what basis he would use it.

20         So the Supreme Court's decision in *Armstrong* dealt

21   with a selective prosecution claim, where the defendant

22   wanted to go searching in the government's files for

23   evidence that its prosecution was racially motivated.

24         The Supreme Court there said, This is a burden on

25   the government, number one; and it intrudes on the executive

1     branch's independence in its prosecutorial decisionmaking.

2              The D.C. Circuit has applied that same logic to

3     other situations where the defendant wants to go rummaging

4     around in the government's internal files.  For example, in

5     *US v. Rashed*, that's 234 F. 3d 1280, there the defendant

6     wanted to make a due process claim about a sham prosecution.

7     And the D.C. Circuit, because it was a constitutional attack

8     on the indictment said, You still need to make a colorable

9     showing of the defense you intend to raise, before we let

10    you go diving into the government's records.

11             So I think that's really the starting line for all

12    of the defendant's requests here for the government's

13    internal records is, Have they made a colorable showing in

14    any defense that they would raise a Motion to Dismiss, some

15    kind of constitutional attack?  And they just haven't done

16    that with respect to the attorney bucket or to the

17    irrelevant records.

18             **THE COURT:**  Okay.  Thank you.

19             So now let's talk about the other -- the motion

20    that is broader, in a sense, because it's not related to the

21    government's efforts to get Mr. Costello's toll records and

22    email records.

23             **MS. VAUGHN:**  Uh-huh.

24             **THE COURT:**  So, obviously there are a number of

25    categories.  I don't want to foreclose you from walking

1    through them in whatever order you like.  I have questions,

2    but feel free to tackle the different components of that in

3    whatever order you would prefer.

4         **MS. VAUGHN:**  I think the best way for me to do

5    that is to walk through, sort of, the individual problems

6    with each of the requests.

7              So first is, he has a bucket of requests that are

8    completely untethered from proving or disproving the

9    elements of the offense at trial.  Did this defendant give

10   subpoena?  Did he understand the requirement to show up?

11   Did he intentionally decide not to?

12             And that is the defendant's request for the

13   internal deliberations about what the law requires for

14   contempt of Congress, and the government's internal

15   deliberations and advice from the Office of Legal Counsel,

16   about under what circumstances the executive branch may or

17   may not seek to prosecute individuals who have committed

18   contempt of Congress.  None of that is relevant to proving

19   or disproving these specific factual elements.

20             So, again, it goes back to the defendant wants to

21   get into the internal records of the government.  He needs

22   to under *Armstrong* and as has been applied later, make a

23   colorable showing of what defense --

24        **THE COURT:**  So -- I want to understand the

25   government's argument here.  It has been long-standing

1    Department of Justice policy that very close current

2    advisors of the president are absolutely immune from

3    Congressional subpoenas.

4              Imagine, hypothetically, that tomorrow -- I know

5    this is a counterfactual but Ron Klain gets a subpoena from

6    Congress to show up.  And he and the department take the

7    position that he is absolutely immune.

8              Congress doesn't like that.  Makes a contempt

9    referral.  And for whatever reason, the department -- again,

10   this is counterfactual given the parties -- but the

11   department says, We are prosecuting Mr. Klain for willfully

12   not showing up.  And Mr. Klain says, What are you talking

13   about?  The OLC opinion says, I have absolute immunity.

14             The government's view is that is irrelevant to the

15   case?

16        **MS. VAUGHN:**  That is irrelevant, Your Honor,

17   because, again -- that is the government's --

18        **THE COURT:**  But the government would be saying, We

19   have binding OLC opinion that someone has absolute immunity,

20   but we are nevertheless the same department authorized to

21   prosecute that person.

22        **MS. VAUGHN:**  Our -- the department's views on when

23   and under what circumstances it should prosecute someone is

24   different from --

25        **THE COURT:**  But how are those consistent

1     positions?  In other words, how can the department, assuming

2     the OLC opinion I just talked about has not been rescinded,

3     I don't think it has -- how can the department

4     simultaneously say someone in that position has absolute

5     immunity from showing up, and can be prosecuted for failing

6     to show up?

7               **MS. VAUGHN:**  Well, I guess the department --

8               **THE COURT:**  Those two positions would be held at

9     the same time by the same department.

10              **MS. VAUGHN:**  I think the department certainly

11    might have an inconsistent legal view at that point.  But as

12    far as whether the elements are met under the statute,

13    that's a different question --

14              **THE COURT:**  Isn't there an estoppel argument at

15    that point that the defendant might want to make and/or the

16    defendant argues that that goes to whether he has made

17    default?

18              **MS. VAUGHN:**  Well, the issue of whether or not the

19    defendant has made default, in an estoppel argument, this

20    idea that he was given permission somehow to make default;

21    that again goes to what was in the defendant's mind at the

22    time.

23              The defendant's request here is not about, We

24    think you have evidence about what was in my mind at the

25    time.  We've provided everything we have about

1    communications between the defendant and his representative

2    and the Committee, and the defendant's representative and

3    the White House.  We have provided all of that.  The

4    defendant's request is broader than that.  He says,

5    Government, I know that you have decided before that you

6    wouldn't prosecute people like me -- obviously the

7    government disagrees we ever said that.

8            **THE COURT:**  I understand there is a difference of

9    opinion about where Mr. Bannon fits within those OLC

10   opinions.  I'm testing the proposition on the assumption

11   that there is an express OLC opinion covering the person in

12   Mr. Bannon's shoes and -- that is why I am using Mr. Klain

13   as an example.  Chief of Staff to the President.  It fits

14   within the OLC opinions quite clearly -- and the

15   government's position here is that OLC opinion is altogether

16   irrelevant.

17           **MS. VAUGHN:**  It is.  Well, first, this goes back

18   to the government's Motion to Exclude Advice of Counsel --

19           **THE COURT:**  Partly.

20           **MS. VAUGHN:**  -- because of a mistake of law.  A

21   mistake of law, a mistake that you were not committing

22   contempt when you were --

23           **THE COURT:**  Right.  And your view is --

24           **MS. VAUGHN:**  -- is not an offense here.

25           **THE COURT:**  -- because of your position on advice

1    of counsel, Mr. Klain could not argue that he relied on -- I

2    assume he could not rely on what a lawyer told him about the

3    OLC opinions.  But you are saying he could not rely on the

4    OLC opinions themselves.

5            **MS. VAUGHN:**  Because practically at trial, how

6    would that OLC opinion come in?  He's testifying about --

7    Well, I knew I got a subpoena.  I decided not to show up --

8    or the government is presenting evidence that that's the

9    case.  There is no relevance that that OLC opinion has to

10   establishing or disproving those elements.

11           **THE COURT:**  Is it relevant -- assuming there is a

12   Motion to Dismiss the Indictment here, is it relevant or can

13   it be relevant to my consideration of that, understanding

14   the various positions OLC, at least, has taken on these

15   issues.  Not to say that they have, necessarily, taken a

16   crystal-clear position as to someone in Mr. Bannon's shoes.

17   But OLC has taken positions on issues around Congressional

18   subpoenas and executive privilege and people in certain

19   positions in the White House, are those official OLC

20   opinions?  I'll put it that way.  Are they relevant, at

21   least to my consideration, if there is a Motion to Dismiss

22   the Indictment?

23           **MS. VAUGHN:**  Your Honor, that is -- they are

24   internal department advice, and I don't think that they

25   would be controlling in any way on this Court's decisions.

1    In fact, I think sometimes courts have disagreed with the

2    DOJ's view.

3            **THE COURT:**  I agree they are not controlling.  The

4    question is whether they are relevant.

5            **MS. VAUGHN:**  I don't think that they would be.

6    The executive branch, obviously, doesn't decide what the law

7    is in a court of law.

8            And so the executive branch internally, all of the

9    time, takes views on what the law requires and does not

10   require.  But that, at the end of the day, is not

11   determinative, once we are before a judge.  And I think

12   courts before have, actually, rejected some of the reasoning

13   in DOJ OLC opinions.

14           **THE COURT:**  I know of one case very well.

15           **MS. VAUGHN:**  So I think what the defendant is

16   after here is not evidence of his intent, it's evidence of

17   the way we internally, at the Department of Justice, view

18   the law.  And that wouldn't provide him any basis for relief

19   either before trial or during trial.

20           **THE COURT:**  But isn't -- isn't there something

21   anomalous -- and I'm not sure what the right legal hook for

22   it is -- but for DOJ, the official DOJ policy to be, We say

23   someone has absolute immunity in this context and/or, We

24   will not prosecute someone in this context.  And then to say

25   that those statements of official DOJ policy are irrelevant

1    altogether in such a prosecution?

2         **MS. VAUGHN:**  I don't think it is, Your Honor, and

3    here's why.  I think the Department, as the executive, the

4    one enforcing the law through prosecutions is making

5    decisions all of the time about what it believes merits

6    prosecution and what does not.  And that is sometimes based

7    on the department's interpretation of the law.

8         DOJ OLC opinions around contempt of Congress are

9    really no different.  They are about, Under what

10   circumstances do we, the Department of Justice, believe that

11   someone is subject to prosecution under the law?

12        The analysis might change.  I guess, if we are at

13   the point we are prosecuting Ron Klain, it definitely has

14   changed.  But at the end of the day, that still is not --

15   it's just the department's view on whether prosecution is

16   appropriate.

17        **THE COURT:**  Okay.  I understand the government's

18   position.

19        Obviously my hypothetical is pointed because it

20   assumes a crystal-clear inconsistency, one would say,

21   between the OLC opinion and the later prosecution.  And I

22   understand the government's position here is there is no

23   such inconsistency, at least as to public OLC opinions.

24        **MS. VAUGHN:**  That's right, Your Honor.

25        So that's, sort of, the first bucket of what the

1    defendant is seeking, the things that are internal

2    government deliberations.

3         Second, he seeks materials in Congress'

4    possession.  Obviously we, as the executive branch, cannot

5    compel Congress to provide records to us.  In fact, it might

6    be that some of the records the defendant wants are

7    potentially protected by the Speech or Debate Clause.  So

8    even if we wanted to, we could not force Congress to turn

9    those records over.

10        Just because they are, essentially, the

11   complainant in this case, does not make them part of the

12   prosecution team, and we don't have the ability to go

13   searching in their files to produce those records.  So his

14   request relating to further searches for records in

15   Congressional files, has to be denied on that basis.

16        **THE COURT:**  But to circle back to a question that

17   arose from, my perspective at least, first in the context of

18   the attorney records, if hypothetically the government were

19   to call a witness who is a Congressional employee,

20   whether -- you know, a member of the Committee or a staff

21   person or whatever, it would have an obligation to turn over

22   impeachment evidence, if any.

23        **MS. VAUGHN:**  Anything we have or are aware of,

24   yes, it would have an obligation to turn that over.

25        **THE COURT:**  Does the government have a view about

1    whether statements about the political nature, from

2    Mr. Bannon's perspective of this prosecution, if somebody

3    said, you know, we need to go after Mr. Bannon for X-reason

4    that that would be considered *Giglio* impeachment material?

5         **MS. VAUGHN:**  If a witness said that, we would

6    certainly turn that over as potential impeachment material.

7         **THE COURT:**  Okay.  But we are not there yet,

8    obviously, because under the current schedule, there's a

9    later process for turning over impeachment information.

10        **MS. VAUGHN:**  Yes, Your Honor.

11        And our practice is, as soon as we get it, we will

12   turn it over as soon as practicable.  We won't sit on things

13   until the last minute.

14        And, actually, that's another bucket of

15   information.  Obviously his request for impeachment

16   information is essentially moot, because we provided

17   everything that we are aware of currently, and we haven't

18   even identified our trial witnesses yet.

19        The other two categories really go to what we

20   already discussed with respect to the attorney records and

21   the irrelevant email records.  It's either grand jury

22   material or it's material going to the government's internal

23   deliberations that don't go to any kind of defense pretrial

24   or during trial.

25        So unless the Court has other questions, I think

1     we've addressed all of the buckets.

2              **THE COURT:**  Yes, I agree.  I would like to hear

3     from defense counsel now.

4              **MS. VAUGHN:**  Thank you.

5              **MR. SCHOEN:**  Judge, my first role is sort of

6     emcee.  I just want to explain how we will proceed, if we

7     might.

8              **THE COURT:**  Yes.

9              **MR. SCHOEN:**  I intend to address the Costello

10    motions and Mr. Corcoran, possibly, in addition from me, is

11    going to address the other two motions.

12             So given the order the Court started in before, if

13    the Court would rather hear from Mr. Corcoran on advice of

14    counsel first, we can do that.

15             **THE COURT:**  Why don't we do that.  These are all

16    interrelated, to an extent, but since I started there, and

17    then in some ways ended with something it sounds like

18    Mr. Corcoran is going to address as well, why don't we begin

19    with him and then we will come to you.

20             **MR. SCHOEN:**  Yes, Your Honor.

21             **THE COURT:**  Very well.  Mr. Corcoran.

22             **MR. SCHOEN:**  Your Honor, Mr. Costello may also

23    address the Court on the Costello motion issue.

24             **THE COURT:**  Fair enough.

25             **MR. SCHOEN:**  By the way, the legal hook that we

1    intend to use is entrapment by estoppel, just a little plug.

2                **MR. CORCORAN:**  Good morning, Your Honor.

3                **THE COURT:**  Good morning.

4                **MR. CORCORAN:**  Your Honor, your questions on

5    advice of counsel tend to track the way that I think about

6    it in terms of the elements of the offense; that's sort of

7    how I always start with every case.  And here it's not so

8    much a defense, but it goes to this issue of "willfully

9    makes default."

10               I think one interesting thing is that you raise a

11   hypothetical, which is not so far from happening, and that

12   is, this particular statute has been used.  And Congress has

13   voted to hold in contempt a lot of top public officials.

14               On June 28th of 2012, Attorney General Eric Holder

15   was held in contempt by Congress, and a referral was made

16   under the statute to the U.S. Attorney's Office.  About

17   seven years after that, Attorney General William Barr, was

18   held by the House of Representatives in contempt of

19   Congress.  And a referral was made to the U.S. Attorney's

20   Office.  Long before that, EPA Administrator, Ann Gorsuch,

21   in 1982, was held in contempt by the House, by a House vote,

22   and a referral was made to the U.S. Attorney's Office.

23               And the odd thing is, given the elements of the

24   offense, as described by the government, if any of those

25   three top government officials were prosecuted and appeared

1    in court, they would be limited to saying, I received the

2    subpoena, which each of them obviously did; and I made a

3    decision not to comply with the subpoena, which each of them

4    obviously did.

5          All three of those top government officials would

6    be guilty of the crime.  And they would not, under the

7    government's theory, be able to say -- in the case, for

8    instance of the Attorney Generals, Look, we got the best

9    lawyers in the world here at the Department of Justice.

10   They've given me advice I don't need to appear.  The jury

11   should hear that is the way I acted the way I did.  They

12   wouldn't be able to do that.

13         So I think there's a real element of unfairness in

14   the position that the government has taken.

15         **THE COURT:**  But do you agree that if *Licavoli* is

16   binding, that it forecloses at least a component of that

17   argument?  In other words, *Licavoli* says, Advice of counsel

18   is not a defense.

19         **MR. CORCORAN:**  Right.  I don't.

20         First of all, I think it's clear, and you asked

21   the direct question, Is *Licavoli* correct?  And I am not here

22   to say that the D.C. Circuit is incorrect.  I think it is

23   clear that the case would be decided differently today.

24         **THE COURT:**  But that is not a reason that I can

25   ignore it.

1          **MR. CORCORAN:**  Oh, I understand that.  And I'm not

2    suggesting that, other than to say, you know, sometimes we

3    have to go with what's right.

4          I think what's clear in *Locavoli* is that it's

5    totally distinguishable from the case here; and that is*,*

6    *Licavoli* did not involve an assertion of a

7    constitutionally-based privilege.  Totally distinguishable.

8          I will read this sentence from *Licavoli* that

9    caught my eye.  It says, "Advise of counsel cannot immunize

10   a deliberate, intentional failure to appear, pursuant to a

11   lawful subpoena, lawfully served."  That's the distinction.

12         Here, as you identified, OLC opinions give

13   absolute immunity to a top presidential adviser, when the

14   president they serve asserts executive privilege.

15   Therefore, *Locavoli* is distinguishable.  It's not a case of

16   lawful opinion, lawfully served.

17         What we are talking about is a subpoena that was

18   void because of the situation that Mr. Bannon was put in,

19   and asked to protect the privilege.

20         **THE COURT:**  You can argue that the subpoena was

21   void and was unlawful for other reasons.  In fact, you've

22   suggested that you might, violation of the rules, the

23   failure to have somebody, a minority, you know, ranking

24   member or whatever.

25         But if the subpoena was lawfully served, doesn't

1    -- and that's -- that's probably a legal question.  If the

2    subpoena was lawfully served, are you saying that the fact

3    that Mr. Bannon says that he would have been testifying

4    about privileged information made the subpoena unlawful?

5         **MR. CORCORAN:**  I think that in -- yes.  In terms

6    of distinguishing *Locavoli* --

7         **THE COURT:**  In the cases that the -- so my

8    recollection is in OLC opinions about absolute immunity,

9    they don't say that by seeking the testimony of the senior

10   adviser to the president or whatever, that the subpoena is

11   unlawful or was lawfully served.  They say, You have an

12   immunity from responding to it.

13        Is your view that a subpoena as to which someone

14   has immunity is an unlawful subpoena?

15        **MR. CORCORAN:**  I'm not sure -- I'm using that

16   language because that is the language in *Locavoli*.  What I

17   would say is, Receipt of a subpoena from someone in -- it's

18   not unlawful to ignore based on OLC opinions.  If you are in

19   Mr. Bannon's shoes, it's not unlawful to ignore a subpoena,

20   even if it is validly served.

21        We have got other reasons -- and, again, for

22   purposes of deciding what the elements of the offense are,

23   we don't necessarily -- we aren't necessarily in a position

24   of having to prove each of the items that we would -- that

25   the subpoena is about.

1          I'll give you another example.  There are OLC

2     opinions, to go to the question of whether a subpoena is

3     valid, if it is served on an executive branch person.  But

4     counsel -- the president's counsel in this case -- can't

5     attend the hearing in order to assert privilege.  In our

6     view, because of OLC opinions, that subpoena is void.  The

7     person in receipt of that subpoena doesn't need to appear.

8          I am listing these things only to say *Locavoli*,

9     which did not deal with somebody asserting executive

10    privilege, asserting even a Fifth Amendment privilege, which

11    wasn't an issue here.  But a constitutionally-based

12    privilege totally distinguishes the case.

13         **THE COURT:**  Let's assume that -- assume that I

14    think that *Locavoli* is on all fours with this case or at

15    least that it's holding covers.  It's not distinguishable.

16         What is your best argument for why I need not

17    follow it?

18         **MR. CORCORAN:**  I don't think this court is a

19    potted plant, such that you have to ignore the law as it's

20    been developed and been articulated.  Not just by the D.C.

21    Circuit, but by the Supreme Court, on the keyword at issue

22    in the statute, which is "willfully."

23         The Supreme Court, in *Bryan*, was crystal clear

24    that "willfully" in a criminal context means, knowing you

25    are doing something wrong.  Knowing that you are doing

1    something unlawful.

2            **THE COURT:**  That's not the statute, that *Bryan*,

3    the 1998 *Bryan*.  And I don't think there is any Supreme

4    Court decision post *Locavoli* that says, Willfully in the

5    context of this statute means something different.

6            **MR. COSTELLO:**  That's very true.  These cases come

7    up, thankfully, once a decade.  So the Supreme --

8            **THE COURT:**  Don't you think the D.C. Circuit would

9    find itself bound by *Locavoli*, whatever it stands for,

10   whether it is distinguishable or not, but at least as to its

11   terms, unless and until it takes that question en banc?

12           **MR. CORCORAN:**  I don't think so.  I think that --

13   and we cited --

14           **THE COURT:**  So what's the legal -- what's the rule

15   of law principle that allows me to ignore a D.C. Circuit

16   opinion that has not been overruled by the D.C. Circuit or

17   the Supreme Court in the years since it's been decided?

18           **MR. CORCORAN:**  Well, I think the legal -- well, I

19   think, first of all, it's a distinguishable case.  But

20   you're assuming, and you are asking me if it's on fours, and

21   it's 60 years old, and the Supreme Court has spoken to the

22   very word that's contained in the statute, are you bound

23   with a 60-year-old D.C. Circuit opinion?  My answer is, You

24   are not.

25           **THE COURT:**  Why?

1          **MR. CORCORAN:**  Because you are allowed to --

2          **THE COURT:**  I'm allowed to ignore D.C. Circuit

3     opinions that have not been overruled.

4          **MR. CORCORAN:**  No.  No.  But you are allowed to

5     follow the guidance of the Supreme Court in a context of a

6     criminal statute where the rule of lenity applies, where if

7     there are multiple readings, the -- you know, the winner is

8     the defendant, et cetera, et cetera.

9          I see my co-counsel approaching --

10         **THE COURT:**  I really don't want to be doing a

11    back-and-forth.  I will let you speak when we get there, but

12    I would rather hear from Mr. Corcoran.

13         So your answer is, I can ignore a binding D.C.

14    Circuit precedent, so long as I don't think it's right and

15    it's old.

16         **MR. CORCORAN:**  My answer is, Where the Supreme

17    Court has spoken, specifically in the criminal context to

18    the meaning of the word "willfully" --

19         **THE COURT:**  I don't think anybody disagrees that

20    willfully does mean different things in different contexts.

21         **MR. CORCORAN:**  Absolutely.  And here, when it's

22    paired with default, that only adds to our position, which

23    is it is something more than intentional.  It's something

24    more than knowing.

25         **THE COURT:**  I think that the D.C. Circuit may very

1   well have gotten this wrong; that makes sense to me, what

2   you just said.  The problem is, I'm not writing on a clean

3   slate here.

4           **MR. CORCORAN:**  Well, I think the slate that you

5   are writing on is one that has already been prepared by the

6   Supreme Court in *Bryan* and by the D.C. Circuit in the cases

7   that we cite that go into great detail about the use of the

8   word "willingly" in criminal statutes.  So I don't think we

9   are asking the Court to do anything --

10          **THE COURT:**  Did you argue in your brief that

11  *Locavoli* was distinguishable from this case because it did

12  not involve the context of executive privilege and former

13  executive branch employees?

14          **MR. CORCORAN:**  I think we did.  I can't point to

15  the page right now, but that's clearly -- you know, that's

16  clearly a distinction.

17          And if you look at these cases, and many of them

18  come from the 50s and the 60s, House -- Committee on

19  Un-American Activities.  One of the things that I found,

20  where there is an assertion of a constitutionally-based

21  privilege, those cases the defendant wins.

22          And in some of the cases where it is just an

23  expression where even if a lawyer says, Well, that's not

24  within the purview of the Committee.  So we are not going to

25  answer that question, the defendant loses.

1              None of the cases deal with this specific question

2     where there's a constitutionally-based privilege that's

3     asserted from the outset by counsel to Committee counsel.

4     And a request is made, Let's let a judge decide this.  It's

5     just a different situation, Your Honor.

6              **THE COURT:**  I have that one.

7              So let's do the rest of the non-Costello email

8     discovery issues.  And I'm happy to have you walk me through

9     them in whatever order you would like to take them.

10             **MR. CORCORAN:**  Okay.

11             Well, the first -- anything that applies to the

12    grand jury -- again, I take a very practical view of this.

13    There's no doubt that the cases talk about secrecy of the

14    grand jury, the specific federal rule, Rule (6)(e) pertains

15    to it.  But there's a suggestion in the writing and the oral

16    argument of the government that somehow the grand jury is an

17    impenetrable fortress.  And it's not.

18             In this case, the government in their briefs have

19    said, We gave you all of the testimony already.  And we gave

20    you all of the exhibits already.  And they are covered by

21    the protective order.  And that's protecting -- whatever

22    secrecy interest remains is protected by the protective

23    order.

24             What they are now saying is, We are not going to

25    give you the actual subpoena, a piece of paper to a phone

1    company; that is pretty vanilla, frankly.  We are not going

2    to give you the order, which the Court has already reviewed

3    --

4            **THE COURT:**  That's not true.  They offered to give

5    you the order.

6            **MR. CORCORAN:**  Well, we will accept that offer

7    under the protective order.

8            **THE COURT:**  Okay.  So that's moot.

9            **MR. CORCORAN:**  That's moot.

10           But key -- they said is, We don't want to give you

11   the instructions or the argument of counsel.  Essentially

12   saying, grand jury members, you heard the evidence.  Here

13   are the instructions.  Read the instructions.  This is what

14   you should find.  Please return an indictment.  We will type

15   it up for you and hand it to you.  Please return it.

16           That information -- first of all, the instructions

17   themselves in most cases would just be Red Book.  This

18   statute is not a Red Book statute because it only comes

19   along every ten years.

20           The notion that Red Book jury instructions are

21   somehow secret, does not make sense to me.  I can say that.

22   Particularly when there is a protective order in place, we

23   believe that they should be given to us.  And we cite a case

24   from the Northern District of California.

25           **THE COURT:**  So why?  What's your hook for why you

1   think that you should get them?  Beyond just, There's a

2   protective order and we --

3            **MR. CORCORAN:**  Right.  We set forth our -- you

4   know, when you used the words "particularized need."  What

5   are our hooks?  What are our needs?  And we've identified

6   several of them.  One is -- and it's not speculative.  We

7   believe that the government provided an -- the instructions

8   on the elements of the offense, that it is wrong; that's the

9   incorrect law.

10            It's the same knowledge that they've provided here

11  today.  And we believe --

12           **THE COURT:**  So if you lose the Motion in Limine,

13  do you lose that argument as to the instructions?

14           **MR. CORCORAN:**  I don't think so, because we would

15  still want the materials --

16           **THE COURT:**  I'm sure you'd want it, but what's the

17  argument for it?

18           **MR. CORCORAN:**  No.  I'm saying we should still be

19  entitled to them for examination.

20           **THE COURT:**  But why?

21           **MR. CORCORAN:**  Because there's enough there --

22  there's enough there for us to show a particularized need.

23  In other words, to state with some specificity that it may

24  -- and that's what the rule says -- may allow us to dismiss

25  the indictment.

1          It doesn't say that we have to prove that the

2     grand jury instructions will result in a dismissal of the

3     indictment.  That would be impossible, because they are

4     secret.  The word is "may."  And we identify a number of

5     different things that suggest that the instructions are

6     wrong.  And if they are wrong, the indictment should be

7     dismissed and we'd move on that basis.

8          The other thing is we identify the grand jury

9     testimony talking about an adjournment where Mr. Costello

10    sent a letter to the Committee and said, Can we have a

11    one-week adjournment?  A case was just filed that may have

12    bearing on this issue.  We've asked all along to ask a judge

13    decide this legal issue of privilege.

14         Well, in the grand jury, that was not the

15    testimony.  The suggestion was that no request had ever been

16    made for a later date to appear.  And if that was argued, if

17    there was argument by the AUSA that said, You know what, you

18    heard there was no request for a later date, when they had

19    in their position a letter seeking an adjournment, that

20    would be a basis for the dismissal of the indictment.

21         The final issue is there's testimony before the

22    grand jury that suggests to the grand jury that President

23    Trump did not validly assert or communicate an assertion of

24    executive privilege to the Select Committee.  That was done

25    by a letter from Mr. Costello that quoted a letter from

1      counsel to the president.

2            So it would be a basis for the dismissal of the

3      indictment if the prosecutors, in telling the grand jury,

4      Well, this is a willful default here.  And by the way, there

5      was no valid assertion of executive privilege because the

6      president didn't himself communicate that to the Select

7      Committee.  If that was the argument, it would be a basis to

8      dismiss the indictment.  It is not speculative.  There is

9      grand jury testimony right on point, which we cite in our

10     motion.

11           So I think, overall in these grand jury materials,

12     particularized need just aren't magic words.  It just means

13     we need to specify why we need it.  In each of the cases

14     that I've just run through, if we get the information, we

15     believe it's a basis for dismissal of the indictment.

16           Certainly, it's a balancing.  How does that

17     balance -- how does what I said -- even if you don't believe

18     it word for word in terms of what we are going to get, how

19     does it balance with the secrecy interest?

20           There is a general secrecy interest for the grand

21     jury, it's going to be totally protected because we are

22     talking about instructions and argument by counsel to the

23     grand jury by the protective order.

24           **THE COURT:**  Okay.  You also seek non-grand jury

25     discovery.

1      **MR. CORCORAN:**  Yes, Your Honor.

2      **THE COURT:**  Why don't we start with executive

3  branch OLC opinions.

4      **MR. CORCORAN:**  Yes, the OLC opinions.  The cases

5  are pretty clear.  There are a bunch of them cited in our

6  brief and in the government's; that the US District Court

7  cases from this court are really instructive on this kind of

8  guidance.

9      *Naegel*, 468 F.Supp 2d. required the discovery of

10  guidance materials and policy statements from numerous US

11  trustee offices.  *O'Keefe*, 2007 West Law 123, 9204 said,

12  Decisions and policies on expedited visas at six

13  international consulates had to be turned over.

14      The *Poindexter* case involving the Iran Contra

15  issues, before Judge Greene, there were 300,000 pages of

16  documents turned over by the government before the defense

17  moved for additional discovery.  And Judge Greene said, All

18  documents in the executive branch on the applicability of

19  the Boland amendment, must be searched for and disclosed to

20  Mr. Poindexter.

21      In addition, all documents showing that executive

22  branch official had knowledge of the National Security

23  Counsel activities, had to be searched for and provided.  We

24  are asking for a much, much more narrow set of information.

25  Take our letter.  Email it to the US House of

1    Representatives' General Counsel.  Please search for these

2    materials.  Send it to Main Justice Office of Legal Counsel.

3    Please provide any information that's responsive to this

4    request.

5              **THE COURT:**  Would you be willing to limit that to,

6    what I would consider to be OLC opinions, published or not?

7    I mean, is an email from an attorney adviser to a deputy in

8    OLC discoverable if it's not an official OLC opinion?  Or

9    why should I permit that type of thing?

10             **MR. CORCORAN:**  Well, it is discoverable.

11             **THE COURT:**  On what ground?

12             **MR. CORCORAN:**  Under the local rules.

13             **THE COURT:**  What issue does it go to?

14             **MR. CORCORAN:**  Well, estoppel, essentially.

15             **THE COURT:**  So an email from an attorney adviser

16   to the Deputy Assistant Attorney General of OLC, would estop

17   the United States government from taking some position in

18   litigation?  That can't be right.

19             **MR. CORCORAN:**  Let's say the email said, You know

20   what?  It's our long-standing policy here at the Department

21   of Justice not to prosecute former, even former, top

22   presidential advisers when the president asserts privilege.

23   But let's make an example of Mr. Bannon.  That, we believe,

24   the government should search for and provide emails along

25   those lines, because they would tend to negate an element of

1    offense.

2            The local rule requires that.  It's broader than

3    *Giglio.*  It's broader than *Brady*.  The local rule that

4    applies to the courts that --

5            **THE COURT:**  So what element of the prosecution or

6    what defense does such an email go to?  It's even better for

7    you.  Imagine, hypothetically --

8            **MR. CORCORAN:**  Yes.

9            **THE COURT:**  -- there is an official, but

10   not-published OLC opinion, that is 100 percent on all fours

11   with this case.  Right?  Former executive branch employee

12   discussing things with the current president, Congressional

13   subpoena, assertion of privilege --

14           **MR. CORCORAN:**  Yes.

15           **THE COURT:**  -- and that OLC opinion is as strong

16   with respect to immunity or non-prosecution as one can

17   imagine.  I'm not saying there is such an opinion.  I am

18   just hypothesizing it.  The government says, That's

19   irrelevant because it doesn't go to an element of the charge

20   or a defense.  So what does it go to?

21           **MR. CORCORAN:**  Well, I think it does go to an

22   element of the charge of the offense.  Willfully makes

23   default.

24           **THE COURT:**  But why?  If that is a non-public OLC

25   opinion, then by definition neither Mr. Costello nor

1    Mr. Bannon would have known about them.

2              **MR. CORCORAN:**  Well, first of all, the discovery

3    rules do not require -- relevance is a concept for trial.

4              **THE COURT:**  I'm just trying to understand how the

5    opinion would be relevant in your view --

6              **MR. CORCORAN:**  Right.

7              **THE COURT:**  -- to something either the government

8    has to prove or you would want to say in your defense.

9              **MR. CORCORAN:**  Just to be very clear in my answer,

10   that document doesn't have to be admissible in trial.

11   Relevance is not a consideration when considering discovery.

12   The rules make clear that even if it's inadmissible, but

13   could lead to admissible evidence, then it has to be turned

14   over.

15             So for instance, in the *Safavian* case -- that was

16   Judge Friedman -- he required turning over -- it was a GSA

17   case and ethics and the government in that case for a White

18   House official.  He required at 233 FRD 12, he required the

19   turning over internal GSA guidelines and procedures

20   regarding ethics opinions and disciplinary actions.  He

21   required -- it involved Abramoff.  He said, Even emails by

22   Abramoff and Associates, even if unknown to the defendant,

23   must be turned over, because they may lead to admissible

24   evidence.

25             So for your hypothetical, a request to OLC, give

1    us emails, give us drafts, give us information, may lead to

2    admissible evidence.  So it doesn't have to be relevant.

3    And it doesn't have to be something that's in -- you know,

4    in the mind of either Mr. Bannon or counsel.  And that's,

5    you know, that's the nature.

6            In *Trie*, another case we cite, the judge required

7    both DOJ and Federal Election Commission, internal memoranda

8    had to be searched for and turned over on the topic of

9    whether a specific statute applied to conduct like the

10   defendant's.

11           In other words, it's analogous.  We are asking

12   for, not internal deliberations, but statements within the

13   government that talk about whether a certain statute applies

14   to Mr. Bannon.

15           **THE COURT:**  Okay.  So now let's turn to the other

16   bucket, which I guess is statements, documents, et cetera,

17   to suggest that this is a political prosecution.  And I

18   don't mean to limit your argument.

19           **MR. CORCORAN:**  Yes, I understand.

20           **THE COURT:**  That's a different category, I think.

21           **MR. CORCORAN:**  Well, I think, first of all, on

22   Congressional documents.  And I understand there are cases

23   that talk about Congress being, you know, obviously the

24   constitution talks -- has Congress in a different building

25   so to speak, than the Court.

1          We are not asking the Court to compel Congress to

2     do anything.  We are asking the Court to compel a litigant,

3     the United States Attorney's Office, which is prosecuting

4     our client criminally, to seek records.

5          In other words, again, from just a practical

6     standpoint, all they need to do is send to the general

7     counsel of the U.S. House of Representatives our letter.

8     Say, We are engaged in litigation.  We followed the criminal

9     contempt vote of the House, and we are proceeding with the

10    prosecution.

11         Please search for and give us from the Select

12    Committee staff, Select Committee members, the Speaker of

13    the House, because she had a role in certifying the vote to

14    the U.S. Attorney's Office.  Please search for these

15    materials and give them to us.

16         And the reason why it's -- so it's more like --

17    it's not just that the Select Committee is a complainant

18    here.  They initiated the prosecution.  The statutory scheme

19    gives the Select Committee and the U.S. House of

20    Representatives the power to initiate this prosecution.

21         The statutes, 2 U.S.C. 192 but 2 U.S.C. 194 says

22    that once the certification is made, the U.S. Attorney's

23    Office "shall" present the information to a grand jury.  In

24    other words, there is no choice.

25         Now, I know that different cases and OLC opinion

1     at different times has taken a different position on it.

2     But from our perspective, it's not just a complainant.  They

3     sit in the -- they are in the shoes of any other

4     investigatory or partner in a prosecution.  That's why we

5     are seeking the documents from them.  They've already made a

6     lot of public statements, members of the Committee, that

7     they are trying to make an example of Mr. Bannon.  Obviously

8     we are trying to present a defense and develop a defense,

9     prepare a defense.  And that is important information to

10    know if the reason that he -- you know, that Attorney

11    General Barr and U.S. Attorney General Holder were not

12    criminally prosecuted, but Mr. Bannon is.  And the reason is

13    they want to make an example of him, we are entitled to that

14    information from the Committee.  And it's not -- it's not a

15    burdensome request.  Again, it's sending an email with our

16    attachment and asking for them to do it.

17          Now, again, as I stated, we are not asking the

18    Court to compel Congress to do anything.  They could respond

19    to the email that they get from the AUSAs and say, You know

20    what?  We are not going to give you that.  We are not going

21    to give you that information.  Then we are in a different

22    posture.  And we'll have to decide as a defense team, what

23    do we do in that posture?

24          We are not asking you to compel them to do

25    anything.  We are saying, If we are going to have a fair

1    trial and it's initiated by members of Congress, and they

2    made statements to the effect they want to make an example

3    of him, we need their private conversations on that as well,

4    on that topic.

5            **THE COURT:**  So you are not asking me to order the

6    production of anything.  You are asking me to order the

7    government to ask Congress to "pretty please" give them

8    these materials?

9            **MR. CORCORAN:**  Yes.  You don't have to use that

10   exact language.

11           **THE COURT:**  And I wouldn't.  But if Congress

12   refuses?

13           **MR. CORCORAN:**  Then we as a defense team will have

14   to take the next step.  But we may seek, in some way, to get

15   an evidentiary benefit from that.  We may seek to foreclose

16   certain positions that might be taken at trial by the

17   government.

18           But right now we are in discovery.  Discovery is

19   all about, How do we get what we need to prepare a defense?

20   We don't have the ability to go -- we are not talking about

21   rummaging in their files.  That's the words that the

22   prosecutor used.

23           We have discrete requests that will take very

24   little time to search and fulfill.  And we believe it's

25   necessary for a fair trial.

1          **THE COURT:**  Thank you, Mr. Corcoran.  I would like

2     to hear from Mr. Schoen on the Costello emails.

3          **MR. SCHOEN:**  Your Honor, first of all, I want to

4     apologize for the protocol breach earlier.

5          **THE COURT:**  No problem.

6          **MR. SCHOEN:**  Fundamental rule, I suppose.

7          Having said that, to explain, our original plan

8     was to divide up that issue, the advice of counsel.  But I

9     wanted to respect of course the Court's wishes announced

10    this morning.

11         Can I have 20 seconds, though -- the Court asked

12    the question what is the best argument.

13         **THE COURT:**  Yes.  Yes, please.

14         **MR. SCHOEN:**  I want to give you what I believe.

15    To crystalize it, the Court's question really was, If I find

16    *Licavoli* is best law still, what is your best argument

17    around it?  Because here I am in District Court, and I am

18    bound by that.

19         I think the best argument is -- Mr. Corcoran

20    alluded to toward the end -- executive privilege takes this

21    case out of *Licavoli*.  Why?  Because it raises a separation

22    of power issues, not contemplated in *Licavoli*.  And all of

23    that is based on the advice of counsel in this case.

24         In other words, the advice of counsel, with

25    respect to executive privilege is, Bannon, your hands are

1       tied.  You don't have the will.  Willfulness is removed from

2       this equation.  Once executive privilege is invoked, there

3       is nothing volitional --

4                **THE COURT:**  This argument is that *Licavoli* can

5       still be perfectly good law and binding, but it's not

6       applicable.  So where in your brief did you make this

7       argument?

8                **MR. SCHOEN:**  I don't think that argument, in that

9       form, is made.

10               **THE COURT:**  Are you close to that form?

11               **MR. SCHOEN:**  Your Honor, I think it is sort of

12      close to it.

13               **THE COURT:**  Point me to where that is in your

14      brief.

15               **MR. SCHOEN:**  I think after you get to the *Licavoli*

16      discussion, and we talk about separation of powers, it

17      doesn't make the argument that, By the way, if you buy into

18      *Licavoli*, here is why *Licavoli* is different.

19               **THE COURT:**  No.  It just says, *Licavoli* is no

20      longer good law.  It doesn't say, Even if it is good law, we

21      win.  Because it is completely irrelevant to the question at

22      hand.

23               **MR. SCHOEN:**  I think that's right, Your Honor. I

24      think we address that when we say *Licavoli*, that standard

25      has been replaced by *Zeese* and *Ratzlaf* and all of that.  But

1        this is an argument.

2               I personally think it's the best argument; and

3        that is -- and we do make the point about executive

4        privilege in the brief.  But the point here is, the jury

5        deserves to know what really happened.  And, in fact, if we

6        believe what Mr. Costello has said in his declaration, what

7        really happened is, he on behalf of Bannon, tried to find a

8        way to accommodate the subpoena, the opposite of "lack of

9        willfullness."  He was willing to testify.

10              He didn't default.  He didn't willfully make

11       default.  He said, Work it out with the president or take me

12       before a judge and let the judge tell me it doesn't apply.

13       I need to testify.  He was willing to do those things.  But

14       his lawyer said, You can't -- absent those things, you

15       cannot go forward.  Your hands are tied.  That's what the

16       law is, Bannon, and you've got to follow the law.

17              The jury deserves to hear that.  And if they don't

18       hear it, all they hear is, well, let's see.  Bannon got a

19       subpoena.  And Bannon didn't show up.

20              It gives Congress, in a sense, a veto power over

21       the executive privilege.  The executive branch has the right

22       to determine for itself what's a privileged matter.  The

23       ultimate arbitor would be you or the court; and that's what

24       the courts have said in a number of cases.  The ultimate

25       arbitor -- I'm sorry I'm talking too fast.  The ultimate

1    arbiter on executive privilege is the Court.

2          And so we need advice of counsel here because

3    Mr. Costello was the only -- they like to call intermediary

4    or point of contact.  He was the only person who ever dealt

5    with this Committee on Mr. Bannon's behalf.

6          To tell the story of this case, and specifically

7    on willfulness, we need to have Mr. Bannon -- we need to

8    have the evidence go in on advice of counsel.  That's, I

9    think, the best answer on that.

10          The other thing, the OLC opinions of course, is a

11    conceptually different argument.  It may be relevent to

12    wilfulness, but it's a due-process-based argument.  That is,

13    the government is estopped.  This is the classic entrapment

14    by estoppel.  The government is estoped from taking a

15    position inconsistent with these publicly-issued, binding on

16    the Department of Justice, legal opinions.

17          When they say things like, If you get -- former

18    member of the executive branch -- if you get a subpoena and

19    the rules or by Fiat, Congress committee won't allow the

20    privilege holder invoker, that subpoena is invalid -- (A

21    sneeze.)  God bless you -- that subpoena is invalid.  That's

22    a position taken in OLC opinion.

23          If an OLC opinion says, An executive branch member

24    or former executive branch member cannot be prosecuted by

25    the Department of Justice, if that person invokes executive

1    privilege, that's a binding, publicly-issued opinion, that

2    Mr. Bannon and everybody else is entitled to rely on.  And

3    that the government is estopped from prosecuting or from

4    violating, put it that way.  And that's a due-process-based

5    argument.

6             All right.  Back to my agenda, Your Honor.

7             Just a couple things.  I know, first of all, the

8    Court clearly has read all of the papers, knows all of the

9    arguments and is very familiar with all of the facts, which

10   is extraordinarily impressive in and of itself.  But I don't

11   need to go into the facts.  And the Court's questions at the

12   beginning of this discussion with the AUSA pointed that out.

13            I do think we have to ask the question, which the

14   Court asked, Why?  The Court knows what happened here.  They

15   went after emails -- well, we are still not clear exactly.

16   I gather from the discussion today, there is only one Stored

17   Communication Act application in order.  I'm not clear why

18   there is only one, when they went after several email

19   accounts.  And 2703(d) clearly contemplates using the Stored

20   Communications Act to get other email accounts.  So I don't

21   know what happened there on their end.

22            And I'm not sure, by the way -- it's a little bit

23   of a side issue I don't think we need to deal with today.

24   I'm not sure -- and some commendators have suggested what I

25   am going to say -- that after *Carpenter*, just getting a

1    Stored Communications Act order is enough, even for records,

2    non-content records.  But that's a question for another day

3    and another Court, I suppose.

4         But today we look at what they got, these email

5    records, none of which were Mr. Costello.  So it's not in

6    the posture of a Motion to Suppress.  And the telephone

7    records that are of Mr. Costello.

8         And, of course, you know, we hear the government

9    dismiss all of this as, Well, we didn't get any contents.

10   We don't know what he said in the conversation, which

11   undercuts the very basis they have for trying to get these.

12   But these are still very important.  And this is why the

13   Department of Justice's policy says, A subpoena to an

14   attorney related to the representation of clients.  It

15   doesn't require just when it relates to contents.

16        The position, by the way, since I want to try to

17   cut to what the questions and answers were earlier -- the

18   positions, by the way, that the position only applies if you

19   serve the subpoena on the attorney himself, and not to a

20   third party -- for which no authority is cited in the

21   government's brief -- is absurd on its face.

22        The principles behind the policy are reflected in

23   the policy.  There is a special relationship between

24   attorney and client.  You risk imposing and interfering with

25   that relationship by going after an attorney's records of

1       any kind by subpoena.  And that doesn't depend on whether

2       you handed it to Bob Costello or you handed it to TMobile.

3               In fact, there is no reason in this case not to

4       give notice to Mr. Costello.  His phone records were not

5       going away.  There is no reason in this case not to have

6       abided by the DOJ policy that requires the government to

7       seek those records voluntarily, as a matter of first course.

8               Now, you know, the government said, This policy

9       isn't binding on the Court; that's absolutely right.  The

10      Court can't enforce that policy.  I'm hopeful the Inspector

11      General will see things differently from how the government

12      presents in this case but that's also beyond the purview.

13              **THE COURT:**  So let's cut to the chase.

14              **MR. SCHOEN:**  Yes, sir.

15              **THE COURT:**  As to emails, email records, at least

16      as the record reflects, no email records for Mr. Bannon's

17      lawyer, Costello -- to be distinguished from other Costellos

18      in the world -- were collected.  I assume you agree, the

19      email records from other Costellos are completely irrelevant

20      here.

21              **MR. SCHOEN:**  The records themselves are

22      irrelevant.

23              **THE COURT:**  The records themselves.

24              **MR. SCHOEN:**  Any representation made to a federal

25      judge to get those records, under 2703(d) specific,

1    articulable facts that --

2             THE COURT:  Just hold on.

3             MR. SCHOEN:  Yes.

4             THE COURT:  The government has offered, and

5    Mr. Corcoran accepted the offer to produce that application

6    to you.  So you are getting that.

7             MR. SCHOEN:  I understand.

8             THE COURT:  So at least as to that question, you

9    have a set of irrelevant emails that you already have, and

10   you have an application that you are about to get.  It seems

11   to me that that's -- at least for present purposes, that's

12   the email stuff.  Now, you may want to do something with

13   that application, but in terms of discovery, you got it.

14            MR. SCHOEN:  Yes, Your Honor.

15            THE COURT:  Now, as to the phone records, you have

16   the phone records.  I'm relying on the government's

17   representations that all records that were collected have

18   been produced.  I can't do anything other than rely on that.

19   The government has said there were subpoenas as to those

20   records, and they will produce them to me for my in-camera

21   review but not to you.

22            What more do you want?

23            MR. SCHOEN:  I tell you what I think is relevant,

24   to some degree, I was surprised to hear today the government

25   say, Well, these telephone subpoenas really go to the grand

1    jury investigation.

2          I would be surprised, to put it mildly, if the

3    grand jury actually requested subpoenas for Bob Costello's

4    telephone records for the purposes stated here.

5          In my imagination, at least, I believe it is

6    possible that the government decided that they wanted to

7    subpoena those records.  And so I think there -- if it's

8    otherwise, if the grand jury really asked for Bob Costello's

9    telephone records, then I think we are back to

10   Mr. Corcoran's argument on another reason we need grand jury

11   minutes, because what on earth were they told about what the

12   government knew at this point?

13         Let me try to bring that home.  The Court asked

14   earlier to the government, Well, you know, certainly

15   today -- by today the defense has conceded that Mr. Bannon

16   got the subpoena and so, you know, today you wouldn't really

17   need to get those records, would you?

18         Two answers to that.  Bologna, is one.  They knew

19   -- the referral in this case was made on October 21st to the

20   Justice Department.  Banners about Bannon were in newspapers

21   all over the world.  Everybody knew that Bannon's position

22   was he wasn't complying with the subpoena because executive

23   privilege had been invoked and he couldn't.

24         There's never been any discussion that Mr. Bannon

25   never received the subpoena or that Mr. Bannon showed up in

1    the wrong place or that this was a matter of accident and

2    that's what really happened.  And it's disingenuous to

3    suggest otherwise.  These subpoenas went out after that

4    referral.  The earliest one we know about is October 25th.

5            Putting aside all of the other interaction, on

6    November 1st -- it's in the record.  I think it's 34-1 at

7    Pages 15 to 24 -- Mr. Costello put in writing to the

8    government his whole defense in the case.  The defense that

9    Bannon would raise and why the government shouldn't

10   prosecute this case.

11           No one on this planet could read that by November

12   1st and conclude in any way that either Mr. Bannon was or

13   could consider taking the defense that he never received the

14   subpoena or that there was some accident involved here.

15           But here we are in March, with the government

16   telling the Court that that's the reason they went after

17   these records.  In fact, they gave two different answers.

18   One was in document 30 -- well, one was Document 31, Page 12

19   they say, "Costello is a witness to Bannon's decision not to

20   comply."  That was on February 25th.  Then on March 14th

21   they say they have into prove deliberate non-compliance, it

22   wasn't an accident.  And Costello's a witness to establish

23   that Bannon had knowledge of the subpoena and his

24   communications are relevant to the government's

25   investigation.  And then the government tells you, at 36-1,

1      Page 2, Bannon finally has conceded in his post-indictment

2      pleadings that he knew of the demands.

3              Again, we have in the record already Bannon -- a

4      letter from Costello to the Committee that he accepted the

5      subpoena for Bannon.  But more than that, we have in writing

6      on November 1st the whole scenario of the defense.

7              According to the papers we have so far, and of

8      course now we will get the order.  The order referred to the

9      Stored Communications Act order referred to was dated

10     November 11th.  It's impossible that by November 11th the

11     government could have thought that Mr. Bannon's defense was

12     going to be, I never got the subpoena or that it was an

13     accident.

14              Putting all of that to the side, what on earth

15     were they going to tell from the records that they got?

16     From the metadata, from who we sent it to, who we got it

17     from, all of those things.  Nothing about whether he

18     received --

19              THE COURT:  Isn't the government allowed to, as

20     part of its investigation, look for cumulative evidence?

21              MR. SCHOEN:  First of all, this wouldn't be

22     cumulative, Your Honor, in my view.  But secondly --

23              THE COURT:  Why not?

24              MR. SCHOEN:  Cumulative of the fact that Bannon

25     actually received the subpoena?

1    **THE COURT:**  Or at least that Bannon and Costello

2    were talking on particular dates, which would be cumulative

3    of whether Costello had told Bannon there was a subpoena or

4    whatever.

5    **MR. SCHOEN:**  Could be, Judge.

6    Getting subpoena for attorney records wouldn't be

7    the way to do it and certainly not a matter of first course.

8    They knew he was communicating, from his written --

9    (indiscernible) -- so the Court says, Okay.  How about

10   cumulative?

11   Well, again, if Costello is going to be a witness,

12   you've got it in writing from him.  You've got in your 302s

13   that you took when you were interviewing him and all of

14   that.  But we have rules around, and ethical concepts,

15   around subpoenaing attorney records.

16   Consider this, for example --

17   **THE COURT:**  So assuming that is all true, how does

18   it impact this case?

19   **MR. SCHOEN:**  I will tell you how it impacts this

20   case, it's obviously, you know, the $64 million question, in

21   some sense.  So why am I not wasting the Court's time with

22   all of this?  I hope I am not waisting the Court's time,

23   because I think what happened is outrageous.  But I also

24   think if it's allowed to stand without being addressed, then

25   it will be accepted practice in the future.

1          **THE COURT:**  What do you mean by "without being

2     addressed"?

3          **MR. SCHOEN:**  Without being --

4          **THE COURT:**  Do you think it goes to a substantive

5     question in the case?

6          **MR. SCHOEN:**  No.  No, your Honor.

7          Right now, from what we know, I think that it goes

8     to a matter within the Court's supervisory power, to send a

9     clear message on, that this was inappropriate what happened

10    here.  The reasons given don't make any sense, and the

11    methods used don't make any sense, to try to achieve those

12    goals.  And I think that's crystal clear.  I think that

13    message has to be sent.

14         The other reason, Judge, that I thought it was

15    important to still raise this issue, once -- even though we

16    know now, we hope, what happened.  And I'm hoping that what

17    we have is a representation that Mr. Bannon's other lawyer,

18    Adam Katz's records were not going over.  I think we have

19    that representation in some earlier writing.

20         But, in any event, I think that the other reason

21    it's important is because notwithstanding what the

22    government says about -- since they didn't get the contents,

23    it doesn't affect privilege issues.  It interferes with the

24    attorney/client relationship.  And there is a long line of

25    authority going back, way back, talking about the importance

1   and the sometimes tenuous nature of that relationship, and

2   how attorney subpoenas, pitting an attorney against a

3   client, or just attorney subpoenas, puts that delicate

4   relationship at issue.  And I'm thinking of cases like *Maine*

5   *versus Moulton*, a whole host of case of cases, Judge.  You

6   are as familiar with them or more probably than I am.

7   Probably more.

8             I think that's it.  The last thing I want to talk

9   about is remedy.  The government says that we are trying to

10  get at all of their internal deliberations about all of this

11  process.  I looked at the relief we asked for.  I don't see

12  that.

13            I am looking at Document 34, Pages 24 and 25.  We

14  asked for, you know, a copy of all of the subpoenas that

15  were issued, directed at third parties, to get the email and

16  telephone records, along with all of the applications for

17  those things.

18            Then a list -- number two, "A list of third

19  parties on whom a subpoena, court order or other process was

20  served."  And I say "other process" because Google at that

21  time referred to it as an SCA order or equivalent.

22            **THE COURT:**  Uh-huh.

23            **MR. SCHOEN:**  Number three, "A list of all people

24  in the Department of Justice for whom authorization to seek

25  and obtain the email and telephone records was received."

1          I mean, I guess that's going to look something

2    like this.  (Showed the Court a blank page.) I don't know

3    that we have to follow it.  Sorry.  (Turned around and

4    displayed to opposing counsel.)

5          I asked for them to disclose to us -- or we asked

6    them to disclose to us, "Whether the email records and

7    telephone records that were obtained were shown to or

8    referred to in front of the grand jury."

9          Now, I'm led to believe today they must have been.

10   Because we heard earlier that this is all part of the grand

11   jury investigation.  So the grand jury asked for it, and

12   they must have been told something about it.

13         I think that's all I have, Judge.  I think it is

14   an important issue to take up with the Court, even if it

15   doesn't impact substantively on the case.

16         Thank you, very much, Your Honor.

17         **THE COURT:**  Thank you, Counsel.

18         Mr. Costello?

19         **MR. COSTELLO:**  Thank you, Your Honor.

20         I am the actual Robert Costello that they were

21   looking for.

22         I am kind of the cleanup hitter here.  I have a

23   couple points that I want to make about presentations we've

24   already made.

25         Your Honor was discussing the issue of willfulness

1   and the fact that I asked for an accommodation in not one,

2   not two, but three or four of my correspondence with

3   Chairman Bennie Thompson.  And then at the end, I asked for

4   an extension of time, because that very day -- I think it

5   was October the 18th -- President Trump filed a lawsuit that

6   presumably would have a lot to do with what we were doing.

7           So I said to them, We would like to look at the

8   lawsuit.  We don't know anything about it.  Can you give us

9   a week?  This was the night of the 18th.  They didn't reply

10  that night.  They waited until the next morning and they

11  said, No.  The reason they said no is that was the day they

12  had a televised performance of the vote to hold Mr. Bannon

13  in criminal contempt.  And after that vote, Bennie Thompson

14  and Ms. Cheney both said on television -- I watched it live

15  -- that they were doing this to make an example of

16  Mr. Bannon.

17          With respect to the issue of willfulness.  I mean,

18  when somebody has a lot of experience they are often

19  referred to -- they make a comment that "this isn't my first

20  rodeo."  Well, this isn't Mr. Bannon's first rodeo when it

21  comes to executive privilege and the Congress.  In fact,

22  it's his fifth rodeo.

23          Four times previously he was in a situation where

24  executive privilege was invoked, he was asked to answer

25  questions before the Mueller Committee, before the Senate

1    Intelligence Committee and twice before the House

2    Intelligence Committee.

3              Why is the House Intelligence Committee important?

4    Because the Chairman of the House Intelligence Committee

5    during both of these occasions is Adam Schiff, who sits on

6    the Select Committee.  So he certainly was aware that

7    Mr. Bannon, when pressed on the issue of executive

8    privilege, asked the Committee, on four previous occasions,

9    please talk to the president.  This is not our battle.

10   Executive privilege doesn't belong to Steve Bannon.  This is

11   not our battle.  Please talk to the President's counsel and

12   work something out or if you can't, go to the District Court

13   and have the District Court tell us what's executive

14   privilege, what isn't.  It's not his position or mine to

15   decide what questions are covered by executive privilege.

16             In this particular instance, we were facing a

17   committee that was going to hold a private deposition

18   pursuant to the subpoena.  That private deposition,

19   according to their rules, would not allow the president's

20   counsel to be present, in order to invoke executive

21   privilege, as to what questions he was willing to let

22   Mr. Bannon answer.

23             There is a case -- you talked about the Office of

24   Legal Counsel.  There is a decision, binding upon the

25   executive department, not binding upon the Court, but

1    binding upon the executive branch of the government, of

2    which the U.S. Attorney's Office is part, that says, When

3    Congress issues a subpoena to a man like Mr. Bannon, an

4    executive privilege is involved.  If they do not let the

5    president's lawyer attend the deposition, then that subpoena

6    is -- and this is a quote -- "unlawful, illegal" -- I don't

7    know why they used both words but they did -- "unlawful,

8    illegal and incapable of enforcement either civilly or

9    criminally."  That's information from the OLC opinion that

10   certainly I communicated to Mr. Bannon.

11          Now, let me talk for a moment about the Costello

12   issue and why is that important?  I think it's important

13   because, quite frankly, it shows terrible abuse of the grand

14   jury process.  It is not the ordinary course of business.  I

15   was a federal prosecutor myself.  I was Deputy Chief of the

16   criminal division in the Southern District of New York.  I

17   have a lot of experience in this area.  It is, by far, not

18   the normal experience to turn around and subpoena a defense

19   lawyer's records.

20          And in this case, we first asked -- when I saw

21   that, one night looking at the discovery and realized that

22   the phone number I was looking at is my personal cell phone.

23   Which, as you might imagine, during COVID season became my

24   personal phone and my business cell phone.  And when you

25   further consider that I represent not just Mr. Bannon, but I

1    also represent Rudy Giuliani, who is involved in these same

2    issues.  They subpoenaed those records the very day I

3    reached out to the U.S. Attorney's Office and said, I want

4    to make a presentation seeking a declination -- because

5    there was a long history of declinations in that office --

6    and who is the contact person I should be in touch with?

7    That day, October 25th, they issued the subpoena for my

8    personal cell phone records, which is also my business

9    records.  They went on to subpoena my office direct line in

10   New York City and my home number.  What information could

11   they be looking for?  Well, we asked that question.  And at

12   first they said, Costello is a witness.

13            Now, I can't think of any way to put a wedge

14   between a lawyer and his client than to say that that guy

15   that you thought, Mr. Bannon, was your lawyer, is now going

16   to be a witness against you; that's what they were doing

17   here.

18            The first time we asked that question, they said,

19   He's going to be a witness.  Recently when that question was

20   asked they said, Oh, we have to check to make sure that

21   Mr. Costello told Mr. Bannon about the subpoena; that this

22   isn't all just a big mistake.  First of all, you know

23   somebody is not telling the truth when they give you two

24   explanations for the same thing that are inconsistent with

25   one another.

1          Second of all, that position is preposterous.

2     They should be embarrassed to make that.  It's an insult to

3     the Court.  It's an insult to defense counsel.

4          The question of whether I communicated the fact of

5     the subpoena to Mr. Bannon is mind boggling, because it was

6     the Select Committee that contacted me, in the first

7     instance, and said, Do you represent Mr. Bannon?  Yes, I do.

8     Will you accept service of his subpoena?  I said, Well, I

9     will have to talk to Mr. Bannon about that, of course.  I

10    said, I will get back to you.  I called Mr. Bannon, spoke to

11    him about it, explained it.  He said, Sure.  Accept service

12    of the subpoena.

13         I then sent an email, which is on the record, back

14    to Select Committee saying, I am Mr. Bannon's counsel, and I

15    am accepting service of a subpoena.

16         If you allow this office to do what they did to me

17    to every other lawyer in the system, which is what is going

18    to happen if we just poo-poo this, then no lawyer in his

19    right mind is ever going to accept service or process.

20         Second of all, part of this equation is, because I

21    was acting in good faith, and I said in my first email --

22    that's why I want to talk about the people in U.S.

23    Attorney's Office about a declination.  I was aware of the

24    OLC opinions, aware of the long history of that office not

25    prosecuting.  I was aware of attorney generals, like Mike

1    Mukasey saying, I won't refer it to the U.S. Attorney's

2    Office.

3                So I sat down with them for, I am going to guess

4    because I wasn't keeping close track, maybe a total of five

5    hours on two occasions.  If they really wanted to find out

6    whether -- I mean, first of all, would I do that if I hadn't

7    given Mr. Bannon the subpoena?  Of course not.

8                **THE COURT:**  Do you remember what dates --

9                **MR. COSTELLO:**  I'm sorry?

10               **THE COURT:**  Do you remember what dates those two

11   meetings --

12               **MR. COSTELLO:**  Yeah.  November 3rd and November

13   8th.  November 3rd was the first meeting and November 8th

14   was the second meeting.

15               During that period of time never once said to me,

16   By the way, Mr. Costello, did you give Mr. Bannon the

17   subpoena?  Did you ever tell him about the subpoena?  Of

18   course it was a ludicrous question.  Because I presented

19   them, they wanted to meet right away.  I said, No, I have a

20   better idea.  I am writing a legal memo on why I think your

21   office should decline prosecution.  I would like to send

22   that to you, and then have a day or two go by so you can

23   review it, check the OLC cites, and then we can sit down and

24   have a meaningful discussion.

25               What I didn't know was they viewed that as an

1    opportunity to try to turn me into a witness.  At that Zoom

2    conference, I am looking at a table consisting of four

3    people sitting at the table.  Mr. Cooney, the two other

4    Assistant US Attorneys and in the back was a young man who

5    was a paralegal taking notes.

6              I was told, Oh, by the way, we have FBI agents

7    that are going to be listening in to the conversation.  I

8    could care less who listened in to the conversation.  I was

9    making a legal presentation on a declination.

10             Then when we get to discovery, I see there is an

11   FBI 302 Report of Investigation, pretending to be an

12   interview of me.  The interview of me that is conducted

13   while I'm conducting a Zoom conference with the U.S.

14   Attorney's Office seeking a declination.

15             Part of that FBI 302 said that I was advised of

16   the identity of the agents; that's true.  They introduced

17   themselves orally.  They weren't in the picture at any time.

18   My recollection is they didn't ask any questions.  But I

19   certainly was not advised that this is going to be an FBI

20   interview of you.  I would have been out of my mind to do

21   that.

22             When Mr. Bannon found out about that, he was

23   irritated because he thought I gave an interview to the FBI

24   because of the 302.  So that's the kind of wedge I'm talking

25   about here that they drive between a lawyer and his client,

1    by making that lawyer look like he's not a lawyer

2    representing you.  In fact, he's going to be a witness

3    against you.  To top it off, at the same time, they make a

4    Motion in Limine to deprive Mr. Bannon of the defense of

5    advice of counsel.

6         Well, I think you touched upon this earlier.  With

7    respect to the advice of counsel, especially when I am

8    talking to him about OLC opinions, that information is going

9    to come in in any event.

10        Even if you decide advice of counsel doesn't come

11   in, it's coming in under an estoppel ground because it was

12   presented to Mr. Bannon.  And that's one OLC opinion that so

13   far we haven't discussed, because that's the opinion that

14   says, with executive privilege, that subpoena is dead on

15   arrival.  It is null and void.  It's incapable of being

16   enforced civilly or criminally.

17        That's why Mr. Bannon didn't show up.  Mr. Bannon

18   said, If you can make an accommodation, work out something

19   with the president, I'll show up.  And there's proof of his

20   word.  He did that four times previously.

21        Now, with respect to grand jury materials, we are

22   pretty certain they never said anything to the grand jury

23   about the fact that Mr. Bannon had been down this road four

24   times previously, and in each occasion had ultimately

25   testified when an accommodation was worked out.

1        But there is something even more important that

2   we are almost certain they forgot to tell the grand jury.

3   In reading the FBI 302, I discovered they were interviewing

4   Doug Letter, the general counsel of the House of

5   Representatives.  He represents both democrats and

6   republicans.

7        Mr. Letter pointed out that when I accepted

8   service of the subpoena, the Select Committee did not

9   provide me with Section (3)(a) -- excuse me -- Section

10  (3)(b) of House Resolution 8, adopted January 4th, 2021.

11       Why is that important?  What they did give me was

12  The Congress' Regulations for the Use of Deposition

13  Authority, which contains Paragraph 11 that says, "A witness

14  shall not" -- excuse me.  I'll quote this again.  "A witness

15  shall not be required to testify unless the witness has been

16  provided with a copy of Section (3)(b) of House Resolution

17  8, 117th Congress, and these regulations."

18       What this says is, Because they didn't give us

19  this, (indicated) Mr. Bannon did not have to appear for his

20  deposition.  You can bet your bottom dollar that that grand

21  jury that indicted him for failure to appear, never heard

22  about that.  That's why we need to know what the grand jury

23  was told.  What they were instructed.

24       I think that's everything.  Oh, I'm sorry.  There

25  is one other thing.

1          In talking about this abuse of grand jury process,

2     along the way, trying to put this wedge, they now have

3     written an awful lot of stuff.  They wrote a reply to their

4     in limine motion that for the first nine pages doesn't have

5     anything to do with the in limine motion.  What it has to do

6     with, it's a nine-page, ad hominem attack on me, claiming

7     that I misspoke this or said that or I failed to say this.

8     They call it bad faith.

9          **THE COURT:**  I think both parties decided that it

10    helps their positions to throw a bunch of facts about the

11    underlying issues in their briefs.  So I wouldn't spend a

12    lot of time criticizing --

13         **MR. COSTELLO:**  I don't want to spend a lot of

14    time, Your Honor.  I want to do, unlike what the government

15    did the other night, which is to file a surreply and ask

16    permission.  It's already on the public record.  All the

17    reporters have already read it.

18         I want your permission to file a surreply just to

19    those factual issues where they are impugning my integrity.

20    And I have -- they made 12 allegations.  I can prove all 12

21    of them false.  And one of them is a fraud on the Court,

22    because they cite something from a previous filing, that I

23    quote.  They failed to quote it.  I quote it.  It's directly

24    contrary to the position the US Attorney's Office took.

25         So I don't want you to sit there and deciding

1    things and think, Maybe this guy Costello doesn't tell the

2    truth.  I do.

3              **THE COURT:**  Thank you, Counsel.

4              **MR. COSTELLO:**  Do I have permission, Your Honor?

5              **THE COURT:**  Yes.

6              **MR. CORCORAN:**  Thank you.

7              **THE COURT:**  So here's what I would like to do:  As

8    you can imagine, Madam Court Reporter would like a break.  I

9    would like to finish the argument, and so what I'm thinking

10   of is a brief rebuttal from the government.  A very brief

11   rebuttal from the defendant.  I know the issues.  I just

12   want you to focus on the most pertinent things you've heard.

13             We will then take a break.  And my plan is to then

14   come back after the break and decide some, if not all of the

15   issues that are before me, or at least have a notional way

16   forward to the extent that I am not deciding issues.

17             So with that, a brief rebuttal from the

18   government, please.

19             **MS. VAUGHN:**  Your Honor, I will start with the

20   issue of willfulness.  And there were four brief points I

21   wanted to address.

22             First this idea that *Licavoli* is distinguishable.

23   It's not.  *Licavoli* decided the meaning of willfulness under

24   the statute as a matter of law.  And because the meaning is

25   deliberate and intentional, as a matter of law, a mistaken

1    reliance on the law, whether that is through the defendant

2    reading the law himself or getting it from his attorney is

3    not a defense.  So *Licavoli* cannot be distinguished.

4           There's another reason it is not distinguishable.

5    The defendant claims it is different here because he raised

6    constitutional privilege of some kind.

7           Defendants in these contempt of Congress cases

8    raise constitutional privileges all of the time as a

9    defense.  Fifth Amendment.  First Amendment.  They've raised

10   the gamut.  The defendant is not barred from filing a Motion

11   to Dismiss to argue that the subpoena was invalid for some

12   constitutional violation.  That's a different question than

13   whether his mistaken reliance on the law is a defense.  And

14   *Licavoli* says "as a matter of law."  It's not.  So *Licavoli*

15   is not different.

16          Second, this idea that the Court cannot follow --

17   can decide not to follow controlling precedent in *Bryan* 1950

18   or *Fleischman* or as it was applied in *Licavoli*.  The

19   defendant's position is not that *Bryan* 1998 applies somehow

20   differently in this case because of the specific statute.

21          The defendant's position appears to be that *Bryan*

22   rewrote willfulness across the criminal law.  So if the

23   Court were to apply *Bryan*, it wouldn't be just rewriting

24   willfulness under the Contempt of Congress Statute, it would

25   be rewriting willfulness among many different statutes.  And

1    courts have addressed those post *Bryan* 1998, and find they

2    still require the lowest level of willfulness, which is

3    deliberate and intentional.

4         The defendant is really asking the Court to

5    redefine it in a number of statutes, including Contempt of

6    Congress and the Contempt of Court Statute.  And, again, the

7    Supreme Court's made clear, it does not overturn its

8    precedence by implication.  But that is what the defendant

9    is asking this Court to find and that's not allowed under

10   the law.

11        Third, the defendant suggests that there is an

12   element of unfairness in this, in not allowing him to raise

13   advice of counsel as a defense.  I think at bottom that

14   argument really goes to the fact that the defendant just

15   didn't recognize the constitutional power of Congress to

16   compel witnesses, in the same way that someone might

17   recognize the Court's power to compel witnesses.  But it is

18   a coordinate branch of government.  This is a constitutional

19   power it has, and the witness does not get to decide when

20   and how Congress gets to exercise that.

21        I think what's most telling about the defendant's

22   position is he says, Well, I told Congress that I would

23   comply, if they went to court and got an order telling me

24   to.  He is essentially saying that Congress' constitutional

25   authority to compel testimony is completely subordinate to

1    the power of the courts.  And that's not what the

2    constitution recognizes.  It's not what the Supreme Court

3    has recognized in cases like *Quinn* and *Watkins*, where they

4    say, All right, witness.  You decide that Congress doesn't

5    have this power over you.  You are taking the risk of

6    contempt.  That's your choice.

7            Finally, the defendant says the subpoena was void

8    because of these constitutional issues.  He couldn't have

9    counsel there or whatever it might be.  But that is not even

10   a defense to willfulness under the heightened standards.

11           When you have a legal duty, even under the highest

12   standard, set out by *Cheek* and *Ratzlaf*, the defendant cannot

13   say, for example in the tax context, Well, I know I didn't

14   report my taxes properly, but I think the tax laws are

15   invalid as applied to me.  *Cheek* makes very clear, that's

16   not a defense.  That's, essentially, a sovereign citizen who

17   walks in and says, I am not subject to the power of this

18   court.  I don't recognize it.

19           That's not a defense to willfulness even under the

20   highest standard.  So even if the intermediate or highest

21   standard applied here, the defendant wouldn't be able to

22   raise the defense that he is proffering.

23           So unless the Court has anything else on

24   willfulness, any questions for the government, that's all I

25   have.

1          **THE COURT:**  No.

2          **MS. VAUGHN:**  So I will turn to the discovery

3     issues, starting with the attorney issue.  Bottom line, the

4     defendant still has not identified what relief he would

5     seek.

6          **THE COURT:**  I think the defendant conceded he's

7     not seeking any relief in this case in the most specific

8     sense, but he would like something as to the conduct.  A

9     referral, an admonition, a determination by me, I suppose,

10    about the conduct.

11         **MS. VAUGHN:**  So in that way, if the defendant has

12    abandoned his request for discovery, then I guess that is a

13    different issue.

14         **THE COURT:**  I don't think he has.  I think he

15    said, I want the information I've been seeking, to make the

16    argument to you, as to what those steps should be.

17         **MS. VAUGHN:**  And I'm not aware of any authority in

18    the criminal discovery law that allows a defendant to get

19    internal government deliberations in a criminal case, on the

20    hope that they can make some kind of motion for a sanction

21    or something else.  And he still doesn't even identify what

22    that potential sanction would be.

23         He still has to identify some basis that he would

24    attack the indictment, in which case he needs to make a

25    colorable claim of his defense or attack the merits of the

1     offense at trial.  And he hasn't done either of those

2     things.

3            And, secondly, now defense is saying, Well,

4     everybody knew that Bannon knew about the subpoena.  That is

5     just a lot of Monday morning quarterbacking.  The

6     government's investigation is not limited to one form of

7     evidence.  And, frankly, the government is not required to

8     rely on Mr. Costello's representations.

9            The government's investigation can certainly try

10    to corroborate those claims, whatever he may have made.  It

11    can try to confirm them in some other way.  The government

12    is not limited.  And there is no per se bar on subpoenaing

13    records that do not contain privileged communications just

14    because those records might relate to an attorney.

15           **THE COURT:**  I get that.  Let's talk about the

16    arguments relating to the information that was provided to

17    the grand jury or was not provided to the grand jury or was

18    potentially -- the grand jury wasn't -- I guess the best way

19    to put it is, the grand jury was not fully apprised of the

20    whole situation.  And the indictment is, therefore,

21    potentially suspect.  And, therefore, I should order the

22    government to produce what it told the grand jury.

23           **MS. VAUGHN:**  So I --

24           **THE COURT:**  What's wrong with that argument?

25           **MS. VAUGHN:**  I understand the defendant's argument

1    to be about the government -- an allegation that the

2    government did not present exculpatory evidence to the grand

3    jury.  And the government's not required to do that.  And,

4    again, to show particularized need, it's not just, We don't

5    think the government did this.  You have to have a

6    particularized factual basis to believe that it did not.

7              And the government has no obligation to show

8    exculpatory information to the grand jury.  So just the

9    statement that maybe we didn't do it, doesn't provide any

10   basis to get those grand jury materials.

11             And the defendant still has not identified on what

12   basis they could even move to dismiss the indictment,

13   especially because the government has no obligation to

14   present that exculpatory material to the grand jury, to the

15   extent it even is exculpatory.

16             **THE COURT:**  Thanks.

17             So briefly on OLC opinions, to the extent there is

18   anything you want to say or, Congressional information.

19   Briefly.

20             **MS. VAUGHN:**  Yeah.  As I was listening I heard

21   maybe two new bases for seeking it.  One being the

22   government is estopped in making legal arguments about how

23   the statute applies.

24             So I take that to mean -- and I think Mr. Schoen

25   said it was some kind of due process challenge.  But, again,

1    that puts us right back in the camp of *Armstrong*.  The

2    defendant needs to make a colorable showing of the elements

3    of whatever due process claim he would raise before he's

4    entitled to get the government's internal files.  And that's

5    not just saying, Well, it's a due process violation.  That's

6    showing articulable, colorable claims about how that due

7    process violation may have occurred.

8         The other new argument I think I heard, was a

9    factual issue as to whether or not the defendant at trial

10   will say that he believed he had been authorized by the

11   government to not comply with the subpoena.

12        But, again, OLC internal opinions are privileged

13   attorney advice to its client.  There is nothing to suggest

14   that that would have any relevance to what was in the

15   defendant's mind at the time.  And as I said earlier, the

16   government has already provided everything of which it's

17   aware and has relating to what the defendant knew from the

18   executive branch and the Committee at the time he did not

19   comply.

20        So unless the Court has additional questions.

21        **THE COURT:**  Thank you.

22        **MS. VAUGHN:**  Thank you.

23        **THE COURT:**  Mr. Schoen, very briefly.  Because I

24   know the court reporter is running up against a couple of

25   deadline type of things.

1          **MR. SCHOEN:**  And I made her work too hard by

2     talking too fast.

3               Three points, just very quickly, Judge.  The

4     government said *Licavoli* is not distinguishable because of

5     privilege.  There are all kinds of privileges out there.

6     You know what?  There are.  But executive privilege is

7     different.  It's not his privilege.  It wasn't Mr. Bannon's

8     privilege.  His hands were tied by someone else's privilege.

9     Fifth Amendment, you make a decision.  Often they are

10    cautioned, If you make that position, we may hold you in

11    contempt.

12              But in this case it's not his privilege.  His

13    hands were tied, and that was what the advice of counsel

14    was.  And, in effect again, you would be giving Congress a

15    veto over the executive branch's decision about his

16    privilege; that's number one.

17              Number two, first of all, it's not a new argument

18    we've raised about the OLC opinions and entrapment by

19    estoppel.  It's in our papers.  We allude to it.  We will be

20    making it much more broadly, of course, in the Motion to

21    Dismiss.  But it goes not only to state of mind, it is a due

22    process basis.  Whatever.  I don't need to go into that

23    further.

24              Finally, the idea that if the Court changes the

25    standard of willfulness, it will affect courts all over the

1     place.  Let's be real clear, not every court agrees, in the

2     first place, that in the contempt situation, willfulness

3     just means, Did you show up or not show up?

4             There is a case, *Westbrooks*, for example, out of

5     the Fourth Circuit 2015, 780 Fed. 3d, 593.  Fourth Circuit

6     2015, in which they say, it's an open question.  Now, the

7     opinion treats it as if advice of counsel would apply.  But

8     it says it's an open question and they say, We, the Fourth

9     Circuit, have held in the past or at least considered that

10    advice of counsel applies.

11            Finally, this is in our brief at Document 30, Page

12    24, the law, even in this circuit, doesn't seem to be quite

13    as settled as the government would have it.

14            Why do I say that?  *United States versus Taylor*,

15    139 F. 3d 924, at Page 934, Note 10, D.C. Circuit, 1998.

16    The Court there said in their footnote, in the contempt

17    situation, We note that both sides appear to assume that

18    advice of counsel applies to a contempt -- criminal contempt

19    charge.  And we note that the District Court treated it as

20    if advice of counsel applies to a criminal contempt charge;

21    therefore, we, the D.C. Circuit, don't need to get into that

22    question today.

23            So I would suggest that the *Taylor* footnote

24    suggests that -- more than suggests -- that the D.C. Circuit

25    doesn't see it today -- or in 1998, as quite as settled a

1    question about *Licavoli* as the government would have the

2    Court believe.  Evan is going to make one point.

3          Thank you, Your Honor.

4          **MR. CORCORAN:**  Two very quick points.

5          One on the grand jury question.  Counsel is

6    talking about no need to present exculpatory evidence.  We

7    are not saying that that's the issue at all.  We agree that

8    that's -- although they said in their papers that it's their

9    practice to present exculpatory evidence, we make a

10   different point, which is the evidence that they did present

11   was misleading on two issues.  Whether or not there was a

12   request for a later date, misleading testimony on that, and

13   whether or not executive privilege was communicated to the

14   Select Committee, misleading testimony on that.

15         So it's not a matter of our hope that they would

16   have presented additional evidence to the grand jury.  We

17   get to see what the argument was based on the misleading

18   evidence that they presented.

19         My final point really just goes really to this

20   issue of intent.  You asked what we had in our brief,

21   particularly with regard to *Licavoli*.  Our focus in the

22   brief, really, was that *Licavoli*, both early on, says we are

23   relying on the *Sinclair* case.  And later on, right before

24   holding says, We are relying on the *Sinclair* case.  We say

25   the *Goudin* case, which says that *Sinclair* is totally

1    eviscerated and another reason, essentially, why it's not

2    good law.  Thank you, Your Honor.

3              **THE COURT:**  Thank you.

4              So here's what we are going to do:  We are going

5    to take a short recess.  I am going to come back, as I said,

6    and walk through where I am on all the motions.  To the

7    extent I can, I will decide some of them today orally.  To

8    the extent that I can't, but I have a view of what I would

9    like to do by way of next steps.  I will articulate them.

10   My guess is that this recess will be all of 10 minutes,

11   maybe 15 but that's the plan.

12             So we'll take a quick recess and we'll be back.

13             (Break.)

14             **THE COURT:**  Thank you for the arguments this

15   morning and early afternoon, Counsel.  As I said, I am going

16   to decide, to an extent, some of the issues that are in

17   front of me.

18             I will start first with the United States' Motion

19   in Limine to Exclude Evidence or Argument Relating to

20   Good-Faith Reliance on Law or Advice of Counsel at ECF No.

21   29.  As I think people heard me say earlier, I read all of

22   the briefing on this matter and am familiar with all of the

23   arguments and exhibits in the papers, as well as the cases

24   cited therein.

25             The defendant was charged with violating 2 US Code

1     Section 192.  As relevant here, that statute covers any

2     individual who "willfully makes default" on certain

3     Congressional summonses.

4          The defendant argues he's entitled to argue at

5     trial that he cannot have been "willfully" in default,

6     because he relied in good faith, on the advice of his

7     counsel, in not complying with the Congressional subpoena.

8     He points to many Supreme Court court cases defining

9     "willfully," including *Bryan v. United States*, 524 U.S. 184,

10    1998, to support his reading of the statute.

11         If this were a matter of first impression, the

12    Court might be inclined to agree with defendant and allow

13    this evidence in.  But there is binding precedent from the

14    Court of Appeals, *Licavoli v. United States*, 294 F.2d 207,

15    D.C. Circuit 1961, that is directly on point.  It involved

16    the conviction under the very same part of 2 U.S. Code

17    Section 192, with defendant arguing on appeal that, "good

18    faith reliance upon advice of counsel is a defense."  That

19    is at Page 207.

20         The Court of Appeals explained that, "an essential

21    part of that premise is that an evil motive, which can be

22    negative by bonafide advice of counsel, is an element of

23    'willfully' under the statute."  But it expressly rejected

24    that argument.

25         To quote the Court of Appeals, "Advice of counsel

1    cannot immunize a deliberate intentional failure to appear

2    pursuant to lawful subpoena lawfully served."  Rather, as it

3    explained, "All that is needed...is a deliberate intention

4    to do the act.  Advice of counsel does not immunize that

5    simple intention.  It might immunize if evil motive or

6    purpose were an element of offense.  But such motive or

7    purpose is not an element..."

8         The Court therefore held, "In the case at bar

9    there can be no serious dispute about the deliberate

10   intention of," the defendant there, "Licavoli not to appear

11   before the Committee pursuant to its subpoena.  That he

12   meant to stay away was made abundantly clear.  That he did

13   so upon advice of lawyer is no defense.  The Court

14   instructed the jury."

15        The defendant offered two reasons in his brief why

16   this Court should ignore the holding of *Licavoli*, but

17   neither of those arguments is persuasive.

18        First, defendant claims *Licavoli* relied on bad

19   law, specifically the now-disavowed Supreme Court case of

20   *Sinclair v. United States*.  It is true that subsequent

21   Supreme Court cases have cut back in some of the holdings of

22   *Sinclair*, but not the holding that *Licavoli* relies on.

23        And even if the Supreme Court had done so, the

24   defendant has cited to no authority and the Court has

25   located none on its own, that would allow me to ignore

1   otherwise binding precedent, just because some of the cases

2   on which it relied are no longer good law.

3          Second, the defendant notes that in the sixth

4   decade since *Licavoli*, the Supreme Court has provided

5   clarity on the meaning of "willfully" in criminal statutes.

6   Clarity that favors defendant.  That might very well be

7   true.  But none of that precedent dealt with the charge

8   under 2 U.S. Code, Section 192.  *Licavoli* did.  Thus, while

9   this precedent might furnish defendant with arguments to the

10  Court of Appeals on why *Licavoli* should be overruled, this

11  court has no power to disregard a valid and on-point or

12  seemingly on-point holding from a higher court.

13         The problem is, that a new argument was presented

14  today.  Did not appear in defendant's briefs.  I wasn't

15  prepared to think about it, let alone pass on it.  This

16  argument is not that *Licavoli* is no longer good law, but

17  that *Licavoli* is inapplicable here, because it did not

18  involve an executive privilege assertion, a Congressional

19  subpoena to a former member of the executive branch

20  communicating with the president and the like.

21         I have therefore not had time to consider whether,

22  assuming *Licavoli* is good law, which as I've held it is, it

23  nevertheless is inapplicable here because this case is

24  distinguishable.  I am not prepared to make that

25  determination on the fly here.

1          I am not happy that this argument came up for the

2    first time during argument.  It's an important question and

3    it should have been briefed.  Nevertheless, I am going to

4    give the parties an opportunity to brief it.  So what I

5    would like are supplemental briefs to be filed in the

6    following order, which is:  The defendant shall file a

7    supplemental brief on this question no later than March 22nd

8    to exceed no more than 10 pages, and limited to the question

9    of whether *Licavoli* applies to this case.  The government

10   will then have an opportunity to respond to that argument

11   and to brief whether that argument was somehow waived in its

12   own supplemental brief to be filed March 29th.

13         And I will then consider the question and make a

14   final determination as to the Motion in Limine in light of

15   those arguments.  That's that motion.  So I am taking that

16   motion under advisement.

17         As to the Motion to Compel regarding attorney

18   records, which is called Defendant's Motion to Compel

19   Disclosure of Government Efforts to Obtain Telephone and

20   Email Records of Mr. Bannon's Attorneys, ECF No. 26.

21         Again, I've read all briefing on this matter, and

22   I'm familiar with all of the parties' arguments and exhibits

23   and cases cited therein.  I've also ordered the production

24   of and reviewed the government's ex parte submission as to

25   the Google email order and application.

1    There are really two groups of information within

2    the defendant's request and motion.  The first is

3    information that the government obtained pertaining to an

4    unrelated Robert Costello, i.e., somebody who is not the

5    Costello who represented Mr. Bannon today.  To the extent

6    that the defendant seeks any discovery on that question or

7    information, his motion is denied, such records and

8    information are clearly immaterial to his case, as was

9    essentially conceded today.

10    As to records that the government obtained

11    relating to the actual Robert Costello, I am not yet

12    prepared to rule on the matter.  In its most recent filings,

13    the government has proffered the steps that it took in

14    obtaining Mr. Costello's subscriber information and phone

15    records.

16    As I noted, the government provided me its

17    application for an order pursuant to 18 US Code 2703(d) --

18    although I think it's undisputed that relates to a different

19    Costello -- and its surreply is offered to produce that

20    information to the defendant, if he agrees to treat that

21    application as sensitive under the protective order.

22    As I understood it, the defendant accepted that

23    proposal.  And therefore the government can produce that

24    application, which is -- I acknowledge is not -- did not end

25    up pertaining to the actual Costello here.  But I do think

1    it's relevant, because it has some information in it about

2    the reason the government articulated to at least one judge

3    for its application.  So the government shall produce that

4    information, as it has proposed, to Mr. Bannon.  And that

5    information shall be treated as sensitive under the

6    protective order.  I've seen that application, as I

7    mentioned.

8              I haven't, however, seen additional information

9    described in the government's surreply.  I will just order

10   the government to produce to me for my ex parte, in-camera

11   review, no later than March 18th, the subscriber information

12   the government obtained for what it describes as the Yahoo

13   account, the Comcast account and the Google account, as well

14   as the requests the government used to obtain that

15   information.  That is described at ECF No. 36-1 at 3.

16             And, I think most importantly, the subscriber and

17   toll records for the Westchester County phone number, as the

18   government puts it, that the government obtained, as well as

19   the requests that the government used to obtain that

20   information.  After the government has provided that

21   information to the Court under seal, I will rule on the

22   remainder of defendant's motion.

23             I'll turn last to defendant's Motion to Compel

24   discovery.  Again, I think it's pretty clear I've read all

25   of the briefing on this matter.  I'm familiar with all of

1     the parties' arguments and exhibits, as well as the cases

2     cited therein.   I will deny this motion in part and grant it

3     in part.

4          The defendant seeks many categories of

5     information.   First, citing to Federal Rule of Criminal

6     Procedure 16(a)(1)(E)(i) and the Supreme Court cases of

7     *Brady* and *Giglio* he seeks a broad swath of material that he

8     lumps together as, "Information that tends to show that the

9     indictment is invalid."   The Court will deny this part of

10    the motion.

11         Criminal Procedure Rule 16(a)(1)(E)(i) requires

12    the government to provide the defendant certain items

13    "within the government's possession, custody or control"

14    that are "material to preparing the defense."

15         It covers both inculpatory and exculpatory

16    evidence.   It's generally intended to cover a wide range of

17    material.   *Brady* and *Giglio* on the other hand, require the

18    government to disclose exculpatory and impeachment evidence.

19    The defendant need not make a request for such materials to

20    be disclosed.

21         With respect to what we have been referring to as

22    the grand jury materials, defendant has not shown that it

23    would be material to helping him prepare his defense or that

24    he's entitled to it under *Brady* or *Giglio*.   He attempts to

25    argue that this information might show grounds to dismiss

1    the indictment based on the failure to properly charge the

2    grand jury on applicable law.  But he bases this argument,

3    at least in substantial part, on the arguments in his brief

4    about what "willfully" means in the Circuit.  And at a

5    minimum, those arguments that were presented in brief, I

6    think are wrong.  And I certainly haven't concluded that

7    there is any reason to believe that *Locavoli* doesn't apply

8    here.

9           Regardless, the Court doesn't have some

10   wide-ranging supervisory authority to require the government

11   to give all potentially exculpatory evidence to the grand

12   jury when seeking indictment.  Even if that were not an

13   issue, defendant would still run into the problem of secrecy

14   of grand jury materials.

15          It is, of course, true that some evidence of the

16   grand jury has been released under seal to him.  But that

17   does not mean that no further grounds exist for maintaining

18   the secrecy of the remaining documents.  Quite to the

19   contrary, releasing grand jury documents is a serious step

20   for the Court to take, and not one that it does lightly.  It

21   requires case-by-case adjudication.  Allowing release of

22   some documents, does not mean it is appropriate to release

23   them.  As I have said, I do not believe defendant has made a

24   showing that the materials we are talking about would be

25   material to help him prepare his defense.

1          Next, defendant seeks "information that tends to

2    show that the subpoena was not lawfully authorized" as well

3    as, "information that tends to show bias or the invalidity

4    of the evidence."

5          Specifically, he seeks to have the Court order the

6    government to ask the Select Committee, U.S. House of

7    Representatives and other individuals, regarding the process

8    through which the subpoena was issued and the referral as

9    well.  He also seeks information relating to conversations

10   and communications regarding his interactions with the

11   Select Committee.  But Rule 16 only requires the government

12   to provide information "within the government's possession,

13   custody or control."  Those are quotes.

14         The government in this context refers to the

15   prosecuting office, not the entirety of the government,

16   including a separate branch.  And as the United States

17   notes, defendant has not tied any of the documents he seeks

18   to the possession of the prosecuting agency.

19         Of course, if the government does name an

20   individual from the House as a witness in this matter, it

21   will be obligated to provide discovery on that individual,

22   at least as impeachment evidence, as well as their potential

23   biases.  But we are not at that stage of this case yet.  To

24   the extent there is evidence that defendant seeks that is in

25   the government's possession, the Court notes that he has not

1    shown how it would be relevant to his defense.  At best, it

2    would relate to a selective prosecution claim.  But

3    defendant has not hinted that he will raise such a claim,

4    nor does the Court see how one would be colorable.

5           Accordingly, as to what defendant styles as

6    "information that tends to show that the subpoena was not

7    lawfully authorized," the Court will deny his motion.

8           Finally, defendant seeks what he styles as,

9    "Information That Tends To Negate Willfulness."  Some of

10   what defendant seeks in that way is not going to be

11   discoverable through an order of this Court.  For reasons

12   already discussed.  He seeks, for example, information, the

13   possession of the Select Committee and the Rules Committee

14   of the House of Representatives.  But for reasons I've also

15   discussed, that evidence is not discoverable under Rule 16.

16          But I recognize there are might be some relevancy

17   to defendant -- to this case, whether to an element of the

18   government's claim or defendant's defense for information

19   within the possession of the Department of Justice.

20   Specifically I will grant defendant's motion to the extent

21   it requests statements or writings reflecting official DOJ

22   policy, such as an opinion of the Office of Legal Counsel or

23   the position of an entire division or litigating group,

24   whether those statements are public or not, if such writings

25   relate to the department's policy on prosecuting or not

1    prosecuting government or former government officials

2    raising executive privilege claims or defenses of immunity

3    or similar issues.

4                I therefore will grant [sic] defendant's motion in

5    part and grant it in part.

6                Those are my current holdings.  Any questions?

7          **MS. VAUGHN:**  Your Honor, I just want to make sure

8    that I understood what you would like us to provide ex

9    parte, with respect to the attorney records.

10         **THE COURT:**  Yes.

11         **MS. VAUGHN:**  You said the subscriber information

12   the government actually received for the Yahoo, Google,

13   Comcast and Westchester County accounts?

14         **THE COURT:**  Yes, and how they were obtained.

15         **MS. VAUGHN:**  Okay.

16         **THE COURT:**  Here's -- I am just looking at Pages 3

17   and 4 of your supplemental brief.  The government says, In

18   an effort to confirm the use of these accounts by

19   Mr. Costello, the government first obtained subscriber

20   information for each of them.  Referring to Yahoo, Comcast

21   and Google.  I would like to know what request the

22   government used to get those subscriber information and then

23   the information.

24         **MS. VAUGHN:**  Got it, Your Honor.

25         **THE COURT:**  And then as to the -- what we've been

1    calling the "toll records" the phone records, the same

2    question.  I want to see the phone records and I want to see

3    the requests.  Likely grand jury subpoenas, based on the

4    discussion we had today.  I understand you are not

5    committing to that, but the requests that resulted in the

6    production of those records.

7              **MS. VAUGHN:**  Yes, Your Honor.  Thank you.

8              **THE COURT:**  Thank you.

9              **MR. SCHOEN:**  One question, Your Honor.  If we

10   might add, since the Court is allowing the government on the

11   29th to raise a possible waiver issue, if they deem it, I

12   would like three days to file a reply if they raise the

13   waiver issue.

14             **THE COURT:**  If the government raises a waiver

15   issue, you may respond to that issue and that issue only by

16   April 1st.

17             **MR. SCHOEN:**  Your Honor, housekeeping issue.

18   There is a typo in one of the briefs, just to note.  I had

19   cited -- on Document 38, Page 5 I cited Document 31 at Note

20   1.  It should have been Document 26 at Note 1.  Sorry.

21             **THE COURT:**  Thank you.

22             **MR. SCHOEN:**  Thank you, Your Honor.

23             **THE COURT:**  Thank you, Counsel.

24             (Proceedings adjourned at 1:23 p.m.)

25

1                    **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8

9

10   ___March 18, 2022___          /s/_____
                **DATE**                      **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25