**EXHIBIT 5**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | ) | |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

---

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE
PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT,
& IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Mark Meadows, by and through his undersigned counsel, in accordance with the

Court's Oral Order of May 4, 2022, hereby:

a)      moves pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings;

b)      or, in the alternative, moves pursuant to Fed. R. Civ. P. 56(a) for summary

judgment; and

c)      opposes Defendants' Motion for Summary Judgment (ECF No. 15).

Plaintiff seeks the entry of judgment in his favor on all the claims in his amended complaint

(ECF No. 13).  Specifically, Plaintiff seeks judgment on the pleadings pursuant to Fed. R. Civ. P.

12(c) because no material fact is in dispute and Plaintiff is entitled to judgment as a matter of law

without resort to extrinsic evidence.  In the alternative, Plaintiff seeks summary judgment pursuant

to Fed. R. Civ. P. 56(a) because there is no genuine dispute as to any material fact based on the

evidence presented in support of Plaintiff's motion and Plaintiff is entitled to judgment as a matter

of law.

Inasmuch as the issues and relevant points and authorities are joined as to these Motions and Defendants' pending Motion for Summary Judgment, Plaintiff is filing a combined Memorandum of Points and Authorities in support of both his Motions and in opposition to Defendants' Motion. Attached to that Memorandum are Plaintiff's Statement of Undisputed Material Facts and his Response to Defendants' Statement of Undisputed Material Facts (ECF No. 15-28).

Wherefore, for the reasons stated in the above-referenced filings, Plaintiff asks the Court to: (i) enter judgment as a matter of law in favor of Plaintiff and against Defendants on all claims in Plaintiff's amended complaint; and (ii) deny Defendants' Motion for Summary Judgment, or in the alternative, grant Plaintiff's unopposed Motion filed pursuant to Fed. R. Civ. P. 56(d) (ECF No. 20), which the Court is holding in abeyance.

Dated: May 20, 2022

Respectfully submitted,
MARK R. MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I certify that, on May 20, 2022, a copy of the foregoing was filed on the Court's CM/ECF system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT & IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 9

A.   AUTHORITY AND PURPOSES OF THE SELECT COMMITTEE ........................... 10

B.   COMPOSITION OF THE SELECT COMMITTEE ...................................................... 11

C.   ACTIVITIES OF THE SELECT COMMITTEE ........................................................... 12

D.   THE SELECT COMMITTEE'S SUBPOENA & MR. MEADOWS'S
     ACCOMMODATION EFFORTS ............................................................................. 13

E.   THE SELECT COMMITTEE'S VERIZON SUBPOENA & BREAKDOWN OF
     ACCOMMODATION EFFORTS ............................................................................. 15

STANDARD OF REVIEW ................................................................................ 17

ARGUMENT .................................................................................................... 18

I.   TESTIMONIAL IMMUNITY PROTECTS FORMER CHIEF OF STAFF
     MEADOWS FROM CONGRESSIONAL COMPULSION TO TESTIFY
     ABOUT HIS WHITE HOUSE SERVICE ............................................................ 18

     A.   The Separation of Powers prohibits Congress from subpoenaing the White
          House Chief of Staff for testimony. ................................................................. 19

     B.   Testimonial immunity applies, and Mr. Meadows is entitled to judgment,
          because the subpoenas targeted him based on his role as Chief of Staff. ........... 25

     C.   Even if factual questions about the "capacity" in which Mr. Meadows took
          certain actions were relevant, the Congressional Defendants would not be
          entitled to summary judgment because those factual questions are
          disputed. ...................................................................................................... 30

II.  THE SELECT COMMITTEE DID NOT HAVE A VALID LEGISLATIVE
     PURPOSE FOR THE SUBPOENAS ................................................................... 31

III. THE SUBPOENAS WERE NOT VALIDLY ISSUED ....................................... 35

     A.   The Select Committee Is Not Properly Composed Under H. Res. 503
          § 2(a). ......................................................................................................... 36

     B.   The Subpoenas Were Not Validly Issued Under H. Res. 503 § 5(c)(6). ............. 37

IV.  ADDITIONAL ISSUES WITH THE SUBPOENAS PRECLUDE SUMMARY
     JUDGMENT IN FAVOR OF THE CONGRESSIONAL DEFENDANTS .................. 38

     A.   The Subpoenas Violate the Separation of Powers by Infringing Upon
          Executive Privilege. ....................................................................................... 38

     B.   The Select Committee Cannot Obtain Records under the Verizon
          Subpoena Consistent with the Stored Communications Act. ............................. 43

     C.   Compelled Production under the Verizon Subpoena Would Violate the
          Fourth Amendment. ........................................................................................ 44

    D.     Compelled Production of Cell Phone Data under the Verizon Subpoena
            Would Violate the First Amendment. ................................................................. 46

CONCLUSION ....................................................................................................................... 47

# TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page(s)**

*Air Line Pilots Ass'n v. Fed. Express Corp.*,
   139 F. Supp. 3d 320 (D.C. Cir. 2015)............................................................................17, 18

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*,
   333 F.3d 168 (D.C. Cir. 2003).................................................................................46

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................17, 18

*Army Times Publ'g Co. v. Department of the Air Force*,
   998 F.2d 1067 (D.C. Cir. 1993)..............................................................................39

*Auer v. Robbins*,
   519 U.S. 452 (1997)..............................................................................................31

*Black Panther Party v. Smith*,
   661 F.2d 1243 (D.C. Cir. 1981)..............................................................................46

*Buckley v. Valeo*,
   424 U.S. 1 (1976).................................................................................................46

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018)..........................................................................................45

*Christoffel v. United States*,
   338 U.S. 84 (1949)...............................................................................................2

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)..............................................................................................31

*Clinton v. City of New York*,
   524 U.S. 417 (1998)..............................................................................................42

*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
   558 F. Supp. 2d 53 (D.D.C. 2008)................................................................... *passim*

*Comm. on Judiciary, United States House of Representatives v. McGahn*,
   415 F. Supp. 3d 148 (D.D.C. 2019).....................................................7, 22, 23, 25

*Eastland v. United States Servicemen's Fund*,
   421 U.S. 491 (1975)..............................................................................................31

*Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*,
   655 F.2d 380 (D.C. Cir. 1981)..............................................................................28, 29

*Forrester v. White*,
    484 U.S. 219 (1988).................................................................................26

*Gojack v. United States*,
    384 U.S. 702 (1966).................................................................................36

*Gravel v. United States*,
    408 U.S. 606 (1972).................................................................................20

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982).................................................................................23

*I.N.S. v. Chadha*,
    462 U.S. 919 (1983).................................................................................42

*Katz v. United States*,
    389 U.S. 347 (1967).................................................................................45

*Liveright v. United States*,
    347 F.2d 473 (D.C. Cir. 1965) ................................................................36

*McGrain v. Daugherty*,
    273 U.S. 135 (1927).................................................................................37

*Meadows v. Pelosi*,
    1:21cv3217 (D.D.C. Dec. 8, 2021) .........................................................16

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985)............................................................................26, 27

*Morrison v. Olson*,
    487 U.S. 654 (1988) (Scalia, J., dissenting)...........................................26

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977).................................................................8, 21, 28, 33

*Oklahoma Press Pub. Co. v. Walling*,
    327 U.S. 186 (1946).................................................................................45

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ...........................................................20, 39

*Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) ...........................................................28, 40

*Shelton v. United States*,
    327 F.2d 601 (D.C. Cir. 1963) ................................................................36

* *Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ................................................................... *passim*

*Trump v. Thompson*,
    142 S. Ct. 680 (2022) (statement of Kavanaugh, J., respecting denial) ............ 7, 13, 22, 24, 41

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) ................................................................. 34

*United States v. Bannon*,
    1:21cr670, ECF No. 28-9 (D.D.C. Feb. 4, 2022) ............................................. 9, 38

*United States v. Grumman*,
    227 F. Supp. 227 (D.D.C 1964) ................................................................. 36

*United States v. Nixon*,
    418 U.S. 683 (1974) ................................................................... *passim*

* *Watkins v. United States*,
    354 U.S. 178 (1957) ................................................................... *passim*

*Yellin v. United States*,
    374 U.S. 109 (1963) ................................................................. 2, 9, 36, 38

**Statutes**

18 U.S.C. §§ 241-42 ................................................................................. 28

18 U.S.C. § 2702(c)(1) ............................................................................. 44

18 U.S.C. § 2711 .................................................................................... 43

52 U.S. Code §§ 10307, 20511 ....................................................................... 28

H.R. 3233 .......................................................................................... 10

H. Res. 503, 117th Cong. (2021) ..................................... 8, 10, 11, 12, 33, 36, 37, 38

Presidential Records Act of 1978 ................................................................... 13

Stored Communications Act ........................................................................ 43, 44

U.S. Const. amend. I ......................................................... 1, 19, 28, 29, 46

U.S. Const. amend. IV ........................................................ 1, 41, 44, 45, 46

U.S. Const. amend. V ........................................................................ 1, 41

U.S. Const. amend. VI .............................................................................. 1

U.S. Const. art. I, § 5, cl. 2 ................................................................................5

U.S. Const., art. II, § 3 ....................................................................................27

**Other Authorities**

Aaron Blake, *The key texts between Mark Meadows, Mike Lee and Chip Roy*,
 Wash. Post (Apr. 15, 2022),
 https://www.washingtonpost.com/politics/2022/04/15/lee-roy-meadows-texts/ ......................4

Alan Feuer, et al., *Justice Dept. Widens Jan. 6 Inquiry to Range of Pro-Trump
 Figures*, N.Y. Times (Mar. 30, 2022) ......................................................25

* *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op.
 O.L.C. 1 (1999) ...............................................................6, 18, 19, 20

Bob Woodward & Robert Costa, *Virginia Thomas urged White House chief to
 pursue unrelenting efforts to overturn the 2020 election, texts show*, Wash.
 Post (Mar. 24, 2022)
 https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-
 meadows-texts/ ...................................................................................4

Christina Prignano, *Read Sean Hannity's texts to Mark Meadows*, Boston Globe
 (Jan. 5, 2022) ....................................................................................4

Edward-Isaac Dovere, *Obama's Cabinet Lacks Voter Sway,* Politico (October 31,
 2014), https://www.politico.com/story/2014/10/obamas-cabinet-doesnt-
 deliver-midterm-boost-112370 ..................................................................30

Fed. R. Civ. P. 12(b)(6) ....................................................................................17

Fed. R. Civ. P. 12(c) ...........................................................................1, 17, 19

Fed. R. Civ. P. 56 .............................................................................9, 17, 19, 30, 31

George Washington, *Message to the House Regarding Documents Relative to the
 Jay Treaty*, March 30, 1796. ..................................................................7

House Rule XI, Cl. 2 ...................................................................................4, 11

*Immunity of the Assistant to the President and Director of the Office of Political
 Strategy and Outreach from Congressional Subpoena*,
 38 Op. O.L.C. *5 (July 15, 2014) ..........................................................6, 18, 20, 21

*Immunity of the Former Counsel to the President From Compelled Congressional
 Testimony*,
 31 Op. O.L.C. 191 (2007) ....................................................................6, 18, 21

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic
Affairs, from William H. Rehnquist, Assistant Attorney General, Office of
Legal Counsel, Re: *Power of Congressional Committee to Compel
Appearance or Testimony of "White House Staff"* (Feb. 5, 1971). ....................................6, 18

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has
Asserted a Claim of Executive Privilege*,
8 Op. O.L.C. 101 (1984) .........................................................................................6, 18

*READ: Text messages Sean Hannity, Marjorie Taylor Greene, Ivanka Trump and
others sent to Mark Meadows*, CNN (Apr. 25, 2022),
https://www.cnn.com/2022/04/25/politics/read-mark-meadows-texts-sean-
hannity-ivanka-trump-marjorie-taylor-greene/index.html ..........................................4

Ryan Nobles, et al., *CNN Exclusive: 'We control them all': Donald Trump Jr.
texted Meadows ideas for overturning 2020 election before it was called*,
CNN (Apr. 9, 2022), https://www.cnn.com/2022/04/08/politics/donald-trump-
jr-meadows-text/index.html ........................................................................................4

Mary Clare Jalonick & Michael Balsamo, *House 1/6 Panel Rejects Justice Dept.'s
Transcript Request*, Associated Press (May 17, 2022),
https://apnews.com/article/capitol-siege-government-and-politics-subpoenas-
criminal-investigations-merrick-garland-
73d8309734a5dad4532f96c53f14a403...................................................................24

Max Rose for Congress, *Max Rose: Risk Everything* (Dec. 13, 2021), YouTube,
https://youtu.be/4tKfqiBScaY..................................................................................29

Quaye Quartey for Congress, *Quartey for Congress - Campaign Launch Video*,
Facebook (June 3, 2021),
https://www.facebook.com/quarteyforcongress/videos/188080856538494...........29

SSCI, *Report of the Select Committee on Intelligence*, United States Senate, on
*Russian Active Measures Campaigns & Interference in the 2016 U.S.
Election*, Volume 5: Counterintelligence Threats and Vulnerabilities (116th
Cong.), https://www.intelligence.senate.gov/sites/default/files/documents/
report_volume5.pdf....................................................................................................3

Yair Rosenberg, *Treasury's First Orthodox Chief*, Tablet (January 10, 2013),
https://www.tabletmag.com/sections/news/articles/treasurys-first-orthodox-
chief...........................................................................................................................31

Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over
100 subpoenas for phone records*, CNN Politics (Dec. 7, 2021),
https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-
records/index.html .....................................................................................................3

# INTRODUCTION

The events at the U.S. Capitol building on January 6, 2021, were abhorrent and unjustified. But this case is not about that day. Rather, this case and the cross-motions now before the Court concern the maintenance of important safeguards established under Separation of Powers and other constitutional principles to ensure that those principles are respected and enforced when one of its committees seeks to compel testimony from and about the work of the Chief Executive and his senior aides. As the Supreme Court has made clear, heightened judicial scrutiny is required when congressional subpoenas implicate the Separation of Powers—especially where, as here, they implicate Executive Privilege. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032–35 (2020). A congressional committee witness remains fully protected by the rights specified in the First, Fourth, Fifth and Sixth Amendments, and his obligations under any subpoena are circumscribed by the necessity that those rights be respected. *See Watkins v. United States*, 354 U.S. 178, 188 (1957) ("The Bill of Rights is applicable to investigations as to all forms of governmental action."). Under any level of scrutiny, the Select Committee's subpoenas to Mr. Meadows and his cell phone carrier exceed its constitutional and statutory authority, and the Court can and should declare them without force or effect.

The Congressional Defendants' rushed summary judgment motion should be denied because, in the first instance, the facts upon which it relies are disputed as to material matters. Such purported facts merit testing through discovery. To do otherwise would deny Mr. Meadows the day in court he is due. Moreover, the Congressional Defendants are simply wrong on the law and cannot carry their burden to sustain the motion.

Conversely, Mr. Meadows's cross-motion presents purely legal issues that are ripe for judgment in his favor—either on the pleadings themselves under Rule 12(c) or, alternatively, on summary judgment. No court of authority has ever held that a former President or a senior

presidential aide, such as a White House Chief of Staff, can be compelled to appear before a congressional committee—let alone be compelled to also testify as to matters on which the former President claims Executive Privilege. Two District Court opinions which Defendants cite to the contrary are both distinguishable in context and, in any event, they are not controlling and do not persuasively address the Separation of Powers issues at play.

Testimonial immunity and Executive Privilege represent the clearest grounds for resolving this case in favor of Mr. Meadows. But two additional issues—the unauthorized composition of the Committee and its lack of a recognized legislative purpose for targeting Mr. Meadows—can also be a basis for judgment in Mr. Meadows's favor. As stand-alone issues, courts might prefer to leave such issues in the hands of the Congress that created them. But, here, they merit judicial review because the Court cannot avoid them without giving effect to subpoenas that provoke a Separation of Powers clash between the political branches. A congressional committee is subject to judicial review of its own rules when its conduct fails to abide by such rules to the detriment of a witness's rights. *See Yellin v. United States*, 374 U.S. 109, 114 (1963); *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949) ("The question is rather what rules the House has established and whether they have been followed."). Likewise, the committee subpoena at issue here does not conform to the requirements for its issuance by the Select Committee's authorizing resolution and is invalid on that basis alone. Moreover, the subpoena here fails the test of serving a valid legislative purpose and cannot survive judicial scrutiny on that basis. *See Mazars USA, LLP*, 140 S. Ct. at 2031.

The context of these issues heightens the need for judicial review. This case arises from an attempt by a Select Committee of the U.S. House of Representatives to target the Chief of Staff to a United States President with unprecedented investigative tactics. Federal courts have

traditionally opined on the scope of congressional investigative authority in cases involving investigations more restrained in scope and tactics than those presented by the Congressional Defendants' unprecedented overreach. The Select Committee's sweeping investigation is not the sort of modest investigation-to-inform-lawmaking that has defined most federal jurisprudence on Congress's investigative authority. Three features of the Select Committee's investigation—at least the portion that has swept in Mr. Meadows—highlight how different it is from an ordinary legislative investigation, and highlight the need for a thorough judicial review.

To start, the Select Committee's investigation more closely resembles a law enforcement investigation than a legislative inquiry. The hallmarks of a law enforcement investigation also surround the Committee. The staff includes numerous former federal prosecutors, the Select Committee's members have publicly discussed the theories of criminal liability that they are pursuing, and they have employed tactics like confidential hold letters and cell phone metadata warrants that are hallmarks of a law enforcement investigation.[1] These tactics color the character of the investigation, since it is firmly established that "Congress may not issue a subpoena for the

---

[1] Its tactics, particularly the far-reaching use of metadata subpoenas, represent an unprecedented expansion of Congressional investigative authority. In 2016, the Senate Select Committee on Intelligence pursued cellphone metadata, but noted that it was "not aware of any congressional committee that had pursued the production of such data."[1] SSCI, *Report of the Select Committee on Intelligence*, *United States Senate*, *on Russian Active Measures Campaigns & Interference in the 2016 U.S. Election*, Volume 5: Counterintelligence Threats and Vulnerabilities, at 21 (116th Cong.), https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf ("SSCI Report"). And even in that instance, the Senate Select Committee was circumspect with its use of metadata subpoenas, using them only "in very limited situations in which other avenues for investigation had been foreclosed." SSCI Report, at 23. The Select Committee has not been so circumspect here, seeking the metadata of more than 100 individuals, many of whom are private persons hardly (if at all) connected to the Select Committee's jurisdiction. *See* Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over 100 subpoenas for phone records*, CNN Politics (Dec. 7, 2021), https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-records/index.html (last visited Dec. 21, 2021).

purpose of 'law enforcement.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)).

Next, the Select Committee's public actions have an unmistakably politically motivated "name and shame" element to them. The Select Committee's investigation has so far been defined by leaks of private communications. Within days of his December 3 document production, the Select Committee began releasing Mr. Meadows's private documents, in apparent violation of House rules.[2] They have since waged a sustained campaign against Mr. Meadows in the press, fueled by these steady leaks of text messages.[3] And just recently, they cleared the cache by releasing ***all*** the text messages that Mr. Meadows produced to the Select Committee.[4] Once again, these publicity leaks raise concerns about the Select Committee's motives because it is a settled rule that "'there is no congressional power to expose for the sake of exposure.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)).

---

[2] House Rule XI, Cl. 2(i) states, "[O]nly the chair or ranking minority member, after consultation with each other, may make public statements regarding matters before the committee or any subcommittee thereof." As discussed further below, there is no Ranking Member of the Select Committee with whom the Chair could consult as required, and in any event, the current record does not indicate whether any sort of consultation preceded these leaks.

[3] *See, e.g.*, Aaron Blake, *The key texts between Mark Meadows, Mike Lee and Chip Roy*, Wash. Post (Apr. 15, 2022), https://www.washingtonpost.com/politics/2022/04/15/lee-roy-meadows-texts/; Ryan Nobles, et al., *CNN Exclusive: 'We control them all': Donald Trump Jr. texted Meadows ideas for overturning 2020 election before it was called*, CNN (Apr. 9, 2022), https://www.cnn.com/2022/04/08/politics/donald-trump-jr-meadows-text/index.html; Bob Woodward & Robert Costa, *Virginia Thomas urged White House chief to pursue unrelenting efforts to overturn the 2020 election, texts show*, Wash. Post (Mar. 24, 2022) https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-meadows-texts/; Christina Prignano, *Read Sean Hannity's texts to Mark Meadows*, Boston Globe (Jan. 5, 2022), https://www.bostonglobe.com/2022/01/05/nation/read-sean-hannitys-texts-mark-meadows/.

[4] S*ee READ: Text messages Sean Hannity, Marjorie Taylor Greene, Ivanka Trump and others sent to Mark Meadows*, CNN (Apr. 25, 2022), https://www.cnn.com/2022/04/25/politics/read-mark-meadows-texts-sean-hannity-ivanka-trump-marjorie-taylor-greene/index.html.

Finally, the Select Committee's procedures have deviated from the traditional bipartisan mechanisms that can restrain excess and insure fairness in legislative investigations, particularly those aimed at targets in the political sphere. While the Rulemaking Clause affords the House substantial autonomy in establishing its internal procedures, U.S. Const. art. I, § 5, cl. 2, that authority has long been leavened by minority participation in committee affairs, a check on the exercise of power that is glaringly absent here where the committee has in essence no minority participation. While as a standalone issue, that might be one for the House itself to consider, the Judiciary must step in where its "own duty to enforce the constitutionally protected rights of individuals is affected." *Watkins*, 354 U.S. at 205,

All these factors—the Separation of Powers implications, the Select Committee's use of law-enforcement tactics, including its quest for evidence to support allegations of alleged criminality and its media campaign through politicized leaks—counsel in favor of careful and deliberate judicial review, and against the Congressional Defendant's poorly supported suggestion that the Court should rush to judgment to accommodate their primetime hearings set to begin in less than a month.[5]

As summarized immediately below and on the basis of the points and authorities detailed herein, the Court should deny the Congressional Defendants' motion and grant judgment (either on the pleadings or on summary judgment) and declaratory relief to Mr. Meadows.

*       *       *

**First**, testimonial immunity—long recognized by the U.S. Department of Justice in formal opinions under administrations of both parties as a core principle of the Separation of Powers—

---

[5] The June hearings themselves are likely to yield further evidence of the Defendants' and the Committee's purposes. The Court may therefore wish to defer final consideration of any motion for summary judgment until the parties have an opportunity to address such evidence.

protects Mr. Meadows, as former White House Chief of Staff, from compelled testimony before Congress arising out of his official position. For decades, the Attorneys General of both parties and attorneys in DOJ's Office of Legal Counsel have, after careful analysis of the law, maintained that Congress may not constitutionally compel testimony from the President or his most senior aides[6]—including after their service has ended. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192–93 (2007) ("Separation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers."); *see also Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008) (explaining the persuasive authority of OLC opinions and granting them "as much weight as the force of their reasoning will support"). As Attorney General Janet Reno explained, "[s]ubjecting [a White House Chief of Staff] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999). While two district court opinions have questioned

---

[6] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 131 (1984); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. *5 (July 15, 2014); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971). The testimonial immunity of senior White House advisors has enjoyed unanimous bipartisan support, with notable opinions coming out of the Nixon, Clinton, Bush, and Obama Justice Departments.

this immunity,[7] they have not squarely addressed the important Separation of Powers considerations that the Department of Justice has raised. And in any event, as the Congressional Defendants acknowledge, this immunity remains an open question that neither the Supreme Court nor the D.C. Circuit has ever addressed. *See* Defs.' Mot. for Summ. J., ECF No. 15 at 53.[8]

*Second*, the subpoenas challenged here, to Mr. Meadows and his cell phone carrier, lack a "valid legislative purpose." *Mazars*, 140 S. Ct. at 2033. Dating back to George Washington's seminal invocation of executive privilege in 1796, it has been understood that Congress may only subpoena information relevant to a "purpose under the cognizance of the House of Representatives." George Washington, *Message to the House Regarding Documents Relative to the Jay Treaty*, March 30, 1796. Congress has the burden to "establish a 'demonstrated, specific need" for the [requested] information," *id.* at 2032 (quoting *United States v. Nixon*, 418 U.S. 683, 713 (1974))—in other words, that the information "is 'demonstrably critical' to its legislative purpose," *id.* (quoting *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974)). While the Select Committee has, at various times, articulated potential legislation that might result from its investigation—notwithstanding that the Select

---

[7] *See Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008); *Comm. on Judiciary, United States House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 199–200 (D.D.C. 2019).

[8] As discussed further below, there is also no merit to the Congressional Defendants' suggestion that the privileges and immunities attaching to Mr. Meadows were not properly presented. They can cite no authority for the proposition that President Trump was required to invoke privilege or testimonial immunity in a communication directed to the Select Committee, as opposed to instructing Mr. Meadows to preserve them, as he did. And it is equally irrelevant that President Biden has not supported Mr. Meadows's claims of privilege and immunity, as Justice Kavanaugh recently explained: "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

Committee lacks statutory authority to mark up any proposed legislation, *see* H. Res. 503, 117th

Cong. § 4(d) (2021)—it has never articulated why pursuing privileged communications between

Mr. Meadows and then-President Trump is "demonstrably critical" to its investigation. *Nixon*, 418

U.S. at 713. Nor has the Select Committee even attempted to show, for instance, that its subpoena

was "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*,

140 S. Ct. at 2036. It is also clear that the Select Committee could not make that showing; by its

own admission, it subpoenaed Mr. Meadows before it had even completed other efforts to collect

relevant information from non-privileged sources. *See id.* at 2025 (holding that an important factor

in assessing whether Congress can compel production of information about the President and his

senior advisors is whether Congress has alternative means of getting the same information); *Nixon*

*v. Adm'r of Gen. Servs.*, 433 U.S. 425, 482 (1977) (same). And if anything, the record shows that

the Select Committee is targeting Mr. Meadows for two reasons that are squarely out of bounds:

law enforcement and public exposure.

     *Third*, the subpoenas are invalid because the Select Committee is not a validly constituted

body authorized to issue Congressional subpoenas. The Select Committee was created by the

passage of House Resolution 503, but neither the Select Committee nor the Speaker of the House

have adhered to the resolution's dictates.  Section 2(a) of the Resolution states that "[t]he Speaker

shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation

with the minority leader." H. Res. 503, 117th Cong. (2021). The Select Committee has only 9

members, none of whom were appointed after consultation by the minority leader as required by

§ 2(a). In addition, § 5(c)(6) of the Resolution authorizes Chairman Thompson to order depositions

by subpoena only "upon consultation with the ranking minority member." *Id.*  But the counsel for

the Select Committee has admitted that it has no ranking minority member—*i.e.*, no senior-most

member of the minority, appointed after consultation with the minority leader. *See* Mot. Compel Disc. Ex. 9 at 5, *United States v. Bannon*, 1:21cr670, ECF No. 28-9 (D.D.C. Feb. 4, 2022). Chairman Thompson therefore could not satisfy the consultation requirement of § 5(c)(6) in purporting to subpoena Mr. Meadows to testify before the Select Committee. The Select Committee's failure to adhere to its own rules is judicially cognizable and results in invalidation of the Committee's actions. *See Yellin v. United States*, 374 U.S. 109, 114 (1963); *see also Watkins v. United States*, 354 U.S. 178 (1957) (holding that congressional subpoena could not be enforced where it exceeded "the constitutional requisites of fairness for witnesses").

\*     \*     \*

For these and other reasons set forth below, the subpoenas are invalid and cannot be enforced against Mr. Meadows.  The Court should therefore grant him judgment as a matter of law and enter a declaratory judgment invalidating the subpoenas. But if the Court should conclude that these issues are not determinative, then the proper course would be to take up Mr. Meadows's pending motion under Rule 56(d), defer ruling on the pending dispositive cross motions, and direct the parties to conduct reasonable discovery that would allow them to develop the factual record in a way that would allow the Court to resolve this dispute.

## BACKGROUND

Plaintiff Mark R. Meadows served as Chief of Staff to President Donald J. Trump from March 31, 2020, until January 20, 2021, and before that as a Member of the U.S. House of Representatives, representing North Carolina's 11th Congressional District, from January 3, 2013, to March 30, 2020.  This case arises from two subpoenas issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol—one that seeks to compel Mr. Meadows to testify before Congress about his tenure as White House Chief of Staff, and one that

seeks his personal cell phone records from that time period directly from his telecommunications provider.

## A.     Authority and Purposes of the Select Committee

After the well-known events of January 6, 2021, Congress considered establishing a "National Commission to Investigate the January 6 Attack on the United States Capital Complex," which would have been a bipartisan, bicameral commission tasked with investigating those events and proposing "corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism." First Am. Compl. ¶ 28; Pl.'s Statement of Facts ¶ 1.    The bill to establish this bipartisan commission, H.R. 3233, passed the House on May 19, 2021, but a cloture motion in the Senate failed on May 28, 2021, and the measure died.   First Am. Compl. ¶¶ 29–30; Pl.'s Statement of Facts ¶ 1.

One month later, the House passed H. Res. 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol," on a near party-line vote.   First Am. Compl. ¶¶ 32-35; Pl.'s Statement of Facts ¶ 2. While the Select Committee established by H. Res. 503 has similar aims as the would-be Commission, it expressly provides that "[t]he Select Committee may not hold a markup of legislation," First Am. Compl. ¶ 36; Pl.'s Statement of Facts ¶ 3. Consistent with that limitation, House Speaker Pelosi and members of the Select Committee frequently describe the purposes of the committee as generating a public record of the events of January 6th and making criminal referrals to the U.S. Department of Justice. *See* First Am. Compl. ¶¶ 39–47; Pl.'s Statement of Facts ¶ 20–25.   The Select Committee's investigative staff is led by two former United States Attorneys, Timothy J. Heaphy and John Wood, and includes more than a dozen former federal prosecutors.   *See* First Am. Compl. ¶ 37; Pl.'s Statement of Facts ¶ 19.

**B.      Composition of the Select Committee**

In contrast to the bipartisan Commission that failed to pass Congress, H. Res. 503 contemplates that the Select Committee will have thirteen members appointed by the Speaker, only five of whom are to be "appointed after consultation with the minority leader." First Am. Compl. ¶ 54; Pl.'s Statement of Facts ¶ 4.   Speaker Pelosi appointed Chairman Thompson and six additional Democrat members:  Reps. Lofgren, Schiff, Aguilar, Murphy (FL), Raskin, and Luria. *See* First Am. Compl. ¶ 55; Pl.'s Statement of Facts ¶ 6.  She appointed Republican Liz Cheney, one of the two Republicans who had voted in support of H. Res. 503, without designating any position for her. *See id.*

Consistent with H. Res. 503, House Minority Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, including Rep. Jim Banks of Indiana to serve as Ranking Member. *See* First Am. Compl. ¶ 56; Pl.'s Statement of Facts ¶ 7. Speaker Pelosi then made what she characterized as the "unprecedented decision" not to appoint any of the Republican members recommended by the Minority Leader as contemplated in H. Res. 503. *See* First Am. Compl. ¶ 57; Pl.'s Statement of Facts ¶ 8.  Instead, she added Rep. Kinzinger, the only other Republican who voted in favor of H. Res. 503, and left four vacancies. *See* First Am. Compl. ¶ 58; Pl.'s Statement of Facts ¶ 8. Since there was no Ranking Member, Chairman Thompson subsequently designated Rep. Cheney to serve as "Vice Chair"—a title that nowhere appears in H. Res. 503. *See* First Am. Compl. ¶ 59; Pl.'s Statement of Facts ¶¶ 13–14. And while House Rule XI, cl. 2(d) contemplates the appointment of a committee vice chair, that position is for a "member of the majority party," which Rep. Cheney is not. First Am. Compl. ¶ 60; Pl.'s Statement of Facts ¶ 15–16.

Indeed, counsel for the Congressional Defendants has made clear elsewhere the position that Vice Chair Cheney *is not the Ranking Member* of the Select Committee.  *See* Pl.'s Statement of Facts ¶ 18.  The Ranking Member role is significant because H. Res. 503 provides that orders for the taking of depositions first require "consultation with the ranking minority member."  First Am. Compl. ¶ 53; Pl.'s Statement of Facts ¶ 17.

## C.      Activities of the Select Committee

Since its inception in July 2021, the Select Committee has held only one public hearing. *See* First Am. Compl. ¶ 64; Pl.'s Statement of Facts ¶ 25. The Select Committee has, however, gathered a substantial number of documents and testimony from private individuals and entities, much of which then leaked to the news media.  *See* First Am. Compl. ¶ 64; Pl.'s Statement of Facts ¶ 26.  The Select Committee has issued more than one hundred wide-ranging subpoenas for documents and the testimony of witnesses, *see* First Am. Compl. ¶ 65; Pl.'s Statement of Facts ¶ 27, and by its own account has interviewed more than 1,000 witnesses, *see* Pl.'s Statement of Facts ¶ 26. Unlike in ordinary congressional investigations, the Select Committee has demanded records of and sent preservation notices to social media companies, telecommunications companies, banking entities, and even the national party committee of their political opposition. *See* First Am. Compl. ¶ 65; Pl.'s Statement of Facts ¶¶ 28–31. Many of those subpoenas were issued covertly to third parties who held the cell phone or banking data of the Select Committee's target. *See* First Am. Compl. ¶ 66; Pl.'s Statement of Facts ¶¶ 29, 31.

The Select Committee has also issued "sweeping" demands for presidential records from the National Archives and Records Administration (NARA) and seven other Executive Branch agencies. First Am. Compl. ¶¶ 67–68; Pl.'s Statement of Facts ¶ 32. Those document requests gave rise to a dispute between former President Trump, who asserted Executive Privilege over some of

the documents in NARA's custody pursuant to the procedures set forth in the Presidential Records Act of 1978, and President Biden who, through counsel, instructed NARA to produce the documents and purported to waive privilege. *See* First Am. Compl. ¶¶ 68–69; Pl.'s Statement of Facts ¶ 33. Following a months-long legal battle, NARA released at least some of the requested presidential records to the Select Committee, including some that were created or used by Mr. Meadows. *See* First Am. Compl. ¶ 70; Pl.'s Statement of Facts ¶ 34. In connection with that litigation, Justice Kavanaugh pointedly noted that "[a] former President must be able to successfully invoke the Presidential communications privilege for *communications* that occurred during his Presidency, *even if the current President does not support the privilege claim*." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

**D.      The Select Committee's Subpoena & Mr. Meadows's Accommodation Efforts**

On September 23, 2021, the Select Committee served a subpoena on Mr. Meadows which included a sweeping set of document requests that related to his tenure as White House Chief of Staff and a demand that he appear for a deposition. *See* First Am. Compl. ¶¶ 71–74; Pl.'s Statement of Facts ¶ 37.

On October 6, 2021, former President Trump sent a letter to Mr. Meadows instructing him to maintain privilege and invoke any applicable immunities to resist the subpoena. Pl.'s Statement of Facts ¶ 40. Specifically, the letter instructed Mr. Meadows that he should "where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena . . . [and] not provide any testimony concerning his official duties in response to the Subpoena." First Am. Compl. ¶ 75; Ex. A. As a former member of Congress and former White House Chief of Staff, Mr. Meadows recognized the importance of the Separation of Powers and

respects the prerogatives of both the Legislative Branch and the Executive Branch. And he also appreciated that these sorts of disputes are traditionally resolved through a process of compromise and accommodation between the branches. He therefore for months communicated by and through counsel with the Select Committee in an effort to reach an accommodation that would allow him to provide information to the Select Committee without contradicting longstanding Executive Branch positions about testimonial immunity and Executive Privilege. *See* First Am. Compl. ¶¶ 76–104; Pl.'s Statement of Facts ¶ 46.[9]

Throughout extensive exchanges with the Select Committee, Mr. Meadows remained concerned that the Select Committee did not intend to respect the boundaries of Executive Privilege, but he strove to find a path forward. On November 22, Chairman Thompson rejected Mr. Meadows's latest proposal to answer written interrogatories before testifying. *See* First Am. Compl. ¶ 100; Pl.'s Statement of Facts ¶ 50. The Select Committee eventually accepted Mr. Meadows's proposal to provide a voluntary deposition on December 8, 2021, with certain conditions. *See* First Am. Compl. ¶ 103; Pl.'s Statement of Facts ¶ 51. Chairman Thompson in return demanded that Mr. Meadows produce all responsive documents by Friday, December 3. *See* First Am. Compl. ¶ 104; Pl.'s Statement of Facts ¶ 52.

Notwithstanding reservations about the Select Committee's intentions, Mr. Meadows agreed to produce responsive, non-privileged documents and to make a voluntary appearance for a deposition. *See* First Am. Compl. ¶¶ 101–02; Pl.'s Statement of Facts ¶ 52. His agreement to appear was based on the understanding that the Select Committee would limit its questions in good

---

[9] It is notable that the Committee, while claiming that Mr. Meadows should appear and raise objections to questions where Executive Privilege is claimed, has nowhere cited any evidence that the Committee Chair has by training experience or any other salient factor the expertise to rule substantively as to what is or is not subject to a valid claim of privilege. On the contrary, the subpoena the Chair issued expressly requires production of *prima facie* privileged information.

faith to matters outside the scope of privilege and that Mr. Meadows would have three business days to review any documents which the Select Committee intended to show him or question him about during the deposition. *See* First Am. Compl. ¶¶ 101; Pl.'s Statement of Facts ¶ 51. His document production included more than 1,000 emails and other documents from his personal Gmail account, as well as 2,319 text messages and metadata from his personal cell phone. *See* First Am. Compl. ¶¶ 102, 104; Pl.'s Statement of Facts ¶ 52.

**E.      The Select Committee's Verizon Subpoena & Breakdown of Accommodation Efforts**

The weekend prior to his planned deposition, Mr. Meadows received a letter from Verizon Wireless, the carrier for the personal cell phone he had used during his tenure as White House Chief of Staff. The letter notified him that Verizon had received a subpoena from the Select Committee requesting certain phone records. *See* First Am. Compl. ¶¶ 105–106; Pl.'s Statement of Facts ¶ 56. The Verizon Subpoena instructs Verizon to produce subscriber information and cell phone data associated with Mr. Meadows's prior personal cell phone number held during his time of service as Chief of Staff, including subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. *See* First Am. Compl. ¶ 107; Pl.'s Statement of Facts ¶ 57. The cell phone data requested could include all calls, text messages, and other records of communications associated with that phone number and can be used for historic cell site analysis. *See id.* The Verizon Subpoena requested all Mr. Meadows's personal cell phone data for four months: October 1, 2020 to January 31, 2021. *See id.*

On December 7, 2021, Mr. Meadows notified the Select Committee that he would no longer appear voluntarily for a deposition. *See* First Am. Compl. ¶ 111; Pl.'s Statement of Facts ¶ 58. This decision followed the revelation of the Verizon Subpoena and public statements by

Chairman Thompson and other Select Committee members, all of which indicated that the Select Committee viewed itself as conducting a law enforcement inquiry. *See* First Am. Compl. ¶¶ 109–110; Pl.'s Statement of Facts ¶ 58. He again offered, however, to respond to written interrogatories that would allow the Select Committee to develop a clear record of his answers to the Select Committee's questions while affording Mr. Meadows a meaningful opportunity to assess and assert privilege where appropriate. *See* First Am. Compl. ¶ 111; Pl.'s Statement of Facts ¶ 50.

The next day, December 8, 2021, Mr. Meadows initiated this action to seek a judicial forum to resolve the important Separation of Powers and other issues presented by this dispute. *See* Compl., *Meadows v. Pelosi*, 1:21cv3217 (D.D.C. Dec. 8, 2021); Pl.'s Statement of Facts ¶ 59.

The House of Representatives voted to refer Mr. Meadows to the Department of Justice for contempt of congress on December 14, 2021. *See* First Am. Compl. ¶¶ 113; Pl.'s Statement of Facts ¶ 60. During the floor debate in the House, Chairman Thompson accused Mr. Meadows of being "part of a coverup" of January 6. *See* First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 60. Rep. Cheney read Mr. Meadows's private text messages aloud before making an unmistakable accusation that Mr. Meadows knew former President Trump "through action or inaction, corruptly sought to obstruct or impede Congress' official proceeding to count electoral votes." First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 61. Rep. Lofgren also read Mr. Meadows's text messages on the House floor, First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 62, as did Reps. Schiff, *id.*, Aguilar, *id.*, and Luria, *id.* And in the weeks following the vote, Mr. Meadows's private text messages dominated the news cycle, as the Select Committee intended. *See* First Am. Compl. ¶ 114; Pl.'s Statement of Facts ¶ 63.

The leaks of Mr. Meadows's text messages have continued steadily ever since. *See* Pl.'s Statement of Facts ¶ 63. And just recently, ***all*** the text messages that Mr. Meadows produced to

the Select Committee have been provided to CNN and publicly released.  *See* Pl.'s Statement of

Facts ¶ 64.

The Select Committee is the only plausible source of these leaked communications.  *See*

First Am. Compl. ¶ 115.  Aside from his counsel, only the Select Committee members and staff

possess Mr. Meadows's confidential production of emails and text messages.  *See id.*  And neither

Mr. Meadows nor his counsel has provided these records to the press.  *See id.*; Pl.'s Statement of

Facts ¶ 65.

**STANDARD OF REVIEW**

Under Federal Rule of Procedure 12(c), a party is entitled to judgment on the pleadings

when he can show "at the close of the pleadings, that no issue of material fact remains to be

resolved, and that he or she is entitled to judgment as a matter of law" *Air Line Pilots Ass'n v. Fed.*

*Express Corp.*, 139 F. Supp. 3d 320, 323 (D.C. Cir. 2015) (quoting *Konah v. District of Columbia*,

915 F. Supp. 2d 7, 18 (D.D.C. 2013)). The standard for Rule 12(c) is virtually indistinguishable

from a Rule 12(b)(6) motion. The court views all factual allegations in the light most favorable to

the non-moving party. *Id.* at 324. But in its review, the court is "limited to considering facts alleged

in the [pleadings], any documents attached to or incorporated in the [pleadings], matters of which

the court may take judicial notice, and matters of public record." *Id.* (quoting *Robinson v. District*

*of Columbia*, 403 F. Supp. 2d 39, 47 (D.D.C. 2005)).

If the court does not accept that the moving party is entitled to judgment as a matter of law

based on the pleadings, it can still grant summary judgment pursuant to Federal Rule of Procedure

56 when "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they might affect the outcome of

the case, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), and an issue is "genuine" if

a reasonable jury could find in favor of the non-moving party. *Id.* at 248. "In determining whether

17

a genuine issue of fact exists, the court must view all inferences in favor of the non-moving party."

*Air Line Pilots Ass'n.*, 139 F. Supp. 3d at 324 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The party opposing a motion for summary judgment must provide "affirmative evidence" that disputes of material fact exist and that there is a "genuine issue for trial." *Anderson*, 477 U.S. at 248.

## ARGUMENT

### I.   Testimonial Immunity Protects Former Chief of Staff Meadows from Congressional Compulsion to Testify About His White House Service

The most straightforward basis for granting judgment in favor of Mr. Meadows is that he is constitutionally immune, as a matter of the Separation of Powers, from being compelled to testify before Congress about his service as White House Chief of Staff.  This has been the long-standing position of the U.S. Department of Justice, as articulated by Attorneys General of both major parties and by DOJ's Office of Legal Counsel.  *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 Op. O.L.C. 101, 131 (1984); *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. *5 (July 15, 2014); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007); Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971).  The testimonial immunity of senior White House advisors has enjoyed unanimous

bipartisan support, with notable opinions coming out of the Nixon, Clinton, Bush (43), and Obama Justice Departments.

Under the principles of testimonial immunity, the challenged subpoenas—which seek to compel testimony from Mr. Meadows arising from his service as White House Chief of Staff and to obtain cell phone records in support of his deposition—are constitutionally invalid. The Congressional Defendants suggest that they can nevertheless question him about matters like campaign activity that supposedly fell outside the scope of his official duties. *See* Defs.' Mot. Summ. J., ECF No. 15 at 42-43, 56-58. But that contention fails on many levels: it misconstrues the nature of testimonial immunity for senior White House advisors; it impinges on protected First Amendment activity and misconstrues the role of White House Chief of Staff; and it relies on disputed factual allegations that, at a minimum, would merit further discovery. The Court should thus grant judgment in favor of Mr. Meadows under Rule 12(c) (or alternatively, under Rule 56) based on testimonial immunity. But even if the Court were not prepared to do so, there would be no basis for granting judgment in favor of the Congressional Defendants, and the proper course would be to allow further factual development on the relevant issues.

### A.   The Separation of Powers prohibits Congress from subpoenaing the White House Chief of Staff for testimony.

The constitutional rationale for prohibiting congressional subpoenas to White House Chiefs of Staff is straightforward. As Attorney General Janet Reno explained, "[s]ubjecting [a White House Chief of Staff] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999). "Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise

the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at *5 (July 15, 2014). The challenged subpoenas here show precisely that danger: a congressional committee is targeting the former Chief of Staff to a President from the opposite party and has ***already shown*** that it intends to use the information it obtains from him for partisan gain, including in the run up to the 2022 midterm elections.

The testimonial immunity is also a matter of interbranch comity: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982). And again, as Attorney General Reno explained, a White House Chief of Staff for this purpose is the President's alter ego. *See Assertion of Executive Privilege*, 23 Op. O.L.C. at 5; *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers."). Congress can no more compel testimony from a White House Chief of Staff than the President may compel testimony from a congressman's chief of staff. *Cf. Gravel v. United States*, 408 U.S. 606, 616–17 (1972) (holding that the Speech or Debate Clause covers congressional aides because "the day to day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos").

It is telling that, notwithstanding the more than 1,000 interviews it has apparently conducted, the Select Committee has never attempted to subpoena former President Trump. *See*

Pl.'s Statement of Facts ¶ 26. And that has remained true even as the committee has taken the bold step of issuing subpoenas to fellow members of Congress. *See* Pl.'s Statement of Facts ¶ 27. The decision not to subpoena President Trump likely reflects the Congressional Defendants' awareness that to do so would plainly contravene the Separation of Powers. But those concerns are not assuaged by going after his alter ego "[b]ecause a presidential adviser's immunity is derivative of the President's." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5.

The fact that Mr. Meadows is a former White House Chief of Staff does not change the calculus. As the Office of Legal Counsel has opined, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192–93 (2007). Without a guarantee of continuing confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977). President Truman succinctly explained how important it was for immunity to continue after a President's term in office nearly 70 years ago:

> "'[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President. The doctrine would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes.'"

*Immunity of the Former Counsel to the President* 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14). And Justice Kavanaugh recently emphasized the related point that "[a] former President must be able to successfully invoke the

Presidential communications privilege for communications that occurred during his Presidency."

*Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial).

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

Id. at 681. The logic of that expression of a separation of powers principle applies with equal force to maintenance of testimonial immunity.

In two prior cases, judges in this district have declined to apply testimonial immunity to senior advisers of a former president. *See Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99 (D.D.C. 2008); *Comm. on Judiciary, United States House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 199–200 (D.D.C. 2019). But neither decision is binding on this Court, and the court in *Miers* explicitly limited its decision to the "the context of this particular subpoena dispute." 558 F. Supp. at 106 (admitting that "[t]here may be some instances where absolute (or qualified) immunity is appropriate for such advisors"). Even the Congressional Defendants acknowledge that "[n]either the Supreme Court nor the D.C. Circuit has decided whether any White House advisors could be immune from compulsory Congressional process in matters involving their official conduct." Defs.' Mot. Summ. J., ECF No. 15 at 53. And more importantly, neither the *Miers* decision nor the *McGahn* decision adequately explained how compelled congressional testimony for a senior Presidential aide could comport with relevant Separation of Powers precepts.

In *Miers*, the court rested its decision primarily on the notion that testimonial immunity was "entirely unsupported by existing case law." 558 F. Supp. 2d at 99. But the lack of prior case

22

law just underscores how rare this particular clash of the Legislative and Executive Branches has been in our Nation's history. *See McGahn*, 415 F. Supp. 3d at 200 ("The dearth of cases involving compelled congressional process issued to Executive branch officials is likely attributable to the fact that subpoena-related conflicts between Congress and the Executive branch are usually negotiated, rather than litigated."). As the Supreme Court has emphasized, the two Branches have historically been able to resolve this sort of clash through inter-branch accommodation rather than through recourse to the courts. *See Mazars*, 140 S. Ct. at 2029 (explaining that these types of disputes traditionally "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'") (quoting Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel)).

The *Miers* decision also relied on the Supreme Court's holding in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), that Presidential aides enjoy qualified immunity, rather than absolute immunity, from civil damages claims, and suggested that "civil suits for money damages present a greater potential for such a chilling effect" than congressional subpoenas. 558 F. Supp. 2d at 101–02. But that conclusion ignores the heightened concerns that arise as a matter of the Separation of Powers whenever Congress targets a co-equal branch of government. *See Mazars*, 140 S. Ct. at 2033. Indeed, the Supreme Court in *Mazars* squarely rejected the Congressional Defendants' argument that congressional subpoenas targeting the President indirectly are no different than a congressional subpoena to any other individual. *Compare* Defs.' Mot. Summ. J., ECF No. 15 at 53 ("[C]ompliance with a Congressional subpoena is a legal requirement 'which every person within the jurisdiction of the Government is bound to perform when properly

summoned.'") (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)), *with Mazars*, 140 S.

Ct. at 2033 ("The House . . . would have us ignore that these suits involve the President. . . . [But]

[t]he House's approach fails to take adequate account of the significant separation of powers issues

raised by congressional subpoenas for the President's information.").

    The *Miers* decision further fails to grapple with the underlying purposes of immunity:  to

protect against a chilling effect on the advice of current and future White House aides and to

promote comity among the branches.  As Justice Kavanaugh explained in the context of Executive

Privilege:  "Without sufficient assurances of *continuing* confidentiality, Presidents and their

advisers would be chilled from engaging in the full and frank deliberations upon which effective

discharge of the President's duties depends." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022)

(statement of Kavanaugh, J., respecting denial).  The prospect of compelled congressional

testimony from a President' senior-most aides threatens the same chilling effect—even apart from

the specific concerns raised by individual questions of Executive Privilege.  And it does not

promote comity to create a clash between Legislative and Executive prerogatives—especially at a

time when Congress is apparently unwilling to be cooperative with the Executive Branch either.

*See* Mary Clare Jalonick & Michael Balsamo, *House 1/6 Panel Rejects Justice Dept.'s Transcript

Request*, Associated Press (May 17, 2022), https://apnews.com/article/capitol-siege-government-

and-politics-subpoenas-criminal-investigations-merrick-garland-

73d8309734a5dad4532f96c53f14a403.

    The court also emphasized the necessity of the *Miers* congressional investigation because

Congress was the only institution that could, in their oversight capacity, "investigate and respond"

to possible "improper partisan influence" within the Department of Justice at that time.  558 F.

Supp. 2d at 58.  That is remarkably dissimilar to the case here, where the Congressional

Defendants' investigation itself is undertaking an improperly partisan prosecutorial process and where the current Department of Justice—who is actually tasked with upholding our nation's laws—is investigating the very events on which the Select Committee claims to be seeking Mr. Meadows' testimony. *See* Alan Feuer, et al., *Justice Dept. Widens Jan. 6 Inquiry to Range of Pro-Trump Figures*, N.Y. Times (Mar. 30, 2022), https://www.nytimes.com/2022/03/30/us/politics/justice-dept-widens-jan-6-inquiry.html.

The *McGahn* decision relied principally on *Miers*, citing it as "the only recorded case in our Nation's history that directly addresses the legal argument that a senior-level presidential aide is immune to a legislative subpoena seeking testimony when the President directs him to ignore that congressional mandate." 415 F. Supp. 3d at 200. The court acknowledged that the sparse judicial record "is likely attributable to the fact that subpoena-related conflicts between Congress and the Executive branch are usually negotiated, rather than litigated." *Id.* But then quizzically, the court expressed agreement with *Miers* that OLC's opinions were unpersuasive because they did not "cite[] to a single judicial opinion recognizing the asserted absolute immunity." *Id.* at 202 (quoting *Miers*, 558 F. Supp. 2d at 104). That reasoning is entirely circular, and one could just as easily point out that *Miers* failed to cite a single opinion (judicial or executive) authorizing Congress to subpoena a senior White House aide. Because the *McGahn* Court "adopt[ed] [*Miers*'] absolute testimonial immunity analysis in full," *id.*, it too failed to grasp the important constitutional considerations raised by a congressional subpoena to a senior White House aide.

### B. Testimonial immunity applies, and Mr. Meadows is entitled to judgment, because the subpoenas targeted him based on his role as Chief of Staff.

It would seem fairly straightforward that, if testimonial immunity prohibits Congress from seeking to compel testimony from a former White House Chief of Staff, then the challenged subpoenas are invalid. But the Congressional Defendants contend otherwise, arguing that some

(but not all) of the topics on which they wish to question him "involve his role as a campaign functionary" rather than "Mr. Meadows's activities as an Executive Branch official." Defs.' Mot. Summ. J., ECF No. 15 at 52. This contention is wrong for several reasons.

*First*, in assessing the Separation of Powers concerns that give rise to testimonial immunity, the relevant inquiry is whether the Court has before it "congressional subpoenas for the President's information" which "unavoidably pit the political branches against one another," *Mazars*, 140 S. Ct. at 2034—not whether any given question Congress might ask entails Mr. Meadows's execution of a core Executive function. Indeed, the White House Chief of Staff, though the President's closest advisor and alter ego, does not carry out any core Executive function in his own capacity; his advice and actions bear weight only to the extent they inform or reflect the decision-making of the President. Testimonial immunity is thus, by necessity, different from areas like judicial immunity where "immunity is justified and defined by the functions it protects and serves." *Forrester v. White*, 484 U.S. 219, 227 (1988).[10] In the case of a White House Chief of Staff, the interbranch conflict and the chilling effect against which testimonial immunity protects arises whenever a Chief of Staff is targeted as a Chief of Staff to the President. There is no genuine dispute here that Congress has subpoenaed Mr. Meadows and his cellphone carrier

---

[10] The Supreme Court has also explained that "officials who are entitled to absolute immunity . . . are subject to other checks that help to prevent abuses of authority from going unredressed." *Mitchell v. Forsyth*, 472 U.S. 511, 522 (1985). For the White House Chief of Staff, the President himself provides the check, since the Chief of Staff cannot execute the laws in his own right, and the President is free to terminate the Chief of Staff at will. The President in turn is directly accountable under our Constitution. *See Morrison v. Olson*, 487 U.S. 654, 711 (1988) (Scalia, J., dissenting) ("The checks against any branch's abuse of its exclusive powers are twofold: First, retaliation by one of the other branch's use of *its* exclusive powers: Congress, for example, can impeach the executive who willfully fails to enforce the laws . . . . Second, and ultimately, there is the political check that the people will replace those in the political branches (the branches more 'dangerous to the political rights of the Constitution') who are guilty of abuse.") (quoting Federalist No. 78, p. 465).

precisely because he served as President Trump's Chief of Staff. Testimonial immunity therefore attaches.[11]

**Second**, even if the availability of testimonial immunity hinged on the relevant "function" of the targeted official,[12] the Congressional Defendants' distinction between "Mr. Meadows's activities as an Executive Branch official" and "his role as a campaign functionary," Defs.' Mot. Summ. J., ECF No. 15 at 52, would be wrong both as a matter of law and fact.

Without any legal or factual support, the Congressional Defendants breezily claim that "a typical White House Chief of Staff" limits his role to "advising the President on official matters of government policy" and would have nothing to do with an incumbent President's campaign or with post-election inquiries into the integrity of the election. Defs.' Mot. Summ. J., ECF No. 15 at 56. One might be tempted to think they are new to Washington. Administration of federal election law is just as squarely within the purview of the President (and thus his Chief of Staff), who has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const., art.

_____

[11] The fact that the Office of Legal Counsel has distinguished instances in which a senior White House aide is subpoenaed over "'their private conduct,'" Defs.' Mot. Summ. J., ECF No. 15 at 58. (quoting Memorandum for the Honorable John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* 3 (Mar. 15, 1972)), is wholly irrelevant here. That is plainly not what the Select Committee has done with Mr. Meadows.

[12] The Congressional Defendants' argument assumes that the relevant role or function is the one that they now identify, in the course of defending civil litigation, as opposed to the one they identify in the subpoena itself. *See* Defs.' Mot. Summ. J., ECF No. 15 at 52. They cite no authority for that proposition, however, and it makes little sense as a practical matter. A White House Chief of Staff in receipt of a congressional subpoena for testimony must decide whether to comply before he learns what particular topics Congress might be interested in discussing. Moreover, to suggest that immunity cannot attach until particular questions are posed and assessed defeats the entire purpose of testimonial immunity. *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("[Qualified immunity] is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."). By the time Congress has the Chief of Staff in the witness chair, the damage is done.

II, § 3—as is any other aspect of federal law. *See, e.g.*, 52 U.S. Code §§ 10307, 20511; 18 U.S.C. §§ 241-42. Moreover, an incumbent President running for reelection does not thereby forfeit his First Amendment rights. *See, e.g.*, *Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 388 (D.C. Cir. 1981) (explaining that "political expression and association concerning federal elections and officeholding" represent "the very heart of the organism which the first amendment was intended to nurture and protect" and therefore demand "heightened judicial concern"). The combination of Separation of Powers concerns and First Amendment protection only heightens Congress's burden in seeking Mr. Meadow's testimony about such protected activity.

The Congressional Defendants' argument is further refuted by the Watergate scandal, which arose from President Nixon's alleged involvement in the cover-up of a break-in to the Democratic National Committee headquarters. The scandal sparked numerous proceedings and led to some of the most significant cases involving Presidential records, privilege, and the Separation of Powers. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977); *United States v. Nixon*, 418 U.S. 683 (1974); *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974). In *Senate Select Committee*, the D.C. Circuit specifically held that Congress could not compel production of taped discussions between Nixon and his senior aides. *See* 498 F.2d at 726. But in none of these cases did the Supreme Court or the D.C. Circuit ever suggest that Separation of Powers protections were inapplicable because the Watergate break-in involved a political activity rather than an official one.[13]

---

[13] *Mazars* further undermines their argument by establishing that the Separation of Powers limits Congress's subpoena power even when the subject of the subpoena predates the President's tenure and thus necessarily lacks any connection to his official duties. *See* 140 S. Ct. at 2033 (holding that heightened scrutiny applies even to "cases involving nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations").

The Select Committee's own members surely appreciate that a clear line between official acts and election-related conduct is often untenable.  In fact, several Democrat candidates for Congress have used the events of January 6 in furtherance of their campaigns.  *See, e.g.*, Quaye Quartey for Congress, *Quartey for Congress - Campaign Launch Video*, Facebook (June 3, 2021), https://www.facebook.com/quarteyforcongress/videos/188080856538494;  Max  Rose  for Congress, *Max Rose: Risk Everything* (Dec. 13, 2021), YouTube, https://youtu.be/4tKfqiBScaY. It takes little political savvy to understand the members of the Select Committee are using this investigation—one allegedly conducted in their official roles—to support their case against Republicans in the midterm elections.

Moreover, even if political activity was somehow hermetically sealed off from the official duties of the White House Chief of Staff, that would just take the Congressional Defendants out of the Separation of Powers frying pan and into the First Amendment fire.  *See Machinists Non-Partisan Pol. League*, 655 F.2d at 388; *see also Watkins v. United States*, 354 U.S. 178, 187– 88 (1957) ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. . . . This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice. The Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged.").

The Congressional Defendants' bald assertion that discussions and actions related to President Trump 2020 campaign or integrity of the 2020 election were outside the scope of his work as the Chief of Staff therefore falls flat first as matter of law but also as a matter of fact.

**C.** **Even if factual questions about the "capacity" in which Mr. Meadows took certain actions were relevant, the Congressional Defendants would not be entitled to summary judgment because those factual questions are disputed.**

Should the Court disagree and conclude that it is legally relevant whether Mr. Meadows ever acted in a campaign capacity that exceeded his role as Chief of Staff, then the proper course would be to allow a reasonable discovery period in which the relevant facts can be further developed—after either denying the Congressional Defendants' summary judgment motion outright or granting Mr. Meadows's pending motion under Rule 56(d). *See* Pl.'s Mot. Deny Without Prejudice or Defer Ruling Defs.' Mot. Summ. J., ECF No. 20.

While the Congressional Defendants contend, without citing any factual support, that White House Chiefs of Staff do not get involved with an incumbent President's reelection campaign, common sense and facts subject to judicial notice are to the contrary. The breadth of the Chief of Staff's duties necessarily includes activities relevant to the President's reelection. *See* Pl.'s Statement of Facts ¶ 42. And Mr. Meadows would prove that, if necessary, using facts obtained through discovery. Some of the potentially relevant records are in the Congressional Defendants' custody or control, such as the Presidential records produced to the Select Committee by the National Archives. *See* Pl.'s Statement of Facts ¶ 34. Other potentially relevant information lies in the hands of non-parties, including the Executive Branch and former Chiefs of Staff themselves, many of whom engaged in efforts related to their President's election efforts. The public record readily reveals the existence of such evidence; two of President Barack Obama's Chiefs of Staff, Denis McDonough and Jack Lew, engaged in public efforts to aid the President's election efforts. McDonough's efforts to persuade Cabinet members to campaign on behalf of the President's agenda in advance of the 2014 elections were widely publicized. *See* Edward-Isaac Dovere, *Obama's Cabinet Lacks Voter Sway,* Politico (October 31, 2014),

https://www.politico.com/story/2014/10/obamas-cabinet-doesnt-deliver-midterm-boost-112370.

Lew was involved even more directly, engaging in policy debates and meeting with voters on the

campaign trail. *See* Yair Rosenberg, *Treasury's First Orthodox Chief,* Tablet (January 10, 2013),

https://www.tabletmag.com/sections/news/articles/treasurys-first-orthodox-chief.                These

well-documented events demonstrate at least a dispute of fact as to the scope of the White Chief

of Staff's duties.

It would thus be premature for the Court to grant summary judgment in favor of the

Congressional Defendants, even if the Court were to somehow agree with their legal position that

campaign activities are categorically ineligible for testimonial immunity.[14]   The proper course in

that scenario would be for the Court to deny their motion, or to defer it by granting Mr. Meadows's

pending Rule 56(d) motion, and to allow for a reasonable period of discovery.

## II.      The Select Committee Did Not Have a Valid Legislative Purpose for the Subpoenas

The subpoenas challenged here, to Mr. Meadows and his cellphone carrier, lack a "valid

legislative purpose." *Mazars*, 140 S. Ct. at 2033. The Select Committee has no freestanding

authority to issue subpoenas enforceable by contempt. Instead, its investigative powers are

ancillary to its legislative authority. *See id.* at 2031. Any subpoena not directly tied to a valid

legislative purpose is therefore beyond the scope of Congress's Article I authority. *See Eastland*

*v. United States Servicemen's Fund*, 421 U.S. 491, 506 (1975).

---

[14] As noted above, *see supra* n.11, the Court would also need to conclude that Congress may
narrow its subpoena in defensive litigation and define the capacity in which the respondent will be
questioned based on its *post hoc* litigating position. *Cf. Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142, 156–57 (2012) (holding that federal courts cannot defer to a federal agency's *post
hoc* litigating position, even if it otherwise would under *Auer v. Robbins*, 519 U.S. 452 (1997),
where doing so would create "unfair surprise").

In *Mazars*, the Supreme Court articulated a three-tiered approach to assessing the validity of Congress's aims in obtaining records through an investigation. The lowest burden for Congress applies in cases "that do not involve the President's papers." 140 S. Ct. at 2033. Congress still must show that its requests "relate to a valid legislative purpose or concern a subject on which legislation could be had." *Id.* (internal quotations & alterations omitted). But it does not need to carry any additional burden. The highest burden for Congress applies where, as here, Congress goes after "information subject to executive privilege." *Id.* at 2032. In such cases, Congress "must establish a 'demonstrated, specific need' for the [requested] information," *id.* (quoting *United States v. Nixon*, 418 U.S. 683, 713 (1974))—in other words, that the information "is 'demonstrably critical' to its legislative purpose," *id.* (quoting *Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974)). Finally, the *Mazars* Court articulated an intermediate tier of scrutiny that applies to "congressional subpoenas for the President's information" even when executive privilege is not at issue. *Id.* at 2033. Such requests still raise "significant separation of powers issues" since they "unavoidably pit the political branches against one another." *Id.* at 2034. Applying the ordinary "valid legislative purpose" standard to such cases is inadequate, the Court recognized: "Any personal paper possessed by a President could potentially 'relate to' a conceivable subject of legislation, for Congress has broad legislative powers that touch on a vast number of subjects." *Id.* The Court thus articulated "[a] balanced approach" which requires "a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the 'unique position' of the President." *Id.* at 2035 (quoting *Clinton* v. *Jones*, 520 U.S. 681, 698 (1997)).

The Select Committee has not even tried to meet its burden under these standards. While the Select Committee has, at various times, articulated potential legislation that might result from its investigation—notwithstanding that the Select Committee lacks statutory authority to mark up any proposed legislation, *see* H. Res. 503, 117th Cong. § 4(d) (2021)—it has never articulated why pursuing privileged communications between Mr. Meadows and then-President Trump is "demonstrably critical" to its investigation. *Nixon*, 418 U.S. at 713. Nor has the Select Committee even attempted to show, for instance, that its subpoena was "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S. Ct. at 2036.

Nor could they since the subpoenas targeting Mr. Meadows fall well short of the *Nixon* standard, or even the intermediate *Mazars* standard. The Committee subpoenaed Mr. Meadows before it had even completed other efforts to collect relevant information from non-privileged sources.[15] *See Mazars*, 140 S. Ct. at 2025 (holding that an important factor in assessing whether Congress can compel production of information about the President and his senior advisors is whether Congress has alternative means of getting the same information); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 482 (1977) (same). Indeed, the Select Committee now claims to be "laser-focused" on Mr. Meadows and the questions it seeks to ask him. *See* Tr. Status Conference May 4, 2022. But that contention just further highlights how woefully inadequate the Select

---

[15] *See, e.g.*, Letter from Chairman B. Thompson to G. Terwilliger (Nov. 5, 2021) ("[T]his list is non-exclusive and may be supplemented as our investigation continues …. We also continue to interview additional witnesses who have personal knowledge of these issues and Mr. Meadows's involvement."); Letter from G. Terwilliger to Chairman B. Thompson (Nov. 8, 2021) ("The courts have made clear that an important factor in assessing whether Congress can compel production of information about the President and his senior advisors is whether Congress has alternative means of getting the same information. If the Select Committee is already gathering documents and testimony about Mr. Meadows and his conduct during the relevant period, as your letter suggests, it is not clear why the Select Committee needs to gather that information again from him—in a posture that would threaten long-term effects for executive privilege.") (citations omitted).

Committee's predication was—whether measured by the heightened *Nixon* standard or the intermediate *Mazars* standard—when it issued the subpoenas in late 2021.

The subpoena also fails on legislative purpose because the record shows that the Select Committee has targeted Mr. Meadows for purposes that lie squarely outside its authority.  The Supreme Court has firmly established that "Congress may not issue a subpoena for the purpose of 'law enforcement,'" *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)), and that "'there is no congressional power to expose for the sake of exposure,'" *id.* (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)).  Both statements from members of the Select Committee and its choice of investigative tactics demonstrate that the Select Committee is pursuing a law enforcement objective—at least in its targeting of Mr. Meadows and other senior White House officials.  Moreover, it is equally clear that the Select Committee is seeking information from Mr. Meadows for the purpose of public disclosure, as reflected in the Select Committee's release of his personal text messages.

The Congressional Defendants' reliance on *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), is misplaced.  The legislative purpose inquiry analyzes whether a particular subpoena serves a valid purpose, not whether an investigation as a whole serves a valid purpose. *Mazars*, 140 S. Ct. at 2031.  Though there may be legitimate purposes for the Select Committee's investigation, the Meadows Subpoena extends far beyond the scope of any legitimate legislative purpose.  The Supreme Court has emphasized the need for specificity in Congress's stated legislative purpose. *See Mazars*, 140 S. Ct. at 2036.  And in cases concerning the President, whom Mr. Meadows advised, "it is 'impossible' to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims." *Id.* at 2036.  The Select Committee has failed to consider or recommend any draft legislation related to the topics provided in the Meadows

Subpoena, nor has it provided any explanation for how its requests to Mr. Meadows would further any specific legislative end.

The Select Committee included one stated legislative purpose in the Meadows Subpoena: to "recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations." This statement could not conceivably be more impermissibly "vague" and "loosely worded." *Watkins v. United States*, 354 U.S. 178, 201 (1957). It is exactly the type of authority the Supreme Court criticized in *Watkins*, where a committee tried "in essence, to define its own authority, to choose the direction and focus of its activities." *Id.* at 205. The subpoena seeks Executive Branch deliberative material, information both temporally and logically disconnected from the events of January 6, and information that is irrelevant to any conceivable legislation. The Select Committee seeks to "radiate outward infinitely to any topic thought to be related in some way" to January 6. *Id.* at 204. Its effort to do so places it beyond its constitutional authority.

One need only look to "[t]he authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves" to see the Select Committee's true purpose. *Watkins*, 354 U.S. at 209. Any generalized purported legislative purpose for Mr. Meadows's testimony is entirely pretextual and unsupported by the statements and actions of members of the Select Committee. The subpoenas are relevant only to serve the purpose that members of the Select Committee have stated time and again: to engage in ad-hoc law enforcement and expose possible wrongdoings of their political adversary. *See* First Am. Compl. ¶¶ 26-39; *See* Pl.'s Statement of Facts ¶¶ 20–24. Neither are permissible.

## III.    The Subpoenas Were Not Validly Issued

The subpoenas are invalid because the Select Committee is not a validly constituted body authorized to issue Congressional subpoenas. The Select Committee was created by the passage of House Resolution 503, but the Select Committee and the Speaker of the House have failed to adhere to the Resolutions' dictates.

Contrary to the Congressional Defendants' assertions, "[i]t has been long settled, of course, that rules of Congress and its committees are judicially cognizable." *Yellin v. United States*, 374 U.S. 109 (1963). The same is true of authorizing resolutions, which are a jurisdictional limit on a committee's authority. *Watkins v. United States*, 354 U.S. 178, 206 (1957). More than merely finding congressional rules cognizable, the Supreme Court has held that when a rule relates to the lawful authorization for an inquiry, rules "must be strictly observed." *Gojack v. United States*, 384 U.S. 702, 708 (1966). Putting that principle into practice, the DC Circuit and this Court have invalidated multiple convictions for contempt of Congress where a congressional committee failed to adhere to its own rules in issuing a subpoena. *See Liveright v. United States*, 347 F.2d 473, 474 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963); *United States v. Grumman*, 227 F. Supp. 227, 233 (D.D.C 1964). Particular scrutiny of the Select Committee's compliance with its own rules is justified here, where its use of compulsory process has sparked a separation of powers dispute during an investigation of the majority party's political opposition by an almost entirely partisan committee. To borrow language from the Supreme Court, the Congressional Defendants prepared meticulously to compel Mr. Meadows to testify. "It is not too exacting to require that the Committee be equally meticulous in obeying its own rules." *Yellin*, 374 U.S. at 124.

### A. The Select Committee Is Not Properly Composed Under H. Res. 503 § 2(a).

The subpoenas are invalid because the Select Committee that issued them is not operating as a duly authorized committee of the House of Representatives. The Select Committee was

established by H. Res. 503.  Section 2(a) of that Resolution states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021). The Select Committee has only 9 members: seven Democrats and two Republicans. None of these members was appointed from the selection of five GOP congressman put forth by Minority Leader Kevin McCarthy, as required by § 2(a). And in any event, it lacks even the lopsided 8-5 composition that H. Res. 503 calls for.

Nothing in our Constitution expressly authorizes Congress or its committees to issue subpoenas.  The Supreme Court has held that an authority to investigate is inherent in Congress's lawmaking function, and that duly authorized congressional committees may exercise this subpoena authority implied by Article I.  *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). But the Court has never held that this implied power extends to individual members or to ad hoc groups; only when an authorized committee follows the prescribed rules.

Speaker Pelosi failed to appoint members consistent with the authorizing resolution of the Select Committee. The Speaker has appointed only nine members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs that the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).  Further, of those nine members Speaker Pelosi has appointed, none was appointed after consultation with the minority member, as is required by the authorizing resolution. H. Res. 503 § 2(a), 117th Cong. (2021).  Thus, the Select Committee as it currently stands—and stood at the time it issued the subpoenas in question—has no authority to exercise Congress's implied power to issue subpoenas in support of its lawmaking function.

### B.  The Subpoenas Were Not Validly Issued Under H. Res. 503 § 5(c)(6).

The subpoenas are also invalid, aside from the composition of the Select Committee as a whole, because Chairman Thompson failed to "consult[] with the ranking minority member."  H.

Res. 503 § 5(c)(6).   Section 5(c)(6) authorizes the Chair of the Select Committee to order depositions by subpoena only "upon consultation with the ranking minority member." *Id.* But the Select Committee has no ranking minority member—*i.e.*, no senior-most member of the minority, appointed after consultation with the minority leader.   Indeed, Congress's clear position is that Rep. Cheney—the senior-most Republican member of the Select Committee—serves as Vice Chair and *not* as Ranking Member.   *See* Exhibit 9, Interview of Kristin Amerling at 5, ECF No. 28-9, *United States v. Bannon*, No. 1:21cr670 (D.D.C. Feb. 4, 2022).   Chairman Thompson therefore could not satisfy the consultation requirement of § 5(c)(6) in purporting to subpoena Mr. Meadows to testify before the Select Committee.   As noted above, the Select Committee's failure to adhere to its own rules is judicially cognizable and can result in invalidation of the Committee's actions. *See Yellin*, 374 U.S. at 114; *Watkins*, 354 U.S. at 206.

## IV.   Additional Issues with the Subpoenas Preclude Summary Judgment in Favor of the Congressional Defendants

For each of the forgoing reasons, Mr. Meadows is entitled to judgment in his favor either on the pleadings, or in the alternative, on summary judgment.   But if the Court were to disagree, it would not follow that the Congressional Defendants are entitled to summary judgment.   There are several additional issues that Mr. Meadows has raised in his complaint which, while perhaps not amenable to summary disposition in his favor, nevertheless preclude summary disposition against him.

### A.   The Subpoenas Violate the Separation of Powers by Infringing Upon Executive Privilege.

Separate and apart from the issue of testimonial immunity addressed above, the Meadows Subpoena is invalid to the extent it would require Mr. Meadows to breach Executive Privilege.

During his time as Chief of Staff, Mr. Meadows was among the most senior Executive Branch officials and his communications and deliberations were covered by executive privilege.

That privilege reaches Mr. Meadows's communications "in the course of preparing advice for the President," *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997), and any materials that reveal his or other executive officials' predecisional deliberative processes. *See Army Times Publ'g Co. v. Department of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993). The subpoena served on Mr. Meadows clearly seeks information protected by executive privilege. Among other things, the subpoena expressly requests summaries of Mr. Meadows's conversations with the President, records of his conversations with other senior executive officials, and the contents of advice provided to the President by his senior advisors. *See* Am. Compl. Ex A, ECF No. 13-3.

Throughout the course of negotiations regarding potential accommodations, the Select Committee has repeatedly clarified that the subpoena seeks privileged information. Most notably, the Select Committee provided Mr. Meadows with a list of topics for his deposition, informing him that it believed these topics did not "implicate any cognizable claim of executive privilege." That list expressly included Mr. Meadows's conversations with the President, his communications with the Vice President, two Oval Office meetings, and White House Officials' deliberations regarding election security. *See* Am. Compl. Ex. G, ECF No. 13-9. Mr. Meadows's conversations with the President, Vice President, and other senior executive officials are covered by executive privilege, as is any information regarding executive officials' deliberative processes regarding election security. But the Select Committee's list of topics have varied dramatically over time. What began with 27 topics in the subpoena expanded to sixteen "non-exclusive" topics on November 5, followed by another eight topics on November 9. *See* Am. Compl. Exs. A, ECF No. 13-3, G, ECF No. 13-9, & I, 13-11. It appears the Congressional Defendants have currently settled on seven topics for the purposes of this litigation. *See* Defs.' Mot. Summ. J., ECF No. 15 at 14-15.

When a congressional committee uses its subpoena power to seek information covered by executive privilege, the subpoena will only be enforced where "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Select Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974). The information sought by the Select Committee is not demonstrably critical to its functions as it is not relevant to any legislative purpose and could be obtained from alternative sources. Additionally, the vast majority of the information sought by the Select Committee could be obtained from other sources. Very little, if any, of the information sought by the Select Committee is in Mr. Meadows's sole possession. Much of it could obtained via subpoenas to individuals outside the Executive Branch or individuals who lie farther from the core of executive privilege.

The Select Committee has confirmed that its subpoena violates the Separation of Powers by seeking and obtaining a purported "waiver" of executive privilege from President Biden. To support the efficacy of this waiver, they cite to the DC Circuit's holding in *Trump v. Thompson* that "the profound interests in disclosure advanced by President Biden and the January 6th Committee" exceed the "generalized concerns for Executive Branch confidentiality" asserted by President Trump in that case. *See* ECF No. 15 at 26–27. But Mr. Meadows has articulated specific issues of executive privilege and, to the extent his objections have been generalized, it has been because the Select Committee has refused to identify with particularity the questions it intends to ask. Additionally, as articulated above, the "profound interests" put forward in *Trump v. Thompson* ran to the documents at issue in that case; the subpoena to Mr. Meadows must stand on its own legs.

President Biden's purported waiver does not vitiate Mr. Meadows's assertion of privilege at the direction of former President Trump. Nothing in the Constitution or laws of the United

States gives President Biden the authority to compel a former official (now private citizen) to divulge privileged communications from a former President's administration under the premise that he is simply waiving executive privilege.[16] As Justice Kavanaugh recently explained, "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, *even if the current President does not support the privilege claim.*" *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial) (emphasis added).

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* Therefore, notwithstanding President Biden's purported waiver, Executive Privilege still applies.

Executive privilege does not expire with a President's term. The core purpose of executive privilege is to ensure that a President and his advisors are "free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974). President Biden lacks both the legal authority to compel Mr. Meadows to divulge privileged information and the

---

[16] President Biden's justification for a wholesale waiver of then-President Trump's Executive Privilege does not withstand even a cursory test as matter of law. President Biden asserts that the "unique and extraordinary circumstances" justifies setting aside constitutional principle. Such an assertion should be viewed just as suspect as a claim that Fourth Amendment rights can be abridged by the non-exigent need for a search without warrant because the investigation concerns a "unique and extraordinary" case, or that Fifth Amendment protections can be cast aside because the alleged crime is particularly heinous. President Biden's justification is no justification at all to abandon constitutional principles.

knowledge necessary to making an informed judgment as to whether privilege should be maintained. It is clear that President Biden could not, of his own accord, compel Mr. Meadows to divulge privileged conversations with former President Trump; the President has no such authority over former officials either inherently or as a matter of federal law. Likewise, President Biden is in no position to judge whether it would or would not be in the national interest to "waive" Executive Privilege as to Mr. Meadow's potential testimony because he has no knowledge of the substance of privileged communications and deliberations at issue. Thus, President's Biden's purported waiver of President's Trump's Executive Privilege claims, whatever its effect, is not sufficient to vitiate Mr. Meadow's maintenance of privilege as a matter of law.

It is equally clear that Congress, acting on its own, could not obtain privileged information from Mr. Meadows without satisfying the stringent standards established by the Supreme Court in *United States v. Nixon*, 418 U.S. 683, 714 (1974). The Select Committee and President Biden cannot do collectively what neither can do alone. The Supreme Court has consistently held that two branches acting in concert are no more capable of altering the balance of the separation of powers than one acting alone. *Cf. Clinton v. City of New York*, 524 U.S. 417 (1998) (invalidating a line-item veto for violating the Separation of Powers notwithstanding both Congressional and Presidential consent to the statutory scheme); *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983) (same for a one-house legislative veto). If coordination between a subsequent President and one chamber of Congress were sufficient to overcome testimonial immunity or executive privilege, the very purpose of these constitutional protections would be subverted. A constitutional protection that does not survive a mere party-change in the political branches is no constitutional protection at all.

Mr. Meadows's conversations with former President Trump were protected by executive privilege and testimonial immunity while President Trump was in office, and they remain protected afterwards.

**B.    The Select Committee Cannot Obtain Records under the Verizon Subpoena Consistent with the Stored Communications Act.**

The Stored Communications Act prohibits the Select Committee from obtaining the subpoenaed records from Verizon.  To the extent the Select Committee is seeking production of the contents of communications, that request is prohibited under Section 2702(a)(1) of Title 18.  The Stored Communications Act generally provides that "a person or entity providing electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).  Verizon is "a person or entity providing electronic communication service to the public," and the Select Committee qualifies as "any person or entity" within the meaning of the Stored Communications Act.  *See* 18 U.S.C. § 2711 (providing no specialized definition of "person" or "entity").Section 2702(a)(1) thus prohibits knowing disclosure of "the contents of a communication" stored by Verizon to the Select Committee absent an express statutory exception outlined in Section 2702(b).  None of the statutory exceptions in Section 2702(b) applies to the Select Committee's subpoena.

To the extent the Select Committee is seeking production only of non-communication records and information, that request is prohibited under Section 2702(c) of Title 18.  The Stored Communications Act provides that "[a] provider described in [Section 2702(a)] may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2))" if one of seven criteria is

met.  Mr. Meadows is "a subscriber to or customer of [Verizon's] service" within the meaning of the Stored Communications Act.

The Select Committee cannot obtain the subpoenaed records under Section 2702(c)(1) because disclosure would not be "as otherwise authorized in section 2703." 18 U.S.C. § 2702(c)(1). Specifically, on information and belief, the Select Committee has not obtained and cannot obtain "a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction," as would be required to obtain records "in electronic storage in an electronic communications system for one hundred days or less." *Id.* § 2703(a). Nor has the Select Committee provided Mr. Meadows with "prior notice" and obtained either (i) "an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena" or (ii) "a court order," as would be required to obtain records "in electronic storage . . . for more than one hundred and eighty days." *Id.* § 2703(a), (b)(1).  The Select Committee does not have lawful consent to obtain the subpoenaed records. *See id.* § 2702(c)(2). The Select Committee does not constitute or represent "a law enforcement agency" within the meaning of the Stored Communications Act. *Id.* § 2702(c)(7).  The Select Committee may represent a "governmental entity" but, on information and behalf, have not shown and cannot demonstrate "in good faith" "that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." *Id.* § 2702(c)(4), (6).

Thus, here too, even if the Court were not prepared to grant judgment in favor of Mr. Meadows at this juncture, these deficiencies in the Verizon Subpoena would preclude summary judgment in favor of the Congressional Defendants.

### C.    Compelled Production under the Verizon Subpoena Would Violate the Fourth Amendment.

The Verizon Subpoena is also invalid because it violates Mr. Meadows's Fourth Amendment rights. That subpoena instructs Verizon to produce subscriber information and cell phone data associated with the phone number previously used by Mr. Meadows. This cell phone number was used by Mr. Meadows as his personal cell phone during his tenure as White House Chief of Staff. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. The cell phone data requested includes all calls, text messages, and other records of communications associated with that phone number, and it can be used for historic cell site analysis. The requested data covers four full months: October 1, 2020 through January 31, 2021.

Mr. Meadows has a reasonable expectation of privacy in his personal cell phone data. The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967). The fact that a third party at least temporarily stores a person's cell phone data does not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoenas untethered from any valid legislative purpose. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946). If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. Mr. Meadows has not provided his consent for Verizon to produce his cell phone data to the Select Committee. And for the reasons discussed *supra*, the Select Committee's subpoenas are invalid.

Additionally, a congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents is unreasonable and falls outside the scope of Congress' legitimate legislative power. *See Mazars*, 140 S. Ct. at 2040. The subpoena contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights. For the Select Committee to subpoena Verizon for all Mr. Meadows's personal cell phone data over the course of four months is entirely unreasonable. Such a request is so broad both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose.

As the subpoenas in question exceed the lawfully authorized purpose of the Select Committee, full compliance with such subpoenas would violate Mr. Meadows's Fourth Amendment protection against unlawful search and seizure.

### D.   Compelled Production of Cell Phone Data under the Verizon Subpoena Would Violate the First Amendment.

The subpoena of Mr. Meadows's private cell phone data violates his right to free association and chills the exercise of free speech rights. Mr. Meadows used his personal phone to engage in protected advocacy and other speech, including privileged speech with his attorneys and spouse. Mr. Meadows also used his personal phone to engage in private conversations with friends and family. All of these associational and expressive activities are protected by the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d 1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179 (D.C. Cir. 2003).

The Committee has no legitimate purpose for seeking the protected information demanded by the subpoena, much less a compelling one. Mr. Meadows has already provided the Committee

with the substance and metadata of his responsive emails and text messages. Additional information will not meaningfully aid the Committee in any valid pursuit.

Even if had a valid reason to seek protected information, the Committee has put in place no safeguards to protect Mr. Meadows's rights. It provided Mr. Meadows with no notice of the subpoena and has provided him with no opportunity to assert claims of privilege or other legal protections over the demanded information. It also has no provisions for a taint team or analogous filter for privileged information. The entirety of the demanded information, including that which is constitutionally or otherwise protected, will be turned over to the Committee to do with as it pleases.

The Verizon subpoena is also a clear effort to chill the speech of the Committee Member's political adversaries.  The body that issued this subpoena is composed of 9 members, 7 of whom belong to the political party that opposed the President under which Mr. Meadows served. Allowing an entirely partisan select committee of Congress to subpoena the personal cell phone data of executive officials would work a massive chilling of current and future Executive Branch officials' associational and free speech rights

The Committee's asserted interest is insufficient and its alternative means of obtaining this information are too obvious to justify such a drastic chilling of speech.

## CONCLUSION

For the reasons discussed, the Court should grant Mr. Meadows's motion and deny the Defendants' motion for summary judgment.

Dated: May 20, 2022

Respectfully submitted,
MARK R. MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I certify that, on May 20, 2022, a copy of the foregoing was filed on the Court's CM/ECF system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

1.      Before establishing the Select Committee, Congress considered and ultimately rejected a proposal to establish a bipartisan, bicameral commission to investigate the events of January 6, 2021 and to propose "corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism." H.R. 3233, 117th Cong. (2021).

2.      House Resolution 503, which the House of Representatives passed on a near party-line vote, authorized the Select Committee with goals similar to those of H.R. 3233. H. Res. 503, 117th Cong. (2021).

3.      Section 4 of House Resolution 503 provides that "The Select Committee may not hold a markup of legislation." H. Res. 503, 117th Cong. (2021).

4.      Section 2(a) of the Resolution states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021).

5.      The Select Committee has only nine members. *See* 167 Cong. Rec. H3597, H3885 (2021).

6.      On July 1, 2021, Speaker Pelosi appointed Chairman Thompson and six additional Democrat members—Reps. Lofgren, Schiff, Aguilar, Murphy (FL), Raskin, and Luria—and one Republican—Rep. Liz Cheney. *See* 167 Cong. Rec. H3597 (2021).

7.      Minority Leader McCarthy recommended Rep. Jim Banks to serve as Ranking Member of the Select Committee, alongside four more members of the Republican Conference. *See* Press Release, Jim Banks, Member, H.R., *McCarthy Taps Banks to Lead Republicans on Jan 6 Committee* (July 19, 2021), https://banks.house.gov/news/documentsingle.aspx?DocumentID=1921; Press Release, Kevin McCarthy, Minority Leader, H.R., *McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee* (Jul 21, 2021), https://www.republicanleader.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/ [hereinafter McCarthy Press Release].

8.      Speaker Pelosi made an "unprecedented decision" to decline to appoint some of those members recommended by Minority Leader McCarthy, appointing instead Rep. Adam Kinzinger. *See* Press Release, Nancy Pelosi, Speaker, H.R., *Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol* (July 21, 2021), https://www.speaker.gov/newsroom/72121-2; 167 Cong. Rec. H3885 (2021) [hereinafter Pelosi Press Release].

9.      No member of the Select Committee was recommended by the minority leader or the Republican Conference. *See* McCarthy Press Release, *supra* ¶ 7.

10.     No other current committee of the House of Representatives—standing or select—is composed wholly of members appointed by the Speaker *without* the recommendation of the minority leader. *Compare, e.g*., Pelosi Press Release, *supra* ¶ 8, *with* House Rule X, cl.

5(a) *and* Michael Greene, Cong. Rsch. Serv., R46786, *Rules Governing House Committee and Subcommittee Assignment Procedures* 7 (2021).

11.     When Speaker Pelosi appointed certain members to the Select Committee on July 1, 2021, she named Rep. Thompson as "Chair." 167 Cong. Rec. H3597 (2021).

12.     Speaker Pelosi appointed Rep. Cheney without any designation. *See* 167 Cong. Rec. H3597 (2021).

13.     Chairman Thompson designated Rep. Cheney to serve as "Vice Chair" on September 2, 2021. *See* Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair* (Sept. 2, 2021), https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair.

14.     The term "vice chair" never appears in House Resolution 503. *See generally* H. Res. 503, 117th Cong. (2021).

15.     House Rule XI, cl. 2(d) explains that the vice chair of a committee is to be a "member of the majority party."

16.     Rep. Cheney is a member of the Republican Conference, which is the minority party in the 117th Congress. *See, e.g.*, 167 Cong. Rec. H9 (2021) (statement of Rep. Cheney).

17.     To issue an order for the taking of depositions, House Resolution 503 requires the chair of the Select Committee to "consult[] with the ranking minority member."  H. Res. 503 (2021).

18.     A Federal Bureau of Investigation report dated November 10, 2021 states that Doug Letter, counsel for Defendants, admitted that the Select Committee has no ranking

member. *See* Mot. Compel Disc. Ex. 9 at 5, *United States v. Bannon*, 1:21cr670, ECF No. 28-9 at 5 (D.D.C. Feb. 4, 2022).

19.     The Select Committee's investigative staff is led by two former United States Attorneys: Timothy J. Heaphy and John Wood. *See* Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Thompson Announces Chief Investigative Counsel for Select Committee* (Aug. 12, 2021), https://january6th.house.gov/news/press-releases/thompson-announces-chief-investigative-counsel-select-committee; Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Thompson & Cheney Announce Senior Investigative Counsel for the Select Committee* (Sept. 17, 2021), https://january6th.house.gov/news/press-releases/thompson-cheney-announce-senior-investigative-counsel-select-committee.

20.     The chairman of the Select Committee has described his intention to "bring justice" to the "tragedy of January 6." Bennie Thompson (@BennieGThompson), Twitter, (Jan. 6, 2022 8:31 AM), https://twitter.com/BennieGThompson/status/1479083311163232258?s=20&t=mgVdhFfyScMs Fz-S8KzK4Q.

21.     Rep. Kinzinger has said he wants to "hold the guilty people accountable." *Kinzinger: 'I want to hold the guilty people accountable' for Jan. 6*, CNN (December 19, 2021), https://www.cnn.com/videos/tv/2021/12/19/sotu-kinzinger-full.cnn.

22.     Rep. Schiff has explained that he intends to "expose those responsible for Jan 6," Adam Schiff (@RepAdamSchiff), Twitter (Nov. 12, 2021, 4:54 PM), https://twitter.com/RepAdamSchiff/status/1459278425118625794?s=20&t=m1I0kGXWVIOyM

FMBcXxZXw, and that "exposing all the malefactors and bloodshed that went on here is really important," Mary Clare Jalonick, *Capitol riot committee has interviewed 250 people so far*, Associated Press (Dec. 2, 2021), https://apnews.com/article/steve-bannon-donald-trump-elections-capitol-siege-36b68bd9e0c701fea8e6b11f00292604.

23.     The Select Committee hearings, Rep. Raskin has described, "will expose every facet of the assault against our democracy and Constitution on 1/6." Jamie Raskin (@jamie_raskin), Twitter (Apr. 29, 2022, 11:05 AM), https://twitter.com/jamie_raskin/status/1520056793942175744?s=20&t=Zd3m9rX_OVrwcjyIINCYOw.

24.     Speaker Pelosi explained in a press conference that "the next step for us has always been to seek and to find the truth." See Nancy Pelosi, Speaker, H.R., *Transcript of Pelosi Weekly Press Conference Today* (Jul. 1, 2021), https://www.speaker.gov/newsroom/7121-2.

25.     The Select Committee has held only one hearing, but others appear to be planned for June 2022 forward. *See The Law Enforcement Experience on January 6: Hearing Before the H. Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol*, 117th Cong.; Zak Hudak, *House January 6 committee plans eight hearings for June*, CBS News (Apr. 29, 2022), https://www.cbsnews.com/news/january-6-committee-hearings-june/.

26.     The Select Committee has interviewed nearly 1,000 witnesses. *See* Mychael Schnell & Harper Neidig, *Jan. 6 panel issues subpoenas to five GOP lawmakers*, The Hill (May 12, 2022), https://thehill.com/policy/national-security/3486269-jan-6-panel-issues-subpoenas-to-five-gop-lawmakers/ (citing Rep. Raskin).

27.     The Select Committee has issued more than one hundred subpoenas for documents and/or testimony of witnesses, including fellow members of Congress. *See generally*

Press Releases, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol,

https://january6th.house.gov/news/press-releases. *See also* Claudia Grisales, et al., *Jan. 6*

*subpoena tracker: Here's who the House panel wants to hear from*, NPR (last updated Mar. 3,

2022), https://www.npr.org/2021/11/06/1051652687/jan-6-panel-and-subpoenas-committee-

targets-witnesses-linked-to-day-of-attack.

      28.     The Select Committee has also sent preservation notices and demanded records to

social media companies, which seek "data, reports, analyses, and communications" of fifteen

private companies that "stretch[] back to spring of 2020," months before the 2020 Presidential

election and nearly a year before the January 6 attack.  Press Release, Bennie Thompson,

Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee*

*Demands Records Related to January 6th Attack from Social Media Companies* (Aug. 27, 2021),

https://january6th.house.gov/news/press-releases/select-committee-demands-records-related-

january-6th-attack-social-media-0. *See* Press Release, Bennie Thompson, Chairman, Select

Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Subpoenas*

*Social Media Companies for Records Related to January 6th Attack* (Jan. 13, 2022),

https://january6th.house.gov/news/press-releases/select-committee-subpoenas-social-media-

companies-records-related-january-6th.

      29.     The Select Committee requested from telecommunications companies cellular

data from the personal phones of at least one hundred different individuals, many of whom

(including Mr. Meadows) the Select Committee knows was nowhere near the Capitol on January

6. *See, e.g.*, Compl., *Scavino v. Verizon Communications*, 1:22cv18 (D.D.C. Jan. 5, 2022);

Zachary Cohen, et al., *Exclusive: January 6 committee casts a wide net with over 100 subpoenas*

*for phone records*, CNN (Dec. 7, 2021) https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-records/index.html.

30.     The Select Committee has also sought the fundraising data and tactics from their political adversary: the Republican National Committee. *See* Compl., *Repub. Nat'l Comm. v. Pelosi*, 1:22cv659 (D.D.C. Mar. 15, 2022).

31.     And finally, the Select Committee has subpoenaed the personal banking records of at least one individual associated with the Trump campaign. *See* Compl., *Budowich. v. Pelosi*, 1:21cv3366 (D.D.C. Dec. 24, 2021).

32.     The Select Committee also sent self-described "sweeping" demands for presidential records from the National Archives and Records Administration (NARA)—including records relating to Mr. Meadow specifically—and seven other Executive Branch agencies. Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Issues Sweeping Demand for Executive Branch Records* (Aug. 25, 2021), https://january6th.house.gov/news/press-releases/select-committee-issues-sweeping-demand-executive-branch-records.

33.     After former President Trump asserted Executive Privilege over certain NARA records, President Biden purported to overrule the privilege, given the "unique and extraordinary circumstances" of January 6. *See* Compl. Ex. 5, *Trump v. Thompson*, No. 1:21-cv-2769 (D.D.C. 2021); Second Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/13/second-letter-from-dana-a-remus-counsel-to-the-president-to-david-ferriero-archivist-of-the-united-states-datedoctober-8-2021/.

34.     After a legal battle over the records, NARA eventually released a number of records to the Select Committee, one or more of which related to Mr. Meadows. *See* Decl. George J. Terwilliger III ¶ 4.

35.     But the Select Committee has never called upon President Trump to testify—in fact, the Chairman has signaled he has no intention to do so. *See* Rebecca Beitsch, *Jan. 6 panel has no plans to call Trump*, The Hill (May 17, 2022), https://thehill.com/policy/national-security/3491576-jan-6-panel-has-no-plans-to-call-trump/.

36.     Mr. Meadows served as Chief of Staff to President Trump from March 31, 2020 until January 20, 2021. *See* First Am. Compl., Ex. A, ECF No. 13-3.

37.     The Select Committee issued Mr. Meadows a subpoena on September 23, 2021 demanding he produce documents and appear for a deposition about 27 discrete topics. First Am. Compl. Ex. A, ECF No. 13-3.

38.     The Select Committee included one stated legislative purpose in the Meadows Subpoena: to "recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations." First Am. Compl. Ex. A, ECF No. 13-3.

39.     The U.S. Department of Justice under both Republican and Democrat administrations has researched and analyzed the law and opined officially  that as a matter of law Congress cannot compel testimony from senior advisors of the President. *See, e.g.*, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 131 (1984); *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999).

40. Mr. Meadows has been instructed by former President Trump "to not provide any testimony concerning his official duties in response to the Subpoena," as well as to maintain all applicable privileges and immunities. Ex. A.

41. The administration of federal election laws, *see, e.g.*, 52 U.S.C. §§ 10307, 20511; 18 U.S.C. §§ 241-42, is squarely within the purview of the President (and his Chief of Staff) who has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3.

42. The breadth of a Chief of Staff's duties may necessarily include activities, including political considerations, relevant to the President's reelection and legal matters pertaining to a presidential election. *See* Decl. George J. Terwilliger III ¶ 7.

43. Counsel for Mr. Meadows informed Chief Investigative Counsel for the Select Committee, Timothy J. Heaphy, of former President Trump's invocation of privilege on multiple occasions. *See, e.g.*, Decl. George J. Terwilliger III ¶ 5.

44. Counsel also enclosed this letter with his in his October 11, 2021 correspondence to White House Counsel Dana A. Remus, which was also sent to Heaphy. *See* First Am. Compl. Ex. C.

45. Rules of the House of Representatives provide that if a witness invokes a privilege during his deposition, the chair of a committee ultimately rules on whether or not to override the privilege and order the witness to answer. *See* 167 Cong. Rec. H41 (Jan. 4, 2021).

46. Mr. Meadows engaged in a months-long effort to try to reach an accommodation with the Select Committee concerning testimonial information Mr. Meadows could provide without being compelled to appear and/or unilaterally waiving claims by the former president of Executive Privilege . *See* First Am. Compl. Exs. B, D-K, M-R.

47.     Chairman Thompson on November 5, 2021 explained that Mr. Meadows would be questioned on sixteen "non-exclusive" topics. See First Am. Compl. Exs. A, ECF No. 13-3, G, ECF No. 13-9, & I, 13-11.

48.     For the purpose of this litigation, the Congressional Defendants have described a series of seven topics about which they seek Mr. Meadows's testimony. See Defs.' Mot. Summ. J., ECF No. 15 at 14-15.

49.     Very little, if any, of the information sought by the Select Committee is in Mr. Meadows's sole possession. For example, there were many individuals present for the Oval Office meeting discussed in the interview of Richard Donoghue, *see* Defs.' Mot. Summ. J. Ex. Q, ECF No. 15-18, and the meetings with members of Congress discussed during Cassidy Hutchinson's interview, *see* Defs.' Mot. Summ. J. Ex. P, ECF No. 15-17, some of whom have clearly already provided requested testimony to the Select Committee.

50.     Chairman Thompson twice rejected Mr. Meadows's offer to answer written interrogatories prior to or in lieu of testifying. *See* First Am. Compl. Exs. M, ECF No. 13-15, N, ECF No. 13-16, & T, ECF No. 13-22.

51.     Mr. Meadows and the Select Committee agreed that he would appear for a voluntary deposition on December 8, 2021 upon "certain preconditions," including that "Select Committee or its staff will in good faith limit the matters of inquiry and specific questions to that which it believes to be outside the scope of Executive Privilege" and that Mr. Meadows would have three business days to review any documents the Select Committee intended to question him about during the deposition. *See* First Am. Compl. Ex. O, ECF No. 13-17 (agreeing to appear for voluntary deposition upon certain preconditions); First Am. Compl. Ex. Q, ECF No. 13-19 (accepting Mr. Meadows's offer to appear).

52. As demanded by the Select Committee, Mr. Meadows produced more than 1,000 non-privileged emails and documents, as well as 2,319 text messages from his personal devices. *See* First Am. Compl. Exs. P, ECF No. 13-18, & R, ECF No. 13-20.

53. Mr. Meadows's counsel noted in the cover letter accompanying each production that the production was "not intended to waive any of Mr. Meadows's privileges or rights" and that "production of any privileged or otherwise protected information which is not responsive to the subpoena is unintentional, and we request the prompt return of any such information if identified or upon our request." First Am. Compl. Exs. P, ECF No. 13-18, & R, ECF No. 13-20.

54. This caveat was particularly critical—as the Select Committee was aware—given that Mr. Meadows's counsel was unable to accurately determine the privileged nature of all communications because neither Mr. Meadows nor counsel could not identify the sender and/or recipient associated with text messages correspondent phone numbers. *See* Decl. George J. Terwilliger III ¶ 6.

55. Counsel also requested that the produced materials be "treated as confidential and exempt from disclosure beyond the Select Committee." First Am. Compl. Exs. P, ECF No. 13-18, & R, ECF No. 13-20.

56. Mr. Meadows received a notification from Verizon the weekend before his scheduled deposition, explaining that the Select Committee had subpoenaed records from the personal cell phone he used during his tenure as Chief of Staff. *See* First Am. Compl. Ex. S, ECF No. 13-21.

57. The Verizon Subpoena demands certain data from Mr. Meadows's personal cell phone from October 1, 2020 to January 31, 2021, including the following:  Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile

Electronic Identity Numbers ("MEIN") Mobile Equipment Identifier ("MEID"), Mobile

Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber

Identifiers ("IMS!"), or International Mobile Equipment Identities ("IMEI") associated with the

accounts, "[o]ther subscriber numbers or identities (including temporarily assigned network

addresses and registration Internet Protocol ("IP") addresses)" and "[a]ll call, message (SMS &

MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone

Numbers, including all phone numbers, IP addresses, or devices that communicated with the

Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages,

voicemail, and data connections." First Am. Compl. Ex. S, ECF No. 13-21.

58.     After considering the Verizon subpoena, along with other actions the Select

Committee had recently undertaken, including a statement by Chairman Thompson that those

who plead the Fifth Amendment are "part and parcel guilty," Mr. Meadows through counsel

informed the Committee he could no longer voluntarily appear for a deposition. *See* First Am.

Compl. Ex. T, ECF No. 13-22.

59.     The day after Mr. Meadows so informed the Select Committee of this decision, he

filed this action. *See* Compl., ECF No. 1.

60.     During the floor debate in the House to refer Mr. Meadows for contempt of

Congress, Chairman Thompson accused Mr. Meadows of being "part of a coverup" of January 6.

167 Cong. Rec. H7785.

61.     Rep. Cheney read Mr. Meadows's private text messages aloud before making an

unmistakable accusation that Mr. Meadows knew former President Trump "through action or

inaction, corruptly sought to obstruct or impede Congress' official proceeding to count electoral votes." 167 Cong. Rec. H7786.

62. Rep. Lofgren also read Mr. Meadows's text messages on the House floor, 167 Cong. Rec. H7788, as did Reps. Schiff, *id.* at H7791, Aguilar, *id.,* and Luria, *id.* at H7792.

63. Since Mr. Meadows produced his personal communications to the Select Committee, it has disclosed or caused the disclosure to the news media a steady stream of his communications. *See, e.g.*, Aaron Blake, *The key texts between Mark Meadows, Mike Lee and Chip Roy*, Wash. Post (Apr. 15, 2022), https://www.washingtonpost.com/politics/2022/04/15/lee-roy-meadows-texts/; Ryan Nobles, et al., *CNN Exclusive: 'We control them all': Donald Trump Jr. texted Meadows ideas for overturning 2020 election before it was called*, CNN (Apr. 9, 2022), https://www.cnn.com/2022/04/08/politics/donald-trump-jr-meadows-text/index.html; Bob Woodward & Robert Costa, *Virginia Thomas urged White House chief to pursue unrelenting efforts to overturn the 2020 election, texts show*, Wash. Post (Mar. 24, 2022) https://www.washingtonpost.com/politics/2022/03/24/virginia-thomas-mark-meadows-texts/; Christina Prignano, *Read Sean Hannity's texts to Mark Meadows*, Boston Globe (Jan. 5, 2022), https://www.bostonglobe.com/2022/01/05/nation/read-sean-hannitys-texts-mark-meadows/.

64. On April 25, 2022, all of the 2,319 texts Meadows produced—no more and no less—were provided to CNN and publicly released. *See READ: Text messages Sean Hannity, Marjorie Taylor Greene, Ivanka Trump and others sent to Mark Meadows*, CNN (Apr. 25, 2022), https://www.cnn.com/2022/04/25/politics/read-mark-meadows-texts-sean-hannity-ivanka-trump-marjorie-taylor-greene/index.html.

65. Neither Mr. Meadows nor his counsel provided these texts to members of the press. *See* Decl. George J. Terwilliger III ¶ 8.

66.     House Rule XI, cl. 2(i) states, "[O]nly the chair or ranking minority member, after consultation with each other, may make public statements regarding matters before the committee or any subcommittee thereof."

67.     Though Defendants deny their involvement in this and the many preceding leaks of Mr. Meadows's documents, *see* Answer First Am. Compl., ECF No. 17 at ¶ 115, no member of the Select Committee has condemned the severe breaches of Mr. Meadows's private, confidential communications, aside from the fact that such leaks detract from the drama of the Select Committee's final report. *See* Peter Nicholas, *Avalanche of leaks imperils Jan. 6 committee's delivering on blockbuster hearings*, NBC News (May 1, 2022), https://www.nbcnews.com/politics/congress/avalanche-leaks-risks-jan-6-committee-delivering-blockbuster-hearings-rcna26549.


Dated: May 20, 2022                                   Respectfully submitted,
                                                      MARK R. MEADOWS
                                                      *By Counsel*

                                                      /s/ George J. Terwilliger III
                                                      George J. Terwilliger III
                                                      McGuireWoods LLP
                                                      888 16th Street NW, Suite 500
                                                      Washington, DC 20006
                                                      Phone: (202) 857-1700
                                                      Fax: (202) 857-1737
                                                      gterwilliger@mcguirewoods.com

                                                      Brooks H. Spears
                                                      McGuireWoods LLP
                                                      1750 Tysons Boulevard, Suite 1800
                                                      Tysons, VA 22102
                                                      Phone: (703) 712-5000
                                                      Fax: (703) 712-5050
                                                      bspears@mcguirewoods.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARK MEADOWS, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. 1:21CV3217 (CJN) |
| | ) |
| NANCY PELOSI, et al., | ) |
| | ) |
| *Defendants*. | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Mr. Meadows does not dispute the fact that a joint session of Congress convened in the U.S. Capitol to certify the vote count of the Electoral College on January 6, 2021. Mr. Meadows does not dispute that then-President Donald Trump spoke at the Stop the Steal rally that same day. And finally, Mr. Meadows does not dispute that some individuals who attended the rally went on to the U.S. Capitol that day. Mr. Meadows disputes any additional characterization in the Defendants' assertion that is not factual.

2.      Mr. Meadows does not dispute this assertion.

3.      a.[1] Mr. Meadows does not dispute these assertions.

3.      b. Mr. Meadows does not dispute this assertion. Section 2(a) states, "The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503, 117th Cong. (2021).

---

[1] Defendants' Statement of Undisputed Material Facts, ECF No. 15-28, listed two paragraphs as number 3. For ease of comparison, Plaintiff references those as "3a" and "3b." All other paragraph numbers should correspond accordingly.

4.     Mr. Meadows does not dispute these assertions.[2]

5.     Mr. Meadows disputes the assertions that Speaker Pelosi spoke with the Minority Leader, advised him on the referenced matter, and asked him to recommend two other Republicans. Mr. Meadows also disputes that the Minority Leader took any action "[r]ather than comply with that request." **Mr. Meadows seeks discovery on this and other disputed questions of fact.** The press release cited by the Defendants does not lend any support to their assertions that Speaker Pelosi spoke with the Minority Leader, advised him, and asked for further recommendations. Thus, Defendants have not "include[d] references to the parts of the record relied on to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A). Due to the Defendants' untimely motion for summary judgment and the lack of discovery thus far in this case, Mr. Meadows lacks the necessary "materials in the record" in support of its opposition. *See* Fed. R. Civ. P. 56(c)(1)(A). It is for this reason that Mr. Meadows has moved pursuant to Federal Rule of Civil Procedure 56(d) for the court to defer decision on Defendants' motion for summary judgment until necessary discovery has been conducted.

Mr. Meadows does not dispute the remaining cited actions by the Minority Leader.

---

[2] To the extent Defendants include multiple factual assertions in violation of ¶ 10(a) of the Standing Order, ECF No. 4, Plaintiff will attempt to separate and respond to each discrete allegation. If necessary citation is made to only one allegation within the numbered paragraph, Plaintiff will assume it was intended to lend support to all allegations within the paragraph.

6.     Mr. Meadows does not dispute that the Minority Leader declined to make further recommendations. But Mr. Meadows does dispute that Speaker Pelosi "interpreted House Resolution 503 and the relevant House Rules, and determined a course of action under House Resolution 503 and the House Rules." **Mr. Meadows seeks discovery on this and other disputed questions of fact.** Neither the Congressional Record nor the Amended Complaint cited by Defendants lend support to those facts. Defendants have not "include[d] references to the parts of the record relied on to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A). Due to the Defendants' untimely motion for summary judgment and the lack of discovery thus far in this case, Mr. Meadows lacks the necessary "materials in the record" in support of its opposition. *See* Fed. R. Civ. P. 56(c)(1)(A). It is for this reason that Mr. Meadows has moved pursuant to Federal Rule of Civil Procedure 56(d) for the court to defer decision on Defendants' motion for summary judgment until necessary discovery has been conducted.

Mr. Meadows does not dispute the fact that Speaker Pelosi named an additional Republican to the Select Committee.

7.     Mr. Meadows does not dispute that House Rule XI, cl. 2(h) and House Resolution 503 § 5(c)(3) provide requirements for a quorum. However Mr. Meadows disputes that these materials support any assertion about Speaker Pelosi's state of mind when she appointed nine Members to the Select Committee. **Mr. Meadows seeks discovery on this and other disputed questions of fact.** Defendants have not "include[d] references to the parts of the record relied on

to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A).Due to the Defendants' untimely motion for summary judgment and the lack of discovery thus far in this case, Mr. Meadows lacks the necessary "materials in the record" in support of its opposition. *See* Fed. R. Civ. P. 56(c)(1)(A). It is for this reason that Mr. Meadows has moved pursuant to Federal Rule of Civil Procedure 56(d) for the court to defer decision on Defendants' motion for summary judgment until necessary discovery has been conducted.

8.      Mr. Meadows does not dispute these assertions. But Mr. Meadows does dispute that these actions by the Select Committee are relevant, much less material, to the Defendants' motion for summary judgment, given that Mr. Meadows is not challenging these actions.

9.      Mr. Meadows does not dispute that the Select Committee issued him a subpoena on September 23, 2021 for deposition testimony and documentation. Mr. Meadows disputes that the testimony and documents demanded in the subpoena are limited to "the events of January 6, 2021, and the facts and circumstances that led to the violent attack on the Capitol that day." *See, e.g.*, Am. Compl., Ex. A, ECF No. 13-3 at 6-7 ("From November 3, 2020, to January 20, 2021, all documents and communications reporting, summarizing, or detailing the voting returns and election results of the 2020 Presidential election.").

10.     Mr. Meadows does not dispute this assertion.

11.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

12.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

13.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

14.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

15.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content. However, Mr. Meadows disputes that this assertion is relevant, much less material, to the Defendants' motion for summary judgment.

16.     Mr. Meadows does not dispute that Defendants selectively quote a letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content.

17.     Mr. Meadows does not dispute that Defendants are characterizing documents and a privilege log from Mr. Meadows. Mr. Meadows states the documents speak for themselves,

refers to them for their full and complete contents, and disputes any assertion Defendants make that are inconsistent with the content therein.

18.     Mr. Meadows does not dispute that Defendants are characterizing the referenced privilege log. Mr. Meadows states the document speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content. Further, Mr. Meadows disputes that he identified *any* emails "he initiated or participated in based on his role in the Trump campaign with people reported to be members of the Trump campaign legal team or other Trump campaign staff." *See* Am. Compl. Ex. E, ECF No. 13-7. The Defendants' cited documents also do not support this assertion. Thus, Defendants have not "include[d] references to the parts of the record relied on to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A).

Mr. Meadows disputes the distinction Defendants attempt to draw between actions Mr. Meadows took as Chief of Staff to the President and those he took to reelect the President. *See* Decl. George J. Terwilliger III ¶ 7.

Mr. Meadows does not dispute that he communicated with the state election official Defendants cited. In support of Defendants' many other assertions about Mr. Meadows's actions, they have made no other "reference[] to the parts of the record relied on to support the statement[s]," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A). Plaintiff therefore disputes these unsupported assertions.

19. Mr. Meadows does not dispute that Defendants are characterizing the referenced privilege log. Mr. Meadows states the document speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content. Further, the document cited by the Defendants does not indicate which parties the Defendants claim are "lawyers acting for the campaign" or "other campaign staff."

20. Mr. Meadows does not dispute that Defendants are characterizing a December 7, 2021[3] letter. Mr. Meadows states the letter speaks for itself, refers to it for its full and complete contents, and disputes any assertion Defendants make that are inconsistent with its content. Mr. Meadows does not dispute that he agreed to appear for a deposition on December 8, 2021 upon certain conditions. *See* Am. Compl. Ex. O, ECF No. 13-17. Mr. Meadows does not dispute that he filed this suit, and he does not dispute that he did not appear before or provide testimony to the Select Committee.

Mr. Meadows disputes that he had a "change of heart." Mr. Meadows has stated that it was Defendants' actions that caused Mr. Meadows to decline to appear for a deposition. *See* Am. Compl. ¶ 111.

21. Mr. Meadows does not dispute that the House voted to hold him in contempt and that members of the House made such arguments on the floor. Mr. Meadows also does not dispute that the Rules Committee and full House adopted the Select Committee's contempt

---

[3] Defendants appear to have inadvertently stated that Plaintiff communicated with the Select Committee on December 7, 2022. This communication occurred on December 7, *2021*.

report. Mr. Meadows does dispute that these assertions are accurate, complete, or relevant, much less material, to the Defendants' motion for summary judgment.

Mr. Meadows does not dispute that the contempt report makes the referenced assertion. Mr. Meadows does dispute that he and the Select Committee agree upon any "indisputably non-privileged testimony." *See* Am. Compl. Ex. T, ECF No. 13-22 ("[F]rom the information supplied to us last Friday – upon which Mr. Meadows could expect to be questioned[,] . . . the Select Committee has no intention of respecting boundaries concerning Executive Privilege.").

22.     Mr. Meadows does not dispute that he has not testified before the Select Committee. Mr. Meadows again disputes that he and the Select Committee agree on the scope of "non-privileged information." *See* Am. Compl. Ex. T, ECF No. 13-22.

23.     Mr. Meadows does not dispute the assertion that the Verizon subpoena demands "subscriber information and cell phone data associated with Mr. Meadows's personal cell phone number." Mr. Meadows disputes that the subpoena does not demand the content of communications and geo-location data. On its face, the Verizon subpoena fails to support Defendants' assertion. Defendants also cite nothing to support the fact that Verizon has not produced any subpoenaed information and that Verizon will not do so "absent a ruling from this Court." **Mr. Meadows seeks discovery on these and other disputed questions of fact.** Thus, Defendants have not "include[d] references to the parts of the record relied on to support the statement[s]," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A). Due to the Defendants' untimely motion for summary judgment and the

lack of discovery thus far in this case, Mr. Meadows lacks the necessary "materials in the record" in support of its opposition. *See* Fed. R. Civ. P. 56(c)(1)(A). It is for this reason that Mr. Meadows has moved pursuant to Federal Rule of Civil Procedure 56(d) for the court to defer decision on Defendants' motion for summary judgment until necessary discovery has been conducted.

24.     Mr. Meadows does not dispute this assertion. Mr. Meadows does dispute that this assertion is relevant, much less material, to the Defendants' motion for summary judgment.

25.     Mr. Meadows does not dispute this assertion. Mr. Meadows does dispute that this assertion is relevant, much less material, to the Defendants' motion for summary judgment.

26.     The statement Defendants cite here fails to support their assertion. Thus, Defendants have not "include[d] references to the parts of the record relied on to support the statement," a violation of Local Civil Rule 7(h)(1). Nor do they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," a violation of Federal Rule of Civil Procedure 56(c)(1)(A). Nonetheless, Mr. Meadows also disputes that the assertion is relevant, much less material, to the Defendants' motion for summary judgment.

27.     Mr. Meadows does not dispute that his book discloses some conversations he had with former President Trump. Mr. Meadows does dispute that the assertion is relevant, much less material, to the Defendants' motion for summary judgment.

28.     Mr. Meadows does not dispute that his book discloses some of his views and observations of events that occurred on January 6. Mr. Meadows does dispute that the assertion is relevant, much less material, to the Defendants' motion for summary judgment.

29.     Mr. Meadows does not dispute that he undertook efforts to reelect then-President Trump. Mr. Meadows again disputes the distinction Defendants attempt to draw between actions Mr. Meadows took as Chief of Staff to the President and those he took to reelect the President. *See* Decl. George J. Terwilliger III ¶ 7.

Dated: May 20, 2022                          Respectfully submitted,
                                             MARK R. MEADOWS
                                             *By Counsel*

                                             /s/ George J. Terwilliger III
                                             George J. Terwilliger III
                                             MCGUIREWOODS LLP
                                             888 16th Street NW, Suite 500
                                             Washington, DC 20006
                                             Phone: (202) 857-1700
                                             Fax: (202) 857-1737
                                             gterwilliger@mcguirewoods.com

                                             Brooks H. Spears
                                             MCGUIREWOODS LLP
                                             1750 Tysons Boulevard, Suite 1800
                                             Tysons, VA 22102
                                             Phone: (703) 712-5000
                                             Fax: (703) 712-5050
                                             bspears@mcguirewoods.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
|  | ) | |

## <u>DECLARATION OF GEORGE J. TERWILLIGER III</u>

I, George J. Terwilliger III, pursuant to 28 U.S.C. § 1746, and Federal Rule of Civil Procedure 56(c)(4), declare as follows:

1.  I am over the age of 18 and competent to testify in this matter.

2.  I have personal knowledge about the matters stated in this Declaration.

3.  I am an attorney with the law firm of McGuireWoods LLP, and we represent Plaintiff Mark Meadows in the above-captioned matter.

4.  Based on public reporting, the Select Committee has received from the National Archives and Records Administration one or more documents relating to Mr. Meadows that constitute records created during his tenure as the Chief of Staff for President Trump.

5.  During an October 20, 2021 telephone call, I conveyed to counsel for the Select Committee the fact that former President Trump had instructed Mr. Meadows not to testify and to invoke privileges.

6.  During a November 29, 2021 telephone call with counsel for the Select Committee, counsel for Mr. Meadows explained that we had no access to Mr. Meadows's complete contact list in order for us to meaningfully review his text messages for appropriate privileges.

7.      Upon information, belief, and personal experience, every chief of staff serving a President in the modern era may undertake—and most have undertaken—as part of their duties communicating and deliberating on political matters with the President whom they serve.

8.      To the best of my knowledge and belief, no one who serves as counsel to Mr. Meadows in this matter provided any of Mr. Meadows's private text messages for publication to the press.

9.      Attached hereto as Exhibit A is a true and accurate copy of the October 6, 2021 letter sent by Justin R. Clark, counsel to former President Trump, to Scott Gast, counsel to Mr. Meadows.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this, the 20th day of May, 2022.

/s/ George J. Terwilliger III
George J. Terwilliger III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

# EXHIBIT A

# Elections, LLC

**Attorneys at Law**
**Justin R. Clark**
**E** Justin.Clark@ElectionLawLLC.com

October 6, 2021

Mr. Scott Gast
Compass Legal Services
300 Independence Avenue, SE
Washington, D.C. 20003
sgast@compasslegal.org

Dear Mr. Gast:

I write in reference to a subpoena, dated September 23, 2021, by the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"), that was issued to your client Mark R. Meadows (the "Subpoena"). The Subpoena requests that Mr. Meadows produce documents by October 7, 2021, and appear for a deposition on October 15, 2021. While it is obvious that the Select Committee's obsession with President Trump is merely a partisan attempt to distract from the disastrous Biden administration (*e.g.*, the embarrassing withdrawal from Afghanistan, the overwhelming flood of illegal immigrants crossing our southern border, and growing inflation), President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch.

Through the Subpoena, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is unquestionably protected from disclosure by the executive and other privileges, including among others the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court. Furthermore, President Trump believes that Mr. Meadows is immune from compelled congressional testimony on matters related to his official responsibilities. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. (May 20, 2019), *available at* https://www.justice.gov/olc/opinions-main.

Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Meadows to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning his official duties in response to the Subpoena; and (c) not provide any testimony concerning his official duties in response to the Subpoena.

Page 2

Thank you for your attention to this matter.  Please do not hesitate to contact me if you have any questions or would like to discuss.

Sincerely,

Justin Clark
*Counsel to President Trump*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

                    )

MARK MEADOWS,           )

                    )

        _Plaintiff_,        )

                    )

      v.              )     Case No. 1:21CV3217 (CJN)

                    )

NANCY PELOSI, et al.,     )

                    )

        _Defendants_.    )

_____)

**[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON
THE PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT,
AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On April 22, 2022, Defendants moved for summary judgment pursuant to Fed. R. Civ. P.

56(a). On April 29, 2022, Plaintiff moved to deny without prejudice or defer a ruling on

Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(d). Then, on May 20,

2022, Plaintiff moved for judgment as a matter of law under Fed. R. Civ. P. 12(c), or in the

alternative, for summary judgment under Fed. R. Civ. P. 56(a). Having considered the parties'

briefing and evidence, as well as the argument of counsel, the Court:

[PRIMARY OPTION]

GRANTS Plaintiff's motion for judgment on the pleadings, or in the alternative, for

summary judgment and DENIES Defendants' motion for summary judgment for the reasons stated

at the hearing and in any memorandum opinion. The Court ENTERS judgment as a matter of law

for Plaintiff and against Defendants by declaring as follows:

1. The Meadows Subpoena and the Verizon Subpoena (as those terms are defined in the

    Amended Complaint) are ultra vires, unlawful, and unenforceable;

2. The Meadows Subpoena and the Verizon Subpoena serve no valid legislative purpose and exceed the Select Committee's Constitutional authority;

3. The Meadows Subpoena unconstitutionally compels testimony of a senior executive official and is therefore null, void, and unenforceable; and

4. Plaintiff properly resisted the Meadows and Verizon Subpoenas because they required testimony about matters subject to former President Trump's claim of executive privilege.

In light of the above rulings, the Court also DENIES AS MOOT Plaintiff's pending motion filed pursuant to Fed. R. Civ. P. 56(d).

It is so ORDERED.

## [ALTERNATIVE OPTION]

DENIES Defendants' motion for summary judgment, DENIES Plaintiff's motion for judgment on the pleadings, or in the alternative, for summary judgment, and GRANTS Plaintiff's motion filed pursuant to Fed. R. Civ. P. 56(d) for the reasons stated at the hearing an in any memorandum opinion.

It is so ORDERED.


_____                    _____
DATED                                               THE HON. CARL J. NICHOLS
                                                    U.S. DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MARK MEADOWS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:21CV3217 (CJN) |
| | ) | |
| NANCY PELOSI, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE
PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 9

I.     TESTIMONIAL IMMUNITY PROTECTS FORMER CHIEF OF STAFF
       MEADOWS FROM CONGRESSIONAL COMPULSION TO TESTIFY
       ABOUT HIS WHITE HOUSE SERVICE. ...................................................................... 9

       A.     Testimonial Immunity Is Squarely Rooted in the Separation of Powers and
              Is Directly at Issue in this Case........................................................................ 10

       B.     The Congressional Defendants' Post Hoc Litigation Effort to Narrow
              Their Inquiry Bolsters, Rather than Undermines, Mr. Meadows's Claims. ........ 16

II.    THE SELECT COMMITTEE DID NOT HAVE A VALID LEGISLATIVE
       PURPOSE FOR THE SUBPOENAS. ............................................................................ 20

III.   THE SUBPOENAS WERE NOT VALIDLY ISSUED. ................................................. 23

       A.     Select Committee's failure to adhere to H. Res. 503 is legally cognizable. ........ 23

       B.     The Select Committee's subpoenas were not issued in compliance with H.
              Res. 503 due to failed composition.................................................................... 27

       C.     The Select Committee's subpoenas were not issued in compliance with H.
              Res. 503 due to lack of consultation with a ranking minority member. ............. 28

IV.    THE CONGRESSIONAL DEFENDANTS' PROCEDURAL ARGUMENTS
       ARE ALSO UNAVAILING........................................................................................ 32

       A.     The recent developments in the RNC litigation show that the
              Congressional Defendants' rush to summary judgment in this case was
              misguided and unsupported. ............................................................................. 32

       B.     The Congressional Defendants have not identified defects in Mr.
              Meadows's statement of facts, and any material factual disputes would
              only support his still-pending Rule 56(d) motion. .............................................. 33

       C.     The Congressional Defendants improperly use their reply to claim new
              grounds for seeking summary judgment.............................................................. 37

CONCLUSION.................................................................................................................. 39

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Baker v. Conroy,*
    921 F.3d 1118 (D.C. Cir. 2019) ......................................................................26

*Bloche v. Dep't of Def.,*
    414 F. Supp. 3d 6 (D.D.C. 2019) ..................................................................38

*Bush v. Lucas,*
    462 U.S. 367 (1983) ......................................................................................39

*Carpenter v. United States,*
    138 S. Ct. 2206 (2018) ..................................................................................38

\* *Christoffel v. United States,*
    338 U.S. 84 (1949) ....................................................2, 24, 25, 26, 27, 28

*Clinton v. Jones,*
    520 U.S. 681 (1997) ......................................................................................14

*Comm. on Judiciary, U.S.H.R. v. McGahn,*
    415 F. Supp. 3d 148 (D.D.C. 2019) ........................................................12, 13

*Comm. on Judiciary, U.S.H.R. v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008) ......................................................12, 13, 23

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ..................................................................................22

*Eastland v. United States Servicemen's Fund,*
    421 U.S. 491 (1975) ......................................................................................38

*English v. Trump*
    279 F. Supp. 3d 307, 323 (D.D.C. 2018) ..................................................27

*Firth Sterling Steel Co. v. Bethlehem Steel Co.,*
    199 F. 353 (E.D. Pa. 1912) ........................................................................15

*Gravel v. United States,*
    408 U.S. 606 (1972) ......................................................................................14

*In re Grove,*
    180 F. 62 (3d Cir. 1910) ..............................................................................15

*Kalka v. Hawk,*
    215 F.3d 90 (D.C. Cir. 2000) ........................................................................1

*Liveright v. United States*,
    347 F.2d 473 (D.C. Cir. 1965) ..................................................................................2, 24, 31

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ..............................................................................................................27

*Morrison v. Olson*,
    487 U.S. 654 (1988) (Scalia, J., dissenting) ......................................................................13

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ..............................................................................................................15

*Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973) ............................................................................................12

*Quinn v. United States*,
    349 U.S. 155 (1955) ..............................................................................................................21

*Rangel v. Boehner*
    20 F. Supp. 3d 148 (D.D.C. 2013) ......................................................................................26

*Republican Nat'l Comm. v. Pelosi*,
    No. 22-5123 (D.C. Cir. 2022) ......................................................................6, 8, 21, 32, 33

*Republican Nat'l Comm. v. Pelosi*,
    No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022) ..........6, 16, 20, 32

*Shelby Cnty., Alabama v. Holder*,
    43 F. Supp. 3d 47 (D.D.C. 2014) ........................................................................................39

*Shelton v. United States*,
    327 F.2d 601 (D.C. Cir. 1963) ....................................................................1, 24, 25, 26, 31

*Sitka Sound Seafoods, Inc. v. NLRB*,
    206 F.3d 1175 (D.C. Cir. 2000) ..........................................................................................38

*Smith-Haynie v. D.C.*,
    155 F.3d 575 (D.C. Cir. 1998) ............................................................................................39

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ..............................................................................................11, 21, 22

*Trump v. Mazars USA, LLP*,
    940 F.3d 710 (D.C. Cir. 2019) ............................................................................................22

*Trump v. Thompson*,
    142 S. Ct. 680 (2022) ..................................................................................................5, 11, 12

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ................................................................3, 6, 15, 20

*United States v. Ballin*,
  144 U.S. 1 (1892) ..........................................................................................2

*United States v. Nixon*,
  418 U.S. 683 (1974) .................................................................................10, 11

*United States v. Reynolds*,
  345 U.S. 1 (1953) .........................................................................................15

*United States v. Rostenkowski*,
  59 F.3d 1291 (D.C. Cir. 1995) .................................................................7, 26, 28

*United States v. Smith*,
  286 U.S. 6 (1932) ...........................................................................................2

*Veg-Mix, Inc. v. U.S. Dep't of Agriculture*,
  832 F.2d 601 ................................................................................................35

*Watkins* v. *United States*,
  354 U.S. 178 (1957) .....................................................................................21

* *Yellin v. United States*,
  374 U.S. 109 (1963) .........................................................1, 23, 24, 25, 26, 27, 31

**Statutes**

* H. Res. 503, 117th Cong. (2021) ..................................................................... *passim*

**Other Authorities**

167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) ...............................................................13

Fed. R. Civ. P. 56(c) ...........................................................................................8, 37

Fed. R. Civ. P. 56(d) ...................................................................................8, 9, 33, 37

GOP H. Conf. R. 117th Cong. 14(e) .........................................................................30

H. Rep. No. 114-887 (2016) ...................................................................................30

*Hearing on S. 921 Before the Subcomm. on Constitutional Rights of the Senate
  Comm. on the Judiciary*, 85th Cong., 2d Sess., at 33–146 (1958) (statement of
  Att'y Gen. Rogers)............................................................................................10

*Immunity of the Assistant to the President & Director of the Office of Political Strategy and Outreach from Congressional Subpoena*,
38 Op. O.L.C 1 (2014) ................................................................................14

\* *Immunity of the Director of the Office of Political Strategy & Outreach*,
38 Op. O.L.C. 5 (2014) ..........................................................................13, 18

LCvR 7(h) .............................................................................................................8

Letter from Elliot S. Berke, counsel for House Republican Leader Kevin
McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate
the Jan. 6th Attack on the U.S. Capitol (May 27, 2022) ..........................30

Notice of Hearing, Select Comm. to Investigate the Jan. 6th Attack on the U.S.
Capitol, 117th Cong. (June 2, 2022) .........................................................7

*Presidential Department Descriptions*, The White House: President Barack
Obama,
https://obamawhitehouse.archives.gov/participate/internships/departments#:~:
text=The%20Office%20of%20Political%20Strategy,on%20behalf%20of%20t
he%20President (last visited June 1, 2022) ...........................................18

Press Release, Nancy Pelosi, Democratic Leader, U.S.H.R., *Pelosi Names
Democratic Members to House Select Committee on Benghazi* (May 21, 2014).............30, 31

R. Democratic Caucus 21(D)(1)(a), 117th Cong. (Jan. 14, 2021) ................................30

*Representative Charles B. Rangel*, Congress.gov .......................................................30

*Representative Sander M. Levin*, Congress.gov ........................................................30

*Testimonial Immunity Before Congress of the Former Counsel to the President*,
O.L.C. slip op., at \*4 (May 20, 2019) ....................................................16

## INTRODUCTION

No authoritative appellate court opinion has ever held that a senior aide to a President, or a President himself, can be compelled by Congress to appear and give testimony, let alone when there is claim of Executive Privilege.  In their briefing, the Congressional Defendants do not, because they cannot, dispute this fact.  Likewise, no court has ever held that a former President cannot claim Executive Privilege, or that any President, present or former, must personally communicate a claim of Executive Privilege to a congressional committee.  Nor can the Congressional Defendants identify any case holding that the current President may, as here, act unilaterally to vitiate a former President's claim of Executive Privilege as to testimonial evidence sought by Congress.  Thus, ripe for consideration in this case are these momentous issues of constitutional dimension as to which Mr. Meadows can properly seek declaratory judgment.

Even so, under the avoidance doctrine, where there is a non-constitutional issue before the Court that can resolve the matter without resort to the foregoing and related constitutional issues, the Court should resolve the matter on that basis if possible.  *See Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000) ("Federal courts should not decide constitutional questions unless it is necessary to do so."); *Shelton v. United States*, 327 F.2d 601, 605 (D.C. Cir. 1963) (applying constitutional avoidance to congressional subpoena challenge).  Doing so here would mean granting summary judgment in favor of Mr. Meadows based on the Select Committee's failure to satisfy its composition and consultation requirements (while necessarily denying summary judgment for the Congressional Defendants).   The Supreme Court and the D.C. Circuit have both ruled unmistakably that the courts are empowered to apply and enforce congressional rules that affect the rights of a congressional witness.  *See Yellin v. United States*, 374 U.S. 109, 114 (1963) ("It has been long settled, of course, that rules of Congress and its committees are judicially cognizable.

And a legislative committee has been held to observance of its rules, just as, more frequently, executive agencies have been.") (internal citations omitted).[1]

Here, Mr. Meadows has challenged the subpoena issued to him on the grounds that it was not issued in accordance with applicable congressional rules. The Congressional Defendants attempt to dismiss this issue as one of 'nitpicking titles' and maintain that it is off limits to judicial review pursuant to the Rulemaking Clause. ECF No. 35 at 29. Relevant authority is to the contrary. Under controlling Supreme Court precedent, the issue of whether the subpoenas to Mr. Meadows were validly issued and are thus enforceable is very much a question for the Court. Just as in *Christoffel v. United States*, "[t]he question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. ***The question is rather what rules the House has established and whether they have been followed***." 338 U.S. 84, 88–89 (1949) (emphasis added). As explained in detail below, the rules established for the Select Committee require that, for a deposition subpoena to issue, the Chair must consult with the Ranking Member. That rule was not followed because, as the Congressional Defendants have admitted (and as their dismissive "nitpicks the use of titles" comment confirms), ECF No. 35 at 24, the Select Committee has no designated Ranking Member. Thus, this non-constitutional issue is ripe for resolution and, under the Supreme Court and D.C.

---

[1] *See also Christoffel v. United States*, 338 U.S. 84, 88–90 (1949) (holding that validity of congressional subpoena turned on judicial determination of "what rules the House has established and whether they have been followed"); *United States v. Smith*, 286 U.S. 6, 33 (1932) (holding that, where "the construction to be given to [Senate] rules affects persons other than members of the Senate, the question presented is of necessity a judicial one"); *United States v. Ballin*, 144 U.S. 1 (1892) (interpreting and applying congressional rules to determine whether a bill was properly enacted); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965) (holding that Senate subcommittee's subpoena was invalid where it was authorized only by the subcommittee chairman, with limited consultation, and not by that entire subcommittee as required by Senate resolution).

Circuit decisions on point, results in judgment for Mr. Meadows that the subpoena in question was not validly issued and is unenforceable because its issuance was not in accord with the relevant requirements of the Select Committee and House rules. *See infra* Part III.

The Congressional Defendants' "nitpicking" characterization is also consistent with their summary judgment briefing's cavalier treatment and dismissive rhetoric regarding the important constitutional issues outlined above. Their claim of entitlement to summary judgment *in their favor* is belied by the obvious weaknesses and lack of persuasive force of the arguments they advance. In the world of their arguments, long on rhetoric but short on authority:

- they can "support, rather than undermine," the Separation of Powers by pursuing this clash with a former Executive official, *see* ECF No. 35 at 10;

- the D.C. Circuit's ruling in *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021)—on the propriety of a *different* subpoena *for records* controlled by the Presidential Records Act— gives them a legal cudgel to extinguish constitutional obstacles to their obtaining *testimony* here asserted by a former President to be subject to Executive Privilege, *see* ECF No. 35 at 18–19;

- the current President can waive the former President's privilege in the context of an obviously political controversy, such that the incumbent alone has the final word on a privilege that the Congressional Defendants admit exists for the benefit of the Republic— leaving nothing to review because the President and the House control the question, *see id.* at 32–33;

- it is irrelevant that Mr. Meadows supplied thousands of non-privileged documents, and that the Congressional Defendants rebuffed any efforts to find exactly the kind of accommodation viewed by the Supreme Court favorably to resolve these issues, clearing

the way by their aim for him to be prosecuted for contempt of Congress and sent to prison, *see id.* at 11;

- finally and most pointedly perhaps, the Congressional Defendants maintain that Mr. Meadows cannot waive Executive Privilege yet somehow, at the same time, he is not competent to assert it either, *see id.* at 32, leaving him in exactly the legal no-man's land that justifies his coming to this Court asking it to "say what the law is," ECF No. 13 ¶ 6.

In sum, the Congressional Defendants' claimed highway to summary judgment is riddled with legal potholes, speed bumps, and dead-ends all together desperately lacking in authority or persuasion.

Fortunately for Mr. Meadows, and for the sound functioning of American government, our Constitution and laws do not give Congress the authority to demand whatever they wish and to ignore all constitutional principles that apply to their quest. To the contrary, it is well established that, when a congressional committee seeks to use the implied constitutional authority to compel testimony, it must respect the Separation of Powers; it must do so only in pursuit of a valid legislative purpose (and not for the purpose of generating publicity or pursuing law enforcement); and it must follow the rules associated with the delegation on which its claimed subpoena authority relies. Given its dismissive treatment of these legal guardrails in its brief, it is not surprising that the Congressional Defendants have overstepped them on the undisputed factual record.

\*       \*       \*

There are three straightforward grounds on which Mr. Meadows is entitled to relief, which would necessarily result in the Defendants' Summary Judgment motion being denied and Meadows motion being granted:

*First*, the Court should hold that, as a former Chief of Staff to then-President Trump, Mr. Meadows is immune from the Select Committee's effort to compel him to testify about his service in that role. The Congressional Defendants do not and cannot dispute that no appellate precedent (from any Court of Appeals or from the Supreme Court) has ever held that a President's senior aide—or a President himself—can be compelled by Congress to appear and give testimony. Nor does any such opinion hold, as the Congressional Defendants suggest, *see* ECF No. 35 at 32–33, that a former President cannot assert privilege or immunity, or that a President must personally communicate an assertion of privilege to a congressional committee. Thus, at a minimum, these are open questions on important constitutional issues that merit judicial consideration and intervention.

But more than that, the soundest legal conclusions are that testimonial immunity does protect a former White House Chief of Staff like Mr. Meadows, as bipartisan Attorney General and OLC opinions have concluded; and that Separation of Powers concerns continue to require the protection of former President Trump and his most senior aide, even if the incumbent President does not support the assertion of privilege, as Justice Kavanaugh recently explained in his concurrence as to the denial of *certiorari* in *Trump v. Thompson*, 142 S. Ct. 680, 680–81 (2022) (Mem.) (statement of Kavanaugh, J., respecting denial of application). And while the Congressional Defendants try to sidestep these important constitutional issues through a *post hoc* litigation effort to limit their subpoenas to "campaign activit[y]" supposedly outside his White House role, *see* ECF No. 35 at 20–22, that effort fails on both the facts and on the law. *See infra* Part I.A.

Mr. Meadows is therefore entitled to declaratory relief based on testimonial immunity rooted in the constitutional Separation of Powers.

*Second*, the Court should also hold that the Select Committee has not met its burden of establishing a valid legislative purpose to support its subpoenas directed at Mr. Meadows. In opposition, the Congressional Defendants rely on the D.C. Circuit's opinion in *Thompson*, 20 F.4th 10, and on Judge Kelly's recent ruling in *Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022). But *Thompson* was about a very different case than this one and does not give the Select Committee the license it would take to avoid establishing that a valid legislative purpose underlies the particular subpoenas at issue in this case. The D.C. Circuit has granted the RNC injunctive relief pending its review of Judge Kelly's decision, a ruling that necessarily is based on its conclusion that the RNC is likely to succeed on the merits of its appeal. *See* Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022).

Indeed, the Congressional Defendants' opposition brief further confirms what Mr. Meadows has argued from the beginning: that the Select Committee is improperly pursuing the off-limits purposes of publicity and law enforcement, rather than a valid legislative purpose, in targeting Mr. Meadows. The Congressional Defendants claim that they need Mr. Meadows's testimony in furtherance of their "task to determine the facts, circumstances, and causes related to the January 6th attack." ECF No. 35 at 24. But that is not a legislative purpose at all. The Congressional Defendants make no attempt to identify a single piece of draft legislation—or even a hypothetical bill—that would be better informed by Mr. Meadows's testimony. This only bolsters the conclusion, which was already obvious from the undisputed facts, that the Select Committee's goal is to gather information to make it public and/or for law enforcement purposes.[2]

---

[2] If anything, as Meadows's Amended Complaint avers and the still growing public record shows, the Select Committee is deeply engaged in the non-legislative purposes of exposure for the sake of exposure and/or in support of law enforcement, such as with its announced plans for several

Mr. Meadows is thus entitled to declaratory relief that the subpoenas are unenforceable for want of a valid legislative purpose.

*Third*, the Court should hold that the subpoenas are invalidly issued because the Select Committee is not compliant with the composition or consultation requirements of H. Res. 503. Indeed, this ground provides a narrow basis for invalidating the subpoenas that would allow the Court to avoid resolving the constitutional questions raised by testimonial immunity and legislative purpose.

While the Congressional Defendants make an effort to argue that the Court must take their word for it under the Rulemaking Clause, *see* ECF No. 35 at 26–29, they also cite *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), where the D.C. Circuit *rejected* the notion that House procedures are unreviewable and emphasized that "under Article III of the Constitution the courts are the final arbiters of the law and may not shirk their duty to interpret the law." *Id.* at 1306. Under *Rostenkowski*, in a separation of powers dispute over criminal prosecution of a Member of Congress for allegedly violating House rules, the interpretation of a House rule may be non-justiciable if it is genuinely ambiguous. *Id.* But in this case there is nothing ambiguous about H. Res. 503's direction that the Select Committee "shall" have 13 members, or the rule's requirement that a subpoena to appear for a deposition may only issue by the Chair after consultation with the Select Committee's "Ranking Member" (of which there is none). Not only may the Court apply the rules established for the Select Committee, it must do so.

---

days or prime time televised hearings. *See, e.g.,* Notice of Hearing, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, 117th Cong. (June 2, 2022), https://docs.house.gov/meetings/IJ/IJ00/20220609/114870/HHRG-117-IJ00-20220609-SD001.pdf. If he is not entitled to summary judgment now on this issue, Mr. Meadows is at the very least entitled to the discovery the civil process affords to fully develop this record.

Mr. Meadows is entitled to declaratory relief that the subpoenas are unenforceable based on these failures to comply with H. Res. 503.

The Congressional Defendants try to resist these straightforward grounds for granting relief to Mr. Meadows by claiming that he has failed to comply with Fed. R. Civ. P. 56(c) and LCvR 7(h).  *See* ECF No. 35 at 7–10.  But that argument misstates the record and misconstrues the grounds for relief favoring Mr. Meadows.  And just as importantly, it proves too little asking for too much.  Even if the Court were to agree with the Congressional Defendants that Mr. Meadows has not yet developed a sufficient record of admissible evidence to support summary judgment in his favor, the proper course would be to grant Mr. Meadows's still-pending Fed. R. Civ. P. 56(d) motion to allow him a meaningful opportunity to pursue discovery.

Indeed, the most recent developments in the *RNC* litigation demonstrate that the Congressional Defendants' rush to judgment here is misguided and unsupported.  There, as here, the Congressional Defendants claimed a pressing need for quick resolution ahead of scheduled "primetime" congressional hearings.  But after the RNC appealed and the D.C. Circuit issued an injunction pending appeal, the Congressional Defendants suddenly lost their appetite for expediting proceedings and pursued a motion to defer the D.C. Circuit's consideration of that case. *See* Mot. Postponement Br. & Oral Arg., *RNC v. Pelosi*, No. 22-5123 (D.C. Cir. May 29, 2022). The Court should not countenance such transparent gamesmanship and false claims of a need for haste by rushing past a plaintiff's entitlement to discovery where needed.  Indeed, that course would be all the more appropriate here because, unlike in other pending cases, the Congressional Defendants have waived any assertion of immunity under the Speech or Debate Clause since they have twice answered Mr. Meadows's complaints without asserting it.

Finally, it is important to note that the Congressional Defendants have improperly attempted to raise new grounds for summary judgment in *their* favor as part of their reply brief (which was understandably combined with their opposition to Mr. Meadows's own motion). *See infra* Part IV.C. But it is well established that such arguments are forfeited.

*     *     *

The Court thus has three distinct grounds on which it may grant judgment in Mr. Meadows's favor—testimonial immunity, valid legislative purpose, or compliance with H. Res. 503. The first two raise important constitutional questions about the Separation of Powers and Congress's implied subpoena authority, and the third involves a narrower ground that might avoid the need to resolve those issues. And if the Court should conclude that disputed facts bear on these issues, then it already has pending Mr. Meadow's Rule 56(d) motion to proceed to discovery.

**ARGUMENT**

## I. Testimonial Immunity Protects Former Chief of Staff Meadows from Congressional Compulsion to Testify About His White House Service.

The Congressional Defendants try to create the impression that Mr. Meadow's assertion of testimonial immunity is foreclosed by precedent. But it simply is not. Only two non-binding district court opinions have ever addressed the issue, and as Mr. Meadows previously explained, *see* ECF No. 29-1 at 30–33, neither opinion persuasively makes the case against testimonial immunity in these circumstances. Unable to gloss over the immunity issue, the Congressional Defendants also try to argue *around* it by questioning whether it was ever properly asserted and through a *post hoc* litigation effort to narrow the scope of their subpoenas to allegedly non-official topics. *See* ECF No. 35 at 30–31. But those efforts fail as well.

A. **Testimonial Immunity Is Squarely Rooted in the Separation of Powers and Is Directly at Issue in this Case.**

The doctrine of testimonial immunity against congressional subpoenas for senior Presidential aides is not something that bipartisan Attorneys General and the Office of Legal Counsel made up from whole cloth. The notion that Presidential advisors and their papers enjoy constitutional protection dates back to the Nation's first President. *See generally Hearing on S. 921 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 85th Cong., 2d Sess., at 33–146 (1958) (statement of Att'y Gen. Rogers). One of the many concerning features of government under the Articles of Confederation that our Founders rejected in adopting our Constitution was unfettered access by the Continental Congress to records of core executive functions, such as foreign affairs. *See id.* at 36–37. When a congressional committee tried to investigate President Washington's Administration for its handling of "a military expedition led by General St. Clair under the direction of the Secretary of War," President Washington announced clear limits on his Administration's cooperation—including that "neither the committee nor House had a right to call on the head of a department, who and whose papers were under the President alone." *Id.* at 37. Thus, while many of the earliest disputes focused on production of documents rather than testimony—almost certainly because both branches viewed document production as a *less intrusive* accommodation—and thus on principles of Executive Privilege, it is equally clear that the same principles were understood to prevent Congress from compelling testimony from senior executive officials "who . . . were under the President alone." *Id.*

At least since the 1970s, when the Supreme Court was required to resolve interbranch disputes of executive privilege, federal courts have time and again endorsed the need for Executive Privilege and related protections not only to promote the President's informed and efficient decision-making, but also to preserve the Separation of Powers. *See, e.g.*, *United States v. Nixon*,

418 U.S. 683, 704–05 (1974); *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020). Mr.

Meadows is uniquely situated even among executive officials. As former White House Chief of

Staff, Mr. Meadows served as the most trusted official advisor to the President of the United States.

He participated in some of the President's most delicate conversations, gave candid advice during

the President's most private deliberations, and was privy to the innermost operations of the

Executive Office. The documents and communications of such an advisor enjoy constitutional

protections because, as the Supreme Court has noted, "[h]uman experience teaches that those who

expect public dissemination of their remarks may well temper candor with a concern for

appearances and for their own interests to the detriment of the decision-making process." *Nixon*,

418 U.S. at 705.

As Justice Kavanaugh has explained in the context of the Presidential communications

privilege (which is a particular species of Executive Privilege closely related to testimonial

immunity), the same protection must continue to apply after a President's tenure ends, even if the

new President disagrees. *See Trump v. Thompson*, 142 S. Ct. 680, 680–81 (2022) (Mem.)

(statement of Kavanaugh, J., respecting denial of application).

> By protecting the confidentiality of . . . internal communications, the Presidential
> communications privilege facilitates candid advice and deliberations, and it leads
> to more informed and better Presidential decisionmaking. . . . [B]y way of historical
> example, . . . the Constitutional Convention was conducted in complete privacy and
> . . . the records of the Convention remained confidential for more than 30 years. As
> was true at the Constitutional Convention, the Presidential communications
> privilege cannot fulfill its critical constitutional function unless Presidents and their
> advisers can be confident in the present and future confidentiality of their advice.
> If Presidents and their advisers thought that the privilege's protections would
> terminate at the end of the Presidency and that their privileged communications
> could be disclosed when the President left office (or were subject to the absolute
> control of a subsequent President who could be a political opponent of a former
> President), the consequences for the Presidency would be severe. Without
> sufficient assurances of continuing confidentiality, Presidents and their advisers
> would be chilled from engaging in the full and frank deliberations upon which
> effective discharge of the President's duties depends.

*Id.* at 681 (quotation omitted).

The Congressional Defendants dismiss without evaluation the Justice's statement as lacking the "force of law," ECF No. 35 at 33; yet what the statement has is the force of reason, logic and common sense. The Congressional Defendants would have the Court breeze past that and all the authority underlying learned OLC opinions, boldly asserting that their position to strip Mr. Meadows (and thus former President Trump) of these core constitutional protections "support[s], rather than undermine[s]" the Separation of Powers. *Id.* at 10. But they are simply wrong.

The Congressional Defendants renew their reliance on *Miers* and *McGahn* and assert, as if wishing would make it so, that those decisions "thoroughly addressed—and persuasively rejected—" Mr. Meadow's arguments about testimonial immunity. *See id.* at 13. But they then cite Judge Bates's discussion of a strawman argument that recognizing testimonial immunity would allow a President to "deny access to all documents in all the Executive departments to all citizens and their representatives, *including Congress.*" *Id.* (quoting *Comm. on Judiciary, U.S.H.R. v. Miers*, 558 F. Supp. 2d 53, 103 (D.D.C. 2008)). That passage from *Miers* was quoting *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973), which held that a grand jury subpoena overcame Executive Privilege over documents; it of course had nothing to say about testimonial immunity, and it shows that the quoted language came in the context of deciding whether constitutional protection for the President's information had been *overcome* in a criminal context, where under the relevant precedent the justification for production is far different and, not whether it existed in the first place. Additionally, the Separation of Powers discussion in *McGahn* that they cite, *see* ECF No. 35 at 9 (citing *Comm. on Judiciary, U.S.H.R. v. McGahn*, 415 F. Supp. 3d 148, 212 (D.D.C. 2019), Judge Jackson opines without any citation or support that "the public spectacle of haling current

and former advisors to a sitting President before a committee of Congress" is not a Separation of Powers concern because "the power of inquiry resides with the Legislature." 415 F. Supp. 3d at 212 (cleaned up). That conclusion is at the very least grandly overstated, if not just downright erroneous. Article I of the Constitution conspicuously fails to enumerate any legislative "power of inquiry," and indeed, under our Constitution, the authority to investigate, and where appropriate to prosecute, past wrongdoing is quintessentially an Executive prerogative. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) (explaining that law enforcement is a governmental function which "has always and everywhere—if conducted by government at all— been conducted never by the legislature, never by the courts, and always by the executive"). The *McGahn* decision's reasoning is unpersuasive and offers the Court the thinnest of reeds upon which to rule on a fundamental constitutional question.

Moreover, neither *Miers*, nor *McGahn*, nor the Congressional Defendants' own brief addresses the important constitutional implications of forcing a former White House Chief of Staff to attend a hostile congressional deposition relating to his actions while serving the President. There are no guardrails to protect executive prerogatives in a congressional deposition. House regulations provided that Chairman Thompson serves as the ultimate arbiter of any claimed privilege. *See* 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) ("If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer."). "[T]here is no judge or other neutral magistrate to whom a witness can turn for protection against questions seeking confidential and privileged information. The committee not only poses the questions to the witness, but also rules on any objections to its own questions according to procedures it establishes." *Immunity of the Director of the Office of Political Strategy & Outreach*, 38 Op. O.L.C. 5, 9 (2014). If a single member of Congress can

13

unilaterally override a deponent's valid assertion of privilege belonging to a coequal branch of government, the privilege might as well not even exist. The Congressional Defendants offer nothing to assuage these concerns.

The Congressional Defendants tellingly avoid addressing—and thus seem to concede—that it would be a clear affront to the Separation of Powers for Congress to subpoena former President Trump himself to testify before the Select Committee. *See* ECF No. 29-1 at 28–29. And since "a presidential adviser's immunity [from compelled testimony] is derivative of the President's," *Immunity of the Assistant to the President & Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C 1, 5 (2014), it follows that the Select Committee cannot compel Mr. Meadows to testify either. This is consistent with how the Supreme Court has interpreted the scope of the Speech or Debate protections afforded to Congress, which the courts have extended (without any textual warrant) to legislative aides. *See Gravel v. United States*, 408 U.S. 606 (1972). Mr. Meadows served as the "alter ego" of the President, *id.* at 616, arguably even more than a legislative aide would serve as the alter ego of a Member. "It is literally impossible for Members of Congress to perform their legislative tasks without the help of aides and assistants," *id.*, and the same goes *a fortiori* for the President who has far greater constitutional responsibilities as the one Executive, than any given Member does acting as one of 535 in Congress.[3]

---

[3] Their contention that, "[h]owever far testimonial immunity extends, it does not provide *more* protection to a President's aide than to a President," ECF No. 35 at 18, is another strawman. They do not even contend that President Trump would not have immunity to congressional subpoena, and the supporting case they cite—*Clinton v. Jones*, 520 U.S. 681 (1997)—is wholly inapposite. It famously involved the question whether a sitting President could be sued as a defendant in a civil damages action *during* his Presidency for conduct that occurred *before* the presidency. That holding has nothing to say about testimonial immunity.

The Congressional Defendants argue that President Trump is a "'private party'" who cannot assert Executive Privilege, ECF No. 35 at 32 (quoting *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953)), and that "[a]ny assertions by Mr. Meadows alone are insufficient to invoke executive privilege," *id.* Those arguments invite egregious error. First, former President Trump is nothing like the corporation in *Firth Sterling Steel Co. v. Bethlehem Steel Co.*, 199 F. 353 (E.D. Pa. 1912), that the Supreme Court was referring to as a private party in *Reynolds*. *See* 345 U.S. at 7 n.16. Second, the Supreme Court decades ago squarely "reject[ed] the argument that only an incumbent President may assert [Executive Privilege] and [held] that … a former President[] may also be heard to assert [it]." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 439 (1977). And third, *Reynolds* if anything bolsters Mr. Meadows's position all along that, as a now private citizen who previously served President Trump, he is in no position to *waive* the privileges and immunities that the former President had instructed him to preserve. *See* 345 U.S. at 7 (stating that Executive Privilege "can neither be claimed *nor waived* by a private party") (emphasis added) (citing *In re Grove*, 180 F. 62 (3d Cir. 1910) (holding that navy contractor was not in contempt of Congress by refusing to produce information that he had been instructed to keep confidential by the Navy Department)).

The Congressional Defendants further argue that former President Trump has made only a "generalized" assertion of privilege, ECF No. 35 at 34, which fails to overcome the Select Committee's professed need for Mr. Meadow's testimony. Of course, as discussed further below, *see infra* Part II, one of the major problems here is that the Select Committee has *not* articulated any valid legislative need for his testimony. But even setting that aside, they miss the mark in calling for some more granular assertion of privilege. Unlike the assertion of Executive Privilege in response to a request for documents, as was as issue in *Trump v. Thompson*, which calls for a

document-by-document assessment, testimonial immunity is much simpler. Testimonial immunity is "distinct from, and broader than, executive privilege" in that it "extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself." *Testimonial Immunity Before Congress of the Former Counsel to the President*, O.L.C. slip op., at *4 (May 20, 2019).

### B.   The Congressional Defendants' Post Hoc Litigation Effort to Narrow Their Inquiry Bolsters, Rather than Undermines, Mr. Meadows's Claims.

The Congressional Defendants also argue that, "[e]ven if some form of testimonial immunity did exist, . . . the information sought by the Select Committee is outside the scope of any purported testimonial immunity." ECF No. 35 at 16. That is flat wrong.

To start, we must briefly address the absurd argument that Mr. Meadows only opposes "the topics related to his role in former President Trump's reelection campaign" and did not contest the Congressional Defendants' other arguments on testimonial immunity. *See* ECF No. 35 at 16–17. The Congressional Defendants apparently overlooked at a minimum an entire section of Mr. Meadows's brief. *See* ECF No. 29-1 at 46–51 (Part IV.A). As discussed in Mr. Meadows's opposition to the Congressional Defendants' motion, it is first improper for the Select Committee to now purport to narrow its lines of inquiry as it is convenient to current circumstances. *See id.* at 39 n.14.

This is not the first time the Select Committee has at least claimed to narrow an overly broad subpoena when it is challenged in court. *See also Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509, at *3 (D.D.C. May 1, 2022). Setting that aside, Mr. Meadows has consistently asserted his position that each of the topics set forth by the Select Committee infringe upon former President Trump's valid assertion of Executive Privilege. And

16

though it has been difficult to follow the ever-shifting goalpost of topics the Select Committee has put forward, to be certain, Mr. Meadows believes each of the topics of inquiry the Congressional Defendants claim in their motion would be covered by Executive Privilege, just as Mr. Meadows discussed at length in his May 20, 2022 brief. *See* ECF No. 29-1 at 46–51 (Part IV.A).

Far from undermining Mr. Meadows's claims, this *post hoc* attempt to narrow the subpoena shows that Mr. Meadows is entitled—at a minimum—to relief on those portions of the subpoenas that the Select Committee now claims it is no longer pressing. The only remaining question, then, is whether those topics somehow sidestep testimonial immunity and all the other legal defects that Mr. Meadows has raised.[4] They do not.

As Mr. Meadows has explained, the nice distinction that the Congressional Defendants would have the Court draw between the White House Chief of Staff's official role and his actions that related in one way or another to the then-President's reelection campaign is illusory. *See* ECF No. 29-1 at 35–37. They argue that this view of the role is too broad and even accuse Mr. Meadows (in a footnote) of admitting to violations of the Hatch Act. *See* ECF No. 35 at 18 n.7. That accusation is completely off-base.

Mr. Meadows has made no such admission. Rather, he has asserted time and again that the role of White House Chief of Staff inherently involves political considerations. Mr. Meadows undertook each of the actions discussed in the Congressional Defendants' motion within the scope of his duties as White House Chief of Staff. And, yes, it is untenable for either Mr. Meadows or the Select Committee to tease out which words he used or actions he took with respect to ensuring

---

[4] To be clear, even if the Congressional Defendants were correct that these narrowed topics fell outside the scope of testimonial immunity, the subpoenas would still fail for want of a valid legislative purpose, *see infra* Part II, for failure to comply with H. Res. 503, *see infra* Part III, and for all of the other reasons raised in Mr. Meadows's complaint that may not be appropriate for summary disposition but which nevertheless undermine the subpoenas' enforceability.

our Nation's safety or the integrity of our elections had more political significance than official. To paraphrase the Select Committee on legislative purpose, when the Executive is carrying out its official duties, courts generally do not look behind the curtain to penalize them for ulterior political motives. *See id.* at 25. If they did, the courts would hardly have time for anything other than adjudicating claims that this or that agency action was *really* done for a political bump.

Second, the Hatch Act does not purport to be a touchstone for distinguishing official duties from nonofficial duties for constitutional purposes. It is a focused and limited Act that limits use of official resources for campaign purposes and imposes certain specified restrictions that, frankly, have no bearing on the issues before the Court.

It is no secret that members of the White House serve political functions and do so within the confines of their official roles. For example, the Obama White House established an Office of Political Strategy and Outreach. White House Archives indicate that this Office "provides the President and Senior Staff with information about the political environment to help advance the President's agenda and coordinates constituent outreach efforts on behalf of the President."[5] Somewhat ironically, when the Director of that Office of Political Strategy and Outreach, David Simas, was called before a congressional committee to discuss possible Hatch Act violations, the Department of Justice Office of Legal Counsel issued yet another opinion reiterating the "Executive Branch's longstanding position, reaffirmed by numerous administrations of both political parties, is that the President's immediate advisers are absolutely immune from congressional testimonial process." 38 Op. O.L.C. 5, 5 (2014).

---

[5] *Presidential Department Descriptions*, The White House: President Barack Obama, https://obamawhitehouse.archives.gov/participate/internships/departments#:~:text=The%20Offic e%20of%20Political%20Strategy,on%20behalf%20of%20the%20President (last visited June 1, 2022).

As discussed in Mr. Meadows's brief in support of his motion, even if the Court is to find he took political actions outside the scope of his official duties, congressional actions to impinge on those rights should receive heightened judicial scrutiny.  *See* ECF No. 29-1 at 40.  The Congressional Defendants cannot credibly contend that any of the actions by Mr. Meadows were simply that of a private citizen unrelated to his role as Chief of Staff.  When Mr. Meadows receives a text message on January 6, for instance, the Congressional Defendants' interest in that communication arises solely because Meadows served as Chief of Staff and had a role with the President, not that of some mere citizen interested in the happenings of that day.

While the Congressional Defendants' opposition again tries to assert a "compelling need for the information," as justification for overcoming constitutional obstacles to their demands, "their actions have indicated otherwise.  *See* ECF No. 35 at 20.  They refused to even engage Mr. Meadows on his offers of interrogatories to further their investigation, *see* ECF No. 29-2 ¶¶ 46–55; they knowingly and falsely promised to limit questioning to matters outside the scope of Executive Privilege—only to show their true intentions days before the planned deposition, *see id.*; and instead of expressing gratitude for his cooperation with respect to documents, for the past six months they used Mr. Meadows's private communications as a reason to smear him and his Republican allies in the press based on selective leaks and speculative innuendo as to why he took certain actions.  Even if the Select Committee once had a compelling need for Mr. Meadows's testimony, it is now plain that the one-time "need" pales in comparison to the Select Committee's compelling need to advance a political agenda.[6]

---

[6] Because the Select Committee's purposes are a factual issue as to which its conduct continues to furnish relevant evidence, should the Court not rule dispositively otherwise, Mr. Meadows should clearly be accorded time and the use of discovery to fully develop the factual picture relevant to judicial determination of whether the Select Committee has a legitimate legislative purpose or is instead engaged for purpose the Supreme Court has already defined as exceeding the limitation on

The Congressional Defendants also dispute that Mr. Meadows needs discovery relating to his own political activity.  It is the Congressional Defendants who have created the factual issue.  Mr. Meadows maintains that the actions he took were properly undertaken as Chief of Staff.  It is the Congressional Defendants who claim his actions were private conduct not covered by testimonial immunity or Executive Privilege.  That makes the nature, purpose and extent of the conduct a relevant factual determination and one ripe for discovery.  But such factual development would not necessarily require Mr. Meadows to conduct discovery on the Congressional Defendants themselves.  For example, Mr. Meadows could conduct limited discovery by conducting a third-party deposition of the current White House Chief of Staff and ask which political, reelection, and/or election integrity considerations are excluded from his official duties.  The Congressional Defendants have placed this factual question squarely at issue, and Mr. Meadows should be able to conduct discovery on these issues should the Court find them determinative.[7]

## II.     The Select Committee Did Not Have a Valid Legislative Purpose for the Subpoenas.

The Select Committee has not met its burden of establishing a valid legislative purpose to support its subpoenas directed at Mr. Meadows.

Their legal arguments, which rely primarily on *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), and *Republican Nat'l Comm. v. Pelosi*.  No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022), are misguided and unpersuasive.  *Thompson* does not give the Select Committee license to subpoena whomever and whatever they want, nor does it excuse them from

---

congressional investigative authority, including leaks, by committee staff or otherwise, designed solely to expose for exposure's sake private information provided to the Select Committee.  No court has held that press leaks are a valid legislative purpose.

[7] In any event, to the extent the Congressional Defendants contend in the context of summary judgment proceedings that certain avenues of discovery be foreclosed, their request is premature.  The means and timing of discovery disputes are governed by Federal Rules of Civil Procedure, Local Rules, and the Court's Standing Order and come later in the process.

establishing the connection between a valid legislative purpose and the particular subpoenas at issue in this case. Judge Kelly's decision in the *RNC* case is not binding, and respectfully, wrong on legislative purpose. But more importantly, the D.C. Circuit has effectively stayed that ruling based on an apparent determination that the RNC is likely to succeed on the merits of its appeal. *See* Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022). Neither decision provides any basis to gloss over the Select Committee's obligation to substantiate how Mr. Meadows's testimony would aid Congress in its lawmaking function. The Congressional Defendants must therefore live with the record in *this* case, not another case of their choosing. And on the record here, they have failed to carry their burden.

Their own litigating position confirms that they are running afoul of settled precedent. The Supreme Court very recently reiterated that "'there is no congressional power to expose for the sake of exposure,'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)), and that "Congress may not issue a subpoena for the purpose of 'law enforcement,'" *id.* (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). And yet the Congressional Defendants run headlong into those barriers by arguing that the motivating purpose behind their investigation is to gather information about past events that they publicly allege to constitute criminal wrongdoing and to use that information to prepare a public report. *See* ECF No. 35 at 24 (arguing that compelling Mr. Meadows's testimony would further the Select Committee's "task to determine the facts, circumstances, and causes related to the January 6th attack"); *see also id.* at 25. To argue that an investigation provides a valid legislative purpose for a congressional investigation is the definition of circular reasoning.

The Congressional Defendants do not identify any draft legislation that would be better informed by Mr. Meadows's testimony, or any conceivable legislative initiative that his testimony

might be needed to further.  And of course, the Select Committee has no authority to markup legislation in the first place.  *See* H. Res. 503 § 4(d), 117th Cong. (2021).  By contrast, in the litigation culminating in *Trump v. Mazars*, 140 S. Ct. 2019 (2019), the House was able to identify several pending legislative proposals related to the inquiry, including proposed legislation to require Presidential candidates to disclose tax returns (with President Trump's tax returns being the specific subject of the subpoena). *See generally Trump v. Mazars USA, LLP*, 940 F.3d 710, 727 (D.C. Cir. 2019), vacated and remanded, 140 S. Ct. 2019 (2020).  There is no such legislation in this case.

Without even a fig leaf, the Congressional Defendants cannot hide their naked intentions.  Thus, even if the existence of a valid legislative purpose would prevent a court from looking further into other motives, *see* ECF No. 35 at 25–26,[8] that principle would have no application here.  The very problem is that the Select Committee has not established a valid legislative purpose for its subpoenas targeting Mr. Meadows.

The Congressional Defendants also undermine their claim of a legislative purpose by claiming that they no longer seek to question Mr. Meadows about his official role.  *See* ECF No. 35 at 16–20.  As explained above and elsewhere, it is impossible to draw the fine line the Congressional Defendants would have the Court to draw between Mr. Meadows's role as White House Chief of Staff and activities that might have helped with the President's effort to get reelected.  But even if the Congressional Defendants were right, that would just further undermine the notion that they are pursuing a valid legislative purpose.  To the extent the Select Committee

---

[8] *But see Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–75 (2019) (holding that, while a court ordinarily "may not reject an agency's stated reasons for acting simply because the agency might also have other unstated reasons," a court may nevertheless look past an agency's stated reasons where they present a "significant mismatch" with what they are doing).

is directly targeting the campaign activity of its leadership's political opponent, that effort runs head long into the First Amendment, *see* ECF No. 29-1 at 37, and raises serious questions about what conceivable legislative purpose they could be pursuing. It also means that they can no longer wrap themselves in the mantel of "'Congress's historical oversight function,'" ECF No. 35 at 13 (quoting *Miers*, 558 F. Supp. 2d at 103), since Congress has no oversight over conduct that they themselves claim to be outside the scope of the Executive Branch, *see, e.g.*, ECF No. 35 at 17 (arguing that they are now targeting Mr. Meadows only for "private conduct").

## III. The Subpoenas Were Not Validly Issued.

The Select Committee has not complied with two key aspects of the rules governing Committee proceedings and as a result the subpoena issued to Meadows is invalid. Both flaws are independently material to a judicially cognizable issue before the Court.

### A. *Select Committee's failure to adhere to H. Res. 503 is legally cognizable.*

The Rules applicable to the Select Committee in pertinent part require (a) that the Select Committee be composed of 13 total members and (b) that a subpoena to a deposition can only be issued by the Chair in consultation with the Select Committee's "Ranking Member."[9] As the Supreme Court held in an analogous circumstance: "The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting that the Committee be equally meticulous in obeying its own rules." *Yellin v. United States*, 374 U.S. 109, 124 (1963).

In its brief, the Congressional Defendants boldly assert that Meadows "nitpicks … titles" of committee members and this does not even present a legitimate question for the Court, claiming that judicial consideration is barred by the Rulemaking Clause or some ill-defined deference to the Congressional Defendants' litigating positions. *See* ECF No. 35 at 29–30. They are wrong; what

---

[9] H. Res. 503 §§ 2(a), 5(c)(6), 117th Cong. (2021).

the Rulemaking Clause bars is judicial interpretation of congressional rules that would be rulemaking itself.  What the courts can, and in this instance must, do is hold the Select Committee to obeying the Rules that were made to govern its proceedings.  *See Christoffel*, 338 U.S. at 88–90.  The Rulemaking Clause is not a get out of jail free card for miscreant committees.  In closely analogous cases, the Supreme Court and D.C. Circuit have affirmed the role of courts in policing congressional compliance with its own requirements, including for its use of subpoena authority. The best precedent strongly supports this Court's authority to declare judgment for Mr. Meadows.

Two Supreme Court opinions and two well-reasoned decisions from Judge J. Skelly Wright on the D.C. Circuit strongly support Mr. Meadows's position.  *See Christoffel*, 338 U.S. at 88–90; *Yellin*, 374 U.S. at 121; *Liveright v. United States*, 347 F.2d 473, 475 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601, 605 (D.C. Cir. 1963).  There is no doubt: congressional subpoenas must comply with House rules in order to be valid.  Congress is free to create its own rules, including those delegating the implied authority to issue investigative subpoenas to a committee, but once it creates those rules, it must abide by them.  In *Christoffel*, for instance, the House rules required a quorum, and the defendant argued the committee lacked a quorum during the relevant time when statements challenged for perjury were made.  The committee argued that under the rules a quorum only need be present during the initiation of the testimony, not during the time of the challenged statements.  The Court, in ruling that Congressional rules required the presence of a quorum during the testimony, made clear where the line lies between judicially cognizable enforcement of congressional rules and judicial review barred by the Rulemaking Clause:

> Congressional practice in the transaction of ordinary legislative business is of course none of our concern, and by the same token the considerations which may lead Congress as a matter of legislative practice to treat as valid the conduct of its committees do not control the issue before us.  The question is neither what rules Congress may establish for its own governance, nor whether presumptions of

24

> continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have been followed.

*Christoffel*, 338 U.S. at 89.

Likewise, in a case where subpoena authorization was challenged, *Shelton v. United States*, the D.C. Circuit held that the committee's rules required the committee itself to issue a subpoena, not the chairman or staff of the committee acting alone. The committee claimed its rules allowed the chairman alone to issue a subpoena. The Court examined the relevant rules provisions and determined that the Rules expressly required that the committee as a whole authorize the subpoena (it did not blindly defer to the committee under the Rulemaking Clause, as the Congressional Defendants urge this Court to do). Relying on the Supreme Court's decision in *Yellin*, Judge Wright held: "Since the Subcommittee did not authorize the issuance of the subpoena to Shelton, the subpoena was invalid." 327 F.2d at 606.

The teaching of these cases is plain and contradicts the Congressional Defendants' assertion that the issue of Select Committee adherence to its own rules is non-justiciable in this case. To the contrary, the rule from these decisions is that a congressional committee is bound by the plain terms of its own rules, and when adherence to those rules is challenged by a witness with rights before the committee, the question is a legal one fully cognizable by the courts. These cases all make clear that congressional committees must comply with their own rules, particularly those going to the authority to compel parties with subpoena power, and if they violate those rules, courts can and will declare the subpoena void.

Against this strong authority, the Select Committee here offers ancillary case law and a weak to non-existent response to the on-point precedent. First, the Rulemaking Clause does not work to give the Select Committee cart blanche to violate the terms of delegation from the House. The Select Committee's three primary authorities for broad deference are inapt and do nothing to

undermine the law established in the cases discussed above. In *Rangel v. Boehner*, the court merely rejected Congressman Rangel's attempt to challenge his censure as a political question primarily involving the Discipline Clause, and favorably cites the more on-point precedent from *Yellin* and *Christoffel*, where the Supreme Court decided committee power had been misused. *See* 20 F. Supp. 3d 148 (D.D.C. 2013). *Baker v. Conroy* fares no better. That decision focused on an atheist's Establishment Clause challenge to congressional rules governing prayer, and the court noted how the House's interpretation that "prayer" required "religious prayer" was accepted by the court. *Baker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019). This common-sense conclusion does not support any substantial deference on rules application, as the Select Committee suggests.

The Select Committee's reliance on *United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995), badly misses the mark. That case involved a criminal fraud case against a Congressman, not a challenge to committee investigative authority and use of subpoenas. And most all the House rules at issue were found to be judicially cognizable, even in that context. The case does not require deference to a congressional interpretation of rules and the court follows without qualification *Yellin. Id.* at 1305. If the Select Committee were correct, and any proffered interpretation of House Rules must be deferred to, then *Christoffel* and *Shelton* were wrongly decided, since the congressional interpretation offered therein was rejected by the courts. No rule of strong deference can be drawn from these cases.

The Select Committee also points to Judge Kelly's recent decision in active litigation between the Republican National Committee and the Select Committee, challenging a subpoena for some of the same reasons at issue in this case. Judge Kelly, respectfully, was mistaken by fashioning an ambiguity in H. Res. 503 that plainly does not exist, and by applying an unwarranted level of deference to the Select Committee's litigating positions, taking *Rostenkowski* out of

context and ignoring the more on-point authority of *Yellin* and *Christoffel*. As explained below, Judge Kelly also erred in how he interpreted H. Res. 503 on the merits.

### B. The Select Committee's subpoenas were not issued in compliance with H. Res. 503 due to failed composition.

The Select Committee does not comply with H. Res. 503's requirements that the "Speaker **shall appoint** 13 Members to the Select Committee, 5 of whom **shall be appointed** after consultation with the minority leader." H. Res. 503, 117th Cong. (2021) (emphasis added). The Speaker never appointed 13 members and the Speaker never appointed 5 members in consultation with the Minority Leader. There is no dispute about these facts, they are the status quo of the Select Committee's make-up. For both reasons, the Select Committee was not validly constituted and cannot, as a matter of law, exercise delegated subpoena authority that belongs to Congress by implication. *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Select Committee has almost no response to this. It points to Judge Kelly's recent decision (stayed pending appeal by the D.C. Circuit), as supporting an interpretation that "shall appoint 13 Members" doesn't mean the Speaker shall appoint 13 members, it must mean "may." It then makes the unprecedented and novel claim that the House's action on contempt resolutions operates to "ratify" the view that the Select Committee is validly constructed.

As to Judge Kelly's opinion, with respect, the better interpretation of H. Res. 503 is the plain meaning of the words require the Speaker to appoint 13 members. Nothing in the context of the resolution supports a highly unusual interpretation that "shall" is optional and allows the Speaker to constitute a committee with only nine members, not the 13 specified (with five from the minority consultation process). The only support for this strained interpretation of "shall" is a fleeting citation to *English v. Trump,* where the word "shall" was interpreted in context with other statutes, and otherwise notes that authority strongly supports the common sense view that shall "is

usually understood as mandatory." 279 F. Supp. 3d 307, 323 (D.D.C. 2018). The interrelationship between Dodd-Frank and the Federal Vacancies Reform Acts, at issue in *English*, says nothing about how the Speaker could possibly understand H. Res. 503 as anything other than a requirement to appoint 13 members. Judge Kelly then wrongly deferred to the House view that "shall" means "might," relying on a misreading of *Rostenkowski*. Unreasonable and erroneous House interpretation of rules can and should be rejected by this Court, as the interpretations were in *Christoffel* and its progeny.

The House vote on contempt resolutions cannot operate to "ratify" the Select Committee's legally deficient composition. *But see* ECF No. 35 at 28. There is no legal doctrine of ratification for such a fundamental error. If there were, then virtually all legal challenges to subpoenas would have come out otherwise since it is usually the case that a subpoena challenged in the context of contempt would have been subsequently subject to a referral vote outside the committee being challenged. In other words, failure to follow the rules in committee composition cannot be fixed by a mere contempt resolution vote; it would need to be addressed by amending H. Res. 503 or comply with the plain terms of the resolution by appointing 13 Members.

## C.     The Select Committee's subpoenas were not issued in compliance with H. Res. 503 due to lack of consultation with a ranking minority member.

In addition to lacking the requisite composition, the Select Committee failed to follow the rules for consultation with a ranking minority member before issuing the subpoena to Mr. Meadows. The Select Committee all but concedes it violated its own rules about consultation by claiming this argument is "nitpicking." On the contrary, protecting the rights of the minority party where they impact the Due Process rights of a committee witness, including by the common mechanism of allowing the minority party to designate a ranking member who exercises procedural rights, is precisely what the Supreme Court and the D.C. Circuit instruct that courts

must do. As Mr. Meadows has shown, the Select Committee failed to consult with a "ranking minority member" because *there is no ranking minority member*. In response, the Select Committee again relies on Judge Kelly's recent opinion (stayed pending appeal by the D.C. Circuit), and also contends that Rep. Liz Cheney is "ranking minority member *for consultation purposes*." ECF No. 35 at 29 (emphasis added). Where in House Resolution 503 is there a provision for such a designation? Why the qualification? Perhaps because the Select Committee cannot bring itself to say what it knows to be false: Rep. Cheney is not the "ranking minority member," period.

It is not surprising that counsel for the House would thus readily admit to the Federal Bureau of Investigation that the Select Committee does not have a ranking minority member, and that Rep. Cheney is "Vice Chair," as it was recorded:

> LETTER explained that the Select Committee was specifically appointed by the Speaker of the House and there were no majority or ranking members. Representative LIZ CHENEY is acknowledged to the Vice Chair of the Select Committee … there are no express rules for the Vice Chair as there would be for a Ranking Member.

ECF No. 29-2 ¶ 18. The Select Committee boldly says *nothing* in response to this quasi-judicial admission that Rep. Cheney is not the ranking minority member. This undisputed evidence strongly supports Mr. Meadows's claim for judgment that the subpoenas at issue are invalid because there can be no compliance with the ranking minority member consultation requirements.

The Select Committee's response to the ranking minority member defect amounts to semantics. In addition to mischaracterizing the clear legal requirement as "nitpicking," the Select Committee attempts to demean the position and role of the ranking minority member by calling it a "title." Of course, both major parties regularly rely on appointment of ranking minority members to protect substantive rights; not merely treating it as a title. Regardless of characterization, the Select Committee failed to follow its own clear rule.

In addition, the Select Committee again invokes Judge Kelly's recent opinion as having resolved the issue.  The reasoning of that decision, not binding on this court and unsettled by the ongoing appeal, should be rejected.  Judge Kelly, and the Select Committee, adopt the unreasonable and unprecedented view that the "ranking minority member" can be ascertained by simply looking at the member of a committee who is literally most senior in seniority, and party affiliation, without any role for the minority party and its leadership to designate the ranking position.  Although it is true that Rep. Cheney was the first (of two) Republican members that Speaker Pelosi appointed to the Select Committee, that mechanical understanding of the ranking minority member position is entirely contrary to past congressional practice and at odds with the uncontested view of the Minority Leader Kevin McCarthy that Rep. Cheney is simply not the ranking minority member.[10]

---

[10] As Minority Leader Kevin McCarthy recently stated, Representative Cheney "is clearly not the ranking minority member."  Letter from Elliot S. Berke, counsel for House Republican Leader Kevin McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (May 27, 2022), https://republicanleader.house.gov/wp-content/uploads/2022/05/McCarthyLetter-052722.pdf.  Ranking members, distinct than most senior members, have always been understood as the member designated by the minority party, without regard to simple seniority (on the Select Committee or in the House).  Both the Republican Conference Rules and Democrat Caucus Rules make this clear.  The Republicans provide for term limits, with no reference for seniority, for ranking members.  *See* GOP H. Conf. R. 117th Cong. 14(e), https://www.gop.gov/conference-rules-of-the-117th-congress/.  The Democrat Caucus Rules are even more stark—calling for election or secret ballot, again without reference to simple seniority.  *See* R. Democratic Caucus 21(D)(1)(a), 117th Cong. (Jan. 14, 2021), https://www.dems.gov/imo/media/doc/DEM_CAUCUS_RULES_117TH_April_2021.pdf.  Both Rules are consistent with the longstanding practice of minority party selection or designation of the "ranking minority member."  For example, in the 114th Congress, when the Democrats were in the minority, Representative Levin was ranking member of the House Ways & Means Committee, even though Representative Rangel had been more senior by 12 years.  *See* H. Rep. No. 114-887, at (II), 20 (2016).  *Compare Representative Sander M. Levin*, Congress.gov (last visited June 6, 2022), https://www.congress.gov/member/sander-levin/L000263, *with Representative Charles B. Rangel*, Congress.gov (last visited June 6, 2022), https://www.congress.gov/member/charles-rangel/R000053.  Consistent with this longstanding practice, even in politically contentious situations, the minority party simply speaks of "appointing" or "selecting" members of committees and ranking members.  *See, e.g.*, Press

In addition, the Select Committee argues the court *must* defer to the Select Committee and accept that Rep. Cheney was the "ranking minority member" *for consultation purposes*. It is telling that the Select Committee cannot even bring itself to declaring Rep. Cheney the ranking minority member without qualification. The case law regarding congressional authority to investigate by subpoena does not support the absolute deference the Select Committee demands. If such strong deference were required, then none of the challenges to congressional subpoenas would have succeeded. *See, e.g.*, *Yellin v. United States*, 374 U.S. 109 (1963); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963). Especially when the requested deference is for an unreasonable and unprecedented position (declaring a ranking minority member contrary to the expressed position of the minority party), not only is deference not appropriate, it would constitute precisely the judicial intervention the Rulemaking Clause forecloses.

Finally, while the undisputed facts and public records subject to judicial notice strongly support Meadows position that Cheney is not the ranking minority member, if the Court has any doubt, then it should deny the Select Committee's motion for summary judgment and grant Mr. Meadows the opportunity conduct discovery and develop facts relevant to this issue.

---

Release, Nancy Pelosi, Democratic Leader, U.S.H.R., *Pelosi Names Democratic Members to House Select Committee on Benghazi* (May 21, 2014), https://web.archive.org/web/20141207010037/https://www.democraticleader.gov/newsroom/pelosi-names-democratic-members-house-select-committee-benghazi/.

IV.    **The Congressional Defendants' Procedural Arguments Are Also Unavailing.**

    A.    *The recent developments in the RNC litigation show that the Congressional Defendants' rush to summary judgment in this case was misguided and unsupported.*

The Congressional Defendants' brief in opposition relies heavily on Judge Kelly's recent decision in *Republican Nat'l Comm. v. Pelosi*, No. 22cv659, __ F. Supp. 3d __, 2022 WL 1294509 (D.D.C. May 1, 2022), to justify their response to Mr. Meadows's arguments on invalid legislative purpose, the improper composition of the Select Committee, and the absentee ranking member. Just as they have done in Mr. Meadows's case, the Congressional Defendants in the *RNC* litigation asked the courts to rush to judgment on important constitutional concerns in order to meet their self-imposed (and likely politically motivated) deadlines. But their reliance on *RNC* is flawed. First, the *RNC* case was not filed as a related case to Mr. Meadows's, and there are many critical factors distinguishing the *RNC* case from Mr. Meadows's. In *RNC*, for example, there is no subpoena for testimony, nor are there claims of testimonial immunity or executive privilege. Its ruling thus did not account for many of the important constitutional rights and protections at stake in this litigation. For these reasons, the Court should decline the Congressional Defendants' pleas to adopt Judge Kelly's ruling on dispositive arguments of legislative purpose, the composition of the Select Committee, and the ranking member.

Second, with respect to the limited set of arguments shared by the RNC and Mr. Meadows, the Court should similarly be reluctant to adopt the findings in *RNC*. Just as they did in the instant case, the Congressional Defendants made a dramatic appeal for the courts to quickly resolve their case so as "not to interrupt and delay the Select Committee's work at this critical juncture." Appellees' Corrected Resp. Appellant's Emergency Mot., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 24, 2022). Twelve days ago, the D.C. Circuit issued an injunction pending appeal of Judge Kelly's decision, an action both parties agreed require the Court to consider the

RNC's likelihood of success on the merits, and granted the Congressional Defendants their requested expedited briefing schedule. *See id.*; Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022); Emergency Mot., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 23, 2022). And with that, it appears the juncture may not be so critical as the Congressional Defendants first suggested. Undoubtedly recognizing their diminishing chances of success on appeal and out of concern for an appellate court ruling that would harm their likelihood of success in cases such as Mr. Meadows's, the Congressional Defendants changed their mind and moved the D.C. Circuit for a delay in briefing. *See* Mot. Postponement Br. & Oral Arg., *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 29, 2022). These recent actions by the Congressional Defendants in the *RNC* case indicate their real concern: that the D.C. Circuit may not appease their hasty, bullying tactics against witnesses and courts. The Court should not indulge their feigned rush to judgment in this matter either.

### B.    The Congressional Defendants have not identified defects in Mr. Meadows's statement of facts, and any material factual disputes would only support his still-pending Rule 56(d) motion.

In their opposition to Mr. Meadows's statement of facts, the Congressional Defendants admit that Mr. Meadows disputes at least six paragraphs of their purported "undisputed" statement of facts. *See* ECF No. 35 at 9. That, in addition to their fit over Mr. Meadows's statement of facts in support of his motion and in opposition to the Congressional Defendants' motion for summary judgment, does nothing but emphasize Mr. Meadows's consistent refrain that, should he not be entitled to judgment as a matter of law, then there are clearly disputed material facts in this case that call for discovery.

Actually, Mr. Meadows disputed outright ten of the many allegations contained in the Congressional Defendants' 29 paragraphs of stated facts. *See* ECF No. 35 at 9 (identifying the six disputed paragraphs); ECF No. 29-3 ¶¶ 9 ("Mr. Meadows disputes that the testimony and

documents demanded in the subpoena are limited to 'the events of January 6, 2021, and the facts and circumstances that led to the violent attack on the Capitol that day.'"), 20 ("Mr. Meadows disputes that he had a 'change of heart.'"), 21 ("Mr. Meadows does dispute that he and the Select Committee agree upon any 'indisputably non-privileged testimony.'"), 22 ("Mr. Meadows again disputes that he and the Select Committee agree on the scope of 'non-privileged information.'"). And with another four allegations, Mr. Meadows contested the Congressional Defendants' characterization of the document referenced, stating that the Court may itself refer to the document, rather than accepting the Congressional Defendants' characterizations. *See* ECF No. 29-3 ¶¶ 17–20.

The Congressional Defendants' opposition also contends that Mr. Meadows "appears to be ignoring the actual allegation, each of which includes a citation." ECF No. 35 at 9. But the Congressional Defendants apparently failed to understand Mr. Meadows's objection to each of these referenced statements, which note that the citations do not, in fact, support one or more aspects of the Congressional Defendants' statement.

The first example Congressional Defendants allege cannot be in dispute—that the privilege log "plainly includes communications between Mr. Meadows and well known members of the Trump campaign team" and campaign counsel—clearly ignores Mr. Meadows's argument. The Congressional Defendants' statement in question was that Mr. Meadows's privilege logs, ECF No. 15-6, "identified more than 200 communications he initiated or participated in based on his role in the Trump campaign with people reported to be members of the Trump campaign legal team or other Trump campaign staff." ECF No. 15-28 ¶ 18. Mr. Meadows disputed this part of their allegation on two grounds. First, neither the privilege logs nor the Congressional Defendants identified which individuals included in the privilege log were "reported to be members of the

Trump campaign legal team or other Trump campaign staff." *See* ECF No. 29-3 ¶ 18. In this way, the Congressional Defendants did not properly support their contention, as Mr. Meadows noted. And second, nothing in the Congressional Defendants' referenced document indicates that Mr. Meadows undertook these communications "based in his role in the Trump campaign." *See id.* Further, for the many reasons stated in Part I.B, Mr. Meadows has objected to "the distinction Congressional Defendants attempt to draw between actions Mr. Meadows took as Chief of Staff to the President and those he took to reelect the President." *See id.* So despite the Congressional Defendants' contentions otherwise, this is a material dispute.

The Congressional Defendants' other example, relating to Donald Trump's press release, is even more straightforward. Mr. Meadows disputes that the press release supports the Congressional Defendants' statement that "Former President Trump reviewed [Mr. Meadows's] book in advance and did not object to its publication." Nothing in the press statement Congressional Defendants cite, *see* ECF No. 35-3, states that former President Trump read Mr. Meadows's book. And even if the fact that former President Trump released the statement is alone sufficient to show he "did not object to its' publication" (which Mr. Meadows submits it is not) the Select Committee's own statements dispute the fact that former President Trump approved of Mr. Meadows's book prior to publication. *See* 167 Cong. Rec. H7645 (daily ed. Dec. 14, 2021) (statement of Rep. Raskin) ("Mark Meadows' book came out with tons of startling and eye-popping revelations about January 6th and the role that then-President Donald Trump played. Ex-President Trump exploded and called Mr. Meadows' book fake news.").

The Congressional Defendants next object to a number of Mr. Meadows's presented facts as hearsay and thus, not admissible in evidence. These objections include an official FBI report filed in another case before this very Court. *Compare* ECF No. 35-1 ¶ 18, *with Veg-Mix, Inc. v.*

*U.S. Dep't of Agriculture*, 832 F.2d 601, 607 ("Courts may take judicial notice of official court records."). It is unclear, for example, why the Congressional Defendants argue that Mr. Meadows's citations to press releases are inadmissible hearsay, *see, e.g.*, ECF No. 35-1 ¶ 7, but their own citations to press releases (not by any party to this case or subject to any other obvious hearsay example) are admissible, *see, e.g.*, ECF No. 15-28 ¶ 4, 5, 24. Mr. Meadows has disputed the relevant portions of these statements. The Congressional Defendants' objections are unavailing, and each of these statements is admissible.[11]

Unfortunately, Mr. Meadows has not had the benefit of purported subpoena power to support his arguments in opposition to the Congressional Defendants' motion, nor was he privy to much of the testimony and documents cited by and attached to their motion. As the Congressional Defendants point out in their opposition, ECF No. 35 at 9, without the benefit of any discovery, Mr. Meadows is unable to support factually his challenge to some of the Congressional Defendants' statements of fact, *see* ECF No. 29-3, and his own additional facts in opposition to the Congressional Defendants' motion, *see* ECF No. 29-2. For this reason, Mr. Meadows disputed each statement of alleged fact (and any accompanying commentary) that was unsupported by the Congressional Defendants' own citations. *See* ECF No. 29-3, ¶¶ 5, 6, 7, 18, 23, 26. For example, without additional discovery, Mr. Meadows is unable to support his dispute that Speaker Pelosi has fulfilled her duties pursuant to H. Res. 503. *See* ECF No. 29-3 ¶¶ 5, 6; *see also* Letter from Elliot S. Berke, counsel for House Republican Leader Kevin McCarthy, to Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (May 27, 2022) ("The Speaker did not appoint five members after consultation with the minority leader.").

---

[11] To the extent the Court seeks full briefing on each of the Congressional Defendants' twenty-six hearsay arguments, Mr. Meadows welcomes such opportunity.

It is for these reasons that Mr. Meadows filed a motion pursuant to Federal Rule of Civil Procedure 56(d), asking the Court to deny without prejudice or delay ruling on the Congressional Defendants' motion for summary judgment, ECF No. 20. But while the Court has held that motion in abeyance, Mr. Meadows continues to emphasize that he is entitled to summary judgment on the issues that Congressional Defendants label "irrelevant."

Specifically, the facts relating to "the formation, composition, operations, or investigative scope" and the legislative purpose and intent of the Select Committee are of utmost relevance to Mr. Meadows's motion. *See supra* Parts II–III. The Congressional Defendants' attempt to dismiss such claims as irrelevant due to a nonbinding and distinguishable court decision is unjustified. *See* Part IV.A *supra*.

And lastly, the Congressional Defendants object to counsel's declaration in support of some of the material facts. Counsel's declaration is based on his personal knowledge, the basis of which is provided in each of the specific declarations. *See* ECF No. 29-4. The declaration fully comports with the requirements of Federal Rule of Civil Procedure 56(c)(4).

## C.     *The Congressional Defendants improperly use their reply to claim new grounds for seeking summary judgment.*

The Congressional Defendants' arguments on the other issues which Mr. Meadows has raised in his complaint but on which he has not yet sought summary judgment—namely, the Stored Communications Act, the First Amendment, and the Fourth Amendment—are also misplaced.

To start, the Congressional Defendants have sought summary judgment on Mr. Meadows's Fourth Amendment claim based on absolute immunity for the first time in their reply. They argue that they are immune from Mr. Meadows's argument that the subpoena violates the Fourth Amendment. *See* ECF No. 35 at 36. According to the Congressional Defendants, they have

absolute immunity from this constitutional claim because of the protection afforded to congressional Speech or Debate. *Id.*

This argument is foreclosed as a ground for summary judgment in their favor because Congressional Defendants failed to raise it before their reply. Courts in this Circuit have "generally held that issues not raised until the reply brief are waived." *Bloche v. Dep't of Def.*, 414 F. Supp. 3d 6, 24 n.4 (D.D.C. 2019) (quoting *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C. Cir. 2000)). Thus, a new argument for summary judgment will be rejected when raised for the first time in reply. *See id.*

The Congressional Defendants made no mention of absolute immunity as a defense to Mr. Meadows's Fourth Amendment claim in their motion for summary judgment and supporting memorandum. *See* ECF No. 15 at 62–65. Instead, they argued that the subpoena was not overbroad and that *Carpenter v. United States*, 138 S. Ct. 2206 (2018), did not apply to the information sought. *Id.* The Congressional Defendants cited the case they now rely on to assert immunity—*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975)—but only in a section of their memorandum discussing Mr. Meadows's First Amendment claim. *Id.* at 54. This mere reference to a related case in a different section of their memorandum falls far below the standard to raise immunity as a ground for judgment on the Fourth Amendment claim. *See Bloche*, 414 F. Supp. 3d at 24 n.4 (explaining that an argument is waived "when a party does not argue a point until its reply brief, even if the party referred to the argument in its opening brief").

The argument further fails because the Congressional Defendants have waived their claim for absolute immunity under the Speech or Debate Clause against *any* of Mr. Meadows's claims since they failed to raise that defense in their Answer to Mr. Meadows' First Amended Complaint. *See* ECF No. 17 at 31–33. Constitutional immunity, including under the Speech or Debate Clause,

is an affirmative defense. *See Bush v. Lucas*, 462 U.S. 367, 377 (1983) (referring to an "affirmative defense based on the speech or Debate Clause of the Constitution"); *see also Shelby Cnty., Alabama v. Holder*, 43 F. Supp. 3d 47, 53 (D.D.C. 2014), *aff'd sub nom. Shelby Cnty., Ala. v. Lynch*, 799 F.3d 1173 (D.C. Cir. 2015) (explaining that sovereign immunity is an affirmative defense). "[A]n affirmative defense not raised by answer cannot be raised in dispositive motions that are filed post-answer." *Smith-Haynie v. D.C.*, 155 F.3d 575, 578 (D.C. Cir. 1998). Thus, the Congressional Defendants cannot rely on Speech of Debate immunity to defeat Mr. Meadows's claims.

## CONCLUSION

For the reasons discussed, the Court should grant Mr. Meadows's motion and deny the Congressional Defendants' motion for summary judgment.

Dated: June 6, 2022

Respectfully submitted,
MARK MEADOWS
*By Counsel*

/s/ George J. Terwilliger III
George J. Terwilliger III
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
gterwilliger@mcguirewoods.com

Brooks H. Spears
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
bspears@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I certify that, on June 6, 2022, a copy of the foregoing was filed on the Court's CM/ECF system, which will send notification to all counsel of record.

/s/ George J. Terwilliger III