**EXHIBIT 2**

## Berkeley Journal of Criminal Law

Volume 20
Issue 2 *Fall 2015*

Article 2

2016

# Congressional Gamesmanship Leads To An Acquittal In Deepwater *Horizon Case,* United States v. David Rainey: A Case Study

Brian M. Heberlig
bheberlig@steptoe.com

---

Recommended Citation

Brian M. Heberlig, *Congressional Gamesmanship Leads To An Acquittal In Deepwater Horizon Case, United States v. David Rainey: A Case Study*, 20 Berkeley J. Crim. L. 260 (2015).
Available at: http://scholarship.law.berkeley.edu/bjcl/vol20/iss2/2

Link to publisher version (DOI)
http://dx.doi.org/http://dx.doi.org/10.15779/Z383V98

This Article is brought to you for free and open access by the Law Journals and Related Materials at Berkeley Law Scholarship Repository. It has been accepted for inclusion in Berkeley Journal of Criminal Law by an authorized administrator of Berkeley Law Scholarship Repository. For more information, please contact jcera@law.berkeley.edu.

# Congressional Gamesmanship Leads To An Acquittal In *Deepwater Horizon* Case

## *United States v. David Rainey*: A Case Study

Brian M. Heberlig*

I. INTRODUCTION ........................................................................... 261
II. BACKGROUND ............................................................................ 262
    A.  The *Deepwater Horizon* Incident and Rainey's Involvement .............................................................................. 262
    B.  The Indictment ..................................................................... 265
    C.  The Original Dismissal Of Count One ............................... 266
III. PRETRIAL LITIGATION ............................................................ 267
    A.  Motions Practice Following The Remand .......................... 267
    B.  Dealings With The Congressional Parties And Additional Motions Practice ............................................. 270
        1.  Rainey's Subpoenas Duces Tecum to the Congressional Parties ..................................................... 270
        2.  Rainey's Motion to Compel ......................................... 271
        3.  Negotiated Voluntary Productions of Documents from Individual Members of Congress Revealed Exculpatory Information ............................................... 274
        4.  The District Court Denied Rainey's Motion to Compel ...................................................................... 275
        5.  The Voluntary Production of Committee and

DOI http://dx.doi.org/10.15779/Z383V98

Copyright © 2015 Regents of University of California.

\*   The author heads the white-collar criminal defense practice group at Steptoe & Johnson LLP and represented David Rainey at trial, together with Reid Weingarten of Steptoe & Johnson LLP and Mike Magner of Jones Walker LLP.

Case 1:21-cr-00670-CJN   Document 116-2   Filed 07/15/22   Page 4 of 43
*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

ISSUE 20:2                                                          FALL 2015

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            261

   Subcommittee Records With No Meaningful
   Assurances Regarding Completeness ........................... 277
  6. Rainey's Subpoenas For Trial Testimony to the
   Relevant Members of Congress and Committee Staff .. 277
  7. The Congressional Witnesses Resist Taking Any
   Position On The Trial Subpoenas ................................ 279
  8. The House of Representative's Amicus Brief in
   Opposition to Rainey's Motions to Dismiss ................ 281
  9. The Congressional Witnesses' Motion to Quash .......... 282
  10. Rainey's Motion for Remedial Relief ........................... 283
  11. The Motion for a Protective Order by the
   Congressional Witnesses Willing to Testify for the
   Prosecution .................................................................. 288
IV. THE DISTRICT COURT'S RULINGS ....................................... 289
 A. The Court's Order Granting the Congressional
  Witnesses' Motion To Quash Rainey's Trial Subpoenas ... 289
 B. The Court's Order Granting Rainey's Pending Motions
  To Dismiss Count One and for Remedial Relief ............... 290
 C. The Task Force's Motion For Reconsideration ................. 294
 D. The Court's Order Denying the Task Force's Motion for
  Reconsideration ............................................................... 295
V. LESSONS LEARNED ................................................................ 299

# I.  INTRODUCTION

  After months of gamesmanship by Members of Congress and their staff, U.S. District Court Judge Kurt D. Engelhardt acquitted former BP executive David Rainey of the lead obstruction of Congress count on the first day of trial in *United States v. David Rainey*, Crim. No. 12-291 (E.D. La.). Rainey was the highest-ranking BP executive charged in the aftermath of the *Deepwater Horizon* oil spill. Even though a congressional subcommittee was the purported "victim" of Rainey's alleged crime, no Member of Congress or congressional staffer was willing to waive the protections of the Speech or Debate Clause of the U.S. Constitution and testify freely at Rainey's trial. Based on documents uncovered during pre-trial discovery, these congressional witnesses possessed critical exculpatory evidence suggesting that the alleged congressional inquiry was not duly authorized and was simply a frolic by then-Representative, now Senator, Edward Markey (D-MA) acting as an individual Member. Although the court upheld the

262                 *BERKELEY JOURNAL OF CRIMINAL LAW*                 Vol. 20:2

congressional witnesses' assertion of legislative privilege as absolutely
protected by the Speech or Debate Clause, it held that the consequences
of that privilege assertion were devastating to Rainey's prosecution on
the obstruction of Congress charge. To avoid a one-sided, unfair
presentation of evidence from the handful of congressional staffers
willing to testify as prosecution witnesses, the court excluded all
evidence from congressional witnesses and acquitted Rainey of the
obstruction of Congress charge on a number of grounds shortly after
empaneling the jury. Less than a week later, a New Orleans jury
acquitted Rainey of the sole remaining charge alleging that Rainey made
a false statement to federal law enforcement agents during an interview
a year after the *Deepwater Horizon* incident.

This article analyzes the pre-trial litigation that led to Rainey's
acquittal on the obstruction of Congress charge. It also contains the
district court's unreported oral decisions from the bench, which
addressed an important issue of first impression: the consequences to a
criminal case of a fundamental conflict between the Speech or Debate
Clause privilege and a criminal defendant's Fifth and Sixth Amendment
rights to compulsory process and to present a defense at trial. Finally, it
addresses some of the lessons learned from this case, including (1) there
is only one United States when it comes to a criminal prosecution,
rendering the consequences of a privilege assertion by Members of
Congress attributable to the Executive Branch, (2) a criminal
defendant's right to compulsory process cannot be vindicated by
voluntary testimony limited in scope by the witness, (3) district courts
have power to exclude all congressional evidence if a selective
invocation of the Speech or Debate Clause privilege leads to a one-
sided, unfair presentation of evidence, and may acquit a defendant if the
ruling leads to a failure of proof on an essential element, and (4) given
the unpredictability and self-interest of Members of Congress and their
staff, and the absolute nature of the Speech or Debate Clause privilege,
prosecutors should not pursue a criminal charge that requires
congressional testimony if any alternatives are available.

## II.  BACKGROUND

### A.  The *Deepwater Horizon* Incident and Rainey's Involvement

David Rainey was a Ph.D. geologist who worked for BP for
more than 30 years. In 2010, he was BP's Vice President of Exploration

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

for the Gulf of Mexico, the number two exploration job in the company. On April 20, 2010, a blowout of oil and gas occurred on the *Deepwater Horizon* drilling rig in the Gulf of Mexico. Eleven men were killed in the explosion. Over the next 87 days, oil leaked from the damaged well.

After the blowout, Rainey abandoned his normal job responsibilities and worked full time responding to the oil spill. He served on behalf of BP as a Deputy Incident Commander within the Unified Command, the organization coordinating the response to the oil spill. Unified Command consisted of representatives from federal, state and local governments, as well as BP and Transocean, the designated "responsible parties" for the oil spill response.

Among the many responsibilities he handled within the Unified Command, Rainey prepared some early "flow rate" estimates of the number of barrels of oil per day leaking from the well. Rainey estimated flow rate by calculating the volume of the oil on the water using overflight maps and standard protocols that estimate the thickness of oil by color. This methodology was highly uncertain but it was the best available at the time. The unknown conditions of the damaged well prevented BP from using the sophisticated computer modeling programs normally used by reservoir engineers to calculate flow from completed production wells. To account for the uncertainty, Rainey calculated a range of flow rate estimates with a "low," "best guess," and "high" estimate. On April 27, 2010, using this methodology, Rainey estimated a range of flow rate estimates from roughly 1,000 to 6,000 to 14,000 barrels of oil per day.

On April 26, 2010, a scientist from the National Oceanic and Atmospheric Administration ("NOAA") prepared his own estimate of flow rate. Using two methods, the surface methodology relied on by Rainey and a video methodology, the NOAA scientist estimated that the flow rate was approximately 5,000 barrels of oil per day.

On April 28, 2010, the Unified Command raised its initial flow rate estimate of 1,000 barrels of oil per day to 5,000 barrels of oil per day. This remained the official government estimate of flow rate until late-May 2010.[1]

---

[1]   Even today, following years of scientific study and extensive multi-district litigation, there is significant uncertainty as to the actual flow rate.  According to the final report from the Flow Rate Technical Group, which was created to estimate the flow rate and volume of oil released, the flow rate "decreased over the 87 days [of the oil spill] from an initial 62,000 to a final 53,000 barrels per day, for a total release of 4.9 million barrels of oil . . . .  The estimated uncertainty on these flow values is also

ISSUE 20:2                                                                FALL 2015

In mid-May 2010, BP released a video clip of the plume of oil leaking into the Gulf. This led various individuals to attempt to estimate the flow rate, including a university professor who estimated the flow rate at 70,000 barrels per day. Soon thereafter, BP's general counsel requested a summary of the efforts to estimate flow rate within the Unified Command that had led to the 5,000 barrels per day estimate. Rainey wrote an internal memorandum for counsel that summarized the flow rate work of which he was aware, which became known as the "Rainey Memo."[2] BP subsequently sent the Rainey Memo to government officials within the Unified Command.

On May 14, 2010, Rep. Markey sent a letter to BP on letterhead of the House of Representative's Committee on Energy and Commerce requesting a variety of information regarding flow rate, including BP's current flow rate estimate and all documents that related to estimates of the amount of oil being released.[3] Rainey was asked to use his recently prepared Rainey Memo to draft a response to Rep. Markey's questions. After he did so, a team of BP executives and in-house and outside counsel revised and finalized the draft, ultimately sending the response

---

±10%." NATIONAL INCIDENT COMMAND, INTERAGENCY SOLUTIONS GROUP, FLOW RATE TECHNICAL GROUP, ASSESSMENT OF FLOW RATE ESTIMATES FOR THE DEEPWATER HORIZON / MACONDO WELL OIL SPILL 1-2 (2011). In the multi-district litigation related to the oil spill, the U.S. government argued that the total release was 5 million barrels, while BP maintained that the total release was 3.26 million barrels. Findings of Fact and Conclusions of Law, Phase Two Trial, *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 (MDL 2179), Case 2:10-md-02179-GJB-SS, at 39 (E.D. La. Jan. 15, 2015), ECF No. 14021. BP also argued that the "discharge began at a relatively low rate" and increased over time as various restrictions in the wellbore eroded. *Id.* at 40. The district court described the evidence related to flow rate as "voluminous, dense, highly technical, and conflicting," and stated "[t]here is no way to know with precision how much oil discharged into the Gulf of Mexico." *Id.* at 40-41. With minimal analysis, the court "split the baby" and held that the total release was 4 million barrels. *Id.* at 43.

2    Rainey Memo filed as part of Ex. B to Def. David Rainey's Mot. to Dismiss Count One of the Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Mar. 4, 2013), ECF No. 45-3.

3    Letter from Chairman Edward Markey, Subcommittee on Energy and Environment, Committee on Energy and Commerce, to Lamar McKay, President and CEO, BP America, Inc. (May 14, 2010) filed as Ex. E to Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (or, in the Alternative, Motion for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190-2.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          265

to Rep. Markey on May 24, 2010 with a copy of the Rainey Memo.[4]

Months later, after the well was capped, the U.S. Department of Justice created the *Deepwater Horizon* Task Force (the "Task Force") to investigate the circumstances leading up to the blowout and BP's actions during the response to the oil spill. Among other issues, the Task Force investigated whether BP intentionally understated and attempted to mislead the public and government officials about the flow rate.

On April 6, 2011, the Task Force interviewed Rainey in New Orleans, Louisiana. A colleague and I represented Rainey during the all-day interview. Three prosecutors, two law enforcement agents, and a paralegal participated for the Task Force. The interview was not recorded or transcribed. An FBI agent was the sole government participant who took notes during the interview. The FBI subsequently generated a 33-page, single spaced Form FD-302 summarizing the interview.[5]

## B. The Indictment

On November 14, 2012, Rainey was charged in a two-count indictment.[6] The indictment alleged that after Rainey received the NOAA flow rate estimate of 5,000 barrels of oil per day, he "reverse engineered" his own flow rate estimates to achieve consistent results.

---

[4]   BP's May 24, 2010 letter to Rep. Markey and production of documents filed as Ex. B to Def. David Rainey's Mot. to Dismiss Count One of the Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Mar. 4, 2013), ECF No. 45-3.

[5]   FBI Form FD-302 summarizing Rainey's interview filed as Ex. 2 to Gov't's Mot. Concerning Potential Conflicts of Interest and "Unsworn Witness" Problems Arising from Defense Counsel's Status as a Witness to the Crime Charged in Count Two of the Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 7, 2013), ECF No. 99-2.

[6]   Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Nov. 14, 2012), ECF No. 1. The next day, the Department of Justice issued a press release announcing the charges and also stating that BP had agreed to plead guilty to a 14-count information, including an obstruction of Congress charge that mirrored Count One in Rainey's indictment, and pay a $4 billion criminal fine, the largest criminal fine in history as of that date. *See* Press Release, U.S. Dep't of Justice, BP Exploration and Production Inc. Agrees to Plead Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress Surrounding Deepwater Horizon Incident (Nov. 15, 2012), *available at* http://www.justice.gov/opa/pr/bp-exploration-and-production-inc-agrees-plead-guilty-felony-manslaughter-environmental; *see also* Information, United States v. BP Exploration & Prod., Inc., No. 2:12-CR-292 (E.D. La. Nov. 15, 2012*)*, ECF No. 1; Guilty Plea Agm't, United States v. BP Exploration & Prod., Inc., No. 2:12-CR-292 (E.D. La. Nov. 15, 2012), ECF No. 2.

266                    *BERKELEY JOURNAL OF CRIMINAL LAW*                    Vol. 20:2

The indictment accused Rainey of lying about his flow rate estimates in the Rainey Memo, in BP's response to Rep. Markey's letter, and during his Task Force interview. Count One alleged that Rainey obstructed a congressional investigation, in violation of 18 U.S.C. § 1505. Count Two alleged that Rainey made a false statement during his interview with the Task Force, in violation of 18 U.S.C. § 1001.

The obstruction of Congress charge alleged that following the *Deepwater Horizon* blowout, the Subcommittee on Energy and Environment, a subcommittee of the U.S. House of Representatives' Committee on Energy and Commerce, initiated an investigation into the amount of oil flowing from the well. It alleged that the May 14, 2010 letter from Rep. Markey, the Subcommittee Chairman, was part of the Subcommittee's investigation. The indictment accused Rainey of misleading the team of BP in-house and outside lawyers working on BP's response to the letter, and thereby causing BP to submit a false and misleading response to Rep. Markey. Among other things, the indictment accused Rainey of withholding documents and information inconsistent with the 5,000 barrels per day flow rate estimate, and causing BP to provide Rep. Markey with the Rainey Memo that allegedly contained false and misleading statements defending his flow rate estimates.

Rainey pleaded not guilty to the charges. He maintained that he acted in good faith and his flow rate estimates were legitimate and honest. He also categorically denied making any misrepresentations about his flow rate estimates in any forum. On Rainey's behalf, we also maintained that there was no basis for the obstruction of Congress charge because Rep. Markey sent his letter in an individual capacity and not as part of any authorized congressional inquiry.

### C. The Original Dismissal Of Count One

On May 20, 2013, Judge Engelhardt dismissed Count One of the indictment, holding that Section 1505 did not apply to subcommittee investigations.[7] Analyzing Section 1505's language prohibiting obstruction of "any inquiry or investigation . . . being had by . . . any committee of either House," the district court held: "after consulting the text, context, and legislative history, the Court cannot 'say with

---

[7]    United States v. Rainey, 946 F. Supp. 2d 518, 545-46 (E.D. La. 2013). The Court denied as moot our motion based on unconstitutional vagueness, and denied without prejudice our motion seeking a determination that Rep. Markey's letter on which Count One was based was not part of a congressional investigation. *Id.* at 545.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          267

certainty' that Congress intended section 1505 to reach subcommittee inquiries."[8]

On appeal, the Fifth Circuit reversed and remanded the case for trial.[9] In its ruling, however, the court noted a limitation on the scope of Section 1505 that would become central to the legal proceedings before the district court on remand. The court stated that "[a] successful prosecution under § 1505 must arise from the obstruction of 'the *due and proper exercise of the power of inquiry* under which any inquiry or investigation is being had.'"[10] The court cited a decision in which the Fourth Circuit held that: "'[t]he question of whether a given congressional investigation is a 'due and proper exercise of the power of inquiry' for purposes of § 1505 can not be answered with a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances.'"[11] The Fifth Circuit in *Rainey* went on to state:

> With this discernment in mind, we observe that unauthorized frolics by a House entity might lose protection regardless of its committee status because there would be no 'due and proper exercise of the power of inquiry' to obstruct. Indeed, Rainey invoked this statutory restraint below in a motion to dismiss count one, but the district court denied this motion without prejudice. In sum, § 1505 is powerful, but not without internal restraints.[12]

Although we were disappointed by the Fifth Circuit's ruling, we viewed this statement, which was not necessary to the court's holding, as a potential signal to the district court to credit our argument that Rep. Markey's letter was an individual frolic not covered by the obstruction of Congress statute.

## III.  PRETRIAL LITIGATION

### A.  Motions Practice Following The Remand

Following the remand, the Task Force secured a superseding indictment on September 19, 2014, which contained the same two charges with minor modifications.[13] On behalf of Rainey, we moved to

---

[8]   *Id.* at 542.
[9]   United States v. Rainey, 757 F.3d 234, 235 (5th Cir. 2014).
[10]  *Id.* at 246 (quoting 18 U.S.C. § 1505) (emphasis in original).
[11]  *Id.* (quoting United States v. Mitchell, 877 F.2d 294, 300-01 (4th Cir. 1989)).
[12]  *Rainey*, 757 F.3d at 246-47.
[13]  Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D.

268                *Berkeley Journal of Criminal Law*                Vol. 20:2

dismiss Count One on three distinct grounds.

First, we argued that there was no "due and proper exercise of the power of inquiry" by a subcommittee as required by Section 1505.[14] We contended that there was no specific authorization of the subcommittee investigation alleged in the indictment, and that the general standing authority of the Committee on Energy and Commerce and its Subcommittee on Energy and Environment was insufficient to authorize an "investigation" for purposes of Section 1505. We also asserted that Rep. Markey's actions could not be automatically attributed to the Subcommittee solely based on his status as its chairman. We relied heavily on a series of cases from the McCarthy era involving the House Un-American Activities Committee and other aggressive congressional inquiries, in which the Supreme Court required clear and specific authorization of any congressional investigation before there could be a conviction under the related contempt of Congress statute.[15]

Second, we argued that Rep. Markey sent the May 14, 2010 letter as an individual Member of Congress and not pursuant to any investigation by the Subcommittee on Energy and Environment.[16] Moreover, we contended that the Committee on Energy and Commerce carried out its investigation into the *Deepwater Horizon* incident through its Subcommittee on Investigations and Oversight, not the Subcommittee on Energy and Environment. Thus, BP's response to the May 14 letter was not within the scope of 18 U.S.C. § 1505. Although these arguments were fact-based, we supported them with documentary exhibits from the public domain and relied on a series of cases giving district courts the power to dismiss an indictment where the essential facts are undisputed and reveal that an element of the offense is missing.[17]

---

La. Sept. 19, 2014), ECF No. 179.

[14]  Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment for Lack of a Due and Proper Exercise of the Power of Congressional Inquiry, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 188.

[15]  *Id.* at 12-14 (citing Watkins v. United States, 354 U.S. 178 (1957) and Gojack v. United States, 384 U.S. 702 (1966)).

[16]  Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (Or, In the Alternative, Mot. for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190.

[17]  *Id.* at 2 (citing United States v. Flores, 404 F.3d 320 (5th Cir. 2005) and United

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

Third, we argued that Section 1505 was unconstitutionally vague as applied to the allegations in the case.[18] The obstruction statute vaguely defines "corruptly," the criminal intent standard required, as acting with an "improper purpose."[19] We asserted that this language did not give fair warning that failing to disclose information in response to a voluntary congressional request where there was no legal duty to disclose was covered by the statute.

We recognized that the district court might conclude that the issues we had raised in these motions were factual disputes to be resolved by the jury. Therefore, we took steps to aggressively pursue evidence supporting our claim that Rep. Markey acted on his own without proper authorization. Specifically, we moved for authorization to serve early-return subpoenas *duces tecum* on the Committee on Energy and Commerce, the Subcommittee on Energy and Environment, and the Chairmen and Ranking Members of those entities.[20] We knew the federal rules of criminal procedure limited the scope of discovery a defendant could obtain from third parties, and we anticipated that the congressional witnesses and entities would likely object to the subpoenas. As a result, we narrowly tailored the proposed subpoenas to seek documentary evidence solely regarding whether there was an authorized investigation within the scope of 18 U.S.C. § 1505. We deliberately failed to seek a broader set of documents relevant to our defense in order to maximize the likelihood that the district court would authorize the subpoenas.

The district court held a motions hearing on December 3, 2014. In discussing the motions related to Count One, the court noted that the Fifth Circuit had identified a "limiting principle" in Section 1505, that is "whether or not an investigation is duly authorized."[21] According to the court:

---

States v. Fontenot, 665 F.3d 640 (5th Cir. 2011)).

[18]   Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment for Unconstitutional Vagueness, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 192.

[19]   *See* 18 U.S.C. § 1515(b) ("As used in section 1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.").

[20]   Def. David Rainey's Mot. for Issuance of Early-Return Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 206.

[21]   Transcript of Oral Argument at 13, United States v. Rainey, Crim. No. 12-291 (E.D. La. Dec. 3, 2014).

270          *BERKELEY JOURNAL OF CRIMINAL LAW*          Vol. 20:2

> The reason for that is to prevent a member of Congress, whether it's Senator McCarthy or somebody else, from hauling off and doing a solo act investigation . . . and issuing subpoenas to people to appear all over the place and putting them on the rack to question them.[22]

The court took under advisement the motions to dismiss Count One. With respect to the early-return subpoenas, the court stated: "I'm more convinced now that the information [sought in the subpoenas] is material both for pretrial motion purposes as well as trial purposes."[23] Thus, the court authorized Rainey to serve the early-return document subpoenas on the congressional entities and individuals.[24]

### B.  Dealings With The Congressional Parties And Additional Motions Practice

#### 1.  Rainey's Subpoenas Duces Tecum to the Congressional Parties

In December 2014, Rainey served the subpoenas *duces tecum* on the Committee on Energy and Commerce, the Subcommittee on Energy and Environment, and the Chairmen and Ranking Members of those entities. On behalf of the congressional subpoena recipients, the U.S. House of Representatives General Counsel's office ("House Counsel") objected to the document subpoenas and declined to comply.  Among other things, House Counsel asserted that the subpoena recipients were absolutely protected against making a compelled disclosure of legislative materials by the Speech or Debate Clause.[25] House Counsel offered to make a voluntary production of documents in lieu of subpoena compliance on behalf of the individual Members of Congress. With respect to the Committee on Energy and Commerce and the Subcommittee on Energy and Environment, however, House Counsel flatly declined to comply on Speech or Debate Clause and other grounds.[26]

When these congressional witnesses and entities refused to

---

[22]   *Id.*

[23]   *Id.* at 67.

[24]   Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. Dec. 11, 2014), ECF No. 264.

[25]   U.S. CONST. art. I, § 6, cl. 1 ("for any Speech or Debate in either House they [Senators and Representatives] shall not be questioned in any other Place").

[26]   House Counsel's letter objecting to the subpoenas filed as Ex. M to Def. David Rainey's Mot. to Compel Compliance with Subpoenas Duces Tecum, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 2, 2015), ECF No. 293-2.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          271

comply with Rainey's document subpoenas, we knew we had a real opportunity to challenge the viability of the obstruction of Congress count. Based on the discovery we received from the Task Force, it was apparent that the prosecutors had not fully explored the authorization issue during the investigation. The only congressional records in the Task Force's massive discovery production were a small set of materials obtained informally from one of Rep. Markey's staff members. Moreover, while the Task Force had interviewed a few Markey staffers during the investigation, they had not interviewed Rep. Markey himself or any other Members of the Committee or Subcommittee. Thus, aside from the opinions of a few Markey staffers, the Task Force possessed no evidence that Rep. Markey's letter was part of an authorized Subcommittee investigation. We were convinced that no such evidence existed. We also believed that truthful testimony from congressional witnesses who did not work for Rep. Markey would confirm as much. Yet we were faced with a serious problem: assuming the congressional witnesses would raise the same objections to testimonial subpoenas, Rainey had no ability to compel this favorable evidence if the district court upheld the objections. Our strategy going forward was designed to compel the production of this favorable congressional evidence or obtain the dismissal of the obstruction of Congress charge.

### 2.  Rainey's Motion to Compel

On February 2, 2015, Rainey moved to compel compliance with the document subpoenas.[27] We maintained that the documents sought were central to a key element of the charged offense, whether the alleged investigation was a "due and proper exercise of the power of inquiry" by the Subcommittee. We also argued that Rainey's rights to compel the production of such evidence, and to present material evidence at trial, were guaranteed by the Fifth and Sixth Amendments.

We raised several arguments in response to the congressional parties' Speech or Debate Clause objections. First, relying on *Gravel v. United States*, 408 U.S. 606 (1972), we argued that the Speech or Debate Clause does not forbid disclosure of legislative act evidence if the evidence is "relevant to investigating possible third-party crime," where the legislative act is "in itself not criminal" and the legislator faces

---

[27]   Def. David Rainey's Mot. to Compel Compliance with Subpoenas Duces Tecum, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 2, 2015), ECF No. 293.

Case 1:21-cr-00670-CJN   Document 116-2   Filed 07/15/22   Page 15 of 43
Heberlig: United States v. David Rainey: A Case Study

Issue 20:2                                                          Fall 2015

neither criminal nor civil liability.[28] Specifically, we argued that the Speech or Debate Clause did not contain a non-disclosure privilege precluding the production of documents regarding legislative acts. The only circuit that had endorsed a "non-disclosure privilege" is the D.C. Circuit in *United States v. Rayburn House Office Building, Rm. 2113*, 497 F.3d 654 (D.C. Cir. 2007), where a divided panel concluded that the Executive Branch violated the Clause by executing a search warrant of Representative William Jefferson's congressional office. We relied on *In re Grand Jury Investigation (Eilberg)*, 587 F.2d 589 (3d Cir. 1978), where the Third Circuit enforced a grand jury subpoena for a congressman's telephone bills, stating that "the privilege when applied to records or third-party testimony is one of nonevidentiary use, not of non-disclosure."[29] We also relied on *United States v. Renzi*, 651 F.3d 1012 (9th Cir. 2011), where the Ninth Circuit similarly declined to recognize "some grandiose, yet apparently shy, privilege of non-disclosure that the Supreme Court has not thought fit to recognize."[30]

Second, we argued that even if the Speech or Debate Clause applied to the production of documents in a third-party criminal case, Rainey's constitutional rights to compel production of evidence and present a defense under the Fifth and Sixth Amendments outweighed that interest. Noting that "the authors of the Bill of Rights did not undertake to assign priorities" between amendments, "ranking one as superior to the other,"[31] we urged the district court to balance the competing constitutional interests in Rainey's favor given the fundamental constitutional right of a criminal defendant to present a complete defense.[32] We relied on cases involving other analogous privileges, such as the state secrets privilege,[33] the warmaking power,[34]

---

[28]    *Gravel*, 408 U.S. at 628-29.

[29]    *Eilberg*, 587 F.2d at 597.

[30]    *Renzi*, 651 F.3d at 1032.

[31]    Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 561 (1976).

[32]    Holmes v. South Carolina, 547 U.S. 319, 324 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

[33]    United States v. El-Mezain, 664 F.3d 467, 523 n.16 (5th Cir. 2011) (stating that the absolute privilege against disclosure of state secrets "will not succeed when the information is helpful to the defense or essential to a fair determination of the cause . . .").

[34]    United States v. Moussaoui, 382 F.3d 453, 469-74 (4th Cir. 2004) (holding any potential burden on the Executive Branch's war-making power under Article II does not

Published by Berkeley Law Scholarship Repository, 2015

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          273

the executive privilege,[35] and the informers privilege,[36] where courts have held that those privileges cannot trump a criminal defendant's constitutional rights. We also relied on a long history of Supreme Court cases enforcing subpoenas for evidence served on both Members of Congress and Presidents.[37]

Finally, we argued that any Speech or Debate Clause privilege had been waived by selective invocation of the privilege, where the congressional parties had produced certain documents to the Task Force and permitted select congressional staff members to be interviewed during the investigation. We knew we faced an uphill battle given the Supreme Court's holding in *United States v. Helstoski*, 442 U.S. 477 (1979), that a waiver of the Speech or Debate Clause requires a "clear and unambiguous [] expression of waiver."[38] Nonetheless, we urged the district court to follow analogous precedent from the attorney-client and work product context holding that a privilege holder may not wield a privilege as both a sword and a shield in an unfair manner presenting a distorted view of the subject matter covered by the privilege assertion.[39]

---

outweigh a defendant's rights under the Fifth and Sixth Amendments, even though "no government interest is more compelling than the security of the nation") (citation omitted).

[35]   United States v. Nixon, 418 U.S. 683 (1974) (rejecting claim of absolute Executive Privilege, holding the privilege must be balanced against need for full factual disclosure in criminal proceedings).

[36]   Roviaro v. United States, 353 U.S. 53, 59-61 (1957) (holding government's "informer privilege" must give way to a defendant's rights if the informer's identity would be "relevant and helpful" to the defense).

[37]   *See* United States v. Cooper, 4 U.S. (4 Dall.) 341 (C.C.D. Pa. 1800) (Chase, J., sitting on Circuit) (approving subpoena issued by a criminal defendant to Members of Congress, stating that he "d[id] not know of any privilege to exempt member of congress from . . . the obligations, of a subpoena, in such cases."); United States v. Burr, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (issuing subpoena duces tecum to President Jefferson, requiring production of a letter for use by the defense in Aaron Burr's treason trial); *Nixon*, 418 U.S. at 707-16 (upholding grand jury's subpoena for the Watergate tapes); Clinton v. Jones, 520 U.S. 681, 701-02, 705 (1997) (upholding subpoena requiring President Clinton's testimony in Paula Jones's civil lawsuit).

[38]   *Helstoski*, 442 U.S. at 493.

[39]   *See, e.g.,* In re Pacific Pictures, 679 F.3d 1121, 1125, 1131 (9th Cir. 2012) (rejecting selective waiver where disclosing party provided documents pursuant to subpoena to US Attorney's Office).

Heberlig: United States v. David Rainey: A Case Study

ISSUE 20:2                                                                                    FALL 2015

274                 *BERKELEY JOURNAL OF CRIMINAL LAW*                 Vol. 20:2

### 3.  *Negotiated Voluntary Productions of Documents from Individual Members of Congress Revealed Exculpatory Information*

While the motion to compel was pending, we agreed to withdraw the document subpoenas to the individual Members of Congress in exchange for the voluntary production of documents responsive to the subpoena requests. We hoped that the voluntary productions would contain exculpatory evidence and knew that we would still be able to litigate the Speech or Debate Clause issues with the Committee and Subcommittee, which had flatly refused to provide any information responsive to the subpoenas. On behalf of the individual Members, House Counsel voluntarily produced documents with an express reservation that by doing so, the individual Members did not waive the protections of the Speech or Debate Clause. The ensuing voluntary productions contained a wealth of exculpatory evidence strongly suggesting that the May 14, 2010 letter from Rep. Markey was not part of any authorized investigation by the Subcommittee on Energy and Environment. We outlined this exculpatory evidence in a supplemental memorandum in support of Rainey's motions to dismiss Count One of the indictment.[40] Notably, the documents revealed that Rep. Markey and his staff did not seek authorization from the Committee on Energy and Commerce or the Subcommittee on Energy and Environment to send the May 14, 2010 letter to BP. The individuals who drafted and edited the May 14, 2010 letter were all Rep. Markey's personal staffers or staffers from a different committee that Markey chaired. These staffers originally drafted the letter to be sent by Rep. Markey on behalf of that different committee—the Select Committee on Energy Independence and Global Warming. Only at the last minute did they change the signature block to the Subcommittee on Energy and Environment.

More importantly, the documents revealed conclusively that Rep. Markey did not share the May 14, 2010 letter with the Committee or Subcommittee before he sent it to BP. Indeed, the ranking minority member of the Subcommittee possessed no documents responsive to Rainey's subpoena. Moreover, Rep. Markey failed even to notify Committee staff that he had sent a letter to BP requesting information

---

[40]  Suppl. Mem. in Supp. of Def. David Rainey's Mots. to Dismiss Count One of the Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 315.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          275

until hours after sending the letter to BP. Upon learning of Rep. Markey's request, committee staffers voiced disapproval of the unilateral manner in which Rep. Markey had sought information. An email from the Committee on Energy and Commerce's chief counsel to its majority staff director stated: "This doesn't seem like the way things ought to work. Markey sent a letter to BP as Chair of E&E on E&C letterhead asking for certain BP documents to be produced with 24 hours. We received no heads up until after the letter was sent (and I think in the press)." In addition, Rep. Markey's staffers noted that they had available "stashes" of Committee letterhead that could be used for the letter, calling into question claims by the Task Force that Rep. Markey's use of Committee on Energy and Commerce letterhead carried significance on the authorization issue.[41]

### 4. The District Court Denied Rainey's Motion to Compel

On February 23, 2015, the district court held a hearing on the motion to compel. House Counsel took the position that the Speech or Debate Clause barred Rainey from compelling production of the documents. However, House counsel suggested that Rainey should ask for the documents voluntarily and the Committee and Subcommittee might produce them.[42] Yet counsel was unwilling to make any commitments, stating: "I don't know that the committee has any additional responsive documents. We don't know that yet. The answer might be yes, might be no. I don't know whether the committee would be willing to produce that, would be willing to not assert its Speech or Debate rights."[43]

The district court noted that the Fifth Circuit in *Rainey* had suggested that the issue of whether a congressional investigation was duly authorized must be "answered by a careful examination of all the surrounding circumstances."[44] The court asked House Counsel: "So how would a defendant in Mr. Rainey's position be able to broach that issue

---

[41]   We attached the relevant documents as Exs. D-Y to the Suppl. Mem. in Supp. of Def. David Rainey's Mots. to Dismiss Count One of the Second Superseding Indictment, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 315-1.

[42]   Transcript of Oral Argument at 40, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015) ("he can't compel the documents. He needs to ask for them.").

[43]   *Id.* at 42.

[44]   *Id.* at 44-45.

Issue 20:2                                                          Fall 2015

276                 *Berkeley Journal of Criminal Law*                 Vol. 20:2

and present that issue to the Court or, if need be, to the jury without information such as what has been subpoenaed in this case?"[45] House Counsel declined to answer, deferring to the prosecutors to explain the impact of the Speech or Debate Clause assertion.[46]

At the end of the hearing, the district court denied Rainey's motion to compel from the bench, accepting the House Counsel's argument that the Speech or Debate Clause prevented Rainey from compelling the production of legislative documents for his defense. However, in a foreshadowing of the district court's ultimate decision, the court raised serious concerns with the implications of its ruling:

> I think there were portions of the argument today, the obvious questions are what the implications of the Court's ruling are in terms of Count 1 in this case, and I recited a passage from the Fifth Circuit's opinion in this case—in this case—which troubles me greatly in terms of where we are.
>
> I think there are some evidentiary issues. There are issues relative to the viability of Count 1. And I might even add again, which I commented on a short while ago, on page 20 the Fifth Circuit has even seen fit to question whether § 1505 has a jurisdictional element, which touches upon some of the very documents which may or may not exist in connection with the subpoena that the Court cannot compel a response to.
>
> Moreover, my appreciation of the cases that are cited by counsel for the House are that the Court cannot even indulge in an ex parte or an in camera review of those documents for the same reasons that have been argued by the House here today. So we are sort of at a crossroads in the case, a very interesting one, and one that I think is troublesome in terms of the Fifth and Sixth Amendment arguments that have been made by the defendant.
>
> There is no request in this case for relief along those lines because, obviously, the Court hadn't made a decision on the subpoena. So now that we have a decision on the subpoena, we will go from here.[47]

The district court confirmed its ruling in a minute order issued the same day.[48]

---

[45] *Id.* at 45.

[46] *Id.* at 46.

[47] *Id.* at 63-64.

[48] Minute Entry Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. Feb. 23, 2015), ECF No. 320.

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          277

### 5. The Voluntary Production of Committee and Subcommittee Records With No Meaningful Assurances Regarding Completeness

Following the district court's ruling, with no ability to compel the production of documents, Rainey asked the Committee on Energy and Commerce and Subcommittee on Energy and Environment to voluntarily produce all documents responsive to the document requests in his subpoenas *duces tecum*. Given the importance of the documents to the authorization element of 18 U.S.C. § 1505, we sought to ensure that the voluntary production would be as comprehensive as compliance with the subpoenas. Specifically, we requested that the House Counsel identify the nature and extent of hard copy and electronic records maintained by the Committee and Subcommittee, the document custodians whose hard copy and electronic records would be searched as part of the voluntary production, and the key words that would be used to search for responsive documents.[49]

On behalf of the Committee and Subcommittee, House Counsel voluntarily produced a mere 57 pages of responsive documents, again with an express reservation that those entities were not waiving the Speech or Debate Clause privilege. However, House Counsel did not identify the custodians whose files were searched, the key words that were used for any electronic searches, or any of the other information requested by Rainey.[50] The voluntarily produced documents did not contain any discussion of an inquiry or investigation by the Subcommittee. The documents also failed to show any Committee or Subcommittee involvement in drafting Rep. Markey's May 14, 2010 letter to BP, or even awareness of the letter before Rep. Markey sent it to BP and the media.

### 6. Rainey's Subpoenas For Trial Testimony to the Relevant Members of Congress and Committee Staff

Based on the disclosure of exculpatory information, we asked to interview Rep. Markey, Rep. Henry Waxman (the Chairman of the Committee on Energy and Commerce), and Rep. Bart Stupak (the

---

[49] *See* Ex. A to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.
[50] *See* Exs. B & C to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

278 *BERKELEY JOURNAL OF CRIMINAL LAW* Vol. 20:2

Chairman of the Committee on Energy and Commerce's Subcommittee on Investigation and Oversight), as well as six Committee on Energy and Commerce staffers who sent or received the exculpatory emails in Rep. Markey's voluntary document production.[51] By 2015, neither Waxman nor Stupak was a Member of the House, and Markey was a U.S. Senator. On behalf of all nine witnesses, the House General Counsel's office informed Rainey that each of the Members and staffers declined to be interviewed.[52] Thereafter, on March 10, 2015, Rainey served subpoenas for trial testimony on Reps. Markey, Waxman, and Stupak, as well as the six Committee on Energy and Commerce staff members.[53]

The testimony of the Members was also relevant because the Task Force had asserted that there was an informal agreement between Reps. Waxman, Markey, and Stupak that authorized the Subcommittee investigation. Specifically, in a bill of particulars ordered by the district court, the Task Force alleged: "Chairman Markey of the Subcommittee, Chairman Henry Waxman of the Committee, and Chairman Bart Stupak of the Subcommittee on Oversight and Investigations, and their respective staff, reached an understanding on how to divide the jurisdiction of the Committee's overall investigation into the *Deepwater Horizon* blowout and oil spill."[54] Notably missing from the bill was any allegation specifying when the Members reached this purported understanding. Moreover, the documents voluntarily produced by Rep. Markey called into question this allegation. As a result, Rainey sought to compel trial testimony from the relevant individuals in support of his defense.

In early-April 2015, with the trial date less than two months away, we attempted to learn the congressional witnesses' position on Rainey's request for trial testimony and whether a motion to quash was forthcoming. In a telephone conversation, House Counsel indicated that

---

[51]   *See* Ex. A to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

[52]   *See* Ex. B to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

[53]   *See* Ex. D to Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs., United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392-1.

[54]   Government's Bill of Particulars at 6, United States v. Rainey, Crim. No. 12-291 (E.D. La. Jan. 6, 2015), ECF No. 274.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            279

the subpoena recipients would likely move to quash, but might agree to voluntary testimony, although no decisions had been made and there was no timetable for the witnesses to decide. Accordingly, on April 13, 2015, Rainey asked the district court to set a deadline for the nine subpoenaed witnesses to file any motion to quash and to notify the parties whether they would voluntarily provide trial testimony without invoking the Speech or Debate Clause privilege.[55]

### 7.  The Congressional Witnesses Resist Taking Any Position On The Trial Subpoenas

On April 16, 2015, on behalf of the nine congressional witnesses, House Counsel opposed Rainey's request that the district court set a deadline for any motion to quash and decisions concerning potential voluntary testimony.[56] House Counsel contended that because the trial subpoenas were not returnable until June 1, 2015, the first day of trial, the district court lacked any "coercive power" over the subpoena recipients, and the subpoena recipients were under no obligation to take any positions until that time. In addition, House Counsel maintained that Rainey's pending motions to dismiss Count One rendered his request premature, because a dismissal could moot any need for the requested testimony. House Counsel also noted that three congressional staffers on the Task Force's witness list had agreed to testify at trial on the authorization issue without asserting (but supposedly without waiving) the Speech or Debate Clause in response to the prosecutors' questions or cross-examination questions "within the scope of direct about those same issues." Thus, according to House Counsel, Rainey would have an opportunity to question congressional witnesses about the authorization issue. House Counsel noted that they were "uncertain at this time" whether Reps.  Markey and Waxman, who were also on the Task Force's witness list, would testify at trial.[57]

At a status conference on April 22, 2015, the district court indicated that it would not rule on Rainey's pending motions to dismiss until it understood whether the congressional witnesses subpoenaed by Rainey would testify at trial. During the status conference, the Task

---

[55]   Def. David Rainey's Suppl. Mem. Regarding Cong. Witnesses and Docs. at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 13, 2015), ECF No. 392.

[56]   Opp'n to Defs. "Alternate or Interim" Request that the Court Order Nine Non-Party Witnesses to Respond Six Weeks Early to their Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 16, 2015), ECF No. 400.

[57]   *Id.* at 4 n.4.

280            BERKELEY JOURNAL OF CRIMINAL LAW            Vol. 20:2

Force represented that Reps. Waxman and Markey had not yet agreed to testify in the Task Force's case, and would not decide whether to testify until the district court resolved Rainey's pending motions to dismiss.[58] In other words, these Members of Congress who possessed critical evidence on the authorization issue wanted to "wait and see" before deciding whether to testify for either side. This was particularly galling in the case of Rep. Markey, who had repeatedly demanded information in real time from BP during the emergency response to the oil spill, including requiring executives to participate in briefings and hearings in Washington, D.C.[59] Yet when it came time for Rainey to defend himself, Rep. Markey was unwilling to commit to testifying for either the prosecution or the defense.

On April 23, 2015, Rainey formally moved the district court to set a deadline for the congressional witnesses.[60] Among other things,

---

[58] The Task Force later memorialized this representation in a pleading.  *See* Gov't's Resp. in Opp'n to the Def.'s Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify at 6 n.2, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 438 ("What government counsel informed the Court and the defense was that, as of [April 22, 2015], Reps. Waxman and Markey had not agreed to testify, but rather had chosen to wait and see how the Court would resolve the defendant's pending motions to dismiss. Depending on the resolution of those motions, Reps. Waxman and Markey were willing to revisit the issue of trial testimony on a voluntary basis."). House Counsel confirmed this position. Nine Non-Party Subpoena Recipients' (I) Reply to Def.'s Opp'n to their Mot. to Quash their Trial Subpoenas, and (II) Resp. to Def.'s Mot. for Remedial Relief at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 431 (confirming it had authorized the prosecutors to represent at the April 22 status conference that "Senator Markey and former Congressman Waxman would resist being compelled to testify, but [] would defer making any final decision regarding voluntary testimony until after this Court rules on Mr. Rainey's pending motions to dismiss.").

[59] *See, e.g.*, Exs. E, L, M, N to Def. David Rainey's Mot. to Dismiss Count One of the Second Superseding Indictment Because (Or, In the Alternative, Mot. for an Evidentiary Hearing to Confirm that) the May 4 Briefing and the May 14 Letter Were Not Part of a Subcommittee Investigation, United States v. Rainey, Crim. No. 12-291 (E.D. La. Oct. 27, 2014), ECF No. 190-2. Rep. Markey even later cited his "one man" investigation as a reason he should be elected to the U.S. Senate. *See Pay* (Ed Markey for MA, TV Ad), *available at* http://www.edmarkey.com/video/page/2/ (last visited Oct. 27, 2014) (Narrator: "Eleven Dead.  Communities ruined. The worst environmental disaster in American history. When BP tried to avoid responsibility, one man said no. . . . Ed Markey uncovered the extent of the damage, and when BP executives lied, Ed Markey held them accountable.").

[60] Def. David Rainey's Mot. to Set Deadline for Cong. Witnesses to Respond to Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 23, 2015), ECF No. 405.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          281

Rainey argued that the parties needed to know the congressional witnesses' positions on trial testimony sufficiently far in advance of trial to permit Rainey to seek relief if those witnesses declined to testify.

Later that same day, House Counsel filed a notice of intent to file a motion to quash on behalf of the nine congressional witnesses.[61] However, House Counsel asked the court not to set any deadline for the congressional witnesses to decide whether, and under what conditions, they would be willing to voluntarily testify at trial without invoking the Speech or Debate Clause privilege.[62]

### 8.   The House of Representative's Amicus Brief in Opposition to Rainey's Motions to Dismiss

In the middle of the subpoena litigation, the Bipartisan Legal Advisory Group of the U.S. House of Representatives (the "House") filed an amicus brief in opposition to Rainey's motions to dismiss Count One, authored by the same attorneys fighting Rainey's subpoenas for trial testimony from the congressional witnesses.[63] The House reiterated many of the same arguments advanced by the Task Force. Specifically, the House claimed that the standing authority of the Committee on Energy and Commerce and its Subcommittee on Energy and Environment, as evidenced in their rules and a post-hoc "Activity Report" of the Committee, provided sufficient authority to initiate the investigation alleged in the indictment. The House's brief was remarkably strident and dismissive of Rainey's arguments, which the district court had been considering for months, removing any doubt that the House was a partisan supporting the Task Force's efforts to convict Rainey.[64]

---

[61]   Notice of Nine Non-Party Subpoena Recipients of Intent to Move to Quash, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 23, 2015), ECF No. 406.

[62]   Resp. of Nine Non-Party Subpoena Recipients to Def.'s Mot. to Set Deadline, United States v. Rainey, Crim. No. 12-291 (E.D. La. Apr. 27, 2015), ECF No. 411. Counsel contended that if the district court granted the forthcoming motion to quash, the witnesses would "cease to be subject to the Court's jurisdiction (unless and until they, or some subset of them, voluntarily appear[ed] at trial)." *Id.* at 5.

[63]   Mem. of *Amicus Curiae* Bipartisan Legal Advisory Group of the U.S. House of Representatives, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 5, 2015), ECF No. 415.

[64]   *See id.* at 15 ("Mr. Rainey repeats *ad nauseum* an assertion that the E&E Subcommittee investigation lacked 'formal authorization.' . . . But that statement is false no matter how many times Mr. Rainey repeats it."); *id.* at 18 ("there is no logic to Mr. Rainey's argument"); *id.* at 19 (referring to one of Rainey's arguments: "This is nonsense."); *id.* at 21 ("Mr. Rainey offers no support for these extraordinary assertions,

282                    *BERKELEY JOURNAL OF CRIMINAL LAW*                    Vol. 20:2

### 9.   *The Congressional Witnesses' Motion to Quash*

On May 8, 2015, all nine congressional witnesses moved to quash the trial subpoenas served by Rainey.[65] The congressional witnesses principally contended that they were absolutely protected by the Speech or Debate Clause from being compelled by Rainey to testify in his criminal trial.[66] They argued that the testimony sought by Rainey regarding the authorization of the alleged congressional investigation related to core legislative acts squarely within the scope of the Clause.[67] In addition, the congressional witnesses observed that while the protection afforded by the Speech or Debate Clause "undeniably is broad, the Supreme Court long ago acknowledged and accepted the potential costs associated [with] those broad protections."[68] In other words, the congressional witnesses claimed that the Speech or Debate Clause trumped Rainey's right to present a meaningful defense in his criminal trial.

On May 13, 2015, Rainey opposed the motion to quash.[69] With respect to the Speech or Debate Clause, we reiterated many of the arguments we had advanced in our effort to compel compliance with Rainey's document subpoenas, namely that: (1) the Speech or Debate Clause allows questioning of legislators and their aides about legislative acts in third-party criminal cases that do not call into question the legality of those acts or assert liability against the witnesses; (2) the Speech or Debate Clause must be balanced against a criminal defendant's Fifth and Sixth Amendment rights, and such balancing favored Rainey's rights in this case; and (3) the congressional witnesses had waived the Speech or Debate Clause protection through selective

---

and . . . we are at a loss to understand how he could make them. Moreover, and in any event, asserting that the earth is flat does not make it so."); *id.* at 22 (denigrating Rainey's arguments as "quibbles").

[65]   Mot. to Quash of Nine Non-Party Subpoena Recipients, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 419.

[66]   Mem. of P. & A. in Supp. of Mot. to Quash of Nine Non-Party Subpoena Recipients (Part I), United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 419-1.

[67]   *Id.* at 16 (arguing that the application of the Clause was "not remotely close because all the matters into which Mr. Rainey seeks to probe are manifestly legislative.").

[68]   *Id.* at 16-17 (collecting cases).

[69]   Def. David Rainey's Opp'n to Nine Cong. Witnesses' Mot. to Quash their Trial Subpoenas, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 13, 2015), ECF No. 430.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015             *UNITED STATES V. DAVID RAINEY: A CASE STUDY*             283

invocation of the privilege.[70] We acknowledged, however, that if the district court adhered to its earlier Speech or Debate Clause ruling, the same reasoning would support quashing the trial subpoenas.

### 10. Rainey's Motion for Remedial Relief

We anticipated that the district court was likely to adhere to its earlier reasoning and quash the trial subpoenas. Given the rapidly approaching trial date, however, we were concerned the district court would not have sufficient time to consider the consequences of that ruling on Rainey's criminal trial. As a result, on May 8, 2015, Rainey filed a motion for remedial relief in light of the congressional witnesses' refusal to testify.[71] House Counsel had indicated that congressional staffers closely associated with Rep. Markey would testify voluntarily for the Task Force without invoking privilege. At the same time, they maintained that the congressional witnesses subpoenaed by Rainey could not be compelled to testify and would not commit to testifying voluntarily without invoking the Speech or Debate Clause. No court had previously determined the proper remedy when witnesses with material, exculpatory, noncumulative evidence refuse to comply with a criminal defendant's trial subpoenas on Speech or Debate Clause grounds.[72] In our view, it made no difference that the Legislative Branch was asserting privilege while the Executive Branch was leading the prosecution, because the net result was the same: the United States was simultaneously prosecuting Rainey and relying on privilege assertions to deprive him of critical exculpatory evidence. Therefore, Rainey sought two forms of relief based on the unavailability of these congressional witnesses.

First, we argued that Rainey could not be tried for obstructing Congress, based in large part on the testimony of congressional witnesses favorable to the Task Force on the issue of a duly authorized investigation, while government privilege assertions simultaneously prevented Rainey from calling his own witnesses to challenge the Task

---

[70]   *Id.* at 3.
[71]   Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Gov't Official" Grounds, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427.
[72]   *See generally* United States v. Verrusio, 762 F.3d 1, 23-24 (D.C. Cir. 2014) (noting dearth of case law).

284             BERKELEY JOURNAL OF CRIMINAL LAW             Vol. 20:2

Force's case on that issue.[73] We relied on case law establishing that evidentiary privileges cannot trump a defendant's constitutional rights to compulsory process and due process. We analogized this case to charges dismissed where the government attempted to prosecute a defendant while declining on privilege grounds to produce witness statements of government informants,[74] or the identities of undercover agents.[75] In particular, we relied heavily on *United States v. Fernandez*, 913 F.2d 148, 163-64 (4th Cir. 1990), where the defendant was charged with making false statements about his work for the CIA but prevented by government privilege assertions from fully explaining the nature of his classified work and the context behind his statements. The Fourth Circuit affirmed the dismissal of the indictment, noting that "the government is simultaneously prosecuting the defendant and attempting to restrict his ability to use information that he feels is necessary to defend himself against the prosecution. . . . [C]ourts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence."[76] Similarly, in our case, where a government privilege assertion prevented Rainey from compelling witnesses with exculpatory information to testify in his defense, we argued that the proper remedy was dismissal of the charge.

Second, in the alternative, we argued that the district court should exclude any evidence offered by the Task Force on the issue of authorization. Relying on *United States v. Nobles*, 422 U.S. 225 (1975),

---

[73] *See* Mem. of Law in Supp. of Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Gov't Official" Grounds at 11-21, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427-1.

[74] *See* Jencks v. United States, 353 U.S. 657, 672 (1957) ("criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial.").

[75] Roviaro v. United States, 353 U.S. 53, 60-61 (1957) ("[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, . . . the trial court may require disclosure and, if the Government withholds the information, dismiss the action.").

[76] *Fernandez*, 913 F.2d at 154; *see also id.* at 164 ("The district court acted within its discretion in determining that the government's attempt to exclude evidence necessary to demonstrate this background, as well as its effort to require the defendant to use abbreviated and lifeless substitutions for this crucial evidence, would have deprived Fernandez of any real chance to defend himself.").

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

and other "sword and shield" cases prohibiting selective privilege assertions, we urged the court to prevent the Task Force from presenting a one-sided view of the evidence through a handful of favorable congressional staffers who did not intend to invoke the Speech or Debate Clause privilege, while Rainey was precluded based on government privilege assertions from compelling exculpatory testimony on the same subjects from other staffers and Members of Congress. Based on the subpoenaed congressional witnesses' advance notice that they were unwilling to waive the Speech or Debate Clause privilege, we requested a pretrial ruling excluding the one-sided testimony that the Task Force intended to offer on the authorization issue.[77]

On May 18, 2015, the Task Force opposed Rainey's motion for remedial relief on several grounds.[78] Relying on *United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014), the Task Force argued that a defendant's right to present a defense must yield to the Speech or Debate Clause privilege and is not subject to any balancing.[79] In any event, the Task Force argued, Rainey had not sufficiently demonstrated that the Speech or Debate Clause privilege assertion was depriving him of specific material, exculpatory evidence necessary to present his defense. The Task Force also claimed the testimony sought by Rainey was cumulative because other congressional staffers who would be testifying at trial could be questioned on the authorization issue.

Significantly, the Task Force also maintained there was a distinction between a privilege assertion by the Executive Branch and the Legislative Branch of the government. The Task Force claimed that the Executive Branch did not control the Speech or Debate Clause privilege of the congressional witnesses and was not invoking privilege to deprive Rainey of evidence. Thus, the Task Force argued that the authority relied on by Rainey stood only for the proposition that the *Executive Branch* may be forced to elect between waiving a privilege or dismissing the prosecution. Similarly, the Task Force contended that the "sword and shield" doctrine applied only when a party asserts a

---

[77]   *See* Mem. of Law in Supp. of Def. David Rainey's Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify on Speech or Debate Clause and "High-Ranking Government Official" Grounds at 22-25, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 8, 2015), ECF No. 427-1.

[78]   Gov't's Resp. in Opp'n to the Def.'s Mot. for Remedial Relief in Light of Cong. Subpoena Recipients' Refusal to Testify, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 438.

[79]   *Renzi*, 769 F.2d at 749-50.

ISSUE 20:2                                                                                           FALL 2015

286                *BERKELEY JOURNAL OF CRIMINAL LAW*                Vol. 20:2

privilege selectively. According to the Task Force, where the *Legislative Branch* invokes the Speech or Debate Clause privilege, such action cannot be attributed to the Executive Branch and did not justify the relief sought by Rainey.

House Counsel also opposed Rainey's motion for remedial relief.[80] Most notably, House Counsel asserted in conclusory fashion that the testimony Rainey sought from the congressional witnesses would not be exculpatory because each of the witnesses would supposedly testify that he or she believed the alleged Subcommittee on Energy and Environment investigation was duly authorized.[81] These bald representations were not accompanied by any affidavits or statements from the witnesses, each of whom had declined even to be interviewed by Rainey's counsel.[82] In addition, House Counsel argued that the selective waiver or "sword and shield" doctrine was simply inapplicable in the Speech or Debate Clause context.[83] House Counsel also contended that the Legislative Branch controlled the Speech or Debate Clause assertions, which, in their view, "may not be attributed to, and should not be wielded so as to penalize, the prosecution."[84]

In our reply brief, we argued that it did not matter that the Legislative Branch, not the Executive Branch, was selectively invoking privilege to suppress evidence favorable to Rainey.[85] We relied principally on two cases for this proposition. First, in *United States v.*

---

[80]  Nine Non-Party Subpoena Recipients' (I) Reply to Def.'s Opp'n to their Mot. to Quash Their Trial Subpoenas, and (II) Resp. to Def.'s Mot. for Remedial Relief at 10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 18, 2015), ECF No. 431.

[81]  *Id.* at 6.

[82]  Moreover, House Counsel continued to be dismissive of Rainey's interpretation of the contemporaneous documents produced by Rep. Markey. *See id.* at 6 (stating Rainey's assertion that the investigation was not authorized "simply is not true, no matter how many times Mr. Rainey repeats it or how fervently he wishes it were so."); *id.* (claiming that the congressional witnesses did not believe the documents suggested the investigation was unauthorized, "notwithstanding Mr. Rainey's efforts to spin gold out of documents that clearly are mere straw.").

[83]  *Id.* at 4 ("there simply is no constitutional impediment to an individual Member or staffer to whom the Clause otherwise applies choosing to assert it in response to some questions and not assert it in response to others. . . . But, even if some sort of sword/shield argument were available to Mr. Rainey as to an individual privilege holder (which it emphatically is not), that argument would not function on the collective basis that Mr. Rainey postulates.").

[84]  *Id.* at 8-10.

[85]  Reply Mem. in Supp. of Def. David Rainey's Mot. for Remedial Relief at 7, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 468.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            287

*North*, 910 F.2d 843 (D.C. Cir. 1990) ("*North I*"), where Congress granted Colonel Oliver North immunity over the objections of the Executive Branch, the court held that North was entitled to a full *Kastigar* hearing, and stated that:

> the Fifth Amendment requires that the government establish priorities before making the immunization decision. The government must occasionally decide which it values more: immunization (perhaps to discharge institutional duties, such as congressional fact-finding and information-dissemination) or prosecution. If the government chooses immunization, then it must understand that the Fifth Amendment and *Kastigar* mean that it is taking a great chance that the witness cannot constitutionally be indicted or prosecuted.[86]

In a follow-up decision, the D.C. Circuit made clear that "the government" meant the United States as a whole, and not simply the Executive Branch. In response to the argument that penalizing prosecutors for congressional immunity decisions would unduly restrict Congress's investigative role, the court responded:

> When Congress grants immunity before the prosecution has completed preparing its "case," the prosecutor, whoever that may be, can warn that the grant of immunity has its institutional costs; in this case, the [Independent Counsel] indeed warned Congress that "any grant of use and derivative use immunity would create serious—and perhaps insurmountable—barriers to the prosecution of the immunized witness." . . . The decision as to whether the national interest justifies that institutional cost is, of course, a political one to be made by Congress. Once made, however, that cost cannot be paid in the coin of a defendant's constitutional rights. That is simply not the way our system works. The political needs of the majority, or Congress, or the President never, never, never, should trump an individual's explicit constitutional protections.[87]

Second, we relied on *Calley v. Callaway*, 519 F.2d 184 (5th Cir. 1975), a case involving the military prosecution of Lieutenant William Calley in connection with the My Lai incident during the Vietnam War. In that case, while Calley's military prosecution was pending, a House subcommittee conducted its own investigation of the My Lai incident, taking extensive evidence in executive session.[88] When Calley sought that evidence for use in his defense, the subcommittee refused to

---

[86]  *North I*, 910 F.2d at 862.
[87]  *United States v. North*, 920 F.2d 940, 945-46 (D.C. Cir. 1990) ("*North II*").
[88]  *Calley*, 519 F.2d at 219.

288                    *BERKELEY JOURNAL OF CRIMINAL LAW*                    Vol. 20:2

disclose it, and the military court denied the request as a fishing expedition.[89] On appeal, the Fifth Circuit rejected Calley's claim of a Due Process violation because the defense had conceded the evidence was not exculpatory but merely relevant for impeachment of witnesses.[90] Importantly, however, the court stated:

> We do not consider whether the Hebert Subcommittee could properly invoke its congressional privilege and correctly refuse to furnish the requested testimony. The issue before us is not the legality of this action, but rather the effect of denying the testimony to the defense. Even if the privilege were properly invoked and the testimony validly withheld, the withholding of the material might require the Government to let the petitioner go free if he was denied evidence essential to his defense.[91]

Because a congressional invocation of privilege deprived Rainey of evidence critical for his defense, we argued that the required result should be dismissal—even though the privilege was invoked by a House Subcommittee, rather than the prosecutors.[92]

### 11. The Motion for a Protective Order by the Congressional Witnesses Willing to Testify for the Prosecution

On May 27, 2015, three business days before trial was set to begin, the four congressional staffers willing to testify voluntarily for the prosecution moved for a protective order limiting the scope of their testimony to specific legislative activities outlined by the witnesses.[93] As to all other activities and topics, the staffers indicated that they intended to assert the Speech or Debate Clause privilege to decline to answer questions. We viewed this tactic as a gift that played right into our argument that gamesmanship by the congressional witnesses was depriving Rainey of critical defense evidence.

On May 29, 2015, we opposed the motion for protective order and cross-moved to exclude all testimony by the four congressional

---

[89]   *Id.* at 220.
[90]   *Id.* at 222.
[91]   *Id.* at 220 n.60.
[92]   Reply Mem. in Supp. of Def. David Rainey's Mot. for Remedial Relief at 9-10, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 468.
[93]   Mot. of Non-Parties Phil Barnett, Jeffrey Duncan, Michael Goo, and Michal Freedhoff for Protective Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 27, 2015), ECF No. 474.

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          289

staffers.[94] We argued that permitting the staffers to testify only on limited topics would violate Rainey's Sixth Amendment right to meaningfully cross-examine the witnesses against him, and countenance a fundamentally unfair sword-and-shield use of the Speech or Debate Clause.[95] Specifically, the list of enumerated topics would have prevented Rainey from cross-examining the staffers about several relevant topics, including the investigative actions taken by a different committee chaired by Rep. Markey, and actions taken during different investigations by the Subcommittee on Energy and Environment. These and other areas covered by the proposed protective order would have shown that the "investigation" alleged in the indictment was fundamentally different than a normal, duly authorized congressional investigation.[96] Limiting the staffers' testimony in the manner requested would have also prevented Rainey from asking the staffers about their and Rep. Markey's history of actions adverse to the oil and gas industry, which was relevant to the witnesses' bias and prejudice against Rainey.[97] Accordingly, we asked the district court to deny the motion for a protective order and exclude all evidence from the congressional staffers. We believed the Task Force would be unable to prove its case without this staffer testimony and sought to capitalize on what we viewed as a tactical blunder by House Counsel that would not be viewed favorably by the district court.

## IV.  THE DISTRICT COURT'S RULINGS

On June 1, 2015, the district court engaged in the *voir dire* process and empaneled a jury by early afternoon. At that point, jeopardy attached to Rainey's trial on Counts One and Two of the indictment.[98]

### A.  The Court's Order Granting the Congressional Witnesses' Motion To Quash Rainey's Trial Subpoenas

After sending the jury home for the day, the district court

---

94   Def. David Rainey's Opp'n to the Mot. of Non-Parties Phil Barnett, Jeffrey Duncan, Michael Goo, and Michal Freedhoff for Protective Order, and Mem. in Supp. of Mr. Rainey's Cross Mot. to Exclude All Test. by Those Staffers, United States v. Rainey, Crim. No. 12-291 (E.D. La. May 29, 2015), ECF No. 481-1.

95   *Id.* at 1.

96   *Id.* at 8.

97   *Id.* at 8-9.

98   "There are few if any rules of criminal procedure clearer than the rule that 'jeopardy attaches when the jury is empaneled and sworn.'" Martinez v. Illinois, 134 S. Ct. 2070, 2074 (2014) (quoting Crist v. Bretz, 437 U.S. 28, 35 (1978)).

addressed the congressional witnesses' motion to quash. The court first asked the parties and House Counsel if anyone had anything to add to the pleadings that had been filed. All parties rested on their papers. Thereafter, the court summarily granted the congressional witnesses' motion to quash Rainey's trial subpoenas.[99]

### B.   The Court's Order Granting Rainey's Pending Motions To Dismiss Count One and for Remedial Relief

The district court next addressed Rainey's pending motions to dismiss and his motion for remedial relief in light of the unavailability of the congressional witnesses, as well as the motion for a protective order filed by the four congressional staffers willing to testify for the prosecution. The court issued its ruling orally from the bench.

After the court summarized the parties' arguments on Rainey's motions to dismiss, it explained that it had deferred ruling on the motions while Rainey pursued congressional documents through the subpoena process. Although the court had granted Rainey permission to serve subpoenas on the congressional witnesses, it ultimately upheld their assertion of the Speech or Debate Clause privilege and denied Rainey's motion to compel compliance with the subpoenas. Thereafter, Rainey could only obtain the documents that the congressional witnesses and entities agreed to provide voluntarily. The court appeared to recognize that these voluntary document productions were deficient, stating:

> [T]he House . . . voluntarily produced a number of documents without representing the scope of the search performed, the terms used, or the extent to which it would not produce certain documents as privileged. There is no representation in response that the document production was otherwise in compliance with the scope of the subpoena that was issued and then withdrawn.[100]

Nonetheless, the voluntarily produced documents proved invaluable to Rainey's case. Critically, the district court held that those documents could be reasonably and plausibly read to call into question the existence of an authorized inquiry by the Subcommittee:

> [T]he defendant contended that the documents produced by the House further demonstrate that the May 14 letter was not part of any duly authorized inquiry or investigation. In support of his

---

[99]   Transcript of Jury Trial at 272, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015) ("Motion granted").
[100]   Transcript of Jury Trial at 278, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          291

argument, the defendant points to a number of e-mails and letter correspondence demonstrating, in the defendant's view, that the subcommittee was not authorized to conduct an investigation into the spill, nor was Representative Markey's letter a part of a duly authorized investigation. . . .

At the very least, the defendant argues, the letters and e-mails produced call into question whether the Subcommittee on Energy and Environment was properly investigating the spill and whether Representative Markey's service as chairman of that subcommittee sent the May 14 letter as a due and proper exercise of the power of inquiry.

The Court finds the defendant's arguments related to the communications produced by the House to be a reasonable reading of those documents and plausible under the circumstances.[101]

Having already quashed Rainey's trial subpoenas for the congressional witnesses who authored the documents at issue, the district court recognized that Rainey was "not permitted to call witnesses of his choosing who may, and plausibly do, hold exculpatory evidence critical to his defense."[102]

The district court then held as follows:

As a preliminary matter, the Court finds that few rights are more fundamental than the rights of due process and compulsory process under the Fifth and Sixth Amendments. The Court has serious constitutional and fairness concerns with regard to the following:

First, the defendant received only a partial production of documents from the House, absent a list of searches performed, a list of search terms, or any representations as to documents that were withheld under the House's privilege, which was asserted and which this Court ruled in favor of.

Secondly, certain House witnesses agreed to voluntarily testify in the government's case in chief, but such testimony, as the House proclaimed, would be limited to the scope of direct, presumably determined at the whim of the witness' or house counsel's own discretion.

And third, the House, acting pursuant to its privilege, refused defendant's subpoena request as to eight other witnesses who, potentially and plausibly, hold material and exculpatory

---

[101]  Transcript of Jury Trial at 278-79, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

[102]  Transcript of Jury Trial at 281, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

Case 1:21-cr-00670-CJN   Document 116-2   Filed 07/15/22   Page 35 of 43
Heberlig: United States v. David Rainey: A Case Study

ISSUE 20:2                                                           FALL 2015

292               *BERKELEY JOURNAL OF CRIMINAL LAW*               Vol. 20:2

information related to an essential element of Count 1, which element has, in fact, already been identified by the Fifth Circuit in this very case.

The Fifth Circuit explained, again, in this very case, that an unauthorized frolic by a House entity or House member might lose the protection afforded by § 1505 regardless of its committee status because there would be no "due and proper exercise of the power of inquiry." That can be found in *U.S. v. Rainey*, 757 F.3d 234, a Fifth Circuit opinion from this year in this case. By that same token, the Court finds that an unauthorized frolic by an individual member would also lose the protections afforded by § 1505 regardless of his status as chairman of the subcommittee. As seen repeatedly in the government's briefing, these are factual issues that must be developed at trial and must be submitted to the jury.

Each of these three areas of concern that I just discussed directly implicate factual issues as they relate to the defendant's right to present a full defense pursuant to the Fifth and Sixth Amendments. The Court finds that the evidence sought by the defendant through documentary production and testimony is highly relevant to his defense and material to the issues before the Court for the jury's consideration. The Court, as I stated, [] finds the evidence sought is material noncumulative and, based on the evidence in the record, including but not limited to a number of written communications, both internal and external to the House, favorable to his defense or at least plausibly and arguably and quite conceivably favorabl[e] to the defendant in this case.

The Court has considered all of the pleadings, the relevant record, all of the cases cited by the parties.  The Court also finds the ruling today is in accord with the rulings in *Renzi* and *Verrusio*, which I have cited earlier. To be clear, the Court is not engaging in a balancing or weighing of the speech and debate privilege, which I have already ruled in favor of, with the defendant's Fifth and Sixth Amendment rights, but is considering each on an independent basis in an attempt to honor and reconcile those fundamental constitutional privileges which are before the Court.

As seen earlier today, the Court found in favor of the House, and its ruling supported the House's long-standing constitutional privilege under the Speech or Debate Clause. The Court must now address what implication that ruling has on the defendant's right to a full trial and his constitutionally guaranteed rights, which I have just described.

Thus the Court finds that, similar to the holding in *U.S. v. Fernandez*, 913 F.2d 148, which is a Fourth Circuit case, 1990,

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          293

and consistent with the rulings in *Jencks v. United States*, 353 U.S. 657, and *Roviaro v. U.S.*, 353 U.S. 53, the government's prosecution of Count 1 under § 1505 must give way where the defendant seeks relevant, material, noncumulative evidence related to his defense, but also where he has been precluded from obtaining this evidence due to the invocation of a constitutional privilege by a branch of the very same government involved in his prosecution. Because the defendant is not able to put on a full and fair defense, consistent with his constitutional rights and consistent with an element of the crime as described by the Fifth Circuit and set forth in the jurisprudence, under these circumstances the Court finds the only appropriate remedy is dismissal of Count 1. The Court would reference the case of *Calley v. Callaway*, 519 F.2d 184, which is a Fifth Circuit opinion from 1975 in which the Court of Appeal expressed approval of dismissal where a congressional privilege is asserted prohibiting a defendant from evidence essential to his defense.

Accordingly, for the reasons I have previously stated, the defendant's motion for remedial relief is granted and Count 1 is hereby dismissed with prejudice.

In addition to its findings related to the defendant's constitutional rights, whereby the Court found that the defendant has put forth reasonable and plausible evidence demonstrating a potentially unauthorized investigation by the subcommittee and/or Representative Markey. Without the ability to fully examine those witnesses voluntarily testifying in the government's case in chief and, more importantly, to call witnesses in his favor, and lacking any knowledge as to the scope of the documentary production performed by the House, the Court, consistent with the Supreme Court's guidance in *U.S. v. Nobles*, 422 U.S. 225, and *Davis v. Alaska*, found at 415 U.S. 308, as well as pursuant to the Federal Rules of Evidence giving the District Court broad discretion over the admission or preclusion of evidence, hereby excludes all evidence related to the documentary production by the House and any testimony that the four witnesses would provide in the government's case in chief.

As a result, an examination of all the surrounding circumstances, as indicated in the Fifth Circuit's opinion in this very case and in *U.S v. Mitchell*, 877 F.2d 294, a Fourth Circuit opinion from 1989, is rendered impossible. Absent any evidence of an authorized investigation, the Court would therefore find that the government could not meet its burden of establishing an essential element of the crime charged in Count 1. Therefore, the defendant's motion to dismiss Count 1 of the second superseding indictment for lack of a due and proper exercise of the power of

congressional inquiry (Record Document 188) and his motion to dismiss Count 1 of the second superseding indictment because the May 4 briefing and the May 14 letter were not part of a subcommittee investigation, which is Record Document 190, must also necessarily be and are hereby granted.

In light of all the circumstances, the Court further believes that the motion to dismiss for unconstitutional vagueness, which is Record Document 192, is, under the circumstances, with merit, and the Court will grant it as well.[103]

The district court subsequently entered a minute order confirming its rulings from the bench.[104]

Critically, the district court based its rulings, in part, on the Task Force's inability to "meet its burden of establishing an essential element of the crime charged" in Count One.[105] This ruling was an acquittal after jeopardy had attached on Count One.[106] As a result, the Task Force had no ability to appeal the district court's ruling,[107] and, indeed, did not file any notice of appeal.

The next day, on June 2, 2015, trial commenced on Count Two of the indictment with the parties delivering opening statements and the Task Force calling its first witnesses.

## C. The Task Force's Motion For Reconsideration

On June 2, 2015, after the trial began, the Task Force filed a motion for reconsideration of the district court's order granting Rainey's motions to dismiss Count One and for remedial relief based on the

---

[103] Transcript of Jury Trial at 282-87, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

[104] Minute Entry Order, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 4, 2015), ECF No. 499.

[105] Transcript of Jury Trial at 286, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

[106] As the Supreme Court has stated, "our cases have defined an acquittal to encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." Evans v. Michigan, 133 S. Ct. 1069, 1074-75 (2013); *see also id.* at 1075 ("Thus an 'acquittal' includes 'a ruling by the court that the evidence is insufficient to convict,' a 'factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability,' and any other 'rulin[g] which relate[s] to the ultimate question of guilt or innocence.'") (quoting United States v. Scott, 437 U.S. 82, 91 (1978)).

[107] *See* Sanabria v. United States, 437 U.S. 54, 68-69 (1978) (holding, in a case involving "an erroneous evidentiary ruling, which led to an acquittal for insufficient evidence," that the "judgment of acquittal, however erroneous, bars further prosecution on any aspect of the count and hence bars appellate review of the trial court's error.").

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          295

unavailability of the congressional witnesses.[108]

The Task Force represented that even though House Counsel declined to argue the motion to quash or make any other representations at the hearing the previous day, House Counsel was apparently "prepared" to represent to the court:

> (1) that each of the subpoenaed staffers was willing to testify voluntarily, subject to certain scheduling conflicts some of them had and (2) that Senator Markey had indicated his willingness to be available for testimony voluntarily if he could testify via video conference or some other means that would allow him to remain in Washington, DC, where the Senate is in session.[109]

The Task Force also noted that it had informed the court on June 1, 2015—the first day of trial—that Rep. Waxman was willing to testify voluntarily. The Task Force had interviewed Rep. Waxman by telephone for the first time on May 31, 2015, and reported that Rep. Waxman was prepared to testify that he authorized the Subcommittee on Energy and Environment investigation in a personal conversation with Rep. Markey.[110] This supposed personal conversation was never memorialized or disclosed to Rainey at any point during the five years between the *Deepwater Horizon* incident and the start of his trial.

The Task Force claimed that reconsideration was warranted because the subpoenaed congressional witnesses, "while unwilling to respond to a subpoena," would have been willing to testify voluntarily for the defense though they had never indicated their willingness to Rainey. However, their willingness was subject to unspecified "scheduling issues" or, in the case of Rep. Markey, the requirement that he testify by video or phone from Washington, D.C.[111] The Task Force failed to explain why the congressional witnesses had not previously disclosed their willingness to testify voluntarily during the weeks of pretrial litigation on these precise issues and only revealed it *after* the district court had dismissed Count One with prejudice.

### D. The Court's Order Denying the Task Force's Motion for Reconsideration

On June 4, 2015, at the conclusion of the evidentiary portion of

---

[108]  Gov't's Mot. to Reconsider Dismissal of Count 1 of the Second Superseding Indictment, *United States v. Rainey*, Crim. No. 12-291 (E.D. La. June 2, 2015), ECF No. 491.

[109]  *Id.* at 3.

[110]  *Id.* at 5.

[111]  *Id.* at 4.

Heberlig: United States v. David Rainey: A Case Study

296            *BERKELEY JOURNAL OF CRIMINAL LAW*            Vol. 20:2

the trial and prior to closing arguments the next day, the district court orally denied the Task Force's motion for reconsideration from the bench. The district court noted that it was "disappointed" by the motion because it ignored a number of the bases for the court's ruling. The court then made the following findings:

> Number 1: Congress is the complainant and alleged victim of the crime alleged in Count 1. 18 U.S.C. § 1505 was designed to protect Congress from the type of activity that was alleged in Count 1. Congressional—congressmen and congresswomen and staffers should have had the most interest in the pursuit of this count and should have been here voluntarily, had it been their intent to do so, without the need for subpoenas, in the first place.

> Both the government's attorneys, Mr. Tsao and Mr. Zink, as well as defense counsel—and to their credit, Mr. Tsao and Mr. Zink practically pleaded with the House to ensure the appearances of these witnesses at trial for months, months. And counsel will agree with me, for months the Court and the parties were left to speculate about the intentions of House members whose appearance was desired.

> I might state that there were various representations, which changed seemingly on a weekly basis, as to whether they would or would not appear here in court and, if had they appeared, to what extent they would be willing to testify. Thus the Court finds unacceptable and irresponsible this conduct, as it resulted in the unnecessary and considerable expense of time and resources, particularly in taxpayer money to the federal government, both through expenditures and time made in this Court handling Count 1 and to the Department of Justice, who spent considerable resources charging Count 1 and pursuing it, not to mention the defendant and the cost of defending Count 1.

> The House has continually refused to make a clear and explicit declaration as to the intent of these witnesses appearing voluntarily or otherwise to testify in this trial. The Court, as well as the government and the defendant, have been presented with communications that are equivocal, confusing, and even misleading as to the status of these witnesses' appearances and the willingness of them to testify.

> In fact, earlier in the day Monday, I was advised that one congressman might appear, and yet House counsel was here and did not mention that when I gave him the opportunity to clarify, in which case the motion to quash would have been moot if I had known witnesses were willing to appear voluntarily. We never got a representation that all material witnesses from Congress would testify voluntarily and without condition. Had we gotten that representation, there would have been no issue.

2015            *UNITED STATES V. DAVID RAINEY: A CASE STUDY*            297

The Court afforded House counsel the opportunity to provide any additional information that was not contained in the briefing. I specifically asked if there was anything else not in the briefs that counsel would like to say to the Court at the time of the motion to quash on Monday afternoon. However, House counsel remained silent.

House counsel was not here to serve as a potted plant, and I make reference to that quote because it is—it happened to be made during the *United States v. North* case, which was cited by all parties in an episode relating to that case. Informing the Court at that time that all witnesses would testify unconditionally, without reservation, would have mooted the question on the motion to quash.

Next, video or telephonic appearance of a witness in this Court is unacceptable.  If a witness has been subpoenaed, the witness cannot substitute personal appearance absent consent of the parties and the Court, which was not forthcoming and which I would certainly not agree to had I known of any witness—is not acceptable, even if such a witness is a senator in the United States Senate.

I hardly think—I hardly think that had a congressman or senator issued a subpoena to appear before a House committee, a response that, well, I'm busy but I will appear before the House committee in a videoconference or in a telephone call, would have been acceptable to any member of the House committee, nor should it be.

The government indicates in its pleading that House counsel was prepared to advise the Court—prepared but did not—that certain House witnesses are now prepared to voluntarily appear and testify for the defendant. House counsel made no such representation when afforded the opportunity to do so.

Furthermore, the Court does not find that its rulings in any way called into question, when considering the representations contained in the motion—that is, the documentary production which occurred in February—the self-imposed limitation which the House sought to pursue in the protective order, had they appeared, and the failure to represent the intentions of Former Representative Stupak, who was also subpoenaed.

The Court's ruling remains valid, and the only appropriate remedy under the law and under the Constitution was to dismiss Count 1 in order to serve the constitutional interests of the Speech or Debate Clause, which the Court found to be meritful, as briefed by the House and the right under the Fifth and Sixth Amendments to confrontation, which the Court also found the defendant enjoyed under the Constitution, as do all defendants.

Heberlig: United States v. David Rainey: A Case Study

298               *BERKELEY JOURNAL OF CRIMINAL LAW*               Vol. 20:2

> Neither the Court, the government, nor a criminal defendant are required to plead, implore, or solicit the voluntary testimony of witnesses that are material and possibly favorable to any party's case. The Sixth Amendment affords the right of not just process, compulsory process, not the right to merely request the attendance or beg for the witnesses to appear at trial. . . .
>
> It appears to the Court that only when the viability of Count 1 and its subsequent dismissal arose did the House concern itself then with offering the voluntary testimony of certain individuals. However, the Court will not tolerate any party or nonparty changing its mind after the consequences of a particular course of action become unfavorable to that party.[112]

The court conveyed the frustration that the parties had endured for months in dealing with the congressional witnesses. Despite repeated attempts to secure the appearance of the congressional witnesses, or to get them even to commit to positions on voluntary testimony, the congressional witnesses stonewalled Rainey, the Task Force, and the district court at every step of the way. These so-called "victims" of the alleged crime were unwilling to make decisions of fundamental consequence to Rainey's trial until it became apparent that the district court was poised to dismiss Count One. And even then, the congressional witnesses failed to communicate their positions until *after* the court dismissed the charge with prejudice. Worst of all was Rep. Markey, who had spearheaded the supposed "investigation" that Rainey was accused of obstructing. No court or criminal defendant on trial for serious charges would have deemed acceptable video testimony from Washington, D.C. Such a proposal was disrespectful of the judicial process and an insult to Rainey's constitutional rights. The district court correctly observed that if the tables were turned, Rep. Markey would have never permitted an important witness subpoenaed for one of his congressional hearings to appear by video conference.

The next day, on June 5, 2015, following a four-day trial on Count Two of the indictment, a New Orleans jury acquitted Rainey of that remaining false statements charge after less than two hours of deliberations. After the jury announced its verdict, the district court stated "I agree with the verdict" and characterized it as "a correct verdict based on the evidence."[113]

---

[112] Transcript of Jury Trial at 1059-64, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

[113] Transcript of Jury Trial at 1142, United States v. Rainey, Crim. No. 12-291 (E.D. La. June 1, 2015).

*Berkeley Journal of Criminal Law, Vol. 20, Iss. 2 [2015], Art. 2*

2015          *UNITED STATES V. DAVID RAINEY: A CASE STUDY*          299

## V.  LESSONS LEARNED

There are many lessons to be learned from this case.

First, when it comes to a criminal prosecution, there is only one United States. Even where the Legislative Branch invokes privilege at its own initiative without the endorsement of the Executive Branch, a criminal prosecution cannot proceed where the privilege assertion interferes with a defendant's right to present an effective defense.

Second, a criminal defendant's right to compulsory process of defense evidence is critically important and must not be abridged by the government. This fundamental right cannot be vindicated by voluntary testimony with the scope of examination defined by the witness. Impeachment and bias are always fair game on cross-examination. If a privilege invocation limits the scope of cross-examination, the proper remedy is to exclude the witness's testimony in its entirety.

Third, where a valid but selective privilege assertion leads to a one-sided, incomplete or unfair presentation of evidence, the district court may exclude all evidence on the subject at issue. If the result is an obvious failure of proof on an essential element of the offense, the court has the power to acquit the defendant on the charge at the outset of trial for insufficiency of the evidence without waiting for the inevitable at the close of the government's case. Such a ruling may not be appealed by the government under the Double Jeopardy Clause.

Finally, given the unpredictability and self-interest of Members of Congress and their staff, and the absolute nature of the Speech or Debate Clause privilege, prosecutors should avoid using the obstruction of Congress statute or any other charge requiring congressional testimony if any alternatives are available. At a minimum, prosecutors should ensure that they have the full cooperation of the relevant Members of Congress and their staff *before* pursuing criminal charges that require testimony from congressional witnesses. In this case, there was no referral from Congress to the Department of Justice to pursue the obstruction charge against Rainey. Instead, the Department of Justice created a Task Force to pursue criminal charges that decided on its own to charge Rainey with obstruction of a congressional investigation. Inexplicably, the Task Force never interviewed Rep. Markey during its investigation and only interviewed Rep. Waxman for the first time the day before trial was scheduled to begin. Had the prosecutors done so, they may well have determined that there was no duly authorized congressional investigation to support a criminal charge. Ultimately, however, the failure to perform this basic due diligence and the

300                *BERKELEY JOURNAL OF CRIMINAL LAW*                Vol. 20:2

gamesmanship of these Members of Congress and their staff, including their "wait and see" approach and unwillingness to take litigation positions or commit to unrestricted testimony, completely derailed a federal prosecution and wasted the time and resources of the parties and the Court. Such a debacle could have been avoided if the prosecutors had structured the case to avoid reliance on uncooperative, self-interested congressional witnesses.