**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-670 (CJN)** |
| **v.** | : | |
| | : | |
| **STEPHEN K. BANNON,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>UNITED STATES' SENTENCING MEMORANDUM</u>**

From the moment that the Defendant, Stephen K. Bannon, accepted service of a subpoena from the House Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Committee"), he has pursued a bad-faith strategy of defiance and contempt. The Committee sought documents and testimony from the Defendant relevant to a matter of national importance: the circumstances that led to a violent attack on the Capitol and disruption of the peaceful transfer of power. In response, the Defendant flouted the Committee's authority and ignored the subpoena's demands. The Defendant, a private citizen, claimed that executive privilege—which did not apply to him and would not have exempted his total noncompliance even if it had—justified his actions. Then, on the eve of trial, he attempted an about-face, representing to the Committee that former President Donald J. Trump had waived executive privilege and freed the Defendant to cooperate. But this proved a hollow gesture; when he realized that his eleventh-hour stunt would not prevent his trial, the Defendant's cooperative spirit vanished. Despite the removal of the only purported barrier to his compliance, to this day the Defendant has not produced a single document to the Committee or appeared for testimony. For his sustained, bad-faith contempt of Congress, the Defendant should be sentenced to six months' imprisonment—the top end of the Sentencing Guidelines' range—and fined $200,000—based on his insistence on paying the maximum fine rather than cooperate with the Probation Office's routine pre-sentencing financial investigation.

## PROCEDURAL BACKGROUND

As this Court is aware, and as elaborated below, on October 7, 2021, the Defendant defaulted on the Committee subpoena's demand for documents.  ECF No. 1 (Indictment), ⁋ 15. One week later, on October 14, he defaulted again, this time on the Committee subpoena's demand for deposition testimony.  *Id.* ⁋ 19.  The United States House of Representatives voted on October 21, 2021, to hold the Defendant in contempt and referred his conduct to the United States Attorney for the District of Columbia to be proceeded against as provided for by law.  H.Res. 730, 117th Cong. (2021).  On November 12, a federal grand jury in the District of Columbia returned an indictment charging the Defendant with two counts of contempt of Congress, in violation of 18 U.S.C. § 192—one count for each of his willful defaults—*see* ECF No. 1, and on July 22, 2022, a federal petit jury found him guilty as charged, ECF. No. 135 (Verdict Form).  The Defendant is scheduled to be sentenced on October 21, 2022—one year to the day after he was held in contempt by the House.

## RELEVANT SENTENCING EVIDENCE

To determine an appropriate sentence, the Court may consider all evidence relevant to the conduct of conviction, including evidence not presented to the jury, without regard to the rules of admissibility at trial.  *United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a).  The Court's findings of fact at sentencing are subject to clear error review.  *United States v. Bikundi*, 926 F.3d 761, 796 (D.C. Cir. 2019).

At the Defendant's trial, the reason he willfully defaulted—that is, why he deliberately chose not to comply with the subpoena—was not relevant.  Now, at sentencing, it is.  The Court can and should consider the Defendant's motive as part of his history and characteristics, and as part of the nature and circumstances of the offense.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 485

(1993) (confirming that "[t]he defendant's motive for committing the offense is [an] important factor" to consider when imposing sentence).  The factual record in this case is replete with proof that with respect to the Committee's subpoena, the Defendant consistently acted in bad faith and with the purpose of frustrating the Committee's work.

### The Defendant's Default

On September 23, 2021, the Committee issued the Defendant a subpoena for documents and testimony.  Ex. 1 (Subpoena Packet) at US-000408.  The Committee did so because it had reason to believe that the Defendant had information relevant to its investigation.  For instance, the Defendant had reportedly gathered at the Willard Hotel on January 5, 2021, to persuade Members of Congress to block the certification of the Electoral College vote, and on the same day—the day before the attack on the United States Capitol—the Defendant predicted on his podcast that "All Hell is going to break loose tomorrow."  *Id*. at US-000410.  The subpoena required the Defendant to produce responsive records by October 7, 2021, appear for a deposition on October 14, and set forth rules for how the Defendant should raise privileges and objections—specifically, through a log of withheld records in lieu of documents, and in person on a question-by-question basis during testimony.  *Id*. at US-000414, US-000417.  The Defendant's attorney, Robert J. Costello, accepted service of the subpoena.  Ex. 2 (Sept. 24, 2021, Costello Email) at US-000432.

The subpoena's first deadline, for documents, was October 7, 2021.  But after receiving the subpoena, the Defendant did not begin searching for responsive records.  Instead, he began searching for an excuse not to comply.  Mr. Costello, the Defendant's lawyer—with whom the Defendant worked closely throughout the process of responding to the Committee, and by whom the Defendant was provided and apprised of all correspondence with the Committee, *see, e.g.*, Ex.

3 (Nov. 3 & Nov. 8, 2021, Costello Interviews) at US-001769, US-001770, US-001771, US-001773, US-001781; *see also* July 20, 2021, Trial Tr. 811:12-21—began calling around to identify a lawyer for former President Trump to make an assertion of executive privilege.  Ex. 3 at US-001773.  He did so even though executive privilege could not possibly permit the Defendant's total noncompliance; the Defendant was a private citizen who had not worked at the White House for years; the subpoena's demands sought records and information wholly unrelated to the Defendant's tenure there; and multiple categories of the subpoena were completely unrelated to communications with the former President.  Ultimately, Mr. Costello received contact information for the former President's then-attorneys, and initiated contact with one of them, Justin Clark.  *See* Ex. 4 (Oct. 5, 2021, Text Message Received by Mr. Costello with Mr. Clark's Contact Information) at US-001087; Ex. 5 (June 29, 2022, Clark Interview) at US-002263 ("Costello was responsible for initiating contact" with former president's attorneys).

On October 6, 2021, Mr. Clark sent Mr. Costello a letter that stated that the subpoena sought records "potentially protected from disclosure by the executive and other privileges" and directed the Defendant "to the fullest extent permitted by law" and "where appropriate," not to produce documents or give testimony concerning privileged material.  Ex. 6 (Oct. 6, 2021, Clark Letter) at 1.  The Clark Letter did not direct the Defendant to withhold any specific document under any privilege, and unlike similar letters that Mr. Clark sent to other individuals who had received subpoenas from the Committee, it did not inform the Defendant that the former President believed he may have immunity from appearing because of a role as a high-level White House advisor.  That is because Mr. Clark was unsure whether the Defendant had any privileged documents or information at all, and because the former President did not believe the Defendant had immunity from testimony.  Ex. 5 at US-002265 ("CLARK does not possess, nor has ever

4

possessed, any knowledge of BANNON being in possession of documents, information, and/or testimony which would be protected under 'executive privilege.' . . . Former United States President Donald J. Trump also did not believe BANNON possessed immunity from complying with the congressional subpoena.  As such that is why the instruction letter provided to BANNON was written differently when compared to [other instruction letters].").  Both through its own qualified language and given the Committee's clear rules for raising objections and privileges, the Clark Letter did not exempt the Defendant from complying with the subpoena.

But that did not stop the Defendant from exploiting the Clark Letter as an excuse to ignore the Committee's subpoena.  On October 7, 2021, at 10:00 a.m., the Defendant allowed the document deadline to pass without any attempt at compliance.  He failed to produce a single document and he did not contact the Committee to request an extension or otherwise negotiate regarding the subpoena's demands.  Indeed, by that time, the Defendant had taken no steps to identity and collect responsive records.  Ex. 3 at US-001775 ("COSTELLO was not prepared to respond on BANNON's behalf on October 7, 2021.  At that time, COSTELLO did not know what BANNON possessed that would have been responsive to the Select Committee's subpoena."); *see also* July 20, 2021, Trial Tr. 811:4-11.  Later that day, Mr. Costello sent a letter to the Committee stating that the Defendant could not comply because of the Clark Letter.  Ex. 7 (Oct. 7, 2021, Costello Letter).  Mr. Costello sent this letter even though, when later speaking with the Government, he conceded that not all topics listed in the schedule could possibly implicate executive privilege.  Ex. 3 at US-001772.

The next day, on October 8, 2021, the Committee promptly rejected the Defendant's claims.  Ex. 8 (Oct. 8, 2021, Committee Letter).  The Committee pointed out that the Clark Letter did not constitute an actual assertion of executive privilege—and even if it had, most if not all of

the subpoenaed items could not possibly implicate executive privilege; the subpoena required the Defendant to provide non-privileged documents and indicate in a log any records withheld under a privilege claim; and the subpoena required the Defendant to appear for a deposition on October 13 and assert in person any objections on a question-by-question basis.  Further, the Committee warned the Defendant that his noncompliance could result in referral for criminal prosecution.  *Id*. At the same time, the Defendant was publicizing and celebrating his defiance of the subpoena.  He gave an interview to the Daily Mail, providing a reporter with a copy of Costello's letter to the Committee and stating of his noncompliance, "I stand with Trump and the Constitution."  Ex. 9 (Oct. 8, 2021, Daily Mail Article and Social Media Post) at 1-7.  The Defendant then posted the resulting article on GETTR, a social media platform.  *Id*. at 8.

The Defendant and Mr. Costello did not respond to the Committee's rejection and resolution of his claims for several days.  In fact, their next contact was initiated on October 12, 2021, by a Committee staffer who reached out by phone to Mr. Costello to arrange logistics for the Defendant's deposition, which was scheduled for two days later, on October 14.  Ex. 10 (Nov. 2, 2021, Committee Staffer Interview) at US-000360.  Mr. Costello indicated in that phone conversation that the Defendant was unlikely to appear.  *Id*.  On October 13, the Committee staffer followed up by email and had two additional conversations with Mr. Costello.  *Id*. at US-000360-61.  Mr. Costello was clear that the Defendant would not appear for a deposition as commanded by the subpoena.  *Id*. at US-000361.

Unbeknownst to the Committee, while Mr. Costello was continuing to claim on the Defendant's behalf to the Committee that executive privilege required the Defendant's total noncompliance, Mr. Clark was cautioning the Defendant that it did not.  On October 11, 2021, Mr. Costello sent a text message to Mr. Clark demonstrating that he understood that the former

President had not yet invoked any privilege as to the Defendant.  Ex. 11 (Mr. Costello writing, 'What is President Trump going to do about asserting executive privilege with respect to Steve Bannon?").  And on October 13, seemingly because of the Committee staffer's repeated inquiries, Mr. Costello forwarded to Mr. Clark the Committee's October 8 letter rejecting the Defendant's claims.  Ex. 12 (Oct. 13, 2021, Costello Email).  According to Mr. Clark, he had a phone conversation with Mr. Costello around the time of his receipt of the email, in which he reiterated that there had been no assertion over any specific document in the Defendant's possession because Mr. Clark did not know what the Defendant had.  Ex. 5 at US-002266-67.  Mr. Clark also offered to Mr. Costello to review any documents to which the Defendant believed the privilege might apply—an offer that the Defendant, through Mr. Costello or otherwise, never acted upon—and urged that the Defendant contact the Committee and work with them.  *Id.*  Mr. Clark never "instructed, directed, or implied" that the Defendant should refuse to appear for his deposition.  *Id*. at US-002266.  The Defendant did not follow this advice.  Instead, Mr. Costello sent the Committee a letter stating that the Defendant would refuse to appear for a deposition.  Ex. 13 (Oct. 13, 2021, Costello Letter).

On October 14, 2021, the Defendant failed to appear for his scheduled deposition at 10:00 a.m.  Also on October 14, Mr. Clark emailed Mr. Costello to reiterate the message he had provided by phone the previous day.  Ex. 14 (Oct. 14, 2021, Clark-Costello Emails) at US-000987-88.  Mr. Clark wrote that he had just read Mr. Costello's October 13 letter to the Committee stating that Mr. Clark had "informed us that President Trump is exercising his executive privilege; therefore, he has directed Mr. Bannon not to produce documents or testify until the issue of executive privilege is resolved," *id*. at US-000987, and explained, "To be clear, in our conversation yesterday I simply reiterated the instruction from [the Clark Letter] dated October 6, 2021, and attached

below" *id*. at US-000988.  In an interview with the Government, Mr. Clark explained that when

he read Mr. Costello's October 13 letter, he was angered because Mr. Costello "had completely

misrepresented" to the Committee what Mr. Clark had told him.  Ex. 5 at US-002267.  Separately,

Mr. Costello forwarded Mr. Clark's email message to the Defendant and took issue with what he

understood Mr. Clark to be saying—that the former President was not invoking executive

privilege—and told the Defendant, "I don't know what game Clark is playing but it puts Steve

Bannon in a dangerous position.  Beware."  Ex. 14 at US-00987.  Mr. Costello told the Government

he warned the Defendant because he understood, and wanted to make sure that the Defendant

understood, that failure to comply with the subpoena could result in a referral to the Department

of Justice and criminal prosecution.  Ex. 3 at US-001781.  Nonetheless, neither the Defendant nor

Mr. Costello took any steps to reach out to the Committee, correct Mr. Costello's representations

to the Committee, or otherwise make any effort to comply with the subpoena.

The day after the Defendant failed to appear for his deposition, on October 15, 2021, the

Committee sent Mr. Costello a letter advising that the Defendant had defaulted completely on the

subpoena and that the Committee would be meeting on October 19 to vote on whether to refer him

for prosecution.  Ex. 15 (Oct. 15, 2021, Committee Letter).  The letter directed the Defendant to

raise any issues regarding his noncompliance that the Committee should consider by 6:00 p.m. on

October 18.  *Id*. at US-000449-50.

On October 16, 2021, Mr. Clark again stridently advised Mr. Costello that the former

President was not directing the Defendant to defy the Committee's subpoena, writing:

> Just to reiterate, [the Clark Letter] didn't indicate that we believe there is immunity
> from testimony for your client.  As I indicated to you the other day, we don't believe
> there is.  Now, you may have made a different determination.  That is entirely your
> call.  But as I also indicated the other day other avenues to invoke the privilege – if
> you believe it to be appropriate – exist and are your responsibility.  If you haven't

already I'd encourage you again to contact counsel for the committee to discuss it
further.

Ex. 16 (Oct. 16-18, 2021, Clark-Costello Emails) at US-000985.   In an interview with the

Government, Mr. Clark indicated that he was prompted to send this email upon seeing media

reports that the Defendant had completely defied the subpoena.  Ex. 5 at US-002268.  Mr. Clark

further explained that the "other avenues" he had explained to Mr. Costello included working with

the Committee to identify potentially privileged topics in advance of testimony; appearing at the

deposition and objecting to questions on an individual basis; or initiating a lawsuit over

enforcement of the subpoena.   *Id*. at US-002269.   The Defendant, through Mr. Costello or

otherwise, did none of these.

Instead, two days later, on October 18, 2021, Mr. Costello responded to Mr. Clark's email

by writing that "President Trump's invocation of those privileges absolutely limits Mr. Bannon's

ability to testify before Congress and provide documents."  Ex. 16 at US-000984.  The Defendant

and Mr. Costello allowed the Committee's October 18 deadline for an explanation of his default

to pass without submitting any relevant information.

**The Defendant's Attempt to Enlist Congress to Pressure
<u>the Department of Justice to Dismiss the Case</u>**

In July 2022, shortly before his trial was set to begin and after consuming nine months of

this Court's time and resources, the Defendant attempted to leverage the information he had

unlawfully withheld from the Committee to engineer dismissal of his criminal prosecution.  When

his *quid pro quo* attempt failed, the Defendant made no further attempt at cooperation with the

Committee—speaking volumes about his bad faith.

The Defendant's trial was set for July 18, 2022.  In the weeks leading up to it, he and his

attorneys tried repeatedly, but unsuccessfully, to delay it.  *See, e.g.*, ECF No. 88 (June 29, 2022,

Motion to Continue Trial); ECF No. 95 (July 6, 2022, Reply in Support of Motion to Continue Trial); ECF No. 103 (July 10, 2022, Supplement in Support of Motion to Continue Trial). Then, on July 9, Mr. Costello sent the Committee a letter (which was promptly leaked to the news media[1]) representing that the former President had waived executive privilege "to allow Mr. Bannon to comply with the subpoena issued by your Committee." Ex. 17 (July 9, 2022, Costello Letter) at 2. But Mr. Costello's letter did not then offer the Defendant's compliance; it made no mention of any efforts by the Defendant to gather and produce responsive documents, and it attempted to impose preconditions on the Defendant's potential testimony—including that he be permitted to testify at a public hearing. *Id.* at 1-2. The Committee responded on July 14, informing the Defendant that if he genuinely intended to comply with the subpoena, he could begin by producing documents. Ex. 18 (July 14, 2021, Committee Letter) at 1.

On July 13, 2022, the day before the final pretrial conference, the Defendant renewed his motion to continue the trial—a desperate last-ditch effort at delay. *See* ECF No. 108 (July 13, 2022, Motion to Continue Trial (Renewed)). It was promptly rejected at the pretrial conference. *See* July 14, 2022, Minute Entry. The very next day, on July 15, the Defendant's attorney, Evan Corcoran, contacted Committee counsel and made clear that the Defendant's newfound cooperative spirit had strings attached—namely, that it would require that the Committee and the Government to agree that if the Defendant complied with the subpoena, the Government would delay and ultimately dismiss his trial. Ex. 19 (Oct. 7, 2022, Committee Staffer Interview) at US-002345; Ex. 20 (July 15, 2022, Committee Staffer Email). Committee counsel responded to Mr. Corcoran that Mr. Corcoran would need to contact the Government, the prosecuting entity, to

---

[1] *See, e.g.*, "Bannon, Facing Jail and Fines, Agrees to Testify to Jan. 6 Panel," N.Y. Times, July 10, 2022, *available at* https://www.nytimes.com/2022/07/10/us/politics/bannon-jan-6-trump.html (last accessed Oct. 16, 2022).

discuss any resolution in his criminal case.  Ex. 19 at US-002345; Ex. 20.  Mr. Corcoran subsequently asked Committee counsel if the Committee would join the Defendant in requesting that the Government dismiss his criminal case in exchange for his cooperation with the Committee, to which Committee counsel declined.  Ex. 19 at US-002345; Ex. 20.  The defense never contacted the Government—perhaps because the Government had made clear through its pleadings and at argument that it understood the Defendant's actions to be a stunt and would not consider dismissing the case.  *See* ECF No. 105 (July 11, 2022, United States' Motion in Limine to Exclude Evidence or Argument Relating to the Defendant's Eleventh-Hour Assertion That He is Willing to Testify Before the Select Committee) at 1 (arguing that the Defendant's last-minute cooperative spirit was "irrelevant to whether he willfully refused to comply in October 2021 with the Select Committee's subpoena" and noting that "[t]he criminal contempt statute is not intended to procure compliance; it is intended to punish past noncompliance"); July 11, 2022, Tr. at 20-21 (GOVERNMENT: "And it would be bad precedent if we got into a situation where a defendant could engage in total noncompliance with the Committee, be referred for criminal contempt, have a different branch of government expend considerable resources in preparing –"; COURT: Branches."; GOVERNMENT: "Branches. – expend considerable resources in preparing for a criminal trial, only to have the defendant witness—on the eve of trial, say, Well, actually, I will comply now, in hopes of the criminal case being dismissed.  That's a different kind of contempt and obstruction, and it sort of—validating it would not serve the purpose of the statute.").  When the Defendant's eleventh-hour attempt to derail his trial failed, he never made any further attempt to comply with the subpoena—continuing up to this day.

**The Defendant's Public Attacks on the Committee and Criminal Justice System**

Throughout the pendency of this case, the Defendant has exploited his notoriety—through courthouse press conferences and his War Room podcast—to display to the public the source of his bad-faith refusal to comply with the Committee's subpoena: a total disregard for government processes and the law. Through his public platforms, the Defendant has used hyperbolic and sometimes violent rhetoric to disparage the Committee's investigation, personally attack the Committee's members, and ridicule the criminal justice system. The Defendant's statements prove that his contempt was not aimed at protecting executive privilege or the Constitution, rather it was aimed at undermining the Committee's efforts to investigate an historic attack on government.

The Defendant launched attacks on the Committee and the criminal justice process immediately after his arraignment, on November 15, 2021, when he gathered the press outside of the courthouse and joined his attorneys in a five-minute statement. *See* "Misdemeanor from Hell": Watch Bannon Speak Out After He's Released, CNN, Nov. 15, 2021, available at https://www.youtube.com/watch?v=-diE7kCCidE (last accessed Oct. 16, 2022). The Defendant ridiculed through counsel this case as "a scam from the beginning," *id.* at Minute 1:18, promised that he would make this case "the misdemeanor from hell for Merrick Garland, Nancy Pelosi, and Joe Biden," *id.* at Minute 3:15, and warned that "we're gonna go on the offense on this and stand by," *id.* at Minute 3:28. When a media member asked the Defendant what he meant by his statement that he was "going on offense," the Defendant replied, "Stand by." *Id.* at Minute 3:44. The Defendant answered that question in the months that followed. Rather than respect the criminal justice process and participate meaningfully and seriously in the courtroom defense of his case, for the Defendant, "going on offense" meant resorting to name calling, mimicry, and menacing rhetoric aimed at the Committee's investigation and its membership. For example:

- On June 15, 2022, after a motions hearing, the Defendant exited the courthouse and announced that he looked forward to having "Nancy Pelosi, little Jamie Raskin, and Shifty Schiff in here at trial answering questions." *See* "Judge rejects Bannon's effort to dismiss criminal case for defying Jan. 6 select committee," Politico, June 15, 2022, available at https://www.politico.com/news/2022/06/15/judge-rejects-bannons-effort-to-dismiss-criminal-case-for-defying-jan-6-select-committee-00039888 (last viewed Oct. 16, 2022).

- Shortly before trial, on a July 12 episode of his podcast, the Defendant urged listeners to pray for "our enemies" because "we're going medieval on these people, we're going to savage our enemies. *See* Episode 1996, *War Room: Pandemic*, July 12, 2022, Minute 16:37 to 17:46, available at https://warroom.org/2022/07/12/episode-1996-pfizer-ccp-backed-partners-elon-musk-trolls-trump-alan-dershowitz-on-partisan-america-and-the-constitution-informants-confirmed-at-j6/ (episode webpage last accessed Oct. 16, 2022[2]).

- During trial, on July 19, the Defendant gave another courthouse press conference, in which he accused Committee Chairman Rep. Bennie Thompson of "hiding behind these phony privileges," ridiculed him as "gutless" and not "man enough" to appear in court, and mocked him as a "total absolute disgrace." The Defendant also teased Committee member Rep. Adam Schiff as "shifty Schiff" and another member of Congress, Rep. Eric Swalwell, as "fang fang Swalwell." He went on to say that "this show trial they're running is a disgrace." *See* "Prosecutors say Bannon willfully ignored subpoena," Associated Press Archive, July 24, 2022, available at https://www.youtube.com/watch?v=3SR_EJL5nkw (last accessed Oct. 16, 2022).

- Also during trial, on July 20, the Defendant emerged from the courthouse and derided the Committee's work as a "show trial," likening it to "the Moscow show trial of the 1930s." *See* "Bannon's team questions House subpoena deadline," Associated Press Archive, July 25, 2022, available at https://www.youtube.com/watch?v=RJ9qH4zMMI0 (last accessed Oct. 16, 2022).

- And days after the jury found him guilty, on July 25, 2022, the Defendant proclaimed that he was going to "kill this Administration in the crib" and that if the Department of Justice did not like it, it could "Suck on it. We're destroying this illegitimate regime." *See* "Steve Bannon Sends 'Suck on It' Message to Pelosi, Thompson, DOJ," *Newsweek*, July 25, 2022, available at https://www.newsweek.com/steve-bannon-sends-suck-it-message-pelosi-thompson-doj-1727813 (last accessed Oct. 16, 2022).

---

[2] The Government accessed the War Room website on October 16, 2022, but this episode would not play. It can be accessed as a podcast from Apple and other providers. Upon request, the Government can provide the Court with a recording of the episode or the relevant portions.

**The Presentence Investigation**

After the Defendant was found guilty, the Probation Office initiated its routine presentencing investigation in preparation for the sentencing hearing.  *See* 18 U.S.C. § 3552(a); Fed. R. Crim. P. 32(c).  For any defendant convicted of a federal offense and facing sentencing, that investigation typically includes a personal interview, *see* Fed. R. Crim. P. 32(c)(2), and an assessment of the defendant's financial condition, *see* Fed. R. Crim. P. 32(d)(2)(ii).  For the Defendant's part, he cooperated in that investigation only insofar as it was convenient to his interests.  He freely answered questions about his family, professional life, personal background, and health.  But the Defendant refused to disclose his financial records, instead insisting that he is willing and able to pay any fine imposed, including the maximum fine on each count of conviction. *See* ECF No. 149 (Presentence Investigation Report ("PSR")), ¶ 83.  The Probation Office's investigation of the Defendant's financial condition was, therefore, curtailed to commercially available and other public sources.  *See id.* ¶¶ 84-86.

**ALLOCUTION**

The Defendant's contempt of Congress was absolute and undertaken in bad faith.  To date, he remains in default: more than one year after accepting service of the Committee's subpoena, the Defendant has not produced a single document or answered a single deposition question—nor has he endeavored to do so, except as part of a duplicitous *quid pro quo*.  The mandatory minimum sentence of one month in prison is insufficient to account for, punish, and deter his criminal offenses.  The Court should instead impose a sentence of six months' imprisonment—the top end of the Guidelines' advisory sentencing range—and fine the Defendant $200,000—based on his demand to pay the maximum fine in lieu of participating in the standard presentencing financial investigation conducted by the Probation Office.

**Statutory Penalty**

The first step in determining the appropriate sentence is to look to the statute of conviction itself.  The plain terms of Section 192 require that the Defendant be sentenced to a term of "imprisonment in a common jail for not less than one month nor more than twelve months" for each count of conviction.  The terms may be imposed concurrently.  *See* 18 U.S.C. § 3584.  Although Section 192 provides for a maximum fine of $1,000, 18 U.S.C. § 3571(b) provides that the maximum fine for Class A misdemeanors is the greater of either the amount specified in the law setting forth the offense or $100,000.

Accordingly, the Court must sentence the Defendant to at least one month in prison on each count, which can be imposed concurrently, and the maximum fine for each count is $100,000.

**The Sentencing Guidelines**

The next step in determining the appropriate sentence is to calculate the applicable advisory sentencing range under the United States Sentencing Guidelines.  *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  The Government agrees with the Probation Office that the applicable offense guideline is Section 2X5.2 and that the applicable sentencing range, therefore, is 1 to 6 months, with a fine range of $1,000 to $100,000.  *See* PSR ¶¶ 34-47, 89, 110.

To determine the applicable offense guideline, the Guidelines direct the Court to begin with the Statutory Index found in Appendix A.  U.S.S.G. § 1B1.2(a).  For violations of 2 U.S.C. § 192, the Statutory Index references Guidelines Sections 2J1.1 and 2J1.5.  Because the Statutory Index specifies more than one offense guideline, "the court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged."  U.S.S.G. § 1B1.2, App. Note 1.  Although neither offense guideline specifically addresses contempt of Congress, Section 2J1.1, which is captioned "Contempt," is akin to the Defendant's offense and most appropriate to

address his conduct.  Section 2J1.1 in turn directs that Section 2X5.1 be applied.  *See* U.S.S.G. §
2J1.1, App. Note 1 ("Because misconduct constituting contempt varies significantly and the nature
of the contemptuous conduct, the circumstances under which the contempt was committed, the
effect the misconduct had on the administration of justice, and the need to vindicate the authority
of the court are highly context-dependent, the Commission has not provided a specific guideline
for this offense.").  Because Section 2X5.1 applies only to felony offenses, however, and a
violation of Section 192 is a Class A misdemeanor, the application notes for Section 2X5.1 in turn
indicate that Section 2X5.2 should be applied.  *See* U.S.S.G. § 2X5.1, App. Note 3.  Applying
Section 2X5.2, as did the Probation Office, an offense level of 6 applies to both counts of
conviction in this case and the advisory sentencing range is 1 to 6 months.  *See* PSR ¶¶ 34-47; *see
also* U.S.S.G. §§ 5G1.1(b), (c)(2) (explaining that a statutory mandatory-minimum sentence—
here, one month—shall establish the bottom-end of the applicable range).

Contrary to that analysis, the Defendant asserts that Section 2J1.5 should apply.  *See* PSR
at 29.  But Section 2J1.5, which addresses the failure to appear by a material witness, should not
be applied because the applicable offense level is determined by whether the failure to appear was
in relation to a felony or misdemeanor prosecution—neither of which have a clear corollary in the
context of a subpoena to appear for a congressional deposition or to provide documents to
Congress.  *See* U.S.S.G. § 2J1.5, Background ("The base offense level incorporates a distinction
as to whether the failure to appear was in respect to a felony or misdemeanor prosecution.").  Even
if this guideline were to apply, the Defendant applies it incorrectly, claiming that the offense level
4, for a failure to appear in a misdemeanor prosecution, should apply under Section 2J1.5, instead
of the failure to appear in a felony matter.  *Id*.  The Defendant does not explain why his refusal to
appear to provide testimony and documents in relation to an event—the January 6 attack on the

United States Capitol—that has resulted in numerous felony charges for hundreds of individuals[3] is analogous to a failure to appear in a misdemeanor matter. It is not. To the extent this Court analogizes the Defendant's refusals to appear for testimony and to provide records to a failure of a material witness to appear in a criminal prosecution, therefore, it is most analogous to a witness refusing to appear to give testimony and information in a felony prosecution, not a misdemeanor. Accordingly, should the Court apply U.S.S.G. § 2J1.5, as the Defendant requests, it should find an offense level of 6, for a failure to appear in a felony prosecution, resulting in in the same advisory sentencing range recommended under the Government's and Probation Office's recommendation.

The Court should also reject the Defendant's dubious assertion that he is entitled to credit for acceptance of responsibility. *See* PSR at 27-28. To be entitled to a reduction for acceptance of responsibility, the Guidelines require that the Defendant "clearly demonstrates" his acceptance. U.S.S.G. § 3E1.1(a); *see also United States v. Dozier*, 162 F.3d 120, 128 (D.C. Cir. 1998) ("To qualify for an adjustment, a defendant must 'clearly' accept responsibility for his crime; it is not enough that he arguably do so."). And it is a "rare situation" in which a two-level reduction is appropriate after going to trial. U.S.S.G. § 3E1.1, App. Note 2; *see United States v. Thomas*, 97 F.3d 1499, 1500 (D.C. Cir. 1996) ("Defendants who . . . force the government to trial are not ordinarily entitled to the benefit of U.S.S.G. § 3E1.1."); *United States v. Ring*, 811 F. Supp. 2d 359, 384 (D.D.C. 2011) (denying two-level reduction for acceptance where defendant contested proof of his intent at trial). The Defendant's claim for acceptance of responsibility is contradicted by his sustained bad faith. Not once since he was served by the Select Committee with a subpoena

---

[3] As of October 6, 2022, more than 880 defendants have been arrested on charges arising from the January 6 attack. More than 300 of those defendants have been charged with felony offenses. *See* "21 Months Since the Jan. 6 Attack on the Capitol," United States Attorney's Office for the District of Columbia Press Release, Oct. 6, 2022, available at https://www.justice.gov/usao-dc/21-months-jan-6-attack-capitol (last accessed Oct. 16, 2022).

for documents and testimony has the Defendant, up to and including through his guilty verdict, undertaken a serious effort to comply with his obligations under the law.  Still to this day, the Defendant has not produced a single document or—except preconditioned on making a spectacle through public testimony or in exchange for the delay and dismissal of his case—endeavored to appear for the deposition required by the subpoena.  As Mr. Costello informed the Select Committee on July 9, 2022, "[the Defendant] has not had a change of posture or of heart."  Ex. 17.  Mr. Costello could not have put it more perfectly: the Defendant has maintained a contemptuous posture throughout this episode and his bad faith continues to this day.  The Defendant has expressed no remorse for his conduct and attacked others at every turn.  The Court should reject the Defendant's request to be credited with acceptance of responsibility that he has never shown.

The Court should accept the Government's and Probation Office's recommendation that Section 2X5.2 applies, in which case the Defendant's offense level is 6 and the applicable advisory sentencing range is 1 to 6 months' imprisonment and a fine of $1,000 to $100,000.

## The Statutory Sentencing Factors

The final step in determining the appropriate sentence is to consider the various factors set forth in 18 U.S.C. § 3553(a), *see Gall*, 552 U.S. at 49-50, including the nature, circumstances, and seriousness of the offense; the history and characteristics of the Defendant; the need to promote the rule of law and provide just punishment; the need to afford adequate deterrence; and the need to avoid unwarranted sentencing disparities.  Those factors, which are addressed *in seriatim*, all support a Guidelines-compliant sentence at the top of the advisory sentencing range.

### The Nature, Circumstances, and Seriousness of the Offense

The nature and circumstances of the offense support a top-end Guidelines sentence because a person could have shown no greater contempt than the Defendant did in his defiance of the

Committee's subpoena.  Indeed, it would seem no person violating Section 192 should be subject to a top-end Guidelines sentence if the Defendant is not.  From the time he was initially subpoenaed, the Defendant has shown that his true reasons for total noncompliance have nothing to do with his purported respect for the Constitution, the rule of law, or executive privilege, and everything to do with his personal disdain for the members of Congress sitting on the Committee and their effort to investigate the attack on our country's peaceful transfer of power.  Not once throughout this episode has the Defendant even tried to collect a document to produce, and he has never attempted in good faith to arrange to appear for a deposition.  His noncompliance has been complete and unremitting.  And his effort to exact a *quid pro quo* with the Committee to persuade the Department of Justice to delay trial and dismiss the charges against him should leave no doubt that his contempt was deliberate and continues to this day.

The Defendant hid his disregard for the Committee's lawful authority behind bad-faith assertions of executive privilege and advice of counsel in which he persisted despite the Committee's—and counsel for the former President's—straightforward and clear admonishments that he was required to comply.  As Mr. Costello disclosed to the Government in pre-indictment interviews, the Defendant and Mr. Costello worked together throughout the process of responding to the Committee, and the Defendant was fully apprised of the subpoena, the obligations the subpoena imposed, and Mr. Costello's correspondence on his behalf with the Committee and the former President's lawyer.  The Defendant knew, for example, that the Clark Letter did not direct him to engage in total noncompliance; and he knew that his decision to default subjected him to prosecution.  Moreover, the Defendant's refusal to collect even a single record in preparation for responding to the subpoena, even just to determine which of the records he possessed might be subject to privilege—it remains unclear to the Government what privilege could have applied—

shows he never had any intention of complying in the first place.  The Defendant claims he simply relied on his attorney's advice, but the Defendant is Harvard educated and was directly involved in his response to the subpoena; and he clearly can read.  The Defendant's alleged reliance on executive privilege and advice of counsel was just a cover for his contempt.

The seriousness of the offense also merits a top-end Guidelines sentence.  The Defendant's contempt was directed at a congressional committee convened to investigate a violent attack on the United States Capitol—the worst such assault since a foreign military descended upon the Capitol in 1814—and an unprecedented effort to reverse a presidential election and stop the peaceful transfer of power.  The Defendant's abject refusal to heed the Committee's subpoena, under the circumstances with which this country is confronted, could not be more serious.

### *The History and Characteristics of the Defendant and the Need for Specific Deterrence*

The Defendant's default on the Committee's subpoena is just one entry in a pattern of contempt he has shown for the rule of law and government authority.  Throughout this prosecution, as described above, the Defendant has leveraged his media platform to mock members of the Committee through offensive name calling, deride the Committee's investigation through rhetoric that risks inspiring violence, and ridicule the criminal justice system through hyperbole.  The Defendant is entitled to his views and to express them vociferously; there is nothing criminal about the Defendant's opinions or his expression of those opinions.  But this Court may—and should—consider the Defendant's out-of-court statements to ascertain his motive, evaluate his intent, and measure the degree of his contempt, including appraising his overall disdain and disrespect for the rule of law and the investigative and criminal justice processes that are crucial to maintaining a peaceful, lawful, and orderly society.  *See Mitchell*, 508 U.S. at 489 ("The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or

to prove motive or intent."). Here, the Defendant's constant, vicious barrage of hyperbolic rhetoric disparaging the Committee and its members, along with this criminal proceeding, confirm his bad faith. These statements are powerful evidence of the extent of the Defendant's criminal contempt and demonstrate a pattern of disrespect for lawful authority.

Even now that he is facing sentencing, the Defendant has continued to show his disdain for the lawful processes of our government system, refusing to provide financial information to the Probation Office so that it can properly evaluate his ability to pay a fine. Rather than disclose his financial records, a requirement with which every other defendant found guilty of a crime is expected to comply, the Defendant informed Probation that he would prefer instead to pay the maximum fine. So be it. This Court should require the Defendant to comply with the bargain he proposed when he refused to answer standard questions about his financial condition. The Court should impose a $100,000 fine on both counts—the exact amount suggested by the Defendant.

The Defendant's contempt for Congress and its lawful authority continues to this day, and it was not an aberration. He has consistently and thoroughly opted for fealty to a personal agenda, rather than fealty to the rule of law and the basic obligations of citizenship in an orderly democratic society. The sentence this Court imposes must address the Defendant's belief that he is above the law and processes to which his fellow citizens regularly submit. And this Court's sentence must provide a clear message to the Defendant that his contemptuous conduct stops here. Given this and all the other factors discussed herein, only a sentence at the top end of the Guidelines will be sufficient but not greater than necessary to accomplish this.

### *The Need to Provide for Adequate General Deterrence and to Promote the Rule of Law*

A top-end Guidelines sentence is necessary to provide adequate general deterrence and promote the rule of law. The Defendant thumbed his nose at the Committee from the moment he

was served with a subpoena; he never intended to, or even tried, to comply with his obligations under the law.  Moreover, the Defendant used his public notoriety to boast of his contempt and undermine the Committee's investigative authority and purpose; his contempt was open and notorious.  Such behavior cannot be tolerated, lest it become commonplace and accepted, and the important work of congressional committees like the Select Committee rendered impossible.  The Committee's investigation is not complete and there will be more congressional investigations in the future—a sentence of incarceration is mandatory, and imposing a sentence above the minimum, at the top of the Guidelines, will reinforce to future subpoena recipients their legal obligations.  Moreover, sentencing the Defendant to a term of imprisonment at the top end of the Guidelines will promote public confidence by demonstrating that individuals who commit crimes will be held accountable, regardless of their own influence and prominence and that of their allies.

### *The Need to Avoid Unwarranted Sentencing Disparities*

A sentence of imprisonment is mandatory, and a term at the top end of the Guidelines will avoid unwarranted disparities between the Defendant and other congressional contemnors.  As Mr. Corcoran pointed out through his questioning of Kristin Amerling at trial, it is the rare case in which someone defies a congressional subpoena entirely.   July 20, 2022, Trial Tr. 716:13-22. Indeed, there are only a few cases in which defendants have been charged with willfully defaulting on a subpoena and convicted after trial, like the Defendant was here.  But in those few cases, each has been sentenced to a period of incarceration.  Peter Licavoli, for example, was sentenced to six months' imprisonment for his refusal to testify in response to a congressional subpoena.  *See* "Racket Figure Gets Contempt Sentence," N.Y. Times, Apr. 15, 1960, *available at* https://www.nytimes.com/1960/04/15/archives/racket-figure-gets-contempt-sentence.html   (last accessed Oct. 16, 2022).  In *United States v. Tobin*, the defendant was sentenced to thirty days for

not providing certain documents in response to a subpoena.  195 F. Supp. 588, 617 (D.D.C. 1961).

Notably, however, the defendant in that case, unlike the Defendant here, had previously voluntarily

provided some records and was acting on clear directions not to comply from the sitting governors

of two states which controlled the subpoenaed entity for which the defendant worked.  *Id*. at 596.

The defendant also offered at sentencing to provide the records he previously had withheld.  *Id*. at

617.   The Defendant here, by contrast, has never taken a single step to comply with the

Committee's subpoena and has acted in bad faith throughout by claiming he was merely acting on

former President Trump's instructions—even though former President Trump's attorney made

clear he was not.  A sentence equal to what the court ordered in *Tobin*—the minimum allowed

under Section 192—would not reflect, therefore, the more contemptuous conduct at issue in this

case.  And any sentence below the six-month sentence imposed in *Licavoli* would similarly fail to

account for the full extent of the Defendant's bad faith in the present case.

Moreover, several defendants who did appear in response to subpoenas and were convicted

with contempt for refusing to answer some—but not all—questions posed have been sentenced to

terms of imprisonment ranging from six months to a year.  *See, e.g.*, *Hutcheson v. United States*,

369 U.S. 599, 599 (1962) (defendant sentenced to six months' imprisonment on eighteen counts

of contempt of Congress for refusing to answer eighteen questions); *Yellin v. United States*, 287

F.2d 292, 294 (7th Cir. 1961) (defendant sentenced to one-year terms of imprisonment, concurrent,

on four counts of contempt of Congress for refusing to answer four questions); *United States v.

Seeger*, 303 F.2d 478, 480 (2d Cir. 1962) (defendant sentenced to one-year terms of imprisonment,

concurrent on ten counts of contempt of Congress for refusing to answer ten questions).   The

Defendant's continued and outright refusal to produce a single document or even appear at all is

far more contemptuous than the conduct of defendants who appeared and refused to answer a few

of several questions posed.  Under these circumstances, the Defendant's total noncompliance warrants a sentence of incarceration at the top end of the Guidelines.

## CONCLUSION

The rioters who overran the Capitol on January 6 did not just attack a building—they assaulted the rule of law upon which this country was built and through which it endures.  By flouting the Select Committee's subpoena and its authority, the Defendant exacerbated that assault. To this day, he continues to unlawfully withhold documents and testimony that stand to help the Committee's authorized investigation to get to the bottom of what led to January 6 and ascertain what steps must be taken to ensure that it never happens again.  That cannot be tolerated.  Respect for the rule of law is essential to the functioning of the United States government and to preserving the freedom and good order this country has enjoyed for more than two centuries.  The Defendant's bad-faith strategy of defiance and contempt deserves severe punishment.  This Court should impose a sentence of six months' imprisonment, reflecting the most severe Guidelines-compliant punishment available, and fine the Defendant $200,000.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    J.P. Cooney (D.C. Bar No. 494026)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
Fraud, Public Corruption, and Civil Rights Section
United States Attorney's Office

601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7281 (Cooney)
joseph.cooney@usdoj.gov