```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
        * * * * * * * * * * * * * * *    )
 3      UNITED STATES OF AMERICA,        )      Criminal Action
                                         )        No. 21-00670
 4                     Plaintiff,        )
                                         )
 5        vs.                            )      AFTERNOON SESSION
                                         )
 6      STEPHEN K. BANNON,               )      Washington, D.C.
                                         )      July 19, 2022
 7                     Defendant.        )      1:03 p.m.
                                         )
 8      * * * * * * * * * * * * * * *    )

 9

10                  TRANSCRIPT OF JURY TRIAL - DAY 2
                 BEFORE THE HONORABLE CARL J. NICHOLS,
11                    UNITED STATES DISTRICT JUDGE

12

13      APPEARANCES:

14      FOR THE GOVERNMENT:      AMANDA R. VAUGHN, ESQ.
                                 MOLLY G. GASTON, ESQ.
15                               UNITED STATES ATTORNEY'S OFFICE
                                   FOR THE DISTRICT OF COLUMBIA
16                               555 Fourth Street, Northwest
                                 Eleventh Floor
17                               Washington, D.C. 20530

18
        FOR THE DEFENDANT:       MATTHEW E. CORCORAN, ESQ.
19                               RIANE A. WHITE, ESQ.
                                 SILVERMAN, THOMPSON, SLUTKIN, WHITE
20                               400 East Pratt Street
                                 Suite 900
21                               Baltimore, Maryland 21202

22                               DAVID I. SCHOEN, ESQ.
                                 LAW OFFICES OF DAVID I. SCHOEN
23                               2800 Zelda Road
                                 Suite 100-6
24                               Montgomery, Alabama 36106

25
```

476

1    REPORTED BY:                LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
2                                United States District Court for the
                                   District of Columbia
3                                333 Constitution Avenue, Northwest
                                 Room 6706
4                                Washington, D.C. 20001
                                 (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                I N D E X

2

3

4       The Court's Preliminary Instruction to the Jury      Page 497

5       Opening Statements by Ms. Vaughn                     Page 512

6       Opening Statements by Mr. Corcoran                   Page 524

7

8                                    <u>Direct</u>      <u>Cross</u>        <u>Red.</u>

9

10      <u>WITNESSES FOR THE GOVERNMENT:</u>

11      Kristin Amerling                  549

12

13      <u>EXHIBITS RECEIVED IN EVIDENCE</u>                          <u>PAGE</u>

14      Government's Exhibit No. 1                               558
        Government's Exhibit No. 2                               575
15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Good afternoon.  We are now

2     back on the record.

3          THE COURT:  Thank you, Ms. Lesley.

4          I had a note from the Government just before we

5     came in here about its proposal for how we might proceed.

6     Why don't we start with the Government about the next steps

7     unless, Mr. Corcoran, you'd like to --

8          MR. CORCORAN:  Yeah.  I think in the interest of

9     efficiency, you probably want to hear from my side first.

10          THE COURT:  About the Government's proposal?

11          MR. CORCORAN:  Yes.

12          THE COURT:  Okay.

13          MR. CORCORAN:  Before we broke, we were discussing

14     the introduction into evidence of Government's Exhibits 5,

15     6, 7, 8 and 9.  And there was some discussion about whether

16     Mr. Schoen misspoke, which he never does.  I misunderstood

17     or misheard.  But in the interim, we've looked at the

18     exhibits.  We've looked at the redactions.  And I think

19     it'll cut short our discussion on this topic if I simply say

20     that, obviously, when the exhibits were first introduced, we

21     made and preserved an objection to the exhibits as hearsay.

22          The Court based on a number of factors decided to

23     allow the letters in.  These are 5, 6, 7, 8 and 9, the

24     Thompson and Costello letters, either in their entirety

25     unredacted or in redacted form.

1            And we understand that in order to get them in

2     redacted form we'd have to make some sort of a proffer at

3     this point this time, which we're not prepared to do.  We

4     understand that the import of our position now is that the

5     letters would be admitted wholesale, not retail; in other

6     words, that they'd be admitted without redactions.  So I say

7     that simply because I don't know that it makes -- it may cut

8     short the discussion of the issue.

9            Thank you.

10           THE COURT:  What that would mean, then, just so I

11    have it, Mr. Bannon is not prepared at this time to limit

12    the potential proffers that he might make later about the

13    facts that could be relevant to whether he believed the

14    return dates were malleable, as we're talking about.  I know

15    it's more precise than that.

16           And as a result, then, because I thought there had

17    been a limitation or at least a potential limitation which

18    made discussion of privilege irrelevant, then that would

19    basically take off the table for present purposes my view

20    that the redactions were warranted because that proffer was

21    off the table or more limited.

22           As a result, then, that would mean the exhibits --

23    and I understand you've preserved your objections.  But as a

24    result, then, the exhibits would be from your perspective --

25    mine, too -- admitted in their entirety.

```
 1              MR. CORCORAN:  Correct, your Honor.

 2              THE COURT:  Okay.  Thank you.

 3              MR. CORCORAN:  Thank you.

 4              THE COURT:  Ms. Vaughn?

 5              MS. VAUGHN:  I just want to make sure, your Honor,

 6    that we're not going to end up in a position where at the

 7    close of the Government's case the Defendant stands up and

 8    says:  Well, the Government's opened the door to all these

 9    inadmissible defenses, because that is not what the

10    Government is offering these for.

11              THE COURT:  I understand very well what the

12    Government is offering the letters for in their -- frankly,

13    what would have been their redacted form or in their

14    unredacted form.

15              MS. VAUGHN:  To the Government, there's really no

16    distinction in the two versions of them for our purposes.

17              THE COURT:  Understood.

18              So as a result, my decision, then, is that these

19    letters are admissible in their current form because of the

20    discussion we had -- I mean, in their unredacted form and

21    because of the reasons we discussed earlier today.

22              What is the Government's view, then, about next

23    steps?  Does it think its proposal in its email is no longer

24    necessary?

25              MS. VAUGHN:  I think if we are ready --
```

1          THE COURT:  Just so the record is clear, it was an

2    email to chambers.  I think it needs to be on the record.

3          The Government had proposed a series of redactions

4    to the letters that immediately after lunch, which is what

5    we're doing now, that we would first take up the

6    peremptories; that we get to the 14 seated jurors, so to

7    speak; that we then release the entire jury pool for the

8    day, with instructions to those 14 people to come back

9    tomorrow to be sworn in the morning, instructed in the

10   morning; and trial would open in the morning, with a

11   discussion this afternoon about the issues that we were

12   discussing today.

13         In light of where we are, in light of what we just

14   discussed with Mr. Corcoran, do you think that that's no

15   longer necessary?

16         MS. VAUGHN:  It doesn't sound like we have any

17   other preliminary matters to resolve.  So the Government

18   doesn't see a reason to delay.

19         An additional issue that we do want to raise is we

20   are still concerned based on what -- and I don't know if

21   they plan to provide an opening.  They may not.  If they do,

22   we are concerned that they will improperly suggest to the

23   jury this waiver theory that we don't think is valid under

24   the law.  And we would just ask that they refrain from doing

25   that to the extent they plan to give an opening.

1          THE COURT:  Let me just make sure I understand

2    what you mean by "waiver."

3          The theory that the Committee had waived a

4    default?  Not that the Committee had by its actions and

5    words suggested that the return date was open, malleable,

6    whatever, but had actually waived what would have been a

7    default?

8          MS. VAUGHN:  I think -- yes.  And I think to the

9    extent that they want to point to an October 19th letter

10   where the Committee says, We still would like you to comply

11   with the subpoena, to the point that they want to point to

12   that as evidence that the Committee never viewed a default

13   to have occurred I think is improper.

14         THE COURT:  Why?

15         MS. VAUGHN:  Because it's a suggestion -- because

16   it doesn't go to what the facts were at the time of the

17   default.  It just goes to an additional effort to --

18         THE COURT:  It seems to me those are different

19   issues.  That argument is even an October 19th letter

20   wouldn't be relevant to the question of whether there was a

21   default, not whether they were waiving it.

22         MS. VAUGHN:  It could be relevant --

23         THE COURT:  What if the Committee had said on

24   October 19th, you know, we're going to extend the return

25   date by another week or had said something very ambiguous

1      about the return date?  Why wouldn't that be relevant even

2      though it was after October 18th?

3                  MS. VAUGHN:  If he failed to comply with the

4      subpoena by the deadline, he failed to comply with the

5      subpoena.

6                  THE COURT:  I know that's your argument.  But

7      you're saying it would be inadmissible that the Committee

8      said the day after the return date, Hey, we're extending the

9      return date by a week?  That can't be right.

10                 MS. VAUGHN:  Well --

11                 THE COURT:  Inadmissible?  I know your argument

12     would be that the jury should reach a different conclusion.

13                 MS. VAUGHN:  No.  That's not the statement that's

14     in the letter.

15                 I think my concern is that --

16                 THE COURT:  I understand.  But the temporal nature

17     of the letter doesn't determine its admissibility or not.

18                 MS. VAUGHN:  That's true.

19                 THE COURT:  It seems to me just to be very clear.

20     There are two issues -- or three, right?  One is:  Was there

21     a default?  Another is:  Did Mr. Bannon default deliberately

22     and intentionally based on what was in his mind?  And then

23     another one might be whether, notwithstanding those things,

24     the Committee waived the default.

25                 MS. VAUGHN:  Yes, which -- that doesn't exist in

 1    the law.

 2              THE COURT:  That's what you want me to preclude.

 3    At least that's the thing you most want me to preclude the

 4    Defendant from arguing in his opening?

 5              MS. VAUGHN:  From suggesting.

 6              THE COURT:  From suggesting.

 7              MS. VAUGHN:  Yes.

 8              THE COURT:  I'll ask the Defendant if they intend

 9    to do that.

10              Mr. Corcoran or Mr. Schoen?

11              MR. SCHOEN:  If the only question is whether the

12    Defendant intends to raise it in the opening, the answer is

13    no.

14              We do believe it's a valid defense in the case and

15    we would be able to pursue that.  We should be able to

16    pursue that defense.

17              THE COURT:  Thank you.  For purposes of the

18    opening, it's irrelevant.

19              Can we do the peremptories?  Are we ready to do

20    peremptories?

21              So everybody has the list of qualified jurors.

22    Correct?

23              MS. VAUGHN:  Yes, your Honor.

24              THE COURT:  My plan, absent objection, is to not

25    do a snake method, but is to have the Government strike,

1    then Defendant, then Government, then Defendant, then

2    Government, then Defendant.  That will be the six.  We will

3    then have 16 jurors left.  They will be in a particular

4    order.  We'll know what the two alternate seats are and then

5    we will take those up after that.

6              So Ms. Vaughn?  Ms. Lesley?

7              THE COURTROOM DEPUTY:  Do you want me to give them

8    out?

9              THE COURT:  Yes.

10             THE COURTROOM DEPUTY:  (Tenders document to

11   counsel.)

12             MR. SCHOEN:  Judge, may I ask a question?

13             THE COURT:  Yes.

14             MR. SCHOEN:  I'm just thinking of logistics

15   because I don't want to interrupt once the jury is put in

16   the box.

17             There are still, as the Court is aware, certain

18   exhibits to which there are objections, Government's

19   exhibits to which there are objections that have been

20   lodged.  The question is if the Government intends to use

21   them in their opening.  If not, we don't need to address it

22   now.

23             THE COURT:  I thought we resolved that at the last

24   hearing.  We had a conversation about whether and to what

25   extent the Government was going to use its exhibits.  The

1    Government made a series of representations, and I held that

2    that was adequate from my perspective.

3              MR. SCHOEN:  The Government made a filing, you

4    know, yesterday that -- the Court had ordered us to do a

5    five-page filing on the hearsay letter issues.  And the

6    Government decided to --

7              THE COURT:  But we had resolved -- right.  I

8    wanted that to know about the hearsay questions about the

9    letters.

10             MR. SCHOEN:  Right.

11             THE COURT:  But we resolved the question of

12   opening during the pretrial conference.

13             MR. SCHOEN:  Okay.

14             THE COURT:  It's done.

15             MR. SCHOEN:  I don't know what the status, then,

16   of what the Government --

17             THE COURT:  I expect the Government to act

18   consistent with its representations during the pretrial

19   conference.

20             MR. SCHOEN:  At some point I need to be able to

21   address the Government's filing yesterday.  I was just going

22   to -- I thought we were just going to address it today

23   orally.

24             THE COURT:  Are you talking about the simultaneous

25   filings, essentially, that I had ordered simultaneously?

 1              MR. SCHOEN:  That the Court ordered on the hearsay

 2      letters specifically.  I looked at the transcript again.

 3      The Government decided to raise three other --

 4              THE COURT:  Oh, about the other things.  Okay.

 5      Not just the Costello letters.  You're talking about the

 6      other letters.

 7              MR. SCHOEN:  Correct.  I'm talking about the

 8      telephone --

 9              THE COURT:  The responses to the Defendant's other

10      objections that are not about the Costello letters?

11              MR. SCHOEN:  Yes, sir.

12              THE COURT:  I understand.

13          Let me hear from the Government about its

14      intention with respect to those other documents in its

15      opening.

16              MS. VAUGHN:  The Government only intends to refer

17      to the letters back and forth between Mr. Costello and the

18      Committee in its opening.

19              THE COURT:  And consistent with the way that you

20      represented you would do so during the pretrial conference?

21              MS. VAUGHN:  We don't plan to show them.  The only

22      reference -- I'm doing the opening.  The only reference I

23      intend to make is that the Defendant sent letters refusing

24      to comply, that the excuse he gave was a privilege.  I don't

25      plan to go into the details of what it is, other than to say

```
 1    that the Committee understood that to be a claim that he had
 2    a reason he didn't have to comply; that the Committee
 3    responded that they were rejecting his reason and he needed
 4    to comply; that the Defendant kept going back.  That's all I
 5    intend to do.
 6              THE COURT:  That's fine for purposes of the
 7    opening.
 8              Mr. Schoen?
 9              MR. SCHOEN:  Just to be clear, my only question
10    was about the Costello telephone records, the website posts
11    and the Schoen statement.
12              THE COURT:  Right.  I'm hearing that the
13    Government intends to not mention those at all during its
14    opening.
15              MR. SCHOEN:  That's it.  Thank you, your Honor.
16              THE COURT:  Correct?
17              MS. VAUGHN:  That's correct.  That is correct,
18    your Honor.
19              THE COURT:  Okay.  Fair enough.
20              So the Government has a peremptory to exercise.
21              MS. GASTON:  We'll write it down.
22              THE COURT:  You're going to write it down.  I'm
23    going to look at it and then we will communicate it.  There
24    have been times in which information was communicated that
25    perhaps shouldn't have been.
```

```
 1              MS. VAUGHN:  (Tenders document to the Court.)
 2              THE COURT:  The Government has exercised its first
 3     peremptory on Juror 475.
 4              MR. CORCORAN:  (Tenders document to the Court.)
 5              THE COURT:  Mr. Bannon has exercised his first
 6     peremptory on Juror 1391.
 7              MS. GASTON:  (Tenders documents to the Court.)
 8              THE COURT:  The Government has exercised its
 9     second peremptory on Juror 1913.
10              MR. CORCORAN:  (Tenders document to the Court.)
11              THE COURT:  Mr. Bannon has exercised his second
12     peremptory on Juror 257.
13              MS. GASTON:  (Tenders document to the Court.)
14              THE COURT:  The Government has exercised its third
15     peremptory on Juror 749.
16              MR. CORCORAN:  (Tenders document to the Court.)
17              THE COURT:  Mr. Bannon has exercised his third
18     peremptory on Juror No. 1117.
19              So what I'm going to do now is I'm going to run
20     down the list of the jurors that have not -- that were
21     qualified and have not yet been stricken.  I'm going to note
22     the chair or juror number -- I mean, the juror and the
23     courtroom number that that juror corresponds to.  And then
24     we can take up whether anyone will be exercising an
25     alternate strike.
```

1           So here's what I have:  I have Juror No. 1104 is

2      sitting in Seat 1.

3                1371 is in Seat 2.

4                0014 is in Seat 3.

5                1061 is in Seat 4.

6                122 is in Seat 5.

7                1041 is in Seat 6.

8                544 is in Seat 7.

9                1798 is in Seat 8.

10                1053 is in Seat 9.

11                1957 is in Seat 10.

12                93 is in Seat 11.

13                540 is in Seat 12.

14           MS. VAUGHN:  Your Honor, I think --

15           THE COURT:  Yes.  I think I must have -- I

16      apologize.  I made a mistake.  My apologies.  Let me go back

17      a bit.  I note it as well.  I apologize.

18           So does everybody agree that Seat 6 is 1041?

19           MS. VAUGHN:  Yes, your Honor.

20           MR. CORCORAN:  Yes, your Honor.

21           THE COURT:  And that's where I think I just missed

22      one.  I apologize for that.

23           1425 is Seat 7.  Correct?  Well, I'll keep going.

24      Then we can discuss whether I've gotten something wrong

25      again.

```
1              1425 is Seat 7.

2              Juror No. 544 is Seat 8.

3              Juror 1798 is Seat 9.

4              Juror 1053 is Seat 10.

5              Juror 1957 is Seat 11.

6              Juror 93, Seat 12.

7              Juror No. 540, Seat 13.

8              Juror 764, Seat 14.  That's obviously the 14

9    jurors and alternates, if no alternate strikes were

10   exercised.

11             And then Juror 33 is Seat 15, Alternate-Alternate

12   1.  And Juror 1427 is alternate -- is No. 16, Seat 16,

13   Alternate-Alternate Juror No. 2.

14             MR. CORCORAN:  Could you please repeat the last

15   two?

16             THE COURT:  Yes.  So I have 764 was 14.  Then I

17   have 33 as 15 and 1427 as 16.

18             Does everybody agree with the juror numbers and

19   where they correspond to the seats that I have identified?

20             MS. VAUGHN:  Yes, your Honor.

21             MR. CORCORAN:  Yes, your Honor.

22             THE COURT:  So obviously -- well, here's what I

23   would like to do:  I'd like the parties to spend two minutes

24   thinking about whether they would seek to exercise alternate

25   strikes.  I don't want to disclose on the public record the
```

1    seats that are the alternates.  We will go on the husher to

2    discuss whether either party wants to exercise a strike and,

3    if so, as to which alternate.  Okay?

4              (Counsel confer privately.)

5              THE COURT:  Is everyone ready?  We're going to go

6    under seal with the husher on and we'll do that.

7              (Whereupon, the following proceedings were had at

8    sidebar:)









1

2

3

4

5

6

7

8

9

10

11

12

13           (Whereupon, the following proceedings were had in

14    open court:)

15           THE COURT:  We are back from under seal.

16           We have a jury.  Again, so the jury in order, just

17    so the record is clear, I will read again the juror number

18    and seat number, so to speak.

19           Juror No. 1104 is in Seat 1.

20           1371, Seat 2.

21           14, Seat 3.

22           Juror 1061, Seat 4.

23           Juror 122, Seat 5.

24           Juror 1041, Seat 6.

25           Juror 1425, Seat 7.

```
 1                    Juror 544, Seat 8.

 2                    Juror 1798, Seat 9.

 3                    Juror 1053, Seat 10.

 4                    Juror 1957, Seat 11.

 5                    Juror 93, Seat 12.

 6                    Juror No. 540, Seat 13.

 7                    And Juror 764, Seat 14.

 8                    Does everyone agree that that is our jury and the

 9      seats for the trial?  Ms. Vaughn?

10                    MS. VAUGHN:  Yes, your Honor.

11                    THE COURT:  Mr. Corcoran?

12                    MR. CORCORAN:  Yes, your Honor.

13                    THE COURT:  Thank you.

14                    (Confers with the courtroom deputy privately.)

15                    THE COURT:  We're going to do a 10-, 15-minute

16      recess so that those 14 jurors can be gathered and put in

17      the box and so we can let the other people go.  So we'll be

18      back on the record at approximately 1:55, at which time I

19      will swear the jury; I will give the pretrial instructions;

20      and then, depending on how long they go -- and they are kind

21      of long -- but depending on how long they go, we may start

22      with openings right there or take a brief recess before the

23      openings.  Okay?

24                    Thank you, counsel.

25                    (Thereupon a recess was taken, after which the
```

1    following proceedings were had:)

2              THE COURTROOM DEPUTY:  Your Honor, we are now back

3    on the record.

4              THE COURT:  Thank you, Ms. Lesley.

5              My understanding is that the eight jurors out of

6    the 22 who are no longer needed have been excused.  We have

7    our 14 jurors waiting to come in the courtroom.

8              So, Ms. Lesley, could you please escort those

9    jurors in here.  We will swear them in and then I will do

10   the preliminary instructions.

11             (Whereupon, the jury entered the courtroom at 2:16

12   p.m. and the following proceedings were had:)

13             THE COURT:  Ms. Lesley, could you please swear the

14   jury.

15             (Whereupon, the jury was duly sworn and

16   impaneled.)

17             THE COURTROOM DEPUTY:  Please be seated.

18             THE COURT:  Thank you all.  Thank you for your

19   patience.  Thank you for your service.

20             I'm going to give you some preliminary

21   instructions.  Please listen carefully to these

22   instructions.  I will be giving you other instructions at

23   the end of this trial.

24             But before we begin the trial, I want to explain

25   some of the legal rules that will be important in this

The Court's Preliminary Instructions to the Jury

1    trial.  I want to emphasize that these remarks are not meant

2    to be a substitute for the detailed instructions that I will

3    give at the end of the trial just before you start your

4    deliberations.  These preliminary instructions are intended

5    to give you a sense of what will be going on in the

6    courtroom and what your responsibilities as jurors will be.

7              When you took your seats -- and I can see some of

8    you have them in your hand already -- you probably noticed

9    that each of you had a notebook and pencil waiting for you.

10   That is because I permit jurors to take notes during trial

11   if they wish.  Whether you take notes or not is entirely up

12   to you.  Many people find that taking notes helps them

13   remember testimony and evidence; others find it distracts

14   them from listening to the witnesses.

15             You will be permitted to take your notebooks back

16   with you into the jury room during deliberations.  You

17   should remember, however, that your notes are only an aid to

18   your memory.  They are not evidence in the case and they

19   should not replace your own memory of the evidence.  Those

20   jurors who do not take notes should rely on their own memory

21   of the evidence and should not be influenced by other

22   jurors' notes.

23             Other than during your deliberations, the

24   notebooks will remain locked in the courtroom during

25   recesses and overnight.  You will not be able to take the

The Court's Preliminary Instructions to the Jury

1   notebooks with you as you come and go and you will not be

2   permitted to take them home with you overnight.  At the end

3   of the trial, when you come back to the courtroom to deliver

4   your verdict, your notebooks will be collected and the pages

5   torn out and destroyed.  No one, including myself, will ever

6   look at any notes you have taken.  So you may feel free to

7   write whatever you wish.

8           You have probably noticed that there are 14 of you

9   sitting in the jury box.  Only 12 of you will retire to

10  deliberate in this matter.  Before any of you even entered

11  the courtroom, we randomly selected the alternates' seats.

12  I will not disclose who the alternate jurors are until the

13  end of my final instructions just before you begin your

14  deliberations.  As any seat might turn out to be an

15  alternate seat, it is important that each of you think of

16  yourselves as regular jurors during this trial and that all

17  of you give this case your fullest and most serious

18  attention.

19          At the beginning of the jury selection process,

20  you were introduced to some witnesses in person.  Others

21  were identified to you only by name.  If at any time during

22  this trial you suddenly realize that you recognize or might

23  know any witness, lawyer, someone who is mentioned in the

24  testimony or evidence or anyone else connected with this

25  case in any way, you should raise your hand immediately and

The Court's Preliminary Instructions to the Jury

1     ask to speak with me.

2           So now let me explain briefly some of the

3     procedures we will follow and some of the rules of law that

4     will be important to this case.  This is a criminal case

5     that began when the grand jury returned an indictment.

6           As I previously told you, the indictment in this

7     case charges the Defendant, Stephen K. Bannon, with two

8     counts of contempt of Congress.  In 2021, the Select

9     Committee to Investigate the January 6th Attack on the U.S.

10    Capitol, a Committee of the U.S. House of Representatives,

11    was conducting an investigation into the January 6, 2021,

12    attack on the U.S. Capitol.

13          According to the indictment, on September 23,

14    2021, the Select Committee issued a subpoena to the

15    Defendant directing him to provide records relating to its

16    investigations by October 7, 2021, and to appear and give

17    testimony at a deposition on October 14, 2021.

18          The indictment alleges that the Defendant

19    willfully defaulted by not providing testimony on October

20    14, 2021, and by not producing records as required by

21    October 18, 2021.

22          The indictment alleges that this failure to comply

23    was deliberate and intentional.

24          You should understand clearly that the indictment

25    that I just summarized is not evidence.  The indictment is

1       just a formal way of charging a person with a crime in order

2       to bring him to trial.  You must not think of the indictment

3       as any evidence of the guilt of the Defendant or draw any

4       conclusion about the guilt of the Defendant just because he

5       has been indicted.

6               At the end of the trial, you will have to decide

7       whether or not the evidence presented has convinced you

8       beyond a reasonable doubt that the Defendant committed the

9       offenses with which he has been charged.

10              The Defendant, as I've mentioned, has been charged

11      with two counts of contempt of Congress.  To prove contempt

12      of Congress, the Government must prove beyond a reasonable

13      doubt each of the elements of this offense.

14              The elements of contempt of Congress are:  First,

15      that the Defendant was subpoenaed by the Select Committee to

16      provide testimony or produce papers; second, that the

17      subpoena sought testimony or information pertinent to the

18      investigation that the Select Committee was authorized to

19      conduct; third, that the Defendant failed to comply or

20      refused to comply with the subpoena; and, fourth, that the

21      Defendant's failure or refusal to comply was willful.  I

22      will provide more details about each of these elements

23      before you retire to deliberate at the end of trial.

24              Every defendant in a criminal case is presumed to

25      be innocent.  This presumption of innocence remains with the

The Court's Preliminary Instructions to the Jury

1    Defendant throughout the trial unless and until he is proven

2    guilty beyond a reasonable doubt.

3            The burden is on the Government to prove the

4    Defendant guilty beyond a reasonable doubt, and that burden

5    of proof never shifts throughout the trial.  The law does

6    not require a defendant to prove his innocence or to produce

7    any evidence.  If you find that the Government has proven

8    beyond a reasonable doubt every element of a particular

9    offense with which the Defendant is charged, it is your duty

10   to find him guilty of that offense.

11           On the other hand, if you find that the Government

12   has failed to prove any element of a particular offense

13   beyond a reasonable doubt, you must find the Defendant not

14   guilty of that offense.

15           As I explain how the trial will proceed, I will

16   sometimes refer to the Government on the one hand and the

17   defense or the Defendant on the other.  When I mention the

18   Government, I am referring to Assistant United States

19   Attorneys Ms. Vaughn and Ms. Gaston.  When I mention the

20   Defendant or the defense, I'm referring either to the

21   Defendant, Mr. Bannon, or to his attorneys, Mr. Schoen,

22   Mr. Corcoran or Ms. White.

23           As the first step in this trial, the Government

24   and the Defendant will have an opportunity to make opening

25   statements.  The Defendant may make an opening statement

The Court's Preliminary Instructions to the Jury

1        immediately after the Government's opening statement or he

2        may wait until the beginning of the Defendant's case or he

3        may choose not to make an opening statement at all.  You

4        should understand that the opening statements are not

5        evidence.  They are only intended to help you understand the

6        evidence that the lawyers expect will be introduced.

7               After the opening statement or statements, the

8        Government will put on what is called its case in chief.

9        This means that the Government will call witnesses to the

10       witness stand and ask them questions.  This is called direct

11       examination.  When the Government is finished, the defense

12       may ask questions of those witnesses.  This is called

13       cross-examination.  When the defense is finished with that,

14       the Government may have the opportunity to do a brief

15       redirect examination.

16              After the Government has presented all of its

17       evidence, the Defendant may present evidence, but he is not

18       required to do so.  The law does not require a defendant to

19       prove his innocence or to produce any evidence.  If the

20       defense does put on evidence, the defense will call

21       witnesses to the stand and ask questions on direct

22       examination.  The Government may or will cross-examine, and

23       the defense may have brief redirect examination.

24              Which the defense has finished, the Government may

25       offer a rebuttal case, which would operate along the same

1          lines as its case in chief.

2                    At the end of all the evidence, I will instruct

3          you once more on the rules of law that you are to apply in

4          your deliberations when you retire to consider your verdict

5          in this case.  Then each side will have a chance to present

6          closing arguments in support of its case.

7                    The statements of the lawyers in their closing

8          arguments, just as in their questions and in their opening

9          statements, are not evidence in this case.  They are

10         intended only to help you understand the evidence and what

11         each side claims the evidence shows.

12                   Finally, at the end of the closing arguments, I

13         will have a few additional instructions for you before you

14         begin your deliberations.

15                   I want to briefly describe my responsibilities as

16         the judge and your responsibilities as the jury.  My

17         responsibility is to conduct this trial in an orderly, fair

18         and efficient manner, to rule on legal questions that come

19         up in the course of the trial and to instruct you about the

20         law that applies to this case.  It is your sworn duty as

21         jurors to accept and apply the law as I state it to you.

22                   Your responsibility as jurors is to determine the

23         facts in the case.  You, and only you, are the judges of the

24         facts.  You alone determine the weight, the effect and the

25         value of the evidence as well as the credibility or

1    believability of the witnesses.  You must consider and weigh

2    the testimony of all witnesses who appear before you.  You

3    alone must decide the extent to which you believe any

4    witness.

5            You must pay very careful attention to the

6    testimony of all of the witnesses because you will not have

7    any transcripts or summaries of the testimony available to

8    you during your deliberations.  You will have to rely

9    entirely on your memory and your notes if you choose to take

10   any.

11           During this trial, I may rule on motions and

12   objections by the lawyers, make comment to the lawyers,

13   question the witnesses and instruct you on the law.  You

14   should not take any of my statements or actions as any

15   indication of any opinion about how you should decide the

16   facts.

17           If you think that somehow I've expressed or even

18   hinted at any opinion as to the facts in this case, you

19   should disregard that.  The verdict in this case is your

20   sole and exclusive responsibility.

21           You may consider only the evidence properly

22   admitted in this case.  That evidence includes the sworn

23   testimony of witnesses and the exhibits admitted into

24   evidence.  Sometimes a lawyer's question suggests the

25   existence of a fact, but the lawyer's question alone is not

The Court's Preliminary Instructions to the Jury

1    evidence.  If the evidence includes anything other than

2    testimony and exhibits, I will instruct you about these

3    other types of evidence when they are admitted during the

4    trial.

5            During the trial, if the Court or a lawyer makes a

6    statement or asks a question that refers to evidence that

7    you remember differently, you should rely on your memory of

8    the evidence during your deliberations.

9            The lawyers may object when the other side asks a

10   question, makes an argument or offers evidence that the

11   objecting lawyer believes is not properly admissible.  You

12   must not hold such objections against the lawyer who makes

13   them or the party he or she represents.  It is the lawyer's

14   responsibility to object to evidence that they believe is

15   not admissible.

16           If I sustain an objection to a question asked by a

17   lawyer, the question must be withdrawn and you must not

18   guess or speculate what the answer to the question would

19   have been.  If a question is asked and answered and I then

20   rule that the answer should be stricken from the record, you

21   must disregard both the question and the answer in your

22   deliberations.  You should follow this same rule if any of

23   the written documents or exhibits are stricken.

24           You are not permitted to -- I mentioned some of

25   this last night.  You are not permitted to discuss this case

1    with anyone until this case is submitted to you for your

2    decision at the end of my final instructions.  This means

3    that until the case is submitted to you, you may not talk

4    about it even with your fellow jurors.  It is because we

5    don't want you making decisions until you've heard all the

6    evidence and the instructions of law.

7            In addition, you may not talk about the case with

8    anyone else.  It should go without saying that you may not

9    also write about the case electronically, through any blog,

10   posting or communication, including social networking sites

11   such as Facebook or Twitter until you have delivered your

12   verdict and the case is over.

13           This is all because you must decide the case based

14   on what happens here in the courtroom, not on what someone

15   may or may not tell you outside the courtroom.  I'm sure

16   that when we take our first recess you will call home --

17   maybe you already have -- or work and tell them that you

18   have been selected for a jury.  They'll undoubtedly ask you

19   what kind of case you're sitting on.  You may tell them it's

20   a criminal case, but nothing else.

21           Now, when the case is over, you may discuss any

22   part of it with anyone you wish, but until then you may not

23   do so.

24           Although it's a natural human tendency to talk

25   with people with whom you may come into contact, you must

1    not talk to any of the parties, their attorneys or any

2    witnesses in this case during the time you serve on this

3    jury.  If you encounter anyone connected with the case

4    outside the courtroom, you should avoid having any

5    conversation with them, overhearing their conversation or

6    having any contact with them at all.

7              For example, if you find yourself in a courthouse

8    corridor, elevator or any other location where the case is

9    being discussed by attorneys, parties, witnesses or anyone

10   else, you should immediately leave the area to avoid hearing

11   such discussions.  If you do overhear a discussion about the

12   case, you should report that to me as soon as you can.

13   Finally, if you see any of the attorneys or witnesses

14   involved in the case and they turn and walk away from you,

15   they're not being rude.  They're merely following the same

16   instruction that I gave to them.

17             It is very unlikely, but if someone tries to talk

18   to you about the case, you should refuse to do so and

19   immediately let me know by telling Ms. Lesley or the marshal

20   or another court staff.  Don't tell the other jurors.  Just

21   let me know and I'll bring you in to discuss what happened.

22             Between now and when you are discharged from jury

23   duty, you must not provide to or receive from anyone,

24   including friends, co-workers and family members, any

25   information about your jury service.  You may tell those who

1    need to know where you are that you have been picked for a

2    jury, as I mentioned, and how long the case may take.

3    However, you must not give anyone any information about the

4    case itself or the people involved.

5             You must also warn people not to try to say

6    anything to you or write to you about your jury service or

7    the case.  This includes face-to-face, phone or computer

8    communications.

9             Again, in this age of electronic communications --

10   and I'm afraid it does require stressing -- you must not use

11   electronic devices or computers to talk about this case,

12   including texting, tweeting, blogging, emailing, posting

13   information on a website or chatroom or any other means at

14   all.  Don't send or accept messages, as I said, including

15   email and text messages about your jury service.  You must

16   not disclose your thoughts about your jury service or ask

17   for advice on how to decide any case.

18            You must decide, again, the facts based on the

19   evidence presented in court and according to the legal

20   principles about which I will instruct you.

21            You are not permitted during the course of the

22   trial to conduct any independent investigation of your own

23   or research about the case.  That means, for example, you

24   can't use the internet to do research about the facts or the

25   law or the people involved here.  Research includes

1    something even as simple or seemingly harmless as using the

2    internet to look up a legal term or view a satellite photo

3    of a scene of an alleged crime or something similar.

4         I want to explain briefly why you should not

5    conduct your own investigation.  All parties have a right to

6    have a case like this decided only on evidence and legal

7    rules that they know about and that they have a chance to

8    respond to.  Relying on information you get outside this

9    courtroom is unfair because the parties would have no --

10   would not have a chance to refute, correct or explain it.

11   Unfortunately, information that we get over the internet or

12   from other sources may be incomplete or misleading or just

13   plain wrong.  It is up to you to decide whether to credit

14   any evidence presented in court; and only the evidence

15   presented in court may be considered.  If evidence or legal

16   information has not been presented in court, you cannot rely

17   on it.

18        Moreover, if any of you do your own research about

19   the facts or the law, that might result in different jurors

20   basing their decisions on different information.  Each juror

21   must make his or her decision based on the same evidence and

22   under the same rules.

23        In some cases -- and this is probably one -- there

24   may be reports in the newspaper or on the radio, internet or

25   television concerning the case while the trial is ongoing.

The Court's Preliminary Instructions to the Jury

511

1    If there should be such media coverage in this case, you may

2    be tempted to read, listen to or watch it.  You must not do

3    so.  You must not read, listen to or watch such reports

4    because, again, you must decide this case solely on the

5    evidence presented in this courtroom.

6         If any publicity about this trial inadvertently

7    comes to your attention during trial, do not discuss it with

8    other jurors or anyone else.  Just let me or my clerk know

9    as soon after it happens as you can and I will then discuss

10   it with you.

11        Additionally, I want to instruct each of you, if

12   you use these or have these, to turn off push notifications

13   on your phone.  If you have an iPhone, that can be

14   accomplished by going to Settings, then Notifications.  You

15   will see a list of downloaded applications that may provide

16   you with notifications.  For the pendency of this trial, I

17   ask that you turn each of those notifications off, push

18   notifications relating to social media or news services to

19   "off."  If you do have your phones on you, please do that

20   now.  Or, if not, please do it when you are next in

21   possession of your phone.

22        After I submit the case to you, you may discuss it

23   only when I instruct you to do so and only in the jury room

24   and only in the presence of all your fellow jurors.  It is

25   important that you keep an open mind and not decide any

The Court's Preliminary Instructions to the Jury

1    issue in this case until after I submit the entire case to

2    you with my final instructions.

3              With that, thank you again for your service.

4              It seems to me, Ms. Vaughn, that we have time for

5    the Government at least to do its opening statement.

6              MS. VAUGHN:  Thank you, your Honor.

7              In September of last year, Congress needed

8    information from the Defendant, Stephen Bannon, seated over

9    there.

10             Congress needed to know what the Defendant knew

11   about the events of January 6th, 2021, the day when a mass

12   of people breached the U.S. Capitol a few blocks from here

13   and delayed Congress's vote to certify the official winner

14   of the 2020 presidential election.

15             You see, Congress had gotten information that the

16   Defendant might have some details about the events leading

17   up to that day and what occurred on that day.  So to get the

18   information it needed, Congress gave the Defendant a

19   subpoena, a legally enforceable order, that mandated that

20   the Defendant provide any information he might have relating

21   to January 6th to the Committee.

22             And because it was a subpoena, Congress was

23   entitled to the information it sought.  It wasn't optional,

24   it wasn't a request and it wasn't an invitation.  It was

25   mandatory.

513

1          But as you will learn in this trial, the Defendant

2     refused to hand over the information he might have anyway.

3     Instead, as you'll see, he chose to show his contempt for

4     Congress's authority and its processes.  He refused to tell

5     Congress if he knew anything or, if he did, what he knew

6     about the events of January 6th and what led to them.  He

7     ignored orders to comply even after Congress had rejected

8     his excuses not to.

9          And he put aside multiple warnings that he could

10    face criminal prosecution if he didn't comply with the

11    subpoena as required.

12         And by doing so, the Defendant prevented the

13    Government from getting the important information it needed

14    from him to help it figure out what happened on January 6th

15    and how to make sure it didn't happen again.

16         And that, ladies and gentlemen, ignoring a legal

17    order, a subpoena from the United States Government, the

18    U.S. Congress, that's a crime.  The Defendant decided he was

19    above the law and decided he didn't have to follow the

20    Government's orders like his fellow citizens.  And that's

21    why we're here today.

22         Now, as I said, it was the U.S. Congress that gave

23    the Defendant a subpoena.  Why?  Well, a lot of people know

24    that Congress is the part of our government that passes

25    laws.  But a lot of people don't know or don't really think

514

1       about the work that Congress has to do to figure out what

2       laws to pass.

3               We're going to hear a little bit more about that

4       in this trial from a staff member of Congress who was

5       involved in the Defendant's subpoena named Kristin Amerling.

6       As Ms. Amerling will explain, and as many people including

7       you probably already know, there are two parts of Congress,

8       the House of Representatives and the Senate.  Each part is

9       made up of people who are elected to office by the citizens

10      of the country; and they work together to pass the laws that

11      govern us.

12              But as Mr. Amerling will also explain, to figure

13      out what laws will be helpful, Congress has to do research.

14      It needs to understand what the problems are.  And so under

15      the law, Congress is entitled to gather information to help

16      it understand those problems.

17              And as Ms. Amerling will explain, if Congress

18      can't get the information it needs from citizens or

19      organizations or companies in the country, it can't figure

20      out what the issues are that people are facing that need to

21      be addressed.

22              And so as Ms. Amerling will tell us, to do this

23      research, Congress sets up committees.  The House and the

24      Senate each set up their own committees, each committee with

25      its own area of expertise and focus.  The committees are

1    made up of elected members of Congress and they all have

2    staff, just regular everyday people that help the committees

3    carry out their work.

4         And the committees have a variety of tools they

5    can use to gather the information they need.  They can do

6    things like make voluntary requests for information, asking

7    someone to on their option turn information over, or they

8    can do things like read reports or books or even do research

9    on the internet like any of us might do.

10        And another tool they have is a subpoena

11   requiring, compelling someone to provide information.  These

12   are all things that the committees use every day in their

13   work to figure out what laws would be helpful to the

14   country.

15        And this process of setting up committees and

16   doing research to figure out what laws to pass, this is what

17   the House of Representatives did after the events of January

18   6th.  As you'll see, they set up a special committee called

19   the Select Committee to Investigate the January 6th Attack

20   on the U.S. Capitol.  I'm just going to refer to it as the

21   Committee for short.  And this is the committee that

22   Ms. Amerling works for.

23        As you'll see, the Committee was set up to

24   investigate the causes and events of January 6th.  One of

25   the causes it's investigating is an effort to delay or stop

1    the 2020 presidential election results from being finalized.

2              Something else it's investigating is how the

3    breach of the U.S. Capitol came about, things like what

4    plans were in place, who came to D.C. that day and why and

5    what their intention was upon entering the Capitol.

6              And based on its findings, the Committee is also

7    tasked with identifying what laws or other rules could be

8    made or changed to better protect our democracy, our

9    elections and the safety and security of our government

10   institutions.

11             So as Ms. Amerling will tell us, once the

12   Committee began its investigation, based on information it

13   gathered, it learned that the Defendant might be someone

14   with some information about that day.

15             You see, many years before January 6th, the

16   Defendant worked for a short time as an advisor to former

17   President Donald Trump, one of the candidates in the 2020

18   presidential election.

19             And based on information the Committee had, the

20   Defendant had maintained ties to the former president and

21   others associated with him.  And around the time of January

22   6th, the Defendant hosted a podcast; and on the podcast he

23   talked a lot about the 2020 presidential election and the

24   effort to delay it from being finalized.

25             And the Committee had gathered information

Opening Statements by Ms. Vaughn

517

1    suggesting that the Defendant may have been in touch with or

2    had meetings with people that were involved in the events

3    leading up to January 6th and on that day, people like

4    members of Congress, people that were associated with the

5    effort to stop the election from being finalized, people

6    working with the former President Trump's campaign and the

7    former president himself.

8            So based on this information that the Committee

9    had, it wanted to know what the Defendant knew, if anything,

10   because if he did know things about these topics, it could

11   be helpful to the Committee's investigation to figure out

12   what happened on January 6th.  And it could be helpful to

13   the Committee's task of identifying what laws should be

14   changed or passed to address elections, violence against the

15   government and other issues coming out of that day.

16           So in September 2021, it gave the subpoena to the

17   Defendant.

18           You'll see that subpoena in this trial.  And

19   you'll see that it required two things of the Defendant:

20   One, that by 10:00 in the morning on October 7th, 2021, the

21   Defendant provide documents he might have relating to

22   January 6th; and, two, that at 10:00 in the morning on

23   October 14th, 2021, the Defendant come to a deposition and

24   answer questions the Committee had about what he knew about

25   January 6th.

Opening Statements by Ms. Vaughn

1            And when I say a deposition, I mean an interview
2    that's given under oath.  So in that case, the Committee
3    would be asking the witness -- here, the Defendant --
4    questions, and he would be answering under oath, meaning he
5    made a promise to tell the truth; and if he didn't tell the
6    truth, he could get into legal trouble.
7            Depositions are also recorded so that the
8    Committee can memorialize the information for use in its
9    investigation.  It's just another tool that committees have
10   to do their research.
11           So let's talk a little bit more about what these
12   two requirements were and what the evidence is going to show
13   you about the Defendant's failure to comply with them.  I'll
14   start with the documents.
15           As you'll see in the subpoena, it required that
16   the Defendant turn over documents on various topics relating
17   to January 6th, topics like fundraising and recruiting
18   people to a rally that was held immediately preceding the
19   breach of the Capitol, things like the effort to stop or
20   delay the election results, and things like the Defendant's
21   communications with people who may have participated in or
22   planned January 6th or the events leading up to it.
23           When we're talking about documents, we're talking
24   about things like text messages, emails, notes, recordings
25   the Defendant might have.  And to be clear, if at the end of

1       the day the Defendant didn't have documents on all the

2       topics that the Committee's subpoena required him to turn

3       over, that would have been fine.  There was -- you'll see in

4       the subpoena there was a clear procedure that the Defendant

5       could follow to notify the Committee that he had done a

6       thorough search and had turned over everything he had.

7               Or let's say that the Defendant had so many

8       documents that he needed more time to find them and gather

9       them and turn them over.  You'll see in the subpoena that it

10      also provided a clear procedure for the Defendant to notify

11      the Committee of that.

12              But as the evidence will show, the Defendant

13      didn't follow these procedures or any others.  In fact, as

14      Ms. Amerling will tell you, by that 10:00-in-the-morning

15      deadline on October 7th, 2021, the Committee had not heard a

16      word from the Defendant.

17              That deadline came and went and he ignored it.

18              So what did he do instead?  You're going to see a

19      letter that the Defendant had his attorney send to the

20      Committee.  And you'll see that in that letter the Defendant

21      notified the Committee he was not going to comply with the

22      subpoena in any way.  He wasn't going to provide a single

23      document and he wasn't going to come to the deposition on

24      October 14th and answer questions.

25              You're also going to see in that letter the excuse

Opening Statements by Ms. Vaughn

1    that the Defendant gave for not complying.  You'll see that

2    he claims something called a privilege.

3            Now, as Ms. Amerling will explain, when it comes

4    to Committee subpoenas, sometimes people raise a privilege

5    to claim that they don't have to turn over certain

6    information or that they don't have to comply with the

7    subpoena.

8            But the meaning of the privilege the Defendant

9    claimed and what information he was claiming it over really

10   is not relevant for our purposes because, as you will see in

11   the subpoena and as you'll learn, it's not up to the

12   Defendant or anyone else to decide whether he can ignore the

13   subpoena's requirements and deadlines based on a privilege.

14   It's up to the Committee.

15           And you will see that the Committee told him, told

16   the Defendant, that his privilege did not excuse him from

17   complying with the subpoena's requirement in this case.  And

18   you'll see that they told him that the very next day, on

19   October 8th, 2021, when the Committee sent a letter back to

20   the Defendant.

21           And you'll see in that letter that the Committee

22   told the Defendant:  Your privilege does not get out of this

23   one.  You have to provide documents and you have to come to

24   your deposition on October 14th, 2021, and answer our

25   questions about what you know about January 6th.

1          And most importantly, in that October 8th letter,

2     the Committee told the Defendant:  A refusal to comply, a

3     refusal to do as the subpoena requires, could result in

4     criminal prosecution.

5          But the Defendant did not heed that warning.

6     Instead, as you'll see, on October 13th -- remember, that's

7     the day before the Defendant was supposed to appear for a

8     deposition -- he sent another letter to the Committee.  And

9     in this letter, you will see that he just reiterated the

10    same argument that the Committee had already rejected:  I

11    have a privilege and I'm not complying.

12         And he didn't.  He did not come on October 14th,

13    2021, to answer the Committee's questions about what he

14    knew.

15         So as you'll see, by that date the Defendant had

16    missed both the deadlines in this subpoena.  He had defied

17    the subpoena's requirement to provide documents and he had

18    defied the subpoena's requirement to come to a deposition

19    and answer questions.  He had committed the very crimes the

20    Committee had warned him about.

21         And the Committee told him this.  You will see

22    another letter that the Committee sent to the Defendant on

23    October 15 and they told him:  You have not done what we

24    warned you against.  You have defied the subpoena

25    unlawfully.  We're going to consider referring you for

522

1   prosecution and you have until 6:00 p.m. on October 18th to

2   explain yourself.

3           By this time, you can probably guess what the

4   evidence is going to show on this:  That October 18th 6:00

5   p.m. deadline came and went without any different

6   justifications from the Defendant for his failure to comply

7   and no effort at compliance.

8           Now, for the Defendant's refusal to follow the

9   rules, to follow the law, he's charged with contempt.  One

10  count of contempt for refusing to provide documents, one

11  count of contempt for refusing to come and answer questions

12  at the deposition on October 14th.

13          And contempt just means that the Defendant's

14  failure to comply was deliberate.  It wasn't an accident; it

15  wasn't a mistake.  It was a decision; it was a choice.  And

16  you will see here in the black-and-white pages of that

17  subpoena, of the letters from the Committee to the Defendant

18  and the letters from the Defendant back to the Committee,

19  that the Defendant's failure to comply was deliberate here.

20          You'll see it in that subpoena with its

21  instruction to the Defendant that he was hereby commanded by

22  the authority of the U.S. Congress to appear and provide

23  documents.  You will see it on the face of the letters from

24  the Committee to the Defendant directing him to comply and

25  warning him of the consequences if he didn't.  And you will

1      see it in the Defendant's letters to the Committee, the

2      Defendant's decision that his authority to decide what the

3      law required was greater than the U.S. Government's.

4               You will also see in the evidence in this case

5      that this is not a case of mistake.  The Defendant didn't

6      get the date wrong.  He didn't get confused about where to

7      go.  He didn't get stuck on a broken-down Metro car.  He

8      just refused to follow the rules.

9               To be clear, this case is not about what happened

10     on January 6th or what the Defendant may or may not have

11     done on that day.  This case is about the Defendant thumbing

12     his nose at the orderly processes of our government.

13              And at the end of this case, you might say to

14     yourself:  So this whole case is about a guy who just

15     refused to show up?  Yes.  It is that simple, because ours

16     is a nation of laws and our system doesn't work if people

17     think they're above them.

18              As Ms. Amerling will tell you, our system can't do

19     the work it needs to do to run and protect the country if

20     citizens can simply ignore the government's orders.

21              And by the end of this case, you will find from

22     the evidence that the Defendant had a disregard for these

23     principles, that he refused to work with Congress as he was

24     required to help the American people figure out what

25     happened on January 6th and how to make sure it didn't

1     happen again.

2              And at the end of this case, we'll come back

3     before you and ask you to find the only verdict that is

4     supported by the evidence here:  that the Defendant showed

5     his contempt for the U.S. Government, the U.S. Congress, and

6     that he's guilty.

7              THE COURT:  Thank you, Ms. Vaughn.

8              Mr. Corcoran, will you be giving an opening now or

9     possibly later?

10             MR. CORCORAN:  We will.  Thank you, your Honor.

11             Ladies and gentlemen, good afternoon.

12             THE JURY:   Good afternoon.

13             MR. CORCORAN:  This is Steve Bannon.  And he's

14    innocent of the charges.

15             You're going to hear evidence in this case that

16    Steve Bannon has served our country on two different

17    occasions:  First, he was in the Navy for seven years.  He

18    served honorably and left the Navy with honor.  You'll also

19    hear that after leaving the Navy, he went into business.

20    Much of his career involved the media.

21             He cofounded a successful media company that

22    provided news and commentary across the entire country.  It

23    had a nationwide reach.

24             You'll also hear that he got into politics.  He

25    didn't run for elective office.  He did not.  But he was a

1      political thinker and a political strategist.  And he helped

2      a candidate run for the presidency.  He became the top

3      leader in the candidacy of President Donald J. Trump.

4              After President Trump was elected, the evidence

5      will show that Mr. Bannon again served our country.  And I

6      say "our country" because we're all in this together.  He

7      served as a top advisor to President Donald Trump on

8      strategy and on policy.

9              And when Steve Bannon left the White House, he

10     returned to media.  He developed a show.  Now, the show was

11     videotaped and audiotaped and made available across the

12     internet.  It's called a podcast.  The two words, iPod and

13     broadcast, when they're put together, are podcast.  And

14     that's something that somebody, a listener, a viewer, can

15     download and watch at their leisure.

16             Now, this podcast dealt with politics.  Steve

17     Bannon and his guests discussed the political issues of the

18     day.  And it had a very broad reach.  You'll hear evidence

19     that it's often in the top one or two or three podcasts on

20     Apple in the area of politics, ahead of such well-known news

21     organizations as *The New York Times* or NPR.  A very broad

22     reach on political strategy.

23             On January 5th, 2021, the day before the attack on

24     the Capitol, most major media outlets, most shows, were

25     reporting that there might be violence at the Capitol the

1    next day.  That was something that was widely reported.

2              You've heard about a subpoena.  But I think one

3    important thing to consider in terms of the evidence is, it

4    was eight months later, eight months after January 6th, that

5    a subpoena was pulled together for Stephen Bannon.  Eight

6    months.

7              It had his name on it and it asked him to appear

8    for testimony and to produce documents if he had any.

9              The subpoena that was provided to Mr. Bannon had

10   pages and pages of instructions and legalese.  And as you

11   might imagine, Mr. Bannon spoke to an attorney, Bob

12   Costello.

13             The subpoena set the stage for all that followed.

14   And the subpoena sets the stage for why we're here.  And I

15   think it's important to understand that the stage involves

16   the United States House of Representatives.

17             Politics is the lifeblood of the U.S. House of

18   Representatives.  A member of Congress, every single member

19   of Congress, stands for reelection every two years.  This

20   November there's another election.  And every single member

21   of Congress is running.  So they're perpetual candidates for

22   office, and politics invades every decision that they make.

23             The question is:  Is this going to help or is this

24   going to hurt my chances at keeping my job, my chances at

25   reelection?  And politics also affects staff members in

```
 1    Congress.  It's the currency of Congress.
 2            Back to the subpoena:  A lawyer for the Select
 3    Committee -- Ms. Vaughn mentioned her name, Kristin
 4    Amerling -- contacted Steve Bannon's lawyer, Bob Costello.
 5    No one ignored the subpoena.  Quite to the contrary, the
 6    evidence is going to show that there was direct engagement
 7    by Bob Costello, Steve Bannon's lawyer, and Kristin
 8    Amerling.  Bob Costello immediately communicated to
 9    Ms. Amerling and to the Select Committee that there was an
10    objection to the subpoena and that Steve Bannon could not
11    appear and that he couldn't provide documents.  That was
12    communicated clearly and unequivocally.  So there was no
13    ignoring the subpoena.  There will be no evidence showing
14    that.
15            There followed a considerable back-and-forth
16    between Kristin Amerling, who is an attorney for the
17    Committee, and Bob Costello, who is a lawyer for Steve
18    Bannon.  And they did what two lawyers do:  They negotiated.
19            Now, the Government wants you to believe based on
20    what they said the evidence will show that Mr. Bannon
21    committed a crime by not showing up at a congressional
22    hearing room on October 14, 2021.  But the evidence is going
23    to be crystal clear:  No one, no one, believed that Steve
24    Bannon was going to appear on October 14th, 2021.  He had
25    clearly articulated through his lawyer, Bob Costello, an
```

1    objection and the reasons why he could not appear.

2              The Government said that someone ordered -- that

3    was the word that she used -- someone ordered Steve Bannon

4    to comply with the subpoena.

5              There'll be no evidence at all that anyone ever

6    ordered Mr. Bannon to do anything with respect to the

7    subpoena.  There's no order involved at all.  The evidence

8    will show no order.

9              The key point is that the Government has to prove

10   beyond a reasonable doubt that Steve Bannon willfully

11   defaulted, that he willfully defaulted when he didn't appear

12   at the congressional office on October 14th.  But you'll

13   find from the evidence that that date on the subpoena was

14   the subject of ongoing discussions and negotiations.  The

15   dates in the subpoena were not fixed; they were flexible.

16             So the Government can't prove beyond a reasonable

17   doubt that Steve Bannon committed a crime.

18             You'll hear that in almost every single case,

19   every single subpoena given to a witness for the Select

20   Committee, every single one, you're going to hear that

21   Committee staff and the lawyer for the proposed witness

22   would negotiate and that often the appearance would be at a

23   later date than what appears on the subpoena.  That's the

24   process.  And it's called negotiation.  It's called

25   accommodation.

1          Bob Costello, the attorney for Mr. Bannon, had

2     raised an objection and stated that Steve Bannon clearly

3     could not appear on the date.  It was not an excuse.  He

4     raised an objection.  And the word was used in opening, so

5     I'll use it here:  privilege.  It's not an excuse.  The

6     evidence will show that that's not an excuse.

7          Now, the interesting thing is that among the

8     letters that went back and forth -- and there was a lot of

9     negotiating back and forth between Ms. Amerling on behalf of

10    the Committee and Mr. Costello -- one critical letter was

11    not mentioned in opening, but it will be evidence in this

12    case.  Think about that letter which is dated October 18.

13    It's a letter from Mr. Costello, who is the attorney for

14    Steve Bannon, and it asks for one week.  One week.  Give us

15    one week.  That was not mentioned, but it's a critical

16    letter.

17         And what you'll hear instead is that the day after

18    that request was made on October 18th, 2021, Kristin

19    Amerling, the staffer for the Select Committee, set in

20    motion, set in motion, this criminal prosecution.

21         She did so by putting together a resolution of

22    contempt that went to the full House; and the full House did

23    consider a resolution of contempt and voted by a slim

24    majority to refer the matter to the U.S. Attorney's Office.

25         But you'll hear there'll be evidence in the case

530

```
 1    that 203 members of Congress voted --
 2             MS. VAUGHN:  Objection, your Honor.  Could we have
 3    a side-bar on this?
 4             THE COURT:  Yes.
 5             (Whereupon, the following proceedings were had at
 6    sidebar outside the presence of the jury:)
```



531









6          (Whereupon, the following proceedings were had in

7    open court:)

8          THE COURT:  We are back from under seal.

9          MR. CORCORAN:  Thank you, your Honor.

10         The point is this:  The next step in the process

11   was a resolution that was voted on by members of Congress.

12   And it passed by a slim majority, which is why we are here.

13   But 203 members of Congress found that Mr. Bannon was not in

14   contempt.  And that's something that I believe there will be

15   evidence that you can consider in this case.

16         Now, our system has great respect for your role as

17   jurors.  You're the sole judges of the evidence in the case.

18         And at the end of the trial, you'll be the only

19   ones who decide whether the Government has met its burden of

20   proof beyond a reasonable doubt on every element.

21         No one will be allowed, nobody will be in a

22   position, to question your decision on that.

23         And I just have one request as you consider the

24   evidence, whether it's a document that comes into evidence

25   or a minute of testimony.  My single request for you is to

1    think about it and ask yourself:  Is this piece of evidence

2    affected by politics?  Because if the evidence comes in and

3    you hear that it is affected by politics --

4              MS. VAUGHN:  Your Honor, objection.

5              THE COURT:  Let's let -- I understand the point.

6              Mr. Corcoran, you can finish.

7              Overruled.

8              MR. CORCORAN:  I'd ask you -- you're the judges of

9    the evidence.  I'd ask you as you're listening, carefully

10   listen to whether any document or any statement, testimony

11   by any witness is affected by politics.

12             At the end of the case, after you've heard all the

13   evidence, I'm going to stand up again and I'm going to ask

14   you to find Steve Bannon innocent.

15             Thank you.

16             THE COURT:  Thank you, Mr. Corcoran.

17             I take it we'd now be moving to the Government's

18   first witness.  Why don't we take our last brief recess for

19   the day and then we'll start with the Government's witness.

20             So I don't know whether -- that clock is clearly

21   wrong.  That clock is a little slow.  I believe it is in

22   fact 3:13.  Let's just call it 3:30.  We'll do a

23   one-hour-and-15-minute witness session or so and then we'll

24   let everybody go for the day.  Okay?

25             Thanks.

1          (Thereupon a recess was taken, after which the

2     following proceedings were had:)

3          THE COURTROOM DEPUTY:  Your Honor, we are now back

4     on the record.

5          THE COURT:  Ms. Vaughn?

6          MS. VAUGHN:  Yes, your Honor.

7          Before we call the first witness, we wanted to put

8     something on the record.

9          THE COURT:  Yes.

10         MS. VAUGHN:  As the Court's aware, the witnesses

11    that we may call from the House of Representatives are

12    appearing voluntarily.  And they have stated that they are

13    asserting speech or debate with respect to anything that's

14    not relevant to the elements or available defense in this

15    case.

16         So we just want to note for the record per our

17    effort to comply with our obligations under the voluntary

18    agreement that they're here under that when the Government

19    makes a relevance objection that goes to internal

20    deliberations or things like that, we also intend it to

21    cover this speech-or-debate issue.

22         THE COURT:  Okay.  But as I recall, there had been

23    a suggestion that the Government witnesses who would appear

24    were going to file motions for protective order.  I don't

25    remember getting one of those.

1          MS. VAUGHN:  I think they decided not to, your

2    Honor.  And we're just putting this on the record to --

3          THE COURT:  Fair enough.

4          MS. VAUGHN:  -- fulfill our obligations.

5          THE COURT:  Understood.

6          I understand the voluntary nature from the House's

7    perspective of the witnesses' appearance and the like.  So

8    thank you for putting that on the record.

9          Ms. Lesley, I know we have to collect the jury.

10   That's going to be what?  Five minutes?

11         THE COURTROOM DEPUTY:  Not really.  They're really

12   kind of ready already.  So, like, three minutes.  I just

13   have to go in there and get them.

14         THE COURT:  Mr. Schoen, you wanted to say

15   something?

16         MR. SCHOEN:  Yes, your Honor.

17         I believe there are legal issues we have to take

18   up, as mentioned earlier, before the first witness is

19   called.  For example, I need a ruling on ECF No. 116.

20   That's the motion to dismiss or bar the congressional

21   evidence based on the granting of the motion to quash.  I

22   think from the opening today it highlighted exactly why

23   Chairman Thompson has to be a competent witness.

24         Ms. Amerling is not competent to testify on

25   decision-making.  We were told that she has no

1    decision-making role.

2            She is not competent to testify about a number of

3    the things that the Government said she would be testifying

4    to in their opening today, things like the reason why Bannon

5    was subpoenaed, the reason why Bannon was important, the

6    importance of his information to the Committee, why he was

7    subpoenaed, why any decision by the Committee was made to

8    proceed with contempt or otherwise.

9            So in any event, I need a ruling if I may, your

10   Honor.

11           THE COURT:  Yes.

12           The motion is denied without prejudice to its

13   renewal if when we get to Mr. Bannon's case he establishes

14   that he would like to, for example, call Chairman Thompson

15   and can articulate at that time why he needs Chairman

16   Thompson here.

17           I'm going to allow the testimony from the

18   Government's case.  Mr. Bannon then would have his defense.

19   He is disabled from having people show up for his defense.

20   I understand that.  Based on what the Government would have

21   put in in its case, I will address the motion at that time.

22           MR. SCHOEN:  Okay, your Honor.

23           THE COURT:  You can renew it.

24           MR. SCHOEN:  The second thing:  We have the motion

25   pending, your Honor -- I know the Court reserved on it --

1     about the Trump and Costello letters.  I believe that the

2     Government opened the door today to those letters

3     unequivocally.  And here's how:  The Government said in its

4     pitch in the opening, You're going to see letters from

5     Costello.  And he said, you know, privilege.  And you're

6     going to see another letter from Costello and he said the

7     same reason.

8             And October 18, I guess you know what you're going

9     to see now:  the same justification for this.

10            Well, you know what changed with the Trump letter?

11    That justification.  And that opened the door to that.  The

12    justification changed because his justification according to

13    the Government was privileged.

14            The July 9th letter from Trump removed privilege,

15    purports to remove privilege and is followed by a letter

16    from Costello to the Committee, to Chairman Thompson,

17    saying:  Now that justification has been removed, now I can

18    comply finally.  I can comply.  As you know, I wanted to

19    comply all along.  I told you I wanted to comply.  Take me

20    before a judge.  Make a finding on privilege and I will

21    comply.  Work it out with Trump.  I will comply.

22            But now that was removed.  The Government opened

23    that door by saying he continued to use the same

24    justification each time.  That changed.

25            That's my view.  We need a --

```
 1                   THE COURT:  I want to hear from the Government on
 2          that.
 3                   MR. SCHOEN:  Yes, your Honor.
 4                   THE COURT:  Ms. Vaughn?
 5                   MR. SCHOEN:  I'm just going to say, the reason I
 6          raise it now is I think there may well ought to be
 7          cross-examination on those letters if the testimony is going
 8          to be "He kept using the same justification," as we were
 9          just told in the opening.
10                   THE COURT:  I understand.  Thank you.
11                   Ms. Vaughn?
12                   MS. VAUGHN:  Your Honor, I think what's really
13          going on here is those letters just reaffirmed the
14          Defendant's decision was deliberate.  Right?  That it's
15          based on this consideration of his belief in the law and he
16          made a decision that the law excuses him.
17                   So why does the defense actually want to put it
18          in?  They want to put it in to suggest to the jury that it's
19          no harm, no foul.  Look, he's complying now.  How can you
20          ding him for not complying nine months ago?
21                   There is nothing in those letters to suggest that
22          the reason he didn't comply by the deadlines charged in the
23          indictment were different from what the Government alleges
24          them to be.
25                   So the real reason, I think, that the defense
```

1    wants to offer this is to argue this nullification claim, to

2    suggest to the jury, like:  Here we are.  We're trying to

3    comply all of a sudden.  Please, you know, forgive us.  This

4    is civil contempt.

5              This isn't civil contempt.

6              THE COURT:  Mr. Schoen, let me ask you this

7    question -- actually, let's excuse the witness, please.

8              MS. VAUGHN:  For the day?

9              THE COURT:  No; for the following colloquy I'm

10   about to have.  The witness --

11             MS. VAUGHN:  She's not --

12             THE COURT:  She's not in here?

13             MS. VAUGHN:  No.

14             THE COURT:  Okay.  Good.  My apologies.  I thought

15   perhaps the witness was here.

16             What exactly are you intending to ask the witness

17   about those letters linking it to the letters from October?

18             MR. SCHOEN:  Well, now, quite frankly, given the

19   Government's opening in this, it would be this theme the

20   Government introduced that Costello raised privilege each

21   time.

22             And we were told today -- this is again --

23             THE COURT:  That's always been true.

24             MR. SCHOEN:  Yeah.  It highlights, though, why we

25   need a limiting instruction because what followed that was,

1    "and the Committee decided privilege didn't apply" or words

2    to that effect.  So we're going to need a limiting

3    instruction on the hearsay nature, not offered for the truth

4    of its assertion.  A different issue.  But it reminded me of

5    that.

6            And back to this:  So the justification was the

7    same, the Government said.  Right?  The 8th, the 15th --

8    whatever the dates are -- the 8th, 13th, 18th.

9            THE COURT:  So are you arguing that you can ask

10   the witness about the most recent letters because it tends

11   to show that Mr. Costello's proffered reasons for

12   Mr. Bannon's noncompliance or whatever -- I don't mean to be

13   pejorative, just the actions -- was consistent?

14           MR. SCHOEN:  He consistently raised what the

15   Government said he raised:  privilege.  That's why Bannon

16   can't comply.  And the Government just said:  That wasn't in

17   effect a legitimate reason and the Committee decided that

18   and so on.

19           This is showing now why Bannon -- number one, this

20   will show Bannon wanted to comply.  She's going to have to

21   acknowledge that the letters from Costello said Bannon would

22   comply, in effect.  I'm paraphrasing.  Bannon would comply

23   if you took him before a judge and the judge decided this

24   privilege thing wasn't valid or was not so broadly applied

25   and so on.

1          And then she's going to say, according to what we

2     just heard, that he just kept writing these letters --

3     writing Chairman Thompson these letters, saying:  Bannon has

4     not shown up.  Privilege, privilege, privilege.

5          And she just kept using the same justification,

6     jury, which was a phony justification.

7          Really?  Not for Bannon it wasn't, because as soon

8     as --

9          THE COURT:  Keep going.

10         MR. SCHOEN:  As soon as Trump removed privilege,

11    he was -- Trump wrote that to Bannon -- I mean, to

12    Costello --

13         THE COURT:  I understand what the letters say.

14         MR. SCHOEN:  Okay.

15         THE COURT:  This is the problem I'm having with

16    the lawyering here.  You've got to be more precise.  You

17    have to tell me exactly what the question is that you think

18    this goes to.

19         So what exactly do the letters from Mr. Trump and

20    Mr. Bannon later in the last week and a half -- what do they

21    tend to establish in your view?

22         MR. SCHOEN:  That his justification for not

23    complying wasn't something that was either invalid or that

24    was -- that he believed -- that he was just this guy who

25    decided he was above the law.  The jury was just told that.

```
 1          He wasn't a guy who decided he was above the --
 2          THE COURT:  I've got it.
 3          So you think the Government has basically opened
 4     the door to arguing that Mr. Bannon had either an invalid
 5     assertion of privilege or something --
 6          MR. SCHOEN:  He thought he was above the law.
 7          THE COURT:  -- and that therefore opens the
 8     question not only of what was being said in the October
 9     timeframe about the privileges, but what was said more
10     recently?
11          MR. SCHOEN:  Yes.  And the --
12          THE COURT:  Ms. Vaughn, what is your -- I've got
13     it.
14          What is your response, Ms. Vaughn?
15          MS. VAUGHN:  Your Honor, first --
16          THE COURT:  You did argue in the opening that
17     Mr. Bannon -- you made statements that Mr. Bannon acted as
18     if he was above the law.  He didn't comply with the
19     subpoena.  He asserted privilege.  He stated privilege.
20          MS. VAUGHN:  I think contempt is acting as if
21     you're not subject to the law.  And the Government did not
22     argue that his executive privilege claim was not valid under
23     the law.  It argued that the Committee rejected it and that
24     the Defendant still refused to comply.
25          I think what Mr. Schoen just made clear is that
```

545

1     they want to offer these letters to say:  Look, executive
2     privilege really did excuse his compliance [sic].
3              That is exactly what the Government moved to
4     exclude in that they did not clearly tee it up for the Court
5     and now they apparently want to argue it for the jury.
6              It's asking the jury to decide -- whether the
7     Defendant committed contempt by deciding whether his claim
8     of privilege was actually valid is not a question for the
9     jury.
10              THE COURT:  I agree.
11              But does it go to the question of either -- well,
12     really, whether the question we were discussing before,
13     which is whether Mr. Bannon thought that the date would be
14     extended and whether because of the assertion of privilege
15     and the back-and-forth whether he thought the date was not a
16     firm date.  That's the question I left open, is whether
17     these letters could go to that, at least as we argued it
18     last week.
19              MS. VAUGHN:  So for the Defendant to be able to
20     argue that, based on my assertion of privilege, I thought
21     that even though the Committee was telling me these dates
22     were the dates, they weren't really the dates.
23              That's a mistake-of-law defense.  That's a defense
24     that "I thought the way that executive privilege works is I
25     don't have to listen when the Committee tells me what the

Opening Statements by Mr. Corcoran

1    dates are" or "It's going to get extended in perpetuity

2    until the president waives."

3              I would ask what exactly in these letters goes to

4    "I made a mistake about the dates."

5              THE COURT:  I agree with that.

6              But, Mr. Schoen, I am not holding for all purposes

7    that you cannot ask the witness depending on her testimony

8    about the letters that just came in.  I'm not excluding it

9    for all purposes.

10             I want to hear the witness's testimony.  I don't

11   think the Government's opened the door to these letters

12   coming in for any purpose.  But if the witness's testimony

13   gets into issues that would make this relevant, I am open to

14   this being used in cross-examination.  I'm not there yet.

15             So I want the witness to testify.  After she's

16   done, we can then take up whether and to what extent these

17   letters can be used in cross with her.  Okay?  That's where

18   I am.

19             MR. SCHOEN:  I understand.

20             One more issue.

21             THE COURT:  Okay.

22             MR. SCHOEN:  I don't know whether the Government

23   intends to introduce the exhibits through this witness that

24   have been objected to.  If so, then I think we need to get a

25   ruling on those also.

```
1                    THE COURT:  Which is --

2                    MR. SCHOEN:  It's the three --

3                    THE COURT:  The three remaining?  Not the letters,

4       but the other ones.

5                    Here's what we're going to do:  I'm going to --

6       you preserved your objections.  The Government responded to

7       it.  If the Government seeks to introduce a particular piece

8       of evidence through a witness, we're going to show the

9       document to the witness, not to the jury.  If you have an

10      objection, you'll make the objection.  I'll resolve it.  I'm

11      not just doing all of this acontextually.  We're going to do

12      each document as it goes, these documents.  Okay?

13                   MR. SCHOEN:  Yes.

14                   THE COURT:  So with that, we need five minutes to

15      get the jury back here.  We're going to take a brief recess

16      because I want to get something from my chambers that I

17      forgot to bring with me.  So five minutes.

18                   (Thereupon a recess was taken, after which the

19      following proceedings were had:)

20                   THE COURTROOM DEPUTY:  Your Honor, we're back on

21      the record.

22                   THE COURT:  Thank you, Ms. Lesley.  Can you please

23      bring the jury in.

24                   MS. VAUGHN:  Can I get set up, your Honor?

25                   THE COURT:  Please do.  Thank you for asking.
```

Opening Statements by Mr. Corcoran

```
 1                 (Whereupon, the jury entered the courtroom at 4:00
 2      p.m. and the following proceedings were had:)
 3                 THE COURT:  Ms. Vaughn.
 4                 MS. VAUGHN:  Thank you, your Honor.
 5                 The Government called Kristin Amerling.
 6                 (Thereupon, the witness entered the courtroom and
 7      the following proceedings were had:)
 8                 THE COURTROOM DEPUTY:  Ms. Amerling, over here,
 9      please.  The box right here.
10           KRISTIN AMERLING, GOVERNMENT WITNESS, SWORN.
11                 THE COURT:  Ms. Amerling, my view is that you are
12      free to take off your mask if you feel comfortable doing so.
13      It sometimes helps the jury and the court reporter hear you.
14      But you need not.
15                 THE WITNESS:  Thank you, your Honor.
16                 MS. VAUGHN:  Your Honor, with the Court's
17      permission, I have a binder with the documents I plan to
18      talk with Ms. Amerling about today, if I could provide that
19      to the witness for her reference.
20                 THE COURT:  Have you provided that to defense
21      counsel?  Or they are the exhibits --
22                 MS. VAUGHN:  They are the exhibits we've provided,
23      your Honor.
24                 THE COURT:  Thank you.
25                 MS. VAUGHN:  (Tenders binder to the witness.)
```

```
1                        DIRECT EXAMINATION
2     BY MS. VAUGHN:
3     Q.  Good afternoon, Ms. Amerling.
4     A.  Good afternoon.
5     Q.  Can you please state your name and spell it for the
6     record.
7     A.  Kristin Amerling, K-R-I-S-T-I-N A-M-E-R-L-I-N-G.
8     Q.  Ms. Amerling, how are you currently employed?
9     A.  I am deputy staff director and chief counsel for the
10    Select Committee to Investigate the January 6th Attack on
11    the United States Capitol.
12    Q.  And is the Select Committee part of the U.S. Government?
13    A.  Yes, it is.
14    Q.  What part of the government is the Committee a part of?
15    A.  It is part of the U.S. House of Representatives.
16    Q.  And that's part of Congress?
17    A.  Yes, it is.
18    Q.  And generally, what does the U.S. Congress do as part of
19    the government?
20    A.  U.S. Congress develops laws and conducts oversight to
21    inform the development of those laws.
22    Q.  You mentioned the House of Representatives.  Are there
23    different parts of Congress?
24    A.  Yes.  Congress consists of the House of Representatives
25    and the United States Senate.
```

1    Q.   And the Committee is part of the House side?

2    A.   That's correct.

3    Q.   Does the House have multiple committees?

4    A.   Yes, it does.

5    Q.   Who generally sits on committees?

6    A.   Members of Congress sit on committees.

7    Q.   And those are elected officials?

8    A.   That's correct.

9    Q.   Do committees typically have staff that are not elected?

10   A.   Yes.

11   Q.   And what generally do staff do on committees?

12   A.   They advise the members of the Committee.

13   Q.   Are you an elected member of the Select Committee or a

14   staff member?

15   A.   I'm a staff member.

16   Q.   And I want to talk more about your job specifically and

17   the Committee in a moment.

18        But first, let's talk a little bit more about the

19   role of committees in the House.  Generally, can you

20   describe for the jury what it is that committees do for the

21   House?

22   A.   Yes.  Committees are divided by subject matter,

23   generally speaking, and they focus on the subjects under

24   their jurisdiction.  They conduct oversight and develop

25   proposed bills for Congress to consider to potentially enact

551

1     into law.

2     Q.  And when you say that they conduct oversight to propose

3     bills, what do you mean by that?

4     A.  They gather facts through requests for documents and

5     requests for testimony that inform their understanding of

6     the issues that they're looking at when they develop laws.

7     Q.  Can you describe some of the ways that committees go

8     about collecting facts and information that they need for

9     their work?

10    A.  Committees use a number of different methods to gather

11    information.  Sometimes they issue letter requests for

12    documents or for testimony.  Sometimes they hold

13    depositions, which are more formal transcribed proceedings

14    where they take testimony from witnesses.  Sometimes

15    committees hold hearings, where they bring in witnesses and

16    ask them questions in front of the public.

17    Q.  Do committees have a way to compel people to provide

18    information, require them to provide it?

19    A.  Yes.  Most committees have authority to issue subpoenas.

20    Q.  And can you describe for the jury what a subpoena is?

21    A.  It's a legal document that requires the recipient to

22    produce the documents or information through testimony that

23    is demanded by the document.

24    Q.  Is a subpoena voluntary in any way?

25    A.  No.

1    Q.  And when you say the subpoena can provide people --

2    require people to provide documents or testimony, what do

3    you mean by testimony?

4    A.  Testimony is when individuals come in and provide

5    answers to questions that are asked to them verbally.

6    Q.  And you're testifying today.  Is it like this in court

7    or is it something different?

8    A.  It's got some similarities to what I'm doing today.

9    Q.  What are those similarities?

10   A.  Individuals are required to tell the truth.  And they

11   provide verbal information that informs understanding of the

12   issues.

13   Q.  And when someone's testifying, who's asking questions

14   typically when a committee has someone testify?

15   A.  In hearings, it can be members of the committee.  Also,

16   staff can be authorized to ask questions of witnesses.  And

17   in depositions, under the deposition rules, members of

18   Congress or designated staff can ask witnesses questions.

19   Q.  When committees use subpoenas to require the production

20   of documents or testimony, do the subpoenas have deadlines

21   for people to comply?

22   A.  Yes, they do.

23   Q.  Why do they have deadlines?

24   A.  Because when committees seek information, they are

25   generally trying to find answers to problems that require

1    solutions.  And like in the case of the Select Committee,

2    there is often some urgency for obtaining the information.

3    Q.  And can you just say a little bit more about that?

4    Aside from a subpoena being mandatory, why is it important

5    for committees or why is it necessary for their work to get

6    the information by the deadline or in a timely manner?

7    A.  When you're doing fact-finding, you need to follow the

8    facts where they lead.  And you try to focus on individuals

9    who will have relevant information.  That information can

10   give you leads to other information, to other witnesses.

11   And in order to provide answers to questions to develop the

12   laws that are under the jurisdiction of the Committee, you

13   need to gather the facts to inform the evaluation of those

14   laws.

15   Q.  How does it affect a committee's ability to do its

16   oversight and recommendation function if it can't find the

17   information it needs to determine what the facts are?

18   A.  If there are gaps in information, that hinders the

19   ability of the members of the committee to thoroughly

20   evaluate the issues that are under their jurisdiction.

21   Q.  You testified that each committee has its own focus.  So

22   let's turn back now to the Select Committee, the one that

23   you work for.

24           What is its area of focus?

25   A.  The Select Committee is focused on investigating facts,

1     circumstances and causes of the January 6th, 2021, attack on

2     the United States Capitol and on interference with the

3     peaceful transfer of power.

4     Q.  Can you just describe briefly what it is you're

5     referring to there?

6     A.  Yes.  I'm talking about the events of January 6th, 2021,

7     that involved brutal assault on scores of law enforcement

8     officers that left over 140 injured and that resulted in

9     some deaths.  It was also a set of events that interfered

10    with the election processes that were scheduled to go on

11    that day.

12    Q.  What election processes?

13    A.  The Joint Session of Congress that was scheduled for

14    January 6th as part of the finalization of the vote in the

15    2020 presidential election.

16    Q.  And for what purpose is the Committee investigating what

17    happened that day?

18    A.  The Committee is tasked with providing the public a

19    complete account of what happened on that day, why it

20    happened.  And it is also tasked with evaluating

21    recommendations on laws, regulations, rules, policies that

22    will help make sure something like that never happens again.

23    Q.  And to help us get a better sense of what you mean when

24    you're talking about laws and regulations and things like

25    that, what are some of the kinds of things that Congress has

1    the power to do based on what the Committee finds out?

2    A.  Well, the Committee right now is in its fact-finding

3    phase, so it hasn't yet issued specific recommendations.

4         But a number of experts have been reviewing issues

5    related to January 6th and have made recommendations about

6    legislation or regulations that would help take corrective

7    action.  Examples are increased funding for law enforcement

8    agencies or intelligence agencies that help protect the

9    Capitol, measures that could promote better

10   information-sharing between agencies about potential threats

11   of attack, like what we saw on January 6th.

12        Other measures that the Committee could

13   potentially consider that some members have given by way of

14   example include reforms to the processes relating to the

15   finalization of the vote in a presidential election, reforms

16   to the Electoral Count Act, for example.

17   Q.  And you testified earlier that committees are made up of

18   elected members of Congress and that you're a staff member

19   on the Committee, not an elected member.

20        So as the chief counsel and the deputy staff

21   director, what is your job on the Select Committee?

22   A.  My responsibilities include with the staff director

23   managing the staff of the Select Committee.  My

24   responsibilities also include advising members of the

25   Committee and staff on the Committee about legal rules,

1    procedures and precedents relating to the exercise of

2    congressional oversight powers.

3    Q.  And as part of your role, are you involved in the

4    Committee's investigative efforts in any way?

5    A.  I am.

6    Q.  Can you describe that for the jury?

7    A.  I advise the members of the Committee about the legal

8    rules relating to different investigative steps they may be

9    taking, different investigative powers that they may be

10   considering exercising.  I review information that comes

11   into the Committee.

12   Q.  How long have you worked for the Committee?

13   A.  About a year.

14   Q.  And before you worked for the January 6th Select

15   Committee, did you work for Congress before?

16   A.  Yes, I did.

17   Q.  For about how many years total have you worked for

18   Congress?

19   A.  I have about two decades of experience working for

20   Congress.

21   Q.  And you've described your role with the Select Committee

22   as an advisor on legal issues and investigative steps and

23   things like that.

24          During the prior years that you worked for

25   Congress, have you generally had jobs similar to the one

1    that you have now?

2    A.  I've had jobs with similar responsibilities.  Yes.

3    Q.  And were all of those also on committees that were

4    conducting fact-finding and oversight like you've been

5    describing?

6    A.  Yes, they were.  Not all of my positions on the Hill,

7    but for the most part my experience consists of conducting

8    oversight and investigations.

9    Q.  Let's talk more about the Committee's establishment and

10   purpose.

11              When was the Committee established?

12   A.  June 30th, 2021.

13   Q.  So that's about six months after January 6th?

14   A.  That's correct.

15   Q.  And how was it established?

16   A.  It was established through a resolution approved by the

17   House of Representatives.

18   Q.  Can you explain what a resolution is?

19   A.  A resolution is a legislative measure that can be passed

20   by either the House or the Senate.  It often governs

21   internal operations of the House or the Senate.

22   Q.  So are resolutions different from what we might

23   typically think of as a law that Congress passes?

24   A.  Yes.  They don't have to be approved by both bodies and

25   then signed into law by the president.

1    Q.  Let's take a look at the resolution establishing the

2    Committee.  So if you could look --

3              MS. VAUGHN:  If we could bring up just for

4    Ms. Amerling and the Court Exhibit 1.

5    BY MS. VAUGHN:

6    Q.  Ms. Amerling, are you able to see Exhibit 1 on your

7    screen?

8    A.  Yes, I am.

9    Q.  And Exhibit 1 is a multipage document.  And so the full

10   document is in that binder in front of you.

11             What is Exhibit 1?

12   A.  It looks like a copy of the House resolution that

13   establishes the Select Committee.

14             MS. VAUGHN:  Your Honor, I move to admit and

15   publish to the jury Exhibit 1.

16             MR. CORCORAN:  No objection, your Honor.

17             THE COURT:  Government's Exhibit 1 is admitted.

18             (Whereupon, Government's Exhibit No. 1 was entered

19   into evidence.)

20   BY MS. VAUGHN:

21   Q.  Ms. Amerling, this is, as I said, a multipage document.

22   But I just want to focus on a few things.

23             So first we see on the first page here -- and I

24   think it continues on to the next -- several paragraphs

25   starting with "whereas."  Generally, what kind of

Amerling - DIRECT - By Ms. Vaughn

1    information is included in the whereas paragraphs?

2    A.  Generally those paragraphs describe why a measure is

3    needed.

4    Q.  So why this resolution was needed?

5    A.  Yes.  They give background on the purpose for the

6    resolution.

7    Q.  All right.

8            MS. VAUGHN:  And, Ms. Dunn-Gordon, if we could

9    zoom in on the first paragraph there.

10   BY MS. VAUGHN:

11   Q.  Let's look at an example of these.  Ms. Amerling, can

12   you just read that first paragraph, please?

13   A.  "Whereas January 6th, 2021, was one of the darkest days

14   of our democracy during which insurrectionists attempted to

15   impede Congress's constitutional mandate to validate the

16   presidential election and launched an assault on the United

17   States Capitol Complex that resulted in multiple deaths,

18   physical harm to over 140 members of law enforcement, and

19   terror and trauma among staff, institutional employees,

20   press and members."

21   Q.  And, Ms. Amerling, is that a description of what you

22   were describing earlier as the primary focus of the

23   Committee?

24   A.  That's correct.

25   Q.  And you also mentioned some expert recommendations and

1    things like that.  Does this resolution also reference

2    several findings as being related to the establishment of

3    the Committee?

4    A.  It does.

5    Q.  Let's look at an example of that.

6              MS. VAUGHN:  So, Ms. Dunn-Gordon, if we could just

7    zoom in on the second half of Page 1 of Exhibit 1, please.

8    BY MS. VAUGHN:

9    Q.  Ms. Amerling, can you please just read the first

10   paragraph that's blown up there.

11   A.  Yes.  It says:  Whereas on January 17, 2021, the

12   Department of Homeland Security issued a national terrorism

13   advisory system bulletin that due to the, quote, "heightened

14   threat environment across the United States in which some

15   ideologically motivated violent extremists with objections

16   to the exercise of governmental authority and the

17   presidential transition, as well as other perceived

18   grievances fueled by false narratives, could continue to

19   mobilize to incite or commit violence."

20   Q.  So, Ms. Amerling, findings like that, is that also part

21   of what the Committee is tasked with looking into?

22   A.  That is one of the reasons why the Committee was

23   authorized.

24   Q.  I want to go down a little bit in this resolution.

25             MS. VAUGHN:  Ms. Dunn-Gordon, if we could go to

561

1     Page 3 of Exhibit 1.  And zoom in on Section 1 there,

2     please.

3     BY MS. VAUGHN:

4     Q.  And this section is just entitled Establishment.

5     Ms. Amerling, do you mind reading that for us?

6     A.  It says, Section 1, Establishment:  There is hereby

7     established the Select Committee to investigate the January

8     6th attack on the United States Capitol (hereinafter

9     referred to as the Select Committee).

10    Q.  Ms. Amerling, so we've looked at what prompted the

11    establishment itself.  Does the resolution also articulate

12    the purposes of the Committee?

13    A.  Yes, it does.

14    Q.  Let's look at those.

15              MS. VAUGHN:  So, Ms. Dunn-Gordon, if we could go

16    to the next page and to Section 3 there.

17    BY MS. VAUGHN:

18    Q.  We're only zoomed in on a small part of this,

19    Ms. Amerling.  But if you need to reference other pages of

20    the exhibit as we go, you're welcome to in your binder

21    there.

22              So at the top under Section 3, Purposes, it says:

23    Consistent with the functions described in Section 4, the

24    purposes of the Select Committee are the following.

25              Now, we've only zoomed in on one.  But how many

Amerling - DIRECT - By Ms. Vaughn

1    different purposes does the resolution lay out for the

2    Committee?

3    A.  It lays out three purposes.

4    Q.  Let's look at this first one.

5          MS. VAUGHN:  I apologize, Ms. Dunn-Gordon.  If we

6    could zoom in again on that.  Thank you.

7    BY MS. VAUGHN:

8    Q.  Can you please read that purpose for the jury,

9    Ms. Amerling.

10   A.  Yes.  It says:  To investigate and report upon the

11   facts, circumstances and causes relating to the January 6th,

12   2021, domestic terrorist attack upon the United States

13   Capitol Complex (hereinafter referred to as the, quote,

14   "domestic terrorist attack on the Capitol") and relating to

15   the interference with the peaceful transfer of power,

16   including facts and causes relating to the preparedness and

17   response of the United States Capitol Police and other

18   federal, state and local law enforcement agencies in the

19   national capital region and other instrumentalities of

20   government, as well as the influencing factors that fomented

21   such an attack on American representative democracy while

22   engaged in a constitutional process.

23   Q.  And under Purposes, it also mentions "consistent with

24   the functions described in Section 4."  So let's take a look

25   at those.

563

```
 1              MS. VAUGHN:  Ms. Dunn-Gordon, if we could go to
 2      the next page, Page 5 of Exhibit 1.  And if we could zoom in
 3      on the second half of this page, Ms. Dunn-Gordon.
 4      BY MS. VAUGHN:
 5      Q.  So, Ms. Amerling, under the heading Section 4,
 6      Functions, it says:  The functions of the Select Committee
 7      are to, and then it lists several things.  I want to take a
 8      look at a couple of them.
 9              So first let's focus on the first one.  The first
10      function of the Committee is to do what right there under
11      (a)(1)(A) or (a)(1) and (a)(1)(A)?
12      A.  That function is to investigate the facts, circumstances
13      and causes relating to the domestic terrorist attack on the
14      Capitol, including facts and circumstances relating to
15      activities of intelligence agencies, law enforcement
16      agencies and the Armed Forces, including with respect to
17      intelligence collection, analysis and dissemination and
18      information-sharing among the branches and other
19      instrumentalities of government.
20              MS. VAUGHN:  And then, Ms. Dunn-Gordon, is it
21      possible to bring up the one that's split between two pages?
22      BY MS. VAUGHN:
23      Q.  Ms. Amerling, so another function is listed there under
24      Subpart B right there.  What are the facts and circumstances
25      the Committee is investigating -- or the function of the
```

1     Committee is to investigate in Subsection B?

2     A.  That section concerns influencing factors that

3     contributed to the domestic terrorist attack on the Capitol

4     and how technology, including online platforms, financing

5     and malign foreign influence operations and campaigns may

6     have factored into the motivation, organization and

7     execution of the domestic terrorist attack on the Capitol.

8     Q.  I want to look at one additional function.

9             MS. VAUGHN:  If we could go to Page 8,

10    Ms. Dunn-Gordon, of Exhibit 1, and if we could zoom in on

11    Item 3 at the top there.

12    BY MS. VAUGHN:

13    Q.  Ms. Amerling, what is this additional function that the

14    Committee was authorized to carry out by this resolution?

15    A.  This function concerns issuing a final report.  That

16    report is to contain findings, conclusions and

17    recommendations for corrective measures described in

18    Subsection C.

19    Q.  So let's take a look at the corrective measures

20    described in Subsection C.

21            MS. VAUGHN:  Ms. Dunn-Gordon, if we could zoom in

22    on Subsection C there on Page 8.

23    BY MS. VAUGHN:

24    Q.  So first, the corrective measures described in this

25    subsection may include changes in law, policy, procedures,

1    rules or regulations that could be taken.  And then I want

2    to look at the things that could be taken.

3              MS. VAUGHN:  So, Ms. Dunn-Gordon, if we could zoom

4    in on the top half of Page 9 of Exhibit 1.

5    BY MS. VAUGHN:

6    Q.  Ms. Amerling, is this the list of potential corrective

7    measures that the Committee is tasked with considering?

8    A.  Yes, it is.

9    Q.  And what is the first thing that this resolution

10   authorizes the Committee to consider a corrective measure

11   for?

12   A.  Corrective measures to prevent future acts of violence,

13   domestic terrorism and domestic violent extremism,

14   including acts targeted at American democratic institutions.

15   Q.  And what about the third category of potential

16   corrective measures that the Committee is authorized to

17   consider?

18   A.  Those are measures to strengthen the security and

19   resilience of the United States and American democratic

20   institutions against violence, domestic terrorism and

21   domestic violent extremism.

22   Q.  Ms. Amerling, these purposes and functions that we have

23   just reviewed in the authorizing resolution for the

24   Committee, do they control the scope of the Committee's

25   investigation?

1    A.  Yes, they do.

2    Q.  How so?

3    A.  They provide the authority for the Committee to conduct

4    an investigation.  So they define the scope of what's

5    relevant for the Committee to look at.

6    Q.  You testified earlier about several of the tools that

7    committees have at their disposal to help them carry out

8    their investigations or their fact-finding and oversight.  I

9    think you mentioned things like letter requests and other

10   things like that.

11              Does the Committee use all of those tools as well,

12   the Select Committee?

13   A.  Yes.

14   Q.  We've talked about subpoenas generally.  The Select

15   Committee also uses subpoenas?

16   A.  Yes, it does.

17   Q.  And what kinds of things do the subpoenas that the

18   Select Committee issues -- what kind of things do they

19   require people to do?

20   A.  They require people to produce documents to the

21   Committee and they also require people to provide testimony

22   to the Committee.

23   Q.  Does the Committee use subpoenas frequently in its

24   investigation?

25   A.  It has, yes.

1    Q.  We talked about subpoenas having deadlines.  Do the

2    Committee's subpoenas also include deadlines?

3    A.  They do.

4    Q.  Is the Committee's investigation time-limited in any

5    way?

6    A.  Yes, it is.  The authority for the Select Committee ends

7    at the end of this Congress, the end of this year.

8    Q.  The end of 2022?

9    A.  Yes.  That's correct.

10   Q.  Remind us again, when was the Committee established?

11   A.  It was established on June 30th, 2021.

12   Q.  So that's about a year and a half to complete its work?

13   A.  That's correct.

14   Q.  So when the Committee issues subpoenas with deadlines,

15   is it important to the Committee that people comply by the

16   deadlines?

17   A.  Absolutely.

18   Q.  Why is that?

19   A.  Because there is an urgency to the focus of the Select

20   Committee's work.  The Select Committee is looking at a

21   violent assault on the United States Capitol, on law

22   enforcement officials, on our democratic institutions; and

23   we have a limited amount of time in which to gather

24   information.

25           We also in our establishing resolution included

Amerling - DIRECT - By Ms. Vaughn

1   some of the testimony that experts have provided that

2   underscores that the threat to our democratic institutions

3   continues.  So the Select Committee is focused on

4   expeditiously carrying out its responsibilities.

5   Q.  Can you explain for the jury how the process typically

6   works in getting the information when the Committee gives a

7   subpoena to someone?

8   A.  The Committee issues a subpoena that will be accompanied

9   by a letter that describes different items that the

10  Committee is seeking, if it is seeking documents.  If the

11  Committee is seeking testimony, the letter will generally

12  give a description of the types of subjects that the

13  Committee seeks to address in its questions to the witness.

14  Q.  If the witness that gets the subpoena -- when we say

15  "witness," we're referring to the person that gets the

16  subpoena?

17  A.  That's correct.  I should say the subpoena recipient.

18  Q.  And you've also used the term "issue a subpoena."  Is

19  issue just the same as to give a subpoena to someone or send

20  it to someone?

21  A.  That's right.

22  Q.  What if the person that gets the subpoena has questions

23  about where they should go, how they should get the

24  documents to the Committee, things like that?

25  A.  This is not uncommon.  And what generally happens is the

1    individual who receives the subpoena will contact the

2    Committee and counsels for the Committee will engage with an

3    individual and address questions they might have.

4    Q.  At some point did the Committee issue a subpoena to

5    Stephen Bannon?

6    A.  Yes.

7    Q.  And, Ms. Amerling, have you ever personally met

8    Mr. Bannon?

9    A.  I have not.

10   Q.  Prior to your work on the Committee, though, were you

11   aware of who he was?

12   A.  I was.

13   Q.  How were you aware of that?

14   A.  Just generally through newspaper accounts.

15   Q.  And through your work on the Committee, have you

16   continued to be aware of who he is?

17   A.  Yes.

18   Q.  And through the news accounts and your work on the

19   Committee, did you become familiar with what the Steve

20   Bannon that the Committee subpoenaed looked like?

21   A.  Yes.

22   Q.  And based on your familiarity with that, do you see that

23   Steve Bannon in the courtroom today?

24   A.  Yes, I do.

25   Q.  Can you please identify him by where he's sitting and

1    something he's wearing?

2    A.  He is sitting to your left right now with a black mask

3    on and it looks like a navy blue or black shirt.

4         MS. VAUGHN:  Your Honor, may the record reflect

5    the witness has identified the Defendant?

6         THE COURT:  Yes.

7    BY MS. VAUGHN:

8    Q.  Ms. Amerling, you testified that the Committee

9    subpoenaed the Defendant.  Were you involved in the decision

10   and the issuance of the subpoena to the Defendant?

11   A.  I advised on the issuance of the subpoena to Mr. Bannon.

12   Q.  And we'll look at the subpoena in a moment.

13        But first, when did -- about when did the

14   Committee issue the subpoena to the Defendant?

15   A.  The Select Committee issued the subpoena to Mr. Bannon

16   on September 23rd, 2021.

17   Q.  And you testified that the Committee was established on

18   June 30th.

19        Can you just describe for the jury how far along

20   in the Committee's investigation it was when it issued the

21   subpoena to Mr. Bannon?

22   A.  The Select Committee had hired some staff, had not yet

23   completed hiring all of its staff, but had engaged in

24   investigative legwork and research.

25   Q.  So was the Committee still ramping up in any way?

Amerling - DIRECT - By Ms. Vaughn

```
1    A.  The Committee was still hiring additional staff.  Yes.
2    Q.  And at the time it subpoenaed the Defendant, what
3    information did the Committee have about what the Defendant
4    did for a living around January 6th?
5    A.  I didn't hear your question.  I'm sorry.
6    Q.  At the time that the Committee subpoenaed the Defendant,
7    what information did the Committee have about what the
8    Defendant did for a living around the time of January 6th?
9    A.  According to public accounts, the Defendant was engaged
10   in running a media platform.
11   Q.  What do you mean by "media platform"?
12   A.  A podcast.
13   Q.  And what information did the Committee have about how
14   the Defendant might relate to the Committee's investigation
15   into January 6th when it issued the subpoena?
16   A.  At the time that the --
17             MR. CORCORAN:  Your Honor, objection to the extent
18   it involves hearsay.
19             MS. VAUGHN:  Your Honor, I'm just trying to
20   establish why the Committee --
21             THE COURT:  Yes.  I'll allow it.
22             THE WITNESS:  At the time that the Committee
23   issued the subpoena to Mr. Bannon, according to public
24   accounts, Mr. Bannon had played multiple roles relating to
25   the events of January 6th.  These included participating in
```

1    efforts to persuade the public that the presidential

2    election of 2020 was illegitimate.  They included appearing

3    on a podcast the night before -- the day before the January

4    6th attack making statements including that all hell was

5    going to break loose on January 6th that suggested that he

6    might have some advance knowledge of the events of January

7    6th.

8              According to public reports, he also had been

9    involved in some discussions with individuals in the White

10   House, including the president himself, relating to

11   strategies or initiatives surrounding the events of January

12   6th.

13             And we also had information indicating that he had

14   been involved in discussions in the days leading up to the

15   January 6th attack with private parties who had gathered in

16   the Willard Hotel in Washington, D.C., reportedly to discuss

17   strategies around efforts to interfere with the peaceful

18   transfer of power or overturn the election results.

19             THE COURT:  Ms. Vaughn, hold on a second.

20             Ladies and gentlemen of the jury, I just want you

21   to -- I want to instruct you that what the witness just

22   testified about should not be taken for the truth of whether

23   that in fact was -- whether Mr. Bannon had in fact done

24   those things.

25             She is allowed to testify about what the Committee

1    understood and the reasons that the Committee did what it

2    did.  But that does not establish one way or the other

3    whether those things were true.  Okay?

4           MS. VAUGHN:  Thank you, your Honor.

5    BY MS. VAUGHN:

6    Q.  Ms. Amerling, at the time that the Committee issued the

7    subpoena, if the Defendant had had information on all of

8    those things, is that something that would have been

9    relevant to the Committee's investigation?

10   A.  Yes, because the Select Committee was tasked with trying

11   to understand what happened on January 6th and why.

12   Q.  And we'll look at the subpoena itself in a minute.

13          But first, in general, you testified about a

14   couple of the things that subpoenas can require people to

15   do.  What did the subpoena that the Committee gave to the

16   Defendant -- what did it require him to do?

17   A.  It required him to produce documents to the Select

18   Committee relating to a specified set of subjects by October

19   7th, I believe, 2021, and it required him to appear before

20   the Select Committee at a deposition on October 14th, 2021,

21   to provide testimony.

22   Q.  You just mentioned two deadlines, October 7th and

23   October 14th.  Did the Defendant provide documents and

24   provide testimony by those deadlines?

25   A.  He did not.

 1    Q.  Let's look at the subpoena itself.

 2            MS. VAUGHN:  If we can bring up just for the

 3    witness Government's Exhibit 2.

 4            We could do full screen for this one,

 5    Ms. Dunn-Gordon.

 6    BY MS. VAUGHN:

 7    Q.  Ms. Amerling, what is Government's Exhibit 2?

 8    A.  This looks like a copy of the subpoena that we issued to

 9    Mr. Bannon.

10            MS. VAUGHN:  Your Honor, the Government moves to

11    admit and publish Government's Exhibit 2.

12            MR. CORCORAN:  Your Honor, we have no objection to

13    the admission of Exhibit 2 except for page US-00410 for

14    purposes of that -- based on the reasons we have discussed

15    and briefed.

16            THE COURT:  So I'm going to admit this exhibit.

17    But as to the page that was just mentioned, so Page 410, the

18    exhibit is -- and that page is limited for the purpose of

19    demonstrating that the Committee had articulated its

20    position in the letter to Mr. Bannon, but not for the truth

21    of anything in the letter.

22            So it's a little bit like what I instructed you

23    earlier.  The Committee had -- earlier, I said you should

24    take that testimony for what the Committee believed but not

25    whether the facts were true.

1           And for this page, you may consider it for the

2      fact that the letter was provided to Mr. Bannon and that it

3      was the Committee's position, but not that anything in the

4      letter is true or not.

5           So with that, it may be published to the jury.

6           THE COURT:  And Exhibit 2 is admitted with that

7      limitation.

8           (Whereupon, Government's Exhibit No. 2 was entered

9      into evidence.)

10          MS. VAUGHN:  Would it help your Honor if we just

11     went to that page quickly so that we can identify the one

12     you were talking about for the jury now?

13          THE COURT:  Yes.  That would be helpful.  Thank

14     you.

15          MS. VAUGHN:  Ms. Dunn-Gordon, if we could go to

16     Page 3 of Exhibit 2.

17          Your Honor, is this the page that you were

18     referring to?

19          THE COURT:  This is the page, ladies and gentlemen

20     of the jury, that I was describing.  So that page of the

21     exhibit -- it's a multipage exhibit -- is again admitted for

22     the purpose of demonstrating that the Committee had

23     communicated the positions reflected in here.  But it is not

24     admitted for the purpose of establishing that anything that

25     is said in here is true.

Amerling - DIRECT - By Ms. Vaughn

 1                MS. VAUGHN:  Thank you, your Honor.

 2                Ms. Dunn-Gordon, if we could go to Page 1 of

 3       Government's Exhibit 2.

 4       BY MS. VAUGHN:

 5       Q.  Ms. Amerling, what is contained generally on Page 1 of

 6       Exhibit 2?

 7       A.  This is the subpoena that issued to Mr. Bannon.

 8       Q.  And we see at the top that there's obviously the title,

 9       Subpoena.  What does it say on the first two lines under

10       subpoena?

11       A.  It says:  By authority of the House of Representatives

12       of the Congress of the United States of America.

13       Q.  And then there's a "to" line.  We'll zoom in on that for

14       you and the jury.  There's a "to" line that says:  To

15       Stephen K. Bannon, care of Robert Costello, Esquire,

16       Davidson, Hutcher & Citron.

17                Who is Robert Costello?

18       A.  At the time, he was representing Mr. Bannon.

19       Q.  And why does it say "To Mr. Bannon, care of Robert

20       Costello"?

21       A.  Because Mr. Costello had represented to the Select

22       Committee that he was the attorney for Mr. Bannon and that

23       he would accept service of the subpoena on Mr. Bannon's

24       behalf.

25       Q.  And what do you mean by "accept service"?

                    Amerling - DIRECT - By Ms. Vaughn

1    A.  It means that the attorney is allowed to receive the

2    document on behalf of their client.

3    Q.  And we'll talk more about that in a moment.

4         But before we close out of this popup, below the

5    "to" line there are three lines starting with "You are

6    hereby."  Can you please read that to the end of the box?

7    A.  Yes.  It says, "You are hereby commanded to be and

8    appear before the Select Committee to Investigate the

9    January 6th Attack on the United States Capitol."

10   Q.  And then at the end it says "of the House of

11   Representatives of the United States at the place, date and

12   time specified below."  So let's look at what's below.

13        Ms. Amerling, there are a couple of checkboxes

14   there.  Let's zoom in first on the first checked box.  This

15   is checked.  So does that indicate that this is something

16   that the Defendant was required to do by the subpoena?

17   A.  Yes.

18   Q.  And what is it that this item -- can you please read

19   there the two lines that describe what he's required to do?

20   A.  That says he's required to produce the things identified

21   on the attached schedule touching matters of inquiry

22   committed to said committee or subcommittee.  And you are

23   not to depart without leave of said committee or

24   subcommittee.

25   Q.  And we'll look at the attached schedule in a minute.

1    But "touching matters of inquiry committed to the

2    Committee," what does that mean?

3    A.   Those are the subjects that the Select Committee was

4    reviewing.

5    Q.   And does this subpoena provide a place for production?

6    A.   It does.

7    Q.   And there's an address there.  What is that place?

8    A.   That is one of the House of Representatives office

9    buildings.

10   Q.   And on what date and time was the Defendant required by

11   the subpoena to produce the things in the schedule?

12   A.   He was required to produce the documents that we were

13   requesting by October 7, 2021, at 10:00 a.m.

14   Q.   And it says he's required to produce them at 10:00 a.m.

15   Now, if the Defendant wanted to electronically provide the

16   records or provide them before the date, was that something

17   he was allowed to do?

18   A.   Yes, it is.

19   Q.   Has the Committee allowed other people to provide their

20   documents electronically by the return date?

21   A.   Yes.  The Select Committee has done that.

22   Q.   But did the Defendant produce any records by 10:00 a.m.

23   on October 7th here?

24   A.   He did not.

25   Q.   Let's look at the second checkbox on the subpoena.  This

1    is also checked, so I'm assuming that also means it's

2    something that the Defendant -- the subpoena required the

3    Defendant to do?

4    A.  That's correct.

5    Q.  And what is it that this item required of him?

6    A.  This required him to testify at a deposition touching

7    matters of inquiry committed to said committee or

8    subcommittee, not to depart without leave of said committee

9    or subcommittee.

10   Q.  Who would be present at the deposition for the

11   Defendant?

12   A.  Depositions sometimes have members and staff.  Sometimes

13   they're conducted just by staff.

14   Q.  And it looks like this required the Defendant to come to

15   the same office building.  Is that right?

16   A.  That's correct.

17   Q.  And when did it require the Defendant to come to testify

18   at a deposition?

19   A.  It required him to appear at 10:00 a.m. on October 14,

20   2021.

21   Q.  Did the Defendant appear at that time and on that date

22   to testify at a deposition?

23   A.  He did not.

24   Q.  Let's look at the bottom third of the subpoena.

25          MS. VAUGHN:  Thank you, Ms. Dunn-Gordon.

Amerling - DIRECT - By Ms. Vaughn

1    BY MS. VAUGHN:

2    Q.  And there's another "to" line there.  Can you just read

3    that "to" line through the date?

4    A.  It says:  To any authorized staff member or the United

5    States Marshals Service to serve and make return.  Witness

6    my hand and the seal of the House of Representatives of the

7    United States at the city of Washington, D.C., this 23rd day

8    of September, 2021.

9    Q.  And the date September 23rd, 2021, you said earlier that

10   was also the date that the subpoena was issued?

11   A.  That's correct.

12           And one clarification of what I said when

13   describing the c/o line to the attorney for Mr. Bannon:  He

14   had indicated that he would check to see if Mr. Bannon would

15   allow him to accept service on September 23rd and then

16   confirmed on September 24th that in fact he did have that

17   authority.

18   Q.  And we'll look at that more in a minute.  Thank you for

19   clarifying that.

20           So about how long did the Defendant have to

21   provide documents from the date that this subpoena was

22   issued to the deadline of October 7th?

23   A.  He had about two weeks to provide the documents and

24   about three weeks between the time the subpoena issued to

25   the date when he was required to come and provide testimony.

1    Q.  And there's a signature on the subpoena.  Do you

2    recognize that signature?

3    A.  I do.

4    Q.  Whose signature is that?

5    A.  That's the signature of the chairman of the Select

6    Committee, Chairman Bennie Thompson.

7    Q.  And you said he's the chairman of the Select Committee.

8    What does that mean?

9    A.  It means he leads the members of the Committee; he

10   maintains order at Committee hearings and meetings; and he

11   manages the Select Committee staff.

12   Q.  In your experience on the Committee and working on

13   subpoenas like this, what is the significance of his

14   signature on the subpoena?

15   A.  He has authority to issue subpoenas on behalf of the

16   Select Committee, and those subpoenas require him to sign

17   the subpoenas.

18   Q.  And there is one other signature on the subpoena.  Can

19   you just describe what that signature is for us?

20   A.  That's the signature of the House clerk.

21   Q.  And what is the significance of that on the subpoena?

22   A.  In order for a subpoena to be valid, it has to also have

23   the signature of the House clerk.

24        MS. VAUGHN:  Your Honor, I'm not sure how long you

25   want to go today.  I'm at a good stopping point or I can

1    keep going.

2          THE COURT:  If you're at a good stopping point,

3    why don't we go into recess.

4          Ladies and gentlemen of the jury, thank you again

5    for your time.  You just heard it from me, so I won't repeat

6    it verbatim.  But again, do not discuss this case with

7    anyone.  Do not read your phones.  Do not read social media.

8    Turn off your push notifications.  And for all the reasons I

9    said before, do everything you possibly can not to talk

10   about, read about or otherwise come in contact with

11   information about this case.

12         Thank you.

13         (Confers with the courtroom deputy privately.)

14         Oh, yes.  Now that you have been sworn and are

15   serving, I have to state this for the record for reasons I

16   don't quite understand.  But you will now be provided with

17   meals.  So there you go.

18         Thank you all.  See you in the morning.  9:00 a.m.

19   9:00 a.m. tomorrow.

20         (Whereupon, the jury exited the courtroom at 4:52

21   p.m. and the following proceedings were had:)

22         (Proceedings concluded.)

23

24

25

1                           **<u>CERTIFICATE</u>**

2

3                   I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                  Dated this 19th day of July, 2022.

11

12                  <u>/s/ Lisa Edwards, RDR, CRR</u>
                    Official Court Reporter
13                  United States District Court for the
                      District of Columbia
14                  333 Constitution Avenue, Northwest
                    Washington, D.C. 20001
15                  (202) 354-3269

16

17

18

19

20

21

22

23

24

25

584

## /

**/s** [1] - 109:12

## 0

**0014** [1] - 16:4

## 1

**1** [21] - 3:14, 16:2, 17:12, 21:19, 84:4, 84:6, 84:9, 84:11, 84:15, 84:17, 84:18, 86:7, 87:1, 87:6, 89:2, 90:10, 91:4, 102:2, 102:5
**10** [4] - 16:11, 17:4, 22:3, 22:15
**100-6** [1] - 1:23
**1041** [3] - 16:7, 16:18, 21:24
**1053** [3] - 16:10, 17:4, 22:3
**1061** [2] - 16:5, 21:22
**10:00** [6] - 43:20, 43:22, 104:13, 104:14, 104:22, 105:19
**10:00-in-the-morning** [1] - 45:14
**11** [3] - 16:12, 17:5, 22:4
**1104** [2] - 16:1, 21:19
**1117** [1] - 15:18
**116** [1] - 63:19
**12** [4] - 16:13, 17:6, 22:5, 25:9
**122** [2] - 16:6, 21:23
**13** [2] - 17:7, 22:6
**1371** [2] - 16:3, 21:20
**1391** [1] - 15:6
**13th** [2] - 47:6, 68:8
**14** [14] - 7:6, 7:8, 17:8, 17:16, 21:21, 22:7, 22:16, 23:7, 25:8, 26:17, 26:20, 53:22, 105:19
**140** [2] - 80:8, 85:18
**1425** [1] - 16:23, 17:1, 21:25
**1427** [2] - 17:12, 17:17
**14th** [9] - 43:23, 45:24, 46:24, 47:12, 48:12, 53:24, 54:12, 99:20, 99:23
**15** [3] - 17:11, 17:17,

47:23
**15-minute** [1] - 22:15
**15th** [1] - 68:7
**16** [4] - 11:3, 17:12, 17:17
**17** [1] - 86:11
**1798** [3] - 16:9, 17:3, 22:2
**18** [3] - 26:21, 55:12, 65:8
**18th** [5] - 9:2, 48:1, 48:4, 55:18, 68:8
**19** [1] - 1:6
**1913** [1] - 15:9
**1957** [3] - 16:11, 17:5, 22:4
**19th** [4] - 8:9, 8:19, 8:24, 109:10
**1:03** [1] - 1:7
**1:55** [1] - 22:18

## 2

**2** [14] - 1:10, 3:15, 16:3, 17:13, 21:20, 100:3, 100:7, 100:11, 100:13, 101:6, 101:8, 101:16, 102:3, 102:6
**20001** [2] - 2:4, 109:14
**202** [2] - 2:4, 109:15
**2020** [6] - 38:14, 42:1, 42:17, 42:23, 80:15, 98:2
**2021** [33] - 26:8, 26:11, 26:14, 26:16, 26:17, 26:20, 26:21, 38:11, 43:16, 43:20, 43:23, 45:15, 46:19, 46:24, 47:13, 51:23, 53:22, 53:24, 55:18, 80:1, 80:6, 83:12, 85:13, 86:11, 88:12, 93:11, 96:16, 99:19, 99:20, 104:13, 105:20, 106:8, 106:9
**2022** [3] - 1:6, 93:8, 109:10
**203** [2] - 56:1, 60:13
**20530** [1] - 1:17
**21-00670** [1] - 1:3
**21202** [1] - 1:21
**22** [1] - 23:6
**23** [1] - 26:13
**23rd** [4] - 96:16, 106:7, 106:9, 106:15
**24th** [1] - 106:16
**257** [1] - 15:12
**2800** [1] - 1:23

## 2:16

**2:16** [1] - 23:11

## 3

**3** [7] - 16:4, 21:21, 87:1, 87:16, 87:22, 90:11, 101:16
**30th** [3] - 83:12, 93:11, 96:18
**33** [2] - 17:11, 17:17
**333** [2] - 2:3, 109:14
**354-3269** [2] - 2:4, 109:15
**36106** [1] - 1:24
**3:13** [1] - 61:22
**3:30** [1] - 61:22

## 4

**4** [5] - 16:5, 21:22, 87:23, 88:24, 89:5
**400** [1] - 1:20
**410** [1] - 100:17
**475** [1] - 15:3
**4:00** [1] - 74:1
**4:52** [1] - 108:20

## 5

**5** [5] - 4:14, 4:23, 16:6, 21:23, 89:2
**540** [2] - 16:13, 17:7, 22:6
**544** [3] - 16:8, 17:2, 22:1
**555** [1] - 1:16
**5th** [1] - 51:23

## 6

**6** [6] - 4:15, 4:23, 16:7, 16:18, 21:24, 26:11
**6706** [1] - 2:3
**6:00** [2] - 48:1, 48:4
**6th** [42] - 26:9, 38:11, 38:21, 39:6, 39:14, 41:18, 41:19, 41:24, 42:15, 42:22, 43:3, 43:12, 43:22, 43:25, 44:17, 44:22, 46:25, 49:10, 49:25, 52:4, 75:10, 80:1, 80:6, 80:14, 81:5, 81:11, 82:14, 83:13, 85:13, 87:8, 88:11, 97:4, 97:8, 97:15, 97:25,

**98:4, 98:5, 98:7, 98:12, 98:15, 99:11, 103:9**

## 7

**7** [8] - 4:15, 4:23, 16:8, 16:23, 17:1, 21:25, 26:16, 104:13
**749** [1] - 15:15
**764** [3] - 17:8, 17:16, 22:7
**7th** [6] - 43:20, 45:15, 99:19, 99:22, 104:23, 106:22

## 8

**8** [7] - 4:15, 4:23, 16:9, 17:2, 22:1, 90:9, 90:22
**8th** [4] - 46:19, 47:1, 68:7, 68:8

## 9

**9** [6] - 4:15, 4:23, 16:10, 17:3, 22:2, 91:4
**900** [1] - 1:20
**93** [3] - 16:12, 17:6, 22:5
**9:00** [2] - 108:18, 108:19
**9th** [1] - 65:14

## A

**a)(1** [1] - 89:11
**a)(1)(A** [2] - 89:11
**A-M-E-R-L-I-N-G** [1] - 75:7
**a.m** [6] - 104:13, 104:14, 104:22, 105:19, 108:18, 108:19
**ability** [3] - 79:15, 79:19, 109:7
**able** [6] - 10:15, 12:20, 24:25, 71:19, 84:6
**absent** [1] - 10:24
**absolutely** [1] - 93:17
**accept** [5] - 30:21, 35:14, 102:23, 102:25, 106:15

**accident** [1] - 48:14
**accommodation** [1] - 54:25
**accompanied** [1] - 94:8
**accomplished** [1] - 37:14
**according** [7] - 26:13, 35:19, 65:12, 69:1, 97:9, 97:23, 98:8
**account** [1] - 80:19
**accounts** [4] - 95:14, 95:18, 97:9, 97:24
**accurate** [1] - 109:4
**acknowledge** [1] - 68:21
**acontextually** [1] - 73:11
**act** [1] - 12:17
**Act** [1] - 81:16
**acted** [1] - 70:17
**acting** [1] - 70:20
**Action** [1] - 1:3
**action** [1] - 81:7
**actions** [3] - 8:4, 31:14, 68:13
**activities** [1] - 89:15
**acts** [2] - 91:12, 91:14
**addition** [1] - 33:7
**additional** [6] - 7:19, 8:17, 30:13, 90:8, 90:13, 97:1
**additionally** [1] - 37:11
**address** [8] - 11:21, 12:21, 12:22, 43:14, 64:21, 94:13, 95:3, 104:7
**addressed** [1] - 40:21
**adequate** [1] - 12:2
**admissibility** [1] - 9:17
**admissible** [3] - 6:19, 32:11, 32:15
**admission** [1] - 100:13
**admit** [3] - 84:14, 100:11, 100:16
**admitted** [10] - 5:5, 5:6, 5:25, 31:22, 31:23, 32:3, 84:17, 101:6, 101:21, 101:24
**advance** [1] - 98:6
**advice** [1] - 35:17
**advise** [2] - 76:12, 82:7
**advised** [1] - 96:11

**advising** [1] - 81:24
**advisor** [3] - 42:16, 51:7, 82:22
**advisory** [1] - 86:13
**affect** [1] - 79:15
**affected** [3] - 61:2, 61:3, 61:11
**affects** [1] - 52:25
**afraid** [1] - 35:10
**afternoon** [6] - 4:1, 7:11, 50:11, 50:12, 75:3, 75:4
**AFTERNOON** [1] - 1:5
**age** [1] - 35:9
**agencies** [6] - 81:8, 81:10, 88:18, 89:15, 89:16
**ago** [1] - 66:20
**agree** [5] - 16:18, 17:18, 22:8, 71:10, 72:5
**agreement** [1] - 62:18
**ahead** [1] - 51:20
**aid** [1] - 24:17
**Alabama** [1] - 1:24
**alleged** [1] - 36:3
**alleges** [3] - 26:18, 26:22, 66:23
**allow** [4] - 4:23, 64:17, 97:21, 106:15
**allowed** [5] - 60:21, 98:25, 103:1, 104:17, 104:19
**almost** [1] - 54:18
**alone** [3] - 30:24, 31:3, 31:25
**alternate** [8] - 11:4, 15:25, 17:9, 17:12, 17:24, 18:3, 25:12, 25:15
**Alternate** [4] - 17:11, 17:13
**Alternate-Alternate** [2] - 17:11, 17:13
**alternates** [2] - 17:9, 18:1
**alternates'** [1] - 25:11
**AMANDA** [1] - 1:14
**ambiguous** [1] - 8:25
**America** [1] - 102:12
**AMERICA** [1] - 1:3
**American** [4] - 49:24, 88:21, 91:14, 91:19
**Amerling** [47] - 3:11, 40:5, 40:6, 40:12, 40:17, 40:22, 41:22, 42:11, 45:14, 46:3,

49:18, 53:4, 53:8, 53:9, 53:16, 55:9, 55:19, 63:24, 74:5, 74:8, 74:11, 74:18, 75:3, 75:7, 75:8, 84:4, 84:6, 84:21, 85:11, 85:21, 86:9, 86:20, 87:5, 87:10, 87:19, 88:9, 89:5, 89:23, 90:13, 91:6, 91:22, 95:7, 96:8, 99:6, 100:7, 102:5, 103:13
**AMERLING** [1] - 74:10
**amount** [1] - 93:23
**analysis** [1] - 89:17
**answer** [10] - 10:12, 32:18, 32:20, 32:21, 43:24, 45:24, 46:24, 47:13, 47:19, 48:11
**answered** [1] - 32:19
**answering** [1] - 44:4
**answers** [3] - 78:5, 78:25, 79:11
**anyway** [1] - 39:2
**apologies** [2] - 16:16, 67:14
**apologize** [4] - 16:16, 16:17, 16:22, 88:5
**appear** [15] - 26:16, 31:2, 47:7, 48:22, 52:7, 53:11, 53:24, 54:1, 54:11, 55:3, 62:23, 99:19, 103:8, 105:19, 105:21
**appearance** [2] - 54:22, 63:7
**aPPEARANCES** [1] - 1:13
**appearing** [2] - 62:12, 98:2
**Apple** [1] - 51:20
**applications** [1] - 37:15
**applied** [1] - 68:24
**applies** [1] - 30:20
**apply** [3] - 30:3, 30:21, 68:1
**approved** [2] - 83:16, 83:24
**area** [4] - 34:10, 40:25, 51:20, 79:24
**argue** [5] - 67:1, 70:16, 70:22, 71:5, 71:20
**argued** [2] - 70:23, 71:17
**arguing** [3] - 10:4, 68:9, 70:4

**argument** [5] - 8:19, 9:6, 9:11, 32:10, 47:10
**arguments** [3] - 30:6, 30:8, 30:12
**Armed** [1] - 89:16
**articulate** [2] - 64:15, 87:11
**articulated** [2] - 53:25, 100:19
**aside** [2] - 39:9, 79:4
**assault** [3] - 80:7, 85:16, 93:21
**asserted** [1] - 70:19
**asserting** [1] - 62:13
**assertion** [4] - 68:4, 70:5, 71:14, 71:20
**Assistant** [1] - 28:18
**associated** [2] - 42:21, 43:4
**assuming** [1] - 105:1
**attached** [2] - 103:21, 103:25
**Attack** [4] - 26:9, 41:19, 75:10, 103:9
**attack** [13] - 26:12, 51:23, 80:1, 81:11, 87:8, 88:12, 88:14, 88:21, 89:13, 90:3, 90:7, 98:4, 98:15
**attempted** [1] - 85:14
**attention** [3] - 25:18, 31:5, 37:7
**attorney** [8] - 45:19, 52:11, 53:16, 55:1, 55:13, 102:22, 103:1, 106:13
**Attorney's** [1] - 55:24
**ATTORNEY'S** [1] - 1:15
**Attorneys** [1] - 28:19
**attorneys** [4] - 28:21, 34:1, 34:9, 34:13
**audiotaped** [1] - 51:11
**authority** [10] - 39:4, 48:22, 49:2, 77:19, 86:16, 92:3, 93:6, 102:11, 106:17, 107:15
**authorized** [6] - 27:18, 78:16, 86:23, 90:14, 91:16, 106:4
**authorizes** [1] - 91:10
**authorizing** [1] - 91:23
**available** [3] - 31:7, 51:11, 62:14

**Avenue** [2] - 2:3, 109:14
**avoid** [2] - 34:4, 34:10
**aware** [5] - 11:17, 62:10, 95:11, 95:13, 95:16

# B

**back-and-forth** [2] - 53:15, 71:15
**background** [1] - 85:5
**Baltimore** [1] - 1:21
**BANNON** [1] - 1:6
**Bannon** [65] - 5:11, 9:21, 15:5, 15:11, 15:17, 26:7, 28:21, 38:8, 50:13, 50:16, 51:5, 51:9, 51:17, 52:5, 52:9, 52:11, 53:10, 53:18, 53:20, 53:24, 54:3, 54:6, 54:10, 54:17, 55:1, 55:2, 55:14, 60:13, 61:14, 64:4, 64:5, 64:18, 68:15, 68:19, 68:20, 68:21, 68:22, 69:3, 69:7, 69:11, 69:20, 70:4, 70:17, 71:13, 95:5, 95:8, 95:20, 95:23, 96:11, 96:15, 96:21, 97:23, 97:24, 98:23, 100:9, 100:20, 101:2, 102:7, 102:15, 102:18, 102:19, 102:22, 106:13, 106:14
**Bannon's** [5] - 53:4, 53:7, 64:13, 68:12, 102:23
**bar** [2] - 56:3, 63:20
**based** [19] - 4:22, 7:20, 9:22, 33:13, 35:18, 36:21, 42:6, 42:12, 42:19, 43:8, 46:13, 53:19, 63:21, 64:20, 66:15, 71:20, 81:1, 95:22, 100:14
**basing** [1] - 36:20
**became** [1] - 51:2
**become** [1] - 95:19
**BEFORE** [1] - 1:10
**began** [2] - 26:5, 42:12
**begin** [3] - 23:24, 25:13, 30:14
**beginning** [2] -

25:19, 29:2
**behalf** [4] - 55:9, 102:24, 103:2, 107:15
**belief** [1] - 66:15
**believability** [1] - 31:1
**believes** [1] - 32:11
**below** [1] - 103:4, 103:12
**Bennie** [1] - 107:6
**best** [1] - 109:7
**better** [3] - 42:8, 80:23, 81:9
**between** [7] - 13:17, 34:22, 53:16, 55:9, 81:10, 89:21, 106:24
**beyond** [9] - 27:8, 27:12, 28:2, 28:4, 28:8, 28:13, 54:10, 54:16, 60:20
**bills** [2] - 76:25, 77:3
**binder** [4] - 74:17, 74:25, 84:10, 87:20
**bit** [7] - 16:17, 40:3, 44:11, 76:18, 79:3, 86:24, 100:22
**black** [3] - 48:16, 96:2, 96:3
**black-and-white** [1] - 48:16
**blocks** [1] - 38:12
**blog** [1] - 33:9
**blogging** [1] - 35:12
**blown** [1] - 86:10
**blue** [1] - 96:3
**Bob** [7] - 52:11, 53:4, 53:7, 53:8, 53:17, 53:25, 55:1
**bodies** [1] - 83:24
**books** [1] - 41:8
**bottom** [1] - 105:24
**box** [6] - 11:16, 22:17, 25:9, 74:9, 103:6, 103:14
**branches** [1] - 89:18
**breach** [2] - 42:3, 44:19
**breached** [1] - 38:12
**break** [1] - 98:5
**brief** [5] - 22:22, 29:14, 29:23, 61:18, 73:15
**briefed** [1] - 100:15
**briefly** [4] - 26:2, 30:15, 36:4, 80:4
**bring** [8] - 27:2, 34:21, 73:17, 73:23, 77:15, 84:3, 89:21, 100:2
**broad** [2] - 51:18,

586

51:21
**broadcast** [1] - 51:13
**broadly** [1] - 68:24
**broke** [1] - 4:13
**broken** [1] - 49:7
**broken-down** [1] -
49:7
**brutal** [1] - 80:7
**building** [1] - 105:15
**buildings** [1] - 104:9
**bulletin** [1] - 86:13
**burden** [3] - 28:3,
28:4, 60:19
**business** [1] - 50:19
**BY** [19] - 2:1, 75:2,
84:5, 84:20, 85:10,
86:8, 87:3, 87:17,
88:7, 89:4, 89:22,
90:12, 90:23, 91:5,
96:7, 99:5, 100:6,
102:4, 106:1

# C

**c/o** [1] - 106:13
**campaign** [1] - 43:6
**campaigns** [1] - 90:5
**candidacy** [1] - 51:3
**candidate** [1] - 51:2
**candidates** [2] -
42:17, 52:21
**cannot** [2] - 36:16,
72:7
**capital** [1] - 88:19
**Capitol** [22] - 26:10,
26:12, 38:12, 41:20,
42:3, 42:5, 44:19,
51:24, 51:25, 75:11,
80:2, 81:9, 85:17,
87:8, 88:13, 88:14,
88:17, 89:14, 90:3,
90:7, 93:21, 103:9
**car** [1] - 49:7
**care** [2] - 102:15,
102:19
**career** [1] - 50:20
**careful** [1] - 31:5
**carefully** [2] - 23:21,
61:9
**CARL** [1] - 1:10
**carry** [3] - 41:3,
90:14, 92:7
**carrying** [1] - 94:4
**case** [74] - 6:7,
10:14, 24:18, 25:17,
25:25, 26:4, 26:7,
27:24, 29:2, 29:8,
29:25, 30:1, 30:5,
30:6, 30:9, 30:20,

30:23, 31:18, 31:19,
31:22, 32:25, 33:1,
33:3, 33:7, 33:9,
33:12, 33:13, 33:19,
33:20, 33:21, 34:2,
34:3, 34:8, 34:12,
34:14, 34:18, 35:2,
35:4, 35:7, 35:11,
35:17, 35:23, 36:6,
36:25, 37:1, 37:4,
37:22, 38:1, 44:2,
46:17, 49:4, 49:5,
49:9, 49:11, 49:13,
49:14, 49:21, 50:2,
50:15, 54:18, 55:12,
55:25, 60:15, 60:17,
61:12, 62:15, 64:13,
64:18, 64:21, 79:1,
108:6, 108:11
**cases** [1] - 36:23
**category** [1] - 91:15
**causes** [6] - 41:24,
41:25, 80:1, 88:11,
88:16, 89:13
**certain** [2] - 11:17,
46:5
**CERTIFICATE** [1] -
109:1
**certify** [2] - 38:13,
109:4
**chair** [1] - 15:22
**chairman** [2] - 107:5,
107:7
**Chairman** [6] -
63:23, 64:14, 64:15,
65:16, 69:3, 107:6
**chambers** [2] - 7:2,
73:16
**chance** [3] - 30:5,
36:7, 36:10
**chances** [2] - 52:24
**changed** [5] - 42:8,
43:14, 65:10, 65:12,
65:24
**changes** [1] - 90:25
**charged** [5] - 27:9,
27:10, 28:9, 48:9,
66:22
**charges** [2] - 26:7,
50:14
**charging** [1] - 27:1
**chatroom** [1] - 35:13
**check** [1] - 106:14
**checkbox** [1] -
104:25
**checkboxes** [1] -
103:13
**checked** [3] -
103:14, 103:15, 105:1
**chief** [4] - 29:8, 30:1,

75:9, 81:20
**choice** [1] - 48:15
**choose** [2] - 29:3,
31:9
**chose** [1] - 39:3
**circumstances** [5] -
80:1, 88:11, 89:12,
89:14, 89:24
**citizens** [4] - 39:20,
40:9, 40:18, 49:20
**Citron** [1] - 102:16
**city** [1] - 106:7
**civil** [2] - 67:4, 67:5
**claim** [5] - 14:1, 46:5,
67:1, 70:22, 71:7
**claimed** [1] - 46:9
**claiming** [1] - 46:9
**claims** [2] - 30:11,
46:2
**clarification** [1] -
106:12
**clarifying** [1] -
106:19
**clear** [10] - 7:1, 9:19,
14:9, 21:17, 44:25,
45:4, 45:10, 49:9,
53:23, 70:25
**clearly** [6] - 26:24,
53:12, 53:25, 55:2,
61:20, 71:4
**clerk** [3] - 37:8,
107:20, 107:23
**client** [1] - 103:2
**clock** [2] - 61:20,
61:21
**close** [2] - 6:7, 103:4
**closing** [3] - 30:6,
30:7, 30:12
**co** [1] - 34:24
**co-workers** [1] -
34:24
**cofounded** [1] -
50:21
**collect** [1] - 63:9
**collected** [1] - 25:4
**collecting** [1] - 77:8
**collection** [1] - 89:17
**colloquy** [1] - 67:9
**Columbia** [2] - 2:2,
109:13
**COLUMBIA** [2] - 1:1,
1:15
**comfortable** [1] -
74:12
**coming** [2] - 43:15,
72:12
**commanded** [2] -
48:21, 103:7
**comment** [1] - 31:12
**commentary** [1] -

50:22
**commit** [1] - 86:19
**committed** [8] - 27:8,
47:19, 53:21, 54:17,
71:7, 103:22, 104:1,
105:7
**Committee** [173] -
8:3, 8:4, 8:10, 8:12,
8:23, 9:7, 9:24, 13:18,
14:1, 14:2, 26:9,
26:10, 26:14, 27:15,
27:18, 38:21, 41:19,
41:21, 41:23, 42:6,
42:12, 42:19, 42:25,
43:8, 43:24, 44:2,
44:8, 45:5, 45:11,
45:15, 45:20, 45:21,
46:4, 46:14, 46:15,
46:19, 46:21, 47:2,
47:8, 47:10, 47:20,
47:21, 47:22, 48:17,
48:18, 48:24, 49:1,
53:3, 53:9, 53:17,
54:20, 54:21, 55:10,
55:19, 64:6, 64:7,
65:16, 68:1, 68:17,
70:23, 71:21, 71:25,
75:10, 75:12, 75:14,
76:1, 76:12, 76:13,
76:17, 79:1, 79:12,
79:22, 79:25, 80:16,
80:18, 81:1, 81:2,
81:12, 81:19, 81:21,
81:23, 81:25, 82:7,
82:11, 82:12, 82:15,
82:21, 83:11, 84:2,
84:13, 85:23, 86:3,
86:21, 86:22, 87:7,
87:12, 87:24, 88:2,
89:6, 89:10, 89:25,
90:1, 90:14, 91:7,
91:10, 91:16, 91:24,
92:3, 92:5, 92:11,
92:12, 92:15, 92:18,
92:21, 92:22, 92:23,
93:6, 93:10, 93:14,
93:15, 93:20, 94:3,
94:6, 94:8, 94:10,
94:11, 94:13, 94:24,
95:2, 95:4, 95:10,
95:15, 95:19, 95:20,
96:8, 96:14, 96:15,
96:17, 96:22, 96:25,
97:1, 97:3, 97:6, 97:7,
97:13, 97:20, 97:22,
98:25, 99:1, 99:6,
99:10, 99:15, 99:18,
99:20, 100:19,
100:23, 100:24,
101:22, 102:22,
103:8, 104:2, 104:3,

104:19, 104:21,
107:6, 107:7, 107:9,
107:10, 107:11,
107:12, 107:16
**committee** [11] -
40:24, 41:18, 41:21,
78:14, 78:15, 79:19,
79:21, 103:22,
103:23, 105:7, 105:8
**Committee's** [14] -
43:11, 43:13, 45:2,
47:13, 82:4, 83:9,
91:24, 93:2, 93:4,
93:20, 96:20, 97:14,
99:9, 101:3
**committee's** [1] -
79:15
**Committee)** [1] -
87:9
**committees** [27] -
40:23, 40:24, 40:25,
41:2, 41:4, 41:12,
41:15, 44:9, 76:3,
76:5, 76:6, 76:9,
76:11, 76:19, 76:20,
76:22, 77:7, 77:10,
77:15, 77:17, 77:19,
78:19, 78:24, 79:5,
81:17, 83:3, 92:7
**communicate** [1] -
14:23
**communicated** [4] -
14:24, 53:8, 53:12,
101:23
**communication** [1] -
33:10
**communications** [3]
- 35:8, 35:9, 44:21
**companies** [1] -
40:19
**company** [1] - 50:21
**compel** [1] - 77:17
**compelling** [1] -
41:11
**competent** [3] -
63:23, 63:24, 64:2
**complete** [3] - 80:19,
93:12, 109:6
**completed** [1] -
96:23
**Complex** [2] - 85:17,
88:13
**compliance** [2] -
48:7, 71:2
**comply** [38] - 8:10,
9:3, 9:4, 13:24, 14:2,
14:4, 26:22, 27:19,
27:20, 27:21, 39:7,
39:10, 44:13, 45:21,
46:6, 47:2, 48:6,

587

48:14, 48:19, 48:24, 54:4, 62:17, 65:18, 65:19, 65:21, 66:22, 67:3, 68:16, 68:20, 68:22, 70:18, 70:24, 78:21, 93:15
**complying** [6] - 46:1, 46:17, 47:11, 66:19, 66:20, 69:23
**computer** [1] - 35:7
**computers** [1] - 35:11
**concern** [1] - 9:15
**concerned** [2] - 7:20, 7:22
**concerning** [1] - 36:25
**concerns** [2] - 90:2, 90:15
**concluded** [1] - 108:22
**conclusion** [2] - 9:12, 27:4
**conclusions** [1] - 90:16
**conduct** [7] - 27:19, 30:17, 35:22, 36:5, 76:24, 77:2, 92:3
**conducted** [1] - 105:13
**conducting** [3] - 26:11, 83:4, 83:7
**conducts** [1] - 75:20
**confer** [1] - 18:4
**conference** [3] - 12:12, 12:19, 13:20
**Confers** [1] - 108:13
**confers** [1] - 22:14
**confirmed** [1] - 106:16
**confused** [1] - 49:6
**Congress** [52] - 26:8, 27:11, 27:12, 27:14, 38:7, 38:10, 38:15, 38:18, 38:22, 39:5, 39:7, 39:18, 39:22, 39:24, 40:1, 40:4, 40:7, 40:13, 40:15, 40:17, 40:23, 41:1, 43:4, 48:22, 49:23, 50:5, 52:18, 52:19, 52:21, 53:1, 56:1, 60:11, 60:13, 75:16, 75:18, 75:20, 75:23, 75:24, 76:6, 76:25, 78:18, 80:13, 80:25, 81:18, 82:15, 82:18, 82:20, 82:25, 83:23, 93:7, 102:12
**Congress's** [3] -

38:13, 39:4, 85:15
**congressional** [4] - 53:21, 54:12, 63:20, 82:2
**connected** [2] - 25:24, 34:3
**consequences** [1] - 48:25
**consider** [13] - 30:4, 31:1, 31:21, 47:25, 52:3, 55:23, 60:15, 60:23, 76:25, 81:13, 91:10, 91:17, 101:1
**considerable** [1] - 53:15
**consideration** [1] - 66:15
**considered** [1] - 36:15
**considering** [2] - 82:10, 91:7
**consistent** [5] - 12:18, 13:19, 68:13, 87:23, 88:23
**consistently** [1] - 68:14
**consists** [2] - 75:24, 83:7
**constitutes** [1] - 109:4
**Constitution** [2] - 2:3, 109:14
**constitutional** [2] - 85:15, 88:22
**contact** [4] - 33:25, 34:6, 95:1, 108:10
**contacted** [1] - 53:4
**contain** [1] - 90:16
**contained** [1] - 102:5
**contempt** [18] - 26:8, 27:11, 27:14, 39:3, 48:9, 48:10, 48:11, 48:13, 50:5, 55:22, 55:23, 60:14, 64:8, 67:4, 67:5, 70:20, 71:7
**continue** [1] - 86:18
**continued** [2] - 65:23, 95:16
**continues** [2] - 84:24, 94:3
**contrary** [1] - 53:5
**contributed** [1] - 90:3
**control** [1] - 91:24
**conversation** [3] - 11:24, 34:5
**convinced** [1] - 27:7
**copy** [2] - 84:12, 100:8

**CORCORAN** [20] - 1:18, 4:8, 4:11, 4:13, 6:1, 6:3, 15:4, 15:10, 15:16, 16:20, 17:14, 17:21, 22:12, 50:10, 50:13, 60:9, 61:8, 84:16, 97:17, 100:12
**Corcoran** [9] - 3:6, 4:7, 7:14, 10:10, 22:11, 28:22, 50:8, 61:6, 61:16
**correct** [18] - 6:1, 10:22, 13:7, 14:16, 14:17, 16:23, 36:10, 76:2, 76:8, 83:14, 85:24, 93:9, 93:13, 94:17, 105:4, 105:16, 106:11
**corrective** [8] - 81:6, 90:17, 90:19, 90:24, 91:6, 91:10, 91:12, 91:16
**correspond** [1] - 17:19
**corresponds** [1] - 15:23
**corridor** [1] - 34:8
**Costello** [25] - 4:24, 13:5, 13:10, 13:17, 14:10, 52:12, 53:4, 53:7, 53:8, 53:17, 53:25, 55:1, 55:10, 55:13, 65:1, 65:5, 65:6, 65:16, 67:20, 68:21, 69:12, 102:15, 102:17, 102:20, 102:21
**Costello's** [1] - 68:11
**counsel** [6] - 11:11, 18:4, 22:24, 74:21, 75:9, 81:20
**counsels** [1] - 95:2
**count** [2] - 48:10, 48:11
**Count** [1] - 81:16
**country** [8] - 40:10, 40:19, 41:14, 49:19, 50:16, 50:22, 51:5, 51:6
**counts** [2] - 26:8, 27:11
**couple** [3] - 89:8, 99:14, 103:13
**course** [2] - 30:19, 35:21
**COURT** [108] - 1:1, 4:3, 4:10, 4:12, 5:10, 6:2, 6:4, 6:11, 6:17, 7:1, 8:1, 8:14, 8:18, 8:23, 9:6, 9:11, 9:16,

9:19, 10:2, 10:6, 10:8, 10:17, 10:24, 11:9, 11:13, 11:23, 12:7, 12:11, 12:14, 12:17, 12:24, 13:4, 13:9, 13:12, 13:19, 14:6, 14:12, 14:16, 14:19, 14:22, 15:2, 15:5, 15:8, 15:11, 15:14, 15:17, 16:15, 16:21, 17:16, 17:22, 18:5, 21:15, 22:11, 22:13, 22:15, 23:4, 23:13, 23:18, 50:7, 56:4, 60:8, 61:5, 61:16, 62:5, 62:9, 62:22, 63:3, 63:5, 63:14, 64:11, 64:23, 66:1, 66:4, 66:10, 67:6, 67:9, 67:12, 67:14, 67:23, 68:9, 69:9, 69:13, 69:15, 70:2, 70:7, 70:12, 70:16, 71:10, 72:5, 72:21, 73:1, 73:3, 73:14, 73:22, 73:25, 74:3, 74:11, 74:20, 74:24, 84:17, 96:6, 97:21, 98:19, 100:16, 101:6, 101:13, 101:19, 108:2
**court** [9] - 21:14, 34:20, 35:19, 36:14, 36:15, 36:16, 60:7, 74:13, 78:6
**Court** [18] - 2:1, 2:2, 4:22, 11:17, 12:4, 13:1, 15:1, 15:4, 15:7, 15:10, 15:13, 15:16, 32:5, 64:25, 71:4, 84:4, 109:12, 109:13
**Court's** [3] - 3:4, 62:10, 74:16
**courthouse** [1] - 34:7
**courtroom** [18] - 15:23, 22:14, 23:7, 23:11, 24:6, 24:24, 25:3, 25:11, 33:14, 33:15, 34:4, 36:9, 37:5, 74:1, 74:6, 95:23, 108:13, 108:20
**COURTROOM** [9] - 4:1, 11:7, 11:10, 23:2, 23:17, 62:3, 63:11, 73:20, 74:8
**cover** [1] - 62:21
**coverage** [1] - 37:1
**credibility** [1] - 30:25
**credit** [1] - 36:13
**crime** [5] - 27:1,

36:3, 39:18, 53:21, 54:17
**crimes** [1] - 47:19
**criminal** [6] - 26:4, 27:24, 33:20, 39:10, 47:4, 55:20
**Criminal** [1] - 1:3
**critical** [2] - 55:10, 55:15
**cross** [5] - 29:13, 29:22, 66:7, 72:14, 72:17
**Cross** [1] - 3:8
**cross-examination** [3] - 29:13, 66:7, 72:14
**cross-examine** [1] - 29:22
**CRR** [3] - 2:1, 109:3, 109:12
**crystal** [1] - 53:23
**currency** [1] - 53:1
**current** [1] - 6:19
**cut** [2] - 4:19, 5:7

## D

**D.C** [7] - 1:6, 1:17, 2:4, 42:4, 98:16, 106:7, 109:14
**darkest** [1] - 85:13
**date** [23] - 8:5, 8:25, 9:1, 9:8, 9:9, 47:15, 49:6, 54:13, 54:23, 55:3, 71:13, 71:15, 71:16, 103:11, 104:10, 104:16, 104:20, 105:21, 106:3, 106:9, 106:10, 106:21, 106:25
**dated** [1] - 55:12
**Dated** [1] - 109:10
**dates** [8] - 5:14, 54:15, 68:8, 71:21, 71:22, 72:1, 72:4
**DAVID** [2] - 1:22, 1:22
**Davidson** [1] - 102:16
**DAY** [1] - 1:10
**days** [2] - 85:13, 98:14
**deadline** [6] - 9:4, 45:15, 45:17, 48:5, 79:6, 106:22
**deadlines** [11] - 46:13, 47:16, 66:22, 78:20, 78:23, 93:1, 93:2, 93:14, 93:16, 99:22, 99:24

**dealt** [1] - 51:16
**deaths** [2] - 80:9, 85:17
**debate** [2] - 62:13, 62:21
**decades** [1] - 82:19
**decide** [13] - 27:6, 31:3, 31:15, 33:13, 35:17, 35:18, 36:13, 37:4, 37:25, 46:12, 49:2, 60:19, 71:6
**decided** [12] - 4:22, 12:6, 13:3, 36:6, 39:18, 39:19, 63:1, 68:1, 68:17, 68:23, 69:25, 70:1
**deciding** [1] - 71:7
**decision** [13] - 6:18, 33:2, 36:21, 48:15, 49:2, 52:22, 60:22, 63:25, 64:1, 64:7, 66:14, 66:16, 96:9
**decision-making** [2] - 63:25, 64:1
**decisions** [2] - 33:5, 36:20
**default** [8] - 8:4, 8:7, 8:12, 8:17, 8:21, 9:21, 9:24
**defaulted** [3] - 26:19, 54:11
**Defendant** [107] - 1:7, 6:7, 10:4, 10:8, 10:12, 11:1, 11:2, 13:23, 14:4, 26:7, 26:15, 26:18, 27:3, 27:4, 27:8, 27:10, 27:15, 27:19, 28:1, 28:4, 28:9, 28:13, 28:17, 28:20, 28:21, 28:24, 28:25, 29:17, 38:8, 38:10, 38:16, 38:18, 38:20, 39:1, 39:12, 39:18, 39:23, 42:13, 42:16, 42:20, 42:22, 43:1, 43:9, 43:17, 43:19, 43:21, 43:23, 44:3, 44:16, 44:25, 45:1, 45:4, 45:7, 45:10, 45:12, 45:16, 45:19, 45:20, 46:1, 46:8, 46:12, 46:16, 46:20, 46:22, 47:2, 47:5, 47:7, 47:15, 47:22, 48:6, 48:17, 48:18, 48:21, 48:24, 49:5, 49:10, 49:11, 49:22, 50:4, 70:24, 71:7, 71:19, 96:5, 96:9, 96:10,

96:14, 97:2, 97:3, 97:6, 97:8, 97:9, 97:14, 99:7, 99:16, 99:23, 103:16, 104:10, 104:15, 104:22, 105:2, 105:3, 105:11, 105:14, 105:17, 105:21, 106:20
**defendant** [3] - 27:24, 28:6, 29:18
**DEFENDANT** [1] - 1:18
**Defendant's** [12] - 13:9, 27:21, 29:2, 40:5, 44:13, 44:20, 48:8, 48:13, 48:19, 49:1, 49:2, 66:14
**defense** [18] - 10:14, 10:16, 28:17, 28:20, 29:11, 29:13, 29:20, 29:23, 29:24, 62:14, 64:18, 64:19, 66:17, 66:25, 71:23, 74:20
**defenses** [1] - 6:9
**defied** [3] - 47:16, 47:18, 47:24
**define** [1] - 92:4
**delay** [4] - 7:18, 41:25, 42:24, 44:20
**delayed** [1] - 38:13
**deliberate** [6] - 25:10, 26:23, 27:23, 48:14, 48:19, 66:14
**deliberately** [1] - 9:21
**deliberations** [10] - 24:4, 24:16, 24:23, 25:14, 30:4, 30:14, 31:8, 32:8, 32:22, 62:20
**deliver** [1] - 25:3
**delivered** [1] - 33:11
**demanded** [1] - 77:23
**democracy** [3] - 42:8, 85:14, 88:21
**democratic** [4] - 91:14, 91:19, 93:22, 94:2
**demonstrating** [2] - 100:19, 101:22
**denied** [1] - 64:12
**depart** [2] - 103:23, 105:8
**Department** [1] - 86:12
**deposition** [14] - 26:17, 43:23, 44:1, 45:23, 46:24, 47:8,

47:18, 48:12, 78:17, 99:20, 105:6, 105:10, 105:18, 105:22
**depositions** [4] - 44:7, 77:13, 78:17, 105:12
**DEPUTY** [9] - 4:1, 11:7, 11:10, 23:2, 23:17, 62:3, 63:11, 73:20, 74:8
**deputy** [4] - 22:14, 75:9, 81:20, 108:13
**describe** [10] - 30:15, 76:20, 77:7, 77:20, 80:4, 82:6, 85:2, 96:19, 103:19, 107:19
**described** [6] - 82:21, 87:23, 88:24, 90:17, 90:20, 90:24
**describes** [1] - 94:9
**describing** [4] - 83:5, 85:22, 101:20, 106:13
**description** [2] - 85:21, 94:12
**designated** [1] - 78:18
**destroyed** [1] - 25:5
**detailed** [1] - 24:2
**details** [3] - 13:25, 27:22, 38:16
**determine** [4] - 9:17, 30:22, 30:24, 79:17
**develop** [3] - 76:24, 77:6, 79:11
**developed** [1] - 51:10
**development** [1] - 75:21
**develops** [1] - 75:20
**devices** [1] - 35:11
**different** [16] - 8:18, 9:12, 36:19, 36:20, 48:5, 50:16, 66:23, 68:4, 75:23, 77:10, 78:7, 82:8, 82:9, 83:22, 88:1, 94:9
**differently** [1] - 32:7
**ding** [1] - 66:20
**direct** [3] - 29:10, 29:21, 53:6
**Direct** [1] - 3:8
**DIRECT** [1] - 75:1
**directing** [2] - 26:15, 48:24
**director** [3] - 75:9, 81:21, 81:22
**disabled** [1] - 64:19
**discharged** [1] - 34:22
**disclose** [3] - 17:25,

25:12, 35:16
**discuss** [10] - 16:24, 18:2, 32:25, 33:21, 34:21, 37:7, 37:9, 37:22, 98:16, 108:6
**discussed** [5] - 6:21, 7:14, 34:9, 51:17, 100:14
**discussing** [3] - 4:13, 7:12, 71:12
**discussion** [7] - 4:15, 4:19, 5:8, 5:18, 6:20, 7:11, 34:11
**discussions** [4] - 34:11, 54:14, 98:9, 98:14
**dismiss** [1] - 63:20
**disposal** [1] - 92:7
**disregard** [3] - 31:19, 32:21, 49:22
**dissemination** [1] - 89:17
**distinction** [1] - 6:16
**distracts** [1] - 24:13
**district** [1] - 109:13
**District** [3] - 2:2, 2:2, 109:13
**DISTRICT** [4] - 1:1, 1:1, 1:11, 1:15
**divided** [1] - 76:22
**document** [17] - 11:10, 15:1, 15:4, 15:10, 15:13, 15:16, 45:23, 60:24, 61:10, 73:9, 73:12, 77:21, 77:23, 84:9, 84:10, 84:21, 103:2
**documents** [31] - 13:14, 15:7, 32:23, 43:21, 44:14, 44:16, 44:23, 45:1, 45:8, 46:23, 47:17, 48:10, 48:23, 52:8, 53:11, 73:12, 74:17, 77:4, 77:12, 77:22, 78:2, 78:20, 92:20, 94:10, 94:24, 99:17, 99:23, 104:12, 104:20, 106:21, 106:23
**domestic** [9] - 88:12, 88:14, 89:13, 90:3, 90:7, 91:13, 91:20, 91:21
**Donald** [3] - 42:17, 51:3, 51:7
**done** [7] - 12:14, 45:5, 47:23, 49:11, 72:16, 98:23, 104:21
**door** [6] - 6:8, 65:2, 65:11, 65:23, 70:4,

72:11
**doubt** [9] - 27:8, 27:13, 28:2, 28:4, 28:8, 28:13, 54:10, 54:17, 60:20
**down** [5] - 14:21, 14:22, 15:20, 49:7, 86:24
**download** [1] - 51:15
**downloaded** [1] - 37:15
**draw** [1] - 27:3
**due** [1] - 86:13
**duly** [1] - 23:15
**Dunn** [15] - 85:8, 86:6, 86:25, 87:15, 88:5, 89:1, 89:3, 89:20, 90:10, 90:21, 91:3, 100:5, 101:15, 102:2, 105:25
**Dunn-Gordon** [15] - 85:8, 86:6, 86:25, 87:15, 88:5, 89:1, 89:3, 89:20, 90:10, 90:21, 91:3, 100:5, 101:15, 102:2, 105:25
**during** [20] - 12:12, 12:18, 13:20, 14:13, 24:10, 24:16, 24:23, 24:24, 25:16, 25:21, 31:8, 31:11, 32:3, 32:5, 32:8, 34:2, 35:21, 37:7, 82:24, 85:14
**duty** [3] - 28:9, 30:20, 34:23

# E

**East** [1] - 1:20
**ECF** [1] - 63:19
**Edwards** [1] - 109:12
**EDWARDS** [2] - 2:1, 109:3
**effect** [4] - 30:24, 68:2, 68:17, 68:22
**efficiency** [1] - 4:9
**efficient** [1] - 30:18
**effort** [7] - 8:17, 41:25, 42:24, 43:5, 44:19, 48:7, 62:17
**efforts** [3] - 82:4, 98:1, 98:17
**eight** [4] - 23:5, 52:4, 52:5
**either** [7] - 4:24, 18:2, 28:20, 69:23, 70:4, 71:11, 83:20
**elected** [8] - 40:9,

589

41:1, 51:4, 76:7, 76:9, 76:13, 81:18, 81:19
**election** [14] - 38:14, 42:1, 42:18, 42:23, 43:5, 44:20, 52:20, 80:10, 80:12, 80:15, 81:15, 85:16, 98:2, 98:18
**elections** [2] - 42:9, 43:14
**elective** [1] - 50:25
**Electoral** [1] - 81:16
**electronic** [2] - 35:9, 35:11
**electronically** [3] - 33:9, 104:15, 104:20
**element** [3] - 28:8, 28:12, 60:20
**elements** [4] - 27:13, 27:14, 27:22, 62:14
**elevator** [1] - 34:8
**Eleventh** [1] - 1:16
**email** [3] - 6:23, 7:2, 35:15
**emailing** [1] - 35:12
**emails** [1] - 44:24
**emphasize** [1] - 24:1
**employed** [1] - 75:8
**employees** [1] - 85:19
**enact** [1] - 76:25
**encounter** [1] - 34:3
**end** [21] - 6:6, 23:23, 24:3, 25:2, 25:13, 27:6, 27:23, 30:2, 30:12, 33:2, 44:25, 49:13, 49:21, 50:2, 60:18, 61:12, 93:7, 93:8, 103:6, 103:10
**ends** [1] - 93:6
**enforceable** [1] - 38:19
**enforcement** [6] - 80:7, 81:7, 85:18, 88:18, 89:15, 93:22
**engage** [1] - 95:2
**engaged** [3] - 88:22, 96:23, 97:9
**engagement** [1] - 53:6
**entered** [6] - 23:11, 25:10, 74:1, 74:6, 84:19, 101:9
**entering** [1] - 42:5
**entire** [3] - 7:7, 38:1, 50:22
**entirely** [2] - 24:11, 31:9
**entirety** [2] - 4:24, 5:25

**entitled** [3] - 38:23, 40:15, 87:4
**environment** [1] - 86:14
**escort** [1] - 23:8
**ESQ** [5] - 1:14, 1:14, 1:18, 1:19, 1:22
**Esquire** [1] - 102:15
**essentially** [1] - 12:25
**establish** [3] - 69:21, 97:20, 99:2
**established** [7] - 83:11, 83:15, 83:16, 87:7, 93:10, 93:11, 96:17
**establishes** [2] - 64:13, 84:13
**establishing** [3] - 84:1, 93:25, 101:24
**Establishment** [1] - 87:4
**establishment** [4] - 83:9, 86:2, 87:6, 87:11
**evaluate** [1] - 79:20
**evaluating** [1] - 80:20
**evaluation** [1] - 79:13
**event** [1] - 64:9
**events** [12] - 38:11, 38:16, 39:6, 41:17, 41:24, 43:2, 44:22, 80:6, 80:9, 97:25, 98:6, 98:11
**everyday** [1] - 41:2
**evidence** [72] - 4:14, 8:12, 24:13, 24:18, 24:19, 24:21, 25:24, 26:25, 27:3, 27:7, 28:7, 29:5, 29:6, 29:17, 29:19, 29:20, 30:2, 30:9, 30:10, 30:11, 30:25, 31:21, 31:22, 31:24, 32:1, 32:3, 32:6, 32:8, 32:10, 32:14, 33:6, 35:19, 36:6, 36:14, 36:15, 36:21, 37:5, 44:12, 45:12, 48:4, 49:4, 49:22, 50:4, 50:15, 51:4, 51:18, 52:3, 53:6, 53:13, 53:20, 53:22, 54:5, 54:7, 54:13, 55:6, 55:11, 55:25, 60:15, 60:17, 60:24, 61:1, 61:2, 61:9, 61:13, 63:21, 73:8, 84:19,

101:9
**EVIDENCE** [1] - 3:13
**exactly** [6] - 63:22, 67:16, 69:17, 69:19, 71:3, 72:3
**examination** [7] - 29:11, 29:13, 29:15, 29:22, 29:23, 66:7, 72:14
**EXAMINATION** [1] - 75:1
**examine** [1] - 29:22
**example** [8] - 34:7, 35:23, 63:19, 64:14, 81:14, 81:16, 85:11, 86:5
**examples** [1] - 81:7
**except** [1] - 100:13
**exclude** [1] - 71:4
**excluding** [1] - 72:8
**exclusive** [1] - 31:20
**excuse** [8] - 13:24, 45:25, 46:16, 55:3, 55:5, 55:6, 67:7, 71:2
**excused** [1] - 23:6
**excuses** [2] - 39:8, 66:16
**execution** [1] - 90:7
**executive** [3] - 70:22, 71:1, 71:24
**exercise** [2] - 14:20, 17:24, 18:2, 82:1, 86:16
**exercised** [7] - 15:2, 15:5, 15:8, 15:11, 15:14, 15:17, 17:10
**exercising** [2] - 15:24, 82:10
**exhibit** [5] - 87:20, 100:16, 100:18, 101:21
**Exhibit** [23] - 3:14, 3:15, 84:4, 84:6, 84:9, 84:11, 84:15, 84:17, 84:18, 86:7, 87:1, 89:2, 90:10, 91:4, 100:3, 100:7, 100:11, 100:13, 101:6, 101:8, 101:16, 102:3, 102:6
**Exhibits** [1] - 4:14
**EXHIBITS** [1] - 3:13
**exhibits** [14] - 4:18, 4:20, 4:21, 5:22, 5:24, 11:18, 11:19, 11:25, 31:23, 32:2, 32:23, 72:23, 74:21, 74:22
**exist** [1] - 9:25
**existence** [1] - 31:25
**exited** [1] - 108:20
**expect** [2] - 12:17,

29:6
**expeditiously** [1] - 94:4
**experience** [3] - 82:19, 83:7, 107:12
**expert** [1] - 85:25
**expertise** [1] - 40:25
**experts** [2] - 81:4, 94:1
**explain** [12] - 23:24, 26:2, 28:15, 36:4, 36:10, 40:6, 40:12, 40:17, 46:3, 48:2, 83:18, 94:5
**expressed** [1] - 31:17
**extend** [1] - 8:24
**extended** [2] - 71:14, 72:1
**extending** [1] - 9:8
**extent** [6] - 7:25, 8:9, 11:25, 31:3, 72:16, 97:17
**extremism** [2] - 91:13, 91:21
**extremists** [1] - 86:15

# F

**face** [4] - 35:7, 39:10, 48:23
**face-to-face** [1] - 35:7
**Facebook** [1] - 33:11
**facing** [1] - 40:20
**fact** [11] - 31:25, 45:13, 61:22, 79:7, 81:2, 83:4, 92:8, 98:23, 101:2, 106:16
**fact-finding** [4] - 79:7, 81:2, 83:4, 92:8
**factored** [1] - 90:6
**factors** [3] - 4:22, 88:20, 90:2
**facts** [21] - 5:13, 8:16, 30:23, 30:24, 31:16, 31:18, 35:18, 35:24, 36:19, 77:4, 77:8, 79:8, 79:13, 79:17, 79:25, 88:11, 88:16, 89:12, 89:14, 89:24, 100:25
**failed** [4] - 9:3, 9:4, 27:19, 28:12
**failure** [6] - 26:22, 27:21, 44:13, 48:6, 48:14, 48:19
**fair** [3] - 14:19,

30:17, 63:3
**false** [1] - 86:18
**familiar** [1] - 95:19
**familiarity** [1] - 95:22
**family** [1] - 34:24
**far** [1] - 96:19
**federal** [1] - 88:18
**fellow** [2] - 33:4, 37:24, 39:20
**few** [3] - 30:13, 38:12, 84:22
**figure** [8] - 39:14, 40:1, 40:12, 40:19, 41:13, 41:16, 43:11, 49:24
**file** [1] - 62:24
**filing** [3] - 12:3, 12:5, 12:21
**filings** [1] - 12:25
**final** [4] - 25:13, 33:2, 38:2, 90:15
**finalization** [2] - 80:14, 81:15
**finalized** [3] - 42:1, 42:24, 43:5
**finally** [3] - 30:12, 34:13, 65:18
**financing** [1] - 90:4
**findings** [4] - 42:6, 86:2, 86:20, 90:16
**fine** [2] - 14:6, 45:3
**finish** [1] - 61:6
**finished** [3] - 29:11, 29:13, 29:24
**firm** [1] - 71:16
**first** [30] - 4:9, 4:20, 7:5, 15:2, 15:5, 27:14, 28:23, 33:16, 50:17, 61:18, 62:7, 63:18, 70:15, 76:18, 84:23, 85:9, 85:12, 86:9, 88:4, 89:9, 90:24, 91:9, 96:13, 99:13, 102:9, 103:14
**five** [4] - 12:5, 63:10, 73:14, 73:17
**five-page** [1] - 12:5
**fixed** [1] - 54:15
**flexible** [1] - 54:15
**Floor** [1] - 1:16
**focus** [9] - 40:25, 76:23, 79:8, 79:21, 79:24, 84:22, 85:22, 89:9, 93:19
**focused** [2] - 79:25, 94:3
**follow** [9] - 26:3, 32:22, 39:19, 45:5, 45:13, 48:8, 48:9, 49:8, 79:7

followed [4] - 52:13, 53:15, 65:15, 67:25

following [14] - 18:7, 21:13, 23:1, 23:12, 34:15, 56:5, 60:6, 62:2, 67:9, 73:19, 74:2, 74:7, 87:24, 108:21

fomented [1] - 88:20

FOR [5] - 1:1, 1:14, 1:15, 1:18, 3:10

Forces [1] - 89:16

foregoing [1] - 109:4

foreign [1] - 90:5

forgive [1] - 67:3

forgot [1] - 73:17

form [6] - 4:25, 5:2, 6:13, 6:14, 6:19, 6:20

formal [2] - 27:1, 77:13

former [4] - 42:16, 42:20, 43:6, 43:7

forth [5] - 13:17, 53:15, 55:8, 55:9, 71:15

foul [1] - 66:19

Fourth [1] - 1:16

fourth [1] - 27:20

frankly [2] - 6:12, 67:18

free [2] - 25:6, 74:12

frequently [1] - 92:23

friends [1] - 34:24

front [2] - 77:16, 84:10

fueled [1] - 86:18

fulfill [1] - 63:4

full [5] - 55:22, 84:9, 100:4, 109:5

fullest [1] - 25:17

function [8] - 79:16, 89:10, 89:12, 89:23, 89:25, 90:8, 90:13, 90:15

functions [4] - 87:23, 88:24, 89:6, 91:22

Functions [1] - 89:6

funding [1] - 81:7

fundraising [1] - 44:17

future [1] - 91:12

### G

gaps [1] - 79:18

Gaston [1] - 28:19

GASTON [4] - 1:14, 14:21, 15:7, 15:13

gather [7] - 40:15, 41:5, 45:8, 77:4, 77:10, 79:13, 93:23

gathered [4] - 22:16, 42:13, 42:25, 98:15

general [1] - 99:13

generally [14] - 75:18, 76:5, 76:11, 76:19, 76:23, 78:25, 82:25, 84:25, 85:2, 92:14, 94:11, 94:25, 95:14, 102:5

gentlemen [5] - 39:16, 50:11, 98:20, 101:19, 108:4

given [4] - 44:2, 54:19, 67:18, 81:13

Gordon [15] - 85:8, 86:6, 86:25, 87:15, 88:5, 89:1, 89:3, 89:20, 90:10, 90:21, 91:3, 100:5, 101:15, 102:2, 105:25

govern [1] - 40:11

Government [71] - 4:4, 4:6, 6:10, 6:12, 6:15, 7:3, 7:17, 10:25, 11:1, 11:2, 11:20, 11:25, 12:1, 12:3, 12:6, 12:16, 12:17, 13:3, 13:13, 13:16, 14:13, 14:20, 15:2, 15:14, 27:12, 28:3, 28:7, 28:11, 28:16, 28:18, 28:23, 29:8, 29:9, 29:11, 29:14, 29:16, 29:22, 29:24, 38:5, 39:13, 39:17, 50:5, 53:19, 54:2, 54:9, 54:16, 60:19, 62:18, 62:23, 64:3, 64:20, 65:2, 65:3, 65:13, 65:22, 66:1, 66:23, 67:20, 68:7, 68:15, 68:16, 70:3, 70:21, 71:3, 72:22, 73:6, 73:7, 74:5, 75:12, 100:10

government [8] - 39:24, 42:9, 43:15, 49:12, 75:14, 75:19, 88:20, 89:19

GOVERNMENT [3] - 1:14, 3:10, 74:10

Government's [22] - 4:10, 4:14, 6:7, 6:8, 6:22, 11:18, 12:21, 29:1, 39:20, 49:3, 61:17, 61:19, 64:18, 67:19, 72:11, 84:17,

84:18, 100:3, 100:7, 100:11, 101:8, 102:3

government's [3] - 3:14, 3:15, 49:20

governmental [1] - 86:16

governs [1] - 83:20

grand [1] - 26:5

granting [1] - 63:21

great [1] - 60:16

greater [1] - 49:3

grievances [1] - 86:18

guess [3] - 32:18, 48:3, 65:8

guests [1] - 51:17

guilt [2] - 27:3, 27:4

guilty [5] - 28:2, 28:4, 28:10, 28:14, 50:6

guy [3] - 49:14, 69:24, 70:1

### H

half [5] - 69:20, 86:7, 89:3, 91:4, 93:12

hand [6] - 24:8, 25:25, 28:11, 28:16, 39:2, 106:6

harm [2] - 66:19, 85:18

harmless [1] - 36:1

heading [1] - 89:5

hear [16] - 4:9, 13:13, 40:3, 50:15, 50:19, 50:24, 51:18, 54:18, 54:20, 55:17, 55:25, 61:3, 66:1, 72:10, 74:13, 97:5

heard [6] - 33:5, 45:15, 52:2, 61:12, 69:2, 108:5

hearing [4] - 11:24, 14:12, 34:10, 53:22

hearings [3] - 77:15, 78:15, 107:10

hearsay [6] - 4:21, 12:5, 12:8, 13:1, 68:3, 97:18

heed [1] - 47:5

heightened [1] - 86:13

held [2] - 12:1, 44:18

hell [1] - 98:4

help [13] - 29:5, 30:10, 39:14, 40:15, 41:2, 49:24, 52:23, 80:22, 80:23, 81:6,

81:8, 92:7, 101:10

helped [1] - 51:1

helpful [5] - 40:13, 41:13, 43:11, 43:12, 101:13

helps [2] - 24:12, 74:13

hereby [5] - 48:21, 87:6, 103:6, 103:7, 109:3

hereinafter [2] - 87:8, 88:13

highlighted [1] - 63:22

highlights [1] - 67:24

Hill [1] - 83:6

himself [2] - 43:7, 98:10

hinders [1] - 79:18

hinted [1] - 31:18

hired [1] - 96:22

hiring [2] - 96:23, 97:1

hold [4] - 32:12, 77:12, 77:15, 98:19

holding [1] - 72:6

home [2] - 25:2, 33:16

Homeland [1] - 86:12

Honor [46] - 6:1, 6:5, 10:23, 14:15, 14:18, 16:14, 16:19, 16:20, 17:20, 17:21, 22:10, 22:12, 23:2, 38:6, 50:10, 56:2, 60:9, 61:4, 62:3, 62:6, 63:2, 63:16, 64:10, 64:22, 64:25, 66:3, 66:12, 70:15, 73:20, 73:24, 74:4, 74:15, 74:16, 74:23, 84:14, 84:16, 96:4, 97:17, 97:19, 99:4, 100:10, 100:12, 101:10, 101:17, 102:1, 107:24

honor [1] - 50:18

HONORABLE [1] - 1:10

honorably [1] - 50:18

hosted [1] - 42:22

Hotel [1] - 98:16

House [28] - 26:10, 40:8, 40:23, 41:17, 51:9, 52:16, 52:17, 55:22, 62:11, 75:15, 75:22, 75:24, 76:1, 76:3, 76:19, 76:21, 83:17, 83:20, 83:21,

84:12, 98:10, 102:11, 103:10, 104:8, 106:6, 107:20, 107:23

House's [1] - 63:6

human [1] - 33:24

hurt [1] - 52:24

husher [2] - 18:1, 18:6

Hutcher [1] - 102:16

### I

identified [4] - 17:19, 25:21, 96:5, 103:20

identify [2] - 95:25, 101:11

identifying [2] - 42:7, 43:13

ideologically [1] - 86:15

ignore [2] - 46:12, 49:20

ignored [3] - 39:7, 45:17, 53:5

ignoring [2] - 39:16, 53:13

illegitimate [1] - 98:2

imagine [1] - 52:11

immediately [7] - 7:4, 25:25, 29:1, 34:10, 34:19, 44:18, 53:8

impaneled [1] - 23:16

impede [1] - 85:15

import [1] - 5:4

importance [1] - 64:6

important [10] - 23:25, 25:15, 26:4, 37:25, 39:13, 52:3, 52:15, 64:5, 79:4, 93:15

importantly [1] - 47:1

improper [1] - 8:13

improperly [1] - 7:22

IN [1] - 3:13

inadmissible [3] - 6:9, 9:7, 9:11

inadvertently [1] - 37:6

incite [1] - 86:19

include [5] - 81:14, 81:22, 81:24, 90:25, 93:2

included [4] - 85:1, 93:25, 97:25, 98:2

includes [4] - 31:22,

32:1, 35:7, 35:25
**including** [13] - 25:5, 33:10, 34:24, 35:12, 35:14, 40:6, 88:16, 89:14, 89:16, 90:4, 91:14, 98:4, 98:10
**incomplete** [1] - 36:12
**increased** [1] - 81:7
**independent** [1] - 35:22
**indicate** [1] - 103:15
**indicated** [1] - 106:14
**indicating** [1] - 98:13
**indication** [1] - 31:15
**indicted** [1] - 27:5
**indictment** [9] - 26:5, 26:6, 26:13, 26:18, 26:22, 26:24, 26:25, 27:2, 66:23
**individual** [2] - 95:1, 95:3
**individuals** [4] - 78:4, 78:10, 79:8, 98:9
**influence** [1] - 90:5
**influenced** [1] - 24:21
**influencing** [2] - 88:20, 90:2
**inform** [3] - 75:21, 77:5, 79:13
**information** [56] - 14:24, 27:17, 34:25, 35:3, 35:13, 36:8, 36:11, 36:16, 36:20, 38:8, 38:15, 38:18, 38:20, 38:23, 39:2, 39:13, 40:15, 40:18, 41:5, 41:6, 41:7, 41:11, 42:12, 42:14, 42:19, 42:25, 43:8, 44:8, 46:6, 46:9, 64:6, 77:8, 77:11, 77:18, 77:22, 78:11, 78:24, 79:2, 79:6, 79:9, 79:10, 79:17, 79:18, 81:10, 82:10, 85:1, 89:18, 93:24, 94:6, 97:3, 97:7, 97:13, 98:13, 99:7, 108:11
**information-sharing** [2] - 81:10, 89:18
**informs** [1] - 78:11
**initiatives** [1] - 98:11
**injured** [1] - 80:8
**innocence** [3] - 27:25, 28:6, 29:19

**innocent** [3] - 27:25, 50:14, 61:14
**inquiry** [3] - 103:21, 104:1, 105:7
**instead** [4] - 39:3, 45:18, 47:6, 55:17
**institutional** [1] - 85:19
**institutions** [5] - 42:10, 91:14, 91:20, 93:22, 94:2
**instruct** [8] - 30:2, 30:19, 31:13, 32:2, 35:20, 37:11, 37:23, 98:21
**instructed** [2] - 7:9, 100:22
**Instruction** [1] - 3:4
**instruction** [4] - 34:16, 48:21, 67:25, 68:3
**instructions** [14] - 7:8, 22:19, 23:10, 23:21, 23:22, 24:2, 24:4, 25:13, 30:13, 33:2, 33:6, 38:2, 52:10
**instrumentalities** [2] - 88:19, 89:19
**insurrectionists** [1] - 85:14
**intelligence** [3] - 81:8, 89:15, 89:17
**intend** [1] - 10:8, 13:23, 14:5, 62:20
**intended** [3] - 24:4, 29:5, 30:10
**intending** [1] - 67:16
**intends** [5] - 10:12, 11:20, 13:16, 14:13, 72:23
**intention** [2] - 13:14, 42:5
**intentional** [1] - 26:23
**intentionally** [1] - 9:22
**interest** [1] - 4:8
**interesting** [1] - 55:7
**interfere** [1] - 98:17
**interfered** [1] - 80:9
**interference** [2] - 80:2, 88:15
**interim** [1] - 4:17
**internal** [2] - 62:19, 83:21
**internet** [6] - 35:24, 36:2, 36:11, 36:24, 41:9, 51:12
**interrupt** [1] - 11:15

**interview** [1] - 44:1
**introduce** [2] - 72:23, 73:7
**introduced** [4] - 4:20, 25:20, 29:6, 67:20
**introduction** [1] - 4:14
**invades** [1] - 52:22
**invalid** [2] - 69:23, 70:4
**Investigate** [4] - 26:9, 41:19, 75:10, 103:8
**investigate** [5] - 41:24, 87:7, 88:10, 89:12, 90:1
**investigating** [5] - 41:25, 42:2, 79:25, 80:16, 89:25
**investigation** [14] - 26:11, 27:18, 35:22, 36:5, 42:12, 43:11, 44:9, 91:25, 92:4, 92:24, 93:4, 96:20, 97:14, 99:9
**investigations** [3] - 26:16, 83:8, 92:8
**investigative** [5] - 82:4, 82:8, 82:9, 82:22, 96:24
**invitation** [1] - 38:24
**involved** [12] - 34:14, 35:4, 35:25, 40:5, 43:2, 50:20, 54:7, 80:7, 82:3, 96:9, 98:9, 98:14
**involves** [2] - 52:15, 97:18
**iPhone** [1] - 37:13
**iPod** [1] - 51:12
**irrelevant** [2] - 5:18, 10:18
**issuance** [2] - 96:10, 96:11
**issue** [13] - 5:8, 7:19, 38:1, 62:21, 68:4, 72:20, 77:11, 77:19, 94:18, 94:19, 95:4, 96:14, 107:15
**issued** [13] - 26:14, 81:3, 86:12, 96:15, 96:20, 97:15, 97:23, 99:6, 100:8, 102:7, 106:10, 106:22, 106:24
**issues** [17] - 7:11, 8:19, 9:20, 12:5, 40:20, 43:15, 51:17, 63:17, 72:13, 77:6,

78:12, 79:20, 81:4, 82:22, 92:18, 93:14, 94:8
**issuing** [1] - 90:15
**it'll** [1] - 4:19
**item** [2] - 103:18, 105:5
**Item** [1] - 90:11
**items** [1] - 94:9
**itself** [4] - 35:4, 87:11, 99:12, 100:1

## J

**January** [45] - 26:9, 26:11, 38:11, 38:21, 39:6, 39:14, 41:17, 41:19, 41:24, 42:15, 42:21, 43:3, 43:12, 43:22, 43:25, 44:17, 49:25, 51:23, 52:4, 75:10, 80:1, 80:6, 80:14, 81:5, 81:11, 82:14, 83:13, 85:13, 86:11, 87:7, 88:11, 97:4, 97:8, 97:15, 97:25, 98:3, 98:5, 98:6, 98:11, 98:15, 99:11, 103:9
**job** [3] - 52:24, 76:16, 81:21
**jobs** [2] - 82:25, 83:2
**Joint** [1] - 80:13
**JUDGE** [1] - 1:11
**judge** [5] - 11:12, 30:16, 65:20, 68:23
**judges** [3] - 30:23, 60:17, 61:8
**July** [3] - 1:6, 65:14, 109:10
**June** [3] - 83:12, 93:11, 96:18
**jurisdiction** [3] - 76:24, 79:12, 79:20
**Juror** [26] - 15:3, 15:6, 15:9, 15:12, 15:15, 15:18, 16:1, 17:2, 17:3, 17:4, 17:5, 17:7, 17:8, 17:11, 17:12, 17:13, 21:19, 21:22, 21:23, 21:24, 21:25, 22:2, 22:3, 22:4, 22:6, 22:7
**juror** [9] - 15:22, 15:23, 17:6, 17:18, 21:17, 22:1, 22:5, 36:20
**jurors** [22] - 7:6,

10:21, 11:3, 15:20, 17:9, 22:16, 23:5, 23:7, 23:9, 24:6, 24:10, 24:20, 25:12, 25:16, 30:21, 30:22, 33:4, 34:20, 36:19, 37:8, 37:24, 60:17
**jurors'** [1] - 24:22
**JURY** [2] - 1:10, 50:12
**jury** [53] - 7:7, 7:23, 9:12, 11:15, 21:16, 22:8, 22:19, 23:11, 23:14, 23:15, 24:16, 25:9, 25:19, 26:5, 30:16, 33:18, 34:3, 34:22, 34:25, 35:2, 35:6, 35:15, 35:16, 37:23, 56:6, 63:9, 66:18, 67:2, 69:6, 69:25, 71:5, 71:6, 71:9, 73:9, 73:15, 73:23, 74:1, 74:13, 76:20, 77:20, 82:6, 84:15, 88:8, 94:5, 96:19, 98:20, 101:5, 101:12, 101:20, 102:14, 108:4, 108:20
**Jury** [1] - 3:4
**justification** [11] - 65:9, 65:11, 65:12, 65:17, 65:24, 66:8, 68:6, 69:5, 69:6, 69:22
**justifications** [1] - 48:6

## K

**keep** [4] - 16:23, 37:25, 69:9, 108:1
**keeping** [1] - 52:24
**kept** [4] - 14:4, 66:8, 69:2, 69:5
**key** [1] - 54:9
**kind** [5] - 22:20, 33:19, 63:12, 84:25, 92:18
**kinds** [2] - 80:25, 92:17
**knowledge** [1] - 98:6
**known** [1] - 51:20
**KRISTIN** [2] - 74:10, 75:7
**Kristin** [8] - 3:11, 40:5, 53:3, 53:7, 53:16, 55:18, 74:5, 75:7

# L

**ladies** [5] - 39:16, 50:11, 98:20, 101:19, 108:4
**last** [7] - 11:23, 17:14, 32:25, 38:7, 61:18, 69:20, 71:18
**launched** [1] - 85:16
**LAW** [1] - 1:22
**law** [34] - 7:24, 10:1, 26:3, 28:5, 29:18, 30:3, 30:20, 30:21, 31:13, 33:6, 35:25, 36:19, 39:19, 40:15, 48:9, 49:3, 66:15, 66:16, 69:25, 70:6, 70:18, 70:21, 70:23, 71:23, 77:1, 80:7, 81:7, 83:23, 83:25, 85:18, 88:18, 89:15, 90:25, 93:21
**laws** [16] - 39:25, 40:2, 40:10, 40:13, 41:13, 41:16, 42:7, 43:13, 49:16, 75:20, 75:21, 77:6, 79:12, 79:14, 80:21, 80:24
**lawyer** [11] - 25:23, 32:5, 32:11, 32:12, 32:17, 53:2, 53:4, 53:7, 53:17, 53:25, 54:21
**lawyer's** [3] - 31:24, 31:25, 32:13
**lawyering** [1] - 69:16
**lawyers** [6] - 29:6, 30:7, 31:12, 32:9, 53:18
**lay** [1] - 88:1
**lays** [1] - 88:3
**lead** [1] - 79:8
**leader** [1] - 51:3
**leading** [4] - 38:16, 43:3, 44:22, 98:14
**leads** [2] - 79:10, 107:9
**learn** [2] - 39:1, 46:11
**learned** [1] - 42:13
**least** [4] - 5:17, 10:3, 38:5, 71:17
**leave** [3] - 34:10, 103:23, 105:8
**leaving** [1] - 50:19
**led** [1] - 39:6
**left** [6] - 11:3, 50:18, 51:9, 71:16, 80:8, 96:2

**legal** [13] - 23:25, 30:18, 35:19, 36:2, 36:6, 36:15, 39:16, 44:6, 63:17, 77:21, 81:25, 82:7, 82:22
**legalese** [1] - 52:10
**legally** [1] - 38:19
**legislation** [1] - 81:6
**legislative** [1] - 83:19
**legitimate** [1] - 68:17
**legwork** [1] - 96:24
**leisure** [1] - 51:15
**Lesley** [8] - 4:3, 11:6, 23:4, 23:8, 23:13, 34:19, 63:9, 73:22
**letter** [30] - 8:9, 8:19, 9:14, 9:17, 12:5, 45:19, 45:20, 45:25, 46:19, 46:21, 47:1, 47:8, 47:9, 47:22, 55:10, 55:12, 55:13, 55:16, 65:6, 65:10, 65:14, 65:15, 77:11, 92:9, 94:9, 94:11, 100:20, 100:21, 101:2, 101:4
**letters** [39] - 4:23, 4:24, 5:5, 6:12, 6:19, 7:4, 12:9, 13:2, 13:5, 13:6, 13:10, 13:17, 13:23, 48:17, 48:18, 48:23, 49:1, 55:8, 65:1, 65:2, 65:4, 66:7, 66:13, 66:21, 67:17, 68:10, 68:21, 69:2, 69:3, 69:13, 69:19, 71:1, 71:17, 72:3, 72:8, 72:11, 72:17, 73:3
**lifeblood** [1] - 52:17
**light** [2] - 7:13
**limit** [1] - 5:11
**limitation** [1] - 5:17, 101:7
**limited** [4] - 5:21, 93:4, 93:23, 100:18
**limiting** [2] - 67:25, 68:2
**line** [6] - 102:13, 102:14, 103:5, 106:2, 106:3, 106:13
**lines** [4] - 30:1, 102:9, 103:5, 103:19
**linking** [1] - 67:17
**Lisa** [1] - 109:12
**LISA** [2] - 2:1, 109:3
**list** [4] - 10:21, 15:20, 37:15, 91:6
**listed** [1] - 89:23

**listen** [5] - 23:21, 37:2, 37:3, 61:10, 71:25
**listener** [1] - 51:14
**listening** [2] - 24:14, 61:9
**lists** [1] - 89:7
**living** [2] - 97:4, 97:8
**local** [1] - 88:18
**location** [1] - 34:8
**locked** [1] - 24:24
**lodged** [1] - 11:20
**logistics** [1] - 11:14
**look** [25] - 14:23, 25:6, 36:2, 66:19, 71:1, 84:1, 84:2, 85:11, 86:5, 87:14, 88:4, 88:24, 89:8, 90:8, 90:19, 91:2, 92:5, 96:12, 99:12, 100:1, 103:12, 103:25, 104:25, 105:24, 106:18
**looked** [5] - 4:17, 4:18, 13:2, 87:10, 95:20
**looking** [3] - 77:6, 86:21, 93:20
**looks** [4] - 84:12, 96:3, 100:8, 105:14
**loose** [1] - 98:5
**lunch** [1] - 7:4

# M

**maintained** [1] - 42:20
**maintains** [1] - 107:10
**major** [1] - 51:24
**majority** [2] - 55:24, 60:12
**malign** [1] - 90:5
**malleable** [2] - 5:14, 8:5
**manages** [1] - 107:11
**managing** [1] - 81:23
**mandate** [1] - 85:15
**mandated** [1] - 38:19
**mandatory** [2] - 38:25, 79:4
**manner** [2] - 30:18, 79:6
**marshal** [1] - 34:19
**Marshals** [1] - 106:5
**Maryland** [1] - 1:21
**mask** [2] - 74:12, 96:2

**mass** [1] - 38:11
**matter** [3] - 25:10, 55:24, 76:22
**matters** [4] - 7:17, 103:21, 104:1, 105:7
**MATTHEW** [1] - 1:18
**meals** [1] - 108:17
**mean** [15] - 5:10, 5:22, 6:20, 8:2, 15:22, 44:1, 68:12, 69:11, 77:3, 78:3, 80:23, 97:11, 102:25, 104:2, 107:8
**meaning** [2] - 44:4, 46:8
**means** [8] - 29:9, 33:2, 35:13, 35:23, 48:13, 103:1, 105:1, 107:9
**meant** [1] - 24:1
**measure** [3] - 83:19, 85:2, 91:10
**measures** [9] - 81:9, 81:12, 90:17, 90:19, 90:24, 91:7, 91:12, 91:16, 91:18
**media** [9] - 37:1, 37:18, 50:20, 50:21, 51:10, 51:24, 97:10, 97:11, 108:7
**meetings** [2] - 43:2, 107:10
**member** [10] - 40:4, 52:18, 52:20, 76:13, 76:14, 76:15, 81:18, 81:19, 106:4
**members** [20] - 34:24, 41:1, 43:4, 52:25, 56:1, 60:11, 60:13, 76:6, 76:12, 78:15, 78:17, 79:19, 81:13, 81:18, 81:24, 82:7, 85:18, 85:20, 105:12, 107:9
**memorialize** [1] - 44:8
**memory** [5] - 24:18, 24:19, 24:20, 31:9, 32:7
**mention** [3] - 14:13, 28:17, 28:19
**mentioned** [13] - 25:23, 27:10, 32:24, 35:2, 53:3, 55:11, 55:15, 63:18, 75:22, 85:25, 92:9, 99:22, 100:17
**mentions** [1] - 88:23
**merely** [1] - 34:15
**messages** [3] -

35:14, 35:15, 44:24
**met** [2] - 60:19, 95:7
**method** [1] - 10:25
**methods** [1] - 77:10
**Metro** [1] - 49:7
**might** [20] - 4:5, 5:12, 9:23, 25:14, 25:22, 36:19, 38:16, 38:20, 39:2, 41:9, 42:13, 43:21, 44:25, 49:13, 51:25, 52:11, 83:22, 95:3, 97:14, 98:6
**mind** [3] - 9:22, 37:25, 87:5
**mine** [1] - 5:25
**minute** [4] - 60:25, 99:12, 103:25, 106:18
**minutes** [5] - 17:23, 63:10, 63:12, 73:14, 73:17
**misheard** [1] - 4:17
**misleading** [1] - 36:12
**missed** [2] - 16:21, 47:16
**misspoke** [1] - 4:16
**mistake** [5] - 16:16, 48:15, 49:5, 71:23, 72:4
**mistake-of-law** [1] - 71:23
**misunderstood** [1] - 4:16
**mobilize** [1] - 86:19
**MOLLY** [1] - 1:14
**moment** [3] - 76:17, 96:12, 103:3
**Montgomery** [1] - 1:24
**months** [5] - 52:4, 52:6, 66:20, 83:13
**moreover** [1] - 36:18
**morning** [6] - 7:9, 7:10, 43:20, 43:22, 108:18
**most** [8] - 10:3, 25:17, 47:1, 51:24, 68:10, 77:19, 83:7
**motion** [7] - 55:20, 63:20, 63:21, 64:12, 64:21, 64:24
**motions** [2] - 31:11, 62:24
**motivated** [1] - 86:15
**motivation** [1] - 90:6
**move** [1] - 84:14
**moved** [1] - 71:3
**moves** [1] - 100:10
**moving** [1] - 61:17

593

**MR** [49] - 4:8, 4:11, 4:13, 6:1, 6:3, 10:11, 11:12, 11:14, 12:3, 12:10, 12:13, 12:15, 12:20, 13:1, 13:7, 13:11, 14:9, 14:15, 15:4, 15:10, 15:16, 16:20, 17:14, 17:21, 22:12, 50:10, 50:13, 60:9, 61:8, 63:16, 64:22, 64:24, 66:3, 66:5, 67:18, 67:24, 68:14, 69:10, 69:14, 69:22, 70:6, 70:11, 72:19, 72:22, 73:2, 73:13, 84:16, 97:17, 100:12

**MS** [85] - 6:5, 6:15, 6:25, 7:16, 8:8, 8:15, 8:22, 9:3, 9:10, 9:13, 9:18, 9:25, 10:5, 10:7, 10:23, 13:16, 13:21, 14:17, 14:21, 15:1, 15:7, 15:13, 16:14, 16:19, 17:20, 22:10, 38:6, 56:2, 61:4, 62:6, 62:10, 63:1, 63:4, 66:12, 67:8, 67:11, 67:13, 70:15, 70:20, 71:19, 73:24, 74:4, 74:16, 74:22, 74:25, 75:2, 84:3, 84:5, 84:14, 84:20, 85:8, 85:10, 86:6, 86:8, 86:25, 87:3, 87:15, 87:17, 88:5, 88:7, 89:1, 89:4, 89:20, 89:22, 90:9, 90:12, 90:21, 90:23, 91:3, 91:5, 96:4, 96:7, 97:19, 99:4, 99:5, 100:2, 100:6, 100:10, 101:10, 101:15, 102:1, 102:4, 105:25, 106:1, 107:24

**multipage** [1] - 84:9, 84:21, 101:21

**multiple** [4] - 39:9, 76:3, 85:17, 97:24

**must** [23] - 16:15, 27:2, 27:12, 28:13, 31:1, 31:3, 31:5, 32:12, 32:17, 32:21, 33:13, 33:25, 34:23, 35:3, 35:5, 35:10, 35:15, 35:18, 36:21, 37:2, 37:3, 37:4

# N

**name** [4] - 25:21, 52:7, 53:3, 75:5
**named** [1] - 40:5
**narratives** [1] - 86:18
**nation** [1] - 49:16
**national** [2] - 86:12, 88:19
**nationwide** [1] - 50:23
**natural** [1] - 33:24
**nature** [3] - 9:16, 63:6, 68:3
**navy** [1] - 96:3
**Navy** [3] - 50:17, 50:18, 50:19
**necessary** [3] - 6:24, 7:15, 79:5
**need** [17] - 11:21, 12:20, 35:1, 40:20, 41:5, 63:19, 64:9, 65:25, 67:25, 68:2, 72:24, 73:14, 74:14, 77:8, 79:7, 79:13, 87:19
**needed** [9] - 14:3, 23:6, 38:7, 38:10, 38:18, 39:13, 45:8, 85:3, 85:4
**needs** [6] - 7:2, 40:14, 40:18, 49:19, 64:15, 79:17
**negotiate** [1] - 54:22
**negotiated** [1] - 53:18
**negotiating** [1] - 55:9
**negotiation** [1] - 54:24
**negotiations** [1] - 54:14
**networking** [1] - 33:10
**never** [4] - 4:16, 8:12, 28:5, 80:22
**New** [1] - 51:21
**news** [4] - 37:18, 50:22, 51:20, 95:18
**newspaper** [2] - 36:24, 95:14
**next** [9] - 4:6, 6:22, 37:20, 46:18, 52:1, 60:10, 84:24, 87:16, 89:2
**NICHOLS** [1] - 1:10
**night** [2] - 32:25, 98:3
**nine** [1] - 66:20

**nobody** [1] - 60:21
**noncompliance** [1] - 68:12
**Northwest** [3] - 1:16, 2:3, 109:14
**nose** [1] - 49:12
**note** [4] - 4:4, 15:21, 16:17, 62:16
**notebook** [1] - 24:9
**notebooks** [4] - 24:15, 24:24, 25:1, 25:4
**notes** [10] - 24:10, 24:11, 24:12, 24:17, 24:20, 24:22, 25:6, 31:9, 44:24, 109:5
**nothing** [2] - 33:20, 66:21
**noticed** [2] - 24:8, 25:8
**notifications** [5] - 37:12, 37:16, 37:17, 37:18, 108:8
**Notifications** [1] - 37:14
**notified** [1] - 45:21
**notify** [2] - 45:5, 45:10
**notwithstanding** [1] - 9:23
**November** [1] - 52:20
**NPR** [1] - 51:21
**nullification** [1] - 67:1
**number** [9] - 4:22, 15:22, 15:23, 21:17, 21:18, 64:2, 68:19, 77:10, 81:4
**numbers** [1] - 17:18

# O

**oath** [2] - 44:2, 44:4
**object** [2] - 32:9, 32:14
**objected** [1] - 72:24
**objecting** [1] - 32:11
**objection** [15] - 4:21, 10:24, 32:16, 53:10, 54:1, 55:2, 55:4, 56:2, 61:4, 62:19, 73:10, 84:16, 97:17, 100:12
**objections** [8] - 5:23, 11:18, 11:19, 13:10, 31:12, 32:12, 73:6, 86:15
**obligations** [2] - 62:17, 63:4

**obtaining** [1] - 79:2
**obviously** [4] - 4:20, 17:8, 17:22, 102:8
**occasions** [1] - 50:17
**occurred** [2] - 8:13, 38:17
**October** [37] - 8:9, 8:19, 8:24, 9:2, 26:16, 26:17, 26:19, 26:21, 43:20, 43:23, 45:15, 45:24, 46:19, 46:24, 47:1, 47:6, 47:12, 47:23, 48:1, 48:4, 48:12, 53:22, 53:24, 54:12, 55:12, 55:18, 65:8, 67:17, 70:8, 99:18, 99:20, 99:22, 99:23, 104:13, 104:23, 105:19, 106:22
**OF** [5] - 1:1, 1:3, 1:10, 1:15, 1:22
**offense** [5] - 27:13, 28:9, 28:10, 28:12, 28:14
**offenses** [1] - 27:9
**offer** [3] - 29:25, 67:1, 71:1
**offered** [1] - 68:3
**offering** [2] - 6:10, 6:12
**offers** [1] - 32:10
**OFFICE** [1] - 1:15
**office** [6] - 40:9, 50:25, 52:22, 54:12, 104:8, 105:15
**Office** [1] - 55:24
**officers** [1] - 80:8
**OFFICES** [1] - 1:22
**official** [2] - 38:13, 109:12
**Official** [1] - 2:1
**officials** [2] - 76:7, 93:22
**often** [4] - 51:19, 54:22, 79:2, 83:20
**once** [3] - 11:15, 30:3, 42:11
**one** [42] - 9:20, 9:23, 16:22, 25:5, 28:16, 36:23, 41:24, 42:17, 43:20, 46:23, 48:9, 48:10, 51:19, 52:2, 53:5, 53:23, 54:20, 55:10, 55:14, 55:15, 60:21, 60:23, 62:25, 68:19, 72:20, 79:22, 82:25, 85:13, 86:22, 87:25, 88:4, 89:9,

89:21, 90:8, 99:2, 100:4, 101:11, 104:8, 106:12, 107:18
**one-hour-and-15-minute** [1] - 61:23
**ones** [2] - 60:19, 73:4
**ongoing** [2] - 36:25, 54:14
**online** [1] - 90:4
**open** [7] - 7:10, 8:5, 21:14, 37:25, 60:7, 71:16, 72:13
**opened** [6] - 6:8, 65:2, 65:11, 65:22, 70:3, 72:11
**opening** [30] - 3:5, 7:21, 7:25, 10:4, 10:12, 10:18, 11:21, 12:12, 13:15, 13:18, 13:22, 14:7, 14:14, 28:24, 28:25, 29:1, 29:3, 29:4, 29:7, 30:8, 38:5, 50:8, 55:4, 55:11, 63:22, 64:4, 65:4, 66:9, 67:19, 70:16
**Opening** [1] - 3:6
**openings** [2] - 22:22, 22:23
**opens** [1] - 70:7
**operate** [1] - 29:25
**operations** [2] - 83:21, 90:5
**opinion** [2] - 31:15, 31:18
**opportunity** [2] - 28:24, 29:14
**option** [1] - 41:7
**optional** [1] - 38:23
**orally** [1] - 12:23
**order** [12] - 5:1, 11:4, 21:16, 27:1, 38:19, 39:17, 54:7, 54:8, 62:24, 79:11, 107:10, 107:22
**ordered** [6] - 12:4, 12:25, 13:1, 54:2, 54:3, 54:6
**orderly** [2] - 30:17, 49:12
**orders** [3] - 39:7, 39:20, 49:20
**organization** [1] - 90:6
**organizations** [2] - 40:19, 51:21
**otherwise** [2] - 64:8, 108:10
**ought** [1] - 66:6

594

**outlets** [1] - 51:24
**outside** [4] - 33:15, 34:4, 36:8, 56:6
**overhear** [1] - 34:11
**overhearing** [1] - 34:5
**overnight** [2] - 24:25, 25:2
**overruled** [1] - 61:7
**oversight** [8] - 75:20, 76:24, 77:2, 79:16, 82:2, 83:4, 83:8, 92:8
**overturn** [1] - 98:18
**own** [8] - 24:19, 24:20, 35:22, 36:5, 36:18, 40:24, 40:25, 79:21

**P**

**p.m** [6] - 1:7, 23:12, 48:1, 48:5, 74:2, 108:21
**page** [13] - 12:5, 84:23, 87:16, 89:2, 89:3, 100:13, 100:17, 100:18, 101:1, 101:11, 101:17, 101:19, 101:20
**Page** [13] - 3:4, 3:5, 3:6, 86:7, 87:1, 89:2, 90:9, 90:22, 91:4, 100:17, 101:16, 102:2, 102:5
**PAGE** [1] - 3:13
**pages** [6] - 25:4, 48:16, 52:10, 87:19, 89:21
**papers** [1] - 27:16
**paragraph** [3] - 85:9, 85:12, 86:10
**paragraphs** [3] - 84:24, 85:1, 85:2
**paraphrasing** [1] - 68:22
**part** [15] - 33:22, 39:24, 40:8, 75:12, 75:14, 75:15, 75:16, 75:18, 76:1, 80:14, 82:3, 83:7, 86:20, 87:18
**participated** [1] - 44:21
**participating** [1] - 97:25
**particular** [4] - 11:3, 28:8, 28:12, 73:7
**parties** [6] - 17:23, 34:1, 34:9, 36:5, 36:9,

98:15
**parts** [2] - 40:7, 75:23
**party** [2] - 18:2, 32:13
**pass** [3] - 40:2, 40:10, 41:16
**passed** [3] - 43:14, 60:12, 83:19
**passes** [3] - 39:24, 83:23
**patience** [1] - 23:19
**pay** [1] - 31:5
**peaceful** [3] - 80:3, 88:15, 98:17
**pejorative** [1] - 68:13
**pencil** [1] - 24:9
**pendency** [1] - 37:16
**pending** [1] - 64:25
**people** [34] - 7:8, 22:17, 24:12, 33:25, 35:4, 35:5, 35:25, 38:12, 39:23, 39:25, 40:6, 40:9, 40:20, 41:2, 43:2, 43:3, 43:4, 43:5, 44:18, 44:21, 46:4, 49:16, 49:24, 64:19, 77:17, 78:1, 78:2, 78:21, 92:19, 92:20, 92:21, 93:15, 99:14, 104:19
**per** [1] - 62:16
**perceived** [1] - 86:17
**peremptories** [3] - 7:6, 10:19, 10:20
**peremptory** [7] - 14:20, 15:3, 15:6, 15:9, 15:12, 15:15, 15:18
**perhaps** [2] - 14:25, 67:15
**permission** [1] - 74:17
**permit** [1] - 24:10
**permitted** [5] - 24:15, 25:2, 32:24, 32:25, 35:21
**perpetual** [1] - 52:21
**perpetuity** [1] - 72:1
**person** [4] - 25:20, 27:1, 94:15, 94:22
**personally** [1] - 95:7
**perspective** [3] - 5:24, 12:2, 63:7
**persuade** [1] - 98:1
**pertinent** [1] - 27:17
**phase** [1] - 81:3
**phone** [3] - 35:7, 37:13, 37:21
**phones** [2] - 37:19,

108:7
**phony** [1] - 69:6
**photo** [1] - 36:2
**physical** [1] - 85:18
**picked** [1] - 35:1
**piece** [2] - 61:1, 73:7
**pitch** [1] - 65:4
**place** [4] - 42:4, 103:11, 104:5, 104:7
**plain** [1] - 36:13
**Plaintiff** [1] - 1:4
**plan** [6] - 7:21, 7:25, 10:24, 13:21, 13:25, 74:17
**planned** [1] - 44:22
**plans** [1] - 42:4
**platform** [2] - 97:10, 97:11
**platforms** [1] - 90:4
**played** [1] - 97:24
**podcast** [7] - 42:22, 51:12, 51:13, 51:16, 97:12, 98:3
**podcasts** [1] - 51:19
**point** [11] - 5:3, 8:9, 8:11, 12:20, 54:9, 60:10, 61:5, 95:4, 107:25, 108:2
**Police** [1] - 88:17
**policies** [1] - 80:21
**policy** [2] - 51:8, 90:25
**political** [4] - 51:1, 51:17, 51:22
**politics** [9] - 50:24, 51:16, 51:20, 52:17, 52:22, 52:25, 61:2, 61:3, 61:11
**pool** [1] - 7:7
**popup** [1] - 103:4
**position** [5] - 5:4, 6:6, 60:22, 100:20, 101:3
**positions** [2] - 83:6, 101:23
**possession** [1] - 37:21
**possible** [1] - 89:21
**possibly** [2] - 50:9, 108:9
**posting** [2] - 33:10, 35:12
**posts** [1] - 14:10
**potential** [5] - 5:12, 5:17, 81:10, 91:6, 91:15
**potentially** [2] - 76:25, 81:13
**power** [4] - 80:3, 81:1, 88:15, 98:18

**powers** [2] - 82:2, 82:9
**Pratt** [1] - 1:20
**precedents** [1] - 82:1
**preceding** [1] - 44:18
**precise** [2] - 5:15, 69:16
**preclude** [2] - 10:2, 10:3
**prejudice** [1] - 64:12
**Preliminary** [1] - 3:4
**preliminary** [4] - 7:17, 23:10, 23:20, 24:4
**prepared** [2] - 5:3, 5:11
**preparedness** [1] - 88:16
**presence** [2] - 37:24, 56:6
**present** [4] - 5:19, 29:17, 30:5, 105:10
**presented** [7] - 27:7, 29:16, 35:19, 36:14, 36:15, 36:16, 37:5
**preserved** [3] - 4:21, 5:23, 73:6
**presidency** [1] - 51:2
**President** [5] - 42:17, 43:6, 51:3, 51:4, 51:7
**president** [5] - 42:20, 43:7, 72:2, 83:25, 98:10
**presidential** [9] - 38:14, 42:1, 42:18, 42:23, 80:15, 81:15, 85:16, 86:17, 98:1
**press** [1] - 85:20
**presumed** [1] - 27:24
**presumption** [1] - 27:25
**pretrial** [4] - 12:12, 12:18, 13:20, 22:19
**prevent** [1] - 91:12
**prevented** [1] - 39:12
**previously** [1] - 26:6
**primary** [1] - 85:22
**principles** [2] - 35:20, 49:23
**private** [1] - 98:15
**privately** [3] - 18:4, 22:14, 108:13
**privilege** [31] - 5:18, 13:24, 46:2, 46:4, 46:8, 46:13, 46:16, 46:22, 47:11, 55:5, 65:5, 65:14, 65:15, 65:20, 67:20, 68:1, 68:15, 68:24, 69:4,

69:10, 70:5, 70:19, 70:22, 71:2, 71:8, 71:14, 71:20, 71:24
**privileged** [1] - 65:13
**privileges** [1] - 70:9
**problem** [1] - 69:15
**problems** [3] - 40:14, 40:16, 78:25
**procedure** [2] - 45:4, 45:10
**procedures** [4] - 26:3, 45:13, 82:1, 90:25
**proceed** [3] - 4:5, 28:15, 64:8
**Proceedings** [1] - 108:22
**proceedings** [13] - 18:7, 21:13, 23:1, 23:12, 56:5, 60:6, 62:2, 73:19, 74:2, 74:7, 77:13, 108:21, 109:6
**process** [6] - 25:19, 41:15, 54:24, 60:10, 88:22, 94:5
**processes** [5] - 39:4, 49:12, 80:10, 80:12, 81:14
**produce** [12] - 27:16, 28:6, 29:19, 52:8, 77:22, 92:20, 99:17, 103:20, 104:11, 104:12, 104:14, 104:22
**produced** [1] - 109:6
**producing** [1] - 26:20
**production** [2] - 78:19, 104:5
**proffer** [2] - 5:2, 5:20
**proffered** [1] - 68:11
**proffers** [1] - 5:12
**promise** [1] - 44:5
**promote** [1] - 81:9
**prompted** [1] - 87:10
**proof** [2] - 28:5, 60:20
**properly** [2] - 31:21, 32:11
**proposal** [3] - 4:5, 4:10, 6:23
**propose** [1] - 77:2
**proposed** [3] - 7:3, 54:21, 76:25
**prosecution** [4] - 39:10, 47:4, 48:1, 55:20
**protect** [3] - 42:8, 49:19, 81:8

595

**protective** [1] - 62:24
**prove** [8] - 27:11, 27:12, 28:3, 28:6, 28:12, 29:19, 54:9, 54:16
**proven** [2] - 28:1, 28:7
**provide** [35] - 7:21, 26:15, 27:16, 27:22, 34:23, 37:15, 38:20, 41:11, 43:21, 45:22, 46:23, 47:17, 48:10, 48:22, 53:11, 74:18, 77:17, 77:18, 78:1, 78:2, 78:4, 78:11, 79:11, 92:3, 92:21, 99:21, 99:23, 99:24, 104:5, 104:15, 104:16, 104:19, 106:21, 106:23, 106:25
**provided** [8] - 45:10, 50:22, 52:9, 74:20, 74:22, 94:1, 101:2, 108:16
**providing** [2] - 26:19, 80:18
**public** [7] - 17:25, 77:16, 80:18, 97:9, 97:23, 98:1, 98:8
**publicity** [1] - 37:6
**publish** [2] - 84:15, 100:11
**published** [1] - 101:5
**pulled** [1] - 52:5
**purports** [1] - 65:15
**purpose** [8] - 72:12, 80:16, 83:10, 85:5, 88:8, 100:18, 101:22, 101:24
**purposes** [13] - 5:19, 6:16, 10:17, 14:6, 46:10, 72:6, 72:9, 87:12, 87:24, 88:1, 88:3, 91:22, 100:14
**Purposes** [2] - 87:22, 88:23
**pursue** [2] - 10:15, 10:16
**push** [3] - 37:12, 37:17, 108:8
**put** [10] - 11:15, 22:16, 29:8, 29:20, 39:9, 51:13, 62:7, 64:21, 66:17, 66:18
**putting** [3] - 55:21, 63:2, 63:8

## Q

**qualified** [2] - 10:21, 15:21
**quash** [1] - 63:21
**questions** [22] - 12:8, 29:10, 29:12, 29:21, 30:8, 30:18, 43:24, 44:4, 45:24, 46:25, 47:13, 47:19, 48:11, 77:16, 78:5, 78:13, 78:16, 78:18, 79:11, 94:13, 94:22, 95:3
**quickly** [1] - 101:11
**quite** [3] - 53:5, 67:18, 108:16
**quote** [2] - 86:13, 88:13

## R

**radio** [1] - 36:24
**raise** [6] - 7:19, 10:12, 13:3, 25:25, 46:4, 66:6
**raised** [5] - 55:2, 55:4, 67:20, 68:14, 68:15
**rally** [1] - 44:18
**ramping** [1] - 96:25
**randomly** [1] - 25:11
**RDR** [3] - 2:1, 109:3, 109:12
**reach** [4] - 9:12, 50:23, 51:18, 51:22
**read** [13] - 21:17, 37:2, 37:3, 41:8, 85:12, 86:9, 88:8, 103:6, 103:18, 106:2, 108:7, 108:10
**reading** [1] - 87:5
**ready** [4] - 6:25, 10:19, 18:5, 63:12
**reaffirmed** [1] - 66:13
**real** [1] - 66:25
**realize** [1] - 25:22
**really** [10] - 6:15, 39:25, 46:9, 63:11, 66:12, 69:7, 71:2, 71:12, 71:22
**reason** [10] - 7:18, 14:2, 14:3, 64:4, 64:5, 65:7, 66:5, 66:22, 66:25, 68:17
**reasonable** [9] - 27:8, 27:12, 28:2,

28:4, 28:8, 28:13, 54:10, 54:16, 60:20
**reasons** [8] - 6:21, 54:1, 68:11, 86:22, 99:1, 100:14, 108:8, 108:15
**rebuttal** [1] - 29:25
**receive** [2] - 34:23, 103:1
**RECEIVED** [1] - 3:13
**receives** [1] - 95:1
**recent** [1] - 68:10
**recently** [1] - 70:10
**recess** [9] - 22:16, 22:22, 22:25, 33:16, 61:18, 62:1, 73:15, 73:18, 108:3
**recesses** [1] - 24:25
**recipient** [2] - 77:21, 94:17
**recognize** [2] - 25:22, 107:2
**recommendation** [1] - 79:16
**recommendations** [5] - 80:21, 81:3, 81:5, 85:25, 90:17
**record** [17] - 4:2, 7:1, 7:2, 17:25, 21:17, 22:18, 23:3, 32:20, 62:4, 62:8, 62:16, 63:2, 63:8, 73:21, 75:6, 96:4, 108:15
**recorded** [1] - 44:7
**recordings** [1] - 44:24
**records** [5] - 14:10, 26:15, 26:20, 104:16, 104:22
**recruiting** [1] - 44:17
**Red** [1] - 3:8
**redacted** [3] - 4:25, 5:2, 6:13
**redactions** [4] - 4:18, 5:6, 5:20, 7:3
**redirect** [2] - 29:15, 29:23
**reelection** [2] - 52:19, 52:25
**refer** [4] - 13:16, 28:16, 41:20, 55:24
**reference** [5] - 13:22, 74:19, 86:1, 87:19
**referred** [2] - 87:9, 88:13
**referring** [6] - 28:18, 28:20, 47:25, 80:5, 94:15, 101:18
**refers** [1] - 32:6
**reflect** [1] - 96:4

**reflected** [1] - 101:23
**reforms** [2] - 81:14, 81:15
**refrain** [1] - 7:24
**refusal** [4] - 27:21, 47:2, 47:3, 48:8
**refuse** [1] - 34:18
**refused** [7] - 27:20, 39:2, 39:4, 49:8, 49:15, 49:23, 70:24
**refusing** [3] - 13:23, 48:10, 48:11
**refute** [1] - 36:10
**region** [1] - 88:19
**regular** [2] - 25:16, 41:2
**regulations** [4] - 80:21, 80:24, 81:6, 91:1
**reiterated** [1] - 47:9
**rejected** [3] - 39:7, 47:10, 70:23
**rejecting** [1] - 14:3
**relate** [1] - 97:14
**related** [2] - 81:5, 86:2
**relating** [16] - 26:15, 37:18, 38:20, 43:21, 44:16, 81:14, 82:1, 82:8, 88:11, 88:14, 88:16, 89:13, 89:14, 97:24, 98:10, 99:18
**release** [1] - 7:7
**relevance** [1] - 62:19
**relevant** [10] - 5:13, 8:20, 8:22, 9:1, 46:10, 62:14, 72:13, 79:9, 92:5, 99:9
**rely** [4] - 24:20, 31:8, 32:7, 36:16
**relying** [1] - 36:8
**remain** [1] - 24:24
**remaining** [1] - 73:3
**remains** [1] - 27:25
**remarks** [1] - 24:1
**remember** [5] - 24:13, 24:17, 32:7, 47:6, 62:25
**remind** [1] - 93:10
**reminded** [1] - 68:4
**remove** [1] - 65:15
**removed** [4] - 65:14, 65:17, 65:22, 69:10
**renew** [1] - 64:23
**renewal** [1] - 64:13
**repeat** [2] - 17:14, 108:5
**replace** [1] - 24:19
**report** [4] - 34:12, 88:10, 90:15, 90:16

**reported** [1] - 52:1
**REPORTED** [1] - 2:1
**reportedly** [1] - 98:16
**reporter** [1] - 74:13
**Reporter** [2] - 2:1, 109:12
**reporting** [1] - 51:25
**reports** [4] - 36:24, 37:3, 41:8, 98:8
**representations** [2] - 12:1, 12:18
**representative** [1] - 88:21
**Representatives** [14] - 26:10, 40:8, 41:17, 52:16, 52:18, 62:11, 75:15, 75:22, 75:24, 83:17, 102:11, 103:11, 104:8, 106:6
**represented** [2] - 13:20, 102:21
**representing** [1] - 102:18
**represents** [1] - 32:13
**request** [4] - 38:24, 55:18, 60:23, 60:25
**requesting** [1] - 104:13
**requests** [5] - 41:6, 77:4, 77:5, 77:11, 92:9
**require** [14] - 28:6, 29:18, 35:10, 77:18, 78:2, 78:19, 78:25, 92:19, 92:20, 92:21, 99:14, 99:16, 105:17, 107:16
**required** [23] - 26:20, 29:18, 39:11, 43:19, 44:15, 45:2, 49:3, 49:24, 78:10, 99:17, 99:19, 103:16, 103:19, 103:20, 104:10, 104:12, 104:14, 105:2, 105:5, 105:6, 105:14, 105:19, 106:25
**requirement** [3] - 46:17, 47:17, 47:18
**requirements** [2] - 44:12, 46:13
**requires** [2] - 47:3, 77:21
**requiring** [1] - 41:11
**research** [10] - 35:23, 35:24, 35:25, 36:18, 40:13, 40:23, 41:8, 41:16, 44:10,

96:24
**reserved** [1] - 64:25
**resilience** [1] - 91:19
**resolution** [18] - 55:21, 55:23, 60:11, 83:16, 83:18, 83:19, 84:1, 84:12, 85:4, 85:6, 86:1, 86:24, 87:11, 88:1, 90:14, 91:9, 91:23, 93:25
**resolutions** [1] - 83:22
**resolve** [2] - 7:17, 73:10
**resolved** [3] - 11:23, 12:7, 12:11
**respect** [5] - 13:14, 54:6, 60:16, 62:13, 89:16
**respond** [1] - 36:8
**responded** [2] - 14:3, 73:6
**response** [2] - 70:14, 88:17
**responses** [1] - 13:9
**responsibilities** [7] - 24:6, 30:15, 30:16, 81:22, 81:24, 83:2, 94:4
**responsibility** [4] - 30:17, 30:22, 31:20, 32:14
**result** [6] - 5:16, 5:22, 5:24, 6:18, 36:19, 47:3
**resulted** [2] - 80:8, 85:17
**results** [3] - 42:1, 44:20, 98:18
**retail** [1] - 5:5
**retire** [3] - 25:9, 27:23, 30:4
**return** [8] - 5:14, 8:5, 8:24, 9:1, 9:8, 9:9, 104:20, 106:5
**returned** [2] - 26:5, 51:10
**review** [1] - 82:10
**reviewed** [1] - 91:23
**reviewing** [2] - 81:4, 104:4
**RIANE** [1] - 1:19
**Road** [1] - 1:23
**Robert** [3] - 102:15, 102:17, 102:19
**role** [5] - 60:16, 64:1, 76:19, 82:3, 82:21
**roles** [1] - 97:24
**Room** [1] - 2:3
**room** [3] - 24:16, 37:23, 53:22
**rude** [1] - 34:15
**rule** [4] - 30:18, 31:11, 32:20, 32:22
**rules** [13] - 23:25, 26:3, 30:3, 36:7, 36:22, 42:7, 48:9, 49:8, 78:17, 80:21, 81:25, 82:8, 91:1
**ruling** [3] - 63:19, 64:9, 72:25
**run** [4] - 15:19, 49:19, 50:25, 51:2
**running** [2] - 52:21, 97:10

## S

**safety** [1] - 42:9
**satellite** [1] - 36:2
**saw** [1] - 81:11
**scene** [1] - 36:3
**schedule** [3] - 103:21, 103:25, 104:11
**scheduled** [2] - 80:10, 80:13
**Schoen** [9] - 4:16, 10:10, 14:8, 14:11, 28:21, 63:14, 67:6, 70:25, 72:6
**SCHOEN** [32] - 1:22, 1:22, 10:11, 11:12, 11:14, 12:3, 12:10, 12:13, 12:15, 12:20, 13:1, 13:7, 13:11, 14:9, 14:15, 63:16, 64:22, 64:24, 66:3, 66:5, 67:18, 67:24, 68:14, 69:10, 69:14, 69:22, 70:6, 70:11, 72:19, 72:22, 73:2, 73:13
**scope** [2] - 91:24, 92:4
**scores** [1] - 80:7
**screen** [2] - 84:7, 100:4
**seal** [4] - 18:6, 21:15, 60:8, 106:6
**search** [1] - 45:6
**Seat** [38] - 16:2, 16:3, 16:4, 16:5, 16:6, 16:7, 16:8, 16:9, 16:10, 16:11, 16:12, 16:13, 16:18, 16:23, 17:1, 17:2, 17:3, 17:4, 17:5, 17:6, 17:7, 17:8, 17:11, 17:12, 21:19, 21:20, 21:21, 21:22, 21:23, 21:24, 21:25, 22:1, 22:2, 22:3, 22:4, 22:5, 22:6, 22:7
**seat** [3] - 21:18, 25:14, 25:15
**seated** [3] - 7:6, 23:17, 38:8
**seats** [6] - 11:4, 17:19, 18:1, 22:9, 24:7, 25:11
**second** [8] - 15:9, 15:11, 27:16, 64:24, 86:7, 89:3, 98:19, 104:25
**Section** [7] - 87:1, 87:6, 87:16, 87:22, 87:23, 88:24, 89:5
**section** [2] - 87:4, 90:2
**security** [2] - 42:9, 91:18
**Security** [1] - 86:12
**see** [40] - 7:18, 24:7, 34:13, 37:15, 38:15, 39:3, 41:18, 41:23, 42:15, 43:18, 43:19, 44:15, 45:3, 45:9, 45:18, 45:20, 45:25, 46:1, 46:10, 46:15, 46:18, 46:21, 47:6, 47:9, 47:15, 47:21, 48:16, 48:20, 48:23, 49:1, 49:4, 65:4, 65:6, 65:9, 84:6, 84:23, 95:22, 102:8, 106:14, 108:18
**seek** [2] - 17:24, 78:24
**seeking** [3] - 94:10, 94:11
**seeks** [2] - 73:7, 94:13
**seemingly** [1] - 36:1
**Select** [44] - 26:8, 26:14, 27:15, 27:18, 41:19, 53:2, 53:9, 54:19, 55:19, 75:10, 75:12, 76:13, 79:1, 79:22, 79:25, 81:21, 81:23, 82:14, 82:21, 84:13, 87:7, 87:9, 87:24, 89:6, 92:12, 92:14, 92:18, 93:6, 93:19, 93:20, 94:3, 96:15, 96:22, 99:10, 99:17, 99:20, 102:21, 103:8, 104:3, 104:21, 107:5, 107:7, 107:11, 107:16
**selected** [2] - 25:11, 33:18
**selection** [1] - 25:19
**Senate** [5] - 40:8, 40:24, 75:25, 83:20, 83:21
**send** [3] - 35:14, 45:19, 94:19
**sense** [2] - 24:5, 80:23
**sent** [4] - 13:23, 46:19, 47:8, 47:22
**September** [8] - 26:13, 38:7, 43:16, 96:16, 106:8, 106:9, 106:15, 106:16
**series** [2] - 7:3, 12:1
**serious** [1] - 25:17
**serve** [2] - 34:2, 106:5
**served** [4] - 50:16, 50:18, 51:5, 51:7
**Service** [1] - 106:5
**service** [9] - 23:19, 34:25, 35:6, 35:15, 35:16, 38:3, 102:23, 102:25, 106:15
**services** [1] - 37:18
**serving** [1] - 108:15
**session** [1] - 61:23
**SESSION** [1] - 1:5
**Session** [1] - 80:13
**set** [9] - 40:24, 41:18, 41:23, 52:13, 55:19, 55:20, 73:24, 80:9, 99:18
**sets** [2] - 40:23, 52:14
**setting** [1] - 41:15
**Settings** [1] - 37:14
**seven** [1] - 50:17
**several** [4] - 84:24, 86:2, 89:7, 92:6
**sharing** [2] - 81:10, 89:18
**shifts** [1] - 28:5
**shirt** [1] - 96:3
**short** [4] - 4:19, 5:8, 41:21, 42:16
**show** [17] - 13:21, 39:3, 44:12, 45:12, 48:4, 49:15, 51:5, 51:10, 53:6, 53:20, 54:8, 55:6, 64:19, 68:11, 68:20, 73:8
**showed** [1] - 50:4
**showing** [3] - 53:13, 53:21, 68:19
**shown** [1] - 69:4
**shows** [2] - 30:11, 51:24
**sic]** [1] - 71:2
**side** [6] - 4:9, 30:5, 30:11, 32:9, 56:3, 76:1
**side-bar** [1] - 56:3
**sidebar** [2] - 18:8, 56:6
**sign** [1] - 107:16
**signature** [9] - 107:1, 107:2, 107:4, 107:5, 107:14, 107:18, 107:19, 107:20, 107:23
**signed** [1] - 83:25
**significance** [2] - 107:13, 107:21
**SILVERMAN** [1] - 1:19
**similar** [3] - 36:3, 82:25, 83:2
**similarities** [2] - 78:8, 78:9
**simple** [2] - 36:1, 49:15
**simply** [3] - 4:19, 5:7, 49:20
**simultaneous** [1] - 12:24
**simultaneously** [1] - 12:25
**single** [7] - 45:22, 52:18, 52:20, 54:18, 54:19, 54:20, 60:25
**sit** [1] - 76:6
**sites** [1] - 33:10
**sits** [1] - 76:5
**sitting** [5] - 16:2, 25:9, 33:19, 95:25, 96:2
**six** [2] - 11:2, 83:13
**slim** [2] - 55:23, 60:12
**slow** [1] - 61:21
**SLUTKIN** [1] - 1:19
**small** [1] - 87:18
**snake** [1] - 10:25
**social** [3] - 33:10, 37:18, 108:7
**sole** [2] - 31:20, 60:17
**solely** [1] - 37:4
**solutions** [1] - 79:1
**someone** [12] - 25:23, 33:14, 34:17, 41:7, 41:11, 42:13, 54:2, 54:3, 78:14, 94:7, 94:19, 94:20
**sometimes** [9] - 28:16, 31:24, 46:4,

74:13, 77:11, 77:12, 77:14, 105:12
**soon** [4] - 34:12, 37:9, 69:7, 69:10
**sorry** [1] - 97:5
**sort** [1] - 5:2
**sought** [2] - 27:17, 38:23
**sound** [1] - 7:16
**sources** [1] - 36:12
**speaking** [1] - 76:23
**special** [1] - 41:18
**specific** [1] - 81:3
**specifically** [2] - 13:2, 76:16
**specified** [2] - 99:18, 103:12
**speculate** [1] - 32:18
**speech** [2] - 62:13, 62:21
**speech-or-debate** [1] - 62:21
**spell** [1] - 75:5
**spend** [1] - 17:23
**split** [1] - 89:21
**staff** [25] - 34:20, 40:4, 41:2, 52:25, 54:21, 75:9, 76:9, 76:11, 76:14, 76:15, 78:16, 78:18, 81:18, 81:20, 81:22, 81:23, 81:25, 85:19, 96:22, 96:23, 97:1, 105:12, 105:13, 106:4, 107:11
**staffer** [1] - 55:19
**stage** [3] - 52:13, 52:14, 52:15
**stand** [3] - 29:10, 29:21, 61:13
**stands** [2] - 6:7, 52:19
**start** [5] - 4:6, 22:21, 24:3, 44:14, 61:19
**starting** [2] - 84:25, 103:5
**state** [4] - 30:21, 75:5, 88:18, 108:15
**statement** [9] - 9:13, 14:11, 28:25, 29:1, 29:3, 29:7, 32:6, 38:5, 61:10
**Statements** [2] - 3:5, 3:6
**statements** [8] - 28:25, 29:4, 29:7, 30:7, 30:9, 31:14, 70:17, 98:4
**STATES** [4] - 1:1, 1:3, 1:11, 1:15
**States** [20] - 2:2,

28:18, 39:17, 52:16, 75:11, 75:25, 80:2, 85:17, 86:14, 87:8, 88:12, 88:17, 91:19, 93:21, 102:12, 103:9, 103:11, 106:5, 106:7, 109:13
**status** [1] - 12:15
**stenographic** [1] - 109:5
**step** [2] - 28:23, 60:10
**STEPHEN** [1] - 1:6
**Stephen** [5] - 26:7, 38:8, 52:5, 95:5, 102:15
**steps** [4] - 4:6, 6:23, 82:8, 82:22
**Steve** [17] - 50:13, 50:16, 51:9, 51:16, 53:4, 53:7, 53:10, 53:17, 53:23, 54:3, 54:10, 54:17, 55:2, 55:14, 61:14, 95:19, 95:23
**still** [6] - 7:20, 8:10, 11:17, 70:24, 96:25, 97:1
**stop** [3] - 41:25, 43:5, 44:19
**stopping** [2] - 107:25, 108:2
**strategies** [2] - 98:11, 98:17
**strategist** [1] - 51:1
**strategy** [2] - 51:8, 51:22
**Street** [2] - 1:16, 1:20
**strengthen** [1] - 91:18
**stressing** [1] - 35:10
**stricken** [3] - 15:21, 32:20, 32:23
**strike** [3] - 10:25, 15:25, 18:2
**strikes** [2] - 17:9, 17:25
**stuck** [1] - 49:7
**subcommittee** [4] - 103:22, 103:24, 105:8, 105:9
**subject** [3] - 54:14, 70:21, 76:22
**subjects** [4] - 76:23, 94:12, 99:18, 104:3
**submit** [2] - 37:22, 38:1
**submitted** [2] - 33:1, 33:3
**Subpart** [1] - 89:24

**subpoena** [87] - 8:11, 9:4, 9:5, 26:14, 27:17, 27:20, 38:19, 38:22, 39:11, 39:17, 39:23, 40:5, 41:10, 43:16, 43:18, 44:15, 45:2, 45:4, 45:9, 45:22, 46:7, 46:11, 47:3, 47:16, 47:24, 48:17, 48:20, 52:2, 52:5, 52:9, 52:13, 52:14, 53:2, 53:5, 53:10, 53:13, 54:4, 54:7, 54:13, 54:15, 54:19, 54:23, 70:19, 77:20, 77:24, 78:1, 79:4, 94:7, 94:8, 94:14, 94:16, 94:17, 94:18, 94:19, 94:22, 95:1, 95:4, 96:10, 96:11, 96:12, 96:14, 96:15, 96:21, 97:15, 97:23, 99:7, 99:12, 99:15, 100:1, 100:8, 102:7, 102:10, 102:23, 103:16, 104:5, 104:11, 104:25, 105:2, 105:24, 106:10, 106:21, 106:24, 107:1, 107:14, 107:18, 107:21, 107:22
**Subpoena** [1] - 102:9
**subpoena's** [4] - 46:13, 46:17, 47:17, 47:18
**subpoenaed** [7] - 27:15, 64:5, 64:7, 95:20, 96:9, 97:2, 97:6
**subpoenas** [16] - 46:4, 77:19, 78:19, 78:20, 92:14, 92:15, 92:17, 92:23, 93:1, 93:2, 93:14, 99:14, 107:13, 107:15, 107:16, 107:17
**Subsection** [4] - 90:1, 90:18, 90:20, 90:22
**subsection** [1] - 90:25
**substitute** [1] - 24:2
**successful** [1] - 50:21
**sudden** [1] - 67:3
**suddenly** [1] - 25:22
**suggest** [4] - 7:22,

66:18, 66:21, 67:2
**suggested** [2] - 8:5, 98:5
**suggesting** [3] - 10:5, 10:6, 43:1
**suggestion** [2] - 8:15, 62:23
**suggests** [1] - 31:24
**Suite** [2] - 1:20, 1:23
**summaries** [1] - 31:7
**summarized** [1] - 26:25
**support** [1] - 30:6
**supported** [1] - 50:4
**supposed** [1] - 47:7
**surrounding** [1] - 98:11
**sustain** [1] - 32:16
**swear** [3] - 22:19, 23:9, 23:13
**SWORN** [1] - 74:10
**sworn** [5] - 7:9, 23:15, 30:20, 31:22, 108:14
**system** [4] - 49:16, 49:18, 60:16, 86:13

**T**

**table** [2] - 5:19, 5:21
**targeted** [1] - 91:14
**task** [1] - 43:13
**tasked** [6] - 42:7, 80:18, 80:20, 86:21, 91:7, 99:10
**technology** [1] - 90:4
**tee** [1] - 71:4
**telephone** [2] - 13:8, 14:10
**television** [1] - 36:25
**temporal** [1] - 9:16
**tempted** [1] - 37:2
**tend** [1] - 69:21
**tendency** [1] - 33:24
**tenders** [7] - 15:1, 15:4, 15:7, 15:10, 15:13, 15:16, 74:25
**Tenders** [1] - 11:10
**tends** [1] - 68:10
**term** [2] - 36:2, 94:18
**terms** [1] - 52:3
**terror** [1] - 85:19
**terrorism** [3] - 86:12, 91:13, 91:20
**terrorist** [5] - 88:12, 88:14, 89:13, 90:3, 90:7
**testified** [7] - 79:21, 81:17, 92:6, 96:8,

96:17, 98:22, 99:13
**testify** [8] - 63:24, 64:2, 72:15, 78:14, 98:25, 105:6, 105:17, 105:22
**testifying** [3] - 64:3, 78:6, 78:13
**testimony** [34] - 24:13, 25:24, 26:17, 26:19, 27:16, 27:17, 31:2, 31:6, 31:7, 31:23, 32:2, 52:8, 60:25, 61:10, 64:17, 66:7, 72:7, 72:10, 72:12, 77:5, 77:12, 77:14, 77:22, 78:2, 78:3, 78:4, 78:20, 92:21, 94:1, 94:11, 99:21, 99:24, 100:24, 106:25
**text** [2] - 35:15, 44:24
**texting** [1] - 35:12
**THE** [125] - 1:1, 1:10, 1:14, 1:15, 1:18, 3:10, 4:1, 4:3, 4:10, 4:12, 5:10, 6:2, 6:4, 6:11, 6:17, 7:1, 8:1, 8:14, 8:18, 8:23, 9:6, 9:11, 9:16, 9:19, 10:2, 10:6, 10:8, 10:17, 10:24, 11:7, 11:9, 11:10, 11:13, 11:23, 12:7, 12:11, 12:14, 12:17, 12:24, 13:4, 13:9, 13:12, 13:19, 14:6, 14:12, 14:16, 14:19, 14:22, 15:2, 15:5, 15:8, 15:11, 15:14, 15:17, 16:15, 16:21, 17:16, 17:22, 18:5, 21:15, 22:11, 22:13, 22:15, 23:2, 23:4, 23:13, 23:17, 23:18, 50:7, 50:12, 56:4, 60:8, 61:5, 61:16, 62:3, 62:5, 62:9, 62:22, 63:3, 63:5, 63:11, 63:14, 64:11, 64:23, 66:1, 66:4, 66:10, 67:6, 67:9, 67:12, 67:14, 67:23, 68:9, 69:9, 69:13, 69:15, 70:2, 70:7, 70:12, 70:16, 71:10, 72:5, 72:21, 73:1, 73:3, 73:14, 73:20, 73:22, 73:25, 74:3, 74:8, 74:11, 74:15, 74:20, 74:24, 84:17,

598

96:6, 97:21, 97:22,
98:19, 100:16, 101:6,
101:13, 101:19, 108:2
  **theme** [1] - 67:19
  **theory** [2] - 7:23, 8:3
  **there'll** [2] - 54:5,
55:25
  **therefore** [1] - 70:7
  **Thereupon** [4] -
22:25, 62:1, 73:18,
74:6
  **thinker** [1] - 51:1
  **thinking** [2] - 11:14,
17:24
  **third** [5] - 15:14,
15:17, 27:19, 91:15,
105:24
  **THOMPSON** [1] -
1:19
  **Thompson** [7] -
4:24, 63:23, 64:14,
64:16, 65:16, 69:3,
107:6
  **thorough** [1] - 45:6
  **thoroughly** [1] -
79:19
  **thoughts** [1] - 35:16
  **threat** [2] - 86:14,
94:2
  **threats** [1] - 81:10
  **three** [9] - 9:20, 13:3,
51:19, 63:12, 73:2,
73:3, 88:3, 103:5,
106:24
  **throughout** [2] -
28:1, 28:5
  **thumbing** [1] - 49:11
  **ties** [1] - 42:20
  **time-limited** [1] -
93:4
  **timeframe** [1] - 70:9
  **timely** [1] - 79:2
  **title** [1] - 102:8
  **today** [13] - 6:21,
7:12, 12:22, 39:21,
63:22, 64:4, 65:2,
67:22, 74:18, 78:6,
78:8, 95:23, 107:25
  **together** [5] - 40:10,
51:6, 51:13, 52:5,
55:21
  **tomorrow** [2] - 7:9,
108:19
  **took** [2] - 24:7, 68:23
  **tool** [2] - 41:10, 44:9
  **tools** [3] - 41:4, 92:6,
92:11
  **top** [7] - 51:2, 51:7,
51:19, 87:22, 90:11,
91:4, 102:8

  **topic** [1] - 4:19
  **topics** [4] - 43:10,
44:16, 44:17, 45:2
  **torn** [1] - 25:5
  **total** [1] - 82:17
  **touch** [1] - 43:1
  **touching** [3] -
103:21, 104:1, 105:6
  **transcribed** [1] -
77:13
  **transcript** [3] - 13:2,
109:5, 109:6
  **TRANSCRIPT** [1] -
1:10
  **transcripts** [1] - 31:7
  **transfer** [2] - 80:3,
88:15, 98:18
  **transition** [1] - 86:17
  **trauma** [1] - 85:19
  **trial** [31] - 7:10, 22:9,
23:23, 23:24, 24:1,
24:3, 24:10, 25:3,
25:16, 25:22, 27:2,
27:6, 27:23, 28:1,
28:5, 28:15, 28:23,
30:17, 30:19, 31:11,
32:4, 32:5, 35:22,
36:25, 37:6, 37:7,
37:16, 39:1, 40:4,
43:18, 60:18
  **TRIAL** [1] - 1:10
  **tries** [1] - 34:17
  **trouble** [1] - 44:6
  **true** [8] - 9:18, 67:23,
99:3, 100:25, 101:4,
101:25, 109:4, 109:5
  **Trump** [11] - 42:17,
51:3, 51:4, 51:7, 65:1,
65:10, 65:14, 65:21,
69:10, 69:11, 69:19
  **Trump's** [1] - 43:6
  **truth** [6] - 44:5, 44:6,
68:3, 78:10, 98:22,
100:20
  **try** [2] - 35:5, 79:8
  **trying** [4] - 67:2,
78:25, 97:19, 99:10
  **turn** [11] - 25:14,
34:14, 37:12, 37:17,
41:7, 44:16, 45:2,
45:9, 46:5, 79:22,
108:8
  **turned** [1] - 43:6
  **tweeting** [1] - 35:12
  **Twitter** [1] - 33:11
  **two** [22] - 6:16, 9:20,
11:4, 17:15, 17:23,
26:7, 27:11, 40:7,
43:19, 43:22, 44:12,
50:16, 51:12, 51:19,

52:19, 53:18, 82:19,
89:21, 99:22, 102:9,
103:19, 106:23
  **types** [2] - 32:3,
94:12
  **typically** [4] - 76:9,
78:14, 83:23, 94:5

## U

  **U.S** [18] - 26:9,
26:10, 26:12, 38:12,
39:18, 39:22, 41:20,
42:3, 48:22, 49:3,
50:5, 52:17, 55:24,
75:12, 75:15, 75:18,
75:20
  **uncommon** [1] -
94:25
  **under** [21] - 7:23,
18:6, 21:15, 36:22,
40:14, 44:2, 44:4,
60:8, 62:17, 62:18,
70:22, 76:23, 78:17,
79:12, 79:20, 87:22,
88:23, 89:5, 89:10,
89:23, 102:9
  **underscores** [1] -
94:2
  **understood** [4] -
6:17, 14:1, 63:5, 99:1
  **undoubtedly** [1] -
33:18
  **unequivocally** [2] -
53:12, 65:3
  **unfair** [1] - 36:9
  **unfortunately** [1] -
36:11
  **united** [1] - 2:2
  **UNITED** [4] - 1:1,
1:3, 1:11, 1:15
  **United** [19] - 28:18,
39:17, 52:16, 75:11,
75:25, 80:2, 85:16,
86:14, 87:8, 88:12,
88:17, 91:19, 93:21,
102:12, 103:9,
103:11, 106:4, 106:7,
109:13
  **unlawfully** [1] -
47:25
  **unless** [2] - 4:7, 28:1
  **unlikely** [1] - 34:17
  **unredacted** [3] -
4:25, 6:14, 6:20
  **up** [37] - 6:6, 6:7, 7:5,
11:5, 15:24, 24:11,
30:19, 36:2, 36:13,
38:17, 40:9, 40:23,

40:24, 41:1, 41:15,
41:18, 41:23, 43:3,
44:22, 46:11, 46:14,
49:15, 53:21, 61:13,
63:18, 64:19, 69:4,
71:4, 72:16, 73:24,
81:17, 84:3, 86:10,
89:21, 96:25, 98:14,
100:2
  **urgency** [2] - 79:2,
93:19
  **US-00410** [1] -
100:13
  **uses** [1] - 92:15

## V

  **valid** [6] - 7:23,
10:14, 68:24, 70:22,
71:8, 107:22
  **validate** [1] - 85:15
  **value** [1] - 30:25
  **variety** [1] - 41:4
  **various** [1] - 44:16
  **Vaughn** [15] - 3:5,
6:4, 11:6, 22:9, 28:19,
38:4, 50:7, 53:3, 62:5,
66:4, 66:11, 70:12,
70:14, 74:3, 98:19
  **VAUGHN** [83] - 1:14,
6:5, 6:15, 6:25, 7:16,
8:8, 8:15, 8:22, 9:3,
9:10, 9:13, 9:18, 9:25,
10:5, 10:7, 10:23,
13:16, 13:21, 14:17,
15:1, 16:14, 16:19,
17:20, 22:10, 38:6,
56:2, 61:4, 62:6,
62:10, 63:1, 63:4,
66:12, 67:8, 67:11,
67:13, 70:15, 70:20,
71:19, 73:24, 74:4,
74:16, 74:22, 74:25,
75:2, 84:3, 84:5,
84:14, 84:20, 85:8,
85:10, 86:6, 86:8,
86:25, 87:3, 87:15,
87:17, 88:5, 88:7,
89:1, 89:4, 89:20,
89:22, 90:9, 90:12,
90:21, 90:23, 91:3,
91:5, 96:4, 96:7,
97:19, 99:4, 99:5,
100:2, 100:6, 100:10,
101:10, 101:15,
102:1, 102:4, 105:25,
106:1, 107:24
  **verbal** [1] - 78:11
  **verbally** [1] - 78:5
  **verbatim** [1] - 108:6

  **verdict** [5] - 25:4,
30:4, 31:19, 33:12,
50:3
  **versions** [1] - 6:16
  **videotaped** [1] -
51:11
  **view** [6] - 5:19, 6:22,
36:2, 65:25, 69:21,
74:11
  **viewed** [1] - 8:12
  **viewer** [1] - 51:14
  **violence** [5] - 43:14,
51:25, 86:19, 91:12,
91:20
  **violent** [4] - 86:15,
91:13, 91:21, 93:21
  **voluntarily** [1] -
62:12
  **voluntary** [4] - 41:6,
62:17, 63:6, 77:24
  **vote** [3] - 38:13,
80:14, 81:15
  **voted** [2] - 55:23,
56:1, 60:11
  **vs** [1] - 1:5

## W

  **wait** [1] - 29:2
  **waiting** [2] - 23:7,
24:9
  **waived** [3] - 8:3, 8:6,
9:24
  **waiver** [2] - 7:23, 8:2
  **waives** [1] - 72:2
  **waiving** [1] - 8:21
  **walk** [1] - 34:14
  **wants** [3] - 18:2,
53:19, 67:1
  **warn** [1] - 35:5
  **warned** [2] - 47:20,
47:24
  **warning** [2] - 47:5,
48:25
  **warnings** [1] - 39:9
  **warranted** [1] - 5:20
  **Washington** [6] -
1:6, 1:17, 2:4, 98:16,
106:7, 109:14
  **watch** [3] - 37:2,
37:3, 51:15
  **ways** [1] - 77:7
  **wearing** [1] - 96:1
  **website** [2] - 14:10,
35:13
  **week** [7] - 8:25, 9:9,
55:14, 55:15, 69:20,
71:18
  **weeks** [2] - 106:23,

106:24
weigh [1] - 31:1
weight [1] - 30:24
welcome [1] - 87:20
well-known [1] - 51:20
whereas [4] - 84:25, 85:1, 85:13, 86:11
white [2] - 28:22, 48:16
White [2] - 51:9, 98:9
WHITE [2] - 1:19, 1:19
whole [1] - 49:14
wholesale [1] - 5:5
widely [1] - 52:1
Willard [1] - 98:16
willful [1] - 27:21
willfully [3] - 26:19, 54:10, 54:11
winner [1] - 38:13
wish [3] - 24:11, 25:7, 33:22
withdrawn [1] - 32:17
WITNESS [3] - 74:10, 74:15, 97:22
witness [33] - 25:23, 29:10, 31:4, 44:3, 54:19, 54:21, 61:11, 61:18, 61:19, 61:23, 62:7, 63:18, 63:23, 67:7, 67:10, 67:15, 67:16, 68:10, 72:7, 72:15, 72:23, 73:8, 73:9, 74:6, 74:19, 74:25, 94:13, 94:14, 94:15, 96:5, 98:21, 100:3, 106:5
witness's [2] - 72:10, 72:12
WITNESSES [1] - 3:10
witnesses [20] - 24:14, 25:20, 29:9, 29:12, 29:21, 31:1, 31:2, 31:6, 31:13, 31:23, 34:2, 34:9, 34:13, 62:10, 62:23, 77:14, 77:15, 78:16, 78:18, 79:10
witnesses' [1] - 63:7
word [3] - 45:16, 54:3, 55:4
words [4] - 5:6, 8:5, 51:12, 68:1
workers [1] - 34:24
works [3] - 41:22, 71:24, 94:6
write [5] - 14:21,

14:22, 25:7, 33:9, 35:6
writing [2] - 69:2, 69:3
written [1] - 32:23
wrote [1] - 69:11

# Y

year [4] - 38:7, 82:13, 93:7, 93:12
years [5] - 42:15, 50:17, 52:19, 82:17, 82:24
yesterday [2] - 12:4, 12:21
York [1] - 51:21
yourself [4] - 34:7, 48:2, 49:14, 61:1
yourselves [1] - 25:16

# Z

Zelda [1] - 1:23
zoom [10] - 85:9, 86:7, 87:1, 88:6, 89:2, 90:10, 90:21, 91:3, 102:13, 103:14
zoomed [2] - 87:18, 87:25