**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


UNITED STATES OF AMERICA,

                                      CR Action
                                      No. 1:21-670

        vs.

STEPHEN K. BANNON,
        Defendant.

_____

IN RE: NON-PARTY SUBPOENAS

NANCY PELOSI, et al,                  MC Action
        Petitioner,                   No. 1:22-60
        vs.

STEPHEN K. BANNON,                    July 11, 2022
        Respondent.                   10:04 a.m.


            TRANSCRIPT OF IN-PERSON MOTIONS HEARING
          **BEFORE THE HONORABLE CARL J. NICHOLS**
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the U.S.:**          **AMANDA ROSE VAUGHN**
                          **MOLLY GULLAND GASTON**
                          **J.P. COONEY**
                           U.S. ATTORNEYS OFC. FOR D.C.
                           555 4th Street NW
                           Washington, DC  20001
                           202-252-1793


**For the Defendant:**     **DAVID I. SCHOEN**
                           DAVID I. SCHOEN, ATTORNEY AT LAW
                           2800 Zelda Road, Suite 100-6
                           Montgomery, AL  36106
                           334-395-6611

APPEARANCES (CONT'D.):

For the Defendant:        **MATTHEW EVAN CORCORAN**

                          SILVERMAN THOMPSON SLUTKIN WHITE
                          201 N. Charles Street, 25th Floor
                          Baltimore, MC  21201
                          410-385-2225

For the Petitioner:       **DOUGLAS LETTER**
                          U.S. HOUSE OF REPRESENTATIVES
                          Office of General Counsel
                          5140 O'Neill House Office Building
                          Washington, DC 20515
                          202-225-9700

                          **MICHELLE KALLEN**
                          OFFICE OF GENERAL COUNSEL
                          U.S. House of Representatives
                          5140 ONeill House Office Building
                          Washington, DC 23219
                          202-225-9700

Reported By:              **LORRAINE T. HERMAN, RPR, CRC**
                          Official Court Reporter
                          U.S. District & Bankruptcy Courts
                          333 Constitution Avenue, NW
                          Room 4700-C
                          Washington, DC 20001
                          lorraine_herman@dcd.uscourts.gov

*** Proceedings recorded by stenotype shorthand and this
      transcript was produced by computer-aided
      transcription.

1          **DEPUTY CLERK:**  Good morning, Your Honor.  This

2    is -- this calendar has two cases this morning.  The first

3    case is criminal case year 2021-670, United States of

4    America versus Stephen K. Bannon.  The second case is

5    Miscellaneous case year 2022-060, In Re:  Nonparty

6    subpoenas, Nancy Pelosi, et al., versus Stephen K. Bannon,

7    who is not present in the courtroom.

8          Counsel, please come forward and introduce

9    yourselves for the record for both cases, beginning with the

10   government.

11         **MS. VAUGHN:**  Good morning, Your Honor.  Amanda

12   Vaughn, J.P. Cooney and Molly Gaston for the United States.

13   Also at counsel's table is FBI Special Agent Frank D'Amico.

14         **THE COURT:**  Ms. Vaughn, good morning.

15         As before, Counsel, whoever is at the podium,

16   please take your masks off.  I think it is helpful for

17   everyone.

18         **MR. SCHOEN:**  Your Honor, Evan Corcoran, David

19   Schoen and Keira Sherper here today for Mr. Bannon.

20         **THE COURT:**  Good morning, Counsel.

21         **MR. SCHOEN:**  Good morning, Your Honor.

22         **MR. LETTER:**  Good morning, Your Honor.  Douglas

23   Letter, General Counsel of the U.S. House of

24   Representatives, and presenting much of the argument today

25   will be Michelle Kallen from the Office of General Counsel.

1          **THE COURT:**  Good morning, counsel.  Ms. Kallen.

2          So obviously we have a number of pretrial motions

3    pending.  We also have the motion to quash filed in the

4    Miscellaneous action that Mr. Letter just mentioned.  Here's

5    how I'd like to proceed.

6          I would like to begin by hearing from the

7    government, from the Department of Justice, on all pending

8    matters.  Then I will hear from the House on the Motion to

9    Quash.  Then I'll hear from Mr. Bannon on all topics.

10         And then I'll hear -- so obviously there are

11   motions that have been filed.  There's the Motion to Quash

12   from the House subpoena recipients.  There are the various

13   motions that have been filed by the parties, some filed by

14   Mr. Bannon and some by the government.

15         Just for the sake of efficiency, I want to deal

16   with all of them together.  It doesn't matter who the Movant

17   is, I want to hear from the government on all topics, then

18   the House, then Mr. Bannon on all topics, and then we'll

19   just go back to the government.  If we need to do a short

20   surrebuttal for Mr. Bannon, we can do that.

21         So with that, Ms. Vaughn, will you be taking the

22   lead?

23         **MS. VAUGHN:**  Your Honor, Ms. Gaston will be taking

24   the lead today, and I'll be addressing on the Motion to

25   Compel.

1          **THE COURT:**  Okay.  Ms. Gaston.

2          **MS. GASTON:**  Good morning, Your Honor.

3          **THE COURT:**  Good morning.

4          Why don't -- let's start, if we could, with what I

5   think is a question -- it's a little unclear to me from the

6   papers, and that is, whether any question -- so, let me back

7   up.

8          I understand the government's position as to the

9   alleged violations of the House Resolution 503 in the

10  composition, formation, et cetera, of the Committee to be,

11  first, that those are defenses; those are not elements of

12  the charge here.

13         And then second -- and this is where I'm a little

14  bit unsure about the government's position.  Is the

15  government's position that those questions present pure

16  questions of law that the jury cannot resolve, or that there

17  is some question embedded in the arguments that Mr. Bannon

18  has made that is for the jury to resolve?

19         **MS. GASTON:**  Yes, Your Honor.  The government's

20  position with those objections, with his procedural

21  objections, is that he waived them --

22         **THE COURT:**  Understood.  I recognize the

23  government has argued that Mr. Bannon has waived them, and I

24  understand that argument.

25         Imagine hypothetically, Mr. Bannon, in his letters

1    to the Committee, you know, asserted reliance on assertion

2    of executive privilege and the like, had also said, By the

3    way, I have the following fundamental problems with the

4    House Committee composition and had raised, clearly before

5    the return date on the Subpoena, all of the objections he

6    now presents -- so let's put waiver to the side.  So they

7    had clearly been teed up and they are defenses in the

8    government's view.

9              Who resolves the question of whether -- assuming

10   all of those things -- whether that defense is legitimate?

11        **MS. GASTON:**  In that circumstances, Your Honor,

12   our position is that those are not things that can be

13   submitted to the jury because that would risk a violation of

14   the Rulemaking Clause because there is a situation in which

15   the jury could interpret the House's rules in a different

16   way than the House itself has interpreted it.

17        **THE COURT:**  Who determines whether the House has,

18   in fact, interpreted the rules in a particular way?

19        **MS. GASTON:**  So the Court would determine whether

20   the House has determined the rule -- whether the rules or

21   the House's interpretation is ambiguous.  In this situation,

22   the interpretation is not ambiguous because the House has

23   spoken, and so --

24        **THE COURT:**  Expressly or implicitly?

25        **MS. GASTON:**  Expressly.

1          **THE COURT:**  In the filings here or somewhere else?

2          **MS. GASTON:**  In the filings here and also through

3     the Committee's practice, Your Honor.  *Yellin* and other

4     decisions stand for the proposition that the Committee's

5     practice and the Committee's consistency with respect to

6     that practice is something that the Court can look to, and

7     this is how the Committee --

8          **THE COURT:**  So the government's view then is,

9     these questions present what would be defenses.  Mr. Bannon

10    waived them, and even if he didn't, they are not defenses

11    that, in this circumstance, that can be presented to the

12    jury because it is up to me to decide whether the rules are

13    ambiguous and what the House's interpretation of the rules

14    is, and to allow the jury to come up with an interpretation

15    different than the House would be to violate the Rulemaking

16    Clause.

17          Do I have all of that right?

18          **MS. GASTON:**  Yes, Your Honor.

19          **THE COURT:**  And so is it also the government's

20    position that the question of whether the rules themselves,

21    House Resolution 503, is ambiguous, that is also a legal

22    question that I have to resolve?

23          **MS. GASTON:**  Your Honor, whether the House --

24    whether the resolution is ambiguous, I would have to ask as

25    to what?  Because I think -- just to reiterate something

1    that I think the government stated in its briefs, but just

2    to make sure that it's absolutely clear, the element of the

3    crime of contempt that is the "authority" element, that is

4    the element under the language "by the authority of either

5    House" is an element that essentially means the scope of the

6    authorized investigation.

7         And if you look -- if you look at the case law

8    that sets forth what that element is, it's cases like

9    *Gojack* that talks about whether a subcommittee to a standing

10   committee has an authorization to conduct a specific

11   investigation.  And I think it's useful to think about why

12   that element is the way it is.

13        So there are standing committees of the Congress

14   that have incredibly broad jurisdiction.  There's the Energy

15   and Commerce Committee, the Ways and Means Committee.  There

16   are all kinds of things that fall under the jurisdictions of

17   those committees.

18        So there can sometimes be a question whether that

19   committee has commenced an authorized investigation and

20   whether that investigation is within the scope of the

21   authority delegated to that committee.

22        That is not so much an issue in the circumstance

23   when there is a special committee that is created for a

24   specific purpose.  And if you look at *Gojack*, it speaks

25   directly to this.

1          So in that case, the Court noted that a

2    subcommittee had not defined the subject of its

3    investigation, but *Gojack* said that it was particularly

4    important for that to happen in a case where there is a

5    standing committee with a broad purpose rather than "a

6    special committee with a specific, narrow mandate."

7          And in this case, there is a specific committee

8    with a specific, narrow mandate.  If you look at the

9    authorizing resolution, it describes exactly what this

10   committee is for.  If you look at the name of this

11   committee, the name is, The Select Committee to Investigate

12   the January 6th Attack on the United States Capitol.  And so

13   that is what this element is, is there an authorization for

14   the House --

15          **THE COURT:**  No, I get that.  I get that.

16          I'm talking about the defense.  Mr. Bannon says

17   that House Resolution 503 also has certain procedural

18   protections to include it requires a certain number of

19   members.

20          He says, There have never been that number of

21   members on the Committee; that's a defense in the

22   government's view.  The question is whether the jury decides

23   any component of that.

24          In prior briefing, I thought the government's

25   position was so long as the rule -- so long as House

1    Resolution 503 is ambiguous, you must defer to the House's

2    later implicit or explicit interpretation of it.

3              My question is, who decides whether it's

4    ambiguous?

5              **MS. GASTON:**  The Court decides whether it's

6    ambiguous.  *Rostenkowski* states that the Court decides

7    whether it's ambiguous.

8              **THE COURT:**  So in no circumstance is the jury to

9    be presented with the question of ambiguity or non-ambiguity

10   as to the Rule?

11             **MS. GASTON:**  Yes.

12             **THE COURT:**  So let's turn then -- I don't need to

13   hear anything more on the rules questions.

14             So I'm happy to hear from you on -- and that was

15   one thing I wanted to make sure we focused on because it

16   wasn't technically within motions that we've never discussed

17   before.  It's a lingering question from motions that we've

18   already argued.

19             **MS. GASTON:**  All right.

20             **THE COURT:**  So feel free to address any of the

21   other motions in the order you would like.

22             **MS. GASTON:**  All right.  Thank you, Your Honor.

23             So just very briefly, continuing on that line of

24   thought, the defendant cannot, in our view, because of these

25   questions of law and the Rulemaking Clause, and because he

1    waived them, raised these objections as defenses at trial.

2            Another thing the government wanted clarity on

3    with respect to questions of law versus questions of fact

4    for the jury is the question of executive privilege.  And

5    there are sort of two executive privilege issues floating

6    about.

7            One is the legal question of whether executive

8    privilege excused the defendant's complete noncompliance

9    with the Subpoena, whether that was -- whether that provided

10   him complete immunity.  And then the separate question is a

11   question I will get to second, which is whether the

12   defendant can claim at trial that his belief --

13           **THE COURT:**  Right.

14           **MS. GASTON:**  -- that executive privilege provided

15   him a defense meant that he did not --

16           **THE COURT:**  Which would go to mens rea rather

17   than, I'll put it this way, a legal excuse or something like

18   it.

19           **MS. GASTON:**  Exactly.

20           So the first thing -- because this doesn't seem to

21   have been teed up directly by the defendant's Motion to

22   Dismiss, we just wanted to point out that as a matter of

23   law -- and this is appropriate for the Court to decide at

24   the Rule 12 phase -- as a matter of law, the Court should

25   decide the question of whether the defendant has a complete

1    privilege against conviction based here on executive

2    privilege.

3            In the *United States versus Covington* Supreme

4    Court case that the government cited in its brief, the

5    Supreme Court found there that it was a legal issue for the

6    trial court to decide whether the defendant had a complete

7    defense to a crime based on his Fifth Amendment privilege.

8            And similarly --

9        **THE COURT:**  As it stands right now, I don't know

10   whether Mr. Bannon is even attempting to make this argument.

11   I didn't see much response to this, and I don't know what

12   his view on this question is.

13       **MS. GASTON:**  Your Honor, I agree.  I don't think

14   it was teed up directly.  And so the government is asking

15   that -- this is -- if --

16       **THE COURT:**  That I get an answer as to whether

17   Mr. Bannon is going to make this argument?

18       **MS. GASTON:**  Yes, Your Honor, because it's a legal

19   issue that cannot be presented to the jury.

20       **THE COURT:**  But it's a legal issue I can resolve,

21   but do I have in front of me the components of the arguments

22   to resolve that question?

23       **MS. GASTON:**  You do, Your Honor.

24           So on the record before this Court, the

25   determination must be that there was not an assertion of

1    executive privilege that allowed the defendant to engage in

2    total noncompliance.

3          And to be clear, you do not have to decide whether

4    there was an unambiguous assertion of executive privilege

5    back at the time.  And you don't have to decide whether the

6    former President had the same ability to do that as the

7    sitting President.  Even if both of those things were true,

8    executive privilege would not provide immunity for the

9    defendant's total noncompliance in this situation.

10         So with respect to the document charge and the

11   document part of the Subpoena, the subpoena called for

12   documents that could not possibly implicate executive

13   privilege.  And so the defendant engaged in total

14   noncompliance, including those provisions of the Subpoena.

15         And then with respect to testimony, even under the

16   Department's articulation of testimonial immunity, which is

17   not recognized by law, the defendant's total noncompliance

18   is not sanctioned.  That applies only to senior government

19   employees.  The defendant still did not show up and did not

20   make question-by-question assertions.

21         And practically, there is no way for a jury to

22   decide the scope of executive privilege.  It's impossible to

23   imagine fashioning jury instructions.

24         I'd note that in the defendant's jury

25   instructions, he sort of mentions executive privilege as

1    something that the jury could consider when it's thinking

2    about what the defendant did here.  But it does not attempt

3    to provide any instruction on how to consider executive

4    privilege.

5           And I don't know if that's because it is

6    impossible to do that, which I think it probably is with

7    respect to a jury trying to make this legal determination of

8    scope, or because it is confusing to the jury to have this

9    penumbra of executive privilege without understanding how to

10   interpret it.

11          **THE COURT:**  Well, I think from the defendant's

12   perspective, to date at least, it's relevant to

13   two questions; one of which we haven't talked about yet at

14   all.  First of all, there is the question of whether

15   executive privilege is essentially an excuse or a

16   justification as a matter of law standing alone.

17          Then there's the question of whether it goes to

18   mens rea.  And then there's the question of whether the

19   assertion provides him with a defense, whether it's

20   entrapment by estoppel or public authority.

21          And at least as I understand it to date, the

22   defendant has focused more on those defenses, though, to

23   some extent, to mens rea.

24          **MS. GASTON:**  Yes.

25          **THE COURT:**  So I think it is, at a minimum right

1   now, unclear to me whether the defendant intends to argue at

2   all that his noncompliance was excused altogether by the

3   assertion of privilege.

4           MS. GASTON:  And, Your Honor, the government is

5   simply saying that that is a legal determination, that is

6   not proper for the jury to make.

7           THE COURT:  Fair enough.

8           MS. GASTON:  So once we've established that that

9   is a legal determination, then the question is whether the

10  defendant can argue at trial that regardless of whether

11  there was an assertion or whether -- whether it provides a

12  complete legal defense --

13          THE COURT:  His mens rea was such --

14          MS. GASTON:  His mens rea was such --

15          THE COURT:  -- that it defeats the mens rea under

16  the statute.

17          MS. GASTON:  And that, Your Honor, is just a

18  mistake of law defense that is not available under --

19          THE COURT:  That's *Licavoli*, in the government's

20  view.

21          MS. GASTON:  Exactly.  As *Licavoli* provides, it's

22  no different from the advice of counsel defense that the

23  government has briefed extensively.  And one of my --

24          THE COURT:  Could it go to default?

25          MS. GASTON:  I'm sorry, Your Honor?

1          **THE COURT:**  Could the question either about

2    executive privilege back in the day or the most recent

3    letters that the government brought to my attention last

4    night, could those be relevant to whether Mr. Bannon made

5    default in October 2021?

6          **MS. GASTON:**  They --

7          **THE COURT:**  It's an element of the offense that

8    the defendant has to make default.

9          **MS. GASTON:**  Yes.  The defendant has to make

10   willful default.  That just means that you --

11         **THE COURT:**  Willful is mens rea.

12         **MS. GASTON:**  Willful is mens rea.  It means he --

13         **THE COURT:**  We talked about that before a lot.

14         **MS. GASTON:**  Exactly.  I won't go over all of it

15   now, but it simply means, he knew he had to appear and he

16   made a deliberate decision not to.

17         The last thing I want to say on that is the

18   defendant has really focused on the word "misunderstanding"

19   in the *Licavoli* decision.  I think probably because he wants

20   to suggest that misunderstanding could be a misunderstanding

21   of the law.

22         But to be clear, the misunderstanding discussed in

23   *Licavoli* was a mistake.  So the phrase in *Licavoli* that that

24   comes from is, "But a failure to respond to a subpoena might

25   be due to many causes other than deliberate intention; e.g.,

1    illness, travel trouble, misunderstanding, et cetera."

2          So the kind of misunderstanding that *Licavoli* is

3    talking about there is you got the day wrong that you were

4    supposed to appear.  You got the place wrong that you were

5    supposed to appear.  You got the time wrong.  There was a

6    misunderstanding on that front.  But otherwise, this is

7    something that, like, misunderstanding could swallow the

8    advice of counsel rule.  It could swallow the willfulness.

9          **THE COURT:**  Putting aside the advice of counsel,

10   would it be relevant, in the government's view, if

11   Mr. Bannon were to introduce evidence that he believed or

12   had been told that the return date on the Subpoena had been

13   moved back or would be moved back?

14         **MS. GASTON:**  Um -- if he thought he was supposed

15   to appear a week later and did not appear, then that would

16   be a mistake.

17         **THE COURT:**  What if -- and this goes to one of the

18   government's motions, which I get we have discussed before

19   as well.

20         Would testimony or evidence that I -- you know, I

21   understood the return date was October 24th, but in my

22   experience, return dates are always negotiable.  And I

23   thought it had been moved or I thought it was going to be

24   moved.  Would that be relevant and admissible?

25         **MS. GASTON:**  It would not, as long as he was in

1    receipt of a subpoena that said he had to appear on a

2    certain date and had no indication that it had actually

3    moved.

4         **THE COURT:**  But wouldn't that go to the jury's

5    decision about whether his statement is credible rather than

6    whether it's relevant and admissible?  I understand your

7    view is that would not be persuasive.

8         But what if Mr. Bannon testified or if someone

9    testified for him, I told Mr. Bannon the return date was

10   very likely to be moved, had been moved, was no longer

11   operative.

12        **MS. GASTON:**  If he was told that it had been

13   moved, that would absolutely be a mistake, and we would

14   expect to see some evidence that when he learned it had not

15   been moved --

16        **THE COURT:**  Might have to proffer some story along

17   these lines --

18        **MS. GASTON:**  Yes.

19        **THE COURT:**  -- but at least hypothetically could

20   be relevant.

21        **MS. GASTON:**  Yes.  And we would just say that the

22   defendant's position throughout this litigation, his counsel

23   have said on the record repeatedly, that that is not what

24   happened here.  It was a deliberate decision not to appear.

25        **THE COURT:**  So now let's talk about the Motion to

1   Exclude the most recent set of letters.  I get the

2   government's view -- as I understand it, the government's

3   view is the willful making of default was completed in

4   October 2021 when the return date for the Subpoena came and

5   went.  And whatever has happened since then is irrelevant to

6   that question.

7              What if Mr. Bannon had offered, two weeks after

8   the return date, November 7th or something like that, to

9   appear?

10             **MS. GASTON:**  Yes, Your Honor.  Ms. Vaughn is

11   handling that one.

12             **THE COURT:**  We can wait.  Why don't we wait.

13             **MS. GASTON:**  We'll hold that.

14             **THE COURT:**  Who's going to address the question of

15   the motion to continue the trial?

16             **MS. GASTON:**  I am.

17             **THE COURT:**  So I've read the papers.  I think

18   Mr. Bannon obviously argues that the press around the

19   January 6th Committee hearings warrants moving of the trial.

20   The fact that there are a lot of unresolved issues, at least

21   as of 10:30 a.m. today, warrants moving the trial.

22             He hasn't yet argued, but I think many people

23   are -- and I'm certainly interested in the government's

24   view -- of whether it makes sense to have a trial on Monday

25   when it's at least an open question whether Mr. Bannon will

1    be testifying in front of the Committee.

2              What's the government's view on that question?

3         **MS. GASTON:**   The government's view on that

4    question, Your Honor, is that the offense was completed at

5    the time that he willfully defaulted both on documents and

6    testimony.  And his decision whether to comply now has no

7    bearing on the criminal case.

8         **THE COURT:**  As you know, and as you say in your

9    papers, this case will not result in -- the relief sought in

10   this case is not an order compelling Mr. Bannon's testimony.

11   I recognized that in the first hearing in this case.

12             What this is is a backward-looking prosecution

13   for, in the government's view, past and complete

14   noncompliance, a completed criminal act that occurred

15   nine months ago.

16             If that's the case, why is there a rush to try

17   this case on Monday rather than a month or two from now,

18   since it is altogether backward-looking in the government's

19   view?

20        **MS. GASTON:**   Your Honor, I think it is important

21   for the purposes of vindicating the statute and Congress'

22   authority in these matters, to quickly adjudicate the

23   criminal matter.

24             And it would be bad precedent if we got into a

25   situation where a defendant could engage in total

1    noncompliance with the Committee, be referred for criminal

2    contempt, have a different branch of government expend

3    considerable resources in preparing --

4         THE COURT:  Branches.

5         MS. GASTON:  Branches.

6         -- expend considerable resources in preparing for

7    a criminal trial, only to have the defendant witness -- on

8    the eve of trial, say, Well, actually, I will comply now, in

9    hopes of the criminal case being dismissed.  That's a

10   different kind of contempt and obstruction, and it sort

11   of -- validating it would not serve the purpose of the

12   statute.

13        THE COURT:  And just to round out the point, the

14   government's view is none of the issues at trial -- let me

15   ask the question a little bit better.  Nothing about

16   Mr. Bannon's offer or the President's most -- the former

17   President's most recent letter or even an agreement by which

18   Mr. Bannon hypothetically does everything the Committee asks

19   of him, would in any way affect this case?

20        MS. GASTON:  That's correct, Your Honor.

21        THE COURT:  Okay.  And, therefore, in the

22   government's view, I should grant the Motion to Exclude

23   Evidence around the letters that were signed over the

24   weekend; that's the government's view?

25        MS. GASTON:  Yes, Your Honor.

1          **THE COURT:**  And what -- could Mr. Bannon argue

2     that -- as I recall, there was a statement or something from

3     the Chairman, from Mr. Thompson, suggesting that they would

4     be open to Mr. Bannon having a change of mind.

5          And why couldn't Mr. Bannon say, Look, I thought I

6     wasn't making default because it was -- they were leaving

7     the door open to my appearance.  My having now accepted that

8     open-door offer is inconsistent with being in default.

9          **MS. GASTON:**  If the defendant had done that a week

10    after his default, if the --

11         **THE COURT:**  Why does that matter?  The default, in

12    the government's view, was consummated on the day the return

13    date came and went.

14         **MS. GASTON:**  It was consummated on the day the

15    return date came and went.  And the Committee gave the

16    defendant, essentially, an opportunity to cure his

17    noncompliance.  He was in default.  The Committee could have

18    immediately referred him for contempt, and the House could

19    have immediately voted for it.

20         Instead, the Committee gave him another

21    opportunity after advising him of the risk of a referral.

22    And so the House giving him that opportunity to cure it back

23    at the -- close in time to his offense does not mean that he

24    has carte blanche to spend years defying and remaining in

25    contempt of the Subpoena only to, on the eve of trial,

1    change his course.

2            **THE COURT:**  Okay.  So again, I apologize.  I've

3    been distracting you from argument.  So go ahead and address

4    all of the issues that are otherwise pending.

5            **MS. GASTON:**  Otherwise, with respect to the Motion

6    to Continue, Your Honor, as the government stated in its

7    briefs, in terms of the reasons that the defendant has

8    articulated to date for a continuance, the first reason was

9    pretrial publicity.

10           And the government's position is that the case law

11   is clear that that can be handled through voir dire, and

12   only in extreme cases can publicity not be handled through

13   voir dire.  And those cases bear no resemblance whatsoever

14   to this.

15           Those are cases like *Rideau*, where the defendant's

16   confession was played on a loop on local television in a

17   small town.  Those are cases like *Sheppard*, where the

18   defendant's pregnant wife had been murdered and it sounds

19   like there was chaos in the courthouse.

20           The media coverage that the defendant has talked

21   about is media coverage of the January 6th hearings.  And as

22   the government stated, those are not about the defendant,

23   and there is not the sort of focused and targeted and

24   prejudicial coverage of the defendant that there is in those

25   other cases where courts have found that voir dire cannot

1     control for prejudice.

2              Next, the next issue was scheduling.  I think the

3     fact that we are here having a motions hearing means that

4     that issue is probably moot because all of the issues the

5     defendant was concerned in his motion were not teed up or

6     not being heard by the Court are being heard by the Court.

7              And then the last one last night was the

8     government's production on Friday, and that was *Jencks*

9     material of agent notes, that the government provided on the

10    deadline that the defendant asked the Court to impose and

11    that the Court imposed.

12             Providing, in an abundance of caution, some phone

13    records that he confirmed in his motion are not relevant to

14    this case, and informing the defendant that more than a

15    decade ago, I worked on the same committee as one of the

16    witnesses in the government's case, and that she and I were

17    members of a book club that I have not been to in more than

18    two years, so -- or approximately two years.

19             So to the extent that the defendant wants to use

20    that in cross-examination, he has the information and he can

21    use it.  He has not articulated what prejudice he suffers

22    from a timely *Jencks* disclosure, the production of

23    admittedly irrelevant materials and information that he can

24    use in cross-examination if he wishes.

25             **THE COURT:**  Okay.

1          How about -- I mean, I have a list.  What's the

2    government's view on Mr. Costello's motion to withdraw?

3          **MS. GASTON:**  The government has no objection to

4    Mr. Costello's motion to withdraw.  I assume we would have

5    objections to various testimony that he might offer if he

6    becomes a witness the way that he has suggested he is

7    withdrawing to become.

8          **THE COURT:**  Fair enough.  Those are evidentiary

9    questions that I'm sure we will take up.

10         **MS. GASTON:**  Yes.

11         **THE COURT:**  All right.

12         So why don't we go through, then -- well, let's go

13   then to the Motion to Compel the Meadows and Scavino

14   Declination Discovery?  Oh, you're not going to handle that.

15         **MS. GASTON:**  No, I'm sorry.

16         **THE COURT:**  Are you doing the Omnibus Motion in

17   Limine the government filed?

18         **MS. GASTON:**  Yes.

19         **THE COURT:**  Well, let's just tick through that.

20   Really, I have the issues.  Why don't you highlight anything

21   that you think is particularly noteworthy or difficult

22   there.

23         **MS. GASTON:**  Absolutely.

24         So first on that, let me just say broadly that

25   there seems to be this idea advanced in the defendant's

1    opposition that the Court can just let the jury hear all

2    kinds of things, some of it irrelevant and prejudicial, and

3    as long as they are instructed afterwards, there is no harm

4    no foul; that's the adversarial process.

5            That is not the way a trial works under the

6    Federal Rules of Evidence.  There are rules for relevance

7    for a reason, and Rule 103 exists for a reason, which

8    provides that the Court should, to the extent practical,

9    conduct a jury trial so that inadmissible evidence is not

10   suggested to the jury by any means; that means, like, not

11   through argument, not through stray comments.  The jury

12   should not be hearing inadmissible evidence.

13           And the government's Motion in Limine, quite

14   frankly, some of the things that the government included in

15   its opening brief were things that seemed obvious to us and

16   we did not expect opposition to them.  So it was a surprise

17   to receive opposition to things like no mention of the

18   potential punishment for the defendant, because that is such

19   a bedrock principle of law.

20           I will tick through very quickly.

21           So in terms of the cross-examination about a

22   witness's political affiliation, we're talking about things

23   here like asking the witness what their voter registration

24   is, like what the party of a member they've worked for is,

25   who they voted for.  And these are not things that the

1    defendant has articulated would lead a witness to slant his

2    or her testimony in the way described in *Abel* that is

3    grounds for appropriate cross-examination for bias.

4         Political affiliation does not say anything about

5    the truthfulness of factual testimony a witness might offer

6    about things like sending a subpoena by email.

7         In terms of the misconduct point, government

8    misconduct allegations, like selective prosecution

9    allegations, are not a matter that go to a defendant's guilt

10   or innocence, and they do not belong in front of a jury.

11        The *Sager* case that the defendant cited in his

12   opposition is a different kind of case.  It's a case in

13   which it was appropriate to cross-examine a witness, a

14   government agent witness, about inconsistencies in that

15   agent's testimony, about evidence that he, perhaps, should

16   have gotten and didn't.

17        But those are not government misconduct claims

18   like the defendant has suggested he wants to bring before

19   the jury in this case, claiming that the government has

20   committed misconduct.

21        In terms of the -- I will not go into detail on

22   the subject of the congressional witnesses.  I will just

23   reserve and say that we will respond to a motion on that

24   when and if it arises.

25        Punishment, I think, does not bear anymore

1      discussion.

2                Ms. Vaughn will handle the information related to

3      other contempt referrals.

4                And then the statements of counsel.  This is --

5      you know, their claims about their statements is, Well,

6      government -- the lawyers' statements are not evidence

7      before the jury.  But, again, improper bolstering or making

8      improper comments is the kind of thing that Rule 103 says

9      that the Court should not allow the jury to hear.

10               **THE COURT:**  Thank you.

11               Are you also going to address the three motions

12     for Mr. Bannon to exclude evidence regarding Mr. Costello's

13     emails and phone records, which I've largely addressed, but

14     the Motion in Limine about presenting the Indictment and the

15     Motion in Limine about evidence or argument regarding the

16     attack on the Capitol?

17               **MS. GASTON:**  Ms. Vaughn is going to handle those.

18               **THE COURT:**  Okay, great.  So, Ms. Vaughn.

19               Thank you.

20               **MS. VAUGHN:**  Good morning, Your Honor.

21               **THE COURT:**  Good morning.

22               **MS. VAUGHN:**  I can start with the defendant's

23     motions.

24               **THE COURT:**  Sure.

25               **MS. VAUGHN:**  The government defers to the Court on

1      the Indictment issue.

2              And then with respect to the Motion to Exclude

3      Evidence about January 6th, based on the defendant's reply,

4      it doesn't seem that he's seeking to exclude evidence about

5      the scope of the investigation and the pertinence of the

6      defendant's subpoena to that investigation.

7              So the Court -- I mean, the government has no

8      intention of introducing video of the attack or evidence

9      about specific attacks or things like that, but it certainly

10     plans to introduce evidence about why the Committee

11     believed --

12             **THE COURT:**  Right, it goes to pertinency.

13             **MR. COONEY:**  So we just ask for clarity on that

14     because we just don't want to be surprised with objection at

15     trial.

16             With respect to Mr. Costello's information, the

17     government doesn't intend to offer Mr. Costello's toll

18     records unless the defendant puts them in issue somehow.

19     For example, if he were to claim that they were not in touch

20     or something, he had no idea that the Committee had rejected

21     his reasons for not showing or things like that.

22             With respect to Mr. Costello's letters to the

23     Committee, I don't think the defendant objects to those.

24     And then it's not clear that he's moving to exclude any

25     other evidence relating to Mr. Costello.

1        **THE COURT:**  Okay.

2        **MS. VAUGHN:**  I can also address the Motion to

3    Compel and Motion in Limine that we filed last night with

4    respect to the late efforts at compliance --

5        **THE COURT:**  Yes.

6        **MS. VAUGHN:**  -- if the Court wants to hear more on

7    that.

8        **THE COURT:**  Well, let's talk about *Meadows* and

9    *Scavino* first.  I don't think we've addressed that at all.

10       **MS. VAUGHN:**  I think with respect to *Meadows* and

11   *Scavino*, we noted in our opposition that the government

12   doesn't have any documents laying out official policy

13   relating to Mr. *Meadows* and Mr. *Scavino* such that they would

14   fall within the Court's March 16th order.

15            So the question is, let's get back to basics, what

16   are the rules of discovery in a criminal case and does the

17   government's work product and decision-making about whether

18   or not someone is subject to criminal prosecution, is that

19   discoverable in this case.  And the defendant has not shown

20   that it has.

21            In fact, in his reply, he spends most of it

22   talking about civil discovery cases, but courts are clear

23   that civil discovery is not equal to Rule 16; and that

24   Rule 16 is much narrower in that.  The same with *Brady* and

25   *Giglio* material.

1          So, one, all of these materials were generated

2    weeks, months, well after the defendant was charged in this

3    case.  So they can't possible go to his intent at the time

4    because there's no way he could have relied on them.  They

5    didn't exist when he defaulted.

6          And the defendant tries to fall back on the

7    argument, Well, if we're allowed to put on an entrapment by

8    estoppel argument, then it goes to reasonableness.

9          But, again, the reasonableness standard is whether

10   an objective person in the defendant's position, someone

11   truly desirous of following the law, would have still

12   followed the course that he followed.  Materials created

13   weeks, months after that objective person acted couldn't

14   have possibly influenced the reasonableness of that act.

15         So for those reasons, the defendant hasn't met his

16   burden to show that he's entitled to these internal

17   deliberations, and his Motion to Compel should be denied.

18         **THE COURT:**  If entrapment by estoppel is a defense

19   that goes to the jury here, and if the defendant gets to put

20   on, say, for example, his theory about why he fits within

21   the DOJ opinions, the OLC opinions, why wouldn't he be able

22   to say, And DOJ actually has acted consistent with my

23   reading, see *Meadows*, see *Scavino*?

24         **MS. VAUGHN:**  *Meadows* and *Scavino* are completely

25   differently situated.  Again, this just goes --

1    **THE COURT:**  Why can't he make the argument?  The

2    government would say, They're a totally differently

3    situation.  They fit within the OLC opinions in a way you

4    don't.

5         **MS. VAUGHN:**  It's confusing for the jury.  He's

6    then asking the jury -- so this is how the testimony would

7    go.  The defendant testifies, because his lawyer can't

8    testify about what he relied on.  The defendant has to

9    testify.

10        The defendant testifies:  I read these five,

11   40-page OLC opinions, and based on the "principles," which

12   is what they said --

13        **THE COURT:**  I understand the government's view of

14   the --

15        **MS. VAUGHN:**  -- I decided -- and so then he's

16   asking the jury, Jury, you should decide whether I'm the

17   same as Mark Meadows or Dan Scavino.

18        That is so far afield from what entrapment by

19   estoppel is about.  Entrapment by estoppel is about being

20   essentially tricked by the government into committing a

21   crime.  It is not about, I read between the lines of 50

22   different documents and decided that surely they --

23        **THE COURT:**  No, that is why the government thinks

24   I should not allow this issue to go to the jury.  But if

25   it's going to the jury, if Mr. Bannon has an argument that

1    the DOJ opinions, by implication in the government's view,

2    give him this defense, then why isn't it relevant to show

3    that in the specific context of January 6th, the government

4    did decline, and he would argue, presumably in reliance on

5    prior OLC policy and statements, to not prosecute two people

6    who he would say are similarly situated to him?

7              The government would have the opportunity to say,

8    No, that's not right.  He's totally differently situated.

9    And you -- so you, jury, should conclude the defense is not

10   available.

11        **MS. VAUGHN:**  It's a temporal issue.  So the issue

12   of entrapment by estoppel is what was reasonable at the time

13   the defendant acted.  Things that happened that postdate

14   that can't inform the reasonableness of the actor at the

15   time.

16        **THE COURT:**  So if the government had given Meadows

17   or Scavino declination letters before, would they have been

18   admissible?  Again, assuming entrapment by estoppel goes to

19   the jury.

20        **MS. VAUGHN:**  We turned over to the defendant,

21   earlier, letters that the Department had issued in which it

22   referenced its official policies.  Of course, those all

23   called back to the underlying OLC opinions, but as we've

24   told the defendant, we just don't have anything like that

25   here.

1          **THE COURT:**  Okay.  I can't remember if there were

2    other topics you were going to address.

3          **MS. VAUGHN:**  Yes.  I think the Court was asking

4    whether -- in respect to our Motion in Limine we filed last

5    night, when the default occurs.

6          **THE COURT:**  Yeah.

7          **MS. VAUGHN:**  And default, in plain English, is

8    just a failure to comply.  So then what defines the nature

9    of the default that's criminal is the "willfulness" word.

10   So a default is just not showing up as you're required or

11   not producing documents, and that was complete at the time.

12         So the Court had a question if he had complied

13   two weeks later.

14         **THE COURT:**  Yes.

15         **MS. VAUGHN:**  That wouldn't erase the basis for a

16   criminal contempt.

17         Now, certainly could it inform, you know,

18   Congress' decision to refer?  Could it inform the

19   government's exercise of its prosecutorial discretion?  Of

20   course.

21         But as far as whether the elements of the offense

22   are satisfied, they've already been satisfied, and there's

23   nothing that that later compliance could do to erase that.

24         So here we are now, nine months later, and it's

25   the same issue.  His default was complete in October 2021;

1    that's what he's being prosecuted for.  His later efforts to

2    comply don't change that.

3              It's the same in the contempt of court context.

4    It doesn't matter if someone cures later, they're still

5    guilty of the default at the time.

6              **THE COURT:**  So obviously I haven't heard from the

7    House yet on the Motion to Quash the Subpoena to the House

8    Members, but does the government agree with the proposition,

9    as a general matter, that if a motion seeking congressional

10   testimony -- or sorry -- if a subpoena seeking congressional

11   testimony is quashed based on Speech or Debate Clause

12   grounds, and the effect of that would be to make unavailable

13   to a defendant evidence that's highly relevant to his or her

14   defense, that that could result in a dismissal of an

15   indictment or some -- an instruction or something to the

16   benefit of the defendant, assuming, again -- I'm not saying

17   you agree with this but assuming that the evidence that the

18   defendant seeks to elicit through the Subpoena that's

19   quashed is highly relevant?

20             **MS. VAUGHN:**  Is material.

21             **THE COURT:**  Is material, yes.

22             **MS. VAUGHN:**  Yeah.  The government doesn't view it

23   as really any different from a claim that a defendant might

24   make if the government refuses to immunize a witness who's

25   claiming their Fifth Amendment.  So in that situation, for

1    there to be any adverse consequences to the government's

2    case, the defendant has to show some form of government

3    misconduct like it's been threatening the witness with

4    prosecution or -- and on top of that, has to show that it's

5    material and noncumulative.  And even the *Rainey* Court

6    recognized that.

7            So are there circumstances under which a witness's

8    unavailability because of a privilege could provide a basis

9    for some kind of adverse action, yes.

10           **THE COURT:**  And analytically, is the way the

11   government thinks about the way a Court should approach it

12   is, first, think about the immunity question; decide whether

13   or not to grant the Motion to Quash?  If the motion is

14   granted, hypothetically, then you take up the question of

15   what evidence was sought to be adduced?  Is it material?  Is

16   it nonduplicative, or whatever, and what is the effect of

17   its exclusion or nonavailability, I guess, on the case?

18           **MS. VAUGHN:**  Yes.

19           And I think just reading the briefs in the other

20   case, it seems that the privilege issue may not even be

21   determinative at the end of the day because the defendant

22   hasn't met his burden under Rule 17 to show that it's

23   relevant, admissible, material evidence.

24           So if that were the basis on which the motions

25   were quashed --

1          **THE COURT:**  It would necessarily mean there was no

2     effect on the case --

3          **MS. VAUGHN:**  Exactly.

4          **THE COURT:**  -- if that were true.

5          **MS. VAUGHN:**  Exactly.

6          **THE COURT:**  Right.  But if not, or if,

7     hypothetically, I thought that one needed to resolve

8     immunities first and were to agree that there was immunity,

9     the immunity forecloses the defendant from evidence that he

10    wishes to adduce.  And then one has to think through, What

11    is that evidence and what does the exclusion of that

12    availability mean for the defendant's ability to try his

13    case?

14         **MS. VAUGHN:**  Right.

15         And the question there is, What is the

16    nonspeculative basis to believe that this witness has

17    material, exculpatory information that is noncumulative that

18    the defendant -- you know, can't get from another source;

19    and was there some effort on the part of the government to

20    improperly make this an issue, which, looking ahead to the

21    defendant's motion if this should come to pass, the

22    government just doesn't think he'll be able to meet that.

23         **THE COURT:**  Right.  But it hasn't been filed yet

24    so who knows what it will say.

25         **MS. VAUGHN:**  Right.

1          **THE COURT:**  Any other topics you'd like to

2     address, Ms. Vaughn?

3          **MS. VAUGHN:**  Not unless the Court has any

4     questions.

5          **THE COURT:**  No.  Thank you.

6          I'd like to hear from the House now, Ms. Kallen,

7     Mr. Letter?

8          **MR. LETTER:**  Thank you, Your Honor.  As I said

9     earlier, Ms. Kallen will be delivering most of the

10    presentation to Your Honor.

11         **THE COURT:**  Very well.

12         **MR. LETTER:**  I did, though, just want to start out

13    with a very brief introduction.

14         As you know here, criminal trial subpoenas have

15    been issued to the Speaker of the United States House of

16    Representatives, the Majority Leader, the Majority Whip, the

17    Chairman of the Select Committee, the Vice Chair of the

18    Select Committee, all of the other members of the Select

19    Committee, me and staffers for the Committee.

20         In calling for all of these witnesses to testify,

21    to us it seems clear that Mr. Bannon is attempting to turn

22    this into some sort of political circus that cannot be

23    allowed.

24         But the main point I very briefly wanted to make

25    is something I know you and I have discussed in this very

1    courtroom before, the speech or debate immunity.  There's a

2    key argument that is made right up front in Mr. Bannon's

3    opposition to the Motion to Quash, which is it's so unfair,

4    the members relying on speech or debate, when Mr. Bannon has

5    been summoned -- is here because he defied a subpoena.  And

6    they are saying, What a double standard.

7            Mr. Bannon's argument is, therefore, with the

8    Constitution itself.  The framers put the Speech or Debate

9    Clause in the Constitution as a key bulwark for our

10   democracy, and so it's right there in the Constitution.  We

11   know why it is there.

12           There is no similar provision, no constitutional

13   or legal basis that Mr. Bannon had to ignore the Subpoena

14   from the House.  And so, again, the main point I wanted to

15   make is, his argument really is the Constitution should be

16   different from what it is.

17           And so -- otherwise, I'm going to turn this over

18   to Ms. Kallen.  It may be appropriate for me to pop up

19   again.

20           **THE COURT:**  That's fine.

21           **MR. LETTER:**  Thank you, Your Honor.

22           **THE COURT:**  I'm happy to hear from Ms. Kallen.

23           **MS. KALLEN:**  Good morning, Your Honor.

24           **THE COURT:**  Good morning.

25           **MS. KALLEN:**  There's a proper way to contest a

1     subpoena, and the members of Congress and their staff

2     engaged in that process by moving to quash the subpoenas at

3     issue here.  They did not simply defy the judicial

4     subpoenas.

5              The 16 subpoenas that the defendant issued are

6     fatally flawed as a matter of law because, first, they do

7     not even meet the burden under Federal Rules of Criminal

8     Procedure 17 to establish both the testimony and the

9     documents the defendant seeks are essential and material to

10    his case.

11             The documents the defendant seeks are precisely

12    the sort of broad requests that read more like civil

13    discovery requests, not the targeted requests appropriate

14    under Rule 17(c).  And the Supreme Court has made clear that

15    Rule 17(c) is not an avenue to conduct discovery.

16             This Court also explained in the *Libby* case that

17    if a subpoenaing party cannot specify the information

18    contained in the documents sought but merely hopes that

19    something useful will show up, that is a sure sign that the

20    Subpoena is being misused, and that is the case here.

21             The trial testimony that the subpoenas seek is

22    cumulative and is neither material nor essential to

23    Mr. Bannon's defense.

24             **THE COURT:**  What if the question of whether the

25    House Committee was formed or exists in compliance with

1    House rules -- House Res. 503, if that's a question that

2    goes to the jury, why wouldn't some of this testimony be

3    relevant?  Why wouldn't Speaker Pelosi's testimony about

4    whether she believes the Committee was formed consistent

5    with the Resolution 503, or even her testimony about how it

6    was formed, why wouldn't that be relevant?

7            **MS. KALLEN:**  So accepting Your Honor's

8    representation that that would be a question of fact -- with

9    which we vehemently disagree, Your Honor.

10           **THE COURT:**  I'm assuming hypothetically.  I know

11   the Department's view is different.  But assuming

12   hypothetically for the question that this is a -- that there

13   are facts here that go to the jury, I assume it's a defense.

14   It doesn't really matter.

15           But assume it's a defense.  Mr. Bannon has the

16   defense that the Committee was formed inconsistent with

17   House rules, or even just simply is not operating with the

18   number of members required by House Res. 503.  Why isn't

19   some of the testimony sought by the Subpoena relevant?

20           **MS. KALLEN:**  So, Your Honor, it's still not

21   relevant to his defense because it does not excuse complete

22   noncompliance with the Subpoena.

23           But even if he can identify some sort of relevant

24   information, the two witnesses that will be made available

25   at trial, Ms. Amerling and Mr. Tonolli, are perfectly

1    competent to testify to anything that would be relevant on

2    that front.

3            **THE COURT:**  But isn't Speaker Pelosi a much more

4    relevant witness than the two witnesses that the House has

5    volunteered on the question of compliance with the rules.

6            **MS. KALLEN:**  Potentially, Your Honor, but the

7    legal standard is not whether or not someone is a much more

8    relevant witness, particularly in the context of

9    high-ranking government officials.

10           The question under Rule 17 is whether the

11   information is material and essential.  And it's not

12   essential when other people can testify.  And especially if

13   one considers the high-ranking official context.  Even

14   there, the fact that there are two witnesses who are

15   perfectly competent to testify on these issues, which is the

16   standard; that's sufficient to justify quashal.  And all of

17   that is assuming one sets aside the speech or debate

18   immunity.

19           **THE COURT:**  As to the speech or debate immunity,

20   as to the two witnesses whom the House is making available,

21   is the House or are they waiving Speech or Debate Clause

22   immunity with respect to their testimony?

23           **MS. KALLEN:**  No, Your Honor.

24           **THE COURT:**  So what happens if they are

25   cross-examined?  What if Mr. Bannon seeks to ask questions

1        outside the scope of direct when they are here?  Will they

2        assert Speech or Debate Clause immunity at that point?

3               **MS. KALLEN:**  I think, Your Honor, it depends on

4        the parameters of this Court's ruling with regard to the

5        various pending motions.  I think it's going to depend on

6        whether or not it applies to the sphere of issues that are

7        relevant at trial.

8               So -- and we indicated to the Court that we would

9        intend to seek a protective order, and that would be -- you

10       know, assuming that's still necessary, that would be subject

11       to the parameters of this Court's ruling on the various

12       other pending motions as to what's live issues at trial.

13              **THE COURT:**  So just to be clear, even the

14       witnesses who would appear voluntarily would be doing so but

15       not as a waiver of Speech or Debate Clause immunity.  They

16       would be appearing voluntarily.  They would seek -- assuming

17       that the Motion to Quash is otherwise granted and the like,

18       they would seek a protective order, what prohibiting

19       cross-examination outside of the scope of their direct or

20       even, you know, essentially examination that goes to a

21       defense that they don't address, or something like that?

22              **MS. KALLEN:**  Essentially, Your Honor, I think it

23       would depend on the scope of what's live with regard to the

24       individual defenses.  Our view is that some of the issues

25       that he raises as defenses are exclusively questions of law,

1    not questions of fact.

2            And so if this Court disagrees with that and

3    concludes that certain things are questions of fact, then

4    the parameters that would be appropriate to the defense

5    would be contingent on this Court's decision as to what

6    precisely is a question of fact and what precisely is a

7    question of law.

8            But I do think it's worth emphasizing to this

9    Court that no Court has held that waiver of speech or debate

10   immunity is even possible and so courts have hypothesized

11   that in the event that --

12           **THE COURT:**  Does the House believe that it can be

13   waived?

14           **MS. KALLEN:**  No, Your Honor.

15           **THE COURT:**  Okay.  So does that mean in any case

16   in which a member or the House -- well, a member might have

17   Speech or Debate Clause immunity, even if it's not asserted,

18   the Court must address whether it's appropriate?

19           **MS. KALLEN:**  No, Your Honor.

20           It's an immunity that the holder of the immunity

21   can raise when the holder of immunity concludes that it's

22   appropriate.  And so it's in the holder of the immunity's

23   power to decide whether or not to raise it.

24           That's not to say that the Court is without any

25   power to consider that.  It's not a question of, Oh, it's

1   not raised, therefore it's waived.

2          **THE COURT:**  No, no, I think we might be talking

3   past each other.

4          Does Speaker Pelosi have the constitutional

5   authority to waive her Speech or Debate Clause immunity?

6   Expressly waive it?

7          **MS. KALLEN:**  I can't speak to that, Your Honor.  I

8   can certainly -- you know, if Mr. Letter would like --

9          **THE COURT:**  We can take it up.  I don't think it's

10  material for today's purpose.  So I'm happy to hear from you

11  at the end of this, Mr. Letter.

12          Because no one is -- well, I guess I should say no

13  one in the Subpoena recipient group, in your view, is

14  attempting to waive Speech or Debate Clause immunity, it

15  doesn't matter.

16          I know Mr. Bannon argues that there has been a

17  waiver at least as to certain members, but you are not

18  taking the position that anyone has, in fact, waived.

19  Correct?

20          **MS. KALLEN:**  That's correct, Your Honor.

21          **THE COURT:**  Or could.  You don't need to address

22  that question?

23          **MS. KALLEN:**  Our position is that no one has

24  waived their immunity and no one intends to do so.

25          **THE COURT:**  Does Speech or Debate Clause immunity

46

1   apply to some of the topics that Mr. Bannon asked about,

2   like Tweets or book deals?

3         **MS. KALLEN:**  So it does not apply to express

4   communications with the press, Your Honor.  But beyond that,

5   questions about motives underlying what led to any

6   communication with the public, those are all covered by

7   speech or debate immunity.

8         **THE COURT:**  So there's at least -- there are some

9   topics Mr. Bannon seeks testimony about that would not be

10  covered by Speech or Debate Clause immunity.  That doesn't

11  mean the Subpoena is valid.  It just means that to the

12  extent that you seek to quash the Subpoena, it has to be on

13  some other basis, like Rule 17 or senior member of the

14  government?

15        **MS. KALLEN:**  That's correct, Your Honor.

16        And any of those topics still do not meet the

17  Rule 17 requirement that the testimony sought being material

18  and essential.

19        **THE COURT:**  And do you agree with DOJ, or at least

20  my colloquy earlier with Ms. Vaughn, that analytically, the

21  way to approach this question is to decide whether there's

22  immunity or whether the Motion to Quash should be granted?

23        And then if it is in part or in whole, you then

24  have to address the question of how it affects the criminal

25  case because that may, in fact, disable Mr. Bannon from

1    putting on evidence that is relevant to his case.

2              **MS. KALLEN:**  So I can't speak to the second piece

3    of that, Your Honor.  Our view was that the Motion to Quash

4    is an independent motion in and of itself with its own legal

5    standard, and any subsequent impact that it may or may not

6    have on the criminal trial is for the Department of Justice

7    to weigh it on.

8              I do want to address, Your Honor, the that

9    question you raised of the Department of Justice regarding

10   whether or not the challenges to the composition of the

11   Select Committee were that -- whether they are questions of

12   law or questions of fact.

13             **THE COURT:**  Yes.

14             **MS. KALLEN:**  And they are pure questions of law,

15   Your Honor.  And I direct the Court's attention to

16   two Supreme Court cases that support that proposition.

17             The first is the *Bryan* case.  That's B-R-Y --

18             **THE COURT:**  The old *Bryan*?

19             **MS. KALLEN:**  Yes, Your Honor.

20             And there the questions challenging the validity

21   of the Committee were expressly taken away from the jury and

22   decided by the Court at trial.

23             I'd also direct the Court's attention to the

24   *Wilkinson* case, which the Department of Justice raised in

25   their response to the jury instructions at ECF 90.  And in

1      both those cases, there were challenges to the validity of

2      committees, and those were viewed as questions of law.

3                 Your Honor, also, this is a situation where the

4      House of Representatives has been crystal clear about its

5      position as to whether or not its rules were properly

6      followed.  Not just before this Court in the amicus brief

7      but also through subsequent actions of the House of

8      Representatives.

9                 So this is certainly not one of those situations

10     where there's any ambiguity as to what the House's position

11     is because the House has been very clear that its position

12     is that its rules were followed, and proper rulemaking

13     deference under the Rulemaking Clause requires deference to

14     that conclusion.

15         **THE COURT:**  Does the House have a view about

16     whether, in light of Mr. Bannon's letter over the weekend,

17     the trial should occur in a week or whether we should pause

18     it?

19         **MS. KALLEN:**  Your Honor, the House's view is

20     that -- you know, we don't take -- we are here on the Motion

21     to Quash, Your Honor, not in terms of implications for the

22     criminal trial.

23                 That said, by virtue of our contempt referral, the

24     crime was completed at the time of failure to comply with

25     the Subpoena, and that happened months ago.

1          I'd like to also address the high-ranking

2     government official doctrine.  These are not just any

3     subpoenas served on any witnesses.  The 16 subpoenas here

4     were served on the Speaker of the House of Representatives,

5     the Majority Leader, the Majority Whip, all members of the

6     January 6th Select Committee, three of its high-level staff

7     members and the General Counsel of the House of

8     Representatives.

9          To justify subpoenas to these high-ranking

10    officials, the defendant had to demonstrate with specificity

11    and in concrete terms what further information only these

12    high-ranking officials could supply that would be material

13    and essential to his defense, and he has not done so.

14          This is especially true because the Select

15    Committee has made clear that Chief Counsel and Deputy Staff

16    Director Kristen Amerling and Senior Investigative Counsel

17    Sean Tonolli will voluntarily be made available by the

18    Select Committee to testify, and they can competently

19    address any issues necessary to any of the elements or

20    defenses in this case.

21          And rather than specify the precise information

22    that the defendant seeks from each of these numerous

23    high-ranking officials, he insists that a proper defense

24    requires testimony from officials that he labels as having

25    decision-making authority.

1          But this decision-making authority is not a

2    prerequisite for competent trial testimony, nor does it

3    discount the testimony that Ms. Amerling or Mr. Tonolli

4    could provide.

5          In fact, if this Court took Mr. Bannon up on his

6    offer to invent some new decision-making authority test for

7    trial testimony, that would undermine the high-ranking

8    official test itself and that doctrine.  That's especially

9    true for contempt charges, Your Honor, where those with

10   decision-making authority over a contempt referral are the

11   members of Congress themselves.

12         Adopting that test means that high-ranking

13   government officials and high-ranking officials even in the

14   private sector would spend nearly all their time dealing

15   with litigation.

16         That is why the relevant question in the context

17   of a high-ranking official is whether -- and whether the

18   relevant question, even under the Federal Rules of Criminal

19   Procedure, is whether a witness can offer competent

20   testimony, not whether the actual decision maker is taking

21   the stand.

22         And even setting all of that aside, Your Honor,

23   then comes the question of speech or debate immunity.

24   Binding Supreme Court case law and binding D.C. precedent

25   establish that the actions at issue here squarely fall

1    within the sphere of legislative activity.  They are thus

2    covered by the Speech or Debate Clause, and there is

3    absolute immunity.

4        Your Honor, there is a process for contesting a

5    subpoena, a judicial subpoena is under Rule 17, and the

6    defendant did not follow that process.

7        There's also a process to contest a congressional

8    subpoena, but rather than engage in that process, the

9    defendant decided to defy the Subpoena altogether and defy

10   the Subpoena that he received from the Select Committee.

11   The United States seeks to hold him accountable for defiance

12   of that subpoena.

13       This is entirely different than the issue here

14   where the recipients have followed the proper process to

15   contest a judicial subpoena they moved to quash and the

16   subpoenas that the defendant issued to the 12 members of

17   Congress, three senior staff and the General Counsel of the

18   House of Representatives in his criminal trial do not comply

19   with the requirements for criminal trial subpoenas.  And for

20   that reason, they should be quashed.

21       But issuing blatantly improper subpoenas may be

22   the point here.  The defendant spends pages of his brief in

23   the Miscellaneous case arguing that if the Subpoena

24   recipients do not testify, the United States should be

25   stripped of its ability to present its evidence in the

1   criminal trial or the entire criminal prosecution should be

2   dismissed.

3           The purpose of these overbroad subpoenas appears

4   to be trapping members of Congress into foregoing speech or

5   debate immunity lest they deem this prosecution.

6           Should this Court adopt Mr. Bannon's "Heads, I

7   win.  Tails, you lose" approach to contempt proceedings,

8   this playbook will be copied by any defendant who faces a

9   congressional subpoena that they don't like, and Congress'

10  subpoena power will be seriously undermined.  So we ask this

11  Court not to fall prey to that tactic.

12          The defendant issued sweeping subpoenas after he

13  stood on the steps of this very courthouse and vowed to use

14  his criminal trial as an opportunity to harass and burden

15  members of Congress.  He should not be permitted to abuse

16  this Court's subpoena power for that purpose.

17          So we ask that the Motion to Quash be granted.

18  Thank you.

19          **THE COURT:**  Thank you, Counsel.

20          Mr. Letter, anything you'd like to address?

21          **MR. LETTER:**  Thank you, Your Honor.  I'll be very

22  brief to address your questions.

23          First of all, on the trial point, whether the

24  trial should be postponed, as Ms. Kallen said, our view is

25  that's a determination for the Justice Department.  But the

1    Committee itself has no reason to think that it is

2    appropriate for the trial to be postponed.  But, again,

3    that's a judgment for the Executive Branch of the government

4    to make.

5              On the point about waiver -- and as Your Honor

6    knows, you have asked us to address this, which we'll be

7    doing several days from now in *Meadows*.

8              **THE COURT:**  Yes.

9              **MR. LETTER:**  But to just give you a preview,

10   because you've asked about it, at this point the position we

11   will most certainly be taking is the privilege is not

12   waivable.  But I know you're thinking, Hmmm?  That's because

13   we say that the privilege is absolute, but it is not

14   self-executing.

15             So members of Congress have the ability to choose,

16   in particular instances, not to assert the privilege.  And

17   this is discussed at considerable length, as we will be

18   setting out for you, in the Supreme Court decision in

19   *Helstoski*, where the Court addressed the question of

20   waivability.

21             And there, by the way, the Court just said, I

22   quote, Explicit and unequivocal renunciation of the

23   privilege would be necessary, even assuming that the

24   privilege could be waived.

25             So as you know, there are cases like *Meadows* where

1    the House has chosen not to assert executive -- assert

2    speech or debate immunity, but that does not mean that it is

3    waivable by particular members of the House.  It's just a

4    question of it's not self-executing.  And so we can choose

5    not to assert it.

6           One other thing, again, just giving you a preview,

7    one of the key cases here is *Senate Permanent Committee*

8    *versus Ferrer*, and there the Senate actually brought suit in

9    Federal District Court to enforce a subpoena pursuant to a

10   statute that allows that.

11          The defendant there said, Oh, okay.  I want to

12   then raise all of these other points.  The D.C. Circuit

13   said, No, not so fast.  Speech or debate immunity continues

14   to apply to other subjects even though the Senate had --

15          **THE COURT:**  Initiated a lawsuit.

16          **MR. LETTER:**  Exactly, Your Honor.  And so

17   that's -- it's a 2017 opinion of the D.C. Circuit.  In any

18   event, I hope that answers -- if Your Honor has any other --

19          **THE COURT:**  It does.

20          Thank you, Mr. Letter.

21          **MR. LETTER:**  Thank you, Your Honor.

22          **THE COURT:**  I look forward to seeing that brief.

23          Here is what I would like to do:  I'd like to give

24   the court reporter a break.  So why don't we take a brief

25   recess.  Let's take 10 minutes.  We'll come back at 11:20,

1    and then I'll hear from Mr. Corcoran and Mr. Schoen, I

2    expect.

3                (Recess at 11:13 a.m. and concluded at 11:29 a.m.)

4                **DEPUTY CLERK:**  We are now back on the record.

5                **THE COURT:**  Mr. Corcoran.

6                **MR. CORCORAN:**  Good morning, Your Honor.

7                **THE COURT:**  Good morning.

8                **MR. CORCORAN:**  I am going to address the Motion to

9    Quash first and then try to work through the Motions in

10   Limine in workmanlike fashion.  And then David Schoen will

11   address the Motion to Continue and one of the Motions in

12   Limine as well.

13               **THE COURT:**  Sounds fine.

14               **MR. CORCORAN:**  First, with regard to the two-step

15   process for consideration of whether to grant the Motion to

16   Quash, and then depending on that, whether to go to a remedy

17   in a criminal case, we agree with that process and believe

18   that the Department of Justice -- we may have to brief the

19   issue in between and allow the Department of Justice to have

20   their say on any remedy.

21               I want to address the notion of absolute immunity.

22   You know, more than 100 years ago in the field of physics,

23   there was a sense that time and space were absolute.  But

24   then Albert Einstein came up with an idea that things should

25   be considered relative to one another.  And that's how I

1    view these two constitutional issues because both are in the

2    text of the Constitution.

3              Different than what Mr. Letter has said -- and I

4    understand and respect his advocacy -- we are not trying to

5    rewrite the Constitution.  What we're saying is, Here are

6    two explicit grants with regard to members of Congress.

7    It's a protection, the Speech or Debate Clause, and with

8    regard to Mr. Bannon or any defendant, it's, you know,

9    it's --

10             **THE COURT:**  What's your best case for the

11   proposition that I could hold that Speech or Debate Clause

12   immunity as to a topic that's covered by Speech or Debate

13   Clause immunity can be overridden because of a criminal

14   defendants' Fifth or Sixth Amendment right?

15             **MR. CORCORAN:**  *Johnson*, 383 U.S. 178, the Supreme

16   Court said that the Speech or Debate Clause was designed to

17   preserve legislative independence, not supremacy.

18             And in our view, requiring members who have direct

19   personal knowledge regarding an alleged contempt of Court

20   will not infringe in the least on the legislative

21   independence of Congress.

22             **THE COURT:**  What issue, that's relevant in this

23   case, would the testimony or documents you seek go to?

24             **MR. CORCORAN:**  If I could just have one moment

25   before I get to that --

1          **THE COURT:**  Sure.

2          **MR. CORCORAN:**  -- because it's -- just on the

3  issue of the weighing of the two ideas, because I think that

4  is an important thing.

5          What I've quoted from *Johnson* with regard to the

6  need to preserve legislative independence, a contempt

7  resolution is not a legislative act.  And so there's no

8  concern in the area of contempt under *Johnson* -- I know it

9  doesn't deal directly with contempt of Congress.  These

10  cases come along, as we said before, every 10 or 20 years.

11          But the concept is that the Speech or Debate

12  Clause is designed to preserve legislative independence.

13  Here, you know, criminal contempt resolution, the Latin lex

14  legis law, a contempt resolution is not a law.  It's not a

15  law.

16          And so there's no infringement on the legislative

17  power of the Congress --

18          **THE COURT:**  So is your argument that --

19          **MR. CORCORAN:**  So it's not a waiver.  It just

20  doesn't apply.

21          **THE COURT:**  So your argument is that there is no

22  Speech or Debate Clause immunity regarding the reasons for

23  or the fact of the contempt resolution whatsoever.  So you

24  don't even need to worry about the defendant's

25  constitutional rights?  It's just a question of whether that

1      evidence is relevant?

2                  **MR. CORCORAN:**  No, you definitely --

3                  **THE COURT:**  You said there's no Speech or Debate

4      Clause immunity whatsoever because it's not a legislative

5      act.

6                  **MR. CORCORAN:**  Right.

7                  **THE COURT:**  Okay.  So immunity is out, and the

8      only question, in your view, is whether the testimony's

9      relevant?

10                 **MR. CORCORAN:**  I don't think it's a question of

11     relevancy at all.  I think from our perspective, the

12     defendant has a right, and the Supreme Court in *Chambers*

13     *versus Mississippi*, it's called one of the most fundamental

14     rights; that a person accused of a crime can present a

15     defense and present witnesses in his own defense.

16                 **THE COURT:**  Does a defendant have a constitutional

17     right to present irrelevant evidence?  Surely the answer is,

18     No.

19                 **MR. CORCORAN:**  I don't know that there's any

20     constitutional right to present irrelevant evidence, but I

21     think a defendant has a right to present a defense.  And

22     you're going to hear that again from me as we go through the

23     Motions in Limine, et cetera.

24                 But I think one of the key points that separates a

25     legislative act from a contempt is, contempt is a sword

1    where the Congress has pointed the sword at an individual

2    and has asked the Executive Branch to prosecute and has

3    asked this Court to preside.

4              In that circumstance, the members of Congress who

5    have factual information about the underlying facts that

6    constitute a contempt, they can't use as a shield --

7              **THE COURT:**  What noncumulative evidence do the

8    members you've tried to subpoena have about the contempt

9    resolution?

10             **MR. CORCORAN:**  Well, communicative --

11             **THE COURT:**  Let's talk specifically.  What do you

12   want to ask the members of the Committee about that you

13   wouldn't be able to elicit through other -- either the two

14   people who are volunteering to appear or witnesses on

15   Mr. Bannon's side?

16             **MR. CORCORAN:**  Yeah.

17             The testimony -- I won't go through each one of

18   them unless the Court wants me to, but let's start with the

19   testimony of Speaker Pelosi.  Her testimony would be

20   exculpatory.  And remember the test is not what the Speaker

21   thinks matters or what Mr. Letter or what the prosecutor

22   thinks isn't material to guilt or punishment doesn't make it

23   less likely, based on the evidence and testimony of

24   Speaker Pelosi, that Mr. Bannon is not guilty of a crime.

25             And we're dealing with an element of the offense

1    here, and that is that one of the elements, as we've

2    discussed, is that Mr. Bannon -- the government has proved

3    beyond a reasonable doubt that Mr. Bannon was subpoenaed in

4    accordance with the authority of the U.S. House of

5    Representatives.

6             At this stage, it's not a legal question.  It will

7    be up to the jury.  I disagree with the DOJ on that.  And

8    Justice Scalia has given the guidance on that in *Gaudin* that

9    it's a fact question for the jury.

10             With regard to Speaker Pelosi --

11        **THE COURT:**  Well, *Gaudin* is about pertinency.

12        **MR. CORCORAN:**  I understand that.

13        **THE COURT:**  That's not what we're talking about

14    here unless you're arguing that -- is there testimony you

15    would seek from one of these witnesses that goes to

16    pertinency?

17        **MR. CORCORAN:**  No.

18        **THE COURT:**  So it's just about whether the House

19    Committee complied with the rules?

20        **MR. CORCORAN:**  Not really.  It's not compliance

21    with the rules.  It's whether they acted within the

22    authority that was granted --

23        **THE COURT:**  That's what I mean.

24        **MR. CORCORAN:**  -- to them.

25        **THE COURT:**  I'm using that as a shorthand.

1        **MR. CORCORAN:**  And so what Speaker Pelosi -- for

2   instance, to get even more granular, what are her reasons

3   for not appointing the full membership of the House?  That's

4   something that's in her personal knowledge that would be

5   exculpatory, we believe, if the jury hears it.

6        What efforts has she made to obtain Mr. Bannon's

7   testimony as required by the contempt resolution?

8        The contempt resolution, which is H.Res. 730,

9   requires that she take action, all appropriate action, to

10  enforce the Subpoena.  That's after the referral has been

11  made to the Department of Justice.

12       And so we want to ask the Speaker, What efforts

13  have been undertaken?  If efforts have not been undertaken,

14  that goes to whether there was a real default, whether there

15  were realistic attempts to reach an accommodation.

16       The other thing she would testify about are the

17  reasons for not allowing a ranking minority member on the

18  Committee.  Again, that may be a disputed factual issue, but

19  that doesn't take it away from the jury.  They get to hear

20  our idea, based on the evidence.

21       And Chairman Thompson, same thing.  He

22  testified -- not testified -- well, at the hearing -- at one

23  of his hearings, he didn't testify but he spoke at the very

24  first hearing and said, There's no ranking member.  We'd

25  like his testimony on that so that the jury can consider

1    that as they look through H.Res. 503, which is the

2    resolution setting up the Select Committee.

3         **THE COURT:**  Didn't *United States versus Bryan*

4    bless -- the Supreme Court decision bless, either explicitly

5    or implicitly, taking away from the jury, which is what the

6    District Court judge did there, the question of whether the

7    Committee had acted in compliance with at least one rule.

8         **MR. CORCORAN:**  You called it the old *Bryan*, I

9    think, and I agree.  It's old and outdated.  I mean, now

10   it's clear --

11        **THE COURT:**  I don't get to ignore old and outdated

12   Supreme Court cases.

13        **MR. CORCORAN:**  Oh, I understand that.  But when

14   we're talking about whether an element of the crime goes to

15   the jury, I think you've got to go with more current

16   precedent, *Apprendi* and others.

17        I think --

18        **THE COURT:**  If the House Committee's compliance --

19   I mean in the general sense and whatever sense one wants to

20   argue about its compliance with the rules -- if that's a

21   defense rather than an element, does that mean it has to go

22   to the jury?

23        **MR. CORCORAN:**  Yes.  Yeah.  Yeah.

24        I mean, the idea is our -- what we want to do is

25   tell the jury what happened.  And we want to present the

1    witnesses who know what happened.  And then you will provide

2    the legal framework for how they can consider that, and

3    counsel will argue, as we will, as to how they should

4    consider it consistent with the law.  But that doesn't mean

5    we don't get to present it to the jury.  We just want to be

6    able to tell them what happened here.

7          I want to speak to the issue of the cumulative

8    nature of the testimony and whether staff would suffice,

9    because I think they certainly wouldn't.  I mean, the issue

10   really -- look, congressional staff play an important role

11   as to staff or any government agency.

12         But the staff members do not have the authority or

13   the power that is important to a contempt proceeding.

14   They've got no authority to appoint members to the

15   committee.  They have no authority to issue subpoenas or

16   sign subpoenas.  And they have no authority to deny, on

17   their own accord, an accommodation that is requested by a

18   witness.

19         Nor do they have any authority, as Speaker Pelosi,

20   does, to make further efforts -- or requirement to make

21   further efforts to obtain Mr. Bannon's testimony and force

22   the Subpoena after the contempt citation.

23         There's no question that a judicial law clerk has

24   an important role, but he can't sign a search warrant.  I

25   mean, we want the actual member, not a designee.  And while

1    we appreciate the House's offer to make two witnesses

2    available, I mean, it's a little bit cold comfort, because

3    the two witnesses that they agree to provide are the ones

4    that the government wants and has listed on their exhibit

5    list.  We've got a whole host of others and wish they would

6    allow us that.

7         The other problem is they've said that they're not

8    going to waive Speech or Debate Clause privilege for those

9    two staff; so the staff essentially can only testify on what

10   they think is appropriate.  That's a clash with our ability

11   to elicit from any congressional witness or staff what's

12   necessary to provide a defense to Mr. Bannon.

13        So our request is that you deny the Motion to

14   Quash and allow us to present these witnesses at trial.  If

15   there's some question about the cumulative nature of one

16   member over another, that could be something that is

17   discussed at trial in terms of number of witnesses, as is

18   often the case.

19        If the Court is inclined to grant the Motion to

20   Quash, then we'd like an opportunity to discuss remedies,

21   because it will certainly infringe upon Mr. Bannon's right

22   to have a fair trial.

23        Should I move to the Motions in Limine,

24   Your Honor?

25        **THE COURT:**  Yes.

1        **MR. CORCORAN:**  Okay.

2            I think the two that we've filed, the Presenting

3     of the Indictment to the Jury, Document 83 and Document 84,

4     precluding evidence or argument on the January 6th attack

5     are essentially agreed by the parties.

6        **THE COURT:**  That's the way it seems to me.

7        **MR. CORCORAN:**  I think -- in terms of the omnibus

8     government motion, I think -- my request, I guess, or

9     suggestion is -- would be to take it under advisement.

10    These are issues that can be resolved at trial.  The

11    government has asked for a lot of blanket restrictions that

12    I don't think are appropriate.

13           Today at argument they said they think we're going

14    to talk about possible punishment.  That's not anything we

15    would ever do.  Punishment is, of course, not relevant to

16    the jury's consideration as to whether the charges were

17    proved.

18           I think one key concept is politics.  You know,

19    politics is an important part of this case from the start to

20    finish, and in order to present -- guarantee Mr. Bannon a

21    fair trial, we're going to have to have the ability to

22    question witnesses and examine them as to whether politics

23    plays any role in their actions, and obviously the exposure

24    of a witness's motivation is constantly [sic] protected;

25    that's *Davis,* 415 U.S. at 316 to 317.

1          On the issue of how we can probe the investigation

2     that the government has undertaken, again, that's the same

3     thing.  We are not going to argue that in that form, that

4     there was "prosecutorial misconduct."

5          The issue is, we're allowed to ask witnesses what

6     was done in this investigation and what was not done, so

7     that the jury can be in a position to analyze not just the

8     results of the investigation but the quality of the

9     investigation.  And that's *Sager*, 227 F.3d at 1145.

10         On one -- one other thing that came up is

11    essentially -- and Ms. Gaston addressed this -- the Court's

12    questions about the rules, should they go to the jury or

13    not.  At this stage, it's our position -- of course, we

14    fully briefed these issues --

15         **THE COURT:**  Yes.

16         **MR. CORCORAN:**  -- and at that stage, we asked the

17    Court and we tried to present enough information that based

18    on the law, we could get the Indictment dismissed, and it

19    didn't happen.  Now these are issues that go to the jury.

20         When it comes to issues such as -- to use your

21    formulation, whether the House followed its own rules, we

22    are not asking the jury to make up any rules or resolve

23    ambiguous things.

24         What we want to do is go down and present to them

25    evidence on whether or not a ranking minority member was

1   consulted, whether or not there were the number of

2   committees that were required, in our view, in the

3   continuing resolution and things like that, whether an

4   accommodation was offered.

5          The arguments that Ms. Gaston made today,

6   persuasively, she can make to the jury because they're jury

7   arguments, because they're not arguments about whether that

8   evidence can come in at all.  And we feel that the

9   government is inviting you into error by keeping that

10   important information from the jury.

11          You know, we went back -- it's kind of

12   interesting -- and I'm not in any way endorsing *Licavoli*,

13   because you know our position on *Licavoli*, which is we don't

14   agree with it.  But we went back to look at it and got the

15   trial transcript.  It was a little bit like Raiders of the

16   Lost Ark because it's in the National Archives and not

17   online and everything.

18          But in that case -- and the reason that we wanted

19   to do that is because in the opinion at the circuit level

20   there's reference to defense lawyer testifying.  And so the

21   question is, Why is a defense lawyer testifying?  What did

22   he get into?

23          And in that case, that was discussed before the

24   trial.  And the judge said, "Of course, I will admit the

25   evidence.  I think that a defendant has a right to present

1    evidence on his theory.  I can't exclude it on the ground

2    that the theory is wrong.  He has a right to make a record

3    of his theory.  Then, of course, I'll instruct the jury that

4    that particular evidence is immaterial."  There's more

5    discussion, and the judge says, "I don't think that this is

6    the kind of matter from which I should exclude the jury."

7            When the witness -- in that case, the defense

8    lawyer testified.  He testified extensively about his

9    receipt of the Subpoena, his presence when the Subpoena was

10   served, his communications and his advice to Mr. Licavoli.

11           In other words, defense gets to present the facts,

12   and then the jury, using the legal framework provided by the

13   judge, gets to make a decision.  Is the person guilty or

14   innocent?  So that's all we are asking here.

15           I think with that, I'm through the Motions in

16   Limine.

17           **THE COURT:**  Very well.  Thank you.

18           Mr. Schoen.

19           **MR. SCHOEN:**  Yes, Your Honor.

20           Judge, what I thought I would do is deal with

21   the -- whichever order the Court prefers, the Motion to

22   Continue and the *Meadows* and *Scavino* Motion to Compel, and

23   then I'd like to address the questions the Court asked sort

24   of randomly early on.

25           **THE COURT:**  I'm happy to hear those two motions in

1      either order.

2                 **MR. SCHOEN:**  Okay.  Thank you, Your Honor.

3                 Ready, Judge?

4            **THE COURT:**  I'm ready.  Are you?

5            **MR. SCHOEN:**  Yes, Your Honor.

6            **THE COURT:**  Okay.

7            **MR. SCHOEN:**  All right.

8                 Let's talk about the *Meadows* and *Scavino* motion

9      first, Your Honor.

10                We kind of lay it all out in the motion, but to be

11     clear, the declination letters is kind of the first, most

12     fundamental, thing we're talking about here, the reasons

13     given for not prosecuting them.  There may be other things

14     that also are not deliberative-process, covered information

15     but we don't know.  As they say in the papers, according to

16     The New York Times, they received a copy of these

17     declination letters.

18                First argument we make is that it comes within the

19     Court's oral order, and it does reflect policy on some

20     level.  These are high-profile cases.  Someone made a

21     decision on some policy level as to whether to prosecute

22     *Meadows* and *Scavino* and got a lot of pushback on that from

23     the Congress, publicly and otherwise.

24                The most direct reason that the letters are

25     relevant is because one of the issues here being contested

1    is whether the invocation of executive privilege was valid

2    here.  And now we see, from the letters last night, whether

3    it was specific enough and so on.

4          One of the fundamental points we tried to make in

5    the motion is executive privilege was invoked in *Bannon* by

6    the same person as agent for the former President, in the

7    same manner, with the exact same language, word for word

8    except for one sentence on immunity in the Bannon letter,

9    Meadows letter and Scavino letter.

10         If the government is challenging the invocation --

11   whether there was a valid invocation here -- remember, the

12   Committee challenged, Well, it wasn't -- executive privilege

13   wasn't ever invoked by the former President or to the

14   Committee specifically, and they're challenging the form of

15   that, and here we've seen it was raised in a recent hearing.

16   The Court said it wasn't clear whether executive privilege

17   was invoked unequivocally and so on.

18         To the extent that the *Meadows* and *Scavino*

19   decisions were based in any part on the invocation of

20   executive privilege and a finding that that was valid,

21   therefore, that it was properly invoked, then they're

22   directly relevant to that issue in this case.  Same manner,

23   same person, same language.

24         **THE COURT:**  You heard my -- the colloquy with

25   government counsel about the three ways in which the

1    invocation of executive privilege could be relevant here.

2    It could go to mens rea.  It could go to the affirmative

3    defenses of entrapment by estoppel or public authority or it

4    could just be -- I'll put it this way -- a freestanding

5    defense or excuse.

6              I understand Mr. Bannon has clearly argued

7    entrapment by estoppel and public authority are valid

8    defenses that should go to the jury, relying on the OLC

9    opinions, et cetera.

10             He's also argued at a minimum in the jury

11   instructions for a different view of mens rea than the

12   government, as to which his understanding of executive

13   privilege and the like, as it goes to his head, would be

14   relevant, you know, what was in his head.

15             Is Mr. Bannon arguing that he is -- the assertion

16   of privilege excuses or is a defense to this prosecution by

17   itself?

18             **MR. SCHOEN:**  Yes, Your Honor.

19             **THE COURT:**  Where does that appear in your papers?

20             **MR. SCHOEN:**  I'm not prepared to answer that

21   exactly right now, Your Honor.  But I'll tell you this --

22             **THE COURT:**  What's the argument?

23             **MR. SCHOEN:**  It's at the heart of every argument

24   we've made.

25             **THE COURT:**  Does it go to something other than

1    entrapment by estoppel and mens rea?

2         **MR. SCHOEN:**  Yes, it does.  Ordinarily,

3    Your Honor, it sounds like a crazy principle that the

4    invocation of privilege would excuse what we call here total

5    noncompliance; usually a privilege log, et cetera.

6         But the courts and the Justice Department have

7    treated executive privilege as unique.  They created --

8    let's say the OLC opinions, they created this idea that you

9    don't even have to appear.

10        By the way, Janet Reno in 1999 clemency OLC

11   opinion, which is cited by Cipollone and Purpura, in

12   representing people who have never been employed by the

13   Executive Branch, as applying to them also.

14        And Janet Reno says, Executive privilege is

15   different, you don't appear.  That's what all of the OLC

16   opinions that we've cited to Your Honor say.  It's because

17   the executive privilege and the separation of powers element

18   is different from every other kind of privilege that you

19   don't even have to appear or comply.

20        The other reason -- by the way, there's a second

21   reason offered by Mr. Costello for total -- what they're

22   calling total noncompliance --

23        **THE COURT:**  I understand.  It's just argument.  I

24   understand the point.  I don't think there's anything

25   binding anyone to some concession.  It wasn't total

1        noncompliance.  We're just using that as a term for purposes

2        of advancing the argument.

3                      **MR. SCHOEN:**  Thank you, Your Honor.

4                      The other argument to that is the very specific

5        OLC opinion that says, If agency counsel is not permitted,

6        by rules or otherwise, to accompany the deponent, then the

7        Subpoena is invalid, unconstitutional and can be ignored.

8        So that's another basis for why the invocation of executive

9        privilege itself excused any further compliance in this

10       case.

11                     In terms of, you know, raising executive privilege

12       as a defense like this, again, I pointed out last time, the

13       OLC opinion itself, for example, the Olson memo,

14       specifically says that if one is relying -- I'm reading,

15       Page 135, Note 34.  "There is some doubt whether obeying the

16       President's direct order to assert his constitutional claim

17       of executive privilege would amount to a willful violation

18       of the statute."

19                     **THE COURT:**  That seems to me that OLC screwed that

20       up.  No one read *Licavoli*.

21                     **MR. SCHOEN:**  I disagree 100 percent, respectfully,

22       Your Honor.

23                     **THE COURT:**  Okay.

24                     **MR. SCHOEN:**  Again, it goes back to our

25       supplemental brief.  *Licavoli* did not involve executive

1          privilege; that changes the whole ballgame.  And according

2          to the OLC, it changes the whole ballgame because executive

3          privilege triggers separation of powers --

4                    THE COURT:  Is *Licavoli* cited in the OLC opinions?

5                    MR. SCHOEN:  No --

6                    THE COURT:  So OLC --

7                    MR. SCHOEN:  -- because it didn't apply.

8                    THE COURT:  -- wrote a bunch of opinions and they

9          didn't address -- I mean, I get that it's a D.C. Circuit

10         opinion, so that rule may not apply in other circuits.

11                   MR. SCHOEN:  Judge, they cite plenty of D.C.

12         Circuit opinions in here.  And it's hard to imagine Ted

13         Olson, Walter Dellinger -- you know, on and on and on --

14         luminaries in the law, weren't familiar with *Licavoli* when

15         they were researching the contempt of Congress statute.  I

16         don't think it's fair to assume that.

17                   THE COURT:  So what's your definition of willful

18         consistent with *Licavoli*?

19                   MR. SCHOEN:  You have to have some recognition

20         that what you're doing is wrong, wrongful conduct or

21         violates the law.  Mr. Bannon didn't --

22                   THE COURT:  How is that consistent with *Licavoli*?

23                   MR. SCHOEN:  Pardon?

24                   THE COURT:  How is that consistent with *Licavoli*?

25                   MR. SCHOEN:  Oh, it's not consistent with

1    *Licavoli.*

2              **THE COURT:**  But I'm bound by *Licavoli.*

3              **MR. SCHOEN:**  I don't think so because executive

4    privilege is in this case.  We've already made that point.

5    I know Your Honor and I disagree, respectfully.  But

6    executive privilege changes the ballgame on every level --

7              **THE COURT:**  So your view then -- I mean, I know

8    this -- we already discussed this*, is that Licavoli* mens

9    rea, holdings and the like, mean that the mens rea under the

10   statute means one thing in executive privilege contexts and

11   another thing and in non.

12             **MR. SCHOEN:**  Yes, Your Honor.  And the cases have

13   said -- the old cases, new cases, there's a dispute -- a

14   question comes up in this *United States versus U.S. House,*

15   Gorsuch wanted to raise executive privilege as a defense.

16   Well, it arose in the civil case, and they say, Listen, this

17   is a very difficult question.  Let's not deal with it if we

18   don't have to.

19             Which, by the way, that case has language in it

20   that goes directly to one of the Court's questions earlier,

21   Are we making a mistake dealing with all of this stuff right

22   now when we may not have to?

23             I mean, there's case after case that says it's

24   inappropriate for these kinds of issues to be determined in

25   the criminal sphere or otherwise.  There's an accommodation

1       process that's constitutionally mandated.

2              **THE COURT:**  Why didn't you bring Mr. Bannon's

3       letter to the Committee to my attention in your filing last

4       night?

5              **MR. SCHOEN:**  One reason is, the media response

6       that we saw today; that is, Oh, Bannon is trying to get out

7       of something.  Mr. Bannon has taken a principled stance from

8       day one.  And by the way, Your Honor, I only saw it for the

9       first time on Saturday night after I finished my Sabbath

10      observance; that's when I think it came out.

11             In any event, Mr. Bannon has taken a principled

12      stance.  "Bannon:  My hands are tied because executive

13      privilege was invoked.  My hands, for the first time now,

14      are untied by the person who invoked executive privilege.  I

15      can now comply with the Subpoena."  Period.

16             That's his position with Congress.  And it was

17      appropriate for him to go to Congress, because that's where

18      the dispute was.

19             I would like to get into this point.  I'm skipping

20      ahead.  But the Court asked before, Couldn't this issue

21      possibly go to default?  I saw a little snippet of the

22      government's motion last night.  I was traveling but I saw a

23      friend, Kyle Cheney, excerpted a part of it in a Twitter

24      feed today, this motion about barring testimony on this

25      thing, and I intend to address it in the papers.

1           However, of course that testimony has to come in

2    that he's now agreed to testify.  The government raised it

3    by way of their Motion in Limine.  We didn't raise it.  But

4    since it's been raised, of course it comes in.  Why?

5    Because there's a factual question here on when there was a

6    default.

7           On October 19th -- back up a step.  The Indictment

8    in this case charges the default on specific dates:  October

9    14th in Count 1, and by October 18th in Count 2.

10          On October 19th, Chairman Thompson wrote to

11   Mr. Bannon -- this is the 19th, after the date the

12   government claims the default happened -- "These

13   developments underscore the folly of any continuing defiance

14   of the Select Committee's subpoena by Mr. Bannon.  The

15   Select Committee remains focused on expeditiously obtaining

16   the testimony and documents necessary to meet our

17   responsibilities, and we continue to expect immediate

18   compliance," compliance with the Subpoena, "by Mr. Bannon."

19          It doesn't say with the Subpoena.  I added that.

20          "-- compliance by Mr. Bannon.  Should Mr. Bannon

21   choose to change his posture, please notify Select Committee

22   staff at 202-225-7800."  That's October 19th, after the

23   supposed date of the default.

24          The contempt referral, Mr. Corcoran referred to

25   it, resolved that the Speaker of the House shall otherwise

1    take all appropriate action to enforce the Subpoena.  The

2    subpoena is still out there to be enforced.  So there's a

3    real fact question for the jury on whether there was any

4    default in this case or if compliance with the Subpoena, as

5    Congressman Thompson urged -- (brief pause) -- yeah,

6    Thompson urged, is still compliance with the Subpoena today.

7         And before, the government, I think, said

8    something like, Well, for a week after, or something like

9    that.  That's not relevant.  It doesn't matter if it was a

10   week after or a day after, as long as that question is open.

11        There is a principle in the law that conduct can

12   waive a default.  If the parties act like a question is

13   still open and they're still negotiating or they're still

14   urging compliance, then there is a reasonable basis for a

15   jury to find there was no default.

16        **THE COURT:**  So that goes to the question of

17   whether these letters would be admissible.

18        **MR. SCHOEN:**  I don't know about the admissibility

19   of letters.  Testimony about --

20        **THE COURT:**  Testimony --

21        **MR. SCHOEN:**  -- Bannon's  willingness now to

22   testify and produce documents.

23        **THE COURT:**  Whatever evidence is going to be

24   proffered about Bannon's willingness to testify now would,

25   in your view, be relevant at a trial, but it doesn't tell me

1     one way or the other whether the trial should start on

2     Monday.

3              **MR. SCHOEN:**  The trial shouldn't -- well, I

4     haven't gotten that continued.

5              **THE COURT:**  No, but I understand your motion and

6     the arguments you made before about continuance.

7              **MR. SCHOEN:**  Right.

8              **THE COURT:**  But while we're on the topic --

9              **MR. SCHOEN:**  Yeah.  Yeah.

10             **THE COURT:**  -- are you arguing that the trial

11    should be postponed because Mr. Bannon has now made an

12    offer, such that it is, to testify; and it would be

13    inefficient or improper to have a trial while that offer is

14    extant?

15             **MR. SCHOEN:**  I think, number one, it would be

16    contrary to the constitutionally-mandated accommodation

17    process.

18             Here's my answer:  There's no reason to have this

19    trial starting on Monday when there are two things -- one

20    thing that infringes, in my view without question, on the

21    defendant's constitutional rights.  That's the publicity

22    risk that only exists in June and July and doesn't exist in

23    October, when we've proposed, in a case that's never been

24    continued before.  And the second reason is this

25    development.

1          Now, the government posed this development as --
2    and I saw it in the media also -- cynics.  Well, the last
3    minute before trial, to avoid trial.  That's the other
4    reason I didn't bring the letters to the Court's attention
5    directly.  It's a matter I brought it to Congress'
6    attention.  Let's see what they have to say about it.  So
7    far they have indicated they would like to hear his
8    testimony.

9          But this isn't a last-hour move by Mr. Bannon.
10   His principled position has been, My hands are tied.  His
11   hands were tied under his understanding of executive
12   privilege, his respect for the invocation of executive
13   privilege by a former President.  His hands were now untied
14   for the first time, and that's what he told Congress.

15         You know, the government mocks this idea about
16   respecting the invocation of privilege by a former
17   President.  And, of course -- and I see, again, in the media
18   it's misreported.  That's not the status.  The status is
19   uncertain at best.

20         Justice Kavanaugh wrote extensively in his comment
21   on the denial of cert in *Trump versus Thompson*.  Certainly
22   *Nixon versus GSA* recognizes a former President can have
23   executive privilege and can invoke executive privilege, but
24   it may be that the current President supersedes that.

25         So here's another thing:  Why no default?  On

1    October 18th, a letter comes from the Office of current

2    President Biden from a guy named Mr. Su, I think, S-U.  And

3    it says they've reviewed it and they don't see any reason

4    further for Mr. Bannon to avoid testimony, complying with

5    the Subpoena.

6            I'm paraphrasing obviously.  That's October 18th.

7    That's after the deadline had passed; and that's his view of

8    things, that there's no reason for you not to comply now.

9            So what does Bannon's lawyer do?  He writes to the

10   Committee and says, Listen, I've seen this case, *Trump*

11   *versus Thompson*.  I'd like a week extension to study that.

12           What's the issue in that case?  Exactly this

13   issue -- one of the issues.  Again, the Supreme Court took

14   it away from them.  But one of the issues is, Can the

15   current President supersede the former President.  Or I

16   think it's well settled that he or she can.  The question

17   is, Under what circumstances can it be superseded?  And so,

18   again, Bannon is trying to find out.  And in terms of this,

19   Is the guy seriously trying to comply with the law?

20           Look at every communication from Bannon's lawyer

21   to the Committee.  Bannon will comply with the Subpoena if

22   you work out privilege with former President Trump or you

23   take me before a Court and the Court says, This privilege

24   I'm relying on wasn't valid or orders me to testify

25   otherwise.

1          So that's why I say it's a principled position.

2     He's offered to comply.  He's not a guy who said, Get lost;

3     I'm not complying, and so on.  He said very specifically, I

4     will comply but my hands are tied.

5          I got myself a little disorganized now trying to

6     skip around to the questions.

7          And again, I know we've made this position to the

8     Court.  I don't know if I've made it clear, but I've tried

9     to make it clear, that in terms of the entrapment by

10    estoppel argument, it doesn't matter whether executive

11    privilege was properly invoked; the question is, Did he have

12    a reasonable belief?

13         And in terms of that argument of whether that

14    would have excused total noncompliance, absolutely.  That's

15    his -- the fundamental underlying principle of Mr. Bannon's

16    understanding and his lawyer's understanding and reasonable

17    belief in then OLC opinions is that it's the underlying

18    principles that make clear that once executive privilege is

19    invoked for communications or deliberations between a

20    President and another person, current employee, former

21    employee, outside advisor, that triggers the whole panoply

22    of rights, duties and obligations that are described in the

23    OLC opinions because they flow from the invocation of

24    executive privilege and separation of powers' concerns and

25    the presumption that privilege is valid once it's invoked;

1    and that executive privilege is different.

2           By the way, Judge, I think -- I mean, there's an

3    additional argument besides just the jury question on the

4    Indictment.  This is not an on-or-about indictment.  This is

5    an indictment' that charges the default on the specific

6    dates, October 14th and by October 18th.

7           There is a legal argument to be made, I believe,

8    that given his willingness to comply now, there can't be a

9    default as a matter of law; and that's based on the conduct

10   that showed that wasn't a drop-dead default date.  It no

11   longer existed as a default date by waiver by conduct.  But

12   it's, at a minimum, a jury question.

13          The *Meadows* and *Scavino* thing, to return to that

14   for a moment, by the way, is also relevant.  I mean, I cover

15   this to some degree, and we cover this to some degree in the

16   motion.  It's relevant because of the -- again, Bannon's

17   underlying belief on the applicability of the OLC opinions.

18   Which I think, by the way, the idea that the Justice

19   Department doesn't consider there to be a distinction

20   between former, current and outside people is also

21   highlighted by the fact that Navarro was indicted.  And

22   that's a sort of backwards way of looking at it.  But I

23   think that emphasizes it.  And some members of Congress have

24   made this statement publicly.  They don't see what the

25   distinction was between Meadows, Scavino, Bannon, Navarro.

1          So it's -- I mean, the Court may disagree with me.

2     I understand this.  And I hope, you know, we're going to get

3     a ruling on it today, I'm sure.  But it would be

4     unreasonable for someone to read these opinions, especially

5     a layperson, and not believe -- if you look at all of the

6     reasoning in them and all of the language in them, and not

7     believe that they would apply to a person when executive

8     privilege is involved based -- invoked based on

9     communications with the President or deliberations with the

10    President.  And, you know, Henry Kissinger, again, is one of

11    the best examples I can think of.

12         But certainly the question meets the threshold.

13    I'm -- call me crazy.  I'm shocked that this is a question

14    that we're still dealing with, quite frankly.

15         In the Picco case, P-i-c-c-o, there's a real

16    question there whether the regulations the person relied on

17    applied at all or they were outdated regulations and so on.

18    But the Court said this is -- they reversed it and said,

19    This is a question that has to go to the jury --

20         In *Abecassis*, does anybody really believe that

21    that agent gave Abecassis the right to bring in a heroin

22    deal in one town, while telling him about another town?  Was

23    it reasonable to believe in that?  But the error the Court

24    made was in not letting us put on the defense, not letting

25    the jury consider it.  The threshold is just not that high.

1    It's not so high that when we see here White House counsel,

2    Cipollone and Purpura, citing to an OLC opinion that deals

3    with Executive Branch advisors, and they're citing it in the

4    context of people never before employed by the Executive

5    Branch, I'd suggest it's not unreasonable for Mr. Bannon to

6    think that those OLC opinions apply also.  (Brief pause)

7    Discussed in the papers, you know, why the *Meadows* and

8    Scavino business would be *Brady* and *Giglio*.

9             And I suppose, you know, if these recent filings,

10   last night's filings, are relevant to this question at all,

11   it is that, again, the government appears to be taking issue

12   through this Justin Clark as to what was invoked, you know,

13   on executive privilege and so on.

14            And so, again, since he uses the same language,

15   were those same questions asked in the *Meadows* and *Scavino*

16   consideration, and the idea that I read in the Twitter post

17   that the government is complaining, through Justin Clark,

18   that there were no assertions as to specific documents and

19   all that, this was a protective assertion; that's recognized

20   as a matter of law.  It's recognized in the OLC opinions, a

21   protected or prophylactic assertion.  And some of the cases

22   say, even before privilege is invoked, if we are dealing

23   with communications, then they could be treated as

24   privileged.  But there is no impediment here or deficiency

25   because it supposedly wasn't specific enough.  Anyway,

1      *Meadows* and *Scavino*, Judge.

2              I think I covered it.  It's not deliberative

3      processes.  It is *Brady* material, potentially.  The fact

4      that executive privilege is invoked in the same manner by

5      the same person and so on is directly relevant to that.

6              Continuance motion, Judge.

7              **THE COURT:**  Thank you, Mr. Schoen.

8              **MR. SCHOEN:**  I was going to get into the

9      continuance motion.

10             **THE COURT:**  Oh, I thought we discussed it.

11             **MR. SCHOEN:**  No, Your Honor.

12             **THE COURT:**  Well, we discussed, at least, the

13     implications of the events over the weekend.

14             **MR. SCHOEN:**  That's right.

15             **THE COURT:**  So I don't think anything is rocket

16     science with respect to your motion, but your argument is --

17             **MR. SCHOEN:**  That might be because I was involved

18     with it, Judge.  I'm not close to a rocket scientist.  I

19     don't think anything I write is.

20             **THE COURT:**  But, I mean, it's not complex.  How's

21     that?

22             The argument, as I understand it is, it's really

23     two things.  One is, there is currently a lot of public

24     information flowing out of the January 6th Committee, and

25     that would be prejudicial to have a trial now.

1          **MR. SCHOEN:**  And Bannon has been cited, and

2     specifically we have important, I think, facts and specific

3     details about his mentions.  Those mentions are -- those are

4     just mentions of Bannon with respect to the January 6th

5     events, and they skyrocket after the hearings.

6          **THE COURT:**  How do we know that there won't be

7     similar hearings in October?

8          **MR. SCHOEN:**  We don't know that.  What we do know

9     is, the hearings are scheduled, publicly announced, for

10    tomorrow and the 14th, and they've said they want to report

11    in the fall.  But the fact that we don't know that they will

12    continue then, I don't think, is a good enough reason.

13    There are fundamental rights of the defendant at issue here.

14         **THE COURT:**  Why can't I take those

15    considerations -- why isn't the appropriate course to see

16    whether we can, through voir dire, seat a jury that is

17    appropriately unbiased and the like, and if we can't,

18    because of this reason among others, then we would postpone?

19         **MR. SCHOEN:**  Well, here's an answer in Mr. Justice

20    Jackson's words:  "The naive assumption that prejudicial

21    effects can be overcome by instructions to the jury, all

22    practicing lawyers know to be unmitigated fiction, one

23    cannot assume that the average juror is so endowed with a

24    sense of detachment, so clear in his introspective

25    perception of his own mental processes, that he may

1    confidently exclude even the unconscious influence of his

2    preconceptions as to probable guilt engendered by a

3    pervasive pretrial publicity."  That's why, Judge.  We can't

4    weed that out.

5           First of all, people come into a political --

6           **THE COURT:**  So what if the Boston Bomber -- to use

7    an example -- the Boston Marathon Bomber didn't get to move

8    his trial, notwithstanding the unique effects that that

9    conduct had on the City of Boston and the like with all the

10   publicity about both him and the trial, and the judge there

11   didn't move it, and that was not reversed, why is the

12   publicity here substantially worse such that either delay

13   or -- I know you haven't asked to move the trial physically,

14   but why is delay warranted here if not --

15          **MR. SCHOEN:**  I don't think, Judge, that it has to

16   be worse than another case.  I think this case stands on its

17   own facts.  This is the seminal event in the country right

18   now, by design.  I don't -- by design?  They were horrific

19   events that happened.

20          But the design is to influence as many people on a

21   daily basis as possible; that's their stated purpose in

22   hiring a television producer and in conducting these

23   hearings in prime time and otherwise; that's their purpose.

24   To effect potential jurors, anybody and everybody out there,

25   to change their minds for political reasons and others.

1      They've said this publicly.  So that's one thing, Judge.

2              But I think another is this principle.  Due

3      process requires that the accused receive a trial by an

4      impartial jury, free from outside influences.  Given the

5      pervasiveness of modern communications and the difficulty of

6      effacing prejudicial publicity from the minds of jurors, the

7      trial courts must take strong measures to ensure that the

8      balance is never weighed against the accused.

9              And that's the point here, Judge.  There is

10     nothing magic about this block in July, and there are risks

11     that are unique to this block in July.  I mean, Judge Kelly

12     found it.  The Justice Department from a different office,

13     apparently, consented that there was a risk from that.  So

14     why take the risk when we have these fundamental rights at

15     issue?

16             And I'd say this --

17             **THE COURT:**  What's the magic behind October?

18             **MR. SCHOEN:**  Nothing about October, just --

19             **THE COURT:**  What about August?

20             **MR. SCHOEN:**  -- it's just a date.  I mean, if the

21     question is -- I mean, I didn't pick August because August

22     was when the Judge Kelly trial was scheduled, the end of

23     August, and they moved that.  They felt that was still too

24     close in proximity, apparently.

25             So I don't know that there's a magic date but

1    October -- from October on, from what we know now --

2         THE COURT:  What is it specifically?  Is it the

3    fact that there are these hearings that are happening right

4    now on the eve of trial?  And how long between those

5    hearings and the trial date is it, in your view, going to

6    cure it?  Because there has to be a cure if --

7         MR. SCHOEN:  Sure.  I think that's credible.  We

8    picked three months.  I think that's a relatively arbitrary

9    date.  I don't have any science that show that it would have

10   sufficiently dissipated by then.  Based on what we know now,

11   we're willing to accede to the point that that would be a

12   date by which it was sufficiently dissipated.

13         I would say this, Judge, without any commentary on

14   the current players, but I would say a myopic insistence

15   upon expeditiousness in the face of a justifiable request

16   for delay can render the right to defend with counsel an

17   empty formality.  A scheduled trial date should never become

18   such an overarching end that it results in the erosion of

19   the defendant's right to a fair trial.

20         If forcing a defendant to an early trial date

21   substantially impairs his ability to effectively present

22   evidence to rebut the prosecution's case or to establish

23   defenses, then pursuit of the goal of expeditiousness is far

24   more detrimental to our common purposes in the criminal

25   justice system than the delay of a few days or weeks that

1    may be sought.

2              I think the overarching principle is, Why now?

3    Yes, we set a trial date of now.  We didn't know any of

4    these factors then.

5              And the other thing, Judge, you know, I understand

6    the government took exception to it because it was raised in

7    a Reply, but we are closer now to the date.

8              I'm saying, Your Honor -- and I don't say this

9    lightly -- I believe firmly that if forced to trial in a

10   week, we would be providing ineffective assistance of

11   counsel to our client.

12             And I say that because today, a week ahead of

13   time, we don't know what defenses are permitted in the case.

14   I don't say this is the Court's doing.  There have been a

15   rash of Motions in Limine, which in my view have been

16   directed towards simply blocking the jury from finding out

17   what actually happened here.  Why did Bannon not comply from

18   Bannon's perspective?  Period.

19             But, anyway, when we develop a defense theory of

20   the case, Judge, that then means plugging in all of the

21   other elements that will be consistent with it from opening

22   to examinations, voir dire, exhibits, witnesses, testimony,

23   exercising the right of compulsory process, exercising the

24   right of confrontation.  We can't do that in a week.

25             Now, sure, we've had time to prepare, but we can't

1    prepare alternate theories, not know which witnesses to

2    prepare and so on.  And we are a week away from trial.

3             The other thing is, Judge, the government has said

4    here they anticipate their case taking one day, their

5    case-in-chief taking one day.  That's not a major lift then

6    to move that trial for that reason alone.

7             **THE COURT:**  Do you have a sense -- I suspect it

8    depends on some of my pretrial rulings, but assuming that

9    they go largely your way, how long would your case be?

10            **MR. SCHOEN:**  We've discussed it at some length to

11   try to give the Court -- we said originally two weeks.  I

12   happen to think that's longer than it will take.  It depends

13   100 percent on the Court's rulings.

14            You know, for example, we will -- we would

15   certainly call Mr. Costello as a witness, and he would

16   testify about the events that happened here.  But there's,

17   you know, got to be significant cross-examination, which

18   will depend, in part, on what issues the Court says can go

19   before the jury.  That cross-examination -- all of these

20   examinations and the development of the theory cannot

21   constitutionally effectively be done on the fly.

22            I am going to say this, Judge, just as an aside.

23   I know I was mocked last time for saying I have some

24   experience with entrapment by estoppel.  But I wasn't led to

25   a government Motion in Limine.  We shouldn't brag to the

1    jury about who we are.  Mine was a response to their

2    arguments on entrapment by estoppel.  I'm not in the habit

3    of blowing my own horn.

4              But I will say this, Judge, I bring

5    ineffectiveness cases against lawyers all around the

6    country, and have for about 30 years.  The number one

7    problem I see is the lawyer's unwillingness before the trial

8    to recognize the problems.  And then the defensiveness and

9    the ego that comes in after the fact in defending practices

10   that clearly were a function of a lack of preparation or a

11   lack of thought.

12             We've worked on this case 8, 10, 12 hours a day,

13   sometimes 20 hours a day.  There's not been a lack of

14   preparation here.  But we can't formulate a cogent defense

15   theory and plug everything else into it a week from now,

16   given the things that are outstanding and that wouldn't

17   change from rulings today.  I have to say that, Judge.  I

18   think I'm duty-bound to say it.  The Court may reject it,

19   but that's my perspective on it.

20             I don't think the Court needs anything else from

21   me.

22             **THE COURT:**  Thank you, Mr. Schoen.

23             **MR. SCHOEN:**  Thank you, Your Honor.

24             **THE COURT:**  Ms. Gaston or Ms. Vaughn?  I am happy

25   to hear from either or both of you.

1      **MS. VAUGHN:**  I will address the arguments defense

2 counsel made, Your Honor.

3           Actually, even though the Motion to Quash is not

4 ours, a couple of evidentiary issues came up during the

5 argument that I think we'd like to address as the

6 government, since they're related to the trial in this case.

7      **THE COURT:**  Sure.

8      **MS. VAUGHN:**  So the Court asked, I think, What

9 would happen if the question was submitted to the jury about

10 whether the rules were followed with respect to someone like

11 Speaker Pelosi?  And so I thought it would be helpful to

12 share the government's view of how that would work.

13           So let's say, for example, Mr. Corcoran cited the

14 rule about whether there was a conferral with a ranking

15 member before a subpoena for deposition testimony.

16           A conferral is the sort of internal rule

17 requirement that could be at issue in a trial.  So if that

18 were an issue, they could present evidence or ask witnesses,

19 Was there a conference between --

20      **THE COURT:**  Are you conceding this is a question

21 for the jury or are you just saying, assuming it's a

22 question for the jury?

23      **MS. VAUGHN:**  Assuming it's a question for the

24 jury.

25      **THE COURT:**  Okay.

1     **MS. VAUGHN:**  Well, I should make clear that we

2     view the question of whether there has to be someone with a

3     ranking minority title as different from whether

4     Representative Cheney as the Vice Chair needed to be

5     notified under the rules that there was going to be a

6     subpoena for a deposition or something like that.

7         **THE COURT:**  Okay.

8         **MS. VAUGHN:**  So let's say that internal rule were

9     at issue.  So Kristen Amerling is testifying.  The defendant

10    is free to ask her, This rule here that requires that notice

11    be sent to all the members, or whatever the rule is, was

12    that followed?  Ms. Amerling, to the extent that she has

13    personal knowledge of something, is a competent witness

14    under the rule so she testifies to that.  Then we get to the

15    end of the case, and it's time to instruct the jury.

16        Because of the Rulemaking Clause, the Court could

17    not submit to the jury the question of whether Ms. Cheney

18    qualifies as a ranking minority member, because the House

19    has spoken on that.  The Court could submit to the jury the

20    question of was she, as the ranking minority member,

21    consulted as required by the rules, whatever that rule might

22    be.

23        So that's how it would actually play out.  And

24    that, I think, is dictated by *Rostenkowski*, where it's the

25    Court deciding if there's ambiguity.  And *Rostenkowski* and

1    *Barker v. Conroy*, I think, is the case.  It's the Court

2    deciding whether there's ambiguity and the Court deciding

3    where the House has spoken on a rule, and then it can't

4    leave to the jury to potentially come up with a different

5    conclusion than what the House has come up with.

6         So when you think about it that way, the defendant

7    can't really show that testimony -- thinking ahead to their

8    request for relief, should it result in a certain way -- the

9    defendant really can't show the testimony they're seeking is

10   materially exculpatory if the witnesses that are already

11   testifying have personal knowledge of what happened.

12        They would have to then somehow not speculatively

13   establish that there was some kind of material difference

14   that that person was going to testify to as to what

15   occurred.  And they just haven't done that.

16        **THE COURT:**  So I guess I'm -- forgive me, maybe

17   I'm missing something.

18        Is it the government's position that I have to

19   decide, because it would be unconstitutional to allow the

20   jury to decide, that a House rule is X, if the House has

21   said it's Y?  And those are legal questions that I cannot

22   leave to the jury.

23        But once I decide what the House rules are or once

24   I decide what constitutionally they have to be deferred to,

25   the jury actually gets to decide whether the rules were, as

1    interpreted by me, actually complied with?

2              **MS. VAUGHN:**  Yes.

3              **THE COURT:**  Okay.

4              So what if I -- imagine hypothetically I say that

5    the House has said there has to be some -- I'm struggling

6    with the question that in this case, in the government's

7    view, would go to the jury.

8              **MS. VAUGHN:**  Well, because I think, like, there's

9    just no -- no one disputes that there were nine members on

10   the Committee.  But just to make up a rule -- let's say

11   there was a rule that the Committee has to have lunch, to

12   talk about the testimony, two days before the deposition.

13             Well, that obviously raises more factual questions

14   like, Was everyone at lunch?  Did they discuss the

15   deposition?  There could be factual issues there.  So I

16   think it's just difficult in the rules that the defendant

17   has been challenging here -- which, again, he's waived, in

18   our view but -- because there's just no factual dispute.

19   It's almost like there could be judicial notice of the fact

20   that there's only nine members on the Committee.

21             The problem for the defendant is once -- if he

22   hadn't waived it, the jury would still have to be instructed

23   that you have to accept the House's interpretation of its

24   rule that it's not required to have 13 members.

25             And so if there were a factual question on how

1    many members there were on the Committee, they could decide

2    that.  I guess the defendant could still argue to the jury

3    if there's some factual question.

4            THE COURT:  I mean, put differently, let's use the

5    inverse of that.  If the rule was clear, unambiguous, and

6    the House had adopted the view that there had to be

7    13 members of the Committee, and there's a factual dispute

8    about whether there were, that would be a jury question?

9            MS. VAUGHN:  In the government's view, yes.

10           THE COURT:  Okay.

11           MS. VAUGHN:  That's the kind of sort of mixed

12   question of law and fact that would go to the jury.

13           THE COURT:  Uh-huh.  Yep.

14           Let's go through the -- let's just, really

15   briefly, go through the other alleged rule violations here.

16   Can you just tick through, with each of the alleged rule

17   violations, what the government thinks is the line between

18   the law and the question for the jury?

19           MS. VAUGHN:  So we've addressed the number of

20   members.

21           THE COURT:  Yes.

22           MS. VAUGHN:  The ranking minority member issue.

23           THE COURT:  Okay.

24           MS. VAUGHN:  So I don't think we -- I mean, we've

25   disclosed in discovery that -- evidence that the

1      consultation requirements were followed, so it's not clear

2      to me that the defendant is challenging that.

3              It seems to be what the defendant is challenging

4      is that Ms. Cheney can't qualify because she's not the

5      ranking minority member.  But I think, as we talked about

6      last time, the House has made clear that its ranking

7      minority member is like a functional title, if not an

8      official title.  So for whatever purposes they need her

9      under the rules, that's what she's doing.

10             And then providing Rule 3b, I think that that's

11     the kind of rule, under *Rostenkowski*, where it's just clear

12     on its face it has to be provided before there's testimony.

13     And the defendant could elicit testimony that he never got

14     it, and the government would obviously offer testimony that

15     it's because he never showed up and that the Committee was

16     prepared to provide it.

17             **THE COURT:**  So let's just use that as an example.

18     If I say the rule required the defendant to be provided, no

19     later than his deposition, with these -- with the piece of

20     paper that says X, Y, Z, then it actually would be a

21     question for the jury what the plan was?

22             **MS. VAUGHN:**  Well, I think in that case, I

23     don't -- that rule, I don't think anyone is arguing there's

24     ambiguity in it.

25             I think the issue with the other --

1          **THE COURT:**  No, it's not about ambiguity.  It's

2    whether it was complied with.

3          **MS. VAUGHN:**  Right.  So whether --

4          **THE COURT:**  The rule could be clear but the

5    jury -- I understand your view to be, You, Judge Nichols,

6    need to decide, What does the rule mean?  Because to allow

7    the jury to have a view different than the House's view

8    would be unconstitutional.

9          I say as to this rule, it required X, whatever X

10   was.  There's a fact question about whether X occurred.

11         **MS. VAUGHN:**  Yeah.

12         **THE COURT:**  And here the X would be, the

13   government's view is, as to this specific rule, the rule

14   allows the provision of this information as late as the day

15   of the deposition.  Imagine I agree with that based on the

16   government's argument.

17         The question, I guess, is -- doesn't the jury then

18   still have to decide, Why was it not provided to Mr. Bannon;

19   and there would have to be some sliver of evidence, at

20   least, in front of the jury about what the House's plan had

21   been?

22         **MS. VAUGHN:**  Yes.

23         So if the defendant wants to challenge being

24   provided -- that he was never provided with it, and there

25   was a factual question about that, of whether they followed

1    the rule, that would be a jury question.

2              THE COURT:  Okay.

3              MS. VAUGHN:  But, again, this was an issue that

4    was known to him at the time and so under --

5              THE COURT:  I understand the view about waiver,

6    yep.

7              MS. VAUGHN:  So I say all that because it's kind

8    of looking ahead to when they start to seek a remedy, should

9    the subpoenas be quashed, that there really isn't -- because

10   of the rules that he is arguing are at issue -- there just

11   really isn't the kind of factual question that's going to

12   make any of these witnesses' testimony materially

13   exculpatory to that question that Ms. Amerling and

14   Mr. Tonolli aren't already addressing.

15              I think, as well, just looking ahead, to the

16   extent that the defendant wants to seek this remedy, the

17   government just wants to note -- if the subpoenas are

18   quashed, the government just wants to note to the Court that

19   we think that all can be resolved within a day or two.

20              The defenses and the elements issues have been

21   fully briefed.  We've been arguing them for months.  If the

22   defendant cannot articulate at this point why what he seeks

23   is materially exculpatory, after he's issued the subpoenas,

24   that's not a showing he's going to be able to make.

25              So to the extent that the Court quashes the

1    subpoenas and the defendant wishes to make a motion, the

2    government is happy to come back tomorrow and argue that

3    issue.  We don't think that there's any reason to delay

4    addressing that.

5         **THE COURT:**  What about the general point that

6    Mr. Schoen made, which is there is no magic to July 18th.

7    And to the extent that July is a month where he has -- he,

8    Mr. Bannon -- both particular concerns about publicity and

9    particular concerns about preparation, because there's no

10   magic to July 18th, there's really no reason not to delay,

11   perhaps not for three months, but for some reasonable period

12   of time, just the beginning of trial, almost for reasons

13   altogether unrelated to Mr. Bannon's offer.

14        What is the magic to July 18th?

15        **MS. VAUGHN:**  Well, the magic is that the

16   defendant's not the only one with speedy trial concerns.

17   The public has one too.  And there has to be a basis under

18   the Speedy Trial Act to push this and exclude time.

19        So I'll start with the publicity.  Courts are

20   uniform that a defendant being named in a news article, even

21   a lot, is not sufficient to either move venue or engage in a

22   lengthy continuance.

23        Here the defendant's cited to less than 30 seconds

24   of mentions of him in the hearings.  He has cited in a

25   number of mentions in the media within a day but has

1    provided no information about what those mentions are.

2    I mean, the defendant is a public figure.  He

3    seeks publicity himself.  The Court can't just look at a

4    number that the defendant has provided and say, Well, that's

5    clearly pretrial publicity about this case, which is the

6    next issue.

7    The question of whether there's prejudicial

8    pretrial publicity is about whether the publicity is about

9    this case, whether the publicity is aimed at shaping

10   potential jurors' views of this case.

11   The fact that it's not an automatic continuance

12   for actual January 6th defendants, when these hearings are

13   going on, means it is -- it definitely should not be an

14   automatic continuance for someone whose case is sort of

15   ancillary to the subject matter on which the hearings are

16   focused.

17   The cases that Mr. Schoen cited, they all assume

18   that we already have jurors that are prejudiced beyond an

19   ability to be fair.  That is not the kind of publicity

20   that's at issue here, and there's no reason to think that --

21   **THE COURT:**  Okay.  What about their argument that

22   there is a lot going on.  There are lots of motions,

23   including a motion that was filed last night at midnight.

24   And because of that, there's only a week to -- assuming I

25   decide a bunch of motions today, there is only a week to

1    figure out openings and directs and cross and, you know,

2    maybe in a simple case that would be enough but in a

3    difficult, complicated case, that's not enough.  And, again,

4    there is no magic to July 18th.  What's your response to

5    that?

6         **MS. VAUGHN:**  Your Honor, my response is that the

7    defendant purposefully manufactured this.  He requested this

8    schedule.  In his initial request, he didn't want any of the

9    Motions in Limine to be filed until the later date on which

10   we filed them.

11        **THE COURT:**  But to be fair, to go back to the

12   original discussion about scheduling, the government wanted

13   to move faster, and Mr. Bannon wanted to move more slowly.

14   And I didn't, like, split the baby so to speak, just to

15   split the baby.  But I arrived on this date, which was

16   faster than Mr. Bannon had requested originally.  He wanted

17   a later trial date.

18        **MS. VAUGHN:**  Mr. Bannon has provided us his

19   witness list.  We've done our jury instructions.  We've

20   exchanged objections to witnesses.  We've exchanged

21   potential voir dire.

22        They -- they're experienced attorneys, Your Honor,

23   and this claim that they haven't been planning for

24   contingencies, the government just doesn't find credible.

25   To the extent that the Court is entertaining this, we submit

1    that the Court should engage in a questioning, in camera,

2    with defense counsel to evaluate exactly what it is they

3    don't think that they have done, that they have to do, to

4    provide effective assistance.

5         This claim is coming at the end of filing a Motion

6    to Continue for Pretrial Publicity, a motion to -- a

7    suggestion to this Court that they also wanted to continue

8    at some point to build their legislative purpose record, a

9    suggestion now in that the motions schedule they requested

10   isn't working for them, and a last-minute effort to comply

11   with the Subpoena.

12        It's just not -- I understand the defense has to

13   advocate for their client.  Their client doesn't want to go

14   to trial.  But it's just very telling that they are making

15   this claim at noon on Monday after they've had argument on

16   all of these other issues.

17        So the government would submit that at least the

18   Court should inquire as to specifically what it is they

19   think they still need to do.  And, again, balance that

20   against -- especially if the defendant -- all these

21   extraneous defenses are excluded, the issues in this case,

22   as they should be, are very narrow.  It's about whether he

23   got a subpoena, whether he knew about it and whether he

24   showed up when he knew he was supposed to be there.  Which I

25   can go to the Motion to Exclude and the *Meadows/Scavino*

1        issue from there.

2                THE COURT:  Sure.  Briefly.  I have the arguments

3        so I don't think you need to --

4                MS. VAUGHN:  One thing I just want to point out is

5        the Court asked Mr. Schoen how executive privilege

6        independently provides a defense to this case, and

7        Mr. Schoen only just kept citing back to DOJ opinions.  But

8        DOJ opinions, one, they don't provide an excuse but even if

9        they did, they're not the law.  And he has not shown that

10       under the law executive privilege provided a basis for total

11       noncompliance.

12               They talk a lot about showing up for testimony.

13       What they don't talk about is the document demand.  How are

14       communications with the Proud Boys and the Oath Keepers

15       possibly relevant to executive privilege?  How are

16       communications on his podcast possibly relevant to executive

17       privilege?  They don't address any of that.

18               So to the extent that they now are making an

19       independent claim that this case should be dismissed based

20       on executive privilege, the law just simply isn't that broad

21       when it comes to executive privilege.

22               I have to go back to the entrapment by estoppel

23       point one more time, because Mr. Schoen continually just

24       discusses about how he had a reasonable belief, reasonable

25       belief, reasonable belief.  He completely ignores the first

element that there has to be an affirmative statement.  The
government submitted with its proposed jury instructions an
example instruction out of the Ninth Circuit.  There are
several others.

It is not just the defendant's reasonable belief;
that's a mistake of law defense.  It is, There has to be an
affirmative statement.  And this notion that a defendant can
piece together statements that he's pulled out of five
different documents is just completely without limit.

I don't see why any defendant couldn't find some
20-year-old pleading and say, Well, I read this line out of
a pleading.  I therefore have an entrapment defense.  The
defendant just keeps ignoring that requirement and has not,
to this day, identified a single statement, which is why he
can't even begin to show that the *Meadows* and *Scavino* issues
are relevant.

I think, unless the Court has anything else,
that's everything.

**THE COURT:**  Thank you, Counsel.

Mr. Corcoran, briefly.

**MR. CORCORAN:**  Yeah, 30 seconds on the rulemaking
issue.  And this may be self-evident, but the suggestion was
that the jury would have some sort of a view on the House
Rules that would somehow create an unconstitutional conflict
with what's been expressed as the House of Representatives'

1       position on the meaning of the Rules; that's not going to

2       happen.

3               There's a jury verdict form that's going to have

4       two questions:  Guilty or not guilty on Count 1 and Count 2.

5       We don't impeach the verdict of the jury.  Whatever their

6       verdict is in the case, it is not going to be a statement on

7       what the meaning of the House Rules are, and so there could

8       never be a constitutional violation based on that.

9               **MR. SCHOEN:**  (Inaudible)

10              **THE COURT:**  Okay.  Mr. Schoen?

11              **MR. SCHOEN:**  The idea that we should move forward

12      because we provided our witness and exhibit list is just an

13      outrageous statement to make.  The government was told

14      clearly, and we filed in our papers, that we're not in a

15      position to make out an exhibit or witness list.

16              The government filed this motion to file

17      separately.  It's true.  It is misery for us to have to deal

18      with them in this meet and confer process.  It is misery.

19      But the Court ordered us to do it, so we crafted together a

20      potential witness and exhibit list while reserving the

21      rights.  It's outrageous to say that's a reason to move

22      forward because we provided it.  That's just not honest.

23      It's not honest to say we haven't identified a single OLC

24      opinion that we've relied on.  They say two things --

25              **THE COURT:**  No, I understand your argument there.

1   I get it.

2           **MR. SCHOEN:**  Okay.  Yeah.  And the last thing is I

3   don't know what argument they're saying we're making Monday

4   at noon.  We said in our papers why we can't be prepared for

5   this thing.  It's not -- I understand.  They would like to

6   go to trial, you know, November 13th last year if they

7   could.

8           But we have an obligation to our clients, and we

9   have an obligation to the Constitution.  And the

10  Constitution provides for fair trial rights and the right to

11  effective assistance of counsel, and we have the obligation

12  to speak up otherwise.

13          So all of this, you know, casting it off.  I don't

14  know what it takes.  I don't know what could happen here,

15  what they need this for.  A lot of it; that's what we need.

16  They want to know what we need specifically, we need to know

17  what defenses we're going to have and then build a case

18  around that.  We need to know all of the outstanding things

19  that are pending before the Court.  And, again, we don't sit

20  at home doing modeling, Well, let's plan a defense and then

21  jump into action depending on what that's going to be.

22          It's simply not fair.  Believe me, I don't say it

23  lightly when I have to say publicly we cannot provide

24  effective assistance of counsel.

25          Thank you, Your Honor.

1            **THE COURT:**  Thank you, Mr. Schoen.

2            I'm just looking at the clock.  My goal is today

3    to resolve orally at least a number of the pending motions.

4    I would like some time to reflect upon what I've heard this

5    morning.

6            I think the most appropriate course is to

7    reconvene at 2 p.m., but it need not be in person.  That is

8    to say, I am happy to -- if people have things they need to

9    do or would rather not stick around in the courthouse for an

10   hour and 20 minutes and the like -- do this by phone if

11   people would prefer, because I don't intend to have anymore

12   argument on the questions that I'll be resolving.  I suppose

13   there may be some issues we should be discussing, but it

14   could be done as well by phone.

15           So I guess I'm willing to either come back into

16   the courtroom and for people who would rather just listen by

17   phone to open a public line or I'm willing to just do it by

18   phone, if that's everyone's preference.  I am open to

19   either.

20           Ms. Vaughn?  Ms. Gaston?  Do you have a view?

21   Would you rather just do it by phone?

22           **MS. VAUGHN:**  We're fine to come back in person,

23   Your Honor.

24           **THE COURT:**  Okay.  Counsel?

25           **MR. SCHOEN:**  In person, Your Honor.

1          **THE COURT:**  All right.  So let's do that then.

2          Why don't we make it 1:30?  I was thinking 2:00

3     only because, if we were going to do it by phone, then I

4     would be keeping people around for less time, but 1:30 means

5     50 minutes from now.  So let's do that.  Let's go to a

6     recess.  I'll come back at 1:30 and issue an oral decision

7     on these questions.  Thank you.

8          **DEPUTY CLERK:**  All rise.

9          (Court recessed from 12:44 p.m. until 1:35 p.m.)

10         **DEPUTY CLERK:**  We are now back on the record.

11         **THE COURT:**  Thank you, Ms. Lesley.

12         Thank you for the argument this morning, Counsel,

13    and for all of the briefs that have been filed on all of the

14    pending motions.

15         Before me are multiple motions from two related

16    matters.  Obviously, *United States versus Bannon*, but also

17    *In re Nonparty Subpoenas*, the miscellaneous action filed to

18    quash the  subpoenas to various House members and staff.  I

19    will resolve all or at least a number of the pending motions

20    today.

21         A number of those motions turn on three key issues

22    in this case.  The first is the mens rea required for a

23    violation of the statute.  That is, what does it mean to

24    willfully make default?  The second is whether Mr. Bannon

25    can present to the jury his affirmative defenses of

entrapment by estoppel or public authority.  And the third
is whether and to what extent Mr. Bannon can present his
claims that the Select Committee or at least the Subpoena
issued to him is not in compliance with the House Rules.

I'll discuss each of those three sort of
overarching issues in turn, along with how, in my view, the
resolution of those questions resolves the pending motions.
So, as I indicated, the first question is what does the mens
rea willfully in 2 U.S. Code, Section 192 mean?  That is,
what does it mean to willfully make default?

In their proposed jury instructions and various
briefs, the parties present very different definitions of
willfully.  The government argues that it means deliberate
and intentional.  The government contends that willfully
"does not mean that the defendant's failure or refusal to
comply with the Select Committee Subpoena must necessarily
be for an evil or bad purpose.  The reason or purpose of
failure or refusal to comply is immaterial so long as the
failure or refusal was deliberate and intentional and was
not a mere inadvertence or accident."

Mr. Bannon, on the other hand, as we discussed
earlier, argues that to prove he acted willfully, the
government must show that he "was conscious of wrongdoing."
He argues therefore that it must be shown that he "acted on
his own volition and knew or should reasonably have known

1    that his conduct was unlawful."

2         Thus, in his proposed jury instruction, Mr. Bannon

3    proposes that the Court instruct the jury that willful

4    default "means that Mr. Bannon knew or should reasonably

5    have known that his conduct was unlawful, was conscious of

6    wrongdoing, and that his actions were deliberate and

7    intentional and not the result of accident, mistake or

8    misunderstanding or the assertion of a valid privilege."

9         In my view the precedent from the Court of Appeals

10   and the Supreme Court on this question is unequivocal and on

11   point.  In order to demonstrate that Mr. Bannon acted

12   willfully, as that term is used in Section 192, the

13   government need only prove beyond a reasonable doubt that

14   Mr. Bannon acted deliberately and intentionally in failing

15   to comply with the Subpoena.

16        As the Court of Appeals explained in *Licavoli*, "It

17   was established by the *Bryan* and *Fleischman* cases that he

18   who deliberately and intentionally fails to respond to a

19   subpoena willfully makes default.  Evil motive is not a

20   necessary ingredient of willfulness under this clause of the

21   statute.  A deliberate intention not to appear is

22   sufficient."

23        It was established by the *Quinn* case that a

24   deliberate intentional refusal is an element of the offense

25   of refusing to answer a pertinent question under the other

clause of the statute.  We discussed this in *United States*
*versus Deutch*.  So it is established that the intent
essential to constitute an offense under these two clauses
is the same in nature of deliberate, intentional failure
without more, in each case.

And there are other relevant quotes.  I'll just
read one more.  "It has been established since the *Sinclair*
case that reliance upon advice of counsel is no defense to a
charge of refusing to answer a question.  Such reliance is
not a defense to a charge of failure to respond.  The
elements of intent are the same in both cases.  All that is
needed in either event is a deliberate intention to do the
act.  Advice of counsel does not immunize that simple
intention.  It might immunize if evil motive or purpose were
an element of the offense, but such motives or purpose is
not an element of either of these offenses.  We are of
opinion that the doctrine laid down in *Sinclair* applies also
to a charge of willfully making default.  Advice of counsel
cannot immunize a deliberate intentional failure to appear
pursuant to a lawful subpoena lawfully served."

And then it goes on to summarize the holding,
which I think is important here.  In the case at bar there
can be no serious dispute about the deliberate intention of
*Licavoli* not to appear before the Committee pursuant to its
subpoena.  That he meant to stay away was made abundantly

1    clear.  That he did so upon the advice of a lawyer is no

2    defense.  The trial judge correctly instructed the jury.

3           And it's worth noting that the arguments made by

4    Mr. Licavoli in that care are much the same as Mr. Bannon's.

5    And again, to quote the *Licavoli* decision, *Licavoli*'s

6    principal point here is that the trial judge erred in

7    refusing to instruct the jury that if the accused acted upon

8    the advice of counsel, they should acquit.

9           Indeed, the judge instructed to the contrary.  The

10   Court of Appeals, of course, concluded that this contrary

11   instruction was proper.  These are clear and express

12   holdings that, in my view, are binding here.

13          As I've stressed many times, I have serious

14   reservations that the Court of Appeals' interpretation of

15   willfully is consistent with the modern understanding of the

16   word.  It's not consistent with modern case law surrounding

17   the use of that term, let alone the traditional definition

18   of the word.  But as I've previously held and I reiterate

19   again today, I am bound by *Licavoli* and its holdings.

20          So what does that mean for the pending motions?

21   First, as I've previously held, Mr. Bannon cannot present

22   evidence that he relied on advice of counsel as the reason

23   for declining to appear or produce documents.  The same goes

24   with the OLC opinions and other DOJ writings.

25          Mr. Bannon cannot present evidence regarding those

1   documents to demonstrate that he believed he was not

2   required to comply with the Subpoena, since that question is

3   irrelevant to whether Mr. Bannon deliberately and

4   intentionally failed to comply with the Subpoenas.  So too

5   with his assertions of privilege.  As a general matter, none

6   of that evidence can justify his failure to appear or

7   produce documents under *Licavoli*.

8          But that does not necessarily mean that all

9   evidence covered by the government's motions is irrelevant.

10  In my view, Mr. Bannon is entitled to offer evidence that

11  would tend to show he was not aware of the return date on

12  the Subpoenas, for example, or that he did not otherwise

13  intentionally fail to comply with them for a similar reason.

14         For such evidence to be relevant, however,

15  Mr. Bannon would need to demonstrate at trial that such

16  evidence would tend to establish that his failure to appear

17  or produce documents was either not deliberate or not

18  intentional, as the Court of Appeals has used those terms.

19  If Mr. Bannon cannot make such a proffer with some showing

20  that would tend to go to his mens rea so defined, then the

21  evidence would be altogether irrelevant and excluded.

22         Take an example:  If Mr. Bannon were to introduce

23  evidence at trial that he did not believe that the date for

24  complying with the Subpoena was the operative one, that

25  evidence would likely be admissible.  After all, Rule of

1    Evidence 401, which renders evidence relevant, unless

2    admissible under Rule 402 -- excuse me.

3              After all, Federal Rule of Evidence 401 renders

4    evidence relevant if it has any tendency to make a fact more

5    or less probable than it would be without the evidence and

6    the fact is of consequence in determining the action.

7              I note that this is not a method through which

8    Mr. Bannon can argue that he thought, for example, that he

9    was legally excused from responding to the Subpoena or that

10   the Subpoena was invalid, be it from the composition of the

11   Select Committee or some other alleged flaw.

12             Such arguments would not go to any aspect of

13   willfully, as the Court of Appeals has defined it.  It would

14   not show that the failure to attend was not deliberate and

15   intentional.  Thinking one is legally excused from

16   responding to a subpoena or that a subpoena is not valid is

17   not the same as thinking that the date had been put on hold.

18   While such evidence, that is, thinking that one is legally

19   excused from responding to a subpoena or that a subpoena is

20   not valid would be admissible under a more common

21   understanding of willfully, that is not the operative one

22   here.

23             So to the specific motions, the government's

24   Motion in Limine to Exclude Evidence of Department of

25   Justice Subpoenas and Writings, ECF No. 52, is granted in

1    part and denied in part.

2            This evidence is excluded to the extent that

3    Mr. Bannon would offer it to show that he was legally

4    excused from responding to the Subpoena or that he believed

5    that he was; that the Subpoena was invalid or he believed it

6    was; or that he was not otherwise required to respond to it.

7            But such evidence might, and I stress might, be

8    relevant if Mr. Bannon was prepared to offer evidence that

9    he did not think the date on the Subpoenas was operative.

10   It might be that Mr. Bannon cannot proffer that he intends

11   to introduce such evidence.  If not, then this evidence

12   would be entirely irrelevant and excluded.

13           But before such a proffer is made or not, and I

14   will not require Mr. Bannon to make one before trial begins,

15   granting this motion in its entirety is premature.  I do

16   note, however, that this decision says nothing about whether

17   such evidence -- talking about the evidence covered by the

18   government's motion, ECF No. 52, can be introduced to

19   support an entrapment by estoppel or other affirmative

20   defense, which I will discuss later.

21           Next is the government's Motion in Limine to

22   exclude evidence of the defendant's prior experience with

23   subpoenas, ECF No. 56.  I will also grant this motion in

24   part and deny it in part as well.

25           To the extent that Mr. Bannon would attempt to

1    introduce such evidence for the purposes of explaining that
2    he did not think he had to comply with the Subpoena or that
3    his understanding of privilege exempted him from following
4    the Subpoena's commands, then it cannot be admitted.

5           Again, if Mr. Bannon can proffer that he intends
6    to show that he did not believe the return dates on the
7    subpoenas were operative, perhaps because his prior
8    experience led him to believe that the return date had been
9    or maybe would be moved, then the evidence may be relevant.

10          I stress, once again, however, that such evidence
11   is only relevant so long as it would go to one of the narrow
12   aspects of mens rea element so defined by the Court of
13   Appeals.  If Mr. Bannon cannot proffer that he would intend
14   to make that showing, this evidence would be entirely
15   irrelevant.

16          These thoughts also resolve one part of the
17   government's Omnibus Motion in Limine, ECF No. 85, Section
18   I.F of the Omnibus Motion seeks to exclude testimony from
19   defense counsel based on their "claimed experience."  Again,
20   that motion is granted in part and denied in part or that
21   portion of the motion.

22          The motion is granted to the extent that such
23   testimony would be offered to show that the advice that
24   counsel gave Mr. Bannon included that he had a justification
25   not to comply with the subpoenas.  To the extent it tries to

show that privilege or OLC documents justified Mr. Bannon in
not complying or to the extent that it was offered to show
that the subpoenas were invalid, or to the extent that this
testimony might shed light on Mr. Bannon's subjective belief
as it relates to the narrow mens rea requirement.  If, for
example, counsel had told Mr. Bannon that they were in
negotiations with the Select Committee, and that the date on
the subpoenas was no longer the operative one, then the
evidence might be relevant.

In light of what I've just said, it's also worth
clarifying, if necessary, my previous order, ECF No. 49, on
the United States' Motion in Limine to Exclude Evidence or
Argument Relating to Good-Faith Reliance on Law or Advice of
Counsel, which was ECF No. 29.

To the extent that Mr. Bannon seeks to argue that
his failure to comply with the Subpoena should be excused
because he relied in good faith on the advice of his
counsel -- and thus that he did not comply with the Subpoena
because he did not think it was valid as it applied to him
or he had a justification for not doing so -- such evidence
is clearly irrelevant in light of *Licavoli*.

But as I just noted, to the extent that
discussions with counsel might go to Mr. Bannon's subjective
belief about whether the date on the subpoenas was
operative, that evidence could be relevant.  Advice of

counsel that the Subpoena was invalid or that he was excused
from attending, of course, would remain barred.

It's worth repeating, again, how relatively low
the bar is for satisfying the mens rea of the statute.
Under *Licavoli*, which binds me, the only question is whether
the failure to appear was deliberate and intentional and not
due to inadvertence or accident.

If evidence is irrelevant to that question, if,
for example, it doesn't go to the question of whether
Mr. Bannon understood the date for compliance with the
Subpoena or something similar, then it is inadmissible.

I do want to reiterate my concerns with the mens
rea standard as held by *Licavoli*.  Evidence regarding the
reasons that Mr. Bannon did not comply with the Subpoena
here, for example, because he didn't believe the Subpoena
was valid or because he was -- he believed he was legally
excused from showing up as a result of the former
President's implication of executive privilege or because he
relied on his lawyers' advice on these topics, these are
relevant to the criminal charges here and therefore
inadmissible.

Such evidence would likely be admissible, however,
under a different definition of willfully.  It's likely, for
that reason, this dynamic created by this low bar of
willfully, I think is one reason that Mr. Bannon may seek to

1    introduce this evidence through the affirmative defenses of

2    entrapment by estoppel and public authority, which I will

3    discuss now.

4           So, as I indicated, the second sort of

5    overarching, relevant issue is whether the affirmative

6    defenses of entrapment by estoppel or public authority can

7    go to the jury.  I conclude that they cannot.

8           Begin with the defense of entrapment by estoppel.

9    As I explained at the June 15th hearing, none of the OLC

10   opinions or other DOJ statements concern a situation

11   involving communications by a nongovernment employee with

12   the President who, at the time of the Subpoena, was no

13   longer in office.

14          That dooms any invocation of entrapment by

15   estoppel.  While neither the Supreme Court nor the D.C.

16   Circuit has laid out the precise elements required by this

17   defense, I agree with the following statement from the

18   Eighth Circuit.  "Entrapment by estoppel arises when a

19   government official tells a defendant that certain conduct

20   is legal and the defendant commits what otherwise would be a

21   crime in reasonable reliance on that official

22   representation."

23          That's the *Peithman* case, 917 F.3d at 648.  So

24   assuming that this defense could even extend to documents,

25   like OLC opinions -- and I do believe the government

appeared during the last hearing to concede that it could, none of the documents Mr. Bannon points to deals with his situation specifically, and none of them is equivalent therefore to a government official telling him that his conduct is legal such that the government would be estopped from pursuing the charges here.

At best, Mr. Bannon can draw inferences from the opinions to his situation combining the underlying legal principles from those opinions to the specific factual situation here.

But because none of those opinions deals with this precise factual situation, none standing on its own could guide his decision.  Entrapment by estoppel requires a much more precise showing than one by inference, and there are a number of cases to that effect, including *United States versus West Indies Transportation*, 127 F.3d 299, Third Circuit.  So too here.

While the OLC opinions might, by their own terms, apply to somewhat similar situations, they do not cover the precise one here.  Because of that, I will not instruct the jury on this defense.  And since I will not instruct the jury on this defense, any evidence related to it is irrelevant.

Turning next to the defense of public authority. Again, the D.C. Circuit has not laid out the precise

1    contours of this defense.  But I agree with the Eleventh

2    Circuit that: "A defendant may assert a public authority

3    affirmative defense when he has knowingly acted in violation

4    of federal criminal law but has done so in reasonable

5    reliance on the authorization of a government official."

6    That's the *Alvarado* case, 808 F.3d 474, Eleventh Circuit

7    2015.

8            The Court went on to say, "The public authority

9    defense is narrowly defined, however, and a defendant will

10   not be allowed to assert the defense or to demand that the

11   jury be instructed on it unless he meets certain evidentiary

12   prerequisites.  First, as the name of the defense implies, a

13   federal law enforcement officer must have actually

14   authorized the defendant to commit the particular criminal

15   act at issue, and the defendant must have reasonably relied

16   on that authorization when engaging in that conduct.

17           "Second, the government official, on whom the

18   defendant purportedly relied, must have actually had the

19   authority to permit a cooperating individual to commit the

20   criminal act in question.  If, contrary to the defendant's

21   genuine belief, the official possessed no such authority,

22   then the public authority defense cannot be asserted."

23           As I understand it, Mr. Bannon seeks to base this

24   defense not on the OLC opinions or not specifically but also

25   at least on the instructions on former President Trump.  The

1    former President, in his civilian capacity, is by definition

2    not a federal official.  This defense simply does not fit

3    the circumstances of this case.

4            Especially true, given under these circumstances,

5    the former President never instructed Mr. Bannon to not show

6    up altogether.  The letter from President Trump's counsel,

7    on which Mr. Bannon relies, instructed Mr. Bannon to, "(a)

8    where appropriate, invoke any immunities and privileges he

9    may have from compelled testimony in response to the

10   Subpoena; (b) not produce any documents concerning

11   privileged material in response to the Subpoena; and (c) not

12   provide any testimony concerning privileged material in

13   response to the Subpoena."

14           President Trump's counsel later clarified in an

15   email to Mr. Bannon's counsel that, "Just to reiterate, our

16   letter referenced below didn't indicate that we believe

17   there is immunity from testimony for your client."  The

18   lawyer continued, "As I indicated to you the other day, we

19   don't belief there is."

20           I will therefore not instruct the jury on a

21   defense of public authority, and I will exclude the evidence

22   that would go to that defense.  It is also worth noting

23   Mr. Bannon seeks to have me instruct the jury on the defense

24   of apparent authority, which I will not do, because the

25   defense has never been authorized in this or any other

1    circuit.

2           I'm repeating myself to some extent, but it is

3    worth acknowledging that this outcome, together with my

4    decisions relating to willfulness, might seem anomalous.

5    After all, it seems like the jury should hear the

6    defendant's side of the story that, for example, he was

7    acting on advice of counsel about OLC opinions or that he

8    thought that his conduct was consistent with the former

9    President's invocation of executive privilege.

10          But this evidence cannot establish the affirmative

11   defenses of entrapment by estoppel or actual authority.

12   Instead, those defenses are something of a round hole into

13   which Mr. Bannon seeks to fit evidence that would be more

14   naturally relevant to determining whether his alleged

15   noncompliance was willful.  But, again, *Licavoli* makes such

16   evidence irrelevant.  So the government's motion as to the

17   defenses of entrapment by estoppel and public authority is

18   granted.

19          The third major issue relates to whether and to

20   what extent questions regarding whether the Select Committee

21   is operating consistent with House Rules are questions for

22   the jury.  Mr. Bannon has raised challenges to the

23   composition of the Select Committee as well as particular

24   challenges to the alleged failure of his subpoena to comply

25   with certain House Rules.  Many were presented in his Motion

1    to Dismiss the case.  But as I explained at our last

2    hearing, those arguments did not warrant dismissal of the

3    Indictment.

4            The question now is whether these arguments go to

5    issues that must be decided by the jury.  As an initial

6    matter, I conclude that they are not relevant to an element

7    of the offense.  Rather, Mr. Bannon's challenges, based on

8    noncompliance with House Rules, are best characterized as

9    defenses to the charge at issue.

10           I think that's the clear implication in *United*

11   *States v. Bryan*, and it would be odd at the very least to

12   say that something can be waived.  And it is the case that

13   challenges to House Rules can in certain circumstances be

14   waived.  It would be odd to say that something that can be

15   waived is an essential element of the defense.

16           But as I discussed, Supreme Court precedent on

17   this matter is clear, challenges to a committee's failure to

18   comply with House Rules can be waived.  And the Supreme

19   Court has stated in other cases that rules, compliance

20   challenges, are defenses not elements of the offense.  For

21   example, in *Yellin*, at 374 U.S. at 123, the Court stated

22   that the defendant, "would be entitled to acquittal were he

23   able to prove his defense."

24           In my view, therefore, compliance with the House

25   Rules is not therefore an element of the offense.  But can

1    Mr. Bannon present these defenses and evidence regarding

2    them to the jury?

3         As the Court of Appeals has made clear, a

4    defendant may only present a defense to the jury "if the

5    record contains sufficient evidence from which a reasonable

6    jury could find for the defendant on his theory."  That's

7    *Akhigbe,* 642 F.3d at 1083.  I conclude that, for the most

8    part, this evidence is excludable and will not be presented

9    to the jury for two different though somewhat related

10   reasons.

11        First, Mr. Bannon has waived his arguments, at

12   least some of them.  The Supreme Court held in several

13   decisions in the 1950s and 1960s that claims that a

14   congressional committee is in violation of a rule -- and

15   therefore defenses based on such alleged violations -- can

16   be waived by failing to make them to the Committee.

17        As the Supreme Court put it in *United States*

18   *versus Bryan*, "if respondent had legitimate reasons for

19   failing to produce the records, a decent respect for the

20   House of Representatives by whose authority the subpoenas

21   issued would have required that she state her reasons for

22   noncompliance upon the return of the writ."

23        As the *Bryan* Court continued:  "To deny the

24   Committee the opportunity to consider the objection or

25   remedy is in itself a contempt to its authority and an

1    obstruction of its process."

2            As the Court of Appeals explained in *Shelton*,

3    "Contempt which might be avoided if valid and timely

4    objection is made and denied is not avoided by refusing to

5    produce what one lawfully could not be required to produce

6    if such objection had been made and denied."  And the

7    Supreme Court reiterated the *Bryan* rule a decade later in

8    the cause of *McPhaul versus U.S.*, 364 U.S. 372.

9            To be sure, the Court in *Bryan* did note that the

10   alleged defect there, the alleged lack of quorum, "was one

11   which could easily have been remedied."  That's a quote.

12   And here the alleged rule violations that Mr. Bannon points

13   to are ones that would not be so easily remedied.  But even

14   *Bryan* itself seemed to walk away from a suggestion that

15   waiver occurs only with respect to rules/violations that are

16   easily remedied.

17           To take a hypothetical the Court itself offered:

18   "Suppose one who has been summoned to produce papers fails

19   to deliver them as required but refuses to give any reason,

20   may he defend a prosecution for willful default many months

21   later on the ground that he had not been given a sufficient

22   time to gather the papers?  We think such a contention

23   hardly tenable."

24           Courts have suggested that such defenses are not

25   waived when the claimed violation of the rules could not

have been known by the subpoena recipient at the time.  As
the Court of Appeals has phrased it, "the objection which
the Court held should have been raised was one which the
witness had fully perceived at the time he appeared." That's
*Liveright*, 347 at 475.

But here, there's no serious argument that
Mr. Bannon could not have known of the alleged rules
violation he now points to.  The composition of the Select
Committee, the alleged lack of a ranking minority member and
the like were publicly known and discussed and was readily
available to Mr. Bannon as an objection at the time as they
are now.  Mr. Bannon "had reason to be aware," in the
language of *Liveright* of, these violations.

I indicated there were two reasons that I think
most of this evidence is excluded.  And the second is,
waiver aside, as the government has correctly argued, the
question of what the House Rules require is a legal
question.  That includes the question of whether a
particular rule is ambiguous and whether the House has taken
a view on a particular rule.

So those are questions what I must resolve as a
legal matter.  And I conclude that the rules Mr. Bannon
alleges violations of were, at a minimum, ambiguous and the
House has indicated its views of those rules.  In other
words, I must defer to the House's own interpretation of its

1    rules.  Any other rule, a rule that would allow me or the

2    jury to second guess the House's own view of the meaning of

3    its own rules and resolutions, would raise serious

4    separation of powers concerns.

5         The Rulemaking Clause vests exclusive control over

6    the House's rules with the House.  As it says, "Each House

7    may determine the rules of its proceedings."  To allow a

8    jury to say that the House's rules mean something different

9    than the House understands them would be to wrest that

10   Constitutionally-prescribed power from the Legislative

11   Branch and to bring it into the Judicial Branch.  Thus,

12   separation-of-powers concerns require me to decide these

13   questions as a matter of law and to defer to the House on

14   its own interpretations of its rules.

15        I conclude that, as to almost all issues, the

16   House's rules were -- or that Mr. Bannon could not present

17   evidence that the House's rules were not complied with.  By

18   making several contempt referrals to the Department of

19   Justice and in various briefs it is filed in this court,

20   including in this case, the entire House has, on multiple

21   occasions, ratified that the Committee is validly

22   constituted and operating.  That really resolves questions

23   about the number of members and whether Ms. Cheney is acting

24   as the ranking minority member.

25        But as we discussed earlier, if there is some rule

132

on which the House's view is apparent but a factual dispute
about whether that rule was complied with, that might be an
appropriate question for the jury.  If, for example, the
House rule required Mr. Bannon to be provided with
information before his deposition began but a question about
whether it did so, including the question of whether the
Committee intended to give Mr. Bannon that information on
the day of his deposition, in that context the jury might
need to reach that mixed question of law and fact.  But as I
understand it, there is not really such a defense pending
before me.

I therefore conclude that rules-based objections
to the composition of the Select Committee are not an
element of the charge but are a defense.  And subject to the
kind of rules-based defense being presented at trial that
includes an open question of fact, such evidence is excluded
from the trial here.

Note, however, this is a separate question from
whether the Select Committee has a valid legislative
purpose.  As I've previously indicated, that is a question
of law that the Court of Appeals has already answered in the
affirmative.

So how does that leave us on some of the other
pending motions?  The first is the government's Motion in
Limine to Exclude Evidence Relating to Objections to

1    Subpoena that Defendant Waive; that's ECF No. 53.  For the

2    reasons discussed, I'll grant this motion.

3          The defenses discussed in that motion that

4    Mr. Bannon might wish to raise were ones that he either was

5    or reasonably should have been aware of at the time of his

6    alleged noncompliance.  Since he did not communicate these

7    objections to the Select Committee at the time, I must

8    conclude that the defenses are waived.  In any event, such

9    evidence is irrelevant to questions that will go to the

10   jury.

11         As to Section II.A of the government's Omnibus

12   Motion in Limine, the government contends that the Select

13   Committee's constitutional and statutory legitimacy are not

14   factual questions for the jury.  They seek to exclude

15   evidence relating to them as a result.  The government is

16   correct, at least as the issues discussed in that motion.

17         Whether the Select Committee has a valid

18   legislative purpose is a pure question of law, one that the

19   Court of Appeals has endorsed, Mr. Bannon cannot offer

20   contrary evidence to this point.  It's a question of law

21   that won't go to the jury.  And I've already discussed the

22   questions about the Select Committee's compliance with House

23   rules.  Therefore, part II.A of the government's omnibus

24   Motion in Limine is granted.

25         So having addressed those three, sort of, general

1    overarching legal questions, there are still a number of

2    outstanding motions for me to deal with.  I'll turn to

3    those.

4              First is Mr. Bannon's Motion to Exclude Evidence,

5    ECF No. 56, relating to evidence that the government acquire

6    from subpoenas of cell phone and email records for and

7    interviews with and letters with Mr. Bannon's attorney,

8    Robert Costello.  I've effectively already granted part of

9    this motion.

10             As I noted in the prior hearing, I do not expect

11   the government to introduce any evidence obtained through

12   subpoenas relating to Mr. Costello's phone records or email

13   addresses, certainly not regarding the email addresses of

14   random people named Robert Costello that the government

15   incorrectly subpoenaed.  The former evidence about

16   Mr. Costello's emails and phone records I anticipate being

17   entirely unnecessary, and the latter of course is wholly

18   irrelevant.

19             Should at trial the government truly believe it is

20   necessary to introduce such evidence, it will need to make a

21   proffer outside of the presence of the jury, and I will be

22   very skeptical that any such proffer will be sufficient.

23   But until then, I'll grant the motion as to that information

24   with the understanding that I may consider this decision if

25   truly necessary and raised by the government.

1        As to evidence gleaned from interviews with

2   Mr. Costello or letters of the Committee however, the motion

3   is denied.  Mr. Costello knowingly engaged in those

4   interviews, and the evidence is thus not appropriate to

5   exclude, at least not at this stage, although it must go,

6   regardless of the party introducing it, to an element of the

7   offense as I've defined them.

8        The second is Mr. Bannon's Motion in Limine on

9   Presenting the Indictment to the Jury.  The motion is

10  granted.  This matter is within my discretion and given the

11  speaking nature of the Indictment, I find it inappropriate

12  to have it read or otherwise presented to the jury in its

13  totality.

14       I note that the government doesn't oppose this

15  motion.  When it comes to jury instructions, when we get

16  there, I do think it would be appropriate to advise the jury

17  of the specific charges that Mr. Bannon faces, but I don't

18  think it's appropriate to read the indictment in this

19  matter.

20       The next motion is Mr. Bannon's Motion in Limine

21  to Preclude Evidence or Argument Regarding the Attack on the

22  U.S. Capitol.  That's ECF 84.  I'll grant this motion as

23  well, to the extent that it covers general or specific

24  discussions of the nature of the January 6th events.

25       That being said, I won't prohibit the government

1   from using, at least sometimes, the full title of the Select

2   Committee.  I do admonish the government that unnecessary

3   invocation of the full title might lead me to reconsider

4   that decision.  And, of course, the government must prove

5   that the Select Committee's subpoena sought testimony and

6   records from Mr. Bannon that were pertinent to the topics

7   that the Select Committee was investigating.  That will

8   necessarily require some mentions of the events of January

9   6th generally.  I'll allow such evidence, but I intend to

10  police this line tightly.

11          Now to the remaining portions of the government's

12  Omnibus Motion in Limine with the caveats to be mentioned,

13  I'll grant the motion as to these remaining points with the

14  understanding that I might consider any of the rulings on

15  this motion as necessary during trial.

16          The government asks me to preclude Mr. Bannon from

17  making improper arguments that politicize the case.  I agree

18  that such arguments would be inappropriate.  This is not a

19  forum for partisan politics.  I will not allow it to become

20  one, but I also will not prevent Mr. Bannon from attempting

21  to show bias when cross-examining the witnesses.

22          It's a fine line to draw here, and I expect the

23  parties to respect it.  It goes without saying that a

24  witness cannot be called for the sole purpose of impeaching

25  him or her.  But a witness who is testifying is subject to

1    appropriate cross-examination, and bias is one such

2    appropriate topic.

3           Now, the government argues in Section I.B that

4    claims about government misconduct relating to its efforts

5    to procure Mr. Costello's email and phone records are not

6    proper issues for trial.  As I previously held, I agree with

7    that.  No evidence or arguments on this topic will be

8    permitted at the trial, either from Mr. Bannon or from the

9    government.  As I already indicated, if the government

10   believes it must introduce such evidence at trial, it needs

11   to make a proffer to me.  And just know that I will be

12   skeptical.

13          Questions about the government's conduct regarding

14   the subpoenas or subpoena for Mr. Costello's email and phone

15   records or efforts to procure that information, questions

16   about that conduct in my mind remain a matter for resolution

17   after trial not during it.

18          The government argues in Section I.C of its

19   Omnibus Motion that if Mr. Bannon's subpoenas to members of

20   Congress and their staff are quashed, the Court should

21   preclude him from arguing that this provides a basis for

22   acquittal or some adverse inference against the government.

23   I'll discuss in a moment whether the subpoenas will be

24   quashed.  But if they are, I agree with the government's

25   argument and will grant their motion conditionally in that

1    sense.

2          As the Court of Appeals has explained, "The rule

3    authorizing this inference referred to as applicable, in the

4    language of the Supreme Court, 'when a party has it

5    peculiarly within its power to produce witnesses whose

6    testimony would elucidate the transaction' and fails to do

7    so."  I find that, in these circumstances if I grant the

8    Motion to Quash, that the United States has no more power

9    than Mr. Bannon to compel the attendance of members of the

10   House and their staff to this trial.

11         The government asks, in part I.D of its motion,

12   that evidence or arguments relating to the misdemeanor,

13   nature of the charges or the potential punishment is

14   improper.  I heard defense counsel to agree that it would be

15   improper to discuss the potential punishments in front of

16   the jury.  And I certainly agree, as a result, that any

17   evidence relating to the potential penalties of the

18   conviction are improper.  It won't be allowed.

19         The government asks me in part I.E to preclude

20   Mr. Bannon from making claims about other individuals who

21   have not been prosecuted for contempt of Congress.  I agree

22   and will not allow such evidence.  It does not go, in my

23   view, to any of the elements of the charged offenses or

24   defenses and is thus irrelevant.

25         The final point in the Omnibus Motion is a little

1    tricky.  We discussed this earlier.  The government argues
2    that whether executive privilege excused Mr. Bannon from
3    compliance with the subpoenas altogether is not a factual
4    question for the jury.

5         We discussed at this hearing whether Mr. Bannon is
6    really making this argument, which is not an argument about
7    mens rea.  It's not an argument about entrapment by
8    estoppel.  It's really an argument that, I think in its
9    simplest form, would be that Mr. Bannon was excused from
10   responding to the Subpoena because it covered privileged
11   information.

12        I haven't really received briefing on this
13   question.  I think it is an unteed-up issue and it therefore
14   seems premature to rule on it now.  I don't think Mr. Bannon
15   really grappled with the government's argument on this
16   question, but I do think it's a distinct issue.

17        And just to be really clear, one question in this
18   case is did Mr. Bannon act with the requisite mens rea in
19   declining to appear for his deposition or producing
20   documents?  That's one question as to which I've already
21   reached a series of holdings about what that standard is and
22   what's relevant or not to it.

23        Another set of issues is whether the government is
24   estopped, as a result of, for example, the entrapment by
25   estoppel argument from prosecuting this case.  Those are not

1    the same questions, I believe, because the information here

2    was actually privileged, executive privilege, whether

3    Mr. Bannon was excused altogether from complying with the

4    Subpoena.  And whether that's a valid argument in this case

5    and whether it's being advanced is not clear to me, and

6    therefore, I am going to not resolve the government's motion

7    on that point.

8          The next pretrial motion is Mr. Bannon's Motion to

9    Compel the Meadows and Scavino Declination Discovery, Motion

10   for Discovery and Motion for Release of *Brady* Materials,

11   which is ECF No. 86.  I'll deny this motion.

12         My previous discovery order mandated the

13   government provide documents reflecting official DOJ policy.

14   The government has represented that no such records exist in

15   connection with the government's consideration of the

16   Congressional contempt referrals of Meadows or Scavino.  To

17   the extent it requires further clarification, my previous

18   order was never intended to mandate the disclosure of

19   internal work product by the Department.  Such an order

20   would be inappropriate for a myriad of reasons.

21         It was also not intended to mandate the disclosure

22   of specific declination decisions as to particular persons

23   unless they stated broader DOJ policy.  And given my

24   previous ruling on the unavailability of the entrapment by

25   estoppel defense, none of these declination documents would

1    be relevant in any event.

2          I will note Mr. Bannon hints in his brief some of

3    this information could be relevant to a selective

4    prosecution claim.  To an extent that Mr. Bannon wishes to

5    raise such a claim, he must move separately for it.  I will

6    not treat the passing mention of selective prosecution as

7    sufficient.

8          Also pending, as we all know, is the Motion to

9    Quash, which is ECF No. 1, in Miscellaneous Case 22-MC-60.

10   I'll grant this motion.

11         The Speech or Debate Clause provides that "for any

12   Speech or Debate in either House, [the Senators or

13   Representatives shall] not be questioned in any other

14   place."

15         The language of the Speech or Debate Clause is

16   absolute.  It bars the questioning of any member of Congress

17   in court, so long as that questioning relates to any speech

18   or debate in either House.

19         The Supreme Court has given speech or debate a

20   broad reading.  As the Court has put it:  "Without

21   exception, our cases have read the Speech or Debate Clause

22   broadly to effectuate its purpose."  That's *Eastland*.  Thus,

23   the Clause reaches not only the conduct of Congress people

24   but their staff too.  Nor is it limited to literal speech

25   and debate.  Rather, the question is whether the particular

1   activities about which testimony is sought fall within "the

2   legitimate legislative sphere."  That requires me to

3   determine whether the activities are "an integral part of

4   the deliberative and communicative processes by which

5   members participate in Committee and House proceedings with

6   respect to the consideration or rejection of proposed

7   legislation or with respect to other matters which the

8   Constitution places within the jurisdiction of either

9   House."  As the Supreme Court has also explained, "The power

10  to investigate and to do so through a compulsory process

11  plainly falls within that definition."  Again, that's

12  *Eastland*.  It specifically blessed, the Supreme Court did,

13  the issuance of subpoenas.

14       I conclude that much of the testimony that

15  Mr. Bannon would seek from the individuals he has subpoenaed

16  and most of the documents are barred by the Speech or Debate

17  Clause.  Questions as to the motivations of the Committee,

18  its internal deliberations, its reasons for subpoenaing him,

19  or the personal views of its members on internal House Rules

20  would all require testimony on an integral part of the

21  deliberative and communicative process by which the members

22  participate in the Committee.  The Speech or Debate Clause

23  bars such testimony.

24       To the extent that Mr. Bannon seeks

25  non-Congressional testimony from these members and to the

1    extent that he seeks documents not covered by the Speech or

2    Debate Clause, I do not believe such evidence is relevant

3    here.  As we discussed earlier, comments made to the press

4    or posted on social media are not covered by the Clause, so

5    too with documents relating to book deals and the like.  But

6    evidence on these topics is also not relevant to this case.

7            As I've already concluded, there will be little,

8    if any, evidence that will go to the jury about whether the

9    Select Committee complied with the House Rules.  And

10   therefore any nonspeech or debate testimony or documents

11   from the members of Congress at issue in the Subpoena or

12   their staff would be irrelevant to the trial.  And, of

13   course, under Rule 17, a subpoena must seek relevant

14   evidence.

15           Mr. Bannon argues that some members waived their

16   Speech or Debate Clause immunity by filing an amicus brief

17   in this case.  Assuming such immunity is waivable, and

18   obviously I discussed that topic to some extent with

19   Mr. Letter, such waiver would require an explicit and

20   unequivocal renunciation of the protection.  But the amicus

21   brief contains no such language and many courts have

22   concluded that the filing of an amicus brief waives no

23   privilege no matter what the privilege may be.  In any

24   event, the amicus brief was filed on behalf of the House as

25   a whole.  We would not provide a waiver as to the

1       individuals that Mr. Bannon seeks to subpoena.

2               One final point, as we discussed before,

3       Mr. Bannon has suggested that if he cannot subpoena these

4       members of Congress and therefore that this information is

5       not available to him, then he may move for dismissal of the

6       charges against him.

7               As we discussed, Mr. Bannon is, of course, now

8       free to file such a motion now that I've quashed the

9       Subpoena.  But I will note that Mr. Bannon must show that

10      the testimony he seeks would be relevant to an issue at

11      trial which, in my view, seems unlikely.

12              Since the question whether the Select Committee

13      complied with House Rules is not a defense, at least

14      generally speaking, that will be submitted to the jury.  And

15      in light of my decision about the other issues in this case,

16      the Motion to Quash in case number 22-mc-60 is thus granted.

17              That brings me to the final pending motion,

18      Mr. Bannon's Motion to Continue Trial, which is ECF No. 88.

19      I am cognizant -- and which is really, at this point, based

20      on three different though not unrelated grounds.  The first

21      is pretrial publicity.  The second is the status of the case

22      as the case exists.  And the third is, to some extent at

23      least, the fact of the letter that Mr. Bannon sent to the

24      Committee over the weekend.

25              I am certainly cognizant of Mr. Bannon's concerns

1    regarding publicity but, in my view, the correct mechanism

2    at this time for addressing that concern is through the voir

3    dire process.  It may very well be that, in light of the

4    ongoing Select Committee hearings, that we will be unable to

5    pick a jury, though I find that unlikely.  But should that

6    be the case, the motion may be renewed again then.  And if

7    we can't pick a jury and we have to suspend the trial, we

8    will do that.

9           Mr. Bannon also notes that discovery is

10   outstanding and, at the time of filing his Reply brief, it

11   was both unclear which defense witnesses or at least the

12   House witnesses would comply with the Subpoena.  It was

13   uncertain which defenses would be allowed at trial or the

14   scope of the Motions in Limine.  Those issues have now

15   largely been resolved by me.

16          If they were resolved in a way that would greatly

17   expand or complicate this case, perhaps all that might favor

18   an extension, but the motions did not pan out that way.  As

19   a result, I see no reason, based on preparation, for

20   extending this case any further.

21          And finally, as it relates to the letter that

22   Mr. Bannon sent over the weekend and the letter Mr. Bannon

23   received from former President Trump, I am not deciding one

24   way or the other today whether that evidence might be

25   relevant.

1          As we discussed, it's possible that it might come

2     in with respect to the arguments that Mr. Schoen made about

3     default and whether and to what extent Mr. Bannon's

4     compliance was left open by the Committee.  But even if

5     that's going to come in, that's a discrete issue and it

6     doesn't seem to me that we are incapable of taking that up

7     in the next week.

8          So with that, we have a pretrial conference on

9     Thursday.  What time?  Morning I think.  I forget when it

10    is, but I look forward to seeing everyone then.

11          Thank you, Counsel.

12          Mr. Schoen, would you like to say something?

13    **MR. SCHOEN:**  A couple of things that I don't

14    understand about the order.  I don't understand -- it's a

15    long time ago now so I'm not sure how to direct the Court to

16    it, but it was something about it would permit testimony

17    that Mr. Bannon believed that the date wasn't really the

18    date.  I'm not sure what that means.  Was that what we were

19    talking about today, whether there was a default or not?

20    **THE COURT:**  No, it goes to whether his failure to

21    appear was deliberate and intentional.  If he was mistaken

22    about the date or actually believed that the date had been

23    moved, I think that would go to mens rea.

24    **MR. SCHOEN:**  Had been moved or that that wasn't

25    the date anymore because the default had been waived?

1          **THE COURT:**  I think it could go to both, but he

2    cannot introduce evidence that he thought he was legally

3    excused from complying with the Subpoena because of the

4    exertion of executive privilege because he had been advised

5    by his counsel to that effect and the like.

6          **MR. SCHOEN:**  I got that.

7          **THE COURT:**  The question in the trial -- it's

8    really simple.

9          **MR. SCHOEN:**  I just want to be clear --

10         **THE COURT:**  Mr. Schoen, hold on a second.  The

11   question in the trial on mens rea is whether he failed to

12   appear, as *Licavoli* says, whether his failure to appear was

13   deliberate and intentional as to mens rea.  Did he make a

14   mistake?  Was it the result of inadvertence or, I suppose

15   hypothetically, because he did not believe the return date

16   was the return date?  I'm leaving open that possibility.

17   I'm not sure that you can make a proffer that he would

18   introduce such evidence.  I'm just leaving open that

19   possibility.

20         **MR. SCHOEN:**  And I'm not clear about what

21   Costello, if anything, can testify about.

22         **THE COURT:**  Well, not advice of counsel he gave to

23   Mr. Bannon but, to the extent that his discussions with the

24   Committee go to either, for example, whether it was left

25   open -- you've argued today that you might want to make an

1    argument that the Committee, you know, waived any default or

2    something like that, or left open his future compliance and

3    that Mr. Costello, I assume, would be able to testify about

4    that.

5            **MR. SCHOEN:**  Yeah.

6            **THE COURT:**  I'm not saying that this is true but,

7    if Mr. Costello, for example, told Mr. Bannon the return

8    date on the Subpoena is no longer October 18th, then that

9    testimony might be relevant.  Again, I'm not saying he did.

10           **MR. SCHOEN:**  Let me ask this, Judge:  Is there a

11   way -- if we were to respond to the government's motion to

12   bar that evidence by tomorrow or Wednesday, is there a way

13   the Court could resolve that issue?

14           **THE COURT:**  Are you talking about the letter?

15           **MR. SCHOEN:**  Yeah.  About raising this issue that

16   it is default?  I'd like --

17           **THE COURT:**  Yes.  Yes.  I have not resolved --

18           **MR. SCHOEN:**  Well --

19           **THE COURT:**  I have not resolved the government's

20   motion that they filed last night at midnight.

21           **MR. SCHOEN:**  I understand that, Judge.  I'm asking

22   whether it can be resolved.  In other words, we have to make

23   a decision.  What's the point in going to trial here if

24   there is no defenses?  So we have to make a decision about

25   that --

1          **THE COURT:**  Agreed.

2          **MR. SCHOEN:**  -- and have to do it very quickly.

3          **THE COURT:**  Yes.  Would you like to respond by

4     tomorrow to that motion?

5          **MR. SCHOEN:**  The question is I have to travel and

6     stuff back home.  I don't know if I could finish it by

7     tomorrow but I think we can.

8          **THE COURT:**  I'm happy to give you whatever time

9     you think you need.

10          **MR. SCHOEN:**  I think we can do it by Wednesday.

11          **THE COURT:**  Sure.  You say Wednesday, what time?

12          **MR. SCHOEN:**  I was going to say end of the day

13     Wednesday, but if you want to pick a time in the middle of

14     the day --

15          **THE COURT:**  No, it's just we're running out of

16     time.

17          **MR. SCHOEN:**  Yeah.  I'm traveling Wednesday to

18     come back up here also.  So I guess noon Wednesday.

19          **THE COURT:**  Fair enough.

20          **MR. SCHOEN:**  Listen, okay, last thing is, I didn't

21     understand -- two other things I didn't understand.  I think

22     I understood it, but I didn't hear it clearly enough.  The

23     Court said that the reason the OLC opinions don't apply

24     that's because Bannon wasn't employed at the time?

25          **THE COURT:**  Well, for all the reasons I said

1    before, there is no OLC opinion that says, We will not

2    prosecute someone in the situation that Mr. Bannon found

3    himself in.

4            **MR. SCHOEN:**  What was that situation?  That's my

5    question, I think, not being an Executive Branch employee at

6    the time?

7            **THE COURT:**  So I think there is a number of them.

8    One is not being an Executive Branch employee at the time

9    and the assertion of privilege by someone who was no longer

10   the President at the time of the Subpoena.  You don't

11   have -- there is no opinion that covers the circumstances.

12   I understand your view is that the President still has

13   privilege.  I'm just saying there is no opinion that

14   addresses the specific circumstances we find ourselves in

15   here.

16           **MR. SCHOEN:**  Even though the conversation --

17           **THE COURT:**  I don't want to hear argument on this

18   again --

19           **MR. SCHOEN:**  No, I am asking you a question.

20   Clearly the conversations occurred while he was still

21   President --

22           **THE COURT:**  I understand that.  I understand that.

23           **MR. SCHOEN:**  Okay.

24           The last thing I didn't understand was the Court

25   said that it didn't understand what we had raised -- I may

1        have just heard it wrong -- that we had raised the issue

2        that Rule 3b had to be given before the deposition and it

3        wasn't given.  I understood the Court to say it didn't

4        understand that issue to be presented to it.

5              **THE COURT:**  I don't think I said it that way.

6        What I meant to say is, if that is an issue at the trial,

7        then that might actually present a mixed question of law and

8        fact that the jury would get.  That is to say, I would have

9        to decide what the rule meant, but the jury might have to

10       decide whether the rule was complied with.  That's what I

11       meant to say.

12             **MR. SCHOEN:**  When the Court said it didn't have

13       the issue before it, I wanted to be clear that we raised

14       that issue.  Thank you.

15             **THE COURT:**  Thank you.  Anything else?

16             **MR. SCHOEN:**  [SHAKES HEAD]

17             **THE COURT:**  Okay.

18             **MS. VAUGHN:**  Nothing from the government.

19             **THE COURT:**  Okay.  So will the government want to

20       file a reply brief in support of its motion regarding the

21       letter/letters?

22             **MS. VAUGHN:**  We can file by Wednesday night, if we

23       appear on Thursday morning.

24             **THE COURT:**  It may not be long, and we can take it

25       up on Thursday if necessary.  Thank you, all.

1                    (Proceedings concluded at 2:29 p.m.)

1                    C E R T I F I C A T E

2

3           I, **Lorraine T. Herman, Official Court**

4      **Reporter,** certify that the foregoing is a true and

5      correct transcript of the record of proceedings in the

6      above-entitled matter.

7

8

9

10     ____July 12, 2022____          __/s/_____
                 **DATE**                        **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25