\

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|                                    |   |                              |
|------------------------------------|---|------------------------------|
| UNITED STATES OF AMERICA           | : |                              |
|                                    | : | Criminal No. 21-670 (CJN)    |
| v.                                 | : |                              |
|                                    | : |                              |
| STEPHEN K. BANNON,                 | : |                              |
|                                    | : |                              |
| *Defendant*.                       | : |                              |

---

## NOTICE OF OUTSTANDING ISSUE REGARDING GOVERNMENT MISCONDUCT[1]

As the Court will recall, there was a significant amount of litigation in this case arising from the Government's surreptitious use of subpoenas and the Stored Communications Act to try to obtain the personal and professional telephone, email, and social media records of Mr. Bannon's attorney, Robert J. Costello.  [See e.g., ECF## 26, 31, 34, 34-1, 36, 38, 85 at 7, 94 at 6-7, Hearing Transcripts of March 16, 2022, at 9-18, 54-74, 79-80, 90-92; June 15, 2022, at 129-130; July 11, 2022 at 9, 29, 134-137].

---

[1] A Notice of Appeal already has been filed in this case as to the judgment of conviction and sentence [ECF# 166]; however, this does not remove this Court's jurisdiction to consider the pending matter of sanctions for the government's misconduct.  *See Cooter & Gell v. Hartmark Corp.*, 464 U.S. 384, 396 (1990) (imposition of sanctions is the "determination of a collateral issue" which "may be made after the principal suit has been terminated" for lack of jurisdiction); *Sweigert v. Podesta*, 2019 U.S. Dist. LEXIS 43206, *4, n.4 (D.D.C. March 18, 2019 (filing notice of appeal does not divest court of jurisdiction of pending matter of sanctions) *McManus v. District of Columbia*, 545 F. Supp. 2d 129, 133 (D.D.C. 2008).  The Court has broad authority to impose sanctions on the government, of course, under both its inherent power and Rule 11.  *See e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 50 (1991) (inherent power to impose sanctions for bad faith conduct); *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174 (D.C. Cir. 1985); *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 267-268 (D.D.C. 2012).  *See also* Rule 3.3(a)(1), D.C. Rules of Professional Conduct (Duty of Candor to the Tribunal, including the affirmative duty to correct a misrepresentation).

On June 15, 2022, this Court expressed its concern about the Government's conduct in relation to this very disturbing matter and with the fact that the Government did not even seem to recognize how problematic its conduct was. This Court indicated that it is a matter that should be dealt with after the trial.[2] During a hearing on July 11, 2022, this Court reiterated that it considered the matter of the Government's conduct in relation to Mr. Costello's private personal and professional records to be a matter best dealt with after the trial.[3] To date, the defense is not aware of this very serious matter having been addressed and therefore files this Notice to bring the matter to the Court's attention.

. To that end, Mr. Costello has asked to have his attached letter and the exhibits to which it refers provided to the Court to remind the Court of the relevant events and the relevant chronology. They are provided herewith collectively as Exhibit 1. Additionally, of course, the underlying facts that are relevant to this matter have been presented to the Court in some detail in pleadings already filed, reviewed by the Court, and discussed at hearings. [See e.g., ECF## 26, 31, 34, 34-1, 36, 38, 85 at 7, 94 at 6-7, Hearing Transcripts of March 16, 2022, at 9-18, 54-74, 79-80, 90-92; June 15, 2022, at 129-130; July 11, 2022, at 9, 29, 134-137]. Accordingly, only a summary will be provided in this Notice. If the Court wishes to have a formal motion and/or briefing on the issue, the Defendant will, of course, provide the same as directed.

---

[2] **The Court:** "I do continue to have serious issues with how the government treated the situation of Mr. Bannon's counsel and also how the government does not appear to have any issue with its conduct. But, in my view, those issues are better left to be addressed at a later date after trial." [June 15, 2022 Hearing Tr. at 129-130].

[3] **The Court:** "Questions about the government's conduct regarding the subpoenas or subpoena for Mr. Costello's email and phone records or efforts to procure that information, questions about that conduct in my mind remain a matter for resolution after trial not during it." [July 11, 2022 Hearing Tr. at 137].

.

## Summary of the Relevant Underlying Facts

It is now beyond dispute that the three prosecutors in this misdemeanor case, through the abuse of grand jury subpoenas, obtained the personal and professional law firm telephone records of Mr. Bannon's defense attorney Robert J. Costello. Additionally, in their misguided effort at further intruding on defense counsel's private records, these prosecutors abused grand jury subpoenas to obtain Mr. Costello's email records from four different email accounts and four different telephone numbers, in some instances by simply making up email addresses that had some form of the name Robert Costello in them. [ECF## 26, 34].

The prosecutors did not just limit their intrusions to email and telephone records. They used a Stored Communications Act Order, procured from a federal judge in this district through recklessly and demonstrably false representations, to try to obtain information from Google about Mr. Costello's social media habits, including what groups he is a member of, who he associates with, what sites and chat groups he frequents, and more. And they sought and obtained such records going back to March of 2021, many months before the Congressional subpoena underlying this case was even issued.[4] [ECF## 26, 34]. These prosecutors' efforts yielded literally hundreds and hundreds of responsive private records – some of which were Mr. Costello's personal and professional records and some of which belonged to Robert Costellos bearing no relationship to Mr. Bannon's defense counsel.

---

[4] In *Leopold v. United States*, 964 F.3d 1121, 1128-1129 (D.C. Cir. 2020), the Court of Appeals made clear that Stored Communications Act Orders and Applications are judicial records to which the presumption of public access attaches. Mr. Bannon again urges the Court to make the Stored Communications Act Order and Application, with its recklessly false representations and reflecting the names of each of these prosecutors, public documents, fully accessible to the public and the press.

The latter fact is especially shocking since the three prosecutors assigned to this case were assisted by four Special Agents of the FBI.  Not one of the seven of them had the ability to discern among people around the country named Robert Costello, with different middle names, when using the particularly intrusive Stored Communications Act or the grand jury subpoena process?  Or did they just not care about the intrusions and the damage they caused?  Inexplicably, based on the discovery provided to Mr. Bannon, the government excluded from its broadly intrusive efforts, the one email account the prosecutors knew for sure belonged to Mr. Costello – the one he used to communicate with them.

Also based on the discovery provided to Mr. Bannon, it does not appear that these prosecutors ever either notified or apologized to the wrong Robert Costellos whose personal records they obtained; nor is there any indication that the prosecutors apologized to the court to which it made the recklessly false representations to obtain the Stored Communications Act Order.  Perhaps even more significantly, there is no indication in the materials provided to Mr. Bannon that would indicate that even as of today, the prosecutors ever advised the court that the representations in their Stored Communications Act Application were false, as they were ethically bound to do under Rule 3.3 (a)(1) of the D.C. Rules of Professional Conduct.  These transgressions are particularly egregious, committed as they were, by prosecutors who represent the so-called "Public Integrity Section" of this prosecutorial office.

### Indications of Sanctionable Bad Faith in the Conduct at Issue

The Court asked the prosecutors directly why they engaged in this conduct and sought these records.  [March 16, 2022 Hearing Tr. at 11-13].  The prosecution responded with a pretextual lie.  They represented to the Court that they sought these records to determine whether Mr. Costello apprised Mr. Bannon of the Committee's subpoena. [*Id.*].  This was an

absurd response given that the House attorneys had asked Mr. Costello to accept service of the subpoena for Mr. Bannon and that Mr. Costello asked Bannon and confirmed in writing that he had the explicit authority from Mr. Bannon to accept service of the subpoena. The Court queried further with the obvious questions – how would records of Mr. Costello's phone calls and emails establish whether he told Mr. Bannon about the subpoena or delivered it to him? And why would that have been necessary at that point when it did not appear to be a disputed issue in the case? [*Id.*].[5]

Later the Court appeared to suggest as a lifeline for the government's abuse that perhaps it was entitled to pursue these records even if the fact of whether Mr. Bannon received the subpoena had been conceded, because the government is entitled to obtain "cumulative" evidence of a fact. [March 16, 2022 Hearing Tr. at 60-61]. The obvious retort to that is that, as the Court earlier had implied, there is nothing about Mr. Costello's phone or email records that would establish whether he spoke to Mr. Bannon about the subpoena or delivered it to him.

But perhaps the even more obvious and telling question that would have exposed the completely specious nature of the government's purported justification, would have been how Mr. Costello's Google records, reflecting his chat groups, social media sites visited, etc. extending back 7-8 months before the subpoena was even issued, would be relevant to the government's claimed justification. The government's bad faith in abusively seeking defense counsel's personal and professional private records and in offering the Court a false post-hoc justification for the same are undeniable.

---

[5] As the record unequivocally reflects, at the Committee's request, Mr. Costello expressly accepted the subpoena for Mr. Bannon and all interaction between Mr. Costello and these prosecutors clearly reflected that Mr. Bannon was fully aware of the subpoena and that there never was any issue about whether he was aware of it or had received it.

The fact that the government appears never to have advised the Court that issued the Stored Communications Act Order that its Application had completely misrepresented the facts – that the account it sought and obtained permission to invade was not actually in any way related to defense attorney Robert J. Costello – further reflects bad faith and a clear violation both of the requirements of the Stored Communications Act and the affirmative ethical duty of candor with the tribunal and the obligation to correct any false statement of fact under Rule 3.3 (a)(1) of the D.C. Rules of Professional Conduct.

Finally, these prosecutors' sanctionable bad faith is reflected in another exchange with the Court.

The Court asked the prosecutors directly whether it needed supervisory permission to seek and obtain email and telephone records from an attorney in the case. Reference was made to DOJ policy.[6] [March 16, 2022, Hearing Tr. at 13]. These prosecutors shockingly represented to the Court that, while DOJ policy requires obtaining supervisory authority to obtain attorney records, that policy only requires supervisory authority when the records are sought directly from the attorney and not when they are sought from a third party like a phone company or internet provider. [*Id*. at 13-14].

That representation by government counsel is absolutely absurd, defies any sense of logic, and completely ignores the basis for the DOJ policy and its underlying concerns. *See also, In Re Grand Jury Investigations*, 2019 U.S. Dist. LEXIS 86801, *29-*30, 2019 WL 2179116 (D.D.C., March 4, 2019) (emphasizing the special status to be accorded to attorney records). The risk of exposing the attorney's client confidences and secrets that might be evident from her

---

[6] See DOJ Manual §9-13.410: https://www.justice.gov/jm/jm-9-13000-obtaining-evidence#9-13.410https://www.justice.gov/jm/jm-9-13000-obtaining-evidence#9-13.410.

or his records, reflected in the DOJ policy and case law is somehow not a concern if the attorney's records are obtained by the government surreptitiously from a third party, but the concern arises if the attorney is asked to produce his records? The Court should require government counsel to produce an official Justice Department statement supporting its representation on this matter or clearly find that this untenable position reflected sanctionable bad faith by government counsel.

## <u>Conclusion</u>

Mr. Bannon respectfully asks the Court to take notice of its repeated assurance to the parties and to the public that it was appropriate to address this matter after the trial was concluded and that the Court would do so and he asks the Court to do so now, with the trial concluded. It is a matter of public and institutional importance for the Court to address this conduct. Mr. Bannon asks the Court to consider Mr. Costello's attached letter to the Court and the exhibits to his letter that he has provided and he further asks the Court to review the relevant record materials cited in the first paragraph of this Notice.

Dated: January 4, 2023

Respectfully submitted,

_/s/ David I. Schoen_____
David I. Schoen (D.C. Bar No. 391408)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
Telephone: (334) 395-6611
Facsimile: (917) 591-7586
Email: Schoenlawfirm@gmail.com

*Counsel for Defendant Stephen K. Bannon*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of January, 2023, a copy of the foregoing Notice

was served *via* the Court's CM/ECF system on all properly registered parties and counsel.


       /s/ David I. Schoen
David I. Schoen (D.C. Bar No. 391408)

**EXHIBIT 1**



# DAVIDOFF HUTCHER & CITRON LLP

ATTORNEYS AT LAW

605 THIRD AVENUE
NEW YORK, NEW YORK 10158

TEL: (212) 557-7200
FAX: (212) 286-1884
WWW.DHCLEGAL.COM

FIRM OFFICES

WHITE PLAINS
ATTORNEYS AT LAW
120 BLOOMINGDALE ROAD
WHITE PLAINS, NY 10605
(914) 381-7400

WEST PALM BEACH
ATTORNEYS AT LAW
1107 NORTH OLIVE AVENUE
WEST PALM BEACH, FL 33401
(561) 567-8488

FIRM OFFICES

ALBANY
ATTORNEYS AT LAW
150 STATE STREET
ALBANY, NY 12207
(518) 465-8230

WASHINGTON, D.C.
ATTORNEYS AT LAW
201 MASSACHUSETTS AVENUE N.E.
WASHINGTON, D.C. 20002
(202) 347-1117

December 29, 2022

Honorable Carl J. Nichols
United States District Judge
United States District Court
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:   <u>United States v. Stephen Bannon: 21-cr-0670 (CJN)</u>

Dear Judge Nichols:

I was one of Stephen Bannon's lawyers in the above captioned case, until I requested to withdraw as trial counsel because I was going to be a witness on Mr. Bannon's behalf. My testimony was going to discuss all of my dealings with the January 6th Committee, as well as my subsequent dealings with the United States Attorney's Office for the District of Columbia. My client, Mr. Bannon had no communications with either of those two entities.

Right after the referral of the criminal Contempt of Congress charge was made, I reached out to the United States Attorney's Office seeking a contact Assistant U. S. Attorney. I was referred to AUSA J.P. Cooney. I emailed him seeking a meeting to discuss declination of Mr. Bannon's case. Mr. Cooney suggested that he would arrange an almost immediate meeting. I declined the immediate meeting, because I informed Mr. Cooney that I was preparing a legal memorandum to support my request. Assuming erroneously that the Government was acting in good faith, I thought it was useful for the Government to know the legal and factual reasons for my requested declination. Mr. Cooney then agreed to schedule a Webex (Video Conference) meeting after his receipt of the legal and factual memorandum. That Memorandum is attached as Exhibit A to this letter.

Unknown to me, at approximately the same time, one or all of the AUSA's assigned to this case ( J.P. Cooney, Molly Gaston and Amanda Vaughn) secretly obtained records of my home, law office and personal cellphone calls for a two-month time period. In addition, equally unknown to me, they also sought my e-mail and social media information pursuant to the Stored

DAVIDOFF HUTCHER & CITRON LLP

Honorable Carl J. Nichols
December 29, 2022
Page 2

Communications Act for a longer period of time. They succeeded in obtaining my home, law office and personal cellphone records; they sought my email and social media records pursuant to the Stored Communications Act, but the Government only obtained the social media information for two other Robert or Bob Costello's, each of whom had a different middle name than I have. This "detail" was too much for the Government to notice. As a result of their sloppiness, they did not obtain my actual emails or social media information, but they tried to secure that information.

On the scheduled date, November 3, 2021, unaware of the surreptitious surveillance being conducted on counsel, I appeared on Webex with Adam Katz, Esq. and the Government was represented by Assistant United States Attorneys ("AUSA's") J. P. Cooney, Molly Gaston and Amanda Vaughn. The three AUSA's, together with a paralegal to take notes, were the only people visible on screen. J.P. Cooney informed me that there were FBI agents who were going to listen and asked me if I cared. I said I did not care if they listened, but this was a meeting to discuss a proposed declination, as my legal memorandum had clearly indicated. There was a follow up Webex meeting on November 8, 2021, after I produced documentation that was requested by the government during the first meeting.

At the time of the first Webex teleconference, I assumed that I was dealing with Government lawyers of integrity, who were about to participate in a legal discussion of the merits of the case with an open mind as to whether this case should be prosecuted. Since I had been the Deputy Chief of the Criminal Division of the United States Attorney's Office for the Southern District of New York, I was well acquainted with such meetings. Those meetings are an opportunity for counsel to meet and discuss the facts and the law relevant to the particular case with a view toward convincing the prosecution that this is not a case that should be prosecuted.

A request for a declination conference is not an invitation to the prosecution to conduct an investigation of the attorney's professional communications with clients. It is not an invitation to the Government to interfere with the attorney's relationship with his or her client. Additionally, such a meeting is not an invitation or consent to a "voluntary" interview of that attorney by the FBI who would then prepare a report of investigation (FBI-302) and claim this was a voluntary interview by the attorney against his own client. The resulting FBI-302 would clearly serve to drive a wedge between that attorney and his client by falsely making it appear that the defense counsel has volunteered to be a witness against his own client. This scheme was known to the AUSA's but not at all to myself or Adam Katz.

As Mr. Bannon's defense counsel, we were operating with the knowledge that based upon a 2019 decision of the Office of Legal Counsel ("OLC"), where, as here, Executive Privilege was involved, and the Congressional Committee had a rule which prohibited the President's Counsel from attending the requested interview in order to protect the Executive Privilege, the subpoena itself was - using OLC's terminology, illegal, unlawful and incapable of

DAVIDOFF HUTCHER & CITRON LLP

Honorable Carl J. Nichols
December 29, 2022
Page 3

being enforced either civilly or criminally.  That meant that the subpoena accepted by me for Mr. Bannon, was invalid and Mr. Bannon did not have to appear.  Defense Counsel were aware that OLC opinions were binding upon the Executive Branch, but not upon the Courts.  That meant that the U. S. Attorney's Office, as part of the Executive Branch of Government was instructed by OLC not to prosecute this case.  That was the principal reason for the requested declination.  There was another OLC opinion that stated that criminal contempt of Congress should not be pursued against former White House officials, like Stephen Bannon. In addition to the OLC opinions there was another basis for the belief that Mr. Bannon did not have to appear and testify.  The subpoena package contained the Rules for the conduct of House Depositions and those rules provided that  when the witness, or his counsel, have not been provided with Section 3(b), Rule 11 of those Rules  provided that Mr. Bannon did not have to testify.  The subpoena package I received did not contain Section 3(b) as counsel for the House, Douglas Letter, later confirmed.  That meant that Bannon's counsel were operating on a good faith legal basis in requesting a declination conference with government counsel.

Through their surreptitious activities, the AUSA'a and the FBI agents made it clear that they did not meet in good faith to discuss a possible declination, rather they used that opportunity as a ruse to investigate defense counsel in the hopes of utilizing the information gleaned to attack defense counsel's client.  The Government clearly had no intention of ever considering a declination, despite the long list of prior cases in that same office where they declined to follow a Congressional referral of criminal contempt.

The Government's stated reason for the requested seizure of defense counsel's telephone, e-mail and social media records, provided to the Court under the Stored Communications Act, and later provided to this Court was clearly pretextual and false.  The claim that I was a witness that the Government needed to establish that Stephen K. Bannon received the Congressional subpoena is belied by the admitted fact that at the request of the Congressional Committee, I was asked if I would accept service of the subpoena on behalf of my client, Stephen K. Bannon. I informed the Congressional Committee that I would ask Mr. Bannon and that I would get back to them.  I did exactly that, and within a day, I informed the Committee in an email that I was authorized by Mr. Bannon to accept the subpoena.  By doing so, I legally became the agent of Mr. Bannon accepting service of the subpoena.  Legally this was exactly the same as Mr. Bannon receiving the subpoena.  Therefore, the question of whether Mr. Bannon received the subpoena was legally established by that acceptance of service of process.  Surely the AUSA's were aware of this, which means that their claim that they needed me as a witness for that proposition was entirely a pretext.

If I had been made aware of these surreptitious investigative activities, I would not have participated in the two declination conferences,  because it would have been clear, that the AUSA's were not acting in good faith with an open mind regarding the question of declination.  I would not have provided the AUSA's with factual records and emails  that supported our request for a declination. ( Exhibit B, attached) . Perhaps most importantly, I would not have acquiesced in allowing the FBI agents to "listen in" to this lawyers meeting, because I was not

DAVIDOFF HUTCHER & CITRON LLP

Honorable Carl J. Nichols
December 29, 2022
Page 4

informed that the FBI would prepare an FBI-302 Report of Investigation that would make it appear that I had given the FBI a voluntary interview against my own client. I was unaware of all of this trickery until we received discovery from the United States Attorney's Office on January 4, 2022. Needless to say, I was outraged that the Government would practice this deception in a case of this national exposure.

On the basis of this improper Government activity, Mr. Bannon's counsel consisting of myself, M. Evan Corcoran and David Schoen made applications to this Court. This Court denied our motions to dismiss the Indictment, but stated that it would revisit and deal with this behavior after the Bannon case was finished.

The Bannon case is now finished, but this Court has not yet dealt with this clearly improper Government activity built upon a pretext. If no punitive action is taken, this behavior will become the norm. This means that no defense attorney will dare risk a meeting with representatives of the prosecution for fear that the Government and the FBI will endeavor to drive a wedge between the defense counsel and his or her client by making it appear that the defense lawyer has become a witness against their own client through a surreptitious FBI interview, and a review by the Government of all of the defense attorney's telephone, e-mail and social media contacts with this client and other non-related clients and proposed or potential witnesses.

It is telling that these AUSA's failed to seek Main Justice approval before seeking an attorney's telephone and social media records. Their claim that the official Justice Department policy requiring supervisory authority prior to seeking attorney records only applies when they are requesting these records directly from the attorney rather than surreptitiously as is the case here, simply defies logic and is an insult to this Court and to defense counsel.

Allowing this type of Governmental activity here, will encourage this type of activity in the future. These AUSA's did not seek prior approval of their surreptitious activities because they knew it would be denied. They made up a pretextual excuse to try to justify their activities. Win at all cost is not and should not be the mantra of the United States Department of Justice. This tactic cannot be allowed to succeed because it undermines the essential relationship that should exist among counsel of good faith. This underhanded activity must be dealt with in such a way as to prevent it from ever occurring in this or any other federal district in this country.

Respectfully submitted,

Robert J. Costello

RJC/ela
Attachments

DAVIDOFF HUTCHER & CITRON LLP

Honorable Carl J. Nichols
December 29, 2022
Page 5

cc:    AUSA J. P.  Cooney (via ECF)
       AUSA Molly Gaston (via ECF)
       AUSA Amanda Vaughan (via ECF)

# EXHIBIT A

# DAVIDOFF HUTCHER & CITRON LLP

### ATTORNEYS AT LAW
### 605 THIRD AVENUE
### NEW YORK, NEW YORK 10158

---

### (212) 557-7200
### FAX (212) 286-1884
#### WWW.DHCLEGAL.COM

## <u>MEMORANDUM</u>

TO:      United States Attorney for the District of Columbia ("USAO-DC")

FROM:   Robert J. Costello

DATE:   October 29, 2021

RE:      Congressional Referral of Stephen K. Bannon for Criminal Contempt

---

## I — EXECUTIVE SUMMARY

This memo sets forth several legal bases for the USAO-DC to demonstrate that if this case were handled based upon the prevailing rules of the Justice Department, it would decline prosecution of Mr. Stephen K. Bannon, based on numerous opinions from the DOJ's Office of Legal Counsel ("OLC"), which, pursuant to well-settled law, are binding opinions on the Executive Branch of the United States, including the DOJ.

First, pursuant to a well-settled OLC opinion, the DOJ and USAO-DC in fact have discretion in deciding whether or not to prosecute Mr. Bannon, regardless of Congress's vote to recommend prosecution.

Second, pursuant to an OLC opinion, the subpoena, in this case, was *void ab initio*, because it specifically barred President Trump's counsel from appearing at Mr. Bannon's deposition or from reviewing the documents that Mr. Bannon was to produce, which violates the executive privilege because it prevented President Trump from protecting his executive privilege. Relatedly, the United States Supreme Court has held that a former president may invoke the executive privilege and there are several effective OLC holdings that a non-governmental, private citizen is bound by the President's invocation of the executive privilege.

Third, pursuant to another OLC opinion, the DOJ is not permitted to prosecute a former White House employee for contempt of Congress where the issue involves the invocation of executive privilege. Based on the foregoing, unless the Department wants to treat Mr. Bannon differently than the Justice Department rules set out for everyone else, the USAO-DC should decline to prosecute Mr. Bannon. A decision to decline would also go a long way to dispel the doubts about the Justice Department's independence, particularly in light of the inappropriate and inaccurate comments of a partisan Congress and the unfortunate interference by the President. It

1

would also uphold the Justice Department's traditional role of appropriately defending the prerogatives of the Executive Branch of government.

## II — FACTUAL BACKGROUND

Through counsel, Mr. Bannon had communicated by emailed letters to the Select Committee Chairman Bennie G. Thompson, as well as by telephone with Committee counsel Sean Tonolli that, acting in accordance with instructions received from President Trump's counsel, Mr. Bannon would be unable to comply.

As Mr. Bannon's counsel, on September 23, 2021, I was contacted by Committee Chief Counsel Kristin Amerling, to inquire whether I would accept service for Mr. Bannon via email. Mr. Bannon immediately agreed, but before I informed Ms. Amerling, I was contacted by the Associated Press, CNN and MSNBC, who already had copies of the subpoena. I then notified Ms. Amerling that we would accept service of the subpoena.

The subpoena called for the production of documents and a private deposition. In addition to the subpoena, I was provided with a copy of the rules that would govern the taking of testimony. Surprisingly, the rules called for only Mr. Bannon's private counsel to attend the deposition and that a copy of the transcript of that deposition would not be made available to the witness, Mr. Bannon.

After the Committee notified the media that they had served subpoenas for Mark Meadows, the former Chief of Staff to President Trump, Mr. Bannon and two others, on the evening of October 5, 2021, I received a telephone call from Justin Clark, Esq., who informed me that he was counsel to President Donald Trump and that President Trump was going to invoke executive privilege for the four named individuals and that he would be sending a letter to confirm the instructions. On October 6, 2021, Justin Clark emailed me a letter stating, in part:

"President Trump vigorously objects to the overbreadth and scope of these requests and believes they are a threat to the institution of the Presidency and the independence of the Executive Branch." Mr. Clark added that:

"Through the Subpoenas, the Select Committee seeks records and testimony purportedly related to the events of January 6th, 2021, including but not limited to information which is potentially protected from disclosure by the executive and other privileges, including among others, the presidential communications, deliberative process, and attorney-client privileges. President Trump is prepared to defend these fundamental privileges in court.

Therefore, to the fullest extent permitted by law, President Trump instructed Mr. Bannon to: (a) where appropriate, invoke any immunities and privileges he may have from compelled testimony in response to the Subpoena; (b) not produce any documents concerning privileged material in response to the Subpoena; and (c) not provide any testimony concerning privileged material in response to the Subpoena."

Faced with this instruction by counsel to President Trump, I advised Mr. Bannon that he should not provide documents or testify, because Mr. Bannon must be guided by President Trump's invocation of the privilege.

2

As a matter of professional courtesy, I took a call from Sean Tonolli, Staff Counsel to the Select Committee.  Mr. Tonolli advised me that he was the Staff Counsel who would be questioning Mr. Bannon.  I took the opportunity to ask Mr. Tonolli about the rule that stated that only Mr. Bannon and his personal counsel could attend the deposition.  Mr. Tonolli confirmed "that was the position of the Select Committee."  I asked that question because if that rule were followed, there would be no one to represent the interests of President Trump whose privileges were at stake at Mr. Bannon's private deposition.  I was aware of the OLC Opinion issued on May 23, 2019, finding that where Congress, in a matter involving executive privilege, refuses to allow a representative of the Executive Branch to attend the private deposition and invoke the privileges of the President, the subpoenas were deemed by OLC to be illegal and invalid.  In light of the OLC opinion, I wanted to know from staff counsel if the Select Committee intended to enforce that rule which would abrogate the validity of Mr. Bannon's subpoena.  On October 7, 2021, the day before documents were due to the Committee from Mr. Bannon, and a day after receiving a letter of instructions from President Trump's counsel, on Mr. Bannon's behalf, I notified Chairman Thompson, that pursuant to President Trump's instruction, we would be unable to respond to the requests for documents or testimony.  This was not a contemptuous refusal; we were simply following the instructions of President Trump's counsel regarding privileges which belonged to President Trump.

Chairman Thompson responded the next day, October 8, 2021, claiming that Mr. Bannon could not take advantage of the executive privilege because he was a private citizen on January 6th.  Second, Chairman Thompson stated that the Committee had not received "any assertion, formal or otherwise, of any privilege from the (sic) Mr. Trump."  Third, Chairman Thompson argued that "even if your client had been a senior aide to the President during the time period covered by the…testimony, which he was most assuredly not, he is not permitted by law to the type of immunity you suggest."  As to points One and Two offered by the Chairman, both of his assertions are wrong and directly contradicted by opinions of the Office of Legal Counsel which are discussed more fully below.  As to the third point, we did not claim any immunity in our initial response to Chairman Thompson and the Select Committee.

On October 13, 2021, on Mr. Bannon's behalf, I responded to some of the remarks made by Chairman Thompson in his October 8, 2021 letter, that his use of the word "defiance" to describe Mr. Bannon's behavior was inappropriate because Mr. Bannon was merely following the instructions of counsel for President Trump and being appropriately response to the Select Committee's request.

On October 15, 2021, at 2:05 p.m., the Chairman again wrote to me, claiming that the basis for Mr. Bannon's refusal to produce documents or testify, namely President Trump's assertion of executive privilege, had not been made, in the opinion of the Committee.  Chairman Thompson again argued that Mr. Bannon did not have the immunity that we never claimed he had, and therefore, Chairman Thompson claimed that Mr. Bannon was in "willful non-compliance" of the Subpoena.  That letter provided that we had until 6:00 p.m. on Monday, October 18, 2021, to respond.  Slightly later that afternoon, President Biden interjected himself into this dispute by answering a reporter's question stating that the Justice Department should prosecute those who refused to comply with the Select Committee subpoenas.  Within an hour, the Attorney General's spokesman was forced to state that the Justice Department would make "its own independent decisions in all prosecutions based solely on the facts and the law. Period. Full stop."  The damage

had already been done.  The Select Committee would not vote for another three days, the entire House would not vote until the following Thursday, October 21, 2021, but the message had been sent and it was impossible to unring the bell.  The Select Committee would use the House to urge the Justice Department to make an example out of Stephen K. Bannon.

Late in the afternoon of October 18, 2021, as we were preparing to send our response to Chairman Thompson's October 15 letter as he provided, we were notified that President Trump filed a lawsuit in Federal Court in the District of Columbia, naming Chairman Thompson, in his official capacity, as well as the Select Committee.  Instead of sending the letter I had prepared, I wrote a short note to Chairman Thompson informing him that we had just become aware that President Trump had filed a lawsuit and therefore, I was requesting a one-week adjournment of our response, so we could review the lawsuit and determine its impact on Mr. Bannon's response.

After we sent in our request for an adjournment, at 6:50 p.m., I received an email from the Office of White House Counsel.  That letter stated that:

> "Mr. Bannon's tenure as a White House employee ended in 2017.  To the extent any privileges could apply to Mr. Bannon's conversations with the (then) former (sic) President or White House staff, after the conclusion of his tenure, President Biden has already determined that an assertion of executive privilege is not in the public interest, and therefore is not justified…"

White House Counsel's letter fails to recognize that the conversations were with the *sitting* President and it continues to rely on the legally incorrect assertion that executive privilege only involves government employees, when the OLC, in an opinion by Solicitor General and then Acting Attorney General Paul Clement, states otherwise, as set forth *infra*. The letter also wrongfully claims that President Biden has any authority whatsoever to waive executive privilege asserted by President Trump.

The next morning, October 19, 2021, Chairman Thompson  denied our request for a short adjournment, thereby terminating our ability to communicate before the Committee printed its conclusions and recommendations to the entire House that same day.  Later that evening, the Committee held a televised press event to conduct a live vote to recommend to the entire House that Stephen K. Bannon be held in criminal contempt of Congress.  In comments made by Committee members on television that night, they made clear that they intended to make an example out of Mr. Bannon.  Even after the televised vote, and the fact that Chairman Thompson had prohibited us from responding by turning down our request for an adjournment to review the Trump Lawsuit, Chairman Thompson sent me another long-winded letter late in the evening, urging Mr. Bannon to "change course", relying on the letter from White House Counsel that the Chairman believed demonstrated "the inappropriateness of Mr. Bannon's reliance on assertions of executive privilege…"

As noted in the paragraphs above, Mr. Bannon has been appropriately responsive to both the Committee and to counsel to President Trump and has been responsive to the instructions and directions of President Trump's counsel.  The response of the Committee, on the other hand, has been to leak to the press and issue grandstanding, legally incorrect press releases.  Adopting the

partisan Congress' position would do great damage to executive privilege and would do great harm to future Presidents.

III — LEGAL BASES TO DECLINE PROSECUTION

The DOJ should decline to prosecute Mr. Bannon because a decision by the DOJ, a member of the Executive Branch, to prosecute Mr. Bannon would be violative of several binding OLC opinions. It is well settled that OLC opinions are entitled to considerable weight because they "reflect[] the legal position of the executive branch" and "provid[e] binding interpretive guidance for executive agencies." See *Casa de Maryland. v. United States Dep't of Homeland Sec.*, 924 F.3d 684, 718, n.1 (4th Cir. 2019); *see also, Cherichel v. Holder*, 591 F.3d 1002, 1016, n.17 (8th Cir. 2010) (noting that "while OLC opinions are generally binding on the Executive branch…courts are not bound by them") (citations omitted). An OLC memorandum is final when it serves as the OLC's last word on the subject matter that was provided to the decisionmaker who requested it. *Samahon v. United States DOJ*, 2015 U.S. Dist. LEXIS 23813, *45 (E.D. Pa. Feb. 27, 2015).

**A.    The U.S. Attorney/D.O.J. has discretion to decide whether to indict for misdemeanor criminal contempt.**

The United States Attorney and the Department of Justice retain the discretion to refuse to charge a referred criminal contempt of Congress matter. On June 16, 2014, the Office of Legal Counsel ("OLC") issued an opinion letter for the United States Attorney for the District of Columbia, 38 Op. O.L.C. 1, on the issue of Prosecutorial Discretion regarding Citations for Contempt of Congress. The 2014 opinion was issued when the United States Attorney considered the finding of an earlier, 1984 opinion of OLC, 8 Op. O.L.C. 101 (1984) which concluded that the United States Attorney is not required by "the criminal contempt of Congress statute, 2 U.S.C. Sections 192, 194…(to) prosecute or refer to a grand jury for contempt of Congress issued with respect to an Executive Branch official who has asserted a claim of privilege in response to written instructions from the President of the United States." The 2014 OLC opinion affirmed the earlier 1984 opinion. We now know from the OLC opinion of Solicitor General Paul Clement in 2007 that executive privilege is not limited to Executive Branch Officials but applies equally to individuals outside the Government such as Mr. Bannon. Based on the foregoing, the United States Attorney and the DOJ have discretion to decline prosecution of Mr. Bannon and should do so in this instance. This would be consistent with prior decisions involving Eric Holder, Lois Lerner and others.

**B.    The Subpoena issued by the Select Committee was illegal and invalid.**

The subpoena accepted by counsel for Mr. Bannon was illegal and therefore invalid because it contained rules that, in an executive privilege case, denied access to the private deposition to everyone except the witness and his personal counsel. During a conversation with staff counsel Sean Tonolli, who stated that he was going to be the staff counsel questioning Mr. Bannon, I inquired about the written rule limiting attorney presence to Mr. Bannon's personal counsel. Mr. Tonolli confirmed that the rule was the position of the Select Committee. That rule, imposed by this Select Committee, knowing that it would encounter claims of executive privilege,

has been found by OLC to be unconstitutional and as a result, in the opinion of the OLC, the Subpoena issued by the Committee is illegal and invalid.

On May 13, 2019, the OLC issued an opinion regarding the constitutionality and enforceability of subpoenas issued by the House Committee on Oversight and Reform. The Committee sought to question the two witnesses subpoenaed "about matters that potentially involved communications that were protected by executive privilege. Although the Committee's Rule 15 (e) permitted the witnesses to be accompanied at the depositions by private counsel, who would owe duties to the witnesses themselves, the rule purported to bar the presence of agency counsel, who would represent the interests of the Executive Branch." In response to the request by the Attorney General, the OLC "advised that a congressional committee may not constitutionally compel an executive branch witness to testify about potentially privileged matters while depriving the witness of the assistance of agency counsel." While OLC speaks of "agency counsel" in the opinion, in a footnote, OLC adds that their "analysis applies equally to all counsel representing the interests of the Executive Branch, no matter whether the witness works for an "agency", as defined by statute."

With respect to the Constitutional question, the OLC stated: "we concluded that Congress may not compel an executive branch witness to appear without agency counsel and thereby compromise the President's constitutional authority to control the disclosure of privileged information and to supervise the Executive Branch's communications with congressional entities...Committee subpoenas purporting to require the witnesses to appear without agency counsel were legally invalid and not subject to civil or criminal enforcement."

This same provision is found in the rules attached to the subpoena served upon Mr. Bannon's counsel and as such, renders the subpoena illegal and invalid in accordance with the opinion of the Office of Legal Counsel. The rule provided to counsel for Mr. Bannon reads:

> "3. Witnesses may be accompanied at a deposition by personal, non-governmental counsel to advise them of their rights. Only members, committee staff designated by the Chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend."

## C.     The Department of Justice May Not Prosecute White House Officials or *former* White House Officials for Contempt of Congress.

On February 29, 2008, the OLC issued an opinion to then Attorney General Michael B. Mukasey, who asked whether the Department of Justice may bring before a grand jury, criminal contempt of Congress citations, or take any other prosecutorial action, with respect to current or *former* White House officials who declined to provide documents or testimony, or who declined to appear to testify, in response to subpoenas from a congressional committee, based on the President's assertion of executive privilege or the immunity of senior presidential advisers from compelled congressional testimony. The OLC concluded it may not.

The opinion unequivocally explained that the:

"Department of Justice has long taken the position, *during administrations of both political parties*, that the criminal contempt of Congress statute does not apply to the President or presidential subordinates who exert executive privilege."

The opinion goes on to cite different examples of the Department of Justice adhering to that standard over the years, citing *opinions by Theodore Olson in 2008 during the George W. Bush Administration and Walter Dellinger during the Clinton Administration.*

**D.      Contrary to the position taken by Chairman Thompson, the Select Committee and current White House counsel, President Trump retains the right to exercise the invocation of executive privilege.**

The issue of whether President Trump can legally invoke executive privilege has plagued these proceedings, because the Committee, as well as certain sectors of the press, have consistently stated that Mr. Bannon could not invoke the executive privilege because executive privilege is held by the sitting President and not a former President; they add that even if President Trump could involve executive privilege, Mr. Bannon would not be covered because Mr. Bannon was not a government employee at the time of the communications. That position, embraced by the Select Committee, is wrong on both fronts. In *Nixon v. Adm'r of Gen Services,* 433 U.S. 425, 448-49 (1977), the Supreme Court stated:

"Nevertheless, we think that the Solicitor General states the sounder view and we adopt it. This Court held in *United States v. Nixon,* … that the privilege is necessary to provide the confidentiality required for the President's conduct of office. Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; **the privilege is not for the benefit of the President as an individual, but for the Republic. Therefore, the privilege survives the individual President's tenure."** (emphasis supplied).

**E.      Contrary to Chairman Thompson's assertions, a non-governmental employee such as Stephen K. Bannon can invoke executive privilege.**

Although a theory that Mr. Bannon has no right to refuse to testify based upon executive privilege since he was not a government employee at the time has been bandied about by partisan members of the Select Committee and of Congress devoid of any knowledge of this area of the law, it is simply not accurate and not the policy of the DOJ.

On June 27, 2007, Paul Clement, who was at the time both the Solicitor General and Acting Attorney General of the United States, wrote a legal opinion for then President George W. Bush, concerning the issue of subpoenas that had been issued by the House Judiciary Committee, relating to the resignations of several United States Attorneys in 2006. The House sought documents in the possession of current or *former* White House officials. Additionally, testimony was sought from two *former* officials. The President requested guidance on whether he could assert executive

privilege with respect to *both* the current *and former* White House officials.  Paul Clement found that:

> "communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch...fall within the scope of executive privilege...Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch."

A prosecution of Mr. Bannon for criminal contempt of Congress would be in violation of years of precedent in cases involving the executive privilege and would fly in the face of the OLC opinions discussed above.  It would only serve to satisfy the political agenda of the Select Committee and would not ensure answers to the questions they have posed.  The Select Committee must first resolve their differences on executive privilege in Federal Court or with Donald Trump, rather than trying to utilize the Department of Justice to make an example of Mr. Bannon, as the Chairman of the Select Committee has stated on national television.

**F.     The Trump Lawsuit filed October 18, 2021 challenges the very existence of the Select Committee and therefore challenges its ability to issue subpoenas to anyone.**

On October 18, 2021, counsel for President Trump filed *Trump v. Bennie Thompson,* 21-Civ- 02769, ( D.D.C. 2021).  That is the lawsuit we asked for time to review before responding to Chairman Thompson's letter of October 15, 2021.  That lawsuit provides the Select Committee and counsel for President Trump with the Federal Court forum within which to decide the issues of the constitutionality of the Select Committee, President Trump's ability to invoke executive privilege and the scope of such invocation.  The constitutionality of the Select Committee is challenged in the Trump lawsuit, because it has abrogated to itself investigative and prosecutorial powers that are the exclusive province of the Executive Branch.  If President Trump prevails in that lawsuit, it will establish yet another basis to invalidate the subpoena issued to Mr. Bannon and indeed anyone else subpoenaed by the Select Committee.  Simply put, President Trump argues that there is no legislative purpose to the Select Committee's actions.  President Trump argues that the Select Committee's only purpose is to investigate.  That investigative function belongs exclusively to the Executive Branch, more specifically, to the Federal Bureau of Investigation ("FBI").  The FBI has already investigated this event and reached conclusions that some Members of the House are not satisfied with, so they have unconstitutionally seized upon this to form a Select Committee to do that which is delegated solely to the Executive Branch.  A favorable decision for President Trump will render all activities of the Select Committee unconstitutional and moot, including their referral for criminal prosecution.

## CONCLUSION

Any decision to go forward with a prosecution, would be contrary to all existing rules of the Justice Department and could appear to be based on the pressure being applied by a partisan Congress and unfortunately, by the President.  A decision to decline would go a long way to demonstrate the Department of Justice and the Attorney General's desire to decide issues like this

solely on the law and the existing rules and regulations.  Any decision to go forward would violate decades of opinions of the OLC under both Democrat and Republican Presidents.

As detailed above, Mr. Bannon's conduct here was far from contemptuous.  In fact, he was acting on advice of counsel, consistent with the several opinions of the OLC which are outlined above.  Mr. Bannon is not a witness who has flouted either the Congress or the Independent Counsel assigned to investigate specified matters.  The law in the area of executive privilege is the basis of President Trump's current lawsuit in Federal Court against the Committee.  Mr. Bannon is covered by executive privilege, in the opinion of the OLC.  President Trump was entitled to invoke executive privilege according to the United States Supreme Court.  President Trump through his counsel directed Mr. Bannon not to provide documents or testimony, citing executive privilege.  The OLC has opined that under these circumstances, a current or former White House employee should not be indicted and charged with criminal contempt of Congress.  As I stated to Chairman Thompson, since the rules set up by the Select Committee did not allow for any participation by the President's counsel to protect executive privileges, and as the OLC opinion states, in circumstances exactly like this one, where Congress has imposed rules which prohibit counsel for the President to be present and object to testimony based upon executive privilege, the subpoena itself is unconstitutional, illegal and invalid.  That being the case, there is nothing for the United States Attorney's Office for the District of Columbia to consider.  Accordingly, the USAO-DC should refuse to allow itself to be used as a political pawn to make an example of Mr. Bannon, who was acting on the advice of both his own counsel and the settled policy of the Office of Legal Counsel, in preserving President Trump's invocation of executive privilege.  Therefore, the USAO-DC should decline to prosecute Mr. Bannon.

Respectfully submitted for your consideration,

Robert J. Costello
Counsel for Stephen K. Bannon

# EXHIBIT B



**U.S. Department of Justice**

Channing D. Phillips
Acting United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

November 3, 2021

<u>**DELIVERY VIA EMAIL**</u>
Mr. Robert J. Costello
Davidoff Hutcher & Citron LLP
605 3rd Ave.
New York, NY 10158
Email: rjc@dhclegal.com

      RE:    Stephen K. Bannon

Mr. Costello and Mr. Katz:

      Thank you for meeting with us today to discuss the U.S. House of Representatives' referral of House Resolution 730, concerning your client, Stephen K. Bannon, to the United States Attorney's Office for the District of Columbia. Per our discussion, in connection with our Office's independent examination of the referral, we request that you produce to us as soon as practicable the following documents and information for the period spanning September 22, 2021, to the present:

1. Correspondence between representatives of Mr. Bannon and representatives of the January 6 Select Committee, including but not limited to Chairman Bennie Thompson, Kristin Amerling, and Sean Tonolli;

2. Correspondence between representatives of Mr. Bannon and representatives of former President Donald Trump, including but not limited to Justin Clark;

3. Correspondence between representatives of Mr. Bannon and representatives of President Joseph Biden, including but not limited to the White House Counsel's Office and Jonathan Su; and,

4. The letter that you, on Mr. Bannon's behalf, were preparing to send to the Select Committee on October 18, 2021, described on page 4 of your October 29, 2021, Memorandum addressed to our Office.

The word "correspondence" includes written correspondence, such as formal letters and emails, and contemporaneous memorialization of oral correspondence, such as notes, emails, and calendar entries.

In addition, we kindly request that you maintain copies of records, electronic or physical, that relate to your representation of Mr. Bannon arising from the Select Committee's subpoena. As you are aware, our independent examination of this matter is ongoing and may prompt future information requests.

We appreciate your assistance in this matter.  Please do not hesitate to contact us with any questions.

Sincerely,

CHANNING D. PHILLIPS
Acting United States Attorney

By: _J.P. Cooney_____
J.P. Cooney
Molly Gaston
Amanda R. Vaughn
Assistant United States Attorneys
Public Corruption and Civil Rights Section

Joseph.Cooney@usdoj.gov; 202.252.7281
Molly.Gaston@usdoj.gov; 202.252.7803
Amanda.Vaughn@usdoj.gov; 202.252.1793

## Costello, Robert J.

| | |
|---|---|
| **From:** | Costello, Robert J. |
| **Sent:** | Thursday, November 4, 2021 10:58 PM |
| **To:** | Cooney, Joseph (USADC) |
| **Subject:** | Re: Follow Up on 11/3/2021 Meeting |

In response to your letter, I went through my emails both incoming and outgoing.  At the risk of being redundant, I sent you a number of emails which in several cases is rally the covering email which will show you when the email was received or sent.

I will try to go over my text messages over the weekend, to make sure I have provided you what we have.

You have bates stamped all of the documents I provided before tonight, but they are not in chronological order.

As far as a follow up interview I will check with Adam Katz for his availability,

But mine would be Monday afternoon or Wednesday.  As soon as I reach Adam I will let you know.

You are being very diligent in collecting documents, but that factual background is unnecessary according to the OLC opinions of May 13,2019 and February 29, 2008.  That being said, I will be happy to answer any follow up questions you may have.

       Bob Costello

Sent from my iPhone


On Nov 4, 2021, at 8:27 PM, Cooney, Joseph (USADC) <Joseph.Cooney@usdoj.gov> wrote:


**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Mr. Costello:

Enclosed, please find a cover letter, Bates stamped compilation of your production to us, and index.  As inquired in the letter, could you please review and let us know if this constitutes your entire production?

Thank you again for meeting with us yesterday.  Are you and Mr. Katz available for another videoconference?  We have a few follow up questions.  We can be available tomorrow (Friday) afternoon at or after 2:30; or Monday?  Please let us know a time or times that work for you and Mr. Katz.

Thank you,

J.P. Cooney

J.P. Cooney
Chief, Public Corruption & Civil Rights Section
U.S. Attorney's Office for the District of Columbia
C/ 202-468-4529; O/ 202-252-7281


<Index-Bannon Production-11.04.2021.pdf>
<Bannon Production-11.04.2021.pdf>
<Letter to Robert Costello-11.04.2021.pdf>