**EXHIBIT 3**



**U.S. Department of Justice**

Office of Legislative Affairs

_Office of the Assistant Attorney General_                    _Washington, DC 20530_

May 16, 2024

The Honorable Jim Jordan
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

The Honorable James Comer
Chairman
Committee on Oversight and Accountability
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Jordan and Chairman Comer:

The Department of Justice (Department) has responded in good faith to your requests for information concerning Special Counsel Robert K. Hur's investigation, including the subpoenas issued by the Committee on the Judiciary and Committee on Oversight and Accountability (Committees) on February 27, 2024. Specifically, the Department has provided materials in response to each of the four categories of materials in the Committees' subpoenas. Despite this record of compliance, the Committees have scheduled meetings to consider resolutions citing the Attorney General for contempt. As the Department has previously explained, a contempt citation is not justified on this record.[1] I write to inform you that the President has asserted executive privilege over the requested audio recordings and is making a protective assertion of privilege over any remaining materials responsive to the subpoenas that have not already been produced. A copy of the Attorney General's letter to the President setting forth the legal bases for the assertions is enclosed with this letter.

When he was nominated, the Attorney General pledged to reaffirm the principles that have guided the Department and protected the rule of law for decades. That is exactly what the Department has done here. While our cooperation with Congress has been extraordinary, we also have a responsibility to safeguard the confidentiality of law enforcement files where disclosure would jeopardize future investigations. The Attorney General must draw a line that safeguards the Department from improper political influence and protects our principles, our law

---

[1] Letter from Hon. Carlos Uriarte, Assistant Att'y Gen., Off. of Legis. Aff., to Hon. Jim Jordan, Chairman, U.S. H. Comm. on the Judiciary, and Hon. James Comer, Chairman, U.S. H. Comm. on Oversight & Accountability at 10 (April 25, 2024).

The Honorable Jim Jordan
The Honorable James Comer
Page 2

enforcement work, and the people who carry out that work independently, without fear or favor. This protects the rule of law, now and in the future. The Committees seek to hold the Attorney General in contempt not for failing in his duties, but for upholding them.

The Department's record in this matter is clear. We have made substantial efforts to accommodate your interest in Special Counsel Hur's investigation. In addition to providing the Special Counsel's report and facilitating the Special Counsel's testimony, the Department provided the two classified documents the Committees requested, transcripts of the interviews of the President and of Mark Zwonitzer, and correspondence regarding the Special Counsel's report. In short, the Department has responded to each of the four requests in your subpoenas. As the Department wrote in prior letters to the Committees, these efforts reflect that we have taken seriously each of the reasons for which the Committees have said they are seeking this information and addressed the Committees' stated informational needs. For example, as the Department wrote previously, in producing the interview transcripts, the Committees now know what was asked during the interviews and what was answered. Despite our repeated requests over several months, the Committees have still not identified a remaining need for these audio files that would serve the asserted purposes of your investigations.[2]

We have repeatedly made clear that disclosure of the subpoenaed audio recordings would damage future law enforcement efforts and that the Committees' continued demands raise serious separation of powers concerns. As the enclosed letter from the Attorney General explains, "[t]he Department has long recognized that executive privilege protects materials related to a closed criminal investigation where disclosure is likely to damage future law enforcement efforts," which "is the case here." The letter further explains that producing the audio recordings to the Committees "would raise an unacceptable risk of undermining the Department's ability to conduct similar high-profile criminal investigations—in particular, investigations where the voluntary cooperation of White House officials is exceedingly important." It also explains that the Committees' "articulated need for the audio recordings is insufficient to meet any potentially applicable standard," and that the audio recordings will "not reveal any information relevant to the Committees' stated needs that is not available in the transcripts and other documents that are already in the Committees' possession." The Committees' "needs are plainly insufficient to outweigh the deleterious effects that production of the recordings would have on the integrity and effectiveness of similar law enforcement investigations in the future."

We are disappointed the Committees have refused to acknowledge or accommodate the Department's concerns and instead appear intent on proceeding with contempt votes. It is the longstanding position of the executive branch held by administrations of both parties that an official who asserts the President's claim of executive privilege cannot be prosecuted for criminal contempt of Congress.[3] With the information you now have, the Committees ought not

---

[2] Id.; Letter from Hon. Carlos Uriarte, Assistant Att'y Gen., Off. of Legis. Aff., to Hon. Jim Jordan, Chairman, U.S. H. Comm. on the Judiciary, and Hon. James Comer, Chairman, U.S. H. Comm. on Oversight & Accountability (April 8, 2024).

[3] See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101, 102 (1984).

The Honorable Jim Jordan
The Honorable James Comer
Page 3

proceed with contempt and should instead avoid unnecessary and unwarranted conflict. In 2008, the Committee on Oversight and Government Reform took down a contempt vote after President Bush asserted executive privilege over the record of a Special Counsel's interview of the Vice President. The Department will continue to respond in good faith to legitimate oversight requests from these and other committees, consistent with our obligations under the constitutionally mandated accommodation process. We encourage the Committees to fulfill their constitutional duty as well.

Sincerely,

Carlos Felipe Uriarte
Assistant Attorney General

Enclosure

cc:

The Honorable Jerrold L. Nadler
Ranking Member
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

The Honorable Jamie Raskin
Ranking Member
Committee on Oversight and Accountability
U.S. House of Representatives
Washington, DC 20515



**Office of the Attorney General**
**Washington, D. C. 20530**

May 15, 2024

The President
The White House
Washington, D.C. 20500

Dear Mr. President:

On February 27, 2024, the Committee on the Judiciary and the Committee on Oversight and Accountability of the United States House of Representatives ("Committees") subpoenaed audio recordings of two of Special Counsel Robert K. Hur's interviews conducted in connection with his investigation of matters related to classified documents discovered at the Penn Biden Center for Diplomacy and Global Engagement and your private residence.

The Department's Office of Legal Counsel has concluded that the subpoenaed audio recordings fall within the scope of executive privilege and that you may assert executive privilege with respect to the recordings. I concur with this assessment. The Department has long recognized that executive privilege protects materials related to a closed criminal investigation where disclosure is likely to damage future law enforcement efforts, which I have concluded is the case here. To date, the Committees have failed to satisfy any of the potentially relevant standards for overcoming an assertion of executive privilege. The Committees' needs are plainly insufficient to outweigh the deleterious effects that production of the recordings would have on the integrity and effectiveness of similar law enforcement investigations in the future. I therefore respectfully request that you assert executive privilege over the subpoenaed recordings. I also request that you make a protective assertion of executive privilege with respect to any other materials responsive to the subpoenas that have not already been produced.

This letter explains in further detail the legal basis for these privilege assertions. The Department has previously recognized that subpoenas like those at issue here raise distinct separation of powers concerns related to the integrity and effectiveness of future law enforcement investigations—in particular, investigations where the voluntary cooperation of White House officials is exceedingly important. *See Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 10–11 (2008) ("*Special Counsel Assertion*"). As described in more detail below, the Department has already provided substantial accommodations in response to the Committees' subpoenas, including by producing to the Committees the transcripts of the Special Counsel's interviews. The needs the Committees have articulated to date for the recordings are plainly insufficient to overcome a privilege claim grounded in these important separation of powers concerns.

**I.**

In January 2023, I appointed Special Counsel Hur to investigate matters including the "possible unauthorized removal and retention of classified documents or other records discovered at the Penn Biden Center for Diplomacy and Global Engagement and the Wilmington, Delaware, private residence of President Joseph R. Biden, Jr." Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023). As the Special Counsel later described, you cooperated with the investigation, including by providing a voluntary interview that took place over the course of two days. *See* Robert K. Hur, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* at 5, 11 (Feb. 5, 2024).

In February 2024, Special Counsel Hur closed his investigation, submitting to me his final report concluding "that no criminal charges are warranted in this matter." *Id.* at 1. Two days later, I informed the relevant committees in Congress that the Special Counsel's investigation had concluded. *See* Letter for Richard Durbin, Chair, Senate Committee on the Judiciary, et al., from Merrick B. Garland, Attorney General (Feb. 7, 2024). The following day, I provided them with a copy of the Special Counsel's report and notified the committees of your decision "not to assert executive privilege over any part of the report or its appendices." Letter for Richard Durbin, Chair, Senate Committee on the Judiciary, et al., from Merrick B. Garland, Attorney General at 1 (Feb. 8, 2024) ("February 8 Letter").

Soon after I transmitted the Special Counsel's report to Congress, the Committees, along with the House Committee on Ways and Means, sent a request to the Department seeking four categories of material: (1) documents and communications, "including audio and video recordings," relating to the Special Counsel's interview of you; (2) the same as to the Special Counsel's interview of your ghostwriter, Mark Zwonitzer; (3) two classified documents; and (4) various Department and White House communications regarding the Special Counsel's report. *See* Letter for Merrick B. Garland, Attorney General, from James Comer, Chairman, House Committee on Oversight and Accountability, et al. at 3 (Feb. 12, 2024). Two weeks later, the Committees issued subpoenas for those four categories of material. *See* Letter for Merrick B. Garland, Attorney General, from James Comer, Chairman, House Committee on Oversight and Accountability, and Jim Jordan, Chairman, House Committee on the Judiciary at 1 (Feb. 27, 2024) ("February 27 Letter") (enclosure). The Committees said that the materials were relevant to their assessment of whether sufficient grounds exist to draft articles of impeachment for consideration by the full House and, separately, the Judiciary Committee's legislative oversight of the Department. *Id.* at 1–2. In doing so, the Committees cited House Resolution 918, which authorized them, along with the Ways and Means Committee, to "continue their existing investigations as part of an impeachment inquiry." H.R. Res. 918, 118th Cong. (2023).

Throughout the Committees' investigations, the Department has made substantial efforts to accommodate the Committees' requests and subpoenas. Just three days after I received Special Counsel Hur's report, I transmitted it to Congress and released it to the public in full without any additions, redactions, or modifications. *See* February 8 Letter. The Department has also produced responsive materials in connection with the Committees' requests and the

2

February 27 subpoenas. Letter for Jim Jordan, Chairman, House Committee on the Judiciary, and James Comer, Chairman, House Committee on Oversight and Accountability, from Carlos Felipe Uriarte, Assistant Attorney General, Office of Legislative Affairs (Apr. 8, 2024) ("April 8 Letter"). The Department provided the transcripts of Special Counsel Hur's interviews with you and Mr. Zwonitzer, correspondence regarding the Special Counsel's report, and the two classified documents the Committees requested. *Id.* The Department has accordingly responded to each of the four requests in the Committees' February 27 subpoenas. *Id.* at 1. The Department and Special Counsel Hur also agreed that the Special Counsel would testify before Congress about his investigation, and the Special Counsel appeared and answered questions for more than five hours. *See* Hearing Before the H. Comm. on the Judiciary on the Report of Special Counsel Robert K. Hur, 118 Cong. (Mar. 12, 2024).

Even after the Department's responses and Special Counsel Hur's testimony, the Committees continued to pursue additional information. Most recently, the Committees specifically requested the audio recordings of your interview and Mr. Zwonitzer's interview with the Special Counsel. *See* Letter for Merrick B. Garland, Attorney General, from James Comer, Chairman, House Committee on Oversight and Accountability, and Jim Jordan, Chairman, House Committee on the Judiciary at 2 (Mar. 25, 2024); Letter for Merrick B. Garland, Attorney General, from James Comer, Chairman, House Committee on Oversight and Accountability, and Jim Jordan, Chairman, House Committee on the Judiciary at 2 (Apr. 15, 2024) ("April 15 Letter"). The Committees threatened to invoke contempt of Congress proceedings if the audio recordings were not produced. April 15 Letter at 4.

Pursuant to the accommodation process, the Department responded on April 25, 2024, to engage further with the Committees' statements of their needs and to explain in additional detail our concerns and confidentiality interests. Letter for Jim Jordan, Chairman, House Committee on the Judiciary, and James Comer, Chairman, House Committee on Oversight and Accountability, from Carlos Felipe Uriarte, Assistant Attorney General, Office of Legislative Affairs (Apr. 25, 2024). To date, the Committees have not responded to this further explanation of the Department's concerns. The Committees have scheduled meetings for May 16, 2024, to vote on resolutions holding me in contempt of Congress for failing to comply with their subpoenas. *See* Amendment in the Nature of a Substitute to the Committee Report for the Resolution Recommending That the House of Representatives Find United States Attorney General Merrick B. Garland in Contempt of Congress for Refusal to Comply with a Subpoena Duly Issued by the Committee on the Judiciary, 118th Cong. (2024) ("Judiciary Contempt Report"); Draft Resolution Recommending That the House of Representatives Find United States Attorney General Merrick B. Garland in Contempt of Congress for Refusal to Comply with a Subpoena Duly Issued by the Committee on Oversight and Accountability, 118th Cong. (2024) ("Oversight Contempt Report").

## II.

The audio recordings of your interview and Mr. Zwonitzer's interview fall within the scope of executive privilege. Production of these recordings to the Committees would raise an unacceptable risk of undermining the Department's ability to conduct similar high-profile

criminal investigations—in particular, investigations where the voluntary cooperation of White House officials is exceedingly important.

Executive privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974). The privilege is "a necessary corollary of the executive function vested in the President by Article II of the Constitution." *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989). It "has been asserted by numerous Presidents from the earliest days of our Nation," *id.*, was explicitly recognized by the Supreme Court in *United States v. Nixon*, 418 U.S. at 708, and has been reaffirmed by the Court several times since then, *see, e.g.*, *Trump v. Mazars USA, LLP*, 591 U.S. 848, 863 (2020); *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004). As the Supreme Court has explained, "information subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" *Mazars*, 591 U.S. at 864 (quoting *Nixon*, 418 U.S. at 715).

Materials protected by executive privilege include materials contained in law enforcement files, over which the President "may invoke executive privilege to preserve the integrity and independence of criminal investigations and prosecutions." *Special Counsel Assertion*, 32 Op. O.L.C. at 10.[1] The law enforcement component of executive privilege protects against, among other things, "the potential damage to proper law enforcement" that would be caused by disclosure, including "the chilling effect" on "sources of information," and reflects a "sensitivity to the rights of innocent individuals who may be identified in law enforcement files but who may not be guilty of any violation of law." *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 76 (1986). This chilling effect can extend to future investigations and thus may exist even if disclosure occurs only once an investigation ends. *Special Counsel Assertion*, 32 Op. O.L.C. at 10 ("Although the law enforcement component of executive privilege is more commonly implicated when Congress seeks materials about an open criminal investigation, the separation of powers necessity of protecting the integrity and effectiveness of the prosecutorial process continues after an investigation closes."). The Department has long recognized, therefore, that executive privilege protects materials related to a closed criminal investigation where disclosure might hamper prosecutorial efforts in future cases. *See id.* at 10–11.

That is precisely the concern at issue here. Even though Special Counsel Hur has concluded his investigation, I share the overarching concern expressed in *Special Counsel*

---

[1] *See also Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 75–78 (1986) (explaining the Executive Branch's authority to withhold open and closed law enforcement files from Congress); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 117 (1984) ("Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature."); *Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 32–33 (1982) (similar concerning law enforcement files of the Environmental Protection Agency); *Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 46–48 (1941) (providing historical examples of Attorneys General "who have uniformly taken the . . . view" that "investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to 'take care that the laws be faithfully executed,' and that congressional or public access to them would not be in the public interest").

4

*Assertion* "about the prospect of committees of Congress obtaining confidential records from Justice Department criminal investigative files for the purpose of addressing highly politicized issues in public committee hearings." *Id.* Also similar to the views expressed in *Special Counsel Assertion*, I have a more specific concern about how the production of the audio recordings might affect the Department's ability to obtain vital cooperation in high-profile criminal investigations—in particular, in investigations where the voluntary cooperation of White House officials is exceedingly important. *Id.* (concluding that the disclosure of summaries of a special counsel's interviews with senior White House officials would "significantly impair the Department's ability to conduct future law enforcement investigations that would benefit from full White House cooperation").

There "is an admirable tradition, extending back through Administrations of both political parties, of full cooperation by the White House with criminal investigations." *Id.* (quotation marks omitted). Consistent with this tradition, you and Mr. Zwonitzer voluntarily agreed to the Special Counsel's requests both for an interview and for that interview to be recorded. But if key witnesses in similar high-profile investigations expected that volunteering to sit for an interview and allowing that interview to be recorded would likely result in the release of that recording to Congress (and potentially the public), there is a significant risk that such witnesses would evaluate the Department's requests for cooperation differently in the future. And an inability to secure cooperation, or a diminution in the degree and extent of cooperation, would significantly impair the Department's ability to conduct similar high-profile investigations where cooperation is exceedingly important.

The unique characteristics of audio recordings raise particularly pronounced concerns about chilling future cooperation. Recording interviews is a highly useful law enforcement tool, especially during high-profile or complex investigations. Audio recordings enable investigators to limit the number of people physically present during interviews, which can facilitate a more candid and robust engagement between investigators and the witness, including when sensitive information may be discussed; they provide a mechanism for investigators and counsel for the witness to ensure that a transcript accurately records the interviewee's testimony, as opposed to relying solely on an investigator's notes; and they allow investigators and counsel to revisit certain elements of the interview by reviewing the audio recording or the transcript of that recording in light of subsequent investigative developments.

But as the Committees themselves acknowledge, *see* April 15 Letter at 3, the disclosure of audio recordings can reveal characteristics that implicate privacy interests. Courts have therefore recognized that the release of such recordings presents a unique intrusion, even when compared to the significant privacy interests that may be present in transcriptions. *See, e.g.*, *New York Times Co. v. NASA*, 920 F.2d 1002, 1005–07 (D.C. Cir. 1990) (en banc) (explaining that "voice inflections can contain personal information" and recognizing the possibility of a privacy interest in an audio recording of astronauts' voices even when a transcript had already been publicly released), *remanded* 782 F. Supp. 628, 631–33 (D.D.C. 1991) (emphasizing that the "very sound of [a person's] words . . . constitute[s] a privacy interest" and exempting the audio recording from disclosure). And that intrusion may be particularly severe when the recording is of a law enforcement interview—a consequential interaction conducted under criminal penalty for false statements—in a case where the interviewee has not been charged with a crime. *Cf.*

*Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 349 (D.C. Cir. 2017) (explaining that "[w]here individuals have been investigated but not charged with a crime," disclosure of certain private law enforcement information "represents a severe intrusion on the privacy interests of the individual in question" (quotation marks and brackets omitted)).

Moreover, as courts have also recognized, the disclosure of audio recordings presents a significant opportunity for misuse and possible manipulation. In 1996, for example, a trial court played a video recording of a deposition of President Clinton. *United States v. McDougal*, 940 F. Supp. 224, 226 (E.D. Ark. 1996). But the trial court refused to order release of that recording, warning that disclosure of the videotape of the President "might impede any future attempts to tailor an arrangement for obtaining a President's testimony while minimizing the intrusion on his duties." *Id.* at 228. And the Eighth Circuit likewise refused to allow the video recording of the depositions to be duplicated, in part because of the "potential for misuse" of the recording, such as through "cutting, erasing, and splicing." *United States v. McDougal*, 103 F.3d 651, 658 (8th Cir. 1996); *see also Nixon v. Warner Communc'ns, Inc.*, 435 U.S. 589, 601, 608 (1978) (denying a press request for access to White House audiotapes that had been played for a jury, and for which transcripts had been furnished to the press, and recognizing that if audio recordings were released, there would not "be any safeguard, other than the taste of the marketing medium, against distortion through cutting, erasing, and splicing of tapes").

For these reasons, in my view, disclosure of the audio recordings of the Special Counsel's interviews with you and Mr. Zwonitzer poses an unacceptable risk of impairing cooperation in future high-profile investigations where voluntary cooperation is exceedingly important, such as those involving White House officials. If witnesses in such investigations reasonably fear that materials like the recordings at issue here would subsequently be released to Congress or the public even when prosecutors declined to charge them with a crime, they may be less likely to cooperate with the Department's investigatory efforts, including by refusing to sit for recorded interviews. Or they might cooperate less fully, such as by being less comprehensive in their answers during interviews. Either way, this diminished cooperation would significantly impair the Department's ability to investigate and prosecute such important matters.

My concerns about disclosing the audio recordings of the Special Counsel's interviews with you and Mr. Zwonitzer mirror in many ways the concerns that led President George W. Bush to assert executive privilege in 2008 to protect information related to interviews conducted in another special counsel investigation involving the White House. In that matter, a House committee sought information about a closed investigation conducted by Special Counsel Patrick Fitzgerald into the disclosure of the identity of a Central Intelligence Agency employee. *Special Counsel Assertion*, 32 Op. O.L.C. at 7. The committee subpoenaed Federal Bureau of Investigation ("FBI") "reports of the Special Counsel's interviews with the Vice President and senior White House staff, as well as handwritten notes taken by FBI agents during some of the interviews." *Id.* President Bush determined that these reports were covered by executive privilege on the grounds that disclosure of the reports would, among other things, impede White House cooperation with future Department criminal investigations. *See id.* at 9–11. For the reasons provided above, I have concluded that you may make a similar determination here with respect to the audio recordings.

Finally, I note that the Department's disclosure of the transcripts of the interviews does not constitute a waiver and does not preclude an assertion of privilege with respect to the audio recordings. As I have explained, audio recordings have distinct features and law enforcement uses, which implicate privacy interests and risks of misuse to a greater degree than transcripts, and disclosure to Congress of the recordings would have a chilling effect on future cooperation in similar investigations. Moreover, it is well established that in the executive privilege context, "waiver should not be lightly inferred." *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (quotation marks omitted). Interpreting the production of the transcripts as a waiver of privilege would incentivize less Executive Branch cooperation and broader privilege assertions, undermining each branch's "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). As the Department has emphasized, the accommodation process should and does "encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process." *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007).

### III.

A congressional committee may overcome a presidential assertion of executive privilege only if it establishes that it has a sufficient need for the subpoenaed materials. There is some question as to what standard of need the Committees must satisfy to overcome a privilege assertion here, but their articulated need for the audio recordings is insufficient to meet any potentially applicable standard.[2]

In their correspondence, the Committees have referenced certain general purposes underlying their investigations, including the Judiciary Committee's oversight of the Department and "whether sufficient grounds exist to draft articles of impeachment against President Biden for consideration by the full House." February 27 Letter at 1. But the Committees have offered no convincing reason why, particularly when they are in possession of transcripts of the two interviews that are the subject of their subpoenas, they also need audio recordings to inform their oversight or impeachment investigations.

The Committees have provided a handful of specific explanations of their need for the audio recordings. First, the Committees have stated that they are interested in understanding

---

[2] In the congressional oversight context, a committee may overcome an executive privilege assertion if the subpoenaed materials are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). The Department has "not settle[d] on the precise standard" for the showing of need that a committee must make to overcome a privilege assertion in an impeachment investigation. *See Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at *3 (Nov. 1, 2019). If the standard for overcoming privilege in the impeachment context is akin to the standard that applies in a grand jury investigation, a committee would need to show that the recordings "likely contain[] important evidence" that "is not available with due diligence elsewhere." *In re Sealed Case*, 121 F.3d at 754. Other potentially analogous standards might be drawn from other contexts. *See Nixon*, 418 U.S. at 713 (discussing the insufficiency of the President's assertion of privilege in light of a court's "demonstrated, specific need" for the information in a criminal case). As described in the text, the Committees' stated need for the audio recordings would not satisfy any of these potential standards.

whether President Biden may have "willfully retained classified information and documents . . . to assist his family's business dealings or to enrich his family." Judiciary Contempt Report at 7; Oversight Contempt Report at 7; *see also* February 27 Letter at 1.  Second, the Committees have indicated that they are interested in understanding "whether White House or President Biden's personal attorneys placed any limitations or scoping restrictions during the interviews with Special Counsel Hur or Mr. Mark Zwonitzer precluding or addressing any potential statements directly linking President Biden to troublesome foreign payments." *Id.*  Third, the Committees have stated that the audio recordings are relevant to their oversight of the Executive Branch, including the "Department's commitment to impartial justice and its handling of the investigation and prosecution of President Biden's presumptive opponent, President Donald J. Trump." *Id.*  Such oversight, the Committees state, could lead to "potential legislative reforms" regarding the Department's "use of a special counsel to conduct investigations of current and former Presidents," such as "codifying certain qualifications and requirements of special counsels appointed by the Attorney General." *Id.* at 2.  The Committees have also stated that the audio recordings are relevant to their determination "if legislation is needed" to ensure that federal agencies "adequately account for records and documents meant to be returned to the federal government upon an executive branch employee's departure from office." Oversight Contempt Report at 2.  Finally, the Committees have suggested that they need access to the audio recordings to verify the accuracy of the transcripts. Judiciary Contempt Report at 14–15; Oversight Contempt Report at 13–15.

The Department has already provided Congress information that satisfies these needs.  As I noted above, just three days after I received the Special Counsel's final report concluding that no criminal charges were warranted, I provided the report to Congress in its entirety, before the Committees had even requested it.  *See* February 8 Letter.  The Department also provided classified documents requested by the Committees, as well as correspondence regarding the Special Counsel's report.  April 8 Letter at 2.  In direct response to the Committees' stated interests, moreover, the Department provided the transcripts of the Special Counsel's interview with you and his interview with Mr. Zwonitzer.  *Id.*  In addition, Special Counsel Hur himself appeared for a hearing before the Judiciary Committee, which was attended by the Chair and Ranking Member of the Oversight Committee, and he answered questions for more than five hours.  *See* Hearing Before the H. Comm. on the Judiciary on the Report of Special Counsel Robert K. Hur, 118 Cong. (Mar. 12, 2024).  Through these extensive efforts, the Department has "amply fulfilled its constitutional obligation to make a principled effort to acknowledge, and if possible to meet, the Committees' legitimate needs." *Assertion of Executive Privilege Over Deliberative Materials Generated in Response to Congressional Investigation Into Operation Fast and Furious*, 36 Op. O.L.C. 1, 8 (2012) (cleaned up).

Indeed, with respect to the first two interests identified above, given all the information the Department has provided to date, the Committees have not been able to explain how the audio recordings are "demonstrably critical to the responsible fulfillment of [their] functions," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc), or why the recordings "likely contain[] important evidence" that "is not available with due diligence elsewhere," *In re Sealed Case*, 121 F.3d at 754.  This is unsurprising: the transcripts the Department produced to the Committees contain all the substantive content of the Special Counsel's interviews with you and Mr. Zwonitzer, and

production of the audio recordings will thus not reveal any information relevant to the Committees' stated needs that is not available in the transcripts and other documents that are already in the Committees' possession.

To be sure, the Committees have recently stated that audio recordings can contain vocal elements that may not be reflected on the face of a transcript. *See* April 15 Letter at 3 (arguing that audio recordings "capture vocal tone, pace, inflections, verbal nuance, and other idiosyncrasies"). The Committees have suggested that these nonsubstantive elements of an interview can provide insight into whether a witness is being evasive. What is important here is that the Committees have not provided an explanation as to how these vocal elements in the Special Counsel's interviews shed any additional light beyond the transcript on whether President Biden may have "willfully retained classified information and documents . . . to assist his family's business dealings or to enrich his family." Judiciary Contempt Report at 7. And the transcripts and related correspondence produced to the Committees also contain any information the Committees are seeking from the interviews as to whether there were scoping restrictions placed on the Special Counsel's interviews.

Moreover, with respect to the Committees' interests in the audio recordings as part of their oversight of the Executive Branch, the Committees have done nothing more than indicate that the vocal elements of the audio recordings "may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it may propose legislation." *Senate Select Comm. on Presidential Campaign Activities*, 498 F.2d at 733. In describing their legislative purpose, the specific areas of potential legislation the Committees have identified are "reforms" to the Department's "use of a special counsel to conduct investigations of current and former Presidents," February 27 Letter at 2, and reforms to ensure that federal agencies "adequately account for records and documents meant to be returned to the federal government upon an executive branch employee's departure from office," Oversight Contempt Report at 2. But the Committees "point[] to no specific legislative decisions" relevant to that effort "that cannot responsibly be made without access to materials uniquely contained in the [audio recordings]." *Senate Select Comm. on Presidential Campaign Activities*, 498 F.2d at 733. The Committees are plainly unable to establish a "demonstrably critical" need for the recordings, especially given that they are in possession of transcripts of those same interviews.

Finally, the Committees have suggested that they need access to the audio recordings to verify the accuracy of the transcripts, pointing to *United States v. Nixon*, 418 U.S. 683, and arguing that audio recordings can themselves have evidentiary value. Judiciary Contempt Report at 14; Oversight Contempt Report at 13–14. In *Nixon*, however, President Nixon had released only "edited transcripts" of a portion of the meetings covered by the audio recordings. 418 U.S. at 688. Here, by contrast, the Department produced unedited transcripts of the interviews to the Committees, and the Committees have identified no reason to believe that those transcripts—which were created by the Special Counsel's Office for use in a criminal investigation in which accuracy was of critical importance—contain any inaccuracies relevant to their impeachment inquiry. The Committees have thus not identified any "specific legislative decisions" that would be frustrated by an inability to compare the transcripts against the audio recordings for purposes of the Judiciary Committee's oversight investigation, nor have the Committees pointed

9

specifically to decisions in their impeachment inquiry that cannot be made without access to the audio recordings containing the same substantive material of the transcripts in their possession.

For these reasons, I conclude that the Committees have failed to satisfy any of the potentially relevant standards for overcoming an assertion of executive privilege. The Committees' needs are insufficient to outweigh the deleterious effects that production of the recordings would have on the integrity and effectiveness of similar high-profile law enforcement investigations in the future—in particular, investigations where the voluntary cooperation of White House officials is exceedingly important.

## IV.

As discussed above, the Department has made substantial efforts to provide materials and accommodations in response to each of the four categories of materials the Committees have subpoenaed. *See supra* Part I. Indeed, in the weeks since the Department provided the two transcripts of the Special Counsel's interviews, correspondence regarding the Special Counsel's report, and the classified documents the Committees requested, the Committees have specifically identified only one set of materials that they are still seeking: the audio recordings of the interviews for which they have transcripts. *See* April 15 Letter at 4 ("If the Department continues to withhold materials responsive to the Committees' subpoenas—namely, the audio recordings of Special Counsel Hur's interviews with President Biden and Mr. Zwonitzer—we will have no choice but to invoke contempt of Congress proceedings."); Judiciary Contempt Report at 3 ("The Department continues to withhold key material responsive to the subpoenas from the Judiciary and Oversight Committees—specifically the audio recordings of Special Counsel Hur's interviews with President Biden and Zwonitzer."); *accord* Oversight Contempt Report at 3.

Nevertheless, the Committees have scheduled votes on resolutions holding me in contempt of Congress for failure to comply with the subpoenas that leave open the possibility that they view the contempt citations as applying to other, unspecified subpoenaed materials as well. Judiciary Contempt Report at 1; Oversight Contempt Report at 1. The Department believes that, aside from the audio recordings, it has complied with the Committees' subpoenas. Consistent with this view, other than the audio recordings, the Committees have not identified any specific materials that the Department has failed to produce or that the Committees continue to seek beyond what that the Department has already made available. Nonetheless, out of an abundance of caution, I am requesting that you make a protective assertion of executive privilege with respect to any remaining materials that might be responsive to the Committees' subpoenas.

Presidents may make a protective assertion of executive privilege to "protect the interests of the Executive Branch pending a final determination about whether to assert privilege." *Assertion of Executive Privilege Over Deliberative Materials Regarding Inclusion of Citizenship Question on 2020 Census Questionnaire*, 43 Op. O.L.C. __, at *8 (June 11, 2019) (quotation marks omitted); *see also Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1 (1996). Here, with respect to any materials beyond the audio recordings that the Committees believe are subject to the subpoenas and remain outstanding, the Department would need the opportunity to engage in the accommodation process with the Committees, including by reviewing the materials for possible privileged

information.  In these circumstances, you may make a protective assertion of executive privilege with respect to any such materials.

## V.

For the reasons set forth above, I believe it is legally permissible for you to assert executive privilege as to the audio recordings of your and Mr. Zwonitzer's interviews with Special Counsel Hur, and that you may make a protective assertion of executive privilege with respect to any remaining materials responsive to the subpoenas that have not already been produced.  I respectfully request that you do so.

Sincerely,

Merrick B. Garland
Attorney General